FILED
OCT 9 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

C 07 5182 WHA

1  COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
2  SHAWN A. WILLIAMS (213113)
    100 Pine Street, 26th Floor
3  San Francisco, CA 94111
    Telephone: 415/288-4545
4  415/288-4534 (fax)
    – and –
5  DARREN J. ROBBINS (168593)
    MARY K. BLASY (211262)
6  655 West Broadway, Suite 1900
    San Diego, CA 92101
7  Telephone: 619/231-1058
    619/231-7423 (fax)
8  darrenr@csgrr.com
    maryb@csgrr.com
9
    Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLAN CANDELORE, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>LDK SOLAR CO., LTD., LDK SOLAR USA, INC., XIAOFENG PENG and JACK K. LAI,<br><br>Defendants. | No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br>DEMAND FOR JURY TRIAL |

# INTRODUCTION

1. This is a securities fraud class action on behalf of purchasers of LDK Solar co., Ltd. ("LDK" or the "Company") American Depositary Shares ("ADSs") during the period from August 1, 2007 to October 3, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2. LDK is headquartered both in the U.S. and the People's Republic of China. LDK completed its initial public offering ("IPO") on June 1, 2007, with the Company issuing and selling over 13 million shares and certain pre-IPO investors selling another 4 million shares. The Company's ADSs are listed on the New York Stock Exchange and do not trade publicly on any other exchange. The Company's Chairman and CEO owns approximately 72% of the ordinary shares, giving him substantial control over LDK.

3. Throughout the Class Period, defendants concealed the full extent of how badly flawed the Company's internal controls were, preventing it from accurately measuring or reporting its inventory. As a result, the Company's inventories were overstated by an estimated 25%, causing inflation in LDK's assets, earnings and earnings per share ("EPS") reported during the Class Period.

4. LDK's share price fell almost 25% on October 3, 2007, following a report that its financial controller had resigned, stating that the Company lacked internal controls and that the Company's reported 1,000 tonne inventory of polysilicon, an essential raw material in the production of solar cells for panels that convert sunlight to electricity, was overstated by 25%. LDK confirmed that it was aware of the former controller's allegations of poor financial controls and a 250-tonne inventory discrepancy. LDK's former controller, Charley Situ ("Situ"), who reported to Qiqiang Yao, assistant president of finance at LDK, reported these discrepancies to both the U.S. Securities and Exchange Commission ("SEC") and the Company's external auditor, KPMG. LDK could not deny or confirm Situ's allegations on

October 3, 2007, but promised to investigate and issue a further statement. The Company has since stated it will have an independent outside auditor investigate Situ's allegations.

5. The Company's ADSs, which traded as high as $76.75 on September 27, 2007 following its IPO at $27, plummeted $16.66, or 24.39%, to close at $51.65 on October 3, 2007. The ADSs continued plummeting in after hours trading, falling to $47.49.

6. Defendants' Class Period statements describing LDK's business fundamentals, financial results and continued sales and earnings growth potential were false and misleading as:

(a) Defendants had overstated LDK's inventory of polysilicon prior to and during the Class Period and those false statements remained alive in the market during the Class Period; and

(b) As a result of the Company's inventory of polysilicon being overstated, the Company's reported earnings and EPS prior to and during the Class Period were false and those false statements remained alive in the market during the Class Period.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

8. Venue is proper here pursuant to §27 of the 1934 Act. LDK is headquartered in this District and many of the acts and transactions giving rise to the violations of law complained of occurred here.

9. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

# THE PARTIES

10. Plaintiff Allan Candelore purchased LDK ADSs as detailed in the attached Certification and was damaged thereby.

11. Defendants LDK and LDK Solar USA, Inc. (collectively "LDK") are based both in Sunnyvale, California, in the U.S., and in Xinyu City, Jiangxi province, in the People's Republic of China. LDK was incorporated in the Cayman Islands on May 1, 2006. Jiangxi LDK Solar ("Jiangxi") was incorporated in China on July 5, 2005 and acquired by LDK on July 10, 2006. Jiangxi is LDK's principle operating subsidiary and the primary contributor to LDK's outpaced revenue growth since its acquisition. LDK made its first commercial sale of multicrystalline solar wafers in April 2006. LDK manufactures multicrystalline solar wafers, which are the principal raw material used to produce solar cells. LDK sells multicrystalline wafers globally to manufacturers of photovoltaic products, including solar cells and solar modules. In addition, the Company provides wafer processing services to monocrystalline and multicrystalline solar cell and module manufacturers. The Company has over 17 million shares of common stock issued and outstanding, all of which have traded in the form of ADSs on the NYSE under the ticker symbol "LDK," following the Company's June 2007 $470 million IPO.

12. Defendant Xiaofeng Peng ("Peng") is, and was at all relevant times, Chairman of the Board and Chief Executive Officer of LDK. Peng, who owns 75 million shares of LDK, is its controlling shareholder. Peng owned approximately 83% of the Company's equity prior to the IPO and continues to hold approximately 72%.

13. Defendant Jack K. Lai ("Lai") is, and was at all relevant times, Chief Financial Officer, Vice President and Secretary of LDK.

14. The defendants named in ¶¶12-13 above are sometimes referred to herein as the "Individual Defendants." They are liable for the false statements pleaded in ¶¶15 and 17-18, as those statements were "group-published" information.

## CLASS PERIOD FALSE AND MISLEADING STATEMENTS

15. On August 1, 2007, the Company issued a release entitled "LDK Solar Reports Financial Results for the Second Quarter 2007," which stated in relevant part:

> LDK Solar Co., Ltd., a leading manufacturer of multicrystalline solar wafers, today reported its unaudited financial results for the second quarter ended June 30, 2007.
>
> ***All financial results are reported on a U.S. GAAP basis***
>
> Second Quarter 2007 Financial Highlights:
>
> - Revenue of $99.1 million, up 716% from the year ago quarter
>
> - Gross profit of $34.9 million, up 1,265% from the year ago quarter
>
> - Net income of $28.7 million, or $0.29 per diluted ADS, up 2,083% from the year ago quarter
>
> - Increased annualized multicrystalline wafer production capacity from 215 MW to 300 MW, up 40% quarter-over-quarter
>
> \* \* \*
>
> "We are pleased to report strong results for the second quarter, our first as a public company," stated Xiaofeng Peng, Chairman and CEO of LDK Solar. "Our results demonstrate our success in providing our customers, leading global solar cell and module manufacturers, with high-quality multicrystalline solar wafers at significant cost advantages. During the quarter, we executed our growth strategy on plan and continued the rapid expansion of our production capacity. In addition to ramping our production lines, we continued to make progress on our cost reduction efforts through further advancements of our production processes.
>
> "We recently ordered additional DSS furnaces and wire saws to further expand our manufacturing capacity to 1,600 MW by the end of 2009. We also announced the purchase of polysilicon production equipment, enabling LDK to produce virgin silicon feedstock. By augmenting our strategy upstream, we believe we will enhance our cost efficiencies," concluded Mr. Peng.
>
> Business Outlook
>
> The following statements are based upon management's current expectations. These statements are forward-looking, and actual results may differ materially. The Company undertakes no obligation to update these statements.
>
> For the third quarter of fiscal 2007, LDK estimates revenue is expected to be in the range of $115 to $125 million and fully diluted earnings per ADS of $0.29 to $0.32.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS — 4 —

16. Also on August 1, 2007, the Company held an earnings conference to discuss the quarterly results. Lai opened the conference stating that "Inventories increased from $140 million at the end of first quarter to $174 million at end of second quarter, as we accumulated additional silicon-free stock." Defendants also provided specific details on the polysilicon inventory on hand in response to Morgan Stanley analyst Sunil Gupta's questions:

> SUNIL GUPTA: Sure, sure. And how about your total silicon inventory? How many tons of inventory do you have right now? And if you could, break it out by raw material, bulk in progress, fresh goods.
>
> XIAOFENG PENG: Assuming that all material inventory is primarily raw material, which we have, the raw material is at 600, a little bit over 600 tons at the warehouse at the end of the second quarter, which is about around 425 tons at the end of the first quarter.
>
> SUNIL GUPTA: Okay. And in terms of your raw material mix, what is the mix between scrap and what is in polysilicon right now?
>
> XIAOFENG PENG: We have a pretty wide range of peat stock material and the cost will be between 25 to 300. And our average cost is still between 135 to 150.
>
> NICOLA SARNO: And we're averaging about 25% of our virgin polysilicon right now.
>
> \* \* \*
>
> SUNIL GUPTA: Okay, alright. And I also wanted to understand what's in your inventory right now? When I look at the value of inventory, it's close to $174 million.
>
> And it's most of, this is raw material. I'm trying to reconcile how many tons this ought to be, if the price is about 135 to 150. I'm wondering, should it not be more than 1,000 tons? Or am I missing something here?
>
> JACK LAI: Because you are looking at a value also including (inaudible - highly accented language) prices, which means that we have 100 furnaces there inside, 270 kilo inside, and that is not in the raw material work in process.
>
> And also, we have ingots available in (inaudible - highly accented language) facility for (inaudible - highly accented language). And that's also on the inventory, so the inventory I provided to you was just raw material.
>
> But if you add the raw material, the supplementary material, and also work in process. That should account for about 95% of our total

inventory. Only 4% or 5% of our inventory, they are finished goods waiting for shipment.

SUNIL GUPTA: I see, I see. Okay, so what portion of your inventory, Jack, would be the raw materials?

JACK LAI: The raw material. In that raw, raw material?

SUNIL GUPTA: Yes, of the $174 million that we have on the balance sheet, what portion there is raw materials?

JACK LAI: It is $88.5 million of it.

SUNIL GUPTA: $88.5 million, that's your raw material?

JACK LAI: Yes.

17.   On September 18, 2007, the Company published an investor presentation which was posted on LDK's website. The presentation materials contained the following slide containing an LDK Balance Sheet highlighting growth in the Company's polysilicon inventory:

## Balance Sheet

| (in US$ '000) | As of 03/31/07 | As of 06/30/07 |
|---|---|---|
| Cash and cash equivalents | $11,348 | $250,600 |
| Account Receivable | 4,998 | 7,825 |
| Inventories | 114,205 | 173,778 |
| Property, plant and equipment, net | 117,678 | 169,330 |
| Prepayment to suppliers | 52,777 | 129,902 |
| Total assets | 340,825 | 790,867 |
| | | |
| Total debt(1) | 91,286 | 109,926 |
| Payables | 7,736 | 9,525 |
| Advance payments from customers | 41,832 | 72,232 |
| Total shareholders' equity | 88,934 | 565,612 |

Note:
1   Total debt includes short-term and long-term bank borrowings

18.   Throughout the Class Period, LDK also reported having received multiple contracts to supply multicrystalline solar wafers, the profitable completion of

which was only possible to the extent LDK had the polysilicon inventory it purported to have. These contracts were valuable and, based on defendants' false statements to the market concerning LDK's inventory levels, investors reasonably believed LDK had the polysilicon inventory required to fulfill these contracts profitably, causing inflation in LDK's share price. Such Class Period announcements included:

(a) On August 16, 2007, LDK announced it had signed a contract to supply multicrystalline solar wafers to Taiwan-based Chuan-Yi Investment Corporation.

(b) On August 29, 2007, LDK announced it had signed a contract to supply multicrystalline solar wafers to Taiwan-based Neo Solar Power Corp.

(c) On September 24, 2007, LDK announced it had signed contracts to supply multicrystalline solar wafers and to purchase polysilicon production equipment from Sunways AG.

(d) On September 27, 2007, LDK announced it had signed a five-year contract to supply multicrystalline solar wafers to Taiwan-based Mosel Vitelic, Inc.

(e) On October 3, 2007, LDK announced that it had signed a five-year contract to supply multicrystalline solar wafers to Taiwan-based Solartech Energy Corp.

19. Suddenly, on October 3, 2007, LDK's stock price fell almost 25% following a report that its financial controller had resigned, stating the Company lacked internal controls and that the Company's reported 1,000 tonne inventory of polysilicon was overstated by 25%. LDK confirmed that it was aware of the former controller's allegations of poor financial controls and a 250-tonne inventory discrepancy. LDK's former controller, Situ, who reported to Qiqiang Yao, assistant president of finance at LDK, reported these discrepancies to both the SEC and the Company's external auditor, KPMG. LDK could not deny or confirm Situ's allegations on October 3, 2007, but promised to investigate and issue a further

1  statement. The Company has since stated it will have an independent auditor investigate Situ's allegations.

20. The Company's ADSs, which traded as high as $76.75 on September 27, 2007, following its IPO at $27, plummeted $16.66, or 24.39%, to close at $51.65 on October 3, 2007. The ADSs continued plummeting in after hours trading, falling to $47.49.

21. Defendants' Class Period statements describing LDK's business fundamentals, financial results and continued sales and earnings growth potential were false and misleading as:

   (a) Defendants had overstated LDK's inventory of polysilicon prior to and during the Class Period and those false statements remained alive in the market during the Class Period; and

   (b) As a result of the Company's inventory of polysilicon being overstated, the Company's reported earnings and EPS prior to and during the Class Period were false and those false statements remained alive in the market during the Class Period.

**DEFENDANTS' MISLEADING FINANCIAL REPORTING DURING THE CLASS PERIOD**

22. In order to inflate the price of LDK stock, defendants caused the Company to falsely report its financial results during the Class Period by overstating its inventory of polysilicon.

23. The financial results had been included in a Form 6-K filed with the SEC. The results were also included in press releases and investor presentations.

24. LDK issued misleading financial statements in that the Company overstated its polysilicon inventory by 25%. As such, the financial reports issued prior to and during the Class Period, which were still alive in the market and uncorrected during the Class Period, were not a fair presentation of LDK's results and

were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

25. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

26. Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was

violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

       (e) The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

       (f) The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

       (g) The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

       (h) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

      27. Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## COUNT I

**For Violation of §10(b) of the 1934 Act
and Rule 10b-5 Against All Defendants
(except Defendant LDK Solar USA, Inc.)**

28. Plaintiff incorporates ¶¶1-27 by reference.

29. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

30. Defendants named in this claim violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

 (a) Employed devices, schemes, and artifices to defraud;

 (b) Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

 (c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of LDK ADSs during the Class Period.

31. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LDK ADSs. Plaintiff and the Class would not have purchased LDK ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

32. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of LDK ADSs during the Class Period.

## COUNT II

**For Violation of §20(a) of the 1934 Act Against All Defendants**

33. Plaintiff incorporates ¶¶1-32 by reference.

34. The executive officers of LDK prepared, or were responsible for preparing, the Company's press releases and SEC filings. The Individual Defendants controlled other employees of LDK. LDK controlled the Individual Defendants and each of its officers, executives and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

35. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased LDK ADSs on the open market during the Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of LDK and their families and affiliates.

36. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, LDK had more than 17 million shares outstanding, owned by thousands of persons.

37. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 12 -

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading.

## PRAYER

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action;

B.     Awarding damages, including interest;

C.     Awarding reasonable costs, including attorneys' fees; and

D.     Such equitable/injunctive or other relief as the Court may deem proper

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 9, 2007

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS

/s/ SHAWN A. WILLIAMS

SHAWN A. WILLIAMS

100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

T:\usersSF\deborahD\Cpt LDK.doc

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                - 13 -

1 | **CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

2 | Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other
3 | than the named parties, there is no such interest to report.

```
                              ATTORNEY OF RECORD FOR
                              PLAINTIFF ALLAN CANDELORE
```

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

ALLAN CANDELORE ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

Acquisitions:

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| See attached Schedule A. | | |
|  |  |  |
|  |  |  |

Sales:

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| See attached Schedule A. | | |
|  |  |  |
|  |  |  |

5. Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

LDK SOLAR CO.

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of October, 2007.

_Allan Candelore_
ALLAN CANDELORE

-2-

## SCHEDULE A

## SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 09/07/2007 | 300 | $54.95 |
| 09/11/2007 | 300 | $59.60 |
| 09/19/2007 | 100 | $61.47 |
| 09/19/2007 | 200 | $61.50 |
| 09/24/2007 | 100 | $69.69 |
| 09/24/2007 | 300 | $71.20 |
| 09/24/2007 | 300 | $69.69 |
| 09/25/2007 | 100 | $63.26 |
| 09/26/2007 | 200 | $71.62 |
| 09/28/2007 | 200 | $72.37 |
| 10/03/2007 | 200 | $68.10 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 09/10/2007 | 300 | $59.45 |
| 09/19/2007 | 300 | $61.95 |
| 09/19/2007 | 300 | $62.05 |