1    Cohen, Milstein, Hausfeld & Toll P.L.L.C.
     Steven J. Toll
2    Mark S. Willis
     Matthew B. Kaplan
3    stoll@cmht.com
     1100 New York Avenue, N.W.
4    Suite 500, West Tower
     Washington, DC 20005
5    Telephone:    (202) 408-4600
     Facsimile:    (202) 408-4699
6
     Cohen, Milstein, Hausfeld & Toll P.L.L.C.
7    Michael Lehmann
     mlehmann@cmht.com
8    One Embarcadero Center
     Suite 526
9    San Francisco, CA 94111
     Telephone:    (415) 623-2048
10   Facsimile:    (415) 433-5994

11   Lead Counsel for the Proposed Class

12
                    UNITED STATES DISTRICT COURT
13
                   NORTHERN DISTRICT OF CALIFORNIA
14

15
     In re LDK Solar Securities Litigation     Master File No. C-07-05182-WHA
16
                                               CONSOLIDATED CLASS ACTION
17   This Document Relates To:                 COMPLAINT

18   All Actions

19

20                                             DEMAND FOR JURY TRIAL

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ...........................................................................1
II.     SUMMARY ................................................................................................1
III.    PARTIES ...................................................................................................3
        A.   The Lead Plaintiff And The Proposed Class ...........................................3
        B.   The Defendants ...............................................................................4
IV.     THE DEFENDANTS' FRAUDULENT SCHEME ..............................................6
        A.   Background ....................................................................................6
        B.   LDK's Pitch To Investors ..................................................................7
        C.   Investors Carefully Monitored LDK's Polysilicon Inventories......................8
        D.   LDK Claimed It Had A Huge Inventory Of Silicon Feedstock ....................9
        E.   LDK's Inventory Claims Were Vastly Exaggerated..................................10
        F.   LDK's Inventory Accounting Inflated The Company's Profits......................12
        G.   LDK's Inventory Accounting Violated GAAP ........................................14
        H.   Post Class Period Disclosures Lend Credence To The Allegations of Former
             Controller Situ ...............................................................................16
        I.   The Defendants' Conduct Was Intentional .............................................18
             1.   Situ Told The Defendants That Their Accounting Was Improper...............18
             2.   The Defendants Knew Situ Was A GAAP Expert..................................20
             3.   Defendant Peng Carefully Monitored LDK's Finances and Inventory ........21
             4.   Other Conduct Demonstrates The Defendants' Pattern Of Intentional Deception ......21
        J.   When The Truth Became Known The Price Of LDK Stock Collapsed .....................22
        K.   The Defendants Were Enriched By Billions Of Dollars Because Of The False
             Information They Disseminated............................................................23
V.      SPECIFIC FALSE STATEMENTS ................................................................24
        A.   LDK's IPO Prospectus ......................................................................24
             1.   Polysilicon Available To Meet Requirements ....................................24
             2.   GAAP Compliance.......................................................................25
             3.   Cost Or Market Inventory Accounting ............................................26
             4.   Value of Inventory .....................................................................26
             5.   Value of Raw Materials ...............................................................26
        B.   LDK's August 1, 2007 Press Release ....................................................26
             1.   Cost Advantages ........................................................................26
             2.   Value of Inventory .....................................................................29
             3.   GAAP Compliance......................................................................29
             4.   Cost Or Market Inventory Accounting ............................................30
        C.   LDK's August 1, 2007 Conference Call ..................................................30
             1.   Value of Inventory .....................................................................30
             2.   Quantity of Raw Materials ...........................................................31
             3.   Cost Advantages ........................................................................31
        D.   LDK's October 4, 2007 Press Release ....................................................33
VI.     LOSS CAUSATION ....................................................................................34
VII.    ADDITIONAL GAAP VIOLATION ALLEGATIONS........................................35
VIII.   ADDITIONAL SCIENTER ALLEGATIONS ..................................................36
IX.     NO SAFE HARBOR ...................................................................................36
X.      FRAUD-ON-THE-MARKET PRESUMPTION ................................................37
XI.     CLASS ACTION ALLEGATIONS ................................................................37
XII.    JURISDICTION AND VENUE ......................................................................39
XIII.   CAUSES OF ACTION .................................................................................39
XIV.    PRAYER FOR RELIEF ...............................................................................43
XV.     JURY DEMAND .......................................................................................43

COHEN, MILSTEIN,
HAUSFELD &
TOLL
P.L.L.C.

Consolidated Class Action Complaint – Master File No. C-07-05182-WHA                    i
IMANAGE 340905.6 73920001

1.     Lead Plaintiff alleges the following based upon personal knowledge with respect to himself and, with respect to other matters, the investigation of Lead Counsel.  Lead Counsel's investigation included a review of United States Securities and Exchange Commission ("SEC") filings by LDK Solar Co., Ltd. ("LDK" or the "Company"), as well as press releases and other public statements issued by the Company, securities analysts' reports, media reports about the Company, internal Company documents, information provided to Lead Counsel by a former senior employee of the Company, and the opinion of certified public accountants consulted by Lead Counsel with respect to the proper application of relevant accounting rules.   Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Defendants in this case are LDK, Jiangxi LDK Solar, LDK Solar USA, Inc., Xiaofeng Peng, Xingxue Tong , Jack Lai, Qiqiang Yao, Liangbao Zhu, Yonggang Shao and Gang Wang.

## I.     <u>NATURE OF THE ACTION</u>

2.     This is a federal class action brought on behalf of purchasers of certain LDK securities from June 1, 2007 through October 7, 2007 (the "Class Period"), and is brought under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## II.    <u>SUMMARY</u>

3.     During the Class Period the Defendants were desperately trying to establish LDK—a company which had only started operations in 2006—as a major player in the capital intensive, highly competitive global solar wafer industry.  Given the economies of scale enjoyed by other wafer producers LDK needed to rapidly and substantially increase its production in order to survive.  This required well over a billion dollars—money LDK did not have—to pay operational expenses and to purchase production equipment.  The Company had no hope of raising such huge sums unless it could convince investors and lenders that it was financially strong and could produce wafers at a significant profit.  But LDK's financial position was not

strong, the Company had no track record to speak of, and its CEO had no experience in the industry. To camouflage these problems, Defendants dressed up LDK's financials—largely by manipulating LDK's inventory—to make the Company appear much stronger than it actually was.

4. Defendants used two principal mechanisms to deceive investors. First, LDK brazenly counted as inventory tons of polysilicon, the principal input used for producing solar wafers that, in fact, did not exist. Second, in a somewhat more sophisticated scheme, LDK bought and booked as inventory tens of millions of dollars of scrap materials from which it claimed it could extract polysilicon. The problem here was that Defendants knew polysilicon feedstock could not be economically extracted from much of this scrap, rendering it useless. Generally Accepted Accounting Principles ("GAAP") prohibit the booking of non-existent items as inventory and prohibit as well the counting as inventory scrap materials found to be unusable.

5. By counting non-existent items and unusable scrap materials as inventory, the Defendants overstated LDK's inventory by some *400%*, making LDK appear to be much stronger than was actually the case. Counting nonexistent and unusable inventory as valuable feedstock inflated the Company's apparent assets by at least tens of millions of dollars. Moreover, the artificially high inventory numbers made it look like LDK had a secure supply of polysilicon feedstock, something that was important to investors because of a worldwide polysilicon shortage.

6. LDK's improper inventory accounting also allowed the Company to significantly understate its cost of production, resulting in overstated profits. The Company used the weighted average cost of the acquisition of its entire inventory of polysilicon to calculate the value of each unit of feedstock used in wafer production. The value of polysilicon accounts for 80% of the cost of producing solar wafers. LDK improperly included in the weighted average cost large amounts of low cost (although unusable) scrap silicon. The result was to artificially lower the apparent value of the polysilicon used in production, consequently reducing the reported cost of the Company's production, a critical metric for investors in what is essentially a commodity industry.

7.     The Defendants knew what they were doing.  They were violating straightforward accounting rules—even a non-accountant would know that non-existent or worthless items should not be counted as inventory.  Moreover, absent extreme recklessness, the Defendants could not have been ignorant of how scrap silicon was accounted for.  Not only did scrap account for most of the feedstock the Company claimed to use to produce its principal product, but, as both Defendants and investors knew, the price and quality of the polysilicon obtained by LDK was probably the most important variable in determining whether LDK would be a success or failure.

8.     The Defendants were repeatedly told that their accounting practices were improper by the Company's controller, Charley Situ.  Situ had considerable experience in applying GAAP and the Company hired him at the insistence of its outside auditors to strengthen internal controls, especially with respect to inventory.  Nevertheless, the Defendants ignored and overruled Situ's repeated efforts to bring inventory accounting into compliance with GAAP.

9.     Frustrated, Situ resigned in late September 2007.  When the market became aware of his departure, and the accounting irregularities that had prompted it, LDK's stock plummeted by nearly 50%.

## III.    **PARTIES**

### A.     *The Lead Plaintiff And The Proposed Class*

10.     Lead Plaintiff Shahpour Javidzad suffered substantial monetary losses as a result of his transactions in LDK securities during the Class Period.

11.     Mr. Javidzad represents a proposed Class comprised of all persons who, during the Class Period:  a) purchased American Depository Shares of LDK Solar Co., Ltd. ("LDK Stock"); b) purchased call options for LDK Stock; or c) sold put options for LDK Stock.  Excluded from the Class are the Defendants and the other current and former officers and directors of the Company, their immediate families, their heirs, successors, or assigns and any entity controlled by any such person.  The Class Period runs from June 1, 2007 through October 7, 2007.

1

**B.     The Defendants**

2      12.     Defendant LDK was incorporated in the Cayman Islands in 2006.  LDK owns

3   Defendant Jiangxi LDK Solar, a Chinese entity which is the Company's operating subsidiary, and

4   which was established on July 5, 2005.  LDK also owns Defendant LDK Solar USA, Inc., which

5   is its U.S. subsidiary.  The Company's principal executive offices and manufacturing facilities are

6   located in Xinyu City, Jiangxi Province, People's Republic of China.  The Company has a small

7   office in Sunnyvale , California and American Depository Shares ("ADS") of LDK have been

8   traded on the New York Stock Exchange since the Company's June 1, 2007 Initial Public

9   Offering (IPO).  Solar wafers are LDK's principal product.  LDK uses the calendar year as its

10   fiscal year.  LDK and its subsidiaries are responsible for the repeated false statements of their

11   officers and directors, statements which caused LDK stock to trade at an artificially inflated price.

12      13.     Defendant Xiaofeng Peng ("Peng") is the Company's founder and was at all

13   relevant times its Chairman of the Board and Chief Executive Officer (CEO).  He owns

14   approximately 70% of the Company's outstanding shares.  Prior to coming to LDK he was CEO

15   of a company that made gloves and other protective equipment; Peng had never worked in the

16   solar wafer or semiconductor industries before LDK.  Peng made, approved or adopted numerous

17   false statements that caused artificial inflation of LDK's price, including statements in LDK's

18   IPO prospectus, which he signed, statements in an August 1, 2008 press release, statements

19   during an August 1, 2008 call with analysts and statements in an October 4, 2008 press release.

20      14.     Defendant Xingxue Tong ("Tong") was at all relevant times the Company's

21   President and Chief Operating Officer.  Tong made, approved or adopted numerous false

22   statements that caused artificial inflation of LDK's price, including statements in LDK's IPO

23   prospectus, which he signed, statements in an August 1, 2008 press release and statements in an

24   October 4, 2008 press release.

25      15.     Defendant Jack Lai ("Lai") was at all relevant times the Company's Chief

26   Financial Officer ("CFO").  He was also an executive vice president and the secretary of the

27   Company.  Lai made, approved or adopted numerous false statements that caused artificial

28   inflation of LDK's price, including statements in LDK's IPO prospectus, which he signed,

1  statements in an August 1, 2008 press release, statements during an August 1, 2008 call with

2  analysts and statements in an October 4, 2008 press release.

3        16.    Defendant Qiqiang Yao ("Yao") was at all relevant times LDK's Vice President

4  and Chief Accounting Officer.  He is a registered accountant in China, but is not a U.S. Certified

5  Public Accountant (CPA).  Yao made, approved or adopted numerous false statements that

6  caused artificial inflation of LDK's price, including statements in LDK's IPO prospectus, which

7  he signed, statements in an August 1, 2008 press release and statements in an October 4, 2008

8  press release.

9        17.    Defendant Liangbao Zhu ("Zhu") was at all relevant times Executive Vice

10  President of LDK and a member of the Company's Board of Directors.  Zhu made, approved or

11  adopted numerous false statements that caused artificial inflation of LDK's price, including

12  statements in LDK's IPO prospectus, which he signed, statements in an August 1, 2008 press

13  release and statements in an October 4, 2008 press release.

14        18.    Defendant Yonggang Shao ("Shao") was at all relevant times Senior Vice

15  President of LDK and a member of the Company's Board of Directors.  Shao made, approved or

16  adopted numerous false statements that caused artificial inflation of LDK's price, including

17  statements in LDK's IPO prospectus, which he signed, statements in an August 1, 2008 press

18  release and statements in an October 4, 2008 press release.

19        19.    Defendant Gang Wang ("Wang") was at all relevant times a member of the

20  Company's Board of Directors.  Wang made, approved or adopted numerous false statements that

21  caused artificial inflation of LDK's price, including statements in LDK's IPO prospectus, which

22  he signed.

23        20.    Defendants Peng, Tong, Lai, Yao, Zhu, Shao and Wang are collectively referred to

24  as the "Individual Defendants."

25        21.    The Individual Defendants, by reason of their management positions, board

26  membership and ownership of the Company's stock and options, were at all relevant times

27  controlling persons of LDK within the meaning of Section 20(a) of the Exchange Act.  These

28

1  defendants had the power and influence to cause LDK to engage in the unlawful acts and conduct

2  alleged herein, and did exercise such power and influence.

3

4  **IV.    THE DEFENDANTS' FRAUDULENT SCHEME**

5        ***A.    Background***

6        22.    LDK is a new player with huge ambitions in a highly competitive multi-billion

7  dollar market.  The Company, which essentially produced nothing before 2006, went public in

8  June 2007.  It manufactures multicrystalline solar wafers, a key component in photovoltaic

9  products such as solar cells, which convert energy from the sun to electricity.  The solar industry

10  is booming because solar energy offers an environmentally friendly alternative to energy

11  generated from oil, whose price has skyrocketed in recent years.

12        23.    The principal input in the wafer manufacturing process is polysilicon (also referred

13  to as polycrystalline silicon), which is a material that contains multiple small silicon crystals.

14  There are two primary ways a manufacturer can obtain polysilicon.  First, high quality polysilicon

15  can be purchased in its raw form from a limited number of manufacturers, although raw

16  polysilicon is expensive.  Second, polysilicon found in the waste product of other manufacturing

17  processes can be recycled, which is considerably cheaper than purchasing raw polysilicon.  This

18  recycling can involve, for example, silicon scraps left over from the manufacture of

19  semiconductors and broken pieces of silicon wafers.  LDK and its competitors purchase such

20  scrap materials for use in their production process.  Although recycled silicon is considerably

21  cheaper than raw silicon, it contains significant impurities and may have undesirable electric

22  conductivity properties, greatly limiting its use in the wafer production process.  To some extent

23  impure recycled silicon can be mixed with raw silicon to produce wafers of acceptable quality at

24  a lower cost than would be the case if only raw silicon were used.  But much of the silicon scrap

25  used in the recycling process is of such poor quality that its usability is limited or it is completely

26  unusable and essentially worthless.

27        24.    LDK purchased for its wafer production process both raw polysilicon and scrap

28  material from which it said it hoped to extract polysilicon through recycling.  The Company

1  employs a large number of workers to sort through the scrap materials it purchases and to identify

2  scrap so impure or contaminated that polysilicon cannot be economically extracted from it.

3      25.     As a new company, founded and largely controlled by Defendant Peng, who had

4  no experience in the industry, LDK faced an uphill fight to convince investors and lenders that it

5  had a viable future.  The industry was already highly competitive, with a number of well-

6  established global players, some backed by wealthy multinational parents, including BP, the

7  international energy giant.  LDK acknowledged in the fine print of its IPO prospectus that:

8          [m]any of our current and potential competitors have a longer
           operating history, better name recognition, greater resources, larger
9          customer base, better access to polysilicon feedstock and greater
           economies of scale than we do.  In addition, most of our
10         competitors are integrated players in the solar industry that also
           engage in the production of virgin polysilicon, photovoltaic cells
11         and/or modules.  Their business models may give them competitive
           advantages as these integrated players place less reliance on the
12         upstream suppliers and/or downstream customers in the value
           chain.
13
       26.     Manufacturing wafers on a large scale at attractive prices is a difficult technical
14
   task that requires the purchase and installation of hundreds of millions of dollars of sophisticated
15
   manufacturing equipment.  It also requires finding reliable suppliers of polysilicon feedstock and
16
   establishing relationships with picky customers who demand a consistently high quality product.
17
       **B.      LDK's Pitch To Investors**
18
       27.     Despite the seemingly long odds against the Company's success, LDK's pitch to
19
   investors was that it would do more than just survive among a large group of fierce competitors.
20
   Indeed, the Company announced in its August 2007 conference call for investors that LDK's
21
   "vision" was to become the world's "largest, lowest cost producer of solar wafers."  The
22
   Company's publicly announced business plan called for explosive growth.  According to its
23
   prospectus, at the end of March 2007 the Company was producing some 215 Megawatts ("MW")
24
   in wafers and its manufacturing facilities were running at nearly full capacity.  But LDK
25
   announced that it would nearly double production to 400 MW by the end of 2007, and then
26
   increase it to 800 MW by the end of 2008, and to 1,600 MW by the end of 2009.  In addition to
27
   increasing wafer production—which would require the purchase of hundreds of millions of
28

1  dollars in equipment—the Company also began building a $1 billion plant to produce raw

2  polysilicon feedstock which, with costly around the clock construction, it hoped would start

3  production in the third quarter of 2008.  LDK needed enormous capital infusions to fund its

4  ambitious plans.  The Company also needed to raise additional cash because many of its raw

5  material suppliers and some of its equipment suppliers demanded payment in advance.

6          28.     Because of LDK's enormous capital needs, and the absence of any operating

7  history that investors could look to for guidance about the competence of management and the

8  likelihood of future profits, LDK insiders needed to convince investors and lenders that the

9  Company was in a strong financial position.  A strong balance sheet and evidence that the

10  Company could produce wafers more cheaply than its competitors were the key to obtaining a

11  high offering price at the Company's June 1, 2007 IPO—even a small boost in the IPO price

12  would make available millions of dollars of additional capital.  Moreover, because even an IPO at

13  an inflated price would not yield nearly enough cash to finance LDK's ambitious plans, the

14  Company needed to convince reluctant potential lenders that, despite its short history, it was a

15  good credit risk.  As LDK acknowledged in its prospectus, in making lending decisions lenders

16  focused on the Company's financial condition and, specifically, on its financial statements.

17          29.     In addition to reassuring investors and lenders, LDK needed to convince its

18  customers that it was a reliable supplier that could fulfill huge orders.  There are a relatively small

19  number of potential purchasers of the Company's solar wafers.  In mid-2006 LDK had only some

20  thirty customers, and, according to its prospectus, for the year ended March 31, 2007 its top five

21  customers made up 57% of its net sales.  Since solar wafers were critical components of their

22  products, these customers were reluctant to do business with a new, untested enterprise.

23          **C.**     ***Investors Carefully Monitored LDK's Polysilicon Inventories***

24          30.     During the Class Period, investors, lenders and potential purchasers of LDK's

25  wafers wanted to know whether the Company had a reliable, reasonably priced source of the

26  polysilicon feedstock that is essential to the production of solar wafers.  ***The Company's***

27  ***inventory of polysilicon was therefore an issue of fundamental importance.***  Because of heavy

28  demand for solar wafers from the semiconductor and solar industries there was, during the entire

Class Period, a severe shortage of polysilicon. LDK acknowledged the shortage and noted that experts expected it to worsen. LDK's prospectus explained that "[o]ur operations depend on our ability to procure sufficient quantities of solar-grade polysilicon on a timely basis and on commercially reasonable terms." If LDK could not obtain adequate polysilicon, not only would its ambitious expansion plans be in jeopardy, but the Company might have to curtail or suspend current production. Even the threat of a feedstock shortage would turn investors, lenders and customers away from LDK. One news report summarized the importance of inventories to investors: "[s]hareholders care about the company's [LDK's] silicon inventory because—with a worldwide shortage of solar-grade silicon—sales, margins and profits all directly relate to the amount of silicon a company is able to obtain and the price it must pay to get it."

31.    Seeking to engender confidence in its future, the Company announced that it had arrangements in place with polysilicon producers to meet some of its needs. But the reassurance that these supply contracts could provide was limited—LDK was compelled to admit in its prospectus that "[m]any of our polysilicon supply agreements are subject to fluctuating market prices or price negotiations with our suppliers. In addition, suppliers may delay or default in their delivery obligations under the supply agreements." LDK noted that "[s]ome of our [polysilicon] suppliers have failed to meet their delivery schedule in the past." Yet, this generic admission was more than counterbalanced by LDK's claims of massive inventories of silicon feedstock— claims which were decidedly false.

### D.    LDK Claimed It Had A Huge Inventory Of Polysilicon Feedstock

32.    LDK could guarantee to investors that there was one source of polysilicon that would be available for production at a stable price—the polysilicon in the Company's own inventory. In its prospectus LDK claimed that, on March 31, 2007, it had inventories worth $114 million, $94 million of which were raw materials—polysilicon that could be used to produce wafers. According to an August 1, 2007 press release from LDK, by June 30 inventories had grown to $174 million in value. In a conference call with analysts on the same day Defendant Lai explained that this increase largely reflected an accumulation of polysilicon feedstock. During the same call Defendant Peng explained that the "raw material is at 600, a little bit over 600 tons

1   at the warehouse." Subsequently, according to an analyst report and a press report, LDK told

2   investors that it had a total of 1,040 metric tons of silicon feedstock in August. According to

3   *Photon International*, a leading trade journal, the Company claimed that "[o]f this [amount] 195

4   tons was in production, while nine tons was in consignment. Another 222 tons was scrap 'in

5   transit,' purchased globally but not yet cleared through customs and on-site." According to the

6   article, LDK asserted that "614 tons of usable feedstock [were] in its warehouse."

7       33.    Given the scarcity and high price of polysilicon feedstock, LDK's claim of a large

8   polysilicon inventory had an enormous impact on investors' valuation of the Company. Using the

9   June 30 valuation of $174 million, inventory accounted for 22% of ***total*** assets on the Company's

10  balance sheet and 30% of its current assets. Moreover, according to *Photon International*, LDK

11  would need 4,400 metric tons of feedstock for all of 2008. If the claim of having an inventory of

12  1,040 metric tons of polysilicon feedstock was true, LDK already had one quarter of what it

13  would need for the next year's production. This inventory reassured investors (and lenders and

14  customers) that LDK would have the raw material needed to meet its ambitious production goals.

15          ***E.    LDK's Inventory Claims Were Vastly Exaggerated***

16      34.    Because of a whistleblower, however, investors learned in early October 2007 that

17  LDK's statements about its raw material inventories were false. The whistleblower, Charley Situ,

18  had worked for LDK as its Financial Controller since mid-March 2007. He disclosed that the

19  Defendants had engaged in a long-running scheme to massively overstate LDK's inventory.

20      35.    With over 15 years of financial management experience, Situ was highly qualified

21  for his position. He received a bachelor's degree in mathematics in 1983 and master's degree in

22  applied statistics in 1987, both from South China Normal University. He subsequently studied at

23  the University of Delaware and received an MBA from the University of Brighton in 1995. A

24  CPA, Situ has been a member of the American Institute of Certified Public Accountants, the

25  Institute of Management Accountants and the Institute of Internal Auditors. Prior to joining LDK

26  he was controller at China GrenTech Corporation Limited, a NASDAQ traded company.

27  According to China GrenTech, Situ had been "responsible for our compliance with U.S. GAAP

28  and other internal control requirements under the U.S. securities laws."

36.    When Situ discovered that the Company's inventory claims were false he urged his superiors to tell the truth to investors.  When they refused to do so, Situ, fearing he could be found liable for securities fraud, resigned and provided a detailed account of the Company's wrongdoing in a series of emails to the Company's audit committee and to the SEC.  He provided further details, and internal Company documents, in a subsequent exchange of emails with a law firm investigating the alleged misconduct.  Lead Counsel has obtained copies of many these emails and internal documents.

37.    According to Situ, the "Silicon Warehouse Stock Ledger," which reflected an accurate physical count of the feedstock in the warehouse, showed that there were only 330 metric tons of feedstock in the warehouse at the time LDK was claiming that the total was 614 metric tons.  According to Situ, 284 metric tons that was supposedly in the warehouse was "'fake' silicon"—it simply did not exist.  Furthermore, according to the former controller, only 45 metric tons of the 330 metric ton amount actually in the warehouse was high quality polysilicon.  The remaining 285 metric tons was comprised of scrap material, most of which was "unusable."  According to Situ, "[o]n average only about 35% of the recycled silicon can be used."  He adds that most of this 285 tons of low quality silicon had been "just storing in the warehouse for a long time, no movement," although some of it had been taken out for testing, but had been returned after it was found to be unsuitable for production.  In other words, LDK had overstated the amount of polysilicon material in the warehouse by nearly 50%.  And if only 35% of the inventory scrap material that LDK did have was usable then only about 145 metric tons should have been accounted for as inventory, less than one fourth of what LDK had claimed.

38.    Situ was in a position to know.  He reported directly to Defendant Qiqiang Yao, the Company's chief accounting officer, who in turn reported to defendant Lai, the CFO.  Moreover, internal emails provided by Situ show that he was regularly in direct contact with Defendant Lai and was often an addressee on emails to and from Defendant Peng, LDK's CEO.  Situ worked from the Company's headquarters in Xinyu City, China, where its manufacturing facilities are also located.  As part of his duties he worked with various departments to implement Enterprise Resource Planning (ERP) software, software meant to be used for running every aspect

of a company, including managing inventory. He went out of his way to understand the wafer production process. He often attended what were referred to as "Green Meetings"—meetings between LDK personnel and foreign experts sent by vendors of production equipment used by LDK. In fact, Situ was one of the few employees to climb to the top of the Dimensional Solidification System, an important component in the production process.

39.    Situ recounts a July 19, 2007 meeting attended by Situ, Defendant Yao, Defendant Lai, Chief Engineer Pietro Rossetto, and the Company's Plant manager. At the meeting the Chief Engineer and the Plant manager expressed the following concerns:

a.    Although, on paper, LDK's feedstock inventory looked tremendous, they often found themselves without the raw material they needed for production.

b.    They could not rely on the Company's official inventory numbers to plan production because, in many cases, the official numbers were "just paper number[s] and there are no items physically existing or just some unusable items."

c.    Despite the supposed abundance of LDK's feedstock inventory the manufacturing department often had to delay production and wait for the purchase of additional feedstock of a usable quality.

40.    In his emails Situ describes in detail the steps he took to confirm that the Company's publicly reported numbers were false. At the end of August, Situ worked with warehouse personnel on a physical inventory which confirmed the inaccuracy of the inventory figures. He reports that, to be sure that the audit was accurate, "I myself … went to the warehouse physically to double check and reconfirm some critical data." Moreover, in reviewing whether LDK's actual inventory was consistent with what the Company was publicly reporting, Situ looked not only at items in the warehouse, but also polysilicon located elsewhere, including items in transit, materials on the production line and the small amount of polysilicon the Company had received on consignment..

**F.    *LDK's Inventory Accounting Inflated The Company's Profits***

41.    In addition to incorrectly causing investors to believe that LDK had a large source of readily available polysilicon and making LDK's assets appear to be worth far more than was

1    actually the case, LDK's false inventory accounting artificially decreased LDK's reported cost of

2    goods sold, making the Company seem much more profitable than was actually the case.

3        42.    According to its prospectus, LDK used the "weighted average method" to value its

4    inventory. The price at which LDK had acquired its feedstock inventory varied widely—a ton of

5    raw polysilicon direct from a manufacturer's factory cost much more than a ton of potentially

6    recyclable scrap materials of differing purity. LDK averaged the per ton price of all the

7    polysilicon feedstock to determine the value it assigned, for accounting purposes, to each ton of

8    feedstock inventory.

9        43.    "Cost of goods sold" is the direct cost attributable to the production of the goods

10    sold by a company. For all public companies investors pay considerable attention to the cost of

11    goods sold—a company's gross profit is determined by subtracting cost of goods sold from its

12    sales revenue. But cost of goods sold is an especially important metric for companies like LDK,

13    which produce commodity products. Purchasers of commodity products often make their

14    purchasing decisions almost exclusively on price alone. Low cost commodity producers can

15    afford to offer lower prices than their competitors while high cost producers may be driven out of

16    business.

17        44.    Cost of goods sold is essentially determined by adding together the cost of the raw

18    material, labor and manufacturing overhead used to make a particular product. For LDK, which

19    utilized low-cost Chinese labor, the value of polysilicon feedstock constituted 80% of LDK's cost

20    to produce wafers, according to what Defendant Peng told a March 2008 investors conference.

21        45.    LDK was attractive to investors because it claimed to have a lower cost of

22    production—cost of goods sold—than its competitors. For example, in the August 2007 investor

23    conference call Nicola Sarno, LDK's Senior Vice President for Manufacturing, claimed that "we

24    are able to offer our … customers considerable cost advantages while maintaining quality and

25    performance," and that "[w]e distinguish ourselves by … maintaining highly cost-effective

26    production."

27        46.    In fact, however, LDK's production costs were greatly understated because, when

28    they prepared LDK's financial statements, the Defendants counted as current inventory scrap

1    acquired at a low price that that the Company had determined was of such poor quality it could

2    not be used within a year, and, in most cases, could not be used ever.  Although it was improper

3    to count this low cost but unusable feedstock as current inventory, the Defendants nevertheless

4    did so.  Consequently, this cheap but unusable scrap was wrongly included when calculating the

5    average price per ton of the feedstock utilized in the manufacturing process, artificially deflating

6    LDK's apparent cost of producing wafers.  Since polysilicon constituted 80% of LDK's cost to

7    produce wafers, the impact of this undervaluing of silicon feedstock was enormous.  Moreover,

8    under LDK's perverse accounting practices, the more cheap but unusable scrap material LDK

9    purchased, the lower its supposed cost per unit of polysilicon used in production and the more

10   profitable the Company appeared to be.

11          47.     After Situ's allegation became public, analysts and investors realized that LDK

12   had been understating its costs.  For example, in an October 25, 2007 report to investors Piper

13   Jaffray analyst Jesse Pichel noted that LDK management was claiming an average polysilicon

14   feedstock cost of $150/kg , but observed skeptically that "this amount appears extremely low

15   given the $230/KG+ blended cost at [LDK] competitors Yingli and Renesola."

16          **G.      *LDK's Inventory Accounting Violated GAAP*

17          48.     LDK's accounting for inventories violated fundamental, easily understood and

18   applied principles of GAAP.

19          49.     GAAP are those principles recognized by the accounting profession and the SEC

20   as the conventions, rules and procedures necessary to define generally accepted accounting

21   practice.  Investors expect the financial statements of public companies to be prepared in

22   accordance with GAAP and SEC Regulation S-X states that financial statements filed with the

23   SEC that are not prepared in conformity with GAAP are presumed to be misleading and

24   inaccurate, notwithstanding any accompanying disclosures.  LDK asserted that the financial

25   statements released in connection with its IPO and during the Class Period had been prepared in

26   accordance with GAAP.  But this was not the case—LDK improperly included in its publicly

27   disclosed inventory of raw material held for production both materials that did not exist and

28   materials that the Company knew could not be used.

50.     Not surprisingly, GAAP provides that materials can only be accounted for as inventory if they actually exist.  For an entity to book inventory or any other type of potential asset as an asset the entity must have "obtained or controlled" the asset.  *See, e.g.,* Statement of Financial Accounting Concepts (FASCON) 6, ¶25; *see also* Accounting Research Bulletin (ARB) 43, Chapter 4, Statement 1 (providing that items accounted for as inventory must be "items of tangible personal property.").  Obviously, something that does not exist is not inventory.  Consequently, the Defendants violated GAAP when they claimed as inventory feedstock that did not exist.

51.     Furthermore, it is a basic principle of GAAP that inventory may not be accounted for at more than its actual worth.  Inventory must be valued at acquisition cost or its "market" value, whichever is lower.  In its prospectus LDK claimed it followed this rule, asserting that its "[i]nventories are stated at the lower of cost or market."  Moreover, under GAAP inventory is normally treated as a "current asset" and, during the Class Period, LDK characterized its entire stock of inventory as a current asset.  Absent unusual circumstances not present here, ARB 43 provides that inventories not likely to be used within one year cannot be booked as current assets.

52.     Although these rules are clear, LDK did not follow them, despite repeated assertions to the contrary.  LDK regularly purchased and had shipped to its factory a variety of scrap materials from which it supposedly hoped to extract polysilicon.  It accounted for these items as current inventory and valued them at the cost of acquiring them.  But after the items were delivered some 3,000 LDK employees sorted through the scrap, segregating out materials from which it would be impossible or uneconomical to extract polysilicon.  These items were worthless, or nearly so and certainly could not be used within a year—most could never be used.  In fact, since GAAP defines "market" value to include the cost of disposition of an item that had been accounted for as inventory, this unusable scrap material probably had a negative value.  Nevertheless, in violation of GAAP, the Defendants continued to count worthless materials as inventory and refused to write down the value of inventory it had found to be of little value.

53.     As Situ pointed out in a September 13 internal LDK conference call that included Defendants Lai and Yao, LDK was obligated to reduce the value of the inventory it carried on its

1   books to take into account that portion of its inventory that it knew had little or no value. Not

2   only did LDK fail to remove worthless inventory from its books, it continued to insist that all the

3   unused scrap it had acquired was a current asset, meaning it supposedly could be used within a

4   year.

**H.      Post Class Period Disclosures Lend Credence To The Allegations of Former Controller Situ**

5

6       54.      When it was publicly disclosed that Situ had resigned because of improper

7   accounting at LDK, the Company rushed to bolster its stock price by insisting that Situ was a

8   disgruntled employee whose claims were unfounded. The implication was that Situ was a liar.

9   But in an interview with the Chinese Interfax news agency CFO Lai acknowledged that this was

10  not the case. In the October 2007 interview "Lai stated that the information released by Situ is

11  'authentic and accurate.'" Lai insisted, however, that Situ's information was incomplete,

12  although he apparently did not explain why this was the case.

13      55.      The SEC seems to be taking Situ seriously. In three terse sentences in an October

14  30, 2007 press release the Company disclosed that it had been contacted by the SEC, which is

15  apparently investigating Situ's revelations about LDK's accounting.

16      56.      For months after the end of the Class Period LDK continued to vigorously deny

17  that there was any truth to Situ's allegations. These denials, and the announcement of large

18  contracts helped the stock rebound for a time (even though, according to one commentator, such

19  contracts meant little because many purchasers, concerned about the polysilicon shortage, were

20  over ordering wafers and would likely cancel many of the orders they placed).

21      57.      Nevertheless, in its fourth quarter 2007 financial statements LDK essentially

22  confirmed one of Situ's central allegations. Situ had noted that one indicator that much of the

23  Company's inventory was unusable was that a large portion of the inventory simply remained in

24  the warehouse unused, despite LDK's all out production of solar wafers. When the fourth quarter

25  numbers were released in late February 2008 the Company added a line to its balance sheet

26  labeled "Inventories to be processed beyond one year, net"—meaning inventory sitting in the

27

28

1    warehouse unused and probably unusable—and reported that such inventories totaled $30

2    million.

3        58.    During the February 25, 2008 conference call that immediately followed the fourth

4    quarter earnings release securities analysts demanded an explanation of this new line item.  In

5    response, Defendant Lai insisted that accounting for inventory in this manner was common.  This

6    is not true.  During the call Credit Suisse analyst Satya Kumar expressed concern about LDK's

7    new method of inventory accounting, noting that other companies do not segregate inventory into

8    categories by the amount of time it will take to use it in a production process.  Moreover, in a

9    March 3, 2008 article on LDK, *Barron's*, the respected business journal, reported that it had

10   "searched ***all*** filings at the Securities and Exchange Commission since 2006 to see how

11   companies treated inventories they didn't expect to sell within a year" and found that "all but a

12   handful took reserves against the inventory's value" (emphasis added)—in other words, instead of

13   simply recharacterizing inventory as a long-term asset they wrote down the value of the inventory

14   on their balance sheet—the course urged by Situ during the September 2007 internal conference

15   call.

16       59.    After the February 2008 conference call *Barron's* and several analysts expressed

17   concern that LDK was playing games with its inventory numbers.  In a February 25 research note

18   titled "Inventory Questions Resurface Following 4Q07 Results" Oppenheimer & Co. analyst

19   Adam Hinckley questioned the transparency of LDK's inventory management.  Piper Jaffray

20   analyst Jesse Pichel noted that the addition of the new balance sheet line "would appear to

21   validate some earlier investor fears that the company holds unusable inventory."  In its March 3

22   article *Barron's* said that LDK's disclosures suggested that the Company was "plow[ing]" money

23   into a growing scrap pile" and that LDK's accounting disclosure "seems to validate LDK's

24   former controller, who quit in September complaining that the … company refused to write off

25   silicon inventory that was unusable."

26       60.    If LDK's financial statements are to be believed, at the end of the second and third

27   quarters of 2007 the Company had ***no*** inventory that it did not expect to process within a year.

28   Given Situ's allegations, and the sudden appearance of $30 million in unusable inventory on the

1   balance sheet, without any announced change in the Company's procedures for acquiring or

2   handling inventory, this seems unlikely. Significantly, while LDK's reported results for the

3   second and third quarters of 2007 were unaudited, the Company announced its fourth quarter

4   results shortly before it was required to file its annual report, which investors would expect to

5   contain an opinion from the Company's outside auditor that the financial statements were fairly

6   presented.

7   **I.    *The Defendants' Conduct Was Intentional***

8   61.    Defendants' GAAP violations and their false statements regarding matters they

9   knew were central to their business and how that business was perceived by investors, were made

10  intentionally or, at the very least, with an extremely reckless disregard for the truth.

11  1.    Situ Told The Defendants That Their Accounting Was Improper

12  62.    According to a report in *The Wall Street Journal*, which was based on an interview

13  and documents Situ provided, Situ first raised his concerns that LDK's accounting was improper

14  in an email sent to Defendant Lai on May 29, 2007, two days before the Company priced its

15  initial public offering. Situ was responding to Lai's request to look into two figures related to

16  inventory that didn't match. In his email Situ told Lai that the Company's financial and

17  operational sides were using different sources and methods to calculate inventory and output and

18  that it was impossible to verify which figures were accurate. Subsequently, in a June 27 email to

19  Defendant Lai Situ expressed concern that, with respect to LDK's finances, "[t]he actual story is

20  quite different from what the investors expect or are told."

21  63.    In an email to Lai dated September 10, 2007, a copy of which has been obtained

22  by Lead Counsel, Situ wrote: "You may recall . . . a meeting with you . . . and me on July 19,

23  2007 asking for help with the following issues: Although the LDK feedstock inventory looks

24  tremendous, it often lacks of raw material for production. PMC and plant manager cannot base

25  on the book inventory to plan the production because in many cases data is just paper number and

26  there are no items physically existing or just some unusable items…. The fact is that among the

27  LDK feedstock only a small percentage is good stock. According to US GAAP (ARB 43 Ch.4;

28

1    APB 28, etc.), the management should make provision in this regard.  In fact, nobody knows if

2    LDK is profitable or not."

3        64.    In a September 13 internal conference call, Situ told Defendants Lai and Yao that

4    two-thirds of the Company's feedstock had been sitting for over 180 days and was unusable,

5    according to a *Wall Street Journal* article.  Situ argued, unsuccessfully, that the Company was

6    required to reflect this reality by taking a charge on its financial records.  According to *The Wall*

7    *Street Journal*, it based its account of this conference call on a recording of the call which it had

8    reviewed.

9        65.    In late September, with management refusing to heed his advice, and fearing that

10   he would be implicated in securities fraud if he remained at LDK, Situ resigned from the

11   Company.  On September 25 he outlined his concerns with the inventory in an email he sent to

12   LDK's management, members of its audit committee and employees of LDK's auditor, KPMG.

13   He copied the SEC and the Public Company Accounting Oversight Board.  In response LDK did

14   nothing, refusing even to tell investors that Situ had left the Company.

15       66.    It is clear from the available information that Situ repeatedly warned the

16   Defendants during the Class Period that their inventory accounting was false and misleading and

17   violated GAAP.  Indeed, according to the online trade publication *Greentech Media*, in a private

18   conference call with certain investors in early October, Defendant Lai acknowledged that Situ had

19   raised the inventory issue with him while Situ was still at the Company.  *Greentech* said it had a

20   recording of the call.

21       67.    There are compelling reasons to believe that Situ is telling the truth.  As described

22   in detail in this Complaint, his account of misconduct at LDK is supported by internal LDK

23   documents, press reports, a knowledgeable anonymous source interviewed by *Barron's* and by

24   LDK's own admissions after the Class Period.  Moreover, Situ had little to gain and much to lose

25   by disclosing the fraud at LDK.  In addition to losing his job, he put his future ability to earn a

26   living at risk.  Situ has told Lead Counsel that he has been "suffering a lot" as a result of his

27   departure from the Company and has been the victim of "many slanders, personal attacks and

28   distortions," originating from people who "don't like the truth at all."

## 2. The Defendants Knew Situ Was A GAAP Expert

68.     If the Defendants had been acting in good faith they would have responded to Situ's repeated warnings of inventory problems with prompt and effective action.  Their failure to do so provides strong support for the proposition that the Company's vast exaggeration of its inventory was the result of a deliberate effort by the Defendants to mislead investors.  The Defendants ignored Situ's warnings even though others had warned them that their inventory accounting might not be consistent with GAAP, and even though they claimed to have hired Situ specifically to find and correct GAAP deficiencies at the Company.

69.     In a February 2007 document entitled "Report to Board of Directors on Internal Control Observations", a copy of which has been obtained by Lead Counsel, KPMG, LDK's auditor, warned the Company's board of directors that LDK's inventory accounting was inadequate.  KPMG also identified a "significant deficiency" in LDK's internal controls—the Company's accounting personnel had little experience with GAAP.

70.     LDK responded to the report by hiring Situ to deal with the inventory and other accounting issues KPMG had identified.  In the report KPMG had urged LDK to "consider recruiting additional US GAAP expertise."  Since the accounting firm's opinion on the Company's financial statements was needed for LDK's planned IPO, the Company had little choice but to accept KPMG's advice.  LDK's board informed KPMG that, as of mid-March, it had "employed a US-trained CPA who has 15+ years of experience"—Charley Situ—to ensure that the Company followed GAAP.  Nevertheless, when Situ did what he was hired to do— uncovering and bringing to the attention of top managers material violations of GAAP in the Company's public financial statements—the Defendants refused to take any action.

71.     Aside from the warning by KPMG, there were other communications from outsiders that put the Defendants on notice that there was reason to doubt the accuracy the LDK's inventory accounting.  For example, in a May 25, 2007 email entitled "per our conversation" Jimmy Chang of Morgan Stanley asked Defendant Lai to explain why there was a $20 million discrepancy between the inventory number prepared for the IPO prospectus and the amount of inventory listed on a spreadsheet listing inventory apparently prepared by LDK and sent to

1    Morgan Stanley.  It is unclear if Lai replied.  Given KPMG and Morgan Stanley's previously

2    expressed concerns about the accuracy of the Company's inventory accounting, it is particularly

3    difficult to see how the Defendants could have been acting in good faith when they refused to

4    take any corrective action when their own GAAP expert warned them that their inventory

5    accounting was improper.

6                             3.  Defendant Peng Carefully Monitored LDK's Finances and Inventory

7          72.    Defendant Peng was clearly aware of the misconduct within his Company.  Aside

8    from the fact that Situ had repeatedly raised the issue, Peng knew the importance of inventory to

9    the investors and lenders whose support was desperately needed for the survival of the company

10   he largely owned.

11         73.    Peng personally told investors that LDK would be successful because of its low

12   costs.  For example, in the Company's August 1 conference call he told investors that one of the

13   Company's key "advantages" was its low "operating cost."  LDK's reported operating cost was,

14   of course, largely dependent on the value LDK attributed to the polysilicon inventory that was the

15   principal input for its product.  And Peng knew enough about LDK's inventory to discuss the

16   subject in detail with analysts on the call.  Moreover, as Situ explains, Peng tightly controlled the

17   Company, especially its finances.  Situ says, for example, that, in LDK, "Peng's approval rather

18   than CFO's is required even for a small amount of payment or transfer."

19                            4.  Other Conduct Demonstrates The Defendants' Pattern Of Intentional
20                                Deception

21         74.    Two incidents during 2007 underscore that the Defendants' lack of inclination to

22   follow the rules that apply to companies traded in the U.S. securities markets.

23         75.    In a May 10 email, a copy of which Lead Counsel has obtained, Defendant Lai

24   informed Defendant Peng that the underwriters of the Company's planned IPO wanted LDK to

25   hire a consultant to assist the Company in complying with the Sarbanes-Oxley Act prior to the

26   IPO.  Even though announcing that such an arrangement was in place at the time of the IPO

27   would have made the Company's shares more attractive to investors, and even though he had

28   been told by KPMG that LDK had inadequate internal controls, Peng refused to hire the

1  Sarbanes-Oxley consultant, explaining that "*we* declare what it is [sic] correct" and informing Lai

2  that LDK would not start complying with the requirements of Sarbanes Oxley until "after our

3  IPO" (emphasis added).

4        76.    The second incident involved backdated stock options.  Throughout 2007 there

5  was widespread media coverage of improper stock options backdating by publicly traded

6  companies.  Because of backdating allegations a number of public companies and their top

7  executives were facing lawsuits and, in some cases, criminal charges.  Nevertheless, Situ reports

8  that "[o]n August 9, LDK gave me the attached 'dateback option' and asked me to sign it and <u>date</u>

9  <u>back it to April 17</u>."  Situ refused to do so.

10        77.    Situ, who has years of experience working in Chinese enterprises, provides some

11  relevant background on Chinese business practices.  He explains that "[i]t is a well-known

12  common practice" in China for companies to have "two different sets of books.  One set is the

13  'internal books' … or the real books, for internal use only.  The other one is 'external books' …

14  or the manipulated book[s], for external use only or for reporting purpose. e.g. for the purpose of

15  tax evasion, financing, etc."  In Situ's view, LDK's inventory accounting is "just a typical case of

16  this kind of practice."

17      ***J.    When The Truth Became Known The Price Of LDK Stock Collapsed***

18        78.    On October 3, 2007, Piper Jaffray analyst Pichel disclosed in a research note that

19  "[w]e have confirmed that the LDK financial controller recently left the company," and "[w]e are

20  also aware of the former controller's allegations of poor financial controls and … [an] inventory

21  discrepancy."  Pichel added, however, that he had "spoken to the LDK CFO [Defendant Lai]

22  about these claims" and that, as a result of this conversation, he had no reason to doubt LDK's

23  assertion that Situ's claims were false.

24        79.    Despite the reassurances from Defendant Lai that accompanied Pichel's report,

25  investors were stunned by the allegations and by Situ's resignation, which the Company itself had

26  not disclosed.  In reaction to this news, LDK's shares closed at $51.65 on October 3 on unusually

27  heavy volume, down 24.4% from the previous day's close of $68.31.

28

80.    On Monday, October 8, 2007, *Barron's* published an article that discredited the Company's denial of wrongdoing by describing Situ's allegations in much greater detail than the information in Pichel's report, including that the Company may have overstated its inventory by up to $92 million.  The article also cited a second, unidentified source who confirmed that LDK had serious problems with the quality of the polysilicon in its inventory, an allegation consistent with Situ's assertion that much of the Company's feedstock was of very poor quality and effectively unusable.

81.    In reaction to this news, LDK's shares closed at $37.50 on October 8, 2007 on unusually heavy volume, down 26.4% from the previous trading day's close of $50.95 and down 45.1% from the stock's October 2, 2007 price.

### K.    *The Defendants Were Enriched By Billions Of Dollars Because Of The False Information They Disseminated*

82.    The Defendants, and especially Defendant Peng, had a strong and direct financial interest in keeping truthful negative information about the Company from investors.  Concealing the truth about LDK's financial condition allowed LDK's IPO to be priced at an artificially high level and kept the stock price artificially inflated after the IPO.  Peng holds (and has held since the IPO) approximately 75 million shares of LDK stock.  At $68.31 a share, LDK's trading price on October 3, 2007, the day before Piper Jaffray's analyst disclosed Situ's allegations, Peng's interest in the Company was worth $5.12 billion.  On October 8, 2007, the date on which *Barron's* published its article detailing Situ's allegations, LDK's shares closed at 37.50, reducing the value of Peng's holdings to $2.81 billion.  In other words, when the market learned of LDK's accounting problems, Peng lost some $2.31 billion in less than a week.

83.    In addition to Peng's shares, each of the Individual Defendants owned large blocks of LDK options whose value dropped dramatically when Situ's concerns became public.  Defendant Tong had at least 1.3 million options, Defendants Zhu and Shao had at least 1 million options and Defendant Wang had at least 100,000 options.  LDK has not disclosed the exact number of options held by Defendants Lai and Yao, but, according to the Company's prospectus,

they were among a group of six officers who had a combined total of 1.36 million at the time of the IPO.

84.    None of the Individual Defendants could sell their securities during the Class Period because they had entered into a post-IPO "lock up" agreement.  According to the IPO prospectus, Defendant Peng was barred from selling for one year after the IPO and the other Defendants were required to wait 180 days.  If, however, the Defendants were able to keep the truth from investors until the lockup period was over they could sell their stock at inflated prices, making hundreds of millions of dollars in illicit profits.

## V.    SPECIFIC FALSE STATEMENTS

### A.    *LDK's IPO Prospectus*

85.    LDK filed and publicly released a prospectus in connection with the Company's June 1, 2007 IPO.  Each of the individual defendants signed the prospectus.

#### 1.    Polysilicon Available To Meet Requirements

86.    The prospectus asserted that "we believe that our polysilicon feedstock inventory and commitments from suppliers are sufficient to satisfy over 90% of our estimated requirements for 2007 and approximately 50% of our estimated requirements for 2008."  As set forth in detail herein, this statement was false and the makers of this statement knew it to be false.

87.    This statement was based on the false premise that LDK's reported inventory was accurate.  In fact, LDK had a significantly smaller percentage of the feedstock it would need in 2007 and 2008 than it claimed.  According to former controller Situ, in late August 2007, when LDK was claiming that there were over 600 metric tons in the Company's warehouse, 284 metric tons of what was supposedly in the warehouse simply did not exist.  ¶37, above.  Furthermore, according to Situ, only 45 metric tons of the 330 metric ton amount actually in the warehouse was high quality polysilicon.  The remaining 285 metric tons was comprised of scrap material, most of it "unusable."  ¶37.  According to Situ, "[o]n average only about 35% of the recycled silicon can be used."  ¶37.  Most of this 285 tons of low quality silicon had been stored for months at the warehouse; some of it had been taken out for testing, but had been returned after it was found to

1   be unsuitable for production.  ¶37.  In other words, LDK was overstating the amount of

2   polysilicon material in its warehouse by nearly 50%.  ¶37.  And if only 35% of the scrap material

3   was usable then only about 145 metric tons should have been accounted for as inventory, less

4   than one quarter of the over 600 metric tons that LDK claimed to have.  ¶37.

5               2.  GAAP Compliance

6       88.    LDK's IPO prospectus further asserted that the financial statements accompanying

7   the prospectus "have been prepared in accordance with U.S. generally accepted accounting

8   principles ('US GAAP')."  As set forth in detail herein, this statement was false and the makers of

9   this statement knew that it was false.

10      89.    GAAP provides that materials can only be accounted for as inventory if they

11  actually exist.  For an entity to book an item as inventory the item must be an item of personal

12  property which has been "obtained or controlled" by the entity.  ¶50.  Something that does not

13  exist is not inventory and the Defendants violated GAAP when they claimed as inventory

14  feedstock that did not exist.  ¶50.

15      90.    Furthermore, GAAP provides that inventory should be accounted for at its

16  acquisition cost or its "market" value, whichever is lower.  ¶51.  In addition, under GAAP

17  inventory is normally treated as a "current asset" and, during the Class Period, LDK characterized

18  its entire stock of inventory as a current asset.  GAAP generally bars accounting for inventories

19  not likely to be used within one year as current assets.  ¶51.

20      91.    LDK violated these rules.  It regularly purchased and had shipped to its factory a

21  variety of scrap materials from which it supposedly hoped to extract polysilicon.  ¶52.  After the

22  items were delivered LDK employees sorted through the scrap, segregating out materials from

23  which it would be impossible or uneconomical to extract polysilicon.  ¶52.  These items were

24  worthless, or nearly so and certainly could not be used within a year—most of it could never be

25  used.  ¶52.  In fact, since GAAP defines "market" value to include the cost of disposition of an

26  item that had been accounted for as inventory, this unusable scrap material probably had a

27  negative value.  ¶52.  Nevertheless, in violation of GAAP, the Defendants continued to count

28

1   worthless materials as inventory and refused to write down the value of inventory it knew to be of

2   nearly worthless.  ¶52.

3               3.   Cost Or Market Inventory Accounting

4       92.   The prospectus further asserted that, in the accompanying financial statements,

5   "[i]nventories are stated at the lower of cost or market."  As set forth in detail herein, and as

6   specifically described in the discussion inventory accounting in ¶91, this statement was false and

7   the makers of this statement knew it to be false.

8               4.   Value Of Inventory

9       93.   The prospectus further asserted that LDK had $114.2 of inventory on March 31,

10  2007.  As set forth in detail herein, this statement was false and the makers of this statement knew

11  it was false.

12      94.   This statement was based on the false premise that LDK's reported inventory was

13  accurate.  In fact, as described in ¶87, the quantity of LDK's inventory was significantly less than

14  the Company claimed.  As a result, the reported value of LDK's inventory was substantially

15  overstated.

16              5.   Value Of Raw Materials

17      95.   The IPO prospectus further asserted that LDK's inventory included raw materials

18  of $93.9 million on March 31, 2007.  As set forth in detail herein, this statement was false and the

19  makers of this statement knew it to be false.  Raw material constituted by far the largest

20  component of LDK's inventory.  Consequently, this valuation of raw materials was overstated for

21  the reasons set out in ¶¶87 and 95.

22      **B.    LDK's August 1, 2007 Press Release**

23      96.   On August 1, 2007 LDK issued a press release entitled "LDK Solar Reports

24  Financial Results for the Second Quarter 2007."  This press release was prepared, approved or

25  adopted by each of the Defendants and quoted Defendant Peng.

26              1.   Cost Advantages

27      97.   The press release quoted Defendant Peng as saying the following:

28

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

1

2

3

4

5

"Our results demonstrate our success in providing our customers … with high-quality multicrystalline solar wafers at significant cost advantages.  During the quarter, we executed our growth strategy on plan ….  In addition to ramping our production lines, we continued to make progress on our cost reduction efforts through further advancements of our production processes."

By augmenting our strategy upstream, we believe we will enhance our cost efficiencies," concluded Mr. Peng.

6

7

8

9

10

11

12

13

98.     As set forth in detail herein, this statement was false and misleading and the makers of this statement knew it to be false.  In fact the cost reductions referred to by Peng were not principally the result of following the Company's publicly announced growth strategy or from "augmenting" that strategy or through "cost reduction efforts" or "advancements" in the production process.  LDK's apparent efficiency—its supposed ability to produce at low cost—and the supposed increases in that efficiency were, in substantial part, the result of the Defendants' fraudulent manipulation of the value of the Company's feedstock inventory, which made LDK appear to be a far more efficient producer of solar wafers than was actually the case.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

99.     Peng's statement was based, in part, on the false premise that LDK's reported inventory was accurate.  In fact, the quantity, and consequently the value of LDK's inventory was significantly less than the Company claimed.  According to former controller Situ, in late August 2007 284 metric tons of what was supposedly in the warehouse simply did not exist.  ¶37.  Furthermore, according to Situ, only 45 metric tons of the 330 metric ton amount actually in the warehouse was high quality polysilicon.  The remaining 285 metric tons was comprised of scrap material, most of it "unusable."  ¶37.  According to Situ, "[o]n average only about 35% of the recycled silicon can be used."  ¶37.  Most of this 285 tons of low quality silicon had been stored for months at the warehouse; some of it had been taken out for testing, but had been returned after it was found to be unsuitable for production.  ¶37.  In other words, LDK was overstating the amount of polysilicon material in its warehouse by nearly 50%.  ¶37.  And if only 35% of the scrap material was usable then only about 145 metric tons should have been accounted for as inventory, less than one quarter of the over 600 metric tons that LDK claimed to have.  ¶37.

28

100.    LDK's false inventory accounting made the Company appear far more efficient than was actually the case.  According to its prospectus, LDK used the "weighted average method" to value its inventory.  ¶42.  The price at which LDK had acquired its feedstock inventory varied widely—a ton of raw polysilicon direct from a manufacturer's factory cost much more than a ton of potentially recyclable scrap materials of differing purity.  ¶42.  LDK averaged the per ton price of all the polysilicon feedstock to determine the value it assigned, for accounting purposes, to each ton of feedstock inventory.  ¶42.

101.    "Cost of goods sold" is the direct cost attributable to the production of the goods sold by a company.  ¶43.  For all public companies investors pay considerable attention to the cost of goods sold—a company's gross profit is determined by subtracting cost of goods sold from its sales revenue.  ¶43.  But cost of goods sold is an especially important metric for companies like LDK, which produce commodity products.  ¶43.  Purchasers of commodity products often make their purchasing decisions almost exclusively on price alone.  ¶43.

102.    Cost of goods sold is essentially determined by adding together the cost of the raw material, labor and manufacturing overhead used to make a particular product.  ¶44.  For LDK, which utilized low-cost Chinese labor, the value of polysilicon feedstock constituted 80% of LDK's cost to produce wafers, according to what Defendant Peng told a March 2008 investors conference.  ¶44.

103.    In fact, however, LDK's production costs were greatly understated because, when they prepared LDK's financial statements, the Defendants counted as current inventory scrap acquired at a low price that that the Company had determined was of such poor quality it could not be used within a year, and, in most cases, could not be used ever.  ¶46.  Although it was improper to count this low cost but unusable feedstock as current inventory, the Defendants nevertheless did so.  ¶46.  Consequently, this cheap but unusable scrap was wrongly included when calculating the average price per ton of the feedstock utilized in the manufacturing process, artificially deflating LDK's apparent cost of producing wafers.  ¶46.  Since polysilicon constituted 80% of LDK's cost to produce wafers, the impact of this undervaluing of silicon feedstock was enormous.  ¶46.  In an October 25, 2007 report to investors an analyst noted that

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

1  LDK management was claiming an average polysilicon feedstock cost of $150/kg, but observed

2  skeptically that LDK's claimed costs were supposedly far lower than those of its competitors.

3  ¶47.

4          2.  Value Of Inventory

5      104.    The press release also contained what were purportedly LDK's financial

6  statements for the first and second quarters of 2007.  Among other things, the financial statements

7  asserted that LDK's inventories totaled $173.8 million at the end of the second quarter of 2007

8  and $114.2 million at the end of the first quarter.  As set forth herein, these statements were false

9  and the makers of this statement knew them to be false.

10     105.    This statement was based on the false premise that LDK's reported inventory was

11  accurate.  In fact, as described in ¶99, the value of LDK's inventory was significantly less than

12  the Company claimed.  As a result, the reported value of LDK's inventory was substantially

13  overstated.

14         3.  GAAP Compliance

15     106.    The press release further claimed that "[a]ll financial results are reported on a U.S.

16  GAAP basis."  As set forth in detail herein, this statement was false and the makers of this

17  statement knew it to be false.

18     107.    GAAP provides that materials can only be accounted for as inventory if they

19  actually exist.  For an entity to book an item as inventory the item must be an item of personal

20  property which has been "obtained or controlled" by the entity.  ¶50.  Something that does not

21  exist is not inventory and the Defendants violated GAAP when they claimed as inventory

22  feedstock that did not exist.  ¶50.

23     108.    Furthermore, GAAP provides that inventory should be accounted for at its

24  acquisition cost or its "market" value, whichever is lower.  ¶51.  In addition, under GAAP

25  inventory is normally treated as a "current asset" and, during the Class Period, LDK characterized

26  its entire stock of inventory as a current asset.  GAAP generally bars accounting for inventories

27  not likely to be used within one year as current assets.  ¶51.

28

109.    LDK violated these rules.  It regularly purchased and had shipped to its factory a variety of scrap materials from which it supposedly hoped to extract polysilicon.  ¶52.  After the items were delivered LDK employees sorted through the scrap, segregating out materials from which it would be impossible or uneconomical to extract polysilicon.  ¶52.  These items were worthless, or nearly so and certainly could not be used within a year—most of it could never be used.  ¶52.  In fact, since GAAP defines "market" value to include the cost of disposition of an item that had been accounted for as inventory, this unusable scrap material probably had a negative value.  ¶52.  Nevertheless, in violation of GAAP, the Defendants continued to count worthless materials as inventory and refused to write down the value of inventory it knew to be nearly worthless.  ¶52.

### 4.  Cost Or Market Inventory Accounting

110.    The prospectus further asserted that, in the accompanying financial statements, "[i]nventories are stated at the lower of cost or market."  As set forth in detail herein, and as specifically described in the discussion inventory accounting in ¶108, this statement was false and the makers of this statement knew it to be false.

### C.    *LDK's August 1, 2007 Conference Call*

111.    On August 1, 2007 Defendants Peng and Lai hosted a conference call for analysts and investors to explain LDK's just-released financial statements.

### 1.  Value Of Inventory

112.    During this call Defendant Lai asserted that "[i]nventories increased from $140 million at the end of first quarter to $174 million at end of second quarter, as we accumulated additional silicon feedstock."  As set forth in detail in this Complaint, this statement is false and Defendant Lai knew it to be false.

113.    This statement was based on the false premise that LDK's reported inventory was accurate.  In fact, the quantity of LDK's inventory was significantly less than the Company claimed and, as a result, the reported value of LDK's inventory was substantially overstated.  According to former controller Situ, in late August 2007, when LDK was claiming that there were over 600 metric tons in the Company's warehouse, 284 metric tons of what was supposedly in the

1    warehouse simply did not exist.  ¶37.  Furthermore, according to Situ, only 45 metric tons of the

2    330 metric ton amount actually in the warehouse was high quality polysilicon.  The remaining

3    285 metric tons was comprised of scrap material, most of it "unusable."  ¶37.  According to Situ,

4    "[o]n average only about 35% of the recycled silicon can be used."  ¶37.  Most of this 285 tons of

5    low quality silicon had been stored for months at the warehouse; some of it had been taken out for

6    testing, but had been returned after it was found to be unsuitable for production.  ¶37.  In other

7    words, LDK was overstating the amount of polysilicon material in its warehouse by nearly 50%.

8    ¶37.  And if only 35% of the scrap material was usable then only about 145 metric tons should

9    have been accounted for as inventory, less than one quarter of the over 600 metric tons that LDK

10   claimed to have.  ¶37.  Situ had repeatedly urged the Defendants to correct the record and report

11   the Company's inventory accurately.  ¶66.

### 2.  Quantity Of Raw Materials

12   114.    During this call Defendant Peng asserted that "the raw material is at 600, a little bit

13   over 600 tons at the warehouse at the end of the second quarter, which is about around 425 tons at

14   the end of the first quarter."  As set forth in detail herein, this statement was false and misleading

15   and Peng knew it to be false.

16   115.    This statement was based on the false premise that LDK's reported inventory was

17   accurate.  As discussed in ¶113, this was not correct—the amount and value of LDK's inventory

18   was substantially overstated.

### 3.  Cost Advantages

19   116.    Defendant Peng also asserted that one of the Company's key "advantages" was its

20   low "operating cost."  As set forth in detail herein, this statement was false and misleading and

21   Peng knew it to be false.

22   117.    In fact the cost reductions referred to by Peng were not principally the result of

23   following the Company's publicly announced growth strategy or from "augmenting" that strategy

24   or through "cost reduction efforts" or "advancements" in the production process.  LDK's apparent

25   efficiency—its supposed ability to produce at low cost—and the supposed increases in that

26   efficiency were, in substantial part, the result of the Defendants' fraudulent manipulation of the

1    value of the Company's feedstock inventory, which made LDK appear to be a far more efficient

2    producer of solar wafers than was actually the case.

3         118.    Peng's statement was based on the false premise that LDK's reported inventory

4    was accurate.  In fact, as described in detail in ¶113, the value of LDK's inventory was

5    significantly less than the Company claimed.

6         119.    Moreover, LDK's false inventory accounting made the Company appear far more

7    efficient than was actually the case.  According to its prospectus, LDK used the "weighted

8    average method" to value its inventory.  ¶42.  The price at which LDK had acquired its feedstock

9    inventory varied widely—a ton of raw polysilicon direct from a manufacturer's factory cost much

10   more than a ton of potentially recyclable scrap materials of differing purity.  ¶42.  LDK averaged

11   the per ton price of all the polysilicon feedstock to determine the value it assigned, for accounting

12   purposes, to each ton of feedstock inventory.  ¶42.

13        120.    "Cost of goods sold" is the direct cost attributable to the production of the goods

14   sold by a company.  ¶43.  For all public companies investors pay considerable attention to the

15   cost of goods sold—a company's gross profit is determined by subtracting cost of goods sold

16   from its sales revenue.  ¶43.  But cost of goods sold is an especially important metric for

17   companies like LDK, which produce commodity products.  ¶43.  Purchasers of commodity

18   products often make their purchasing decisions almost exclusively on price alone.  ¶43.

19        121.    Cost of goods sold is essentially determined by adding together the cost of the raw

20   material, labor and manufacturing overhead used to make a particular product.  ¶44.  For LDK,

21   which utilized low-cost Chinese labor, the value of polysilicon feedstock constituted 80% of its

22   cost to produce wafers, according to what Defendant Peng told a March 2008 investors

23   conference.  ¶44.

24        122.    In fact, however, LDK's production costs were greatly understated because, when

25   they prepared LDK's financial statements, the Defendants counted as current inventory scrap

26   acquired at a low price that that the Company had determined was of such poor quality it could

27   not be used within a year, and, in most cases, could not be used ever.  ¶46.  Although it was

28   improper to count this low cost but unusable feedstock as current inventory, the Defendants

1    nevertheless did so.  ¶46.  Consequently, this cheap but unusable scrap was wrongly included

2    when calculating the average price per ton of the feedstock utilized in the manufacturing process,

3    artificially deflating LDK's apparent cost of producing wafers.  ¶46.  Since polysilicon

4    constituted 80% of LDK's cost to produce wafers, the impact of this undervaluing of silicon

5    feedstock was enormous.  ¶46.  In an October 25, 2007 report to investors an analyst noted that

6    LDK management was claiming an average polysilicon feedstock cost of $150/kg, but observed

7    skeptically that LDK's claimed costs were supposedly far lower than those of its competitors.

8    ¶47

9        **D.    *LDK's October 4, 2007 Press Release***

10        123.    On October 4, 2007, the day after Piper Jaffray published a research note reporting

11    Situ's resignation and suggesting that there might be irregularities with respect to LDK's

12    accounting, LDK issued a press release about Situ's allegations which asserted that "[t]he

13    management team believes that these allegations have no merit."  Each of the Individual

14    Defendants who is an employee of the Company is a member of the management team and each

15    is responsible for the content of this press release.

16        124.    As set forth in detail herein, the statement that the management team believed that

17    Situ's allegation had "no merit" was false and the makers of the statement knew it to be false

18        125.    The Defendants knew that Situ's allegations about inflated inventories were

19    accurate.  According to former controller Situ, in late August 2007, when LDK was claiming that

20    there were over 600 metric tons in the Company's warehouse, 284 metric tons of what was

21    supposedly in the warehouse simply did not exist.  ¶37.  Furthermore, according to Situ, only 45

22    metric tons of the 330 metric ton amount actually in the warehouse was high quality polysilicon.

23    The remaining 285 metric tons was comprised of scrap material, most of it "unusable."  ¶37.

24    According to Situ, "[o]n average only about 35% of the recycled silicon can be used."  ¶37.  Most

25    of this 285 tons of low quality silicon had been stored for months at the warehouse; some of it had

26    been taken out for testing, but had been returned after it was found to be unsuitable for

27    production.  ¶37.  In other words, LDK was overstating the amount of polysilicon material in its

28    warehouse by nearly 50%.  ¶37.  And if only 35% of the scrap material was usable then only

1  about 145 metric tons should have been accounted for as inventory, less than one quarter of the

2  over 600 metric tons that LDK claimed to have.  ¶37.

3      126.    The Defendants also knew that Situ was an expert in the application of GAAP and

4  that he had considerable information about LDK, its finances and its inventories and that others

5  had raised concerns about the Company's inventory accounting.  ¶68.  Given these circumstances,

6  the Defendants had no reasonable basis to conclude that his allegation had "no merit," or if they

7  did reach such a conclusion, they could only have done so by acting with extreme recklessness.

8

9  **VI.    LOSS CAUSATION**

10     127.    During the Class Period, as detailed herein, defendants engaged in a scheme to

11  deceive the market and in a course of conduct that artificially inflated LDK's stock price and

12  operated as a fraud or deceit on Class Period purchasers of LDK stock by grossly misrepresenting

13  the Company's inventory.  When more accurate information concerning LDK's inventory entered

14  the market on October 3, 2007, and October 8, LDK's stock price fell drastically.

15     128.    On October 3, 2007 Piper Jaffray issued a research note disclosing allegations of

16  inventory discrepancies at LDK.  As a result of this revelation, LDK's stock price declined 24%,

17  from $68.31 to $51.65 per share.  Moreover, the day of this announcement, the trading volume of

18  LDK's stock was extremely high.

19     129.    On October 8, 2007, Barron's reported additional information regarding the

20  Company's inventory problems, including shortages of usable feedstock.  As a result of these

21  additional revelations, LDK's stock price declined 26.4%, from $50.95 to $37.50 per share.

22  Moreover, the day of this announcement, the trading volume of LDK's stock was extremely high.

23     130.    It was reasonably foreseeable that disclosure of this information would cause the

24  price of LDK's stock to drop precipitously.

25     131.    The decline in LDK's stock price at or near the end of the Class Period was a

26  direct result of the Defendants' fraud being at least partially revealed to investors and the market.

27  The timing and magnitude of LDK's stock price declines negate any inference that the loss

28  suffered by Class Members was caused by changed market conditions, macroeconomic or

1   industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct.

2   Defendants' misrepresentations during the Class Period were the proximate cause of Plaintiff's

3   losses.

4

5   **VII.    ADDITIONAL GAAP VIOLATION ALLEGATIONS**

6          132.    In addition to the violations of GAAP discussed above, the Defendants also

7   violated other principles of GAAP, including the following principles:

8          a.    The principle that interim financial reporting should be based upon the same

9               accounting principles and practices used to prepare annual financial statements

10              (APB Opinion No. 28, ¶10);

11         b.    The principle that financial reporting should provide information that is useful to

12              present and potential investors and creditors and other users in making rational

13              investment, credit and similar decisions (FASCON No. 1, ¶34);

14         c.    The principle that financial reporting should provide accurate information about

15              the economic resources of an enterprise, the claims to those resources, and the

16              effects of transactions, events and circumstances that change resources and claims

17              to those resources (FASCON No. 1,¶40);

18         d.    The principle that financial reporting should provide information about how

19              management of an enterprise has discharged its stewardship responsibility to

20              stockholders for the use of enterprise resources entrusted to it  (FASCON No. 1,

21              ¶50);

22         e.    The principle that financial reporting should provide information about an

23              enterprise's financial performance during a period.  Investors use information

24              about the past in assessing the prospects of an enterprise.  Thus, although

25              investment and credit decisions reflect investors' expectations about future

26              enterprise performance, those expectations are commonly based at least partly on

27              evaluations of past enterprise performance (FASCON No. 1, ¶42);

28

f.   The principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion central to accounting (FASCON No. 2, ¶¶58-59);

g.   The principle of completeness, which means that nothing material is left out of financial statements that may be necessary to insure that they validly represents underlying events and conditions (FASCON No. 2, ¶79); and,

h.   The principle that conservatism be used so that risks and uncertainties are adequately considered (FASCON No. 2, ¶95).

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

133.   As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding LDK, their control over, and/or receipt and/or modification of LDK's materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning LDK, participated in the fraudulent scheme alleged herein.

## IX.   NO SAFE HARBOR

134.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this complaint.  The specific statements pleaded herein were not forward-looking and were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual

1    results to differ materially from those in the purportedly forward-looking statements.  Moreover,

2    the Defendants made the false statements alleged herein knowing that these statements were false.

3

4    **X.    FRAUD-ON-THE-MARKET PRESUMPTION**

5            135.    Plaintiffs may rely upon the presumption of reliance established by the fraud-on-

6    the-market doctrine, in that:

7            a.    The Defendants made public material misrepresentations and failed to disclose

8                  material facts regarding LDK's business and financial condition during the Class

9                  Period;

10           b.    The Company's  common stock is traded on the New York Stock Exchange, an

11                 efficient and open market;

12           c.    The misrepresentations and omissions alleged would tend to induce a reasonable

13                 investor to misjudge the value of the Company's common stock;

14           d.    Lead Plaintiff and other Class Members purchased their common stock between

15                 the time defendants failed to disclose or misrepresented material facts and the time

16                 true facts were disclosed, without knowledge of the misrepresented facts; and,

17           e.    LDK is followed by various analysts and news media.  At all relevant times, the

18                 price of LDK's common stock reflected the effect of news disseminated in the

19                 market.

20

21   **XI.    CLASS ACTION ALLEGATIONS**

22           136.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

23   Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who engaged in any of

24   the following securities transactions during the Class Period:  a) purchased LDK Stock;

25   b) purchased call options for LDK Stock; or c) sold put options for LDK Stock.  Excluded from

26   the Class are the Defendants and the other current and former officers and directors of the

27   Company, their immediate families, their heirs, successors, or assigns and any entity controlled

28   by any such person.  The Class period is June 1, 2007 through October 7, 2007.

137.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, LDK's securities were actively traded on the New York Stock Exchange and in the options markets.  While the exact number of Class can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by LDK or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

138.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' wrongful conduct in violation of federal law that is complained of herein.

139.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

140.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class Members.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by the Defendants' acts as alleged herein;

b.    whether statements made by the Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of LDK; and

c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

141.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it difficult or impossible for Class Members to redress

1  individually the wrongs done to them.  There will be no difficulty in the management of this

2  action as a class action.

3

4  **XII.    JURISDICTION AND VENUE**

5         142.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

6  the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17

7  C.F.R. § 240.10b-5).

8         143.    This Court has jurisdiction over the subject matter of this action pursuant to § 27

9  of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10        144.    Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15

11  U.S.C. § 78aa and 28 U.S.C. § 1391(b).

12        145.    In connection with the acts, conduct, and other wrongs alleged in this complaint,

13  the Defendants, directly or indirectly, used the means and instrumentalities of interstate

14  commerce, including but not limited to, the United States mails, interstate telephone

15  communications, the Internet, and the facilities of a national securities exchange.

16

17  **XIII.   CAUSES OF ACTION**

18                          **FIRST CLAIM**

19  **For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5**
    **Promulgated Thereunder (Against All Defendants)**

20
         146.    Lead Plaintiff repeats and realleges each and every allegation contained above as if
21
    fully set forth herein.
22
         147.    During the Class Period, the Defendants carried out a plan, scheme, and course of
23
    conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing
24
    public, including Lead Plaintiff and other Class Members, as alleged herein; and (ii) cause
25
    Plaintiff and other members of the Class to purchase LDK securities at artificially inflated prices.
26
    In furtherance of this unlawful scheme, plan and course of conduct, the Defendants, and each of
27
    them, took the actions set forth herein.
28

148.    The Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for LDK securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

149.    The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of LDK as specified herein.

150.    The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about LDK and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of LDK securities during the Class Period.

151.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the

1    Company's finances, operations, and sales at all relevant times; and (d) each of these Defendants

2    was aware of the Company's dissemination of information to the investing public which they

3    knew or recklessly disregarded was materially false and misleading.

4         152.    The Defendants had actual knowledge of the misrepresentations and omissions of

5    material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

6    ascertain and to disclose such facts, even though such facts were available to them.  The

7    Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

8    for the purpose and effect of concealing LDK's operating condition and future business prospects

9    from the investing public and supporting the artificially inflated price of its securities.  As

10   demonstrated by the Defendants' overstatements and misstatements of the Company's business,

11   operations and earnings throughout the Class Period, defendants, if they did not have actual

12   knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain

13   such knowledge by deliberately refraining from taking those steps necessary to discover whether

14   those statements were false or misleading.

15        153.    As a result of the dissemination of the materially false and misleading information

16   and failure to disclose material facts, as set forth above, the market price of LDK securities was

17   artificially inflated during the Class Period.  In ignorance of the fact that market prices of LDK's

18   publicly-traded securities were artificially inflated, and relying directly or indirectly on the false

19   and misleading statements made by the Defendants, or upon the integrity of the markets in which

20   the securities trade, and/or on the absence of material adverse information that was known to or

21   recklessly disregarded by the Defendants but not disclosed in public statements by defendants

22   during the Class Period, Lead Plaintiff and the other Class Members acquired LDK securities

23   during the Class Period at artificially high prices and were damaged thereby.

24        154.    By virtue of the foregoing, the Defendants have violated Section 10(b) of the

25   Exchange Act, and Rule 10b-5 promulgated thereunder.

26        155.    As a direct and proximate result of the Defendants' wrongful conduct, Lead

27   Plaintiff and the other Class Members suffered damages in connection with their respective

28   purchases and sales of the Company's securities during the Class Period.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SECOND CLAIM

### For Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

156.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

157.    The Individual Defendants acted as controlling persons of LDK within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

158.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

159.    As set forth above, LDK the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiff and the other Class Members suffered damages in connection with their purchases of LDK securities during the Class Period.

1

## XIV.   <u>PRAYER FOR RELIEF</u>

2

160.   **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

3

161.   Determining that this action is a proper class action, certifying Lead Plaintiff as a

4

class representative under Rule 23 of the Federal Rules of Civil Procedure and appointing Lead

5

Plaintiff's counsel as counsel for the Class;

6

162.   Awarding compensatory damages in favor of Lead Plaintiff and the other Class

7

Members against all Defendants, jointly and severally, for all damages sustained as a result of the

8

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

9

163.   Awarding Lead Plaintiff and the Class their reasonable costs and expenses

10

incurred in this action, including counsel fees and expert fees; and

11

164.   Such other and further relief as the Court may deem just and proper.

12

13

## XV.   <u>JURY DEMAND</u>

14

165.   Plaintiff hereby demands a trial by jury.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COHEN, MILSTEIN, HAUSFELD & TOLL P.L.L.C.

IMANAGE 340905.6 73920001

1

2   Dated: March 10, 2008               COHEN, MILSTEIN, HAUSFELD & TOLL P.L.L.C.

3

4

5                         By:   /s/ Michael Lehmann
                             Michael Lehmann

6                         Cohen, Milstein, Hausfeld & Toll P.L.L.C.
                         mlehmann@cmht.com

7                         One Embarcadero Center
                         Suite 526

8                         San Francisco, CA  94111
                         Telephone:   (415) 623-2048

9                         Facsimile:    (415) 433-5994

10

11                       Cohen, Milstein, Hausfeld & Toll P.L.L.C.
                       Steven J. Toll

12                       Mark S. Willis
                       Matthew B. Kaplan

13                       stoll@cmht.com
                       1100 New York Avenue, N.W.

14                      Suite 500, West Tower
                       Washington, DC  20005

15                      Telephone:   (202) 408-4600
                       Facsimile:    (202) 408-4699

16

17                       Lead Counsel for the Proposed Class

18

19

20

21

22

23

24

25

26

27

28