LATHAM & WATKINS LLP
  James J. Farrell (Bar No. 166595)
  james.farrell@lw.com
633 West Fifth Street, Suite 4000
Los Angeles, California 90071-2007
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

LATHAM & WATKINS LLP
  Philip J. Wang (Bar No. 218349)
  philip.wang@lw.com
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600

Attorneys for Defendants LDK Solar Co.,
Ltd., LDK Solar USA, Inc., Xiaofeng Peng,
and Jack Lai

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LDK SOLAR SECURITIES LITIGATION | MASTER FILE NO. C-07-05182-WHA |
| _____ | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED CLASS ACTION COMPLAINT PURSUANT TO RULE 12(b)(6)** |
| This Document Relates To: | |
| ALL ACTIONS. | Judge:     Hon. William H. Alsup<br>Date:      May 15, 2008<br>Time:      8:00 a.m.<br>Courtroom: 9, 19th Floor |

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................. 1

II.  STATEMENTS OF FACTS ................................................................... 3

    A.   LDK's Inventory and Operations.................................................. 3

    B.   LDK's Use of Recycled Polysilicon Scrap Is Its Key Competitive
         Advantage ........................................................................ 4

    C.   The Independent Investigation and External Auditors Concluded
         That Situ's Allegations Were Unfounded............................................ 5

III. ARGUMENT ............................................................................. 7

    A.   The Complaint Fails to Allege Falsity ............................................ 7

         1.   Situ Admittedly Lacks The Requisite Knowledge And
              Technical Expertise To Determine The Quantity Or
              Usability Of LDK's Polysilicon Inventory ................................. 8

         2.   LDK's Inventory Was Independently Corroborated............................ 11

         3.   The SEC and Research Analysts Also Disagreed With Situ ................... 12

         4.   LDK's "Worthless" Inventory Is Not Pled With
              Particularity............................................................ 13

    B.   The Complaint Fails to Establish A Strong Inference of Scienter................. 15

         1.   Plaintiff's Bald Assertions Do Not Demonstrate That
              Defendants Acted With Actual Knowledge................................... 16

              a.   Situ's Analysis Of LDK's Polysilicon Inventory
                   Lacks Foundation And Is Not Based On Personal
                   Knowledge .......................................................... 16

              b.   Plaintiff Fails To Provide Particularized Allegations
                   That Any Defendant Made Misstatements With
                   Fraudulent Intent................................................... 16

         2.   Plaintiff's Allegations Of Accounting Fraud Fall Short Of
              Establishing A "Strong Inference" Of Scienter .......................... 18

         3.   Defendants' Lack Of Stock Sales Weighs Strongly Against
              Scienter ............................................................... 20

         4.   Scienter Cannot Be Inferred From The Individual
              Defendants' Positions .................................................. 21

    C.   The Complaint Attacks Forward-Looking Statements Protected by
         The Safe Harbor Provision of the PSLRA............................................ 23

1    D.  The Complaint Fails to Plead Loss Causation ...................................................... 24

2    E.  The Complaint Fails To State A 20(a) Claim ...................................................... 25

3 IV.  CONCLUSION............................................................................................................... 25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

ii

# TABLE OF AUTHORITIES

**Page**

## CASES

Caiafa v. Sea Containers Ltd.,
  525 F. Supp. 2d 398 (S.D.N.Y. 2007)........................................................................ 21

Chill v. Gen. Elec. Co.,
  101 F.3d 263 (2nd Cir. 1996)................................................................................... 21

Dura Pharm., Inc. v. Broudo,
  544 U.S. 336 (2005)................................................................................................. 25

Dura Pharms., Inc. v. Broudo,
  544 U.S. 336 (2005)............................................................................................. 7, 24

Elliot Associates, L.P. v. Hayes,
  141 F. Supp. 2d 344 (S.D.N.Y 2000)....................................................................... 16

Eminence Capital, LLC v. Aspeon, Inc.,
  316 F.3d 1048 (9th Cir. 2003) ................................................................................... 7

Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.,
  353 F.3d 1125 (9th Cir. 2004) ................................................................................. 23

Griffin v. Ramtek Corp.,
  1988 WL 159162 (N.D. Cal. 1988) .......................................................................... 16

In re 2TheMart.com, Inc. Sec. Litig.,
  114 F. Supp. 2d 955 (C.D. Cal. 2000) ...................................................................... 16

In re Apple Computer, Inc.,
  243 F. Supp. 2d 1012 (C.D. Cal. 2002) .............................................................. 22, 23

In re Autodesk, Inc. Sec. Litig.,
  132 F. Supp. 2d 833 (N.D. Cal. 2000) ................................................................ 17, 22

In re Copper Mountain Sec. Litig.,
  311 F. Supp. 2d 857 (N.D. Cal. 2004) ...................................................................... 24

In re Daou Systems, Inc. Securities Litig.,
  411 F.3d 1006 (9th Cir. 2005) ................................................................................. 24

In re FVC.COM Sec. Litig.,
  136 F. Supp. 2d 1031 (N.D. Cal. 2000) .................................................................... 18

In re Hansen Natural Corp. Sec. Litig.,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................ 14, 17, 19, 23

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

In re ICN Pharms. Inc. Sec. Litig.,
    299 F. Supp. 1055 (C.D. Cal. 2004) ....................................................................... 8, 18, 19

In re Impax Labs.,
    2007 U.S. Dist. LEXIS 723 (N.D. Cal. 2007) ................................................................. 25

In re Infonet Services Corp. Sec. Litig.,
    310 F. Supp. 2d 1080 (C.D. Cal. 2003) ......................................................................... 23

In re Infosonics Corp. Sec. Litig.,
    2007 U.S. Dist. LEXIS 57784 (S.D. Cal. 2007) ............................................................. 15

In re Levi Strauss & Co. Sec. Litig.,
    527 F. Supp. 2d 965 (N.D. Cal. 2007) ........................................................................... 11

In re Nextcard Sec. Litig.,
    2006 WL 708663 (N.D. Cal. Mar. 20, 2006) ................................................................. 17

In re Omnicom Group, Inc. Sec. Litig.,
    2008 WL 243788 (S.D.N.Y. 2008) .................................................................................. 25

In re Pacific Gateway Exch., Inc., Sec. Litig.,
    169 F. Supp. 2d 1160 (N.D. Cal. 2001) ......................................................................... 18

In re Petsmart, Inc. Sec. Litig.,
    61 F. Supp. 2d 982 (D. Ariz. 1999) ................................................................................ 20

In re Pixar, Inc. Sec. Litig.,
    450 F. Supp. 2d 1096 (N.D. Cal. 2006) ......................................................................... 20

In re Read-Rite Corp. Sec. Litig.,
    335 F.3d 843 (9th Cir. 2003) .................................................................................... 15, 21

In re Siebel Sec. Litig.,
    2005 WL 3555718 (N.D. Cal. 2005) ............................................................................... 16

In re Silicon Graphics, Inc. Sec. Litig.,
    183 F.3d 970 (9th Cir. 1999) .......................................................................................... 15

In re Silicon Storage Technology, Inc. Sec. Litig.,
    2007 U.S. Dist. LEXIS 21953 (N.D. Cal. 2007) ................................................. 8, 9, 11, 14

In re Tibco Software Secs. Litig.,
    2006 U.S. Dist LEXIS 36666 (N.D. Cal. 2006) ................................................... 8, 17, 20

In re Wet Seal Secs. Litig.,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) .......................................................................... 19

In re Worlds of Wonder Sec. Litig.,
    35 F.3d 1407 (9th Cir. 1994) .......................................................................................... 18

Kane v. Madge Networks,
     2000 WL 33208116 (N.D. Cal. 2000) ................................................................. 23

Knollenberg v. Harmonic, Inc.,
     152 Fed. Appx. 674 (9th Cir. 2005) .................................................................... 24

Lipton v. Pathogenesis Corp.,
     284 F.3d 1027 (9th Cir. 2002) ..................................................................... 23, 25

Middlesex Ret. Sys. v. Quest Software, Inc.,
     2007 U.S. Dist. LEXIS 84695 (C.D. Cal. Oct. 22, 2007) ..................................... 15

Nursing Home Pension Fund, Local 144 v. Oracle Corp.,
     380 F.3d 1226 (9th Cir. 2004) ............................................................................ 16

Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.,
     365 F.3d 353 (5th Cir. 2004) .............................................................................. 17

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
     127 S. Ct. 2499 (2007) ............................................................................ 3, 15, 17

Winer Family Trust v. Queen,
     503 F.3d 319 (3rd Cir. 2007) .............................................................................. 17

**STATUTES**

15 U.S.C. § 78u-4 ....................................................................................................... 1

15 U.S.C. § 78u-4(b)(2) ....................................................................................... 13, 15

15 U.S.C. § 78u-5(c) ................................................................................................. 22

**RULES**

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 1, 28

Fed. R. Civ. P. 9(b) ................................................................................................. 6, 17

1    **NOTICE OF MOTION AND MOTION**

2    PLEASE TAKE NOTICE that Defendants LDK Solar Co., Ltd., LDK Solar USA, Inc.,

3    Xiaofeng Peng, and Jack Lai hereby move to dismiss this action under Fed. R. Civ. P. 12(b)(6).

4    The Motion is scheduled to be heard at 8:00 a.m. on May 15, 2008, in the courtroom of the

5    Honorable William H. Alsup, in the United States District Court for the Northern District of

6    California, 450 Golden Gate Avenue, San Francisco, California.  Defendants request that Lead

7    Plaintiff's Consolidated Class Action Complaint be dismissed with prejudice.

8    **STATEMENT OF ISSUE TO BE DECIDED**

9    Whether the Consolidated Class Action Complaint should be dismissed under Fed. R.

10    Civ. P. 12(b)(6) for failure to meet the heightened pleading standards under the Private Securities

11    Litigation Reform Act, 15 U.S.C. § 78u-4.

12    **MEMORANDUM OF POINTS AND AUTHORITIES**

13    **I.    PRELIMINARY STATEMENT**

14    Based solely on the allegations of a disgruntled former employee, the Consolidated Class

15    Action Complaint ("Complaint") alleges that Defendants LDK Solar and various officers and

16    directors of LDK (collectively "Defendants")[1] fraudulently overstated LDK's polysilicon

17    inventory in violation of federal securities laws.  However, Charley Situ, the former employee,

18    admits that he lacks the necessary basis and expertise to support his speculation regarding LDK's

19    inventory.  Situ, the sole source for the Complaint's allegations of missing and useless inventory

20    admits he did not count all of it and is not qualified to determine if the raw material meets the

21    technical requirements for use.

22    Far from establishing a cogent and more plausible inference of intentional deception, the

23    events described in the Complaint actually undermine the notion of a strong inference of

24    scienter.  There has been no restatement, no stock sale by any Defendant, a positive conclusion

25    to the SEC's informal inquiry, and the unqualified opinions by outside auditors and counsel

26    supporting LDK's inventory reports, which all corroborate LDK's inventory calculation.  In

27

28    [1]  Only defendants LDK Solar, LDK Solar USA, Jack Lai and Xiaofeng Peng have been served
with the Complaint and summons in this action.

1   short, there is no support for Situ's allegations and the Complaint should therefore be dismissed

2   for failure to meet the heightened pleading standard under the Private Securities Litigation

3   Reform Act ("PSLRA").

4        The Complaint makes two unsupported claims of falsity:  (1) LDK fabricated a portion of

5   its inventory; and (2) LDK overvalued the remainder of its polysilicon inventory.  (¶ 4.)

6   However, the Situ email relied upon by Plaintiff admits that Situ only checked the inventory in

7   one of several LDK warehouses and that Situ lacked the technical expertise to evaluate the

8   usability of LDK's polysilicon inventory.

9        In response to Situ's assertions, LDK immediately formed a special committee of the

10   independent directors, who retained legal, accounting and polysilicon experts to analyze these

11   assertions.  After two months of work, Simpson Thacher & Bartlett, a Big Four accounting firm

12   and the polysilicon experts considered ***all*** of the inventory and concluded that Situ's assertions

13   had no merit.  LDK's external auditor also considered and rejected Situ's assertions in

14   connection with the 3Q07, 4Q07 and year-end financials.  The corroboration of LDK's inventory

15   by these seasoned independent professionals undercuts any inference of falsity derived from

16   Situ's outrageous claims.

17        In desperation, Plaintiff resorts to misquoting an LDK executive as saying that Situ's

18   information was "complete and accurate" but omitting the rest of the sentence, which said that

19   Situ's allegations "only offer[] a partial picture" alluding to the fact that Situ's incorrect count

20   arose because he considered only one of several warehouses.[2]  Plaintiff also struggles to fabricate

21   credibility for Situ by claiming that the SEC believes Situ and is investigating LDK, but again,

22   the opposite is true.  The SEC officially concluded <u>not</u> to open an enforcement action based on

23   Situ's allegations.  Similarly, Situ's email contends that KPMG will support his assertions

24   because as he concedes, the amount of inventory is a verifiable fact.  Again, the objective third

25   parties disagree with Situ.  KPMG issued a clean audit opinion, confirming the accuracy of

26   LDK's inventory well after learning of Situ's assertions.  Thus, every third party that is discussed

27   in the Complaint as corroborating Situ's assertions actually disagrees with him and has

28

[2] <u>See</u> Request for Judicial Notice In Support of Motion to Dismiss ("RJN"), Ex. T.

1    concluded that Situ's allegations have no merit.

2        Plaintiff's allegations also do not adequately plead a cogent and compelling inference of

3    scienter as required under the PSLRA and the Supreme Court's decision in <u>Tellabs</u>.  Not only

4    does Plaintiff fail to allege facts that would give rise to a strong inference that any individual

5    defendant knew that the inventory was purportedly false, Plaintiff does not allege any specific

6    false statement by most of the individual defendants.  And ***Defendants did not sell a single***

7    ***share of LDK stock during the Class Period*** –  a compelling and irrefutable fact that

8    undermines the inference of scienter as a matter of law.  Plaintiff does not allege a single

9    suspicious stock sale.  Indeed, Plaintiff admits that the decline in LDK's stock price caused the

10   individual defendants to sustain substantial losses, including Mr. Peng, who, by Plaintiff's

11   concession, lost $2.31 billion.

12       Given Situ's lack of knowledge, the absence of any suspicious trades, and the

13   corroboration of LDK's inventory by independent professionals, Plaintiff has not established a

14   "strong inference" of scienter as required under the PSLRA. Having failed to plead sufficient

15   facts to support the necessary elements of falsity and scienter, and for other reasons explained in

16   detail in this brief, the Complaint fails as a matter of law and should be dismissed.

17   **II.    STATEMENTS OF FACTS**

18       A.    <u>LDK's Inventory and Operations</u>

19       LDK is a manufacturer of polysilicon wafers for use in solar panels.  (¶ 23.)[3]  LDK is

20   incorporated in the Cayman Islands and is headquartered in Xinyu, China.  <u>See</u> Request for

21   Judicial Notice ("RJN"), Ex. A (LDK May 11, 2007 Form F-1 Registration Statement ("LDK

22   2007 F-1")), at 2, 3.  LDK's American Depository Shares were first listed on the New York

23   Stock Exchange on June 1, 2007.  <u>See</u> RJN, Ex. E (LDK May 31, 2007 Press Release), at 1.

24       LDK manufactures solar wafers, which are the primary element in a photovolic solar cell

25   that converts sunlight into electricity.  (¶ 22.)  To manufacture the wafers, LDK treats polysilicon

26   feedstock in a directional solidification system for many hours and transforms this feedstock into

27   multicrystalline ingots, which are fashioned into wafers.  <u>See</u> RJN, Ex. A (LDK 2007 F-1), at 1.

28

---

[3] References to the Consolidated Class Action Complaint (Dkt. 65) are cited herein as ¶__.

1    LDK uses a research and development lab associated with the Shanghai Jiaotong University to

2    assist with the technical support needed to develop its proprietary processes relating to the

3    analysis and use of its range of polysilicon feedstock, which includes determining the optimal

4    allocation of various feedstock sources and the accurate valuation of LDK's material quality.  Id.

5    at Ex. 10.6, p. 2-3.  LDK closely analyzes all of its polysilicon feedstock to determine usability,

6    which involves a quality analysis of all of its feedstock:

> We adhere to a strict system of quality control over our operations, from the
> sourcing of raw materials to production and delivery. We have established
> quality-control at each stage of our production process to closely monitor the
> quality of our production and to ensure that our solar wafers and ingots meet all
> our internal benchmarks and customers' specifications. In addition, we have
> established a quality documentation system for all purchasing, production and
> sales units and implemented procedures for constant improvement and flaw
> prevention.
> . . . .
>
> We purchase raw materials from trusted suppliers on our approved vendor list
> whenever possible and only those suppliers that pass our assessment are admitted
> to our approved vendor list. Raw materials are inspected by our quality
> management unit. Raw materials which fail to pass our incoming inspection are
> returned to the suppliers.

15   Id. at 75.

16       LDK has 146 employees who perform and supervise these quality control procedures,

17   and the Complaint does not include a reference to any of these individuals as a source, nor any

18   reference to any of the controls as being inadequate or circumvented.  These quality control

19   procedures include running several tests at various points along LDK's production process, such

20   as performing "infra-red scans for impurities, as well as resistivity and life-time tests" on the

21   materials, followed by further tests on the final output.  Id.  In fact, in February 2007, LDK

22   obtained a Quality Assurance Certification pursuant to ISO 9001, which is a set of quality

23   management control guidelines, accepted around the world.  See RJN, Ex. S at 42.[4]  Essentially,

24   seven months before Situ's claim, LDK's quality control procedures over its raw materials and

25   operations generally had been certified under acceptable international standards.

26       B.    LDK's Use of Recycled Polysilicon Scrap Is Its Key Competitive Advantage

27

28
_____

[4] See www.iso.org.

1    Due to the industry-wide shortage of polysilicon, an essential raw material in the

2  production of solar wafers, one of LDK's chief competitive advantages is its ability to use

3  recyclable polysilicon to produce solar-grade silicon wafers.[5]  Contrary to Plaintiff's suggestion

4  that LDK's use of polysilicon scraps was a nefarious plot that Plaintiff has unwound, LDK's

5  registration statement plainly and repeatedly disclosed that it uses recycled and scrap material:

6
> We have developed proprietary production processes for the use of polysilicon
> scraps and recyclable polysilicon in manufacturing our ingots while maintaining
7
> our product quality and performance.

8
> . . .

9
> To increase our raw material supply and reduce costs, our polysilicon feedstock
> also includes polysilicon scrap, polysilicon powder, broken wafers and recyclable
10
> polysilicon sourced from semiconductor manufacturers, equipment vendors and
> others, which we use in our ingot manufacturing process.  Scraps and recyclable
11
> materials account for the majority of our polysilicon feedstock.

12
> . . .

13
> We use a variety of polysilicon materials, including solar-grade virgin polysilicon
> that is at least 99.9999% pure, recyclable polysilicon scraps from third parties and
14
> silicon powder.

15  Id. at 43, 66, 73.

16    C.    The Independent Investigation and External Auditors Concluded That Situ's
          Allegations Were Unfounded

17
      On October 3, 2007, a Piper Jaffray analyst disclosed that Charley Situ, LDK's former

18  financial controller, made allegations that LDK had fraudulently overstated its polysilicon

19  inventory.  See RJN, Ex. H (October 3, 2007 Piper Jaffray Company Note: LDK Solar Update;

20  Takeaways From Management Meetings), at 1.  While the Piper Jaffray analyst stated that he

21  "found no reason/proof to dispute management's claim of 1000MT of polysilicon in

22  inventory/WIP[,]" LDK's stock price dropped from $68.31 to $51.65 the following trading day.

23  Id.; (¶ 5.)

24

25

26  _____

27  [5]  Indeed, LDK repeatedly cautioned investors about the industry-wide shortage of polysilicon in
    its registration statement.  See, e.g., RJN, Ex. A (LDK 2007 F-1), at 10.  ("The significant
    growth of the solar wafer industry and the competing demand and buying power of the
28  semiconductor industry have resulted in an industry-wide shortage in solar-grade polysilicon and
    a significant increase in solar-grade polysilicon price over the past few years.").

1       On October 4, 2007, LDK announced that Situ had been terminated in late September for

2  cause before he made his public allegations regarding LDK's inventory.  See RJN, Ex. B (LDK

3  October 4, 2007 Form 6-K), at 2.  LDK also announced that following Situ's initial allegations,

4  LDK management conducted its own internal investigation and concluded that Situ's allegations

5  were unfounded.  See id.  LDK further announced that the Audit Committee of the LDK Board

6  of Directors, which consisted of two independent directors who joined the company after the

7  initial public offering and who are not named as defendants in this case, was also conducting an

8  independent investigation into the allegations.[6]  See id.  After hiring outside independent

9  accountants and Simpson Thatcher & Bartlett LLP as independent outside counsel, the

10  Committee conducted a two-month investigation.  See RJN, Ex. C (LDK December 17, 2007

11  Form 6-K), at 2.  The outside professionals applied their expertise to a thorough record of the

12  facts, which they compiled through forensic accounting procedures, testing of the Company's

13  feedstock by independent experts, review of company and third-party documentation, and

14  interviews of certain present and former Company personnel and third parties.  See id.

15       On December 17, 2007, the Audit Committee announced the results of its investigation,

16  which found "no material errors in the Company's stated silicon inventory quantities as of

17  August 31, 2007, and concluded that Mr. Situ's allegations of an inventory discrepancy were

18  incorrect because he had not taken into account all locations in which the Company stored its

19  silicon feedstock."  Id.  The investigation further concluded that "the Company is using each of

20  its various types of silicon feedstock in the production of its multicrystalline solar wafers, and

21  that a provision for obsolete or excess silicon feedstock is not required."  Id.

22       Following the conclusion of the internal investigation, LDK announced its third quarter

23  financial statements for 2007 without any restatement.  See RJN, Ex. D (LDK December 20,

24  2007 Form 6-K), at 2.  On February 25, 2007, LDK announced its 4Q07 results without a

25  restatement.  See RJN Ex. U.  On March 24, 2008, the Securities Exchange Committee ("SEC")

26  informed LDK that it had terminated its informal inquiry and recommended no enforcement

27

28  [6]  Mr. Peng – a member of the Audit Committee – was not a member of the Special Committee
to ensure its independence.

1  action against LDK.  <u>See</u> RJN, Ex. G (SEC March 24, 2008 No Enforcement Letter), at 1; RJN,

2  Ex. S (LDK April 7, 2008 Form F-20), at 50, F-28.  On March 31, 2008, KPMG issued its audit

3  opinion for all of 2007, confirming the accuracy of LDK's inventory and finding no material

4  weaknesses in LDK's internal controls (which includes the controls over LDK's inventory

5  calculation):

6  In our opinion, the consolidated financial statements referred to
   above present fairly, in all material respects, the financial position
7  of the Group as of December 31, 2006 and 2007, and the results of
   its operations and its cash flows for the period from July 5, 2005
8  (date of inception) to December 31, 2005 and the years ended
   December 31, 2006 and 2007, in conformity with U.S. generally
9  accepted accounting principles.

10  <u>Id.</u> at 119, F-2.

11  Well before the independent investigation and extended audit ever completed, LDK was

12  immediately besieged by several strike suits, filed in a knee-jerk reaction to LDK's stock price

13  decline on October 3.  Based entirely on the Situ allegations as reported in the press, the

14  complaints uniformly alleged that LDK had overstated the quantity of its polysilicon inventory

15  before the outside investigators completed their months of investigation, determining that the

16  inventory was correct.  This consolidated complaint similarly relies solely on Situ's unsupported

17  conjectures.

18  **III.    ARGUMENT**

19  To state a claim under Section 10(b), Plaintiff must allege that, in connection with the

20  purchase or sale of securities, (1) a material misrepresentation or omission of fact, (2) made with

21  scienter, (3) on which plaintiffs relied, (4) proximately caused plaintiffs' economic loss.  <u>Dura</u>

22  <u>Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 341-42 (2005).  Plaintiff must plead falsity and

23  scienter "with an unprecedented degree of specificity and detail" according to the Private

24  Securities Litigation Reform Act ("PSLRA") and Rule 9(b).  <u>Eminence Capital, LLC v. Aspeon,</u>

25  <u>Inc.</u>, 316 F.3d 1048, 1052 (9th Cir. 2003).  These prerequisites are, and were intended to be,

26  difficult to comply with.  <u>Dura</u>, 544 U.S. at 342.

27  A.    <u>The Complaint Fails to Allege Falsity</u>

28  To sufficiently plead falsity under Rule 9(b) and the PSLRA, plaintiffs must allege with

1    specificity why the challenged statements were false when made.  See In re Tibco Software Secs.

2    Litig., 2006 U.S. Dist LEXIS 36666, at *64 (N.D. Cal. 2006).  Plaintiff here relies exclusively on

3    the allegations of Charley Situ, a disgruntled employee at LDK, who was terminated for cause.

4    The Complaint claims that Defendants' statements regarding LDK inventory were false based on

5    two demonstrably incorrect theories:  (1) LDK reported inventory which "did not exist,"[7] and (2)

6    the remaining polysilicon inventory was not usable.[8]  When viewed in its entirety, and in the

7    context of judicially noticeable facts, both claims are baseless.

8           1.     Situ Admittedly Lacks The Requisite Knowledge And Technical Expertise
                     To Determine The Quantity Or Usability Of LDK's Polysilicon Inventory

9         When a plaintiff relies on employee allegations regarding falsity, the complaint and

10   documents cited therein must demonstrate that the employee "was qualified to state

11   authoritatively" that the challenged statement was false, and that the employee based his or her

12   opinion on "personal knowledge."  In re Silicon Storage Technology, Inc. Sec. Litig., 2007 U.S.

13   Dist. LEXIS 21953, *56-57 (N.D. Cal. 2007).[9]  In Silicon Storage, plaintiffs alleged that

14   defendant falsely reported its inventory valuation because the market value for certain inventory

15   had fallen below cost.  To support this claim, plaintiffs relied in part on the statements made by

16   various employees of the defendant regarding the market price SST's inventory.  The court

17   rejected the opinions of the employees where the complaint did not allege facts to show that

18   those employees would know about the market price of SST's inventory during the alleged class

19   period.  See Silicon Storage, 2007 U.S. Dist. LEXIS at *55-56.[10]  As a result, the court

20   concluded that plaintiffs failed to show that defendants' inventory valuations were false or

21   misleading.

---

22   [7]  See ¶¶ 37, 50, 86-87, 89, 93-94, 95, 97-99, 105, 106-107, 114, 123-125.

23   [8]  See ¶¶ 42-47, 50-52, 66, 68, 86-87, 90-92, 95, 97-99, 100, 102-103, 105, 106-110, 112-119,
24   123-126.

25   [9]  See also In re Tibco Software Secs. Litig, 2006 U.S. Dist. LEXIS 36666 at *65 (N.D. Cal.
     2006) (granting motion to dismiss for failure to plead falsity where "the descriptions of the duties
26   performed by most of the witnesses do not satisfactorily demonstrate that the witnesses would
     know the information that is ascribed to them."); In re ICN Pharms., Inc., 299 F. Supp. 2d 1055
27   at *1064 (C.D. Cal. 2004) (granting motion to dismiss for failure to plead falsity where plaintiffs
     failed to allege the witnesses' "expertise" regarding the fact at issue).

28   [10]  The Court deemed irrelevant the only other employee's allegations because certain parts of the
     complaint contradicted that employee's allegations.  See id. at *60.

1    Similarly, here, Plaintiff fails to establish that Situ's accusations have any foundation.  As

2  discussed above, LDK's manufacturing process is highly technical and complex, and

3  experienced personnel must closely examine LDK's polysilicon to determine its usability in the

4  solar wafering manufacturing process.  <u>See</u> Section II.A, above.  Any person undertaking such an

5  analysis would need technical expertise.

6    Situ, on the other hand, lacks the technical ability necessary to test LDK's polysilicon.

7  Situ's degrees in math and business have nothing to do with determining the usability of

8  polysilicon.  (¶ 35.)  Situ's CPA license has nothing to do with polysilicon or solar wafers, much

9  less with determining the usability of polysilicon.  (<u>Id.</u>)  Situ's former job as an accountant for

10  China GrenTech, a company that provided wireless services, also has nothing to do with

11  determining the usability of polysilicon.  (<u>Id.</u>)  Plaintiff must show that Situ "was qualified to

12  state authoritatively" that the majority of the LDK's polysilicon inventory was unusable, and

13  Plaintiff fails to make that showing here.

14    In fact, Situ himself admits that he lacks the expertise to evaluate the usability of

15  polysilicon in the email relied upon heavily by the Complaint.  In the email, Situ admits that "it

16  is a little more difficult to revaluate the quality" and relies on speculation that "most employees

17  know the fact that there is little good feedstock for production."  RJN, Ex. F (September 25,

18  2007 email from Charley Situ to Jack Lai, Louis Hsieh and KPMG Hong Kong ("Situ September

19  23, 2007 Email")), at ¶ 2.  Thus, the Complaint and Situ's allegations both reveal that Situ's

20  assertion about the technical sufficiency of tons of raw materials is nothing more than rank

21  speculation on his part.  In short, Situ's own words show he has no personal knowledge and is

22  merely parroting the speculation and unspecified rumors.

23    In addition, Situ also admits that he did not consider all of the inventory warehouses

24  when he made his allegations.  Contrary to the Complaint's allegation that "Situ looked not only

25  at items in the warehouse, but also polysilicon located elsewhere, including items in transit [and]

26  materials on the production line…" (¶ 40), Situ admits that he only considered the polysilicon

27  stored in one of LDK's several warehouses.  First, in the email, Situ states that he looked "in

28  warehouse only."  RJN, Ex. F (Situ September 25, 2007 Email), at ¶ 7.  His email also says the

1   scope of his "review" (which he called "FA/IA") was limited to a single warehouse and did not

2   include inventory in the Materials Department or in transit:

3       "[t]he scope of the FA/IA is the feedstock *in warehouse*. Feedstock in *Material*
        *Department and in transit not yet verified*. To be further accessed."

4

5   Id. at ¶ 6. (emphasis added). Since Situ did not consider these other locations where LDK kept

6   inventory, his bald allegation that certain inventory "did not exist" or was unusable must be

7   rejected.

8       As depicted below, LDK uses at least four warehouses to store polysilicon, including the

9   Materials Department warehouse and the Bonded Warehouses where "in transit" material was

10  located until it cleared China's final customs requirements. All of these warehouses held

11  inventory that Situ admittedly did not verify. The internal investigation and KPMG considered

12  *all* of the inventory in LDK's several warehouses, as well as the tons of inventory in use, and

13  concluded Situ was mistaken.

14

15

16  

17

18

19

20

21

22

23

24

25

26      In sum, the pleadings, in their entirety, show that Situ looked in only one of the many

27  places where LDK keeps its inventory. Situ conceded that a proper analysis of the inventory

28  would consider the quantity of material in other locations at LDK, such as the materials

1    department and in transit.  Contrary to Plaintiff's allegations, Situ admits he never considered

2    that material.  Accordingly, just like <u>Silicon Storage</u>, Plaintiff has failed to plead falsity because

3    the Complaint does not demonstrate that Situ's opinion deserves any credence.

4                    2.    <u>LDK's Inventory Was Independently Corroborated</u>

5        Even if Situ possessed the knowledge and expertise required to evaluate LDK's

6    inventory, the Complaint would also need to plead facts sufficient to convince the Court that Situ

7    is correct and not merely recounting a difference of opinion.  <u>See</u> <u>In re Levi Strauss & Co. Sec.</u>

8    <u>Litig</u>, 527 F. Supp. 2d 965, 987 (N.D. Cal. 2007) (dismissing § 10(b) claim for failure to plead

9    falsity).  <u>Levi</u> is instructive.  In <u>Levi</u>, two named, high level tax accountants from the defendant's

10   tax department accused Levi of improperly accounting for tax reserves.  <u>Id.</u> at 987-988.  The *San*

11   *Francisco Chronicle* disclosed the allegations, and the price of Levi securities plummeted.  <u>Id.</u> at

12   968.  Citing the accountants' allegations in detail, plaintiffs filed suit and set forth, with

13   particularity, the accountants' first-hand knowledge of the alleged wrongdoing.  This Court ruled

14   that the accountants' allegations were not sufficiently compelling to establish falsity because

15   "plaintiffs have failed to plead facts suggesting improper accounting other than the views

16   expressed by two former employees."  <u>Id.</u> at 987.  The Court conclude that: "it [was] more

17   plausible, as defendants suggest, that [the accountants] merely disagree with the tax positions

18   taken by Levi."  <u>Id.</u> at 987.

19       In dismissing the complaint for failure to plead falsity, the Court relied heavily upon

20   three judicially-noticeable facts:  (1) "the audit committee's investigation, with the assistance of

21   outside counsel, did not reveal material false or misleading statements based on the improprieties

22   pled by plaintiffs," (2) "audited financial statements and filings with the SEC do not reflect any

23   restatements for these improprieties," and (3) "KPMG issued unqualified audit opinions as to the

24   financial statements."  <u>Id.</u> at 985-988.

25       All three facts are present here and outweigh Situ's rank speculation about the technical

26   sufficiency of LDK's inventory.  First, as discussed above, a two-month independent

27   investigation, conducted by experts with the knowledge and expertise that Situ lacks, confirmed

28   that LDK correctly accounted for its inventory.  Second, following the conclusion of the internal

investigation, LDK announced its third and fourth quarter financial statements for 2007 without any restatement.  Third, KPMG, LDK's external auditors, have given their unqualified opinion supporting LDK's year-end financials.  <u>See</u> RJN, Ex. S (LDK April 7, 2008 Form 20-F Annual Report), at F-2.  Thus, according to every sufficiently knowledgeable entity that has conducted a thorough investigation of LDK's inventory, (1) all of LDK's stated inventory did exist, and (2) 100% of this polysilicon inventory was usable.  The only support for Plaintiff's allegations is Situ, who lacks any credible basis for his bald assertions.  Just as in <u>Levi</u>, the Complaint merely cites a former employee, who has a different opinion which is insufficient as a matter of law.  Worse, here, Situ admittedly has no basis for his conjecture about LDK's inventory.  Thus, the Complaint must be dismissed.

### 3.  The SEC and Research Analysts Also Disagreed With Situ

Plaintiff's attempt to buttress his thread-bare allegations with the SEC's informal inquiry and analysts' reports also fails.  (¶ 55.)  As of March 24, 2008, the SEC has concluded its informal inquiry and recommended against bringing an enforcement action:

> "This investigation has been completed as to LDK Solar Co. Ltd, against whom *we do not intend to recommend any enforcement action by the Commission*."

RJN, Ex. G (SEC March 24, 2008 No Enforcement Letter), at 1 (emphasis added); RJN Ex. S (LDK April 7, 2008 Form F-20), at 50, F-28.

As to analysts' reports, Plaintiff asserts that "[a]fter Situ's allegation became public, analysts and investors realized that LDK had been understating its costs."  (¶ 47.)  However, in the October 3, 2007 Piper Jaffray report that first disclosed Situ's allegations, Pichel concluded that, "[w]e have spoken to the LDK CFO about these claims and have found no reason/proof to dispute management's claim of 1000MT of polysilicon in inventory/WIP."  <u>See</u> RJN, Ex. H (October 3, 2007 Piper Jaffray Company Note: *LDK Solar Update; Takeaways From Management Meetings*), at 1.  In his report the following day, Pichel maintains LDK's rating at "Outperform," the highest designation given by Piper Jaffray.  <u>See</u> RJN, Ex. I (October 4, 2007 Piper Jaffray Company Note: *Management Defends Financials, Ind Audit Pending; Some Risk Priced In*), at 1.  Other analysts, such as Dr. Pierre Maccagno from Needham & Company, LLC,

1   also advised investors to buy LDK stock:  "[w]e continue to feel very positive on the stock and

2   strongly recommend buying at current price levels.  Recent weakness has created a very

3   attractive entry point in our opinion."[11]  See RJN, Ex. M (October 10, 2007 Needham & Co.'s

4   Investment Analysis: *LDK: Upgrade to Strong Buy on Conviction that Accounting Concerns*

5   *Related to Scrap are Unwarranted (Intraday price $45.23 at 2:00 p.m.)*, at 1.

6          In fact, contrary to Plaintiff's allegations, Piper Jaffray did not downgrade its

7   recommendation from Outperform to Market Perform until October 31, 2007, for reasons

8   unrelated to Situ's allegations.  In this report, Pichel explained, "[w]e lower estimates for LDK

9   on our belief that scrap polysilicon supplies are tightening and this will result in higher input

10  prices.  LDK is highly leveraged to scrap prices at ~80% of its COGS (cost of goods sold)."  See

11  RJN, Ex. J (October 31, 2007 Piper Jaffray Company Note: *LDK Solar: Market Perform;*

12  *Reduce 2008 Estimates on Tightening Scrap Supply; Downgrade to MP*), at 1.[12]  The change in

13  rating had nothing to do with LDK's existing inventory in August, 2007.

14         In short, the SEC and analysts did not endorse Situ's allegations as the Complaint alleges.

15                 4.     LDK's "Worthless" Inventory Is Not Pled With Particularity

16         Plaintiff contends that LDK failed to comply with GAAP because it failed to account for

17  its polysilicon inventory at the lower of cost or market.  (¶ 51.)  Apart from being an

18  oversimplification of GAAP, Plaintiff must plead specific information on both the cost and

19  market price of LDK's inventory products to establish that LDK's inventory was overvalued.

[11] The October 4, 2007 report from Needham & Co. similarly concluded, "we continue to feel very positive on the stock and recommend buying at current price levels."  See RJN, Ex. L (October 4, 2007 Needham & Co.'s Investment Analysis:  *LDK Solar Co. Ltd. (LDK) — Buy: Allegations of Poor Controls and Inventory Discrepancy by ex Financial Controller Drives Stock Down 24%.  Management Reassures there are no Issues.  Reiterate BUY*), at 1.  Needham continues to recommend that investors purchase LDK stock, as the March 7, 2008 headline urged: "Reiterate SB.  Management visits with Investors in NYC to Provide Answers to Key Questions.  LDK Undervalued @ 6x 09 EPS Est."  See RJN, Ex. N (March 7, 2008 Needham & Co.'s Investment Analysis:  *Reiterate SB.  Management visits with Investors in NYC to Provide Answers to Key Questions.  LDK Undervalued @ 6x 09 EPS Est.* ("March 7, 2008 Needham & Co. Investment Analysis Report"), at 1.

[12]  Other analysts in the industry also agreed that the price of scrap polysilicon was rising.  For example, a CIBC World Markets report from December 17, 2007 states that "the rate of increase for scrap/recycled material has been faster than for virgin material."  See RJN, Ex. O (December 17, 2007 CIBC World Markets Equity Research Company Update:  *Clean Bill of Health from Independent Audit Price In from Recent Share Gains*), at 1-2.

1   See In re Silicon Storage Tech., Inc., Sec. Litig., 2007 U.S. Dist. LEXIS at *49 (N.D. Cal. 2007)

2   (dismissing complaint for failure to plead falsity "with regard to [defendant company's]

3   inventory valuation, because plaintiffs fail to provide particularized information regarding the

4   relationship between the cost and market prices" of the inventory).[13]

5          Plaintiff here provides none of the requisite detail and specificity to survive dismissal.

6   Plaintiff does not allege either the cost or the market price of LDK's polysilicon inventory, or

7   otherwise show that LDK's valuation was incorrect.  Indeed, as discussed above, market prices

8   for polysilicon scrap rose throughout the class period, rendering LDK's inventory increasingly

9   valuable; not less valuable, as Plaintiff seems to suggest.[14]

10         Furthermore, it is uncontroverted that LDK paid a significant amount of money to acquire

11  this inventory, as reflected in the supply contracts attached to LDK's F-1.  See RJN, Ex. A.

12  (LDK 2007 F-1), at Exs. 10.11 - 10.21.  It makes no sense that LDK, a "cash-starved start up"

13  according to Plaintiff, would expend scarce funds on useless or nonexistent inventory.  Either

14  LDK acquired recycled inventory at market prices through legitimate transactions with third

15  parties (confirming the inventory was correct) or Plaintiff must plead specific facts showing that

16  the supply contracts with various third parties are sham transactions, wherein LDK and several

17  other companies conspired to provide LDK with useless material.[15]  Plaintiff has failed to plead

18  any facts indicating that these agreements to acquire recycled polysilicon from well established

---

20  [13]  See also In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1152-1153 (C.D. Cal.
21  2007) (deeming 17 pages of allegations insufficient because "nowhere in the Complaint do
    Plaintiffs explain in which of the myriad of ways… each of the 17 pages of allegedly false
    statements are false," and because, with respect to the alleged GAAP violations, plaintiffs "fails
22  to explain which line items of the statements were false, why the statements were false, the
    amount by which the financial statements were misstated, what provisions of GAAP were
23  violated, how those provisions were violated, and who was involved in the alleged GAAP
    violations.")

24  [14]  The Complaint and documents referenced in it make clear that there is a full scale market for
25  the recycled and scrap polysilicon LDK purchased.  Plaintiff alleges that a market for such
    materials exists but inexplicably alleges that the material becomes worthless merely because
26  LDK possesses it.  Plaintiff's bald assertions do nothing to reconcile this internal inconsistency.
    If nothing else, LDK could simply have resold the material back into the recycled polysilicon
27  market that it was purchased from, meaning the inventory is not worthless as alleged.  Indeed,
    given the allegations in the complaint that the price of recycled polysilicon has increased, LDK
28  would actually make money on its recycled inventory.

    [15]  E.g. Komex, Kunical, Prime, Q-Cell, RJN Ex. A at 76-77.

1   third parties are sham transactions. Thus, Plaintiff has failed to allege the requisite facts to show

2   how LDK purchased raw materials, recorded the assets at cost, but somehow intentionally

3   overstated its inventory amount. Other than rank speculation, Plaintiff has provided no details as

4   to which recycled material is bogus, why it is useless or how or why LDK paid cash for useless

5   products.

6         B.     The Complaint Fails to Establish A Strong Inference of Scienter

7        Under the PSLRA, Plaintiff must "state with particularity facts giving rise to a strong

8   inference" (15 U.S.C. § 78u-4(b)(2)) that *each* Defendant acted with the intent "to deceive,

9   manipulate, or defraud" LDK's investors. In re Infosonics Corp. Sec. Litig., 2007 U.S. Dist.

10  LEXIS 57784 at *10 (S.D. Cal. 2007) (citation omitted). In doing so, Plaintiff "must plead, in

11  great detail, facts that constitute strong circumstantial evidence of deliberately reckless or

12  conscious misconduct." In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir.

13  1999); In re Read-Rite Corp. Sec. Litig., 335 F.3d 843, 846 (9th Cir. 2003). The Ninth Circuit in

14  Silicon Graphics further clarified that "recklessness only satisfies scienter under 10(b) to the

15  extent that it reflects some degree of intentional or conscious misconduct." In re Silicon

16  Graphics, 183 F.3d at 977.

17       In 2007, the United States Supreme Court issued its landmark decision, Tellabs, Inc. v.

18  Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007), in which the Court affirmed the Ninth

19  Circuit standard for examining the PSLRA's "strong inference" requirement for pleading

20  scienter. See Middlesex Ret. Sys. v. Quest Software, Inc., 2007 U.S. Dist. LEXIS 84695 at *34

21  (C.D. Cal. Oct. 22, 2007). Under Tellabs, courts must consider "not only inferences urged by the

22  plaintiff," but also "competing inferences" and "non-culpable explanations" urged by the

23  defendants that may be "rationally drawn from the facts alleged." Tellabs, 127 S.Ct. at 2504-05.

24  The "inference of scienter must be more than merely plausible or reasonable – it must be cogent

25  and at least as compelling as any opposing inference of nonfraudulent intent." Id. Plaintiff has

26  not met his pleading burden of showing a "strong inference" of scienter under this standard.

27

28

1.    <u>Plaintiff's Bald Assertions Do Not Demonstrate That Defendants Acted With Actual Knowledge</u>

a.    *Situ's Criticism Of LDK's Polysilicon Inventory Lacks Foundation And Is Not Based On Personal Knowledge*

Situ's criticism of LDK's polysilicon inventory lacks foundation and fails to establish a "strong inference" of scienter.  <u>See</u> Section III-A; <u>In re Siebel Sec. Litig.</u>, 2005 WL 3555718 (N.D. Cal. 2005) (allegation derived from a source without personal knowledge of the circumstances of the alleged fraud fail to give rise to a strong inference of scienter); <u>see also</u> <u>Nursing Home Pension Fund, Local 144 v. Oracle Corp.</u>, 380 F.3d 1226, 1233 (9th Cir. 2004) (stating that "personal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged'") (citation omitted).

Absent personal knowledge, the allegations that Defendants misrepresented the total amount of polysilicon in LDK's inventory constitute nothing more than "bald assertions."  Bald assertions are insufficient as a matter of law to establish a "strong inference" of scienter.  <u>See</u> <u>Elliot Associates, L.P. v. Hayes</u>, 141 F. Supp. 2d 344, 357 (S.D.N.Y 2000) ("[B]ald assertions do not constitute adequate allegations of scienter."); <u>see also</u> <u>Griffin v. Ramtek Corp.</u>, 1988 WL 159162 at *4 (N.D. Cal. 1988) ("[B]ald assertions are simply insufficient to state the requisite scienter . . . for a violation of Rule 10b-5.").  Here, Situ admits that he did not look in all the places where LDK's inventory was stored, and he has no technical expertise to ascertain the usability of the inventory.  Thus, his assertions regarding inventory and usable inventory are simply insufficient "bald assertions."

b.    *Plaintiff Fails To Provide Particularized Allegations That Any Defendant Made Misstatements With Fraudulent Intent*

Despite the PSLRA's requirement that Plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" as to "*each* alleged misrepresentation or omission," the Complaint fails to allege any facts about the individual defendants' state of mind.  <u>In re 2TheMart.com, Inc. Sec. Litig.</u>, 114 F. Supp. 2d 955, 960 (C.D. Cal. 2000) (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis added).

In particular, Plaintiff makes no specific allegations as to Peng's and Lai's state of mind

1    even though they are the only individual defendants who allegedly made any misstatements.

2    Therefore, Plaintiff has failed to specifically allege scienter as to these two defendants.

3        Plaintiff's failure to plead specific facts about the state of mind as to defendants Tong,

4    Yao, Zhu, Shao and Wang is even more egregious as those defendants are not alleged to have

5    made any misstatements.  With respect to each of these "non-speaking" defendants, the

6    Complaint provides a generic allegation that appears to be copied from boilerplate in virtually

7    every securities complaint:

8        [D]efendants acted with scienter in that they knew that the public documents and
         statements issued or disseminated in the name of the Company were materially
9        false or misleading; knew that such statements would be issued or disseminated to
         the investing public; and knowingly and substantially participated or acquiesced
10       in the issuance or dissemination of such statements or documents as primary
         violators of the federal securities laws.

11
12   (¶ 133.)  This boilerplate language cannot satisfy Plaintiff's obligation of pleading specific facts

13   creating a strong inference as to each Defendant individually.  There is not a single specific fact

14   alleged regarding the acts, statements, or state of mind of these defendants.

15       To the extent Plaintiff relies on the "group pleading" doctrine[16] to establish liability of

16   these five individuals, the allegations contained in the Complaint are woefully inadequate.

17   Plaintiff fails to allege particular facts to show that any of the five non-speaking defendants

18   "were directly involved in the preparation of the allegedly misleading statements," or "specify

19   which of the allegedly misleading statements provide the basis for" application of the group

20   pleading doctrine.  In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d at 845.  Moreover, the

21   Complaint fails to make even the slightest attempt to allege how or why any of the five "non-

22
     _____

23   [16]  Numerous cases have held that the group pleading doctrine fundamentally contradicts the
     PSLRA's requirements.  See, e.g., Winer Family Trust v. Queen, 503 F.3d 319, 337 (3rd Cir.
24   2007) (holding that "the group pleading doctrine is no longer viable in private securities actions
     after the enactment of the PSLRA"); Southland Secs. Corp. v. INSpire Ins. Solutions, Inc., 365
25   F.3d 353, 363-66 (5th Cir. 2004) (group pleading doctrine cannot be reconciled with Reform
     Act's requirements); In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1153-1154
26   (C.D. Cal. 2007) (holding that based on Tellabs, the group pleading doctrine did not survive the
     PSLRA, this Court concludes that the "group pleading doctrine can no longer be used in pleading
27   cases under the PSLRA…") In re Tibco Software Secs. Litig., 2006 U.S. Dist. LEXIS 36666, at
     *82 (N.D. Cal. May 25, 2006) ("courts in this district are increasingly finding that the group
28   pleading doctrine is contrary to the PSLRA"); In re Nextcard Sec. Litig., 2006 WL 708663, at *3
     (N.D. Cal. Mar. 20, 2006) ("This Court adopts the reasoning of the decisions concluding that the
     group published pleading doctrine no longer is viable after the PSLRA.").

1  speaking" individuals had responsibility for, or participated in, any of the statements at issue.

2  Nor does Plaintiff attempt to show why it might be appropriate to treat the diverse collection of

3  non-speakers – a President and Chief Operating Officer, a Vice President and Chief Accounting

4  Officer, an Executive Vice President, a Senior Vice President and a non-executive member of

5  LDK's Board of Directors – as a group for pleading purposes.  Such cookie-cutter pleading

6  cannot satisfy the particularity requirements imposed by the PSLRA and Rule 9(b).

7

8            2.    Plaintiff's Allegations Of Accounting Fraud Fall Short Of Establishing A "Strong Inference" Of Scienter

9        Plaintiff's unsupported allegation that LDK's accounting violated GAAP does not

10  establish a "strong inference" of scienter.  (¶¶ 2, 8, 48-53, 61-66, 88-95, 106-109, 132.)  As this

11  Court noted in In re Pacific Gateway Exch., Inc., Sec. Litig., 169 F. Supp. 2d 1160, 1167 (N.D.

12  Cal. 2001), mere "allegations of failure to follow GAAP are not adequate to establish scienter,

13  because scienter requires more than a misapplication of accounting principles" (quoting In re

14  Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir. 1994)).  To plead a strong inference

15  of fraud in cases alleging accounting fraud, Plaintiff must provide copious detail of such

16  misconduct, rather than allege in mere general terms that Defendants failed to comply with

17  GAAP.  See In re FVC.COM Sec. Litig., 136 F. Supp. 2d 1031, 1037 (N.D. Cal. 2000)

18  (dismissing complaint that failed to plead accounting fraud in great detail); see also In re ICN

19  Pharms. Inc. Sec. Litig., 299 F. Supp. 1055, 1067 (C.D. Cal. 2004) ("GAAP violations must be

20  pled with particularity.") (citation omitted).

21        Here, Plaintiff's sole basis for alleging accounting fraud rests on Situ's claim that

22  inventory did not exist (although he did not count it) and the remaining inventory is worthless

23  (although he is not qualified to test it).  As discussed, Situ's assertions simply cannot be relied

24  upon as they lack foundation and are not based on personal knowledge.

25        Moreover, Plaintiff cannot meet his high pleading burden under the PSLRA by simply

26  alleging a disagreement with LDK's inventory valuation.  As discussed above, independent

27  experts performed a thorough two-month investigation and KPMG gave its unqualified opinion

28  corroborating LDK's inventory figures, and the SEC has concluded that Situ's allegations do not

1   warrant an investigation.  This process of thoroughly investigating the inventory and months of

2   review by various independent third parties belies Plaintiff's attempt to establish a "strong

3   inference" of an intent to deceive.  See In re Hansen Natural Corp. Sec. Litig., 527 F. Supp.2d

4   1142, 1158 (C.D. Cal. 2007) (finding that defendant's independent auditors' unqualified opinion

5   that the financial statements presented fairly the financial position of the company during the

6   relevant period, was "highly probative" of an absence of scienter); see also In re Wet Seal Secs.

7   Litig., 518 F. Supp. 2d 1148, at 1166 (C.D. Cal. 2007) (finding that Deloitte's approval or the

8   defendant's financial statements "weighs against scienter as well").

9       Contrary to the Complaint, the new line item for "non-current inventory" in LDK's fourth

10  quarter financial results is not an admission that the earlier financials were incorrect.  (¶ 59.)

11  Rather, the line item reflects a new, fourth quarter event.  As illustrated in LDK's financials and

12  explained by Peng in the analyst call cited by Plaintiff, LDK acquired an additional 613 MT of

13  polysilicon in the fourth quarter.  See RJN Exs. R, V at 16.  This new shipment increased the

14  quantity of polysilicon in LDK's inventory by over 60%.  See RJN Ex. V at 16.  LDK uses a

15  proprietary blend of polysilicon in producing wafers, and the new shipment, in combination with

16  the pre-existing inventory, increased LDK's quantity of certain types of feedstock to an amount

17  which would not likely be fully used within 12 months.  See RJN Exs. R, V.  Accordingly, LDK

18  classified this portion of its inventory as non-current under FASB 43.[17]  Put differently, this

19  classification reflects a fourth quarter event caused by a substantial increase in LDK's inventory

20  in 4Q07; it is not an indication that financials in prior quarters were wrong as now alleged.[18]

21  _____

22  [17] Plaintiff's assertion that classifying a portion of inventory in 4Q07 as "non-current" somehow
    proves that all of the 3Q07 inventory was unusable is also an absurd distortion of the accounting

23  rules.  The non-current classification does not mean the inventory is unusable.  If LDK's
    inventory was non-existent or unusable – as Plaintiff contends – it would be written off

24  completely, not simply classified as non-current.  So the 4Q07 "reclassification" of less than
    10% of LDK's inventory as non-current does not show that 3Q07 inventory was useless.

25  Moreover, as a matter of law, Plaintiff's allegations regarding this "non-current" line item are
    irrelevant.  Even if the new category of inventory represented some type of reclassification of the
    polysilicon—which it clearly does not—Plaintiff still has not adequately pled falsity under the

26  PSLRA:  "even a delinquent write-down of the impaired assets, without anything more, does not

27  state a claim of securities fraud, stating at best a bad business decision."  In re ICN Pharms., Inc.,
    299 F. Supp. 2d 1055, at 1065 (C.D. Cal. 2004).

28  [18] The Oppenheimer analyst report cited by Plaintiff as corroborating LDK's alleged deception
    regarding the inventory (¶ 59) states only that management "did not provide much detail" on the

1                           3.     <u>Defendants' Lack Of Stock Sales Weighs Strongly Against Scienter</u>

2          The fact that **none** of the individual defendants sold **a single share** of LDK stock during

3 the Class Period further undercuts any "strong inference" of scienter.  Courts in this district – and

4 across the country – have held that "the absence of insider trading by a defendant is highly

5 relevant and undermines any inference of scienter." <u>In re Pixar, Inc. Sec. Litig.</u>, 450 F. Supp. 2d

6 1096, 1107 (N.D. Cal. 2006); <u>see also</u> <u>In re Petsmart, Inc. Sec. Litig.</u>, 61 F. Supp. 2d 982, 1000

7 (D. Ariz. 1999) ("we find that defendant . . . did not sell any shares of stock during the class

8 period and there can be no argument therefore that she was motivated to defraud Petsmart

9 investors by a desire to maximize personal economic benefit.").

10          Despite the utter lack of any insider trading or sale of any shares of LDK's stock,

11 Plaintiff suggests that an inference of scienter nonetheless exists because each of the Defendants

12 had numerous shares of LDK stock and each stood to gain by the stock's artificially inflated

13 price.  (¶¶ 82, 83.)  Plaintiff's argument is misplaced.  In <u>In re Tibco Software Sec. Litig.</u>, 2006

14 U.S. Dist. LEXIS 36666 at *56-63 (N.D. Cal. 2006), the court held that plaintiffs allegations

15 regarding certain individual defendants' stock sales fell short of meeting the required pleading

16 standard under the PSLRA because they failed to show that defendants were *motivated* to

17 commit fraud.  There, several of the defendants – including the individual alleged to have the

18 greatest access to inside information and held more than 14 million shares and vested options –

19 did not sell any shares of stock, which the Court found dispositive.

20          Here, as in <u>Tibco</u>, Defendants' mere ownership of stock does not create a strong

21 inference of scienter, especially where not one share was sold by a single Defendant.  The

22 Complaint concedes that each of the individual defendants actually held on to his shares

23 throughout the entire decline in LDK's stock price, including Peng, who owns more than a 72%

24

25 non-current classification. <u>See</u> RJN, Ex. K (February 26, 2008 Oppenheimer & Co. Quarterly Update:  *4Q7 Results: Inventory Questions Resurface – Likely to Be a Negative*), at 1.   It had nothing to do with the inventory allegations by Situ.  Other analysts, such as Dr. Pierre

26 Maccagno from Needham & Company, LLC, who directly addressed the "non current" inventory classification, reported that management "provid[ed] answers to key questions."  Maccagno

27 explains the reclassification in his report, which is headlined "LDK: Reiterate SB (strong buy). Management Visits with Investors in NYC to Provide Answers to Key Questions.  LDK

28 Undervalued @ 6x 09 EPS Est."  <u>See</u> RJN, Ex. N (March 7, 2008 Needham & Co. Investment Analysis Report), at 1.

1  stake in LDK.  As Plaintiff acknowledges, "Peng lost some $2.31 billion" and "each of the

2  Individual Defendants owned large blocks of LDK options whose value dropped dramatically

3  . . . ."  (¶¶ 82, 83.)  Thus, the fact that Defendants sold nothing and lost billions of dollars

4  undercuts any inference that they engaged in fraudulent activity to maximize personal gain.

5          Plaintiff's speculation that Defendants concealed the truth about LDK's financial

6  condition in order to raise capital to complete the IPO and to artificially inflate the price of

7  LDK's stock after the IPO also does not give rise to a strong inference of scienter.  (¶ 28.)  As a

8  matter of law, mere allegations regarding LDK's desire for a successful completion of an IPO or

9  to maintain the appearance of corporate profitability do not establish a "strong inference" of

10 scienter.  See Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, at 412-413 (S.D.N.Y. 2007)

11 ("[T]he alleged desires to raise additional capital in a private placement or to maintain

12 compliance with the financial covenants of a company loan agreement . . . are . . . inadequate to

13 support an allegation of intent to commit fraud.").  See also Chill v. Gen. Elec. Co., 101 F.3d

14 263, 268 (2d Cir. 1996) ("The motive to maintain the appearance of corporate profitability . . .

15 does not entail concrete benefits.").

16         Simply stated, Plaintiff fails to allege that any individual defendant derived a tangible,

17 personal benefit from any alleged fraud or misrepresentation.  These facts significantly

18 undermine any inference of scienter, let alone a  "strong inference" as required by the PSLRA.

19                 4.    Scienter Cannot Be Inferred From The Individual Defendants' Positions

20         Lacking any legitimate grounds, Plaintiff makes the desperate argument that a strong

21 inference of scienter can be inferred by the mere fact that Defendants are officers or directors of

22 LDK and their "associations with the Company."  (¶ 133.)  This argument, however, has been

23 squarely rejected by the Ninth Circuit.

24         In In re Read-Rite Corp. Sec. Litig., 335 F.3d 843, 848 (9th Cir. 2003), the Ninth Circuit

25 rejected the notion that a plaintiff pleads a strong inference of scienter based solely on an

26 individual's position within the company, and held that even when an individual defendant is an

27 officer or director, a plaintiff must still "plead 'particular facts in the complaint' that 'raise a

28 strong inference' that misleading statements were [made] knowingly or [with] deliberate

1   recklessness." Id.  The Read-Rite court further reasoned that even if the plaintiffs may have

2   established a "reasonable inference" that the defendants would be aware of the falsity of some or

3   all of the statements at issue based on their job duties, the existence of a "reasonable inference"

4   would not satisfy PSLRA's requirement that plaintiffs allege particular facts that give rise to a

5   "strong inference" of scienter.  Id. at 848-49.

6          Other courts have similarly rejected the argument that scienter can be inferred merely

7   from a defendant's position in the company.  In In re Apple Computer, Inc., 243 F. Supp. 2d

8   1012, 1026 (C.D. Cal. 2002), the court found that allegations that the senior officers had a

9   "hands on management style" and that the CEO "runs every aspect of the business" were

10  insufficient to establish a "strong inference" of scienter:

11          It is not enough for Plaintiffs to allege that Defendants could have known about
            the [] problems, or even that they should have known about them.  Plaintiffs must
12          allege something approaching actual knowledge on the part of [senior officers]
            who made statements regarding the company.  Because they do not, their claim
13          regarding alleged misrepresentations [] fails.

14  Id.; see also In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000)

15  ("plaintiffs must do more than allege that these key officers had the requisite knowledge by

16  virtue of their 'hands on' positions, because that would eliminate the necessity for specially

17  pleading scienter, as any corporate officer could be said to possess the requisite knowledge by

18  virtue of his or her position.").

19          Here, Plaintiff attempts to establish a "strong inference" of scienter regarding LDK's

20  CEO, Peng, by alleging that "Peng tightly controlled the Company, especially its finances."

21  (¶ 73.)  But those feeble allegations are insufficient.  As Apple Computer illustrates, mere

22  allegations that the CEO is heavily involved in every aspect of the business are insufficient to

23  show a strong inference of scienter.

24          With respect to the other individual defendants, Plaintiff fails to allege any *facts* which

25  establish a finding of a "strong inference" of scienter.  Instead, Plaintiff merely alleges that by

26  virtue of their individual positions, the individual defendants acted with a "strong inference" of

27  scienter because they were in "receipt of information reflecting the true facts regarding LDK,

28  their control over, and/or receipt and/or modification of LDK's materially misleading

1    misstatements." (¶ 133.)  Plaintiff's argument is unavailing, as "[m]ere access to data is

2    insufficient to support a securities claim under the PSLRA."  Apple Computer, 243 F. Supp. 2d

3    at 1026 (citing Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035-36 (9th Cir. 2002); Kane v.

4    Madge Networks, 2000 WL 33208116 *10 (N.D. Cal. 2000).  Plaintiff's generic allegations –

5    without any averment showing that an individual defendant had actual knowledge and then made

6    false or misleading statements – fail as a matter of law.

7         Finally, the fact that the Defendants signed SEC filings as officers and directors of the

8    Company does not establish a "strong inference" of scienter.  (¶ 133.)  As a matter of law,

9    general allegations that a defendant signed a registration statement or other publicly filed SEC

10   document does not establish a strong inference of scienter.  See In re Infonet Services Corp. Sec.

11   Litig., 310 F. Supp. 2d 1080, 1103 (C.D. Cal. 2003) (finding strong showing of scienter not

12   satisfied with general allegations that individual defendants signed registration statement).

13   Indeed, "[i]f that were true, 'scienter would be established in every case where there was an

14   accounting error or auditing mistake made by a publicly traded company, thereby eviscerating

15   the pleading requirements for scienter set forth in the PSLRA.'"  In re Hansen Natural Corp. Sec.

16   Litig., 527 F. Supp. 2d 1142, 1159-1160 (C.D. Cal. 2007).  Because Plaintiff has not alleged a

17   single fact regarding the individual defendants suggesting their actual knowledge of a

18   misstatement, the individual defendants signatures on those public filings do not give rise to a

19   "strong inference" of scienter.

20        C.    The Complaint Attacks Forward-Looking Statements Protected by The Safe
              Harbor Provision of the PSLRA

21        Various alleged misstatements made by LDK are protected forward-looking statements

22   that are not actionable.  The PSLRA provides a safe harbor for forward-looking statements that

23   are accompanied by meaningful cautionary statements.  See 15 U.S.C. § 78u-5(c); Employers

24   Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1132 (9th

25   Cir. 2004) (noting that the PSLRA created a statutory version of the bespeaks caution doctrine by

26   providing a safe harbor for forward-looking statements).  A forward-looking statement is any

27   statement regarding (1) financial projections, (2) plans and objectives of management for future

28

1  operations, (3) future economic performance, or (4) the assumptions underlying or related to any

2  of these issues.  See Knollenberg v. Harmonic, Inc., 152 Fed. Appx. 674, 678 (9th Cir. 2005).

3  Here, the Complaint seeks recovery for various non-actionable forward-looking

4  statements throughout the Complaint.  Including, for example:

5    • In summary, we remained *focused* on *achieving our vision of becoming* the largest,
     lowest cost producer of solar wafers and *do not intend* to compete with our

6    customers.  (¶ 27) (emphasis added);

7    • [W]e *believe* that our polysilicon feedstock inventory and commitments from
     suppliers and sufficient to satisfy over 90% of our *estimated requirements for 2007*

8    and approximately 50% of our *estimated requirements* for 2008.  (¶ 86) (emphasis
     added);

9

10   • In addition to ramping our production lines, we continued to make progress on our
     cost reduction efforts through further advancements of our production processes. . . .

11   By augmenting our strategy upstream, we *believe* we will enhance our cost
     efficiencies . . . .  (¶ 97) (emphasis added);

12

13   • We *think* we have many advantages by our strategic location with our facility cost,
     with our operating cost.  We *believe* that we can get to very competitive cost in a

14   very short period of time. (¶¶ 73, 116) (emphasis added).

15  There can be no doubt that these statements are forward-looking as they are based on projections

16  of future need and cannot be disproven until some time in the future.  See In re Copper Mountain

17  Sec. Litig., 311 F. Supp. 2d 857 at 880 (N.D. Cal. 2004) (granting motion to dismiss where

18  forward-looking statements in company press releases, SEC filings, conference calls and follow-

19  up conversations, constituted forecasts of future revenues and were predictions regarding the

20  company's future economic performance, and were therefore entitled to safe harbor protection).

21  The Complaint, premised on attacking such forward looking statements, should be dismissed.

22  D.    The Complaint Fails to Plead Loss Causation

23  Under the PSLRA, Plaintiff must establish that Defendants' alleged conduct proximately

24  caused, and not just "touched upon" the economic loss at issue.  Dura Pharms., Inc. v. Broudo,

25  544 U.S. 336, 342 (2005); In re Daou Systems, Inc. Securities Litig., 411 F.3d 1006, 1025 (9th

26  Cir. 2005).  Accordingly, Plaintiff must plead facts to show that the Defendants' alleged

27  misrepresentation actually caused the alleged losses by connecting the drop in stock price to a

28  corrective disclosure, i.e. "the truth mak[ing] its way into the market place."  Dura Pharms., 544

1  U.S. at 342; see also In re Impax Labs., 2007 U.S. Dist. LEXIS 723, at **13-16 (N.D. Cal. 2007)

2  (dismissing complaint for failure to plead loss causation because the announcement that caused

3  the stock price to decline "did not represent a public disclosure of the truth with respect to [the

4  company]'s alleged material misstatements" at issue).  In addition, Plaintiff must also plead facts

5  ruling out the possibility that the lowered stock price "'reflect[s] not the earlier

6  misrepresentation, but changed economic circumstances, changed investor expectations, new

7  industry-specific or firm-specific facts, conditions or other events.'"  In re Omnicom Group, Inc.

8  Sec. Litig., 2008 WL 243788 at *3 (S.D.N.Y. 2008).  One of the many alternate causes which

9  Plaintiff must address is "investor skittishness" caused by the specter of "impropriety."  Id. at *7.

10      Plaintiff here does not – and cannot – identify a corrective disclosure correcting a

11  previous misstatement by LDK.  At most, Situ's allegations may have raised the specter that

12  LDK's financial statements may contain inaccuracies, and Plaintiffs plead no facts to rule out the

13  possibility of investor skittishness stemming from China's unproven economy and mercurial

14  political environment.  Instead, Plaintiff merely alleges that "the timing and magnitude of LDK's

15  stock price" negates all other potential reasons for the decline.  This is the exact type of

16  boilerplate language judged inadequate by the Supreme Court in Dura Pharm., at 339-40.

17  Accordingly, Plaintiff has failed to plead loss causation.

18      E.    The Complaint Fails To State A 20(a) Claim

19      As discussed above, because there is no violation of §10(b), there can be no control

20  person liability under Section 20(a) for any of the individual defendants.  See Lipton v.

21  Pathogenesis Corp., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("to prevail on their claims for

22  violations of § 20(a) & § 20A, plaintiffs must first allege a violation of § 10(b) or Rule 10b-5").

23  For this reason alone, Plaintiff's 20(a) claim should be dismissed.

24  **IV.    CONCLUSION**

25      For the foregoing reasons, the Complaint should be dismissed with prejudice.

26  Dated:  April 7, 2008                    Respectfully submitted,
                                            LATHAM & WATKINS LLP
27                                            James J. Farrell

28                                          By _____/s/_____