# EXHIBIT A



# FORM F-1

## LDK Solar Co., Ltd. - LDK

**Filed: May 11, 2007 (period: )**

Registration statement for certain foreign private issuers

**As filed with the Securities and Exchange Commission on May 11, 2007**

Registration No. 333-

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form F-1
### REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

# LDK Solar Co., Ltd.
*(Exact name of Registrant as specified in its charter)*

**Not Applicable**
*(Translation of Registrant's name into English)*

| | | |
|---|---|---|
| **Cayman Islands** | **3674** | **Not Applicable** |
| *(State or other jurisdiction of incorporation or organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification Number)* |

**Hi-Tech Industrial Park**
**Xinyu City**
**Jiangxi Province 338032**
**People's Republic of China**
**(86 790) 686-0171**
*(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)*

**Law Debenture Corporate Services Inc.**
**767 Third Avenue, New York, New York 10017**
**212-750-6474**
*(Name, address, including zip code, and telephone number, including area code, of agent for service)*

*Copies to:*

| | |
|---|---|
| **Huanting Timothy Li, Esq.** | **W. Clayton Johnson, Esq.** |
| **Sidley Austin LLP** | **Cleary Gottlieb Steen & Hamilton LLP** |
| **Level 39, Two International Finance Centre** | **Bank of China Tower** |
| **8 Finance Street** | **One Garden Road** |
| **Central, Hong Kong** | **Hong Kong** |
| **(852) 2509-7888** | **(852) 2521-4122** |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this Registration Statement.

If any of the securities being registered on this form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to Be Registered | Proposed Maximum Aggregate Offering Price(2) | Amount of Registration Fee |
|---|---|---|
| Ordinary shares, $0.10 par value per share(1) | $400,000,000 | $12,280 |

(1) Includes ordinary shares that may be purchased by the underwriters pursuant to an over-allotment option, and also includes ordinary shares initially offered and sold outside the United States that may be resold from time to time in the United States either as part of their distribution or within 40 days after the later of the effective date of this registration statement and the date the ordinary shares are first bona fide offered to the public. Such ordinary shares are not being registered for the purposes of sales outside the United States. See "Underwriting." American depositary shares issuable on deposit of the ordinary shares registered hereby will be/have been registered under a separate registration statement on Form F-6 (Registration No. 333-          ). Each American depositary share represents one ordinary share.

(2) Estimated pursuant to Rule 457(o) solely for the purpose of computing the amount of the registration fee. Includes offering price of ordinary shares that may be purchased by the underwriters pursuant to their over-allotment option.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the**

Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to such Section 8(a), may determine.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

The information in this prospectus is not complete and may be changed. Neither we nor the selling shareholders may sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting any offer to buy these securities in any state where the offer or sale is not permitted.

PROSPECTUS **(Subject to Completion)**
**Issued May     , 2007**

## American Depositary Shares



# LDK Solar Co., Ltd.

**Representing                Ordinary Shares**

This is our initial public offering. We are offering                American depositary shares, or ADSs, and the selling shareholders identified in this prospectus are offering                ADSs. Each ADS represents one ordinary share, par value $0.10 per share. We will not receive any proceeds from the ADSs sold by the selling shareholders. We expect that the initial public offering price of the ADSs will be between $        and $        per ADS.

Prior to this offering, there has been no public market for our ordinary shares. We have applied for listing of our ADSs on the New York Stock Exchange under the symbol "LDK."

**Investing in our ADSs involves a high degree of risk. See "Risk Factors" beginning on page 10.**

|  | Price to Public | Underwriting Discounts and Commissions | Proceeds to Us | Proceeds to the Selling Shareholders |
|---|---|---|---|---|
| Per ADS | $ | $ | $ | $ |
| Total | $ | $ | $ | $ |

We and the selling shareholders have granted the underwriters a 30-day option to purchase up to                additional ADSs from us and up to                additional ADSs from the selling shareholders to cover over-allotments at the initial public offering price less underwriting discounts and commissions.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

The underwriters expect to deliver the ADSs to purchasers on or about                , 2007.

# Morgan Stanley                                    UBS Investment Bank

**Piper Jaffray**                 **CIBC World Markets**                 **CLSA Asia-Pacific Markets**

The date of this prospectus is                , 2007.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007



Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## TABLE OF CONTENTS

| | Page |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 10 |
| Special Note on Forward-Looking Statements | 31 |
| Use of Proceeds | 33 |
| Capitalization | 34 |
| Dilution | 36 |
| Dividend Policy | 38 |
| Exchange Rate Information | 39 |
| Selected Consolidated Financial and Operating Data | 40 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 42 |
| Business | 66 |
| PRC Government Regulations | 82 |
| Management | 86 |
| Principal and Selling Shareholders | 94 |
| Related Party Transactions | 97 |
| Description of Share Capital | 99 |
| Description of American Depositary Shares | 105 |
| Shares Eligible for Future Sale | 114 |
| Taxation | 117 |
| Underwriting | 122 |
| Expenses Relating to This Offering | 129 |
| Enforceability of Civil Liabilities | 130 |
| Legal Matters | 132 |
| Experts | 132 |
| Where You Can Find Additional Information | 133 |
| Index to Consolidated Financial Statements | F-1 |
| EX-3.1 3RD AMENDED AND RESTATED MEMORANDUM AND ARTICLES | |
| EX-3.2 4TH AMENDED AND RESTATED MEMORANDUM AND ARTICLES | |
| EX-4.4 AMENDED AND RESTATED SHAREHOLDERS AGREEMENT, DATED DEC 19, 2006 | |
| EX-4.5 SHARE PURCHASE AGREEMENT, DATED AS OF JULY 28, 2006 | |
| EX-4.6 SERIES B PREFERRED SHARES PURCHASE AGMT | |
| EX-4.7 SERIES C PREFERRED SHARES PURCHASE AGMT | |
| EX-4.8 CONFIRMATION APR 30,2007BY FINANCIERE NATEXIS SINGAPORE 4 PTE LTD. | |
| EX-4.9 CONFIRMATION APR 30,2007, BY SHINE FIELD INVESTMENT LIMITED | |
| EX-4.10 CONFIRMATION APR 30,2007, BY CDH SOLARFUTURE LIMITED | |
| EX-4.11 CONFIRMATION APR 30,2007, BY CHF WAFER COMPANY LIMITED | |
| EX-4.12 CONFIRMATION APR 30,2007, B CHINA ENVIRONMENT FUND 2004 L.P. | |
| EX-4.13 CONFIRMATION APR 30,2007, BY JAFCO ASIA TECHNOLOGY FUND 3 | |
| EX-4.14 CONFIRMATION APR 30,2007, BY MUS ROOSEVELTCHINA PACIFIC FUND L.P. | |
| EX-4.15 CONFIRMATION APR 30,2007, BY TECH TEAM HOLDINGS LIMITED | |
| EX-4.16 CONFIRMATION APR 30,2007, BY BOFA CAPITAL COMPANY LIMITED | |
| EX-4.17 CONFIRMATION APR 30,2007, BY GRAND GAINS INTERNATIONAL LIMITED | |
| EX-4.18 CONFIRMATION APR 30,2007, BY SILVERPOINTE INVESTMENTS LTD. | |
| EX-10.1 2006 STOCK INCENTIVE PLAN | |
| EX-10.2 FORM EMPLOYMENT AGREEMENT | |
| EX-10.3 FORM SERVICE AGREEMENT, BETWEEN THE REGISTRANT AND EACH EXECUTIVE DIRECTOR | |
| EX-10.4 FORM SERVICE AGREEMENT | |
| EX-10.5 FORM CONFIDENTIALITY AND NON COMPLETE AGREEMENT BETWEEN THE REGISTRANT AND EACH INDEPENDENT DIRECTOR | |
| EX-10.6 SUMMARY ENG TRANSLATION OF COOPERATION AGREEMENT | |
| EX-10.7.1 AGREEMENT DATED JUN 21,2005 | |
| EX-10.7.2 ADDENDUM 2 TO AGREEMENT AUG 13,2006 | |
| EX-10.7.3 AGREEMENT PHASE 3 JAN 6,2006 | |
| EX-10.7.4 AGREEMENT PHASE 4 OCT 1,2006 | |
| EX-10.8 PURCHASING AGREEMENT, JAN 5, 2007 | |
| EX-10.9 CONTRACT JAN 25,2006 | |
| EX-10.10 ENG TRANSLATION OF COOPERATION AGREEMENT | |
| EX-10.11 SALES CONTRACT, OCT 29, 2006. B/T TECHNISHER WARENHANDEL HELLER & NCA FORTIN INC | |
| EX-10.12 5 YEAR SALES CONTRACT | |
| EX-10.13 BEST EFFORT COOPERATION AGREEMENT | |
| EX-10.14 8 YEAR SILICON SALES CONTRACT | |
| EX-10.15 SUMMERY ENGLISH TRANSLATION OF COOPERATION AGREEMENT | |

EX-10.16 SUMMARY ENGLISH TRANSLATION OF FRAMEWORK COOPERATION AGREEMENT
EX-10.17 WAFER SALES AGREEMENT, DATED MARCH 5, 2006
EX-10.18 SUMMARY ENGLISH TRANSLATION OF SOLAR CELL SILICON WAFER SUPPLY AGREEMENT
EX-10.19 SUMMARY ENGLISH TRANSLATION OF SILICON SUPPLY AGREEMENT
EX-10.20 SUMMARY ENGLISH TRANSLATION OF SILICON SUPPLY COOPERATION AGREEMENT
EX-10.21 COOPERATION AGREEMENT, DATED MARCH 28, 2007
EX-10.22 SUMMARY ENGLISH TRANSLATION OF LOAN AGREEMENT, DATED SEPTEMBER 22, 2005
EX-10.23 SUMMARY ENGLISH TRANSLATION OF GURANTEE AGREEMENT, DATED OCTOBER 21, 2005
EX-10.24 SUMMARY ENGLISH TRANSLATION OF LOAN AGREEMENT, DATED JULY 24, 2006
EX-10.25 SUMMARY ENGLISH TRANSLATION OF LOAN REPAYMENT CONFIRMATION AGREEMENT, DATED MARCH 28, 2006
EX-10.26 SUMMARY ENGLISH TRANSLATION OF LOAN REPAYENT CONFIRMATION AGREEMENT, DATED APRIL 8, 2006
EX-10.27 SUMMARY ENGLISH TRANSLATION OF ENTRUSTMENT AGREEMENT
EX-10.28 SUMMARY ENGLISH TRANSLATION OF RENMINBI LOAN AGREEMENT
EX-10.29 SUMMARY ENGLISH TRANSLATION OF ENTRUSTED LOAN AGREEMENT, DATED DEC 22, 2006
EX-10.30 SUMMARY ENGLISH TRANSLATION OF FOREIGN CURRENCY LOAN CONTRACT, DEC 29, 2006.
EX-10.31 SUMMARY ENGLISH TRANSLATION OF FOREIGN CURRENT CONTRACT, DATED FEB 5, 2007
EX-10.32 SUMMARY ENGLISH TRANSLATION OF PROPERTY SUBLEASE AGREEMENT, DATED DEC 1, 2006
EX-10.33 SUMMARY ENGLISH TRANSLATION OF LAND USE RIGHT TRANSFER AGREEMENT, MAY 15, 2006.
EX-10.34 SUMMARY ENGLISH TRANSLATION OF REAL PROPERTY PURCHASE AGREEMENT
EX-10.35 SUMMARY ENGLISH TRANSLATION OF LAND USE RIGHT TRANSFER AGREEMENT, DATED SEP 5, 2006
EX-10.36 SUMMARY ENGLISH TRANSLATION OF REAL PROPERTY PURCHASE AGREEMENT, DATED SEP 5, 2006
EX-21.1 LIST OF SUBSIDIARIES
EX-23.1 CONSENT OF KPMG
EX-23.3 CONSENT OF SALLMANNS (FAR EAST) LIMITED
EX-23.4 CONSENT OF SHANGHAI ORIENT REAL ESTATE APPRAISAL
EX-23.5 CONSENT OF GRANDALL LEGAL GROUP
EX-99.1 CODES OF ETHICS OF THE REGISTRANT

You should rely only on the information contained in this prospectus. We have not authorized anyone to provide you with information different from that contained in this prospectus. We are offering to sell, and seeking offers to buy, the ADSs only in jurisdictions where offers and sales are permitted. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of the ADSs.

We have not taken any action to permit a public offering of the ADSs outside the United States or to permit the possession or distribution of this prospectus outside the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about and observe any restrictions relating to the offering of the ADSs and the distribution of the prospectus outside the United States.

Until June                    , 2007 (25 days after the date of this prospectus), all dealers that buy, sell or trade ADSs, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the obligation of dealers to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## PROSPECTUS SUMMARY

*You should read the entire prospectus carefully, including the "Risk Factors" section beginning on page 10 and the consolidated financial statements and the accompanying notes to those financial statements beginning on page F-1, before making an investment decision.*

**Overview**

We manufacture multicrystalline solar wafers, which are thin sheets of crystalline silicon material primarily made by slicing multicrystalline ingots or monocrystalline boules. Solar wafers are the principal raw material used to produce solar cells, which are devices capable of converting sunlight into electricity. We sell multicrystalline wafers globally to manufacturers of photovoltaic products, including solar cells and solar modules. We produce and sell multicrystalline solar wafers between 180 and 240 microns in thickness. In addition, we provide wafer processing services to monocrystalline and multicrystalline solar cell and module manufacturers.

We manufacture multicrystalline ingots from polysilicon feedstock in our directional solidification system furnaces, or DSS furnaces, as an interim step in producing wafers. In addition to using solar-grade virgin polysilicon, we also use other polysilicon materials from various sources in our ingot manufacturing process. We have developed proprietary production processes for the use of polysilicon scraps and recyclable polysilicon in manufacturing our ingots while maintaining our product quality and performance. We use substantially all of our ingots for production of our own wafers. In addition, we also sell polysilicon materials, which include ingots and polysilicon scraps.

As of March 31, 2007, we had an annual multicrystalline wafer production capacity of approximately 215 megawatts, or MW. We intend to continue to increase our annual production capacity to approximately 400 MW by the end of 2007 and approximately 800 MW by the end of 2008. We have entered into contracts to purchase additional equipment that is expected to be sufficient for our planned expansion to approximately 400 MW by the end of 2007 and approximately 600 MW by mid-2008. We currently do not have contractual commitments for all the equipment necessary for the expansion of our production capacity beyond 600 MW to approximately 800 MW by the end of 2008.

Despite the current industry-wide shortage of polysilicon, we have inventory and commitments from suppliers that we believe will satisfy over 90% of our estimated requirements through the end of 2007. The majority of our polysilicon feedstock consists of polysilicon scraps and recyclable polysilicon. In addition to polysilicon scraps and recyclable polysilicon, we also use virgin polysilicon for our polysilicon feedstock. We have purchased polysilicon scraps and recyclable polysilicon from semiconductor materials trading companies, including Komex Inc., or Komex, Kunical International Group Ltd., or Kunical, and Prime GLP Inc., or Prime. We have also purchased virgin polysilicon from virgin polysilicon manufacturers. In addition, some of our major customers, including Canadian Solar Inc., or CSI, and Q-Cells AG, or Q-Cells, have supplied us with polysilicon feedstock. We also source polysilicon feedstock from the spot market from time to time depending on the price and our requirements.

Our principal customers have included CSI, Chinalight Solar Co., Ltd., or Chinalight, Solarfun Power Holdings Co., Ltd., or Solarfun, Solartech Energy Corp., or Solartech Energy, Solland Solar Energy B.V., or Solland Solar, and Suntech Power Holdings Co., Ltd., or Suntech, in terms of net sales during the 12-month period ended March 31, 2007. Historically, the majority of our sales have been in China. We are enhancing and broadening our revenue and customer base to target other leading global photovoltaic cell and module manufacturers. We have sold wafers to Chinalight primarily pursuant to short-term sales contracts and monthly and quarterly purchase orders.

Our increasing scale of operations and cost reduction program have generally reduced our unit production cost since our inception. We are, however, subject to fluctuations in market prices of raw materials used in our production. We have a dedicated research and development team, whose primary objectives are to enhance our product quality and achieve a more efficient manufacturing process by improving production yield and lowering production costs.

1

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

==We were incorporated in the Cayman Islands on May 1, 2006.== Our principal operating subsidiary, Jiangxi LDK Solar Hi-Tech Co., Ltd., or Jiangxi LDK Solar, was incorporated in China on July 5, 2005. Since we made our first commercial sale of multicrystalline wafers in April 2006, we have experienced significant growth. Our net sales increased from $12.1 million for the three months ended June 30, 2006 to $31.5 million for the three months ended September 30, 2006, $61.9 million for the three months ended December 31, 2006 and $73.4 million for the three months ended March 31, 2007. Our net income increased from $1.3 million for the three months ended June 30, 2006 to $5.0 million for the three months ended September 30, 2006, $24.3 million for the three months ended December 31, 2006 and $24.5 million for the three months ended March 31, 2007.

**Our Strengths**

We believe that our rapid growth and strong market position are largely attributable to our following competitive strengths:

• pure-play multicrystalline solar wafer manufacturer;

• cost-effective production;

• large-scale manufacturing utilizing state-of-the-art equipment;

• strong relationships with suppliers and customers; and

• experienced management team.

**Our Strategies**

Our principal objective is to strengthen our position as a global leader in the manufacturing of multicrystalline solar wafers by increasing our production capacity and strengthening our cost competitiveness. We intend to achieve this objective by pursuing the following strategies:

• expand our production capacity to meet customer demand and enhance economies of scale;

• continue to improve our research and development to reduce manufacturing costs, improve production yield and pursue technological innovation;

• secure supplies of polysilicon feedstock;

• broaden our geographic presence and strengthen our customer relationships; and

• consider selective alliances and acquisitions.

**Our Challenges**

We face challenges in our business operations, including:

• our short operating history;

• uncertainties in acquiring sufficient quantities of polysilicon feedstock at reasonable prices;

• possibility of reduction or elimination of governmental support for the solar industry;

• uncertainties in implementing our expansion plan;

• increasing competition in the solar wafer manufacturing business;

• difficulties in recruiting sufficient technical and professional personnel; and

• possible elimination of preferential PRC tax treatment.

See "Risk Factors" for a detailed description of these and other risks and uncertainties that we face.

**Our Corporate Structure**

Our principal operating subsidiary, Jiangxi LDK Solar, was incorporated in China on July 5, 2005 by Suzhou Liouxin Industry Co., Ltd., or Suzhou Liouxin, a company incorporated under the laws of China, and Liouxin Industrial Limited, a company incorporated under the laws of Hong Kong, each beneficially and wholly owned by Mr. Xiaofeng Peng, our founder, chairman and chief executive officer. We were incorporated in the Cayman Islands on May 1, 2006 by LDK New Energy Holding Limited, or LDK New Energy, a British

2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

Virgin Islands company wholly owned by Mr. Peng, to acquire all of the equity interests in Jiangxi LDK Solar from Suzhou Liouxin and Liouxin Industrial Limited. On July 10, 2006, upon approval of the relevant PRC government authorities, Jiangxi LDK Solar became our wholly owned subsidiary. On September 5, 2006, we incorporated LDK International Solar Co., Ltd. in Hong Kong as our wholly owned subsidiary.

In 2006, we issued an aggregate of 15,580,000 redeemable convertible preferred shares, with a par value of $0.10 each, or preferred shares, which are convertible into 15,580,000 ordinary shares.

We are currently 82.8% beneficially owned by Mr. Peng. Upon consummation of this offering, we expect Mr. Peng to own             % (assuming the underwriters do not exercise their over-allotment option) or             % (assuming the underwriters exercise their over-allotment option in full) of our company. As a result, Mr. Peng maintains effective control over our business and corporate matters that require shareholders' approval. See "Principal and Selling Shareholders" for more information.

**Our Corporate Information**

Our principal executive offices are located at Hi-Tech Industrial Park, Xinyu city, Jiangxi province 338032, People's Republic of China, and our telephone number is (86 790) 686-0171. Our website is *www.ldksolar.com*. Information contained on our website is not a part of this prospectus.

**Conventions Applicable to This Prospectus**

Unless otherwise indicated, information in this prospectus assumes (i) each ordinary share we issued with a par value of $1.00 each was split into 10 ordinary shares with a par value of $0.10 each on its original issue date, and (ii) the automatic conversion of all our outstanding Series A, Series B and Series C preferred shares into an aggregate of 15,580,000 ordinary shares immediately upon the consummation of this offering.

The number of our ordinary shares outstanding immediately after this offering excludes:

• ordinary shares underlying any additional ADSs issuable upon exercise by the underwriters of their over-allotment option;

• 6,093,900 ordinary shares, 2,065,900 ordinary shares and 550,900 ordinary shares issuable upon exercise of our outstanding stock options and additional ordinary shares reserved for issuance under our 2006 stock incentive plan; and

• ordinary shares issuable upon conversion of any Series A preferred shares issuable upon exercise of the warrants issued to our Series A preferred shareholders.

The terms of our outstanding Series B and Series C preferred shares provide that the respective ratios at which they are convertible into our ordinary shares are subject to adjustment based on our net earnings for the 12 months ending June 30, 2007 or the year ending December 31, 2007. For descriptions of these conversion ratio adjustment provisions, see "Description of Share Capital — History of Securities Issuances — Series A preferred shares," "— Series B preferred shares" and "— Series C preferred shares" in this prospectus. In April 2007, we agreed with the holders of our preferred shares that, if we publicly file our F-1 registration statement covering this offering on or before May 31, 2007, these conversion ratio adjustments would be determined based on our net income for the nine months ended March 31, 2007 with respect to our Series B preferred shares and the three months ended March 31, 2007 with respect to our Series C preferred shares. The holders of our Series B and Series C preferred shares have confirmed, after their review of our consolidated interim financial statements as of, and for the three months ended, March 31, 2007 included in this prospectus, that no adjustments to the conversion ratios of the preferred shares need be made. For more information on our warrants and convertible preferred shares, see "Description of Share Capital — History of Securities Issuances — Series A preferred shares," "— Series B preferred shares" and "— Series C preferred shares" in this prospectus and notes (15) and (16) to our audited consolidated financial statements beginning on page F-1.

We measure our wafer production capacity in megawatts, representing 1,000,000 watts, a unit of power-generating capacity. For purposes of this prospectus, we have assumed an average photovoltaic conversion efficiency rate of 15.3% for cells using our wafers. The conversion efficiency rate of a photovoltaic cell is the percentage of light energy from the sun that the cell converts into electrical energy. This conversion efficiency

3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

is estimated based on feedback from selected customers of ours and is highly dependent on the solar cell and module production processes of our selected customers. Based on this conversion efficiency, we have assumed that each 125 by 125 millimeters, or mm, wafer we produce generates approximately 2.4 watts of power and each 156 by 156 mm wafer we produce generates approximately 3.7 watts of power. We calculate our production capacity, as of March 31, 2007, based on the ingot production capacity and wafer slicing, or wafering, capacity of our equipment in operation as of March 31, 2007, on an annualized basis. We calculate our planned production capacity of approximately 400 MW by the end of 2007 and approximately 800 MW by the end of 2008 based on the ingot production capacity and wafering capacity of our equipment planned to be in operation by the end of 2007 and 2008, respectively, on an annualized basis.

For the purpose of this prospectus, geographical references to "China" and the "PRC" are to the People's Republic of China and do not include the Hong Kong Special Administrative Region, or Hong Kong, the Macau Special Administrative Region, or Macau, and Taiwan. References to "provinces" of China are to provinces or municipalities under direct administration of the PRC central government and provincial-level autonomous regions of China.

"We," "us," "our company" or "LDK Solar" refers to LDK Solar Co., Ltd., a Cayman Islands company, and its predecessor entities and its subsidiaries.

"RMB," "Rmb" or "Renminbi" refers to the legal currency of China; "$," "dollars," "US$" or "U.S. dollars" refers to the legal currency of the United States.

We have sourced various solar industry data used in this prospectus from Photon Consulting published by Solar Verlag GmbH, or Photon Consulting, Photon International published by Solar Verlag GmbH, or Photon International, and Solarbuzz LLC, or Solarbuzz, each an independent solar energy industry research company or publication. We have assumed the correctness and truthfulness of such data, including projections and estimates, when we use them in this prospectus. You should read our cautionary statement in "Special Note on Forward-Looking Statements" in this prospectus.

We have approximated all the numbers in this prospectus to their closest round numbers. Due to rounding, figures shown as totals in tables may not be arithmetic aggregations of the figures preceding them.

Unless otherwise indicated, references in this prospectus to:

• "off-grid applications" are to applications of photovoltaic products to systems that operate on a stand-alone basis to provide electricity independent of an electricity transmission grid; and

• "on-grid applications" are to applications of photovoltaic products to systems that are connected to an electricity transmission grid and feed electricity generated into the electricity transmission grid.

4

**THE OFFERING**

| | |
|---|---|
| Price per ADS | We currently estimate the initial public offering price will be between $              and $                  per ADS. |
| Total ADSs offered | ADSs. |
| by us | ADSs. |
| by the selling shareholders | ADSs. |
| The ADSs | Each ADS represents one ordinary share, par value $0.10 per share. The ADSs will be evidenced by American depositary receipts, or ADRs. A nominee of the depositary will be the registered holder of the ordinary shares underlying your ADSs. As an ADS holder, you will not be treated as one of our shareholders. You will have rights as provided in the deposit agreement. Under the deposit agreement, you may instruct the depositary to vote the ordinary shares underlying your ADSs. You must pay a fee for each issuance or cancellation of an ADS, each distribution of securities by the depositary and any other depositary service. For more information about our ADSs, see "Description of American Depositary Shares" in this prospectus. We also encourage you to read the deposit agreement, which is an exhibit to the registration statement that includes this prospectus. |
| ADSs outstanding immediately after this offering | ADSs (or              ADSs if the underwriters exercise their over-allotment option in full). |
| Ordinary shares outstanding immediately after this offering | ordinary shares (or                  ordinary shares if the underwriters exercise their over-allotment option in full). |
| Over-allotment option | We and the selling shareholders have granted the underwriters an option, exercisable for 30 days from the date of this prospectus, to purchase up to              additional ADSs from us and up to              additional ADSs from the selling shareholders at the initial public offering price, less underwriting discounts and commissions, solely for the purpose of covering over-allotments. |
| Use of proceeds | We intend to use our net proceeds from this offering primarily for the following purposes: |
| | • approximately $              million to expand our production capacity (including the purchase of manufacturing equipment and the construction of additional production and ancillary facilities); |
| | • approximately $              million to purchase or prepay for polysilicon feedstock; and |
| | • approximately $              million to invest in our research and development efforts. |
| | We will use the balance of our net proceeds from this offering for other general corporate purposes, including potential acquisitions. |
| | We will not receive any of the proceeds from the sale of ADSs by the selling shareholders. |

5

| | |
|---|---|
| Risk factors | See "Risk Factors" and other information included in this prospectus for a discussion of factors and uncertainties that you should carefully consider before deciding to invest in our ADSs. |
| Listing | We have applied for the listing of our ADSs on the New York Stock Exchange. Our ordinary shares will not be listed on any exchange or quoted for trading on any over-the-counter trading system. |
| New York Stock Exchange symbol | LDK. |
| Depositary | JPMorgan Chase Bank, N.A. |
| Lock-up | We, our directors and executive officers, all our existing shareholders and certain of our existing optionholders have agreed with the underwriters, subject to certain exceptions, not to sell, transfer or dispose of, directly or indirectly, any of our ADSs or ordinary shares or securities convertible into or exercisable or exchangeable for our ADSs or ordinary shares for a period of 180 days (or 12 months in the case of LDK New Energy) following the date of this prospectus. See "Underwriting" for more information. |

6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## SUMMARY CONSOLIDATED FINANCIAL AND OPERATING DATA

The following summary consolidated statement of operations data and statement of cash flows data for the period from July 5, 2005, the date of our inception, to December 31, 2005 and for the year ended December 31, 2006 and the summary consolidated balance sheet data as of December 31, 2005 and 2006 have been derived from our audited consolidated financial statements included elsewhere in this prospectus. The following summary consolidated statement of operations data and statement of cash flows data for the three months ended March 31, 2006 and 2007 and the consolidated balance sheet data as of March 31, 2007 have been derived from our unaudited condensed consolidated interim financial statements included elsewhere in this prospectus. You should read the following summary consolidated financial and operating data in conjunction with those financial statements and the related notes and the information under "Selected Consolidated Financial and Operating Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus. We have prepared our consolidated financial statements in accordance with generally accepted accounting principles in the United States, or U.S. GAAP. Our historical results for any period are not necessarily indicative of results to be expected for any future period.

We were incorporated in the Cayman Islands on May 1, 2006 as the holding company for, and currently conduct our operations through, Jiangxi LDK Solar, which became our wholly owned subsidiary on July 10, 2006 when we acquired all of its equity interests. As the acquisition of Jiangxi LDK Solar was made between entities under common control, the transaction has been accounted for in a manner similar to the pooling-of-interests method. Accordingly, the assets and liabilities of Jiangxi LDK Solar have been included in our consolidated financial statements at their historical amounts. The consolidated financial statements present our financial condition and results of operations as if the acquisition had occurred as of the beginning of the earliest period presented.

| | Period from July 5 to December 31, 2005 | Year Ended December 31, 2006 | Three Months Ended March 31, | |
|---|---|---|---|---|
| | | (in thousands, except per share and per ADS data) | 2006 | 2007 |
| **Consolidated Statement of Operations Data** | | | | |
| Net sales | $   — | $   105,454 | $   — | $73,400 |
| Gross profit[1] | — | 41,492 | — | 28,380 |
| (Loss) income from operations[2] | (143) | 37,145 | (129) | 26,117 |
| Interest expense and amortization of discount on exchangeable notes[3] | (102) | (7,133) | (340) | (1,529) |
| (Loss) income before income tax benefit | (309) | 30,069 | (494) | 24,534 |
| Net (loss) income[4] | $   (274) | $   30,182 | $   (440) | $24,534 |
| Accretion of Series A, Series B and Series C preferred shares to redemption values | — | (2,729) | — | (2,942) |
| Deemed dividend to Series A preferred shareholders | — | (1,568) | — | — |
| Net (loss) income available to ordinary shareholders[4] | (274) | 25,885 | (440) | 21,592 |
| Net (loss) income per ordinary share[4][5] | | | | |
| Basic | $   (0.01) | $   0.35 | $   (0.01) | $   0.29 |
| Diluted | $   (0.01) | $   0.35 | $   (0.01) | $   0.27 |
| Net (loss) income per ADS | | | | |
| Basic | $ | $ | $ | $ |
| Diluted | $ | $ | $ | $ |
| Ordinary shares used in computation[5] | | | | |
| Basic | 75,000 | 75,000 | 75,000 | 75,000 |
| Diluted | 75,000 | 75,000 | 75,000 | 90,580 |

7

Table of Contents

(1) Gross profit for the year ended December 31, 2006 and the three months ended March 31, 2007 reflected $174,000 and $155,000 of share-based compensation expense allocated to cost of goods sold, respectively.

(2) Income from operations for the year ended December 31, 2006 and the three months ended March 31, 2007 reflected $2,028,000 and $1,106,000 of share-based compensation expense, respectively.

(3) Interest expense for the year ended December 31, 2006 and the three months ended March 31, 2007 included $4,440,000 and nil related to debt discount amortization for the embedded beneficial conversion feature of our exchangeable notes, respectively. See note (14) to the audited consolidated financial statements.

(4) Our PRC subsidiary, Jiangxi LDK Solar, is entitled to exemption from PRC national enterprise income tax for at least two years and PRC local enterprise income tax for at least five years, each beginning with calendar year 2006. Without this tax holiday, our income tax expense would have increased and our net income and net income available to ordinary shareholders would have been reduced by approximately $12,387,000 and $8,461,000 for the year ended December 31, 2006 and the three months ended March 31, 2007, respectively. Our basic net income per ordinary share would have been reduced by $0.17 and $0.11 for the year ended December 31, 2006 and the three months ended March 31, 2007, respectively, and our diluted net income per ordinary share would have been reduced by $0.17 and $0.09 for the year ended December 31, 2006 and the three months ended March 31, 2007, respectively.

(5) All share and per share data have been presented to give retrospective effect to our reorganization as described above.

The following table presents our summary consolidated balance sheet data as of December 31, 2005 and 2006 on an actual basis and as of March 31, 2007 (1) on an actual basis and (2) on a pro forma basis to give effect to the automatic conversion of all of our outstanding preferred shares into 15,580,000 ordinary shares upon the completion of this offering.

| | As of December 31, 2005 | As of December 31, 2006 | As of March 31, 2007 | |
| | | | Actual | Pro Forma |
| | | (in thousands) | | |
| **Consolidated Balance Sheet Data** | | | | |
| Cash and cash equivalents | $    9,687 | $    30,227 | $    11,348 | $    11,348 |
| Inventories | — | 94,886 | 114,205 | 114,205 |
| Prepayments to suppliers | 966 | 37,718 | 52,777 | 52,777 |
| Total current assets | 20,815 | 172,746 | 194,052 | 194,052 |
| Property, plant and equipment, net | 10,491 | 100,875 | 117,678 | 117,678 |
| Total assets | 31,647 | 292,719 | 340,825 | 340,825 |
| Short-term bank borrowings | — | 56,765 | 61,481 | 61,481 |
| Advance payments from customers | 3,717 | 40,002 | 41,832 | 41,832 |
| Total current liabilities | 20,348 | 117,486 | 131,398 | 131,398 |
| Long-term bank borrowings | — | 30,245 | 29,805 | 29,805 |
| Total liabilities | 20,348 | 147,733 | 161,205 | 161,205 |
| Series A, Series B and Series C preferred shares | — | 87,744 | 90,686 | — |
| Total shareholders' equity | $    11,299 | $    57,242 | $    88,934 | $    179,620 |

The following table sets forth a summary of our consolidated statement of cash flows data for the periods specified:

| | Period From July 5 to December 31, 2005 | Year Ended December 31, 2006 | Three Months Ended March 31, | |
| | | | 2006 | 2007 |
| | | (in thousands) | | |
| **Consolidated Statement of Cash Flows Data** | | | | |
| Net cash provided by (used in) operating activities | $    2,511 | $    (57,067) | $    2,511 | $    (8,707) |
| Net cash used in investing activities | (20,940) | (79,564) | (19,095) | (23,336) |
| Net cash provided by financing activities | $    28,077 | $    154,891 | $    30,902 | $    11,660 |

8

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

The following table sets forth certain other financial and operating data of our company for the periods since we commenced our first commercial sales of multicrystalline wafers in April 2006. Net margin represents net income as a percentage of net sales.

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| **Other Financial and Operating Data** | **June 30, 2006** | **September 30, 2006** | **December 31, 2006** | **March 31, 2007** |
| Gross margin | 21.0% | 39.4% | 42.9% | 38.7% |
| Operating margin | 17.4 | 33.6 | 39.8 | 35.6 |
| Net margin | 10.9% | 15.8% | 39.3% | 33.4% |
| Net sales of wafers (in thousands) | $ 10,388 | $ 30,772 | $ 61,292 | $ 66,704 |
| Wafers sold (in MW) | 4.8 | 14.0 | 26.4 | 29.6 |
| Average wafer selling price (per watt) | $ 2.15 | $ 2.20 | $ 2.32 | $ 2.25 |

9

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## RISK FACTORS

*Investment in our ADSs and our ordinary shares involves a high degree of risk. You should consider carefully the following information about these risks, together with other information contained in this prospectus, before you decide whether to buy our ADSs.*

### Risks Relating to Our Company and Our Industry

*Our operating history is short and may not provide you with an adequate basis upon which to evaluate our business and prospects.*

We were incorporated on May 1, 2006 to acquire our operating subsidiary, Jiangxi LDK Solar, which was incorporated on July 5, 2005. We commenced construction of our first manufacturing plant in Xinyu Hi-Tech Industrial Park of Jiangxi province in China in 2005. We completed the installation of our first set of production equipment for trial runs in February 2006 and made our first commercial shipment of solar wafers in April 2006. Our operating history may be too short to give you a sufficient basis for evaluating our business, financial performance and prospects. We may not be able to achieve similar results or growth in future periods. Accordingly, you should not rely on our results of operations for any prior periods as an indication of our future performance.

*If we are not able to manage our rapid growth effectively, our results of operations may be adversely affected.*

In anticipation of the growth in demand for our multicrystalline wafers, we plan to expand our business operations significantly. The success of such business expansion and operational growth will depend upon the improvement of our operational and financial systems, enhancement of our internal procedures and controls, increase in our manufacturing capacity and output, and effective recruitment, training and retention of technicians and skilled employees. In addition, we will need to maintain and expand our relationships with customers, suppliers and other third parties. We cannot assure you that our current and planned operations, personnel, systems, internal procedures and controls will be adequate to support our future growth. If we are unable to manage our rapid growth effectively, we may not be able to take advantage of market opportunities, successfully execute our business strategies or respond to competitive pressures, and our results of operations may be adversely affected.

*Failure to secure sufficient quantities of polysilicon feedstock on commercially reasonable terms could adversely affect our results of operations and impede our business expansion plans.*

Solar-grade polysilicon feedstock is an essential raw material in manufacturing our multicrystalline solar wafers. Our operations depend on our ability to procure sufficient quantities of solar-grade polysilicon on a timely basis and on commercially reasonable terms. Polysilicon is also an essential raw material for the semiconductor industry, which requires polysilicon of higher purity than that for the solar industry. The significant growth of the solar wafer industry and the competing demand and buying power of the semiconductor industry have resulted in an industry-wide shortage in solar-grade polysilicon and a significant increase in solar-grade polysilicon price over the past few years. According to Solarbuzz, the average price of virgin polysilicon under long-term supply contracts increased from approximately $35 to $40 per kilogram delivered in 2005 to $50 to $55 per kilogram delivered in 2006, and was estimated to further increase to $60 to $65 per kilogram delivered in 2007. In addition, according to Photon Consulting, spot prices for virgin polysilicon feedstock were $100 per kilogram in 2005, were estimated to increase to $150 per kilogram in 2006, and are expected to further increase to $200 per kilogram in 2007 and $225 per kilogram in 2008. Currently, we have polysilicon inventories and supply commitments that we believe will satisfy over 90% of our estimated polysilicon requirements for 2007; however, we only have limited polysilicon supply commitments that extend beyond 2007. In addition, suppliers may delay or default in their delivery obligations under the supply agreements, as we have disclosed in the risk factor "— There are a limited number of suppliers of virgin polysilicon feedstock and failure or delay by any of our polysilicon suppliers in delivering supplies to us could adversely impact our production and delivery schedule and harm our reputation" below. We cannot assure you that we will continue to be able to acquire polysilicon in sufficient quantities and on commercially reasonable

10

terms or that we will be able to pass any increased costs of polysilicon to our customers. If we fail to do so, our business and profitability will be adversely affected.

***There are a limited number of suppliers of virgin polysilicon feedstock and failure or delay by any of our polysilicon suppliers in delivering supplies to us could adversely impact our production and delivery schedule and harm our reputation.***

Polysilicon manufacturing is a highly concentrated industry and there are only a limited number of virgin polysilicon producers in the world. According to Solarbuzz, the largest five virgin polysilicon producers had a combined production capacity of approximately 86% of the global production capacity of polysilicon in 2006. These virgin polysilicon producers not only provide silicon feedstock to the solar industry but are also the sources of polysilicon feedstock for the semiconductor industry. Although a small portion of our polysilicon feedstock consists of virgin polysilicon, the suppliers of our remaining requirements in the form of recyclable polysilicon also rely on the virgin polysilicon producers for their polysilicon raw materials. There have been reports and announcements that these virgin polysilicon producers have implemented production expansion programs in one form or another, but there can be no assurance that such expansion plans will succeed or increase their production enough to relieve the industry-wide shortage in solar-grade polysilicon supply. In addition, there is no assurance that the various reported greenfield projects by new entrants in the virgin polysilicon industry will be successful and increase supply of virgin polysilicon feedstock to our industry. From time to time we have experienced delays or defaults by some of our polysilicon suppliers in delivering supplies to us. For example, we entered into a supply contract in late 2006 to purchase raw materials from Technischer Warenhandel Heller and NCA Fortin Inc., as co-sellers, from 2006 to 2011. Pursuant to the terms of the contract, we have agreed to prepay each monthly shipment 15 days in advance. We paid $3.0 million in October 2006 as our partial prepayment with respect to the first shipment of silicon feedstock scheduled for delivery in November 2006. Technischer Warenhandel Heller and NCA Fortin Inc. have not, however, commenced delivery of any polysilicon feedstock as required and have informed us that delivery under this contract will be delayed. We are currently re-negotiating this contract with Technischer Warenhandel Heller and NCA Fortin Inc. Material or prolonged delays or defaults could adversely impact our production and delivery schedule and harm our reputation. If we fail to develop or maintain our relationships with these and other polysilicon suppliers, or should any of our major suppliers encounter difficulties in its production or shipment of polysilicon feedstock to us, whether due to natural disasters, labor unrest or any other reason, it will be difficult for us to find alternative sources on a timely basis and on commercially reasonable terms. In that event, we may be unable to manufacture and sell our products in the required quantities and on a timely basis. As a result, our production and delivery schedules may be adversely affected and our reputation may be harmed.

Our suppliers, particularly virgin polysilicon suppliers, require us to make prepayments from time to time. We make these prepayments, without receiving any collateral, in order to secure stable supply of polysilicon. As of December 31, 2006, our prepayments to polysilicon suppliers amounted to $37.7 million. Some of our suppliers have failed to meet their delivery schedule in the past. If our suppliers fail to deliver the polysilicon we have ordered on time or at all and do not return our prepayments, our results of operations may be adversely affected.

In order to secure supplies of polysilicon, we have entered into substantial long-term contractual commitments to purchase polysilicon from various suppliers. As of March 31, 2007, these purchase commitments amounted to approximately $897 million. Our polysilicon purchase commitments are generally on a "take or pay" basis, so that we are required to purchase the contracted supplies of polysilicon even if we are unable to use them. Therefore if our wafer production and sales and polysilicon requirements do not grow as expected, these purchase commitments could have a material adverse effect on our financial condition and results of operations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Contractual Commitments" in this prospectus.

11

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

*Reduction or elimination of government subsidies and economic incentives for the solar power industry could cause demand for our products to decline, thus adversely affecting our business prospects and results of operations.*

Growth of the solar power market, particularly for on-grid applications, depends largely on the availability and size of government subsidies and economic incentives. At present, the cost of solar power substantially exceeds the cost of conventional power provided by electric utility grids in many locations around the world. Various governments have used different policy initiatives to encourage or accelerate the development and adoption of solar power and other renewable energy sources. Renewable energy policies are in place in the European Union, most notably Germany and Spain, certain countries in Asia, including China, Japan and South Korea, and many of the states in Australia and the United States. Examples of government-sponsored financial incentives include capital cost rebates, feed-in tariffs, tax credits, net metering and other incentives to end-users, distributors, system integrators and manufacturers of solar power products to promote the use of solar power in both on-grid and off-grid applications and to reduce dependency on other forms of energy. Governments may decide to reduce or eliminate these economic incentives for political, financial or other reasons. Reductions in, or eliminations of, government subsidies and economic incentives before the solar power industry reaches a sufficient scale to be cost-effective in a non-subsidized marketplace could reduce demand for our products and adversely affect our business prospects and results of operations.

*We operate in a competitive market against players with greater resources and more advanced technologies and we may not be able to compete successfully.*

The multicrystalline solar wafer manufacturing market is competitive. Our competitors include international players such as affiliates of BP plc, or BP Solar, Deutsche Solar AG, or Deutsche Solar, Evergreen Solar Inc., or Evergreen Solar, Green Energy Technology, Inc., or Green Energy, JFE Steel Corporation, or JFE, Kyocera Corporation, or Kyocera, M.SETEK Co. Ltd., or M.SETEK, PV Crystalox Solar AG, or PV Crystalox, and Renewable Energy Corporation ASA, or REC, and MEMC Electronic Materials, Inc., or MEMC, which has announced plans to manufacture multicrystalline solar wafers. Our competitors also include companies located in China such as Jiangsu Shunda PV-Tech Co., Ltd., or Shunda, Jinggong P-D Shaoxing Solar Energy Technology Co., Ltd., or Jinggong P-D, and Tianwei Yingli New Energy Resources Co., Ltd., or Tianwei Yingli. Many of our current and potential competitors have a longer operating history, better name recognition, greater resources, larger customer base, better access to polysilicon feedstock and greater economies of scale than we do. In addition, most of our competitors are integrated players in the solar industry that also engage in the production of virgin polysilicon, photovoltaic cells and/or modules. Their business models may give them competitive advantages as these integrated players place less reliance on the upstream suppliers and/or downstream customers in the value chain. We currently have no plans to expand into the production of photovoltaic cells or modules, and we have entered into non-competition agreements with some of our customers, pursuant to which we have agreed not to engage in the production of solar cells or modules based on current wafer technology for the next 10 years. Furthermore, due to the perceived growth in demand for multicrystalline wafers, we expect an increase in the number of competitors over the next few years. The key barriers to entry into our industry at present consist of access to supplies of solar-grade polysilicon, availability of financing and availability of various production equipment, such as ingot-producing DSS furnaces and wafering equipment. If these barriers disappear or become more easily surmountable, new competitors may successfully enter our industry, resulting in loss of our market share and increased price competition.

Within the crystalline wafer industry, we also compete with monocrystalline wafer manufacturers. According to Solarbuzz, monocrystalline wafers in 2006 represented approximately 42% of the global photovoltaic cell production while multicrystalline wafers constituted approximately 49%. Certain monocrystalline wafer manufacturers have begun or intend to manufacture multicrystalline wafers, and they currently supply multicrystalline wafers to multicrystalline photovoltaic cell manufacturers, including some of our customers. Manufacturers of monocrystalline wafers that compete with us include Ersol Solar Energy AG, or Ersol, M.SETEK, ReneSola Ltd., or Renesola, Sumitomo Mitsubishi Silicon Corporation, or SUMCO, and Sino-American Silicon Products Inc., or Sino-American Silicon, and Trina Solar Limited.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

We also compete with alternative solar technologies. Some companies have spent significant resources in the research and development of proprietary solar technologies that may eventually produce photovoltaic products at costs similar to, or lower than, those of multicrystalline wafers without compromising product quality. For example, they are developing or currently producing photovoltaic products based on thin film photovoltaic materials, which require significantly less polysilicon to produce than multicrystalline solar products. These alternative photovoltaic products may cost less than those based on multicrystalline technologies while achieving the same level of conversion efficiency.

The solar power market in general also competes with other sources of renewable energy and conventional power generation. If prices for conventional and other renewable energy sources decline, or if these sources enjoy greater policy support than solar power, the solar power market could suffer and our business and results of operations may be adversely affected.

### *We may not be able to significantly increase our production capacity or output in order to increase our sales and gain additional market share.*

We need to significantly increase our production capacity and output to be able to meet the growing demand of our customers. As of March 31, 2007, we had an annual production capacity of approximately 215 MW. All of our production facilities are operating at full or close to full capacity. Our strategy includes a rapid expansion of our production capacity. To accommodate our business expansion plan, we have acquired additional land adjacent to our current production site at Xinyu Hi-Tech Industrial Park and are constructing additional manufacturing facilities on the acquired land. Our expansion plan requires a substantial increase in our production and ancillary equipment. We have entered into contracts to purchase additional equipment that is expected to be sufficient for our planned expansion to approximately 400 MW by the end of 2007 and approximately 600 MW by mid-2008. We currently do not have contractual commitments for all the equipment necessary for the expansion of our production capacity beyond 600 MW to approximately 800 MW by the end of 2008. If we are unable to enter into additional equipment purchase contracts at reasonable costs, or at all, or if any of our equipment manufacturers fails to deliver, or delays its delivery of, our equipment for any reason, the implementation of our expansion plan may be adversely affected. In addition, there is a limited supply in the world of the principal manufacturing equipment we use and we may not be able to replace our providers for the required equipment at reasonable costs and on a timely basis to implement our expansion plan.

We cannot assure you that we will be able to implement our business expansion plan on a timely basis or at all. Our ability to successfully implement our business expansion plan to establish additional manufacturing capacity and to increase our output and sales is subject to various risks and uncertainties, including:

• the need to procure additional equipment at reasonable costs and on a timely basis;

• the need to procure sufficient supplies of polysilicon feedstock at reasonable costs and on a timely basis;

• the need to raise additional funds to finance our purchase of additional polysilicon feedstock and equipment and the construction of additional manufacturing facilities, which we may be unable to obtain on reasonable terms or at all;

• construction delays and cost overruns;

• difficulties in recruitment and training of additional skilled employees, including technicians and managers at different levels;

• diversion of significant management attention and other resources; and

• delays or denials of required approvals for our land acquisition and plant construction by relevant government authorities.

Our expansion plan contemplates a substantial increase in production capacity and we cannot assure you that we can successfully implement our expansion plan or manage such an expanded capacity. If we fail, or encounter significant delays in our efforts, to establish or successfully utilize additional manufacturing

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

capacity or to increase our manufacturing output, we will be unable to increase our sales and capture additional market share, and our results of operations will be adversely affected.

> ***We rely on a limited number of suppliers for our production equipment and failure or delay by any of them in delivering equipment or spare parts to us could adversely impact our production.***

We rely on a limited number of equipment suppliers for all of our principal manufacturing equipment and spare parts, including our DSS furnaces, squarers that we use to cut multicrystalline ingots into smaller blocks, and wafering wire saws that we use to slice these blocks into wafers. Our equipment suppliers include GT Solar Incorporated, or GT Solar, HCT Shaping Systems SA, or HCT Shaping, Meyer Burger AG, or Meyer Burger, and Sinocon Machinery Company. These suppliers have supplied most of our current equipment and spare parts, and we will also rely on them to provide a substantial portion of the principal manufacturing equipment and spare parts contemplated in our expansion program. There is currently a shortage globally in much of the equipment required for our manufacturing process and capacity expansion. Our strategy includes a substantial expansion of our annual production capacity. We have entered into contracts with these equipment manufacturers to purchase additional equipment from them that is expected to be sufficient for our planned expansion up to approximately 400 MW by the end of 2007 and to approximately 600 MW by mid-2008. Although we also plan to further expand our annual production capacity to approximately 800 MW by the end of 2008, we currently do not have all the equipment supply contracts necessary to support the additional 200 MW expansion.

If we fail to develop or maintain our relationships with these and other equipment suppliers, or should any of our major equipment suppliers encounter difficulties in the manufacturing or shipment of its equipment to us, including due to natural disasters or otherwise fail to supply equipment according to our requirements, it will be difficult for us to find alternative providers for such equipment on a timely basis and on commercially reasonable terms. As a result, the implementation of our expansion plan may be interrupted and our production may be adversely impacted.

> ***We may develop excess production capacity and, as a result, our profitability may be adversely affected.***

Our expansion plan is based on the projected market demand for solar wafers relative to the current insufficient production capacity in the wafer manufacturing segment of the solar industry. There has been an industry-wide expansion effort to increase the overall wafer production capacity. In connection with our expansion plan, we have entered into substantial commitments to purchase polysilicon feedstock over the next few years. As of March 31, 2007, these commitments amounted to approximately $896.7 million in the aggregate, with the purchase price subject to periodical renegotiations. Any aggressive expansion of manufacturing capacity by us and our competitors may result in significant excess capacity in the wafer segment or in the overall solar industry and, as a result, prices may decline, our utilization ratio may decrease and our results of operations may be adversely affected.

> ***Prices for our wafers are expected to decline in the next few years, which could adversely affect our gross margin.***

Our wafer prices are based on a variety of factors, including global market wafer prices, supply and demand conditions in China, which currently is our largest market, and the terms of our customer contracts, including sales volumes and the terms on which certain customers supply us with polysilicon feedstock. According to Photon Consulting, wafer prices on a per-watt basis are expected to decline in the next few years due to increased production efficiencies, expected increases in global polysilicon supplies, declines in polysilicon prices, and increased wafer production capacity in our industry. If wafer prices decline and we are unable to lower our costs in line with the price decline, whether through manufacturing larger ingots or thinner wafers, or through technological advances, our gross margins would be adversely affected. In addition, as a part of our geographic expansion strategy and to strengthen our long-term customer base, we plan to significantly expand our overseas sales in 2007 and future years to target the top 20 solar cell and module manufacturers in the world. The current prevailing international market price for solar wafers is lower than the prevailing PRC market price. As a result, our increase in overseas sales may reduce our gross margin in the near term.

14

---

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

***We depend on a limited number of customers for a significant portion of our net sales; we do not have long-term commitments from them; and changes in their purchase terms or patterns may cause significant fluctuations or declines in our revenues.***

We currently sell our multicrystalline wafers to over 30 customers. They are mostly solar cell and module manufacturers, including CSI, Chinalight, Solarfun, Solartech Energy, Solland Solar and Suntech. For the year ended December 31, 2006 and March 31, 2007, our five largest customers collectively accounted for approximately 70.2% and 56.8%, respectively, of our net sales. Suntech and Solarfun contributed 39.7% and 13.9%, respectively, of our net sales for the year ended December 31, 2006. During the three months ended March 31, 2007, Suntech and Solarfun contributed 18.3% and 9.7%, respectively, of our net sales. Chinalight contributed 13.6% of our net sales for the three-month period. We do not, however, have long-term contracts with Chinalight. We have sold wafers to Chinalight primarily pursuant to short-term sales contracts and monthly and quarterly purchase orders. In addition, we have entered into a cooperation agreement with Suntech, pursuant to which we have committed to supply to Suntech 100 MW of wafers in 2007 and, in each year from 2008 to 2015, wafers equal to 40% to 60% of our annual production. Pursuant to this cooperation agreement, we and Suntech have periodically negotiated the specific quantities and prices of wafers to be supplied and, as a result, we have generally delivered less quantities than provided in the cooperation agreement. In addition, we have entered into written agreements with E-Ton Solar Tech Co., Ltd., or E-Ton, General Electric International Inc., or GE Energy, Motech Industries, Inc., or Motech, and Q-Cells, pursuant to which we have committed to supply each of them with specific annual quantities of wafers over the next few years, subject to periodic negotiations on prices. We do not have long-term purchase commitments from most of our customers, which may result in significant variation of our major customers from period to period. Our contracts with customers generally are framework agreements that are subject to future quarterly or annual agreements or monthly purchase orders by the parties as to specific terms, including quantity and price. See "Business — Customers, Sales and Marketing" in this prospectus.

We will continue to rely on a relatively small number of customers for a significant portion of our net sales for the foreseeable future. There can be no assurance that any of these customers will continue to purchase significant quantities of wafers from us. If any of these customers fails to purchase our committed production, we will be required to find alternative customers for these wafers. In addition, our customers could decide to expand upstream into the solar wafer business, which could adversely affect our sales to such customers. Because of our reliance on a limited number of customers, any of the following events may cause material fluctuations or declines in our net sales and profits:

• reductions, delays or cancellations of purchase orders from one or more of our significant customers;

• loss of one or more of our significant customers and our failure to identify additional or replacement customers; and

• failure of any of our significant customers to make timely payments for our products.

If we fail to develop or maintain our customer relationships with these and other customers, or if any of our major customers should encounter difficulties in its operations or reduce its purchases of our products, it may be difficult for us to find alternative customers on a timely basis and on commercially reasonable terms or at all, which may have an adverse effect on our revenue and profitability.

***If we are unable to fulfill our commitments to customers or customer orders on a timely basis, we may lose customers, our reputation may be damaged, and we may face penalties for breach of contracts.***

We have experienced delays in fulfilling purchase orders from some of our customers due to shortages in supplies of polysilicon feedstock and constraints in our production capacity. For example, during the first quarter of 2007, our production was interrupted because we temporarily shut down our DSS furnaces to install safety kits provided by GT Solar, manufacturer of our DSS furnaces. These safety kits are thermal blankets which are placed at the bottom of our DSS furnaces to prevent molten silicon from breaching the furnaces. In addition, our ability to meet existing contractual commitments to our customers depends on the successful and timely implementation of our expansion plan. If we are unable to fulfill our commitments to customers or customer orders on a timely basis, we may lose our customers and our reputation may be damaged. Moreover, our contracts with our customers sometimes provide for specified monetary damages or penalties for non-

15

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

delivery or failure to meet delivery schedules or product specifications. If any of our customers invokes these clauses against us, we may need to defend against the relevant claims, which could be time consuming and expensive. We may be found liable under these clauses and be required to pay damages.

***We require a significant amount of cash to fund our operations as well as meet future capital requirements; if we cannot obtain additional capital when we need it, our growth prospects and future profitability may be materially and adversely affected.***

We require a significant amount of cash to fund our operations, in particular payments to suppliers to secure our polysilicon feedstock requirements. We will also need capital to fund the expansion of our production capacity and other investing activities, as well as our research and development activities in order to remain competitive. We believe that our current cash and cash equivalents, anticipated cash flow from operations and the proceeds from this offering will be sufficient to meet our anticipated cash needs until the end of 2007, including for working capital and capital expenditure requirements. However, future acquisitions, expansions, market changes or other developments may cause us to require additional funds. Our ability to obtain external financing in the future is subject to a number of uncertainties, including:

• our future financial condition, results of operations and cash flows;

• general market conditions for financing activities by companies in our industry; and

• economic, political and other conditions in China and elsewhere.

If we are unable to obtain funding in a timely manner or on commercially acceptable terms, or at all, our growth prospects and future profitability may be materially and adversely affected.

***Our business depends on the continued services of our executive officers and key personnel and our business may be severely disrupted if we lose their services.***

Our success depends on the continued services of our executive officers and key personnel, in particular Mr. Xiaofeng Peng, our founder, chairman and chief executive officer. We do not maintain key-man life insurance on any of our executive officers and key personnel. If one or more of our executive officers and key personnel are unable or unwilling to continue in their present positions, we may not be able to replace them readily, if at all. As a result, our business may be severely disrupted and we may have to incur additional expenses in order to recruit and retain new personnel. In addition, if any of our executives joins a competitor or forms a competing company, we may lose some of our customers. Each of our executive officers and key personnel has entered into an employment agreement with us that contains confidentiality and non-competition provisions. However, if any dispute arises between our executive officers or key personnel and us, we cannot assure you, in light of uncertainties associated with the PRC legal system, that these agreements could be enforced in China where most of our executive officers and key personnel reside and hold most of their assets. See "— Risks Relating to Business Operations in China — The uncertain legal environment in China could limit the legal protections available to you" in this prospectus.

***If solar power is not adopted for wide commercial application, our revenues may decline and we may be unable to sustain our profitability.***

The solar power market is at an early stage of development and the extent of acceptance of solar power technology and products is uncertain. Many factors may affect the viability of wide commercial adoption and application of solar power technology, including:

• cost-effectiveness, performance and reliability of solar power technology and products compared to conventional and other renewable energy sources and products;

• availability of government subsidies and economic incentives to support the development of the solar power industry;

• success of, or increased government support for, other alternative energy generation technologies, such as fuel cells, wind power, hydroelectric power and biomass energy;

• fluctuations in economic and market conditions that affect the viability of renewable energy sources, such as increases or decreases in the prices of oil and other fossil fuels;

16

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

• deregulation of the electric power industry and the broader energy industry; and

• levels of capital expenditures by end-users of solar energy products, which tend to decrease when economic growth slows.

Market data on the solar power industry is not as readily available as that on other more established industries where trends can be assessed more reliably from data gathered over a longer period of time. If solar power technology proves unsuitable for wide commercial adoption and application or if demand for solar power products fails to develop sufficiently, we may not be able to grow our business or generate sufficient revenues to sustain our profitability.

### *Technological changes in the solar power industry could render our products uncompetitive or obsolete, which could reduce our market share and cause our net sales and profits to decline.*

The solar power industry is characterized by evolving technologies and standards. These technological evolutions and developments place increasing demands on the improvement of our products, such as higher photovoltaic efficiency and larger and thinner wafers. Other companies may devise production technologies that enable them to produce multicrystalline wafers that could yield higher photovoltaic conversion efficiencies at a lower cost than our products. Some of our competitors are developing alternative and competing solar technologies that may require significantly less silicon than multicrystalline solar cells and modules, or no silicon at all. Technologies developed or adopted by others may prove more advantageous than ours for commercialization of solar products and may render our products obsolete. As a result, we may need to invest significant resources in research and development to maintain our market position, keep pace with technological advances in the solar power industry and effectively compete in the future. Our failure to further refine and enhance our multicrystalline wafers or to keep pace with evolving technologies and industry standards could cause our products to become uncompetitive or obsolete, which could in turn reduce our market share and cause our net sales and profits to decline.

### *Unexpected equipment failures or accidents may lead to production curtailments or shutdowns, personal injuries or damage to properties.*

Our manufacturing processes use hazardous equipment, such as DSS furnaces, squarers and wire saws. Such equipment requires skills and experience for safe operation. We could experience events such as equipment failures, explosions or fires due to employee errors, equipment malfunctions, accidents, interruptions in electricity or water cooling supplies, natural disasters or other causes. As a result, we may in the future experience production curtailments or shutdowns or periods of reduced production, which would negatively affect our results of operations. In addition, such events could cause damage to properties, personal injuries or deaths. Any such event could result in civil lawsuits or regulatory enforcement proceedings, which in turn could lead to significant liabilities.

### *Our strategy includes possible alliances and acquisitions and our failure to successfully implement this strategy could have a material adverse effect on our business.*

As part of our strategy, we intend to consider entering into strategic acquisitions and investments and establishing strategic alliances with third parties in the solar industry. Strategic acquisitions, investments and alliances with third parties could subject us to a number of risks, including risks associated with sharing proprietary information and loss of control of operations that are material to our business. Moreover, strategic acquisitions, investments and alliances may be expensive to implement and subject us to the risk of non-performance by a counterparty, which may in turn lead to monetary losses that may materially and adversely affect our business.

### *Product defects could result in increased costs, damage to our reputation and loss of revenues and market share.*

Our products may contain defects that are not detected until after they are shipped or installed. For example, in July 2006, we had sales returns of over 7,000 pieces of improperly cleaned wafers due to the malfunction of our automated cleaning system and the limited operating experience of our employees. In our ordinary course of business, we also encounter periodic sales returns due to non-conformity with customers'

17

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

specifications or product defects. In each case, we are required to replace our products promptly. Product defects and the possibility of product defects could cause significant damage to our market reputation and reduce our product sales and market share. If we cannot successfully maintain the consistency and quality throughout our production process, this will result in substandard quality or performance of our wafers, including their reduced photovoltaic efficiency and higher wafer breakage. If we deliver solar wafers with defects, or if there is a perception that our products are of substandard quality, we may incur substantially increased costs associated with replacements of wafers, our credibility and market reputation will be harmed and sales of our wafers may be adversely affected.

### *If we fail to successfully expand our sales to overseas markets, our results of operations and prospects will be adversely affected.*

For the year ended December 31, 2006 and the three months ended March 31, 2007, 24.5% and 50.0% of our net sales were to customers outside China, respectively. We plan to continue to expand our overseas sales. Expansion of our sales to overseas markets is an essential part of our business expansion plan. If we fail to enhance and strengthen our revenue and customer base globally, our results of operations and long-term business prospects will be adversely affected.

### *Our independent registered public accounting firm, in the course of auditing our consolidated financial statements for the year ended December 31, 2006, noted a significant deficiency and other weaknesses in our internal control over financial reporting; if we fail to maintain an effective system of internal control over financial reporting, we may be unable to accurately report our financial results or prevent fraud, and investor confidence and the market price of our ADSs may be adversely affected.*

Our reporting obligations as a public company will place a significant strain on our management, operational and financial resources and systems for the foreseeable future. Prior to this offering, we have been a private company with a short operating history and have limited accounting personnel and other resources with which to address our internal control over financial reporting. In the course of auditing our consolidated financial statements for the year ended December 31, 2006, our independent registered public accounting firm noted and communicated to us a significant deficiency and other weaknesses in our internal control over financial reporting as defined in standards established by the U.S. Public Company Accounting Oversight Board. A "significant deficiency" is a control deficiency, or combination of control deficiencies, that adversely affects a company's ability to initiate, authorize, record, process or report external financial data reliably in accordance with generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of the company's annual or interim financial statements that is more than inconsequential will not be prevented or detected.

The significant deficiency identified by our independent registered public accounting firm is that our chief financial officer joined us in August 2006 and that we did not previously have any personnel who were familiar with U.S. GAAP. We currently do not have sufficient personnel with adequate expertise to ensure that we can produce financial statements in accordance with U.S. GAAP on a timely basis.

Following the identification of this significant deficiency and other weaknesses, we have adopted certain steps, and we plan to implement additional steps, to address them and to improve our internal control over financial reporting generally. However, the implementation of these measures may not fully address this significant deficiency and other weaknesses in our internal control over financial reporting, and we cannot yet conclude that they have been fully remedied. Our failure to correct this significant deficiency and other weaknesses or our failure to discover and address any other control deficiencies or weaknesses could result in inaccuracies in our financial statements and could also impair our ability to comply with applicable financial reporting requirements and related regulatory filings on a timely basis. As a result, our business, financial condition, results of operations and prospects, as well as the trading price of our ADSs, may be materially and adversely affected. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Internal Control Over Financial Reporting" in this prospectus.

Upon completion of this offering, we will become a public company in the United States that is subject to the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act. Section 404 of the Sarbanes-Oxley Act will require that we include a report from management on our internal control over financial reporting in our

18

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

annual report on Form 20-F beginning with our annual report for the fiscal year ending December 31, 2008. In addition, beginning at the same time, our auditors must attest to and report on our management's assessment of the effectiveness of our internal control over financial reporting. Our management may conclude that our internal control over financial reporting is not effective. Moreover, even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm may disagree. If our independent registered public accounting firm is not satisfied with our internal control over financial reporting or the level at which our internal control over financial reporting is documented, designed, operated or reviewed, or if the independent registered public accounting firm interprets the requirements, rules or regulations differently than we do, then they may decline to attest to our management's assessment or may issue an adverse opinion. Any of these possible outcomes could result in an adverse reaction in the financial marketplace due to a loss of investor confidence in the reliability of our reporting processes, which could adversely impact the market price of our ADSs. We will need to incur significant costs and use significant management and other resources in order to comply with Section 404 of the Sarbanes-Oxley Act.

### If we are unable to attract, train and retain technicians and a skilled labor force, our business may be materially and adversely affected.

Our continued success depends, to a significant extent, on our ability to attract, train and retain technicians and a skilled labor force for our business. Recruiting and retaining capable technicians, particularly those with expertise in the solar power industry, are vital to our success. Our principal operations are located at Xinyu city of Jiangxi province, a relatively less developed region compared to coastal cities in China. Our location adds difficulties to our recruiting efforts. In addition, there exists substantial competition for qualified technicians in the solar power industry, and there can be no assurance that we will be able to attract or retain technicians. Neither can we assure you that we will be able to recruit, train and retain skilled workers. If we fail to attract and retain qualified employees, our business and prospects may be materially and adversely affected.

### Fluctuations in exchange rates could adversely affect our business.

A significant portion of our sales is denominated in Renminbi. Our costs and capital expenditures are largely denominated in U.S. dollars and euros. Therefore, fluctuations in currency exchange rates could have a material adverse effect on our financial condition and results of operations. Fluctuations in exchange rates, particularly among the U.S. dollar, Renminbi and euro, affect our gross and net profit margins and could result in foreign exchange and operating losses.

Our financial statements are expressed in U.S. dollars but the functional currency of our principal operating subsidiary, Jiangxi LDK Solar, is Renminbi. The value of your investment in our ADSs will be affected by the foreign exchange rate between U.S. dollars and Renminbi. For example, to the extent that we need to convert U.S. dollars received from this offering into Renminbi for our operations, appreciation of Renminbi against the U.S. dollar would reduce the Renminbi amount for use in our operations. In addition, to the extent we hold assets denominated in U.S. dollars, including the net proceeds to us from this offering, any appreciation of Renminbi against the U.S. dollar could result in a charge to our income statement and a reduction in the value of our U.S. dollar denominated assets. On the other hand, if we decide to convert our Renminbi amounts into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, a decline in the value of Renminbi against the U.S. dollar could reduce the U.S. dollar equivalent amounts of the Renminbi we convert. In addition, a depreciation of Renminbi against the U.S. dollar could reduce the U.S. dollar equivalent amounts of our financial results, the value of your investment in our company and the dividends we may pay in the future, if any, all of which may have a material adverse effect on the price of our ADSs.

We incurred a net foreign currency loss of $1.3 million and $0.5 million during the year ended December 31, 2006 and the three months ended March 31, 2007, respectively. We cannot predict the impact of future exchange rate fluctuations on our results of operations and may incur additional net foreign currency losses in the future. Currently, we do not plan to enter into any hedging arrangements to reduce the effect of our foreign exchange exposure, but even if we do, we cannot assure you that such hedging activities will be effective in managing our foreign exchange risk exposure.

19

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

*Compliance with environmental regulations can be expensive, and noncompliance may result in adverse publicity and potentially significant monetary damages and fines or suspension of our business operations.*

We are required to comply with all national and local regulations regarding protection of the environment. Compliance with environmental regulations is expensive. In addition, if more stringent regulations are adopted by the PRC government in the future, the costs of compliance with PRC environmental protection regulations could increase. If we fail to comply with present or future environmental regulations, we may be subject to substantial fines or damages or suspension of our business operations, and our reputation may be harmed.

*We have limited insurance coverage and may incur losses resulting from product liability claims or business interruptions.*

We are exposed to risks associated with product liability claims in the event that the use of our solar wafers and ingots results in injury. Since our solar wafers and ingots are made into electricity producing devices, it is possible that users could be injured or killed by devices that use our solar wafers and ingots, whether by product malfunctions, defects, improper installations or other causes. Due to our limited historical experience, we are unable to predict whether product liability claims will be brought against us in the future or to predict the effect of any resulting adverse publicity on our business. The successful assertion of product liability claims against us could result in potentially significant monetary damages and require us to make significant payments. Moreover, we do not carry any product liability insurance and may not have adequate resources to satisfy a judgment in the event of a successful claim against us. In addition, we do not carry any business interruption insurance. As the insurance industry in China is still in its early stage of development, even if we decide to take out business interruption coverage, such insurance available in China offers limited coverage compared to that offered in many other countries. Any business disruption or natural disaster could result in substantial losses and diversion of our resources.

*Increases in electricity costs or shortage of electricity supply may adversely affect our operations.*

We consume a significant amount of electricity in our operations. In August 2006, as support to our operations in Xinyu city, the Xinyu Industry Development District government agreed to subsidize us for our utility charges over and above $0.05 per kilowatt-hour. At the current market rate of $0.07 per kilowatt-hour, we are effectively subsidized by $0.02 per kilowatt-hour we use. In 2006, we received an aggregate of $0.8 million in such government subsidies. This utility arrangement is valid for three years from August 2006. The government may also terminate its subsidy prior to the expiration of the three-year term. Upon expiration or termination of the arrangement, our electricity costs may increase. Moreover, with the rapid development of the PRC economy, demand for electricity has continued to increase. There have been shortages in electricity supply in various regions across China, especially during peak seasons, such as summer. For instance, our production was significantly disrupted in August 2006 due to power blackouts in Xinyu city. To prevent similar occurrences, we have since installed backup power transformer substations at our Xinyu site with an installed capacity of 40 million volt-amperes. Although the capacity of the backup transformer substation is sufficient to support our current operations and our expansion program through the end of 2007, we cannot assure you that there will be no interruption or shortages in our electricity supply or that there will be sufficient electricity available to us to meet our future requirements. Increases in electricity costs or shortages in electricity supply may disrupt our normal operations and adversely affect our profitability.

*Failure to protect our intellectual property rights, know-how and technology may undermine our competitive position.*

We have developed various production process related know-how and technologies in the production of solar wafers and ingots. Such know-how and technologies play a critical role in our quality assurance and cost reduction. In addition, we have implemented a number of research and development programs with a view to developing techniques and processes that will improve production efficiency and product quality. Our intellectual property and proprietary rights arising out of these research and development programs will be crucial in maintaining our competitive edge in the solar wafer industry. We currently do not have any patent or patent application pending in China or elsewhere. We currently use contractual arrangements with employees

20

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

and trade secret protections to protect our intellectual property and proprietary rights. Nevertheless, contractual arrangements afford only limited protection and the actions we may take to protect our intellectual property and proprietary rights may not be adequate. In addition, others may obtain knowledge of our know-how and technologies through independent development. Our failure to protect our production process related know-how and technologies and/or our intellectual property and proprietary rights may undermine our competitive position. Third parties may infringe or misappropriate our proprietary technologies or other intellectual property and proprietary rights. Policing unauthorized use of proprietary technology can be difficult and expensive. Also, litigation, which can be costly and divert management attention and other resources away from our business, may be necessary to enforce our intellectual property rights, protect our trade secrets or determine the validity and scope of our proprietary rights. We cannot assure you that the outcome of such potential litigation will be in our favor. An adverse determination in any such litigation will impair our intellectual property and proprietary rights and may harm our business, prospects and reputation.

### We may be exposed to infringement, misappropriation or other claims by third parties and an adverse determination could result in us paying significant damages.

Our success depends on our ability to use and develop our technology and know-how and to manufacture and sell our solar wafers and ingots without infringing the intellectual property or other rights of third parties. We do not have, and have not applied for, any patents for our proprietary technologies in China or elsewhere. We may be subject to litigation involving claims of patent infringement or violation of intellectual property rights of third parties. The validity and scope of claims relating to solar power technology patents involve complex scientific, legal and factual questions and analyses and, therefore, may be highly uncertain. The defense and prosecution of intellectual property suits, patent opposition proceedings, trademark disputes and related legal and administrative proceedings can be both costly and time consuming and may significantly divert our resources and the attention of our technical and management personnel. An adverse ruling in any such litigation or proceedings could subject us to significant liability to third parties, require us to seek licenses from third parties, to pay ongoing royalties, or to redesign our products or subject us to injunctions prohibiting the manufacture and sale of our products or the use of our technologies. Protracted litigation could also result in our customers or potential customers deferring or limiting their purchase or use of our products until resolution of such litigation.

### Our principal shareholder, Mr. Xiaofeng Peng, has substantial control over our company and his interests may not be aligned with the interests of our other shareholders.

Mr. Peng, our founder, chairman and chief executive officer, currently beneficially owns 82.8% of our outstanding share capital and will beneficially own approximately          % of our outstanding share capital upon completion of this offering, assuming no exercise by the underwriters of their over-allotment option, or approximately           % of our outstanding share capital if the underwriters exercise their over-allotment option in full. As such, Mr. Peng will have substantial control over our business, including decisions regarding mergers, consolidations and the sale of all or substantially all of our assets, election of directors, dividend policy and other significant corporate actions. Mr. Peng may take actions that are not in the best interest of our company or our other shareholders. For example, this concentration of ownership may discourage, delay or prevent a change in control of our company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of a sale of our company and might reduce the price of our ADSs. On the other hand, if Mr. Peng is in favor of any of these actions, these actions may be taken even if they are opposed by our other shareholders, including you and those who purchase ADSs in this offering.

### We have granted, and may continue to grant, stock options under our stock incentive plan and our net income could be adversely impacted.

We adopted a stock incentive plan in 2006. As of the date of this prospectus, we have outstanding stock options under our stock incentive plan with respect to 8,710,700 ordinary shares, of which 8,510,700 were granted to our directors, employees, consultants and service providers. In December 2004, the Financial Accounting Standards Board, or FASB, issued Statement of Financial Accounting Standards, or SFAS, No. 123R, "Share-Based Payment." This statement, which became effective in the first quarter of 2006,

21

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

prescribes how we account for share-based compensation and may have an adverse impact on our results of operations or the price of our ADSs. SFAS No. 123R requires us to recognize share-based compensation as compensation expense in the statement of operations based on the fair value of equity awards on the date of the grant, with the compensation expense recognized over the period in which the recipient is required to provide service in exchange for the equity award. The additional expenses associated with share-based compensation may reduce the attractiveness of issuing stock options under our stock incentive plan. However, if we do not grant stock options or reduce the number of stock options that we grant, we may not be able to attract and retain key personnel. If we grant more stock options to attract and retain key personnel, the expenses associated with share-based compensation may adversely affect our net income.

**Risks Relating to Business Operations in China**

*Changes in PRC political and economic policies and conditions could adversely affect our business and prospects.*

China has been, and will continue to be, our primary production base and currently almost all of our assets are located in China. While the PRC government has been pursuing economic reforms to transform its economy from a planned economy to a market-oriented economy since 1978, a substantial part of the PRC economy is still being operated under various controls of the PRC government. By imposing industrial policies and other economic measures, such as control of foreign exchange, taxation and foreign investment, the PRC government exerts considerable direct and indirect influence on the development of the PRC economy. Many of the economic reforms carried out by the PRC government are unprecedented or experimental and are expected to be refined and improved over time. Other political, economic and social factors may also lead to further adjustments of the PRC reform measures. This refining and adjustment process may not necessarily have a positive effect on our operations and our future business development. For example, the PRC government has in the past implemented a number of measures intended to slow down certain segments of the PRC economy that the government believed to be overheating, including raising benchmark interest rates of commercial banks, reducing money supply and placing additional limitations on the ability of commercial banks to make loans by raising bank reserves against deposits. Our business, prospects and results of operations may be materially and adversely affected by changes in the PRC economic and social conditions and by changes in the policies of the PRC government, such as measures to control inflation, changes in the rates or method of taxation and the imposition of additional restrictions on currency conversion.

*Changes in foreign exchange and foreign investment regulations in China may affect our ability to invest in China and the ability of our PRC subsidiary to pay dividends and service debts in foreign currencies.*

Renminbi is not a freely convertible currency at present. The PRC government regulates conversion between Renminbi and foreign currencies. Changes in PRC laws and regulations on foreign exchange may result in uncertainties in our financing and operating plans in China. Over the years, China has significantly reduced the government's control over routine foreign exchange transactions under current accounts, including trade and service related foreign exchange transactions, payment of dividends and service of foreign debts. In accordance with the existing foreign exchange regulations in China, our PRC subsidiary, Jiangxi LDK Solar, is able to pay dividends and service debts in foreign currencies without prior approval from the PRC State Administration of Foreign Exchange, or SAFE, by complying with certain procedural requirements. However, there can be no assurance that the current PRC foreign exchange policies regarding debt service and payment of dividends in foreign currencies will continue in the future. Changes in PRC foreign exchange policies may have a negative impact on the ability of our PRC subsidiary to service its foreign currency-denominated indebtedness and to distribute dividends to us in foreign currencies.

Foreign exchange transactions by our PRC subsidiary under the capital account continue to be subject to significant foreign exchange controls. Subsequent to this offering, we have the choice, as permitted by the PRC foreign investment regulations, to invest our net proceeds from this offering in the form of registered capital or a shareholder loan into our PRC subsidiary to finance our operations in China. Our choice of investment is affected by the relevant PRC regulations with respect to capital-account and current-account foreign exchange transactions in China. In addition, our transfer of funds to our subsidiary in China is subject

22

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

to approval by PRC governmental authorities in case of an increase in registered capital, or subject to registration with PRC governmental authorities in case of a shareholder loan. These limitations on the flow of funds between us and our PRC subsidiary could restrict our ability to act in response to changing market conditions.

### *The uncertain legal environment in China could limit the legal protections available to you.*

Our principal operating subsidiary, Jiangxi LDK Solar, is a wholly foreign-owned enterprise in China and is subject to laws and regulations applicable to foreign investments in China in general and laws and regulations applicable to wholly foreign-owned enterprises in particular. The PRC legal system is a civil law system based on written statutes. Unlike the common law system, the civil law system is a system in which decided legal cases have little precedential value. When the PRC government started its economic reform in 1978, it began to formulate and promulgate a comprehensive system of laws and regulations to provide general guidance on economic and business practices in China and to regulate foreign investments. China has made significant progress in the promulgation of laws and regulations dealing with economic matters such as corporate organization and governance, foreign investment, commerce, taxation and trade. However, the promulgation of new laws, changes in existing laws and abrogation of local regulations by national laws may have a negative impact on our business and prospects. In addition, as these laws, regulations and legal requirements are relatively recent and because of the limited volume of published cases and their non-binding nature, the interpretation and enforcement of these laws, regulations and legal requirements involve significant uncertainties. These uncertainties could limit the legal protections available to foreign investors, including you.

### *Our primary source of funds in the form of dividends and other distributions from our operating subsidiary in China is subject to various legal and contractual restrictions and uncertainties, and our ability to pay dividends or make other distributions to our shareholders is negatively affected by those restrictions and uncertainties.*

We are a holding company established in the Cayman Islands and conduct our core business operations through our principal operating subsidiary, Jiangxi LDK Solar, in China. As a result, our profits available for distribution to our shareholders are dependent on the profits available for distribution from Jiangxi LDK Solar. If Jiangxi LDK Solar incurs debt on its own behalf, the debt instruments may restrict its ability to pay dividends or make other distributions, which in turn would limit our ability to pay dividends on our ordinary shares and ADSs. Under the current PRC laws, because we are incorporated in the Cayman Islands, our PRC subsidiary, Jiangxi LDK Solar, is regarded as a wholly foreign-owned enterprise in China. Although dividends paid by foreign-invested enterprises, such as wholly foreign-owned enterprises, are currently not subject to any PRC corporate withholding tax, the PRC laws permit payment of dividends only out of net income as determined in accordance with PRC accounting standards and regulations. Determination of net income under PRC accounting standards and regulations may differ from determination under U.S. GAAP in significant aspects, such as the use of different principles for recognition of revenues and expenses. In addition, distribution of additional equity interests by Jiangxi LDK Solar to us which is credited as fully paid through capitalizing its undistributed profits requires additional approval of the PRC government due to an increase in the registered capital and total investment in Jiangxi LDK Solar. Under the PRC laws, Jiangxi LDK Solar, a wholly foreign-owned enterprise, is required to set aside a portion of its net income each year to fund designated statutory reserve funds. These reserves are not distributable as cash dividends. As a result, our primary internal source of funds for dividend payments from Jiangxi LDK Solar is subject to these and other legal and contractual restrictions and uncertainties.

### *Expiration of, or changes to, current PRC tax incentives that our business enjoys could have a material adverse effect on our results of operations.*

Under current PRC laws and regulations, a company established in China is typically subject to a national enterprise income tax at the rate of 30% on its taxable income and a local enterprise income tax at the rate of 3% on its taxable income. A company that qualifies as a "high and new technology enterprise" is entitled to a reduced national enterprise income tax rate of 15%. The PRC government has provided various incentives to foreign-invested enterprises to encourage foreign investments. Such incentives include reduced

23

tax rates and other measures. Foreign-invested enterprises that are determined by PRC tax authorities to be manufacturing companies with authorized terms of operation for more than ten years are eligible for:

• a two-year exemption from the national enterprise income tax beginning with their first profitable year; and

• a 50% reduction of their applicable national enterprise income tax rate for the succeeding three years.

The local preferential enterprise taxation treatment is within the jurisdiction of the local provincial authorities as permitted under the current PRC tax laws relating to foreign-invested enterprises. The local tax authorities decide whether to grant any tax preferential treatment to foreign-invested enterprises on basis of their local conditions. The Jiangxi provincial government has announced that energy companies with authorized terms of operation for more than ten years are eligible for:

• a five-year exemption from the 3% local enterprise income tax from their first profitable year; and

• a 50% reduction of their local enterprise income tax rate for the succeeding five years.

Under current PRC laws and regulations, Jiangxi LDK Solar is entitled to a two-year exemption from the national enterprise income tax for 2006 and 2007 and will be subject to a reduced national enterprise income tax rate of 15% from 2008 through 2010. Likewise, Jiangxi LDK Solar is entitled to a five-year exemption from the local enterprise income tax beginning in 2006 and will be subject to a reduced local enterprise income tax rate of 1.5% from 2011 through 2015. When these tax benefits expire, the effective tax rate of our PRC subsidiary will increase, which will result in an increase in our income tax expenses.

In March 2007, the National People's Congress of China enacted a new Enterprise Income Tax Law, which will become effective on January 1, 2008. The new tax law would impose a unified income tax rate of 25% on all domestic enterprises and foreign-invested enterprises unless they qualify under certain limited exceptions. The new tax law permits companies to continue to enjoy their existing preferential tax treatment until such treatment expires in accordance with its current terms. Under the new tax law, "high and new technology enterprises" specially supported by the PRC government will continue to enjoy a reduced national enterprise tax rate of 15%. The new tax law, however, does not specify what high and new technology enterprises will be eligible for special support from the government. Our wholly owned subsidiary, Jiangxi LDK Solar, obtained the "high and new technology enterprise" status in December 2006. Such status is valid for two years and is renewable upon review and approval by the Science and Technology Bureau of Jiangxi Province. If we fail to maintain our status as a "high and new technology enterprise" or fail to qualify for special support from the PRC government, we will be subject to the 25% unified enterprise income tax rate beginning in 2011 after our current preferential tax treatment expires.

If our current tax benefits expire or otherwise become unavailable to us for any reason, our profitability may be materially and adversely affected.

***Our failure to obtain the prior approval of the China Securities Regulatory Commission, or CSRC, for the listing and trading of our ADSs on the New York Stock Exchange could significantly delay this offering or adversely affect our business and reputation and the trading price of our ADSs, and may also create uncertainties for this offering.***

On August 8, 2006, six PRC regulatory agencies, including the Ministry of Commerce, the State Assets Supervision and Administration Commission, the State Administration for Taxation, the State Administration for Industry and Commerce, the CSRC, and the SAFE, jointly issued the Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, which became effective on September 8, 2006. This regulation, among other things, includes provisions that purport to require that an offshore special purpose vehicle formed for purposes of overseas listing of equity interests in PRC companies and controlled directly or indirectly by PRC companies or individuals obtain the approval of the CSRC prior to the listing and trading of such special purpose vehicle's securities on an overseas stock exchange.

On September 21, 2006, the CSRC published on its official website procedures regarding its approval of overseas listings by special purpose vehicles. The CSRC approval procedures require the filing of a number of documents with the CSRC and it would take several months to complete the approval process.

24

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

The application of this new PRC regulation remains unclear with no consensus currently existing among leading PRC law firms regarding the scope of the applicability of the CSRC approval requirement.

Our PRC counsel, Grandall Legal Group, has advised us that, based on their understanding of the current PRC laws and regulations as well as the procedures announced on September 21, 2006:

- The CSRC currently has not issued any definitive rule or interpretation concerning whether offerings like ours under this prospectus are subject to this new procedure; and

- In spite of the above, given that we have completed our restructuring before September 8, 2006, the effective date of the new regulation, this regulation does not require an application be submitted to the CSRC for its approval of the listing and trading of our ADSs on the New York Stock Exchange, unless we are clearly required to do so by possible later rules of the CSRC.

If the CSRC requires that we obtain its approval prior to the completion of this offering, this offering will be delayed until we obtain CSRC approval, which may take several months. If prior CSRC approval is required but not obtained, we may face regulatory actions or other sanctions from the CSRC or other PRC regulatory agencies. These regulatory agencies may impose fines and penalties on our operations in China, limit our operating privileges in China, delay or restrict the repatriation of the proceeds from this offering into China, or take other actions that could have a material adverse effect on our business, financial condition, results of operations, reputation and prospects, as well as the trading price of our ADSs. The CSRC or other PRC regulatory agencies also may take actions requiring us, or making it advisable for us, to halt this offering before settlement and delivery of the ADSs offered hereby. Consequently, if you engage in market trading or other activities in anticipation of and prior to settlement and delivery, you do so at the risk that settlement and delivery may not occur.

Also, if the CSRC subsequently requires that we obtain its approval, we may be unable to obtain a waiver of the CSRC approval requirements, if and when procedures are established to obtain such a waiver. Any uncertainties and/or negative publicity regarding this CSRC approval requirement could have a material adverse effect on the trading price of our ADSs.

***Recent PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may subject our PRC resident shareholders to personal liability and limit our ability to acquire PRC companies or to inject capital into our PRC subsidiary, limit our PRC subsidiary's ability to distribute profits to us, or otherwise materially and adversely affect us.***

The SAFE issued a public notice in October 2005, or the SAFE notice, requiring PRC residents, including both legal persons and natural persons, to register with the competent local SAFE branch before establishing or controlling any company outside China, referred to as an "offshore special purpose company," for the purpose of acquiring any assets of or equity interest in PRC companies and raising funds from overseas. In addition, any PRC resident that is the shareholder of an offshore special purpose company is required to amend its SAFE registration with the local SAFE branch with respect to that offshore special purpose company in connection with any increase or decrease of capital, transfer of shares, merger, division, equity investment or creation of any security interest over any assets located in China. If any PRC shareholder of an offshore special purpose company fails to make the required SAFE registration and amendment, the PRC subsidiaries of that offshore special purpose company may be prohibited from distributing their profits and the proceeds from any reduction in capital, share transfer or liquidation to the offshore special purpose company. Moreover, failure to comply with the SAFE registration and amendment requirements described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions. Our current beneficial owners who are PRC residents have registered with the local SAFE branch as required under the SAFE notice. The failure of these beneficial owners to amend their SAFE registrations in a timely manner pursuant to the SAFE notice or the failure of future beneficial owners of our company who are PRC residents to comply with the registration procedures set forth in the SAFE notice may subject such beneficial owners to fines and legal sanctions and may also result in restrictions on our PRC subsidiary's ability to distribute profits to us or otherwise materially and adversely affect our business.

25

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**Risks Relating to This Offering**

*The market price of our ADSs may be volatile.*

The market price of our ADSs is likely to be highly volatile and subject to wide fluctuations in response to factors such as:

• actual or anticipated fluctuations in our results of operations;

• announcements of new products by us or our competitors;

• technological breakthroughs in the solar and other renewable power industries;

• reduction or elimination of government subsidies and economic incentives for the solar industry;

• news regarding any gain or loss of customers by us;

• news regarding recruitment or loss of key personnel by us or our competitors;

• announcements of competitive developments, acquisitions or strategic alliances in our industry;

• changes in earnings estimates or recommendations by financial analysts;

• potential litigation or regulatory investigations;

• general market conditions or other developments affecting us or our industry;

• the operating and stock price performance of other companies, other industries and other events or factors beyond our control; and

• release of lock-up or other transfer restrictions on our outstanding ADSs or equity securities or sales or perceived sales of additional equity securities or ADSs.

You should note that the stock prices of companies in the solar power sector have experienced wide fluctuations. Such wide market fluctuations may adversely affect the market price of our ADSs.

In addition, the securities markets have from time to time experienced significant price and volume fluctuations that are not related to the operating performance of particular companies. These market fluctuations may also materially and adversely affect the market price of our ADSs.

*There has been no prior public market for our ADSs or equity securities, and you may not be able to sell your ADSs at or above the initial public offering price.*

Before this initial public offering, there has been no public market for our ADSs or equity securities. We cannot assure you that an active public market for our ADSs will develop or that the market price of our ADSs will not decline below their initial public offering price. The initial public offering price of our ADSs will be determined by negotiations among us, the selling shareholders and the underwriters and may not be indicative of prices that will prevail in the trading market. You may be unable to resell your ADSs at a price that is attractive to you.

*We may not be able to pay any dividends on our ordinary shares and ADSs.*

Under Cayman Islands law, we may only pay dividends out of our profits or our short premium account subject to our ability to service our debts as they fall due in the ordinary course of our business. Our ability to pay dividends will therefore depend on our ability to generate sufficient profits. We cannot give any assurance that we will declare dividends of any amounts, at any rate or at all in the future. We have not paid any dividends in the past. Future dividends, if any, will be at the discretion of our board of directors and will depend upon our future operations and earnings, capital expenditure requirements, general financial conditions, legal and contractual restrictions and other factors that our board of directors may deem relevant. You should refer to the "Dividend Policy" section in this prospectus for additional information regarding our current dividend policy and the risk factor entitled "— Risks Relating to Business Operations in China — Our primary source of funds in the form of dividends and other distributions from our operating subsidiary in China is subject to various legal and contractual restrictions and uncertainties, and our ability to pay dividends or make other distributions to our shareholders are negatively affected by those restrictions and uncertainties" above for additional legal restrictions on the ability of our PRC subsidiary to pay dividends to us.

26

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

***Future financing may cause a dilution in your shareholding or place restrictions on our operations.***

We may require additional funding to meet our working capital or capital expenditure requirements or in connection with any acquisition we may make in the future. If we raise such funding through issuance of new equity or equity-linked securities it may cause a dilution in the percentage ownership of our then existing shareholders. Alternatively, if we meet such funding requirements by way of additional debt financing, we may have restrictions placed on us through such debt financing arrangements which may:

- limit our ability to pay dividends or require us to seek consents for the payment of dividends;

- increase our vulnerability to general adverse economic and industry conditions;

- limit our ability to pursue our business strategies;

- require us to dedicate a substantial portion of our cash flow from operations to service our debt, thereby reducing the availability of our cash flow to fund capital expenditure, working capital requirements and other general corporate needs; and

- limit our flexibility in planning for, or reacting to, changes in our business and our industry.

***Future sales or issuances, or perceived future sales or issuances, of substantial amounts of our ordinary shares or ADSs could adversely affect the price of our ADSs.***

If our existing shareholders sell, or are perceived as intending to sell, substantial amounts of our ordinary shares or ADSs, including those issued upon the exercise of our outstanding stock options, following this offering, the market price of our ADSs could fall. Such sales, or perceived potential sales, by our existing shareholders might make it more difficult for us to issue new equity or equity-related securities in the future at a time and place we deem appropriate. The          ADSs representing          ordinary shares offered in this offering will be eligible for immediate resale in the public market without restrictions, and those held by our existing shareholders may also be sold in the public market in the future subject to the restrictions contained in Rule 144 and Rule 701 under the Securities Act and the applicable lock-up agreements. If any existing shareholder or shareholders sell a substantial amount of ordinary shares after the expiration of the lock-up period, the prevailing market price for our ADSs could be adversely affected. See "Underwriting" and "Shares Eligible for Future Sale" for additional information regarding resale restrictions.

In addition, we may issue additional ADSs or ordinary shares for future acquisitions or other purposes. If we issue additional ADSs or ordinary shares, your ownership interests in our company would be diluted and this in turn could have a material adverse effect on the price of our ADSs.

***You will experience immediate and substantial dilution in the book value of the ADSs you purchase.***

The initial public offering price per ADS is substantially higher than the net tangible book value per ADS prior to the offering. Accordingly, if you purchase our ADSs in this offering, you will incur immediate dilution of approximately $          in the net tangible book value per ADS from the price you pay for our ADSs, representing the difference between:

- the assumed initial public offering price of $          per ADS (the mid-point of the estimated initial public offering price range set forth on the front cover of this prospectus), and

- the pro forma as adjusted net tangible book value per ADS of $          at March 31, 2007, assuming the automatic conversion of our outstanding Series A, Series B and Series C preferred shares into ordinary shares and after giving effect to this offering.

You may find additional information in the section entitled "Dilution" in this prospectus. If we issue additional ADSs in the future, you may experience further dilution. In addition, you may experience further dilution to the extent that ordinary shares are issued upon the exercise of stock options. Substantially all of the ordinary shares issuable upon the exercise of our currently outstanding stock options will be issued at a purchase price on a per ADS basis that is less than the initial public offering price per ADS in this offering.

27

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

*You may not be able to exercise your right to vote.*

As an ADS holder, you may only exercise the voting rights with respect to the underlying ordinary shares in accordance with the provisions of the deposit agreement. Under the deposit agreement, you must vote by giving voting instructions to the depositary. Upon receipt of your voting instructions, the depositary will vote the underlying ordinary shares in accordance with these instructions. Otherwise, you will not be able to exercise your right to vote unless you withdraw the ordinary shares underlying your ADSs. Pursuant to our articles of association, we may convene a shareholders' meeting upon 10 clear days' prior notice. When a shareholder's meeting is convened, you may not receive sufficient advance notice to withdraw the ordinary shares underlying your ADSs to allow you to vote with respect to any specific matter. If we give timely notice, the depositary will notify you of the upcoming vote and arrange to deliver our voting materials to you. We cannot assure you that you will receive the voting materials in time to instruct the depositary to vote the ordinary shares underlying your ADSs. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for the manner of carrying out voting instructions. This means that you may not be able to exercise your right to vote and there may be nothing you can do if the ordinary shares underlying your ADSs are not voted as you requested.

*You may not receive distributions on ordinary shares or any value for them if it is unlawful or impractical to make them available to you.*

Subject to the terms and conditions of the deposit agreement, the depositary of our ADSs has agreed to pay to you the cash dividends or other distributions it or the custodian receives on ordinary shares or other deposited securities after deducting its fees and expenses. You will receive these distributions in proportion to the number of ordinary shares your ADSs represent. However, the depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to any holders of ADSs, in which case it may determine not to make such a distribution. Neither we nor the depositary have any obligation to register ADSs, ordinary shares, rights or other securities subject to such distribution under U.S. securities laws. Neither we nor the depositary have any obligation to take any other action to permit the distribution of ADSs, ordinary shares, rights or anything else to holders of ADSs. This means that you may not receive the distribution we make on our ordinary shares or any value for them if it is unlawful or impractical for us to make them available to you. These restrictions may have a material adverse effect on the value of your ADSs.

*You may be subject to limitations on transfer of your ADSs.*

Your ADSs are transferable on the books of the depositary. However, the depositary may close its transfer books at any time and from time to time when it deems expedient in connection with the performance of its duties. In addition, the depositary may refuse to deliver, transfer or register transfers of ADSs generally when our books or the books of the depositary are closed or at any time if we or the depositary deem it advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

*You may not be able to participate in rights offerings or elect to receive stock dividends and may experience dilution of your holdings, and the sale, deposit, cancellation and transfer of our ADSs issued after exercise of rights may be restricted.*

If we offer holders of our ordinary shares any rights to subscribe for additional shares or any other rights, the depositary may make these rights available to you after consultation with us. We cannot make rights available to you in the United States unless we register the rights and the securities to which the rights relate under the Securities Act or an exemption from the registration requirements is available. In addition, under the deposit agreement, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs, or are registered by us under the provisions of the Securities Act. We can give no assurance that we can establish an exemption from the registration requirements under the Securities Act, and we are under no obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, you may be unable to participate in our rights offerings and may experience dilution of

28

your holdings as a result. The depositary may allow rights that are not distributed or sold to lapse. In that case, you will receive no value for them. In addition, U.S. securities laws may restrict the sale, deposit, cancellation and transfer of ADSs issued after exercise of rights.

### *You may face difficulties in protecting your interests because we are incorporated under Cayman Islands law.*

We are incorporated in the Cayman Islands and our corporate affairs are governed by our memorandum and articles of association and by the Companies Law (2004 Revision) and common law of the Cayman Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are not as clearly established as they are under statutes or judicial precedents in existence in the United States. In particular, the Cayman Islands has a less developed body of securities laws as compared to the United States and provides significantly less protection to investors. Therefore, our public shareholders may have more difficulties in protecting their interests in the face of actions by our management, directors or controlling shareholder than would shareholders of a corporation incorporated in a jurisdiction in the United States. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action before federal courts of the United States.

The Cayman Islands courts are unlikely:

- to recognize or enforce judgments of courts of the United States obtained against us or our directors or officers predicated upon the civil liability provisions of securities laws of the United States or any state in the United States; or

- to entertain original actions brought against us or our directors or officers predicated upon the securities laws of the United States or any state in the United States.

There is no statutory recognition in the Cayman Islands of judgments obtained in the United States although the courts of the Cayman Islands would recognize as a valid judgment, a final and conclusive judgment in personam obtained in a federal or state court of the United States under which a sum of money is payable, other than a sum payable in respect of multiple damages, taxes or other charges of a like nature or in respect of a fine or other penalty and would give a judgment based thereon; provided that (i) such court had proper jurisdiction over the parties subject to such judgment; (ii) such court did not contravene the rules of natural justice of the Cayman Islands; (iii) such judgment was not obtained by fraud; (iv) the enforcement of the judgment would not be contrary to the public policy of the Cayman Islands; (v) no new admissible evidence relevant to the action is submitted prior to the rendering of the judgment by the courts of the Cayman Islands; and (vi) there is due compliance with the correct procedures under the laws of the Cayman Islands.

### *You will have limited ability to bring an action against us or against our directors and officers, or to enforce a judgment against us or them.*

We are incorporated in the Cayman Islands and conduct substantially all of our operations in China through our wholly owned subsidiary established in China. Most of our current directors and officers also reside outside the United States. Substantially all of our assets and the assets of those persons are located outside the United States. As a result, it may be difficult or impossible for you to bring an action against us or against these individuals in the United States, in the Cayman Islands or in China in the event that you believe that your rights have been infringed under the applicable securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers. For more information regarding the relevant laws of the Cayman Islands and China, see "Enforceability of Civil Liabilities" in this prospectus.

### *Our articles of association contain anti-takeover provisions that could prevent a change in control even if such takeover is beneficial to our shareholders.*

Our articles of association contain provisions that could delay, defer or prevent a change in control of our company that could be beneficial to our shareholders. These provisions could also discourage proxy contests and make it more difficult for you and other shareholders to elect directors and take other corporate actions. As a result, these provisions could limit the price that investors are willing to pay in the future for our ADSs. These provisions might also discourage a potential acquisition proposal or tender offer, even if the acquisition

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

proposal or tender offer is at a price above the then current market price of our ADSs. These provisions provide that our board of directors has authority, without further action by our shareholders, to issue preferred shares in one or more series and to fix their designations, powers, preferences, privileges, and relative participating, optional or special rights and the qualifications, limitations or restrictions, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our ordinary shares, in the form of ADSs or otherwise. Our board of directors may decide to issue such preferred shares quickly with terms calculated to delay or prevent a change in control of our company or make the removal of our management more difficult. If our board of directors decides to issue such preferred shares, the price of our ADSs may fall and the voting and other rights of holders of our ordinary shares and ADSs may be materially and adversely affected.

### *Our management will have broad discretion as to the use of a portion of the proceeds from this offering, and may not use the proceeds effectively.*

We will use the net proceeds from this offering for the expansion of our production capacity, purchase and prepayment for polysilicon feedstock, investment in research and development, and for working capital and other general corporate purposes, including potential acquisitions that we may make. However, we have not designated specific expenditures for all of those proceeds. Accordingly, our management will have significant flexibility and discretion in applying our net proceeds of this offering. Depending on future events and other changes in the business climate, we may determine at a later time to use the net proceeds for different purposes. Our shareholders may not agree with the manner in which our management chooses to allocate and spend those proceeds. Moreover, our management may use the net proceeds for purposes that may not increase the market value of our ADSs.

### *We will incur increased costs as a result of being a public company.*

As a public company, we will incur significant legal, accounting and other expenses that we did not incur as a private company. We will incur costs associated with our public company reporting requirements. In addition, the Sarbanes-Oxley Act, as well as rules subsequently implemented by the Securities and Exchange Commission, and the New York Stock Exchange, have imposed increased regulation and required enhanced corporate governance practices for public companies. Our efforts to comply with evolving laws, regulations and standards in this regard are likely to result in increased general and administrative expenses and a diversion of management time and attention from revenue generating activities to compliance activities. We also expect these new rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. As a result, it may be more difficult for us to attract and retain qualified candidates to serve on our board of directors or as executive officers.

30

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

## SPECIAL NOTE ON FORWARD-LOOKING STATEMENTS

This prospectus, including in particular the sections entitled "Prospectus Summary," "Risk Factors," "Use of Proceeds," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business," contains forward-looking statements that relate to future events, including our future operating results and conditions, our prospects and our future financial performance and condition. These statements involve known and unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. These risks and other factors include those listed under "Risk Factors" and elsewhere in this prospectus.

In some cases, these forward-looking statements can be identified by words or phrases such as "anticipate," "believe," "expect," "estimate," "predict," "potential," "continue," "future," "intend," "may," "ought to," "plan," "should," "will," negatives of such terms or other expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, without limitation, statements relating to:

- our goals and strategies;

- our future business development, results of operations and financial condition;

- expected growth of and changes in the multicrystalline wafer industry, photovoltaic power industry and renewable energy industry;

- our ability to maintain and strengthen our position as a leading multicrystalline wafer producer globally;

- our ability to maintain strong relationships with any particular supplier or customer;

- our planned use of proceeds;

- our plan of operations;

- effect of competition on demand for and price of our products;

- determination of the fair value of our ordinary shares and preferred shares;

- any government subsidies and economic incentives to the solar power industry; and

- PRC governmental policies regarding foreign investments.

This prospectus also contains data related to the solar power market in several countries, including China. This market data, including data from Solarbuzz, Photon International and Photon Consulting, includes projections that are based on a number of assumptions. The solar power market may not grow at the rates projected by the market data, or at all. The failure of the market to grow at the projected rates may materially and adversely affect our business and the market price of our ADSs. In addition, the rapidly changing nature of the solar power market subjects any projections or estimates relating to the growth prospects or future condition of our market to significant uncertainties. If any one or more of the assumptions underlying the market data proves to be incorrect, actual results may differ from the projections based on these assumptions. You should not place undue reliance on these forward-looking statements.

In order to calculate our share-based compensation expenses, we were required to determine the fair value of the underlying ordinary shares at the dates of the grant of our stock options. Because we were a privately held company at such date of grant, the determination of the fair value of our ordinary shares requires making complex and subjective judgments regarding projected financial and operating results, our unique business risks, the liquidity of our shares and our operating history and prospects at the time of grant. There are inherent risks and uncertainties in making such forward-looking statements.

31

The forward-looking statements contained in this prospectus speak only as of the date of this prospectus or, if obtained from third-party studies or reports, the date of the corresponding study or report and are expressly qualified in their entirety by the cautionary statements in this prospectus. Since we operate in an emerging and evolving environment and new risk factors emerge from time to time, you should not rely upon forward-looking statements as predictions of future events. Except as otherwise required by the securities laws of the United States, we undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, to reflect events or circumstances after the date of this prospectus or to reflect the occurrence of unanticipated events. All forward-looking statements contained in this prospectus are qualified by reference to this cautionary statement.

32

## USE OF PROCEEDS

We estimate that our net proceeds from this offering, net of underwriting discounts and commissions and estimated aggregate offering expenses payable by us and assuming no exercise of the over-allotment option, will be approximately $                million based on an assumed initial public offering price of $                per ADS, the mid-point of the estimated range of the initial public offering price shown on the front cover of this prospectus. If the underwriters exercise their over-allotment option in full, we estimate that our net proceeds will be approximately $                million. A $1.00 increase (decrease) in the assumed initial public offering price of $                per ADS would increase (decrease) the net proceeds to us from this offering by $                , after deducting the estimated underwriting discounts and commissions and estimated aggregate offering expenses payable by us and assuming no change to the number of ADSs offered by us as set forth on the cover page of this prospectus. We will not receive any of the proceeds from the sale of ADSs by the selling shareholders.

We intend to use our net proceeds from this offering primarily for the following purposes:

- approximately $                million to expand our production capacity (including the purchase of manufacturing equipment and the construction of additional production and ancillary facilities);

- approximately $                million to purchase or prepay for polysilicon feedstock; and

- approximately $                million to invest in our research and development efforts.

We will use the balance of our net proceeds from this offering for other general corporate purposes, including potential acquisitions.

The foregoing represents our current intentions with respect to the use of our net proceeds of this offering based upon our present plans and business conditions. However, our management will have significant flexibility and discretion in applying our net proceeds of this offering. Depending on future events and other changes in the business climate, we may determine at a later time to use the net proceeds for different purposes. Pending use of any net proceeds, we intend to invest such net proceeds in short-term, interest-bearing deposits with commercial banks.

33

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## CAPITALIZATION

The following table sets forth our capitalization as of March 31, 2007:

• on an actual basis;

• on a pro forma basis to reflect the automatic conversion, based on a 1:1 conversion ratio, of all of our outstanding Series A, Series B and Series C preferred shares into an aggregate of 15,580,000 ordinary shares upon the completion of this offering; and

• on a pro forma as adjusted basis to further give effect to the issuance and sale of          ordinary shares in the form of ADSs by us in this offering, assuming an initial public offering price of $          per ADS, the mid-point of the estimated range of the initial public offering price shown on the front cover of this prospectus, after deducting underwriting discounts and commissions and estimated aggregate offering expenses payable by us and assuming no exercise by the underwriters of their over-allotment option and no other change to the number of ADSs sold by us as set forth on the cover page of this prospectus.

You should read this table in conjunction with our audited consolidated financial statements and unaudited condensed consolidated interim financial statements beginning on page F-1 and the information under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this prospectus. You may find additional information about our capitalization under "Description of Share Capital" in this prospectus.

| | As of March 31, 2007 | | |
|---|---|---|---|
| | Actual | Pro Forma | Pro Forma as Adjusted |
| | | (in thousands) | |
| Long-term bank borrowings | $ 29,805 | $ 29,805 | $ 29,805 |
| Series A preferred shares, $0.10 par value; 5,000,000 shares authorized; 4,580,000 shares issued and outstanding; nil (pro forma) | 15,959 | — | — |
| Series B preferred shares, $0.10 par value; 8,000,000 shares authorized, issued and outstanding; nil (pro forma) | 51,346 | — | — |
| Series C preferred shares, $0.10 par value; 3,000,000 shares authorized, issued and outstanding; nil (pro forma) | 23,381 | — | — |
| Ordinary shares, $0.10 par value; 134,000,000 shares authorized; 75,000,000 shares issued and outstanding (actual); 90,580,000 shares issued and outstanding (pro forma) and      shares issued and outstanding (pro forma as adjusted) | 7,500 | 9,058 | |
| Additional paid-in capital | 30,408 | 119,536 | |
| Statutory reserve | 3,623 | 3,623 | 3,623 |
| Accumulated other comprehensive income | 3,823 | 3,823 | 3,823 |
| Retained earnings | 43,580 | 43,580 | 43,580 |
| Total shareholders' equity | 88,934 | 179,620 | |
| Total capitalization | $209,425 | $ 209,425 | $ |

Ordinary shares in the above table excludes 8,710,700 ordinary shares reserved for future issuance upon the exercise of options outstanding as of March 31, 2007 granted under our 2006 stock incentive plan. Preferred shares and ordinary shares in the above table also exclude shares issuable pursuant to our outstanding warrants as described in note (15) to our audited consolidated financial statements.

34

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

The terms of our Series A, Series B and Series C preferred shares provide for an adjustment to their respective conversion ratios in the event our net earnings for specified periods in 2006 and 2007 are lower than specified minimum amounts. Holders of our Series A preferred shares have confirmed that no adjustments to the conversion ratio of our Series A preferred shares need be made on the basis of our net earnings for the year ended December 31, 2006. Based on our net income for the nine-month period and the three-month period ended March 31, 2007, respectively, holders of our Series B and Series C preferred shares have confirmed that no adjustments to the respective conversion ratios of our Series B and Series C preferred shares need be made. Accordingly, preferred shares and ordinary shares in the above table do not reflect any such adjustments to the conversion ratios. See "Description of Share Capital — History of Securities Issuances — Series A preferred shares," "— Series B preferred shares" and "— Series C preferred shares" in this prospectus.

A $1.00 increase (decrease) in the assumed initial public offering price of $          per ADS would increase (decrease) each of the total shareholder's equity and total capitalization in the above table by $          million.

35

## DILUTION

If you invest in our ADSs, your interest will be diluted to the extent there is a difference between the initial public offering price per ADS and the net tangible book value per ADS after this offering. Our net tangible book value as of March 31, 2006 was approximately $          million, or $          per ordinary share and $          per ADS. We have calculated our net tangible book value per ordinary share by dividing our net tangible book value by the number of outstanding ordinary shares. We have determined our net tangible book value by subtracting the value of our intangible assets and total liabilities from our total assets. We have calculated dilution by subtracting our pro forma as adjusted net tangible book value per ordinary share as of March 31, 2007 from the assumed initial public offering price per ordinary share. In arriving at the number of ordinary shares to calculate dilution, we have assumed the automatic conversion of all of our outstanding Series A, Series B and Series C preferred shares into ordinary shares that will occur upon the completion of this offering.

Without taking into account any other changes in our net tangible book value after March 31, 2007, other than to give effect to:

- the automatic conversion of all of our outstanding Series A, Series B and Series C preferred shares into 15,580,000 ordinary shares upon the completion of this offering, and

- our issuance and sale of          ordinary shares in the form of ADSs in this offering, assuming an initial public offering price of $          per ADS, which represents the mid-point of the estimated initial public offering price range shown on the front cover of this prospectus, after deduction of the underwriting discounts and commissions and estimated aggregate offering expenses payable by us and assuming no exercise by the underwriters of their over-allotment option and no other change to the number of ADSs sold by us as set forth on the cover page of this prospectus,

our pro forma as adjusted net tangible book value as of March 31, 2007 would have been approximately $          million, or $          per ordinary share and $          per ADS. This represents an immediate increase in net tangible book value of $          per ordinary share or $          per ADS to our existing shareholders and an immediate dilution in net tangible book value of $          per ordinary share or $          per ADS to you and other purchasers of our ADSs in this offering. The following table illustrates this dilution effect:

| | |
|---|---|
| Assumed initial public offering price per ordinary share | $ |
| Net tangible book value per ordinary share as of March 31, 2007 | |
| Pro forma net tangible book value per ordinary share before this offering as of March 31, 2007, assuming automatic conversion of all of our outstanding Series A, Series B and Series C preferred shares | |
| Increase in net tangible book value per ordinary share attributable to price paid by you and other new investors | |
| Pro forma as adjusted net tangible book value per ordinary share after giving effect to this offering | |
| Dilution in net tangible book value per ordinary share to you and other new investors in this offering | |
| Dilution in net tangible book value per ADS to you and other new investors in this offering | $ |

A $1.00 increase (decrease) in the assumed initial public offering price of $          per ADS would increase (decrease) our pro forma as adjusted net tangible book value per ordinary share after giving effect to this offering by $          million, the pro forma as adjusted net tangible book value per ordinary share after giving effect to this offering by $          per ordinary share, the dilution in net tangible book value per ordinary share to new investors in this offering by $          per ordinary share and the dilution in net tangible book value per ADS to new investors in this offering by $          per ADS, assuming no exercise by the underwriters of their over-allotment option and no other change to the number of ADSs sold by us as set forth on the cover page of this prospectus, after deducting the underwriting discounts and commissions and estimated aggregate offering expenses payable by us. Both the pro forma information and the pro forma as adjusted information discussed above are illustrative only. Our net tangible book value following the completion of this offering is

36

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

subject to adjustments based on the actual initial public offering price of our ADSs and other terms of this offering determined at pricing.

The following table summarizes, on a pro forma basis as of March 31, 2007, the differences between our existing shareholders and the new investors, including you, in this offering with respect to the number of ordinary shares (including ordinary shares underlying the ADSs) purchased from us, the total consideration paid and the average price per ordinary share paid before deducting the underwriting discounts and commissions and estimated aggregate offering expenses payable by us. The total number of ordinary shares does not include ordinary shares underlying the ADSs issuable upon the exercise of the over-allotment option granted to the underwriters.

| | Ordinary Shares Purchased | | Total Consideration | | Average Price per Ordinary Share | Average Price per ADS |
|---|---|---|---|---|---|---|
| | Number | % | Amount | % | $ | $ |
| | (in thousands, except per share and per ADS data and percentages) | | | | | |
| Existing shareholders | 90,580 | % | $ 93,000 | % | $    1.03 | $ |
| New investors | | | | | | |
| Total | | 100.0% | $ | 100.0% | $ | $ |

A $1.00 increase (decrease) in the assumed initial public offering price of $          per ADS would increase (decrease) total consideration paid by new investors, total consideration paid by all shareholders, the average price per ordinary share paid by all shareholders and the average price per ADS paid by all shareholders by $          , $          , $          and $          , respectively, before deducting the underwriting discounts and commissions and estimated aggregate offering expenses payable by us and assuming no exercise by the underwriters of their over-allotment option and no other change to the number of ADSs sold by us as set forth on the cover page of this prospectus.

The discussion and the table above assume automatic conversion of all of our Series A, Series B and Series C preferred shares into ordinary shares upon completion of this offering and are based on the number of our ordinary shares and Series A, Series B and Series C preferred shares outstanding or assumed to be outstanding as of March 31, 2007, excluding ordinary shares reserved as of March 31, 2007 for issuance upon the exercise of stock options that we have granted and may grant in the future pursuant to our 2006 stock incentive plan. As of March 31, 2007, we had options outstanding to purchase a total of 8,159,800 ordinary shares at a weighted average exercise price of $5.60 per ordinary share. These stock options did not include stock options to purchase 172,100 ordinary shares that have been forfeited subsequent to their grant dates due to termination of employment for cause. On April 17, 2007, we granted to Gang Wang, one of our directors, options to purchase 100,000 of our ordinary shares at the exercise price of $9.00 per share. On April 17, 2007, we also authorized options to be granted to our employees to purchase 350,900 ordinary shares at the exercise price of $          , the low end of the price range for this offering as shown on the cover of the preliminary prospectus, and options to purchase 100,000 ordinary shares at the exercise price of $9.00 to be granted to Mr. Louis T. Hsieh, who will become our director on the date of this prospectus. To the extent that any of the outstanding options are exercised, there will be further dilution to you and other new investors. If all of the outstanding options had been exercised on March 31, 2006, after giving effect to this offering, our pro forma as adjusted net tangible book value would have been approximately $          million, or $          per ordinary share and $          per ADS, and the dilution in net tangible book value to you and other new investors would have been $          per ordinary share and $          per ADS.

37

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## DIVIDEND POLICY

We have never declared or paid any dividends, nor do we anticipate paying any cash dividends on our ordinary shares in the foreseeable future. We currently intend to retain most, if not all, of our available funds and any future earnings for use in the operation and expansion of our business.

We are a holding company and our cash flow depends on dividends from our principal operating subsidiary, Jiangxi LDK Solar, in China. The ability of our subsidiary in China to pay dividends to us is subject to various restrictions, including legal restrictions in China that permit payment of dividends only out of net income determined in accordance with PRC accounting standards and regulations. Under PRC laws, Jiangxi LDK Solar, as a wholly foreign-owned enterprise in China, must allocate at least 10% of its after-tax profit to its statutory general reserve fund until the balance of the fund reaches 50% of its registered capital. It also has discretion in allocating its after-tax profit to its statutory employee welfare reserve fund. These reserve funds are not distributable as cash dividends.

Our board of directors has complete discretion as to whether we will pay dividends in the future. Even if our board of directors decides to pay dividends, the form, frequency and amount will depend upon our future operations and earnings, capital requirements and surplus, general financial condition, contractual restrictions and other factors that our board of directors may deem relevant.

The depositary has agreed to distribute any dividend we declare and pay on our ordinary shares evidenced by ADSs to the holders of our ADSs, subject to the terms of the deposit agreement, to the same extent as holders of our ordinary shares, less its fees and expenses payable under the deposit agreement and after deduction of any applicable taxes. The depositary may send to you anything else we distribute on deposited securities by means it considers lawful and reasonably practical. If it cannot make the distribution that way, the depositary may decide to sell what we distribute and distribute the net proceeds in the same way as it does with cash or hold what we distribute if it cannot be sold. Cash dividends on our ordinary shares, if any, will be paid in U.S. dollars. See "Description of American Depositary Shares" in this prospectus for additional information.

38

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## EXCHANGE RATE INFORMATION

We conduct substantially all of our business operations in and from China with a substantial portion of our sales denominated in Renminbi, while a significant portion of our costs and expenses is denominated in U.S. dollars. We will make periodic reports to our shareholders in U.S. dollars by using the then-current exchange rates. We make no representation that any amounts in Renminbi or U.S. dollars could be or could have been converted into each other at any particular rate or at all. The PRC government imposes controls over its foreign exchange in part through regulation of the conversion between Renminbi and foreign currencies as we have disclosed in "Risk Factors — Risks Relating to Our Company and Our Industry — Fluctuations in exchange rates could adversely affect our business" and "— Risks Relating to Business Operations in China — Changes in foreign exchange and foreign investment regulations in China may affect our ability to invest in China and the ability of our PRC subsidiary to pay dividends and service debts in foreign currencies" in this prospectus.

The following table sets forth, for the periods indicated, the noon buying rates for U.S. dollars in New York City for cable transfers in Renminbi as certified for customs purposes by the Federal Reserve Bank of New York:

| Period | Noon Buying Rate | | | |
| | Period End | Average | High | Low |
| --- | --- | --- | --- | --- |
| | | (Renminbi per $1.00) | | |
| 2002 | 8.2800 | 8.2772 | 8.2800 | 8.2700 |
| 2003 | 8.2767 | 8.2771 | 8.2800 | 8.2765 |
| 2004 | 8.2765 | 8.2768 | 8.2774 | 8.2764 |
| 2005 | 8.0702 | 8.1826 | 8.2765 | 8.0702 |
| 2006 | 7.8041 | 7.9579 | 8.0702 | 7.8041 |
| November | 7.8340 | 7.8622 | 7.8750 | 7.8303 |
| December | 7.8041 | 7.8219 | 7.8350 | 7.8041 |
| 2007 | | | | |
| January | 7.7714 | 7.7876 | 7.8127 | 7.7705 |
| February | 7.7410 | 7.7502 | 7.7632 | 7.7410 |
| March | 7.7232 | 7.7369 | 7.7454 | 7.7232 |
| April | 7.7090 | 7.7247 | 7.7345 | 7.7090 |
| May (through May 11) | | | | |

Annual averages in the above table are calculated by averaging the noon buying rates on the last business day of each month during the year. Monthly averages are calculated by averaging the noon buying rates for all days during the month or the elapsed portion thereof.

On May 11, 2007, the noon buying rate for U.S. dollars in effect in New York City for cable transfers of Renminbi as certified for customs purposes by the Federal Reserve Bank of New York was $1.00 = Rmb          .

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## SELECTED CONSOLIDATED FINANCIAL AND OPERATING DATA

The following selected consolidated statement of operations data and statement of cash flows data for the period from July 5, 2005, the date of our inception, to December 31, 2005 and for the year ended December 31, 2006 and the selected consolidated balance sheet data as of December 31, 2005 and 2006 have been derived from our audited consolidated financial statements included elsewhere in this prospectus. The following selected consolidated statement of operations data and statement of cash flows data for the three months ended March 31, 2006 and 2007 and the consolidated balance sheet data as of March 31, 2007 have been derived from our unaudited condensed consolidated interim financial statements included elsewhere in this prospectus. You should read the following selected consolidated financial data in conjunction with the consolidated financial statements and related notes and the information under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus. We have prepared our consolidated financial statements in accordance with U.S. GAAP. Our historical results for any period are not necessarily indicative of results to be expected for any future period.

We were incorporated in the Cayman Islands on May 1, 2006 as the holding company for, and currently conduct our operations through, Jiangxi LDK Solar, which became our wholly owned subsidiary on July 10, 2006 when we acquired all of its equity interests. As the acquisition of Jiangxi LDK Solar was made between entities under common control, the transaction has been accounted for in a manner similar to the pooling-of-interest method. Accordingly, the assets and liabilities of Jiangxi LDK Solar have been included in our consolidated financial statements at their historical amounts. The consolidated financial statements present our financial condition and results of operations as if the acquisition had occurred as of the beginning of the earliest period presented.

| | Period from July 5 to December 31, 2005 | Year Ended December 31, 2006 | Three Months Ended March 31, | |
| | | | 2006 | 2007 |
| --- | --- | --- | --- | --- |
| | | (in thousands, except per share data) | | |
| **Consolidated Statement of Operations Data** | | | | |
| Net sales | $       — | $  105,454 | $       — | $73,400 |
| Gross profit[1] | — | 41,492 | — | 28,380 |
| (Loss) income from operations[2] | (143) | 37,145 | (129) | 26,117 |
| Interest expense and amortization of discount on exchange notes[3] | (102) | (7,133) | (340) | (1,529) |
| Net (loss) income[4] | $     (274) | $   30,182 | $   (440) | $24,534 |
| Accretion of Series A, Series B and Series C preferred shares to redemption values | — | (2,729) | — | (2,942) |
| Deemed dividend to Series A preferred shareholders | — | (1,568) | — | — |
| Net (loss) income available to ordinary shareholders[4] | (274) | 25,885 | (440) | 21,592 |
| Net (loss) income per ordinary share[4][5] | | | | |
| Basic | $    (0.01) | $     0.35 | $  (0.01) | $   0.29 |
| Diluted | $    (0.01) | $     0.35 | $  (0.01) | $   0.27 |

[1] Gross profit for the year ended December 31, 2006 and the three months ended March 31, 2007 reflected $174,000 and $155,000 of share-based compensation expense allocated to cost of goods sold.

[2] Income from operations for the year ended December 31, 2006 and the three months ended March 31, 2007 reflected $2,028,000 and $1,106,000 of share-based compensation expense, respectively.

[3] Interest expense for the year ended December 31, 2006 and the three months ended March 31, 2007 included $4,440,000 and nil related to debt discount amortization for the embedded beneficial conversion feature of our exchangeable notes, respectively. See note 14 to the audited consolidated financial statements.

[4] Our PRC subsidiary, Jiangxi LDK Solar, is entitled to exemption from PRC national enterprise income tax for at least two years and PRC local enterprise income tax for at least five years, each beginning with calendar year 2006. Without this tax holiday, our income tax expense would have increased and our net income and net income available to ordinary shareholders would have been reduced by approximately $12,387,000 and $8,461,000 for the year ended December 31, 2006 and the three months ended March 31, 2007, respectively, and our basic net income per ordinary share would have been reduced by $0.17 and $0.11 for the year ended December 31, 2006 and the three months ended March 31, 2007, respectively, and our diluted net income per share would have been reduced by $0.17 and $0.09 for the year ended December 31, 2006 and the three months ended March 31, 2007, respectively.

[5] All share and per share data have been presented to give retrospective effect to our reorganization as described above.

40

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

The following table presents our selected consolidated balance sheet data as of December 31, 2005 and 2006 and as of March 31, 2007.

| | As of December 31, 2005 | As of December 31, 2006 | As of March 31, 2007 |
|---|---|---|---|
| | | (in thousands) | |
| **Consolidated Balance Sheet Data** | | | |
| Cash and cash equivalents | $ 9,687 | $ 30,227 | $ 11,348 |
| Inventories | — | 94,886 | 114,205 |
| Prepayments to suppliers | 966 | 37,718 | 52,777 |
| Total current assets | 20,815 | 172,746 | 194,052 |
| Property, plant and equipment, net | 10,491 | 100,875 | 117,678 |
| Total assets | 31,647 | 292,719 | 340,825 |
| Short-term bank borrowings | | 56,765 | 61,481 |
| Advance payments from customers | 3,717 | 40,002 | 41,832 |
| Total current liabilities | 20,348 | 117,486 | 131,398 |
| Long-term bank borrowings | — | 30,245 | 29,805 |
| Total liabilities | 20,348 | 147,733 | 161,205 |
| Series A, Series B and Series C preferred shares | — | 87,744 | 90,686 |
| Total shareholders' equity | $ 11,299 | $ 57,242 | $ 88,934 |

The following table sets forth our selected consolidated statement of cash flows data for the periods specified:

| | Period from July 5 to December 31, 2005 | Year Ended December 31, 2006 | Three Months Ended March 31, 2006 | Three Months Ended March 31, 2007 |
|---|---|---|---|---|
| | | (in thousands) | | |
| **Consolidated Statement of Cash Flows** | | | | |
| Net cash provided by (used in) operating activities | $ 2,511 | $ (57,067) | $ 2,511 | $ (8,707) |
| Net cash used in investing activities | (20,940) | (79,564) | (19,095) | (23,336) |
| Net cash provided by financing activities | $ 28,077 | $ 154,891 | $ 30,902 | $ 11,660 |

The following table sets forth some other selected financial and operating data of our company for the periods since we commenced our first commercial sales of multicrystalline wafers in April 2006:

| | Three Months Ended June 30, 2006 | September 30, 2006 | December 31, 2006 | March 31, 2007 |
|---|---|---|---|---|
| **Other Financial and Operating Data** | | | | |
| Gross margin | 21.0% | 39.4% | 42.9% | 38.7% |
| Operating margin | 17.4 | 33.6 | 39.8 | 35.6 |
| Net margin | 10.9% | 15.8% | 39.3% | 33.4% |
| Net sales of wafers (in thousands) | $ 10,388 | $ 30,772 | $ 61,292 | $ 66,704 |
| Wafers sold (in MW) | 4.8 | 14.0 | 26.4 | 29.6 |
| Average wafer selling price (per watt) | $ 2.15 | $ 2.20 | $ 2.32 | $ 2.25 |

41

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
## CONDITION AND RESULTS OF OPERATIONS

*You should read the following discussion and analysis of our financial condition and results of operations in conjunction with the section entitled "Selected Consolidated Financial and Operating Data" and our audited consolidated financial statements and unaudited condensed consolidated interim financial statements included elsewhere in this prospectus. The following discussion and analysis contain forward-looking statements that involve risks and uncertainties. Our actual results and the timing of selected events could differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" and elsewhere in this prospectus.*

### Overview

We produce and sell multicrystalline solar wafers to manufacturers of photovoltaic products, including solar cells and solar modules, both in and outside China. The multicrystalline wafers we produce and sell are between 180 and 240 microns in thickness. In addition, we provide wafer processing services to monocrystalline and multicrystalline solar cell and module manufacturers. We also sell polysilicon materials, which include ingots and polysilicon scraps.

As of March 31, 2007, we had an annual multicrystalline wafer production capacity of approximately 215 MW. According to our current expansion plan, we intend to continue to increase our annual production capacity, which we expect to reach approximately 400 MW by the end of 2007 and approximately 800 MW by the end of 2008. Despite the current industry-wide shortage of polysilicon, we believe that our polysilicon feedstock inventory and commitments from suppliers are sufficient to satisfy over 90% of our estimated requirements for 2007. The majority of our polysilicon feedstock consists of polysilicon scraps and recyclable polysilicon. We source a portion of polysilicon feedstock from the spot market from time to time depending on the price and our requirements. For the year ended December 31, 2006, we derived approximately 75.5% of our net sales from sales to PRC manufacturers of photovoltaic products and approximately 24.5% from exports. For the three months ended March 31, 2007, we derived approximately 50.0% of our net sales from sales to PRC manufacturers and approximately 50.0% from exports.

Since we made our first commercial sales of multicrystalline wafers in April 2006, we have experienced significant growth. Our net sales increased from $12.1 million for the three months ended June 30, 2006 to $31.5 million for the three months ended September 30, 2006, $61.9 million for the three months ended December 31, 2006 and $73.4 million for the three months ended March 31, 2007. Our net income increased from $1.3 million for the three months ended June 30, 2006 to $5.0 million for the three months ended September 30, 2006, $24.3 million for the three months ended December 31, 2006 and $24.5 million for the three months ended March 31, 2007.

### Key Factors Affecting Our Results of Operations

The following are key factors that affect our financial condition and results of operations. They are important for understanding our business:

• demand for our solar power products, including government incentives to promote the usage of solar energy;

• our production capacity and its utilization;

• the availability, cost, quality and mix of our polysilicon feedstock;

• our manufacturing costs; and

• the pricing of our products.

#### *Demand for our solar products*

Our business and revenue growth is, in part, a function of the demand for solar power products. Although the solar power market remains at a relatively early stage of development and it is uncertain whether solar energy will be widely adopted, demand for solar energy products has grown significantly over the past decade. According to Photon International, global crystalline solar cell or module production will increase from 1.5 gigawatts in 2005 to

42

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

12.0 gigawatts in 2010, representing a compound annual growth rate of 51.6%. According to Solarbuzz, monocrystalline wafers in 2006 represented approximately 42% of the global photovoltaic cell production while multicrystalline wafers constituted approximately 49%.

Demand for solar products is driven, in part, by government incentives that make the economic cost of solar power competitive compared to that of traditional forms of electricity generation. The unsubsidized cost of using solar energy is currently more expensive, on a per watt basis, than the retail cost of conventional fossil fuel-generated, hydroelectric or nuclear energy sources in most industrialized regions of the world. To the extent that government incentives decrease, demand for our solar wafers and our sales and profits may be harmed.

### Our production capacity and its utilization

Demand for our solar wafers is currently greater than our production capacity. As of March 31, 2007, we had an annual production capacity of approximately 215 MW. All of our principal production facilities are operating at close to full capacity. As a result, we need to increase our production capacity in order to capitalize on the strong demand for our products and grow our business and net sales. We plan to increase our annual production capacity of multicrystalline wafers to approximately 400 MW by the end of 2007 and approximately 800 MW by the end of 2008. If we fail, or encounter significant delays in our efforts, to establish or successfully utilize additional manufacturing capacity or to increase manufacturing output, we will be unable to increase our sales and profits and capture additional market share, and our results of operations will be adversely affected.

### Availability, cost, quality and mix of our polysilicon feedstock

Solar-grade polysilicon is a specially processed form of silicon and is the primary raw material used to make our multicrystalline wafers. The increase in demand for solar energy products has led to an industry-wide polysilicon shortage and significant price increases in polysilicon feedstock. As a result, our raw material costs have increased. According to Solarbuzz, the average long-term supply contract price of virgin polysilicon increased from approximately $35 to $40 per kilogram delivered in 2005 to $50 to $55 per kilogram delivered in 2006, and was estimated to increase to $60 to $65 per kilogram delivered in 2007. In addition, according to Photon Consulting, spot prices for virgin polysilicon were $100 per kilogram in 2005, were estimated to increase to $150 per kilogram in 2006, and are expected to increase to $200 per kilogram in 2007 and $225 per kilogram in 2008.

Access to a secure and stable supply of polysilicon feedstock continues to be a critical factor that could limit our production output. Since our inception, we have relied on a combination of one-time purchase orders and long-term purchase contracts with our suppliers in order to fulfill our polysilicon requirements. We have inventory and commitments from polysilicon suppliers that we believe will satisfy over 90% of our estimated requirements for 2007. We source a portion of polysilicon feedstock from the spot market from time to time depending on the price and our requirements. We are continuing to secure additional supply to support our growth without interruption. To increase our raw material supply and reduce costs, our polysilicon feedstock also includes polysilicon scrap, polysilicon powder, broken wafers and recyclable polysilicon sourced from semiconductor manufacturers, equipment vendors and others, which we use in our ingot manufacturing process. Scraps and recyclable materials account for the majority of our polysilicon feedstock. We also purchase polysilicon ingots from time to time to produce wafers. If we fail to continue to acquire sufficient quantities of polysilicon at commercially viable prices, our business and profitability will be adversely affected.

### Our manufacturing costs

Our cost of goods sold consists primarily of the costs of polysilicon feedstock, raw materials and other manufacturing costs. For the year ended December 31, 2006, our costs of polysilicon feedstock accounted for approximately 75% of our cost of goods sold. As we believe global polysilicon supplies will increase and polysilicon prices will decline in the long run, we expect that our manufacturing costs as a percentage of our cost of goods sold will become more significant. Since our inception, we have taken a series of measures to reduce our manufacturing costs, through increased production scale, improved production yield, using automatic sorting equipment to reduce wafer breakage, and more skilled manufacturing personnel following

43

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

their initial learning curve. If we fail to continue to reduce our manufacturing costs, our profitability will be adversely affected.

### Pricing of our products

Our wafer prices are based on a variety of factors, including global market wafer prices, supply and demand conditions in China, which is our largest market, and the terms of our customer contracts, including sales volumes and the terms on which certain customers supply us with polysilicon. We price our wafers on a per-piece basis. According to Photon Consulting, wafer prices on a per-watt basis are expected to decline in the next few years due to increased production efficiencies, expected increases in global polysilicon supplies and declines in polysilicon prices, and increased wafer production capacity in our industry, and we expect the average selling price of our wafers to decline in 2007 and thereafter. If wafer prices decline and we are unable to lower our costs in line with the price decline, whether through manufacturing larger ingots or thinner wafers, or through technological advances, our gross margins would be adversely affected. In addition, as a part of our geographic expansion strategy, we plan to significantly expand our overseas sales in 2007 and future years to target the top 20 solar cell and module manufacturers in the world to strengthen our long-term customer base. The current prevailing international market price for solar wafers is lower than the prevailing PRC market price. As a result, our increase in overseas sales may reduce our gross margin in the near term.

## Net Sales

We derive revenues primarily from the sale of multicrystalline wafers. We also sell a small number of monocrystalline wafers. We provide wafer processing services to customers who supply silicon materials and/or multicrystalline or monocrystalline ingots to us for processing into wafers. The silicon materials we sell include multicrystalline ingots as well as silicon scraps. In the year ended December 31, 2006, our net sales were generated almost entirely from the sale of wafers, which accounted for 97.2% of our net sales. Sale of silicon materials and wafer processing services accounted for 2.4% and 0.4%, respectively, of our net sales during the year ended December 31, 2006. During the three months ended March 31, 2007, approximately 83.5% of our net sales were generated from sales of multicrystalline wafers and 7.4% from sales of monocrystalline wafers. Sales of silicon materials and wafer processing services accounted for 3.2% and 5.9%, respectively, of our net sales during the three months ended March 31, 2007. We expect that sales of multicrystalline wafers will continue to account for a majority of our net sales for the foreseeable future. We also expect that our net sales will increase as we expand our production capacity to meet the market demand.

Our net sales are affected by our unit sales volume and average selling prices. We currently make most of our sales to customers through non-exclusive, short-term purchase order arrangements. Increased sales on a contract rather than spot market basis are likely to lead to a reduction in average selling prices. We have entered into long-term sales arrangements with some of our major customers, including CSI, Chinalight, Solarfun, Solartech Energy, Solland Solar and Suntech. We have also entered into sales arrangements with BP Solar, E-Ton, GE Energy, Motech, Q-Cells and other customers. In the year ended December 31, 2006, our top five customers accounted for 70.2% of our net sales. Suntech and Solarfun contributed 39.7% and 13.9%, respectively, of our net sales for the same period. During the three months ended March 31, 2007, our top five customers accounted for 56.8% of our net sales. Suntech and Solarfun contributed 18.3% and 9.7%, respectively, of our net sales for the three-month period. Chinalight contributed 13.6% of our net sales for the three-month period.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

We have four geographic markets where our current customers are located, China, Asia Pacific ex-China, North America and Europe. During the year ended December 31, 2006 and the three months ended March 31, 2007, our net sales generated from these geographic regions were as follows:

| Geographic Regions | Year Ended December 31, 2006 | | Three Months Ended March 31, 2007 | |
|---|---|---|---|---|
| | Net Sales (in millions) | % of Total | Net Sales (in millions) | % of Total |
| China | $ 79.6 | 75.5% | $ 36.7 | 50.0% |
| Asia Pacific ex-China | 17.2 | 16.3 | 23.4 | 31.8 |
| North America | 5.3 | 5.0 | 6.0 | 8.2 |
| Europe | 3.4 | 3.2 | 7.3 | 10.0 |
| Net sales | $ 105.5 | 100.0% | $ 73.4 | 100.0% |

We determine the geographical market of our net sales based on the immediate destination of our goods shipped.

**Cost of Goods Sold**

Our cost of goods sold consists primarily of:

• polysilicon feedstock, including solar-grade virgin polysilicon, polysilicon ingots, polysilicon powder, scraps and recyclable polysilicon;

• consumables, including slurry, crucibles, sawing wires and packaging materials;

• depreciation and amortization of property, plant, equipment and technical know-how;

• factory overhead, including utilities, net of government subsidies, maintenance of production equipment and other support expenses associated with the manufacturing of our solar wafers and ingots;

• direct labor, including salaries and benefits of personnel directly involved in manufacturing activities; and

• stock-based compensation attributable to our manufacturing personnel.

Our total cost of goods sold will increase as we increase our production volume. We do not record polysilicon costs for our wafer processing services.

**Operating Expenses**

Our operating expenses include selling expenses, general and administrative expenses, and research and development expenses. Our operating expenses will increase substantially as we expand our operations in the next few years.

*Selling expenses*

Selling expenses consist primarily of salaries and benefits for sales personnel, transportation costs and marketing expenses. We have incurred immaterial marketing expenses since our inception primarily due to the current strong demand for our products. Our selling expenses will increase as we increase our sales and marketing efforts, hire additional sales personnel and establish overseas sales and support offices to enhance the effectiveness of our direct marketing.

*General and administrative expenses*

General and administrative expenses consist primarily of salaries, bonuses and benefits for our administrative and management personnel, consulting and professional service fees, insurance premiums, travel and related costs of our administrative and management personnel, and costs of maintaining our information technology systems. General and administrative expenses also include the share-based compensation attributable to our administrative and management personnel and service providers. Our general and administrative expenses will increase with the anticipated growth of our business and continued upgrade of our information technology infrastructure. Our general and administrative expenses will also increase as a result of becoming a

45

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

listed public company in the United States upon completion of this offering, including investor relations and compliance-related costs.

### Research and development expenses

Research and development expenses primarily relate to raw materials used in our research and development activities, research and development personnel costs, and other costs related to the design, development, testing and enhancement of our products and processes. Research and development expenses also include the share-based compensation attributable to our research and development personnel. Our research and development expenses also include costs incurred in connection with our joint research and development program with Shanghai Jiaotong University. We expense research and development costs as incurred. We have not incurred any development costs that meet the U.S. GAAP criteria for capitalization for deferral and amortization over the period over which we expect to benefit from the resulting product or process.

We expect our research and development expenses to increase substantially in the near future as we hire additional research and development personnel, devote more resources toward improving manufacturing processes and optimizing polysilicon use in the production of our solar wafers and ingots.

## Share-based Compensation Expenses

For the year ended December 31, 2006, we recorded share-based compensation expenses of approximately $2,028,000. We allocated these share-based compensation expenses as follows:

- approximately $174,000 to our cost of goods sold;

- approximately $1,697,000 to our general and administrative expenses; and

- approximately $157,000 to our research and development expenses.

For the three months ended March 31, 2007, we recorded share-based compensation expenses of approximately $1,106,000. We allocated these share-based compensation expenses as follows:

- approximately $155,000 to our cost of goods sold;

- approximately $1,000 to our selling expenses;

- approximately $885,000 to our general and administrative expenses; and

- approximately $65,000 to our research and development expenses.

We made the above allocations on the basis of the job functions of grantees to whom we granted the stock options. As of December 31, 2006 and March 31, 2007, there was unrecognized compensation cost in the aggregate of $10.0 million and $14.6 million, respectively, relating to non-vested stock options. We expect to recognize this stock option compensation cost over the remaining vesting period of the related options. We will incur additional share-based compensation expenses in 2007 and future periods due to amortization of the unrecognized cost as of December 31, 2006 as well as additional stock option grants after December 31, 2006.

We estimate that our share based compensation expenses for our option grants after April 1, 2007 will be as follows:

- approximately $            for the 100,000 options granted on April 17, 2007, to one of our directors;

- approximately $            for the 350,900 options deemed to be granted on the date of the preliminary prospectus for this offering to our employees; and

- approximately $            for the 100,000 options deemed to be granted on the date of this prospectus to one of our directors, which we calculated based on the mid-point of the price range for this offering set forth on the cover page of the preliminary prospectus.

We will recognize these stock compensation expenses over the vesting periods of the related options, which are three years from the grant dates. See "Critical Accounting Policies — Share-based Compensation" for additional information regarding the assumptions and methodologies used in determining share-based compensation expenses.

46

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

**Other Income and Expenses**

Our other income and expenses consist of interest income, interest expense, change in fair value of warrants and foreign currency exchange gains and losses.

*Interest income or expense*

Our interest income represents interests on our cash balances.

Our interest expense consists primarily of interest expenses with respect to our short-term and long-term borrowings from banks and related parties less interest expenses capitalized to the extent they relate to our capital expenditures. During the year ended December 31, 2006, we incurred charges relating to the embedded beneficial conversion feature of our exchangeable notes issued during the year.

*Foreign currency exchange loss, net*

Our foreign currency exchange loss, net, derives from our net exchange gains and losses on our monetary assets and liabilities denominated in foreign currencies during the relevant period.

*Government subsidy*

Government subsidy represents grants and payments by the PRC government to support the photovoltaic industry and our research and development efforts. Some of the government subsidies are calculated on the basis of our tax payments, including income tax, if any, value-added tax and stamp duty tax.

**Taxation and Incentives**

Under the current laws of the Cayman Islands, we are not subject to any income or capital gains tax. Additionally, dividend payments made by us are not subject to any withholding tax in the Cayman Islands.

Under current PRC laws and regulations, a company established in China is typically subject to a national enterprise income tax at the rate of 30% on its taxable income and a local enterprise income tax at the rate of 3% on its taxable income. A company that qualifies as a "high and new technology enterprise" is entitled to a reduced national enterprise income tax rate of 15%. The PRC government has provided various incentives to foreign-invested enterprises to encourage foreign investments. Such incentives include reduced tax rates and other measures. Foreign-invested enterprises that are determined by PRC tax authorities to be manufacturing enterprises with authorized terms of operation for more than ten years are eligible for:

• a two-year exemption from the national enterprise income tax from their first profitable year; and

• a 50% reduction of their applicable national enterprise income tax rate for the succeeding three years.

The local preferential enterprise taxation treatment is within the jurisdiction of the local provincial authorities as permitted under the current PRC tax laws relating to foreign-invested enterprises. The local tax authorities decide whether to grant any tax preferential treatment to foreign-invested enterprises on basis of their local conditions. The Jiangxi provincial government has announced that energy companies with authorized terms of operation for more than ten years are eligible for:

• a five-year exemption from the 3% local enterprise income tax from their first profitable year; and

• a 50% reduction of their local enterprise income tax rate for the succeeding five years.

As 2006 was the first profit-making year of Jiangxi LDK Solar, Jiangxi LDK Solar is entitled to a two-year exemption from the national enterprise income tax from 2006 and will be subject to a reduced national enterprise income tax rate of 15% from 2008 through 2010. Likewise, Jiangxi LDK Solar is entitled to a five-year exemption from the local enterprise income tax beginning in 2006 and will be subject to a reduced local enterprise income tax rate of 1.5% from 2011 through 2015. Due to these preferential tax treatments, no income tax was incurred by Jiangxi LDK Solar for the year ended December 31, 2006. Upon the lapse of the above preferential enterprise income tax rates of Jiangxi LDK Solar, our effective tax rate and tax expense will increase. See "Risk Factors — Risks Relating to Business Operations in China — Expiration of, or changes to, current PRC tax incentives that our business enjoys could have a material adverse effect on our results of operations" in this prospectus.

47

In March 2007, the National People's Congress of China enacted a new Enterprise Income Tax Law, which will become effective on January 1, 2008. The new tax law would impose a unified income tax rate of 25% on all domestic enterprises and foreign-invested enterprises unless they qualify under certain limited exceptions. The new tax law permits companies to continue to enjoy their existing preferential tax treatment until such treatment expires in accordance with its current terms. Under the new tax law, "high and new technology enterprises" specially supported by the PRC government will continue to enjoy a reduced national enterprise tax rate of 15%. The new tax law, however, does not specify what high and new technology enterprises will be eligible for special support from the government. Our wholly owned subsidiary, Jiangxi LDK Solar, obtained the "high and new technology enterprise" status in December 2006. Such status is valid for two years and is renewable upon review and approval by the Science and Technology Bureau of Jiangxi Province. If we fail to maintain our status as a "high and new technology enterprise" or fail to qualify for special support from the PRC government, we will be subject to the 25% unified enterprise income tax rate beginning in 2011 after our current preferential tax treatment expires.

We recognize deferred tax assets and liabilities for temporary differences between financial statement and income tax bases of assets and liabilities. Valuation allowances are provided against the carrying amount of our deferred tax assets on our financial statements when our management cannot conclude that it is more likely than not that some portion or all of the deferred tax asset will be realized.

## Critical Accounting Policies

We prepare our consolidated financial statements in accordance with U.S. GAAP, which requires us to make judgments, estimates and assumptions that affect:

• the reported amounts of our assets and liabilities;

• the disclosure of our contingent assets and liabilities at the end of each reporting period; and

• the reported amounts of revenues and expenses during each reporting period.

We continually evaluate these estimates based on our own experience, knowledge and assessment of current business and other conditions, our expectations regarding the future based on available information and reasonable assumptions, which together form our basis for making judgments about matters that are not readily apparent from other sources. Since the use of estimates is an integral component of the financial reporting process, our actual results could differ from those estimates. Some of our accounting policies require a higher degree of judgment than others in their application. When reading our consolidated financial statements, you should consider:

• our selection of critical accounting policies;

• the judgment and other uncertainties affecting the application of such policies; and

• the sensitivity of reported results to changes in conditions and assumptions.

We believe the following accounting policies involve the most significant judgments and estimates used in the preparation of our financial statements:

### *Depreciation and amortization*

Our long-lived assets include property, plant and equipment, and intangible assets relating to technical know-how. We amortize our long-lived assets using the straight-line method over the estimated useful lives of the assets, taking into account the assets' estimated residual values. We estimate the useful lives and residual values at the time we acquire the assets based on our management's knowledge on the useful lives of similar assets and replacement costs of similar assets having been used for the same useful lives respectively in the market, and taking into account anticipated technological or other changes. On this basis, we have estimated the useful lives of our buildings to be 30 years, our plants and machinery to be 10 years, our furniture and office equipment to be five years and our motor vehicles to be six years. For intangible assets of technical know-how that we acquire from equipment manufacturers in connection with the operation of our acquired production equipment, we amortize them over their estimated useful lives of 10 years. We review the estimated useful life and residual value for each of our long-lived assets on a regular basis. If technological changes are to occur more rapidly than anticipated, we may shorten the useful lives or lower the residual value

48

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

assigned to these assets, which will result in the recognition of increased depreciation and amortization expense in future periods.

### Impairment of long-lived assets

We evaluate our long-lived assets for impairment whenever events or changes in circumstances indicate that their carrying amounts may not be recoverable, such as change of business plan, obsolescence, and continuous loss suffered. We assess recoverability of assets by comparing the carrying amount of an asset to the estimated undiscounted future cash flows expected to be generated by the asset. In determining estimates of future cash flows, we have to exercise significant judgment in terms of projection of future cash flows and assumptions. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset exceeds its fair value. We estimate the fair value of an asset based on the best information available, including prices for similar assets and, in the absence of observable market prices, the result of using a present value technique to estimate the fair value of the asset. For the periods presented, we recorded no impairment of our long-lived assets.

### Share-based compensation

We adopted our 2006 stock incentive plan on July 31, 2006 and have outstanding options granted to certain of our officers, directors and employees and certain service providers to purchase an aggregate of 8,510,700 ordinary shares as of the date of this prospectus. For a description of our stock options granted, including the exercise prices and vesting periods, see "Management — 2006 Stock Incentive Plan" in this prospectus. Under SFAS 123R, we are required to recognize share-based compensation as compensation expense in our statement of operations based on the fair value of equity awards on the date of the grant, with the compensation expense recognized over the period in which the recipient is required to provide service in exchange for the equity award. A fair value-based method is used for measuring the compensation expense related to share-based compensation. We estimate our forfeitures based on past employee retention rates and our expectations of future retention rates, and we will prospectively revise our forfeiture rates based on actual history. Our stock option compensation charges may change based on changes in our actual forfeitures. We record compensation expense for the fair value of the options at the grant date. We then amortize share-based compensation expenses over the vesting periods of the related options.

Determining the fair value of our ordinary shares requires making complex and subjective judgments regarding projected financial and operating results, our unique business risks, the liquidity of our shares and our operating history and prospects at the time of grant. Our revenues and earnings growth rates, as well as major milestones that we have achieved, primarily since the end of 2006, have contributed significantly to the increase in the fair value of our ordinary shares. However, as we were still a private company prior to the completion of this offering, the determination of these fair values was inherently uncertain and highly subjective. The assumptions used in deriving the fair values were consistent with our business plan. These assumptions included:

• no material changes in the existing political, legal, fiscal and economic conditions in China;

• no major changes in the tax rates applicable to our subsidiary in China;

• our ability to retain competent management, key personnel and technical staff to support our ongoing operations; and

• no material deviation in industry trends and market conditions from economic forecasts.

These assumptions were inherently uncertain. The risks associated with achieving our forecasts were assessed in selecting the appropriate discount rates under the income approach. If different discount rates had been used, the valuations would have been different and the amount of share-based compensation would also have been different because the fair value of the underlying ordinary shares for the options granted would have been different.

We adopted an option-pricing model to allocate enterprise value to preferred and ordinary shares. The option-pricing model involved making estimates of the anticipated timing of a potential liquidity event such as a sale of our company or an initial public offering and estimates of the volatility of our equity securities. The

49

anticipated timing was based on the plans of our board of directors and management. Estimating the volatility of our share price as a privately held company was complex because there was no readily available market for the shares. We estimated the volatility of our shares to range from 51% to 64% with reference to the average implied volatility of U.S.-listed companies in similar industries. Had we used different estimates of volatility, the allocations between preferred and ordinary shares would have been different.

Our share-based compensation expenses will affect our reported net income, earnings per share and each line item of our operating expenses, which include cost of goods sold, selling expenses, general and administrative expenses and research and development expenses.

From our inception to April 30, 2007, we have granted the following options to our employees and non-employees.

| Grant Date | Number of Options | Exercise Price | Fair Value of Ordinary Shares at Grant Date |
|---|---|---|---|
| August 1, 2006 | 6,093,900 | $ 4.45 | $ 4.37 |
| February 6, 2007 | 1,865,900 | $ 9.00 | $ 7.98 |
| April 17, 2007 | 100,000(1) | $ 9.00 | $ 25.00 |
| May          , 2007 | 350,900(2) | $ | $ |
|              , 2007 | 100,000(3) | $ 9.00 | $ |

(1) Represent the 100,000 options granted on April 17, 2007 to one of our existing directors. We determined the fair value of our ordinary shares as of the grant date based on our preliminary discussions with the underwriters for this offering regarding the possible price range for this offering, and we determined such fair value to be $25 per share.

(2) Represent the 350,900 options authorized on April 17, 2007 to be granted to our employees. The exercise price for such options will be the low end of the price range for this offering as shown on the cover of the preliminary prospectus. The grant date of such options will be deemed to be the date such exercise price is determined. We determined that the fair value of the ordinary shares on the grant date of such options was to be $          per share, which is the low end of the price range set forth on the cover of the preliminary prospectus.

(3) Represent the 100,000 options authorized on April 17, 2007 to be granted to Mr. Louis T. Hsieh, who will become our director on the date of this prospectus. The exercise price for such options will be $9.00 per share and the grant date of such options will be the date of this prospectus. We determined that the fair value of our ordinary shares on such grant date will be the final price per share in this offering.

In determining the fair value of the underlying ordinary shares at the date of grant, we have considered the guidance prescribed by the AICPA Audit and Accounting Practice Aid "Valuation of Privately-Held-Company Equity Securities Issued as Compensation," or the Practice Aid. We engaged an independent valuation firm, Sallmanns (Far East) Limited, or Sallmanns, to perform appraisals of the fair value for the options and the ordinary shares underlying the options granted in August 2006 and February 2007 and the fair value for the options granted after April 1, 2007.

### August 1, 2006 Grant

In its assessment of the fair value of our ordinary shares underlying the options granted on August 1, 2006, Sallmanns considered the income approach and the market approach, and used the income approach to derive the fair value of our ordinary shares.

Under the income approach, value depends on the present worth of future economic benefits to be derived from the projected income. Indications of value were developed by discounting projected future net cash flows available for shareholders to their present worth at discount rates which, in the opinion of Sallmanns, were appropriate for the risks associated with our business. For the income approach, Sallmanns utilized our projected cash flows through 2011. In considering the appropriate discount rates to be applied, Sallmanns took into account a number of factors including the then current cost of capital and the risks inherent in our business, such as our limited operating history, risks associated with the implementation of our business plan and strategies and the risks and uncertainties inherent in the development of our business as of the grant dates. Sallmanns used a weighted average cost of capital, or WACC, of 17% given our short operating history and limited historical financial records.

50

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

For the August 1, 2006 grant, Sallmanns considered the income approach and the market approach, and used the income approach to derive the fair value of our ordinary shares underlying the options granted. In August 1, 2006, we were unable to identify companies that were directly comparable to us, given our operating history of less than a year, the nature of our business as a pure wafer manufacturer and our rapid development. Although there were public companies in solar-energy related industries, the valuation ratios of those companies vary significantly. Some valuation ratios, such as price-to-earnings ratios, were not available for some of those companies. As a result, Sallmanns concluded that the historical and projected financial conditions of these companies were significantly different from one another and that there were no consensus valuation ratios applicable for purposes of the valuation. As such, Sallmanns did not believe that the market approach was applicable to us in August 2006.

The fair value of our company was allocated between our Series A preferred shares and our ordinary shares using the option-pricing model. Under the option-pricing model, the allocation of the equity fair value was based on the liquidation of Series A preferred shares, anticipated timing of a potential liquidity event, such as this offering, and estimates of the volatility of the equity securities. The anticipated timing of this offering was based on the plans of our board of directors and management. The estimate of volatility of the equity securities was based on the implied volatility of the options of comparable companies that Sallmanns used in the market approach.

### December 19, 2006 Valuation

Sallmanns conducted a valuation of our ordinary shares as of December 19, 2006, the closing date for the issuance of our Series C preferred shares and determined that the fair value of our ordinary shares was $5.04 per share. See "— Embedded beneficial conversion feature of the convertible instruments."

### February 6, 2007 Grant

For the February 6, 2007 grant, Sallmanns considered the income approach and the market approach. For the same reasons as described above under "— August 1, 2006 Grant", Sallmanns did not believe that the market approach was applicable to us in February 2007 and derived the fair value of our ordinary shares using the income approach.

Our estimated fair value per ordinary share increased by approximately 58.3% from $5.04 on December 19, 2006 to $7.98 on February 6, 2007. The following is a list of the significant factors and events that contributed to the increase:

- We were able to secure more polysilicon feedstock. Given the constraints in polysilicon supply in the market, we focused our efforts on securing more polysilicon during the period between December 19, 2006 and February 6, 2007. During this period, we were able to secure commitments for an additional 256 tons of polysilicon for our wafer production in 2007.

- We were able to secure more firm commitment contracts from our customers. During this period, we were able to obtain sales contracts for over 350 MW of wafer sales, of which approximately 50 MW were for 2007. We also entered into sales contracts with two of the market leaders in photovoltaic cells, Motech and E-Ton. We signed a three-year agreement with Motech for approximately 100 MW and a four-year agreement with E-Ton for approximately 200 MW.

- We were able to secure additional wire saws to increase our annual production capacity. To produce wafers, we are dependent on our wire saws to slice bricks into wafers. On January 4, 2007, we entered into a master purchase agreement with HCT Shaping to acquire 170 wire saws in total, including 17 wire saws that had been previously delivered. We believe this agreement will provide sufficient wire saw capacity for us to reach our planned annual capacity of approximately 800 MW by the end of 2008.

- We further strengthened our management team. We hired our president and chief operating officer, Xingxue Tong, who has over 10 years experience in managing operations of companies in the solar industry. Mr. Tong also serves as a director on our board. In early February, we hired Yuepeng Wan as our chief technology officer to lead our research and development efforts. We also hired additional middle management personnel.

51

*Option Grants after April 1, 2007*

In connection with our option grants after April 1, 2007, we did not engage Sallmans to conduct a valuation of our ordinary shares as of the grant dates of the options because the completion of this offering was more certain and closer in time than in February 2007. For the 100,000 options granted on April 17, 2007 to one of our existing directors, we determined the fair value of our ordinary shares as of the grant date based on our preliminary discussions with the underwriters for this offering regarding the possible price range for this offering, and we determined such fair value to be $25 per share. For the 350,900 options authorized on April 17, 2007 to be granted to our employees, the exercise price will be the low end of the price range for this offering on the cover page of the preliminary prospectus, and therefore the grant date of such options will be deemed to be the date such price range is determined. Therefore we determined that the fair value of the ordinary shares on the grant date of such options was to be $    per share, which is the low end of the price range set forth on the cover of the preliminary prospectus. We selected the low end of the price range because there will remain uncertainties after such date regarding the completion of this offering and the offering price. For the 100,000 options authorized on April 17, 2007 to be granted to Louis T. Hsieh, who will become our director on the date of this prospectus, the exercise price will be $9.00 per share and the grant date of such options will be the date of this prospectus. We determined that the fair value of our ordinary shares on such grant date would be the final price per share in this offering.

Our estimated fair value per ordinary share increased substantially from $7.98 on February 6, 2007 to $25 on April 17, 2007, $   on the date of the preliminary prospectus for this offering and $   on the date of this prospectus. We believe that the following factors and events have contributed to the increase in the fair value of our ordinary shares since February 6, 2007:

• We were able to expand our capacity significantly. At the end of January 2007, we had an annual production capacity of approximately 175 MW. Our annual production capacity increased by 40 MW to approximately 215 MW at the end of March 2007. During this period, we also ordered and paid deposits for equipment to support approximately an additional 95 MW of annual production capacity.

• We believe that our future growth will be more assured following this offering. We believe that after the completion of this offering, we will be able to use the proceeds from this offering for further our capacity expansion, achieve higher growth and secure more polysilicon feedstock. With the proceeds from this offering, we will be able to purchase the equipment necessary to achieve our planned capacity expansion to approximately 800 MW by the end of 2008 and secure more polysilicon feedstock necessary for our future production.

• We were able to secure more polysilicon. During this period, we were able to secure contracts for over 3,000 tons of polysilicon for the next few years. Of this amount, approximately 160 tons will be delivered in 2007 and 300 tons in 2008.

• We were able to secure more firm commitment contracts from our customers. During this period, we entered into sales contracts with our customers for over 270 MW of wafer sales, of which approximately 45 MW were for 2007 and approximately 110 MW were for 2008. We also entered into a contract with Q-Cells, the second largest photovoltaic cell manufacturer according to Solarbuzz. This long term contract is for three years, during which Q-Cells will supply silicon feedstock to us and purchase wafers from us. Under this contract, we will sell approximately 180 MW of wafers to Q-Cells between 2007 and 2009.

• We believe that our business prospects improved as well because of a substantial increase in our net revenues for the three months ended March 31, 2007 as compared with the three months ended December 31, 2006. We achieved revenues of $73.4 million for the three months ended March 31, 2007, representing an increase of approximately 19% from our revenues for the three months ended December 31, 2006.

• When the valuation was conducted in February 2007, we were still in the early stage of the offering process and there were significant uncertainties regarding the success of this offering. In April 2007, we were much further along in the offering process and the probability of a successful offering increased significantly.

52

*Embedded beneficial conversion feature of the convertible instruments*

In connection with our private placements with strategic and venture capital investors, we issued exchangeable notes in July 2006 and Series A, Series B and Series C preferred shares in July, September and December 2006, respectively. The exchangeable notes were exchangeable into our Series A preferred shares and all our preferred shares are convertible into our ordinary shares at a 1:1 ratio, subject to adjustments on the basis of our audited consolidated net earnings for the various periods as described in note (16) to our audited consolidated financial statements included elsewhere in this prospectus. For additional information on these conversion ratio adjustment provisions, see "Description of Share Capital — History of Securities Issuances — Series A preferred shares," "— Series B preferred shares" and "— Series C preferred shares" in this prospectus. These preferred shares are also subject to anti-dilution adjustments as disclosed in note (16) to our audited consolidated financial statements.

We recognize and measure the embedded beneficial conversion feature of each of our convertible instruments by allocating a portion of the proceeds from our convertible instruments equal to the intrinsic value of that feature to additional paid-in capital. The intrinsic value of the embedded beneficial conversion feature is calculated at the commitment date as the difference between the conversion price and the fair value of the securities into which the convertible instruments are convertible. For our exchangeable notes, the intrinsic value is the difference between (i) the fair value of the underlying Series A preferred shares on the commitment date of our exchangeable notes and (ii) the gross proceeds we received and allocated to our exchangeable notes; and for our preferred shares, the intrinsic value is the difference between (i) the fair value of the underlying ordinary shares on the respective commitment dates of our preferred shares and (ii) the gross proceeds we received and allocated for such preferred shares. We recognize the intrinsic value of the embedded beneficial conversion feature of our exchangeable notes so computed as interest expenses over the period from the date of issuance to the date when our exchangeable notes were exchanged into our Series A preferred shares. For our preferred shares, we recognize the intrinsic value of their embedded beneficial conversion feature as deemed dividends to our preferred shareholders at the date of issuance as our preferred shares were convertible at their respective issuance dates. Changes to the conversion terms that would be triggered by future events not controlled by us is accounted for as contingent conversion options, and the intrinsic value of such contingent conversion options will not be recognized until and unless the triggering event occurs.

We obtained a valuation analysis from Sallmanns with respect to the fair value of the securities into which our convertible instruments are convertible. Sallmanns used the income approach to assess the fair value of the our business. Under the income approach, Sallmanns performed a discounted cash flow analysis based on our projected cash flows through 2011. The cash flow projections were formulated to take into consideration the nature of our company, our relatively limited operating history, the growth prospects of our company and the business risks associated with our operations.

In addition to business specific assumptions, the following major assumptions have been adopted in calculating the fair value of our business, including:

- WACC: WACC of 17% was applied. This was the combined result of the risk-free rate, market return rate, industry average beta, and our company-specific risk premium that reflects the risks associated with achieving the projections at various stages of development.

- Lack of Marketability Discount, or LOMD: Sallmanns considered both the option method and the quantitative marketability discount model to quantify the LOMD. Both methods provided similar results on LOMD, which decreased from 35% as at June 28, 2006, which was the commitment date of the issuance of our exchangeable notes, to 20% as at September 15, 2006, which was the commitment date of the issuance of our Series B preferred shares, and to 10% as at December 15, 2006, which was the commitment date of the issuance of our Series C preferred shares. The decrease in LOMD was primarily attributable to our achievements in company restructuring and fund raising, which increased our resources to carry through this initial public offering.

The value of our business was then allocated to the fair value of our preferred shares and ordinary shares. Sallmanns considered the liquidation preference and conversion feature of our preferred shares under the

53

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

allocation method. To determine the fair market value of the securities underlying our convertible instruments requires us to make complex and subjective judgments regarding projected financial and operating results, our unique business risks, the liquidity of our various instruments including preferred shares, ordinary shares, share options and warrants, and our operating history and prospects at respective commitment dates of our convertible instruments.

### Income taxes

We recognize deferred tax assets for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements. Deferred tax assets are reduced by a valuation allowance when, in our opinion, it is likely that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing jurisdictions. We continue to assess, on an ongoing basis, the degree of certainty regarding the realization of deferred tax assets and whether a valuation allowance is required.

## Internal Control Over Financial Reporting

In the course of auditing our consolidated financial statements for the year ended December 31, 2006, our independent registered public accounting firm noted and communicated to us a significant deficiency and other weaknesses in our internal control over financial reporting. The significant deficiency identified by our independent registered public accounting firm is that our chief financial officer joined us in August 2006 and that we did not previously have any personnel who were familiar with U.S. GAAP. We currently do not have sufficient personnel with adequate expertise to ensure that we can produce financial statements in accordance with U.S. GAAP on a timely basis.

Following the identification of this significant deficiency and other weaknesses, we have adopted certain steps, and we plan to implement additional steps, to address them and to improve our internal control over financial reporting generally. In particular, we are committed to building a strong financial reporting, analysis and internal control team to ensure our full compliance with U.S. GAAP. We have hired a U.S. certified public accountant with more than 15 years of experience in financial reporting under U.S. GAAP as our financial controller. In addition, we intend to hire a senior manager for financial reporting and analysis, who will be a U.S. certified public accountant and have extensive experience in financial reporting under U.S. GAAP. To complement our own recruiting efforts, we have retained recruiting firms to search for additional qualified personnel to further strengthen our finance and accounting team. We plan to approximately double our finance and accounting staff by the end of 2007 by recruiting personnel who possess U.S. GAAP knowledge. We intend to engage a U.S.-based consulting firm to provide us with consultancy services, including training our internal finance and accounting staff in Sarbanes-Oxley Act compliance and financial reporting under U.S. GAAP.

However, the implementation of these measures may not fully address this significant deficiency and other weaknesses in our internal control over financial reporting, and we cannot yet conclude that they have been fully remedied.

## Results of Operations

We were incorporated in the Cayman Islands on May 1, 2006. Our principal operating subsidiary, Jiangxi LDK Solar, was established in China on July 5, 2005. Through a reorganization of entities under common control, Jiangxi LDK Solar became our wholly owned subsidiary. We commenced commercial production of solar wafers in April 2006 at our manufacturing facilities in Xinyu city, Jiangxi province, China. Due to our short history of operations, the comparison of our results of operations between 2006 and 2005 would not be meaningful.

### Period from July 5 to December 31, 2005

Our principal operating subsidiary, Jiangxi LDK Solar, was established on July 5, 2005 in China. We had no revenue and a net loss of $274,000 for the period from July 5, 2005 to December 31, 2005 as a result of our pre-production start-up costs and expenses, which primarily consisted of general and administrative expenses, research and development expenses, interest expenses and foreign currency exchange loss, net.

54

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

*Year ended December 31, 2006*

The following table sets forth a summary of our statement of operations for the year ended December 31, 2006 and as a percentage of our net sales for the year. Our historical results presented below are not necessarily indicative of the results that may be expected for any future period.

| | Year Ended December 31, 2006 | |
|---|---|---|
| | (in thousands) | (% of net sales) |
| Net sales | $ 105,454 | 100.0% |
| Cost of goods sold | (63,962) | (60.7) |
| Gross profit | 41,492 | 39.3 |
| Selling expenses | (286) | (0.3) |
| General and administrative expenses | (3,771) | (3.6) |
| Research and development expenses | (290) | (0.2) |
| Total operating expenses | (4,347) | (4.1) |
| Income from operations | 37,145 | 35.2 |
| Other income/(expenses): | | |
| Interest income | 105 | 0.1 |
| Interest expense and amortization of discount on exchangeable notes | (7,133) | (6.8) |
| Decrease in fair value of warrants | 9 | 0.0 |
| Foreign currency exchange loss, net | (1,325) | (1.2) |
| Government subsidy | 1,268 | 1.2 |
| Income before income tax benefit | 30,069 | 28.5 |
| Income tax benefit | 113 | 0.1 |
| Net income | 30,182 | 28.6% |
| Accretion of Series A preferred shares to redemption value | (814) | |
| Accretion of Series B preferred shares to redemption value | (1,799) | |
| Accretion of Series C preferred shares to redemption value | (116) | |
| Deemed dividend to Series A preferred shareholders | (1,568) | |
| Net income available to ordinary shareholders | $ 25,885 | |

Since we made our first commercial sale of multicrystalline wafers in April 2006, we experienced significant growth in sales volume in the second, third and last quarters of 2006.

For the year ended December 31, 2006, we had net sales of $105.5 million, gross profit of $41.5 million, net income of $30.2 million and net income available to ordinary shareholders of $25.9 million. Our gross margin for the year ended December 31, 2006 was 39.3%; our operating margin for the year was 35.2%; and our net margin for the year was 28.6%.

55

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

*Selected unaudited quarterly financial data*

The following table provides a comparison of our quarterly results of operations for the periods indicated and as a percentage of our net sales for the respective periods indicated:

| | Three Months Ended June 30, 2006 | | Three Months Ended September 30, 2006 | | Three Months Ended December 31, 2006 | | Three Months Ended March 31, 2007 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | (in thousands, except per share and per ADS data) | (% of net sales) | (in thousands, except per share and per ADS data) | (% of net sales) | (in thousands, except per share and per ADS data) | (% of net sales) | (in thousands, except per share and per ADS data) | (% of net sales) |
| Net sales | $ 12,144 | 100.0% | $ 31,450 | 100.0% | $ 61,860 | 100.0% | $ 73,400 | 100.0% |
| Cost of goods sold | (9,588) | (79.0) | (19,069) | (60.6) | (35,305) | (57.1) | (45,020) | (61.3) |
| Gross profit | 2,556 | 21.0 | 12,381 | 39.4 | 26,555 | 42.9 | 28,380 | 38.7 |
| Selling expenses | (85) | (0.7) | (117) | (0.4) | (84) | (0.1) | (183) | (0.2) |
| General and administrative expenses | (345) | (2.8) | (1,633) | (5.2) | (1,664) | (2.7) | (1,819) | (2.5) |
| Research and development expenses | (15) | (0.1) | (76) | (0.2) | (199) | (0.3) | (261) | (0.4) |
| Total operating expenses | (445) | (3.6) | (1,826) | (5.8) | (1,947) | (3.1) | (2,263) | (3.1) |
| Income from operations | 2,111 | 17.4 | 10,555 | 33.6 | 24,608 | 39.8 | 26,117 | 35.6 |
| Other income/(expenses): | | | | | | | | |
| Interest income | 22 | 0.2 | 26 | 0.1 | 26 | 0.0 | 25 | 0.0 |
| Interest expense and amortization of discount on exchangeable notes | (837) | (6.9) | (4,961) | (15.8) | (995) | (1.6) | (1,529) | (2.1) |
| Decrease in fair value of warrants | — | — | 9 | 0.0 | | | | |
| Foreign currency exchange loss, net | (36) | (0.3) | (667) | (2.1) | (566) | (0.9) | (516) | (0.7) |
| Government subsidy | — | — | — | — | 1,268 | 2.0 | 437 | 0.6 |
| Income before income tax benefit | 1,260 | 10.4 | 4,962 | 15.8 | 24,341 | 39.3 | 24,534 | 33.4 |
| Income tax benefit | 57 | 0.5 | — | — | 2 | (0.0) | — | — |
| Net income | $ 1,317 | 10.9% | $ 4,962 | 15.8% | $ 24,343 | 39.3% | $ 24,534 | 33.4% |
| Accretion of Series A preferred shares to redemption value | — | | (262) | | (552) | | (512) | |
| Accretion of Series B preferred shares to redemption value | — | | (267) | | (1,532) | | (1,625) | |
| Accretion of Series C preferred shares to redemption value | — | | — | | (116) | | (805) | |
| Deemed dividend to Series A preferred shareholders | — | | (1,568) | | — | | — | |
| Net income available to ordinary shareholders | $ 1,317 | | $ 2,865 | | $ 22,143 | | $ 21,592 | |
| Net income per ordinary share | | | | | | | | |
| Basic | $ 0.02 | | $ 0.04 | | $ 0.30 | | $ 0.29 | |
| Diluted | $ 0.02 | | $ 0.04 | | $ 0.28 | | $ 0.27 | |
| Net income per ADS | | | | | | | | |
| Basic | $ | | $ | | $ | | $ | |
| Diluted | $ | | $ | | $ | | $ | |
| Ordinary shares used in computation: | | | | | | | | |
| Basic | 75,000 | | 75,000 | | 75,000 | | 75,000 | |
| Diluted | 75,000 | | 75,000 | | 88,004 | | 90,580 | |

56

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

*Three months ended March 31, 2007 compared with three months ended December 31, 2006*

*Net sales.* For the three months ended March 31, 2007, our net sales were approximately $73.4 million, representing an increase of $11.5 million from our net sales of $61.9 million for the three months ended December 31, 2006. This increase was primarily due to our increased sales volume, which was offset in part by a decline in our average wafer selling price. We sold 29.6 MW of wafers during the three months ended March 31, 2007 and 26.4 MW of wafers during the three months ended December 31, 2006. To meet growing demand for our products, we have been increasing our production capacity. We had 61 DSS furnaces and 27 wire saws in operation as of March 31, 2007 compared with 51 DSS furnaces and 21 wire saws in operation as of December 31, 2006. Our net sales generated from the various geographic regions during the three months ended March 31, 2007 as a percentage of our net sales has experienced some significant changes as compared to the year ended December 31, 2006. In line with our strategy to broaden our geographic presence, our net sales to China during the three months ended March 31, 2007 decreased to 50.0% of our total net sales during the period as compared to 75.5% during the year ended December 31, 2006. Our net sales to Asia Pacific ex-China during the three months ended March 31, 2007 increased to 31.8% as compared to 16.3% during the year ended December 31, 2006. Our net sales to North America during the three months ended March 31, 2007 increased to 8.2% as compared to 5.0% during the year ended December 31, 2006. Our net sales to Europe during the three months ended March 31, 2007 increased to 10.0% as compared to 3.2% during the year ended December 31, 2006. For further information on our geographic markets, see "— Net Sales" above.

*Gross profit.* Our gross profit increased by $1.8 million to $28.4 million for the three months ended March 31, 2007 from $26.6 million for the three months ended December 31, 2006. Our gross margin declined to 38.7% for the three months ended March 31, 2007 from 42.9% for the three months ended December 31, 2006, primarily due to a decrease in our average wafer selling price and an increase in the cost of our raw materials. The increase in the cost of our raw materials was primarily due to the increase in the cost of our polysilicon feedstock, which, in turn, was primarily the result of an increase in our purchase of monocrystalline ingots used in our production and sale of monocrystalline wafers.

*Operating expenses.* For the three months ended March 31, 2007, our operating expenses were $2.3 million, an increase of $316,000 from our operating expenses of $1.9 million from approximately $1.9 million for the three months ended December 31, 2006. This increase was primarily due to an increase of approximately $155,000 in our general and administrative expenses, as a result of the addition of administrative personnel and the corresponding increases in salaries, benefits and traveling expenses during the three months ended March 31, 2007.

*Interest income and expense.* For the three months ended March 31, 2007, our interest income was approximately $25,000, which remained substantially the same as our interest income for the three months ended December 31, 2006 of approximately $26,000 because our total cash on deposit in interest-bearing savings accounts and the relevant interest rates both remained approximately the same over this period. For the three months ended March 31, 2007, our interest expense increased to $1.5 million from $1.0 million for the three months ended December 31, 2006 as a result of an increase in our borrowings.

*Foreign currency exchange loss, net.* For the three months ended March 31, 2007, our foreign currency exchange loss, net, decreased by $50,000 to approximately $516,000 from approximately $566,000 for the three months ended December 31, 2006 primarily because we held a smaller amount of foreign currency denominated assets in our current accounts, such as prepayments to our foreign suppliers of polysilicon feedstock, deposits with our production equipment vendors overseas and trade accounts receivable, for the three months ended March 31, 2007 on a net basis than we did for the three months ended December 31, 2006. We recognized an exchange loss with respect to these assets due to the appreciation of Renminbi. See "Exchange Rate Information" in this prospectus for more information on exchange rates between the U.S. dollar and Renminbi.

*Net income.* For the three months ended March 31, 2007, our net income increased by $191,000 to $24.5 million compared with our net income of $24.3 million for the three months ended December 31, 2006. For the three months ended March 31, 2007, our net margin decreased to 33.4% from 39.3% for the three months ended December 31, 2006. Our PRC subsidiary, Jiangxi LDK Solar, is entitled to exemptions from the PRC national and local enterprise income tax for at least two and five years, respectively, beginning with calendar year 2006. Without this tax holiday, our income tax expense would have increased by approximately

57

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

$8.5 million and $8.4 million for the three months ended March 31, 2007 and the three months ended December 31, 2006, respectively, with a corresponding reduction in the amount of our net income for the periods.

*Accretion of Series A, Series B, Series C preferred shares to redemption values.* We issued our Series A preferred shares in July 2006, our Series B preferred shares in September 2006 and our Series C preferred shares in December 2006. For the three months ended March 31, 2007, we recognized accretion to the redemption values of our Series A, Series B and Series C preferred shares of approximately $512,000, $1.6 million and $805,000, respectively. The Series A, Series B, Series C preferred shares are each redeemable 36 months following the issuance date of the Series C preferred shares if a qualified initial public offering has not occurred. The accretion of the Series A, Series B, Series C preferred shares to their redemption prices was reflected as a reduction to our net income and represented the difference between our net income and our net income available to ordinary shareholders.

*Net income available to ordinary shareholders*. As a result of the foregoing, for the three months ended March 31, 2007, our net income available to ordinary shareholders was $21.6 million. Our net income available to ordinary shareholders for the three months ended December 31, 2006 was $22.1 million. Without the tax holiday as described in "— Net income" above, our net income available to ordinary shareholders would have been reduced by approximately $8.5 million and $8.4 million for the three months ended March 31, 2007 and the three months ended December 31, 2006, respectively.

*Net income per ordinary share.* For the three months ended March 31, 2007, net income per ordinary share was $0.29 and $0.27 per share on a basic and diluted basis, respectively. For the three months ended December 31, 2006, net income per ordinary share was $0.30 and $0.28 per share on a basic and diluted basis, respectively. Without the tax holiday as described in "— Net income" above, our basic net income per ordinary share would have been reduced by $0.11 for the three months ended March 31, 2007 and the three months ended December 31, 2006, respectively, and our diluted net income per ordinary share would have been reduced by $0.09 for the three months ended March 31, 2007 and the three months ended December 31, 2006, respectively.

### Three months ended December 31, 2006 compared with three months ended September 30, 2006

*Net sales.* For the three months ended December 31, 2006, our net sales were approximately $61.9 million, an increase of $30.4 million from our net sales of $31.5 million for the three months ended September 30, 2006. This increase was primarily due to our increased sales volume. We sold 26.4 MW of wafers during the three months ended December 31, 2006 and 14.0 MW of wafers during the three months ended September 30, 2006. To meet growing demand for our products, we have been increasing our production capacity. We had 51 DSS furnaces and 21 wire saws in operation as of December 31, 2006 compared with 30 DSS furnaces and 12 wire saws in operation as of September 30, 2006.

*Gross profit.* Our gross profit increased by $14.2 million to $26.6 million for the three months ended December 31, 2006 from $12.4 million for the three months ended September 30, 2006. Our gross margin increased to 42.9% for the three months ended December 31, 2006 from 39.4% for the three months ended September 30, 2006, primarily due to our improved manufacturing efficiencies and economies of scale.

*Operating expenses.* For the three months ended December 31, 2006, our operating expenses were $1.9 million, an increase of $121,000 from our operating expenses of $1.8 million for the three months ended September 30, 2006. This increase was primarily due to an increase of approximately $123,000 in our research and development expenses as a result of additional personnel we hired and our increased research and development activities in the three months ended December 31, 2006.

*Interest income and expense.* For the three months ended December 31, 2006, our interest income remained at approximately $26,000 as compared with the three months ended September 30, 2006 because our total cash on deposit in interest-bearing savings accounts and the relevant interest rates both remained approximately the same over this period. For the three months ended December 31, 2006, our interest expense decreased to $1.0 million from $5.0 million for the three months ended September 30, 2006 as a result of the decrease in our debt discount amortization over this period. We had $4.4 million of debt discount amortization for the three months ended September 30, 2006 in connection with the issuance of our exchangeable notes,

58

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

which contained beneficial conversion features. These exchangeable notes were issued on July 18, 2006 and exchanged into our Series A preferred shares at the end of July 2006. As a result, we did not record any further debt discount amortization for the three months ended December 31, 2006. The $4.4 million charge for debt discount amortization represented the difference, measured as of the original commitment date for the issuance of the exchangeable notes, between the exchange price at which the exchangeable notes were exchangeable into our Series A preferred shares and the fair market value of the underlying Series A preferred shares.

*Foreign currency exchange loss, net.* For the three months ended December 31, 2006, our foreign currency exchange loss, net, decreased by $101,000 to approximately $566,000 from approximately $667,000 for the three months ended September 30, 2006 primarily because we held a smaller amount of foreign currency denominated assets in our current accounts, such as prepayments to our foreign suppliers of polysilicon feedstock, deposits with our production equipment vendors overseas and trade accounts receivable, for the three months ended December 31, 2006 on a net basis than we did for the three months ended September 30, 2006. We recognized an exchange loss with respect to these assets due to the appreciation of Renminbi. See "Exchange Rate Information" in this prospectus for more information on exchange rates between the U.S. dollar and Renminbi.

*Net income.* For the three months ended December 31, 2006, our net income increased by $19.4 million to $24.3 million compared with our net income of $5.0 million for the three months ended September 30, 2006. For the three months ended December 31, 2006, our net margin increased to 39.3% from 15.8% for the three months ended September 30, 2006. Our PRC subsidiary, Jiangxi LDK Solar, is entitled to exemptions from the PRC national and local enterprise income tax for at least two and five years, respectively, beginning with calendar year 2006. Without this tax holiday, our income tax expense would have increased by approximately $8.4 million and $3.5 million for the three months ended December 31, 2006 and the three months ended September 30, 2006, respectively, with a corresponding reduction in the amount of our net income for the periods.

*Accretion of Series A, Series B, Series C preferred shares to redemption values.* We issued our Series A preferred shares in July 2006, our Series B preferred shares in September 2006 and our Series C preferred shares in December 2006. For the three months ended December 31, 2006, we recognized accretion to the redemption values of our Series A, Series B and Series C preferred shares of approximately $552,000, $1.5 million and $116,000, respectively. The Series A, Series B, Series C preferred shares are each redeemable 36 months following the issuance date of the Series C preferred shares if a qualified initial public offering has not occurred. The accretion of the Series A, Series B, Series C preferred shares to their redemption prices was reflected as a reduction to our net income and represented the difference between our net income and our net income available to ordinary shareholders.

*Net income available to ordinary shareholders.* As a result of the foregoing, for the three months ended December 31, 2006, our net income available to ordinary shareholders was $22.1 million. Our net income available to ordinary shareholders for the three months ended September 30, 2006 was $2.9 million. Without the tax holiday as described in "— Net income" above, our net income available to ordinary shareholders would have been reduced by approximately $8.4 million and $3.5 million for the three months ended December 31, 2006 and the three months ended September 30, 2006, respectively.

*Net income per ordinary share.* For the three months ended December 31, 2006, net income per ordinary share was $0.30 and $0.28 per share on a basic and diluted basis, respectively. For the three months ended September 30, 2006, net income per ordinary share was 0.04 per share on both basic and diluted bases. Without the tax holiday as described in "— Net income" above, our basic net income per ordinary share would have been reduced by $0.11 and $0.05 for the three months ended December 31, 2006 and the three months ended September 30, 2006, respectively, and our diluted net income per ordinary share would have been reduced by $0.09 and $0.05 for the three months ended December 31, 2006 and the three months ended September 30, 2006, respectively.

59

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

*Three months ended September 30, 2006 compared with three months ended June 30, 2006*

We were still at pre-operating stage prior to April 2006. During the three months ended March 31, 2006, we did not generate any sales revenue and had a net loss of approximately $440,000. We made our first commercial sale of wafers in April 2006 and have experienced rapid growth in sales since then.

*Net sales.* For the three months ended September 30, 2006, our net sales were approximately $31.5 million, an increase of $19.3 million from our net sales of $12.1 million for the three months ended June 30, 2006. This increase was primarily due to our increased sales volume. We sold 14.0 MW of wafers during the three months ended September 30, 2006 and 4.8 MW of wafers during the three months ended June 30, 2006. We increased our production capacity over this period to meet the demand for our products. We had 30 DSS furnaces and 12 wire saws installed as of September 30, 2006 compared with 12 DSS furnaces and eight wire saws as of June 30, 2006.

*Gross profit.* Our gross profit increased by $9.8 million to $12.4 million for the three months ended September 30, 2006 from $2.6 million for the three months ended June 30, 2006. Our gross margin increased to 39.4% for the three months ended September 30, 2006 from 21.0% for the three months ended June 30, 2006, primarily due to our improved manufacturing efficiencies and economies of scale.

*Operating expenses.* For the three months ended September 30, 2006, our operating expenses were $1.8 million, an increase of $1.4 million from our operating expenses of $445,000 for the three months ended June 30, 2006. This increase was primarily due to an increase of $1.3 million in general and administrative expenses as a result of our hiring of an additional 25 administrative personnel and the corresponding increases in salaries, benefits and traveling expenses during the three months ended September 30, 2006. Our research and development expenses, although relatively small in absolute amounts, increased substantially between these periods.

*Interest income and expense.* For the three months ended September 30, 2006, our interest income increased to approximately $26,000 from approximately $22,000 for the three months ended June 30, 2006 as a result of an increased average balance of our cash in interest-bearing saving accounts. For the three months ended September 30, 2006, our interest expense increased to $5.0 million from $837,000 for the three months ended June 30, 2006 primarily due to $4.4 million of debt discount amortization in connection with the issuance in July 2006 of our exchangeable notes which contained beneficial conversion features.

*Foreign currency exchange loss, net.* For the three months ended September 30, 2006, our foreign currency exchange loss, net, increased to approximately $667,000 from approximately $36,000 for the three months ended June 30, 2006 primarily because we held a much larger amount of foreign currency denominated assets in our current accounts, such as prepayments to our foreign suppliers of polysilicon feedstock, deposits with our production equipment vendors overseas and trade accounts receivable, during the three months ended September 30, 2006 on a net basis than we did for the three months ended June 30, 2006. We recognized an exchange loss with respect to these assets due to the appreciation of Renminbi.

*Income tax benefit.* We incurred pre-operating expenses prior to our commencement of first commercial sales by our principal operating subsidiary, Jiangxi LDK Solar, in April 2006. For the three months ended June 30, 2006, we recognized a deferred tax credit of approximately $57,000 as the portion of our pre-operating expenses attributable to the quarter before we started our operations. For the three months ended September 30, 2006, we had no such deferred tax credit. Jiangxi LDK Solar is entitled to exemptions from the PRC national and local enterprise income tax for at least two and five years, respectively, beginning with calendar year 2006. As a result, we made no provision for any current income tax during each of the three-month periods ended June 30 and September 30, 2006.

*Net income.* For the three months ended September 30, 2006, our net income increased by $3.6 million to $5.0 million from our net income of $1.3 million for the three months ended June 30, 2006. For the three months ended September 30, 2006, our net margin increased to 15.8% from 10.9% for the three months ended June 30, 2006. Without the tax holiday available to our PRC subsidiary, Jiangxi LDK Solar, our income tax expense would have increased by approximately $3.5 million and $0.6 million, respectively, for the three months ended September 30, 2006 and the three months ended June 30, 2006 with a corresponding reduction in the amount of our net income for the periods.

60

*Accretion of Series A and Series B preferred shares to redemption values.* In the three months ended September 30, 2006, we issued our Series A and Series B preferred shares and recognized accretion to their respective redemption values of approximately $262,000 and approximately $267,000. The Series A and Series B preferred shares are each redeemable 36 months following the issuance date of the Series C preferred shares if a qualified initial public offering has not occurred. The accretion of the Series A and Series B preferred shares to their redemption prices was reflected as a reduction to our net income and represented the difference between our net income and our net income available to ordinary shareholders.

*Deemed dividend to Series A preferred shareholders.* For the three months ended September 30, 2006, we recognized embedded beneficial conversion of our Series A preferred shares of $1.6 million, which represented the intrinsic value of the difference between the conversion price of the Series A preferred shares and the fair market value of the underlying ordinary shares at the original issue date of the Series A preferred shares. The value of the beneficial conversion feature was treated as a deemed dividend on the Series A preferred shares and reduced our net income to arrive at net income available to ordinary shareholders.

*Net income available to ordinary shareholders.* As a result of the foregoing, for the three months ended September 30, 2006, net income available to ordinary shareholders was $2.9 million. Our net income available to ordinary shareholders for the three months ended June 30, 2006 was $1.3 million. Without the tax holiday available to Jiangxi LDK Solar as described in "— Net income" above, our net income available to ordinary shareholders would have been reduced by approximately $3.5 million and $0.6 million for the three months ended September 30, 2006 and the three months ended June 30, 2006, respectively.

*Net income per ordinary share.* For the three months ended September 30, 2006 and June 30, 2006, net income per ordinary share, on both basic and diluted basis, was $0.04 per share and $0.02 per share, respectively. Without the tax holiday available to Jiangxi LDK Solar as described in "— Net income" above, our basic and diluted net income per ordinary share would have been reduced by $0.05 and $0.01 for the three months ended September 30, 2006 and the three months ended June 30, 2006, respectively.

## Plan of Operations

We have embarked on a business expansion program to capture what we believe to be an attractive market opportunity in the solar wafer industry. Our annual solar wafer production capacity as of March 31, 2007 was approximately 215 MW. We intend to continue to expand our current annual solar wafer production capacity to approximately 400 MW by the end of 2007 and approximately 800 MW by the end of 2008.

We believe that our current cash and cash equivalents, anticipated cash flow from our operations and proceeds from this offering will be sufficient to meet our anticipated cash needs, including our cash needs for working capital and capital expenditures for at least the next 12 months. We anticipate that our expenditures through the end of 2007 will include the following categories:

 • acquisition of additional polysilicon feedstock;

 • acquisition of additional production equipment;

 • installation of additional utilities and ancillary facilities;

 • purchase of additional land use rights in China;

 • research and development to improve our production processes;

 • employment of additional staff in various departments, including research and development, manufacturing, finance and accounting, sales and marketing and general administrative departments; and

 • establishment of sales and support offices in our targeted markets.

For additional information relating to our plan of operations through the remainder of 2007, see "Use of Proceeds," "— Liquidity and Capital Resources" and "Business — Production — Production capacity expansion" in this prospectus.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**Liquidity and Capital Resources**

*Cash flow and working capital*

Multicrystalline wafer manufacturing requires intensive capital investment and, due to our relatively short history of operations, we have financed our operations substantially through cash flow from financing activities.

The following table sets forth a summary of our net cash flows for the periods indicated:

| | Period from July 5 to December 31, 2005 | | Year Ended December 31, 2006 | | Three Months Ended March 31, 2007 | |
|---|---|---|---|---|---|---|
| | (in thousands) | | | | | |
| Net cash provided by (used in) operating activities | $ | 2,511 | $ | (57,067) | $ | (8,707) |
| Net cash used in investing activities | | (20,940) | | (79,564) | | (23,336) |
| Net cash provided by financing activities | | 28,077 | | 154,891 | | 11,660 |
| Effect of exchange rate changes | | 39 | | 2,280 | | 1,504 |
| Net increase in cash and cash equivalents | | 9,687 | | 20,540 | | (18,879) |
| Cash and cash equivalents at the beginning of period | | — | | 9,687 | | 30,227 |
| Cash and cash equivalents at the end of period | $ | 9,687 | $ | 30,227 | $ | 11,348 |

*Operating activities*

Although we had no revenues and incurred a net loss of $274,000 for the period from July 5 to December 31, 2005, our net cash provided by operating activities was $2.5 million because we received $3.7 million from our customers in advance payments for sales orders, which were offset in part by prepayments to our suppliers for purchases of materials to fill those orders. While we had $30.2 million of net income during the year ended December 31, 2006, our net cash used in operating activities was $57.1 million because we increased our inventories by $94.9 million and increased our advance payments to suppliers by $36.8 million to secure future sources of materials. These cash outflows were only partially offset by an increase of $36.3 million in advance payments from our customers for future sales. During the three months ended March 31, 2007, while we had $24.5 million of net income, our net cash used in operating activities was $8.7 million primarily because we increased our inventory of polysilicon feedstock by $19.3 million and our advance payments to suppliers by $15.1 million to secure our future sources of raw materials.

*Investing activities*

Our investing activities in 2005 comprised primarily our acquisition of property, plant and equipment. See "— Capital expenditures" below. Net cash used in investing activities for the period from July 5 to December 31, 2005 amounted to $20.9 million, mainly as a result of our purchases of property, plant and equipment for $15.5 million and an advance of $5.5 million made to a related party for the purchase of equipment and materials. Net cash used in investing activities for the year ended December 31, 2006 increased to approximately $79.6 million from $20.9 million for the period from July 5 to December 31, 2005, mainly as a result of acquisitions of additional property, plant and equipment for $72.8 million, purchase of land use rights at our Xinyu Hi-Tech Industrial Park site for $5.5 million and acquisition of intangible assets, such as technical know-how, from equipment manufacturers in connection with the operation of our acquired production equipment for $1.2 million. During the three months ended March 31, 2007, our net cash used in investing activities was approximately $23.3 million mainly as a result of acquisitions of additional property, plant and equipment for $22.0 million and payment of $1.3 million for the land use rights at our Xinyu Hi-Tech Industrial Park site that we purchased in 2006.

62

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

### *Financing activities*

Net cash provided by financing activities for the period from July 5 to December 31, 2005 amounted to $28.1 million, mainly as a result of the initial capital contributions made to Jiangxi LDK Solar and loans and advances from related parties. Net cash provided by financing activities for the year ended December 31, 2006 amounted to $154.9 million, mainly as a result of an aggregate of $77.4 million of net proceeds from our Series A, Series B and Series C preferred share placements, net bank borrowings of $87.0 million and net proceeds of $7.9 million from the issuance of our exchangeable notes. During the three months ended March 31, 2007, net cash provided by financing activities amounted to $11.7 million mainly as a result of $7.5 million of settlement of subscription receivable for ordinary shares and $4.3 million of net bank borrowings.

The aggregate principal amount of our short-term bank borrowings outstanding as of December 31, 2006 was $56.8 million, compared to zero as of December 31, 2005. The aggregate principal amount of our long-term bank borrowings outstanding as of December 31, 2006 was $30.2 million, compared to zero as of December 31, 2005.

### *Capital expenditures*

We made capital expenditures of $10.5 million, $93.1 million and $18.9 million during the period from July 5 to December 31, 2005, for the year ended December 31, 2006 and during the three months ended March 31, 2007, respectively. Our capital expenditures were used primarily to build our wafer and ingot processing plant, purchase production equipment and acquire advanced technologies.

Our capital expenditures will increase in the future as we expand our manufacturing capacity in line with our business expansion strategy. We estimate that our capital expenditures will be approximately $160 million in 2007 and approximately $180 million in 2008.

We have also entered into substantial commitments for future purchases of polysilicon feedstock. These commitments as of March 31, 2007 amounted to approximately $896.7 million in total, including $172.2 million for 2007 and $172.5 million for 2008. Our actual polysilicon feedstock purchases in the future may exceed these amounts.

We believe that our current cash and cash equivalents, anticipated cash flow from our operations and proceeds from this offering will be sufficient to meet our anticipated cash needs, including our cash needs for working capital, such as purchases of polysilicon feedstock, and capital expenditures for at least the next 12 months. We may, however, require additional cash due to changing business conditions or other future developments, including any investments or acquisitions we may decide to pursue. If we do not have sufficient cash to meet our requirements, we may seek to issue additional equity securities or debt securities or to borrow from lending institutions. If we are unable to obtain additional equity or debt financing as required, our business operations and prospects may suffer.

## Contractual Commitments

The following table sets forth our contractual cash commitments as of December 31, 2006. Amounts for debt obligations are principal amounts only.

| | Total | Year-End 2007 | Payment Due by Year-End 2008 (in thousands) | Year-End 2009 | After 2009 |
|---|---|---|---|---|---|
| Long-term debt obligations | $ 30,245 | $ — | $ 9,866 | $ 10,379 | $ 10,000 |
| Short-term debt obligations | 56,765 | 56,765 | — | — | — |
| Non-cancelable purchase obligations | | | | | |
|   — raw materials | 847,790 | 174,600 | 169,525 | 173,916 | 329,749 |
|   — equipment | 212,317 | 182,217 | 30,100 | — | — |
| Total | $1,147,117 | $ 413,582 | $ 209,491 | $ 184,295 | $ 339,749 |

The non-cancelable purchase obligations relating to raw materials in the above table included an aggregate amount of $729.6 million relating to a supply contract under which we would purchase raw

63

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

materials from Technischer Warenhandel Heller and NCA Fortin Inc., as co-sellers, from 2006 to 2011. Pursuant to the terms of the contract, we have agreed to prepay each monthly shipment 15 days in advance. Under the contract, the purchase price will be renegotiated every six months. The $729.6 million included above was determined based on the annual quantities we agreed to purchase and the purchase price effective as of December 31, 2006. Pursuant to the contract, we were required to pay an aggregate of $7.2 million in October and November 2006 for the first shipment of silicon feedstock in November 2006. For each subsequent monthly shipment between December 2006 and October 2007, we are required to pay $12.0 million each month at least 15 days before the shipment. Technischer Warenhandel Heller and NCA Fortin Inc. have not commenced delivery of any polysilicon as required and have informed us that delivery under this contract will be delayed. We have paid an aggregate of $3.0 million to date under this contract, as our partial prepayment with respect to the first shipment of silicon feedstock scheduled for delivery in November 2006. We have not made any additional payments under this contract. We are currently re-negotiating this contract with Technischer Warenhandel Heller and NCA Fortin Inc.

The $212.3 million of non-cancelable purchase obligations relating to equipment in the above table included an aggregate amount of $99.3 million in purchase obligations to HCT Shaping for wafering wire saws and squarers to be delivered during 2007 and 2008, $91.4 million in purchase obligations to GT Solar primarily for DSS furnaces to be delivered in 2007 and $19.3 million in purchase obligations to Meyer Burger for wafering wire saws to be delivered in 2007.

As of March 31, 2007, while our long-term debt obligations and short-term debt obligations were approximately $29.8 million and $61.5 million, respectively, our non-cancelable purchase obligations for raw materials and equipment were $896.7 million and $197.9 million, respectively. Our non-cancelable purchase obligation relating to the raw materials supply contract with Technischer Warenhandel Heller and NCA Fortin Inc. was $726.6 million.

We intend to use a portion of our net proceeds from this offering to purchase raw materials and equipment. See "Use of Proceeds."

## Quantitative and Qualitative Disclosure about Market Risks

### *Foreign exchange risk*

A significant portion of our sales is denominated in Renminbi. Our costs and capital expenditures are largely denominated in U.S. dollars and euros. Fluctuations in currency exchange rates, particularly among the U.S. dollar, Renminbi and euro, could have a significant impact on our financial condition and results of operations, affect our gross and operating profit margins and result in foreign exchange and operating losses.

We incurred a foreign currency exchange loss, net, of approximately $1.3 million and $0.5 million for the year ended December 31, 2006 and the three months ended March 31, 2007, respectively. We currently do not plan to enter into any hedging arrangements, such as forward exchange contracts and foreign currency option contracts, to reduce the effect of our foreign exchange risk exposure. Even if we decide to enter into any such hedging activities in the future, we cannot assure you that we would be able to effectively manage our foreign exchange risk exposure.

Our financial statements are expressed in U.S. dollars but the functional currency of our principal operating subsidiary, Jiangxi LDK Solar, is Renminbi. To the extent Jiangxi LDK Solar holds assets denominated in U.S. dollar currencies, any appreciation of Renminbi against such foreign currencies could result in a charge to our income statement and decrease the value of our foreign currency denominated assets. See note (2)(c) to our audited consolidated financial statements for more information on foreign currency translations for our financial reporting purposes.

### *Interest rate risk*

Our exposure to interest rate risk relates to interest expenses incurred by our short-term and long-term borrowings. We have not used any derivative financial instruments to manage our interest rate risk exposure. Historically, we have not been exposed to material risks due to changes in interest rates on any third-party debt; however, future interest expenses on our borrowings may increase due to changes in market interest rates. We are currently not engaged in any interest rate hedging activities.

64

**Inflation**

Since our inception, inflation in China has not materially impacted our results of operations. According to the National Bureau of Statistics of China, inflation as measured by the consumer price index in China was 3.9%, 1.8% and 1.5% in 2004, 2005 and 2006, respectively.

**Off-balance Sheet Commitments and Arrangements**

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of third parties. We have not entered into any derivative contracts that are indexed to our shares and classified as shareholder's equity or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or that engages in leasing, hedging or research and development services with us. There are no off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, net sales or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to you and other investors.

**Restricted Net Assets**

Our principal operating subsidiary, Jiangxi LDK Solar, is required under PRC laws and regulations to make appropriations from net income as determined under PRC accounting standards and regulations to nondistributable reserves, which include a general reserve and an employee benefits and bonus reserve. The general reserve is required to be made at not less than 10% of the profit after tax as determined under PRC accounting standards and regulations. The employee benefits and bonus reserve is determined by our board of directors at its discretion. The general reserve is used to offset future extraordinary losses. Jiangxi LDK Solar may, upon a resolution of its board of directors, convert the general reserve into capital. The employee benefits and bonus reserve is used for the collective welfare of the employees of Jiangxi LDK Solar. These reserves represent appropriations of the retained earnings determined under the PRC law. In addition to the general reserve, Jiangxi LDK Solar is required to obtain approval from the local government authorities prior to distributing any of its registered share capital. Accordingly, both the appropriations to the general reserve and the registered capital of Jiangxi LDK Solar are considered as restricted net assets.

**Recent Accounting Pronouncements**

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements." SFAS No. 157 defines fair value, establishes a framework for measuring fair value under U.S. GAAP and expands disclosures about fair value measurements. SFAS No. 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007 with earlier application encouraged. We are currently evaluating the impact, if any, of this statement on our consolidated financial statements.

In June 2006, the FASB released Interpretation No. 48, "Accounting for Uncertainty in Income Taxes — an Interpretation of FASB Statement No. 109," or FIN 48, which clarifies the accounting for uncertainty in tax positions. This interpretation requires that we recognize in our consolidated financial statements the impact of a tax position, if that position is more likely than not of being sustained upon examination, based on the technical merits of the position. FIN 48 is effective for fiscal years beginning after December 15, 2006. We do not expect the adoption of this interpretation to have a material effect on our consolidated financial statements.

In September 2006, the Securities and Exchange Commission issued Staff Accounting Bulletin No. 108, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements, or SAB 108, to address diversity in practice in quantifying financial statement misstatements. SAB 108 requires that misstatements be quantified based on their impact on the financial statements and related disclosures. SAB 108 is effective as of the end of fiscal year 2006, allowing a one-time transitional cumulative effect adjustment to retained earnings as of January 1, 2006 for errors that were not previously deemed material, but are material under the guidance in SAB 108. We do not expect the initial adoption of SAB 108 to affect our consolidated financial condition or results of operations.

65

## BUSINESS

### Overview

We manufacture multicrystalline solar wafers. Solar wafers are thin sheets of crystalline silicon material primarily made by slicing multicrystalline ingots or monocrystalline boules. Wafers are the principal raw material used to produce solar cells, which are devices capable of converting sunlight into electricity. We sell multicrystalline wafers globally to manufacturers of photovoltaic products, including solar cells and solar modules. We produce and sell solar wafers between 180 and 240 microns in thickness. In addition, we provide wafer processing services to both monocrystalline and multicrystalline solar cell and module manufacturers.

We manufacture multicrystalline ingots from polysilicon feedstock in our DSS furnaces as an interim step in producing wafers. In addition to using solar-grade virgin polysilicon, we also use other polysilicon materials from various sources in our ingot manufacturing process. We have developed proprietary production processes for the use of polysilicon scraps and recyclable polysilicon in manufacturing our ingots while maintaining our product quality and performance. We use substantially all of our ingots for production of our own wafers, and also sell a portion of our ingots directly to our customers.

As of March 31, 2007, we had an annual multicrystalline wafer production capacity of approximately 215 MW. We intend to increase our annual multicrystalline wafer production capacity to approximately 400 MW by the end of 2007 and approximately 800 MW by the end of 2008.

Despite the current industry-wide shortage of polysilicon, we have inventory and commitments from suppliers that we believe will satisfy over 90% of our estimated requirements through the end of 2007. The majority of our polysilicon feedstock consists of polysilicon scraps and recyclable polysilicon. In addition to polysilicon scraps and recyclable polysilicon, we also use virgin polysilicon as polysilicon feedstock. We have purchased polysilicon scraps and recyclable polysilicon from semiconductor materials trading companies, including Komex, Kunical and Prime. We have also purchased virgin polysilicon from virgin polysilicon manufacturers including MEMC and Wacker Chemie AG, or Wacker. In addition, some of our major customers, including CSI and Q-Cells, also have supplied us with polysilicon feedstock. We also source polysilicon feedstock from the spot market from time to time depending on the price and our requirements.

Our principal customers have included CSI, Chinalight, Solarfun, Solartech Energy, Solland Solar and Suntech. We also sell our wafers to BP Solar, E-Ton, GE Energy, Motech, Q-Cells, and other customers. Historically, the majority of our sales have been in China. We are enhancing and broadening our revenue and customer base to target other leading global photovoltaic cell and module producers.

Our increasing scale of operations and continuous cost reduction program have reduced our unit production cost since our inception. We have a dedicated research and development team, whose primary objectives are to enhance our product quality and achieve a more efficient manufacturing process by improving production yield and lowering production costs.

We were incorporated in the Cayman Islands on May 1, 2006. Our principal operating subsidiary, Jiangxi LDK Solar, was incorporated in China on July 5, 2005. Since we made our first commercial sale of our multicrystalline wafers in April 2006, we have experienced significant growth. Our net sales increased from $12.1 million for the three months ended June 30, 2006 to $31.5 million for the three months ended September 30, 2006, $61.9 million for the three months ended December 31, 2006 and $73.4 million for the three months ended March 31, 2007. Our net income increased from $1.3 million for the three months ended June 30, 2006 to $5.0 million for the three months ended September 30, 2006, $24.3 million for the three months ended December 31, 2006 and $24.5 million for the three months ended March 31, 2007.

### Our Industry

Solar power is one of the most rapidly growing renewable energy sources in the world today. The photovoltaic industry has experienced significant growth over the past decade. Despite the rapid growth, according to the International Energy Agency's estimates, solar energy constituted less than 0.4% of the world's total primary energy supply in 2004. According to Photon International, global crystalline solar cell or

66

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

module production will increase from 1.5 gigawatts in 2005 to 12.0 gigawatts in 2010, representing a compound annual growth rate of 51.6%.

**Global Annual Crystalline Silicon-Based Solar Cell/Module Production**



*Source*: Photon International

### Key growth drivers

We believe the following factors will continue to drive the global demand in the photovoltaic industry:

*Rising Prices of Conventional Energy Sources.* According to The International Energy Agency's estimate, approximately 80% of the world's electricity in 2004 was generated from fossil fuels such as coal, oil and natural gas. According to the United States Department of Energy's International Energy Outlook, worldwide demand for electricity is projected to increase from 14.8 trillion kilowatt hours in 2003 to 30.1 trillion kilowatt hours by 2030. The prices of conventional energy sources, including oil, gas and coal, have been steadily increasing in recent years. A more sustainable energy source is needed to address price increases of conventional/fossil fuel energy sources given the limited nature of fossil fuel supply and escalating electricity consumption.

*Government Incentives for Renewable Energy Sources.* Governments around the world are implementing renewable energy policies to encourage the use of clean and sustainable energy sources, such as solar energy that does not consume any fuel and produces no pollution during operation. Use of solar power has been growing at a fast pace in countries where incentives are offered by their governments to encourage its use. Countries such as Australia, China, Germany, Japan, Korea, Spain and the United States have offered or plan to offer substantial incentives in the form of direct subsidies for solar power system installations or rebates for electricity produced from solar power. Increasing government support for solar energy in regions, such as California and southern Europe, which receive many hours of sunlight and where solar energy is more cost competitive, is also driving demand.

*Tightening of Environmental Regulations.* Solar power is capable of generating electricity without producing pollution such as gaseous or water emissions or noise during operation. Governments around the world are adopting initiatives aimed at addressing worldwide environmental concerns and climate change risks associated with the use of fossil fuel. Problems such as greenhouse gas emissions are being addressed by initiatives such as the United Nations Kyoto Protocol and many national and regional air pollution regulations.

*Increasing Cost Competitiveness of Solar Energy.* According to Photon Consulting, the average prices of solar cells and modules are expected to decrease over the next few years as a result of improved production technologies and manufacturers attaining economies of scale. Accelerated aging tests have also shown that solar modules can operate for 30 years or more without the need for major maintenance other than the cleaning of module surfaces, making them inexpensive and reliable to operate. Solar power systems are also more cost-effective for use in remote rural applications, where grid-connection costs are prohibitive. A combination of these factors is increasing solar energy's cost competitiveness compared with other alternative energy sources.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

*Challenges facing the solar power industry*

Some of the key challenges faced by the solar power industry include the following:

*Possible Reduction or Elimination of Government Subsidies and Incentives.* The current growth of the solar power industry substantially relies on the availability and size of government subsidies and economic incentives, such as capital cost rebates, reduced tariffs, tax credits, net metering and other incentives. Governments may eventually decide to reduce or eliminate these subsidies and economic incentives. It remains a challenge for the solar power industry to reach sufficient scale to be cost-effective in a non-subsidized marketplace.

*Need to Improve Cost Competitiveness Against Other Energy Sources.* The cost of installing a solar power system may render solar energy more expensive than traditional fossil fuel generated electricity. Relatively high product costs remain one of the impediments to growth in solar power usage. Manufacturers must address this by improving the cost efficiency of solar power systems through innovation and continuous improvement of production techniques.

*Supply Constraint of Polysilicon.* Polysilicon is currently in short supply. According to Photon Consulting, in 2006, the global demand for photovoltaic modules is expected to exceed that of production by 2.6 gigawatts. Underlying demand will outstrip supply through at least 2008 and likely 2010. Insufficient supply of polysilicon may hinder the growth of the solar power industry.

*Need to Broaden Awareness and Acceptance of Solar Power Usage.* Growth in solar power usage has been mostly limited to on-grid applications. Solar energy products sales consist substantially of standard solar modules and systems. Broader market awareness will be required in order to tap the potential of the off-grid market.

### Photovoltaic products manufacturing value chain

Solar power systems generally comprise a multitude of solar modules, which are made of multiple solar cells. There are two main categories of solar cell technology entailing very different production processes:

• crystalline wafer-based production technology, and

• thin-film production technology.

Crystalline wafer-based technologies accounted for approximately 92% of solar cells produced in 2006, according to Photon International.

The crystalline silicon-based photovoltaic products manufacturing value chain starts with the processing of quartz sands to produce metallurgical-grade silicon. This material is further purified to become semiconductor-grade or solar-grade virgin polysilicon feedstock. Recyclable polysilicon raw materials, which include tops and tails of discarded portions of polysilicon ingots, pot scraps and broken polysilicon wafers acquired from the semiconductor and solar power industries, may also be used as feedstock.

In the most widely used crystalline silicon-based solar manufacturing process, feedstock is melted in high temperature furnaces and is then formed into ingots through a crystallization process. Due to the significant increase in virgin polysilicon prices, using less virgin polysilicon and more recyclable polysilicon raw materials to manufacture ingots results in lower overall cost of raw materials. However, the use of recyclable polysilicon raw materials increases the difficulty of producing ingots with quality similar to those made from virgin polysilicon. Ingots are cut into blocks and then sliced into wafers using high precision techniques.

Wafers are manufactured into solar cells through a multiple step manufacturing process that entails etching, doping, coating and applying electrical contacts. Solar cells are then interconnected and packaged to form solar modules, which together with system components such as batteries and inverters, are distributed to installers, systems integrators, service providers or directly to end-users, for installation onto on-grid or off-grid systems.

68

The following diagram illustrates the value chain for the manufacture of photovoltaic products.



### Solar wafer industry

According to Photon International, sawn wafer technologies accounted for approximately 97% of the crystalline wafer market in 2006. These technologies apply to both monocrystalline and multicrystalline wafers. Non-sawn wafer technologies consist primarily of ribbon wafers and sheet wafers. For sawn wafer technologies, polysilicon is converted into monocrystalline or multicrystalline silicon wafers through an ingot producing and slicing process. Sawn wafer cells convert between 13% and 22% of the sunlight that they receive into electricity, with monocrystalline-based cells generally achieving efficiencies at the top of the range.

Multicrystalline wafers generally contain more impurities and crystal defects which impede the flow of electrons than monocrystalline wafers, as a monocrystalline wafer is made from one single crystal. Compared to monocrystalline wafers, multicrystalline wafers are cheaper to produce and offer greater scope for further technological development, such as increasing the size of the ingot and reducing silicon waste and crystal defects. According to Solarbuzz, multicrystalline wafer-based cell production represented approximately 49% while monocrystalline wafer-based cell production constituted approximately 42% of the total photovoltaic market in 2006.

The solar wafer industry is relatively concentrated. According to Photon Consulting, the five largest wafer manufacturers accounted for approximately 60% of global production in 2005. Key players in the industry either supply wafers to the market or produce for their own cell manufacturing consumption. Of the largest crystalline wafer manufacturers, Deutsche Solar, JFE, PV Crystalox, and REC supply a significant portion of their wafer output to the open market. In additional, various existing and new wafer manufacturers are expanding their production capacity to meet the growing market demand. The main barriers to entry into wafer manufacturing industry currently include significant capital expenditures, access to high performance manufacturing equipment, availability of polysilicon, solid customer relationships with leading solar cell producers worldwide and significant manufacturing experience required to achieve optimal manufacturing efficiency. While current polysilicon feedstock shortages enable wafer manufacturers to reliably sell their output, relationships with the leading established solar cell producers are critical to gaining feedback on wafer performance and fine-tuning wafer production to ensure a sustainable technological lead.

The key competitive attributes of solar wafers are the potential conversion efficiency, the physical properties and the production cost. These three factors ultimately contribute to a solar cell's cost per watt of electricity generation. The photovoltaic industry's main goal is to reduce this cost per watt of solar electricity generation in order to increase solar energy's competitiveness. Often there exists a trade-off between achieving high technical efficiency, or a high conversion efficiency, and a high manufacturing efficiency, or low production costs. Companies in the industry are striving to improve the quality and efficiency of solar wafers through improvements to their production processes.

Production costs of multicrystalline wafers can be reduced through the creation of larger ingots and thinner wafers, as well as the reduction of operational costs. Larger ingots reduce the amount of consumables used on a per watt of product manufactured basis and increase production yield. One crucible is used for each ingot produced, regardless of its size. Producing a larger ingot requires only a moderate increase in crucible materials and is therefore less expensive than producing multiple, smaller ingots. Additionally, larger ingots have less surface area per unit volume of multicrystalline silicon produced, thus reducing the potential for contamination with impurities. The wafer area is the key factor in determining how much incident light can possibly be absorbed and converted into electricity. By manufacturing thinner wafers, less polysilicon is required to capture the same area of incident light. Location of the manufacturing plants in countries with low labor and utility costs also reduces operational costs.

69

**Competitive Strengths**

We believe that our rapid growth and strong market position are largely attributable to our following principal competitive strengths:

### *Pure-play multicrystalline solar wafer manufacturer*

We are a pure-play manufacturer focused on the production of multicrystalline solar wafers. We dedicate all our management efforts and financial, technical, research and human resources to the design, development, manufacturing and distribution of multicrystalline solar wafer products. As the global demand for solar power expands, we believe we will continue to be well positioned to benefit from the growth of upstream polysilicon capacity expansion and downstream photovoltaic cell and module production. Our position as a pure-play wafer manufacturer minimizes competition and conflicts of interest with our customers and suppliers. It enables us to form strong strategic relationships with them to gain feedback, improve our technology and secure polysilicon feedstock.

### *Cost-effective production*

We believe our production is cost-effective due to the following factors:

• *Efficient Production Process.* We have taken a series of cost reduction measures and developed processing technologies to reduce our production costs at each step of the production process, which include recycling more polysilicon, producing bigger ingots, increasing wafer size, reducing wafer thickness, implementing a slurry recovery program and using automatic sorting equipment to reduce wafer breakage.

• *China-based Manufacturing Facilities.* By manufacturing all of our products in China, we are able to benefit from low-cost labor, land, ancillary equipment and facilities, consumables and utilities. The low-cost labor in China allows us to utilize, in a cost-effective manner, recyclable polysilicon feedstock that requires intensive labor in its sorting, inspection and preparation.

• *Research and Development.* Our research and development efforts are aimed at achieving both near-term production process efficiency improvements and long-term technological breakthroughs through our collaborations with leading universities and our internal resources. Our efforts have enabled us to diversify and optimize our polysilicon feedstock mix, to manufacture larger ingots and thinner and larger wafers. We have established a dedicated laboratory in collaboration with Shanghai Jiaotong University, a leading university in science and engineering in China, to enhance the performance of consumables sourced in China such as crucibles, slurry and sawing wires as well as to develop innovative equipment and technologies to improve our manufacturing processes.

### *Large-scale manufacturing utilizing state-of-the-art equipment*

We have established a large-scale manufacturing facility with an annual production capacity of approximately 215 MW as of March 31, 2007. Based on our current expansion plan, we intend to increase our wafer production capacity to approximately 400 MW by the end of 2007 and approximately 800 MW by the end of 2008. We utilize state-of-the-art equipment throughout our manufacturing process, which includes DSS furnaces made by GT Solar and wire-saw squarers and wafering equipment made by HCT Shaping and Meyer Burger. Our current purchase orders and commitments are sufficient to support our production expansion to approximately 400 MW by the end of 2007 and to approximately 600 MW by mid-2008. We believe our state-of-the-art production equipment strengthens our competitive position in production efficiency and quality.

### *Strong relationships with suppliers and customers*

Our strong relationships with suppliers have provided us with materials needed to produce our wafers and ingots. According to Photon International, there is an industry-wide polysilicon supply shortage, which is a hinderance to the growth of solar wafer manufacturing. Through purchase orders and long-term supply contracts with virgin polysilicon manufacturers and other recyclable polysilicon purchase arrangements with our photovoltaic cell producer customers, we have secured over 90% of our polysilicon requirements for 2007.

70

Because we are a pure-play solar wafer manufacturer, we have established a number of long-term relationships and sales arrangements with key players in the photovoltaic industry. Our current customer base consists of some of the major international players in the photovoltaic cell and module manufacturing sector.

### Experienced management team

We have an experienced management team led by our founder, chairman and chief executive officer, Mr. Xiaofeng Peng, with proven execution capabilities in planning and implementing our corporate strategies. Members of our senior management team have extensive experience in the photovoltaic industry, manufacturing and corporate management. We believe the insight and execution capabilities of our management team have been instrumental in managing our rapid growth and in achieving our current leading market position. Subsequent to the incorporation of our principal operating subsidiary in China in July 2005, we made our first commercial sales in April 2006 and became profitable in the first quarter of our operations. We believe that the technical and industry knowledge and the business management experience of our senior executives provide us with significant competitive advantages in the fast growing solar industry.

## Our Strategies

Our principal objective is to strengthen our position as a global leader in the manufacturing of multicrystalline solar wafers through increasing our production capacity and strengthening our cost competitiveness. We intend to achieve this objective by pursuing the following strategies:

### Expand our production capacity to meet customer demand and enhance economies of scale

We plan to expand our production capacity rapidly in order to gain market share and cement our position as one of the leading players in the solar wafer industry. Both our upstream polysilicon suppliers and our downstream solar cell and/or module manufacturer customers have been aggressively expanding their operations due to strong global demand for solar products. We believe there exists an opportunity for us to quickly grow our operations to support the development of the solar power industry chain. When our wafer production capacity reaches approximately 400 MW by the end of 2007, as currently anticipated, increased economies of scale will further enhance our competitive position within the solar value chain. We plan to further expand our production capacity to approximately 800 MW by the end of 2008.

### Continue to improve our research and development to reduce manufacturing costs, improve production yield and pursue technological innovation

We plan to devote substantial research and development resources and recruit additional experienced research and development personnel to enhance our technological capabilities. As demand for photovoltaic products increases and production capacity expands across the value chain, we believe that the ability to maintain a competitive cost structure will be crucial to our success. We plan to continue providing high quality solar wafers at competitive prices by focusing on research and development in the following areas:

- maximize the utilization of polysilicon by making larger ingots and thinner wafers;

- improve technologies used in our polysilicon and slurry recovery program;

- improve production output by making thinner and larger wafers;

- reduce the costs associated with consumable items, such as sawing wires, crucibles and slurry; and

- utilize more low-cost raw materials by improving our processing technology.

We will continue to devote substantial resources to research and development in order to improve our production yield. We will also focus our research and development efforts on the application of next generation solar technologies in order to strengthen our market position and capture future development opportunities in the solar industry.

### Secure supplies of polysilicon feedstock

To address the current industry-wide polysilicon shortage, we seek to enter into additional long-term supply agreements with leading virgin polysilicon suppliers as well as recyclable polysilicon suppliers. Our

71

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

current inventory and commitments will satisfy over 90% of our estimated requirements through the end of 2007. We also intend to further broaden our supplier base to diversify our raw material sources.

### Broaden our geographic presence and strengthen our customer relationships

We plan to broaden our geographic presence and further strengthen our relationships with customers both in China and internationally. We intend to further enhance our customer feedback system and collaborate closely with our customers to improve our technology and services. In China, we plan to increase our sales and service forces to provide wider coverage of the market and gather customer feedback on a timely basis. Internationally, we intend to significantly increase our sales to the global top 20 solar cell and module manufacturers in order to strengthen our long-term customer base. We plan to establish sales and support offices in each of our major international markets, including Europe, Japan and the United States, to facilitate communications with our customers in those markets and to complement our global sales efforts.

### Consider selective alliances and acquisitions

We will consider suitable opportunities to enter into strategic alliances or acquisitions that provide synergies or otherwise strengthen our existing business. We believe that our relationships with many industry participants and our knowledge of, and experience in, the solar power industry allow us to understand industry trends, technological developments and applications of solar power technologies, which will assist us in making decisions regarding such alliances and acquisitions.

## Our Products

We manufacture and sell multicrystalline solar wafers. We focus on the production of multicrystalline wafers instead of monocrystalline wafers primarily because:

• we can use a wider range of polysilicon feedstock in the production of multicrystalline wafers; and

• multicrystalline wafer production process has a lower cost structure.

We currently produce and sell multicrystalline wafers in two principal sizes of 125 by 125 mm and 156 by 156 mm, and with thicknesses from 180 to 240 microns.

We also provide wafer processing services to both monocrystalline and multicrystalline solar cell and module manufacturers, who provide us with their own silicon materials, such as polysilicon feedstock and ingots. We process such feedstock to produce ingots. We then slice such ingots and ingots provided by our customers into wafers to be delivered back to our customers. We charge a fee based on the number of wafers processed and the type of materials we receive. In addition, we also sell silicon materials, which include ingots and polysilicon scraps.

## Production

### Production process

Production of multicrystalline wafers can be divided into two main steps:

• ingot production, and

• wafering.

We use manufacturing equipment and related technologies purchased from well-known solar equipment vendors, including GT Solar, HCT Shaping and Meyer Burger. We also use other equipment manufactured domestically or imported from overseas.

*Production of Polysilicon Ingot.* We prepare our polysilicon feedstock with de-ionized water in etching stations. The prepared polysilicon feedstock is then placed in crucibles and each crucible is loaded into our DSS furnaces for melting and crystallization. Polysilicon ingots formed during the crystallization process are then cut into smaller blocks with a squarer, a process known as squaring. Our polysilicon ingots are currently 270 kilograms in weight and 690 by 690 mm in width and 216 or 243 mm in height. We are engaged in research and development efforts in collaboration with GT Solar to produce bigger ingots of 350 to 450 kilograms.

72

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

*Wafering.* After passing inspection, the polysilicon blocks are cropped and prepared for slicing. The prepared polysilicon blocks are sliced into wafers by wire saws. We then wash and dry the wafers at our wafer cleaning stations before our final inspection and packaging for delivery.

In addition, we also sell polysilicon materials, which include ingots and polysilicon scraps.

Illustrated below is a diagram of our ingot production and wafering process:



### Materials used in our production process

*Polysilicon Feedstock.* The main raw material for multicrystalline wafer and ingot production is polysilicon feedstock. We use a variety of polysilicon materials, including solar-grade virgin polysilicon that is at least 99.9999% pure, recyclable polysilicon scraps from third parties and silicon powder.

*Crucibles.* A crucible is a ceramic container used to hold polysilicon feedstock for melting in the furnace and has to withstand extremely high temperatures. Crucibles are currently not reusable, as once the ingot is formed, the crucible holding the ingot will be broken and removed from the ingot.

*Slurry and Wire.* Slurry is used in the wire sawing process. It is a fluid composed of silicon carbide, or SiC, which functions as an abrasive, and polyethylene glycol, or PEG, which acts as a coolant. Wires are used in wire saws to carry the slurry in order to create an abrasive cutting tool.

### Production facilities

We manufacture multicrystalline wafers and ingots at our facilities in Xinyu city, Jiangxi province, China. Our manufacturing facilities occupy a site area of approximately 172,000 square meters in the Xinyu Hi-Tech Industrial Park of the high-tech development zone of Xinyu city.

We currently have two plants to house our operations in the Xinyu Hi-Tech Industrial Park. As of March 31, 2007, we had the following equipment in operation:

• 61 DSS furnaces used for ingot production;

• 15 squarers used to cut ingots into blocks;

• 27 wire saws used to slice blocks into wafers; and

• other supplemental or ancillary facilities.

Our annual production capacity as of March 31, 2007 was approximately 215 MW.

### Production capacity expansion

We are constructing a third plant, which is expected to be completed in the third quarter of 2007. We plan to install additional manufacturing equipment to increase our total annual production capacity to approximately 400 MW by the end of 2007 and approximately 800 MW by the end of 2008.

As of March 31, 2007, we had commitments from our equipment suppliers for the delivery of 139 additional DSS furnaces, 50 additional squarers and 183 additional wire saws, which can support an annual manufacturing capacity of approximately 600 MW by mid-2008. We currently do not have contractual commitments for all the equipment necessary for the expansion of our production capacity from 600 MW to approximately 800 MW by the end of 2008. We have, however, already commenced negotiations with our equipment suppliers for additional equipment. We plan to use a part of our net proceeds from this offering to pay for such additional equipment as we have disclosed in "Use of Proceeds" in this prospectus. We also plan

73

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

to procure supplemental facilities, such as a ventilation system, air purification system, water station and waste water treatment station, as needed in our expansion plan.

*Manufacturing technologies*

We have been improving our technologies and expertise to clean and optimize the mix of polysilicon feedstock of different grades and to ensure and improve our polysilicon yield. We use wire saws rather than band saws in our squaring. This enables us to reduce silicon material loss in the squaring processes, or kerf loss. We have purchased automatic wafer cleaning and sorting equipment to improve sorting efficiency and reduce breakage.

We recover some of our slurry through third-party service providers. We have also purchased slurry recovery systems from HCT Shaping and GT Solar to recover the slurry internally. In January 2007, we installed our first line of the slurry recovery systems. We intend to install additional slurry recovery systems as we expand our production capacity. The slurry recovery ratio of these systems is over 75%. Through additional research and development, we will endeavor to recycle and re-use as many of our production consumables as possible. This is not only a cost reduction measure, but also an important part of our environmentally friendly program.

**Quality Control**

We adhere to a strict system of quality control over our operations, from the sourcing of raw materials to production and delivery. We have established quality-control at each stage of our production process to closely monitor the quality of our production and to ensure that our solar wafers and ingots meet all our internal benchmarks and customers' specifications. In addition, we have established a quality documentation system for all purchasing, production and sales units and implemented procedures for constant improvement and flaw prevention. Our senior management team is actively involved in setting quality control policies and monitoring our quality control performance. However, it is impossible to avoid product defects. As we have disclosed in the "Risk Factors — Risks Relating to Our Company and Our Industry — Product defects could result in increased costs, damage to our reputation and loss of revenues and market share" in this prospectus, we encounter periodic sales returns in our ordinary course of business due to improper cleaning, non-conformity with customers' specifications or product defects.

As of March 31, 2007, we had a core quality management unit consisting of 146 persons overseeing our quality control processes, audits and engineering. In addition, this unit runs the testing procedures at the quality-control checkpoints during the production process of multicrystalline wafers and ingots. We purchase raw materials from trusted suppliers on our approved vendor list whenever possible and only those suppliers that pass our assessment are admitted to our approved vendor list. Raw materials are inspected by our quality management unit. Raw materials which fail to pass our incoming inspection are returned to the suppliers. At each stage of the production process, we conduct tests to ensure quality and compliance with all our internal production benchmarks. We conduct infra-red scans for impurities, as well as resistivity and life-time tests, on our ingots and multicrystalline blocks before proceeding to the next production step. We then conduct a final quality check after all wafers are cleaned and prior to packaging. Following completion of the production process, our products are inspected and tested thoroughly in the form of an output quality check to ensure that all customers' specifications are met before our products are delivered to customers.

We are currently implementing an ISO9001 Quality Assurance system at our production facilities. Our quality assurance and quality control procedures, together with our corporate standards established for the quality checks exercised by our quality management unit, are compliant with ISO9001 requirements as well as our own internal quality guidelines. We expect to obtain the ISO9001 Quality Assurance Certification in 2007.

**Customers, Sales and Marketing**

Our customers currently comprise some of the industry leaders in the photovoltaic cell and module sector, both within and outside China. They include BP Solar, China Sunergy Co., Ltd., Chinalight, CSI, E-Ton, GE Energy, Mosel Vitelic, Motech, Q-Cells, Solarfun, Solartech Energy, Solland Solar and Suntech. Historically, the majority of our sales have been in China. However, we have been enhancing and broadening

74

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

our revenue and customer base to target other leading photovoltaic cell and module producers around the world. For the year ended December 31, 2006 and the three months ended March 31, 2007, we derived approximately 75.5% and 50.0%, respectively, of our net sales from sales to manufacturers of photovoltaic products in China and approximately 24.5% and 50.0%, respectively, from exports. During the year ended December 31, 2006 and the three months ended March 31, 2007, our top five customers collectively accounted for approximately 70.2% and 56.8%, respectively, of our net sales. Suntech and Solarfun contributed 39.7% and 13.9%, respectively, of such net sales for the year ended December 31, 2006. During the three months ended March 31, 2007, Suntech and Solarfun contributed 18.3% and 9.7%, respectively, of our net sales. Chinalight contributed 13.6% of our net sales for the three-month period.

We have written agreements with our principal customers:

- Pursuant to our cooperation agreement with Suntech, we have committed to supply to Suntech 100 MW of wafers in 2007 and, in each year from 2008 to 2015, wafers equal to 40% to 60% of our annual production. This cooperation agreement contemplates that the parties will agree annually on the specific quantities and prices of wafers to be supplied each year. We and Suntech have periodically negotiated the specific quantities and prices of wafers to be supplied under this cooperation agreement and, as a result, we have generally delivered less quantities than provided in the cooperation agreement.

- Pursuant to our agreement with CSI, we have committed to supply to CSI an aggregate of approximately 260 MW of wafers over a four-year period from 2007 to 2010, at prices to be determined through negotiation on a monthly basis.

- Pursuant to our agreement with E-Ton, we have committed to supply to E-Ton an aggregate of 200 MW of wafers over a four-year period, from January 2007 through the end of 2010, at a fixed price for the first six months of 2007 and at prices to be negotiated later for the remaining term of the agreement.

- Pursuant to our agreement with Q-Cells, we have agreed to supply to Q-Cells approximately 180 MW of wafers over a three-year period from 2007 to 2009, at prices to be negotiated from time to time. In addition, we have agreed to supply to Q-Cells additional quantities of wafers from 2007 to 2009 in exchange for certain quantities of silicon feedstock supplied by Q-Cells to us.

- Pursuant to our agreement with Solarfun, we have also agreed to supply to Solarfun approximately 10 MW of wafers from December 2006 to July 2007 at a fixed price, and approximately 60 MW of wafers from July 2007 to June 2008 at prices to be negotiated later.

- We have also entered into a five-year solar wafer supply agreement with Solland Solar, commencing on January 1, 2006 through December 31, 2010 and automatically renewable at one-year increments. Both parties have agreed to determine the wafer supply quantities and prices for 2007 and each subsequent year through negotiation.

- In addition, we have entered into agreements with BP Solar, Motech and Ningbo Solar pursuant to which we have committed to supply each of them with specific annual quantities of wafers over the next few years.

Our commitments to Suntech and other major customers have not materially affected our strategy to diversify our customer base. As we expand our production capacity, we have been able to sell more of our products to other customers and to broaden our geographic presence. During the three months ended March 31, 2007, our net sales to China decreased to 50.0% of our total net sales as compared to 75.5% during the year ended December 31, 2006, while our net sales to Asia Pacific ex-China during the three-month period increased to 31.8% from 16.3% in 2006, with net sales to North America during the period increased to 8.2% from 5.0% in 2006 and net sales to Europe increased to 10.0% from 3.2% in 2006.

We have written agreements with most of our customers although our sales to some of our customers have been based on periodic purchase orders. We typically require our customers to prepay a portion of the contracted purchase price before we deliver our products.

75

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**Suppliers**

*Raw materials and consumables*

The materials used to produce our solar wafers include virgin polysilicon, recyclable polysilicon acquired from semiconductor manufacturers and equipment vendors and related consumables. The majority of our polysilicon feedstock consists of polysilicon scraps and recyclable polysilicon.

We source our polysilicon feedstock from both domestic and international sources, including:

• semiconductor materials trading companies, such as Komex, Kunical and Prime;

• solar cell and module makers, such as CSI and Q-Cells; and

• solar-grade virgin polysilicon manufacturers, such as MEMC and Wacker.

For the year ended December 31, 2006 and the three months ended March 31, 2007, polysilicon feedstock comprised approximately 75% and 76% of our costs of goods sold, respectively.

We have inventory and commitments from suppliers that we believe will satisfy over 90% of our estimated polysilicon requirements for 2007. We source a portion of polysilicon feedstock from the spot market from time to time depending on the price and our requirements.

Since our inception, we have relied on a combination of one-time purchase orders and long-term purchase contracts with our suppliers in order to fulfill our polysilicon requirements. In addition, we have diversified our polysilicon sourcing through purchase and sale arrangements with our solar cell and module customers that possess solar-grade polysilicon feedstock. Through these arrangements, these customers sell us a certain amount of polysilicon feedstock and we sell them certain quantities of solar wafers.

We have written agreements with our principal suppliers:

• Our framework silicon purchase contract with Komex entered into in December 2006 has a term of eight years from January 2007 to January 2015. Pursuant to the contract, Komex is required to supply at least 35 tons of solar-grade polysilicon feedstock to us at market prices for each month during the term of the contract. The Komex contract provides for a monthly delivery schedule and we are required to pay 100% of the purchase price in advance for each shipment.

• Our cooperation agreement with Kunical entered into in December 2006 has a term of four years from 2007 to 2010. Pursuant to this contract, Kunical is required to use its best efforts to supply to us 200 tons of polysilicon feedstock each year during the term of the contract for a total price of $96 million. Kunical is required to deliver polysilicon feedstock within seven business days upon receipt of our purchase order and we are required to pay 100% of the purchase price for each shipment five days after receipt of its invoice.

• Our raw materials supply contract with Technischer Warenhandel Heller and NCA Fortin Inc., as co-sellers, entered into in October 2006 has a term of five years from October 2006 to December 2011. Our purchase price is subject to renegotiation every six months. The contract provides for a monthly delivery schedule and we are required to pay 15 days in advance for each monthly shipment. Although we have paid $3.0 million as our partial prepayment with respect to the first shipment of silicon feedstock scheduled for delivery in November 2006, Technischer Warenhandel Heller and NCA Fortin Inc. have not commenced delivery of polysilicon as required and have informed us that delivery under this contract will be delayed. We are currently re-negotiating this contract with Technischer Warenhandel Heller and NCA Fortin Inc.

• Our agreement with E'mei Semi-conductor Materials Plant, or E'mei, entered into in March 2007 has a term of six years. Pursuant to this agreement, E'mei is required to supply approximately 100 tons of polysilicon feedstock in 2008, 500 tons in each year from 2009 to 2012, and 400 tons in 2013. The purchase price will be based on prevailing PRC domestic market prices. We are required, however, to make prepayments to E'mei in the aggregate of Rmb 250.0 million, payable as follows: Rmb 10.0 million by September 30, 2007, Rmb 40.0 million by December 31, 2007, Rmb 80.0 million by June 30, 2008 and Rmb 120.0 million by December 31, 2008.

76

- Our agreement with Luoyang Zhonggui High-Tech Co., Ltd, or Luoyang Zhonggui, entered into in April 2007 has a term of five years. Pursuant to this agreement, Luoyang Zhonggui will supply approximately 200 tons of polysilicon feedstock in 2008, 400 tons in 2009, 800 tons in 2010, 1,000 tons in 2011 and 1,500 tons in 2012. The purchase price will be based on prevailing PRC domestic market prices. We are required, however, to make prepayments to Luoyang Zhonggui in the aggregate of Rmb 400.0 million, payable as follows: Rmb 50.0 million by October 30, 2007, Rmb 150.0 million by November 30, 2007, Rmb 180.0 million by April 30, 2008 and Rmb 20.0 million by December 31, 2008.

We have also entered into polysilicon raw material supply arrangements with other suppliers, such as CSI, MEMC, Prime, Q-Cells, and Wacker. Due to the current worldwide shortage in polysilicon supply, we generally have to make prepayments to our virgin polysilicon suppliers in order to secure stable supply of our virgin polysilicon feedstock. We make these prepayments without receiving any collateral. As of March 31, 2007, our prepayments to suppliers amounted to $52.8 million. If our suppliers fail to deliver the polysilicon we have ordered and do not return our prepayments, our results of operations may be adversely affected.

We use consumables in our production include slurry, sawing wires, crucibles and other materials. We source most of our consumables from suppliers in China.

### Equipment

We source our key manufacturing equipment from leading international manufacturers. GT Solar provides all of our current DSS furnaces. All of our DSS furnaces are equipped with safety kits that limit potential damage in the event of an accident. HCT Shaping and Meyer Burger provide all of our squarers and wire saws. We also purchase ancillary equipment from other manufacturers.

In connection with our expansion plan, we had equipment supply contracts outstanding as of March 31, 2007 for:

- 139 additional DSS furnaces from GT Solar;

- 149 additional wafering wire saws from HCT Shaping;

- 34 additional wafering wire saws from Meyer Burger; and

- 50 additional squarers from HCT Shaping.

We expect the additional equipment will be sufficient to accommodate our increase in production capacity to approximately 400 MW by the end of 2007 and to approximately 600 MW by mid-2008. We currently do not have contractual commitments for all the equipment necessary for the expansion of our production capacity from 600 MW to approximately 800 MW by the end of 2008. We have, however, already commenced negotiations with our equipment suppliers for additional equipment. We plan to use a part of our net proceeds from this offering to pay for such additional equipment as we have disclosed in "Use of Proceeds" in this prospectus. We intend to enter into further arrangements with our equipment suppliers for additional equipment required to fully implement our expansion plan.

We have entered into a number of equipment and technologies purchase contracts with GT Solar since June 2005 for an aggregate of 200 DSS furnaces. We are required under these contracts to pay a deposit equal to 20% of the purchase price, to pay an additional 70% by a letter of credit issued prior to each shipment and payable upon presentation of shipping documents, and to pay the remaining 10% of the purchase price within 90 days after receipt of each shipment. GT Solar is required under these contracts to provide equipment installation, support, training, assistance and other services to our employees. We have also entered into a framework equipment purchase contract with HCT Shaping to purchase 170 wafering wire saws and 65 squarers. Pursuant to the contract, we are required to make 15% advance payment, to pay an additional 75% of the purchase price by a letter of credit prior to each shipment and to pay the remaining 15% within 10 days after the installation and acceptance of the machine. We have also entered into a framework equipment purchase contract with Meyer Burger in January 2006 for 40 wire saws and the purchase price is subject to negotiation according to the market conditions at the time of supply. We are required to make a 25% advance payment nine months before each shipment, to pay an additional 65% by a letter of credit issued 60 days prior to the shipment and to pay the remaining 10% within 30 days after the acceptance of the

77

Source: LDK Solar Co., Ltd.-1, F-1, May 11, 2007

equipment. We make prepayments to our equipment suppliers without receiving any collateral prior to the shipment of the equipment. If our equipment suppliers fail to deliver the equipment we have ordered and do not return our prepayments, our results of operations would be adversely affected.

## Research and Development

We have a dedicated research and development team at our manufacturing facility in Xinyu Hi-Tech Industrial Park. Its primary objectives are to enhance our product quality and to achieve a more efficient production process by improving yield and lowering production costs. Our current initiatives include:

- optimizing our solidification process to achieve the highest conversion efficiency;

- improving our solidification purification process to allow us to use low-cost polysilicon materials without losing wafer efficiency and quality;

- reducing polysilicon kerf losses and improving polysilicon recoveries;

- improving our crucible and coating technology to achieve re-usability of our crucibles;

- optimizing our ingot and wafer sizes, including making larger ingots and larger and thinner wafers;

- localizing the production of additional consumables in China; and

- localizing the production of some of our auxiliary equipment in China.

In addition, we established the LDK Laboratory with Shanghai Jiaotong University in October 2005. This laboratory currently focuses on developing quality consumables and supplemental equipment to be produced in China. Under our arrangement with Shanghai Jiaotong University, we and the university will jointly own all research results of the laboratory and we will have the priority right to utilize these research results. We and the university are entitled to 40% and 30% of all economic benefits derived from these research results, respectively, and the remaining 30% of the economic benefits will be reinvested in the laboratory. We plan to continue to expand our research and development efforts by establishing additional research ventures, both in China and overseas, to improve our production technologies and processes.

## Competition

The multicrystalline wafer manufacturing industry is competitive. According to Photon Consulting, the five largest wafer manufacturers accounted for approximately 60% of global production in 2005. We believe that the supply of polysilicon feedstock will significantly increase in the next few years, thus easing supply constraints to solar wafer manufacturers. Although we expect demand for solar wafers to grow in response to higher demand for photovoltaic cells and modules, the international solar wafer market will become more competitive. Like us, other solar wafer manufacturers are also engaged in aggressive expansion programs. In addition, new entrants are reported to be making significant investments in our industry. We expect to face increased competition, which may result in price reductions, reduced margins or loss of market share. We compete with international players such as BP Solar, Deutsche Solar, Ersol, Evergreen Solar, Green Energy, JFE, Kyocera, M.SETEK, PV Crystalox, REC and MEMC, which has recently announced its plans to manufacture solar wafers. We also compete with players in China such as Jinggong P-D, Shunda and Tianwei Yingli. Many of our current and potential competitors have a longer operating history, wider name recognition, greater resources, larger customer base, better access to polysilicon feedstock and greater economies of scale than us. In addition, most of these competitors are integrated players in our solar industry that also engage in the production of virgin polysilicon, photovoltaic cells and/or modules. Their business models may give them competitive advantages as these integrated competitors place less reliance on the upstream suppliers and/ or downstream customers in the value chain. We currently have no plans to expand into the production of photovoltaic cell or modules, and we have entered into non-competition agreements with some of our customers, pursuant to which we have agreed not to engage in the production of solar cell or modules based on current wafer technology for the next 10 years.

We believe that the key competitive factors in our solar wafer market include:

- cost competitiveness and price;

- continuous access to polysilicon feedstock;

78

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

- product quality;

- economies of scale;

- advanced technology and manufacturing processes; and

- strong global distribution channels.

Some companies have spent significant resources in the research and development of proprietary solar technologies that may eventually produce photovoltaic products at costs similar to, or lower than, those of multicrystalline wafers without compromising product quality. For example, they are developing or currently producing photovoltaic products based on thin film photovoltaic materials, which require significantly less polysilicon to produce than multicrystalline solar products. These alternative photovoltaic products may cost less than those based on multicrystalline technologies while achieving the same level of conversion efficiency. The solar industry in general also competes with other sources of renewable energy and conventional power generation.

## Property

We both own and lease properties for our operations. When we state that we own certain properties in China, we own the relevant land use rights because land is owned by the PRC state under the PRC land system.

### Owned property

We own the land use rights to the underlying parcel of land for our manufacturing facilities located at the Hi-Tech Industrial Park, Xinyu city, Jiangxi province of China. As of March 31, 2007, the total site area that we owned was approximately 357,815 square meters for an original term of 50 years expiring on May 20, 2055, renewable upon its expiration. The gross floor area of our plants in Xinyu Hi-Tech Industrial Park was approximately 73,869 square meters as of March 31, 2007 and is expected to increase to approximately 102,151 square meters when we complete the new plant in the third quarter of 2007. We occupy our owned properties for purposes of manufacturing, research and development and as a headquarter office and employee living quarters.

### Leased property

We currently sub-lease 208 square meters of office space in Shanghai from Suzhou Liouxin free of charge. This sub-lease will expire in November 2007. See "Related Party Transactions — Sublease of Property" in this prospectus.

## Intellectual Property Rights

We have developed various production process related know-how and technologies in-house. In addition, we have embarked on a number of research and development programs, including our collaboration with Shanghai Jiaotong University, with a view to developing techniques and processes that will improve conversion efficiency and product quality. We currently do not have any patents or patent applications pending in China or elsewhere. We rely on nondisclosure agreements, trade secrets and technical know-how to protect our intellectual property and proprietary rights. We have entered into confidentiality, assignment of inventions and non-competition agreements with our executive employees, engineers and technicians. We have also entered into confidentiality arrangements with other employees, suppliers and distributors. Pursuant to the confidentiality, assignment of inventions and non-competition agreements, our senior employees, engineers and technicians have agreed and acknowledged that we own the rights to all technology, inventions, trade secrets, developments and other processes generated in connection with their employment with us or their use of our resources or relating to our business and that they must assign any ownership rights that they may claim in those works to us. As substantially all of our business is currently conducted in China, we have not taken any action outside China to protect our intellectual property.

As of the date of this prospectus, Suzhou Liouxin owns "LDK" as a registered trademark for solar wafers and ingots. Suzhou Liouxin is in the process of transferring the trademark to us for a nominal consideration.

79

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**Insurance**

We maintain property insurance coverage on our facilities and production equipment, which amounted to approximately $65.8 million as of December 31, 2006 and March 31, 2007. We do not have insurance coverage on other assets of ours, such as products in transit, inventory in stock, interruption of business or product liabilities. We consider our insurance coverage to be adequate to cover all normal risks associated with our operations in accordance with industry standards and practices in China. We are in the process of purchasing director and officer liability insurance for our directors and officers.

**Production Safety and Environment**

We are in material compliance with all applicable production safety and environmental protection laws and regulations in China. We emphasize production safety and endeavor to operate our manufacturing facilities in an environmentally responsible manner.

### *Safety*

Our plants, working stations and various facilities have been designed to maintain a safe working environment. All of our DSS furnaces are equipped with safety kits that limit potential damage in the event of an accident. We have established a designated safety monitoring office that directly reports to our senior management. We have adopted a set of production safety procedures that we require our employees to follow and we provide related trainings to our employees. Our team leaders are regularly required to confirm production safety and our managers are accountable for any failure to observe our safety procedures. To enforce our safety procedures, we have formulated an award and penalty system, awarding those who consistently follow safety procedures and penalizing those who fail to do so.

We require our employees who operate special equipment to have the relevant necessary training before they are allowed to operate such equipment. We conduct regular and required maintenance on our equipment to ensure proper and safe working conditions.

### *Environment*

We have undertaken various measures to reduce pollution and the impact of our manufacturing process on the environment. These measures include monitoring and controlling solid waste, waste water, exhaust fumes and noise. We currently have an on-site sewage treatment station with a 16-metric-ton daily sewage treatment capacity and plan to increase its capacity to 30 metric tons per day during the first quarter of 2007. We believe that we are currently in compliance with all environmental laws and regulations applicable to our operations in China.

**Employees**

As of March 31, 2007, we had an aggregate of 3,145 full-time employees. Of these employees, 3,142 were located at our headquarters and manufacturing plants in Xinyu city, Jiangxi province, China, and three were located in our branch office in Shanghai, China. Compared to December 31, 2006, we added 1,767 employees to our workforce during the three months ended March 31, 2007, including 1,638 new employees for our manufacturing operations. We established our second materials sorting department and third manufacturing department during the three months ended March 31, 2007. These new departments employed approximately 650 and 100 employees, respectively, as of March 31, 2007.

80

A breakdown of our employees by areas of operations and as a percentage of our workforce as of March 31, 2007 is set forth below:

| | Number of Employees | Percentage of Total |
|---|---|---|
| Manufacturing | 2,670 | 84.9% |
| Quality control | 146 | 4.6 |
| Research, development and engineering | 112 | 3.6 |
| Administration | 106 | 3.4 |
| Production planning | 69 | 2.2 |
| Finance | 24 | 0.8 |
| Procurement | 18 | 0.5 |
| Total | 3,145 | 100.0% |

From time to time, we also employ part-time or contract employees, as required, to meet any increased demand for our products. We plan to hire additional employees as we expand.

As required by PRC regulations, we participate in statutory retirement plans organized by the respective PRC local governments. We currently contribute 29% of the staff's basic salaries to such funds. Our contributions to the statutory retirement plans are charged to the consolidated profit and loss account as and when incurred. We also provide our employees with medical insurance and unemployment insurance as required by the PRC laws and regulations. For the year ended December 31, 2006 and the three months ended March 31, 2007, our total expense under the statutory employee benefit plans was approximately $220,000 and $45,000, respectively.

We have not experienced any significant difficulties in recruiting employees nor have we had any significant labor disputes. We consider our relationship with our employees to be good.

We enter into employment contracts with all of our officers, managers and employees, which contain a non-compete clause both for the period of their employment with our company and for two to three years thereafter.

**Legal and Administrative Proceedings**

We are not involved in any litigation or other legal or administrative proceedings that would have a material adverse effect on our business operations.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## PRC GOVERNMENT REGULATIONS

This section sets forth a summary of the most significant regulations and requirements that affect our business activities in China or our shareholders' right to receive dividends and other distributions from us.

**Renewable Energy Law and Government Directives**

In February 2005, China enacted its Renewable Energy Law, which became effective on January 1, 2006. The Renewable Energy Law sets forth national policies to encourage and support the development and use of solar energy and other non-fossil fuel renewable energy and their on-grid application. It authorizes the relevant government authorities to set favorable prices for the purchase of electricity generated by solar and other renewable power generation systems.

The law also encourages the installation and use of solar-powered water-heating systems, solar-powered heating and cooling systems and other solar energy utilization systems. It expressly contemplates and permits financial incentives, such as national funding, preferential loans and tax preferences for the development of renewable energy projects. In January 2006, the PRC National Development and Reform Commission promulgated two implementation directives with respect to the Renewable Energy Law. These directives set forth specific measures relating to pricing of electricity generated by solar and other renewal power generation systems and sharing by all utility end-users of certain costs incurred by solar and other renewable power generation systems. The directives further provide specific allocations of administrative and supervisory powers and responsibilities among various relevant government agencies at the national and provincial levels and stipulate relevant responsibilities among electricity grid companies and power generation companies with a view to the implementation of the renewable energy law.

The PRC Ministry of Construction issued a directive in June 2005 to encourage the use of solar energy in residential and commercial buildings and the increased application of solar energy in townships in China. Because China is consuming more and more energy as its economy expands and the related industrial pollution is threatening the environment and livelihood of the nation, the PRC State Council promulgated a directive in July 2005 with specific measures to conserve energy resources.

In December 2006, the PRC National Development and Reform Commission issued a notice to announce the PRC government's support of the development of renewable energy resources in China, including solar power. The government appropriated an aggregate of $330 million in equivalent Renminbi as a grant to support various renewable energy projects, including commercialization of wafer and ingot production at our company.

**Environmental Regulations**

We are subject to a variety of governmental regulations related to the storage, use and disposal of hazardous materials. The major environmental regulations applicable to us include the PRC Environmental Protection Law, the PRC Law on the Prevention and Control of Water Pollution, the PRC Implementation Rules of the Law on the Prevention and Control of Water Pollution, the PRC Law on the Prevention and Control of Air Pollution, the PRC Law on the Prevention and Control of Solid Waste Pollution and the PRC Law on the Prevention and Control of Noise Pollution.

**Restriction on Foreign Investments**

The principal regulation governing foreign ownership of solar power businesses in China is the Foreign Investment Industrial Guidance Catalogue, effective as of January 1, 2005. Under this guidance, the solar power business is listed as an industry with foreign investments permitted.

**Tax**

The PRC enterprise income tax is calculated based on the taxable income determined under the PRC accounting standards and regulations. In accordance with the PRC Income Tax Law for Enterprises with Foreign Investment and Foreign Enterprises and the related implementation rules, foreign-invested enterprises incorporated in China, such as Jiangxi LDK Solar, are generally subject to a national enterprise income tax at the rate of 30% on their taxable income and a local enterprise income tax at the rate of 3% of their taxable income. This foreign invested enterprise income tax law and its implementation rules provide certain favorable

82

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

tax treatments to foreign-invested enterprises such as a two-year exemption from the national enterprise income tax for their first two profitable years of operation and a 50% reduced national enterprise income tax for the subsequent three years for manufacturing companies with operating terms of more than ten years.

Pursuant to the PRC Provisional Regulation on the Value Added Tax, or VAT, and its implementation rules, any entity or individual engaged in the sale of goods, provision of specified services and importation of goods in China is generally required to pay a VAT, at the rate of 17.0% of the gross sales proceeds received, less any deductible VAT already paid or borne by such entity or individual. When an entity exports goods from China, the exporter is entitled to a refund of a portion or all of the VAT paid by the entity. Our imported raw materials used for manufacturing products subject to export, to the extent they are placed in government-sanctioned bonded warehouses, are exempt from import VAT.

In March 2007, the National People's Congress enacted a new Enterprise Income Tax Law, which will become effective on January 1, 2008. The new tax law would impose a unified income tax rate of 25% on all domestic enterprises and foreign-invested enterprises unless they qualify under certain limited exceptions. The new tax law permits companies to continue to enjoy their existing preferential tax treatment until such treatment expires in accordance with its current terms. Under the new tax law, "high and new technology enterprises" specially supported by the PRC government will continue to enjoy a reduced national enterprise tax rate of 15%. The new tax law, however, does not specify what high and new technology enterprises will be eligible for special support from the government. Our wholly owned subsidiary, Jiangxi LDK Solar, obtained the "high and new technology enterprise" status in December 2006. Such status is valid for two years and is renewable upon review and approval by the Science and Technology Bureau of Jiangxi Province. If we fail to maintain our status as a "high and new technology enterprise" or fail to qualify for special support from the PRC government, we will be subject to the 25% unified enterprise income tax rate beginning in 2011 after our current preferential tax treatment expires.

## Foreign Currency Exchange

China regulates foreign currency exchanges primarily through the following rules and regulations:

• Foreign Currency Administration Rules of 1996, as amended; and

• Administrative Rules of the Settlement, Sale and Payment of Foreign Exchange of 1996.

As we have disclosed in "Risk Factors — Risks Relating to Business Operations in China — Changes in foreign exchange and foreign investment regulations in China may affect our ability to invest in China and the ability of our PRC subsidiary to pay dividends and service debts in foreign currencies" in this prospectus, Renminbi is not a freely convertible currency at present. Under the current PRC regulations, conversion of Renminbi is permitted in China for routine current-account foreign exchange transactions, including trade and service related foreign exchange transactions, payment of dividends and service of foreign debts. Conversion of Renminbi for most capital-account items, such as direct investments, investments in PRC securities markets and repatriation of investments, however, is still subject to the approval of the SAFE.

Pursuant to the above-mentioned administrative rules, foreign-invested enterprises, such as Jiangxi LDK Solar, may buy, sell and/or remit foreign currencies for current-account transactions at banks in China with authority to conduct foreign exchange business by complying with certain procedural requirements, such as presentment of valid commercial documents. As disclosed, for most capital-account transactions, approval from the SAFE is a pre-condition. Capital investments by foreign-invested enterprises outside China are also subject to limitations and requirements in China, such as prior approvals from the PRC Ministry of Commerce, the SAFE and the PRC National Development and Reform Commission, or the NDRC.

## Dividend Distribution

The principal regulations governing distribution of dividends by wholly foreign owned enterprises, such as Jiangxi LDK Solar, include:

• Corporation Law of 1993, as amended;

• Wholly Foreign-Owned Enterprise Law of 1986, as amended; and

• Wholly Foreign-Owned Enterprise Law Implementation Rules of 1990, as amended.

83

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Under the current regulatory regime in China, foreign-invested enterprises in China, including Jiangxi LDK Solar, may pay dividends only out of their accumulated profits, if any, determined in accordance with the PRC accounting standards and regulations. After making up for any deficit in prior years pursuant to the PRC laws, a wholly foreign-owned enterprise in China, such as Jiangxi LDK Solar, is required to set aside at least 10% of their after-tax profit calculated in accordance with the PRC accounting standards and regulations each year as its general reserves until the cumulative amount of such reserves reaches 50% of its registered capital. These reserves are not distributable as cash dividends. The board of directors of a wholly foreign-owned enterprise has the discretion to allocate a portion of its after-tax profits to its staff welfare and bonus funds, which is likewise not distributable to its equity owners except in the event of a liquidation of the foreign-invested enterprise.

**Regulation of Overseas Investments and Listings**

The SAFE issued a public notice in October 2005, or the SAFE notice, requiring PRC residents, including both legal persons and natural persons, to register with the relevant local SAFE branch before establishing or gaining control over any company outside China, referred to in the SAFE notice as an "offshore special purpose company," for the purpose of acquiring any assets of or equity interest in PRC companies and raising funds from overseas. In addition, any PRC resident that is a shareholder of an offshore special purpose company is required to amend its SAFE registration with the local SAFE branch, with respect to that offshore special purpose company in connection with any increase or decrease of capital, transfer of shares, merger, division, equity or debt investment or creation of any security interest. If any PRC shareholder of any offshore special purpose company fails to make the required SAFE registration and amendment, the PRC subsidiaries of that offshore special purpose company may be prohibited from distributing their profits and the proceeds from any reduction in capital, share transfer or liquidation to the offshore special purpose company. Moreover, failure to comply with the SAFE registration and amendment requirements described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

The NDRC promulgated a rule in October 2004, or the NDRC rule, which requires NDRC approval for overseas investment made by PRC-incorporated entities. The NDRC rule also provides that approval procedures for overseas investment by PRC individuals will be based on the NDRC rule.

On August 8, 2006, six PRC regulatory agencies, including the Ministry of Commerce, the State Assets Supervision and Administration Commission, the State Administration for Taxation, the State Administration for Industry and Commerce, the CSRC, and the SAFE, jointly adopted the Regulation on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the new M&A rule, which became effective on September 8, 2006. This regulation includes provisions that purport to require special purpose companies formed for purposes of overseas listing of equity interest in PRC companies and controlled directly or indirectly by PRC companies or individuals to obtain the approval of the CSRC prior to the listing and trading of their securities on any overseas stock exchange.

On September 21, 2006, the CSRC published on its official website procedures regarding its approval of overseas listings by special purpose companies. The CSRC approval procedures require the filing of a number of documents with the CSRC and it could take several months to complete the approval process.

The application of the new M&A rule with respect to overseas listings of special purpose companies remains unclear with no consensus currently among leading PRC law firms regarding the scope of the applicability of the CSRC approval requirement.

Our PRC counsel, Grandall Legal Group, has advised us that, based on their understanding of the current PRC laws, regulations and rules, including the new M&A rule and the CSRC procedures announced on September 21, 2006:

- CSRC currently has not issued any definitive rule or interpretation requiring offerings like ours pursuant to this prospectus to be subject to its new procedure; and

- In spite of the above, because we completed our restructuring and established an overseas holding structure before September 8, 2006, the effective date of the new M&A rule, neither the new M&A rule nor the CSRC procedures require an application to be submitted to the CSRC for the approval of

84

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

the listing and trading of our ADSs on the New York Stock Exchange unless we are clearly required to do so by possible later rules of CSRC.

See "Risk Factors — Risks Relating to Business Operations in China — Our failure to obtain the prior approval of the China Securities Regulatory Commission, or the CSRC, of the listing and trading of our ADSs on the New York Stock Exchange could significantly delay this offering or adversely affect our business and reputation and the trading price of our ADSs, and may also create uncertainties for this offering."

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

## MANAGEMENT

**Directors and Executive Officers**

The following table sets forth information regarding our directors and executive officers as of the date of this prospectus.

| Directors and Executive Officers | Age | Position |
|---|---|---|
| Xiaofeng Peng | 31 | Chairman and Chief Executive Officer |
| Xingxue Tong | 43 | Director, President and Chief Operating Officer |
| Liangbao Zhu | 41 | Director and Senior Vice President |
| Yonggang Shao | 43 | Director and Senior Vice President |
| Gang Wang | 39 | Non-executive Director |
| Louis T. Hsieh* | 42 | Independent Director |
| Jack Lai | 53 | Executive Vice President, Chief Financial Officer and Secretary |
| Nicola Sarno | 55 | Senior Vice President of Manufacturing and Plant Manager |
| Yuepeng Wan | 42 | Chief Technology Officer |
| Rongqiang Cui | 66 | Head of Shanghai Jiaotong University LDK Laboratory |
| Pietro Rossetto | 57 | Chief Engineer |
| Qiqiang Yao | 35 | Assistant President of Finance |

* Mr. Hsieh will become our independent director on the date of this prospectus.

### *Directors*

*Xiaofeng Peng* is the chairman of our board of directors and the chief executive officer of our company. He founded our company in July 2005. Prior to founding our company, Mr. Peng founded Suzhou Liouxin in March 1997 and was its chief executive officer until February 2006. Suzhou Liouxin is a leading manufacturer of personal protective equipment in Asia. Mr. Peng graduated from Jiangxi Foreign Trade School in 1993 with a diploma in international business and from Beijing University Guanghua School of Management with an executive MBA degree in 2002.

*Xingxue Tong* is a director and the president and chief operating officer of our company. He joined our company in January 2007. Mr. Tong has over 10 years of experience in managing operations of companies in the solar industry. Prior to joining our company, Mr. Tong served as general manager for south-east Asia business development with GT Solar since 2004. He was the executive president of commerce of CSI in 2004 and vice general manager of an affiliate of Tianwei Yingli from 1999 to 2004. Mr. Tong received a diploma in industrial economic management from Renmin University of China in 1988 and a diploma in English from Hebei University in 1998.

*Liangbao Zhu* is a director and a senior vice president of operations of our company. He joined our company in November 2005. Dr. Zhu has over 15 years of experience in managing operations of manufacturing enterprises and managing marketing and sales operations in China and overseas. Prior to joining our company, Dr. Zhu held multiple management positions in manufacturing, investment and trading companies in China and overseas from 1993 to 2005. Dr. Zhu graduated from Yangzhou Normal College with a bachelor's degree in 1982, from Suzhou University with an MBA degree in 2002 and a doctor's degree in business management in 2005.

*Yonggang Shao* is a director and a senior vice president of corporate strategy of our company. He joined our company in February 2006. Prior to joining our company, Mr. Shao served as a managing director in the corporate finance department of Guotai Junan Securities Company Limited and its predecessors from 1998 to 2006. Mr. Shao graduated from Shanghai University in 1990 with a bachelor's degree in industrial management and from Beijing University Guanghua School of Management with an executive MBA degree in 2002.

86

*Gang Wang* is a non-executive director of our company. He became our non-executive director in July 2006. Mr. Wang has, since 2002, been a director and chief representative in China of Natixis Private Equity Asia Limited, beneficially wholly owned by Natixis Banques Populaires. Mr. Wang held various senior financial management positions in a number of technology and manufacturing companies from 1999 to 2002 in New Zealand and China. Mr. Wang received his bachelor's degree in mechanical engineering from the Hefei University of Technology of China in 1989 and an MBA degree from the Massey University in New Zealand in 1995.

*Louis T. Hsieh* will be an independent director of our company. We expect him to join our company on the date of this prospectus. Mr. Hsieh has been the chief financial officer and a member of the board of directors of New Oriental Education & Technology Group, a company listed on the New York Stock Exchange, since 2005. Mr. Hsieh was the chief financial officer of ARIO Data Networks, Inc. in San Jose, California, from April 2004 until he joined New Oriental Education & Technology Group. Prior to that, Mr. Hsieh was a managing director for the private equity firm of Darby Asia Investors (HK) Limited from 2002 to 2003. From 2000 to 2002, Mr. Hsieh was managing director and Asia-Pacific tech/media/telecoms head of UBS Capital Asia Pacific, the private equity division of UBS AG. From 1997 to 2000 Mr. Hsieh was a technology investment banker at JPMorgan in San Francisco, California, where he was a vice president, and Credit Suisse First Boston in Palo Alto, California, where he was an associate. From 1990 to 1996, Mr. Hsieh was a corporate and securities attorney at White & Case LLP in Los Angeles and is a member of the California bar. Mr. Hsieh holds a B.S. degree in engineering from Stanford University, an MBA degree from the Harvard Business School, and a J.D. degree from the University of California at Berkeley.

### Executive Officers

*Jack Lai* is an executive vice president, chief financial officer and secretary of our company. He joined our company in August 2006. Mr. Lai has over 20 years of experience in finance, strategic planning and corporate management. Prior to joining our company, Mr. Lai served as the chief financial officer and vice president of Silicon Storage Technology, Inc. He was the vice president of finance and administration and the chief financial officer of Aplus Flash Technology, Inc. in San Jose, California from 2000 to 2003. He served as vice president of finance and administration, chief financial officer and general manager of Wirex Corporation, Inc. in Portland, Oregon, from 1998 to 2000. Mr. Lai graduated from Tamkang University with a bachelor's degree in business administration in 1976, from Chinese Culture University with an MBA degree in 1978 and from San Jose State University with an MBA degree in 1982.

*Nicola Sarno* is the senior vice president of manufacturing and the plant manager of our company. He joined our company in April 2006. Mr. Sarno has over 20 years of experience in silicon manufacturing, having held multiple positions in the areas of production, process engineering and strategic material supply globally. He was a manufacturing director, engineering manager of crystal growing and operations/strategic materials manager of MEMC from 1985 to 2002 and a production manager of S.E.H. America, Inc. from 1981 to 1985. Mr. Sarno received a diploma in mechanical engineering from Mander College in 1971.

*Yuepeng Wan* is the chief technology officer of our company. He joined our company in February 2007. Dr. Wan has over 15 years of experience in research and development in silicon and materials engineering. Prior to joining our company, Dr. Wan was a research and development manager at GT Solar in New Hampshire from October 2005 to February 2007 in charge of DSS furnace research and development. Prior to that, he was a research associate of the materials crystal division at Saint-Gobain Northboro R&D Center in Massachusetts from January 2005 to October 2005. From April 2000 to January 2005, he was a senior applications engineer at GT Solar in New Hampshire responsible for design and development of crystal growth furnaces. Dr. Wan received a bachelor of science degree in materials engineering from University of Science & Technology of China in 1986, a master of science degree in mechanical engineering from University of Science & Technology of China in 1989 and a Ph.D. degree in mechanical engineering from Aachen University of Technology of Germany in 1997.

*Rongqiang Cui* is the head of our research and development laboratory operated jointly with Shanghai Jiaotong University. He is also a professor at Shanghai Jiaotong University. Professor Cui joined our company in September 2005 as director of our Shanghai Jiaotong University LDK Laboratory. Professor Cui began

87

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

solar energy research in 1971 and became the head of the solar research institute of Shanghai Jiaotong University in 1997. Previously, he was an assistant tutor, lecturer and professor in the physics department of Xian Jiaotong University from 1964 to 1996. Professor Cui graduated from the Xian Jiaotong University in 1964 with a diploma in engineering physics.

*Pietro Rossetto* is the chief engineer of our company. He joined our company in June 2006. Prior to joining our company, Mr. Rossetto taught electrical engineering and computer science in Meran, Italy, from 2003 to 2005. He held multiple positions from 1976 to 2002 at MEMC, including as manager and senior manager for single crystal technology and as manager for various special projects. Mr. Rossetto received his college degree in physics from University of Milan Institute of Physical Science in 1975.

*Qiqiang Yao* is an assistant president of finance of our company. He joined our company in February 2006. Prior to joining our company, Mr. Yao held multiple positions in finance and accounting from 2002 to 2006 at various companies in China. Mr. Yao received a bachelor's degree in accounting from Anhui University of Accounting in 1993 and an MBA from China Southeast University in 2003. Mr. Yao is a registered accountant in China.

## Board of Directors

Our board of directors is currently comprised of six directors, including one independent board member. We intend to appoint additional independent directors subsequent to this offering. A director is not required to hold any shares in our company by way of qualification. A director may vote with respect to any contract, proposed contract or arrangement in which he or she has a material interest. Any director may exercise all the powers of our company to borrow money, mortgage its undertaking, property and uncalled capital, and issue debentures or other securities whenever money is borrowed or as security for any obligation of our company or of any third party. We have established three committees of the board of directors:

• the audit committee,

• the compensation committee, and

• the corporate governance and nominating committee.

We have adopted a charter for each committee to comply with the Sarbanes-Oxley Act and New York Stock Exchange corporate governance rules. Each committee's members and functions are described below.

We have a staggered board of directors. Our directors will be divided into three classes, as nearly equal in number as the then total number of directors permits. By unanimous written resolutions, our shareholders in April 2007 designated Yonggang Shao and Liangbao Zhu as Class I directors for a one-year term, Xingxue Tong and Gang Wang as Class II directors for a two-year term and Xiaofeng Peng and Louis T. Hsieh as Class III directors for a three-year term. At each succeeding annual general meeting of shareholders beginning in 2008, successors to the class of directors whose terms expire at that meeting shall be elected for a three-year term. If the number of directors changes, any increase or decrease will be apportioned among the classes so as to maintain the number of directors in each class as nearly as possible. Any additional directors of a class elected to fill a vacancy resulting from an increase in such class will hold office for a term that coincides with the remaining term of that class. Decrease in the number of directors will not shorten the term of any incumbent director. Nonetheless, whenever the holders of preferred shares have the right, voting separately as a class, to elect directors, the election, term of office, filling of vacancies and other features of directorships will be governed by the applicable terms of our articles of association and the rights attaching to those preferred shares. These board provisions make it more difficult for third parties to gain control of our company because it is more difficult to replace members of a staggered board.

### Audit committee

Our audit committee initially will consist of three directors, namely Louis T. Hsieh, Xiaofeng Peng and Yonggang Shao. Mr. Hsieh satisfies the "independence" requirements of the New York Stock Exchange Listing Rules and the Securities and Exchange Commission regulations. In addition, our board of directors has determined that Mr. Hsieh is qualified as an audit committee financial expert within the meaning of Securities and Exchange Commission regulations. Within 90 days following our offering, a majority of the

88

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

directors on our audit committee will be independent directors. Within a year following this offering, all members of our audit committee will be independent directors. The audit committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee is responsible for, among other things:

- selecting the independent auditors and pre-approving all auditing and non-auditing services permitted to be performed by the independent auditors;

- reviewing and approving all proposed related-party transactions;

- discussing the annual audited financial statements and interim financial statements with management and the independent auditors;

- annually reviewing and reassessing the adequacy of our audit committee charter;

- meeting separately and periodically with management and the independent auditors;

- such other matters that are specifically delegated to our audit committee by our board of directors from time to time; and

- reporting regularly to the full board of directors.

### Compensation committee

Our compensation committee initially will consist of Xiaofeng Peng, Louis T. Hsieh and Liangbao Zhu. Mr. Hsieh satisfies the "independence" requirements of the New York Stock Exchange Listing Rules and the Securities and Exchange Commission regulations. Our compensation committee assists the board in reviewing and approving the compensation structure of our directors and executive officers, including all forms of compensation to be provided to our directors and executive officers. The compensation committee is responsible for, among other things:

- reviewing and determining the compensation package for our senior executives;

- reviewing and making recommendations to the board with respect to the compensation of our directors;

- reviewing and approving officer and director indemnification and insurance matters;

- reviewing periodically and approving any long-term incentive compensation or equity plans, programs or similar arrangements, annual bonuses, employee pension and welfare benefit plans; and

- reporting regularly to the full board of directors.

### Corporate governance and nominating committee

Our corporate governance and nominating committee initially will consist of Xiaofeng Peng, Louis T. Hsieh and Xingxue Tong. Mr. Hsieh satisfies the "independence" requirements of the New York Stock Exchange Listing Rules and the Securities and Exchange Commission regulations. The corporate governance and nominating committee assists the board of directors in identifying individuals qualified to become our directors and in determining the composition of the board and its committees. The corporate governance and nominating committee is responsible for, among other things:

- identifying and recommending to the board nominees for election or re-election to the board;

- appointment to fill any vacancy;

- reviewing annually with the board the current composition of the board in light of the characteristics of independence, age, skills, experience and availability of service to us;

- identifying and recommending to the board the directors to serve as members of the board's committees;

- advising the board periodically with respect to significant developments in the law and practice of corporate governance as well as our compliance with applicable laws and regulations, and making recommendations to the board on all matters of corporate governance and on any corrective action to be taken;

89

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

- monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance; and

- reporting regularly to the full board of directors.

**Duties of Directors**

Under Cayman Islands law, our directors have a common law duty of loyalty to act honestly in good faith with a view to our best interests. Our directors also have a duty to exercise the skill they actually possess and such care and diligence that a reasonably prudent person would exercise in comparable circumstances. In fulfilling their duty of care to us, our directors must ensure compliance with our memorandum and articles of association. A shareholder has the right to seek damages if a duty owed by our directors is breached. You should refer to "Description of Share Capital — Differences in Corporate Law" for additional information on our standard of corporate governance under Cayman Islands law.

**Employment Agreements**

Officers are selected by and serve at the discretion of our board of directors. Each executive officer has entered into an employment agreement with us commencing from the date of this prospectus for an initial term of one year, which will be automatically renewed for successive one-year terms until terminated by either party with three months' notice in writing to the other party.

**Compensation of Directors and Executive Officers**

All directors receive reimbursements from us for expenses necessarily and reasonably incurred by them for providing services to us or in the performance of their duties. Our directors who are also our employees receive compensation in the form of salaries, housing allowances, other allowances and benefits in kind in their capacity as our employees.

Each of our directors is entitled to a discretionary bonus as determined by the compensation committee of our board of directors provided that the total amount of bonuses payable to all of our directors for such year shall not exceed 5% of our audited consolidated profit after taxation and minority interests but before extraordinary items (if any) for the relevant year. In 2005, the aggregate cash compensation and benefits that we paid to our directors and executive officers for the period from July 5 to December 31, 2005 was approximately $3,000. We did not make any contribution to the pension schemes in respect of our directors for the period from July 5 to December 31, 2005. Under our current arrangements, the aggregate remuneration and benefits in kind which our directors and executive officers received for the year ended December 31, 2006 and the three months ended March 31, 2007 were approximately $552,000 and $337,000, respectively, excluding any discretionary bonuses which may be paid to our directors and executive officers. No executive officer is entitled to any severance benefits upon termination of his or her employment with our company.

You may find more details of the stock options we have granted to our directors and executive officers pursuant to our 2006 stock incentive plan under "— 2006 Stock Incentive Plan — Outstanding options granted under our 2006 stock incentive plan" below.

**Indemnification**

Cayman Islands law does not limit the extent to which a company's articles of association may provide for indemnification of officers and directors, except to the extent any such provision may be held by the Cayman Islands courts to be contrary to public policy, such as to provide indemnification against civil fraud or the consequences of committing a crime. Pursuant to our memorandum and articles of association, our directors and officers, as well as any liquidator or trustee for the time being acting in relation to our affairs, will be indemnified and held harmless out of our assets and profits from and against all actions, costs, charges, losses, damages and expenses that any of them or any of their heirs, executors or administrators may incur or sustain by reason of any act done, concurred in or omitted in or about the execution of their duties in their respective offices or trusts. Accordingly, none of these indemnified persons will be answerable for the acts, receipts, neglects or defaults of each other; neither will they be answerable for joining in any receipts for the sake of conformity, or for any bankers or other persons with whom any moneys or effects belonging to us may have been lodged or deposited for safe custody, or for insufficiency or deficiency of any security upon which any

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

monies of or belonging to us may be placed out on or invested, or for any other loss, misfortune or damage which may happen in the execution of their respective offices or trusts. This indemnity will not, however, extend to any fraud or dishonesty which may attach to any of said persons.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling us pursuant to the foregoing provisions, we have been informed that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

## 2006 Stock Incentive Plan

We adopted our 2006 stock incentive plan on July 31, 2006. The purpose of our 2006 stock incentive plan is to recognize and acknowledge the contributions the eligible participants made to our company and to promote the success of our business. Through the provision of an opportunity to have a personal stake in our company, our 2006 stock incentive plan aims to:

• motivate the eligible participants to optimize their performance efficiency for the benefit of our company;

• attract and retain the best available personnel in our industry through additional incentive to our employees and directors; and

• attract and otherwise maintain our on-going business relationship with consultants and business entities whose contributions are or will be beneficial to our long-term growth.

### Eligible participants

Under our 2006 stock incentive plan, our board of directors may, at its discretion, offer to grant an option to subscribe for such number of our ordinary shares at an exercise price as our directors may determine to:

• any full-time or part-time employees, executives or officers of our company or any of our subsidiaries;

• any directors, including non-executive directors and independent non-executive directors, of our company or any of our subsidiaries;

• any advisers, consultants and agents to us or any of our subsidiaries; and

• such other persons who, in the sole opinion of our board of directors, will contribute or have contributed to our development and operations.

### Maximum number of shares

The maximum number of ordinary shares in respect of which options may be granted (including ordinary shares in respect of which options, whether exercised or still outstanding, have already been granted) under our 2006 stock incentive plan may not in the aggregate exceed 10% of the total number of ordinary shares in issue from time to time, including ordinary shares issuable upon conversion of any of our preferred shares in issue from time to time. Immediately following completion of this initial public offering, the maximum number of ordinary shares in respect of which we may grant options (including ordinary shares in respect of which options, whether exercised or still outstanding, have already been granted) under our 2006 stock incentive plan will be          ordinary shares.

### Price of shares

Our board of directors may, in its discretion, determine the subscription price of an ordinary share in respect of any particular option granted under our 2006 stock incentive plan. However, such determination by our board of directors of the subscription price will be by reference to the fair market value of the ordinary shares. If there exists a public market for our ordinary shares, including our ADSs, the fair market value of our ordinary shares will be the closing price for the last market trading day prior to the time of the determination on the stock exchange determined by our board of directors to be the primary market for our ordinary shares or ADSs. If there is no established market for our ordinary shares, our board of directors will determine the fair market value of our ordinary shares in good faith by reference to the placing price of the latest private

91

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

placement of our ordinary shares and the development of our business operations since such latest private placement.

### *Performance criteria*

Our 2006 stock incentive plan allows our board of directors to establish the performance criteria when granting stock options on the basis of any one of, or combination of, increase in our share price, earnings per share, total shareholder return, return on equity, return on assets, return on investment, net operating income, cash flow, revenue, economic value added, personal management objectives, or other measures of performance selected by our board of directors. Partial achievement of the specified criteria may result in a vesting corresponding to the degree of achievement as specified in the award agreement with the relevant optionee.

### *Outstanding options granted under our 2006 stock incentive plan*

The following table summarizes, as of the date of this prospectus, the outstanding options granted under our 2006 stock incentive plan to several of our directors, executive officers and investors and to other individuals as a group. Unless otherwise noted, the options granted vest over a three-year period beginning on the date of their respective grants.

| Name | Ordinary Shares Underlying Outstanding Options | Exercise Price ($/Share) | Date of Grant | Date of Expiration |
|------|------|------|------|------|
| Xiaofeng Peng(1) | 1,500,000 | $ 4.45 | August 1, 2006 | July 31, 2011 |
| Xingxue Tong (2) | 1,300,000 | 9.00 | February 6, 2007 | February 5, 2012 |
| Liangbao Zhu(3) | 1,000,000 | 4.45 | August 1, 2006 | July 31, 2011 |
| Yonggang Shao(4) | 1,000,000 | 4.45 | August 1, 2006 | July 31, 2011 |
| Gang Wang (5) | 100,000 | 9.00 | April 17, 2007 | April 16, 2012 |
| Louis T. Hsieh** | * | 9.00 | ** | ** |
| Jack Lai(6) | * | 4.45 | August 1, 2006 | July 31, 2011 |
| Nicola Sarno | * | 4.45 | August 1, 2006 | July 31, 2011 |
| Yuepeng Wan | * | 9.00 | February 6, 2007 | February 5, 2012 |
| Rongqiang Cui | * | 4.45 | August 1, 2006 | July 31, 2011 |
| Pietro Rossetto | * | 4.45 | August 1, 2006 | July 31, 2011 |
| Qiqiang Yao(7) | * | 4.45 | August 1, 2006 | July 31, 2011 |
| Boundless Future Investment Limited(8) | 100,000 | 4.45 | August 1, 2006 | July 31, 2011 |
| Brilliant Ever Investments Limited(8) | 100,000 | 4.45 | August 1, 2006 | July 31, 2011 |
| Other employees as a group(9) | 1,133,900 | 4.45 | August 1, 2006 | July 31, 2011 |
| Other employees as a group(9) | 665,900 | 9.00 | February 6, 2007 | February 5, 2012 |
| Other employees as a group(9) | 350,900 | $ *** | *** | *** |
| Total | 8,710,700 | | | |

(1) Mr. Peng is holding his stock options through his wholly owned British Virgin Islands company, LDK New Energy.

(2) Mr. Tong is holding his stock options through his wholly owned British Virgin Islands company, Superb Bright Limited.

(3) Mr. Zhu is holding his stock options through his wholly owned British Virgin Islands company, Feliz International Inc.

(4) Mr. Shao is holding his stock options through his wholly owned British Virgin Islands company, SM Future Investment Inc.

(5) Mr. Wang is holding his stock options through his wholly owned British Virgin Islands company, Sun Forever Limited.

(6) Relates to options granted to Mr. Lai in his capacity as consultant prior to his employment at our company and in anticipation of his employment at our company.

(7) Mr. Yao is holding his stock options through his wholly owned British Virgin Islands company, Qiqiang Investment Consulting Inc.

(8) Vests on July 31, 2007. Brilliant Ever Investments Limited and Boundless Future Investment Limited are each a company organized and existing under the laws of the British Virgin Islands and wholly owned by Mr. Chen Lu. Brilliant Ever Investments Limited and Boundless Future Investment Limited were each an investor in our Series A preferred shares.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(9) Each employee holds less than 1% of our total outstanding voting securities, including one employee and a former non-executive director holding his/ her options through their wholly owned British Virgin Islands companies.

* Directors and executive officers as a group, each holding less than 1% of our outstanding ordinary shares and together holding stock options exercisable for 1,460,000 ordinary shares.

** The grant of stock options to Mr. Hsieh will take effect upon commencement of his service with us as an independent director on the date of this prospectus, which will be the date of grant for his stock options. The date of expiration will be the last day of the fifth year from the date of grant.

*** Low end of the initial public offering price range on the cover of the preliminary prospectus. The grant date will be the date of the preliminary prospectus. The date of expiration will be the last day of the fifth year from the date of grant.

   Other than options granted to Xiaofeng Peng, Liangbao Zhu, Yonggang Shao, Boundless Future Investment Limited and Brilliant Ever Investments Limited, the numbers of ordinary shares underlying options granted, as described in the above table, are subject to reduction by our board of directors on the basis of performance of each relevant optionee.

93

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth information with respect to the beneficial ownership of our ordinary shares, on a fully diluted basis assuming conversion of all of our Series A, Series B and Series C preferred shares issued to our shareholders and as adjusted to reflect the sale of the ADSs offered in this offering, as of the date of this prospectus, by each of our directors and executive officers and each of our shareholders.

| Name | Shares Beneficially Owned Prior to This Offering | | Shares to be Sold by Selling Shareholders | | Shares Beneficially Owned After This Offering | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Xiaofeng Peng(1) | 75,000,000 | 82.80% | — | —% | 75,000,000 | % |
| Financiere Natixis Singapore 4 Pte Ltd(2) | 3,745,237 | 4.13 | | | | |
| CDH SolarFuture Limited(3) | 3,066,667 | 3.39 | | | | |
| Brilliant Ever Investments Limited(4) | 2,000,000 | 2.21 | | | | |
| Shine Field Investment Limited(5) | 1,483,333 | 1.64 | | | | |
| CHF Wafer Company Limited(6) | 1,000,000 | 1.10 | | | | |
| Boundless Future Investment Limited(7) | 1,000,000 | 1.10 | | | | |
| China Environment Fund 2004, LP(8) | 833,333 | 0.92 | | | | |
| JAFCO Asia Technology Fund III(9) | 833,333 | 0.92 | | | | |
| MUS Roosevelt China Pacific Fund L.P.(10) | 520,049 | 0.57 | | | | |
| Decatur Overseas Corporation(11) | 451,429 | 0.50 | | | | |
| Tech Team Holdings Limited(12) | 270,048 | 0.30 | | | | |
| Grand Gain International Limited(13) | 250,000 | 0.28 | | | | |
| China Environment Fund 2002, LP(14) | 66,667 | 0.07 | | | | |
| BOFA Capital Company Limited(15) | 34,671 | 0.04 | | | | |
| Silverpointe Investments Ltd.(16) | 25,233 | 0.03 | | % | | % |
| Total | 90,580,000 | 100.00% | | | | % |

(1) Mr. Peng holds these ordinary shares through LDK New Energy, his wholly owned British Virgin Islands company.

(2) Formerly known as Financiere Natixis Singapore 4 Pte Ltd. Represents 1,128,571 ordinary shares issuable upon conversion of Series A-2 preferred shares, 1,150,000 ordinary shares issuable upon conversion of Series B preferred shares and 1,466,666 ordinary shares issuable upon conversion of Series C preferred shares, each held by Financiere Natixis Singapore 4 Pte Ltd, a company organized and existing under the laws of the Republic of Singapore and beneficially wholly owned by NATIXIS S.A. Voting and investment power of shares held by Financiere Natixis Singapore 4 Pte Ltd is exercised by its directors, Jean de Severac and Jean Louis Delvaux. The address of Financiere Natixis Singapore 4 Pte Ltd is Abrogado Pte., Ltd., Temasek Avenue, 2701 Millenia Tower, Singapore 039192. Financiere Natixis Singapore 4 Pte Ltd is affiliated with Natixis Bleichroeder Inc., which is a registered broker-dealer and a member of the NYSE. Its principal place of business is at 1345 Avenue of the Americas, New York, New York 10105-4300, U.S.A.

(3) Represents 2,000,000 ordinary shares issuable upon conversion of Series B preferred shares and 1,066,667 of ordinary shares issuable upon conversion of Series C preferred shares, each held by CDH SolarFuture Limited, a company organized and existing under the laws of the British Virgin Islands and is wholly owned by CDH Venture Partners L.P. Voting and investment power of shares held by CDH SolarFuture Limited is exercised by Lew Kiang Hua and Yan Huang. The address of CDH Venture Partners, L.P. is Level 30, Six Battery Road, Singapore 049909.

(4) Represents 2,000,000 ordinary shares issuable upon conversion of Series A-1 preferred shares held by Brilliant Ever Investments Limited, a company organized and existing under the laws of the British Virgin Islands and is wholly owned by Chen Lu, who has the sole voting and investment power of shares held by Brilliant Ever Investments Limited.

(5) Represents 1,150,000 ordinary shares issuable upon conversion of Series B preferred shares and 333,333 ordinary shares issuable upon conversion of Series C preferred shares, each held by Shine Field Investment Limited, a company organized and existing under the laws of the British Virgin Islands and is wholly owned by Chen Lu and Ngan Iek, who have the voting and investment power of shares held by Shine Field Investment Limited.

(6) Represents 1,000,000 ordinary shares issuable upon conversion of Series B preferred shares held by CHF Wafer Company Limited, a British Virgin Islands company, with the registered address at P.O. Box 173, Kingston Chambers, Road Town, Tortola, British Virgin Islands. China Harvest Fund, L.P. and China Harvest Parallel Fund I, L.P. beneficially own 97.83% and 2.17%, respectively, of the share capital of CHF Wafer Company Limited. Each of China Harvest Fund, L.P. and China Harvest Parallel Fund I, L.P. is a Cayman Islands exempted limited partnership, with its registered address at the offices of M&C Corporate Services Limited,

94

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

P.O. Box 309GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands. The general partner of each China Harvest Fund, L.P. and China Harvest Parallel Fund I, L.P. is China Renaissance Capital Investment, L.P., a Cayman Islands exempted limited partnership. Voting and investment power of shares beneficially held by China Harvest Fund, L.P. and China Harvest Parallel Fund I, L.P. is exercised by the investment committee of China Renaissance Capital Investment, L.P., which consists of Mark Qiu, Hung Shih, Li Zhenzhi, Charles Pieper and Nicole Arnaboldi. The address for these committee members is c/o China Renaissance Capital Investment, L.P., M&C Corporate Services Limited, P.O. Box 309GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands. CHF Wafer Company Limited is affiliated with Credit Suisse Securities (USA) LLC, which is a registered broker-dealer and a member of the NASD. Credit Suisse Securities (USA) LLC is a limited liability company with its principal place of business at 11 Madison Avenue, New York, New York 10010, U.S.A.

(7) Represents 1,000,000 ordinary shares issuable upon conversion of Series A-1 preferred shares held by Boundless Future Investment Limited, a company organized and existing under the laws of the British Virgin Islands and is wholly owned by Chen Lu, who has the sole voting and investment power of shares held by Boundless Future Investment Limited.

(8) Represents 833,333 ordinary shares issuable upon conversion of Series B preferred shares held by China Environment Fund 2004, LP., an exempted partnership organized and existing under the laws of the Cayman Islands, with its registered office at c/o Walkers SPV Limited, P.O. Box 908, George Town, Cayman Islands. Voting and investment power of shares held by China Environment Fund 2004, LP. is exercised by its investment committee, which consists of Jason Whittle, Sandy Selman, Tony Bakels and Donald Chang Ye.

(9) Represents 833,333 ordinary shares issuable upon conversion of Series B preferred shares held by JAFCO Asia Technology Fund III, an exempted company organized and existing under the laws of the Cayman Islands and wholly owned by JAFCO Asia Technology Fund III L.P., a limited partnership established in the Cayman Islands. JAFCO Asia Technology Holdings III Limited, a Cayman Islands company and a wholly-owned subsidiary of JAFCO Investment (Asia Pacific) Ltd., is the sole general partner of JAFCO Asia Technology Fund III L.P. and controls the voting and investment power over the shares owned by JAFCO Asia Technology Fund III. JAFCO Investment (Asia Pacific) Ltd. is wholly owned by JAFCO Co., Ltd., a public company listed on the Tokyo Stock Exchange. Hiroshi Yamada, Vincent Chan Chun Hung, Chew Cheng Keat and Junitsu Uchikata as a whole have the voting and investment power of shares held by JAFCO Asia Technology Fund III. The address for JAFCO Asia Technology Fund III is c/o JAFCO Investment (Asia Pacific) Limited, 6 Battery Road, #42-01, Singapore 049909. JAFCO Asia Technology Fund III is affiliated with Nomura Securities International, Inc., which is a registered broker-dealer and a member of NASD. Nomura Securities International, Inc. has its principal place of business at Two World Financial Center, Building B, New York, New York 10281-1198, U.S.A.

(10) Represents 500,000 ordinary shares issuable upon conversion of Series B preferred shares and 20,049 ordinary shares issuable upon conversion of Series C preferred shares, each held by MUS Roosevelt China Pacific Fund L.P., an exempted limited partnership organized and existing under the laws of the Cayman Islands. MUS Roosevelt Capital Partners, Ltd., a Cayman Islands company, is the sole general partner of MUS Roosevelt China Pacific Fund L.P. Voting and investment power of shares held by MUS Roosevelt Capital Partners, Ltd. is exercised by its investment committee, which consists of Yasuhiro Matsumura, Jun Otsuka, Brian Chang and Tin Lung Tse. The address for MUS Roosevelt China Pacific Fund L.P. is c/o MUS Roosevelt Capital Partners, Ltd., Offshore Incorporations (Cayman) Limited, Scotia Centre, 4/F, P.O. Box 2804, George Town, Grand Cayman, Cayman Islands. MUS Roosevelt Capital Partners, Ltd. is affiliated with Mitsubishi UFJ Securities Co., Ltd., which is a broker-dealer and a member of the Japan Securities Dealers Association. Mitsubishi UFJ Securities Co., Ltd. is a company with its principal place of business at 2-4-1, Marunouchi, Chiyoda-ku, Tokyo 100-6317, Japan.

(11) Represents 451,429 ordinary shares issuable upon conversion of Series A-2 preferred shares held by Decatur Overseas Corporation, a company organized and existing under the laws of the British Virgin Islands and wholly owned by Rafael E. Alain, with his address at 16th Floor, Swiss Tower, 53rd Street, Urbanizacion Obarrio, Panama. The directors of Decatur Overseas Corporation, Cynthia de Raveneau and Pamela D. Hall, have the voting and investment power of shares held by Decatur Overseas Corporation.

(12) Represents 250,000 ordinary shares issuable upon conversion of Series B preferred shares and 20,048 ordinary shares issuable upon conversion of Series C preferred shares, each held by Tech Team Holdings Limited, a company organized and existing under the laws of the British Virgin Islands and wholly owned by Pinpoint Capital Limited, as general partner of the Pinpoint China Direct Investment Fund Limited Partnership, with its address at 2nd Floor, Abbott Building, Road Town, Tortola, British Virgin Islands. Voting and investment power of shares held by Tech Team Holdings Limited is exercised by its directors, Xuan Li, Qiang Wang and Jiyi Weng.

(13) Represents 250,000 ordinary shares issuable upon conversion of Series B preferred shares held by Grand Gains International Limited, a company organized and existing under the laws of the British Virgin Islands and wholly owned by Li Hong Wei, with its address at Palm Grove House, P.O. Box 438, Road Town, Tortola, British Virgin Islands. Li Hong Wei has the sole voting and investment power of shares held by Grand Gains International Corporation.

(14) Represents 66,667 ordinary shares issuable upon conversion of Series C preferred shares held by China Environment Fund 2002, LP., an exempted limited partnership organized and existing under the laws of the Cayman Islands, with its registered office at c/o Walkers SPV Limited, P.O. Box 908, George Town, Cayman Islands. The general partner is China Environment Fund 2002 Management LP., a Cayman Islands exempted limited liability company, and the limited partners include LESS Limited and Asian Development Bank. Voting and investment power of shares held by China Environment Fund 2002, LP. is exercised by its investment committee, which consists of Jason Whittle, Sandy Selman and Donald Chang Ye.

(15) Represents 33,334 ordinary shares issuable upon conversion of Series B preferred shares and 1,337 ordinary shares issuable upon conversion of Series C preferred shares, each held by BOFA Capital Company Limited, a company organized and existing under the

95

laws of the British Virgin Islands and wholly owned by Lingyong Peng, Yu Chen and Yiven Le, who have the voting and investment power of shares held by BOFA Capital Company Limited.

(16) Represents 25,233 ordinary shares issuable upon conversion of Series C preferred shares held by Silverpointe Investments Ltd., a company organized and existing under the laws of the British Virgin Islands and wholly owned by Yang Yang, with its address at Portculli TrustNet (BVI) Limited, Portcullis TrustNet Chambers, P.O. Box 3444, Road Town, Tortola, British Virgin Islands. Yang Yang has the sole voting and investment power of shares held by Silverpointe Investments Ltd.

As of the date of this prospectus, none of our outstanding ordinary shares or our outstanding preferred shares is held by any record holders in the United States.

None of our existing shareholders has different voting rights from other shareholders subsequent to the completion of this offering. We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company.

Each selling shareholder has confirmed that it is not a broker-dealer and that, other than Financiere Natixis Singapore 4 Pte Ltd, CHF Wafer Company Limited, JAFCO Asia Technology Fund III and MUS Roosevelt China Pacific Fund L.P., it is not an affiliate of any broker-dealer. Financiere Natixis Singapore 4 Pte Ltd, CHF Wafer Company Limited, JAFCO Asia Technology Fund III and MUS Roosevelt China Pacific Fund L.P., each being an affiliate of a registered broker-dealer, have each represented that it purchased our preferred shares in the ordinary course of business, that the ordinary shares being registered for resale by our preferred shareholders will be issued upon conversion of the preferred shares and that, at the time of the purchase, it had no agreements or understandings, directly or indirectly, with any person to distribute our preferred shares or our ordinary shares issuable upon conversion of such preferred shares.

96

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## RELATED PARTY TRANSACTIONS

We have engaged from time to time in various transactions with related parties. We believe that we have conducted our related-party transactions on terms comparable to, or more favorable to us than, similar transactions we would enter into with independent third parties. Upon completion of this offering, our related-party transactions will be subject to the review and approval of the audit committee of our board of directors. The charter of our audit committee as adopted by our board of directors provides that we may not enter into any related-party transaction unless and until it has been approved by the audit committee.

### Restructuring

Jiangxi LDK Solar was incorporated in China on July 5, 2005 by Suzhou Liouxin, a PRC company, and Liouxin Industrial Limited, a Hong Kong company, each beneficially and wholly owned by Mr. Peng, our founder, chairman and chief executive officer. Suzhou Liouxin and Liouxin Industrial Limited owned 27.6% and 72.4%, respectively, of Jiangxi LDK Solar at the time of its incorporation.

Mr. Peng incorporated LDK New Energy on April 27, 2006 as his wholly owned company under the laws of the British Virgin Islands. LDK New Energy incorporated LDK Solar Co., Ltd. on May 1, 2006 as its wholly owned subsidiary under the laws of the Cayman Islands.

Upon approval of the relevant PRC government authorities, LDK Solar Co., Ltd. acquired all of the equity interests in Jiangxi LDK Solar from Suzhou Liouxin and Liouxin Industrial Limited on July 10, 2006 for an aggregate consideration of $8,000,001.

On September 5, 2006, LDK Solar Co., Ltd. incorporated LDK International Solar Co., Ltd. in Hong Kong as its wholly owned subsidiary.

### Borrowings

#### *Loan from Mr. Xiaofeng Peng*

Under a loan agreement dated September 22, 2005, Mr. Peng granted a line of credit of up to $24.2 million to Jiangxi LDK Solar at an interest rate as published by the People's Bank of China from time to time. This loan is guaranteed by Suzhou Liouxin, Saiweng Technology (Suzhou) Co., Ltd., and Jiangxi Liouxin Industry Co., Ltd., all of which are controlled by Mr. Peng. The loan is to be repaid at the demand by Mr. Peng with 15-business day prior notice specifying the amount and date due.

During the period from October to December 2005, Jiangxi LDK Solar borrowed a cumulative amount of $16.1 million under the line of credit and at the same time lent $5.5 million to Saiweng Technology (Suzhou) Co., Ltd. In the first six months of 2006, Jiangxi LDK Solar borrowed an additional $8.1 million and repaid $5.4 million under this line of credit. Among the repayment of $5.4 million, Jiangxi LDK Solar paid $1.3 million to a third party at the instruction of Mr. Peng and signed an agreement with Mr. Peng in April 2006 to confirm and ratify that the payment of $1.3 million constituted a repayment of the same amount it owed Mr. Peng. In March 2006, Jiangxi LDK Solar signed an agreement with Mr. Peng to use the $5.5 million it lent to Saiweng Technology (Suzhou) Co., Ltd. to offset $5.5 million of the amount it owed Mr. Peng under the credit line. In December 2006, Jiangxi LDK Solar repaid the outstanding balance of $13.4 million to Mr. Peng, together with an accrued interest of $0.9 million.

#### *Loan from Jiangxi Liouxin Industry Co., Ltd.*

Jiangxi LDK Solar borrowed $2.6 million from Jiangxi Liouxin Industry Co., Ltd., a company controlled by Mr. Peng, on August 12, 2006 for working capital purposes. There was no written agreement, and the loan was interest free. This loan was repaid in full in September 2006.

#### *Loan from Suzhou Liouxin*

Under a loan agreement dated July 24, 2006, Jiangxi LDK Solar borrowed $8.1 million from Suzhou Liouxin free of interest. This loan was repaid in full in December 2006.

97

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

*Entrusted Loan from Jiangxi Liouxin Industry Co., Ltd.*

Through Bank of China, Xinyu Branch, Jiangxi LDK Solar borrowed $15.0 million from Jiangxi Liouxin Industry Co., Ltd. in December 2006 through an entrusted loan agreement. The loan carries an interest of 5.022% per year and is due in June 2007. Under PRC law, a non-financial institution may not make any interest-bearing loans directly to any company, and a company may not borrow interest-bearing loans directly from a non-financial institution. A non-financial institution may deposit its funds with a PRC bank, however, for the purpose of lending the funds to a designated corporate borrower as an entrusted loan.

### Land Use Rights and Property Ownership

In connection with the commencement of operations by Jiangxi LDK Solar, Jiangxi LDK Solar entered into an entrustment agreement with Jiangxi Liouxin Industry Co., Ltd. in August 2005. Pursuant to this agreement, Jiangxi Liouxin Industry Co., Ltd. acquired land use rights to certain parcels of land that constitute a part of our current site in the Xinyu Hi-Tech Industrial Park and certain buildings on the land parcel. Jiangxi LDK Solar paid $3.3 million for the land use rights at their fair market value as assessed by Shanghai Orient Real Estate Appraiser Co., Ltd., an independent valuer, and $7.1 million for the completed buildings and $637,000 for assets under construction, in each case at original cost. Jiangxi LDK Solar prepaid $4.7 million in 2005 and paid $6.4 million in 2006 for such purchases. Jiangxi LDK Solar received legal title to the land use rights and the completed buildings in 2006.

### Sublease of Property

Suzhou Liouxin owns the leasehold interest in our branch office in Shanghai. We sublease it from Suzhou Liouxin free of charge. Suzhou Liouxin currently pays $5,000 per month in rent for the premises.

### Guarantees

As of the date of this prospectus, an aggregate of $32.2 million of our borrowings from commercial banks in China are secured by guarantees from companies wholly owned by Mr. Peng.

### Registration Rights Agreement

See "Description of Share Capital — Registration Rights" in this prospectus.

### Employment Agreements

See "Management — Employment Agreements" in this prospectus.

### Stock Option Grants

See "Management — 2006 Stock Incentive Plan" in this prospectus.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## DESCRIPTION OF SHARE CAPITAL

We are a Cayman Islands company and our affairs are governed by our memorandum and articles of association and the Cayman Companies Law (2004 Revision) of the Cayman Islands, or the Cayman Companies Law. We have filed copies of our current third amended and restated memorandum and articles of association and our fourth amended and restated memorandum and articles of association that will become effective upon consummation of this offering as exhibits to our registration statement on Form F-1, of which this prospectus forms a part.

As of the date of this prospectus, our authorized share capital consists of 134,000,000 ordinary shares, par value of $0.10 each, and 16,000,000 preferred shares, par value of $0.10 each. As of the date of this prospectus, an aggregate of 75,000,000 ordinary shares and 15,580,000 preferred shares were issued and outstanding. All of our issued and outstanding preferred shares will automatically convert into ordinary shares at a conversion rate of one preferred share to one ordinary share, immediately prior to closing of this offering.

Upon consummation of this offering, our authorized share capital will consist of 499,580,000 ordinary shares, par value of $0.10 each, and 420,000 shares of such class or designation as our board of directors may determine in accordance with our articles of association, par value of $0.10 each.

The following are summaries of material provisions of our fourth amended and restated memorandum and articles of association that will become effective upon consummation of this offering and the Cayman Companies Law insofar as they relate to our ordinary shares. You, as holder of our ADSs, will not be treated as our shareholders and you must surrender your ADSs for cancellation and withdraw from the depositary facility in which the ordinary shares are held in order to exercise shareholders' rights as holders of our ordinary shares in respect of the ordinary shares underlying your ADSs. Under the terms of the deposit agreement, the depositary has agreed, subject to certain legal and contractual limitations, to exercise certain shareholder rights on your behalf and on behalf of other holders of our ADSs. See "Description of American Depositary Shares" for more information.

## Ordinary Shares

All of our outstanding ordinary shares are fully paid and non-assessable. We issue certificates representing our ordinary shares in registered form. Our shareholders who are non-residents of the Cayman Islands may freely hold and vote their shares.

### Dividends

The holders of our ordinary shares are entitled to such dividends as may be declared by our board of directors subject to the Cayman Companies Law.

### Voting rights

Each of our ordinary shares is entitled to one vote on all matters upon which our ordinary shares are entitled to vote. Voting at any meeting of our shareholders is by show of hands unless a poll is demanded or required by the rules of the designated stock exchange as described in our fourth amended and restated articles of association. A poll may be demanded by:

- the chairman of the meeting;

- at least three shareholders present in person or, in the case of a shareholder being a corporation, by its duly authorized representative, or by proxy for the time being entitled to vote at the meeting;

- any shareholder or shareholders present in person or, in the case of a shareholder being a corporation, by its duly authorized representative, or by proxy and representing not less than one-tenth of the total voting rights of all the shareholders having the right to vote at the meeting; or

- a shareholder or shareholders present in person or, in the case of a shareholder being a corporation, by its duly authorized representative, or by proxy and holding not less than one-tenth of the issued share capital of our voting shares.

A quorum required for a meeting of our shareholders consists of at least two shareholders holding at least one-third of our total outstanding shares present in person or by proxy or, if a corporation or other non-natural

99

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

person, by its duly authorized representative. Our shareholders' meetings are held annually and may be convened by our board of directors on its own initiative. Advance notice of at least ten clear days is required for the convening of our annual general meeting and other shareholders' meetings.

An ordinary resolution to be passed by our shareholders requires the affirmative vote of a simple majority of the votes attaching to our ordinary shares cast in a general meeting, while a special resolution requires the affirmative vote of no less than two-thirds of the votes cast attaching to our ordinary shares. A special resolution is required for important matters such as a change of name or an amendment to our fourth amended and restated memorandum or fourth amended and restated articles of association. Holders of our ordinary shares may effect certain changes by an ordinary resolution, including alteration of the amount of our authorized share capital, consolidation and division of all or any of our share capital into shares of larger or smaller amount than our existing share capital, and cancel any unissued shares.

### *Transfer of shares*

Subject to the restrictions contained in our fourth amended and restated articles of association, as more fully described below, any of our shareholders may transfer all or any of his or her ordinary shares by an instrument of transfer in the usual or common form or by any other form approved by our board of directors or in a form prescribed by a designated stock exchange.

Our board of directors may, in its absolute discretion, and without giving any reason, decline to register a transfer of any ordinary share which is not fully paid up or on which we have a lien. Our directors may also decline to register any transfer of any ordinary share unless:

- the instrument of transfer is lodged with us, accompanied by the relevant certificate for the ordinary shares and such other evidence as our board of directors may reasonably require to show the right of the transferor to make the transfer;

- the instrument of transfer is in respect of only one class of ordinary shares;

- the instrument of transfer is properly stamped, if applicable;

- in the case of a transfer to joint holders, the number of joint holders to whom the ordinary share is to be transferred does not exceed four; or

- a fee of such maximum sum as a designated stock exchange may determine to be payable, or such lesser sum as our board of directors may from time to time require, is paid to us.

There is presently no legal requirement under Cayman Islands law for instruments of transfer relating to our ordinary shares to be stamped. In addition, our board of directors has no present intention to charge any fee in connection with the registration of a transfer of our ordinary shares.

If our directors refuse to register a transfer, they must, within two months after the date on which the instrument of transfer was lodged, send to each of the transferor and the transferee notice of such refusal. The registration of transfers may, upon prior notice given by advertisement in one or more newspapers or by electronic means, be suspended and the register closed at such times and for such periods as our board of directors may from time to time determine, but we may not suspend the registration of transfers nor close the register for more than 30 days in any year.

### *Liquidation*

Upon a return of capital on winding-up or otherwise (other than on conversion, redemption or purchase of shares), assets available for distribution among the holders of our ordinary shares will be distributed among the holders of our ordinary shares on a *pro rata* basis. If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that the losses are borne by our shareholders proportionately.

### *Calls on shares and forfeiture of shares*

Our fourth amended and restated articles of association permit us to issue our shares, including ordinary shares, nil paid and partially paid. This permits us to issue shares where the payment for such shares has yet to be received. Although our fourth amended and restated articles of association give us the flexibility to issue nil

100

Table of Contents

paid and partly paid shares, our board of directors has no present intention to do so. Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their shares in a notice served to such shareholders at least 14 days prior to the specified time and place of payment. The shares that have been called upon and remain unpaid on the specified time are subject to forfeiture.

### Redemption of shares

Subject to the provisions of the Cayman Companies Law, the rules of the designated stock exchange, our fourth amended and restated memorandum and articles of association and any special rights conferred on the holders of any shares or class of shares, we may issue shares on terms that they are subject to redemption at our option or at the option of the holders, on such terms and in such manner as may be determined by our board of directors. Our currently outstanding ordinary shares and those to be issued in this offering will not be subject to redemption at the option of the holders or our board of directors.

### Variations of rights of shares

All or any of the special rights attached to any class of our shares may, subject to the provisions of the Cayman Companies Law, be varied with the sanction of a special resolution passed at a general meeting of the holders of the shares of that class.

### Inspection of register of members

Pursuant to our fourth amended and restated articles of association, our register of members and branch register of members shall be open for inspection, unless the register is closed in accordance with our fourth amended and restated articles of association:

- by shareholders for such times and on such days as our board of directors may determine, without charge, at our registered office or such other place where we keep our register in accordance with the Cayman Companies Law, or

- by any other person, upon a maximum payment of $2.50 or such other sum specified by our board of directors, at our registered office or such other place where we keep our register in accordance with the Cayman Companies Law.

### Designations and classes of shares

All of our issued shares upon the closing of this offering will be ordinary shares. Our fourth amended and restated articles of association provide that our authorized unissued shares shall be at the disposal of our board of directors, which may offer, allot, grant options over or otherwise dispose of them to such persons, at such times and for such consideration and upon such terms and conditions as our board of directors may in its absolute discretion determine. In particular, our board of directors is empowered to authorize from time to time the issuance of one or more classes or series of preferred shares and to fix their designations, powers, and preferences, as well as their relative, participating, optional and other rights, if any, and their qualifications, limitations and restrictions, if any, including the number of shares constituting each such class or series, dividend rights, conversion rights, redemption privileges, voting powers, full or limited or no voting powers, and liquidation preferences, and to increase or decrease the size of any such class or series.

### Anti-takeover provisions

Cayman Islands law does not prevent companies from adopting a wide range of defensive measures, such as staggered boards, blank check preferred, removal of directors only for cause and provisions that restrict the right of shareholders to call meetings, act by written consent and submit shareholder proposals See "Risk Factors — Risks Relating to This Offering — Our articles of association contain anti-takeover provisions that could prevent a change in control even if such takeover is beneficial to our shareholders" in this prospectus.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

**History of Securities Issuances**

The following is a summary of the issuances of our securities since our inception on May 1, 2006.

### Ordinary shares

In May 2006, we issued 100,000 ordinary shares at par value to LDK New Energy, a British Virgin Islands company wholly owned by Mr. Peng, for an aggregate consideration of $10,000.

In July 2006, we issued 74,900,000 ordinary shares at par value to LDK New Energy, for an aggregate consideration of $7,490,000.

### Series A preferred shares

In July 2006, we issued an aggregate of 4,580,000 Series A preferred shares, convertible into 4,580,000 ordinary shares, for an aggregate consideration of $15,000,000.

The conversion ratio of our Series A preferred shares is subject to adjustments if our 2006 net earnings are lower than $28,500,000. Any adjustment to the conversion ratio of our Series B or Series C preferred shares may also trigger adjustment to the conversion ratio of our Series A preferred shares. If we consummate this offering prior to the end of 2007 reflecting a valuation immediately prior to this offering of no less than $1,210,000,000, with a per-share offering price of no less than $11.00 and aggregate proceeds to us of at least $300,000,000, no such conversion ratio adjustment to Series A preferred shares will be made. The holders of our Series A preferred shares have confirmed that, after their review of our net earnings up to December 31, 2006, no adjustments to the conversion ratio of our Series A preferred shares need be made on the basis of our net earnings for the year ended December 31, 2006.

### Series B preferred shares

In September 2006, we issued an aggregate of 8,000,000 Series B preferred shares, convertible into 8,000,000 ordinary shares, for an aggregate consideration of $48,000,000.

The conversion ratio of our Series B preferred shares is subject to adjustments if our net earnings for the 12-month period ending June 30, 2007 are lower than $57,000,000. Any adjustment to the conversion ratio of our Series A or Series C preferred shares may also trigger adjustment to the conversion ratio of our Series B preferred shares. If this offering meets the criteria as described in "— Series A preferred shares" above and is consummated on or before June 30, 2007, any conversion ratio adjustment to the Series B preferred shares based on our net earnings for the 12-month period ending June 30, 2007 will be computed on the basis of the annualized amount of our net earnings for number of full months that elapsed prior to this offering. In April 2007, we agreed with the holders of our Series B preferred shares that, if we publicly file our F-1 registration statement covering this offering on or before May 31, 2007, the conversion ratio adjustments for our Series B preferred shares would be determined based on our aggregate net income for the three months ended March 31, 2007 and the six months ended December 31, 2006 on an annualized basis, or an aggregate of $42.75 million for the nine-month period. The holders of our Series B preferred shares have confirmed that no adjustments to the conversion ratio of our Series B preferred shares need be made after their review of our consolidated interim financial statements as of, and for the three months ended, March 31, 2007 included in this prospectus.

### Series C preferred shares

In December 2006, we issued an aggregate of 3,000,000 Series C preferred shares, convertible into 3,000,000 ordinary shares, for an aggregate consideration of $22,500,000.

The conversion ratio of our Series C preferred shares is subject to adjustments if our net earnings for the year ending December 31, 2007 are lower than $104,500,000. Any adjustment to the conversion ratio of our Series A or Series B preferred shares may also trigger adjustment to the conversion ratio of our Series C preferred shares. If this offering meets the criteria as described in "— Series A preferred shares" above and is consummated before the end of 2007, any conversion ratio adjustment to the Series C preferred shares based on our net earnings for the year ending December 31, 2007 will be computed on the basis of an adjusted annualized amount of our net earnings for the number of full months that elapsed prior to this offering. In

102

April 2007, we agreed with the holders of our Series C preferred shares that, if we publicly file our F-1 registration statement covering this offering on or before May 31, 2007, the conversion ratio adjustments to our Series C preferred shares would be determined based on our aggregate net income for the three months ended March 31, 2007 on an adjusted annualized basis, or $23.75 million for the three-month period. The holders of our Series C preferred shares have confirmed that no adjustments to the conversion ratio of our Series C preferred shares need be made after their review of our consolidated interim financial statements as of, and for the three months ended, March 31, 2007 included in this prospectus.

## Differences in Corporate Law

The Cayman Companies Law differs from laws applicable to corporations established in jurisdictions in the United States and to their shareholders. Set forth below is a summary of significant differences between the provisions of the Cayman Companies Law applicable to us and the laws applicable to companies incorporated in jurisdictions in the United States and their shareholders.

### Mergers and similar arrangements

The Cayman Islands law does not provide for mergers as that expression is understood under United States corporate law. However, there are statutory provisions that facilitate the reconstruction and amalgamation of companies so long as the arrangement is approved by:

• a majority in number of each class of shareholders and creditors, respectively, with whom the arrangement is to be made, and

• in addition, at least three-fourths in value of each such class of shareholders and creditors, respectively,

that are present and voting either in person or by proxy at a meeting, or meetings, convened for that purpose. The convening of the meetings and the subsequent arrangement must be sanctioned by the Grand Court of the Cayman Islands. While a dissenting shareholder has the right to express to the court its view that the transaction ought not to be approved, the court can be expected to approve the arrangement if it determines that:

• the company is not proposing to act illegally or beyond the scope of its authority;

• the statutory provisions as to majority vote have been complied with;

• the shareholders have been fairly represented at the meeting in question;

• the arrangement is such that a businessman would reasonably approve; and

• the arrangement is not one that would more properly be sanctioned under some other provision of the Cayman Companies Law or that would amount to a "fraud on the minority" under the Cayman Islands law.

When a take-over offer is made and accepted by holders of 90% of the shares within four months, the offerer may, within a two-month period, require the holders of the remaining shares to transfer such shares on the terms of the offer. An objection can be made to the Grand Court of the Cayman Islands, but this is unlikely to succeed unless there is evidence of fraud, bad faith or collusion.

If the arrangement and reconstruction is so approved, the dissenting shareholder would have no rights comparable to appraisal rights, which would otherwise ordinarily be available to dissenting shareholders of corporations incorporated under jurisdictions of the United States, providing rights to receive payment in cash for the judicially determined value of the shares.

### Shareholders' suits

We are not aware of any reported class action or derivative action having been brought in a Cayman Islands court. In principle, we will normally be the proper plaintiff and a derivative action may not be brought by a minority shareholder. However, based on English authorities, which would in all likelihood be of

103

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

persuasive authority in the Cayman Islands, exceptions to the foregoing principle apply in circumstances in which:

- a company is acting or proposing to act illegally or beyond the scope of its authority;

- the act complained of, although not beyond the scope of its authority, could be effected duly if authorized by more than a simple majority vote which has not been obtained; and

- those who control the company are perpetrating a "fraud on the minority" under the Cayman Islands law.

**Registration Rights**

We have granted registration rights to the holders of our Series A, Series B and Series C preferred shares, including their assignees, in connection with their subscription for our Series A preferred shares in July 2006, Series B preferred shares in September 2006 and Series C preferred shares in December 2006. These registration rights will terminate on the earlier of:

- two years following the consummation of this offering; or

- with respect to any holder of our Series A, Series B and Series C preferred shares, such earlier time after this offering when such holder may sell all its registrable securities in any three-month period without registration under the Securities Act or the volume limitation under Rule 144 of the Securities Act.

Set forth below is a summary description of the registration rights granted to the holders of our Series A, Series B and Series C preferred shares, including their assignees.

*Demand registration rights*

At any time after this offering, holders of a majority in voting power of the registrable securities have the right to demand that we file a registration statement covering the offer and sale of their securities. At any time commencing one year after this offering, if we become eligible to use Form F-3, holders of the registrable securities have the right to request that we file a registration statement under Form F-3. However, we are not obligated to effect more than two Form F-3 demand registrations. We have subsequently waived our right to defer any request by holders of the registrable securities for the filing of a registration statement.

*Piggyback registration rights*

If we propose to file a registration statement with respect to an offering of equity securities of our company, then we must offer each holder of the registrable securities the opportunity to include its shares in the registration statement. If the underwriters in any underwritten offering determine that market factors require a limitation on the number of equity securities in the underwritten offering, we will have priority to include our equity securities for the offering, but holders of the registrable securities have the right to include their registrable securities to the extent that such included registrable securities will not in the aggregate exceed 25% of the offering.

*Expenses of registrations*

We will pay all expenses relating to any demand or piggyback registration whether or not such registrations become effective, except that holders of the registrable securities will bear the underwriting discounts and commissions relating to registration and sale of their shares and their own legal fee and transfer tax.

104

## DESCRIPTION OF AMERICAN DEPOSITARY SHARES

JPMorgan Chase Bank, N.A., as depositary will issue the ADSs which you will be entitled to receive in this offering. Each ADS will represent an ownership interest in one ordinary share which we will deposit with the custodian, as agent of the depositary, under the deposit agreement among ourselves, the depositary and yourself as an ADR holder. In the future, each ADS will also represent any securities, cash or other property deposited with the depositary that have not been distributed directly to you. Unless specifically requested by you, all ADSs will be issued on the books of our depositary in book-entry form and periodic statements will be mailed to you that reflect your ownership interest in such ADSs. In our description, references to American depositary receipts, or ADRs, will include the statements you will receive that reflect your ownership of ADSs.

The depositary's office is located at 4 New York Plaza, New York, New York 10004.

You may hold ADSs either directly or indirectly through your broker or other financial institution. If you hold ADSs directly, by having an ADS registered in your name on the books of the depositary, you are an ADR holder. This description assumes you hold your ADSs directly. If you hold the ADSs through your broker or financial institution nominee, you must rely on the procedures of such broker or financial institution to assert the rights of an ADR holder described in this section. You should consult with your broker or financial institution to find out what those procedures are.

Because the depositary's nominee will actually be the registered owner of the ordinary shares underlying your ADSs, you must rely on it to exercise the rights of a shareholder on your behalf. The obligations of the depositary and its agents are set out in the deposit agreement. The deposit agreement and the ADSs are governed by New York law.

The following is a summary of the material terms of the deposit agreement. Because it is a summary, it does not contain all the information that may be important to you. For more complete information, you should read the entire deposit agreement, including the form of ADR, which contains the terms of your ADSs. You can read a copy of the deposit agreement which is filed as an exhibit to the registration statement, of which this prospectus forms a part. You may also obtain a copy of the deposit agreement at the Securities and Exchange Commission's Public Reference Room which is located at 100 F Street, N.E., Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the Securities and Exchange Commission at 1-800-732-0330. You may also find the registration statement and the attached deposit agreement from the Securities and Exchange Commission's website at http://www.sec.gov.

## Share Dividends and Other Distributions

### *How will I receive dividends and other distributions on the shares underlying my ADSs?*

We may make various types of distributions with respect to our securities. The depositary has agreed to pay to you the cash dividends or other distributions it or the custodian receives on shares or other deposited securities, after converting any cash received into U.S. dollars and, in all cases, making any necessary deductions provided for in the deposit agreement. You will receive these distributions in proportion to the number of underlying securities that your ADSs represent.

Except as stated below, to the extent the depositary is legally permitted it will deliver such distributions to ADR holders in proportion to their interests in the following manner:

• *Cash.* The depositary will distribute any U.S. dollars available to it resulting from a cash dividend or other cash distribution or the net proceeds of sales of any other distribution or portion thereof (to the extent applicable), on an averaged or other practicable basis, subject to (i) appropriate adjustments for taxes withheld, (ii) such distribution being impermissible or impracticable with respect to certain registered holders, and (iii) deduction of the depositary's expenses in (1) converting any foreign currency to U.S. dollars to the extent that it determines that such conversion may be made on a reasonable basis, (2) transferring foreign currency or U.S. dollars to the United States by such means as the depositary may determine to the extent that it determines that such transfer may be made on a reasonable basis, (3) obtaining any approval or license of any governmental authority required for such conversion or transfer, which is obtainable at a reasonable cost and within a reasonable time and (4)

105

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

making any sale by public or private means in any commercially reasonable manner. *If exchange rates fluctuate during a time when the depositary cannot convert a foreign currency, you may lose some or all of the value of the distribution.*

- *Shares.* In the case of a distribution in shares, the depositary will issue additional ADRs to evidence the number of ADSs representing such shares. Only whole ADSs will be issued. Any shares which would result in fractional ADSs will be sold and the net proceeds will be distributed in the same manner as cash to the ADR holders entitled thereto.

- *Rights to Receive Additional Shares.* In the case of a distribution of rights to subscribe for additional shares or other rights, if we provide satisfactory evidence that the depositary may lawfully distribute such rights, the depositary will distribute warrants or other instruments representing such rights. However, if we do not furnish such evidence, the depositary may (i) sell such rights if practicable and distribute the net proceeds as cash; or (ii) if it is not practicable to sell such rights, do nothing and allow such rights to lapse, in which case ADR holders will receive nothing. We have no obligation to file a registration statement under the Securities Act in order to make any rights available to ADR holders.

- *Other Distributions.* In the case of a distribution of securities or property other than those described above, the depositary may either (i) distribute such securities or property in any manner it deems equitable and practicable or (ii) to the extent the depositary deems distribution of such securities or property not to be equitable and practicable, sell such securities or property and distribute any net proceeds in the same way it distributes cash.

If the depositary determines that any distribution described above is not practicable with respect to any specific ADR holder, the depositary may choose any practicable method of distribution for such ADR holder, including the distribution of foreign currency, securities or property, or it may retain such items, without paying interest on or investing them, on behalf of the ADR holder as deposited securities, in which case the ADSs will also represent the retained items.

Any U.S. dollars will be distributed by checks drawn on a bank in the United States for whole dollars and cents. Fractional cents will be withheld without liability for interest thereon and dealt with by the depositary in accordance with its then current practices.

The depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to any ADR holders.

*There can be no assurance that the depositary will be able to convert any currency at a specified exchange rate or sell any property, rights, shares or other securities at a specified price, nor that any of such transactions can be completed within a specified time period.*

**Deposit, Withdrawal and Cancellation**

*How does the depositary issue ADSs?*

The depositary will issue ADSs if you or your broker deposit shares or evidence of rights to receive shares with the custodian. In the case of the ADSs to be issued under this prospectus, we will arrange with the underwriters named in this prospectus to deposit such shares.

Shares deposited in the future with the custodian must be accompanied by certain delivery documentation, including instruments showing that such shares have been properly transferred or endorsed to the person on whose behalf the deposit is being made.

The custodian will hold all deposited shares (including those being deposited by or on our behalf in connection with this offering) for the account of the depositary. ADR holders thus have no direct ownership interest in the shares and only have such rights as are contained in the deposit agreement. The custodian will also hold any additional securities, property and cash received on or in substitution for the deposited shares. The deposited shares and any such additional items are referred to as "deposited securities" in this prospectus.

Upon each deposit of shares, receipt of related delivery documentation and compliance with the other provisions of the deposit agreement, including the payment of the fees and charges of the depositary and any

106

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

taxes or other fees or charges owing, the depositary will issue an ADR or ADRs in the name or upon the order of the person entitled thereto evidencing the number of ADSs to which such person is entitled. All of the ADSs issued will, unless specifically requested to the contrary, be part of the depositary's direct registration system, and a registered holder will receive periodic statements from the depositary which will show the number of ADSs registered in such holder's name. An ADR holder can request that the ADSs not be held through the depositary's direct registration system and that a certificated ADR be issued.

### *How do ADR holders cancel an ADS and obtain deposited securities?*

When you turn in your ADSs at the depositary's office, or when you provide proper instructions and documentation in the case of ADSs within the depositary's direct registration system, the depositary will, upon payment of certain applicable fees, charges and taxes, deliver the underlying shares at the custodian's office or effect delivery by such other means as the depositary deems practicable, including transfer to an account of an accredited financial institution on your behalf. At your risk, expense and request, the depositary may deliver deposited securities at such other place as you may request.

The depositary may only restrict the withdrawal of deposited securities in connection with:

• temporary delays caused by the closing of our transfer books or those of the depositary, the deposit of shares in connection with voting at our shareholders' meeting or the payment of dividends;

• the payment of fees, taxes and similar charges; or

• compliance with any U.S. or foreign laws or governmental regulations relating to the ADRs or to the withdrawal of deposited securities.

This right of withdrawal may not be limited by any other provision of the deposit agreement.

## Record Dates

The depositary may fix record dates for the determination of the ADR holders who will be:

• entitled to receive dividends, distributions or rights,

• entitled to give instructions for the exercise of voting rights at a meeting of holders of ordinary shares or other deposited securities,

• obligated to pay fees assessed by the depositary for administration of the ADR program and for any expenses as provided for in the deposit agreement, or

• entitled to receive any notice or to act in respect of other matters,

all subject to the provisions of the deposit agreement.

## Voting Rights

### *How do I vote?*

If you are an ADR holder and the depositary asks you to provide it with voting instructions, you may instruct the depositary how to exercise the voting rights for the shares that underlie your ADSs. After receiving voting materials from us, the depositary will notify the ADR holders of any shareholders meeting or solicitation of consents or proxies. This notice will provide such information as is contained in the voting materials and describe how you may instruct the depositary to exercise the voting rights for the shares that underlie your ADSs. It will also include instructions for giving a discretionary proxy to a person designated by us. For instructions to be valid, the depositary must receive them in the manner and on or before the date specified. The depositary will try, as far as practical, subject to the provisions of or governing the underlying shares or other deposited securities, to vote or to have its agents vote the shares or other deposited securities as you instruct. The depositary will only vote or attempt to vote as you instruct. The depositary will not itself exercise any voting discretion. Furthermore, neither the depositary nor its agents are responsible for any failure to carry out any voting instructions, for the manner in which any vote is cast or for the effect of any vote.

There is no guarantee that you will receive voting materials in time to instruct the depositary to vote and it is possible that you, whether you hold your ADSs through brokers, dealers or other third parties, will not have the opportunity to exercise a right to vote.

107

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

**Reports and Other Communications**

*Will I be able to view our reports?*

The depositary will make available for inspection by ADR holders any written communications from us which are both received by the custodian or its nominee as a holder of deposited securities and made generally available to the holders of deposited securities. We will furnish these communications in English when so required by any rules or regulations of the Securities and Exchange Commission.

Additionally, if we make any written communications generally available to holders of our shares, including the depositary or the custodian, and we request the depositary to provide them to ADR holders, the depositary will mail copies of them or, at its option, English translations or summaries of them to ADR holders.

**Fees and Expenses**

*What fees and expenses will I be responsible for paying?*

ADR holders will be charged a fee for each issuance of ADSs, including issuances resulting from distributions of shares, rights and other property, and for each surrender of ADSs in exchange for deposited securities. The fee in each case is $5.00 for each 100 ADSs (or any portion thereof) issued or surrendered.

The following additional charges will be incurred by the ADR holders, by any party depositing or withdrawing shares or by any party surrendering ADRs or to whom ADRs are issued (including issuance pursuant to a stock dividend or stock split declared by us or an exchange of stock regarding the ADRs or the deposited securities or a distribution of ADRs), whichever is applicable:

- to the extent not prohibited by the rules of any stock exchange or interdealer quotation system upon which the ADSs are traded, a fee of $1.50 per ADR or ADRs for transfers of certificated ADRs or ADRs in the depositary's direct registration system;

- a fee of $0.02 or less per ADS (or portion thereof) for any cash distribution made pursuant to the deposit agreement;

- a fee of $0.02 per ADS (or portion thereof) per calendar year for services performed by the depositary in administering our ADR program (which fee will be assessed against holders of ADRs as of the record date set by the depositary not more than once each calendar year and will be payable in the manner described in the next succeeding provision);

- any other charge payable by the depositary, any of the depositary's agents, including the custodian, or the agents of the depositary's agents in connection with the servicing of our shares or other deposited securities (which charge will be assessed against registered holders of our ADRs as of the record date or dates set by the depositary and will be payable at the sole discretion of the depositary by billing such registered holders or by deducting such charge from one or more cash dividends or other cash distributions);

- a fee for the distribution of securities (or the sale of securities in connection with a distribution), such fee being in an amount equal to the fee for the execution and delivery of ADSs which would have been charged as a result of the deposit of such securities (treating all such securities as if they were shares) but which securities or the net cash proceeds from the sale thereof are instead distributed by the depositary to those holders entitled thereto;

- stock transfer or other taxes and other governmental charges;

- cable, telex and facsimile transmission and delivery charges incurred at your request;

- transfer or registration fees for the registration of transfer of deposited securities on any applicable register in connection with the deposit or withdrawal of deposited securities;

- expenses of the depositary in connection with the conversion of foreign currency into U.S. dollars; and

- such fees and expenses as incurred by the depositary (including, without limitation, expenses incurred in connection with compliance with foreign exchange control regulations or any law or regulation

108

relating to foreign investment) in delivery of deposited securities or otherwise in connection with the depositary's or its custodian's compliance with applicable laws, rules or regulations.

We will pay all other charges and expenses of the depositary and any agent of the depositary (except the custodian) pursuant to agreements from time to time between us and the depositary. The fees described above may be amended from time to time.

Our depositary has agreed to reimburse us for certain expenses we incur that are related to the establishment and maintenance of our ADR program, including investor relations expenses and New York Stock Exchange application and listing fees. There are limits on the amount of expenses for which the depositary will reimburse us, but the amount of reimbursement available to us is not related to the amounts of fees the depositary collects from investors. The depositary collects its fees for the issuance and cancellation of ADSs directly from investors depositing shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The depositary also collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deduction from cash distributions, directly billing investors, or charging the book-entry system accounts of participants acting for them. The depositary may generally refuse to provide services to any holder until the fees and expenses owed by such holder for those services or otherwise are paid.

**Payment of Taxes**

ADR holders must pay any tax or other governmental charge payable by the custodian or the depositary on any ADS or ADR, deposited security or distribution. If an ADR holder owes any tax or other governmental charge, the depositary may (i) deduct the amount thereof from any cash distributions or (ii) sell deposited securities and deduct the amount owing from the net proceeds of such sale. In either case, the ADR holder remains liable for any shortfall. Additionally, if any tax or governmental charge is unpaid, the depositary may also refuse to effect any registration, registration of transfer, split-up or combination of deposited securities or withdrawal of deposited securities (except under limited circumstances mandated by securities regulations). If any tax or governmental charge is required to be withheld on any non-cash distribution, the depositary may sell the distributed property or securities to pay such taxes and distribute any remaining net proceeds to the ADR holders entitled thereto.

By holding an ADR or an interest therein, you are agreeing to indemnify us, the depositary, its custodian and any of our or their respective directors, employees, agents and affiliates against, and hold each of them harmless from, any claims by any governmental authority with respect to taxes, additions to tax, penalties or interest arising out of any refund of taxes, reduced rate of withholding at source or other tax benefit obtained in respect of, or arising out of, your ADSs.

**Reclassifications, Recapitalizations and Mergers**

If we take certain actions that affect the deposited securities, including (i) any change in par value, split-up, consolidation, cancellation or other reclassification of deposited securities or (ii) any recapitalization, reorganization, merger, consolidation, liquidation, receivership, bankruptcy or sale of all or substantially all of our assets, then the depositary may choose to:

• amend the form of ADR;

• distribute additional or amended ADRs;

• distribute cash, securities or other property it has received in connection with such actions;

• sell any securities or property received and distribute the proceeds as cash; or

• none of the above.

If the depositary does not choose any of the above options, any of the cash, securities or other property it receives will constitute part of the deposited securities and each ADS will then represent a proportionate interest in such property.

109

Table of Contents

**Amendment and Termination**

*How may the deposit agreement be amended?*

We may agree with the depositary to amend the deposit agreement and the ADRs without your consent for any reason. ADR holders must be given at least 30 days notice of any amendment that imposes or increases any fees or charges (other than stock transfer or other taxes and other governmental charges, transfer or registration fees, cable, telex or facsimile transmission costs, delivery costs or other such expenses), or prejudices any substantial existing right of ADR holders. If an ADR holder continues to hold an ADR or ADRs after being so notified, such ADR holder is deemed to agree to such amendment. Notwithstanding the foregoing, if any governmental body or regulatory body should adopt new laws, rules or regulations which would require amendment to or supplement of the deposit agreement or the form of ADR to ensure compliance therewith, we and the depositary may amend or supplement the deposit agreement and the ADR at any time in accordance with such changed laws, rules or regulations, which amendment or supplement may take effect before a notice is given or you otherwise receive notice. No amendment, however, will impair your right to surrender your ADSs and receive the underlying securities.

*How may the deposit agreement be terminated?*

The depositary may terminate the deposit agreement by giving the ADR holders at least 30 days prior notice, and it must do so at our request. The deposit agreement will be terminated on the removal of the depositary for any reason. After termination, the depositary's only responsibility will be:

• to deliver deposited securities to ADR holders who surrender their ADRs, and

• to hold or sell distributions received on deposited securities.

As soon as practicable after the expiration of six months from the termination date, the depositary will sell the deposited securities that remain and hold the net proceeds of such sales, without liability for interest, in trust for the ADR holders who have not yet surrendered their ADRs. After making such sale, the depositary will have no obligations except to account for such proceeds and other cash. The depositary will not be required to invest such proceeds or pay interest on them.

**Limitations on Obligations and Liability to ADR Holders**

*Limits on our obligations and the obligations of the depositary; limits on liability to holders of ADSs*

Prior to the issuance, registration, registration of transfer, split-up, combination, or cancellation of any ADRs, or the delivery of any distribution in respect thereof, the depositary and its custodian may require you to pay, provide or deliver:

• payment with respect thereto of (i) any stock transfer or other tax or other governmental charge, (ii) any stock transfer or registration fees in effect for the registration of transfers of shares or other deposited securities upon any applicable register and (iii) any applicable fees and expenses described in the deposit agreement;

• the production of proof satisfactory to the depositary and its custodian of (i) the identity of any signatory and genuineness of any signature and (ii) such other information, including information as to citizenship, residence, exchange control approval, beneficial ownership of any securities, payment of applicable taxes or governmental charges, or legal or beneficial ownership and the nature of such interest, information relating to the registration of the shares on the books maintained by or on our behalf for the transfer and registration of shares, compliance with applicable laws, regulations, provisions of or governing deposited securities and terms of the deposit agreement and the ADRs, as it may deem necessary or proper; and

• compliance with such regulations as the depositary may establish consistent with the deposit agreement.

110

Table of Contents

The deposit agreement expressly limits the obligations and liability of the depositary, ourselves and our respective agents. Neither we nor the depositary nor any such agent will be liable if:

- present or future law, rule or regulation of the United States, China, the Cayman Islands or any other country, or of any governmental or regulatory authority or securities exchange or market or automated quotation system, the provisions of or governing any deposited securities, any present or future provision of our charter, any act of God, war, terrorism or other circumstance beyond our, the depositary's or our respective agent's control will prevent, delay or subject to any civil or criminal penalty any act that the deposit agreement or the ADRs provide should be done or performed by us, the depositary or our respective agents (including voting);

- the depositary or its agents exercise or fail to exercise discretion under the deposit agreement or the ADRs;

- the depositary or its agents perform their obligations without gross negligence or bad faith;

- the depositary or its agents take any action or refrain from taking any action in reliance upon the advice of or information from legal counsel, accountants, any person presenting shares for deposit, any registered holder of ADRs, or any other person believed by it to be competent to give such advice or information; or

- the depositary or its agents rely upon any written notice, request, direction or other document believed by it to be genuine and to have been signed or presented by the proper party or parties.

Neither the depositary nor its agents have any obligation to appear in, prosecute or defend any action, suit or other proceeding in respect of any deposited securities or the ADRs. We and our agents will only be obligated to appear in, prosecute or defend any action, suit or other proceeding in respect of any deposited securities or the ADRs that, in our opinion, may involve us in expense or liability if indemnity to our satisfaction against all expenses (including fees and disbursements of counsel) and liabilities is furnished to us as often as we may require. The depositary and its agents may fully respond to any and all demands or requests for information maintained by or on their behalf in connection with the deposit agreement, any registered holder or holders of ADRs, any ADSs or otherwise to the extent such information is requested or required by or pursuant to any lawful authority, including laws, rules, regulations, administrative or judicial process, banking, securities or other regulators.

As disclosed previously, the depositary will not be responsible for failing to carry out instructions to vote the deposited securities or for the manner in which the deposited securities are voted or the effect of the vote. In no event shall we, the depositary or any of our respective agents be liable to holders of ADSs or interests therein for any indirect, special, punitive or consequential damages.

The depositary may own and deal in deposited securities and in ADSs.

### Disclosure of Interest in ADSs

To the extent that the provisions of or governing any deposited securities may require disclosure of or impose limits on beneficial or other ownership of deposited securities, other shares and other securities and may provide for blocking transfer, voting or other rights to enforce such disclosure or limits, you agree to comply with all such disclosure requirements and ownership limitations and to comply with any reasonable instructions we may provide in respect thereof. We reserve the right to request you to deliver your ADSs for cancellation and withdrawal of the deposited securities so as to permit us to deal with you directly as a holder of deposited securities and, by holding an ADS or an interest therein, you will be agreeing to comply with such instructions.

### Requirements for Depositary Actions

We, the depositary or the custodian may refuse to:

- issue, register or transfer an ADR or ADRs;

- effect a split-up or combination of ADRs;

111

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

- deliver distributions on any ADRs; or

- permit the withdrawal of deposited securities (unless the deposit agreement provides otherwise);

until the following conditions have been met:

- the holder has paid all taxes, governmental charges, and fees and expenses as required in the deposit agreement;

- the holder has provided the depositary with any information it may deem necessary or proper, including, without limitation, proof of identity and the genuineness of any signature; and

- the holder has complied with such regulations as the depositary may establish under the deposit agreement.

The depositary may also suspend the issuance of ADSs, the deposit of shares, the registration, transfer, split-up or combination of ADRs, or the withdrawal of deposited securities (unless the deposit agreement provides otherwise), if the register for ADRs or any deposited securities is closed or the depositary decides it is advisable to do so.

**Books of Depositary**

The depositary or its agent will maintain a register for the registration, registration of transfer, combination and split-up of ADRs, which register will include the depositary's direct registration system. You may inspect such records at such office during regular business hours, but solely for the purpose of communicating with other holders in the interest of business matters relating to the deposit agreement. Such register may be closed from time to time when deemed expedient by the depositary.

The depositary will maintain facilities to record and process the issuance, cancellation, combination, split-up and transfer of ADRs. These facilities may be closed from time to time to the extent not prohibited by law.

**Pre-release of ADSs**

The depositary may issue ADSs prior to the deposit with the custodian of shares (or rights to receive shares) in compliance with the deposit agreement. This is called a pre-release of ADSs. A pre-release is closed out as soon as the underlying shares (or rights to receive shares from us or from any registrar, transfer agent or other entity recording share ownership or transactions) are delivered to the depositary. The depositary may pre-release ADSs only if:

- the depositary has received collateral for the full market value of the pre-released ADSs (marked to market daily); and

- each recipient of pre-released ADSs agrees in writing that he or she:

  - owns the underlying shares,

  - assigns all rights in such shares to the depositary,

  - holds such shares for the account of the depositary, and

  - will deliver such shares to the custodian as soon as practicable, and promptly if the depositary so demands.

In general, the number of pre-released ADSs will not evidence more than 30% of all ADSs outstanding at any given time (excluding those evidenced by pre-released ADSs). However, the depositary may change or disregard such limit from time to time as it deems appropriate. The depositary may retain for its own account any earnings on collateral for pre-released ADSs and its charges for issuance thereof.

112

Table of Contents

**Appointment**

In the deposit agreement, each holder and each person holding an interest in ADSs, upon acceptance of any ADSs (or any interest therein) issued in accordance with the terms and conditions of the deposit agreement will be deemed for all purposes to:

• be a party to and bound by the terms of the deposit agreement and the applicable ADR or ADRs, and

• appoint the depositary its attorney-in-fact, with full power to delegate, to act on its behalf and to take any and all actions contemplated in the deposit agreement and the applicable ADR or ADRs, to adopt any and all procedures necessary to comply with applicable laws and to take such action as the depositary in its sole discretion may deem necessary or appropriate to carry out the purposes of the deposit agreement and the applicable ADR and ADRs, the taking of such actions to be the conclusive determinant of the necessity and appropriateness thereof.

113

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

## SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this offering, we will have outstanding                ADSs representing                % of our ordinary shares, assuming no exercise of the over-allotment option. All of the ADSs sold in this offering and the ordinary shares they represent will be freely transferable by persons other than our "affiliates" without restriction or further registration under the Securities Act. Sales of substantial amounts of our ADSs in the public market could adversely affect prevailing market prices of our ADSs. Prior to this offering, there has been no public market for our ADSs, and while application has been made for the ADSs to be listed on the New York Stock Exchange, we cannot assure you that a regular trading market will develop in the ADSs. We have not listed and do not expect to list our ordinary shares.

### Lock-Up Agreements

We have agreed that, without the prior written consent of each of Morgan Stanley & Co. International plc and UBS AG, we will not, during the period ending 180 days after the date of this prospectus:

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any ordinary shares, ADSs or any securities convertible into or exercisable or exchangeable for ordinary shares or ADSs, or enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the ordinary shares or ADSs, whether any such transaction described above is to be settled by delivery of our ordinary shares or ADSs or such other securities, in cash or otherwise; or

- file any registration statement with the Securities and Exchange Commission relating to the offering of any ordinary shares, ADSs or any securities convertible into or exercisable or exchangeable for ordinary shares or ADSs.

These restrictions do not apply to:

- the sale of our ordinary shares in the form of ADSs to the underwriters in this offering; and

- the issuance by us of ordinary shares upon the exercise of options pursuant to our 2006 stock incentive plan.

Each of our selling shareholders, directors, executive officers, other existing shareholders and certain of our existing optionholders have agreed that, without the prior written consent of each of Morgan Stanley & Co. International plc and UBS AG, they will not, during the period ending 180 days (or 12 months in the case of LDK New Energy) after the date of this prospectus:

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any ordinary shares, ADSs, or any securities convertible into or exercisable or exchangeable for our ordinary shares or ADSs; or

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of our ordinary shares or ADSs;

whether any such transaction described above is to be settled by delivery of our ordinary shares or ADSs or such other securities of ours, in cash or otherwise.

These restrictions do not apply to:

- the sale by the selling shareholders of our ordinary shares in the form of ADSs to the underwriters in this offering; and

- transactions relating to our ordinary shares, ADSs or other securities acquired in open market transactions after the completion of this offering, provided that no filing under Section 16(a) of the Securities Exchange Act of 1934 will be required or will be voluntarily made in connection with subsequent sales of our ordinary shares, ADSs or other securities of ours acquired in such open market transactions.

Each of our selling shareholders, directors, executive officers, other existing shareholders and certain of our existing optionholders have also agreed that, without the prior written consent of each of Morgan Stanley

114

Table of Contents

& Co. International plc and UBS AG, they will not, during the period ending 180 days after the date of this prospectus, make any demand for or exercise any right with respect to, the registration of any of our ordinary shares or ADSs or any security convertible into or exercisable or exchangeable for our ordinary shares or ADSs.

In addition, each of our selling shareholders, directors, executive officers, other existing shareholders and certain of our existing optionholders have agreed and consented to the entry of stop transfer instructions with our transfer agent and registrar against the transfer of our ordinary shares or ADSs except in compliance with the foregoing restrictions.

The 180-day (or 12-month, in the case of LDK New Energy) lock-up period is subject to adjustment under certain circumstances. If:

- during the last 17 days of the 180-day (or 12-month, in the case of LDK New Energy) lock-up period, we issue an earnings release or material news or a material event relating to us occurs; or

- prior to the expiration of the 180-day (or 12-month, in the case of LDK New Energy) lock-up period, we announce that we will release earnings results during the 16-day period beginning on the last day of the 180-day (or 12-month, in the case of LDK New Energy) lock-up period,

the lock-up will continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event; provided that the second bullet point above will not apply to the selling shareholders.

## Rule 144

In general, under Rule 144 as currently in effect, a person (or persons whose shares are aggregated) who has beneficially owned our ordinary shares for at least one year, is entitled to sell within any three-month period a number of ordinary shares that are "restricted securities" under the Securities Act that does not exceed the greater of the following:

- 1% of the then outstanding ordinary shares, in the form of ADSs or otherwise, which will equal approximately       million shares immediately after this offering; or

- the average weekly trading volume of our ordinary shares, in the form of ADSs or otherwise, during the four calendar weeks preceding the date on which notice of the sale is filed with the Securities and Exchange Commission.

Sales under Rule 144 must be through unsolicited brokers' transactions. They are also subject to manner of sale provisions, notice requirements and the availability of current public information about us.

## Rule 144(k)

Under Rule 144(k), a person who is not one of our affiliates at any time during the three months preceding a sale and who has beneficially owned the shares, in the form of ADSs or otherwise, proposed to be sold for at least two years, including the holding period (in case of restricted securities) of any prior owner other than an affiliate, is entitled to sell those shares without complying with the manner of sale, public information, volume limitation or notice provisions of Rule 144. Therefore, unless otherwise restricted, "144(k) shares" may be sold at any time.

115

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**Rule 701**

In general, under Rule 701 of the Securities Act as currently in effect, beginning 90 days after the date of this prospectus, each of our employees, consultants or advisors who purchases shares, in the form of ADSs or otherwise, from us in connection with a compensatory stock plan or other written agreement is eligible to resell such shares in reliance on Rule 144, but without compliance with some of the restrictions, including the holding period, contained in Rule 144.

**Registration Rights**

Upon completion of this offering, certain holders of our ordinary shares or their transferees will be entitled to request that we register their shares under the Securities Act, following the expiration of the lock-up agreements described above. See "Description of Share Capital — Registration Rights" in this prospectus.

116

## TAXATION

The following summary of material Cayman Islands and United States federal tax consequences of an investment in our ordinary shares or ADSs is based upon laws and relevant interpretations thereof in effect as of the date of this prospectus, all of which are subject to change. This summary does not deal with all possible tax consequences relating to an investment in our ordinary shares or ADSs, such as the tax consequences under state, local and other tax laws. To the extent that the discussion relates to matters of Cayman Islands tax law, it represents the opinion of Conyers Dill & Pearman, special Cayman Islands counsel to us. To the extent the discussion relates to matters of United States law or legal conclusions and subject to the qualifications herein, it represents the opinion of Sidley Austin LLP, our special U.S. counsel.

### Cayman Islands Taxation

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us levied by the government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or after execution brought within the jurisdiction of, the Cayman Islands. The Cayman Islands is not party to any double tax treaties. There are no exchange control regulations or currency restrictions in the Cayman Islands.

### United States Federal Income Taxation

The following is a summary of material United States federal tax consequences under present law of an investment in our ordinary shares or ADSs. This summary applies only to investors that hold our ordinary shares or ADSs as capital assets and that have the U.S. dollar as their functional currency.

The following discussion does not deal with the tax consequences to any particular investor or to persons in special tax situations such as:

- banks;

- financial institutions;

- insurance companies;

- broker dealers;

- traders in securities that elect to mark-to-market;

- tax-exempt entities;

- persons liable for alternative minimum tax;

- persons holding an ordinary share or ADS as part of a straddle, constructive sale, hedging, conversion or integrated transaction;

- holders that actually or constructively own 10% or more of our voting stock; or

- holders holding ordinary shares or ADSs through partnerships or other pass-through entities.

**Prospective purchasers are urged to consult their tax advisors about the United States federal, state and local tax consequences to them of the purchase, ownership and disposition of our ordinary shares or ADSs.**

The discussion below of the United States federal income tax consequences to "U.S. Holders" will apply if you are the beneficial owner of ordinary shares or ADSs and you are for United States federal income tax purposes:

- an individual citizen or resident of the United States;

- a corporation (or other entity treated as a corporation for United States federal income tax purposes) organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate whose income is subject to United States federal income taxation regardless of its source;

- a trust that is subject to the primary supervision of a court within the United States and the control of one or more United States persons; or

117

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

• a trust that has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person.

If you are not described as a U.S. Holder, you will be considered a "Non-U.S. Holder." Non-U.S. Holders should consult the discussion below regarding the United States federal income tax consequences applicable to Non-U.S. Holders.

If a partnership holds ordinary shares or ADSs, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding ordinary shares or ADSs, you should consult your tax advisor.

The discussion below assumes that the representations contained in the deposit agreement are true and that the obligations in the deposit agreement and any related agreement will be performed in accordance with the terms. If you hold ADSs, you generally will be treated as the owner of the underlying ordinary shares represented by those ADSs for United States federal income tax purposes. Accordingly, deposits or withdrawals of shares for ADSs will not be subject to United States federal income tax.

## U.S. Holders

### *Taxation of dividends and other distributions on the ordinary shares or ADSs*

Subject to the passive foreign investment company, or PFIC, rules discussed below, all our distributions to you with respect to the ordinary shares or ADSs, other than certain pro rata distributions of our ordinary shares or ADSs, will be includible in your gross income as ordinary dividend income when you, in the case of ordinary shares, or the depositary, in the case of ADSs, receive the distribution, but only to the extent that the distribution is paid out of our current or accumulated earnings and profits. For this purpose, earnings and profits will be computed under United States federal income tax principles. The dividends will not be eligible for the dividends-received deduction allowed to corporations. To the extent that the amount of the distribution exceeds our current and accumulated earnings and profits, it will be treated first as a tax-free return of your tax basis in your ordinary shares or ADSs, and to the extent the amount of the distribution exceeds your tax basis, the excess will be taxed as capital gain.

With respect to individual U.S. Holders, for taxable years beginning before January 1, 2011, dividends may be taxed at the lower applicable capital gains rate provided that (1) the ADS or ordinary shares, as applicable, are readily tradable on an established securities market in the United States, (2) we are not a PFIC (as discussed below) for either our taxable year in which the dividend was paid or the preceding taxable year, and (3) certain holding period requirements are met. Common or ordinary shares, or ADSs representing such shares, are considered for purposes of clause (1) above to be readily tradable on an established securities market in the United States if they are listed on the Nasdaq Stock Market or on certain registered national exchanges. Our ordinary shares are not readily tradable on an established securities market in the United States; consequently, dividends received with respect to such shares are ineligible to be taxed at the lower capital gains rate. The ADSs will be listed on the New York Stock Exchange, however, and thus will qualify as readily tradable on an established securities market in the United States. Moreover, as explained in further detail below, we do not expect to be treated as a PFIC for our current taxable year, and we do not expect to become a PFIC in the future. You should consult your tax advisor regarding the availability of the lower rate for dividends paid with respect to our ADSs or ordinary shares.

Dividends will constitute foreign source income for foreign tax credit limitation purposes. The rules governing the foreign tax credit are complex. Investors are urged to consult their tax advisors regarding the availability of the foreign tax credit under their particular circumstances.

### *Taxation of disposition of ordinary shares or ADSs*

Subject to the PFIC rules discussed below, you will recognize taxable gain or loss on any sale or exchange of an ordinary share or ADS equal to the difference between the amount realized (in U.S. dollars) for the ordinary share or ADS and your tax basis (in U.S. dollars) in the ordinary share or ADS. The gain or loss will generally be capital gain or loss. If you are an individual who has held the ordinary share or ADS for more than one year, you will be eligible for reduced rates of taxation (generally 15%). You may deduct any loss resulting from the sale or exchange of an ordinary share or ADS only against other capital gains. If you are an

118

Table of Contents

individual, up to $3,000 of capital loss in excess of your capital gains may be deducted against ordinary income. Excess losses may be carried forward. Any gain or loss that you recognize will generally be treated as a United States source gain or loss.

*Passive foreign investment company*

We believe that we are not a PFIC for United States federal income tax purposes and do not expect to become a PFIC in the future. A company is considered a PFIC for any taxable year if either

• at least 75% of its gross income is passive income, or

• at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income.

For purposes of the foregoing PFIC tests, we will be treated as owning our proportionate share of the assets and earnings and our proportionate share of the income of any other corporation in which we own, directly or indirectly, more than 25% (by value) of the stock.

We must make a separate determination each year as to whether we are a PFIC. As a result, our PFIC status may change. In addition, the composition of our income and assets will be affected by how, and how quickly, we spend the cash we raise in this offering. If we are a PFIC for any year during which you hold our ordinary shares or ADSs, we generally will continue to be treated as a PFIC for all succeeding years during which you hold our ordinary shares or ADSs.

If we are a PFIC for any taxable year during which you hold our ordinary shares or ADSs, you will be subject to special tax rules with respect to any "excess distribution" that you receive and any gain you realize from a sale or other disposition (including a pledge) of the ordinary shares or ADSs, unless you make a "mark-to-market" election as discussed below. Distributions you receive in a taxable year that are greater than 125% of the average annual distributions you received during the shorter of the three preceding taxable years or your holding period for the ordinary shares or ADSs will be treated as an excess distribution. Under these special tax rules:

• the excess distribution or gain will be allocated ratably over your holding period for the ordinary shares or ADSs,

• the amount allocated to the current taxable year, and to any taxable year prior to the first taxable year in which we were a PFIC, will be treated as ordinary income, and

• the amount allocated to each other year will be subject to tax at the highest tax rate in effect for that year and the interest charge generally applicable to underpayments of tax will be imposed on the resulting tax attributable to each such year.

The tax liability for amounts allocated to years prior to the year of disposition or "excess distribution" cannot be offset by any net operating losses, and gains (but not losses) realized on the sale of the ordinary shares or ADSs cannot be treated as capital, even if you hold the ordinary shares or ADSs as capital assets.

A U.S. Holder of "marketable stock" (as defined below) in a PFIC may make a mark-to-market election for such stock of a PFIC to elect out of the tax treatment discussed in the preceding two paragraphs. If you make a mark-to-market election for the ordinary shares or ADSs, you will include in income each year an amount equal to the excess, if any, of the fair market value of the ordinary shares or ADSs as of the close of your taxable year over your adjusted basis in such ordinary shares or ADSs. You are allowed a deduction for the excess, if any, of the adjusted basis of the ordinary shares or ADSs over their fair market value as of the close of the taxable year. However, deductions are allowable only to the extent of any net mark-to-market gains on the ordinary shares or ADSs included in your income for prior taxable years. Amounts included in your income under a mark-to-market election, as well as gain on the actual sale or other disposition of the ordinary shares or ADSs, are treated as ordinary income. Ordinary loss treatment also applies to the deductible portion of any mark-to-market loss on the ordinary shares or ADSs, as well as to any loss realized on the actual sale or disposition of the ordinary shares or ADSs, to the extent that the amount of such loss does not exceed the net mark-to-market gains previously included for such ordinary shares or ADSs.

119

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Your basis in the ordinary shares or ADSs will be adjusted to reflect any such income or loss amounts. The tax rules that apply to distributions by corporations which are not PFICs would apply to distributions by us.

The mark-to-market election is available only for "marketable stock," which is any stock that is regularly traded in other than *de minimis* quantities on at least 15 days during each calendar quarter on a qualified exchange, including the New York Stock Exchange, or other market, as defined in applicable U.S. Treasury regulations. We expect that our ADSs will be listed and regularly traded on the New York Stock Exchange and, consequently, the mark-to-market election would be available to you with respect to the ADSs were we to be or become a PFIC.

Alternatively, if we are a PFIC, you may avoid taxation under the rules described above by making a "qualified electing fund" election to include your share of our income on a current basis, or a "deemed sale" election once we no longer qualify as a PFIC. However, you may make a qualified electing fund election only if we agree to furnish you annually with certain tax information, and we do not presently intend to prepare or provide such information.

Non-corporate U.S. Holders will not be eligible for reduced rates of taxation on any dividends received from us prior to January 1, 2011, if we are a PFIC in the taxable year in which such dividends are paid or in the preceding taxable year.

If you hold our ordinary shares or ADSs in any year in which we are a PFIC, you would be required to file Internal Revenue Service Form 8621 regarding distributions received on the ordinary shares or ADSs and any gain realized on the disposition of the ordinary shares or ADSs.

You are urged to consult your tax advisor regarding the application of the PFIC rules to your investment in our ordinary shares or ADSs.

**Non-U.S. Holders**

If you are a Non-U.S. Holder, you generally will not be subject to United States federal income tax on dividends paid by us unless the income is effectively connected with your conduct of a trade or business in the United States.

You generally will not be subject to United States federal income tax on any gain attributable to a sale or other disposition of the ordinary shares or ADSs unless such gain is effectively connected with your conduct of a trade or business within the United States or you are a natural person who is present in the United States for 183 days or more and certain other conditions exist.

Dividends and gains that are effectively connected with your conduct of a trade or business in the United States generally will be subject to tax in the same manner as they would be if you were a U.S. Holder. Effectively connected dividends and gains received by a corporate Non-U.S. Holder may also be subject to an additional branch profits tax at a 30% rate or a lower tax treaty rate.

**Information Reporting and Backup Withholding**

In general, information reporting for United States federal income tax purposes will apply to distributions made on the ordinary shares or ADSs paid within the United States to a non-corporate United States person and on sales or other dispositions of the ordinary shares or ADSs to or through a United States office of a broker by a non-corporate United States person. Payments made outside the United States will be subject to information reporting in limited circumstances.

In addition, backup withholding of United States federal income tax at a rate of 28% will apply to distributions made on ordinary shares or ADSs within the United States to a non-corporate United States

120

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

person and on sales of ordinary shares or ADSs to or through a United States office of a broker by a non-corporate United States person who:

- fails to provide an accurate taxpayer identification number,

- is notified by the Internal Revenue Service that backup withholding will be required, or

- in certain circumstances, fails to comply with applicable certification requirements.

The amount of any backup withholding collected will be allowed as a credit against United States federal income tax liability provided that appropriate returns are filed.

A Non-U.S. Holder generally may eliminate the requirement for information reporting and backup withholding by providing certification of its foreign status to the payor, under penalties of perjury, on Internal Revenue Service Form W-8BEN.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## UNDERWRITING

Under the terms and subject to the conditions contained in an underwriting agreement dated the date of this prospectus, the underwriters named below, for whom Morgan Stanley & Co. International plc and UBS AG are acting as representatives, have severally agreed to purchase, and we and the selling shareholders have agreed to sell to them, severally, the number of ADSs indicated below:

| Name | Number of ADSs |
|------|---------------|
| Morgan Stanley & Co. International plc | |
| UBS AG | |
| Piper Jaffray & Co. | |
| CIBC World Markets Corp. | |
| CLSA Limited | |
| Total | |

The underwriting agreement provides that the obligations of the several underwriters to pay for and accept delivery of the ADSs offered by this prospectus are subject to the approval of certain legal matters by their counsel and to certain other conditions. The underwriters are obligated, severally and not jointly, to take and pay for all of the ADSs offered by this prospectus if any such ADSs are taken. However, the underwriters are not required to take or pay for the ADSs covered by the underwriters' over-allotment option described below. Morgan Stanley & Co. International plc will offer ADSs in the United States through its registered broker-dealer affiliate in the United States, Morgan Stanley & Co. Incorporated. UBS AG will offer ADSs in the United States through its registered broker-dealer affiliate in the United States, UBS Securities LLC.

The underwriters initially propose to offer part of the ADSs directly to the public at the public offering price listed on the cover page of this prospectus and part to certain dealers at a price that represents a concession not in excess of $        per ADS under the public offering price. Any underwriter may allow, and such dealers may re-allow, a concession not in excess of $        an ADS to other underwriters or to certain dealers. After the initial offering of the ADSs, the offering price and other selling terms may from time to time be varied by the representatives.

We and the selling shareholders have granted to the underwriters an option, exercisable for 30 days from the date of this prospectus, to purchase up to an aggregate of        additional ADSs at the public offering price set forth on the cover page of this prospectus, less underwriting discounts and commissions. To the extent the option is exercised, each underwriter will become obligated, subject to certain conditions, to purchase about the same percentage of the additional ADSs as the number listed next to the underwriter's name in the preceding table bears to the total number of ADSs listed next to the names of all underwriters in the preceding table. If the underwriters' option is exercised in full, the total price to the public would be $        million, the total underwriters' discounts and commissions would be $        million, total proceeds to us (before expenses) would be $        million and total proceeds to the selling shareholders (before expenses) would be $        million.

The underwriting discounts and commissions are determined by negotiations among us, the selling shareholders and the representatives and are a percentage of the offering price to the public. Among the factors to be considered in determining the discounts and commissions are the size of the offering, the nature of the security to be offered and the discounts and commissions charged in comparable transactions.

The following table shows the per ADS and total underwriting discounts and commissions to be paid by us and the selling shareholders in connection with this offering. These amounts are shown assuming both no exercise and full exercise of the underwriters' over-allotment option.

| Underwriting Discounts and Commissions to Be Paid by | Per ADS | | Total | |
|------|------|------|------|------|
| | No Exercise | Full Exercise | No Exercise | Full Exercise |
| LDK Solar Co., Ltd. | $ | $ | $ | $ |
| Selling shareholders | $ | $ | $ | $ |

122

Table of Contents

The estimated offering expenses payable by us, in addition to the underwriting discounts and commissions, are approximately $                , which includes legal, accounting and printing costs and various other fees associated with registering and listing the ADSs.

The underwriters have informed us that they do not intend sales to discretionary accounts to exceed 5% of the total number of ADSs offered by them.

We have applied to have the ADSs listed on the New York Stock Exchange under the symbol "LDK." We have agreed that, without the prior written consent of each of Morgan Stanley & Co. International plc and UBS AG, we will not, during the period ending 180 days after the date of this prospectus:

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any ordinary shares, ADSs or any securities convertible into or exercisable or exchangeable for ordinary shares or ADSs, or enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the ordinary shares or ADSs, whether any such transaction described above is to be settled by delivery of our ordinary shares or ADSs or such other securities, in cash or otherwise; or

- file any registration statement with the Securities and Exchange Commission relating to the offering of any ordinary shares, ADSs or any securities convertible into or exercisable or exchangeable for our ordinary shares or ADSs.

These restrictions do not apply to:

- the sale of our ordinary shares in the form of ADSs to the underwriters in this offering; and

- the issuance by us of ordinary shares upon the exercise of options granted pursuant to our 2006 stock incentive plan.

Each of our selling shareholders, directors, executive officers, other existing shareholders and certain of our existing optionholders have agreed that, without the prior written consent of each of Morgan Stanley & Co. International plc and UBS AG, they will not, during the period ending 180 days (or 12 months in the case of LDK New Energy) after the date of this prospectus:

- offer, pledge, sell, contract to sell, sell any option or contract to sell, purchase any option or contract to purchase, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any ordinary shares, ADSs, or any securities convertible into or exercisable or exchangeable for our ordinary shares or ADSs; or

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of our ordinary shares or ADSs,

whether any such transaction described above is to be settled by delivery of our ordinary shares or ADSs or such other securities, in cash or otherwise.

These restrictions do not apply to:

- the sale by the selling shareholders of our ordinary shares in the form of ADSs to the underwriters in this offering; and

- transactions relating to ordinary shares, ADSs or other securities acquired in open market transactions after the completion of this offering, provided that no filing under Section 16(a) of the Securities Exchange Act of 1934 will be required or will be voluntarily made in connection with subsequent sales of our ordinary shares, ADSs or other securities acquired in such open market transactions.

Each of our selling shareholders, directors, executive officers, other existing shareholders and certain of our existing optionholders have also agreed that, without the prior written consent of each of Morgan Stanley & Co. International plc and UBS AG, they will not, during the period ending 180 days after the date of this prospectus, make any demand for or exercise any right with respect to, the registration of any of our ordinary shares or ADSs or any security convertible into or exercisable or exchangeable for our ordinary shares or ADSs.

123

Table of Contents

In addition, each of our selling shareholders, directors, executive officers, other existing shareholders and certain of our existing optionholders have agreed and consented to the entry of stop transfer instructions with our transfer agent and registrar against the transfer of our ordinary shares or ADSs except in compliance with the foregoing restrictions.

The 180-day (or 12-month, in the case of LDK New Energy) lock-up period is subject to adjustment under certain circumstances. If (1) during the last 17 days of the 180-day (or 12-month, in the case of LDK New Energy) lock-up period, we issue an earnings release or material news or a material event relating to us occurs, or (2) prior to the expiration of the 180-day (or 12-month, in the case of LDK New Energy) lock-up period, we announce that we will release earnings results during the 16-day period beginning on the last day of the 180-day lock-up (or 12-month, in the case of LDK New Energy) period, the lock-up will continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event; provided that (2) will not apply to the selling shareholders.

In order to facilitate the offering of the ADSs, the underwriters may engage in transactions that stabilize, maintain or otherwise affect the price of the ADSs. Specifically, the underwriters may sell more ADSs than they are obligated to purchase under the underwriting agreement, creating a short position. A short sale is covered if the short position is no greater than the number of ADSs available for purchase by the underwriters under the over-allotment option. The underwriters can close out a covered short sale by exercising the over-allotment option or purchasing ADSs in the open market. In determining the source of ADSs to close out a covered short sale, the underwriters will consider, among other things, the open market price of ADSs compared to the price available under the over-allotment option. The underwriters may also sell shares in excess of the over-allotment option, creating a naked short position. The underwriters must close out any naked short position by purchasing ADSs in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the ADSs in the open market after pricing that could adversely affect investors who purchase in the offering. As an additional means of facilitating the offering, the underwriters may bid for, and purchase, ADSs in the open market to stabilize the price of the ADSs. The underwriting syndicate may also reclaim selling concessions allowed to an underwriter or a dealer for distributing the ADSs in the offering, if the syndicate repurchases previously distributed ADSs to cover syndicate short positions or to stabilize the price of the ADSs. These activities may raise or maintain the market price of the ADSs above independent market levels or prevent or retard a decline in the market price of the ADSs. Neither we nor any of the underwriters make any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the ADSs. The underwriters are not required to engage in these activities, and may end any of these activities at any time.

From time to time, certain of the underwriters or their respective affiliates have provided, and continue to provide, investment banking services to us, our affiliates and employees, for which they have received and continue to receive customary fees and commission.

We, the selling shareholders and the underwriters have agreed to indemnify each other against certain liabilities, including liabilities under the Securities Act. If we or the selling shareholders are unable to provide this indemnification, we and the selling shareholders will contribute to payments the underwriters and their controlling persons may be required to make in respect of those liabilities.

The address of Morgan Stanley & Co. International plc is 25 Cabot Square, Canary Wharf, London E14 4QA, England. The address of UBS AG is 52/F, Two International Finance Centre, 8 Finance Street, Central, Hong Kong.

**Pricing of the Offering**

Prior to this offering, there has been no public market for the ordinary shares or ADSs. The initial public offering price is determined by negotiations between us, the selling shareholders and the representatives of the underwriters. Among the factors considered in determining the initial public offering price are the future prospects of our company and our industry in general, our sales, earnings and certain other financial operating information in recent periods, and the price-earnings ratios, price-sales ratios, market prices of securities and certain financial and operating information of companies engaged in activities similar to those of our company.

124

The estimated initial public offering price range set forth on the cover page of this preliminary prospectus is subject to change as a result of market conditions and other factors.

**Electronic Offer, Sale and Distribution of ADSs**

In connection with the offering, certain of the underwriters or securities dealers may distribute prospectuses by electronic means, such as e-mail. In addition, Morgan Stanley & Co. International plc and UBS AG may be facilitating Internet distribution for this offering to certain of their Internet subscription customers. An electronic prospectus may be available on the Internet websites maintained by Morgan Stanley & Co. International plc and UBS AG. Other than the prospectus in electronic format, the information on the websites of Morgan Stanley & Co. International plc and UBS AG is not part of this prospectus.

**Selling Restrictions**

No action has been taken in any jurisdiction (except in the United States) that would permit a public offering of the ADSs, or the possession, circulation or distribution of this prospectus or any other material relating to us or the ADSs in any jurisdiction where action for that purpose is required. Accordingly, the ADSs may not be offered or sold, directly or indirectly, and neither this prospectus nor any other offering material or advertisements in connection with the ADSs may be distributed or published, in or from any country or jurisdiction except in compliance with any applicable rules and regulations of any such country or jurisdiction.

The ADSs offered pursuant to this prospectus are not being registered under the Securities Act for the purpose of sales outside the United States.

*Canada.* The distribution of the ADSs in Canada is being made only on a private placement basis exempt from the requirement that we prepare and file a prospectus with the securities regulatory authorities in each province where trades of the ADSs are made. Any resale of the ADSs in Canada must be made under applicable securities laws which will vary depending on the relevant jurisdiction, and which may require resales to be made under available statutory registration and prospectus exemptions or under a discretionary exemption granted by the applicable Canadian securities regulatory authority. Purchasers are advised to seek legal advice prior to any resale of the ADSs.

*European Economic Area.* In relation to each Member State of the European Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), an offer to the public of any ADSs which are the subject of the offering contemplated by this prospectus may not be made in that Relevant Member State, except that an offer to the public in that Relevant Member State of any ADSs may be made at any time under the following exemptions under the Prospectus Directive, if they have been implemented in that Relevant Member State:

•  to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

•  to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000; and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

•  by the underwriters to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of Morgan Stanley & Co. International plc and UBS AG; or

•  in any other circumstances falling within Article 3(2) of the Prospective Directive,

provided that no such offer of ADSs shall result in a requirement for the publication by us or any underwriter of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this paragraph, the expression an "offer to the public" in relation to any ADSs in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and any ADSs to be offered so as to enable an investor to decide to purchase any ADSs, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State, and the expression "Prospectus Directive" means Directive 2003/71/ EC and includes any relevant implementing measure in each Relevant Member State.

125

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

The foregoing selling restriction is in addition to any other selling restrictions set out below.

*United Kingdom.* No offer of ADSs may be made to the public in the United Kingdom within the meaning of Section 102B of the Financial Services and Markets Act 2000, as amended, or FSMA, except to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities or otherwise in circumstances which do not require the publication by us of a prospectus pursuant to the Prospectus Rules of the Financial Services Authority, or FSA. Each underwriter: (i) has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of FSMA) received by it in connection with the issue or sale of any ADSs in circumstances in which Section 21 of FSMA does not apply to us; and (ii) has complied with, and will comply with all applicable provisions of FSMA with respect to anything done by it in relation to the ADSs in, from or otherwise involving the United Kingdom.

The foregoing shall apply in addition to the restrictions set out under the heading "European Economic Area" above.

*Italy.* The offering of the ADSs has not been registered pursuant to Italian securities legislation and, accordingly, no ADSs may be offered, sold or delivered, nor may copies of this prospectus or of any other document relating to the ADSs be distributed in the Republic of Italy, except:

(i) to professional investors *(operatori qualificati)*, as defined by *Commissione Nazionale per le Società e la Borsa* ("CONSOB") in Article 31, second paragraph, of CONSOB Regulation No. 11522 of 1 July 1998, as amended; and

(ii) in circumstances which are exempt from the rules on solicitation of investments pursuant to Article 100 of Legislative Decree No. 58 of 24 February 1998, as amended, and Article 33, first paragraph, of CONSOB Regulation No. 11971 of 14 May 1999, as amended.

Any offer, sale or delivery of the ADSs or distribution of copies of this prospectus or any other document relating to the ADSs in the Republic of Italy under (i) or (ii) above must be:

(a) made by an investment firm, bank or financial intermediary permitted to conduct such activities in the Republic of Italy in accordance with the Financial Services Act and Legislative Decree No. 385 of 1 September 1993, as amended; and

(b) in compliance with any other applicable laws and regulations.

*Australia.* This prospectus is not a disclosure document under Chapter 6D of the Corporations Act, 2001 (Cth), or the Australian Corporation Act, has not been lodged with the Australian Securities and Investments Commission and does not purport to include the information required of a disclosure document under the Australian Corporations Act. Accordingly, (1) the offer of ADSs under this prospectus may only be made to persons to whom it is lawful to offer ADSs without disclosure to investors under Chapter 6D of the Australian Corporations Act under one or more exemptions set out in Section 708 of the Australian Corporations Act, (2) this prospectus may be made available in Australia to persons as set forth in clause (1) above, and (3) the underwriters must send the offeree a notice stating in substance that by accepting this offer, the offeree represents that the offeree is such a person as set forth in clause (2) above and agrees not to sell or offer for sale within Australia any ADS sold to the offeree within 12 months after their transfer to the offeree under this prospectus.

*New Zealand.* At the time any ADS is issued, each underwriter may not offer for subscription any ADS or distribute any advertisement in relation to any ADS to the public in New Zealand and may not acquire any ADS with a view to selling it to the public in New Zealand, nor may it sell or offer for sale any ADS to the public in New Zealand within six months after the issue of such ADS (all such conduct to be interpreted in accordance with the Securities Act 1978), and may therefore enter into such conduct only with:

• persons whose principal business is the investment of money or who, in the course of and for the purposes of their business, habitually invest money, and

• any other person who in all the circumstances can properly be regarded as having been selected otherwise than as a member of the public in New Zealand within the meaning of the Securities Act 1978.

126

Table of Contents

*Japan.* The ADSs have not been and will not be registered under the Securities and Exchange Law of Japan, or the Securities and Exchange Law, and ADSs may not be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to any exemption from the registration requirements of, and otherwise in compliance with, the Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

*Hong Kong.* The ADSs may not be offered or sold by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap.571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), and no advertisement, invitation or document relating to the ADSs may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to ADSs which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap.571, Laws of Hong Kong) and any rules made thereunder. The contents of this prospectus have not been reviewed by any regulatory authority in Hong Kong. You are advised to exercise caution in relation to the offer. If you are in any doubt about any of the contents of this document, you should obtain independent professional advice.

*Singapore.* This prospectus has not been registered as a prospectus or information memorandum with the Monetary Authority of Singapore. No advertisement may be made offering or calling attention to an offer or intended offer of the ADSs to the public in Singapore. The underwriters may not offer or sell ADSs, make ADSs the subject of an invitation for subscription or purchase, or circulate or distribute this prospectus or any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of ADSs, whether directly or indirectly, to the public or any member of the public in Singapore other than:

• to an institutional investor or other person specified in Section 274 of the Securities and Futures Act 2001 of Singapore, or the Securities and Futures Act,

• to a relevant person, or any person pursuant to Section 275(1A) of the Securities and Future Act, and in accordance with the conditions, specified in Section 275 of the Securities and Futures Act, or

• otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the Securities and Futures Act.

Where the ADSs are subscribed or purchased under Section 275 by a relevant person which is:

(a) a corporation (which is not an accredited investor (as defined in Section 4A of the Securities and Futures Act)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investors,

equity shares, debentures and units of equity shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for six months after that corporation or that trust has acquired the ADSs under Section 275 except:

(1) to an institutional investor, or to any person pursuant to an offer that is made on terms that such rights or interest are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in Section 275 of the Securities and Futures Act);

(2) where no consideration is given for the transfer; or

(3) by operation of law.

127

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

*United Arab Emirates.* The underwriters may not offer or sell, directly or indirectly, any ADSs in the United Arab Emirates, except:

- in compliance with all applicable laws and regulations of the United Arab Emirates, and

- through persons or corporate entities authorized and licensed to provide investment advice and/or engage in brokerage activity and/or trade in respect of foreign securities in the United Arab Emirates.

*People's Republic of China.* This prospectus may not be circulated or distributed in the PRC, and ADSs may not be offered or sold, or offered or sold to any person for re-offering or resale, directly or indirectly, to any resident of the PRC except pursuant to applicable laws and regulations of the PRC. For the purpose of this paragraph only, the PRC does not include Taiwan, Hong Kong and Macau.

*Cayman Islands.* This prospectus does not constitute an invitation or offer to the public in the Cayman Islands of the ADSs, whether by way of sale or subscription. The underwriters may not offer or sell, directly or indirectly, any ADSs in the Cayman Islands.

128

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

## EXPENSES RELATING TO THIS OFFERING

The following table sets forth the main estimated expenses in connection with this offering, other than the underwriting discounts and commissions, which we will be required to pay:

| | | |
|---|---|---|
| Securities and Exchange Commission registration fee | $ | 12,280 |
| National Association of Securities Dealers Inc. filing fee | | |
| New York Stock Exchange listing fee | | |
| Legal fees and expenses | | |
| Accounting fees and expenses | | |
| Printing fees | | |
| Other fees and expenses | | |
| Total | $ | |

All amounts are estimated, except the Securities and Exchange Commission registration fee, National Association of Securities Dealers Inc. filing fee and the New York Stock Exchange listing fees.

129

# ENFORCEABILITY OF CIVIL LIABILITIES

We are an exempted limited liability company incorporated and existing under the laws of the Cayman Islands. We were incorporated in the Cayman Islands because of certain benefits associated with being a Cayman Islands corporation, such as political and economic stability, an effective judicial system, a favorable tax system, the absence of exchange controls or currency restrictions and the availability of professional and support services. However, the Cayman Islands has a less developed body of securities laws as compared to the United States and provides significantly less protection for investors. In addition, Cayman Islands companies may not have standing to sue before the federal courts of the United States.

Our constituent documents do not contain provisions requiring that disputes, including those arising under the securities laws of the United States, between us, our officers, directors and shareholders be arbitrated.

We conduct substantially all of our current operations in China through Jiangxi LDK Solar, our principal operating subsidiary. All or most of our assets are located in China. A majority of our directors and officers are nationals or residents of jurisdictions outside the United States and a substantial portion of their assets are located outside the United States. As a result, it may be difficult for a shareholder to effect service of process within the United States upon these persons, or to enforce against us or against them judgments obtained in United States courts, including judgments predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States.

We have appointed Law Debenture Corporate Services Inc. at 767 Third Avenue, New York, New York 10017, as our agent upon whom process may be served in any action brought against us in the United States District Court for the Southern District of New York under the federal securities laws of the United States or any action brought against us in the Supreme Court of the State of New York in the County of New York under the securities laws of the State of New York.

Conyers, Dill & Pearman, our counsel as to Cayman Islands law, and Grandall Legal Group, our counsel as to PRC law, have advised us that there is uncertainty as to whether the courts of the Cayman Islands or China, respectively, would

- recognize or enforce judgments of United States courts obtained against us or our directors or officers predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States; or

- entertain original actions brought in the Cayman Islands or China, respectively, against us or our directors or officers predicated upon the securities laws of the United States or any state in the United States.

Conyers, Dill & Pearman has further advised us that the courts of the Cayman Islands would recognize as a valid judgment, a final and conclusive judgment in personam obtained in the federal or state courts in the United States under which a sum of money is payable (other than a sum of money payable in respect of multiple damages, taxes or other charges of a like nature or in respect of a fine or other penalty) and would give a judgment based thereon provided that

- such courts had proper jurisdiction over the parties subject to such judgment;

- such courts did not contravene the rules of natural justice of the Cayman Islands;

- such judgment was not obtained by fraud;

- the enforcement of the judgment would not be contrary to the public policy of the Cayman Islands;

130

- no new admissible evidence relevant to the action is submitted prior to the rendering of the judgment by the courts of the Cayman Islands; and

- there is due compliance with the correct procedures under the laws of the Cayman Islands.

Grandall Legal Group has advised us that the PRC Civil Procedures Law contains provisions relating to recognition and enforcement of foreign judgments. PRC courts may recognize and enforce foreign judgments in accordance with the requirements of the PRC Civil Procedures Law based either on treaties between China and the country where the judgment is made or on reciprocity between China and such other jurisdiction. There is, however, no such treaty between China and the United States or between China and the Cayman Islands.

131

Table of Contents

## LEGAL MATTERS

The validity of the ADSs and certain other legal matters with respect to U.S. federal and New York law will be passed upon for us by Sidley Austin LLP. Certain legal matters with respect to U.S. federal and New York law in connection with this offering will be passed upon for the underwriters by Cleary Gottlieb Steen & Hamilton LLP. The validity of the ordinary shares represented by the ADSs offered in this offering will be passed upon for us by Conyers, Dill & Pearman, our counsel as to Cayman Islands law. Legal matters as to PRC law will be passed upon for us by Grandall Legal Group and for the underwriters by King & Wood. Sidley Austin LLP may rely upon Conyers, Dill & Pearman with respect to matters governed by Cayman Islands law and upon Grandall Legal Group with respect to matters governed by PRC law.

## EXPERTS

Our audited consolidated financial statements for the period from July 5, 2005 to, and as of, December 31, 2005 and for the year ended and as of December 31, 2006 have been included herein and in the registration statement in reliance upon the report of KPMG, independent registered public accounting firm, appearing elsewhere herein, and upon the authority of said firm as experts in accounting and auditing. The offices of KPMG are located at the 8th Floor, Prince's Building, 10 Chater Road, Central, Hong Kong.

The statements included in this prospectus under the captions "Prospectus Summary — Our Corporate Structure," "Risk Factors — Risks Relating to Our Company and Our Industry," "Risk Factors — Risks Relating to Business Operations in China," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Business," "PRC Government Regulations" and "Enforceability of Civil Liabilities," to the extent they constitute matters of PRC law, have been reviewed and confirmed by Grandall Legal Group, our PRC counsel, as experts in such matters, and are included in this prospectus in reliance upon such review and confirmation. The offices of Grandall Legal Group are located at 31st Floor, Nan Zheng Building, 580 West Nanjing Road, Shanghai 200041, China.

The statements included in this prospectus under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" and notes to our audited consolidated financial statements beginning on page F-1, to the extent they relate to the determination of fair value of our warrants, ordinary shares, preferred shares and stock options, have been reviewed and confirmed by Sallmanns (Far East) Limited, independent valuation firm, as experts in such matters, and are included in this prospectus in reliance upon such review and confirmation. The offices of Sallmanns (Far East) Limited are located at 22nd Floor, Siu On Center, 188 Lockhart Road, Wanchai, Hong Kong.

The statements included in this prospectus under the caption "Related Party Transactions — Land Use Rights," to the extent they relate to the determination of fair market value of the land use rights, completed buildings and assets under construction we purchased from an entity controlled by Mr. Peng, have been reviewed and confirmed by Shanghai Orient Real Estate Appraiser Co., Ltd., independent valuation firm, as experts in such matters, and are included in this prospectus in reliance upon such review and confirmation. The offices of Shanghai Orient Real Estate Appraisal Co., Ltd. are located at 2nd Floor, 1279 Dingxi Road, Shanghai 200050, China.

132

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the Securities and Exchange Commission a registration statement on Form F-1 under the Securities Act with respect to our ordinary shares and a registration statement on Form F-6 under the Securities Act with respect to our ADSs offered by this prospectus. This prospectus, which constitutes a part of the F-1 registration statement, does not contain all of the information set forth in the F-1 and F-6 registration statements or the exhibits and schedules that are part of the registration statements. For further information about us and about the ADSs and our ordinary shares represented by the ADSs, you should refer to our F-1 and F-6 registration statements and their exhibits. This prospectus summarizes the content of contracts and other documents to which we refer you. Since this prospectus may not contain all of the information that is important to you, you should review the full text of these documents. We have included copies of these documents as exhibits to our registration statements.

Upon the completion of this offering, we will become subject to periodic reporting and other information requirements of the Exchange Act as applicable to foreign private issuers and will file reports, including annual reports on Form 20-F, and other information with the Securities and Exchange Commission. As we are a foreign private issuer, we are exempt from some of the Exchange Act reporting requirements, the rules prescribing the furnishing and content of proxy statements to shareholders, and Section 16 short swing profit reporting for our officers and directors and for holders of more than 10% of our ordinary shares. You may read and copy any document we file with the Securities and Exchange Commission at the Securities and Exchange Commission's Public Reference Room at 100 F Street, N.E., Washington D.C. 20549. Please call the Securities and Exchange Commission at 1-800-SEC-0330 for more information on the public reference rooms and their copy charges. The Securities and Exchange Commission also maintains a website that contains reports, proxy and information statements and other information regarding issuers, such as us, who file electronically with the Securities and Exchange Commission. The address of that website is http://www.sec.gov.

We will furnish our annual reports to JPMorgan Chase Bank, N.A., as depositary of our ADSs. When the depositary receives these reports, it will upon our request promptly provide them to all holders of record of our ADSs. We will also furnish the depositary with all notices of shareholders' meetings and other reports and communications in English that we make available to our shareholders. The depositary will make these notices, reports and communications available to holders of our ADSs and will, if so requested by us and provided no legal prohibitions exist, mail to all holders of record of our ADSs the information contained in any notice of a shareholder's meeting it receives.

133

**LDK SOLAR CO., LTD.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Annual Consolidated Financial Statements | |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of December 31, 2005 and 2006 | F-3 |
| Consolidated Statements of Operations for the Period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006 | F-5 |
| Consolidated Statements of Shareholders' Equity and Comprehensive (Loss) Income for the Period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006 | F-6 |
| Consolidated Statements of Cash flows for the Period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006 | F-7 |
| Notes to the Consolidated Financial Statements for the Period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006 | F-9 |
| Interim Condensed Consolidated Financial Statements | |
| Unaudited Condensed Consolidated Balance Sheets as of March 31, 2006 and 2007 | F-42 |
| Unaudited Condensed Consolidated Statements of Operations for the three-month periods ended March 31, 2006 and 2007 | F-44 |
| Unaudited Condensed Consolidated Statements of Shareholders' Equity and Comprehensive Income for the three-month period ended March 31, 2007 | F-46 |
| Unaudited Condensed Consolidated Statements of Cash flows for the three-month periods ended March 31, 2006 and 2007 | F-47 |
| Notes to the Unaudited Condensed Consolidated Financial Statements for the three-month periods ended March 31, 2006 and 2007 | F-49 |

F-1

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
LDK SOLAR CO., LTD.:

We have audited the accompanying consolidated balance sheets of LDK Solar Co., Ltd. and its subsidiaries (the "Group") as of December 31, 2005 and 2006, and the related consolidated statements of operations, shareholders' equity and comprehensive (loss) income, and cash flows for the period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006, all expressed in US Dollar. These consolidated financial statements are the responsibility of the Group's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Group as of December 31, 2005 and 2006, and the results of its operations and its cash flows for the period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006, in conformity with U.S. generally accepted accounting principles.

*/s/ KPMG*

Hong Kong, China
February 14, 2007, except as to paragraphs 2 through 6 of note 25, which is as of May 11, 2007.

F-2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

### LDK SOLAR CO., LTD. AND SUBSIDIARIES

### CONSOLIDATED BALANCE SHEETS
### AS OF DECEMBER 31, 2005 AND DECEMBER 31, 2006
(Amounts in US$ thousands, except share and per share data)

| | Note | December 31, 2005 | December 31, 2006 |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets | | | |
| Cash and cash equivalents | | 9,687 | 30,227 |
| Pledged bank deposits | | — | 4,956 |
| Trade accounts receivable, net | | — | 1,490 |
| Bills receivable | | — | 816 |
| Inventories | (3) | — | 94,886 |
| Prepayments to suppliers | (4) | 966 | 37,718 |
| Deferred expenses | (5) | — | 991 |
| Due from related parties | (22) | 10,142 | — |
| Other current assets | | 20 | 1,662 |
| Total current assets | | 20,815 | 172,746 |
| Property, plant and equipment, net | (6)(9) | 10,491 | 100,875 |
| Deposit for purchase of equipment | | 306 | 11,090 |
| Intangible asset, net | (7) | — | 1,149 |
| Land use rights | (8)(9)(22) | — | 6,711 |
| Deferred income tax assets | (12) | 35 | 148 |
| Total assets | | 31,647 | 292,719 |
| **LIABILITIES, REDEEMABLE CONVERTIBLE PREFERRED SHARES AND SHAREHOLDERS' EQUITY** | | | |
| Current liabilities | | | |
| Short-term bank borrowings | (9) | — | 56,765 |
| Trade accounts payable | | 3 | 6,119 |
| Advance payments from customers | | 3,717 | 40,002 |
| Accrued expenses and other payables | (10) | 85 | 14,600 |
| Due to related parties | (22) | 16,543 | — |
| Total current liabilities | | 20,348 | 117,486 |
| Warrants | (15) | — | 2 |
| Long-term bank borrowings, excluding current portions | (9) | — | 30,245 |
| Total liabilities | | 20,348 | 147,733 |
| Series A redeemable convertible preferred shares: US$0.10 par value; nil and 5,000,000 shares authorized; nil and 4,580,000 shares issued and outstanding as of December 31, 2005 and 2006 (Aggregate liquidation value of US$19,500) | (16) | — | 15,447 |
| Series B redeemable convertible preferred shares: US$0.10 par value; nil and 8,000,000 shares authorized; nil and 8,000,000 shares issued and outstanding as of December 31, 2005 and 2006 (Aggregate liquidation value of US$62,400) | (16) | — | 49,721 |
| Series C redeemable convertible preferred shares: US$0.10 par value; nil and 3,000,000 shares authorized; nil and 3,000,000 shares issued and outstanding as of December 31, 2005 and 2006 (Aggregate liquidation value of US$29,250) | (16) | — | 22,576 |

F-3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS — (Continued)**
**AS OF DECEMBER 31, 2005 AND DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

| | Note | December 31, 2005 | December 31, 2006 |
|---|---|---|---|
| **SHAREHOLDERS' EQUITY** | | | |
| Ordinary shares: US$0.10 par value; nil and 134,000,000 shares authorized; nil and 75,000,000 shares issued and outstanding as of December 31, 2005 and 2006 respectively | (17) | — | 7,500 |
| Contributed capital | (1) | 11,534 | — |
| Additional paid-in capital | | — | 29,302 |
| Subscription receivable for ordinary shares | (17) | — | (7,490) |
| Statutory reserve | (18) | — | 3,623 |
| Accumulated other comprehensive income | | 39 | 2,319 |
| (Accumulated deficit) retained earnings | | (274) | 21,988 |
| Total shareholders' equity | | 11,299 | 57,242 |
| Commitments and contingencies | (13) | | |
| Total liabilities, redeemable convertible preferred shares and shareholders' equity | | 31,647 | 292,719 |

See accompanying notes to consolidated financial statements.

F-4

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

| | Note | From July 5, 2005 to December 31, 2005 | Year ended December 31, 2006 |
|---|---|---|---|
| Net sales | | | |
|    125mm × 125mm wafer | | — | 66,189 |
|    156mm × 156mm wafer | | — | 36,263 |
|    Silicon materials | | — | 2,513 |
|    Processing of wafers on behalf of others | | — | 489 |
| Total net sales | | — | 105,454 |
| Cost of goods sold | | | |
|    125mm × 125mm wafer | | — | (40,231) |
|    156mm × 156mm wafer | | — | (21,399) |
|    Silicon materials | | — | (2,019) |
|    Processing of wafers on behalf of others | | — | (313) |
| Total cost of goods sold | | — | (63,962) |
| Gross profit | | — | 41,492 |
| Selling expenses | | — | (286) |
| General and administrative expenses | | (77) | (3,771) |
| Research and development expenses | | (66) | (290) |
|    Total operating expenses | | (143) | (4,347) |
| (Loss) income from operations | | (143) | 37,145 |
| Other income (expenses): | | | |
|    Interest income | | 4 | 105 |
|    Interest expense and amortization of discount on exchangeable notes | (11) | (102) | (7,133) |
|    Decrease in fair value of warrants | (15) | — | 9 |
|    Foreign currency exchange loss, net | | (68) | (1,325) |
|    Government subsidy | | — | 1,268 |
| (Loss) income before income tax benefit | | (309) | 30,069 |
| Income tax benefit | (12) | 35 | 113 |
| Net (loss) income | | (274) | 30,182 |
| Accretion of Series A redeemable convertible preferred shares to redemption value | (16) | — | (814) |
| Accretion of Series B redeemable convertible preferred shares to redemption value | (16) | — | (1,799) |
| Accretion of Series C redeemable convertible preferred shares to redemption value | (16) | — | (116) |
| Deemed dividend to Series A redeemable convertible preferred shareholders | (16) | — | (1,568) |
| Net (loss) income available to ordinary shareholders | | (274) | 25,885 |
| Basic (loss) income per ordinary share | (20) | (0.01) | 0.35 |
| Diluted (loss) income per ordinary share | (20) | (0.01) | 0.35 |

See accompanying notes to consolidated financial statements.

F-5

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
AND COMPREHENSIVE (LOSS) INCOME
FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005
AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

| | Ordinary shares | | Contributed Capital | Additional Paid-in Capital | Subscription Receivable for Ordinary Shares | Statutory Reserve | Accumulated Other Comprehensive Income | (Accumulated deficit) Retained Earnings | Total Shareholders' Equity | Total Comprehensive (Loss) Income |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Amount | | | | | | | | |
| July 5, 2005 | — | — | — | — | — | — | — | — | — | |
| Net loss | — | — | — | — | — | — | — | (274) | (274) | (274) |
| Foreign currency translation adjustment, net of nil tax | — | — | — | — | — | — | 39 | — | 39 | 39 |
| Total comprehensive loss | — | — | — | — | — | — | — | — | | (235) |
| Capital contributions (Note 1) | — | — | 11,534 | — | — | — | — | — | 11,534 | |
| December 31, 2005 | — | — | 11,534 | — | — | — | 39 | (274) | 11,299 | |
| Net income | — | — | — | — | — | — | — | 30,182 | 30,182 | 30,182 |
| Appropriation to statutory reserve (Note 18) | — | — | — | — | — | 3,623 | — | (3,623) | | |
| Foreign currency translation adjustment, net of nil tax | — | — | — | — | — | — | 2,280 | — | 2,280 | 2,280 |
| Total comprehensive income | — | — | — | — | — | — | — | — | | 32,462 |
| Capital contributions (Note 1) | — | — | 17,466 | — | — | — | — | — | 17,466 | |
| Effect of reorganization (Note 1): | | | | | | | | | | |
| Distributions to shareholders in connection with the Reorganization (Note 1) | — | — | (8,000) | — | — | — | — | — | (8,000) | |
| Issuance of ordinary shares (Note 1 & Note 17) | 75,000,000 | 7,500 | — | — | (7,490) | — | — | — | 10 | |
| Transfer to additional paid-in capital | — | — | (21,000) | 21,000 | — | — | — | — | — | |
| Share options (Note 19) | — | — | — | 2,294 | — | — | — | — | 2,294 | |
| Deemed dividend to Series A redeemable convertible preferred shareholders (Note 16) | — | — | — | 1,568 | — | — | — | (1,568) | — | |
| Accretion of Series A redeemable convertible preferred shares to redemption value (Note 16) | — | — | — | — | — | — | — | (814) | (814) | |
| Accretion of Series B redeemable convertible preferred shares to redemption value (Note 16) | — | — | — | — | — | — | — | (1,799) | (1,799) | |
| Accretion of Series C redeemable convertible preferred shares to redemption value (Note 16) | — | — | — | — | — | — | — | (116) | (116) | |
| Discount amortization on exchangeable notes (Note 14) | — | — | — | 4,440 | — | — | — | — | 4,440 | |
| December 31, 2006 | 75,000,000 | 7,500 | — | 29,302 | (7,490) | 3,623 | 2,319 | 21,988 | 57,242 | |

See accompanying notes to consolidated financial statements

F-6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

| | Note | From July 5, 2005 to December 31, 2005 | Year ended December 31, 2006 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net (loss) income | | (274) | 30,182 |
| Adjustments to reconcile net (loss) income to net cash used in operating activities: | | | |
| Depreciation and amortization | | 1 | 2,766 |
| Deferred income tax benefit | | (35) | (113) |
| Share-based compensation | | — | 2,028 |
| Interest on the exchangeable notes | | — | 13 |
| Amortization of discount on the exchangeable notes | | — | 4,440 |
| Decrease in fair value of warrants | | — | (9) |
| Changes in operating assets and liabilities: | | | |
| Pledged bank deposits | | — | (4,956) |
| Trade accounts receivable and bills receivable | | — | (2,306) |
| Inventories | | — | (94,886) |
| Prepayments to suppliers | | (966) | (36,752) |
| Other | | (20) | (1,603) |
| Trade accounts payable | | 3 | 6,116 |
| Advance payments from customers | | 3,717 | 36,285 |
| Accrued expenses and other payables | | 85 | 1,728 |
| Net cash provided by (used in) operating activities | | 2,511 | (57,067) |
| Cash flows from investing activities: | | | |
| Purchase of land use rights | | — | (5,482) |
| Advance to related party | | (5,478) | — |
| Purchase of property, plant and equipment | | (15,462) | (72,840) |
| Purchase of intangible asset | | — | (1,242) |
| Net cash used in investing activities | | (20,940) | (79,564) |

F-7

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

| | Note | From July 5, 2005 to December 31, 2005 | Year ended December 31, 2006 |
|---|---|---|---|
| Cash flows from financing activities: | | | |
| Capital contributions | | 11,534 | 2,022 |
| Proceeds from new loans and borrowings | | — | 114,116 |
| Repayment of loans and borrowings | | — | (27,106) |
| Loans and advances from related parties | | 16,543 | 18,773 |
| Repayment of loans and advances from related parties | | — | (29,838) |
| Proceeds from issuance of ordinary shares | | — | 10 |
| Distributions to shareholders in connection with the Reorganization | | — | (8,000) |
| Payments of expenses relating to the proposed offer | | — | (405) |
| Proceeds from issuance of exchangeable notes, net of issue cost US$52 | | — | 7,948 |
| Proceeds from Series A-2 redeemable convertible preferred shares, net of issue cost US$51 | | — | 6,949 |
| Proceeds from Series B redeemable convertible preferred shares, net of issue cost US$78 | | — | 47,922 |
| Proceeds from Series C redeemable convertible preferred shares | | — | 22,500 |
| Net cash provided by financing activities | | 28,077 | 154,891 |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | | 39 | 2,280 |
| Net increase in cash and cash equivalents | | 9,687 | 20,540 |
| Cash and cash equivalents at beginning of period | | — | 9,687 |
| Cash and cash equivalents at end of period | | 9,687 | 30,227 |
| Supplemental disclosures of cash flow information: | | | |
| Interest payments, net of amount capitalized | | — | 2,680 |
| Supplemental disclosures of non-cash investing and financing transaction: | | | |
| Property, plant and equipment contributed as paid-in capital | (1) | — | 15,444 |
| Payable for purchase of property, plant and equipment | | — | 10,893 |
| Payable for purchase of land use rights | | — | 1,268 |
| Conversion from exchangeable notes to Series A-1 redeemable convertible preferred shares | (14)(16) | — | 7,948 |
| Offset of amounts due to/from a related party | (22) | — | 5,478 |

See accompanying notes to consolidated financial statements.

F-8

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

**(1)    PRINCIPAL ACTIVITIES, ORGANIZATION AND BASIS OF PRESENTATION**

*Principal activities*

The accompanying consolidated financial statements consist of the financial statements of LDK Solar Co., Ltd. (the "Company" or "LDK"), and its subsidiaries Jiangxi LDK Solar Hi-Tech Co., Ltd. ("JXLDK") and LDK International Solar Co., Ltd. ("LDK International"). The Company and its subsidiaries are collectively referred to as the "Group".

The Group's principal activities are manufacture, processing and sale of multicrystalline silicon wafers.

*Organization*

JXLDK was incorporated on July 5, 2005, in Xinyu, Jiangxi Province, the People's Republic of China ("PRC") by Suzhou Liouxin Industry Co., Ltd. ("SZ Liouxin") and Liouxin Industrial Limited ("HK Liouxin") which are both controlled by Mr. Peng. SZ Liouxin is fully owned by HK Liouxin. The registered shareholders of HK Liouxin are Mr. Xiaofeng Peng ("Mr. Peng") and his father, who acts as a nominee and holds the shares in trust for Mr. Peng. JXLDK was in a development stage from July 2005 to April 2006 and started product sales at the end of April 2006. The development stage activities mainly included constructing new manufacturing plants, design, formulation and testing of new products. The registered capital of JXLDK as at the date of its inception and prior to the Reorganization described below was US$29,000. From the inception date to December 31, 2005, SZ Liouxin and HK Liouxin contributed paid-in capital of US$7,479 and US$4,055 respectively to JXLDK in cash. In 2006 prior to the Reorganization, SZ Liouxin contributed to JXLDK paid-in capital of US$521, and HK Liouxin contributed US$1,501 in cash and US$15,444 in the form of property, plant and equipment. The value of these property, plant and equipment, which were newly acquired by HK Liouxin for the purpose of injecting into JXLDK as paid-in capital, are based on the actual purchase costs incurred by HK Liouxin to acquire these property, plant and equipment from the vendors.

On May 1, 2006, Mr. Peng, through his wholly owned subsidiary, LDK New Energy Holding Limited incorporated the Company in the Cayman Islands under the laws of the Cayman Islands as part of the reorganization of JXLDK (the "Reorganization"). In connection with the Reorganization and the preparation for the intended Initial Public Offering, the Company entered into the following series of transactions:

1) The issuance of 75,000,000 ordinary shares of the Company at par value of US$0.10 per share (adjusted for the ten-for-one share split effected on July 18, 2006) to LDK New Energy Holding Limited during 2006 in connection with the Reorganization;

2) The Company's acquisition of all interests in JXLDK from SZ Liouxin and HK Liouxin for the consideration of US$8,000 on July 10, 2006, when government approval was obtained, as part of the Reorganization;

3) The issuance of exchangeable notes to two unrelated investors for cash consideration of US$8,000 which is mandatorily convertible into 3,000,000 Series A redeemable convertible preferred shares as mentioned below (refer to note 14);

4) The issuance of 4,580,000 Series A redeemable convertible preferred shares to a group of unrelated investors including 3,000,000 Series A-1 redeemable convertible preferred shares converted from the exchangeable notes above and 1,580,000 Series A-2 redeemable convertible preferred shares issued for cash consideration of US$7,000 (refer to note 16);

F-9

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

5) The issuance of 8,000,000 Series B redeemable convertible preferred shares to a group of unrelated investors for cash consideration of US$48,000 (refer to note 16);

6) The issuance of 3,000,000 Series C redeemable convertible preferred shares to a group of unrelated investors for cash consideration of US$22,500 (refer to note 16);

7) The formation of a fully owned subsidiary, LDK International on September 5, 2006 in Hong Kong Special Administrative Region ("HK SAR").

*Basis of presentation*

The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("US GAAP").

Since the controlling and majority shareholder of JXLDK prior to the Reorganization remained the controlling and majority shareholder of the Company after consummation of the Reorganization, the Reorganization is considered to be a transfer of equity interests between entities under common control and has been accounted for in a manner similar to a pooling of interests. Accordingly, the assets and liabilities of JXLDK transferred to the Company have been recognized at JXLDK's historical carrying amount and as if the transfer of assets and liabilities and related business operations had occurred as of July 5, 2005, the earliest date presented in the accompanying consolidated financial statements. Cash consideration of US$8,000 paid by the Company to SZ Liouxin and HK Liouxin in connection with the transfer of JXLDK, has been accounted for as a distribution to shareholders on July 21, 2006.

**(2)    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*(a)    Principles of consolidation*

The consolidated financial statements include the financial statements of the Company and its subsidiaries. All significant intercompany transactions and balances are eliminated on consolidation.

*(b)    Use of estimates*

The preparation of financial statements in conformity with US GAAP requires management of the Group to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. On an ongoing basis, management reviews its estimates, including those related to realization of inventories, depreciable lives and residual values of long-lived assets, the recoverability of the carrying values of long-lived assets, and the determination of fair values of financial instruments and share-based instruments. Changes in facts and circumstances may result in revised estimates.

*(c)    Foreign currency translation*

The functional currency of the Company is the United States dollar ("US$"). The functional currency of JXLDK is Renminbi ("RMB"). The functional currency of LDK International is the Hong Kong dollar ("HK$"). Transactions denominated in other currencies are recorded in the functional currency at the rates of exchange prevailing when the transactions occur. Monetary assets and liabilities denominated in other currencies are translated into the functional currency at rates of exchange in effect at the balance sheet dates. Exchange gains and losses are included in the statements of operations.

F-10

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

### LDK SOLAR CO., LTD. AND SUBSIDIARIES

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
### FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005
### AND THE YEAR ENDED DECEMBER 31, 2006
(Amounts in US$ thousands, except share and per share data)

The Group has chosen the U.S. dollar as its reporting currency. Accordingly assets and liabilities are translated using exchange rates in effect at each period end and average exchange rates are used for the statements of operations. Translation adjustments resulting from translation of these financial statements are reflected as foreign currency translation adjustment in other comprehensive income.

*(d)*    *Commitments and contingencies*

Liabilities for loss contingencies arising from claims, assessments, litigation, fines and penalties and other sources are recorded when it is probable that a liability has been incurred and the amount of the assessment can be reasonably estimated. Legal costs incurred in connection with loss contingencies are expensed as incurred.

*(e)*    *Cash and cash equivalents*

Cash and cash equivalents consist of cash at bank and on hand and certificates of deposit with an initial term of less than three months when purchased, which are unrestricted as to withdrawal and use.

*(f)*    *Pledged bank deposits*

Pledged bank deposits represent amounts held by a bank, which are not available for the Group's use, as security for issuance of letters of credit. Upon maturity of the letters of credit which generally range within six months, the cash is available for the use by the Group.

*(g)*    *Trade accounts receivable*

Trade accounts receivable are recorded at the invoiced amount and do not bear interest. Amounts collected on trade accounts receivable are included in net cash provided by operating activities in the consolidated statements of cash flows. Allowance for doubtful accounts is provided based on the Group's best estimate of the amount of probable credit losses in the Group's existing accounts receivable. The Group determines the allowance by analyzing specific customer accounts that have known or potential collection issues.

*(h)*    *Inventories*

Inventories are stated at the lower of cost or market. Cost is determined using the weighted average method.

*(i)*    *Property, plant and equipment, net*

Property, plant and equipment are stated at cost, net of accumulated depreciation and impairment.

Depreciation is calculated using the straight-line method over the following estimated useful lives, taking into account the assets' estimated residual value:

| | |
|---|---|
| Buildings | 30 years |
| Plant and machinery | 10 years |
| Furniture, fixture and office equipment | 5 years |
| Motor vehicles | 6 years |

F-11

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

Cost incurred in constructing new facilities, including progress payment and other costs relating to the construction, are capitalized and transferred to property, plant and equipment on completion and depreciated from that time. Cost comprises direct costs of construction as well as borrowing costs capitalized during the period of construction and installation. The capitalization of borrowing costs as part of the cost of a qualifying asset commences when expenditure for the asset is being incurred, borrowing costs are being incurred and activities that are necessary to prepare the asset for its intended use of sale are in progress. Capitalization of borrowing costs ceases when substantially all the activities necessary to prepare the qualifying asset for its intended use are completed.

No depreciation is provided in respect of construction in progress until it is substantially complete and ready for its intended use.

*(j)    Intangible asset, net*

Intangible asset, net represents technical know-how, which is carried at cost less accumulated amortization. The technical know-how was acquired from equipment manufacturers for operation of equipment. Technical know-how is amortized on a straight-line basis over its expected useful life of 10 years, less impairment losses (see note 2(l)).

*(k)    Land use rights*

Land use rights represent fees paid to obtain the right to use land in the PRC.

*(l)    Impairment of long-lived assets*

Property, plant and equipment and purchased intangible assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset exceeds the fair value of the asset. No impairment of long-lived assets was recognized for the period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006.

*(m)    Fair value of financial instruments*

The Group used the following methods and assumptions to estimate the fair value of financial instruments at the relevant balance sheet date:

• Short-term financial instruments (cash equivalents, trade accounts receivable and payable, short-term bank borrowings, and accrued liabilities) — cost approximates fair value because of the short maturity period.

• Long-term debt — fair value is based on the amount of future cash flows associated with each debt instrument discounted at the Group's current borrowing rate for similar debt instruments of comparable terms. The carrying values of the long term loans approximate their fair values due to their variable market interest rates.

F-12

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

*(n)*    *Revenue recognition*

Sales represent the invoiced value of products sold and services rendered, net of value added taxes (VAT). The Group records revenue from the sale of silicon wafers and other materials when the products are delivered and title transfers, the risks and rewards of ownership have been transferred to the customer, the fee is fixed and determinable and collection of the related receivable is reasonably assured. For domestic sales, the majority of the Company's contracts provide that products are considered delivered when they reach customer's destination and are signed-for by the customer. For export sales, products are considered delivered when the goods have passed over the ship's rail at the named port of shipment. The customer bears all costs and risks of loss or damage to the goods from that point. A majority of the Group's sales to domestic customers require the customers to prepay before delivery has occurred. Such prepayments are recorded as advances from customers in the Group's consolidated financial statements, until delivery has occurred.

Generally, no warranty is provided to customers except pursuant to a short period ranging from 7 to 15 days for sales return. Wafer products are standard and the Group conducts rigorous quality control and testing procedures to ensure that the finished wafers meet the standard quality requirements before the product is shipped. The Group estimates the amount of sales returns and the cost of replacement products based on the level of returns to date, and the analysis of subsequent activity.

The Group recognizes revenue for processing services when the services are completed, which is generally evidenced by delivery of processed products to the customers.

In the PRC, VAT of 17% on invoice amount is collected in respect of the sales of goods on behalf of tax authorities. VAT collected from customers, net of VAT paid for purchase, is recorded as a liability in the consolidated balance sheets until it is paid to the authorities.

*(o)*        *Buy/sell arrangements*

The Group has buy/sell arrangements with certain customers wherein the Group sells wafers in exchange for the acquisition of silicon materials, and sells multi-crystalline silicon materials in exchange for acquisition of mono-crystalline bars. These arrangements are with counterparties in the same line of business as the Group. The exchanges of inventories are recorded at fair value.

During the year ended December 31, 2006, the Group purchased and sold inventories of US$35,671 and US$17,674 respectively under these buy/sell arrangements.

*(p)*    *Shipping and Handling*

Costs to ship products to customers are included in selling expenses in the consolidated statement of operations. Amounts billed to customers, if any, to cover shipping and handling are included in net sales. Cost to ship products to customers were US$ nil and US$63 for the period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006, respectively.

*(q)*    *Research and development costs*

Research and development costs are expensed as incurred. JXLDK has a research and development team to enhance product quality and to achieve a more efficient production process. In addition, the Group has a joint research and development program with Shanghai Jiaotong University to focus on developing quality consumables and supplemental equipment.

F-13

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

*(r)      Advertising expenses*

Advertising expenses are charged to the consolidated statement of operations in the period incurred. The Group incurred advertising expenses amounting to US$ nil and US$138 for the period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006, respectively.

*(s)      Operating leases*

Payments made under operating leases are charged to the consolidated statements of operations on a straight-line basis over the respective lease terms.

*(t)      Government subsidy*

Government subsidies are recognized when received and when all the conditions for their receipt have been met. Subsidies that compensate the Group for expenses incurred are recognized as a reduction of expenses in the consolidated statement of operations in the same period in which the related expenses are incurred. Subsidies that are not associated with expenses incurred or to be incurred are recognized as income.

Xinyu Industry Development District and JXLDK reached an agreement that for electricity costs JXLDK pays at the market value of US$0.07 per kwh, the district will provide JXLDK with an unconditional subsidy of US$0.02 per kwh. For the year ended December 31, 2006, US$808 was received to compensate electricity costs and recorded as a reduction to cost of goods sold.

A subsidy of US$240 was received from local government during 2006 to compensate JXLDK's research and development expenses and was recorded as a reduction of research and development expenses.

JXLDK received a subsidy of US$1,268 in 2006 from the local government authority as an incentive for development of wafer industry in Xinyu, which was recorded as other income as there were no specific expenses required to be incurred by the Group to obtain the subsidy.

*(u)      Income taxes*

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is provided to reduce the carrying amount of deferred tax assets if it is considered more likely than not that some portion, or all, of the deferred tax assets will not be realized.

*(v)      Share-based compensation*

The Group has adopted SFAS No. 123R, *"Share-based Payment"*, which requires that share-based payment transactions with employees, such as share options, be measured based on the grant-date fair value of the equity instrument issued and recognized as compensation expense over the requisite service period, with a corresponding addition to additional paid-in capital. Under this method, compensation cost related to employee share options or similar equity instruments is measured at the grant date based on the fair value of

F-14

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

the award and is recognized over the period during which an employee is required to provide service in exchange for the award, which generally is the vesting period.

The Group accounts for equity instrument issued to non-employee vendors in accordance with the provisions of Emerging Issues Task Force ("EITF") Issue No. 96-18, *"Accounting for Equity Instruments That are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services."* All transactions in which goods or services are received in exchange for equity instruments are accounted for based on the fair value of the consideration received or the fair value of the equity instrument issued, whichever is more reliably measurable. The measurement date of the fair value of the equity instrument issued is the date on which the counterparty's performance is completed.

#### (w)    Embedded beneficial conversion of convertible instruments

In accordance with the provisions of EITF Issue No. 98-5 *"Accounting for Convertible Securities with Beneficial Conversion Features or Contingently Adjustable Conversion Ratios"* and EITF Issue No. 00-27 *"Application of Issue No. 98-5 to Certain Convertible Instruments"*, the Group recognizes and measures the embedded beneficial conversion feature of convertible instruments by allocating a portion of the proceeds from the convertible instruments equal to the intrinsic value of that feature to additional paid-in capital. The intrinsic value of the embedded beneficial conversion feature is calculated at the commitment date as the difference between the effective conversion price and the fair value of the common stock or other securities into which the security is convertible, multiplied by the number of shares into which the security is convertible. Any recorded discount resulting from the allocation of proceeds to the beneficial conversion feature are recognized as interest expenses for convertible instruments in the form of debt or as a deemed dividend for redeemable convertible preferred shares over the period from its date of issuance to its stated mandatory redemption date or to its earliest conversion date if the convertible instruments do not have a stated redemption date. Unamortized discount remaining at the date when the convertible instruments are converted into their respective underlying securities are immediately recognized as interest expenses or as a deemed dividend, as appropriate. Changes to the conversion terms that would be triggered by future events not controlled by the Group is accounted for as contingent conversion options, and the intrinsic value of the such contingent conversion options will not be recognized until and unless the triggering event occurs.

#### (x)    Employee benefit plans

As stipulated by the regulations of the PRC, the Group's PRC subsidiary, JXLDK participates in various defined contribution plans organized by municipal and provincial governments for its employees. These companies are required to make contributions to these plans at a rate of 29% on a standard salary base as determined by the local Social Security Bureau, to a defined contribution retirement scheme organized by the local Social Security Bureau in respect of the retirement benefits for the Group's employees. Under these plans, certain pension, medical and other welfare benefits are provided to the employees. The Group has no other material obligation for the payment of employee benefits associated with these plans beyond the annual contributions described above. Employee benefits associated with these plans are expensed when incurred. The total amounts for such employee benefits, which were expensed as incurred, were US$ nil for the period from July 5, 2005 to December 31, 2005 and US$220 for the year ended December 31, 2006.

#### (y)    Net (loss) income per share

Basic net (loss) income per share is computed by dividing net (loss) income available to ordinary shareholders by the weighted average number of ordinary shares outstanding during the period. Diluted net

F-15

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

(loss) income per share is calculated by dividing net (loss) income available to ordinary shareholders by the weighted average number of ordinary shares and dilutive ordinary share equivalents outstanding during the period. Ordinary share equivalents consist of the ordinary shares issuable upon the conversion of the convertible preferred shares (using the as-converted method) and ordinary shares issuable upon the exercise of outstanding share options and warrants (using the treasury stock method). Ordinary share equivalents in the diluted net (loss) income per share computation are excluded to the extent that their effect would be anti-dilutive.

### (z)    Segment reporting

The Group uses the management approach in determining reportable operating segments. The management approach considers the internal organization and reporting used by the Group's chief operating decision maker for making operating decisions, allocating resources and assessing performance as the source for determining the Group's reportable segments. Management, including the chief operating decision maker, reviews operating results solely by monthly revenue (but not by sub-product type) and operating results of JXLDK, the operating subsidiary in the PRC. As such, management has determined that JXLDK is the Group's only operating segment, as that term is defined by Statement of Financial Accounting Standard No. 131, "*Disclosure about Segments of an Enterprise and Related Information*".

### (aa)    Start-up costs

The Group expensed all costs incurred in connection with start-up activities, including preproduction costs associated with new manufacturing facilities. Preproduction costs including the design, formulation and testing of new products or process alternatives are included in research and development expenses. Preproduction costs including facility and employee costs incurred in connection with constructing new manufacturing plants are included in general and administrative expenses. The Group made first commercial sale on April 28, 2006 and was no longer in the development stage.

### (ab)    Recently issued accounting pronouncement

In September 2006, the FASB issued SFAS No. 157, "*Fair Value Measurements*". SFAS No. 157 defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles and expands disclosures about fair value measurements. SFAS No. 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007 with earlier application encouraged. The Group is currently evaluating the impact, if any, of this statement on the consolidated financial statements.

In September 2006, the Securities and Exchange Commission issued Staff Accounting Bulletin No. 108, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements ("SAB 108"), to address diversity in practice in quantifying financial statement misstatements. SAB 108 requires that misstatements are to be quantified based on their impact on the financial statements and related disclosures. SAB 108 is effective as of the end of 2006 fiscal year, allowing a one-time transitional cumulative effect adjustment to retained earnings as of January 1, 2006 for errors that were not previously deemed material, but are material under the guidance in SAB 108. The Group does not expect the initial adoption of SAB 108 to affect the Group's consolidated financial condition or results of operations.

In June 2006, the FASB issued FIN 48, "*Accounting for Uncertainty in Income Taxes — an Interpretation of FASB Statements No. 109*", which clarifies the accounting for uncertainty in tax positions. This interpretation requires that the Group recognizes in the consolidated financial statements the impact of a tax

F-16

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

position, if that position is more likely than not of being sustained upon examination, based on the technical merits of the position. FIN 48 will be effective for the first fiscal year beginning after December 15, 2006. The Group does not expect the adoption of this interpretation to have a material effect of the Group's consolidated financial statements.

**(3)   INVENTORIES**

|  | December 31, 2005 | December 31, 2006 |
|---|---|---|
| Inventories consist of the following: | | |
| Raw materials | — | 79,496 |
| Work in progress | — | 8,884 |
| Supplies | — | 1,410 |
| Finished goods | — | 5,096 |
| | — | 94,886 |

At December 31, 2006, the Group had US$2,859 of raw materials consigned to a third party.

**(4)   PREPAYMENTS TO SUPPLIERS**

In order to secure a stable supply of silicon materials, the Group makes prepayments to certain suppliers. These prepayments are classified as current assets because the Group expects to take delivery of the inventory within the next twelve months. The outstanding balance of the prepayment to suppliers is reduced and reclassified to inventories as the Group purchases silicon materials. Such reclassification of US$144,482 for the year ended December 31, 2006 is not reflected in the Group's consolidated cash flows from operations.

**(5)   DEFERRED EXPENSES**

Deferred expenses at December 31, 2006 consist of costs incurred in connection with the anticipated IPO of the Company.

**(6)   PROPERTY, PLANT AND EQUIPMENT, NET**

Property, plant and equipment, net consist of the following:

|  | December 31, 2005 | December 31, 2006 |
|---|---|---|
| Buildings | — | 7,716 |
| Plant and machinery | — | 80,549 |
| Furniture, fixtures and office equipment | 12 | 355 |
| Motor vehicles | — | 636 |
| Construction in progress | 10,480 | 14,293 |
| | 10,492 | 103,549 |
| Less: Accumulated depreciation | (1) | (2,674) |
| | 10,491 | 100,875 |

F-17

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

Depreciation expense was US$1 and US$2,673 for the period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006 respectively.

**(7)   INTANGIBLE ASSET, NET**

| | December 31, 2005 | December 31, 2006 |
|---|---|---|
| Technical know-how | | |
| Cost | — | 1,242 |
| Less: Accumulated amortization | — | (93) |
| | — | 1,149 |

Technical know-how was acquired by JXLDK from equipment manufacturers for operation of the equipment.

Amortization expenses of the above technical know-how was US$ nil and US$93 for the period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006 respectively. For each of the next five years, annual amortization expense of the technical know-how is expected to be US$121.

**(8)   LAND USE RIGHTS**

Land use rights represent fees paid to the government and a company controlled by Mr. Peng (see note 22) to obtain the rights to use certain land over periods ranging from 49.5 to 50 years in the PRC. All land use rights have been pledged with banks for the short-term bank loans and long-term bank loans.

**(9)   BANK BORROWINGS**

*(a)      Current*

| | December 31, 2005 | December 31, 2006 |
|---|---|---|
| Bank borrowings — secured | — | 20,026 |
| Bank borrowings — unsecured | — | 31,739 |
| Current installments of long-term bank borrowings (note (b)) | — | 5,000 |
| | — | 56,765 |

The short-term bank borrowings outstanding as of December 31, 2006 carry a weighted average interest rate of 5.876%. The short-term bank borrowings have maturity terms ranging from one to twelve months and interest rates ranging from 5.022% to 6.968% and are borrowed for working capital purpose. None of the short-term bank borrowings contain any financial covenants. Bank loans of US$19,210 were secured over JXLDK's buildings and land use rights with the carrying amounts of US$6,242 and US$3,281 as of December 31, 2006 respectively as well as buildings and land use rights owned by a company controlled by Mr. Peng. A discounted bill of US$816 was included in secured bank borrowings as of December 31, 2006 (see note 13(c)).

Through Bank of China, Xinyu Branch, JXLDK borrowed US$14,971 from Jiangxi Liouxin Industry Co., Ltd. ("JXLXI") in December 2006 through an entrusted loan agreement. The loan carries an interest rate of 5.022% and is repayable in June 2007. The entrusted loan was included in unsecured bank borrowings

F-18

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

as of December 31, 2006. Among the remaining unsecured bank borrowings, US$15,381 was guaranteed by companies controlled by Mr. Peng, Jiangsu Liou Xin Industrial Park Co., Ltd. ("JSLXI"), JXLXI and SZ Liouxin.

The Group has total revolving credit of US$25,612 and unused credit of US$7,371 as of December 31, 2006.

*(b)*    ***Non-current***

|  | December 31, 2005 | December 31, 2006 |
|---|---|---|
| Secured loan from China Construction Bank | — | 10,245 |
| Secured loan from China Development Bank | — | 25,000 |
|  | — | 35,245 |
| Less: current portion | — | (5,000) |
|  | — | 30,245 |

In March 2006, the Group borrowed US$10,245 from China Construction Bank of which US$4,866 is repayable in 2008 and US$5,379 is repayable in 2009. The loan carries variable interest with an effective rate of 6.336% at December 31, 2006. Interest is payable semi-annually. The loan is guaranteed by SZ Liouxin and US$8,857 is secured by the JXLDK's plant and machinery with carrying amounts of US$24,341 as of December 31, 2006.

In December 2006, the Group borrowed US$25,000 from China Development Bank, which is repayable in 5 equal annual installments of US$5,000 through December of 2011. The loan carries variable interest with an effective rate of 6.870% as of December 31, 2006. Interest is payable monthly. The loan is secured by JXLDK's plant and machinery, construction in progress and land use rights with carrying amounts of US$34,796, US$6,966 and US$3,430 as of December 31, 2006 respectively and is guaranteed by the Company's shareholders, Mr. Peng and Ms. Zhou Shan.

Future principal repayments on the long-term bank borrowings are as follows:

| | |
|---|---|
| 2007 | 5,000 |
| 2008 | 9,866 |
| 2009 | 10,379 |
| 2010 | 5,000 |
| 2011 | 5,000 |
| | 35,245 |

F-19

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

**(10)   ACCRUED EXPENSES AND OTHER PAYABLES**

Components of accrued expenses and other payables are as follows:

|  | December 31, 2005 | December 31, 2006 |
|---|---|---|
| Purchase of equipment | — | 10,893 |
| Purchase of land use right | — | 1,268 |
| Accrued payroll and welfare | 1 | 982 |
| Indirect taxes payable | 2 | 93 |
| Other accruals | 82 | 1,364 |
|  | 85 | 14,600 |

**(11)   INTEREST COSTS**

The following is a summary of the Group's interest costs incurred during 2005 and 2006:

|  | From July 5, 2005 to December 31, 2005 | Year ended December 31, 2006 |
|---|---|---|
| Interest cost capitalized | — | 122 |
| Interest cost charged to income |  |  |
| — Interest cost | 102 | 2,680 |
| — Interest on the exchangeable notes | — | 13 |
| — Discount amortization on the exchangeable notes (note 14) | — | 4,440 |
| Sub-total | 102 | 7,133 |
| Total interest cost | 102 | 7,255 |

**(12)   INCOME TAXES**

The Company and its subsidiaries file separate income tax returns.

*Cayman Islands*

Under the current laws of the Cayman Islands, the Company is not subject to tax on its income or capital gains. In addition, upon any payment of dividends by the Company, no Cayman Islands withholding tax is imposed.

*Peoples' Republic of China*

JXLDK is governed by the income tax law of the PRC concerning foreign investment and foreign enterprises (the "FEIT Law"). Under the FEIT Law, JXLDK is entitled to exemption from income tax for at least 2 years starting from the 2006 calendar year and is entitled to a 50% tax reduction for the succeeding 3 years beginning from 2008.

Upon the expiration of such preferential tax treatment, JXLDK will be subject to the PRC enterprise income tax rate of 33%.

F-20

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

*HK SAR*

No provision has been made for Hong Kong Profits Tax as HK International did not have assessable profits subject to Hong Kong Profits Tax during the period.

The income tax benefit attributable to income from operations, which are substantially derived from PRC sources, consist of:

|  | From July 5, 2005 to December 31, 2005 | Year ended December 31, 2006 |
|---|---|---|
| Current income tax | — | — |
| Deferred income tax benefit | (35) | (113) |
| Total income tax benefit | (35) | (113) |

The actual income tax benefit differed from the amounts computed by applying the statutory PRC enterprise income tax rate of 33% to pre-tax (loss) income as a result of the following:

|  | From July 5, 2005 to December 31, 2005 | | Year ended December 31, 2006 | |
|---|---|---|---|---|
| (Loss) income before tax | (309) | 100% | 30,069 | 100% |
| Computed income tax (benefit) expense | (102) | 33% | 9,922 | 33% |
| Non-deductible expenses |  |  |  |  |
| Discount amortization on the exchangeable notes | — | — | 1,465 | 5% |
| Share-based compensation | — | — | 669 | 2% |
| Pre-operating expenses | 67 | (22%) | 217 | 1% |
| Others | — | — | 1 | 0% |
| Tax holiday | — | — | (12,387) | (41%) |
| Actual income tax benefit | (35) | 11% | (113) | (0%) |

Without the tax holiday the Group's income tax expense would have increased and basic and diluted net income per ordinary share for the year ended December 31, 2006 would have been reduced by US$12,387 and US$0.17, respectively.

The tax effects of temporary differences that give rise to significant portions of the deferred income tax assets are presented below. There were no deferred tax liabilities as of December 31, 2006.

|  | December 31, 2005 | December 31, 2006 |
|---|---|---|
| Deferred income tax asset — non current |  |  |
| Pre-operating expenses | 35 | 148 |
| Less: valuation allowance | — | — |
| Net deferred tax assets | 35 | 148 |

F-21

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible or utilized. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Based upon an assessment of the level of historical taxable income and projections for future taxable income over the periods in which the deferred tax assets are deductible or can be utilized, no valuation allowance has been provided as of December 31, 2005 and 2006. The deferred tax assets of US$35 and US$148 as of December 31, 2005 and 2006 respectively, represent the tax benefits of deductible temporary differences which are more likely than not to be realized in a non tax holiday year. Deductible temporary differences as at December 31, 2005 and 2006 represent pre-operating expenses incurred by JXLDK during its start-up period from July 5, 2005 to April 2006, which can be deductible for income tax purposes over 5 years starting from when JXLDK had its first commercial sale. The amount of the deferred tax assets considered realizable, however, could be reduced in the near term if estimates of future taxable income are reduced.

The PRC tax system is subject to substantial uncertainties and has been subject to recently enacted changes, the interpretation and enforcement of which are also uncertain. There can be no assurance that changes in PRC tax laws or their interpretation or their application will not subject the Group's PRC entities to substantial PRC taxes in the future.

**(13)    COMMITMENTS AND CONTINGENCIES**

*(a)    Capital commitments*

Capital commitments outstanding at December 31, 2005 and 2006 not provided for in the financial statements were as follows:

|  | December 31, 2005 | December 31, 2006 |
|---|---|---|
| Production line construction projects | 35,404 | 212,317 |

*(b)    Purchase commitments*

The Group has entered into several purchase agreements with certain suppliers whereby the Group is committed to purchase a minimum amount of raw materials to be used in the manufacture of its products:

|  | December 31, 2005 | December 31, 2006 |
|---|---|---|
| Future minimum purchases | — | 847,790 |

Included in the above purchase commitments was an amount of US$729.6 million that related to a long-term supply contract to procure an agreed quantity of raw materials at an agreed price during 2006 to 2011. Pursuant to that contract, the contract price is to be renegotiated every six months. The purchase commitment of US$729.6 million included above was determined based on the agreed quantities and the effective contract price as at December 31, 2006.

*(c)    Outstanding bills receivable discounted*

As of December 31, 2006, the Group has retained a recourse obligation of US$816 in respect of a bill receivable discounted with and sold to a bank. The recourse obligation represents the amount the Group will

F-22

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

be obligated to repay to the extent that the issuing bank who has guaranteed payment does not honor the bill receivable upon maturity. The discounted bill of US$816 as of December 31, 2006 was included in secured short-term loans (see note 9).

**(14)  EXCHANGEABLE NOTES**

Pursuant to an Exchangeable Note Purchase Agreement (the "Agreement") signed between the Company and a group of third-party investors (the "Holders") dated July 18, 2006, the Company issued the Exchangeable Notes (the "Notes") with the principal of US$8,000 on July 21, 2006.

The terms of the Notes are as follows:

*Maturity date*

Unless previously redeemed or exchanged or purchased and cancelled, the Notes were scheduled to mature on September 30, 2006.

*Interest*

The Holders were entitled to receive interest at 6% per annum on the principal outstanding, payable in arrears. Unless redeemed, exchanged or purchased and cancelled prior to redemption, the principal amount of the Notes and all accrued but unpaid interest thereon would have been paid at the maturity of the Notes. No interest was paid or payable due to the conversion on July 28, 2006.

*Mandatory Exchange*

The Notes were mandatorily convertible into 3,000,000 Series A redeemable convertible preferred shares (see note 16) at a conversion rate of US$2.67 per share. The Notes were converted on July 28, 2006.

Management evaluated the conversion feature embedded in these Notes to determine if there was a beneficial conversion feature. A calculation was performed to determine the intrinsic value of any difference between the conversion price and the fair market value of the underlying securities (Series A redeemable convertible preferred shares) of the Company issuable upon the conversion of the Notes at the commitment date, which was determined to be June 28, 2006. Management obtained a valuation analysis from a third party independent appraiser, Sallmanns (Far East) Limited, ("Sallmanns"), of the potential fair market values of the Company's Series A redeemable convertible preferred shares based on various generally accepted valuation methodologies. Management determined that the income approach was appropriate to determine the fair value of the Company's business. The value of the Company's business was then allocated to the outstanding equity instruments of the Company based on the Options-Pricing method. A discount on the Notes, representing a beneficial conversion feature in the amount of US$4,440 was originally recognized upon the issuance of the Notes, and was amortized to interest expense in the consolidated statement of operations over the period from the issuance date to July 28, 2006 when the Notes were converted to Series A redeemable convertible preferred shares.

**(15)  WARRANTS**

In conjunction with the Series A redeemable convertible preferred shares purchase agreement (see note 16), the holders of Series A-1 and A-2 redeemable convertible preferred shares received warrants on July 28, 2006. The warrants are exercisable by the holders if the number of equity securities issued by the Company in the follow-on financing exceeds 20,420,000 shares. The follow-on financing means the issuance of

F-23

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

shares of the Company's capital stock in a private placement prior to the Qualified IPO (as defined in note 16) of up to 20,420,000 preferred shares with a per share price of no less than US$5.00 and an initial conversion rate of 1:1. The holders are entitled to purchase such amount of additional Series A-1 and A-2 preferred shares at the initial purchase price of US$2.67 and US$4.43 per share respectively, so that after acquiring such number of Series A preferred shares, the ownership of the Series A-1 share and Series A-2 share holders in the Company will be no less than 3% and 1.58% respectively on a fully diluted basis.

The warrants permit the holders to acquire Series A Shares that may require redemption at a future date at the holder's option, and therefore embody conditional obligations to repurchase the Company's shares. Therefore the warrants are classified separately as liabilities (with a corresponding reduction to the carrying amount of Series A shares) on the date of issuance at its fair value in accordance with SFAS No. 150 "*Accounting for Certain Financial Instruments with Characteristics of both Liability and Equity*". Change in fair value of warrants was credited to other income. The fair value of the warrants was approximately US$11 and US$2 at the grant date and December 31, 2006 respectively, estimated on the basis of Black-Scholes model with the following assumptions and the probability of the exercisability of the warrants:

|  | July 28, 2006 | December 31, 2006 |
| --- | --- | --- |
| Expected volatility | 64% | 52% |
| Expected dividends | 0% | 0% |
| Expected term | 1Y3 years | 1Y3 years |
| Risk-free interest rate | 4.93Y5.11% | 4.62Y4.91% |

Management assessed that the probability of the exercisability for the Series A-1 and A-2 preferred shares warrants was 50% and 10% on July 28, 2006 and December 31, 2006 respectively.

**(16)    REDEEMABLE CONVERTIBLE PREFERRED SHARES**

*(a)    Series A redeemable convertible preferred shares*

Pursuant to the Series A redeemable convertible preferred shares purchase agreement dated July 28, 2006 ("Series A Agreement"), the Company issued 3,000,000 Series A-1 redeemable convertible preferred shares ("Series A-1 Shares") on July 31, 2006 as a result of conversion of the US$8,000 exchangeable notes by the holders (see note 14). The Company also issued 1,580,000 Series A-2 redeemable convertible preferred shares ("Series A-2 Shares") to a group of unrelated investors at US$4.43 per share for total cash consideration of US$7,000. Pursuant to the Series A Agreement, as amended by the third amended and restated memorandum of association dated December 19, 2006, the holders of both Series A-1 Shares and Series A-2 Shares (collectively "Series A Shares") have the right to redeem the Series A Shares after 36 months of the date of issuance of Series C redeemable convertible preferred shares at the option of the holders of Series A Shares then outstanding if a Qualified IPO has not occurred. A Qualified IPO refers to an initial public offering on a Qualified Exchange that values the Company at no less than US$1,210,000 immediately prior to the initial public offering with a per share offering price of no less than US$11.00 and that results in aggregate proceeds to the Company of at least US$300,000. In the event of a redemption under this right, the Company shall redeem all of the outstanding Series A Shares at a redemption price equal to 150% of the original issue cost of Series A Shares, plus any declared, accrued but unpaid dividends and interests thereon, (the "Series A Preference Amount") proportionally adjusted for share subdivisions, share dividends, reorganizations, reclassifications, consolidations or mergers. The accretion to the redemption value is reflected as a reduction to net income to arrive at net income available to ordinary shareholders in the accompanying consolidated statement of operations and amounted to US$814 for the year ended Decem-

F-24

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## LDK SOLAR CO., LTD. AND SUBSIDIARIES

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
### FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005
### AND THE YEAR ENDED DECEMBER 31, 2006
(Amounts in US$ thousands, except share and per share data)

ber 31, 2006. Total direct external incremental costs of issuing the security of US$103 was charged against the proceeds of the Series A Shares.

The significant terms of the Series A Shares are as follows:

*Conversion*

The holders of Series A Shares have the right to convert all or any portion of their holdings into ordinary shares of the Company at the then applicable conversion ratio (the "Conversion ratio") at any time after the date of issuance to the closing of a Qualified IPO. In addition, each Series A Share is automatically convertible into one or more ordinary shares, subject to the Conversion ratio adjustment as described below upon the consummation of the Qualified IPO.

Each Series A Share is convertible into one ordinary share where the conversion price is equal to the Series A share issue price, except in the following events that the initial Conversion ratio is adjusted: (1) upon delivery of the 2006 audited report, if the 2006 audited net earnings, as defined, is lower than US$28,500, the 2006 adjusted Conversion ratio will be adjusted to the ratio of US$30,000 divided by the audited 2006 net earnings, as defined ("the 2006 adjusted Conversion ratio); (2) upon delivery of the 2007 audited report, if the 2007 audited net earnings, as defined, is lower than US$95,000, the 2007 Conversion ratio will be adjusted by applying the ratio of US$100,000 divided by the audited 2007 net earnings, as defined, to the 2006 adjusted Conversion ratio. No adjustment to the 2007 Conversion ration will be made if a Qualified IPO consummates in 2007.

The conversion price shall initially be equal to the applicable Series A issue price for each of the outstanding preferred shares, subject to adjustments for dilutions ("Series A Dilution Adjustment") as follows if any of the events listed below occur prior to the conversion of the preferred shares:

   a) The Company shall pay a dividend or make a distribution on its ordinary shares in ordinary shares, subdivide or reclassify its outstanding ordinary shares into a greater number of shares or combine or reclassify its outstanding ordinary shares into a smaller number of shares;

   b) The Company shall issue additional ordinary shares, rights, options or warrants to subscribe for or purchase ordinary shares without consideration or for a consideration per share less than the then effective conversion price on the date the Company issues or sells such new securities; and

   c) The Company shall distribute to all holders of its ordinary shares any share capital of the Company (other than ordinary shares) or evidences of indebtedness or cash or other assets (excluding regular cash dividends or distributions paid from retained earnings of Company and dividends or distributions referred to in previous paragraph a)).

The proceeds received from the issuance of Series A Shares were first allocated to the warrants (see note 15) and share options issued to the holders of the Series A-1 Shares (see note 19) based on their fair values with the residual amount allocated to the preferred shares. Management evaluated the conversion feature embedded in this preferred share arrangement to determine if there was a beneficial conversion feature. A calculation was performed to determine the intrinsic value of the difference between the most favorable conversion price and the fair market value of the underlying securities (ordinary shares) of the Company issuable upon the conversion of the Series A Shares at the commitment date. Based on the calculation, the initial conversion price was lower than the fair value of the Company's ordinary shares at the commitment date determined by management based on a valuation performed by Sallmanns. The computed intrinsic value of the conversion feature of US$1,568 was recorded as a deemed dividend at the date of

F-25

Table of Contents

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

issuance because the Series A Shares were convertible at issuance date. In addition, under the provisions of EITF Issue No. 00-27 *"Application of Issue No. 98-5 to Certain Convertible Instrument"*, the Company determined that the contingent beneficial conversion feature relating to the Conversion ratio adjustment will be recognized only when the 2006 and 2007 audit reports are delivered and the contingency is resolved, and with respect to the Series A Dilution Adjustment, upon the issuance of additional ordinary shares. To the extent that the audited net earnings, as defined, of the Group for 2006 and for 2007 is below US$28,500 or US$95,000 respectively, or the Company issues additional ordinary shares at a price less than the then prevailing Series A Shares' conversion price, the intrinsic value that results from such contingent beneficial conversion feature would be recognized as an addition to paid-in capital with a corresponding charge to net income available to ordinary shareholders at the earliest conversion date, which is the later of the issuance date or the date the contingency is resolved. With reference to the definition of 2006 audited net earnings as set out in the Series A Agreement, management has determined that its 2006 audited net earnings, as defined, exceeds US$28,500 and accordingly the conversion ratio adjustment based on the 2006 audited net earnings was not triggered. As the contingency relating to the 2007 audited net earnings was not resolved as of December 31, 2006, management has not considered the 2007 conversion ratio adjustment when preparing the consolidated financial statements for the year ended December 31, 2006.

### Voting rights

Each Series A Share has voting rights equivalent to the number of ordinary shares into which such Series A Share is then convertible.

### Registration rights

The Series A Shares holders have registration rights similar to the ordinary shareholders. These registration rights include demand, F-3 or equivalent, and piggyback rights. The specific terms of registration rights would include at least the following: (i) starting three years after the Closing Date, the holders of majority of the outstanding Series A Shares may request a Form F-1 registration statement to be filed; (ii) starting one year after the Qualified IPO, two (2) demand registrations upon request of holders of majority of the outstanding Series A Shares on Form F-3 or equivalent if listed on a non-US stock exchange; (iii) unlimited piggyback registrations in connection with registrations of shares for the account of the Company (other than the Qualified IPO) or selling shareholders exercising demand rights; and (iv) cut-back provisions providing that registrations (other than the Qualified IPO) must include at least 25% of the shares requested to be included by the holders of registrable securities, and the ordinary shareholders, management, employees, directors and consultants of the Company must be cut back before the holders of registrable securities would be cut back. The registration rights agreement does not provide for liquidated damages in the event that the Company fails to have the registration statement declared effective or if the effectiveness is not maintained.

### Dividends

The Series A Shares holders shall be entitled to receive dividends out of any funds legally available for this purpose, when and if declared by the Board of Directors of the Company. No dividends shall be declared or paid on any of the ordinary shares unless they shall also be declared or paid on all the outstanding preferred share pro rata treating the preferred shares as the greatest whole number of shares of ordinary shares then issuable upon conversion of such preferred shares.

F-26

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

*Liquidation preference*

In the event of any liquidation, dissolution or winding up of the Company, the holders of Series A Shares shall be entitled to receive, prior to any distribution of any of the assets or surplus funds of the Company to the holders of ordinary shares, an amount equal to 130% of Series A issue price plus all declared but unpaid dividends and interests as of the liquidation date.

**(b)        *Series B redeemable convertible preferred shares***

Pursuant to the Series B redeemable convertible preferred shares purchase agreement dated September 15, 2006 ("Series B Agreement"), the Company issued 8,000,000 Series B redeemable convertible preferred shares ("Series B Shares") on September 28, 2006 to a group of unrelated investors at US$6 per share (the "Series B issue price") for total cash consideration of US$48,000. Pursuant to the Series B Agreement, as amended by the third amended and restated memorandum of association dated December 19, 2006, the holders of Series B Shares have the right to redeem the Series B Shares after 36 months of the date of issuance of Series C redeemable convertible preferred shares at the option of the holders of Series B Shares then outstanding if a Qualified IPO shall not have occurred. In the event of a redemption under this right, the Company shall redeem all of the outstanding Series B Shares at a redemption price equal to 150% of the Series B issue price, plus any declared, accrued but unpaid dividends and interest thereon, (the "Series B Preference Amount") proportionally adjusted for share subdivisions, share dividends, reorganizations, reclassifications, consolidations or mergers. The accretion to the redemption value is reflected as a reduction to net income to arrive at net income available to ordinary shareholders in the accompanying consolidated statement of operations and amounted to US$1,799 for the year ended December 31, 2006. Total direct external incremental costs of issuing the security of US$78 was charged against the proceeds of the Series B Shares.

The significant terms of the Series B Shares are as follows:

*Conversion*

The holders of Series B Shares have the right to convert all or any portion of their holdings into ordinary shares of the Company at the then applicable conversion ratio (the "Conversion ratio") at any time after the date of issuance to the closing of a Qualified IPO. In addition, each Series B Share is automatically convertible into one or more ordinary shares, subject to the Conversion ratio adjustment as described below upon the consummation of a Qualified IPO.

Each Series B Share is convertible into one ordinary share where the conversion price is equal to the Series B share issue price, except in the following events that the initial conversion ratio is adjusted upon the delivery of the audited report for the period from July 1, 2006 to June 30, 2007 and if the audited net earnings, as defined, ("2006/2007 net earnings") is lower than US$57,000. The Conversion ratio will be adjusted to the ratio of US$60,000 divided by the 2006/2007 net earnings, as defined. If the Qualified IPO takes place before June 30, 2007, the net earnings, as defined, will be adjusted on a pro-rata basis.

The Conversion price shall initially be equal to the applicable Series B issue price for each of the outstanding preferred shares, subject to adjustments for dilutions ("Series B Dilution Adjustment") as follows if any of the events listed below occur prior to the conversion of the preferred shares:

a) The Company shall pay a dividend or make a distribution on its ordinary shares in ordinary shares, subdivide or reclassify its outstanding ordinary shares into a greater number of shares or combine or reclassify its outstanding ordinary shares into a smaller number of shares;

F-27

### LDK SOLAR CO., LTD. AND SUBSIDIARIES

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
### FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005
### AND THE YEAR ENDED DECEMBER 31, 2006
(Amounts in US$ thousands, except share and per share data)

b) The Company shall issue additional ordinary shares, rights, options or warrants to subscribe for or purchase ordinary shares without consideration or for a consideration per share less than the then effective conversion price on the date the Company issues or sells such new securities; and

c) The Company shall distribute to all holders of its ordinary shares any share capital of the Company (other than ordinary shares) or evidences of indebtedness or cash or other assets (excluding regular cash dividends or distributions paid from retained earnings of Company and dividends or distributions referred to in previous paragraph a)).

Management has determined that there was no embedded beneficial conversion feature attributable to the Series B Shares, since the initial conversion price of the Series B Shares is equal to the Series B issue price, which was higher than the fair value of the Company's ordinary shares at the commitment date determined by management based on the valuation performed by Sallmanns. In addition, under the provisions of EITF Issue No. 00-27 *"Application of Issue No. 98-5 to Certain Convertible Instrument"*, management determined that the contingent beneficial conversion feature relating to the Conversion ratio adjustment will be recognized only when the related audit report is delivered and the contingency is resolved and with respect of the Series B Dilution Adjustment, upon the issuance of additional ordinary shares. To the extent that the 2006/2007 audited net earnings, as defined, is below US$57,000 or the Company issued additional ordinary shares at a price less than the then prevailing Series B Shares' conversion price, the intrinsic value that results from such contingent beneficial conversion feature would be recognized as an addition to paid-in capital with a corresponding charge to net income available to ordinary shareholders at the earliest conversion date, which is the later of the issuance date or the date the contingency is resolved. As the contingency relating to the 2006/2007 audited net earnings was not resolved as of December 31, 2006, management has not considered the 2006/2007 conversion ratio adjustment when preparing the consolidated financial statements for the year ended December 31, 2006.

*Voting rights*

Each Series B Share has voting rights equivalent to the number of ordinary shares into which such Series B Share is then convertible.

*Registration rights*

Holders of Series B Shares have registration rights similar to the holders of Series A Shares and the ordinary shareholders. These registration rights include demand, F-3 or equivalent, and piggyback rights. The specific terms of registration rights would include at least the following: (i) starting three years after the Closing Date, the holders of majority of the outstanding Series A Shares and Series B Shares may request a Form F-1 registration statement to be filed; (ii) starting one year after the Qualified IPO, two (2) demand registrations upon request of the holders of 50% of the outstanding Series A Shares and Series B Shares on Form F-3 or equivalent if listed on a non-US stock exchange; (iii) unlimited piggyback registrations in connections with registrations of shares for the account of the Company (other than the Qualified IPO) or selling shareholders exercising demand rights; and (iv) cut-back provisions providing that registrations (other than the Qualified IPO) must include at least 25% of the shares requested to be included by the holders of registrable securities, and the ordinary shareholders, management, employees, directors and consultants of the Company must be cut back before the holders of registrable securities would be cut back. The registration rights agreement does not provide for liquidated damages in the event that the Company fails to have the registration statement declared effective or if the effectiveness is not maintained.

F-28

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

*Dividends*

The Series B Shares holders shall be entitled to receive dividends out of any funds legally available for this purpose, when and if declared by the Board of Directors of the Company. No dividends shall be declared or paid on any of the ordinary shares unless they shall also be declared or paid on all the outstanding preferred share pro rata treating the preferred shares as the greatest whole number of shares of ordinary shares then issuable upon conversion of such preferred shares.

*Liquidation preference*

In the event of any liquidation, dissolution or winding up of the Company, the holders of Series B Shares shall be entitled to receive, prior to any distribution of any of the assets or surplus funds of the Company to the holders of ordinary shares, an amount equal to 130% of Series B issue price plus all declared but unpaid dividends and interests as of the liquidation date.

**(c)      Series C redeemable convertible preferred shares**

Pursuant to the Series C redeemable convertible preferred shares purchase agreement dated December 15, 2006 ("Series C Agreement"), the Company issued 3,000,000 Series C redeemable convertible preferred shares ("Series C Shares") on December 19, 2006 to a group of unrelated investors at US$7.5 per share (the "Series C issue price") for total cash consideration of US$22,500. The holders of Series C Shares have the right to redeem the Series C Shares after 36 months of the date of issuance at the option of the holders of Series C Shares then outstanding if a Qualified IPO shall not have occurred. In the event of a redemption under this right, the Company shall redeem all of the outstanding Series C Shares at a redemption price equal to 150% of the Series C issue price, plus any declared, accrued but unpaid dividends and interest thereon, (the "Series C Preference Amount") proportionally adjusted for share subdivisions, share dividends, reorganizations, reclassifications, consolidations or mergers. The accretion to the redemption value is reflected as a reduction to net income to arrive at net income available to ordinary shareholders in the accompanying consolidated statements of operations and amounted to US$116 for the year ended December 31, 2006. Total direct external incremental costs of issuing the security of US$40 was accrued and charged against the proceeds of the Series C Shares.

The significant terms of the Series C Shares are as follows:

*Conversion*

The holders of Series C Shares have the right to convert all or any portion of their holdings into ordinary shares of the Company at the then applicable conversion ratio (the "Conversion ratio") at any time after the date of issuance to the closing of a Qualified IPO. In addition, each Series C Share is automatically convertible into one or more ordinary shares, subject to the Conversion ratio adjustment as described below upon the consummation of a Qualified IPO.

Each Series C Share is convertible into one ordinary share where the conversion price is equal to the Series C share issue price, except in the following events that the initial conversion ratio is adjusted upon the delivery of the 2007 audit report and if the audited net earnings, as defined, ("2007 net earnings") is lower than US$104,500. The Conversion ratio will be adjusted to the ratio of US$110,000 divided by the 2007 net earnings, as defined. If the Qualified IPO takes place before December 31, 2007, the net earnings, as defined, will be adjusted on a pro-rata basis.

F-29

Table of Contents

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

The Conversion price shall initially be equal to the applicable Series C issue price for each of the outstanding preferred shares, subject to adjustments for dilutions ("Series C Dilution Adjustment") as follows if any of the events listed below occur prior to the conversion of the preferred shares:

a) The Company shall pay a dividend or make a distribution on its ordinary shares in ordinary shares, subdivide or reclassify its outstanding ordinary shares into a greater number of shares or combine or reclassify its outstanding ordinary shares into a smaller number of shares;

b) The Company shall issue additional ordinary shares, rights, options or warrants to subscribe for or purchase ordinary shares without consideration or for a consideration per share less than the then effective conversion price on the date the Company issues or sells such new securities; and

c) The Company shall distribute to all holders of its ordinary shares any share capital of the Company (other than ordinary shares) or evidences of indebtedness or cash or other assets (excluding regular cash dividends or distributions paid from retained earnings of Company and dividends or distributions referred to in previous paragraph a)).

Management has determined that there was no embedded beneficial conversion feature attributable to the Series C Shares, since the initial conversion price of the Series C Shares is equal to the Series C issue price, which was higher than the fair value of the Company's ordinary shares at the commitment date determined by management based on the valuation performed by Sallmanns. In addition, under the provisions of EITF Issue No. 00-27 "Application of Issue No. 98-5 to Certain Convertible Instrument", management determined that the contingent beneficial conversion feature relating to the Conversion ratio adjustment will be recognized only when the related audit report is delivered and the contingency is resolved, and with respect of the Series C Dilution Adjustment, upon the issuance of additional ordinary shares. To the extent that the 2007 audited net earnings, as defined, is below US$110,000 or the Company issued additional ordinary shares at a price less than the then prevailing Series C Shares' conversion price, the intrinsic value that results from such contingent beneficial conversion feature would be recognized as an addition to paid-in capital with a corresponding charge to net income available to ordinary shareholders at the earliest conversion date, which is the later of the issuance date or the date the contingency is resolved. As the contingency relating to the 2007 audited net earnings was not resolved as of December 31, 2006, management has not considered the 2007 conversion ratio adjustment when preparing the consolidated financial statements for the year ended December 31, 2006.

*Voting rights*

Each Series C Share has voting rights equivalent to the number of ordinary shares into which such Series C Share is then convertible.

*Registration rights*

Holders of Series C Shares have registration rights similar to the holders of Series A and B Shares and the ordinary shareholders. These registration rights include demand registration, Form F-3 registration and piggyback registration. The registration rights agreement does not provide for liquidated damages in the event that the Company fails to have the registration statement declared effective or if the effectiveness is not maintained.

F-30

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

*Dividends*

The Series C Shares holders shall be entitled to receive dividends out of any funds legally available for this purpose, when and if declared by the Board of Directors of the Company. No dividends shall be declared or paid on any of the ordinary shares unless they shall also be declared or paid on all the outstanding preferred share pro rata treating the preferred shares as the greatest whole number of shares of ordinary shares then issuable upon conversion of such preferred shares.

*Liquidation preference*

In the event of any liquidation, dissolution or winding up of the Company, the holders of Series C Shares shall be entitled to receive, prior to any distribution of any of the assets or surplus funds of the Company to the holders of ordinary shares, an amount equal to 130% of Series C issue price plus all declared but unpaid dividends and interests as of the liquidation date.

**(17)    ORDINARY SHARES**

As at December 31, 2005 and 2006, there were nil and 134,000,000 authorized ordinary shares of the Company with US$0.10 par value per share (adjusted for the ten-for-one share split effected on July 18, 2006). During 2006, the Company issued 75,000,000 ordinary shares at par value of US$0.10 per share (adjusted for the ten-for-one share split effected on July 18, 2006) in connection with the Reorganization. As at December 31, 2006, US$7,490 was receivable from LDK New Energy Holding Limited in respect of the share subscription and is recognized as a reduction to shareholders' equity in the accompanying consolidated financial statements. The receivable is interest free and collectible on demand.

**(18)    STATUTORY RESERVE**

Under the Law of the PRC on Enterprises with Wholly Owned Foreign Investment, JXLDK is required to allocate at least 10% of their after tax profits, after making good of accumulated losses as reported in their PRC statutory financial statements, to the general reserve fund and have the right to discontinue allocations to the general reserve fund if the balance of such reserve has reached 50% of their registered capital. A transfer of US$3,623 from retained earnings to statutory reserve was recorded for the year ended December 31, 2006.

**(19)    SHARE OPTION**

*Share options to employees*

On August 1, 2006, the Board of Directors of the Company approved the granting of 6,230,000 share options to the Company's executives and employees at an exercise price of US$4.45 with a contractual term of five years and vesting period of no less than three years, with no more than one-third of the options to be vested each year.

*Share options to non employees*

On August 1, 2006, the Board of Directors of the Company approved the granting of 210,000 share options to the Company's external consultants in exchange for certain services provided. The exercise price of the share options is US$4.45 and the contractual term is five years. The vesting period is no less than three years, with no more that one-third of the options to be vested each year.

F-31

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

*Share options to investors*

In conjunction with the Series A-1 redeemable convertible preferred shares agreement (note 16), the Company issued 200,000 shares options to the holders of the Series A-1 redeemable convertible preferred shares on August 1, 2006 at an exercise price of US$4.45 with a contractual term of five years and vesting period of one year after the grant date.

The fair value of the option award is estimated on the date of grant using a lattice-based option valuation model that uses the assumptions noted in the following table. Because the Company does not maintain an internal market for its shares, the expected volatility was based on the historical volatilities of comparable publicly traded companies engaged in similar industry. The Company uses historical data to estimate employee termination within the valuation model. The expected term of options granted is derived from the output of the option valuation model and represents the period of time that options granted are expected to be outstanding. The employees that were granted the share options are expected to exhibit the same behavior. Since the share options once exercised will primarily trade in the U.S. capital market and there was no comparable PRC zero coupon rate, the risk-free rate for periods within the contractual life of the option is based on the U.S. Treasury Note as of the grant date.

| | |
|---|---:|
| Expected volatility | 64% |
| Expected dividends | 0% |
| Expected term | 3.5-4.5 years |
| Risk-free interest rate | 4.9% |
| Estimated fair value of underlying ordinary shares | US$4.37 |

The estimated fair value of the underlying ordinary shares on the dates of the above grants was determined based on a valuation analysis performed by Sallmanns based on various generally accepted valuation methodologies. Management determined that the income approach was appropriate to determine the fair value of the Company's business. The weighted-average grant-date fair value of options granted during the year ended December 31, 2006 was US$1.98 per share. The Company recorded non-cash share-based compensation expense of US$1,612 for the year ended December 31, 2006 in respect of share options granted to employees, of which US$174 was allocated to costs of revenues, US$1,281 was allocated to general and administrative expenses and US$157 was allocated to research and development costs. The Company recorded non-cash share-based compensation expense of US$416 in general and administrative expenses for the year ended December 31, 2006 in respect of share options granted to non employees.

A summary of option for the year ended December 31, 2006 is presented below:

| | Employees | Non Employees | Investors | Number of total shares involved in the option | Exercise Price per share | Remaining Contractual Term |
|---|---:|---:|---:|---:|---:|---:|
| Granted | 6,230,000 | 210,000 | 200,000 | 6,640,000 | US$ 4.45 | — |
| Exercised | — | — | — | — | — | |
| Forfeited or cancelled | (380,000) | — | — | (380,000) | — | |
| Outstanding as of December 31, 2006 | 5,850,000 | 210,000 | 200,000 | 6,260,000 | US$ 4.45 | 4.6 years |
| Exercisable as of December 31, 2006 | — | — | — | — | — | — |

F-32

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

As of December 31, 2006, there was US$9,991 of total unrecognized compensation cost related to nonvested share options. This cost is expected to be recognized over the next 2.6 years. The Company is expected to issue new shares to satisfy share option exercises.

**(20)   NET (LOSS) INCOME PER SHARE**

As discussed in note 17, the Company issued 75,000,000 ordinary shares in connection with the Reorganization. For the purpose of calculating basic/ diluted net (loss) income per share as a result of the Reorganization, the number of ordinary shares used in the calculation reflects the issuance of ordinary shares as if it took place on July 5, 2005.

The computation of basic and diluted net (loss) income per share is as follows:

| | From July 5, 2005 to December 31, 2005 | Year ended December 31, 2006 |
|---|---|---|
| Numerator used in basic and diluted net income per share | | |
| (Loss) income from continuing operations attributable to holders of ordinary shares | (274) | 25,885 |
| Shares (denominator): | | |
| Weighted average number of ordinary shares outstanding | 75,000,000 | 75,000,000 |
| Net (loss) income per share — basic | (0.01) | 0.35 |
| Net (loss) income per share — diluted | (0.01) | 0.35 |

During the year ended December 31, 2006, the Group's dilutive potential ordinary shares outstanding consist of Series A, Series B and Series C redeemable convertible preferred shares, share options and warrants issued in connection with the Series A Shares. The computation of diluted income per share for the year ended December 31, 2006 did not assume conversion of the Series A, Series B and Series C redeemable convertible preferred shares because, when applying the as-if-converted method, the effect of the 4,580,000, 8,000,000 and 3,000,000 ordinary shares issuable upon conversion of the Series A, Series B and Series C redeemable convertible preferred shares under the conversion terms of the Series A, Series B and Series C redeemable convertible preferred shares agreements was anti-dilutive. The conversion of the Series A, Series B and Series C redeemable convertible preferred shares was anti-dilutive because the amount of the accretion to the Series A, Series B and Series C redeemable convertible preferred shares redemption value and the beneficial conversion feature relating to the Series A Shares for the period per ordinary share obtainable upon conversion on a weighted average outstanding basis exceeded basic income per share. In addition, in computing diluted income per share for the year ended December 31, 2006, there was no dilutive effect of outstanding share options of 6,260,000 by applying the treasury stock method because the ordinary shares assumed to be issued upon the exercise of the share options was less than the number of shares assumed to be purchased at the average estimated fair value during the period. The proceeds used for the assumed purchase include the sum of the exercise price of the share options and the average unrecognized compensation cost. There was no dilutive effect of outstanding warrants because the condition to trigger the exercising of the warrants was not satisfied at December 31, 2006, and was assumed to remain unchanged until the end of the contingency period.

F-33

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## LDK SOLAR CO., LTD. AND SUBSIDIARIES

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
### FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005
### AND THE YEAR ENDED DECEMBER 31, 2006
(Amounts in US$ thousands, except share and per share data)

**(21)    SIGNIFICANT CONCENTRATIONS AND RISKS**

*Significant concentrations*

The carrying amounts of cash and cash equivalents, trade accounts receivable, prepayments and other current assets represent the Group's maximum exposure to credit risk in relation to financial assets. As of December 31, 2006, substantially all of the Group's cash and cash equivalents were held in major financial institutions located in the PRC and the Hong Kong Special Administrative Region, which management believes have high credit ratings. Accounts receivable are typically unsecured and denominated in RMB.

The following are the customers that directly or indirectly contributed, on an individual basis, 10% or more of revenue for the year ended December 31, 2006:

|  | December 31, 2006 |
|---|---|
| Suntech Power Holdings Co., Ltd. | 41,899 |
| Jiangsu Linyang Solarfun Co., Ltd. | 14,654 |

Solar-grade polysilicon feedstock is an essential raw material in manufacturing the Group's multicrystalline solar wafers. The Group's operations depend on its ability to procure sufficient quantities of solar-grade polysilicon on a timely basis. The significant growth of the solar wafer industry and the competing demand and buying power of the semiconductor industry have resulted in an industry-wide shortage in solar-grade polysilicon. Also, polysilicon manufacturing is a highly concentrated industry and there are only a limited number of polysilicon producers in the world. The Group's failure to obtain sufficient quantities of polysilicon in a timely manner could disrupt its operations, prevent it from operating at full capacity or limit its ability to expand as planned, which will reduce, and stunt the growth of, its manufacturing output and revenue.

In order to secure stable supply of polysilicon, the Group makes prepayments to certain suppliers. Such amounts are recorded as prepayments to suppliers on the consolidated balance sheets and amounted to US$37,718 as of December 31, 2006. The Group makes the prepayments without receiving collateral for such payments. As a result, the Group's claims for such prepayments would rank only as an unsecured claim, which exposes the Group to the credit risks of the suppliers. As of December 31, 2006, advances made to individual suppliers in excess of 10% of total prepayments to suppliers are as follows:

|  | December 31, 2006 |
|---|---|
| Komex Electronic Materials Inc. | 5,668 |

The Group relies on a limited number of equipment suppliers for all of its principle manufacturing equipment. There is currently a shortage globally in much of the equipment required for its manufacturing process and capacity expansion. If any of the Group's major equipment suppliers encounter difficulties in the manufacturing or shipment of its equipment to the Group or otherwise fail to supply equipment according to its requirements, it will be difficult for the Group to find alternative providers for such equipment on a timely basis which in turn could adversely affect its production and sales.

*Business and economic risks*

The Group operates in a dynamic industry with limited operating history and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations or cash flows: advances and new trends in new technologies and industry standards; capital market performance and public interest in companies operating in the PRC that are listed in the United States; competition from other competitors; changes in certain strategic relationships or customers relationships;

F-34

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

regulatory or other factors; the ability to obtain necessary financial and other resources at commercially viable terms; the ability to attract and retain employees necessary to support the Group's growth and general risks associated with the solar industry.

The Group conducts its principal operations in the PRC and accordingly is subject to special considerations and significant risks not typically associated with investments in equity securities of United States and Western European companies. These include risks associated with, among others, the political, economic, legal environment and social uncertainties in the PRC, government agencies' influence over certain aspects of the Group's operations and competition in the solar industry.

In addition, the ability to negotiate and implement specific business development projects in a timely and favorable manner may be impacted by political considerations unrelated to or beyond the control of the Group. Although the PRC government has been pursuing economic reform policies for the past two decades, no assurance can be given that the PRC government will continue to pursue such policies or that such policies may not be significantly altered. There is also no guarantee that the PRC government's pursuit of economic reforms will be consistent or effective and as a result, changes in the rate or method of taxation and changes in State policies may have a negative impact on the Group's operating results and financial position.

*Currency risk*

Substantially all of the revenue generating operations of the Group are transacted in RMB, which is not fully convertible into foreign currencies.

On July 21, 2005, the People's Bank of China announced that the PRC government reformed the exchange rate regime by adopting a managed floating exchange rate regime based on market supply and demand with reference to a basket of currencies. The exchange rate of United States dollars against RMB was adjusted to RMB8.11 per United States dollar with effect from July 21, 2005, and the RMB has gradually appreciated against the US dollar since then.

**(22)    RELATED PARTY TRANSACTIONS**

The Group has entered into a number of transactions with related parties. Amounts outstanding and the amounts of transactions with these related parties for the period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006 are as follows:

*(a)    Transactions*

(i) JXLDK signed an agreement on September 22, 2005 to borrow up to US$24,221 from Mr. Peng which carried an average interest rate of 5.829% in September 2005. During the period from October 27, 2005 to December 31, 2005, JXLDK borrowed from Mr. Peng cumulative loan amount of US$16,109 and at the same time lent US$5,478 to Saiweng Technology (Suzhou) Co., Ltd. ("Saiweng"), a company controlled by Mr. Peng. JXLDK borrowed an additional US$8,112 and repaid US$5,354 to Mr. Peng in the first six months of 2006. In March 2006, JXLDK signed an agreement with Mr. Peng to offset US$5,478 lent to Saiweng against amounts borrowed from Mr. Peng. In December 2006, JXLDK repaid the remaining US$13,389 to Mr. Peng. Interest expenses incurred amounted to US$100 and US$781 for the period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006.

(ii) JXLDK borrowed US$8,075 interest free loan from a company controlled by Mr. Peng, SZ Liouxin, in July 2006, which was repaid in December 2006.

F-35

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

(iii) Two companies controlled by Mr. Peng have provided guarantees or collateral to JXLDK's bankers to secure the JXLDK's bank loans (refer to note 9).

(iv) JXLDK borrowed an interest-free loan of US$2,561 from JXLXI in August 2006. The loan was fully repaid in September 2006.

(v) In connection with the commencement of JXLDK's operation, JXLDK entered into agreements ("Agreements") with JXLXI to acquire rights to use certain parcels of land from JXLXI and certain buildings constructed by JXLXI. Pursuant to the Agreements, the consideration for acquiring the land use rights were determined based on its market value of US$3,273 assessed by an independent valuer Shanghai Orient Real Estate Appraiser Co., Ltd. The consideration for acquiring the completed buildings and assets under construction amounted to US$7,109 and US$637 respectively. JXLDK prepaid U$4,664 in 2005 and paid U$6,355 in 2006 to JXLXI for such purchase. By December 31, 2006, the legal title of the first land use rights and the completed buildings had been transferred to JXLDK.

(vi) JXLDK leased an office in Harbour Ring Plaza from SZ Liouxin free of charge. SZ Liouxin signed the lease contract with a monthly rental charge of US$5. The period of the contract is from December 2005 to December 2007.

(vii) Through Bank of China, Xinyu Branch, JXLDK borrowed US$14,971 from JXLXI. The loans carry an interest rate of 5.022% and are repayable in June 2007.

*(b)    Amounts Outstanding*

| | December 31, 2005 | December 31, 2006 |
|---|---|---|
| **Due from:** | | |
| Advances receivable from Saiweng | 5,478 | — |
| Advance payment for purchase of land use rights and buildings from JXLXI | 4,664 | — |
| | 10,142 | — |
| | | |
| **Due to:** | | |
| Payable to SZ Liouxin | 434 | — |
| Borrowing from Mr. Peng | 16,109 | — |
| | 16,543 | — |

Loans from Mr. Peng are repayable on demand and carried interest rates ranging from 5.52% S 6.138%. The loans were jointly guaranteed by SZ Liouxin, Saiweng, JXLXI and JSLXI, which are companies controlled by Mr. Peng.

F-36

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

**(23)    GEOGRAPHIC AND SEGMENT INFORMATION**

The following table summarizes the Company's net revenues, based on the geographic location of the customers:

|  | From July 5, 2005 to December 31, 2005 | Year ended December 31, 2006 |
|---|---|---|
| Mainland China | — | 79,647 |
| Asia Pacific other than Mainland China | — | 17,116 |
| North America | — | 5,305 |
| Europe | — | 3,386 |
| Total net revenue | — | 105,454 |

The Group's only operating segment is JXLDK, which is an operating subsidiary located in the PRC. Segment profit and loss is determined based on income (loss) before income taxes under generally accepted accounting principles in the PRC ("PRC GAAP"). Segment assets are total assets based on PRC GAAP.

Segment information is set out below:

|  | From July 5, 2005 to December 31, 2005 | Year ended December 31, 2006 |
|---|---|---|
| Segment and consolidated revenue | — | 105,454 |
| Segment income | — | 36,229 |
| Reconciling items (note (a)) | (309) | (6,160) |
| Consolidated (loss) income before income tax benefit | (309) | 30,069 |
| Segment assets (note (b)) | 31,921 | 291,355 |

*(a)    Reconciliation of segment income to consolidated (loss) income before tax benefit*

|  | From July 5, 2005 to December 31, 2005 | Year ended December 31, 2006 |
|---|---|---|
| Total segment income | — | 36,229 |
| PRC GAAP to US GAAP differences: | | |
| Pre-operating expenses | (309) | 309 |
| Share-based compensation | — | (2,028) |
| Discount amortization on the exchangeable notes | — | (4,440) |
| Interest on exchangeable notes | — | (13) |
| Decrease in fair value of warrants | — | 9 |
| Others | — | 3 |
| Consolidated (loss) income before income tax benefit | (309) | 30,069 |

F-37

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

LDK SOLAR CO., LTD. AND SUBSIDIARIES

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

*(b)    Reconciliation of total segment assets to consolidated total assets*

|  | December 31, 2005 | December 31, 2006 |
|---|---|---|
| Total segment assets | 31,921 | 291,355 |
| PRC GAAP to US GAAP differences: | | |
| Pre-operating expenses capitalized under PRC GAAP | (309) | — |
| Deferred income tax assets | 35 | 148 |
| Cash and deferred expenses of the Company | — | 1,169 |
| Cash of LDK International | — | 47 |
| Consolidated total assets | 31,647 | 292,719 |

**(24)    LDK SOLAR CO., LTD. (PARENT COMPANY)**

Relevant PRC statutory laws and regulation permit payments of dividends by JXLDK only out of their retained earnings, if any, as determined in accordance with the PRC accounting standards and regulations.

Under the Law of the PRC on Enterprises with Wholly Owned Foreign Investment, JXLDK is required to allocate at least 10% of their after tax profits, after making good of accumulated losses as reported in their PRC statutory financial statements, to the general reserve fund and have the right to discontinue allocations to the general reserve fund if the balance of such reserve has reached 50% of their registered capital. These statutory reserves are not available for distribution to the shareholders (except in liquidation) and may not be transferred in the form of loans, advances, or cash dividend.

US$3,623 were appropriated from retained earnings and set aside for the statutory reserve by JXLDK on December 31, 2006.

As a result of these PRC laws and regulations, JXLDK is restricted in its ability to transfer a portion of its net assets to either in the form of dividends, loans or advances, which consisted of paid-up capital and statutory reserve amounted to US$107,223 as of December 31, 2006.

The following presents condensed unconsolidated financial information of the Parent Company only.

*Condensed Balance Sheet as of December 31, 2006*

| | |
|---|---|
| Cash and cash equivalents | 178 |
| Due from subsidiaries | 2,149 |
| Deferred expenses | 991 |
| Investment in subsidiaries | 119,251 |
| Total assets | 122,569 |
| Warrant | 2 |
| Accrued expenses | 626 |
| Series A redeemable convertible preferred shares | 15,447 |
| Series B redeemable convertible preferred shares | 49,721 |
| Series C redeemable convertible preferred shares | 22,576 |
| Total shareholders' equity | 34,197 |
| Total liabilities, redeemable convertible preferred shares and shareholders' equity | 122,569 |

F-38

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

The Company had no contingencies, long-term obligations and guarantees as of December 31, 2006.

*Condensed Statement of Operations for the period from May 1, 2006 to December 31, 2006*

| | |
|---|---:|
| Interest income | 4 |
| Interest expense and amortization of discount on exchangeable notes | (4,454) |
| Decrease in fair value of warrant | 9 |
| Loss before income tax and equity in earnings from subsidiary | (4,441) |
| Equity in earnings from the subsidiary | 34,623 |
| Net income | 30,182 |
| Accretion of Series A redeemable convertible preferred shares to redemption value | (814) |
| Accretion of Series B redeemable convertible preferred shares to redemption value | (1,799) |
| Accretion of Series C redeemable conversion preferred shares to redemption value | (116) |
| Deemed dividend to Series A redeemable convertible preferred shareholders | (1,568) |
| Net income available to ordinary shareholders | 25,885 |

*Condensed Cash Flows for the period from May 1, 2006 to December 31, 2006*

| | |
|---|---:|
| *Cash flows from operating activities* | |
| Net income | 30,182 |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Interest on the exchangeable notes | 13 |
| Amortization of discount on exchangeable notes | 4,440 |
| Decrease in fair value of warrants | (9) |
| Equity in earnings from subsidiaries | (34,623) |
| Changes in operating liabilities: | |
| Due from subsidiaries | (2,149) |
| Net cash used in operating activities | (2,146) |
| *Cash flows from investing activities* | |
| Investment in subsidiary | (82,600) |
| Net cash used in investing activities | (82,600) |

F-39

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

| | |
|---|---:|
| *Cash flows from financing activities* | |
| Proceeds from issuance of ordinary shares | 10 |
| Payment of expenses relating to the proposed offer | (405) |
| Proceeds from issuance of exchangeable notes, net of issue cost US$52 | 7,948 |
| Proceeds from Series A-2 redeemable convertible preferred shares, net of issue cost US$51 | 6,949 |
| Proceeds from Series B redeemable convertible preferred shares, net of issue cost US$78 | 47,922 |
| Proceeds from Series C redeemable convertible preferred shares | 22,500 |
| Net cash provided by financing activities | 84,924 |
| Net increase in cash and cash equivalents | 178 |
| Cash and cash equivalents at beginning of period | — |
| Cash and cash equivalents at end of period | 178 |

**(25)  SUBSEQUENT EVENTS**

Pursuant to the share option scheme adopted on July 31, 2006, the Company's Board of Directors resolved on February 6, 2007 to grant 2,071,900 share options to a number of employees which enable the grantees to subscribe for 2,071,900 ordinary shares at an exercise price of US$ 9.00. The options have a contractual term of five years and vesting period of no less than three years, with no more than one-third of the options to be vested each year.

Pursuant to the above share option scheme, the Company's Board of Directors further resolved on April 17, 2007 to grant 550,900 share options in total to a number of employees, a non-executive director and a candidate of an independent director which enable the grantees to subscribe for 550,900 ordinary shares at the exercise price determined at the low-end price of the initial public offering price range, except for 200,000 share options granted to the non-executive director and the candidate of independent director, of which the exercise price is set at US$9.00. The grant of share options to the candidate of independent director is conditional upon the signing of the service contract between the Company and that candidate. The contractual term and vesting period of these share options are the same as those granted previously.

On March 6, 2007, LDK New Energy Holding Limited settled the subscription receivable of US$7,490 in cash.

On March 16, 2007, the National People's Congress of the PRC passed the PRC Enterprise Income Tax Law (the "EIT Law") which will become effective on January 1, 2008 when the FEIT Law will be abolished. The EIT Law adopts a uniform tax rate of 25% for all enterprises including foreign-invested enterprises and revokes the current tax exemption, reduction and preferential treatments only applicable to foreign-invested enterprises. Management has made an assessment of the potential financial impact of this new tax law on the Group's tax position and does not expect the change in the enacted tax law to have material impact on the Group's deferred tax assets and liabilities.

As described in notes 16(b) and (c), the terms of the Series B and Series C preferred shares provide that the respective Conversion Ratios are subject to adjustment based on the 2006/2007 net earnings and the 2007 net earnings respectively. In March 2007, the Company verbally agreed with each of the holders of Series B and Series C preferred shares that, if the Company's public filing for a Qualified IPO takes place on or before April 30, 2007, the 2006/2007 net earnings and the 2007 net earnings, based on which the respective Conversion Ratio adjustments are determined, would be adjusted on a pro-rata basis based on the net earnings

F-40

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JULY 5, 2005 TO DECEMBER 31, 2005**
**AND THE YEAR ENDED DECEMBER 31, 2006**
(Amounts in US$ thousands, except share and per share data)

for the eight months ended February 28, 2007 and the net earnings for the two months ended February 28, 2007, respectively. As of April 4, 2007, all the holders of the Series B and Series C preferred shares confirmed in writing, after their respective reviews of the net earnings up to February 28, 2007, that no adjustment to their respective Conversion Ratios as determined on the above basis needed to be made.

In April 2007, the Company further agreed with the holders of Series B and Series C preferred shares that if the Company's public filing for a qualified IPO on or before May 31, 2007, the Conversion Ratio adjustments for our Series B and Series C preferred shares would be determined with reference on the net income for the nine months ended March 31, 2007 and the net income for the three months ended March 31, 2007, respectively. As of May 11, 2007, the Company obtained written confirmations from all the holders of the Series B and Series C preferred shares confirming that, after their respective review of the net income up to March 31, 2007, no adjustment to their respective Conversion Ratios as determined on the above basis needs to be made.

F-41

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2006 AND MARCH 31, 2007**
(Amounts in US$ thousands, except share and per share data)

| | Note | December 31, 2006 | March 31, 2007 | Pro Forma March 31, 2007 (Note 12) |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | | 30,227 | 11,348 | 11,348 |
| Pledged bank deposits | | 4,956 | 5,444 | 5,444 |
| Trade accounts receivable, net | | 1,490 | 4,998 | 4,998 |
| Bills receivable | | 816 | — | — |
| Inventories | (3) | 94,886 | 114,205 | 114,205 |
| Prepayments to suppliers | | 37,718 | 52,777 | 52,777 |
| Deferred expenses | | 991 | 1,084 | 1,084 |
| Other current assets | | 1,662 | 4,196 | 4,196 |
| Total current assets | | 172,746 | 194,052 | 194,052 |
| Property, plant and equipment, net | | 100,875 | 117,678 | 117,678 |
| Deposit for purchase of equipment | | 11,090 | 21,075 | 21,075 |
| Intangible asset, net | | 1,149 | 1,129 | 1,129 |
| Land use rights | | 6,711 | 6,742 | 6,742 |
| Deferred income tax assets | | 148 | 149 | 149 |
| Total assets | | 292,719 | 340,825 | 340,825 |
| **Liabilities, redeemable convertible preferred shares and shareholders' equity** | | | | |
| Current liabilities | | | | |
| Short-term bank borrowings | (4) | 56,765 | 61,481 | 61,481 |
| Trade accounts payable | | 6,119 | 7,736 | 7,736 |
| Advance payments from customers | | 40,002 | 41,832 | 41,832 |
| Accrued expenses and other payables | | 14,600 | 20,349 | 20,349 |
| Total current liabilities | | 117,486 | 131,398 | 131,398 |
| Warrants | | 2 | 2 | 2 |
| Long-term bank borrowings, excluding current portions | (4) | 30,245 | 29,805 | 29,805 |
| Total liabilities | | 147,733 | 161,205 | 161,205 |

F-42

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS — (CONTINUED)**
**AS OF DECEMBER 31, 2006 AND MARCH 31, 2007**
(Amounts in US$ thousands, except share and per share data)

| | Note | December 31, 2006 | March 31, 2007 | Pro Forma March 31, 2007 (Note 12) |
|---|---|---|---|---|
| Series A redeemable convertible preferred shares: US$0.10 par value; 5,000,000 shares authorized; 4,580,000 shares issued and outstanding (Pro forma: Nil shares issued and outstanding) | (12) | 15,447 | 15,959 | — |
| Series B redeemable convertible preferred shares: US$0.10 par value; 8,000,000 shares authorized, issued and outstanding (Pro forma: Nil shares issued and outstanding) | (12) | 49,721 | 51,346 | — |
| Series C redeemable convertible preferred shares: US$0.10 par value; nil and 3,000,000 shares authorized, issued and outstanding (Pro forma: Nil shares issued and outstanding) | (12) | 22,576 | 23,381 | — |
| **Shareholders' equity** | | | | |
| Ordinary shares: US$0.10 par value; 134,000,000 shares authorized and 75,000,000 shares issued and outstanding (Pro forma: 90,580,000 shares issued and outstanding) | (12) | 7,500 | 7,500 | 9,058 |
| Additional paid-in capital | | 29,302 | 30,408 | 119,536 |
| Subscription receivable for ordinary shares | | (7,490) | — | — |
| Statutory reserve | | 3,623 | 3,623 | 3,623 |
| Accumulated other comprehensive income | | 2,319 | 3,823 | 3,823 |
| Retained earnings | | 21,988 | 43,580 | 43,580 |
| Total shareholders' equity | | 57,242 | 88,934 | 179,620 |
| Commitments and contingencies | (6) | | | |
| Total liabilities, redeemable convertible preferred shares and shareholders' equity | | 292,719 | 340,825 | 340,825 |

See accompanying notes to the unaudited condensed consolidated interim financial statements.

F-43

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

| | Note | Three-month periods ended | |
| --- | --- | --- | --- |
| | | March 31, 2006 | March 31, 2007 |
| Net sales | | | |
|     125mm*125mm wafer | | — | 28,426 |
|     156mm*156mm wafer | | — | 38,278 |
|     Silicon materials | | — | 2,330 |
|     Processing of wafers on behalf of others | | — | 4,366 |
| Total net sales | | — | 73,400 |
| Cost of goods sold | | | |
|     125mm*125mm wafer | | — | (17,662) |
|     156mm*156mm wafer | | — | (22,164) |
|     Silicon materials | | — | (3,200) |
|     Processing of wafers on behalf of others | | — | (1,994) |
| Total cost of goods sold | | — | (45,020) |
| Gross profit | | — | 28,380 |
| Selling expenses | | — | (183) |
| General and administrative expenses | | (129) | (1,819) |
| Research and development expenses | | — | (261) |
|     Total operating expenses | | (129) | (2,263) |
| (Loss) income from operations | | (129) | 26,117 |
| Other income (expenses): | | | |
|     Interest income | | 31 | 25 |
|     Interest expense | | (340) | (1,529) |
|     Foreign currency exchange loss, net | | (56) | (516) |
|     Government subsidy | | — | 437 |
| (Loss) income before income tax benefit | | (494) | 24,534 |
| Income tax benefit | (5) | 54 | — |
| Net (loss) income | | (440) | 24,534 |
| Accretion of Series A redeemable convertible preferred shares to redemption value | | — | (512) |
| Accretion of Series B redeemable convertible preferred shares to redemption value | | — | (1,625) |
| Accretion of Series C redeemable convertible preferred shares to redemption value | | — | (805) |

F-44

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS — (CONTINUED)**
**FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

| | Note | Three-month periods ended | |
| --- | --- | --- | --- |
| | | March 31, 2006 | March 31, 2007 |
| Net (loss) income available to ordinary shareholders | | (440) | 21,592 |
| Basic (loss) income per ordinary share | (9) | (0.01) | 0.29 |
| Diluted (loss) income per ordinary share | (9) | (0.01) | 0.27 |
| Unaudited pro forma net income per ordinary share: | | | |
|     Basic income per ordinary share | (12) | | 0.27 |
|     Diluted income per ordinary share | (12) | | 0.27 |

See accompanying notes to the unaudited condensed consolidated interim financial statements.

F-45

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY AND COMPREHENSIVE INCOME**
**FOR THE THREE-MONTH PERIOD ENDED MARCH 31, 2007**
(Amounts in US$ thousands, except share and per share data)

| | Ordinary shares | | Additional Paid-in Capital | Subscription Receivable for Ordinary shares | Statutory Reserve | Accumulated Other Comprehensive Income | Retained Earnings | Total Shareholders' Equity | Total Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Amount | | | | | | | |
| January 1, 2007 | 75,000,000 | 7,500 | 29,302 | (7,490) | 3,623 | 2,319 | 21,988 | 57,242 | |
| Net income | — | — | — | — | — | — | 24,534 | 24,534 | 24,534 |
| Foreign currency translation adjustment, net of nil tax | — | — | — | — | — | 1,504 | — | 1,504 | 1,504 |
| Total comprehensive income | — | — | — | — | — | — | — | | 26,038 |
| Settlement of subscription receivable | — | — | — | 7,490 | — | — | — | 7,490 | |
| Share options | — | — | 1,106 | — | — | — | — | 1,106 | |
| Accretion of Series A redeemable convertible preferred shares to redemption value | — | — | — | — | — | — | (512) | (512) | |
| Accretion of Series B redeemable convertible preferred shares to redemption value | — | — | — | — | — | — | (1,625) | (1,625) | |
| Accretion of Series C redeemable convertible preferred shares to redemption value | — | — | — | — | — | — | (805) | (805) | |
| March 31, 2007 | 75,000,000 | 7,500 | 30,408 | — | 3,623 | 3,823 | 43,580 | 88,934 | |

See accompanying notes to the unaudited condensed consolidated interim financial statements.

F-46

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

| | Note | Three-month periods ended | |
| --- | --- | --- | --- |
| | | March 31, 2006 | March 31, 2007 |
| Cash flows from operating activities: | | | |
| Net (loss) income | | (440) | 24,534 |
| Adjustments to reconcile net (loss) income to net cash used in operating activities: | | | |
| Depreciation and amortization | | 1 | 2,102 |
| Deferred income tax benefit | | (54) | — |
| Share-based compensation | | — | 1,106 |
| Changes in operating assets and liabilities: | | | |
| Pledged bank deposits | | — | (488) |
| Trade accounts receivable and bills receivable | | (8,438) | (2,692) |
| Inventories | | (5,247) | (19,319) |
| Prepayments to suppliers | | (15,503) | (15,059) |
| Other | | (102) | (2,577) |
| Trade accounts payable | | (10) | 1,617 |
| Advance payments from customers | | 32,064 | 1,830 |
| Accrued expenses and other payables | | 240 | 239 |
| Net cash provided by (used in) operating activities | | 2,511 | (8,707) |
| Cash flows from investing activities: | | | |
| Purchase of land use rights | | (2,022) | (1,293) |
| Purchase of property, plant and equipment | | (17,073) | (22,043) |
| Net cash used in investing activities | | (19,095) | (23,336) |
| Cash flows from financing activities: | | | |
| Capital contributions | | 2,022 | — |
| Proceeds from new loans and borrowings | | 20,581 | 20,454 |
| Repayment of loans and borrowings | | — | (16,178) |
| Loans and advances from related parties | | 2,779 | — |
| Repayment of loans and advances from related parties | | 5,520 | — |
| Cash received for subscription receivable for ordinary shares | | — | 7,490 |
| Issue costs of Series C redeemable convertible preferred shares | | — | (40) |
| Payments of expenses relating to the proposed offer | | - | (66) |
| Net cash provided by financing activities | | 30,902 | 11,660 |

F-47

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS — (Continued)**
**FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

| | Note | Three-Month Periods Ended | |
| --- | --- | --- | --- |
| | | March 31, 2006 | March 31, 2007 |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | | 92 | 1,504 |
| Net increase (decrease) in cash and cash equivalents | | 14,410 | (18,879) |
| Cash and cash equivalents at beginning of period | | 9,687 | 30,227 |
| Cash and cash equivalents at end of period | | 24,097 | 11,348 |
| Supplemental disclosures of cash flow information: | | | |
| Interest payments, net of amount capitalized | | — | 1,529 |
| Supplemental disclosures of non-cash investing and financing transaction: | | | |
| Payable for purchase of property, plant and equipment | | — | 6,932 |
| Offset of amounts due to/from a related party | | 5,478 | — |

See accompanying notes to the unaudited condensed consolidated interim financial statements.

F-48

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE UNAUDITED CONDENSED
CONSOLIDATED INTERIM FINANCIAL STATEMENTS
FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

## (1) PRINCIPAL ACTIVITIES, ORGANIZATION AND BASIS OF PRESENTATION

*Principal activities*

The accompanying unaudited condensed consolidated interim financial statements consist of the financial statements of LDK Solar Co., Ltd. (the "Company" or "LDK"), and its subsidiaries Jiangxi LDK Solar Hi-Tech Co., Ltd. ("JXLDK"), LDK International Solar Co., Ltd. ("LDK International") and LDK Solar USA Inc. ("LDK USA"). The Company and its subsidiaries are collectively referred to as the "Group".

The Group's principal activities are manufacture, processing and sale of multicrystalline silicon wafers.

*Basis of presentation*

The accompanying unaudited condensed consolidated interim financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("US GAAP"). Certain information and footnote disclosures normally included in financial statements prepared in accordance with US GAAP have been condensed or omitted as permitted by rules and regulations of the U.S. Securities and Exchange Commission. The December 31, 2006 consolidated balance sheet was derived from audited consolidated financial statements of the Group, but does not include all disclosures required by US GAAP. However, the Company believes that the disclosures are adequate to make the information presented not misleading. The accompanying unaudited condensed consolidated interim financial statements should be read in conjunction with the audited consolidated financial statements and the notes thereto, for the fiscal year ended December 31, 2006.

In the opinion of management, all adjustments (which include normal recurring adjustments) necessary to present a fair statement of the financial position as of March 31, 2007, and the result of operations and cash flows for the three-month periods ended March 31, 2006 and 2007, have been made. The unaudited condensed consolidated statements of operations for the three-month period ended March 31, 2007 are not necessarily indicative of the operation results for the full fiscal year or any future periods.

See note 12 for basis of presentation of unaudited pro forma information.

## (2) SIGNIFICANT ACCOUNTING POLICIES

The unaudited condensed consolidated interim financial statements have been prepared in accordance with the same accounting policies adopted in the 2006 annual financial statements.

## (3) INVENTORIES

|  | December 31, 2006 | March 31, 2007 |
|---|---|---|
| Inventories consist of the following: |  |  |
| Raw materials | 79,496 | 93,914 |
| Work in progress | 8,884 | 11,192 |
| Supplies | 1,410 | 2,020 |
| Finished goods | 5,096 | 7,079 |
|  | 94,886 | 114,205 |

F-49

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE UNAUDITED CONDENSED
CONSOLIDATED INTERIM FINANCIAL STATEMENTS
FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

The Group had US$2,859 and US$4,142 of raw materials consigned to third parties as at December 31, 2006 and March 31, 2007 respectively.

**(4)    BANK BORROWINGS**

**(a)    Current**

|  | December 31, 2006 | March 31, 2007 |
|---|---|---|
| Bank borrowings — secured | 20,026 | 28,445 |
| Bank borrowings — unsecured | 31,739 | 18,748 |
| Current installments of long-term bank borrowings (note(b)) | 5,000 | 14,288 |
|  | 56,765 | 61,481 |

The short-term bank borrowings outstanding as of March 31, 2007 carry a weighted average interest rate of 6.051%. The short-term bank borrowings have maturity terms ranging from one to twelve months and interest rates ranging from 5.022% to 6.965% and are borrowed for working capital purpose. None of the short-term bank borrowings contain any financial covenants. Bank loans of US$23,273 were secured over JXLDK's buildings and land use rights with the carrying amounts of US$6,254 and US$3,296 as of March 31, 2007 respectively as well as buildings and land use rights owned by a company controlled by Mr. Peng.

Through Bank of China, Xinyu Branch, JXLDK borrowed US$14,971 from Jiangxi Liouxin Industry Co., Ltd. ("JXLXI") in December 2006 through an entrusted loan agreement. The loan carries an interest rate of 5.022% and is repayable on demand. US$9,122 was repaid for the three-month period ended March 31, 2007. The entrusted loan was included in unsecured bank borrowings as of March 31, 2007.

Among the remaining unsecured bank borrowings, US$12,899 was guaranteed by companies controlled by Mr. Peng, Jiangsu Liou Xin Industrial Park Co., Ltd. ("JSLXI"), JXLXI and Suzhou Liouxin Industry Co., Ltd. ("SZ Liouxin").

The Group has total revolving credit of US$79,411 and unused credit of US$42,239 as of March 31, 2007.

**(b)    Non-current**

|  | December 31, 2006 | March 31, 2007 |
|---|---|---|
| Secured loan from China Construction Bank | 10,245 | 10,343 |
| Secured loan from China Development Bank | 25,000 | 25,000 |
| Secured loan from Bank of China | — | 8,750 |
|  | 35,245 | 44,093 |
| Less: current portion | (5,000) | (14,288) |
|  | 30,245 | 29,805 |

In March 2006, the Group borrowed RMB80,000 from China Construction Bank of which RMB38,000 is repayable in 2008 and RMB42,000 is repayable in 2009. The loan carries variable interest with an effective rate of 6.970% as of March 31, 2007. Interest is payable semi-annually. The loan is guaranteed by SZ Liouxin

F-50

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE UNAUDITED CONDENSED**
**CONSOLIDATED INTERIM FINANCIAL STATEMENTS**
**FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

and US$8,942 is secured by the JXLDK's plant and machinery with carrying amounts of US$23,994 as of March 31, 2007.

In December 2006, the Group borrowed US$25,000 from China Development Bank, which is repayable in 5 equal annual installment of US$5,000 through December of 2011. The loan carries variable interest with an effective rate of 6.870% as of March 31, 2007. Interest is payable monthly. The loan is secured by JXLDK's plant and machinery, construction in progress and land use rights with carrying amounts of US$41,264, US$40 and US$3,445 as of March 31, 2007 respectively and is guaranteed by the Company's shareholders, Mr. Peng and his wife.

In February 2007, the Group borrowed US$8,750 from Bank of China, which is repayable in two equal annual installments of US$4,375 each through February of 2009. The loan carries variable interest with an effective rate of 8.7312% as of March 31, 2007. Interest is payable quarterly. The loan is pledged by 150 tons silicon material and is guaranteed by SZ Liouxin and JXLXI and the Company's shareholder, Mr. Peng.

Future principal repayments on the long-term bank borrowing are as follows:

| | |
|---|---:|
| 2007 | 5,000 |
| 2008 | 14,288 |
| 2009 | 14,805 |
| 2010 | 5,000 |
| 2011 | 5,000 |
| | 44,093 |

**(5)   INCOME TAXES**

The actual income tax benefit differed from the amounts computed by applying the statutory PRC enterprise income tax rate of 33% to pre-tax (loss) income as a result of the following:

| | Three-Month Periods Ended | | | |
|---|---:|---:|---:|---:|
| | March 31, 2006 | | March 31, 2007 | |
| (Loss) income before tax | (494) | 100% | 24,534 | 100% |
| Computed income tax (benefit) expense | (163) | 33% | 8,096 | 33% |
| Non-deductible expenses | | | | |
| Share-based compensation | — | — | 365 | 1% |
| Pre-operating expenses | 109 | (22%) | — | — |
| Tax holiday | — | — | (8,461) | (34%) |
| Actual income tax benefit | (54) | 11% | — | — |

Without the tax holiday the Group's income tax expense would have increased and basic and diluted net income per ordinary share for the three-month period ended March 31, 2007 would have been reduced by US$8,461, US$0.11 and US$0.09 respectively.

The PRC tax system is subject to substantial uncertainties and has been subject to recently enacted changes, the interpretation and enforcement of which are also uncertain. There can be no assurance that

F-51

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE UNAUDITED CONDENSED**
**CONSOLIDATED INTERIM FINANCIAL STATEMENTS**
**FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

changes in PRC tax laws or their interpretation or their application will not subject the Group's PRC entities to substantial PRC taxes in the future.

**(6)   COMMITMENTS AND CONTINGENCIES**

*(a)      Capital commitments*

Capital commitments outstanding at December 31, 2006 and March 31, 2007 not provided for in the financial statements were as follows:

|  | December 31, 2006 | March 31, 2007 |
|---|---|---|
| Production line construction projects | 212,317 | 197,908 |

*(b)      Purchase commitments*

The Group has entered into several purchase agreements with certain suppliers whereby the Group is committed to purchase a minimum amount of raw materials to be used in the manufacture of its products:

|  | December 31, 2006 | March 31, 2007 |
|---|---|---|
| Future minimum purchases | 847,790 | 896,694 |

Included in the above purchase commitments was an amount of US$726.6 million that related to a long-term supply contract to procure an agreed quantity of raw materials at an agreed price during 2006 to 2011. Pursuant to that contract, the contract price is to be renegotiated every six months. The purchase commitment of US$726.6 million included above was determined based on the agreed quantities and the effective contract price as at March 31, 2007.

**(7)   REDEEMABLE CONVERTIBLE PREFERRED SHARES**

The holders of Series A, Series B and Series C preferred shares have the right to convert all or any portion of their holdings into ordinary shares of the Company at the then applicable conversion ratio (the "Conversion ratio") at any time after the dates of issuance to the closing of a Qualified IPO.

The terms of the Series A preferred shares provide that the Conversion ratio is subject to adjustment based on the 2007 net earnings. As the contingency relating to the 2007 audited net earnings was not resolved as of March 31, 2007, management has not considered the 2007 conversion ratio adjustment when preparing the unaudited condensed interim consolidated financial statements for the three-month period ended March 31, 2007.

The terms of the Series B and Series C preferred shares provide that the respective Conversion ratios are subject to adjustment based on the 2006/2007 net earnings and the 2007 net earnings respectively. In March 2007, the Company verbally agreed with each of the holders of Series B and Series C preferred shares that, if the Company's public filing for an Qualified IPO takes place on or before April 30, 2007, the 2006/2007 net earnings and the 2007 net earnings, based on which the respective Conversion ratio adjustment are determined, would be adjusted on a pro-rata basis based on the net earnings for the eight months ended February 28, 2007 and the net earnings for the two months ended February 28, 2007 respectively.

As of April 4, 2007, all the holders of Series B and Series C preferred shares have confirmed in writing that no adjustment to the initial Conversion ratio need to be made.

F-52

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE UNAUDITED CONDENSED
CONSOLIDATED INTERIM FINANCIAL STATEMENTS
FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

**(8)    SHARE OPTION**

*Share options to employees*

On February 6, 2007, the Board of Directors of the Company approved the granting of 2,071,900 share options to the Company's executives and employees at an exercise price of US$9.00 with a contractual term of five years and vesting period of no less than three years, with no more than one-third of the options to be vested each year.

A summary of option movements for the three-month period ended March 31, 2007 is presented below:

| | Employees | Non Employees | Investors | Number of Total Shares Involved in the Option | Weighted Average Exercise Price Per Share | Average Remaining Contractual Term |
|---|---|---|---|---|---|---|
| Outstanding as of January 1, 2007 | 5,850,000 | 210,000 | 200,000 | 6,260,000 | | |
| Granted | 2,071,900 | — | — | 2,071,900 | | |
| Exercised | — | — | — | — | | |
| Forfeited or cancelled | (92,100) | (80,000) | — | (172,100) | | |
| Outstanding as of March 31, 2007 | 7,829,800 | 130,000 | 200,000 | 8,159,800 | US$   5.60 | 4.7 years |
| Exercisable as of March 31, 2007 | — | — | — | — | — | — |

As of March 31, 2007, there was US$14,620 of total unrecognized compensation cost related to non-vested share options. This cost is expected to be recognized over the next 3 years. The Company is expected to issue new shares to satisfy share option exercises.

F-53

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE UNAUDITED CONDENSED
CONSOLIDATED INTERIM FINANCIAL STATEMENTS
FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

**(9)    NET (LOSS) INCOME PER SHARE**

The computation of basic and diluted net (loss) income per share is as follows:

|  | Three-month Periods Ended | |
|---|---|---|
|  | March 31, 2006 | March 31, 2007 |
| Numerator used in computing basic net (loss) income per share, net (loss) income available to ordinary shareholders | (440) | 21,592 |
| Accretion of Series A redeemable convertible preferred shares to redemption value | — | 512 |
| Accretion of Series B redeemable convertible preferred shares to redemption value | — | 1,625 |
| Accretion of Series C redeemable convertible preferred shares to redemption value | — | 805 |
| Numerator used in computing diluted net (loss) income per share | (440) | 24,534 |
| Shares (denominator): | | |
| Weighted average number of ordinary shares outstanding used in computing basic net (loss) income per share | 75,000,000 | 75,000,000 |
| Plus weighted average Series A redeemable convertible preferred shares outstanding | — | 4,580,000 |
| Plus weighted average Series B redeemable convertible preferred shares outstanding | — | 8,000,000 |
| Plus weighted average Series C redeemable convertible preferred shares outstanding | — | 3,000,000 |
| Weighted average number of ordinary shares outstanding used in computing diluted net (loss) income per share | 75,000,000 | 90,580,000 |
| Net (loss) income per share — basic | (0.01) | 0.29 |
| Net (loss) income per share — diluted | (0.01) | 0.27 |

During the three-month period ended March 31, 2007, the Group's dilutive potential ordinary shares outstanding, in addition to the Series A, B and C redeemable convertible preferred shares included in the above computation, consist of share options and warrants issued in connection with the Series A Shares. In computing diluted income per share for the three-month period ended March 31, 2007, there was no dilutive effect of outstanding share options of 8,159,800 by applying the treasury stock method because the ordinary shares assumed to be issued upon the exercise of the share options was less than the number of shares assumed to be purchased at the average estimated fair value during the period. The proceeds used for the assumed purchase include the sum of the exercise price of the share options and the average unrecognized compensation cost. There was no dilutive effect of outstanding warrants because the condition to trigger the exercising of the warrants was not satisfied as of March 31, 2007, and was assumed to remain unchanged until the end of the contingency period.

F-54

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Table of Contents

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE UNAUDITED CONDENSED**
**CONSOLIDATED INTERIM FINANCIAL STATEMENTS**
**FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

**(10)     RELATED PARTY TRANSACTIONS**

The Group has entered into a number of transactions with related parties. Amounts outstanding and the amounts of transactions with these related parties for the three-month period ended March 31, 2007 are as follows:

(i) Companies controlled by Mr. Peng have provided guarantees or collateral to JXLDK's bankers to secure the JXLDK's bank loans (refer to note 4)

(ii) JXLDK leased an office in Harbour Ring Plaza from SZ Liouxin free of charge. SZ Liouxin signed the lease contract with a monthly rental charge of US$5. The period of the contract is from December 2005 to December 2007.

**(11)     SEGMENT INFORMATION**

Segment information is set out below:

|  | Three-month Periods Ended | |
|---|---|---|
|  | March 31, 2006 | March 31, 2007 |
| Segment and consolidated revenue | — | 73,400 |
| Segment income | — | 25,645 |
| Reconciling items (note(a)) | (494) | (1,111) |
| Consolidated (loss) income before income tax benefit | (494) | 24,534 |
| Segment assets (note(b)) | 93,315 | 339,497 |

**(a)     Reconciliation of segment income to consolidated (loss) income before tax benefit**

|  | Three-month Periods Ended | |
|---|---|---|
|  | March 31, 2006 | March 31, 2007 |
| Total segment income | — | 25,645 |
| PRC GAAP to US GAAP differences: |  |  |
| Pre-operating expenses | (494) | — |
| Share-based compensation | — | (1,106) |
| Decrease in fair value of warrants | — | (2) |
| Others | — | (3) |
| Consolidated (loss) income before income tax benefit | (494) | 24,534 |

F-55

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE UNAUDITED CONDENSED**
**CONSOLIDATED INTERIM FINANCIAL STATEMENTS**
**FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

*(b)*    *Reconciliation of total segment assets to consolidated total assets*

| | March 31, 2006 | March 31, 2007 |
|---|---:|---:|
| Total segment assets | 93,315 | 339,497 |
| PRC GAAP to US GAAP differences: | | |
| Pre-operating expenses capitalized under PRC GAAP | (803) | — |
| Deferred income tax assets | 89 | 149 |
| Cash and deferred expenses of the Company | — | 1,127 |
| Cash of LDK US | — | 45 |
| Cash of LDK International | — | 7 |
| Consolidated total assets | 92,601 | 340,825 |

**(12)    UNAUDITED PRO FORMA INFORMATION**

If an initial public offering is completed, all of the Series A, Series B and Series C redeemable convertible preferred shares outstanding will automatically convert into 15,580,000 shares of ordinary shares, based on the number of Series A, Series B and Series C redeemable convertible preferred shares of 4,580,000, 8,000,000 and 3,000,000, respectively outstanding at March 31, 2007.

The accompanying unaudited pro forma balance sheet as of March 31, 2007, gives effect to the conversion of the total number of 15,580,000 Series A, Series B and Series C redeemable convertible preferred shares with carrying value of US$90,686 into 15,580,000 ordinary shares.

The accompanying unaudited pro forma basic and diluted net income per share available to ordinary shareholders gives effect to (i) the elimination of accretion to redemption value had the conversion of the redeemable convertible preferred shares occurred on January 1, 2007, and (ii) the incremental number of ordinary shares that would have been outstanding had the redeemable convertible preferred shares been converted into ordinary shares on January 1, 2007.

| | Pro Forma March 31, 2007 |
|---|---:|
| Numerator used in basic and diluted net income per share | |
| Net income available to ordinary shareholders as reported | 21,592 |
| Add: Accretion to redemption value on redeemable convertible preferred shares | 2,942 |
| Pro forma net income available to ordinary shareholders | 24,534 |
| Shares (denominator): | |
| Weighted average number of ordinary shares outstanding | 90,580,000 |
| Pro form net income per share — basic | 0.27 |
| Pro form net income per share — diluted | 0.27 |

F-56

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**LDK SOLAR CO., LTD. AND SUBSIDIARIES**

**NOTES TO THE UNAUDITED CONDENSED**
**CONSOLIDATED INTERIM FINANCIAL STATEMENTS**
**FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2006 AND 2007**
(Amounts in US$ thousands, except share and per share data)

**(13)    SUBSEQUENT EVENTS**

The terms of the Series B and Series C preferred shares provide that the respective Conversion ratios are subject to adjustment based on the 2006/2007 net earnings and the 2007 net earnings respectively. As of May 11, 2007, the Company obtained written confirmations from all the holders of the Series B and Series C preferred shares confirming that, after their review of the net income up to March 31, 2007, no adjustment to their respective Conversion ratios needs to be made.

Pursuant to the share option scheme adopted on July 31, 2006, the Company's Board of Directors resolved on April 17, 2007 to grant 550,900 share options in total to a number of employees, a non-executive director and a candidate of an independent director which enable the grantees to subscribe for 550,900 ordinary shares at the exercise price determined at the low-end price of the initial public offering price range, except for 200,000 share options granted to the non-executive director and the candidate of independent director, of which the exercise price is set at US$9.00. The grant of shares options to the candidate of independent director is conditional upon the signing of the service contract between the Company and that candidate. The options have a contractual term of five years and vesting period of no less than three years, with no more than one-third of the options to be vested each year.

F-57

Source: LDK Solar Co., Ltd., F-1, May 11, 2007



Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**PART II**

**INFORMATION NOT REQUIRED IN PROSPECTUS**

**Item 6.** *Indemnification of Directors and Officers*

Cayman Islands law and Article 167 of our fourth amended and restated articles of association provide that we may indemnify our directors, secretary, officers, liquidator and trustees (if any) acting in relation to any of our affairs against all actions costs, charges, losses, damages and expenses incurred by reason of any act done or omitted in the execution of their duty in their capacities as such, except if they acted in a fraudulent or dishonest manner or defaulted in any action against them.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted for our directors or officers under the provisions contained in our fourth amended and restated memorandum and articles of association, the Cayman Islands law or otherwise, we have been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities, other than the payment by us of expenses incurred or paid by one of our directors or officers in the successful defense of any action, suit, or proceeding, is asserted by such director or officer, we will, unless in the opinion of our counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by us is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

We intend to purchase and maintain insurance on behalf of our directors and officers insuring them against liabilities that they may incur in their capacities as or arising out of their status as directors or officers.

**Item 7.** *Recent Sales of Unregistered Securities*

As of the date hereof, we have sold unregistered securities as set forth below. The consideration we received in each case was cash, except as provided below. No underwriters were employed in any of these transactions. We believe that all of these sales were exempt from registration under the Securities Act pursuant to Section 4(2) of the Securities Act or Regulation D promulgated under the Securities Act as transactions by an issuer not involving a public offering or pursuant to Regulation S promulgated under the Securities Act as sales by an issuer in offshore transactions.

- On May 1, 2006, the registrant issued 10,000 ordinary share, par value $1.00 per share, to LDK New Energy Holding Limited for a cash consideration of $10,000. These shares were subsequently split into 100,000 ordinary shares with a par value of $0.10 each.

- On July 18, 2006, the registrant issued 74,900,000 ordinary share, par value $0.10 per share, to LDK New Energy Holding Limited for a consideration of $7,490,000.

- On July 21, 2006, the registrant issued an exchangeable note due September 30, 2006 to Brilliant Ever Investments Limited in the aggregate principal amount of $5,333,333.

- On July 21, 2006, the registrant issued an exchangeable note due September 30, 2006 to Boundless Future Investment Limited in the aggregate principal amount of $2,666,667.

- On July 31, 2006, the registrant issued 2,000,000 Series A-1 preferred shares, par value $0.10 each, to Brilliant Ever Investments Limited upon its exchange of an exchangeable note in the aggregate principal amount of $5,333,333.

- On July 31, 2006, the registrant issued 1,000,000 Series A-1 preferred shares, par value $0.10 each, to Boundless Future Investment Limited upon its exchange of an exchangeable note in the aggregate principal amount of $2,666,667.

- On July 31, 2006, the registrant issued 1,128,571 Series A-2 preferred shares, par value $0.10 each, to Financiere Natixis Singapore 4 Pte Ltd (formerly known as Financiere Natexis Singapore 4 Pte Ltd) for an aggregate cash consideration of $5,000,000.

II-1

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

- On July 31, 2006, the registrant issued 451,429 Series A-2 preferred shares, par value $0.10 each, to Decatur Overseas Corporation for an aggregate cash consideration of $2,000,000.

- On July 28, 2006, the registrant issued a warrant to Brilliant Ever Investments Limited, exercisable in whole or in part if we issue more than 20,420,000 ordinary shares, par value $0.10 per share, prior to this initial public offering, to entitle Brilliant Ever Investments Limited to purchase additional Series A-1 preferred shares from us at the price of $2.667 per share to ensure its equity interest in our company at 2.0%.

- On July 28, 2006, the registrant issued a warrant to Boundless Future Investment Limited, exercisable in whole or in part if we issue more than 20,420,000 ordinary shares, par value $0.10 per share, prior to this initial public offering, to entitle Boundless Future Investment Limited to purchase additional Series A-1 preferred shares from us at the price of $2.667 per share to ensure its equity interest in our company at 1.0%.

- On July 28, 2006, the registrant issued a warrant to Financiere Natixis Singapore 4 Pte Ltd, exercisable in whole or in part if we issue more than 20,420,000 ordinary shares, par value $0.10 per share, prior to this initial public offering, to entitle Financiere Natixis Singapore 4 Pte Ltd to purchase additional Series A-2 preferred shares from us at the price of $4.43 per share to ensure its equity interest in our company at 1.1286%.

- On July 28, 2006, the registrant issued a warrant to Decatur Overseas Corporation, exercisable in whole or in part if we issue more than 20,420,000 ordinary shares, par value $0.10 per share, prior to this initial public offering, to entitle Decatur Overseas Corporation to purchase additional Series A-2 preferred shares from us at the price of $4.43 per share to ensure its equity interest in our company at 0.4514%.

- On August 1, 2006, the registrant granted stock options exercisable for an aggregate of 6,640,000 ordinary shares, with an exercise price of $4.45 per share, of which options for an aggregate of 546,100 ordinary shares have been forfeited for cause.

- On September 28, 2006, the registrant issued 2,000,000 Series B preferred shares, par value $0.10 each, to CDH SolarFuture Limited for an aggregate cash consideration of $12,000,000.

- On September 28, 2006, the registrant issued 1,150,000 Series B preferred shares, par value $0.10 each, to Financiere Natixis Singapore 4 Pte Ltd for an aggregate cash consideration of $6,900,000.

- On September 28, 2006, the registrant issued 1,150,000 Series B preferred shares, par value $0.10 each, to Shine Field Investment Limited for an aggregate cash consideration of $6,900,000.

- On September 28, 2006, the registrant issued 1,000,000 Series B preferred shares, par value $0.10 each, to CHF Wafer Company Limited for an aggregate cash consideration of $6,000,000.

- On September 28, 2006, the registrant issued 833,333 Series B preferred shares, par value $0.10 each, to China Environment Fund 2004, LP for an aggregate cash consideration of $4,999,998.

- On September 28, 2006, the registrant issued 833,333 Series B preferred shares, par value $0.10 each, to JAFCO Asia Technology Fund III for an aggregate cash consideration of $4,999,998.

- On September 28, 2006, the registrant issued 500,000 Series B preferred shares, par value $0.10 each, to MUS Roosevelt China Pacific Fund L.P. for an aggregate cash consideration of $3,000,000.

- On September 28, 2006, the registrant issued 250,000 Series B preferred shares, par value $0.10 each, to Tech Team Holdings Limited for an aggregate cash consideration of $1,500,000.

- On September 28, 2006, the registrant issued 250,000 Series B preferred shares, par value $0.10 each, to Grand Gains International Limited for an aggregate cash consideration of $1,500,000.

- On September 28, 2006, the registrant issued 33,334 Series B preferred shares, par value $0.10 each, to BOFA Capital Company Limited for an aggregate cash consideration of $200,004.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

- On December 19, 2006, the registrant issued 1,466,666 Series C preferred shares, par value $0.10 each, to Financiere Natixis Singapore 4 Pte Ltd for an aggregate cash consideration of $11,000,000.

- On December 19, 2006, the registrant issued 1,066,667 Series C preferred shares, par value $0.10 each, to CDH SolarFuture Limited for an aggregate cash consideration of $8,000,000.

- On December 19, 2006, the registrant issued 333,333 Series C preferred shares, par value $0.10 each, to Shine Field Investments Limited for an aggregate cash consideration of $2,500,000.

- On December 19, 2006, the registrant issued 66,667 Series C preferred shares, par value $0.10 each, to China Environment Fund 2002, LP for an aggregate cash consideration of $500,000.

- On December 19, 2006, the registrant issued 25,233 Series C preferred shares, par value $0.10 each, to Silverpointe Investments Ltd. for an aggregate cash consideration of $199,249.

- On December 19, 2006, the registrant issued 20,049 Series C preferred shares, par value $0.10 each, to MUS Roosevelt China Pacific Fund L.P. for an aggregate cash consideration of $150,366.

- On December 19, 2006, the registrant issued 20,048 Series C preferred shares, par value $0.10 each, to Tech Team Holdings Limited for an aggregate cash consideration of $150,358.

- On December 19, 2006, the registrant issued 1,337 Series C preferred shares, par value $0.10 each, to BOFA Capital Company Limited for an aggregate cash consideration of $10,027.

- On February 6, 2007, the registrant granted stock options exercisable for an aggregate of 2,071,900 ordinary shares, with an exercise price of $9.00 per share, of which options for an aggregate of 6,000 ordinary shares have been forfeited for cause.

- On April 17, 2007, the registrant (i) granted stock options exercisable for an aggregate of 100,000 ordinary shares, with an exercise price of $9.00 per share, to an existing director; (ii) authorized stock options to be granted to its employees to purchase 350,900 ordinary shares, the exercise price for which will be the low end of the price range for this offering as shown on the cover of the preliminary prospectus, i.e. $         per share; and (iii) authorized options to purchase 100,000 ordinary shares at the exercise price of $9.00 to be granted to Mr. Louis T. Hsieh, who will become its director on the date of the prospectus; with the grant date for the options to purchase 350,900 ordinary shares to be granted to its employees being the date of the preliminary prospectus, and the grant date for the options to be granted to Mr. Hsieh being the date of the prospectus.

We used or plan to use the net proceeds from our Series A, Series B and Series C preferred shares placements primarily to fund our capital expenditures and purchases of polysilicon feedstock and for general corporate purposes.

See "Management — 2006 Stock Incentive Plan" in Part I for a list of all options granted by the registrant.

**Item 8.**   *Exhibits and Financial Statement Schedules*

(a) *Exhibits*

See Index to Exhibits following page II-6 of this registration statement.

(b) *Financial Statement Schedules*

All schedules have been omitted since they are not required or are not applicable or the required information is shown in the financial statements or related notes.

**Item 9.**   *Undertakings*

The registrant hereby undertakes to provide to the underwriters at the closing specified in the underwriting agreement, certificates in such denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the registrant pursuant to the provisions described in Item 6 above, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The registrant hereby undertakes that:

(1) for purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant under Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) for the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) for the purpose of determining liability under the Securities Act to any purchase, if the registrant is subject to Rule 430C, each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness; *provided, however,* that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(4) for the purpose of determining liability of the registrant under the Securities Act to any purchaser in the initial distribution of the securities, in a primary offering of securities of the registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any the following communications, the registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

• any preliminary prospectus or prospectus of the registrant relating to the offering required to be filed pursuant to Rule 424;

• any free writing prospectus relating to the offering prepared by or on behalf of the registrant or used or referred to by the registrant;

• the portion of any other free writing prospectus relating to the offering containing material information about the registrant or its securities provided by or on behalf of the registrant; and

• any other communication that is an offer in the offering made by the registrant to the purchaser.

II-4

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form F-1 and has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized on May 11, 2007.

LDK SOLAR, CO., LTD.

By: /s/ *Xiaofeng Peng*
Name: Xiaofeng Peng
Title:    Chairman & Chief Executive Officer

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Xiaofeng Peng and Jack Lai, and each of them, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this registration statement, and to sign any registration statement for the same offering covered by the registration statement that is to be effective upon filing pursuant to Rule 462(b) promulgated under the Securities Act of 1933 and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their or his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ *Xiaofeng Peng*<br>Xiaofeng Peng | Chairman & Chief Executive Officer | May 11, 2007 |
| /s/ *Xingxue Tong*<br>Xingxue Tong | Director, President & Chief Operating Officer | May 11, 2007 |
| /s/ *Liangbao Zhu*<br>Liangbao Zhu | Director & Senior Vice President | May 11, 2007 |
| /s/ *Yonggang Shao*<br>Yonggang Shao | Director & Senior Vice President | May 11, 2007 |
| /s/ *Gang Wang*<br>Gang Wang | Non-Executive Director | May 11, 2007 |

II-5

| Signature | Title | Date |
|---|---|---|
| /s/ *Jack Lai*<br>Jack Lai | Executive Vice President,<br>Chief Financial Officer &<br>Authorized Representative<br>in the United States | May 11, 2007 |
| /s/ *Qiqiang Yao*<br>Qiqiang Yao | Assistant President &<br>Principal Accounting Officer | May 11, 2007 |

II-6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

**INDEX TO EXHIBITS**

| Exhibit Number | Description |
| --- | --- |
| 1.1* | Form of Underwriting Agreement |
| 3.1 | Third Amended and Restated Memorandum and Articles of Association of the registrant |
| 3.2 | Fourth Amended and Restated Memorandum and Articles of Association of the registrant (effective upon the completion of this offering) |
| 4.1* | Specimen Ordinary Share Certificate |
| 4.2 | Specimen American Depositary Receipt, incorporated by reference to Registration Statement on Form F-6 (Registration No. 333-        ) filed with the Securities and Exchange Commission |
| 4.3 | Form of Deposit Agreement, incorporated by reference to Registration Statement on Form F-6 (Registration No. 333-        ) filed with the Securities and Exchange Commission |
| 4.4 | Amended and Restated Shareholders Agreement, dated December 19, 2006 |
| 4.5 | Share Purchase Agreement, dated as of July 28, 2006, between the registrant and investors in Series A preferred shares, as amended as of September 15, 2006 and supplemented as of December 15, 2006 |
| 4.6 | Series B Preferred Shares Purchase Agreement, dated as of September 15, 2006 between the registrant and investors in Series B preferred shares, as supplemented as of December 15, 2006 |
| 4.7 | Series C Preferred Shares Purchase Agreement, dated as of December 15, 2006, between the registrant and investors in Series C preferred shares |
| 4.8 | Confirmation, dated as of April 30, 2007, by Financiere Natixis Singapore 4 Pte Ltd (formerly known as Financiere Natexis Singapore 4 Pte Ltd), as holder of Series B and Series C preferred shares |
| 4.9 | Confirmation, dated as of April 30, 2007, by Shine Field Investments Limited, as holder of Series B and Series C preferred shares |
| 4.10 | Confirmation, dated as of April 30, 2007, by CDH SolarFuture Limited, as holder of Series B and Series C preferred shares |
| 4.11 | Confirmation, dated as of April 30, 2007, by CHF Wafer Company Limited, as holder of Series B preferred shares |
| 4.12 | Confirmation, dated as of April 30, 2007, by China Environment Fund 2004, LP., as holder of Series B preferred shares, and China Environment Fund 2002, LP., as holder of Series C preferred shares |
| 4.13 | Confirmation, dated as of April 30, 2007, by JAFCO Asia Technology Fund III, as holder of Series B preferred shares |
| 4.14 | Confirmation, dated as of April 30, 2007, by MUS Roosevelt China Pacific Fund L.P., as holder of Series B and Series C preferred shares |
| 4.15 | Confirmation, dated as of April 30, 2007, by Tech Team Holdings Limited, as holder of Series B and Series C preferred shares |
| 4.16 | Confirmation, dated as of April 30, 2007, by BOFA Capital Company Limited, as holder of Series B and Series C preferred shares |
| 4.17 | Confirmation, dated as of April 30, 2007, by Grand Gains International Limited, as holder of Series B preferred shares |
| 4.18 | Confirmation, dated as of April 30, 2007, by Silverpointe Investments Ltd., as holder of Series C preferred shares |
| 5.1* | Opinion of Conyers, Dill & Pearman, Cayman Island special counsel to the registrant, regarding the validity of the ordinary shares being registered |

| 8.1* | Opinion of Conyers, Dill & Pearman, special Cayman Islands tax counsel to the registrant, regarding tax matters |
| 8.2* | Opinion of Sidley Austin LLP regarding certain U.S. tax matters |
| 10.1 | 2006 Stock Incentive Plan |
| 10.2 | Form Employment Agreement between the registrant and each senior officer |
| 10.3 | Form Service Agreement between the registrant and each executive director |

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

| Exhibit Number | Description |
|---|---|
| 10.4 | Form Service Agreement between the registrant and each independent director |
| 10.5 | Form Confidentiality and Non-compete Agreement between the registrant and each senior officer, engineer and technician |
| 10.6 | Summary English translation of Cooperation Agreement, dated October 10, 2005, between the registrant and Shanghai Jiaotong University |
| 10.7.1 | Agreement, dated June 21, 2005, between GT Solar Technologies, as seller, and Jiangxi LDK Solar, as buyer |
| 10.7.2 | Addendum #2 to Agreement, dated August 13, 2005, between GT Solar Technologies, as seller, and Jiangxi LDK Solar, as buyer |
| 10.7.3 | Agreement, Phase 3, dated January 6, 2006, between GT Solar Technologies, as seller, and Jiangxi LDK Solar, as buyer |
| 10.7.4 | Agreement, Phase 4, dated October 1, 2006, between GT Solar Incorporated, as seller, and Jiangxi LDK Solar, as buyer |
| 10.8 | Purchasing Agreement, dated January 5, 2007, between HCT Shaping Systems SA, as seller, and Jiangxi LDK Solar, as buyer |
| 10.9 | Contract, dated January 25, 2006, between Meyer Burger AG, as seller, and Jiangxi LDK Solar, as buyer |
| 10.10 | Summary English translation of Cooperation Agreement, dated October 16, 2005, between Suntech Power Holdings Co., Ltd. and Jiangxi LDK Solar |
| 10.11 | Sales Contract, dated October 29, 2006, between Technischer Warenhandel Heller and NCA Fortin Inc., as co-sellers, and Jiangxi LDK Solar, as buyer |
| 10.12 | Five-Year Sales Contract, dated November 1, 2006, between Prime GLP Inc., as seller, and Jiangxi LDK Solar, as buyer |
| 10.13 | Best Effort Cooperation Agreement, dated December 4, 2006, between Kunical International Group Ltd., as seller, and Jiangxi LDK Solar, as buyer |
| 10.14 | Eight-Year Silicon Sales Contract, dated December 8, 2006, between Komex Inc., as seller, and Jiangxi LDK Solar, as buyer |
| 10.15 | Summary English translation of Cooperation Agreement, dated March 28, 2007, between E'mei Semi-conductor Materials Plant, as seller, and Jiangxi LDK Solar, as buyer |
| 10.16 | Summary English translation of Framework Cooperation Agreement, dated April 8, 2007, between Luoyang Zhonggui Hi-Tech Co., Ltd., as seller, and Jiangxi LDK Solar, as buyer |
| 10.17 | Wafer Sales Agreement, dated March 5, 2006, between Solland Solar Energy B.V., as buyer, and Jiangxi LDK Solar, as seller, as supplemented on October 26, 2006 with respect to appendices A to F thereto and on April 3, 2007 with respect to appendix D thereto |
| 10.18 | Summary English translation of Solar Cell Silicon Wafer Supply Agreement, dated July 6, 2006, between Canadian Solar Inc., as buyer, and Jiangxi LDK Solar, as seller, as supplemented on August 11, 2006 |
| 10.19 | Summary English translation of Silicon Supply Agreement, dated November 11, 2006, between Jiangsu Linyang Solarfun Co., Ltd., as buyer, and Jiangxi LDK Solar, as seller |
| 10.20 | Summary English translation of Silicon Supply Cooperation Agreement, dated November 14, 2006, between Jiangsu Linyang Solarfun Co., Ltd., as buyer, and Jiangxi LDK Solar, as seller |
| 10.21 | Cooperation Agreement, dated March 28, 2007, between Q-Cells AG and Jiangxi LDK Solar |
| 10.22 | |

Summary English translation of Loan Agreement, dated September 22, 2005, between Jiangxi LDK Solar, as borrower, and Mr. Xiaofeng Peng, as lender

10.23        Summary English translation of Guarantee Agreement, dated October 21, 2005, among Suzhou Liouxin Industry Co., Ltd., Saiweng Technology (Suzhou) Co., Ltd., Jiangxi Liouxin Industry Co., Ltd. and Mr. Xiaofeng Peng

10.24        Summary English translation of Loan Agreement, dated July 24, 2006, between Jiangxi LDK Solar, as borrower, and Suzhou Liouxin Industry Co., Ltd., as lender

10.25        Summary English translation of Loan Repayment Confirmation Agreement, dated March 28, 2006, among Saiweng Technology (Suzhou) Co., Ltd., Jiangxi LDK Solar and Mr. Xiaofeng Peng

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.26 | Summary English translation of Loan Repayment Confirmation Agreement, dated April 8, 2006, between Jiangxi LDK Solar and Mr. Xiaofeng Peng |
| 10.27 | Summary English translation of Entrustment Agreement, dated August 10, 2005, between Jiangxi LDK Solar and Jiangxi Liouxin Industry Co., Ltd. |
| 10.28 | Summary English translation of Renminbi Loan Agreement, dated March 20, 2006, between China Construction Bank Corporation, Xinyu Branch, as lender, and Jiangxi LDK Solar, as borrower |
| 10.29 | Summary English translation of Entrusted Loan Agreement, dated December 22, 2006, among Jiangxi Liouxin Industry Co., Ltd., as trustor, Bank of China Limited, Xinyu Branch, as trustee lender, and Jiangxi LDK Solar, as borrower |
| 10.30 | Summary English translation of Foreign Currency Loan Contract, dated December 29, 2006, between China Development Bank, as lender, and Jiangxi LDK Solar, as borrower |
| 10.31 | Summary English translation of Foreign Currency Loan Contract, dated February 5, 2007, between Bank of China Limited, Xinyu Branch, as lender, and Xiangxi LDK Solar, as borrower |
| 10.32 | Summary English translation of Property Sublease Agreement, dated December 1, 2005, between Jiangxi LDK Solar and Suzhou Liouxin Industry Co., Ltd. |
| 10.33 | Summary English translation of Land Use Right Transfer Agreement, dated May 15, 2006, between Jiangxi LDK Solar and Jiangxi Liouxin Industry Co., Ltd. |
| 10.34 | Summary English translation of Real Property Purchase Agreement, dated May 15, 2006, between Jiangxi LDK Solar and Jiangxi Liouxin Industry Co., Ltd. |
| 10.35 | Summary English translation of Land Use Right Transfer Agreement, dated September 5, 2006, between Jiangxi LDK Solar and Jiangxi Liouxin Industry Co., Ltd. |
| 10.36 | Summary English translation of Real Property Purchase Agreement, dated September 5, 2006, between Jiangxi LDK Solar and Jiangxi Liouxin Industry Co., Ltd. |
| 21.1 | List of subsidiaries |
| 23.1 | Consent of KPMG |
| 23.2* | Consent of Conyers, Dill & Pearman (included in Exhibit 5.1) |
| 23.3 | Consent of Sallmanns (Far East) Limited |
| 23.4 | Consent of Shanghai Orient Real Estate Appraisal Co., Ltd. |
| 23.5 | Consent of Grandall Legal Group |
| 24.1 | Power of Attorney (included on Page II-5 of the Registration Statement) |
| 99.1 | Code of Ethics of the registrant |

\* To be filed by amendment

Exhibit 3.1

THIRD AMENDED & RESTATED
MEMORANDUM OF ASSOCIATION AND ARTICLES OF ASSOCIATION

THE COMPANIES LAW (2004 REVISION)
OF THE CAYMAN ISLANDS
COMPANY LIMITED BY SHARES

THIRD AMENDED AND RESTATED MEMORANDUM OF ASSOCIATION
OF
LDK SOLAR CO., LTD.

(as adopted by special resolution passed on December 19, 2006)

1.  The name of the Company is LDK Solar Co., Ltd.

2.  The registered office of the Company shall be at the offices of c/o
    Corporate Filing Services Limited, 4th Floor, Harbour Centre, P.O. Box 613,
    George Town, Grand Cayman, Cayman Islands, British West Indies, or at such
    other place as the Directors may from time to time decide.

3.  The objects for which the Company is established are unrestricted and the
    Company shall have full power and authority to carry out any object not
    prohibited by the Companies Law (2004 Revision) or as revised, or any other
    law of the Cayman Islands.

4.  Except as prohibited or limited by the Companies Law (2004 Revision), the
    Company shall have full power and authority to carry out any object and
    shall have and be capable of from time to time and at all times exercising
    any and all of the powers at any time or from time to time exercisable by a
    natural person or body corporate in doing in any part of the world whether
    as principal, agent, contractor or otherwise whatever may be considered by
    it necessary for the attainment of its objects and whatever else may be
    considered by it as incidental or conducive thereto or consequential
    thereon, including, but without in any way restricting the generality of
    the foregoing, the power to make any alterations or amendments to this
    Memorandum of Association and the Articles of Association of the Company
    considered necessary or convenient in the manner set out in the Articles of
    Association of the Company, and the power to do any of the following acts
    or things, viz: to pay all expenses of and incidental to the promotion,
    formation and incorporation of the Company; to register the Company to do
    business in any other jurisdiction; to sell, lease or dispose of any
    property of the Company; to draw, make, accept, endorse, discount, execute
    and issue promissory notes, debentures, bills of exchange, bills of lading,
    warrants and other negotiable or transferable instruments; to lend money or
    other assets and to act as guarantors; to borrow or raise money on the
    security of the undertaking or on all or any of the assets of the Company
    including uncalled capital or without security; to invest monies of the
    Company in such manner as the Directors determine; to promote other
    companies; to sell the undertaking of the Company for cash or any other
    consideration; to distribute assets in specie to Members of the Company; to
    make charitable or benevolent donations; to pay pensions or gratuities or
    provide other benefits in cash or kind to Directors, officers, employees,
    past or present and their families; to purchase Directors and officers
    liability

insurance and to carry on any trade or business and generally to do all acts and things which, in the opinion of the Company or the Directors, may be conveniently or profitably or usefully acquired and dealt with, carried on, executed or done by the Company in connection with the business aforesaid PROVIDED THAT the Company shall only carry on the businesses for which a licence is required under the laws of the Cayman Islands when so licensed under the terms of such laws.

5.    The liability of each Member is limited to the amount from time to time unpaid on such Member's shares.

6.    The share capital of the Company is US$15,000,000 divided into 134,000,000 ordinary shares of US$0.10 each and 16,000,000 preferred shares of US$0.10 each, of which 3,275,109 are designated as Series A-1 convertible redeemable participating preferred shares of US$0.10 each, 1,724,891 are designated as Series A-2 convertible redeemable participating preferred shares of US$0.10 each, 8,000,000 are designated as Series B convertible redeemable participating preferred shares of US$0.10 each, 3,000,000 are designated as Series C convertible redeemable participating preferred shares of US$0.10 each, with power for the Company insofar as is permitted by law to redeem or purchase any of its shares and to increase or reduce the said capital subject to the provisions of the Companies Law (2004 Revision) and the Articles of Association and to issue any part of its capital, whether original, redeemed or increased with or without any preference, priority or special privilege or subject to any postponement of rights or to any conditions or restrictions and so that unless the conditions of issue shall otherwise expressly declare every issue of shares whether declared to be preference or otherwise shall be subject to the powers hereinbefore contained.

7.    If the Company is registered as exempted, its operations will be carried on subject to the provisions of Section 193 of the Companies Law (2004 Revision) and, subject to the provisions of the Companies Law (2004 Revision) and the Articles of Association, it shall have the power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be de-registered in the Cayman Islands.

-2-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

THE COMPANIES LAW (2004 REVISION)
OF THE CAYMAN ISLANDS
COMPANY LIMITED BY SHARES

THIRD AMENDED AND RESTATED ARTICLES OF ASSOCIATION
OF
LDK SOLAR CO., LTD.

(as adopted by special resolution passed on December 19, 2006)

1.  In these Articles Table A in the First Schedule to the Statute does not
    apply and, unless there be something in the subject or context inconsistent
    therewith,

| | |
|---|---|
| "ARTICLES" | means these Articles as from time to time altered by Special Resolution. |
| "AUDITOR" | means KPMG or any successor auditor retained by the Company, being one of the "Big-4" international accounting firms. |
| "BOARD" | means the board of directors of the Company or any of the Group Companies, as the context requires, as constituted from time to time. |
| "BOARD OBSERVERS" | has the meaning ascribed to it in Article 99 hereof. |
| "CLOSING" | means December 19, 2006. |
| "COMPANY" | means LDK Solar Co., Ltd., a company organized and existing under the laws of the Cayman Islands. |
| "COMPANY OPTION PLAN" | means the employee stock option plan established by the Company in July 2006 pursuant to which stock options may be granted out of the Company Option Pool. |
| "COMPANY OPTION POOL" | means an aggregate of 9,058,000 Ordinary Shares which shall be reserved prior to the Closing, representing up to ten percent (10%) of the total number of issued and outstanding shares of the Company on an as converted and fully diluted basis immediately after the Closing, as may be adjusted from time to time pursuant to the Company Option Plan, to be issued to the Key Persons, officers, directors, consultants, employees or other service providers of the Company from time to time pursuant to the Company Option Plan. |
| "DEBENTURE" | means debenture stock, mortgages, bonds and any other such securities of the Company whether constituting a charge on the assets of the Company or not. |
| "DIRECTORS" | means the directors for the time being of the Company. |
| "DIVIDENDS" | includes interim dividends and bonus issues. |

-3-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

"EQUITY EQUIVALENTS"          means any and all shares, interests, participations or other equivalents (however designated) of equity capital of the Company (or any of its Subsidiaries, as the case may be) and any rights to acquire the foregoing, including, without limitation, any rights to acquire securities exercisable for, convertible into or exchangeable for the foregoing.

"FOUNDER"                     means Peng Xiaofeng.

"GROUP COMPANY"               means a Person (other than a natural person) that is a Subsidiary of the Company.

"INVESTORS"                   means the holders of the Preferred Shares immediately after Closing and their respective transferees and permitted assigns.

"INVESTOR DIRECTOR"           has the meaning ascribed to it in Article 66 hereof.

"KEY PERSONS"                 means Peng Xiaofeng, Shao Yonggang, Zhu Liangbao and all the other Persons listed as Key Persons in the Transaction Documents.

"MEMBER"                      has the meaning ascribed to it in the Statute.

"MONTH"                       means calendar month.

"NEW SECURITIES"              means any Equity Securities of the Company whether now or hereafter authorized; provided that the term "New Securities" does not include (i) securities issued upon conversion of the Preferred Shares; (ii) Preferred Shares issuable upon the exercise of the Warrants and securities issued upon conversion of such Preferred Shares; (iii) Ordinary Shares issuable to the officers, directors, consultants, employees or other service providers of the Company pursuant to the Company Option Plan; (iv) securities issued in a Qualified IPO; (v) securities issued in connection with any stock split, stock dividend or re-capitalization of the Company; and (vi) securities issued pursuant to the acquisition of another business entity or business segment of any such entity by the Company by merger, purchase of substantially all the assets or other reorganization whereby the Company will own not less than fifty-one percent (51%) of the voting power of such business entity or business segment of any such entity.

"ORDINARY RESOLUTION"         means a resolution:

                              (i)  passed by a simple majority of such Members as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Member is entitled; or

-4-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(ii) approved in writing by all of the Members entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Members and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments if more than one, is executed.

"ORDINARY SHAREHOLDERS"   means holders of the Ordinary Shares.

"ORDINARY SHARES"   means the ordinary shares, par value US$0.10 per share, in the capital of the Company.

"PERSON"   means any individual, partnership, corporation, limited liability company, joint venture, trust, firm, association, unincorporated organization or other entity.

"PAID-UP"   means paid-up as to the par value and any premium payable in respect of the issue of any share and includes the same credited as paid-up.

"PRC"   means the People's Republic of China, but solely for the purposes of these Articles, excluding the Hong Kong Special Administrative Region, Macau Special Administrative Region and Taiwan.

"PRC SUBSIDIARY"   means LDK Solar Hi-Tech Co., Ltd. (CHINESE CHARACTERS) LDK (CHINESE CHARACTERS) a wholly foreign-owned enterprise established under the laws of the PRC.

"PREFERRED SHARES"   means the Series A-1 Preferred Shares, the Series A-2 Preferred Shares, the Series B Preferred Shares and the Series C Preferred Shares collectively.

"QUALIFIED EXCHANGE"   means (i) the New York Stock Exchange or the Nasdaq Stock Market's National Market System, or (ii) any other exchange of recognized international reputation and standing duly approved by the Company's Board of Directors, including the affirmative vote of the Investor Director.

"QUALIFIED IPO"   means an initial public offering on a Qualified Exchange that values the Company at no less than US$1,210,000,000 immediately prior to the initial public offering with a per share offering price of no less than US$11.00 and that results in aggregate proceeds to the Company of at least US$300,000,000. The selection of the lead underwriter(s) of the Qualified IPO shall be led by the management of the Company and subject to the consent of the Investor Director, which consent shall not be unreasonably withheld.

"REGISTERED OFFICE"   means the registered office for the time being of the Company.

-5-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

| | |
|---|---|
| "REQUIRED PREFERRED SHAREHOLDER RESOLUTION" | means resolutions or consents of the Preferred Shares which are required by the terms of issue of the Preferred Shares (as set out in Schedule 1 hereto) to be passed or obtained in particular circumstances and which are passed in accordance with such terms. |
| "SEAL" | means the common seal of the Company and includes every duplicate seal. |
| "SECRETARY" | includes an Assistant Secretary and any person appointed to perform the duties of Secretary of the Company. |
| "SERIES A PREFERRED SHARES PURCHASE AGREEMENT" | means the Share Purchase Agreement, dated as of July 28, 2006, by and among the Company, the PRC Subsidiary, the Founder and the holders of the Series A-1 Preferred Shares and the holders of the Series A-2 Preferred Shares, as amended by that certain Amendment to the Share Purchase Agreement dated as of September 15, 2006. |
| "SERIES A-1 PREFERRED SHARES" | means the series A-1 convertible redeemable participating preferred shares, par value US$0.10 per share, in the capital of the Company, which have the rights, preferences, privileges and restrictions set out in these Articles. |
| "SERIES A-2 PREFERRED SHARES" | means the series A-2 convertible redeemable participating preferred shares, par value US$0.10 per share, in the capital of the Company, which have the rights, preferences, privileges and restrictions set out in these Articles. |
| "SERIES B PREFERRED SHARES" | means the series B convertible redeemable participating preferred shares, par value US$0.10 per share, in the capital of the Company, which have the rights, preferences, privileges and restrictions set out in these Articles. |
| "SERIES B PREFERRED SHARES PURCHASE AGREEMENT" | means the Series B Preferred Shares Purchase Agreement, dated as of September 15, 2006, by and among the Company, the PRC Subsidiary, the Founder and the holders of the Series B Preferred Shares, as amended by that certain Amendment to the Series B Preferred Shares Purchase Agreement dated as of September 26, 2006. |
| "SERIES C PREFERRED SHARES" | means the Series C convertible redeemable participating preferred shares, par value US$0.10 per share, in the capital of the Company, which have the rights, preferences, privileges and restrictions set out in these Articles. |
| "SERIES C PREFERRED SHARES PURCHASE AGREEMENT" | means the Series C Preferred Shares Purchase Agreement, dated as of December 15, 2006, by and among the Company, the PRC Subsidiary, the Founder and the holders of the Series C Preferred Shares. |

-6-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

| | |
|---|---|
| "SHARES" | means with respect to any Shareholder, (i) the shares of equity capital of the Company, including without limitation, Ordinary Shares and Preferred Shares, held at any time by such Shareholder, and (ii) any option, warrant, or other right held at any time by such Shareholder, exercisable or convertible for shares of equity capital of the Company. |
| "SHAREHOLDERS" | means the holders of the Preferred Shares and the Ordinary Shareholders, their respective successors and permitted assigns, and any other holder of shares of equity capital of the Company. |
| "SPECIAL RESOLUTION" | has the same meaning as ascribed to it in the Statute and includes a resolution approved in writing as described therein. |
| "STATUTE" | means the Companies Law (2004 Revision) of the Cayman Islands as amended and every statutory modification or re-enactment thereof for the time being in force. |
| "SUBSIDIARY" | means, with respect to any Person, a corporation or other entity that is, directly or indirectly, controlled by such Person, by the possession of the power to direct or cause the direction of the management and policies of first mentioned Person, whether through the ownership of voting securities or equity interest, by contract or otherwise. |
| "TRANSACTION DOCUMENTS" | means, collectively, the Series C Preferred Shares Purchase Agreement, the Amended and Restated Shareholders Agreement, the Second Amended and Restated Registration Rights Agreement, these Articles and such other documents and agreements, each executed and delivered in connection with the issue of the Series C Preferred Shares at Closing. |
| "US GAAP" | means generally accepted accounting principles in the United States, consistently applied. |
| "WRITTEN" or "IN WRITING" | include all modes of representing or reproducing words in visible form. |
| "WARRANT" or "WARRANTS" | means the Warrant(s) the Company issued to the holders of the Series A-1 Preferred Shares and the holders of the Series A-2 Preferred Shares pursuant to certain Warrant Purchase Agreement(s), each dated as of July 28, 2006. |

Words importing the singular number only include the plural number and vice-versa.

Words importing the masculine gender only include the feminine gender.

Words importing persons only include corporations.

The Schedules shall form part of these Articles. If at any time there shall be any conflict between the provision of the Schedules and the provision contained in the remainder of the Articles, then the provisions of the Schedules shall prevail. Defined terms which are

-7-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

defined in the Schedules to these Articles shall bear the meanings ascribed thereto in such Schedules.

2.   The business of the Company may be commenced as soon after incorporation as the Directors shall see fit, notwithstanding that part only of the shares may have been allotted.

3.   The Directors may pay, out of the capital or any other monies of the Company, all expenses incurred in or about the formation and establishment of the Company including the expenses of registration.

CERTIFICATES FOR SHARES

4.   The Company shall maintain a register of its Members and every person whose name is entered as a Member in the register of Members shall be entitled without payment to receive within two months after allotment or lodgement of transfer (or within such other period as the conditions of issue shall provide) one certificate for all his shares or several certificates each for one or more of his shares upon payment of fifty United States cents (US$0.50) for every certificate after the first or such less sum as the Directors shall from time to time determine provided that in respect of a share or shares held jointly by several persons, the Company shall not be bound to issue more than one certificate and delivery of a certificate for a share to one of the several joint holders shall be sufficient delivery to all such holders.

5.   Certificates representing shares of the Company shall be in such form as shall be determined by the Directors. Such certificates may be under Seal. All certificates for shares shall be consecutively numbered or otherwise identified and shall specify the shares to which they relate. The name and address of the person to whom the shares represented thereby are issued, with the number of shares and date of issue, shall be entered in the register of Members of the Company. All certificates surrendered to the Company for transfer shall be cancelled and no new certificate shall be issued until the former certificate for a like number of shares shall have been surrendered and cancelled. The Directors may authorise certificates to be issued with the seal and authorised signature(s) affixed by some method or system of mechanical process.

6.   Notwithstanding Article 5 of these Articles, if a share certificate be defaced, lost or destroyed, it may be renewed on payment of a fee of one United States dollar (US$1.00) or such lesser sum and on such terms (if any) as the Directors may prescribe to indemnify the Company for its costs incurred in connection therewith.

ISSUE OF SHARES

7.      (a) Subject to the provisions, if any, of the Memorandum of Association and to the provisions of these Articles and to any direction that may be given by the Company in general meeting and without prejudice to any special rights previously conferred on the holders of existing shares, the Directors may allot, issue, grant options over or otherwise dispose of shares of the Company (including fractions of a share) with or without preferred, deferred or other special rights or restrictions, whether in regard to dividend, voting, return of capital or otherwise and to such persons, at such times and

-8-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

on such other terms as they think proper. The Company shall not issue shares in bearer form.

(b) The Ordinary Shares shall participate in the profits and assets of the Company but subject always to being subordinate in their rights to the Preferred Shares to the extent provided by the terms of issue of the Preferred Shares.

(c) Preferred Shares shall carry the rights (preferential or otherwise) set forth in these Articles and, in particular, in Schedule 1 hereto.

PRE-EMPTIVE RIGHTS

8.     (a) General. Each Investor has a pre-emptive right to purchase up to a pro rata share of any New Securities which the Company may, from time to time, propose to sell and issue. An Investor's "pro rata share", for purposes of this Article 8, shall be determined according to the number of Ordinary Shares owned by such Investor immediately prior to the issuance of the New Securities (assuming the exercise, conversion or exchange of any Ordinary Share Equivalents) in relation to the total number of Ordinary Shares outstanding immediately prior to the issuance of the New Securities (assuming the exercise, conversion or exchange of any Ordinary Share Equivalents). Each Investor shall have a right of over-allotment such that, if any Investor fails to exercise its right hereunder to purchase its pro rata share of New Securities, the other Investors may purchase the non-purchasing Investor's portion on a pro rata basis within five (5) days from the date such non-purchasing Investor fails to exercise its right hereunder.

(b) Issuance Notice. In the event the Company proposes to undertake an issuance of New Securities, it shall give each Investor written notice (an "ISSUANCE NOTICE") of such intention, describing the type of New Securities, and their price and the general terms upon which the Company proposes to issue the same. Each Investor shall have fifteen (15) days or such shorter period agreed to by such Investor after any such notice is mailed or delivered to agree to purchase up to such Investor's pro rata share of such New Securities for the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased.

(c) Sales by the Company. Upon the expiration of twenty (20) days or such shorter period agreed to by such Investor from the Company's delivery of the Issuance Notice and for sixty (60) days thereafter, the Company may sell any New Securities with respect to which the Investors' pre-emptive rights under this Article 8 was not exercised, at a price and upon terms no more favourable to the purchasers thereof than specified in the Issuance Notice. In the event the Company has not sold such New Securities within such 60-day period, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Investors in the manner provided in Section (b) of this Article 8.

(d) The pre-emptive right granted under this Article 8 shall expire upon, and shall not be applicable to, a Qualified IPO.

-9-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(e) To the extent any holder of Preferred Shares validly transfers any such shares to any other Person, such holder may assign its rights under this Article 8 to such Person.

TRANSFER OF SHARES

9.   Subject to the restrictions in these Articles and the Schedules as may be applicable, any Member may transfer all or any of his shares by instrument in writing in any usual or common form or any other form which the Directors may approve. The instrument of transfer shall be executed by or on behalf of the transferor and the transferor shall be deemed to remain the holder of a share until the name of the transferee is entered in the register in respect thereof.

10.  No Member shall dispose of any interest in, or right attaching to, or renounce or assign any right to receive or subscribe for any shares of the Company (save as may be required in pursuance of his obligations under these Articles) or create or permit to exist any charge, lien, encumbrance or trust over any share or agree (whether subject to any condition precedent, condition subsequent or otherwise) to do any such things except as permitted by the Schedules. The Directors shall not refuse to register any transfer of a share which is permitted under these Articles save that the Directors may decline to recognise any instrument of transfer if the instrument of transfer is not accompanied by the certificate of the shares to which it relates, or such evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The Directors shall in any event refuse to register the transfer of a share which is prohibited by the Schedules.

11.  The registration of transfers may be suspended at such time and for such periods as the Directors may from time to time reasonably determine, provided always that such registration shall not be suspended for more than thirty (30) days in any year.

REDEMPTION AND PURCHASE OF SHARES

12.  Subject to the provisions of the Statute and the Memorandum of Association and these Articles, shares may be issued on the terms that they are, or at the option of the Company or the holder are, to be redeemed on such terms and in such manner as the Company, before the issue of the shares, may by Special Resolution determine.

13.  Subject to the provisions of the Statute and the Memorandum of Association and these Articles, the Company may purchase its own shares (including fractions of a share), including any redeemable shares, provided that the manner of purchase has first been authorised by the Company in general meeting and may make payment therefor, or for any redemption, in any manner authorised by the Statute, including out of capital, provided, however, that the Directors may, without the need for a resolution of the Members, repurchase Ordinary Shares from employees, officers, directors, consultants or other persons performing services for the Company or its subsidiaries pursuant to agreements under which the Company has the option to repurchase such shares upon the occurrence of certain events, such as the termination of employment or in the event of any proposed sale or transfer of shares.

-10-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

## VARIATION OF RIGHTS OF SHARES

14. Subject to the Schedules attached to these Articles, if at any time the share capital of the Company is divided into different classes of shares, the rights attached to any class (unless otherwise provided by the terms of issue of the shares of that class) may, whether or not the Company is being wound-up, be varied with the consent in writing of the holders of at least fifty percent (50%) of the issued shares of that class, or with the sanction of a resolution passed at a general meeting of the holders of the shares of that class by at least fifty percent (50%) of the votes cast.

15. The provisions of these Articles relating to general meetings shall apply to every such general meeting of the holders of one class of shares except that the necessary quorum shall be two persons holding or representing by proxy at least fifty percent (50%) of the issued shares of the class and that any holder of shares of the class present in person or by proxy may demand a poll, unless there is only one member of such class, in which case such quorum shall be one person.

16. Without prejudice to any Required Preferred Shareholders Resolution, the rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking senior, pari passu or subordinate therewith.

## COMMISSION ON SALE OF SHARES

17. The Company may in so far as the Statute from time to time permits pay a commission to any person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any shares of the Company. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up shares or partly in one way and partly in the other. The Company may also on any issue of shares pay such brokerage as may be lawful.

## NON-RECOGNITION OF TRUSTS

18. No person shall be recognised by the Company as holding any share upon any trust and the Company shall not be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future, or partial interest in any share, or any interest in any fractional part of a share, or (except only as is otherwise provided by these Articles or the Statute) any other rights in respect of any share except an absolute right to the entirety thereof in the registered holder. Notwithstanding the foregoing, (i) a Member may be designated as trustee or as the general partner of a partnership in the register of Members (and such designation may also identify the relevant trust or partnership), but such designation shall be for identification purposes only, and neither the Company nor any transferee of any Shares so held shall be bound to enquire as to the terms of the trust upon which such Shares are held, and may deal with such registered Member as if he was the absolute beneficial owner of such Shares, and (ii) the Company shall be entitled to recognise interests by acknowledging such interests in writing to the holder thereof and may be bound by the terms and conditions contained in any such acknowledgement in accordance with the general law.

-11-

CALL ON SHARES

19.  The Directors may from time to time make calls upon the Members in respect
     of any monies unpaid on their shares (whether on account of the nominal
     value of the shares or by way of premium or otherwise) and not by the
     conditions of allotment thereof made payable at fixed terms, provided that
     no call shall be payable at less than one (1) month from the date fixed for
     the payment of the last preceding call, and each Member shall (subject to
     receiving at least fourteen (14) days notice specifying the time or times
     of payment) pay to the Company at the time or times so specified the amount
     called on the shares. A call may be revoked or postponed as the Directors
     may determine. A call may be made payable by instalments.

20.  A call shall be deemed to have been made at the time when the resolution of
     the Directors authorising such call was passed.

21.  The joint holders of a share shall be jointly and severally liable to pay
     all calls in respect thereof.

22.  If a sum called in respect of a share is not paid before or on a day
     appointed for payment thereof, the persons from whom the sum is due shall
     pay interest on the sum from the day appointed for payment thereof to the
     time of actual payment at such rate not exceeding ten percent (10%) per
     annum as the Directors may determine, but the Directors shall be at liberty
     to waive payment of such interest either wholly or in part.

23.  Any sum which by the terms of issue of a share becomes payable on allotment
     or at any fixed date, whether on account of the nominal value of the share
     or by way of premium or otherwise, shall for the purposes of these Articles
     be deemed to be a call duly made, notified and payable on the date on which
     by the terms of issue the same becomes payable, and in the case of
     non-payment all the relevant provisions of these Articles as to payment of
     interest forfeiture or otherwise shall apply as if such sum had become
     payable by virtue of a call duly made and notified.

24.  The Directors may, on the issue of shares, differentiate between the
     holders as to the amount of calls or interest to be paid and the times of
     payment.

25.          (a) The Directors may, if they think fit, receive from any Member
     willing to advance the same, all or any part of the monies uncalled and
     unpaid upon any shares held by him, and upon all or any of the monies so
     advanced may (until the same would but for such advances, become payable)
     pay interest at such rate not exceeding (unless the Company in general
     meeting shall otherwise direct) seven per cent per annum, as may be agreed
     upon between the Directors and the Member paying such sum in advance.

             (b) No such sum paid in advance of calls shall entitle the Member
     paying such sum to any portion of a dividend declared in respect of any
     period prior to the date upon which such sum would, but for such payment,
     become presently payable.

-12-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

FORFEITURE OF SHARES

26.        (a) If a Member fails to pay any call or instalment of a call or to
make any payment required by the terms of issue on the day appointed for
payment thereof, the Directors may, at any time thereafter during such time
as any part of the call, instalment or payment remains unpaid, give notice
requiring payment of so much of the call, instalment or payment as is
unpaid, together with any interest which may have accrued and all expenses
that have been incurred by the Company by reason of such non-payment. Such
notice shall name a day (not earlier than the expiration of fourteen (14)
days from the date of giving of the notice) on or before which the payment
required by the notice is to be made, and shall state that, in the event of
non-payment at or before the time appointed the shares in respect of which
such notice was given will be liable to be forfeited.

        (b) If the requirements of any such notice as aforesaid are not
complied with, any share in respect of which the notice has been given may
at any time thereafter, before the payment required by the notice has been
made, be forfeited by a resolution of the Directors to that effect. Such
forfeiture shall include all dividends declared in respect of the forfeited
share and not actually paid before the forfeiture.

        (c) A forfeited share may be sold or otherwise disposed of on such
terms and in such manner as the Directors think fit and at any time before
a sale or disposition the forfeiture may be cancelled on such terms as the
Directors think fit.

27.  A person whose shares have been forfeited shall cease to be a Member in
respect of the forfeited shares, but shall, notwithstanding, remain liable
to pay to the Company all monies which, at the date of forfeiture were
payable by him to the Company in respect of the shares together with
interest thereon, but his liability shall cease if and when the Company
shall have received payment in full of all monies whenever payable in
respect of the shares.

28.  A certificate in writing under the hand of one Director or the Secretary of
the Company that a share in the Company has been duly forfeited on a date
stated in the declaration shall be conclusive evidence of the fact therein
stated as against all persons claiming to be entitled to the share. The
Company may receive the consideration given for the share on any sale or
disposition thereof and may execute a transfer of the share in favour of
the person to whom the share is sold or disposed of and he shall thereupon
be registered as the holder of the share and shall not be bound to see to
the application of the purchase money, if any, nor shall his title to the
share be affected by any irregularity or invalidity in the proceedings in
reference to the forfeiture, sale or disposal of the share.

29.  The provisions of these Articles as to forfeiture shall apply in the case
of non-payment of any sum which, by the terms of issue of a share, becomes
payable at a fixed time, whether on account of the nominal value of the
share or by way of premium as if the same had been payable by virtue of a
call duly made and notified.

-13-

REGISTRATION OF EMPOWERING INSTRUMENTS

30.  The Company shall be entitled to charge a fee not exceeding one United States dollar (US$1.00) on the registration of every probate, letter of administration, certificate of death or marriage, power of attorney, notice in lieu of distringas, or other instrument.

TRANSMISSION OF SHARES

31.  In case of the death of a Member, the survivor or survivors where the deceased was a joint holder, and the legal personal representatives of the deceased where he was a sole holder, shall be the only persons recognised by the Company as having any title to his interest in the shares, but nothing herein contained shall release the estate of any such deceased holder from any liability in respect of any shares which had been held by him solely or jointly with other persons or from any obligations under the Transaction Documents.

32.      (a) Any person becoming entitled to a share in consequence of the death or bankruptcy or liquidation or dissolution of a Member (or in any other way than by transfer) may, upon such evidence being produced as may from time to time be required by the Directors and subject as hereinafter provided, elect either to be registered himself as holder of the share or to make such transfer of the share to such other person nominated by him as the deceased or bankrupt person could have made and to have such person registered as the transferee thereof, but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the share by that Member before his death or bankruptcy as the case may be.

     (b) If the person so becoming entitled shall elect to be registered himself as holder he shall deliver or send to the Company a notice in writing signed by him stating that he so elects.

33.  A person becoming entitled to a share by reason of the death or bankruptcy or liquidation or dissolution of the holder (or in any other case than by transfer) shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered holder of the share and subject to the provisions of the Transaction Documents, except that he shall not, before being registered as a member in respect of the share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company PROVIDED HOWEVER that the Directors may at any time give notice requiring any such person to elect either to be registered himself or to transfer the share and if the notice is not complied with within ninety (90) days the Directors may thereafter withhold payment of all dividends, bonuses or other monies payable in respect of the share until the requirements of the notice have been complied with.

AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION, ALTERATION OF CAPITAL
& CHANGE OF LOCATION OF REGISTERED OFFICE

34.      (a) Subject to and in so far as permitted by the provisions of the Statute, the Company may from time to time by Special Resolution (and any applicable

-14-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Required Preferred Shareholder Resolution pursuant to the terms of issue of the Preferred Shares) alter or amend its Memorandum of Association with respect to any objects, powers or other matters specified therein, provided always that the Company may by Ordinary Resolution:

     (i) increase the share capital by such sum to be divided into shares of such amount or without nominal or par value as the resolution shall prescribe and with such rights, priorities and privileges annexed thereto, as the Company in general meeting may determine;

     (ii) consolidate and divide all or any of its share capital into shares of larger amount than its existing shares;

     (iii) by subdivision of its existing shares or any of them divide the whole or any part of its share capital into shares of smaller amount than is fixed by the Memorandum of Association or into shares without nominal or par value;

     (iv) cancel any shares which at the date of the passing of the resolution have not been taken or agreed to be taken by any person.

     (b) Subject to the Statute and the Schedules attached to these Articles, the Company may at any time and from time to time by Special Resolution (and any applicable Required Preferred Shareholder Resolution pursuant to the terms of issue of the Preferred Shares) alter or amend these Articles in whole or in part.

     (c) All new shares created hereunder shall be subject to the same provisions with reference to the payment of calls, liens, transfer, transmission, forfeiture and otherwise as the shares in the original share capital.

     (d) Without prejudice to Article 12 hereof and subject to the provisions of the Statute, the Company may by Special Resolution (and any applicable Required Preferred Shareholder Resolution pursuant to the terms of issue of the Preferred Shares) reduce its share capital.

     (e) Subject to the provisions of the Statute, the Company may by resolution of the Directors change the location of its registered office.

CLOSING REGISTER OF MEMBERS OR FIXING RECORD DATE

35.  For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any dividend, or in order to make a determination of Members for any other proper purpose, the Directors of the Company may provide that the register of Members shall be closed for transfers for a stated period but not to exceed in any case forty (40) days. If the register of Members shall be so closed for the purpose of determining Members entitled to notice of or to vote at a meeting of Members such register shall be so closed for at least ten (10) days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the register of Members.

-15-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

36.   In lieu of or apart from closing the register of Members, the Directors may fix in advance a date as the record date for any such determination of Members entitled to notice of or to vote at a meeting of the Members and for the purpose of determining the Members entitled to receive payment of any dividend the Directors may, at or within ninety (90) days prior to the date of declaration of such dividend fix a subsequent date as the record date for such determination.

37.   If the register of Members is not so closed and no record date is fixed for the determination of Members entitled to notice of or to vote at a meeting of Members or Members entitled to receive payment of a dividend, the date on which notice of the meeting is mailed or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this section, such determination shall apply to any adjournment thereof.

GENERAL MEETING

38.   (a) Subject to paragraph (c) hereof, the Company shall within one (1) year of its incorporation and in each year of its existence thereafter hold a general meeting as its annual general meeting and shall specify the meeting as such in the notices calling it. The annual general meeting shall be held at such time and place as the Directors shall appoint and if no other time and place is prescribed by them, it shall be held at the registered office on the second Wednesday in December of each year at ten o'clock in the morning.

(b) At these meetings the report of the Directors (if any) shall be presented.

(c) If the Company is exempted as defined in the Statute it may but shall not be obliged to hold an annual general meeting.

39.   (a) The Directors may whenever they think fit, and they shall on the requisition of Members of the Company holding at the date of the deposit of the requisition not less than ten percent (10%) of such of the paid-up capital of the Company as at the date of the deposit carries the right of voting at general meetings of the Company, proceed to convene a general meeting of the Company.

(b) The requisition must state the objects of the meeting and must be signed by the requisitionists and deposited at the registered office of the Company and may consist of several documents in like form each signed by one or more requisitionists.

(c) If the Directors do not within twenty-one (21) days from the date of the deposit of the requisition duly proceed to convene a general meeting, the requisitionists, or any of them representing more than one-half of the total voting rights of all of them, may themselves convene a general meeting, but any meeting so convened shall not be held after the expiration of three (3) months after the expiration of the said twenty-one (21) days.

-16-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(d) A general meeting convened as aforesaid by requisitionists shall be convened in the same manner as nearly as possible as that in which general meetings are to be convened by Directors.

### NOTICE OF GENERAL MEETINGS

40.   At least twenty (20) days' notice shall be given of an annual general meeting or any other general meeting. Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day for which it is given and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company PROVIDED that a general meeting of the Company shall, whether or not the notice specified in this regulation has been given and whether or not the provisions of Article 39 have been complied with, be deemed to have been duly convened if it is so agreed:

(a) in the case of a general meeting called as an annual general meeting by all the Members entitled to attend and vote thereat or their proxies; and

(b) in the case of any other general meeting, by a majority in number of the Members having a right to attend and vote at the meeting, being a majority together holding not less than eighty-five (85) percent in nominal value or in the case of shares without nominal or par value eighty-five (85) percent of the shares in issue, or their proxies.

41.   The accidental omission to give notice of a general meeting to, or the non-receipt of notice of a meeting by any person entitled to receive notice shall not invalidate the proceedings of that meeting.

### PROCEEDINGS AT GENERAL MEETINGS

42.   No business shall be transacted at any general meeting unless a quorum of Members is present at the time when the meeting proceeds to business; two (2) Members (including at least one (1) holder of the Preferred Shares) holding no less than fifty percent (50%) of the total issued and outstanding Ordinary Shares on a fully diluted and as converted basis present in person or by proxy shall be a quorum provided always that if the Company has only one (1) Member of record entitled to attend and vote the quorum shall be that one Member present in person or by proxy. Members may participate in a general meeting of the Company by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other and participation in a meeting pursuant to this provision shall constitute presence in person at such meeting.

43.   A resolution (including a Special Resolution) in writing (in one or more counterparts) signed by all Members for the time being entitled to receive notice of and to attend and vote at general meetings (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

-17-

44.  If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Members, shall be dissolved and in any other case it shall stand adjourned to the same day in the next week at the same time and place or to such other time or such other place as the Directors may determine and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Members present shall be a quorum.

45.  The Chairman, if any, of the Board of the Company shall preside as Chairman at every general meeting of the Company, or if there is no such Chairman, or if he shall not be present within fifteen minutes after the time appointed for the holding of the meeting, or is unwilling to act, the Directors present shall elect one of their number to be Chairman of the meeting.

46.  If at any general meeting no Director is willing to act as Chairman or if no Director is present within fifteen (15) minutes after the time appointed for holding the meeting, the Members present shall choose one of their numbers to be Chairman of the meeting.

47.  The Chairman may, with the consent of any general meeting duly constituted hereunder, and shall if so directed by the meeting, adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a general meeting is adjourned for thirty (30) days or more, notice of the adjourned meeting shall be given as in the case of an original meeting; save as aforesaid it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned general meeting.

48.  At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands unless a poll is, before or on the declaration of the result of the show of hands, demanded by the Chairman or any other Member present in person or by proxy.

49.  Unless a poll be so demanded a declaration by the Chairman that a resolution has on a show of hands been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the Company's Minute Book containing the Minutes of the proceedings of the meeting shall be conclusive evidence of that fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

50.  The demand for a poll may be withdrawn.

51.  Except as provided in Article 53, if a poll is duly demanded it shall be taken in such manner as the Chairman directs and the result of the poll shall be deemed to be the resolution of the general meeting at which the poll was demanded.

52.  The Chairman of any general meeting shall not be entitled to any second or casting vote.

53.  A poll demanded on the election of a Chairman or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the Chairman of the general meeting directs and any business other than that upon which a poll has been demanded or is contingent thereon may be proceeded with pending the taking of the poll.

-18-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

VOTES OF MEMBERS

54. Subject to any rights or restrictions for the time being attached to any class or classes of shares (including as set out in the Schedules), on a show of hands every Member of record present in person or by proxy at a general meeting shall have one (1) vote and on a poll every Member of record present in person or by proxy shall have one (1) vote for each share registered in his name in the register of Members.

55. In the case of joint holders of record the vote of the senior who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders, and for this purpose seniority shall be determined by the order in which the names stand in the register of Members.

56. A Member of unsound mind, or in respect of whom an order has been made by any court, having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by his committee, receiver, curator bonis, or other person in the nature of a committee, receiver or curator bonis appointed by that court, and any such committee, receiver, curator bonis or other persons may vote by proxy.

57. No Member shall be entitled to vote at any general meeting unless he is registered as a shareholder of the Company on the record date for such meeting nor unless all calls or other sums presently payable by him in respect of shares in the Company have been paid.

58. No objection shall be raised to the qualification of any voter except at the general meeting or adjourned general meeting at which the vote objected to is given or tendered and every vote not disallowed at such general meeting shall be valid for all purposes. Any such objection made in due time shall be referred to the Chairman of the general meeting whose decision shall be final and conclusive.

59. On a poll or on a show of hands votes may be given either personally or by proxy.

PROXIES

60. The instrument appointing a proxy shall be in writing and shall be executed under the hand of the appointor or of his attorney duly authorised in writing, or, if the appointor is a corporation, under the hand of an officer or attorney duly authorised in that behalf. A proxy need not be a Member of the Company.

61. The instrument appointing a proxy shall be deposited at the registered office of the Company or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting, or adjourned meeting provided that the Chairman of the Meeting may at his discretion direct that an instrument of proxy shall be deemed to have been duly deposited upon receipt of telex, cable or telecopy confirmation from the appointor that the instrument of proxy duly signed is in the course of transmission to the Company.

62. The instrument appointing a proxy may be in any usual or common form and may be expressed to be for a particular meeting or any adjournment thereof or generally until

-19-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

revoked. An instrument appointing a proxy shall be deemed to include the power to demand or join or concur in demanding a poll.

63. A vote given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the transfer of the share in respect of which the proxy is given provided that no intimation in writing of such death, insanity, revocation or transfer as aforesaid shall have been received by the Company at the registered office before the commencement of the general meeting, or adjourned meeting at which it is sought to use the proxy.

## CORPORATE MEMBERS

64. Any corporation which is a member of record of the Company may in accordance with its articles or in the absence of such provision by resolution of its directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as the corporation could exercise if it were an individual member of record of the Company.

## SHARES THAT MAY NOT BE VOTED

65. Shares of its own capital belonging to the Company or held by it in a fiduciary capacity shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding shares at any given time.

## DIRECTORS

66. After the date hereof, at an annual or extraordinary general meeting called for such purpose, or by written resolution in lieu of a meeting, the Shareholders agree to vote the Shares owned of record or beneficially by them and to otherwise exercise their powers in relation to the Company (a) to maintain a five (5) member Board of the Company, (b) to elect to the Board of the Company one (1) nominee designated by the holders of the Series A-1 Preferred Shares and the Series A-2 Preferred Shares, voting as a single class, who shall be Kevin Wang (an "INVESTOR DIRECTOR") and four (4) nominees designated by the Ordinary Shareholders, and (c) to appoint the Investor Director to each of the Company's audit committee and compensation committee once they are formed by the Company. The holders of the Series A-1 Preferred Shares and the Series A-2 Preferred Shares, voting together as a single class, shall have the sole right to remove their nominee and to reappoint a successor Investor Director; other directors shall be nominated, elected and removed in accordance with this Article. All such directors shall hold office until their resignation, death or incapacity or until their respective successors shall have been elected and shall have qualified. Any vacancy shall be filled by the Shareholders entitled to designate such director hereunder, which shall be deemed to have a proxy to exercise the vote or provide the consent of such director until the appointment of such director to the Board of the Company. The Company shall provide to such directors the same information concerning the Company and the Group Companies, and access thereto, that is provided to other members of the

-20-

Board of the Company. The reasonable travel expenses incurred by any such director in attending any such meetings shall be reimbursed by the Company to the extent consistent with the Company's then existing policy of travel and reimbursement.

67.  The Company may from time to time by Ordinary Resolution (subject to any applicable Required Preferred Shareholder Resolution) increase or reduce the limit in the number of Directors.

REMUNERATION OF DIRECTORS

68.  The remuneration to be paid to the Directors shall be such remuneration as the Directors shall determine. Such remuneration shall be deemed to accrue from day to day. The Directors shall also be entitled to be paid their travelling, hotel and other expenses properly incurred by them in going to, attending and returning from meetings of the Directors, or any committee of the Directors, or general meetings of the Company, or otherwise in connection with the business of the Company, or to receive a fixed allowance in respect thereof as may be determined by the Directors from time to time, or a combination partly of one such method and partly the other.

69.  The Directors may by resolution award special remuneration to any Director of the Company undertaking any special work or services for, or undertaking any special mission on behalf of, the Company other than his ordinary routine work as a Director. Any fees paid to a Director who is also counsel or solicitor to the Company, or otherwise serves it in a professional capacity shall be in addition to his remuneration as a Director.

DIRECTORS' INTEREST

70.  A Director or alternate Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with his office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

71.  A Director or alternate Director may act by himself or his firm in a professional capacity for the Company and he or his firm shall be entitled to remuneration for professional services as if he were not a Director or alternate Director.

72.  No shareholding qualification shall be required for Directors.

73.  A Director or alternate Director of the Company may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as shareholder or otherwise and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by him as a director or officer of, or from his interest in, such other company.

74.  No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director

-21-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or transaction by reason of such Director holding office or of the fiduciary relation thereby established. A Director (or his alternate Director in his absence) shall be at liberty to vote in respect of any contract or transaction in which he is so interested as aforesaid PROVIDED HOWEVER that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by him or the alternate Director appointed by him at or prior to its consideration and any vote thereon.

75.   A general notice or disclosure to the Directors or otherwise contained in the minutes of a Meeting or a written resolution of the Directors or any committee thereof that a Director or alternate Director is a shareholder of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure under Article 74 and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

ALTERNATE DIRECTORS

76.   Subject to the exception contained in Article 84, a Director who expects to be unable to attend Directors' Meetings because of absence, illness or otherwise may appoint any person to be an alternate Director to act in his stead and such appointee whilst he holds office as an alternate Director shall, in the event of absence therefrom of his appointor, be entitled to attend meetings of the Directors and to vote thereat and to do, in the place and stead of his appointor, any other act or thing which his appointor is permitted or required to do by virtue of his being a Director as if the alternate Director were the appointor, other than appointment of an alternate to himself, and he shall ipso facto vacate office if and when his appointor ceases to be a Director or removes the appointee from office. Any appointment or removal under this Article shall be effected by notice in writing under the hand of the Director making the same.

POWERS AND DUTIES OF DIRECTORS

77.      (a) The business of the Company shall be managed by the Directors, who may pay all expenses incurred in promoting, registering and setting up the Company, and may exercise all such powers of the Company as are not, from time to time by the Statute, or by these Articles, or such regulations, being not inconsistent with the aforesaid, as may be prescribed by the Company in general meeting required to be exercised by the Company in general meeting PROVIDED HOWEVER that no regulations made by the Company in general meeting shall invalidate any prior act of the Directors which would have been valid if that regulation had not been made.

         (b) Notwithstanding the generality of the foregoing, (i) the Directors shall not take any action which requires the prior approval of a Required Preferred Shareholder Resolution, without such prior approval; and (ii) the Directors shall be obliged, so far as may be permitted by law, to act in all respects in accordance with and give effect to the Schedules.

-22-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

78.  The Directors may from time to time and at any time by powers of attorney appoint any company, firm, person or body of persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys of the Company for such purpose and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such powers of attorney may contain such provisions for the protection and convenience of persons dealing with any such attorneys as the Directors may think fit and may also authorise any such attorney to delegate all or any of the powers, authorities and discretions vested in him.

79.  All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed as the case may be in such manner as the Directors shall from time to time by resolution determine.

80.  The Directors shall cause minutes to be made in books provided for the purpose:

        (a) of all appointments of officers made by the Directors;

        (b) of the names of the Directors (including those represented thereat by an alternate or by proxy) present at each meeting of the Directors and of any committee of the Directors;

        (c) of all resolutions and proceedings at all meetings of the Company and of the Directors and of committees of Directors.

81.  The Directors on behalf of the Company may pay a gratuity or pension or allowance on retirement to any Director who has held any other salaried office or place of profit with the Company or to his widow or dependants and may make contributions to any fund and pay premiums for the purchase or provision of any such gratuity, pension or allowance.

82.  The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof and to issue debentures, debenture stock and other securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.

MANAGEMENT

83.  Subject to the Schedules attached to these Articles:

        (a) the Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the next four following paragraphs shall be without prejudice to the general powers conferred by this paragraph;

        (b) the Directors may appoint such officers as they consider necessary on such terms, at such remuneration as may be determined by the Board of the Company and to perform such duties, and subject to such provisions as to disqualification and

-23-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

removal as the Directors may think fit. Unless otherwise specified in the terms of his appointment an officer may be removed by resolution of the Directors or Members;

(c) the Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any persons to be members of such committees or local boards or any managers or agents and may fix their remuneration;

(d) the Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill up any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any person so appointed and may annul or vary any such delegation, but no person dealing in good faith and without notice of any such annulment or variation shall be affected thereby; and

(e) any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretions for the time being vested in them.

MANAGING DIRECTORS

84.   The Directors may, from time to time, appoint one or more of their body (but not an alternate Director) to the office of managing Director for such term and at such remuneration (whether by way of salary, or commission, or participation in profits, or partly in one way and partly in another) as they may think fit but his appointment shall be subject to determination ipso facto if he ceases from any cause to be a Director and no alternate Director appointed by him can act in his stead as a Director or managing Director.

85.   The Directors may entrust to and confer upon a Managing Director any of the powers exercisable by them upon such terms and conditions and with such restrictions as they may think fit and either collaterally with or to the exclusion of their own powers and may from time to time revoke, withdraw, alter or vary all or any of such powers.

PROCEEDINGS OF DIRECTORS

86.   Except as otherwise provided by these Articles and the Schedules attached to these Articles, the Directors shall meet together for the despatch of business, convening, adjourning and otherwise regulating their meetings as they think fit. Questions arising at any meeting shall be decided by a majority of votes of the Directors and alternate Directors present at a meeting at which there is a quorum, the vote of an alternate Director not being counted if his appointor be present at such meeting. In the case of an equality of votes, the Chairman shall not have any second or casting vote.

87.   A Director or an alternate Director, may at any time summon a meeting of the Directors by at least fifteen (15) days' notice in writing to every Director and alternate Director which notice shall set forth the general nature of the business to be considered unless

-24-

notice is waived by all the Directors (or their alternates) either at, before or after the meeting is held and PROVIDED FURTHER if notice is given in person, by cable, telex or telecopy the same shall be deemed to have been given on the day it is delivered to the Directors or transmitting organisation as the case may be.

88.    The Board of the Company and each of the Group Companies shall meet at least once every quarter on as regular a basis as possible by giving at least fifteen (15) calendar days' prior notice of such meeting and the agenda of such meeting. A quorum necessary of the Board of the Company shall consist of at least a majority of the total number of directors then in office. For the purposes of this Article an alternate Director or proxy appointed by a Director shall be counted in a quorum at a meeting at which the Director appointing him is not present. The Company shall establish a compensation committee and an audit committee and the Investor Director shall serve on each of such committees.

89.    The continuing Directors may act notwithstanding any vacancy in their body, but if and so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors the continuing Directors or Director may act for the purpose of increasing the number of Directors to that number, or of summoning a general meeting of the Company, but for no other purpose.

90.    The Directors may elect a Chairman of their Board and determine the period for which he is to hold office; but if no such Chairman is elected, or if at any meeting the Chairman is not present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be Chairman of the meeting.

91.    Except as provided for herein, the Directors may delegate any of their powers to committees consisting of such member or members of the Board of the Company (including Alternate Directors in the absence of their appointors) as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

92.    A committee may meet and adjourn as it thinks proper. Questions arising at any meeting shall be determined by a majority of votes of the members present, and in the case of an equality of votes in a committee meeting the Chairman shall have a second or casting vote.

93.    All acts done by any meeting of the Directors or of a committee of Directors (including any person acting as an alternate Director) shall, notwithstanding that it be afterwards discovered that there was some defect in the appointment of any Director or alternate Director, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and qualified to be a Director or alternate Director as the case may be.

94.    Members of the Board of the Company or of any committee thereof may participate in a meeting of the Board or of such committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other and participation in a meeting pursuant to this provision shall

-25-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

constitute presence in person at such meeting. A resolution in writing (in one or more counterparts), signed by all the Directors for the time being or all the members of a committee of Directors (an alternate Director being entitled to sign such resolution on behalf of his appointor) shall be as valid and effectual as if it had been passed at a meeting of the Directors or committee as the case may be duly convened and held.

95.     (a) A Director may be represented at any meetings of the Board of the Company by a proxy appointed by him in which event the presence or vote of the proxy shall for all purposes be deemed to be that of the Director.

     (b) The provisions of Articles 60 to 63 shall mutatis mutandis apply to the appointment of proxies by Directors.

## VACATION OF OFFICE OF DIRECTOR

96.  The office of a Director shall be vacated:

     (a) if he gives notice in writing to the Company that he resigns the office of Director;

     (b) if he absents himself (without being represented by proxy or an alternate Director appointed by him) from three consecutive meetings of the Board of the Company without special leave of absence from the Directors, and they pass a resolution that he has by reason of such absence vacated office;

     (c) if he dies, becomes bankrupt or makes any arrangement or composition with his creditors generally;

     (d) if he is found a lunatic or becomes of unsound mind; or

     (e) if he is removed from office under the provisions of these Articles.

## APPOINTMENT AND REMOVAL OF DIRECTORS

97.  Subject to Article 66 and the Schedules attached to these Articles, the Company may by Ordinary Resolution appoint any person to be a Director or may by Ordinary Resolution remove any Director. Notwithstanding the generality of the foregoing, a Director nominated by the holders of the Preferred Shares, and any successor thereto, may only be removed by the affirmative vote of a majority of holders of the Preferred Shares.

98.  Subject to Article 66, the Directors may appoint any person to be a Director, either to fill in a vacancy or as an additional Director provided that the appointment does not cause the number of Directors to exceed any number fixed by or in accordance with the Articles as a maximum number of Directors.

## BOARD OBSERVERS

99.  Each of the holder of the Series B Preferred Shares at September 28, 2006 (other than Tech Team Holdings Limited, Grand Gains International Limited and BOFA Capital Company Limited), as long as it retains at least 80% of the Series B Preferred Shares acquired under the Series B Share Purchase Agreement, shall be entitled, by notice in

-26-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

writing to the Company, to appoint one (1) person as observer (collectively, the "BOARD OBSERVERS") to attend and speak at, either in person or by teleconference, any and all meetings of the Board of Directors of the Company, the PRC Subsidiary and all committee meetings thereof, without any voting rights. The Company shall provide such Board Observers the same information concerning the Company, the PRC Subsidiary and such committees thereof. The travel expenses incurred by the Board Observers to attend such meetings shall be borne by the relevant appointing holder of the Series B Preferred Shares.

100. Each of the holder of the Series C Preferred Shares at Closing, as long as it retains at least 80% of the Series C Preferred Shares acquired under the Share Purchase Agreement, shall be entitled, by notice in writing to the Company, to appoint one (1) person as a Board Observer to attend and speak at, either in person or by teleconference, any and all meetings of the Board of Directors of the Company, the PRC Subsidiary and all committee meetings thereof, without any voting rights. The Company shall provide such Board Observers the same information concerning the Company, the PRC Subsidiary and such committees thereof. The travel expenses incurred by the Board Observers to attend such meetings shall be borne by the relevant appointing holder of the Series C Preferred Shares.

## PRESUMPTION OF ASSENT

101. A Director of the Company who is present at a meeting of the Board of Company at which action on any Company matter is taken shall be presumed to have assented to the action taken unless his dissent shall be entered in the Minutes of the meeting or unless he shall file his written dissent from such action with the person acting as the Secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to such person immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favour of such action.

## SEAL

102.     (a) The Company may, if the Directors so determine, have a Seal which shall, subject to paragraph (c) hereof, only be used by the authority of the Directors or of a committee of the Directors authorised by the Directors in that behalf and every instrument to which the Seal has been affixed shall be signed by one person who shall be either a Director or the Secretary or Secretary-Treasurer or some person appointed by the Directors for the purpose.

(b) The Company may have a duplicate Seal or Seals each of which shall be a facsimile of the Common Seal of the Company and, if the Directors so determine, with the addition on its face of the name of every place where it is to be used.

(c) A Director, Secretary or other officer or representative or attorney may without further authority of the Directors affix the Seal of the Company over his signature alone to any document of the Company required to be authenticated by him under Seal or to be filed with the Registrar of Companies in the Cayman Islands or elsewhere wheresoever.

-27-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

OFFICERS

103. Subject to the Schedules attached to these Articles, the Company may have a President, a Secretary or Secretary-Treasurer appointed by the Directors who may also from time to time appoint such other officers as they consider necessary, all for such terms, at such remuneration and to perform such duties, and subject to such provisions as to disqualification and removal as the Directors from time to time prescribe.

DIVIDENDS, DISTRIBUTIONS AND RESERVE

104. Subject to the Statute and these Articles, the Directors may from time to time declare dividends (including interim dividends) and distributions on shares of the Company outstanding and authorise payment of the same out of the funds of the Company lawfully available therefor.

105. The Directors may, before declaring any dividends or distributions, set aside such sums as they think proper as a reserve or reserves which shall, at the discretion of the Directors, be applicable for any purpose of the Company and pending such application may, at the like discretion, be employed in the business of the Company.

106. No dividend or distribution shall be payable except out of the profits of the Company, realised or unrealised, or out of the share premium account or as otherwise permitted by the Statute.

107. Subject to the rights of persons, if any, entitled to shares with special rights as to dividends or distributions, if dividends or distributions are to be declared on a class of shares they shall be declared and paid according to the amounts paid or credited as paid on the shares of such class outstanding on the record date for such dividend or distribution as determined in accordance with these Articles but no amount paid or credited as paid on a share in advance of calls shall be treated for the purpose of this Article as paid on the share.

108. The Directors may deduct from any dividend or distribution payable to any Member all sums of money (if any) presently payable by him to the Company on account of calls or otherwise.

109. The Directors may declare that any dividend or distribution be paid wholly or partly by the distribution of specific assets and in particular of paid up shares, debentures, or debenture stock of any other company or in any one or more of such ways and where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient and in particular may issue fractional certificates and fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any Members upon the footing of the value so fixed in order to adjust the rights of all Members and may vest any such specific assets in trustees as may seem expedient to the Directors.

110. Any dividend, distribution, interest or other monies payable in cash in respect of shares may be paid by cheque or warrant sent through the post directed to the registered address of the holder or, in the case of joint holders, to the holder who is first named on the register of Members or to such person and to such address as such holder or joint

-28-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

holders may in writing direct. Every such cheque or warrant shall be made payable to the order of the person to whom it is sent. Any one of two or more joint holders may give effectual receipts for any dividends, bonuses, or other monies payable in respect of the share held by them as joint holders.

111. No dividend or distribution shall bear interest against the Company.

CAPITALISATION

112. The Company may upon the recommendation of the Directors by Ordinary Resolution authorise the Directors to capitalise any sum standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve fund) or any sum standing to the credit of profit and loss account or otherwise available for distribution and to appropriate such sum to Members in the proportions in which such sum would have been divisible amongst them had the same been a distribution of profits by way of dividend and to apply such sum on their behalf in paying up in full unissued shares for allotment and distribution credited as fully paid up to and amongst them in the proportion aforesaid. In such event the Directors shall do all acts and things required to give effect to such capitalisation, with full power to the Directors to make such provisions as they think fit for the case of shares becoming distributable in fractions (including provisions whereby the benefit of fractional entitlements accrue to the Company rather than to the Members concerned). The Directors may authorise any person to enter on behalf of all of the Members interested into an agreement with the Company providing for such capitalisation and matters incidental thereto and any agreement made under such authority shall be effective and binding on all concerned.

BOOKS OF ACCOUNT

113. The Directors shall cause proper books of account to be kept with respect to:

(a) all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place;

(b) all sales and purchases of goods by the Company;

(c) the assets and liabilities of the Company.

Proper books shall not be deemed to be kept if there are not kept such books of account as are necessary to give a true and fair view of the state of the Company's affairs and to explain its transactions.

114. Subject to the Schedules attached to these Articles, the Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Statute or authorised by the Directors or by the Company in general meeting.

-29-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

115. The Directors may from time to time cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by law.

AUDIT

116. The Company may at any annual general meeting appoint an Auditor or Auditors of the Company who shall hold office until the next annual general meeting and may fix his or their remuneration.

117. The Directors may before the first annual general meeting appoint an Auditor or Auditors of the Company who shall hold office until the first annual general meeting unless previously removed by an Ordinary Resolution of the Members in general meeting in which case the Members at that meeting may appoint Auditors. The Directors may fill any casual vacancy in the office of Auditor but while any such vacancy continues the surviving or continuing Auditor or Auditors, if any, may act. The remuneration of any Auditor appointed by the Directors under this Article may be fixed by the Directors.

118. Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and Officers of the Company such information and explanation as may be necessary for the performance of the duties of the auditors.

119. Auditors shall at the next annual general meeting following their appointment and at any other time during their term of office, upon request of the Directors or any general meeting of the Members, make a report on the accounts of the Company in general meeting during their tenure of office.

NOTICES

120. Except as otherwise expressly provided in these Articles, notices or other communications shall be in writing and shall be given by the Company to any Member by telefax, commercial express courier service or personal delivery, addressed to the Member at such Member's address as appears in the register of members of the Company, as of a record date or dates determined in accordance with the Articles and applicable law, as in effect from time to time.

121. All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; when delivered by such courier, if delivered by commercial express courier service; or if faxed, when transmission is confirmed by the sender's fax machine.

122. A notice may be given by the Company to the joint holders of record of a share by giving the notice to the joint holder first named on the register of Members in respect of the share.

123. A notice may be given by the Company to the person or persons which the Company has been advised are entitled to a share or shares in consequence of the death or bankruptcy of a Member by sending it through the post as aforesaid in a pre-paid letter

-30-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address supplied for that purpose by the persons claiming to be so entitled, or at the option of the Company by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

124. Notice of every general meeting shall be given in any manner hereinbefore authorised to:

    (a) every person shown as a Member in the register of Members as of the record date for such meeting except that in the case of joint holders the notice shall be sufficient if given to the joint holder first named in the register of Members; and

    (b) every person upon whom the ownership of a share devolves by reason of his being a legal personal representative or a trustee in bankruptcy of a Member of record where the Member of record but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other person shall be entitled to receive notices of general meetings.

WINDING UP

125. Subject to the rights provided by the terms of issue of Preferred Shares, if the Company shall be wound up the liquidator may, with the sanction of a Special Resolution of the Company and any other sanction required by the Statute, divide amongst the Members in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Members or different classes of Members. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the contributories as the liquidator, with the like sanction, shall think fit, but so that no Member shall be compelled to accept any shares or other securities whereon there is any liability.

126. If the Company shall be wound up, and the assets available for distribution amongst the Members as such shall be insufficient to repay the whole of the paid-up capital, such assets shall be distributed so that, as nearly as may be, subject to the rights provided by the terms of issue of Preferred Shares, the losses shall be borne by the Members in proportion to the capital paid up, or which ought to have been paid up, at the commencement of the winding up on the shares held by them respectively. And if in a winding up the assets available for distribution amongst the Members shall be more than sufficient to repay the whole of the capital paid up at the commencement of the winding up, the excess shall be distributed amongst the Members in proportion to the capital paid up at the commencement of the winding up on the shares held by them respectively. This Article is to be without prejudice to the rights of the holders of shares issued upon special terms and conditions.

-31-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INDEMNITY

127. The Directors and officers for the time being of the Company and any
     trustee for the time being acting in relation to any of the affairs of the
     Company and their heirs, executors, administrators and personal
     representatives respectively shall be indemnified out of the assets of the
     Company from and against all actions, proceedings, costs, charges, losses,
     damages and expenses which they or any of them shall or may incur or
     sustain by reason of any act done or omitted in or about the execution of
     their duty in their respective offices or trusts, except such (if any) as
     they shall incur or sustain by or through their own wilful neglect or
     default respectively and no such Director, officer or trustee shall be
     answerable for the acts, receipts, neglects or defaults of any other
     Director, officer or trustee or for joining in any receipt for the sake of
     conformity or for the solvency or honesty of any banker or other persons
     with whom any monies or effects belonging to the Company may be lodged or
     deposited for safe custody or for any insufficiency of any security upon
     which any monies of the Company may be invested or for any other loss or
     damage due to any such cause as aforesaid or which may happen in or about
     the execution of his office or trust unless the same shall happen through
     the wilful neglect or default of such Director, Officer or trustee.

128. Without prejudice to the generality of the preceding Article, the Company
     shall indemnify and hold harmless each Director who was or is a party or is
     threatened to be made a party to any threatened, pending or completed
     action, suit or proceeding, whether civil, criminal, administrative or
     investigative by reason of the fact that he is or was a Director of the
     Company, or is or was a Director of the Company serving at the request of
     the Company as a director of another company, partnership, joint venture,
     trust, employee benefit plan or other enterprise, against expenses
     (including attorneys' fees), judgments, fines and amounts paid in
     settlement actually and reasonably incurred by him in connection with such
     action, suit or proceeding if he acted in good faith and in a manner he
     reasonably believed to be in or not opposed to the best interests of the
     Company and, with respect to any criminal action or proceeding, had no
     reasonable cause to believe his conduct was unlawful.

FINANCIAL YEAR

129. Unless the Directors otherwise prescribe, the financial year of the Company
     shall end on December 31 in each year and shall begin on January 1 in each
     year.

TRANSFER BY WAY OF CONTINUATION

130. If the Company is exempted as defined in the Statute, it shall, subject to
     the provisions of the Statute and with the approval of a Special
     Resolution, have the power to register by way of continuation as a body
     corporate under the laws of any jurisdiction outside the Cayman Islands and
     to be de-registered in the Cayman Islands.

-32-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

SCHEDULE 1

PREFERRED SHARES

The respective rights, privileges and restrictions attaching to the Preferred Shares shall be as hereinafter specified in this Schedule 1. Unless otherwise specified, the words "HEREOF," "HEREUNDER" and "HERETO," and words of like import, refer to this Schedule 1.

SECTION 1
DIVIDENDS

1.1   Ranking

The Preferred Shares shall, with respect to dividend rights, rights on other distributions and rights on the occurrence of any Liquidation Event, rank senior to the Ordinary Shares and any other series or class of the Company's ordinary shares, or other share capital, that have been authorized.

1.2   Declaration of Dividends

Subject to the Statute, no dividends shall be declared or paid on any of the Ordinary Shares unless they shall also be declared or paid on all the outstanding Preferred Share pro rata treating the Preferred Shares as the greatest whole number of shares of Ordinary Shares then issuable upon conversion of such Preferred Shares pursuant to this Section 1.

1.3   Record Date

The Board may fix a record date for the determination of holders of Preferred Shares entitled to receive payment of the dividends payable pursuant to Section 1.2 hereof, which record date shall not be more than sixty (60) days nor less than ten (10) days prior to the date on which any such dividend is paid.

1.4   Payment

All dividends on Preferred Shares shall be payable in cash, in United States dollars.

1.5   Certain Restrictions

The Company shall not permit any Group Company, or cause any other Person, to make any distribution with respect to or purchase or otherwise acquire for consideration, any share capital of the Company unless the Company could make such distribution or purchase or otherwise acquire such shares at such time and in such manner in accordance with the Statute.

SECTION 2
CONVERSION

2.1   Right to Convert

At any time and from time to time prior to the closing of a Qualified IPO, without the payment of additional consideration thereof, the holder of any Preferred Shares shall

-33-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

have the right, at its option, to convert, all or any portion of its Preferred Shares into one or more Ordinary Shares at the then applicable conversion rate (the "CONVERSION RATE"). For purposes hereof, the Conversion Rate shall be determined by dividing the applicable Original Issue Price per share by the Conversion Price per share. "CONVERSION PRICE" shall initially be equal to the applicable Original Issue Price for each of the outstanding Preferred Shares, subject to adjustment from time to time as provided herein, provided that at any time, the Conversion Price of a Preferred Share shall not fall under the par value of such Preferred Share.

2.2   Automatic Conversion

Upon the closing of a Qualified IPO duly approved in accordance with the Transaction Documents and this Schedule 1, each of the then outstanding Preferred Shares shall be automatically converted into one or more Ordinary Shares calculated by multiplying the number of the Preferred Shares to be so converted by the applicable Conversion Rate as then in effect.

2.3   Mechanism of Conversion

(a)   Conversion shall be effected by the redemption of the Preferred Shares being converted for an amount per share on the books of the Company equal to the applicable Original Issue Price and the issuance in exchange therefor of Ordinary Shares at a price per share equal to the then applicable Conversion Price. In order to exercise its conversion right, the holder of the Preferred Shares to be converted shall surrender the certificate representing such shares to the Company, with a notice of election to convert, duly completed and signed, at the principal office of the Company. Unless the shares issuable upon conversion are to be issued in the same name as the name in which the Preferred Shares are registered, each share certificate surrendered for conversion shall be accompanied by instruments of transfer duly executed by the holder or his duly authorized attorney. In the case of an automatic conversion pursuant to Section 2.2 hereof, no such surrender is required and upon the issuance of certificates representing Ordinary Shares issued upon such automatic conversion, the certificates representing the converted Preferred Shares shall be deemed cancelled.

(b)   As promptly as practicable after the surrender by a holder of the certificates for the Preferred Shares (together with a duly completed and signed notice of election to convert) and in any event within ten (10) Business Days after such surrender, the Company shall issue and deliver to the Person for whose account such Preferred Shares was surrendered, or to its nominee or nominees and in compliance with the Transaction Documents and other applicable agreements restricting transfer), a certificate or certificates for the number of Ordinary Shares or other securities issuable upon the conversion of those shares and any fractional interest in respect of Ordinary Shares or other security arising upon the conversion shall be settled as provided below.

(c)   Conversion shall be deemed to have been effected immediately prior to the close of business on the date on which the holder delivers the certificates for the

-34-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Preferred Shares and the notice of election to convert to the Company (or in the case of an automatic conversion pursuant to Section 2.2 hereof, immediately prior to the closing of the Qualified IPO), and the Person or Persons in whose name or names any Ordinary Shares or other securities shall be issuable upon such conversion shall be deemed to have become the holder or holders of record of the Ordinary Shares or other securities at such time on such date and such conversion shall be at the Conversion Price in effect at such time, unless the register of members of the Company shall be closed on such date, in which event such Person or Persons shall be deemed to have become such holder or holders of record at the close of business on the next succeeding day on which such register of members is open, and such conversion shall be at the Conversion Price in effect on the date such register of members is open. All Ordinary Shares issuable upon conversion of the Preferred Shares will upon issuance be duly and validly issued and fully paid and nonassessable, free of all liens and charges and not subject to any pre-emptive rights. Upon any such conversion of the Preferred Shares, the shares shall no longer be deemed to be outstanding and all rights of a holder with respect to the shares so converted shall immediately terminate upon the issuance of the Ordinary Shares, except the right to receive accrued but unpaid dividends, cash or other assets as herein provided.

2.4  No Fractional Shares

No fractional shares or securities representing fractional Ordinary Shares shall be issued upon conversion of the Preferred Shares. Any fractional interest in Ordinary Shares resulting from conversion of the Preferred Shares shall be paid in cash (computed to the nearest cent) equal to such fraction multiplied by the fair market value per Ordinary Share as determined by the Board of the Company in good faith. If more than one certificate representing the Preferred Shares shall be surrendered for conversion at one time by the same holder, the number of full Ordinary Shares issuable upon conversion thereof shall be computed on the basis of the aggregate number of the Preferred Shares so surrendered for conversion.

2.5  Adjustment of Conversion Price

Subject to the provisions in Section 7 hereof, the Conversion Price shall be subject to adjustment as follows if any of the events listed below occur prior to the conversion of the Preferred Shares.

(a)  In case the Company shall (i) pay a dividend or make a distribution on its Ordinary Shares in Ordinary Shares, (ii) subdivide or reclassify its outstanding Ordinary Shares into a greater number of shares, or (iii) combine or reclassify its outstanding Ordinary Shares into a smaller number of shares, the Conversion Price in effect immediately prior to such event shall be adjusted so that the holder of the Preferred Shares thereafter converted shall be entitled to receive the number of Ordinary Shares of the Company which it would have owned or have been entitled to receive after the happening of such event had the Preferred Shares been converted immediately prior to the happening of such event. An

-35-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

adjustment made pursuant to this paragraph shall become effective immediately after the record date in the case of a dividend or distribution and shall become effective on the effective date in the case of subdivision, combination or reclassification. If any dividend or distribution is not paid or made, the Conversion Price then in effect shall be appropriately readjusted.

(b)    In case the Company shall (i) issue Ordinary Shares, (ii) issue rights, options or warrants to subscribe for or purchase Ordinary Shares, or (iii) issue or sell other rights for Ordinary Shares or securities (including the Preferred Shares) whether or not convertible or exchangeable into Ordinary Shares (any of the issuances in clauses (i), (ii) or (iii), hereinafter "NEW SECURITIES"), without consideration or for a consideration per share less than the then effective Conversion Price on the date the Company issues or sells such New Securities, then in each such case the Conversion Price shall be reduced, concurrently with such issue, to the consideration per share received by the Company for such issue or deemed issue of the New Securities.

The adjustment provided for in this Section 2.5(b) shall be made successively whenever any New Securities are issued (provided, that no further adjustments in the Conversion Price shall be made upon the subsequent exercise, conversion or exchange, as applicable, of such New Securities pursuant to the original terms of such New Securities) and shall become effective immediately after such issuance. If any or all of such New Securities are not so issued or expire or terminate without having been exercised, converted or exchanged, the Conversion Price then in effect shall be appropriately readjusted to the Conversion Price in effect immediately prior to the issuance of such New Securities, subject, however, to such other adjustments as may have been made or that would have otherwise been made under this Section 2.5(b) since the issuance of such New Securities.

(c)    In case the Company shall distribute to all holders of its Ordinary Shares any share capital of the Company (other than Ordinary Shares) or evidences of Indebtedness or cash or other assets (excluding regular cash dividends or distributions paid from retained earnings of the Company and dividends or distributions referred to in Section 2.5(a) hereof) or rights, options or warrants to subscribe for or purchase any of its securities (excluding those referred to in Section 2.5(b) hereof) then, in each such case, the Conversion Price shall be adjusted so that it shall equal the price determined by multiplying the Conversion Price in effect immediately prior to the date of the distribution by a fraction, the numerator of which shall be the Conversion Price in effect immediately prior to the date of the distribution less the then fair market value (as determined by the Board of the Company, whose determination, if made in good faith, shall be conclusive) of the portion of the share capital, cash or assets or evidences of Indebtedness so distributed, or of the subscription rights, options or warrants so distributed or of such convertible or exchangeable securities, with respect to one Ordinary Share, and the denominator of which shall be the Conversion Price in effect immediately prior to the date of the distribution. Such adjustment shall be made whenever any such distribution is

-36-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

made, and shall become effective retroactive to the record date for the determination of shareholders entitled to receive such distribution. If any such distribution is not made or if any or all of such rights, options or warrants expire or terminate without having been exercised, the Conversion Price then in effect shall be appropriately readjusted.

(d)  Exceptions to Adjustment of Conversion Price

(i)  Notwithstanding the foregoing, the provisions of this Section 2.5 shall not apply to the issuance of: (a) Ordinary Shares issued upon conversion of the Preferred Shares that are issued and outstanding as of the date hereof; (b) Ordinary Shares issued as dividend or distribution on the Preferred Shares or in connection with a subdivision or combination of the Preferred Shares; (c) stock options issued under the Company Option Plan and the Ordinary Shares issued upon the exercise of such stock options; or (d) the Series A-1 Preferred Shares and/or the Series A-2 Preferred Shares issued upon the exercise of the Warrants and the Conversion Shares issued thereof.

(ii)  Notwithstanding any provision in Section 2 hereof to the contrary and without limitation to any other provision contained in Section 2 hereof, in the event any securities of the Company (other than the Preferred Shares), including, without limitation those securities set forth as exceptions in paragraph (i) above (collectively, the "SUBJECT SECURITIES"), are amended or otherwise modified by operation of their terms or otherwise (including, without limitation, by operation of such Subject Securities' anti-dilution provisions) in any manner whatsoever that results in (i) the reduction of the exercise, conversion or exchange price of such Subject Securities payable upon the exercise for, or conversion or exchange into, Ordinary Shares or other securities exercisable for, or convertible or exchangeable into, Ordinary Shares and/or (ii) such Subject Securities becoming exercisable for, or convertible or exchangeable into (A) more shares or a greater dollar amount of such Subject Securities which are, in turn exercisable for, or convertible or exchangeable into, Ordinary Shares, or (B) more Ordinary Shares, then such amendment or modification shall be treated for purposes of Section 2.5(b) hereof as if the Subject Securities which have been amended or modified have been terminated and New Securities have been issued with the amended or modified terms, the Company shall make all necessary adjustments (including successive adjustments if required) to the Conversion Price in accordance with Section 2.5 hereof. On the expiration or termination of any such amended or modified Subject Securities for which adjustment has been made pursuant to the operation of the provisions of this Section 2.5(d)(ii) and Section 2.5(b) hereof, without such Subject Securities having been exercised, converted or exchanged in full pursuant to their terms, the Conversion Price shall be appropriately readjusted in the manner specified in Section 2.5(b) hereof.

-37-

(e)    Whenever the Conversion Price or Conversion Rate is adjusted as herein provided, the Company shall promptly prepare a notice of the adjustment of the Conversion Price and Conversion Rate setting forth the Conversion Price and Conversion Rate and the date on which the adjustment becomes effective and shall mail the notice of such adjustment of the Conversion Price and Conversion Rate (together with a copy of an officer's certificate setting forth the facts requiring such adjustment) to each holder of the Preferred Shares at such holder's last address as shown on the register of members of the Company.

2.6    Notice

In case at any time prior to the conversion of the Preferred Shares:

(a)    the Company shall authorize the granting to all the holders of Ordinary Shares of rights to subscribe for or purchase any shares of any class or of any other rights; or

(b)    there shall be any reclassification of the Ordinary Shares of the Company (other than a subdivision or combination of its outstanding Ordinary Shares); or

(c)    there shall be any capital reorganization by the Company; or

(d)    there shall be a consolidation or merger involving the Company or sale of all or substantially all of the Company's property and assets; or

(e)    there shall be a voluntary or involuntary dissolution, liquidation or winding up by the Company or dividend or distribution to holders of Ordinary Shares; or

(f)    any other event which would cause an adjustment in the Conversion Price or Conversion Rate, including without limitation, any adjustment to the Conversion Rate made pursuant to Section 7 of this Schedule 1;

then in any one or more of said cases, the Company shall cause to be delivered to the holders of the Preferred Shares, at the earliest practicable time (and, in any event, not less than fifteen (15) days before any record date or the date set for definitive action), notice of the date on which the books of the Company shall close or a record shall be taken for such dividend, distribution or subscription rights or such reorganization, sale, consolidation, merger, dissolution, liquidation or winding up or other transaction shall take place, as the case may be. Such notice shall also set forth such facts as shall indicate the effect of such action (to the extent such effect may be known at the date of such notice) on the Conversion Price and the kind and amount of the shares and other securities and property deliverable upon conversion of the Preferred Shares, as well as a comparison of what (if anything) the holders of Preferred Shares would be entitled to receive in connection with such action if such holders elect not to convert their respective Preferred Shares. Such notice shall also specify the date, if known, as of which the holders of record of the Ordinary Shares shall participate in said dividend, distribution or subscription rights or shall be entitled to exchange their Ordinary Shares for securities or other property (including cash) deliverable upon such reorganization, sale, consolidation, merger, dissolution, liquidation or winding up or other transaction, as

-38-

the case may be, and the right of the holders of Preferred Shares to convert their respective Preferred Shares into Ordinary Shares as of such date.

2.7  Ordinary Shares Reserved

  (a)  The Company shall at all times reserve and keep available, out of the aggregate of its authorized but unissued Ordinary Shares, for the purpose of effecting conversions of the Preferred Shares, the full number of Ordinary Shares issuable upon the conversion of all outstanding Preferred Shares not theretofore converted including, for purposes of this paragraph, the number of Ordinary Shares which shall be issuable upon conversion of all of the outstanding Preferred Shares which shall be computed as if, at the time of computation, all of the outstanding shares were held by a single holder. The Company shall from time to time, in accordance with the laws of the Cayman Islands, increase the authorized amount of its Ordinary Shares if at any time the number of Ordinary Shares remaining unissued shall not be sufficient to permit the conversion of all the then outstanding Preferred Shares.

  (b)  Before taking any action which would cause an adjustment reducing the Conversion Price below the then par value of the Ordinary Shares issuable upon conversion of the Preferred Shares, the Company will take any corporate action which may be necessary in order that the Company may validly and legally issue fully paid and nonassessable Ordinary Shares at the adjusted Conversion Price.

2.8  Taxes

Except where registration is requested in a name other than the name of the registered holder, the Company will pay any and all documentary stamp or similar issue or transfer taxes payable in respect of the issue or delivery of Ordinary Shares on conversion of the Preferred Shares pursuant hereto.

2.9  Merger, Consolidation, etc

In case of any reclassification or change of outstanding Ordinary Shares (other than a change in par value, or as a result of a subdivision or combination), or in case of any consolidation of the Company with, or merger of the Company with or into, any other entity that results in a reclassification, change, conversion, exchange or cancellation of outstanding Ordinary Shares or any sale or transfer of all or substantially all of the assets of the Company, each holder of the Preferred Shares then outstanding shall have the right thereafter to convert the Preferred Shares held by the holder into the kind and amount of securities, cash and other property which the holder would have been entitled to receive upon such reclassification, change, consolidation, merger, sale or transfer if the holder had held the Ordinary Shares immediately prior to the reclassification, change, consolidation, merger, sale or transfer. The Company shall provide the holders of the Preferred Shares with a comparison of what (if anything) such holders would be entitled to receive in connection with such action if such holders elect not to convert their respective the Preferred Shares.

-39-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

2.10  Protection of Conversion Rights

The Company will not, by amendment of these Sections or its Memorandum of Association or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company but will at all times in good faith assist in the carrying out of all the provisions of this Section 2 and in the taking of all such action as may be necessary or appropriate in order to protect the conversion rights of the holders of the Preferred Shares against impairment.

SECTION 3
STATUS ON CONVERSION OR REDEMPTION

Upon any conversion or redemption of the Preferred Shares, the shares so converted or redeemed shall be cancelled and shall not be reissued, and the Company may from time to time take such appropriate action as may be necessary to diminish the authorized number of the Preferred Shares accordingly.

SECTION 4
VOTING RIGHTS

4.1  Voting

The issued and outstanding Preferred Shares shall be voted with the issued and outstanding Ordinary Shares at any annual or extraordinary general meeting of the Company, or the holders of such Preferred Shares may act by way of unanimous written resolution in the same manner as holders of the Ordinary Shares, upon the following basis: the holders of any Preferred Shares shall be entitled to the number of votes equal to the number of Ordinary Shares into which such Preferred Shares could be converted at the record date for determination of the Members entitled to vote on such matters, or, if no such record date is established, at the date such vote is taken or any written consent of Members is solicited, such votes to be counted together with all other shares of the Company having general voting power and not counted separately as a class.

4.2  Matters Requiring Approval of the Holders of the Preferred Shares

(a)  So long as any shares of the Preferred Shares remain outstanding, neither the Company nor any other members of the Company Group shall, and the Founder shall cause the Company and such member of the Company Group not to, take any of the following actions without, in addition to any other authorizations or approvals required by applicable law and the Memorandum and Articles, the prior written approval of (i) the holders of at least two thirds (2/3) of the total number of the then issued and outstanding Series A-1 Preferred Shares and the Series A-2 Preferred Shares, voting together as a single class, (ii) the holders of at least two thirds (2/3) of the total number of the then issued and outstanding Series B Preferred Shares, and (iii) the holders of at least two thirds (2/3) of the total number of the then issued and outstanding Series C Preferred Shares:

(i)  any amendment to the Articles of the Company or the PRC Subsidiary;

-40-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(ii)  issuance or sale by any member of the Company Group of any
      securities other than (i) any issuance of the Conversion Shares,
      (ii) any grant of stock options under the Company Option Plan,
      and (iii) any issuance of the Series A-1 Preferred Shares and/or
      the Series A-2 Preferred Shares upon the exercise of the Warrants
      and the issuance of Conversion Shares thereof;

(iii) any redemption, retirement, purchase or other acquisition,
      direct or indirect, by any member of the Company Group of any
      outstanding Ordinary Shares or Equity Securities (or any
      warrants, rights or options to acquire any such Ordinary Shares
      or Equity Securities), other than in accordance with the right of
      redemption of the Investors as provided in the Memorandum and
      Articles, or any other reduction or similar change of capital
      structure of any member of the Company Group;

(iv)  any merger, acquisition, consolidation, joint venture or like
      transaction involving any member of the Company Group (whether or
      not such member of the Company Group is the surviving
      corporation), including, but not limited to, any transfer of
      equity interest in the PRC Subsidiary or any new issue of
      registered capital in the PRC Subsidiary to any Person other than
      the Company;

(v)   any liquidation, dissolution, winding-up, bankruptcy, revocation
      of voluntary dissolution (judicial or non-judicial) or similar
      proceeding filed by or against any of the members of the Company
      Group;

(vi)  any sale, lease, transfer, exchange or other disposition of all
      or substantially all of the assets of the Company (including the
      disposition of operating rights of any member of the Company
      Group);

(vii) any transfer or exclusive license in any of the Company Group's
      technology other than licenses of non-exclusive rights in such
      technology that are required or necessary in the ordinary course
      of business;

(viii) creation, incurrence, assumption or permission to exist any
      mortgage, pledge, charge, lien or other encumbrance on all or
      substantially all of assets of any member of the Company Group,
      other than those required or necessary in the ordinary course of
      business which shall not exceed US$5,000,000 in any single
      transaction;

(ix)  launch of an initial public offering of the Ordinary Shares at a
      price lower than the minimum offering price as required for a
      Qualified IPO (i.e., US$11.00 per Ordinary Share) or issuance of
      Ordinary Shares in an amount that exceeds the IPO Maximum New
      Issue in an initial public offering of the Ordinary Shares;

(x)   any declaration or payment of any dividend or other distribution
      prior to an IPO of the Company, direct or indirect, in cash or in
      property by any

-41-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

member of the Company Group on account of any class of share
capital of such member of the Company Group now or hereafter
outstanding;

(xi) any sale, transfer or other disposition of any Ordinary Shares by
the Founder prior to the expiration of the twelve (12) month
period after the closing of the Qualified IPO;

(xii) any sale, transfer or other disposition by any Key Person of any
shares acquired through the exercise of stock options received
under the Company Option Plan before the Qualified IPO;

(xiii) any sale, transfer or other disposition of any shares by any
other holder of equity interest in the Company (other than any of
the Investors or their transferees or permitted assigns)
representing more than a five percent (5%) equity interest in the
Company (on a fully diluted and as converted basis);

(xiv) engagement in any transactions by any member of the Company
Group with (i) its directors, (ii) shareholders, (iii) the
Founder, the Key Persons or their respective Affiliates, (iv)
close relatives of the Founder or Affiliates of such relatives,
(v) close relatives of the Affiliates of the Founder or
Affiliates of such relatives, or (vi) any corporation or other
entity of which majority equity is held or which is otherwise
controlled by any of the Persons listed in (i) through (vi) of
this paragraph (p), jointly or respectively;

(xv) creation, incurrence, assumption, guarantee or otherwise becoming
liable (directly or indirectly) by any of the member of the
Company Group with respect to any indebtedness (including capital
leases) which represents an amount in excess of US$8,000,000;

(xvi) the purchase or lease by any member of the Company Group of any
real estate property valued in excess of US$3,000,000;

(xvii) the purchase by any member of the Company Group of listed or
unlisted securities;

(xviii) public offerings and/or registration of securities other than
the Qualified IPO of the Company;

(xix) any adoption by the Company Group of a business plan or annual
budget or any material amendment to its current business plan or
annual budget, or any material alteration or change in the
strategic direction or business operations in a manner that is
not contemplated in the most recent business plan or annual
budget;

(xx) termination of the Company Option Plan or adoption of any other
share option or similar incentive plan of any member of the
Company Group or any material amendment to the same, including
change or determination

-42-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

of the number of options reserved, vesting periods and exercise prices of the stock options thereunder;

(xxi) grant of loans to any director, officer or employee of any member of the Company Group; and

(xxii) changes of the independent auditors or changes in accounting practices or policies by any member of the Company Group.

(b)  So long as any shares of the Series A-1 Preferred Shares and/or Series A-2 Preferred Shares remain outstanding, neither the Company nor any other members of the Company Group shall, and the Founder shall cause the Company and such member of the Company Group not to, make increase or decrease in the total number of directors comprising the board of directors of any member of the Company Group without, in addition to any other authorizations or approvals required by applicable law and the Memorandum and Articles, the prior written approval of the holders of at least two thirds (2/3) of the total number of the then issued and outstanding Series A-1 Preferred Shares and the Series A-2 Preferred Shares, voting together as a single class.

(c)  Notwithstanding anything provided in this Section 4.2 to the contrary, to the extent any of the actions referred to in Sections 4.2(a) and 4.2(b) above will impact the liquidation preference or redemption rights of the holders of the Series A-1 Preferred Shares and/or the holders of the Series A-2 Preferred Shares, the holders of the Series A-1 Preferred Shares and the Series A-2 Preferred Shares shall vote as separate classes with respect to each of such actions.

(d)  Notwithstanding anything provided in this Section 4.2 to the contrary, the selection of the lead underwriter(s) of the Qualified IPO shall be led by the management of the Company and subject to the consent of the Investor Director, which consent shall not be unreasonably withheld.

(e)  The Shareholders shall exercise their powers and otherwise act to ensure that the Company or the Group Companies, as applicable, will be fully authorized to take other actions that are not required to be approved in accordance with this Section 4.2 so long as they are approved by a simple majority of the members present in person or by proxy at a duly constituted meeting of the Board.

SECTION 5
REDEMPTION

The Company shall, as provided below, redeem the Preferred Shares.

5.1  Redemption of Preferred Shares

If a Qualified IPO shall not have occurred during the thirty-six (36) months following the Closing, then each holder of the Preferred Shares then outstanding may require the Company to redeem all of the then outstanding Preferred Shares held by it in accordance with these Articles by giving written notice to the Company at any time beginning on the

-43-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

thirty-seventh (37th) month following the Closing, specifying a redemption date that is at least sixty (60) calendar days from the date of such written notice.

5.2   Material Breach

If the Company or any Group Company is in material breach of any of its representations, warranties or covenants under either the Series A Preferred Shares Purchase Agreement or Transaction Documents, (i) the holders of not less than two-thirds (2/3) of the Series A-1 Preferred Shares then outstanding, or (ii) the holders of not less than two-thirds (2/3) of the Series A-2 Preferred Shares then outstanding, or (iii) the holders of not less than two-thirds (2/3) of the Series B Preferred Shares then outstanding or (iv) the holders of not less than two-thirds (2/3) of the Series C Preferred Shares then outstanding may require the Company to redeem all of the then outstanding Preferred Shares in accordance with these Articles, by giving written notice to the Company at any time specifying a redemption date that is at least thirty (30) calendar days from the date of such written notice.

5.3   Redemption Price

For the purposes of this Section 5, the written notice given in Sections 5.1 and 5.2 hereof shall be referred to as the "REDEMPTION NOTICE" and such redemption date specified in the Redemption Notice shall be referred to as the "REDEMPTION DATE". The Company shall, on the Redemption Date, redeem each of the Preferred Shares requested to be redeemed in the Redemption Notice in immediately available funds at a price equal to (i) one hundred and fifty percent (150%) of their respective Original Issue Prices, in the case of Series B Preferred Shares and Series C Preferred Shares, plus (ii) any declared, accrued but unpaid dividends and interests thereon, proportionally adjusted for share subdivisions, share dividends, reorganizations, reclassifications, consolidations or mergers.

5.4   Termination of Rights

Except as set forth in Section 5.5 hereof, on and after the Redemption Date, all rights of any holder of the Preferred Shares that have been redeemed under this Section 5 (the "REDEEMED SHARES") shall cease and terminate, and such Redeemed Shares shall no longer be deemed to be outstanding, whether or not the certificates representing such shares have been received by the Company; provided, however, that, if the Company defaults in the payment of any redemption payment as provided in this Section 5 for any reason, including without limitation the lack of legally available funds for redemption, the rights of the holders of the Preferred Shares shall continue until the Company cures such default.

5.5   Insufficient Funds for Redemption

If on the Redemption Date, the number of Preferred Shares that may then be legally redeemed by the Company is less than the number of all Preferred Shares to be redeemed, then (i) the number of Preferred Shares that the Company may legally redeem shall be calculated pro-rata among the holders thereof based on the respective redemption amounts of the Preferred Shares requested to be redeemed, and (ii) the

-44-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

remaining Preferred Shares requested to be redeemed shall be carried forward and redeemed as soon as the Company has legally available funds to do so. If all of the Preferred Shares subject to the Redemption Notice has not been redeemed in full by the Company and if any Preferred Shares remain outstanding,

(a)   the Company shall issue on the Redemption Date a one-year promissory note dated as of the Redemption Date to each holder of the Preferred Shares (each a "PROMISSORY NOTE", and collectively, the "PROMISSORY NOTES"), which will bear interest at the compounded rate of six percent (6%) per annum, with an aggregate principal amount equal to the redemption price of such Preferred Shares that are not redeemed. The Promissory Notes shall become due and payable one year from the Redemption Date. The Promissory Notes shall be freely assignable by the holders thereof. If the Company is unable to satisfy its obligations under a Promissory Note when due, the holder of the Promissory Note may, but is not obligated to, extend the repayment date by another twelve (12) months, provided, however, the Company shall provide collaterals with a fair market value no less than the aggregate principal amount outstanding on the Promissory Notes to secure its repayment obligations under such Promissory Note;

(b)   the Board of the Company shall declare and pay a special dividend equal to the higher of (i) no less than sixty percent (60%) out of the Company's annual profit and (ii) the largest amount of dividend that is legally permissible to the holders of the Promissory Notes until such time all amounts outstanding on each of the Promissory Notes are fully paid for; and

(c)   the Company shall cause each of the Group Companies, including the PRC Subsidiary, to remit the higher of (i) no less than sixty percent (60%) of the annual profit of each of the Group Companies and (ii) the largest amount of dividend that is legally permissible to the Company until such time all amounts outstanding on each of the Promissory Notes are fully paid for.

SECTION 6
LIQUIDATION, DISSOLUTION OR WINDING UP

6.1   Ranking

Upon the occurrence of any Liquidation Event, the assets of the Company available for distribution shall be distributed in the following order:

(a)   before any distribution or payment shall be made to the holders of any Ordinary Shares, each holder of the Preferred Shares shall be entitled to receive, with respect to each of the Preferred Shares held by it, an amount equal to one hundred and thirty percent (130%) of their respective Original Issue Price (in each case as adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions), plus all dividends or interests declared and unpaid with respect thereto (as adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions) (each a "LIQUIDATION PREFERENCE" and collectively, the "LIQUIDATION PREFERENCES"),

-45-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

provided that if the assets of the Company available for distribution are less than the aggregate amount of the Liquidation Preferences, the holders of the Preferred Shares shall be entitled to participate pro rata in the distribution of the assets of the Company based on their respective Liquidation Preferences; and

(b)    if there are assets of the Company available for distribution after the payments referred to in clause (a) above, all the Ordinary Shareholders of the Company shall be entitled to participate pro rata in the residual assets of the Company.

6.2    Liquidation Event

For purposes of this Section 6, any of the following events shall be treated as a Liquidation Event (unless otherwise agreed to by the holders of not less than two-thirds (2/3) of the Preferred Shares, voting together as a single class):

(a)    liquidation, winding up or dissolution of the Company (either voluntary or involuntary);

(b)    the consummation of a consolidation or merger (other than a reincorporation transaction) or acquisition or sale of voting securities of the Company resulting in the holders of the issued and outstanding voting securities of the Company immediately prior to such transaction beneficially owning or controlling less than fifty one percent (51%) of the voting securities of the continuing or surviving entity immediately following such transaction; or

(c)    a sale of all or substantially all of the assets of the Company Group (taken as a whole).

The Company shall give each holder of the Preferred Shares written notice of any of the foregoing events as soon as practicable and in no event later than ten (10) business days prior to the occurrence thereof. In the event the requirements of Section 6.1 hereof are not complied with in respect of Section 6.2 (b) or (c), the Company shall forthwith either (i) cause such closing to be postponed until such time as the requirements of Section 6.1 hereof have been complied with, or (ii) cancel such transaction.

6.3    Non-cash Distribution

In the event the Company proposes to distribute assets other than cash in connection with any liquidation, dissolution or winding up of the Company, the value of the assets to be distributed to the holder of the Preferred Shares and Ordinary Shares shall be determined by an appraiser of recognized standing selected in good faith by the Board. Any securities to be delivered pursuant to Section 6 hereof shall be valued as follows:

(a)    Securities not subject to investment letter or other similar restrictions on free marketability: (i) if traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty (30) day period ending three days prior to the closing; (ii) if actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever are applicable) over the thirty (30) day period ending three (3) days prior to the closing; and (iii) if there is no active

-46-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

public market, the value shall be the fair market value thereof, as reasonably determined by the Board in good faith.

(b)  The method of valuation of securities subject to investment letter or other restrictions on free marketability shall be to make an appropriate discount from the market value determined as above in paragraph (a) to reflect the approximate fair market value thereof, as determined by the Board the Company in good faith.

SECTION 7
OWNERSHIP ADJUSTMENT OF PREFERRED SHARES

7.1  Following the issue by the Auditor of the 2006 Audited Income Statement:

(a)  if the 2006 Net Earnings are equal to or more than the Guaranteed 2006 Net Earnings,

   (i)   the Final Ownership of the holders of the Series A-1 Preferred Shares and the holders of the Series A-2 Preferred Shares (collectively, the "SERIES A SHAREHOLDERS") shall remain unchanged as the Initial Ownership of the Series A Shareholders in the Company;

   (ii)  the Final Ownership of the holders of the Series B Preferred Shares (the "SERIES B SHAREHOLDERS") in the Company shall remain unchanged as the Initial Ownership of the Series B Shareholders in the Company; and

   (iii) the Final Ownership of the holders of the Series C Preferred Shares (the "SERIES C SHAREHOLDERS") in the Company shall remain unchanged as the Initial Ownership of the Series C Shareholders in the Company.

   For purposes of this Section 7, (1) "INITIAL OWNERSHIP" shall mean the respective initial ownership of the Series A Shareholders, the Series B Shareholders and the Series C Shareholders in the Company determined in accordance with the Series A Preferred Shares Purchase Agreement, the Series B Preferred Shares Purchase Agreement and the Series C Preferred Shares Purchase Agreement, being 5.056%, 8.832% and 3.312%, respectively; and (2) "FINAL OWNERSHIP" shall mean the respective final ownership of the Series A Shareholders, the Series B Shareholders and the Series C Shareholders in the Company (each to be adjusted as provided hereunder) determined by dividing the total number of issued and outstanding Series A Preferred Shares or Series B Preferred Shares or the Series C Preferred Shares by the sum of the total issued and outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Preferred Shares, all on an as-converted basis, as of the date of the Closing or the date of adjustment, as the case may be. For the avoidance of doubt, calculation of the Initial Ownership and the Final Ownership herein shall not take into account any shares issuable upon the exercise of stock options granted under the Company Option Plan.

(b)  If the 2006 Net Earnings are less than the Guaranteed 2006 Net Earnings,

-47-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

    (i)  the Final Ownership of the Series A Shareholders in the Company shall be adjusted in accordance with the following formula promptly following the issue of the 2006 Audited Income Statement:

$$FOA1 = IOA \times \frac{GE06}{AE06}$$

        For purposes of the foregoing formula, the following definitions shall apply: (1) FOA1 shall mean the Final Ownership of the Series A Shareholders after adjustment in accordance with this Section 7.1(b); (2) IOA shall mean the Initial Ownership of the Series A Shareholders in the Company; (3) GE06 shall mean the Guaranteed 2006 Net Earnings of the Company Group, being an amount that is US$30,000,000; and (4) AE06 shall mean the actual 2006 Net Earnings.

    (ii)  the Final Ownership of the Series B Shareholders in the Company shall remain unchanged as the Initial Ownership of the Series B Shareholders in the Company.

    (iii)  the Final Ownership of the Series C Shareholders in the Company shall remain unchanged as the Initial Ownership of the Series C Shareholders in the Company.

(c)  The adjustment of the Final Ownership as contemplated in this Section 7.1 shall be effected by adjusting the respective Conversion Rate of the Series A Preferred Shares, the Series B Preferred Shares and Series C Preferred Shares in accordance with the formulas set forth in Section 7.4 below.

7.2  Following the issue by the Auditor of the 2006/2007 Audited Income Statement:

(a)  If the 2006/2007 Net Earnings are equal to or more than the Guaranteed 2006/2007 Net Earnings,

    (i)  the Final Ownership of the Series A Shareholders in the Company shall remain unchanged as the Final Ownership of the Series A Shareholders adjusted, if any, in accordance with Section 7.1(b) above;

    (ii)  the Final Ownership of the Series B Shareholders in the Company shall remain unchanged as the Initial Ownership of the Series B Shareholders in the Company; and

    (iii)  the Final Ownership of the Series C Shareholders in the Company shall remain unchanged as the Initial Ownership of the Series C Shareholders in the Company.

(b)  If the 2006/2007 Net Earnings are less than the Guaranteed 2006/2007 Net Earnings;

    (i)  the Final Ownership of the Series A Shareholders in the Company shall remain unchanged as the Final Ownership of the Series A Shareholders adjusted, if any, in accordance with Section 7.1(b) above;

-48-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(ii) the Final Ownership of the Series B Shareholders in the Company shall be adjusted in accordance with the following formula promptly following the issue of the 2006/2007 Audited Income Statement:

$$FOB = IOB \times \frac{GE06/07}{AE06/07}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) FOB shall mean the Final Ownership of the Series B Shareholders in the Company after adjustment in accordance with this Section 7.2(b); (2) IOB shall mean the Initial Ownership of the Series B Shareholders in the Company; (3) GE06/07 shall mean the Guaranteed 2006/2007 Net Earnings of the Company Group, being an amount that is US$60,000,000; and (4) AE06/07 shall mean the actual 2006/2007 Net Earnings.

(iii) the Final Ownership of the Series C Shareholders in the Company shall remain unchanged as the Initial Ownership of the Series C Shareholders in the Company.

(c) The adjustment of the Final Ownership as contemplated in this Section 7.2 shall be effected by adjusting the respective Conversion Rate of the Series A Preferred Shares, the Series B Preferred Shares and the Series C Preferred Shares in accordance with the formulas set forth in Section 7.4 below.

7.3 Following the issue by the Auditor of the 2007 Audited Income Statement:

(a) if the 2007 Net Earnings are equal to or more than the Guaranteed 2007 Net Earnings,

(i) the Final Ownership of the Series A Shareholders in the Company shall remain unchanged as the Final Ownership of the Series A Shareholders adjusted, if any, in accordance with Section 7.1(b) above;

(ii) the Final Ownership of the Series B Shareholders in the Company shall remain unchanged as the Final Ownership of the Series B Shareholders adjusted, if any, in accordance with Section 7.2(b) above; and

(iii) the Final Ownership of the Series C Shareholders in the Company shall remain unchanged as the Initial Ownership of the Series C Shareholders.

(b) if the 2007 Net Earnings are less than the Guaranteed 2007 Net Earnings but are equal or more than US$100,000,000,

(i) the Final Ownership of the Series A Shareholders in the Company shall remain unchanged as the Final Ownership of the Series A Shareholders adjusted, if any, in accordance with Section 7.1(b) above;

(ii) the Final Ownership of the Series B Shareholders in the Company shall remain unchanged as the Final Ownership of the Series B Shareholders adjusted, if any, in accordance with Section 7.2(b) above; and

-49-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

      (iii) the Final Ownership of the Series C Shareholders in the Company
            shall be adjusted in accordance with the following formula
            promptly following the issue of the 2007 Audited Income
            Statement:

$$FOC = IOC \times \frac{GE07}{AE07}$$

            For purposes of the foregoing formula, the following definitions
            shall apply: (1) FOC shall mean the Final Ownership of the Series
            C Shareholders in the Company after adjustment in accordance with
            this Section 7.3(b); (2) IOC shall mean the Initial Ownership of
            the Series C Shareholders in the Company; (3) GE07 shall mean the
            Guaranteed 2007 Net Earnings of the Company Group, being an
            amount that is US$110,000,000; and (4) AE07 shall mean the actual
            2007 Net Earnings.

  (c)    if the 2007 Net Earnings are less than US$100,000,000,

      (i)  the Final Ownership of the Series A Shareholders in the Company
            shall be adjusted in accordance with the following formula
            promptly following the issue of the 2007 Audited Income
            Statement:

$$FOA2 = FOA1 \times \frac{US\$100,000,000}{AE07}$$

            For purposes of the foregoing formula, the following definitions
            shall apply: (1) FOA2 shall mean the Final Ownership of the
            Series A Shareholders in the Company after adjustment in
            accordance with this Section 7.3(c); (2) FOA1 shall mean the
            Final Ownership of the Series A Shareholders in the Company
            adjusted, if any, in accordance with Section 7.1(b) above; and
            (3) AE07 shall mean the actual 2007 Net Earnings;

      (ii) the Final Ownership of the Series B Shareholders in the Company
            shall remain unchanged as the Final Ownership of the Series B
            Shareholders adjusted, if any, in accordance with Section 7.2(b)
            above; and

      (iii) the Final Ownership of the Series C Shareholders in the Company
            shall be adjusted in accordance with the formula set forth in
            Section 7.3(b) above promptly following the issue of the 2007
            Audited Income Statement.

  (d)  The adjustment of the Final Ownership as contemplated in this Section
      7.3 shall be effected by adjusting the respective Conversion Rate of
      the Series A Preferred Shares, the Series B Preferred Shares and the
      Series C Preferred Shares in accordance with the formulas set forth in
      Section 7.4 below.

7.4  To effect the ownership adjustment as set forth in this Section 7, the
    applicable Conversion Rate of the Series A Preferred Shares, the Series B
    Preferred Shares and the Series C Preferred Shares shall be adjusted in
    accordance with the following formulas:

$$CR(A) = FO(A) \times \frac{TS}{4,580,000}$$

$$CR(B) = FO(B) \times \frac{TS}{8,000,000}$$

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
                           TS
       CR(C) = FO(C) x ---------
                        3,000,000
```

For purposes of the foregoing formulas, the following definitions
shall apply: (1) CR(A) shall mean the effective Conversion Rate of the
Series A Preferred Shares at which the Series A Preferred Shares are
converted into Ordinary Shares in accordance with this Section 7; (2)
CR(B) shall mean the effective Conversion Rate of the Series B
Preferred Shares at which the Series B Preferred Shares are converted
into Ordinary Shares in accordance with this Section 7; (3) CR(C)
shall mean the effective Conversion Rate of the Series C Preferred
Shares at which the Series C Preferred Shares are converted into
Ordinary Shares in accordance with this Section 7; (4) FO(A) shall
mean the final ownership of the Series A Shareholders in the Company
as adjusted according to Section 7.1(b) and/or Section 7.3(c) above;
(5) FO(B) shall mean the Final Ownership of the Series B Shareholders
in the Company as adjusted according to Section 7.2(b) above; (6)
FO(C) shall mean the Final Ownership of the Series C Shareholders in
the Company as adjusted according to Section 7.3(b) above; and (7) TS
shall mean the total number of Ordinary Shares to be issued and
outstanding, on an as-converted basis, as of the date of the Closing
or the date of adjustment, as the case may be, which shall be equal to
the number derived from the following formula:

```
             75,000,000
     TS = ------------------
          1-FO(A)-FO(B)-FO(C)
```

7.5  Notwithstanding anything to the contrary,

   (a)  the Series A Shareholders agree not to make any adjustment of the
        ownership (i) with respect to the 2006 Audited Income Statement under
        Section 7.1 hereof if the 2006 Net Earnings is no less than
        US$28,500,000; and (ii) with respect to the 2007 Audited Income
        Statement under Section 7.3 hereof if the 2007 Net Earnings is no less
        than US$95,000,000;

   (b)  the Series B Shareholders agree not to make any adjustment to the
        ownership with respect to the 2006/2007 Audited Income Statement under
        Section 7.2 hereof if the 2006/2007 Net Earnings is no less than
        US$57,000,000; and

   (c)  the Series C Shareholders agree not to make any adjustment to the
        ownership with respect to the 2007 Audited Income Statement under
        Section 7.3 hereof if the 2007 Net Earnings is no less than
        US$104,500,000.

7.6  Notwithstanding the above, in the event a Qualified IPO consummates or is
     expected to consummate prior to June 30, 2007, the Company agrees to
     perform a special audit of the interim period covering the number of
     complete months prior to such date. If the 2006/2007 Net Earnings is less
     than the Guaranteed 2006/2007 Net Earnings, each on a

-51-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

pro rata basis, then the Final Ownership of Series B Shareholders in the Company shall be adjusted, prior to the consummation of the Qualified IPO, in accordance with the formulas and principles set forth in Section 7.2 hereof, except the actual adjustment will be made on a pro rata basis.

For the avoidance of doubt, both the pro rata Guaranteed 2006/2007 Net Earnings and the pro rata 2006/2007 Net Earnings shall be calculated on a monthly basis, and for purposes of this Section 7.6, the monthly average of the Guaranteed 2006/2007 Net Earnings shall be US$5,000,000.

7.7    Notwithstanding the above, in the event a Qualified IPO consummates or is expected to consummate prior to December 31, 2007, the Company agrees to perform a special audit of the interim period covering the number of complete months prior to such date. If the actual 2007 Net Earnings is less than the Guaranteed 2007 Net Earnings, each on a pro rata basis, then the Final Ownership of Investors in the Company shall be adjusted, prior to the consummation of the Qualified IPO, in accordance with the formulas and principles set forth in Section 7.3 hereof, except the actual adjustment will be made on a pro rata basis. For purpose of the pro rata adjustment to be made in accordance with this Section 7.7, the Guaranteed 2007 Net Earnings allocable to the first six (6) months of 2007 shall be US$50,000,000 and the Guaranteed 2007 Net Earnings allocable to the last six (6) months of 2007 shall be US$60,000,000.

For the avoidance of doubt, both the pro rata Guaranteed 2007 Net Earnings and the pro rata 2007 Net Earnings shall be calculated on a monthly basis, and for purposes of this Section 7.7, the monthly average of the Guaranteed 2007 Net Earnings shall be derived from the following formulas:

(i)    if the Qualified IPO consummates prior to June 30, 2007,

$$PNE = \frac{US\$50,000,000 \times N}{6}$$

(ii) if the Qualified IPO consummates on or after July 1, 2007,

$$PNE = US\$50,000,000 + US\$10,000,000 \times (N-6)$$

For purposes of the foregoing formulas, the following definitions shall apply: (1) PNE shall mean the pro rata Guaranteed 2007 Net Earnings; and (2) N shall mean the number of complete months that have been audited by the special audit pursuant to this Section 7.7.

7.8    Notwithstanding the above, the Company and the Investors may agree from time to time, based on legal advice mutually acceptable to the Company and the Investors, on any other method to effect the adjustment(s) to the respective Final Ownership of the Series A Shareholders, the Series B Shareholders and the Series C Shareholders in the Company to be equal to the amounts derived from the formulas and principles set forth in this Section 7.

-52-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

7.9    For the avoidance of doubt, the respective Final Ownership of the Series A
       Shareholders, the Series B Shareholders and the Series C Shareholders in
       the Company after any adjustment made under this Section 7 shall not be
       lower than their respective ownership before such adjustment, and no
       adjustment to the ownership of the Series A Shareholders in the Company
       will be made according to Section 7.3(b) hereof if a Qualified IPO
       consummates in 2007.

SECTION 8
MISCELLANEOUS

8.1    Except as may otherwise be conferred or required by law, the Preferred
       Shares shall not have any designations, preferences, limitations or
       relative rights other than those specifically set forth in this Schedule 1
       (as such may be amended from time to time) and in any other provision of
       these Articles.

8.2    If any right, preference or limitation of the Preferred Shares set forth
       herein (as amended from time to time) is invalid, unlawful or incapable of
       being enforced by reason of any rule or law or public policy, all other
       rights, preferences and limitations set forth in this Schedule 1 which can
       be given effect without the invalid, unlawful or unenforceable right,
       preference or limitation herein set forth shall not be deemed dependant
       upon any other such right, preference or limitation unless so expressed
       herein.

8.3    Any registered holder of the Preferred Shares shall be entitled to an
       injunction or injunctions to prevent violations of the provisions of the
       Articles and to enforce specifically the terms and provisions of the
       Articles in any court of the Cayman Islands or any countries having
       jurisdiction, this being in addition to any other remedy to which such
       holder may be entitled at law or in equity. Notwithstanding the foregoing,
       the observance of any term of these Articles which benefits only the
       holders of the Preferred Shares may be waived by holders of at least two
       thirds (2/3) of all issued and outstanding Preferred Shares of such series
       voting as a single class (either generally or in a particular instance and
       either retroactively or prospectively).

SECTION 9
DEFINITIONS

For the purposes of this Schedule 1, the following terms shall have the meanings
indicated below. All capitalized terms used but not otherwise defined herein
shall have the respective meanings ascribed to them in Article 1 of these
Articles.

"2006 AUDITED INCOME STATEMENT" means the consolidated income statement of the
Company Group for the financial year ending December 31, 2006 audited and
approved by the Auditor in conformity with IFRS or US GAAP (which shall be the
same as the relevant accounting standards used in connection with the Company's
Qualified IPO).

"2006 NET EARNINGS" means the US Dollar equivalent (based on the then applicable
daily USD/CNY exchange rate set by the People's Bank of China and published by
the State Administration of Foreign Exchange at www.safe.gov.cn for the Business
Day immediately prior to December 31, 2006, rounded to the nearest ten
thousandth USD) of the Net Earnings (as

-53-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

defined below) of the Company Group that is stated in Renminbi as determined from the 2006 Audited Income Statement.

"2006/2007 AUDITED INCOME STATEMENT" means the consolidated income statement of the Company Group for the financial period between July 1, 2006 and June 30, 2007 audited and approved by the Auditor in conformity with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"2006/2007 NET EARNINGS" means the US Dollar equivalent (based on the then applicable daily USD/CNY exchange rate set by the People's Bank of China and published by the State Administration of Foreign Exchange at www.safe.gov.cn for the Business Day immediately prior to June 30, 2007, rounded to the nearest ten thousandth USD) of the Net Earnings (as defined below) of the Company Group that is stated in Renminbi as determined from the 2006/2007 Audited Income Statement.

"2007 AUDITED INCOME STATEMENT" means the consolidated income statement of the Company Group for the financial year ending December 31, 2007 audited and approved by the Auditor in conformity with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"2007 NET EARNINGS" means the US Dollar equivalent (based on the then applicable daily USD/CNY exchange rate set by the People's Bank of China and published by the State Administration of Foreign Exchange at www.safe.gov.cn for the Business Day immediately prior to December 31, 2007, rounded to the nearest ten thousandth USD) of the Net Earnings (as defined below) of the Company Group that is stated in Renminbi as determined from the 2007 Audited Income Statement.

"AFFILIATE" means with respect to any Person, any other Person that directly or indirectly, though one or more intermediaries, controls, is controlled by, or under common control with, the first mentioned Person. For purposes of this definition, "CONTROL" (including with correlative meanings, the terms "CONTROLLING", "CONTROLLED BY" and under "COMMON CONTROL WITH") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"BUSINESS DAY" means any day other than a Saturday, Sunday or other day on which commercial banks in the PRC, Hong Kong or New York are authorized or required by law or governmental order to close.

"COMPANY GROUP" means the Company and all Group Companies, taken together.

"CONTINGENT OBLIGATION" means as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument or arrangement (whether in writing or otherwise) to which such Person is a party or by which it or any of such Person's property is bound.

"CONVERSION PRICE" has the meaning set forth in Section 2.1 hereof.

"CONVERSION RATE" has the meaning set forth in Section 2.1 hereof.

-54-

"FINAL OWNERSHIP" has the meaning set forth in Section 7.1 hereof.

"GROUP COMPANY" means a Person (other than a natural person) that is a Subsidiary of the Company.

"GUARANTEED 2006 NET EARNINGS" means the guaranteed Net Earnings of the Company Group for the financial year ending December 31, 2006, being an amount that is US$30,000,000.

"GUARANTEED 2006/2007 NET EARNINGS" means the guaranteed Net Earnings of the Company Group for the financial period between July 1, 2006 and June 30, 2007, being an amount that is US$60,000,000.

"GUARANTEED 2007 NET EARNINGS" means the guaranteed Net Earnings of the Company Group for the financial year ending December 31, 2007, being an aggregate amount of US$110,000,000; it being understood that such guaranteed Net Earnings of the Company Group for the six months ending June 30, 2007 are US$50,000,000 and that for the six months ending December 31, 2007 are US$60,000,000.

"HONG KONG" means the Special Administration Region of Hong Kong.

"IFRS" means the International Financial Reporting Standards promulgated by the International Accounting Standards Board (IASB) (which includes standards and interpretations approved by the IASB and International Accounting Principles issued under previous constitutions), together with its pronouncements thereon from time to time, and applied on a consistent basis.

"INDEBTEDNESS" means as to any Person (a) all obligations of such Person for borrowed money (including without limitation, reimbursement and all other obligations with respect to surety bonds, unfunded credit commitments, letters of credit and bankers' acceptances, whether or not matured), (b) all indebtedness, obligations or liability of such Person (whether or not evidenced by notes, bonds, debentures or similar instruments) whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several, that should be classified as liabilities in accordance with IFRS, including without limitation, any items so classified on a balance sheet and any reimbursement obligations in respect of letters of credit or obligations in respect of bankers acceptances, (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable and accrued commercial or trade liabilities arising in the ordinary course of business, (d) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency, (e) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (f) all obligations of such Person under leases which have been or should be, in accordance with IFRS, recorded as capital leases, (g) all indebtedness secured by any Lien (other than Liens in favor of lessors under leases other than leases included in clause (f) above) on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person, and (h) any Contingent Obligation of such Person incurred in respect of any Indebtedness referred to in (a) to (g) above.

-55-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

"INITIAL OWNERSHIP" has the meaning set forth in Section 7.1 hereof.

"LIEN" means any mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), charge, claim, restriction or preference, priority, right or other security interest or preferential arrangement of any kind or nature whatsoever (excluding preferred share and equity related preferences) including, without limitation, those created by, arising under or evidenced by any conditional sale or other title retention agreement, or any financing lease having substantially the same economic effect as any of the foregoing.

"MAXIMUM IPO NEW ISSUE" means the number of Ordinary Shares to be issued at an initial public offering of the Company that represents 15% of the total number of issued and outstanding Ordinary Shares (including the number of Ordinary Shares to be issued in such an initial public offering and the over-allotment option, if any) on an as converted basis, being an amount of 15,984,705 shares.

"NET EARNINGS" means the consolidated and normalized positive profit after tax (less one-off, non-recurring and extraordinary items as well as stock compensation charges which are required to be deducted from the Company's income under the currently effective US GAAP or IFRS, if any, but plus any governmental grants and subsidies) attributable to the shareholders of the Company Group as audited by the Auditor in accordance with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"ORIGINAL ISSUE PRICE" means (i) US$2.6667 per share with respect to the Series A-1 Preferred Shares; (ii) US$4.4304 per share with respect to the Series A-2 Preferred Shares; (iii) US$6.00 per share with respect to the Series B Preferred Shares; and (iv) US$7.50 per share with respect to the Series C Preferred Shares.

"PERSON" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity.

"PREFERRED SHARE LIQUIDATION PREFERENCE" has the meaning set forth in Section 6.1 hereof.

"USD", "US DOLLAR" or "US$" shall mean the lawful currency of the United States of America.

"US GAAP" means generally accepted accounting principles in the United States, consistently applied.

"WARRANT" or "WARRANTS" means the Warrant(s) the Company issued to the holders of the Series A-1 Preferred Shares and the holders of the Series A-2 Preferred Shares pursuant to certain Warrant Purchase Agreement(s), each dated as of July 28, 2006.

-56-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

SCHEDULE 2

PROVISIONS RELATING TO TRANSFER OF SHARES

SECTION 1

DEFINITIONS

For the purposes of this Schedule 2, the following terms shall have the meanings indicated below. All capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in Article 1 of these Articles or Section 9 of Schedule 1, as the case may be. Unless otherwise specified, the words "hereof," "hereunder" and "hereto," and words of like import, refer to this Schedule 2.

"COMPETITOR" means any Person that may be reasonably deemed to be engaged in any business that develops, manufactures or produces solar grade silicon ingots and wafers.

"EQUITY SECURITIES" means any Ordinary Shares or Ordinary Share Equivalents.

"EXERCISING HOLDER" has the meaning set forth in Section 3.1(b)(iii).

"HOLDERS" means the Investors, together with the permitted transferees and assigns of any Investor.

"ORDINARY SHARE EQUIVALENTS" means warrants, options and rights exercisable for Ordinary Shares and instruments convertible or exchangeable for Ordinary Shares, including, without limitation, the Preferred Shares.

"PROHIBITED TRANSFER" has the meaning set forth in Section 3.5(a).

"SECURITIES ACT" means the U.S. Securities Act of 1933, as amended.

"SELLING HOLDER" has the meaning set forth in Section 3.2(a).

"TRANSFER" has the meaning set forth in Section 2.1.

"TRANSFER NOTICE" has the meaning set forth in Section 3.1 (a).

"TRANSFEROR" has the meaning set forth in Section 3.1(a).

SECTION 2

TRANSFER OF SHARES

2.1  Prohibition on Transfer of Shares by Founder.

     Prior to the expiration of twelve (12) months after the closing of a Qualified IPO, the Founder, regardless of the Founder's employment with the Company, may not sell, assign, transfer, pledge, hypothecate, or otherwise encumber or dispose of in any way ("TRANSFER"), all or any part of any interest in the Equity Securities now or hereafter owned or held by him, except with the prior written consent of two thirds (2/3) of the total number of issued and outstanding Preferred Shares, voting together as a single class.

-57-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

2.2  Lock Up and Competitors.

Notwithstanding anything to the contrary contained herein, each of Holders agrees

(a)  not to Transfer any Preferred Shares (i) prior to January 31, 2007 with respect to the holders of the Series A-1 Preferred Shares and the Series A-2 Preferred Shares; (ii) prior to March 28, 2006 with respect to the holders of the Series B Preferred Shares and (iii) within the six (6) month period after the Closing with respect to the holders of the Series C Preferred Shares (each a "LOCK-UP PERIOD");

(b)  to notify the Company in writing of any proposed Transfer after the expiration of the respective Lock-up Period set forth in Section 2.2(a) above; and

(c)  to be subject to any reasonable lock-up period as may be determined in good faith by the lead underwriter(s) of the Qualified IPO.

Further, each of the Holders may not, in any event, transfer any Equity Securities held by it to any Competitor as determined in good faith by the Board of Directors of the Company.

2.3  Prohibited Transfers Void. Any sale, assignment, transfer, pledge, hypothecation or other encumbrance or disposition of Equity Securities not made in conformance with this Section 2 shall be null and void, shall not be recorded on the books of the Company and shall not be recognized by the Company.

SECTION 3

RIGHT OF FIRST REFUSAL; CO-SALE RIGHT

3.1  Rights of First Refusal.

(a)  Transfer Notice.

If at any time any holder of Equity Securities that is not also a Holder (a "TRANSFEROR") proposes to Transfer Equity Securities to one or more third parties, then the Transferor shall give each Holder written notice of the Transferor's intention to make the Transfer (the "TRANSFER NOTICE"), which Transfer Notice shall include (i) a description of the Equity Securities to be transferred ("OFFERED SHARES"), including without limitation the number of shares of the Equity Securities to be Transferred and the nature of such Transfer, (ii) the identity(identities) (including name(s) and address(es)) of the prospective transferee(s), and (iii) the consideration and the material terms and conditions upon which the proposed Transfer is to be made. The Transfer Notice shall certify that the Transferor has received a firm offer from the prospective transferee(s) and in good faith believes a binding agreement for the Transfer is obtainable on the terms set forth in the Transfer Notice. The Transfer Notice shall also include a copy of any written proposal, term sheet or letter of intent or other agreement relating to the proposed Transfer.

(b)  Holders' Option.

-58-

(i)   Each Holder shall have an option for a period of thirty (30) days from the Holder's receipt of the Transfer Notice to elect to purchase its respective pro rata share of the Offered Shares at the same price and subject to the same terms and conditions as described in the Transfer Notice.

(ii)  Each Holder may exercise such purchase option and, thereby, purchase all or any portion of its pro rata share (with any re-allotments as provided below) of the Offered Shares, by notifying the Transferor and the Company in writing, before expiration of the 30-day period as to the number of such shares which it wishes to purchase (including any re-allotment). For purposes of this clause (ii), each Holder's pro rata share of the Offered Share shall be a fraction of the Offered Shares, of which the number of Equity Securities (assuming the exercise, conversion and exchange of any Ordinary Shares Equivalents) owned by such Holder on the date of the Transfer Notice shall be the numerator and the total number of Equity Securities (assuming the exercise, conversion and exchange of any Ordinary Share Equivalents) held by all Holders on the date of the Transfer Notice shall be the denominator.

(iii) Each Holder which exercises its right of first refusal under clause (ii) above (an "EXERCISING HOLDER") shall have a right of re-allotment such that, if any other Holder fails to exercise the right to purchase its full pro rata share of the Offered Shares, the Exercising Holder may exercise an additional right to purchase a pro rata share of such unpurchased Offered Shares by notifying the Transferor and the Company in writing within ten (10) days after the expiration of the 30-day period described in clause (ii) above. For purposes of this clause (iii), each Exercising Holder's pro rata share of the unpurchased Offered Shares shall be a fraction of the unpurchased Offered Shares (rounded to the nearest whole share), of which the number of shares to be purchased by such Exercising Holder under clause (ii) shall be the numerator, and the total number of shares to be purchased by all Exercising Holders under clause (ii) shall be the denominator.

(iv)  Each Holder shall be entitled to apportion the Offered Shares to be purchased among its partners and affiliates, provided that such Holder notifies the Transferor of such allocation.

(v)   If a Holder gives the Transferor notice that it desires to purchase its pro rata share of the Offered Shares and, as the case may be, its re-allotment, then payment for the Offered Shares shall be by a cashier's or certified check or wire transfer in immediately available funds, against delivery of the Offered Shares to be purchased at a place agreed by the parties and at the time of the scheduled closing therefor, which shall be no later than sixty (60) days after the Holder's receipt of the Transfer Notice, unless the Transfer Notice contemplated a later closing with the prospective third party transferee or unless the value of the purchase price has not yet been established pursuant to Section 3.1(c) hereof.

-59-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(c)  Valuation of Property.

    (i)  Should the purchase price specified in the Transfer Notice be payable in property other than cash or evidences of indebtedness, the Holders shall have the right to pay the purchase price in the form of cash equal in amount to the value of such property.

    (ii)  If the Transferor and the Holders cannot agree on such cash value within ten (10) days after the date on which the relevant option is exercised by the Holders, the valuation shall be made by an appraiser of recognized standing selected by the Transferor and the Holders or, if they cannot agree on an appraiser within twenty (20) days after the Holders' receipt of the Transfer Notice, each shall select an appraiser of recognized standing and the two appraisers shall designate a third appraiser of recognized standing, whose appraisal shall be determinative of such value.

    (iii)  The cost of such appraisal shall be shared equally by the Transferor and the Holders, with the half of the cost borne by the Company and the Holders to be borne pro rata by each based on the number of shares such Holders were interested in purchasing pursuant to this Section 3.

    (iv)  If the time for the closing of the Holders' purchase has expired but for the determination of the value of the purchase price offered by the prospective transferee(s), such closing shall be held on or prior to the fifth business day after such valuation shall have been made pursuant to this subsection.

3.2  Right of Co-Sale.

(d)  To the extent the Holders do not exercise their respective rights of first refusal as to all of the Offered Shares pursuant to Section 3.1, each Holder (a "SELLING HOLDER") which notifies the Transferor in writing within thirty (30) days after receipt of the Transfer Notice referred to in Section 3.1(a), shall have the right to participate in such sale of Equity Securities on the same terms and conditions as specified in the Transfer Notice.

    (i)  Such Selling Holder's notice to the Transferor shall indicate the number of Equity Securities the Selling Holder wishes to sell under its right to participate.

    (ii)  To the extent one or more of the Holders exercise such right of participation in accordance with the terms and conditions set forth below, the number of Equity Securities that the Transferor may sell in the Transfer shall be correspondingly reduced.

(e)  Each Selling Holder may elect to sell up to such number of Equity Securities equal to (on a fully converted basis) the product obtained by multiplying (i) the aggregate number of Ordinary Shares covered by the Transfer Notice (including the number of Ordinary Shares that would be issuable upon the exercise, conversion or exchange of Ordinary Share Equivalents) by (ii) a fraction, the numerator of which is the number of Ordinary Shares (including the number of

-60-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Ordinary Shares that would be issuable upon the exercise, conversion or exchange of Ordinary Share Equivalents) owned by the Selling Holder on the date of the Transfer Notice and the denominator of which is the total number of Ordinary Shares (including the number of Ordinary Shares that would be issuable upon the exercise, conversion or exchange of Ordinary Share Equivalents) owned by all Selling Holders on the date of the Transfer Notice.

(f)    If any Holder fails to elect to fully participate in such Transferor's sale pursuant to this Section 3.2, the Transferor shall give notice of such failure to the Selling Holders. Such notice may be made by telephone if confirmed in writing within two (2) days. The Selling Holders shall have five (5) days from the date such notice was given to agree to sell their pro rata share of the unsold portion. For purposes of this paragraph, a Selling Holder's pro rata share shall be a fraction of the unsold portion, the numerator of which shall be the number of Ordinary Shares (including the number of Ordinary Shares that would be issuable upon the exercise, conversion or exchange of Ordinary Share Equivalents) notified to be sold by the Selling Holder pursuant to Section 3.2(b) and the denominator of which shall be the total number of Ordinary Shares (including the number of Ordinary Shares that would be issuable upon the exercise, conversion or exchange of Ordinary Share Equivalents) notified to be sold by all Selling Holders pursuant to Section 3.2(b).

(g)    Each Selling Holder shall effect its participation in the sale by promptly delivering to the Transferor for transfer to the prospective purchaser one or more certificates, properly endorsed for transfer, which represent the type and number of Equity Securities which such Selling Holder elects to sell; provided, however that if the prospective third-party purchaser objects to the delivery of Equity Securities in lieu of Ordinary Shares, such Selling Holder shall convert such Equity Securities into Ordinary Shares and deliver certificates corresponding to such Ordinary Shares. The Company agrees to make any such conversion concurrent with the actual transfer of such shares to the purchaser and contingent on such transfer.

(h)    The share certificate or certificates that a Selling Holder delivers to the Transferor pursuant to Section 3.2(d) shall be transferred to the prospective purchaser in consummation of the sale of the Equity Securities pursuant to the terms and conditions specified in the Transfer Notice, and the Transferor shall concurrently therewith remit to such Selling Holder that portion of the sale proceeds to which such Selling Holder is entitled by reason of its participation in such sale.

(i)    To the extent that any prospective purchaser prohibits the participation of a Selling Holder exercising its co-sale rights hereunder in a proposed Transfer or otherwise refuses to purchase shares or other securities from a Selling Holder exercising its co-sale rights hereunder, the Transferor shall not sell to such prospective purchaser any Equity Securities unless and until, simultaneously with such sale, the Transferor shall purchase such shares or other securities

-61-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

from such Selling Holder for the same consideration and on the same terms and conditions as the proposed transfer described in the Transfer Notice.

(j)   Notwithstanding the above terms under this Section 3.2, if at any time, the Founder has a bona fide offer from a third party which offers to purchase from the Founder such number of Equity Securities that results in the number of Equity Securities held by the Founder after such sale (which must be approved by Holders representing not less than two thirds (2/3) of all the Preferred Shares then outstanding, voting as a single class) being less than 75% of the total Equity Securities that are then issued and outstanding (on an as-converted and fully diluted basis), the Founder shall procure that the Holders be offered to sell all of their Equity Securities at the same price and subject to the same material terms and conditions as offered by such third party to the Founder, on an as-converted and fully converted basis. For the avoidance of doubt, reduction of the Founder's ownership in the Company by any other reason, such as upward adjustment of any Holder's ownership in the Company or issuance of stock options under the Company Option Plan, shall not trigger such co-sale rights.

3.3   Non-Exercise of Rights.

(k)   Subject to any other applicable restrictions on the sale of such shares, to the extent that the Holders have not exercised their rights to purchase the Offered Shares within the time periods specified in Section 3.1 and the Holders have not exercised their rights to participate in the sale of the Offered Shares within the time periods specified in Section 3.2, the Transferor shall have a period of sixty (60) days from the expiration of such rights in which to sell the Offered Shares to the third-party transferee(s) identified in the Transfer Notice upon terms and conditions (including the purchase price) no more favorable than those specified in the Transfer Notice. Within fifteen (15) days of entering into any agreement to sell Offered Shares to a third party under this Section, the Transferor shall furnish each Holder with a copy of all agreements relating to such sale.

(l)   The third-party transferee(s) shall acquire the Offered Shares free and clear of subsequent rights of first refusal and co-sale rights under this Section 3. In the event the Transferor does not consummate the sale or disposition of the Offered Shares within sixty (60) days from the expiration of such rights, the Holders' first refusal rights and co-sale rights shall continue to be applicable to any subsequent disposition of the Offered Shares by the Transferor until such rights lapse in accordance with the terms of this Section 3.

(m)   The exercise or non-exercise of the rights of the Holders under this Section 3 to purchase Equity Securities from a Transferor or participate in the sale of Equity Securities by a Transferor shall not adversely affect their rights to make subsequent purchases from a Transferor of Equity Securities or subsequently participate in sales of Equity Securities by a Transferor hereunder.

3.4   Limitations to Co-Sale.

-62-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Notwithstanding the provisions of Section 3.2 herein, the co-sale right of the Holders shall not apply to the sale of any Equity Securities (A) to the public pursuant to a registration statement filed with, and declared effective by, the Securities and Exchange Commission under the Securities Act, including a Qualified IPO or (B) to or by the Company.

3.5  Prohibited Transfers.

(n)  In the event any Transferor should sell any Equity Securities in contravention of the co-sale rights of the Holders under Section 3.2 (a "PROHIBITED TRANSFER"), the Holders, in addition to such other remedies as may be available at law, in equity or hereunder, shall have the put option provided below, and such Transferor shall be bound by the applicable provisions of such option.

(o)  In the event of a Prohibited Transfer, each Holder shall have the right to sell to the Transferor the type and number of Equity Securities equal to the number of Equity Securities such Holder would have been entitled to transfer to the third-party transferee(s) under Section 3.2 hereof had the Prohibited Transfer been effected pursuant to and in compliance with the terms hereof. Such sale shall be made on the following terms and conditions:

    (i)  The price per share at which the shares are to be sold to the Transferor shall be equal to the price per share paid by the third-party transferee(s) to the Transferor in the Prohibited Transfer. The Transferor shall also reimburse each Holder for any and all fees and expense, including legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of such Holder's rights under this Section 3.

    (ii)  Within ninety (90) days after the later of the dates on which the Holder (A) received notice of the Prohibited Transfer or (B) otherwise becomes aware of the Prohibited Transfer, such Holder shall, if exercising the option created hereby, deliver to the Transferor the certificate or certificates representing shares to be sold under this Section 3.5 by such Holder, each certificate to be properly endorsed for transfer.

    (iii)  The Transferor shall, upon receipt of the certificate or certificates for the shares to be sold by a Holder, pursuant to this Section 3.5, pay the aggregate purchase price therefor and the amount of reimbursable fees and expenses, as specified in subparagraph 3.5(b)(i), in cash or by other means acceptable to the Holder.

    (iv)  Notwithstanding the foregoing, any attempt by the Transferor to transfer Equity Securities in violation of this Section 3 shall be void, and the Company agrees it will not effect such a transfer nor will it treat any alleged transferee(s) as the holder of such shares without the written consent of a majority in interest of the Holders.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

SECTION 4

LEGEND

4.1    Each existing or replacement certificate for shares now owned or hereafter
       acquired by the Founder or issued to any person in connection with a
       transfer pursuant to Section 3.1 hereof shall bear the following legend
       upon its face:

       "THE SALE, PLEDGE, HYPOTHECATION, ASSIGNMENT OR TRANSFER OF THE SECURITIES
       REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A
       SHAREHOLDERS AGREEMENT BY AND BETWEEN THE SHAREHOLDER, THE COMPANY AND
       CERTAIN HOLDERS OF SHARES OF THE COMPANY. COPIES OF SUCH AGREEMENT MAY BE
       OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY."

4.2    The Founder agrees that the Company may instruct its transfer agent to
       impose transfer restrictions on the shares represented by certificates
       bearing the legend referred to in Section 4.1 above to enforce the
       provisions of this Schedule 2 and the Company agrees to promptly do so. The
       legend shall be removed upon termination of the Shareholders Agreement.

SECTION 5

EFFECT OF CHANGE IN COMPANY'S CAPITAL STRUCTURE

       Appropriate adjustments shall be made in the number and class of shares in
       the event of a stock dividend, stock split, reverse stock split,
       combination, reclassification or like change in the capital structure of
       the Company.

-64-

</TEXT>
</DOCUMENT>

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhbit 3.2

THE COMPANIES LAW (2004 REVISION)
COMPANY LIMITED BY SHARES

FOURTH AMENDED AND RESTATED MEMORANDUM OF ASSOCIATION
OF

LDK SOLAR CO., LTD.

(ADOPTED BY WAY OF A SPECIAL RESOLUTION PASSED ON APRIL 17, 2007
AND EFFECTIVE CONDITIONAL AND IMMEDIATELY UPON
COMMENCEMENT OF THE TRADING OF THE
COMPANY'S AMERICAN DEPOSITARY SHARES REPRESENTING ITS
ORDINARY SHARES ON THE NEW YORK STOCK EXCHANGE)

1.  The name of the Company is LDK Solar Co., Ltd..

2.  The Registered Office of the Company shall be at the offices of c/o
    Corporate Filing Services Limited, 4th Floor, Harbour Centre,
    addressStreetP.O. Box 613, CityGeorge Town, Grand Cayman, Cayman Islands,
    placeBritish West Indies.

3.  Subject to the following provisions of this Memorandum, the objects for
    which the Company is established are unrestricted.

4.  Subject to the following provisions of this Memorandum, the Company shall
    have and be capable of exercising all the functions of a natural person of
    full capacity irrespective of any question of corporate benefit, as
    provided by Section 27(2) of The Companies Law.

5.  Nothing in this Memorandum shall permit the Company to carry on a business
    for which a licence is required under the laws of the Cayman Islands unless
    duly licensed.

6.  The Company shall not trade in the Cayman Islands with any person, firm or
    corporation except in furtherance of the business of the Company carried on
    outside the Cayman Islands; provided that nothing in this clause shall be
    construed as to prevent the Company effecting and concluding contracts in
    the Cayman Islands, and exercising in the Cayman Islands all of its powers
    necessary for the carrying on of its business outside the Cayman Islands.

7.  The liability of each member is limited to the amount from time to time
    unpaid on such member's shares.

8.  The share capital of the Company is US$50,000,000 divided into 499,580,000
    ordinary shares of a nominal or par value of US$0.10 each and 420,000
    shares of such class or designation as the board of directors may determine
    in accordance with Article 12 of the Articles of Association.

9.  The Company may exercise the power contained in the Companies Law to
    deregister in the Cayman Islands and be registered by way of continuation
    in another jurisdiction.

The Companies Law (2004 Revision)
Company Limited by Shares

FOURTH AMENDED AND RESTATED

ARTICLES OF ASSOCIATION


OF


LDK Solar Co., Ltd.


(Adopted by way of a special resolution passed on
April 17, 2007 and effective conditional and immediately
upon commencement of the trading of the
Company's American depositary shares representing its
ordinary shares on the New York Stock Exchange)

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

I N D E X
---------

| SUBJECT | Article No. |
| ------- | ----------- |
| Table A | 1 |
| Interpretation | 2 |
| Share Capital | 3 |
| Alteration Of Capital | 4-7 |
| Share Rights | 8-9 |
| Variation Of Rights | 10-11 |
| Shares | 12-15 |
| Share Certificates | 16-21 |
| Lien | 22-24 |
| Calls On Shares | 25-33 |
| Forfeiture Of Shares | 34-42 |
| Register Of Members | 43-44 |
| Record Dates | 45 |
| Transfer Of Shares | 46-51 |
| Transmission Of Shares | 52-54 |
| Untraceable Members | 55 |
| General Meetings | 56-58 |
| Notice Of General Meetings | 59-60 |
| Proceedings At General Meetings | 61-65 |
| Voting | 66-77 |
| Proxies | 78-83 |
| Corporations Acting By Representatives | 84 |
| No Action By Written Resolutions Of Members | 85 |
| Board Of Directors | 86-88 |
| Disqualification Of Directors | 89 |
| Executive Directors | 90-91 |
| Directors' Fees And Expenses | 96-99 |
| Directors' Interests | 100-103 |
| General Powers Of The Directors | 104-109 |
| Borrowing Powers | 110-113 |
| Proceedings Of The Directors | 114-123 |
| Audit Committee | 124-126 |
| Officers | 127-130 |
| Register of Directors and Officers | 131 |
| Minutes | 132 |
| Seal | 133 |
| Authentication Of Documents | 134 |
| Destruction Of Documents | 135 |
| Dividends And Other Payments | 136-145 |
| Reserves | 146 |
| Capitalisation | 147-148 |
| Subscription Rights Reserve | 149 |
| Accounting Records | 150-154 |
| Audit | 155-160 |
| Notices | 161-163 |
| Signatures | 164 |
| Winding Up | 165-166 |
| Indemnity | 167 |
| Amendment To Memorandum and Articles of Association And Name of Company | 168 |
| Information | 169 |

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INTERPRETATION

TABLE A

1.      The regulations in Table A in the Schedule to the Companies Law (2004 Revision) do not apply to the Company.

INTERPRETATION

2.   (1)  In these Articles, unless the context otherwise requires, the words standing in the first column of the following table shall bear the meaning set opposite them respectively in the second column.

| WORD | MEANING |
|---|---|
| "Audit Committee" | the audit committee of the Company formed by the Board pursuant to Article 124 hereof, or any successor audit committee |
| "Auditor" | the independent auditor of the Company which shall be an internationally recognized firm of independent accountants |
| "Articles" | these Articles in their present form or as supplemented or amended or substituted from time to time |
| "Board" or "Directors" | the board of directors of the Company or the directors present at a meeting of directors of the Company at which a quorum is present |
| "capital" | the share capital from time to time of the Company. |
| "clear days" | in relation to the period of a notice, that period excluding the day when the notice is given or deemed to be given and the day for which it is given or on which it is to take effect |
| "clearing house" | a clearing house recognised by the laws of the jurisdiction in which the shares of the Company (or depositary receipts therefor) are listed or quoted on a stock exchange or interdealer quotation system in such jurisdiction |
| "Company" | LDK Solar Co., Ltd. |
| "competent regulatory authority" | a competent regulatory authority in the territory where the shares of the Company (or depositary receipts therefor) are listed or quoted on a stock exchange or interdealer quotation system in such territory |
| "debenture" and "debenture holder" | include debenture stock and debenture stockholder respectively. |

| | |
|---|---|
| "Designated Stock Exchange" | the New York Stock Exchange. |
| "dollars" and "$" | dollars, the legal currency of the placecountry-regionUnited States of America |
| "Exchange Act" | the Securities Exchange Act of 1934, as amended. |
| "head office" | such office of the Company as the Directors may from time to time determine to be the principal office of the Company |
| "Law" | The Companies Law, Cap. 22 (Law 3 of 1961, as consolidated and revised) of the placeCayman Islands |
| "Member" | a duly registered holder from time to time of the shares in the capital of the Company |
| "month" | a calendar month. |
| "NYSE Rules" | the rules set forth in the New York Stock Exchange Listed Company Manual. |
| "Notice" | written notice unless otherwise specifically stated and as further defined in these Articles |
| "Office" | the registered office of the Company for the time being. |
| "ordinary resolution" | a resolution shall be an ordinary resolution when it has been passed by a simple majority of votes cast by such Members as, being entitled so to do, vote in person or, in the case of any Member being a corporation, by its duly authorised representative or, where proxies are allowed, by proxy at a general meeting of which not less than ten (10) clear days' Notice has been duly given |
| "paid up" | paid up or credited as paid up. |
| "Register" | the principal register and where applicable, any branch register of Members of the Company to be maintained at such place within or outside the Cayman Islands as the Board shall determine from time to time |
| "Registration Office" | in respect of any class of share capital such place as the Board may from time to time determine to keep a branch register of Members in respect of that class of share capital and where (except in cases where the Board otherwise directs) the transfers or other documents of title for such class of share capital are to be lodged for registration and are to be registered |
| "SEC" | the United States Securities and Exchange Commission. |

| | |
|---|---|
| "Seal" | common seal or any one or more duplicate seals of the Company (including a securities seal) for use in the Cayman Islands or in any place outside the Cayman Islands |
| "Secretary" | any person, firm or corporation appointed by the Board to perform any of the duties of secretary of the Company and includes any assistant, deputy, temporary or acting secretary |
| "special resolution" | a resolution shall be a special resolution when it has been passed by a majority of not less than two-thirds of votes cast by such Members as, being entitled so to do, vote in person or, in the case of such Members as are corporations, by their respective duly authorised representative or, where proxies are allowed, by proxy at a general meeting of which not less than ten (10) clear days' Notice, specifying (without prejudice to the power contained in these Articles to amend the same) the intention to propose the resolution as a special resolution, has been duly given.  Provided that, except in the case of an annual general meeting, if it is so agreed by a majority in number of the Members having the right to attend and vote at any such meeting, being a majority together holding not less than ninety-five (95) per cent. in nominal value of the shares giving that right and in the case of an annual general meeting, if it is so agreed by all Members entitled to attend and vote thereat, a resolution may be proposed and passed as a special resolution at a meeting of which less than ten (10) clear days' Notice has been given; |
| | a special resolution shall be effective for any purpose for which an ordinary resolution is expressed to be required under any provision of these Articles or the Statutes |
| "Statutes" | the Law and every other law of the Legislature of the placeCayman Islands for the time being in force applying to or affecting the Company, its Memorandum of Association and/or these Articles |
| "year" | a calendar year. |

(2)  In these Articles, unless there be something within the subject or context inconsistent with such construction:

(a)  words importing the singular include the plural and vice versa;

(b)  words importing a gender include both gender and the neuter;

(c)  words importing persons include companies, associations and bodies of persons whether corporate or not;

(d)  the words:

    (i)  "may" shall be construed as permissive;

    (ii) "shall" or "will" shall be construed as imperative;

(e)  expressions referring to writing shall, unless the contrary intention appears, be construed as including printing, lithography, photography and other modes of representing words or figures in a visible form, and including where the representation takes the form of electronic display, provided that both the mode of service of the relevant document or notice and the Member's election comply with all applicable Statutes, rules and regulations;

(f)  references to any law, ordinance, statute or statutory provision shall be interpreted as relating to any statutory modification or re-enactment thereof for the time being in force;

(g)  save as aforesaid words and expressions defined in the Statutes shall bear the same meanings in these Articles if not inconsistent with the subject in the context;

(h)  references to a document being executed include references to it being executed under hand or under seal or by electronic signature or by any other method and references to a notice or document include a notice or document recorded or stored in any digital, electronic, electrical, magnetic or other retrievable form or medium and information in visible form whether having physical substance or not.

SHARE CAPITAL

3.  (1)  The share capital of the Company at the date on which these Articles come into effect shall be divided into shares of a par value of $0.10 each.

(2)  Subject to the Law, the Company's Memorandum of Association and these Articles and, where applicable, the rules of the Designated Stock Exchange and/or any competent regulatory authority, any power of the Company to purchase or otherwise acquire its own shares shall be exercisable by the Board in such manner, upon such terms and subject to such conditions as it thinks fit.

(3)  No share shall be issued to bearer.

ALTERATION OF CAPITAL

4.      The Company may from time to time by ordinary resolution in accordance with the Law alter the conditions of its Memorandum of Association to:

(a)   increase its capital by such sum, to be divided into shares of such amounts, as the resolution shall prescribe;

(b)   consolidate and divide all or any of its capital into shares of larger amount than its existing shares;

(c)   without prejudice to the powers of the Board under Article 12, divide its shares into several classes and without prejudice to any special rights previously conferred on the holders of existing shares attach thereto respectively any preferential, deferred, qualified or special rights, privileges, conditions or such restrictions which in the absence of any such determination by the Company in general meeting, as the Directors may determine; provided always that, for the avoidance of doubt, where a class of shares has been authorized by the Company, no resolution of the Company in general meeting is required for the issuance of shares of that class and the Directors may issue shares of that class and determine such rights, privileges, conditions or restrictions attaching thereto as aforesaid, and further provided that, where the Company issues shares which do not carry voting rights, the words "non-voting" shall appear in the designation of such shares and where the equity capital includes shares with different voting rights, the designation of each class of shares, other than those with the most favourable voting rights, must include the words "restricted voting" or "limited voting";

(d)   sub-divide its shares, or any of them, into shares of smaller amount than is fixed by the Memorandum of Association (subject, nevertheless, to the Law), and may by such resolution determine that, as between the holders of the shares resulting from such sub-division, one or more of the shares may have any such preferred, deferred or other rights or be subject to any such restrictions as compared with the other or others as the Company has power to attach to unissued or new shares; or

(e)   cancel any shares which, at the date of the passing of the resolution, have not been taken, or agreed to be taken, by any person, and diminish the amount of its capital by the amount of the shares so cancelled or, in the case of shares, without par value, diminish the number of shares into which its capital is divided.

5.      The Board may settle as it considers expedient any difficulty which arises in relation to any consolidation and division under the last preceding Article and in particular but without prejudice to the generality of the foregoing may issue certificates in respect of fractions of shares or arrange for the sale of the shares representing fractions and the distribution of the net proceeds of sale (after deduction of the expenses of such sale) in due proportion amongst the Members who would have been entitled to the fractions, and for this purpose the Board may authorise some person to transfer the shares representing fractions to their purchaser or resolve that such net proceeds be paid to the Company for the Company's benefit. Such purchaser will not be bound to see to the application of the purchase money nor will his title to the shares be affected by any irregularity or invalidity in the proceedings relating to the sale.

6.      The Company may from time to time by special resolution, subject to any confirmation or consent required by the Law, reduce its share capital or any capital redemption reserve or other undistributable reserve in any manner permitted by law.

7.      Except so far as otherwise provided by the conditions of issue, or by these Articles, any capital raised by the creation of new shares shall be treated as if it formed part of the original capital of the Company, and such shares shall be subject to the provisions contained in these Articles with reference to the payment of calls and instalments, transfer and transmission, forfeiture, lien, cancellation, surrender, voting and otherwise.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

SHARE RIGHTS

8.      Subject to the provisions of the Law, the rules of the Designated
Stock Exchange, the Company's Memorandum of Association and there Articles and
to any special rights conferred on the holders of any shares or class of shares,
and without prejudice to Article 12 hereof, any share in the Company (whether
forming part of the present capital or not) may be issued with or have attached
thereto such rights or restrictions whether in regard to dividend, voting,
return of capital or otherwise as the Board may determine, including without
limitation on terms that they may be, or at the option of the Company or the
holder are, liable to be redeemed on such terms and in such manner, including
out of capital, as the Board may deem fit.

9.      Subject to the Law, any preferred shares may be issued or converted
into shares that, at a determinable date or at the option of the Company or the
holder if so authorised by its Memorandum of Association, are liable to be
redeemed on such terms and in such manner as the Company before the issue or
conversion may by ordinary resolution of the Members determine. Where the
Company purchases for redemption a redeemable share, purchases not made through
the market or by tender shall be limited to a maximum price as may from time to
time be determined by the Board, either generally or with regard to specific
purchases. If purchases are by tender, tenders shall comply with applicable
laws.

VARIATION OF RIGHTS

10.     Subject to the Law and without prejudice to Article 8, all or any of
the special rights for the time being attached to the shares or any class of
shares may, unless otherwise provided by the terms of issue of the shares of
that class, from time to time (whether or not the Company is being wound up) be
varied, modified or abrogated with the sanction of a special resolution passed
at a separate general meeting of the holders of the shares of that class. To
every such separate general meeting all the provisions of these Articles
relating to general meetings of the Company shall, mutatis mutandis, apply, but
so that:

        (a)   the necessary quorum (whether at a separate general meeting or at its
              adjourned meeting) shall be a person or persons (or in the case of a
              Member being a corporation, its duly authorized representative)
              together holding or representing by proxy not less than one-third in
              nominal value of the issued shares of that class;

        (b)   every holder of shares of the class shall be entitled on a poll to one
              vote for every such share held by him; and

        (c)   any holder of shares of the class present in person or by proxy or
              authorised representative may demand a poll.

11.     The special rights conferred upon the holders of any shares or class
of shares shall not, unless otherwise expressly provided in the rights attaching
to or the terms of issue of such shares, be deemed to be varied, modified or
abrogated by the creation or issue of further shares ranking pari passu
therewith.

SHARES

12.  (1)  Subject to the Law, these Articles and, where applicable, the rules of the Designated Stock Exchange and without prejudice to any special rights or restrictions for the time being attached to any shares or any class of shares, the unissued shares of the Company (whether forming part of the original or any increased capital) shall be at the disposal of the Board, which may offer, allot, grant options over or otherwise dispose of them to such persons, at such times and for such consideration and upon such terms and conditions as the Board may in its absolute discretion determine but so that no shares shall be issued at a discount. In particular and without prejudice to the generality of the foregoing, the Board is hereby empowered to authorize by resolution or resolutions from time to time the issuance of one or more classes or series of preferred shares and to fix the designations, powers, preferences and relative, participating, optional and other rights, if any, and the qualifications, limitations and restrictions thereof, if any, including, without limitation, the number of shares constituting each such class or series, dividend rights, conversion rights, redemption privileges, voting powers, full or limited or no voting powers, and liquidation preferences, and to increase or decrease the size of any such class or series (but not below the number of shares of any class or series of preferred shares then outstanding) to the extent permitted by Law. Without limiting the generality of the foregoing, the resolution or resolutions providing for the establishment of any class or series of preferred shares may, to the extent permitted by law, provide that such class or series shall be superior to, rank equally with or be junior to the preferred shares of any other class or series.

(2)  Neither the Company nor the Board shall be obliged, when making or granting any allotment of, offer of, option over or disposal of shares, to make, or make available, any such allotment, offer, option or shares to Members or others with registered addresses in any particular territory or territories being a territory or territories where, in the absence of a registration statement or other special formalities, this would or might, in the opinion of the Board, be unlawful or impracticable. Members affected as a result of the foregoing sentence shall not be, or be deemed to be, a separate class of members for any purpose whatsoever. Except as otherwise expressly provided in the resolution or resolutions providing for the establishment of any class or series of preferred shares, no vote of the holders of preferred shares of or ordinary shares shall be a prerequisite to the issuance of any shares of any class or series of the preferred shares authorized by and complying with the conditions of the Company's Memorandum of Association and these Articles.

(3)  The Board may issue options, warrants or convertible securities or securities of similar nature conferring the right upon the holders thereof to subscribe for, purchase or receive any class of shares or securities in the capital of the Company on such terms as it may from time to time determine.

13.     The Company may in connection with the issue of any shares exercise all powers of paying commission and brokerage conferred or permitted by the Law. Subject to the Law, the commission may be satisfied by the payment of cash or by the allotment of fully or partly paid shares or partly in one and partly in the other.

14.     Except as required by law, no person shall be recognised by the Company as holding any share upon any trust and the Company shall not be bound by or required in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any share or any fractional part of a share or (except only as otherwise provided by these Articles or by law) any other rights in respect of any share except an absolute right to the entirety thereof in the registered holder.

15.     Subject to the Law and these Articles, the Board may at any time after the allotment of shares but before any person has been entered in the Register as the holder, recognise a renunciation thereof by the allottee in favour of some other person and may accord to any allottee of a share a right to effect such renunciation upon and subject to such terms and conditions as the Board considers fit to impose.

SHARE CERTIFICATES

16.      Every share certificate shall be issued under the Seal or a facsimile thereof and shall specify the number and class and distinguishing numbers (if any) of the shares to which it relates, and the amount paid up thereon and may otherwise be in such form as the Directors may from time to time determine. No certificate shall be issued representing shares of more than one class. The Board may by resolution determine, either generally or in any particular case or cases, that any signatures on any such certificates (or certificates in respect of other securities) need not be autographic but may be affixed to such certificates by some mechanical means or may be printed thereon.

17.  (1)  In the case of a share held jointly by several persons, the Company shall not be bound to issue more than one certificate therefor and delivery of a certificate to one of several joint holders shall be sufficient delivery to all such holders.

    (2)  Where a share stands in the names of two or more persons, the person first named in the Register shall as regards service of notices and, subject to the provisions of these Articles, all or any other matters connected with the Company, except the transfer of the shares, be deemed the sole holder thereof.

18.      Every person whose name is entered, upon an allotment of shares, as a Member in the Register shall be entitled, without payment, to receive one certificate for all such shares of any one class or several certificates each for one or more of such shares of such class upon payment for every certificate after the first of such reasonable out-of-pocket expenses as the Board from time to time determines.

19.      Share certificates shall be issued within the relevant time limit as prescribed by the Law or as the Designated Stock Exchange may from time to time determine, whichever is the shorter, after allotment or, except in the case of a transfer which the Company is for the time being entitled to refuse to register and does not register, after lodgment of a transfer with the Company.

20.  (1)  Upon every transfer of shares the certificate held by the transferor shall be given up to be cancelled, and shall forthwith be cancelled accordingly, and a new certificate shall be issued to the transferee in respect of the shares transferred to him at such fee as is provided in paragraph (2) of this Article. If any of the shares included in the certificate so given up shall be retained by the transferor a new certificate for the balance shall be issued to him at the aforesaid fee payable by the transferor to the Company in respect thereof.

    (2)  The fee referred to in paragraph (1) above shall be an amount not exceeding the relevant maximum amount as the Designated Stock Exchange may from time to time determine provided that the Board may at any time determine a lower amount for such fee.

21.      If a share certificate shall be damaged or defaced or alleged to have been lost, stolen or destroyed a new certificate representing the same shares may be issued to the relevant Member upon request and on payment of such fee as the Company may determine and, subject to compliance with such terms (if any) as to evidence and indemnity and to payment of the costs and reasonable out-of-pocket expenses of the Company in investigating such evidence and preparing such indemnity as the Board may think fit and, in case of damage or defacement, on delivery of the old certificate to the Company provided always that where share warrants have been issued, no new share warrant shall be issued to replace one that has been lost unless the Board has determined that the original has been destroyed.

LIEN

22.     The Company shall have a first and paramount lien on every share (not being a fully paid share) for all moneys (whether presently payable or not) called or payable at a fixed time in respect of that share. The Company shall also have a first and paramount lien on every share (not being a fully paid share) registered in the name of a Member (whether or not jointly with other Members) for all amounts of money presently payable by such Member or his estate to the Company whether the same shall have been incurred before or after notice to the Company of any equitable or other interest of any person other than such member, and whether the period for the payment or discharge of the same shall have actually arrived or not, and notwithstanding that the same are joint debts or liabilities of such Member or his estate and any other person, whether a Member of the Company or not. The Company's lien on a share shall extend to all dividends or other moneys payable thereon or in respect thereof. The Board may at any time, generally or in any particular case, waive any lien that has arisen or declare any share exempt in whole or in part, from the provisions of this Article.

23.     Subject to these Articles, the Company may sell in such manner as the Board determines any share on which the Company has a lien, but no sale shall be made unless some sum in respect of which the lien exists is presently payable, or the liability or engagement in respect of which such lien exists is liable to be presently fulfilled or discharged nor until the expiration of fourteen (14) clear days after a notice in writing, stating and demanding payment of the sum presently payable, or specifying the liability or engagement and demanding fulfilment or discharge thereof and giving notice of the intention to sell in default, has been served on the registered holder for the time being of the share or the person entitled thereto by reason of his death or bankruptcy.

24.     The net proceeds of the sale shall be received by the Company and applied in or towards payment or discharge of the debt or liability in respect of which the lien exists, so far as the same is presently payable, and any residue shall (subject to a like lien for debts or liabilities not presently payable as existed upon the share prior to the sale) be paid to the person entitled to the share at the time of the sale. To give effect to any such sale the Board may authorise some person to transfer the shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the shares so transferred and he shall not be bound to see to the application of the purchase money, nor shall his title to the shares be affected by any irregularity or invalidity in the proceedings relating to the sale.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

CALLS ON SHARES

25.     Subject to these Articles and to the terms of allotment, the Board may from time to time make calls upon the Members in respect of any moneys unpaid on their shares (whether on account of the nominal value of the shares or by way of premium), and each Member shall (subject to being given at least fourteen (14) clear days' Notice specifying the time and place of payment) pay to the Company as required by such notice the amount called on his shares. A call may be extended, postponed or revoked in whole or in part as the Board determines but no member shall be entitled to any such extension, postponement or revocation except as a matter of grace and favour.

26.     A call shall be deemed to have been made at the time when the resolution of the Board authorising the call was passed and may be made payable either in one lump sum or by instalments.

27.     A person upon whom a call is made shall remain liable for calls made upon him notwithstanding the subsequent transfer of the shares in respect of which the call was made. The joint holders of a share shall be jointly and severally liable to pay all calls and instalments due in respect thereof or other moneys due in respect thereof.

28.     If a sum called in respect of a share is not paid before or on the day appointed for payment thereof, the person from whom the sum is due shall pay interest on the amount unpaid from the day appointed for payment thereof to the time of actual payment at such rate (not exceeding twenty per cent. (20%) per annum) as the Board may determine, but the Board may in its absolute discretion waive payment of such interest wholly or in part.

29.     No Member shall be entitled to receive any dividend or bonus or to be present and vote (save as proxy for another Member) at any general meeting either personally or by proxy, or be reckoned in a quorum, or exercise any other privilege as a Member until all calls or instalments due by him to the Company, whether alone or jointly with any other person, together with interest and expenses (if any) shall have been paid.

30.     On the trial or hearing of any action or other proceedings for the recovery of any money due for any call, it shall be sufficient to prove that the name of the Member sued is entered in the Register as the holder, or one of the holders, of the shares in respect of which such debt accrued, that the resolution making the call is duly recorded in the minute book, and that notice of such call was duly given to the Member sued, in pursuance of these Articles; and it shall not be necessary to prove the appointment of the Directors who made such call, nor any other matters whatsoever, but the proof of the matters aforesaid shall be conclusive evidence of the debt.

31.     Any amount payable in respect of a share upon allotment or at any fixed date, whether in respect of nominal value or premium or as an instalment of a call, shall be deemed to be a call duly made and payable on the date fixed for payment and if it is not paid the provisions of these Articles shall apply as if that amount had become due and payable by virtue of a call duly made and notified.

32.     On the issue of shares the Board may differentiate between the allottees or holders as to the amount of calls to be paid and the times of payment.

33.     The Board may, if it thinks fit, receive from any Member willing to advance the same, and either in money or money's worth, all or any part of the moneys uncalled and unpaid or instalments payable upon any shares held by him and upon all or any of the moneys so advanced (until the same would, but for such advance, become presently payable) pay interest at such rate (if any) as the Board may decide. The Board may at any time repay the amount so advanced upon giving to such Member not less than one month's Notice of its intention in that behalf, unless before the expiration of such notice the amount so advanced shall have been called up on the shares in respect of which it was advanced. Such payment in advance shall not entitle the holder of such share or shares to participate in respect thereof in a dividend subsequently declared.

FORFEITURE OF SHARES

34.   (1)   If a call remains unpaid after it has become due and payable the Board may give to the person from whom it is due not less than fourteen (14) clear days' Notice:

(a)   requiring payment of the amount unpaid together with any interest which may have accrued and which may still accrue up to the date of actual payment; and

(b)   stating that if the Notice is not complied with the shares on which the call was made will be liable to be forfeited.

(2)   If the requirements of any such Notice are not complied with, any share in respect of which such Notice has been given may at any time thereafter, before payment of all calls and interest due in respect thereof has been made, be forfeited by a resolution of the Board to that effect, and such forfeiture shall include all dividends and bonuses declared in respect of the forfeited share but not actually paid before the forfeiture.

35.      When any share has been forfeited, notice of the forfeiture shall be served upon the person who was before forfeiture the holder of the share. No forfeiture shall be invalidated by any omission or neglect to give such Notice.

36.      The Board may accept the surrender of any share liable to be forfeited hereunder and, in such case, references in these Articles to forfeiture will include surrender.

37.      Any share so forfeited shall be deemed the property of the Company and may be sold, re-allotted or otherwise disposed of to such person, upon such terms and in such manner as the Board determines, and at any time before a sale, re-allotment or disposition the forfeiture may be annulled by the Board on such terms as the Board determines.

38.      A person whose shares have been forfeited shall cease to be a Member in respect of the forfeited shares but nevertheless shall remain liable to pay the Company all moneys which at the date of forfeiture were presently payable by him to the Company in respect of the shares, with (if the Directors shall in their discretion so require) interest thereon from the date of forfeiture until payment at such rate (not exceeding twenty per cent. (20%) per annum) as the Board determines. The Board may enforce payment thereof if it thinks fit, and without any deduction or allowance for the value of the forfeited shares, at the date of forfeiture, but his liability shall cease if and when the Company shall have received payment in full of all such moneys in respect of the shares. For the purposes of this Article any sum which, by the terms of issue of a share, is payable thereon at a fixed time which is subsequent to the date of forfeiture, whether on account of the nominal value of the share or by way of premium, shall notwithstanding that time has not yet arrived be deemed to be payable at the date of forfeiture, and the same shall become due and payable immediately upon the forfeiture, but interest thereon shall only be payable in respect of any period between the said fixed time and the date of actual payment.

39.      A declaration by a Director or the Secretary that a share has been forfeited on a specified date shall be conclusive evidence of the facts therein stated as against all persons claiming to be entitled to the share, and such declaration shall (subject to the execution of an instrument of transfer by the Company if necessary) constitute a good title to the share, and the person to whom the share is disposed of shall be registered as the holder of the share and shall not be bound to see to the application of the consideration (if any), nor shall his title to the share be affected by any irregularity in or invalidity of the proceedings in reference to the forfeiture, sale or disposal of the share. When any share shall have been forfeited, notice of the declaration shall be given to the Member in whose name it stood immediately prior to the forfeiture, and an entry of the forfeiture, with the date thereof, shall forthwith be made in the register, but no forfeiture shall be in any manner invalidated by any omission or neglect to give such notice or make any such entry.

40.    Notwithstanding any such forfeiture as aforesaid the Board may at any time, before any shares so forfeited shall have been sold, re-allotted or otherwise disposed of, permit the shares forfeited to be bought back upon the terms of payment of all calls and interest due upon and expenses incurred in respect of the share, and upon such further terms (if any) as it thinks fit.

41.    The forfeiture of a share shall not prejudice the right of the Company to any call already made or instalment payable thereon.

42.    The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which, by the terms of issue of a share, becomes payable at a fixed time, whether on account of the nominal value of the share or by way of premium, as if the same had been payable by virtue of a call duly made and notified.


REGISTER OF MEMBERS

43.    (1)  The Company shall keep in one or more books a Register of its Members and shall enter therein the following particulars, that is to say:

   (a)   the name and address of each Member, the number and class of shares held by him and the amount paid or agreed to be considered as paid on such shares;

   (b)   the date on which each person was entered in the Register; and

   (c)   the date on which any person ceased to be a Member.

   (2)  The Company may keep an overseas or local or other branch register of Members resident in any place, and the Board may make and vary such regulations as it determines in respect of the keeping of any such register and maintaining a Registration Office in connection therewith.

44.    The Register and branch register of Members, as the case may be, shall be open to inspection for such times and on such days as the Board shall determine by Members without charge or by any other person, upon a maximum payment of $2.50 or such other sum specified by the Board, at the Office or such other place at which the Register is kept in accordance with the Law or, if appropriate, upon a maximum payment of $1.00 or such other sum specified by the Board at the Registration Office. The Register including any overseas or local or other branch register of Members may, after notice has been given by advertisement in an appointed newspaper or any other newspapers in accordance with the requirements of the Designated Stock Exchange or by any electronic means in such manner as may be accepted by the Designated Stock Exchange to that effect, be closed at such times or for such periods not exceeding in the whole thirty (30) days in each year as the Board may determine and either generally or in respect of any class of shares.

RECORD DATES

45.      For the purpose of determining the Members entitled to notice of or to
vote at any general meeting, or any adjournment thereof, or entitled to express
consent to corporate action in writing without a meeting, or entitled to receive
payment of any dividend or other distribution or allotment of any rights, or
entitled to exercise any rights in respect of any change, conversion or exchange
of shares or for the purpose of any other lawful action, the Board may fix, in
advance, a date as the record date for any such determination of Members, which
date shall not be more than sixty (60) days nor less than ten (10) days before
the date of such meeting, nor more than sixty (60) days prior to any other such
action.

        If the Board does not fix a record date for any general meeting, the
record date for determining the Members entitled to a notice of or to vote at
such meeting shall be at the close of business on the day next preceding the day
on which notice is given, or, if in accordance with these Articles notice is
waived, at the close of business on the day next preceding the day on which the
meeting is held. If corporate action without a general meeting is to be taken,
the record date for determining the Members entitled to express consent to such
corporate action in writing, when no prior action by the Board is necessary,
shall be the first date on which a signed written consent setting forth the
action taken or proposed to be taken is delivered to the Company by delivery to
its head office. The record date for determining the Members for any other
purpose shall be at the close of business on the day on which the Board adopts
the resolution relating thereto.

        A determination of the Members of record entitled to notice of or to
vote at a meeting of the Members shall apply to any adjournment of the meeting;
provided, however, that the Board may fix a new record date for the adjourned
meeting.

TRANSFER OF SHARES

46.      Subject to these Articles, any Member may transfer all or any of his
shares by an instrument of transfer in the usual or common form or in a form
prescribed by the Designated Stock Exchange or in any other form approved by the
Board and may be under hand or, if the transferor or transferee is a clearing
house or its nominee(s), by hand or by machine imprinted signature or by such
other manner of execution as the Board may approve from time to time.

47.      The instrument of transfer shall be executed by or on behalf of the
transferor and the transferee provided that the Board may dispense with the
execution of the instrument of transfer by the transferee in any case which it
thinks fit in its discretion to do so. Without prejudice to the last preceding
Article, the Board may also resolve, either generally or in any particular case,
upon request by either the transferor or transferee, to accept mechanically
executed transfers. The transferor shall be deemed to remain the holder of the
share until the name of the transferee is entered in the Register in respect
thereof. Nothing in these Articles shall preclude the Board from recognising a
renunciation of the allotment or provisional allotment of any share by the
allottee in favour of some other person.

48.  (1)  The Board may, in its absolute discretion, and without giving any
reason therefor, refuse to register a transfer of any share (not being a fully
paid up share) to a person of whom it does not approve, or any share issued
under any share incentive scheme for employees upon which a restriction on
transfer imposed thereby still subsists, and it may also, without prejudice to
the foregoing generality, refuse to register a transfer of any share to more
than four joint holders or a transfer of any share (not being a fully paid up
share) on which the Company has a lien.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(2)   The Board in so far as permitted by any applicable law may, in its absolute discretion, at any time and from time to time transfer any share upon the Register to any branch register or any share on any branch register to the Register or any other branch register. In the event of any such transfer, the shareholder requesting such transfer shall bear the cost of effecting the transfer unless the Board otherwise determines.

(3)   Unless the Board otherwise agrees (which agreement may be on such terms and subject to such conditions as the Board in its absolute discretion may from time to time determine, and which agreement the Board shall, without giving any reason therefor, be entitled in its absolute discretion to give or withhold), no shares upon the Register shall be transferred to any branch register nor shall shares on any branch register be transferred to the Register or any other branch register and all transfers and other documents of title shall be lodged for registration, and registered, in the case of any shares on a branch register, at the relevant Registration Office, and, in the case of any shares on the Register, at the Office or such other place at which the Register is kept in accordance with the Law.

49.    Without limiting the generality of the last preceding Article, the Board may decline to recognise any instrument of transfer unless:-

(a)   a fee of such maximum sum as the Designated Stock Exchange may determine to be payable or such lesser sum as the Board may from time to time require is paid to the Company in respect thereof;

(b)   the instrument of transfer is in respect of only one class of share;

(c)   the instrument of transfer is lodged at the Office or such other place at which the Register is kept in accordance with the Law or the Registration Office (as the case may be) accompanied by the relevant share certificate(s) and such other evidence as the Board may reasonably require to show the right of the transferor to make the transfer (and, if the instrument of transfer is executed by some other person on his behalf, the authority of that person so to do); and

(d)   if applicable, the instrument of transfer is duly and properly stamped.

50.    If the Board refuses to register a transfer of any share, it shall, within two months after the date on which the transfer was lodged with the Company, send to each of the transferor and transferee notice of the refusal.

51.    The registration of transfers of shares or of any class of shares may, after notice has been given by advertisement in an appointed newspaper or any other newspapers or by any other means in accordance with the requirements of the Designated Stock Exchange to that effect be suspended at such times and for such periods (not exceeding in the whole thirty (30) days in any year) as the Board may determine.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

TRANSMISSION OF SHARES

52.    If a Member dies, the survivor or survivors where the deceased was a joint holder, and his legal personal representatives where he was a sole or only surviving holder, will be the only persons recognised by the Company as having any title to his interest in the shares; but nothing in this Article will release the estate of a deceased Member (whether sole or joint) from any liability in respect of any share which had been solely or jointly held by him.

53.    Any person becoming entitled to a share in consequence of the death or bankruptcy or winding-up of a Member may, upon such evidence as to his title being produced as may be required by the Board, elect either to become the holder of the share or to have some person nominated by him registered as the transferee thereof. If he elects to become the holder he shall notify the Company in writing either at the Registration Office or Office, as the case may be, to that effect. If he elects to have another person registered he shall execute a transfer of the share in favour of that person. The provisions of these Articles relating to the transfer and registration of transfers of shares shall apply to such notice or transfer as aforesaid as if the death or bankruptcy of the Member had not occurred and the notice or transfer were a transfer signed by such Member.

54.    A person becoming entitled to a share by reason of the death or bankruptcy or winding-up of a Member shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered holder of the share. However, the Board may, if it thinks fit, withhold the payment of any dividend payable or other advantages in respect of such share until such person shall become the registered holder of the share or shall have effectually transferred such share, but, subject to the requirements of Article 75(2) being met, such a person may vote at meetings.

UNTRACEABLE MEMBERS

55.  (1)  Without prejudice to the rights of the Company under paragraph (2) of this Article, the Company may cease sending cheques for dividend entitlements or dividend warrants by post if such cheques or warrants have been left uncashed on two consecutive occasions. However, the Company may exercise the power to cease sending cheques for dividend entitlements or dividend warrants after the first occasion on which such a cheque or warrant is returned undelivered.

       (2)  The Company shall have the power to sell, in such manner as the Board thinks fit, any shares of a Member who is untraceable, but no such sale shall be made unless:

    (a)  all cheques or warrants in respect of dividends of the shares in question, being not less than three in total number, for any sum payable in cash to the holder of such shares in respect of them sent during the relevant period in the manner authorised by the Articles of the Company have remained uncashed;

    (b)  so far as it is aware at the end of the relevant period, the Company has not at any time during the relevant period received any indication of the existence of the Member who is the holder of such shares or of a person entitled to such shares by death, bankruptcy or operation of law; and

    (c)  the Company, if so required by the rules governing the listing of shares on the Designated Stock Exchange, has given notice to, and caused advertisement in newspapers to be made in accordance with the requirements of, the Designated Stock Exchange of its intention to sell such shares in the manner required by the Designated Stock Exchange, and a period of three months or such shorter period as may be allowed by the Designated Stock Exchange has elapsed since the date of such advertisement.

       For the purpose of the foregoing, the "relevant period" means the period commencing twelve (12) years before the date of publication of the advertisement referred to in paragraph (c) of this Article and ending at the expiry of the period referred to in that paragraph.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(3)  To give effect to any such sale the Board may authorise some person to transfer the said shares and an instrument of transfer signed or otherwise executed by or on behalf of such person shall be as effective as if it had been executed by the registered holder or the person entitled by transmission to such shares, and the purchaser shall not be bound to see to the application of the purchase money nor shall his title to the shares be affected by any irregularity or invalidity in the proceedings relating to the sale. The net proceeds of the sale will belong to the Company and upon receipt by the Company of such net proceeds it shall become indebted to the former Member for an amount equal to such net proceeds. No trust shall be created in respect of such debt and no interest shall be payable in respect of it and the Company shall not be required to account for any money earned from the net proceeds which may be employed in the business of the Company or as it thinks fit. Any sale under this Article shall be valid and effective notwithstanding that the Member holding the shares sold is dead, bankrupt or otherwise under any legal disability or incapacity.

## GENERAL MEETINGS

56.     An annual general meeting of the Company shall be held in each year other than the year of the Company's incorporation at such time and place as may be determined by the Board.

57.     Each general meeting, other than an annual general meeting, shall be called an extraordinary general meeting. General meetings may be held at such times and in any location in the world as may be determined by the Board.

58.     Only a majority of the Board or the Chairman of the Board may call extraordinary general meetings, which extraordinary general meetings shall be held at such times and locations (as permitted hereby) as such person or persons shall determine.

## NOTICE OF GENERAL MEETINGS

59.  (1)  An annual general meeting and any extraordinary general meeting may be called by not less than ten (10) clear days' Notice but a general meeting may be called by shorter notice, subject to the Law, if it is so agreed:

    (a)  in the case of a meeting called as an annual general meeting, by all the Members entitled to attend and vote thereat; and

    (b)  in the case of any other meeting, by a majority in number of the Members having the right to attend and vote at the meeting, being a majority together holding not less than ninety-five per cent. (95%) in nominal value of the issued shares giving that right.

(2)  The notice shall specify the time and place of the meeting and, in case of special business, the general nature of the business. The notice convening an annual general meeting shall specify the meeting as such. Notice of every general meeting shall be given to all Members other than to such Members as, under the provisions of these Articles or the terms of issue of the shares they hold, are not entitled to receive such notices from the Company, to all persons entitled to a share in consequence of the death or bankruptcy or winding-up of a Member and to each of the Directors and the Auditors.

60.     The accidental omission to give Notice of a meeting or (in cases where instruments of proxy are sent out with the Notice) to send such instrument of proxy to, or the non-receipt of such Notice or such instrument of proxy by, any person entitled to receive such Notice shall not invalidate any resolution passed or the proceedings at that meeting.

PROCEEDINGS AT GENERAL MEETINGS

61.  (1)  All business shall be deemed special that is transacted at an extraordinary general meeting, and also all business that is transacted at an annual general meeting, with the exception of:

    (a)  the declaration and sanctioning of dividends;

    (b)  consideration and adoption of the accounts and balance sheet and the reports of the Directors and Auditors and other documents required to be annexed to the balance sheet;

    (c)  the election of Directors;

    (d)  appointment of Auditors (where special notice of the intention for such appointment is not required by the Law) and other officers;

    (e)  the fixing of the remuneration of the Auditors, and the voting of remuneration or extra remuneration to the Directors;

    (f)  the granting of any mandate or authority to the Directors to offer, allot, grant options over or otherwise dispose of the unissued shares in the capital of the Company representing not more than 20 per cent. (20%) in nominal value of its existing issued share capital; and

    (g)  the granting of any mandate or authority to the Directors to repurchase securities of the Company.

    (2)  No business other than the appointment of a chairman of a meeting shall be transacted at any general meeting unless a quorum is present at the commencement of the business. At any general meeting of the Company, two (2) Members entitled to vote and present in person or by proxy or (in the case of a Member being a corporation) by its duly authorised representative representing not less than one-third in nominal value of the total issued voting shares in the Company throughout the meeting shall form a quorum for all purposes.

62.      If within thirty (30) minutes (or such longer time not exceeding one hour as the chairman of the meeting may determine to wait) after the time appointed for the meeting a quorum is not present, the meeting shall stand adjourned to the same day in the next week at the same time and place or to such time and place as the Board may determine. If at such adjourned meeting a quorum is not present within half an hour from the time appointed for holding the meeting, the meeting shall be dissolved.

63.      The chairman of the Company shall preside as chairman at every general meeting. If at any meeting the chairman is not present within fifteen (15) minutes after the time appointed for holding the meeting, or is not willing to act as chairman, the Directors present shall choose one of their number to act, or if one Director only is present he shall preside as chairman if willing to act. If no Director is present, or if each of the Directors present declines to take the chair, or if the chairman chosen shall retire from the chair, the Members present in person or by proxy and entitled to vote shall elect one of their number to be chairman.

64.      The chairman may adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business which might lawfully have been transacted at the meeting had the adjournment not taken place. When a meeting is adjourned for fourteen (14) days or more, at least seven (7) clear days' notice of the adjourned meeting shall be given specifying the time and place of the adjourned meeting but it shall not be necessary to specify in such notice the nature of the business to be transacted at the adjourned meeting and the general nature of the business to be transacted. Save as aforesaid, it shall be unnecessary to give notice of an adjournment.

65.      If an amendment is proposed to any resolution under consideration but is in good faith ruled out of order by the chairman of the meeting, the proceedings on the substantive resolution shall not be invalidated by any error in such ruling. In the case of a resolution duly proposed as a special resolution, no amendment thereto (other than a mere clerical amendment to correct a patent error) may in any event be considered or voted upon.

VOTING

66.      Subject to any special rights or restrictions as to voting for the time being attached to any shares by or in accordance with these Articles, at any general meeting on a show of hands every Member present in person (or being a corporation, is present by a duly authorised representative), or by proxy shall have one vote and on a poll every Member present in person or by proxy or, in the case of a Member being a corporation, by its duly authorised representative shall have one vote for every fully paid share of which he is the holder but so that no amount paid up or credited as paid up on a share in advance of calls or instalments is treated for the foregoing purposes as paid up on the share. Notwithstanding anything contained in these Articles, where more than one proxy is appointed by a Member which is a clearing house (or its nominee(s)), each such proxy shall have one vote on a show of hands. A resolution put to the vote of a meeting shall be decided on a show of hands unless (before or on the declaration of the result of the show of hands or on the withdrawal of any other demand for a poll) a poll is demanded:

    (a)  by the chairman of such meeting; or

    (b)  by at least three Members present in person or in the case of a Member being a corporation by its duly authorised representative or by proxy for the time being entitled to vote at the meeting; or

    (c)  by a Member or Members present in person or in the case of a Member being a corporation by its duly authorised representative or by proxy and representing not less than one-tenth of the total voting rights of all Members having the right to vote at the meeting; or

    (d)  by a Member or Members present in person or in the case of a Member being a corporation by its duly authorised representative or by proxy and holding shares in the Company conferring a right to vote at the meeting being shares on which an aggregate sum has been paid up equal to not less than one-tenth of the total sum paid up on all shares conferring that right.

A demand by a person as proxy for a Member or in the case of a Member being a corporation by its duly authorised representative shall be deemed to be the same as a demand by a Member.

67.     Unless a poll is duly demanded and the demand is not withdrawn, a declaration by the chairman that a resolution has been carried, or carried unanimously, or by a particular majority, or not carried by a particular majority, or lost, and an entry to that effect made in the minute book of the Company, shall be conclusive evidence of the facts without proof of the number or proportion of the votes recorded for or against the resolution.

68.     If a poll is duly demanded the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded. There shall be no requirement for the chairman to disclose the voting figures on a poll.

69.     A poll demanded on the election of a chairman, or on a question of adjournment, shall be taken forthwith. A poll demanded on any other question shall be taken in such manner (including the use of ballot or voting papers or tickets) and either forthwith or at such time (being not later than thirty (30) days after the date of the demand) and place as the chairman directs. It shall not be necessary (unless the chairman otherwise directs) for notice to be given of a poll not taken immediately.

70.     The demand for a poll shall not prevent the continuance of a meeting or the transaction of any business other than the question on which the poll has been demanded, and, with the consent of the chairman, it may be withdrawn at any time before the close of the meeting or the taking of the poll, whichever is the earlier.

71.     On a poll votes may be given either personally or by proxy.

72.     A person entitled to more than one vote on a poll need not use all his votes or cast all the votes he uses in the same way.

73.     All questions submitted to a meeting shall be decided by a simple majority of votes except where a greater majority is required by these Articles or by the Law. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of such meeting shall be entitled to a second or casting vote in addition to any other vote he may have.

74.     Where there are joint holders of any share any one of such joint holder may vote, either in person or by proxy, in respect of such share as if he were solely entitled thereto, but if more than one of such joint holders be present at any meeting the vote of the senior who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders, and for this purpose seniority shall be determined by the order in which the names stand in the Register in respect of the joint holding. Several executors or administrators of a deceased Member in whose name any share stands shall for the purposes of this Article be deemed joint holders thereof.

75.  (1)  A Member who is a patient for any purpose relating to mental health or in respect of whom an order has been made by any court having jurisdiction for the protection or management of the affairs of persons incapable of managing their own affairs may vote, whether on a show of hands or on a poll, by his receiver, committee, curator bonis or other person in the nature of a receiver, committee or curator bonis appointed by such court, and such receiver, committee, curator bonis or other person may vote on a poll by proxy, and may otherwise act and be treated as if he were the registered holder of such shares for the purposes of general meetings, provided that such evidence as the Board may require of the authority of the person claiming to vote shall have been deposited at the Office, head office or Registration Office, as appropriate, not less than forty-eight (48) hours before the time appointed for holding the meeting, or adjourned meeting or poll, as the case may be.

(2)    Any person entitled under Article 53 to be registered as the holder of any shares may vote at any general meeting in respect thereof in the same manner as if he were the registered holder of such shares, provided that forty-eight (48) hours at least before the time of the holding of the meeting or adjourned meeting, as the case may be, at which he proposes to vote, he shall satisfy the Board of his entitlement to such shares, or the Board shall have previously admitted his right to vote at such meeting in respect thereof.

76.    No Member shall, unless the Board otherwise determines, be entitled to attend and vote and to be reckoned in a quorum at any general meeting unless he is duly registered and all calls or other sums presently payable by him in respect of shares in the Company have been paid.

77.    If:

(a)    any objection shall be raised to the qualification of any voter; or

(b)    any votes have been counted which ought not to have been counted or which might have been rejected; or

(c)    any votes are not counted which ought to have been counted;

the objection or error shall not vitiate the decision of the meeting or adjourned meeting on any resolution unless the same is raised or pointed out at the meeting or, as the case may be, the adjourned meeting at which the vote objected to is given or tendered or at which the error occurs. Any objection or error shall be referred to the chairman of the meeting and shall only vitiate the decision of the meeting on any resolution if the chairman decides that the same may have affected the decision of the meeting. The decision of the chairman on such matters shall be final and conclusive.

PROXIES

78.    Any Member entitled to attend and vote at a meeting of the Company shall be entitled to appoint another person as his proxy to attend and vote instead of him. A Member who is the holder of two or more shares may appoint more than one proxy to represent him and vote on his behalf at a general meeting of the Company or at a class meeting. A proxy need not be a Member. In addition, a proxy or proxies representing either a Member who is an individual or a Member which is a corporation shall be entitled to exercise the same powers on behalf of the Member which he or they represent as such Member could exercise.

79.    The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under its seal or under the hand of an officer, attorney or other person authorised to sign the same. In the case of an instrument of proxy purporting to be signed on behalf of a corporation by an officer thereof it shall be assumed, unless the contrary appears, that such officer was duly authorised to sign such instrument of proxy on behalf of the corporation without further evidence of the facts.

80.    The instrument appointing a proxy and (if required by the Board) the power of attorney or other authority (if any) under which it is signed, or a certified copy of such power or authority, shall be delivered to such place or one of such places (if any) as may be specified for that purpose in or by way of note to or in any document accompanying the notice convening the meeting (or, if no place is so specified at the Registration Office or the Office, as may be appropriate) not less than forty-eight (48) hours before the time appointed for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote or, in the case of a poll taken subsequently to the date of a meeting or adjourned meeting, not less than twenty-four (24) hours before the time appointed for the taking of the poll and in default the instrument of proxy shall not be treated as valid. No instrument appointing a proxy shall be valid after the expiration of twelve (12) months from the date named in it as the date of its execution, except at an adjourned meeting or on a poll demanded at a meeting or an adjourned meeting in cases where the meeting was originally held within twelve (12) months from such date. Delivery of an instrument appointing a proxy shall not preclude a Member from attending and voting in person at the meeting convened and in such event, the instrument appointing a proxy shall be deemed to be revoked.

81.    Instruments of proxy shall be in any common form or in such other form as the Board may approve (provided that this shall not preclude the use of the two-way form) and the Board may, if it thinks fit, send out with the notice of any meeting forms of instrument of proxy for use at the meeting. The instrument of proxy shall be deemed to confer authority to demand or join in demanding a poll and to vote on any amendment of a resolution put to the meeting for which it is given as the proxy thinks fit. The instrument of proxy shall, unless the contrary is stated therein, be valid as well for any adjournment of the meeting as for the meeting to which it relates.

82.    A vote given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal, or revocation of the instrument of proxy or of the authority under which it was executed, provided that no intimation in writing of such death, insanity or revocation shall have been received by the Company at the Office or the Registration Office (or such other place as may be specified for the delivery of instruments of proxy in the notice convening the meeting or other document sent therewith) two hours at least before the commencement of the meeting or adjourned meeting, or the taking of the poll, at which the instrument of proxy is used.

83.    Anything which under these Articles a Member may do by proxy he may likewise do by his duly appointed attorney and the provisions of these Articles relating to proxies and instruments appointing proxies shall apply mutatis mutandis in relation to any such attorney and the instrument under which such attorney is appointed.

CORPORATIONS ACTING BY REPRESENTATIVES

84.   (1)  Any corporation which is a Member may by resolution of its
directors or other governing body authorise such person as it thinks fit to act
as its representative at any meeting of the Company or at any meeting of any
class of Members. The person so authorised shall be entitled to exercise the
same powers on behalf of such corporation as the corporation could exercise if
it were an individual Member and such corporation shall for the purposes of
these Articles be deemed to be present in person at any such meeting if a person
so authorised is present thereat.

      (2)  If a clearing house (or its nominee(s)), being a corporation, is a
Member, it may authorise such persons as it thinks fit to act as its
representatives at any meeting of the Company or at any meeting of any class of
Members provided that the authorisation shall specify the number and class of
shares in respect of which each such representative is so authorised. Each
person so authorised under the provisions of this Article shall be deemed to
have been duly authorised without further evidence of the facts and be entitled
to exercise the same rights and powers on behalf of the clearing house (or its
nominee(s)) as if such person was the registered holder of the shares of the
Company held by the clearing house (or its nominee(s)) including the right to
vote individually on a show of hands.

      (3)  Any reference in these Articles to a duly authorised representative of
a Member being a corporation shall mean a representative authorised under the
provisions of this Article.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

NO ACTION BY WRITTEN RESOLUTIONS OF MEMBERS

85.        Any action required or permitted to be taken at any annual or extraordinary general meetings of the Company may be taken only upon the vote of the Members at an annual or extraordinary general meeting duly noticed and convened in accordance with these Articles and the Law and may not be taken by written resolution of Members without a meeting.

BOARD OF DIRECTORS

86.   (1)   Unless otherwise determined by the Company in general meeting, the number of Directors shall not be less than two (2). There shall be no maximum number of Directors unless otherwise determined from time to time by the Members in general meeting. The Directors shall be elected or appointed in the first place by the subscribers to the Memorandum of Association or by a majority of them and shall hold office until their successors are elected or appointed.

      (2)   Subject to the Articles and the Law, the Company may by ordinary resolution elect any person to be a Director either to fill a casual vacancy or as an addition to the existing Board.

      (3)   The Directors shall have the power from time to time and at any time to appoint any person as a Director to fill a casual vacancy on the Board or as an addition to the existing Board but so that the total number of Directors shall not at any time exceed the number fixed in accordance with these Articles.

      (4)   No Director shall be required to hold any shares of the Company by way of qualification and a Director who is not a Member shall be entitled to receive notice of and to attend and speak at any general meeting of the Company and of all classes of shares of the Company.

      (5)   Subject to any provision to the contrary in these Articles, a Director may be removed by way of an ordinary resolution of the Members at any time before the expiration of his period of office notwithstanding anything in these Articles or in any agreement between the Company and such Director (but without prejudice to any claim for damages under any such agreement).

      (6)   A vacancy on the Board created by the removal of a Director under the provisions of subparagraph (5) above may be filled by the election or appointment by ordinary resolution of the Members at the meeting at which such Director is removed or by the affirmative vote of a simple majority of the remaining Directors present and voting at a Board meeting.

      (7)   The Company may from time to time in general meeting by ordinary resolution increase or reduce the number of Directors but so that the number of Directors shall never be less than two (2).

87.    The Directors shall be divided into three classes, designated Class I, Class II, and Class III, as nearly equal in number as the then total number of Directors permits. At the 2007 annual general meeting of Members, Class I Directors shall be elected for a one-year term, Class II Directors for a two-year term and Class III Directors for a three-year term. At each succeeding annual general meeting of Members beginning in 2008, a successor to the class of Directors or any re-elected Director whose term expires at that meeting shall be elected for a three-year term such that all Directors shall hold office for a term of three years. If the number of Directors changes, any increase or decrease shall be apportioned among the classes so as to maintain the number of Directors in each class as nearly equal as possible. Any additional Directors of a class elected to fill a vacancy resulting from an increase in such class shall hold office for a term that coincides with the remaining term of that class. Decrease in the number of Directors will not shorten the term of any incumbent Director. Notwithstanding the foregoing, whenever the holders of any one or more classes or series of preferred share issued by the Company shall have the right, voting separately as a class or series, to elect directors at an annual or special meeting of shareholders, the election, term of office, filling of vacancies and other features of such directorships shall be governed by the applicable terms of these Articles and the rights attaching to those preferred share, and such Directors so elected shall not be divided into classes pursuant to this Article 87 unless expressly provided by such terms.

88.    Reserved.

DISQUALIFICATION OF DIRECTORS

89.    The office of a Director shall be vacated if the Director:

    (1)    resigns his office by notice in writing delivered to the Company at the Office or tendered at a meeting of the Board;

    (2)    becomes of unsound mind or dies;

    (3)    without special leave of absence from the Board, is absent from meetings of the Board for six consecutive months and the Board resolves that his office be vacated; or

    (4)    becomes bankrupt or has a receiving order made against him or suspends payment or compounds with his creditors;

    (5)    is prohibited by law from being a Director; or

    (6)    ceases to be a Director by virtue of any provision of the Statutes or is removed from office pursuant to these Articles.

EXECUTIVE DIRECTORS

90.      The Board may from time to time appoint any one or more of its body to be a managing director, joint managing director or deputy managing director or to hold any other employment or executive office with the Company for such period (subject to their continuance as Directors) and upon such terms as the Board may determine and the Board may revoke or terminate any of such appointments. Any such revocation or termination as aforesaid shall be without prejudice to any claim for damages that such Director may have against the Company or the Company may have against such Director. A Director appointed to an office under this Article shall be subject to the same provisions as to removal as the other Directors of the Company, and he shall (subject to the provisions of any contract between him and the Company) ipso facto and immediately cease to hold such office if he shall cease to hold the office of Director for any cause.

91.      Notwithstanding Articles 96, 97, 98 and 99, an executive director appointed to an office under Article 90 hereof shall receive such remuneration (whether by way of salary, commission, participation in profits or otherwise or by all or any of those modes) and such other benefits (including pension and/or gratuity and/or other benefits on retirement) and allowances as the Board may from time to time determine, and either in addition to or in lieu of his remuneration as a Director.

92.      Reserved.

93.      Reserved.

94.      Reserved.

95.      Reserved.


DIRECTORS' FEES AND EXPENSES

96.      The Directors shall receive such remuneration as the Board may from time to time determine based on the recommendation of the compensation committee.

97.      Each Director shall be entitled to be repaid or prepaid all travelling, hotel and incidental expenses reasonably incurred or expected to be incurred by him in attending meetings of the Board or committees of the Board or general meetings or separate meetings of any class of shares or of debentures of the Company or otherwise in connection with the discharge of his duties as a Director.

98.      Any Director who, by request, goes or resides abroad for any purpose of the Company or who performs services which in the opinion of the Board go beyond the ordinary duties of a Director may be paid such extra remuneration (whether by way of salary, commission, participation in profits or otherwise) as the Board may determine and such extra remuneration shall be in addition to or in substitution for any ordinary remuneration provided for by or pursuant to any other Article.

99.      The Board may make any payment to any Director or past Director of the Company by way of compensation for loss of office, or as consideration for or in connection with his retirement from office (not being payment to which the Director is contractually entitled).

DIRECTORS' INTERESTS

100.    A Director may:

(a)    hold any other office or place of profit with the Company (except that
of Auditor) in conjunction with his office of Director for such period
and upon such terms as the Board may determine. Any remuneration
(whether by way of salary, commission, participation in profits or
otherwise) paid to any Director in respect of any such other office or
place of profit shall be in addition to any remuneration provided for
by or pursuant to any other Article;

(b)    act by himself or his firm in a professional capacity for the Company
(otherwise than as Auditor) and he or his firm may be remunerated for
professional services as if he were not a Director;

(c)    continue to be or become a director, managing director, joint managing
director, deputy managing director, executive director, manager or
other officer or member of any other company promoted by the Company
or in which the Company may be interested as a vendor, shareholder or
otherwise and (unless otherwise agreed) no such Director shall be
accountable for any remuneration, profits or other benefits received
by him as a director, managing director, joint managing director,
deputy managing director, executive director, manager or other officer
or member of or from his interests in any such other company. Subject
as otherwise provided by these Articles the Directors may exercise or
cause to be exercised the voting powers conferred by the shares in any
other company held or owned by the Company, or exercisable by them as
Directors of such other company in such manner in all respects as they
think fit (including the exercise thereof in favour of any resolution
appointing themselves or any of them directors, managing directors,
joint managing directors, deputy managing directors, executive
directors, managers or other officers of such company) or voting or
providing for the payment of remuneration to the director, managing
director, joint managing director, deputy managing director, executive
director, manager or other officers of such other company and any
Director may vote in favour of the exercise of such voting rights in
manner aforesaid notwithstanding that he may be, or about to be,
appointed a director, managing director, joint managing director,
deputy managing director, executive director, manager or other officer
of such a company, and that as such he is or may become interested in
the exercise of such voting rights in manner aforesaid.

Notwithstanding the foregoing, no "Independent Director" as defined in
NASD Rules or in Rule 10A-3 under the Exchange Act, and with respect of whom the
Board has determined constitutes an "Independent Director" for purposes of
compliance with applicable law or the Company's listing requirements, shall
without the consent of the Audit Committee take any of the foregoing actions or
any other action that would reasonably be likely to affect such Director's
status as an "Independent Director" of the Company.

101.    Subject to the Law and to these Articles, no Director or proposed or
intending Director shall be disqualified by his office from contracting with the
Company, either with regard to his tenure of any office or place of profit or as
vendor, purchaser or in any other manner whatever, nor shall any such contract
or any other contract or arrangement in which any Director is in any way
interested be liable to be avoided, nor shall any Director so contracting or
being so interested be liable to account to the Company or the Members for any
remuneration, profit or other benefits realised by any such contract or
arrangement by reason of such Director holding that office or of the fiduciary
relationship thereby established provided that such Director shall disclose the
nature of his interest in any contract or arrangement in which he is interested
in accordance with Article 102 herein. Any such transaction that would
reasonably be likely to affect a Director's status as an "Independent Director",
or that would constitute a "related party transaction" as defined by Item 7.N of
Form 20F promulgated by the SEC, shall require the approval of the Audit
Committee.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

102.    A Director who to his knowledge is in any way, whether directly or indirectly, interested in a contract or arrangement or proposed contract or arrangement with the Company shall declare the nature of his interest at the meeting of the Board at which the question of entering into the contract or arrangement is first considered, if he knows his interest then exists, or in any other case at the first meeting of the Board after he knows that he is or has become so interested. For the purposes of this Article, a general Notice to the Board by a Director to the effect that:

    (a)    he is a member or officer of a specified company or firm and is to be regarded as interested in any contract or arrangement which may after the date of the Notice be made with that company or firm; or

    (b)    he is to be regarded as interested in any contract or arrangement which may after the date of the Notice be made with a specified person who is connected with him;

shall be deemed to be a sufficient declaration of interest under this Article in relation to any such contract or arrangement, provided that no such Notice shall be effective unless either it is given at a meeting of the Board or the Director takes reasonable steps to secure that it is brought up and read at the next Board meeting after it is given.

103.    Following a declaration being made pursuant to the last preceding two Articles, subject to any separate requirement for Audit Committee approval under applicable law or the listing rules of the Company's Designated Stock Exchange, and unless disqualified by the chairman of the relevant Board meeting, a Director may vote in respect of any contract or proposed contract or arrangement in which such Director is interested and may be counted in the quorum at such meeting.

GENERAL POWERS OF THE DIRECTORS

104. (1)  The business of the Company shall be managed and conducted by the Board, which may pay all expenses incurred in forming and registering the Company and may exercise all powers of the Company (whether relating to the management of the business of the Company or otherwise) which are not by the Statutes or by these Articles required to be exercised by the Company in general meeting, subject nevertheless to the provisions of the Statutes and of these Articles and to such regulations being not inconsistent with such provisions, as may be prescribed by the Company in general meeting, but no regulations made by the Company in general meeting shall invalidate any prior act of the Board which would have been valid if such regulations had not been made. The general powers given by this Article shall not be limited or restricted by any special authority or power given to the Board by any other Article.

    (2)  Any person contracting or dealing with the Company in the ordinary course of business shall be entitled to rely on any written or oral contract or agreement or deed, document or instrument entered into or executed as the case may be by any two of the Directors acting jointly on behalf of the Company and the same shall be deemed to be validly entered into or executed by the Company as the case may be and shall, subject to any rule of law, be binding on the Company.

(3)  Without prejudice to the general powers conferred by these Articles it is hereby expressly declared that the Board shall have the following powers:

    (a)  To give to any person the right or option of requiring at a future date that an allotment shall be made to him of any share at par or at such premium as may be agreed.

    (b)  To give to any Directors, officers or employees of the Company an interest in any particular business or transaction or participation in the profits thereof or in the general profits of the Company either in addition to or in substitution for a salary or other remuneration.

    (c)  To resolve that the Company be deregistered in the Cayman Islands and continued in a named jurisdiction outside the Cayman Islands subject to the provisions of the Law.

105.     The Board may establish any regional or local boards or agencies for managing any of the affairs of the Company in any place, and may appoint any persons to be members of such local boards, or any managers or agents, and may fix their remuneration (either by way of salary or by commission or by conferring the right to participation in the profits of the Company or by a combination of two or more of these modes) and pay the working expenses of any staff employed by them upon the business of the Company. The Board may delegate to any regional or local board, manager or agent any of the powers, authorities and discretions vested in or exercisable by the Board (other than its powers to make calls and forfeit shares), with power to sub-delegate, and may authorise the members of any of them to fill any vacancies therein and to act notwithstanding vacancies. Any such appointment or delegation may be made upon such terms and subject to such conditions as the Board may think fit, and the Board may remove any person appointed as aforesaid, and may revoke or vary such delegation, but no person dealing in good faith and without notice of any such revocation or variation shall be affected thereby.

106.     The Board may by power of attorney appoint any company, firm or person or any fluctuating body of persons, whether nominated directly or indirectly by the Board, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Board under these Articles) and for such period and subject to such conditions as it may think fit, and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with any such attorney as the Board may think fit, and may also authorise any such attorney to sub-delegate all or any of the powers, authorities and discretions vested in him. Such attorney or attorneys may, if so authorised under the Seal of the Company, execute any deed or instrument under their personal seal with the same effect as the affixation of the Company's Seal.

107.     The Board may entrust to and confer upon a managing director, joint managing director, deputy managing director, an executive director or any Director any of the powers exercisable by it upon such terms and conditions and with such restrictions as it thinks fit, and either collaterally with, or to the exclusion of, its own powers, and may from time to time revoke or vary all or any of such powers but no person dealing in good faith and without notice of such revocation or variation shall be affected thereby.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

108.    All cheques, promissory notes, drafts, bills of exchange and other instruments, whether negotiable or transferable or not, and all receipts for moneys paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as the Board shall from time to time by resolution determine. The Company's banking accounts shall be kept with such banker or bankers as the Board shall from time to time determine.

109. (1)    The Board may establish or concur or join with other companies (being subsidiary companies of the Company or companies with which it is associated in business) in establishing and making contributions out of the Company's moneys to any schemes or funds for providing pensions, sickness or compassionate allowances, life assurance or other benefits for employees (which expression as used in this and the following paragraph shall include any Director or ex-Director who may hold or have held any executive office or any office of profit under the Company or any of its subsidiary companies) and ex-employees of the Company and their dependants or any class or classes of such person.

    (2)    The Board may pay, enter into agreements to pay or make grants of revocable or irrevocable pensions or other benefits to employees and ex-employees and their dependants, or to any of such persons, including pensions or benefits additional to those, if any, to which such employees or ex-employees or their dependants are or may become entitled under any such scheme or fund as mentioned in the last preceding paragraph. Any such pension or benefit may, as the Board considers desirable, be granted to an employee either before and in anticipation of or upon or at any time after his actual retirement, and may be subject or not subject to any terms or conditions as the Board may determine.

BORROWING POWERS

110.    The Board may exercise all the powers of the Company to raise or borrow money and to mortgage or charge all or any part of the undertaking, property and assets (present and future) and uncalled capital of the Company and, subject to the Law, to issue debentures, bonds and other securities, whether outright or as collateral security for any debt, liability or obligation of the Company or of any third party.

111.    Debentures, bonds and other securities may be made assignable free from any equities between the Company and the person to whom the same may be issued.

112.    Any debentures, bonds or other securities may be issued at a discount (other than shares), premium or otherwise and with any special privileges as to redemption, surrender, drawings, allotment of shares, attending and voting at general meetings of the Company, appointment of Directors and otherwise.

113. (1)    Where any uncalled capital of the Company is charged, all persons taking any subsequent charge thereon shall take the same subject to such prior charge, and shall not be entitled, by notice to the Members or otherwise, to obtain priority over such prior charge.

    (2)    The Board shall cause a proper register to be kept, in accordance with the provisions of the Law, of all charges specifically affecting the property of the Company and of any series of debentures issued by the Company and shall duly comply with the requirements of the Law in regard to the registration of charges and debentures therein specified and otherwise.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

PROCEEDINGS OF THE DIRECTORS

114.     The Board may meet for the despatch of business, adjourn and otherwise regulate its meetings as it considers appropriate. Questions arising at any meeting shall be determined by a majority of votes. In the case of any equality of votes the chairman of the meeting shall have an additional or casting vote.

115.     A meeting of the Board may be convened by the Secretary on request of a Director or by any Director. The Secretary shall convene a meeting of the Board of which notice may be given in writing or by telephone or in such other manner as the Board may from time to time determine whenever he shall be required so to do by the president or chairman, as the case may be, or any Director.

116. (1)  The quorum necessary for the transaction of the business of the Board may be fixed by the Board and, unless so fixed at any other number, shall be no less than one half of the total number of Directors.

(2)   Directors may participate in any meeting of the Board by means of a conference telephone or other communications equipment through which all persons participating in the meeting can communicate with each other simultaneously and instantaneously and, for the purpose of counting a quorum, such participation shall constitute presence at a meeting as if those participating were present in person.

(3)   Any Director who ceases to be a Director at a Board meeting may continue to be present and to act as a Director and be counted in the quorum until the termination of such Board meeting if no other Director objects and if otherwise a quorum of Directors would not be present.

117.      The continuing Directors or a sole continuing Director may act notwithstanding any vacancy in the Board but, if and so long as the number of Directors is reduced below the minimum number fixed by or in accordance with these Articles, the continuing Directors or Director, notwithstanding that the number of Directors is below the number fixed by or in accordance with these Articles as the quorum or that there is only one continuing Director, may act for the purpose of filling vacancies in the Board or of summoning general meetings of the Company but not for any other purpose.

118.      The Chairman of the Board shall be the chairman of all meetings of the Board. If the Chairman of the Board is not present at any meeting within five (5) minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

119.      A meeting of the Board at which a quorum is present shall be competent to exercise all the powers, authorities and discretions for the time being vested in or exercisable by the Board.

120. (1)   The Board may delegate any of its powers, authorities and discretions to committees (including, without limitation, the Audit Committee), consisting of such Director or Directors and other persons as it thinks fit, and they may, from time to time, revoke such delegation or revoke the appointment of and discharge any such committees either wholly or in part, and either as to persons or purposes. Any committee so formed shall, in the exercise of the powers, authorities and discretions so delegated, conform to any regulations which may be imposed on it by the Board.

(2)  All acts done by any such committee in conformity with such regulations, and in fulfilment of the purposes for which it was appointed, but not otherwise, shall have like force and effect as if done by the Board, and the Board (or if the Board delegates such power, the committee) shall have power to remunerate the members of any such committee, and charge such remuneration to the current expenses of the Company.

121.      The meetings and proceedings of any committee consisting of two or more members shall be governed by the provisions contained in these Articles for regulating the meetings and proceedings of the Board so far as the same are applicable and are not superseded by any regulations imposed by the Board under the last preceding Article, indicating, without limitation, any committee charter adopted by the Board for purposes or in respect of any such committee.

122.      A resolution in writing signed by all the Directors except such as are temporarily unable to act through ill-health or disability shall (provided that such number is sufficient to constitute a quorum and further provided that a copy of such resolution has been given or the contents thereof communicated to all the Directors for the time being entitled to receive notices of Board meetings in the same manner as notices of meetings are required to be given by these Articles) be as valid and effectual as if a resolution had been passed at a meeting of the Board duly convened and held. Such resolution may be contained in one document or in several documents in like form each signed by one or more of the Directors and for this purpose a facsimile signature of a Director shall be treated as valid.

123.      All acts bona fide done by the Board or by any committee or by any person acting as a Director or members of a committee, shall, notwithstanding that it is afterwards discovered that there was some defect in the appointment of any member of the Board or such committee or person acting as aforesaid or that they or any of them were disqualified or had vacated office, be as valid as if every such person had been duly appointed and was qualified and had continued to be a Director or member of such committee.


                              AUDIT COMMITTEE

124.      Without prejudice to the freedom of the Directors to establish any other committees, for so long as the shares of the Company (or depositary receipts therefor) are listed or quoted on the Designated Stock Exchange, the Board shall establish and maintain an Audit Committee as a committee of the Board, the composition and responsibilities of which shall comply with the NASD Rules and the rules and regulations of the SEC.

125. (1)  The Board shall adopt a formal written audit committee charter and review and assess the adequacy of the formal written charter on an annual basis.

     (2)  The Audit Committee shall meet at least once every financial quarter, or more frequently as circumstances dictate.

126.      For so long as the shares of the Company (or depositary receipts therefor) are listed or quoted on the Designated Stock Exchange, the Company shall conduct an appropriate review of all related party transactions on an ongoing basis and shall utilize the Audit Committee for the review and approval of potential conflicts of interest. Specially, the Audit Committee shall approve any transaction or transactions between the Company and any f the following parties: (i) any shareholder owning an interest in the voting power of the Company or any subsidiary of the Company that gives such shareholder significant influence over the Company or any subsidiary of the Company, (ii) any director or executive officer of the Company or any subsidiary of the Company and any relative of such director or executive officer, (iii) any person in which a substantial interest in the voting power of the Company is owned, directly or indirectly, by any person described in (i) or (ii) or over which such a person is able to exercise significant influence, and (iv) any affiliate (other than a subsidiary) of the Company.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

OFFICERS

127. (1)  The officers of the Company shall consist of the Chairman of the Board, the Directors, Secretary, managers and such additional officers (who may or may not be Directors) as the Board may from time to time determine, all of whom shall be deemed to be officers for the purposes of the Law and these Articles.

(2)  The Directors shall, as soon as may be after each appointment or election of Directors, elect amongst the Directors a chairman and if more than one Director is proposed for this office, the election to such office shall take place in such manner as the Directors may determine.

(3)  The officers shall receive such remuneration as the Directors may from time to time determine.

128. (1)  The Secretary and additional officers, if any, shall be appointed by the Board and shall hold office on such terms and for such period as the Board may determine. If thought fit, two or more persons may be appointed as joint Secretaries. The Board may also appoint from time to time on such terms as it thinks fit one or more assistant or deputy Secretaries.

(2)  The Secretary shall attend all meetings of the Members and shall keep correct minutes of such meetings and enter the same in the proper books provided for the purpose. He shall perform such other duties as are prescribed by the Law or these Articles or as may be prescribed by the Board.

129.     The officers of the Company shall have such powers and perform such duties in the management, business and affairs of the Company as may be delegated to them by the Directors from time to time.

130.     A provision of the Law or of these Articles requiring or authorising a thing to be done by or to a Director and the Secretary shall not be satisfied by its being done by or to the same person acting both as Director and as or in place of the Secretary.


REGISTER OF DIRECTORS AND OFFICERS

131.     The Company shall cause to be kept in one or more books at its Office a Register of Directors and Officers in which there shall be entered the full names and addresses of the Directors and Officers and such other particulars as required by the Law or as the Directors may determine. The Company shall send to the Registrar of Companies in the Cayman Islands a copy of such register, and shall from time to time notify to the said Registrar of any change that takes place in relation to such Directors and Officers as required by the Law.

MINUTES

132. (1)  The Board shall cause minutes to be duly entered in books provided for the purpose:

    (a)  of all elections and appointments of officers;

    (b)  of the names of the Directors present at each meeting of the Directors and of any committee of the Directors;

    (c)  of all resolutions and proceedings of each general meeting of the Members, meetings of the Board and meetings of committees of the Board and where there are managers, of all proceedings of meetings of the managers.

    (2)  Minutes shall be kept by the Secretary at the Office.


SEAL

133. (1)  The Company shall have one or more Seals, as the Board may determine. For the purpose of sealing documents creating or evidencing securities issued by the Company, the Company may have a securities seal which is a facsimile of the Seal of the Company with the addition of the word "Securities" on its face or in such other form as the Board may approve. The Board shall provide for the custody of each Seal and no Seal shall be used without the authority of the Board or of a committee of the Board authorised by the Board in that behalf. Subject as otherwise provided in these Articles, any instrument to which a Seal is affixed shall be signed autographically by one Director and the Secretary or by two Directors or by such other person (including a Director) or persons as the Board may appoint, either generally or in any particular case, save that as regards any certificates for shares or debentures or other securities of the Company the Board may by resolution determine that such signatures or either of them shall be dispensed with or affixed by some method or system of mechanical signature. Every instrument executed in manner provided by this Article shall be deemed to be sealed and executed with the authority of the Board previously given.

    (2)  Where the Company has a Seal for use abroad, the Board may by writing under the Seal appoint any agent or committee abroad to be the duly authorised agent of the Company for the purpose of affixing and using such Seal and the Board may impose restrictions on the use thereof as may be thought fit. Wherever in these Articles reference is made to the Seal, the reference shall, when and so far as may be applicable, be deemed to include any such other Seal as aforesaid.


AUTHENTICATION OF DOCUMENTS

134.   Any Director or the Secretary or any person appointed by the Board for the purpose may authenticate any documents affecting the constitution of the Company and any resolution passed by the Company or the Board or any committee, and any books, records, documents and accounts relating to the business of the Company, and to certify copies thereof or extracts therefrom as true copies or extracts, and if any books, records, documents or accounts are elsewhere than at the Office or the head office the local manager or other officer of the Company having the custody thereof shall be deemed to be a person so appointed by the Board. A document purporting to be a copy of a resolution, or an extract from the minutes of a meeting, of the Company or of the Board or any committee which is so certified shall be conclusive evidence in favour of all persons dealing with the Company upon the faith thereof that such resolution has been duly passed or, as the case may be, that such minutes or extract is a true and accurate record of proceedings at a duly constituted meeting.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

DESTRUCTION OF DOCUMENTS

135. (1)  The Company shall be entitled to destroy the following documents
at the following times:

    (a)  any share certificate which has been cancelled at any time after the
        expiry of one (1) year from the date of such cancellation;

    (b)  any dividend mandate or any variation or cancellation thereof or any
        notification of change of name or address at any time after the expiry
        of two (2) years from the date such mandate variation cancellation or
        notification was recorded by the Company;

    (c)  any instrument of transfer of shares which has been registered at any
        time after the expiry of seven (7) years from the date of
        registration;

    (d)  any allotment letters after the expiry of seven (7) years from the
        date of issue thereof; and

    (e)  copies of powers of attorney, grants of probate and letters of
        administration at any time after the expiry of seven (7) years after
        the account to which the relevant power of attorney, grant of probate
        or letters of administration related has been closed;

and it shall conclusively be presumed in favour of the Company that every entry
in the Register purporting to be made on the basis of any such documents so
destroyed was duly and properly made and every share certificate so destroyed
was a valid certificate duly and properly cancelled and that every instrument of
transfer so destroyed was a valid and effective instrument duly and properly
registered and that every other document destroyed hereunder was a valid and
effective document in accordance with the recorded particulars thereof in the
books or records of the Company. Provided always that: (1) the foregoing
provisions of this Article shall apply only to the destruction of a document in
good faith and without express notice to the Company that the preservation of
such document was relevant to a claim; (2) nothing contained in this Article
shall be construed as imposing upon the Company any liability in respect of the
destruction of any such document earlier than as aforesaid or in any case where
the conditions of proviso (1) above are not fulfilled; and (3) references in
this Article to the destruction of any document include references to its
disposal in any manner.

    (2)  Notwithstanding any provision contained in these Articles, the
Directors may, if permitted by applicable law, authorise the destruction of
documents set out in sub-paragraphs (a) to (e) of paragraph (1) of this Article
and any other documents in relation to share registration which have been
microfilmed or electronically stored by the Company or by the share registrar on
its behalf provided always that this Article shall apply only to the destruction
of a document in good faith and without express notice to the Company and its
share registrar that the preservation of such document was relevant to a claim.

DIVIDENDS AND OTHER PAYMENTS

136.     Subject to the Law, the Board may from time to time declare dividends in any currency to be paid to the Members but no dividend shall be declared in excess of the amount recommended by the Board.

137.     Dividends may be declared and paid out of the profits of the Company, realised or unrealised, or from any reserve set aside from profits which the Directors determine is no longer needed. The Board may also declare and pay dividends out of share premium account or any other fund or account which can be authorised for this purpose in accordance with the Law.

138.     Except in so far as the rights attaching to, or the terms of issue of, any share otherwise provide:

   (a)   all dividends shall be declared and paid according to the amounts paid up on the shares in respect of which the dividend is paid, but no amount paid up on a share in advance of calls shall be treated for the purposes of this Article as paid up on the share; and

   (b)   all dividends shall be apportioned and paid pro rata according to the amounts paid up on the shares during any portion or portions of the period in respect of which the dividend is paid.

139.     The Board may from time to time pay to the Members such interim dividends as appear to the Board to be justified by the profits of the Company and in particular (but without prejudice to the generality of the foregoing) if at any time the share capital of the Company is divided into different classes, the Board may pay such interim dividends in respect of those shares in the capital of the Company which confer on the holders thereof deferred or non-preferential rights as well as in respect of those shares which confer on the holders thereof preferential rights with regard to dividend and provided that the Board acts bona fide the Board shall not incur any responsibility to the holders of shares conferring any preference for any damage that they may suffer by reason of the payment of an interim dividend on any shares having deferred or non-preferential rights and may also pay any fixed dividend which is payable on any shares of the Company half-yearly or on any other dates, whenever such profits, in the opinion of the Board, justifies such payment.

140.     The Board may deduct from any dividend or other moneys payable to a Member by the Company on or in respect of any shares all sums of money (if any) presently payable by him to the Company on account of calls or otherwise.

141.     No dividend or other moneys payable by the Company on or in respect of any share shall bear interest against the Company.

142.     Any dividend, interest or other sum payable in cash to the holder of shares may be paid by cheque or warrant sent through the post addressed to the holder at his registered address or, in the case of joint holders, addressed to the holder whose name stands first in the Register in respect of the shares at his address as appearing in the Register or addressed to such person and at such address as the holder or joint holders may in writing direct. Every such cheque or warrant shall, unless the holder or joint holders otherwise direct, be made payable to the order of the holder or, in the case of joint holders, to the order of the holder whose name stands first on the Register in respect of such shares, and shall be sent at his or their risk and payment of the cheque or warrant by the bank on which it is drawn shall constitute a good discharge to the Company notwithstanding that it may subsequently appear that the same has been stolen or that any endorsement thereon has been forged. Any one of two or more joint holders may give effectual receipts for any dividends or other moneys payable or property distributable in respect of the shares held by such joint holders.

143.     All dividends or bonuses unclaimed for one (1) year after having been declared may be invested or otherwise made use of by the Board for the benefit of the Company until claimed. Any dividend or bonuses unclaimed after a period of six (6) years from the date of declaration shall be forfeited and shall revert to the Company. The payment by the Board of any unclaimed dividend or other sums payable on or in respect of a share into a separate account shall not constitute the Company a trustee in respect thereof.

144.     Whenever the Board or the Company in general meeting has resolved that a dividend be paid or declared, the Board may further resolve that such dividend be satisfied wholly or in part by the distribution of specific assets of any kind and in particular of paid up shares, debentures or warrants to subscribe securities of the Company or any other company, or in any one or more of such ways, and where any difficulty arises in regard to the distribution the Board may settle the same as it thinks expedient, and in particular may issue certificates in respect of fractions of shares, disregard fractional entitlements or round the same up or down, and may fix the value for distribution of such specific assets, or any part thereof, and may determine that cash payments shall be made to any Members upon the footing of the value so fixed in order to adjust the rights of all parties, and may vest any such specific assets in trustees as may seem expedient to the Board and may appoint any person to sign any requisite instruments of transfer and other documents on behalf of the persons entitled to the dividend, and such appointment shall be effective and binding on the Members. The Board may resolve that no such assets shall be made available to Members with registered addresses in any particular territory or territories where, in the absence of a registration statement or other special formalities, such distribution of assets would or might, in the opinion of the Board, be unlawful or impracticable and in such event the only entitlement of the Members aforesaid shall be to receive cash payments as aforesaid. Members affected as a result of the foregoing sentence shall not be or be deemed to be a separate class of Members for any purpose whatsoever.

145. (1)   Whenever the Board or the Company in general meeting has resolved that a dividend be paid or declared on any class of the share capital of the Company, the Board may further resolve either:

    (a)   that such dividend be satisfied wholly or in part in the form of an allotment of shares credited as fully paid up, provided that the Members entitled thereto will be entitled to elect to receive such dividend (or part thereof if the Board so determines) in cash in lieu of such allotment. In such case, the following provisions shall apply:

        (i)   the basis of any such allotment shall be determined by the Board;

        (ii)  the Board, after determining the basis of allotment, shall give not less than ten (10) days' Notice to the holders of the relevant shares of the right of election accorded to them and shall send with such notice forms of election and specify the procedure to be followed and the place at which and the latest date and time by which duly completed forms of election must be lodged in order to be effective;

(iii) the right of election may be exercised in respect of the whole or part of that portion of the dividend in respect of which the right of election has been accorded; and

(iv) the dividend (or that part of the dividend to be satisfied by the allotment of shares as aforesaid) shall not be payable in cash on shares in respect whereof the cash election has not been duly exercised ("the non-elected shares") and in satisfaction thereof shares of the relevant class shall be allotted credited as fully paid up to the holders of the non-elected shares on the basis of allotment determined as aforesaid and for such purpose the Board shall capitalise and apply out of any part of the undivided profits of the Company (including profits carried and standing to the credit of any reserves or other special account, share premium account, capital redemption reserve other than the Subscription Rights Reserve) as the Board may determine, such sum as may be required to pay up in full the appropriate number of shares of the relevant class for allotment and distribution to and amongst the holders of the non-elected shares on such basis; or

(b) that the Members entitled to such dividend shall be entitled to elect to receive an allotment of shares credited as fully paid up in lieu of the whole or such part of the dividend as the Board may think fit. In such case, the following provisions shall apply:

(i) the basis of any such allotment shall be determined by the Board;

(ii) the Board, after determining the basis of allotment, shall give not less than ten (10) days' Notice to the holders of the relevant shares of the right of election accorded to them and shall send with such notice forms of election and specify the procedure to be followed and the place at which and the latest date and time by which duly completed forms of election must be lodged in order to be effective;

(iii) the right of election may be exercised in respect of the whole or part of that portion of the dividend in respect of which the right of election has been accorded; and

(iv) the dividend (or that part of the dividend in respect of which a right of election has been accorded) shall not be payable in cash on shares in respect whereof the share election has been duly exercised ("the elected shares") and in lieu thereof shares of the relevant class shall be allotted credited as fully paid up to the holders of the elected shares on the basis of allotment determined as aforesaid and for such purpose the Board shall capitalise and apply out of any part of the undivided profits of the Company (including profits carried and standing to the credit of any reserves or other special account, share premium account, capital redemption reserve other than the Subscription Rights Reserve) as the Board may determine, such sum as may be required to pay up in full the appropriate number of shares of the relevant class for allotment and distribution to and amongst the holders of the elected shares on such basis.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(2)  (a)  The shares allotted pursuant to the provisions of paragraph (1) of this Article shall rank pari passu in all respects with shares of the same class (if any) then in issue save only as regards participation in the relevant dividend or in any other distributions, bonuses or rights paid, made, declared or announced prior to or contemporaneously with the payment or declaration of the relevant dividend unless, contemporaneously with the announcement by the Board of their proposal to apply the provisions of sub-paragraph (a) or (b) of paragraph (2) of this Article in relation to the relevant dividend or contemporaneously with their announcement of the distribution, bonus or rights in question, the Board shall specify that the shares to be allotted pursuant to the provisions of paragraph (1) of this Article shall rank for participation in such distribution, bonus or rights.

(b)  The Board may do all acts and things considered necessary or expedient to give effect to any capitalisation pursuant to the provisions of paragraph (1) of this Article, with full power to the Board to make such provisions as it thinks fit in the case of shares becoming distributable in fractions (including provisions whereby, in whole or in part, fractional entitlements are aggregated and sold and the net proceeds distributed to those entitled, or are disregarded or rounded up or down or whereby the benefit of fractional entitlements accrues to the Company rather than to the Members concerned). The Board may authorise any person to enter into on behalf of all Members interested, an agreement with the Company providing for such capitalisation and matters incidental thereto and any agreement made pursuant to such authority shall be effective and binding on all concerned.

(3)  The Company may upon the recommendation of the Board by ordinary resolution resolve in respect of any one particular dividend of the Company that notwithstanding the provisions of paragraph (1) of this Article a dividend may be satisfied wholly in the form of an allotment of shares credited as fully paid up without offering any right to shareholders to elect to receive such dividend in cash in lieu of such allotment.

(4)  The Board may on any occasion determine that rights of election and the allotment of shares under paragraph (1) of this Article shall not be made available or made to any shareholders with registered addresses in any territory where, in the absence of a registration statement or other special formalities, the circulation of an offer of such rights of election or the allotment of shares would or might, in the opinion of the Board, be unlawful or impracticable, and in such event the provisions aforesaid shall be read and construed subject to such determination. Members affected as a result of the foregoing sentence shall not be or be deemed to be a separate class of Members for any purpose whatsoever.

(5)  Any resolution declaring a dividend on shares of any class, whether a resolution of the Company in general meeting or a resolution of the Board, may specify that the same shall be payable or distributable to the persons registered as the holders of such shares at the close of business on a particular date, notwithstanding that it may be a date prior to that on which the resolution is passed, and thereupon the dividend shall be payable or distributable to them in accordance with their respective holdings so registered, but without prejudice to the rights inter se in respect of such dividend of transferors and transferees of any such shares. The provisions of this Article shall mutatis mutandis apply to bonuses, capitalisation issues, distributions of realised capital profits or offers or grants made by the Company to the Members.

RESERVES

146. (1)  The Board shall establish an account to be called the share
premium account and shall carry to the credit of such account from time to time
a sum equal to the amount or value of the premium paid on the issue of any share
in the Company. Unless otherwise provided by the provisions of these Articles,
the Board may apply the share premium account in any manner permitted by the
Law. The Company shall at all times comply with the provisions of the Law in
relation to the share premium account.

    (2)  Before recommending any dividend, the Board may set aside out of the
profits of the Company such sums as it determines as reserves which shall, at
the discretion of the Board, be applicable for any purpose to which the profits
of the Company may be properly applied and pending such application may, also at
such discretion, either be employed in the business of the Company or be
invested in such investments as the Board may from time to time think fit and so
that it shall not be necessary to keep any investments constituting the reserve
or reserves separate or distinct from any other investments of the Company. The
Board may also without placing the same to reserve carry forward any profits
which it may think prudent not to distribute.

CAPITALISATION

147.     The Company may, upon the recommendation of the Board, at any time and
from time to time pass an ordinary resolution to the effect that it is desirable
to capitalise all or any part of any amount for the time being standing to the
credit of any reserve or fund (including a share premium account and capital
redemption reserve and the profit and loss account) whether or not the same is
available for distribution and accordingly that such amount be set free for
distribution among the Members or any class of Members who would be entitled
thereto if it were distributed by way of dividend and in the same proportions,
on the footing that the same is not paid in cash but is applied either in or
towards paying up the amounts for the time being unpaid on any shares in the
Company held by such Members respectively or in paying up in full unissued
shares, debentures or other obligations of the Company, to be allotted and
distributed credited as fully paid up among such Members, or partly in one way
and partly in the other, and the Board shall give effect to such resolution
provided that, for the purposes of this Article, a share premium account and any
capital redemption reserve or fund representing unrealised profits, may be
applied only in paying up in full unissued shares of the Company to be allotted
to such Members credited as fully paid.

148.     The Board may settle, as it considers appropriate, any difficulty
arising in regard to any distribution under the last preceding Article and in
particular may issue certificates in respect of fractions of shares or authorise
any person to sell and transfer any fractions or may resolve that the
distribution should be as nearly as may be practicable in the correct proportion
but not exactly so or may ignore fractions altogether, and may determine that
cash payments shall be made to any Members in order to adjust the rights of all
parties, as may seem expedient to the Board. The Board may appoint any person to
sign on behalf of the persons entitled to participate in the distribution any
contract necessary or desirable for giving effect thereto and such appointment
shall be effective and binding upon the Members.

SUBSCRIPTION RIGHTS RESERVE

149.    The following provisions shall have effect to the extent that they are not prohibited by and are in compliance with the Law:

(1)    If, so long as any of the rights attached to any warrants issued by the Company to subscribe for shares of the Company shall remain exercisable, the Company does any act or engages in any transaction which, as a result of any adjustments to the subscription price in accordance with the provisions of the conditions of the warrants, would reduce the subscription price to below the par value of a share, then the following provisions shall apply:

(a)    as from the date of such act or transaction the Company shall establish and thereafter (subject as provided in this Article) maintain in accordance with the provisions of this Article a reserve (the "Subscription Rights Reserve") the amount of which shall at no time be less than the sum which for the time being would be required to be capitalised and applied in paying up in full the nominal amount of the additional shares required to be issued and allotted credited as fully paid pursuant to sub-paragraph (c) below on the exercise in full of all the subscription rights outstanding and shall apply the Subscription Rights Reserve in paying up such additional shares in full as and when the same are allotted;

(b)    the Subscription Rights Reserve shall not be used for any purpose other than that specified above unless all other reserves of the Company (other than share premium account) have been extinguished and will then only be used to make good losses of the Company if and so far as is required by law;

(c)    upon the exercise of all or any of the subscription rights represented by any warrant, the relevant subscription rights shall be exercisable in respect of a nominal amount of shares equal to the amount in cash which the holder of such warrant is required to pay on exercise of the subscription rights represented thereby (or, as the case may be the relevant portion thereof in the event of a partial exercise of the subscription rights) and, in addition, there shall be allotted in respect of such subscription rights to the exercising warrantholder, credited as fully paid, such additional nominal amount of shares as is equal to the difference between:

(i)    the said amount in cash which the holder of such warrant is required to pay on exercise of the subscription rights represented thereby (or, as the case may be, the relevant portion thereof in the event of a partial exercise of the subscription rights); and

(ii)    the nominal amount of shares in respect of which such subscription rights would have been exercisable having regard to the provisions of the conditions of the warrants, had it been possible for such subscription rights to represent the right to subscribe for shares at less than par and immediately upon such exercise so much of the sum standing to the credit of the Subscription Rights Reserve as is required to pay up in full such additional nominal amount of shares shall be capitalised and applied in paying up in full such additional nominal amount of shares which shall forthwith be allotted credited as fully paid to the exercising warrantholders; and

(d)   if, upon the exercise of the subscription rights represented by any warrant, the amount standing to the credit of the Subscription Rights Reserve is not sufficient to pay up in full such additional nominal amount of shares equal to such difference as aforesaid to which the exercising warrantholder is entitled, the Board shall apply any profits or reserves then or thereafter becoming available (including, to the extent permitted by law, share premium account) for such purpose until such additional nominal amount of shares is paid up and allotted as aforesaid and until then no dividend or other distribution shall be paid or made on the fully paid shares of the Company then in issue. Pending such payment and allotment, the exercising warrantholder shall be issued by the Company with a certificate evidencing his right to the allotment of such additional nominal amount of shares. The rights represented by any such certificate shall be in registered form and shall be transferable in whole or in part in units of one share in the like manner as the shares for the time being are transferable, and the Company shall make such arrangements in relation to the maintenance of a register therefor and other matters in relation thereto as the Board may think fit and adequate particulars thereof shall be made known to each relevant exercising warrantholder upon the issue of such certificate.

(2)   Shares allotted pursuant to the provisions of this Article shall rank pari passu in all respects with the other shares allotted on the relevant exercise of the subscription rights represented by the warrant concerned. Notwithstanding anything contained in paragraph (1) of this Article, no fraction of any share shall be allotted on exercise of the subscription rights.

(3)   The provision of this Article as to the establishment and maintenance of the Subscription Rights Reserve shall not be altered or added to in any way which would vary or abrogate, or which would have the effect of varying or abrogating the provisions for the benefit of any warrantholder or class of warrantholders under this Article without the sanction of a special resolution of such warrantholders or class of warrantholders.

(4)   A certificate or report by the Auditor for the time being of the Company as to whether or not the Subscription Rights Reserve is required to be established and maintained and if so the amount thereof so required to be established and maintained, as to the purposes for which the Subscription Rights Reserve has been used, as to the extent to which it has been used to make good losses of the Company, as to the additional nominal amount of shares required to be allotted to exercising warrantholders credited as fully paid, and as to any other matter concerning the Subscription Rights Reserve shall (in the absence of manifest error) be conclusive and binding upon the Company and all warrantholders and shareholders.

ACCOUNTING RECORDS

150.     The Board shall cause true accounts to be kept of the sums of money received and expended by the Company, and the matters in respect of which such receipt and expenditure take place, and of the property, assets, credits and liabilities of the Company and of all other matters required by the Law or necessary to give a true and fair view of the Company's affairs and to explain its transactions.

151.     The accounting records shall be kept at the Office or, at such other place or places as the Board decides and shall always be open to inspection by the Directors. No Member (other than a Director) shall have any right of inspecting any accounting record or book or document of the Company except as conferred by law or authorised by the Board or the Company in general meeting.

152.     Subject to Article 153, applicable law and rules of the Designated Stock Exchange, a printed copy of the Directors' report, accompanied by the balance sheet and profit and loss account, including every document required by law to be annexed thereto, made up to the end of the applicable financial year and containing a summary of the assets and liabilities of the Company under convenient heads and a statement of income and expenditure, together with a copy of the Auditors' report, shall be sent to each person entitled thereto at least ten (10) days before the date of the general meeting and laid before the Company at the annual general meeting held in accordance with Article 56 provided that this Article shall not require a copy of those documents to be sent to any person whose address the Company is not aware or to more than one of the joint holders of any shares or debentures.

153.     Subject to due compliance with all applicable Statutes, rules and regulations, including, without limitation, the rules of the Designated Stock Exchange, and to obtaining all necessary consents, if any, required thereunder, the requirements of Article 152 shall be deemed satisfied in relation to any person by sending to the person in any manner not prohibited by the Statutes, a summary financial statement derived from the Company's annual accounts and the directors' report which shall be in the form and containing the information required by applicable laws and regulations, provided that any person who is otherwise entitled to the annual financial statements of the Company and the directors' report thereon may, if he so requires by notice in writing served on the Company, demand that the Company sends to him, in addition to a summary financial statement, a complete printed copy of the Company's annual financial statement and the directors' report thereon.

154.     The requirement to send to a person referred to in Article 152 the documents referred to in that article or a summary financial report in accordance with Article 153 shall be deemed satisfied where, in accordance with all applicable Statutes, rules and regulations, including, without limitation, the rules of the Designated Stock Exchange, the Company publishes copies of the documents referred to in Article 152 and, if applicable, a summary financial report complying with Article 153, on the Company's computer network or in any other permitted manner (including by sending any form of electronic communication), and that person has agreed or is deemed to have agreed to treat the publication or receipt of such documents in such manner as discharging the Company's obligation to send to him a copy of such documents.

AUDIT

155.     Subject to applicable law and rules of the Designated Stock Exchange:

    (1)  The Board shall appoint an Auditor to Audit the accounts of the Company and such Auditor shall hold office until the Board appoints another Auditor. Such Auditor may be a Member but no Director or officer or employee of the Company shall, during his continuance in office, be eligible to act as an Auditor of the Company.

    (2)  A person, other than a retiring Auditor, shall not be capable of being appointed Auditor unless notice in writing of an intention to nominate that person to the office of Auditor has been given not less than fourteen (14) days before the Board meeting and furthermore, the Company shall send a copy of any such notice to the retiring Auditor.

    (3)  The Board may remove the Auditor at any time before the expiration of his term of office and may at that meeting appoint another Auditor in his stead for the remainder of his term.

156.    Subject to the Law the accounts of the Company shall be audited at least once in every year.

157.    The remuneration of the Auditor shall be fixed by the Board.

158.    If the office of Auditor becomes vacant by the resignation or death of the Auditor, or by his becoming incapable of acting by reason of illness or other disability at a time when his services are required, the Directors shall fill the vacancy and determine the remuneration of such Auditor.

159.    The Auditor shall at all reasonable times have access to all books kept by the Company and to all accounts and vouchers relating thereto; and he may call on the Directors or officers of the Company for any information in their possession relating to the books or affairs of the Company.

160.    The statement of income and expenditure and the balance sheet provided for by these Articles shall be examined by the Auditor and compared by him with the books, accounts and vouchers relating thereto; and he shall make a written report thereon stating whether such statement and balance sheet are drawn up so as to present fairly the financial position of the Company and the results of its operations for the period under review and, in case information shall have been called for from Directors or officers of the Company, whether the same has been furnished and has been satisfactory. The financial statements of the Company shall be audited by the Auditor in accordance with generally accepted auditing standards. The Auditor shall make a written report thereon in accordance with generally accepted auditing standards and the report of the Auditor shall be submitted to the Members in general meeting. The generally accepted auditing standards referred to herein may be those of a country or jurisdiction other than the Cayman Islands. If so, the financial statements and the report of the Auditor should disclose this act and name such country or jurisdiction.

NOTICES

161.    Any Notice or document, whether or not, to be given or issued under these Articles from the Company to a Member shall be in writing or by cable, telex or facsimile transmission message or other form of electronic transmission or communication and any such Notice and document may be served or delivered by the Company on or to any Member either personally or by sending it through the post in a prepaid envelope addressed to such Member at his registered address as appearing in the Register or at any other address supplied by him to the Company for the purpose or, as the case may be, by transmitting it to any such address or transmitting it to any telex or facsimile transmission number or electronic number or address or website supplied by him to the Company for the giving of Notice to him or which the person transmitting the notice reasonably and bona fide believes at the relevant time will result in the Notice being duly received by the Member or may also be served by advertisement in appropriate newspapers in accordance with the requirements of the Designated Stock Exchange or, to the extent permitted by the applicable laws, by placing it on the Company's website and giving to the member a notice stating that the notice or other document is available there (a "notice of availability"). The notice of availability may be given to the Member by any of the means set out above. In the case of joint holders of a share all notices shall be given to that one of the joint holders whose name stands first in the Register and notice so given shall be deemed a sufficient service on or delivery to all the joint holders.

162.    Any Notice or other document:

    (a)    if served or delivered by post, shall where appropriate be sent by airmail and shall be deemed to have been served or delivered on the day following that on which the envelope containing the same, properly prepaid and addressed, is put into the post; in proving such service or delivery it shall be sufficient to prove that the envelope or wrapper containing the notice or document was properly addressed and put into the post and a certificate in writing signed by the Secretary or other officer of the Company or other person appointed by the Board that the envelope or wrapper containing the notice or other document was so addressed and put into the post shall be conclusive evidence thereof;

    (b)    if sent by electronic communication, shall be deemed to be given on the day on which it is transmitted from the server of the Company or its agent. A notice placed on the Company's website is deemed given by the Company to a Member on the day following that on which a notice of availability is deemed served on the Member;

    (c)    if served or delivered in any other manner contemplated by these Articles, shall be deemed to have been served or delivered at the time of personal service or delivery or, as the case may be, at the time of the relevant despatch or transmission; and in proving such service or delivery a certificate in writing signed by the Secretary or other officer of the Company or other person appointed by the Board as to the act and time of such service, delivery, despatch or transmission shall be conclusive evidence thereof; and

    (d)    may be given to a Member either in the English language or the Chinese language, subject to due compliance with all applicable Statutes, rules and regulations.

163. (1)    Any Notice or other document delivered or sent by post to or left at the registered address of any Member in pursuance of these Articles shall, notwithstanding that such Member is then dead or bankrupt or that any other event has occurred, and whether or not the Company has notice of the death or bankruptcy or other event, be deemed to have been duly served or delivered in respect of any share registered in the name of such Member as sole or joint holder unless his name shall, at the time of the service or delivery of the notice or document, have been removed from the Register as the holder of the share, and such service or delivery shall for all purposes be deemed a sufficient service or delivery of such Notice or document on all persons interested (whether jointly with or as claiming through or under him) in the share.

    (2)    A notice may be given by the Company to the person entitled to a share in consequence of the death, mental disorder or bankruptcy of a Member by sending it through the post in a prepaid letter, envelope or wrapper addressed to him by name, or by the title of representative of the deceased, or trustee of the bankrupt, or by any like description, at the address, if any, supplied for the purpose by the person claiming to be so entitled, or (until such an address has been so supplied) by giving the notice in any manner in which the same might have been given if the death, mental disorder or bankruptcy had not occurred.

    (3)    Any person who by operation of law, transfer or other means whatsoever shall become entitled to any share shall be bound by every notice in respect of such share which prior to his name and address being entered on the Register shall have been duly given to the person from whom he derives his title to such share.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

SIGNATURES

164.      For the purposes of these Articles, a cable or telex or facsimile or electronic transmission message purporting to come from a holder of shares or, as the case may be, a Director, or, in the case of a corporation which is a holder of shares from a director or the secretary thereof or a duly appointed attorney or duly authorised representative thereof for it and on its behalf, shall in the absence of express evidence to the contrary available to the person relying thereon at the relevant time be deemed to be a document or instrument in writing signed by such holder or Director in the terms in which it is received.


WINDING UP

165. (1)  The Board shall have power in the name and on behalf of the Company to present a petition to the court for the Company to be wound up.

     (2)  A resolution that the Company be wound up by the court or be wound up voluntarily shall be a special resolution.

166. (1)  Subject to any special rights, privileges or restrictions as to the distribution of available surplus assets on liquidation for the time being attached to any class or classes of shares (i) if the Company shall be wound up and the assets available for distribution amongst the Members of the Company shall be more than sufficient to repay the whole of the capital paid up at the commencement of the winding up, the excess shall be distributed pari passu amongst such members in proportion to the amount paid up on the shares held by them respectively and (ii) if the Company shall be wound up and the assets available for distribution amongst the Members as such shall be insufficient to repay the whole of the paid-up capital such assets shall be distributed so that, a nearly as may be, the losses shall be borne by the Members in proportion to the capital paid up, or which ought to have been paid up, at the commencement of the winding up on the shares held by them respectively.

     (2)  If the Company shall be wound up (whether the liquidation is voluntary or by the court) the liquidator may, with the authority of a special resolution and any other sanction required by the Law, divide among the Members in specie or kind the whole or any part of the assets of the Company and whether or not the assets shall consist of properties of one kind or shall consist of properties to be divided as aforesaid of different kinds, and may for such purpose set such value as he deems fair upon any one or more class or classes of property and may determine how such division shall be carried out as between the Members or different classes of Members. The liquidator may, with the like authority, vest any part of the assets in trustees upon such trusts for the benefit of the Members as the liquidator with the like authority shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no contributory shall be compelled to accept any shares or other property in respect of which there is a liability.

(3)   In the event of winding-up of the Company in the People's Republic of China, every Member of the Company who is not for the time being in the People's Republic of China shall be bound, within 14 days after the passing of an effective resolution to wind up the Company voluntarily, or the making of an order for the winding-up of the Company, to serve notice in writing on the Company appointing some person resident in the People's Republic of China and stating that person's full name, address and occupation upon whom all summonses, notices, process, orders and judgements in relation to or under the winding-up of the Company may be served, and in default of such nomination the liquidator of the Company shall be at liberty on behalf of such Member to appoint some such person, and service upon any such appointee, whether appointed by the Member or the liquidator, shall be deemed to be good personal service on such Member for all purposes, and, where the liquidator makes any such appointment, he shall with all convenient speed give notice thereof to such Member by advertisement as he shall deem appropriate or by a registered letter sent through the post and addressed to such Member at his address as appearing in the register, and such notice shall be deemed to be service on the day following that on which the advertisement first appears or the letter is posted.

INDEMNITY

167. (1)   The Directors, Secretary and other officers for the time being of the Company and the liquidator or trustees (if any) for the time being acting in relation to any of the affairs of the Company and everyone of them, and everyone of their heirs, executors and administrators, shall be indemnified and secured harmless out of the assets and profits of the Company from and against all actions, costs, charges, losses, damages and expenses which they or any of them, their or any of their heirs, executors or administrators, shall or may incur or sustain by or by reason of any act done, concurred in or omitted in or about the execution of their duty, or supposed duty, in their respective offices or trusts; and none of them shall be answerable for the acts, receipts, neglects or defaults of the other or others of them or for joining in any receipts for the sake of conformity, or for any bankers or other persons with whom any moneys or effects belonging to the Company shall or may be lodged or deposited for safe custody, or for insufficiency or deficiency of any security upon which any moneys of or belonging to the Company shall be placed out on or invested, or for any other loss, misfortune or damage which may happen in the execution of their respective offices or trusts, or in relation thereto; PROVIDED THAT this indemnity shall not extend to any matter in respect of any fraud or dishonesty which may attach to any of said persons.

(2)   Each Member agrees to waive any claim or right of action he might have, whether individually or by or in the right of the Company, against any Director on account of any action taken by such Director, or the failure of such Director to take any action in the performance of his duties with or for the Company; PROVIDED THAT such waiver shall not extend to any matter in respect of any fraud or dishonesty which may attach to such Director.

AMENDMENT TO MEMORANDUM AND ARTICLES OF ASSOCIATION
AND NAME OF COMPANY

168.    No Article shall be rescinded, altered or amended and no new Article
shall be made until the same has been approved by a special resolution of the
Members. A special resolution shall be required to alter the provisions of the
Memorandum of Association or to change the name of the Company.


INFORMATION

169.    No Member shall be entitled to require discovery of or any information
respecting any detail of the Company's trading or any matter which is or may be
in the nature of a trade secret or secret process which may relate to the
conduct of the business of the Company and which in the opinion of the Directors
it will be inexpedient in the interests of the members of the Company to
communicate to the public.

</TEXT>
</DOCUMENT>

Exhibit 4.4

LDK SOLAR CO., LTD.

AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

THIS SHAREHOLDERS AGREEMENT (this "AGREEMENT") is entered into as of December 19, 2006 by and among LDK Solar Co., Ltd., a company organized and existing under the laws of the Cayman Islands (the "COMPANY"), Mr. Peng Xiaofeng (together with any permitted transferee or assign of such person, the "FOUNDER"), and each of the investors set forth in Schedule A hereto (together with any permitted transferee or assign of such investor, each an "INVESTOR" and collectively, the "INVESTORS").

RECITALS

A.   The Company and certain of the Investors are parties to the Series C Preferred Shares Purchase Agreement, dated as of December 15, 2006 (the "SHARE PURCHASE AGREEMENT"), pursuant to which such Investors have agreed to subscribe for a certain number of Series C Preferred Shares of the Company.

B.   The Company and certain of the Investors are parties to that certain Shareholders Agreement (the "PRIOR AGREEMENT"), dated as of September 28, 2006, by and among the Company, the Founder, the holders of the Series A-1 Preferred Shares, the holders of the Series A-2 Preferred Shares and the holders of the Series B Preferred Shares (collectively, the "EXISTING SHAREHOLDERS").

C.   It is a condition precedent under the Share Purchase Agreement that the Prior Agreement be amended and restated and this Agreement be entered into by and among the Company, the Founder and the Investors.

D.   The Prior Agreement may be amended with the consent of the written consent of each of (i) the Company; (ii) the Founder; (iii) the holders holding at least two thirds (2/3) of the total number of issued and outstanding Series A-1 Preferred Shares and Series A-2 Preferred Shares, voting together as a single class; and (iv) the holders holding at least two thirds (2/3) of the total number of issued and outstanding Series B Preferred Shares.

E.   The undersigned Existing Shareholders include (i) holders of at least two thirds (2/3) of the total number of issued and outstanding Series A-1 Preferred Shares and Series A-2 Preferred Shares, voting together as a single class and (ii) holders of at least two thirds (2/3) of the total number of issued and outstanding Series B Preferred Shares.

F.   It is understood by the Company, the Founder and the Investors that this Agreement is intended to be binding on all shareholders of the Company.

NOW, THEREFORE, in consideration of the premises set forth above and the mutual promises and covenants set forth in this Agreement, the parties to the Prior Agreement hereby agree to amend and restate the Prior Agreement in its entirety as set forth herein, and all parties hereto agree as follows:

1.    INTERPRETATION.

1.1    Definitions.

The following terms shall have the meanings ascribed to them below:

"AFFILIATE" means, with respect to any given Person, a Person that Controls, is Controlled by, or is under common Control with the given Person.

"AGREEMENT" has the meaning set forth in the preamble hereto.

"CENTER" means the Hong Kong International Arbitration Centre.

"CLOSING" has the meaning set forth in Section 2.2 of the Share Purchase Agreement.

"COMPANY" has the meaning set forth in the preamble hereto.

"COMPANY GROUP" means the Company and all Group Companies, taken together.

"COMPANY OPTION PLAN" means an employee stock option plan adopted by established by the Company on July 28, 2006 pursuant to which stock options will be granted out of the Company Option Pool.

"COMPANY OPTION POOL" means an aggregate of 9,024,666 Ordinary Shares which shall be reserved prior to the Closing, representing up to ten percent (10%) of the total number of issued and outstanding shares of the Company on an as converted and fully diluted basis immediately after the Closing, as may be adjusted from time to time pursuant to the Company Option Plan, to be issued to the Key Persons, officers, directors, consultants, employees or other service providers of the Company from time to time pursuant to the Company Option Plan.

"COMPETITOR" means any Person that may be reasonably deemed to be engaged in any business that develops, manufactures or produces solar grade silicon ingots and wafers.

"CONTROL" means, when used with respect to any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"CONVERSION SHARES" means shares issuable upon conversion of the Preferred Shares or upon exercise of the Warrants.

"EQUITY SECURITIES" means any Ordinary Shares or warrants, options and rights exercisable for Ordinary Shares and instruments convertible or exchangeable for Ordinary Shares, including, without limitation, the Preferred Shares.

"EXCHANGE ACT" means the U.S. Exchange Act of 1934, as amended.

"EXERCISING HOLDER" has the meaning set forth in Section 2.2(b)(iii).

"FOUNDER" has the meaning set forth in the preamble hereto.

"GROUP COMPANIES" means a Person (other than a natural person) that is a Subsidiary of

-2-

the Company.

"HOLDERS" means the Investors, together with the permitted transferees and assigns of any Investor.

"ISSUANCE NOTICE" has the meaning set forth in Section 3.2 hereof.

"INVESTOR DIRECTOR" has the meaning set forth in Section 6.1 hereof.

"KEY PERSONS" means Peng Xiaofeng, Shao Yonggan, Zhu Liangbao and all the other Persons listed in Schedule B hereof.

"LOCK-UP PERIOD" has the meaning set forth in Section 5.1(a) hereof.

"MAXIMUM IPO NEW ISSUE" means the number of Ordinary Shares to be issued at an initial public offering of the Company that represents 15% of the total number of issued and outstanding Ordinary Shares (including the number of Ordinary Shares to be issued in such an initial public offering and the over-allotment option, if any) on an as converted basis, being an amount of 15,984,705 shares.

"MEMORANDUM AND ARTICLES" means the third amended and restated memorandum and articles of association of the Company to be adopted by the members of the Company in December 2006, as may be amended from time to time.

"NEW SECURITIES" means any Equity Securities of the Company whether now or hereafter authorized; provided that the term "New Securities" does not include (i) securities issued upon conversion of the Preferred Shares; (ii) the Preferred Shares issuable upon the exercise of the Warrants and securities issued upon conversion of such Preferred Shares; (iii) Ordinary Shares issuable to the Key Persons, officers, directors, consultants, employees or other service providers of the Company pursuant to the Company Option Plan; (iv) securities issued in a Qualified IPO; (v) securities issued in connection with any stock split, stock dividend or re-capitalization of the Company; and (vi) securities issued pursuant to the acquisition of another business entity or business segment of any such entity by the Company by merger, purchase of substantially all the assets or other reorganization whereby the Company will own not less than fifty-one percent (51%) of the voting power of such business entity or business segment of any such entity.

"OFFERED SHARES" has the meaning set forth in Section 2.2(a).

"ORDINARY SHARES" means the Company's ordinary shares, with a par value of US$0.10 per share.

"ORDINARY SHARE EQUIVALENTS" means warrants, options and rights exercisable for Ordinary Shares and instruments convertible or exchangeable for Ordinary Shares, including, without limitation, the Preferred Shares.

"PERSON" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity.

"PRC" means the People's Republic of China, but solely for the purposes of this

-3-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Agreement, excluding the Hong Kong Special Administrative Region, Macau Special Administrative Region and Taiwan.

"PRC SUBSIDIARY" means Jiangxi LDK Solar Hi-Tech Co., Ltd., a company organized and existing under the laws of the PRC.

"PREFERRED SHARES" means the Company's outstanding Series A-1 Preferred Shares, Series A-2 Preferred Shares, Series B Preferred Shares and Series C Preferred Shares collectively.

"PROHIBITED TRANSFER" has the meaning set forth in Section 2.6(a).

"QUALIFIED EXCHANGE" means (i) the New York Stock Exchange or the Nasdaq Stock Market's National Market System, or (ii) any other exchange of recognized international reputation and standing duly approved by the Company's Board of Directors, including the affirmative vote of the Investor Director.

"QUALIFIED IPO" means an initial public offering on a Qualified Exchange that values the Company at no less than US$1,210,000,000 immediately prior to the initial public offering with a per share offering price of no less than US$11.00 and that results in aggregate proceeds to the Company of at least US$300,000,000. The selection of the lead underwriter(s) of the Qualified IPO shall be led by the management of the Company and subject to the consent of the Investor Director, which consent shall not be unreasonably withheld.

"SECURITIES ACT" means the U.S. Securities Act of 1933, as amended.

"SELLING HOLDER" has the meaning set forth in Section 2.3(a).

"SERIES A SHARE PURCHASE AGREEMENT" means the Series A Preferred Shares Purchase Agreement, dated as of July 28, 2006.

"SERIES A-1 PREFERRED SHARES" means the Company's series A-1 preferred shares, with a par value of US$0.10 per share.

"SERIES A-2 PREFERRED SHARES" means the Company's series A-2 preferred shares, with a par value of US$0.10 per share.

"SERIES B SHARE PURCHASE AGREEMENT" has the meaning set forth in Section 6.6.

"SERIES B PREFERRED SHARES" means the Company's series B preferred shares, with a par value of US$0.10 per share.

"SERIES C PREFERRED SHARES" means the Company's series C preferred shares, with a par value of US$0.10 per share.

"SHARE PURCHASE AGREEMENT" has the meaning set forth in the recitals.

"SUBSIDIARY" means, with respect to any Person, a corporation or other entity that is, directly or indirectly, controlled by such Person, by the possession of the power to direct or cause the direction of the management and policies of first mentioned Person, whether through the ownership of voting securities or equity interest, by contract or otherwise.

-4-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

"TAX" and "TAXES" means and includes any and all taxes, including any and all income, gross receipts, franchise, license, severance, stamp, occupation, premium, environmental, customs duties, capital stock, profits, unemployment, disability, real property, personal property, transfer, registration, value added, estimated, sales, use, excise, withholding, employment, payroll, social security taxes, and similar assessments, charges, and fees (including interest, penalties and additions to such taxes, penalties for failure to file or late filing of any return, report or other filing, and any interest in respect of such penalties and additions) imposed or assessed by any federal, state or local taxing authority, including the Cayman Islands, Hong Kong or the PRC (or any political subdivision thereof or therein).

"TAX RETURNS" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"TRANSFER" has the meaning set forth in Section 2.1(a).

"TRANSFER NOTICE" has the meaning set forth in Section 2.2(a).

"TRANSFEROR" has the meaning set forth in Section 2.2(a).

"WARRANT" or "WARRANTS" means the Warrant(s) the Company issued to the holders of the Series A-1 Preferred Shares and the holders of the Series A-2 Preferred Shares pursuant to certain Warrant Purchase Agreement(s), each dated as of July 28, 2006.

1.2    Interpretation.

For all purposes of this Agreement, except as otherwise expressly provided, (i) the terms defined in this Section 1 shall include the plural as well as the singular, (ii) all references in this Agreement to designated "Sections" and other subdivisions are to the designated Sections and other subdivisions of the body of this Agreement, (iii) pronouns of either gender or neuter shall include, as appropriate, the other pronoun forms, (iv) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section or other subdivision and (v) all references in this Agreement to designated Schedules, Exhibits and Annexes are to the Schedules, Exhibits and Annexes attached to this Agreement unless explicitly stated otherwise.

2.    RIGHTS OF FIRST REFUSAL AND CO-SALE RIGHTS.

2.1    Prohibition on Transfer of Shares.

(a)    Founder.

Notwithstanding the other terms of this Agreement, prior to the expiration of twelve (12) months after the closing of a Qualified IPO, the Founder, regardless of the Founder's employment with the Company, may not, directly or indirectly, sell, assign, transfer, pledge, hypothecate, or otherwise encumber or dispose of in any way, all or any part of any interest (whether involving the legal or beneficial interest) ("TRANSFER") in the Equity Securities now or hereafter owned or held by him, except with the prior written consent of two

-5-

thirds (2/3) of the total number of issued and outstanding Preferred Shares, voting as a single class and on an as converted basis.

(b)  Prohibited Transfers Void.

Any sale, assignment, transfer, pledge, hypothecation or other encumbrance or disposition of Equity Securities not made in conformance with this Agreement shall be null and void, shall not be recorded on the books of the Company and shall not be recognized by the Company.

2.2  Rights of First Refusal.

(a)  Transfer Notice.

If at any time any holder of Equity Securities that is not also a Holder (as defined herein) (a "TRANSFEROR") proposes to Transfer Equity Securities to one or more third parties, then the Transferor shall give each Holder written notice of the Transferor's intention to make the Transfer (the "TRANSFER NOTICE"), which Transfer Notice shall include (i) a description of the Equity Securities to be transferred ("OFFERED SHARES"), including without limitation the number of shares of the Equity Securities to be Transferred and the nature of such Transfer, (ii) the identity(identities) (including name(s) and address(es)) of the prospective transferee(s), and (iii) the consideration and the material terms and conditions upon which the proposed Transfer is to be made. The Transfer Notice shall certify that the Transferor has received a firm offer from the prospective transferee(s) and in good faith believes a binding agreement for the Transfer is obtainable on the terms set forth in the Transfer Notice. The Transfer Notice shall also include a copy of any written proposal, term sheet or letter of intent or other agreement relating to the proposed Transfer.

(b)  Holders' Option.

(i)  Each Holder shall have an option for a period of thirty (30) days from the Holder's receipt of the Transfer Notice to elect to purchase its respective pro rata share of the Offered Shares at the same price and subject to the same terms and conditions as described in the Transfer Notice.

(ii)  Each Holder may exercise such purchase option and, thereby, purchase all or any portion of its pro rata share (with any re-allotments as provided below) of the Offered Shares, by notifying the Transferor and the Company in writing, before expiration of the 30-day period as to the number of such shares which it wishes to purchase (including any re-allotment). For purposes of this clause (ii), each Holder's pro rata share of the Offered Share shall be a fraction of the Offered Shares, of which the number of Equity Securities (assuming the exercise, conversion and exchange of any Ordinary Shares Equivalents) owned by such Holder on the date of the Transfer Notice shall be the numerator and the total number of Equity Securities (assuming the exercise, conversion and

-6-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

exchange of any Ordinary Share Equivalents) held by all Holders on the date of the Transfer Notice shall be the denominator.

(iii) Each Holder which exercises its right of first refusal under clause (ii) above (an "EXERCISING HOLDER") shall have a right of re-allotment such that, if any other Holder fails to exercise the right to purchase its full pro rata share of the Offered Shares, the Exercising Holder may exercise an additional right to purchase a pro rata share of such unpurchased Offered Shares by notifying the Transferor and the Company in writing within ten (10) days after the expiration of the 30-day period described in clause (ii) above. For purposes of this clause (iii), each Exercising Holder's pro rata share of the unpurchased Offered Shares shall be a fraction of the unpurchased Offered Shares (rounded to the nearest whole share), of which the number of shares to be purchased by such Exercising Holder under clause (ii) shall be the numerator, and the total number of shares to be purchased by all Exercising Holders under clause (ii) shall be the denominator.

(iv) Each Holder shall be entitled to apportion the Offered Shares to be purchased among its partners and affiliates, provided that such Holder notifies the Transferor of such allocation.

(v) If a Holder gives the Transferor notice that it desires to purchase its pro rata share of the Offered Shares and, as the case may be, its re-allotment, then payment for the Offered Shares shall be by a cashier's or certified check or wire transfer in immediately available funds, against delivery of the Offered Shares to be purchased at a place agreed by the parties and at the time of the scheduled closing therefor, which shall be no later than sixty (60) days after the Holder's receipt of the Transfer Notice, unless the Transfer Notice contemplated a later closing with the prospective third party transferee or unless the value of the purchase price has not yet been established pursuant to Section 2.2(c).

(c) Valuation of Property.

(i) Should the purchase price specified in the Transfer Notice be payable in property other than cash or evidences of indebtedness, the Holders shall have the right to pay the purchase price in the form of cash equal in amount to the value of such property.

(ii) If the Transferor and the Holders cannot agree on such cash value within ten (10) days after the date on which the relevant option is exercised by the Holders, the valuation shall be made by an appraiser of recognized standing selected by the Transferor and the Holders or, if they cannot agree on an appraiser within twenty (20) days after the Holders' receipt of the Transfer Notice, each shall select an appraiser of recognized standing and the two appraisers shall designate a third appraiser of recognized standing, whose appraisal shall be determinative of such value.

-7-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(iii) The cost of such appraisal shall be shared equally by the Transferor and the Holders, with the half of the cost borne by the Company and the Holders to be borne pro rata by each based on the number of shares such Holders were interested in purchasing pursuant to this Section 2.

(iv) If the time for the closing of the Holders' purchase has expired but for the determination of the value of the purchase price offered by the prospective transferee(s), such closing shall be held on or prior to the fifth business day after such valuation shall have been made pursuant to this subsection.

2.3  Right of Co-Sale.

(a)  To the extent the Holders do not exercise their respective rights of first refusal as to all of the Offered Shares pursuant to Section 2.2, each Holder (a "SELLING HOLDER") which notifies the Transferor in writing within thirty (30) days after receipt of the Transfer Notice referred to in Section 2.2(a) shall have the right to participate in such sale of Equity Securities on the same terms and conditions as specified in the Transfer Notice.

(i)  Such Selling Holder's notice to the Transferor shall indicate the number of Equity Securities the Selling Holder wishes to sell under its right to participate.

(ii) To the extent one or more of the Holders exercise such right of participation in accordance with the terms and conditions set forth below, the number of Equity Securities that the Transferor may sell in the Transfer shall be correspondingly reduced.

(b)  Each Selling Holder may elect to sell up to such number of Equity Securities equal to (on a fully converted basis) the product obtained by multiplying (i) the aggregate number of Ordinary Shares covered by the Transfer Notice (including the number of Ordinary Shares that would be issuable upon the exercise, conversion or exchange of Ordinary Share Equivalents) by (ii) a fraction, the numerator of which is the number of Ordinary Shares (including the number of Ordinary Shares that would be issuable upon the exercise, conversion or exchange of Ordinary Share Equivalents) owned by the Selling Holder on the date of the Transfer Notice and the denominator of which is the total number of Ordinary Shares (including the number of Ordinary Shares that would be issuable upon the exercise, conversion or exchange of Ordinary Share Equivalents) owned by all Selling Holders on the date of the Transfer Notice.

(c)  If any Holder fails to elect to fully participate in such Transferor's sale pursuant to this Section 2.3, the Transferor shall give notice of such failure to the Selling Holders. Such notice may be made by telephone if confirmed in writing within two (2) days. The Selling Holders shall have five (5) days from the date such notice was given to agree to sell their pro rata share of the unsold portion. For purposes of this paragraph, a Selling Holder's pro rata share shall be a fraction of the unsold portion, the numerator of which shall be the number of Ordinary

-8-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Shares (including the number of Ordinary Shares that would be issuable upon the exercise, conversion or exchange of Ordinary Share Equivalents) notified to be sold by the Selling Holder pursuant to Section 2.3(b) and the denominator of which shall be the total number of Ordinary Shares (including the number of Ordinary Shares that would be issuable upon the exercise, conversion or exchange of Ordinary Share Equivalents) notified to be sold by all Selling Holders pursuant to Section 2.3(b).

(d)    Each Selling Holder shall effect its participation in the sale by promptly delivering to the Transferor for transfer to the prospective purchaser one or more certificates, properly endorsed for transfer, which represent the type and number of Equity Securities which such Selling Holder elects to sell; provided, however that if the prospective third-party purchaser objects to the delivery of Equity Securities in lieu of Ordinary Shares, such Selling Holder shall convert such Equity Securities into Ordinary Shares and deliver certificates corresponding to such Ordinary Shares. The Company agrees to make any such conversion concurrent with the actual transfer of such shares to the purchaser and contingent on such transfer.

(e)    The share certificate or certificates that a Selling Holder delivers to the Transferor pursuant to Section 2.3(d) shall be transferred to the prospective purchaser in consummation of the sale of the Equity Securities pursuant to the terms and conditions specified in the Transfer Notice, and the Transferor shall concurrently therewith remit to such Selling Holder that portion of the sale proceeds to which such Selling Holder is entitled by reason of its participation in such sale.

(f)    To the extent that any prospective purchaser prohibits the participation of a Selling Holder exercising its co-sale rights hereunder in a proposed Transfer or otherwise refuses to purchase shares or other securities from a Selling Holder exercising its co-sale rights hereunder, the Transferor shall not sell to such prospective purchaser any Equity Securities unless and until, simultaneously with such sale, the Transferor shall purchase such shares or other securities from such Selling Holder for the same consideration and on the same terms and conditions as the proposed transfer described in the Transfer Notice.

(g)    Notwithstanding the above terms under this Section 2.3, if at any time, the Founder has a bona fide offer from a third party which offers to purchase from the Founder such number of Equity Securities that results in the number of Equity Securities held by the Founder after such sale (which must be approved by Holders representing not less than two thirds (2/3) of all the Preferred Shares then outstanding, voting as a single class on an as converted basis) being less than 75% of the total Equity Securities that are then issued and outstanding (on an as-converted and fully diluted basis), the Founder shall procure that the Holders be offered to sell all of their Equity Securities at the same price and subject to the same terms and conditions as offered by such third party to the Founder, on an as-converted and fully converted basis. For the avoidance of doubt, reduction of the Founder's ownership in the Company by any other

-9-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

reason, such as upward adjustment of any Holder's ownership in the Company or issuance of stock options under the Company Option Plan, shall not trigger such co-sale rights.

2.4    Non-Exercise of Rights.

(a)    Subject to any other applicable restrictions on the sale of such shares, to the extent that the Holders have not exercised their rights to purchase the Offered Shares within the time periods specified in Section 2.2 and the Holders have not exercised their rights to participate in the sale of the Offered Shares within the time periods specified in Section 2.3, the Transferor shall have a period of sixty (60) days from the expiration of such rights in which to sell the Offered Shares to the third-party transferee(s) identified in the Transfer Notice upon terms and conditions (including the purchase price) no more favorable than those specified in the Transfer Notice. Within fifteen (15) days of entering into any agreement to sell Offered Shares to a third party under this Section, the Transferor shall furnish each Holder with a copy of all agreements relating to such sale.

(b)    The third-party transferee(s) shall acquire the Offered Shares free and clear of subsequent rights of first refusal and co-sale rights under this Agreement. In the event the Transferor does not consummate the sale or disposition of the Offered Shares within sixty (60) days from the expiration of such rights, the Holders' first refusal rights and co-sale rights shall continue to be applicable to any subsequent disposition of the Offered Shares by the Transferor until such rights lapse in accordance with the terms of this Agreement.

(c)    The exercise or non-exercise of the rights of the Holders under this Section 2 to purchase Equity Securities from a Transferor or participate in the sale of Equity Securities by a Transferor shall not adversely affect their rights to make subsequent purchases from a Transferor of Equity Securities or subsequently participate in sales of Equity Securities by a Transferor hereunder.

2.5    Limitations to Co-Sale.

Notwithstanding the provisions of Section 2.3, the co-sale right of the Holders shall not apply to the sale of any Equity Securities (A) to the public pursuant to a registration statement filed with, and declared effective by, the Securities and Exchange Commission under the Securities Act, including a Qualified IPO or (B) to or by the Company.

2.6    Prohibited Transfers.

(a)    In the event any Transferor should sell any Equity Securities in contravention of the co-sale rights of the Holders under Section 2.3 (a "PROHIBITED TRANSFER"), the Holders, in addition to such other remedies as may be available at law, in equity or hereunder, shall have the put option provided below, and such Transferor shall be bound by the applicable provisions of such option.

(b)    In the event of a Prohibited Transfer, each Holder shall have the right to sell to the Transferor the type and number of Equity Securities equal to the number of Equity Securities such Holder would have been entitled to transfer to the third-

-10-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

party transferee(s) under Section 2.3 hereof had the Prohibited Transfer been effected pursuant to and in compliance with the terms hereof. Such sale shall be made on the following terms and conditions:

(i)   The price per share at which the shares are to be sold to the Transferor shall be equal to the price per share paid by the third-party transferee(s) to the Transferor in the Prohibited Transfer. The Transferor shall also reimburse each Holder for any and all fees and expense, including legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of such Holder's rights under Section 2.

(ii)  Within ninety (90) days after the later of the dates on which the Holder (A) received notice of the Prohibited Transfer or (B) otherwise becomes aware of the Prohibited Transfer, such Holder shall, if exercising the option created hereby, deliver to the Transferor the certificate or certificates representing shares to be sold under this Section 2.6 by such Holder, each certificate to be properly endorsed for transfer.

(iii) The Transferor shall, upon receipt of the certificate or certificates for the shares to be sold by a Holder, pursuant to this Section 2.6, pay the aggregate purchase price therefor and the amount of reimbursable fees and expenses, as specified in subparagraph 2.6(b)(i), in cash or by other means acceptable to the Holder.

(iv)  Notwithstanding the foregoing, any attempt by the Transferor to transfer Equity Securities in violation of this Section 2 shall be void, and the Company agrees it will not effect such a transfer nor will it treat any alleged transferee(s) as the holder of such shares without the written consent of a majority in interest of the Holders.

3.    PRE-EMPTIVE RIGHT

3.1   General

The Company hereby grants to each Holder a pre-emptive right to purchase up to a pro rata share of any New Securities which the Company may, from time to time, propose to sell and issue. A Holder's "pro rata share", for purposes of this pre-emptive right, shall be determined according to the number of Ordinary Shares owned by such Holder immediately prior to the issuance of the New Securities, on an as-converted basis, in relation to the total number of Ordinary Shares outstanding immediately prior to the issuance of the New Securities, on an as-converted basis. Each Investor shall have a right of over-allotment such that, if any Investor fails to exercise its right hereunder to purchase its pro rata share of New Securities, the other Investors may purchase the non-purchasing Investor's portion on a pro rata basis within five (5) days from the date such non-purchasing Investor fails to exercise its right hereunder.

3.2   Issuance Notice

In the event the Company proposes to undertake an issuance of New Securities, it shall

-11-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

give each Investor written notice (an "ISSUANCE NOTICE") of such intention, describing the type of New Securities, and their price and the general terms upon which the Company proposes to issue the same. Each Investor shall have fifteen (15) days or such shorter period of time agreed to by such Investor after any such notice is mailed or delivered to agree to purchase up to such Investor's pro rata share of such New Securities for the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased.

3.3    Sales by the Company

Upon the expiration of twenty (20) days or such shorter period of time agreed to by such Investor from the Company's delivery of the Issuance Notice and for sixty (60) days thereafter, the Company may sell any New Securities with respect to which the Investors' pre-emptive rights under this Section 3 was not exercised, at a price and upon terms no more favorable to the purchasers thereof than specified in the Issuance Notice. In the event the Company has not sold such New Securities within such 60-day period, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Investors in the manner provided in Section 3.1 above.

3.4    The pre-emptive right granted under this Agreement shall expire upon, and shall not be applicable to, a Qualified IPO.

3.5    To the extent any holder of Preferred Shares transfers any such shares to any other Person, such holder may assign its rights under this Section 3 to such Person.

4.    INFORMATION AND INSPECTION RIGHTS

4.1    The Company shall deliver to each Investor:

(a)    as soon as practicable, but in any event within one-hundred and twenty (120) days after the end of each fiscal year of the Company, consolidated (with respect to the Company) and unconsolidated (with respect to the PRC Subsidiary) income statements and statements of cash flows for the Company Group for such fiscal year, consolidated balance sheets for the Company and each member of the Company Group as of the end of the fiscal year all prepared in accordance with IFRS and audited and certified by the Auditor;

(b)    as soon as practicable, but in any event within sixty (60) days after the end of each fiscal quarter, unconsolidated unaudited income statements, statements of cash flows and balance sheets for such fiscal quarter of the PRC Subsidiary, and a management report of the Company;

(c)    as soon as practicable, but in any event within thirty (30) days of the end of each month, unconsolidated unaudited income statements, statements of cash flows and balance sheets for the PRC Subsidiary as of the end of such month, and a management report of the Company; and

(d)    as soon as practicable, but in any event prior to the end of each fiscal year, an operating budget, budget of capital expenditures, and strategic plan for the succeeding fiscal year, all as approved by the Board.

-12-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

4.2  Inspection

The Company shall permit each Investor, at such Investor's expense, to visit and inspect any of the properties and examine the books of account and records of the Company Group and discuss the affairs, finances and accounts of the Company Group with the directors, officers, accountants, legal counsel and investment bankers of the Company Group, all at such reasonable times as may be requested in writing by such Investor. Without limiting the foregoing, the Company shall permit each Investor, at such Investor's expense, to inspect all Tax Returns for the Company Group, together with all supporting materials or materials used in the preparation of such Tax Returns, and to discuss the Company's Tax policies with the directors, officers, employees, accountants, legal counsel and investment bankers of the Company and the Group Companies, all at such reasonable times as may be requested by the Investors.

4.3  Termination of Information and Inspection Covenants

The covenants set forth in Sections 4.1 through 4.2 shall terminate as to each holder of the Preferred Shares or Conversion Shares and be of no further force or effect if (i) the Company becomes subject to the filing requirements of the Exchange Act or the rules of any other organized securities exchange, or (ii) such holder of the Preferred Shares shall cease to hold any Preferred Shares or Conversion Shares.

5.  LOCK-UP OF INVESTORS' PREFERRED SHARES

5.1  Notwithstanding anything to the contrary contained herein, each of the Investors agrees:

(a)  not to Transfer any Preferred Shares (i) prior to January 31, 2007 with respect to the holders of the Series A-1 Preferred Shares and the holders of the Series A-2 Preferred Shares; (ii) prior to March 28, 2007 with respect to the holders of the Series B Preferred Shares; and (iii) within the six (6) month period after the Closing Date (as defined in the Share Purchase Agreement) with respect to the holders of the Series C Preferred Shares (each a "LOCK-UP PERIOD");

(b)  to notify the Company in writing of any proposed Transfer after the expiration of the respective Lock-up Period set forth in Section 5.1(a) above; and

(c)  to be subject to any reasonable lock-up period as may be determined in good faith by the lead underwriter(s) of the Qualified IPO.

5.2  Each of the Investors agrees not to, in any event, transfer any Equity Securities held by it to any Competitor as determined in good faith by the Board of Directors of the Company.

6.  BOARD OF DIRECTORS

6.1  The Board of Directors of the Company shall consist of five (5) directors. The holders of the Series A-1 Preferred Shares and Series A-2 Preferred Shares, voting as a single class, shall have the right to appoint one (1) member of the Board of Directors, who shall be Kevin Wang (the "INVESTOR Director"). The remaining directors shall be nominated, elected and removed by the holders of Ordinary Shares in accordance with the Memorandum and Articles. The Investor Director designated by the holders of the

-13-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Series A-1 Preferred Shares and the Series A-2 Preferred Shares will be entitled to be a member of all board committees, including the Compensation Committee and the Auditing Committee once they are formed by the Board of Directors.

6.2 Meetings of the Board of Directors shall be held at least once per calendar quarter on as regular a basis as possible by giving at least fifteen (15) calendar day's prior notice of such meeting and the agenda of such meeting. The number of directors necessary to constitute a quorum at any regular or special meeting of the Board of Directors of the Company shall be a majority of the total number of directors then in office.

6.3 The Company and the PRC Subsidiary shall, and the Founder shall procure the Company and the PRC Subsidiary to, cause the Board of Directors of each member of the Company Group to be composed of the same nominees designated by such Persons pursuant to Section 6.1.

6.4 The Company shall indemnify and hold harmless each director appointed pursuant to Section 6.1 who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that he is or was a director of the Company, or is or was a director of the Company serving at the request of the Company as a director of another company, partnership, joint venture, trust, employee benefit plan or other enterprise, against expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.

6.5 Each of the parties to this Agreement shall vote any shares of the Company held thereby and if applicable, cause its respective representatives on the Board to, and the Company shall, and the Founder shall cause the Company to, promptly take any and all actions necessary to effect the provisions of this Section 6 and Section 7 below.

6.6 Each of the Investors who is a holder of the Series B Preferred Shares at September 28, 2006 (excluding Tech Team Holdings Limited, Grand Gains International Limited and BOFA Capital Company Limited), as long as it retains at least 80% of the Series B Preferred Shares acquired under that Series B Preferred Shares Purchase Agreement, dated as of September 28, 2006 (as amended, the "SERIES B SHARE PURCHASE AGREEMENT"), shall be entitled, by notice in writing to the Company, to appoint one (1) person as an observer (collectively, the "BOARD OBSERVERS") to attend and speak at, either in person or by teleconference, any and all meetings of the Board of Directors of the Company, the PRC Subsidiary and all committee meetings thereof, without any voting rights. The Company shall provide such Board Observers the same information concerning the Company, the PRC Subsidiary and such committees thereof. The travel expenses incurred by the Board Observers to attend such meetings shall be borne by the relevant appointing holder of the Series B Preferred Shares.

6.7 Each of the Investors who is a holder of the Series C Preferred Shares at December 19, 2006, as long as it retains at least 80% of the Series C Preferred Shares acquired under

-14-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

the Share Purchase Agreement, shall be entitled, by notice in writing to the Company, to appoint one (1) person as a Board Observer to attend and speak at, either in person or by teleconference, any and all meetings of the Board of Directors of the Company, the PRC Subsidiary and all committee meetings thereof, without any voting rights. The Company shall provide such Board Observers the same information concerning the Company, the PRC Subsidiary and such committees thereof. The travel expenses incurred by the Board Observers to attend such meetings shall be borne by the relevant appointing holder of the Series C Preferred Shares.

7.    MAJOR CORPORATE TRANSACTIONS

7.1   So long as any shares of the Preferred Shares remain outstanding, neither the Company nor any other members of the Company Group shall, and the Founder shall cause the Company and such member of the Company Group not to, take any of the following actions without, in addition to any other authorizations or approvals required by Applicable Law and the Memorandum and Articles, the prior written approval of (i) the holders of at least two thirds (2/3) of the total number of the then issued and outstanding Series A-1 Preferred Shares and the Series A-2 Preferred Shares, voting together as a single class, (ii) the holders of at least two thirds (2/3) of the total number of the then issued and outstanding Series B Preferred Shares, and (iii) the holders of at least two thirds (2/3) of the total number of the then issued and outstanding Series C Preferred Shares:

(a)   any amendment to the Articles of the Company or the PRC Subsidiary;

(b)   issuance or sale by any member of the Company Group of any securities other than (i) any issuance of the Conversion Shares, (ii) any grant of stock options under the Company Option Plan, and (iii) any issuance of the Series A-1 Preferred Shares and/or the Series A-2 Preferred Shares upon the exercise of the Warrants and the issuance of Conversion Shares thereof;

(c)   any redemption, retirement, purchase or other acquisition, direct or indirect, by any member of the Company Group of any outstanding Ordinary Shares or Equity Securities (or any warrants, rights or options to acquire any such Ordinary Shares or Equity Securities), other than in accordance with the right of redemption of the Investors as provided in the Memorandum and Articles, or any other reduction or similar change of capital structure of any member of the Company Group;

(d)   any merger, acquisition, consolidation, joint venture or like transaction involving any member of the Company Group (whether or not such member of the Company Group is the surviving corporation), including, but not limited to, any transfer of equity interest in the PRC Subsidiary or any new issue of registered capital in the PRC Subsidiary to any Person other than the Company;

(e)   any liquidation, dissolution, winding-up, bankruptcy, revocation of voluntary dissolution (judicial or non-judicial) or similar proceeding filed by or against any of the members of the Company Group;

-15-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(f)  any sale, lease, transfer, exchange or other disposition of all or substantially all of the assets of the Company (including the disposition of operating rights of any member of the Company Group);

(g)  any transfer or exclusive license in any of the Company Group's technology other than licenses of non-exclusive rights in such technology that are required or necessary in the ordinary course of business;

(h)  creation, incurrence, assumption or permission to exist any mortgage, pledge, charge, lien or other encumbrance on all or substantially all of assets of any member of the Company Group, other than those required or necessary in the ordinary course of business which shall not exceed US$5,000,000 in any single transaction;

(i)  launch of an initial public offering of the Ordinary Shares at a price lower than the minimum offering price as required for a Qualified IPO (i.e., US$11.00 per Ordinary Share) or issuance of Ordinary Shares in an amount that exceeds the IPO Maximum New Issue in an initial public offering of the Ordinary Shares;

(j)  any declaration or payment of any dividend or other distribution prior to an IPO of the Company, direct or indirect, in cash or in property by any member of the Company Group on account of any class of share capital of such member of the Company Group now or hereafter outstanding;

(k)  any sale, transfer or other disposition of any Ordinary Shares by the Founder prior to the expiration of the twelve (12) month period after the closing of the Qualified IPO;

(l)  any sale, transfer or other disposition by any Key Person of any shares acquired through the exercise of stock options received under the Company Option Plan before the Qualified IPO;

(m)  any sale, transfer or other disposition of any shares by any other holder of equity interest in the Company (other than any of the Investors or their transferees or permitted assigns) representing more than a five percent (5%) equity interest in the Company (on a fully diluted and as converted basis);

(n)  engagement in any transactions by any member of the Company Group with (i) its directors, (ii) shareholders, (iii) the Founder, the Key Persons or their respective Affiliates, (iv) close relatives of the Founder or Affiliates of such relatives, (v) close relatives of the Affiliates of the Founder or Affiliates of such relatives, or (vi) any corporation or other entity of which majority equity is held or which is otherwise controlled by any of the Persons listed in (i) through (vi) of this paragraph (p), jointly or respectively;

(o)  creation, incurrence, assumption, guarantee or otherwise becoming liable (directly or indirectly) by any of the member of the Company Group with respect to any indebtedness (including capital leases) which represents an amount in excess of US$8,000,000;

-16-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(p)  the purchase or lease by any member of the Company Group of any real estate property valued in excess of US$3,000,000;

(q)  the purchase by any member of the Company Group of listed or unlisted securities;

(r)  public offerings and/or registration of securities other than the Qualified IPO of the Company;

(s)  any adoption by the Company Group of a business plan or annual budget or any material amendment to its current business plan or annual budget, or any material alteration or change in the strategic direction or business operations in a manner that is not contemplated in the most recent business plan or annual budget;

(t)  termination of the Company Option Plan or adoption of any other share option or similar incentive plan of any member of the Company Group or any material amendment to the same, including change or determination of the number of options reserved, vesting periods and exercise prices of the stock options thereunder;

(u)  grant of loans to any director, officer or employee of any member of the Company Group; and

(v)  changes of the independent auditors or changes in accounting practices or policies by any member of the Company Group.

7.2  So long as any shares of the Series A-1 Preferred Shares and/or Series A-2 Preferred Shares remain outstanding, neither the Company nor any other members of the Company Group shall, and the Founder shall cause the Company and such member of the Company Group not to, make increase or decrease in the total number of directors comprising the board of directors of any member of the Company Group without, in addition to any other authorizations or approvals required by Applicable Law and the Memorandum and Articles, the prior written approval of the holders of at least two thirds (2/3) of the total number of the then issued and outstanding Series A-1 Preferred Shares and the Series A-2 Preferred Shares, voting together as a single class.

7.3  Notwithstanding anything provided in Section 7 to the contrary, to the extent any of the actions referred to in Sections 7.1 and 7.2 above will impact the liquidation preference or redemption rights of the holders of the Series A-1 Preferred Shares and/or the holders of the Series A-2 Preferred Shares, the holders of the Series A-1 Preferred Shares and the Series A-2 Preferred Shares shall vote as separate classes with respect to each of such actions.

7.4  Notwithstanding anything provided in Section 7 to the contrary, the selection of the lead underwriter(s) of the Qualified IPO shall be led by the management of the Company and subject to the consent of the Investor Director, which consent shall not be unreasonably withheld.

-17-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

8.    ASSIGNMENTS AND TRANSFERS; NO THIRD PARTY BENEFICIARIES.

This Agreement and the rights and obligations of the parties hereunder shall inure to the benefit of, and be binding upon, their respective successors and permitted assigns, but shall not otherwise be for the benefit of any third party.

9.    LEGEND.

9.1   Each existing or replacement certificate for shares now owned or hereafter acquired by the Founder or issued to any person in connection with a transfer pursuant to Section 2.2 hereof shall bear the following legend upon its face:

"THE SALE, PLEDGE, HYPOTHECATION, ASSIGNMENT OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A SHAREHOLDERS AGREEMENT BY AND BETWEEN THE SHAREHOLDER, THE COMPANY AND CERTAIN HOLDERS OF SHARES OF THE COMPANY. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY."

9.2   The Founder agrees that the Company may instruct its transfer agent to impose transfer restrictions on the shares represented by certificates bearing the legend referred to in Section 9.1 above to enforce the provisions of this Agreement and the Company agrees to promptly do so. The legend shall be removed upon termination of this Agreement.

10.   EFFECT OF CHANGE IN COMPANY'S CAPITAL STRUCTURE.

Appropriate adjustments shall be made in the number and class of shares in the event of a stock dividend, stock split, reverse stock split, combination, reclassification or like change in the capital structure of the Company.

11.   FURTHER INSTRUMENTS AND ACTIONS.

The parties agree to execute such further instruments and to take such further action as may reasonably be necessary to carry out the intent of this Agreement. The Founder agrees to cooperate affirmatively with the Company and the Holders, to the extent reasonably requested by the Company or the Holders, to enforce rights and obligations pursuant hereto.

12.   MISCELLANEOUS.

12.1  Governing Law.

This Agreement shall be governed by and construed under the laws of Hong Kong without regard to conflicts of law thereunder.

12.2  Notices.

Any notice required or permitted by any provision of this Agreement shall be given in writing in English and shall be provided by one or more of the following means and shall be deemed to have been duly given (a) if delivered personally, when received, (b) if transmitted by facsimile, on the date of transmission with receipt of a transmittal

-18-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

confirmation, (c) if by international courier service, on the fourth (4th) business day following the date of deposit with such courier service, or such earlier delivery date as may be confirmed in writing to the sender by such courier service or (d) if transmitted by telephone as permitted by Section 2.3(c), on the date of such telephone transmission. If notice is provided pursuant to subclause (a) or (c) above, such notice shall be addressed: (i) in case of the Company, the Founder and the Investors, to their respective addresses as set forth on the signature page hereof or at such other addresses as such parties may designate by ten (10) day's advance written notice to the other parties hereto, and (ii) in the case of any permitted transferee of a party to this Agreement or its transferee, to such transferee at its address as designated in writing by such transferee to the Company from time to time.

12.3 Term.

This Agreement shall terminate upon the earlier of (i) the closing of a Qualified IPO, and (ii) the full redemption of the Preferred Shares pursuant to the Articles of Association of the Company.

12.4 Entire Agreement.

This Agreement contains the entire understanding of the parties hereto with respect to the subject matter hereof, supersedes all other agreements between or among any of the parties with respect to the subject matter hereof. Notwithstanding the foregoing, all the provisions in the Series A Share Purchase Agreement other than Section 9 shall remain in full force and effect and be binding on the parties thereto.

12.5 Amendments and Waivers.

Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of each of (i) the Company, (ii) the Founder, (iii) the Holders representing not less than two thirds (2/3) of the then issued and outstanding Series A-1 Preferred Shares and the Series A-2 Preferred Shares, voting together as a single class, (iv) the Holders representing not less than two thirds (2/3) of the then issued and outstanding Series B Preferred Shares and (v) the Holders representing not less than two thirds (2/3) of the then issued and outstanding C Preferred Shares. Any amendment or waiver effected in accordance with this paragraph shall be binding upon the parties and their respective successors and assigns.

12.6 Ownership.

The Founder represents and warrants that he is the sole ultimate and beneficial owner of the Equity Securities subject to the right of first refusal and co-sale agreements as set forth in this Agreement and that no other person has any interest (other than a community property interest) in such shares.

12.7 Waiver of Pre-emptive Right

Effective upon the later of (a) the Closing and (b) the execution and delivery of this Agreement by the Company, the Founder, the holders of at least two thirds (2/3) of the

-19-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

then issued and outstanding Series A-1 Preferred Shares and the Series A-2 Preferred Shares, voting together as a single class, and the holders of at least two thirds (2/3) of the then issued and outstanding Series B Preferred Shares, the holders of a pre-emptive right under the Prior Agreement hereby waive, pursuant to the relevant provisions in the Prior Agreement, any right to receive notice of, and to participate in, the sale and issuance by the Company of any shares of the Series C Preferred Shares (including the Conversion Shares) pursuant to the Share Purchase Agreement.

12.8  Severability.

In case any provision of the Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

12.9  Titles and Subtitles.

The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

12.10  Counterparts.

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.11  Dispute Resolution.

(a)  Any dispute, controversy or claim arising out of or relating to this Agreement, or the interpretation, breach, termination or validity hereof, shall be resolved through consultation. Such consultation shall begin immediately after one party hereto has delivered to the other party hereto a written request for such consultation. If within thirty (30) days following the date on which such notice is given the dispute cannot be resolved, the dispute shall be submitted to arbitration upon the request of either party with notice to the other.

(b)  The arbitration shall be conducted in Hong Kong under the auspices of the Hong Kong International Arbitration Centre (the "CENTRE"). There shall be three arbitrators. Each party hereto shall each select one arbitrator within thirty (30) days after giving or receiving the demand for arbitration. Such arbitrators shall be freely selected, and the parties shall not be limited in their selection to any prescribed list. The Chairman of the Centre shall select the third arbitrator, who shall be qualified to practice law in the State of New York. If either party does not appoint an arbitrator who has consented to participate within thirty (30) days after selection of the first arbitrator, the relevant appointment shall be made by the Chairman of the Centre.

(c)  The arbitration proceedings shall be conducted in English. The arbitration tribunal shall apply the arbitration rules of the Centre in effect at the time of the arbitration. However, if such rules are in conflict with the provisions of this

-20-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Section 12.11, including the provisions concerning the appointment of arbitrators, the provisions of this Section 12.11 shall prevail.

(d)    The arbitrators shall decide any dispute submitted by the parties to the arbitration strictly in accordance with the substantive law of the State of New York and shall not apply any other substantive law.

(e)    Each party hereto shall cooperate with the other in making full disclosure of and providing complete access to all information and documents requested by the other in connection with such arbitration proceedings, subject only to any confidentiality obligations binding on such party.

(f)    The award of the arbitration tribunal shall be final and binding upon the disputing parties, and either party may apply to a court of competent jurisdiction for enforcement of such award.

(g)    Either party shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the arbitral tribunal.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK.]

-21-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the
date first written above.

COMPANY:


LDK SOLAR CO., LTD.


By: /s/ Xiaofeng Peng
    -----------------
Name: Peng Xiaofeng
Capacity: Chief Executive Officer


Address:

LDK Solar Co., Ltd.
Room 2303
Harbor Ring Plaza
No. 18 Xizang Middle Road
Shanghai 200001

Attention: Mr. Peng Xiaofeng & Mr. Shao Yonggang
Facsimile: (86-21) 6350-8707

                    -22-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
FOUNDER:


PENG XIAOFENG


By: /s/ Xiaofeng Peng
    -----------------
Name: Peng Xiaofeng


Address:

LDK Solar Co., Ltd.
Room 2303
Harbor Ring Plaza
No. 18 Xizang Middle Road
Shanghai 200001

                     -23-

INVESTOR:


FINANCIERE NATEXIS SINGAPORE 4 PTE, LTD.


By: /s/ Gang Wang
    -------------
Name: Gang Wang (Kevin)
Capacity: Authorized Officer


Registered Address:

Financiere Natexis Singapore 4 Pte, Ltd.
Wong & Leow
27th Floor, Millennia Tower
1 Temasek Avenue
Singapore 03919201


Notice Address:

Natexis Private Equity Asia Limited
Suite 1808, 18/F Westgate Mall Plaza
1038 Nanjing West Road
Shanghai, China 200041

Attention: Gang Wang (Kevin)
Facsimile: (86-21) 6217-3742

                     -24-
```

```
INVESTOR:


DECATUR OVERSEAS CORPORATION


By:  /s/ Gang Wang
    ------------------------------
Name:  Gang Wang (Kevin)
    ------------------------------
Capacity: Authorized Officer


Address:

Natexis Private Equity Asia Limited
Suite 1808, 18/F Westgate Mall Plaza
1038 Nanjing West Road
Shanghai, China 200041

Attention: Gang Wang (Kevin) or Nicolazo De Barmon, Gael
Facsimile: (86-21) 6217-3742
```

-25-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INVESTOR:


BRILLIANT EVER INVESTMENTS LIMITED


By: /s/ Chen Lu
    ------------------------------
Name: Chen Lu
    ------------------------------
Capacity: Authorized Signatory
    ------------------------

Address:

Suite 2302-3, 23/F Great Eagle Centre
23 Harbour Road
Wanchai
Hong Kong

Attention: Ms Clara Chan
Facsimile: (852) 2877-6852

-26-

INVESTOR:


BOUNDLESS FUTURE INVESTMENT LIMITED


By: /s/ Chen Lu
    ------------------------------
Name: Chen Lu
    ------------------------------
Capacity: Authorized Signatory
         ------------------------


Address:

Suite 2302-3, 23/F Great Eagle Centre
23 Harbour Road
Wanchai
Hong Kong

Attention: Ms Clara Chan
Facsimile: (852) 2877-6852

                    -27-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:


SHINE FIELD INVESTMENTS LIMITED


By: /s/ Chen Lu
    -------------------------------
Name: Chen Lu
      ------------------------------
Capacity: Authorized Signatory
          ------------------------


Address:

P.O. Box 957
Offshore Incorporations Centre
Road Town, Tortola, BVI

c/o Petrius Lui or Ignatius Seu
41st Floor Jardine House
1 Connaught Place
Hong Kong

Attention: Petrius Lui or Ignatius Seu
Facsimile: (852) 2111-3299
                  -28-
```

INVESTOR:


CDH SOLARFUTURE LIMITED


By: /s/ Lew Kiang Hua
    -----------------
Name: Lew Kiang Hua
Capacity: Director


Address:

Level 30, Six Battery Road
Singapore 049909

Attention: Mr. Lew Kiang Hua
Facsimile: (65) 6550 9898

-29-

INVESTOR:


CHF WAFER COMPANY LIMITED


By: /s/ Andrew Lo
    ---------------------------------
Name: Andrew Lo
    -------------------------------
Capacity: Authorized Representative
         ----------------------------

Address:

P.O. Box 173, Kingston Chamber
Road Town, Tortola
British Virgin Islands

c/o China Renaissance Capital Investment
Suites 305-307
St George's Building
2 Ice House Street, Central
Hong Kong

Attention: Hung Shih
Facsimile: (852) 2521-8023

-30-

```
INVESTOR:


CHINA ENVIRONMENT FUND 2004, LP.


By: /s/ Hua Cao
    -------------------------------
Name: Hua Cao
    -------------------------------
Capacity: Authorized Signatory
          ------------------------

Address:

P.O. Box 908
George Town, Cayman Islands

c/o Tsinghua Venture Capital Management
A2302, SP Tower, Tsinghua Science Park
Beijing, China 100084

Attention: Dr. Catherine Cao
Facsimile: (86-10) 8215-1150
```

                              -31-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:


CHINA ENVIRONMENT FUND 2002, LP.


By: /s/ Hua Cao
    ------------------------------
Name: Hua Cao
      ------------------------------
Capacity: Authorized Signatory
          ------------------------


Registered address:

P.O. Box 908
George Town, Cayman Islands

Notice address:

c/o Tsinghua Venture Capital Management
A2302, SP Tower, Tsinghua Science Park
Beijing, China 100084

Attention: Dr. Catherine Cao
Facsimile: (86-10) 8215-1150
```
                                   -32-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:


SILVERPOINTE INVESTMENTS LTD


By: /s/ Yang Yang
    -------------------------------
Name: Yang Yang
      -----------------------------
Capacity: Director
          ------------------------


Registered address:

Portcullis TrustNet (BVI) Limited
Portcullis TrustNet Chambers
P.O. Box 3444, Road Town, Tortola, British Virgin Islands

Notice address:
8 Cross Street, #28-01 PWC Building, Singapore 048424

Attention: Chiang Heng Liang
Telephone: (65) 6878-3876
```

                                  -33-

```
INVESTOR:


JAFCO ASIA TECHNOLOGY FUND III


By: /s/ Vincent Chan Chun Hung
    ------------------------------
Name: Vincent Chan Chun Hung
      ------------------------------
Capacity: Attorney
          ------------------------


Address of registered office:

c/o Walkers SPV Limited
P.O. Box 908GT, Mary Street
George Town, Grand Cayman, Cayman Islands

Notice address:

c/o JAFCO Investment (Asia Pacific) Ltd.
6 Battery Road
#42-01 Singapore 049909

Attention: The President
Facsimile: (65) 6221-3690

With a copy to:

JAFCO Investment (Hong Kong) Ltd.
30/F, Two IFC, 8 Finance Street, Central, Hong Kong

Attention: General Manager

Facsimile: (852) 2536-1979
```

-34-

```
INVESTOR:


MUS ROOSEVELT CHINA PACIFIC FUND L.P.


By: /s/ Jun Otsuka
    ---------------
Name: Jun Otsuka
Capacity: Managing Director


Address:

c/o MUS Roosevelt Capital Partners, Ltd.
Offshore Incorporations (Cayman) Limited
Scotia Centre 4/F
P.O. Box 2804
George Town, Grand Cayman, Cayman Islands

With a copy to:

Mitsubishi UFJ Securities (HK) Capital, Limited
11/F, AIG Tower
One Connaught Road
Central, Hong Kong

Attention: Mr. Jun Otsuka (Managing Director)
Facsimile: (852) 2865-6214
```

-35-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:


TECH TEAM HOLDINGS LIMITED


By: /s/ Jiyi Weng
    -------------------------------
Name: Jiyi Weng
      -------------------------------
Capacity: Director
          ------------------------


Address:

2nd Floor, Abbott Building, Road Town, Tortola, British Virgin
Islands

Notice address:

299 Bisheng Road
Suite 13-101
Pudong, Shanghai
China 201204

Attention: Jerry Jiyi WENG
Facsimile: (86-21) 5080-1333
```

                                    -36-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:


GRAND GAINS INTERNATIONAL LIMITED


By: /s/ Jiyi Weng
    ------------------------------
Name: Jiyi Weng
      ------------------------------
Capacity: Authorized Signatory
          ------------------------


Registered address:

Palm Grove House, P.O. Box 438, Road Town, Tortola, British
Virgin Islands

Notice address:

32/F, Tower of China Merchants Bank

No. 7088 Shennan Road
Futian, Shenzhen 518040

Attention: Li Hongwei
Facsimile: (86-755) 8319-5157
```

                              -37-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:


BOFA CAPITAL COMPANY LIMITED


By: /s/ Lingyong Peng
    -----------------------------
Name: Lingyong Peng
      -----------------------------
Capacity: Authorized Signatory
          ------------------------


Registered address:

c/o Maples Finance BVI Limited, P.O. Box 173, Kingston Chambers,
Road Town, Tortola, British Virgin Islands

Notice address:

Room 16D
Building 8
Shijicheng 3 Term
Haidian District
Beijing, P.R.China

Attention: Mr. Peng Lingyong
Facsimile: (86-10) 8889 1502
```

                         -38-

SCHEDULE A

INVESTORS
---------

| NAME OF INVESTORS | TYPE AND NUMBER OF PREFERRED SHARES HELD |
|---|---|
| Brilliant Ever Investments Limited | 2,000,000 Series A-1 Preferred Shares |
| Boundless Future Investment Limited | 1,000,000 Series A-1 Preferred Shares |
| Financiere Natexis Singapore 4 Pte Ltd. | 1,128,571 Series A-2 Preferred Shares |
| | 1,150,000 Series B Preferred Shares |
| | 1,466,666 Series C Preferred Shares |
| Decatur Overseas Corporation | 451,429 Series A-2 Preferred Shares |
| Shine Field Investments Limited | 1,150,000 Series B Preferred Shares |
| | 333,333 Series C Preferred Shares |
| CDH SolarFuture Limited | 2,000,000 Series B Preferred Shares |
| | 1,066,667 Series C Preferred Shares |
| Silverpointe Investments Ltd. | 25,233 Series C Preferred Shares |
| CHF Wafer Company Limited | 1,000,000 Series B Preferred Shares |
| China Environment Fund 2004, LP. | 833,333 Series B Preferred Shares |
| China Environment Fund 2002, LP. | 66,667 Series C Preferred Shares |
| JAFCO Asia Technology Fund III | 833,333 Series B Preferred Shares |
| MUS Roosevelt China Pacific Fund L.P. | 500,000 Series B Preferred Shares |
| | 20,049 Series C Preferred Shares |
| Tech Team Holdings Limited | 250,000 Series B Preferred Shares |
| | 20,048 Series C Preferred Shares |
| Grand Gains International Limited | 250,000 Series B Preferred Shares |
| BOFA Capital Company Limited | 33,334 Series B Preferred Shares |
| | 1,337 Series C Preferred Shares |

-39-

SCHEDULE B

KEY PERSONS
-----------

| | |
|---|---|
| Peng Xiaofeng | Fu Xiangqun |
| Zhu Liangbao | Huang Qiumao |
| Shao Yonggang | Fu Delin |
| Jack Lai | Huang Weixing |
| Nicola Sarno | Lu Xiaodong |
| Yao Qiqiang | Song Yong |
| Kuo Lung Lin | Lin Qinyun |
| Alberto Di Gaetano | Renato Alberto Cabrini |
| Rosseio Pleiro | Xing Guo Ping |
| Cui Rong Qiang | Peng Zhijian |
| Martin Huang | Chen Jianwen |

-40-

</TEXT>
</DOCUMENT>

Exhibit 4.5

SHARE PURCHASE AGREEMENT

THIS SHARE PURCHASE AGREEMENT (this "AGREEMENT") is made as of this July 28, 2006, by and among LDK Solar Co., Ltd., a company organized and existing under the laws of the Cayman Islands (the "COMPANY"), Jiangxi LDK Solar Hi-Tech Co., Ltd. (Chinese Characters LDK Chinese Characters), a company organized and existing under the laws of the PRC (the "PRC SUBSIDIARY"), each of the investors set forth in Schedule A attached hereto (each an "INVESTOR" and collectively, the "INVESTORS") and Mr. Peng Xiaofeng (the "FOUNDER").

WITNESSETH

THE PARTIES HEREBY AGREE AS FOLLOWS:

1.   DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings ascribed to them in the Schedule of Definitions.

2.   PURCHASE AND SALE OF SECURITIES

2.1  Sale and Issuance of Series A-1 and Series A-2 Preferred Shares and Warrants

(i)   The Company shall adopt on or before the Closing the Memorandum and Articles in substantially the form attached hereto as Exhibit A and file such Memorandum and Articles with the Registrar of Companies of the Cayman Islands within fifteen (15) days of such adoption.

(ii)  On or prior to the Closing, the Company shall have authorized (i) the sale and issuance to the Investors of the Preferred Shares; (ii) the issuance of the Conversion Shares upon conversion of the Preferred Shares pursuant to the Memorandum and Articles; and (iii) the sale and issuance of the Warrants. The Preferred Shares shall have the rights, preferences, privileges and restrictions set forth in the Memorandum and Articles.

(iii) Subject to the terms and conditions of this Agreement, each Investor agrees, severally and not jointly, to purchase at the Closing and the Company agrees to sell and issue to each Investor at the Closing (a) that number of the Preferred Shares set forth opposite such Investor's name on Schedule A attached hereto for the purchase price set forth thereon, including the mandatory conversion of the Exchangeable Notes in accordance with the terms and conditions therein (the "SUBSCRIPTION PRICE"); and (b) the Warrants, the terms and conditions of which are set forth in the Warrant Purchase Agreement substantially in the form attached hereto as Exhibit B. It is understood that the aggregate number of Preferred Shares to be issued by the Company at the Closing shall be 4,580,000 shares, representing a 5.7552% ownership in the Company immediately after the Closing (the "INITIAL OWNERSHIP"). For the avoidance of doubt, the calculation of the Initial Ownership hereunder and any adjustment to such ownership under Section 2.4 shall be based on the total issued and outstanding 75,000,000 Ordinary Shares plus the total issued and outstanding 4,580,000 Preferred Shares, without consideration of any shares issued pursuant to the Company Option Plan and any issuance by the Company under the Follow-on Financing.

2.2  Closing

Subject to the satisfaction or waiver of the conditions to closing set
forth in Section 5 and Section 6 of this Agreement, the purchase and sale
of the Preferred Shares set forth on Schedule A shall take place at the
offices of Clifford Chance LLP, 40th Floor, the Bund Center, No. 222 Yan An
Road East, Shanghai 200002, PRC, at 10:00 a.m., on or prior to the fifth
(5th) Business Day following satisfaction or waiver of all the closing
conditions set forth in Section 5 and Section 6 of this Agreement, or at
such other time and place as the Company and the Investors may mutually
agree upon orally or in writing (which time and place are designated herein
as the "CLOSING").

2.3  Closing Delivery

At the Closing, the Company shall deliver to each Investor: (i) a
certificate or certificates in form reasonably satisfactory to such
Investor evidencing the Preferred Shares purchased or mandatorily converted
(in case of the Exchangeable Notes) by such Investor, registered in such
Investor's or its nominee's name as evidenced by delivery of a certified
copy of the Company's Register of Members, reflecting such Investor's
ownership of the Preferred Shares purchased or mandatorily converted (in
case of the Exchangeable Notes) hereunder, against delivery to the Company
of the Subscription Price, by a wire transfer of United States Dollars in
immediately available funds, by mandatory conversion of the Exchangeable
Notes in accordance with the terms and conditions therein, or by other
payment methods mutually agreed to by Company and the Investors; and (ii)
the Warrant against payment of US$1.00 to the Company.

2.4  Ownership Adjustments

(i)  Following the issue by the Auditor of the 2006 Audited Income
     Statement:

     (a)  If the 2006 Net Earnings are equal to or more than Guaranteed
          2006 Net Earnings, the final ownership of the Investors in the
          Company after adjustment (the "FINAL OWNERSHIP") shall remain
          unchanged as the Initial Ownership of the Investors in the
          Company.

     (b)  If the 2006 Net Earnings are less than Guaranteed 2006 Net
          Earnings, the Final Ownership of the Investors in the Company
          shall be adjusted in accordance with the following formula
          promptly following the issue of the 2006 Audited Income
          Statement:

          $$FO1 = IO \times \frac{GE06}{AE06}$$

          For purpose of the foregoing formula, the following definitions
          shall apply: (1) FO1 shall mean the Final Ownership after
          adjustment in accordance with this Section 2.4(i)(b); (2) IO
          shall mean the Initial Ownership of the Investors in the Company;
          provided that if the Warrants have been exercised prior to the
          adjustment under this Section 2.4, IO shall mean the product of
          the total number of Preferred Shares held by the Investors
          (including the Preferred Shares issued under the Warrants)
          divided by the sum of the total number of Preferred Shares held
          by the Investors (including the Preferred Shares issued under the
          Warrants) and 75,000,000 Ordinary Shares; (3) GE06 shall mean the
          Guaranteed 2006 Net

-2-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Earnings of the Company Group, being an amount that is US$30,000,000; and (4) AE06 shall mean the actual 2006 Net Earnings.

(c) The adjustment of the Final Ownership as contemplated in Section 2.4(i)(b) above shall be effected by adjusting the Conversion Rate of the Preferred Shares in accordance with the following formula within twenty (20) Business Days following the issue of the 2006 Audited Income Statement:

$$CR1 = \frac{FO1 \times NO}{NS \times (1 - FO1)}$$

For purpose of the above formula, the following definitions shall apply: (1) CR1 shall mean the effective Conversion Rate of the Preferred Shares at which the Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4(i); (2) FO1 shall mean the Final Ownership as adjusted according to Section 2.4(i)(b); (3) NO shall mean the total number of Ordinary Shares outstanding at the time of the adjustment under this Section 2.4(i); and (4) NS shall mean the total number of Preferred Shares outstanding immediately prior to the adjustment under this Section 2.4(i).

(d) For the avoidance of doubt, after the adjustment under Section this 2.4(i), the aggregate number of Ordinary Shares convertible from the total number of the Preferred Shares held by the Investors will equal to:

NS x CR1

For purpose of the above formula, the following definitions shall apply: (1) NS shall mean the total number of Preferred Shares outstanding immediately prior to the adjustment under this Section 2.4(i); and (2) CR1 shall mean the effective Conversion Rate of the Preferred Shares as adjusted according to Section 2.4(i)(c).

Notwithstanding the above, the parties hereto may agree from time to time, based on legal advice mutually acceptable to the Company and the Investors, on any other method to effect the adjustment to the Final Ownership of the Investors to be equal to the amount derived from the formula set forth in Section 2.4(i)(b) hereof.

(ii) Following the issue by the Auditor of the 2007 Audited Income Statement:

(a) If the 2007 Net Earnings are equal to or more than Guaranteed 2007 Net Earnings, the Final Ownership of the Investors in the Company after adjustment shall remain unchanged as the ownership of the Investors adjusted, if any, in accordance with Section 2.4(i) above.

(b) If the 2007 Net Earnings are less than Guaranteed 2007 Net Earnings, the Final Ownership of the Investors in the Company shall be adjusted in accordance with the following formula promptly following the issue of the 2007 Audited Income Statement:

$$FO2 = FO1 \times \frac{GE06}{AE06}$$

-3-

For purpose of the foregoing formula, the following definitions shall apply: (1) FO2 shall mean the Final Ownership after adjustment in accordance with this Section 2.4(ii)(b); (2) FO1 shall mean the Final Ownership of the Investors in the Company as adjusted under Section 2.4 (i)(b); (3) GE07 shall mean the Guaranteed 2007 Net Earnings of the Company Group, being an amount that is US$100,000,000; and (4) AE07 shall mean the actual 2007 Net Earnings.

(c)   The adjustment of the Final Ownership as contemplated in Section 2.4(ii)(b) above shall be effected by adjusting the Conversion Rate of the Preferred Shares in accordance with the following formula within twenty (20) Business Days following the issue of the 2007 Audited Income Statement:

$$CR2 = \frac{FO2 \times NO}{NS \times (1 - FO2)}$$

For purpose of the above formula, the following definitions shall apply: (1) CR2 shall mean the effective Conversion Rate of the Preferred Shares at which the Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4(ii); (2) FO2 shall mean the Final Ownership as adjusted in accordance with Section 2.4 (ii)(b); (3) NO shall mean the total number of Ordinary Shares outstanding at the time of the adjustment under this Section 2.4(ii); and (4) NS shall mean the total number of the Preferred Shares outstanding immediately prior to the adjustment under this Section 2.4(ii).

(d)   For the avoidance of doubt, after the adjustment under this Section 2.4(ii), the aggregate number of Ordinary Shares convertible from the total number of Preferred Shares held by the Investors will equal to:

$$NS \times CR2$$

For purpose of the above formula, the following definitions shall apply: (1) NS shall mean the total number of Preferred Shares outstanding immediately prior to the adjustment under Section 2.4(ii); and (2) CR2 shall mean the effective Conversion Rate of the Preferred Shares as adjusted according to Section 2.4(ii)(c).

Notwithstanding the above, the parties hereto may agree from time to time, based on legal advice mutually acceptable to the Company and the Investors, on any other method to effect the adjustment to the Final Ownership of the Investors to be equal to the amount derived from the formula set forth in Section 2.4(ii)(b) hereof.

(iii) Notwithstanding anything to the contrary, the Investors agree not to make any adjustment to the ownership (a) with respect to the 2006 Audited Income Statement under Section 2.4(i), if the 2006 Net Earnings is no less than US$28,500,000; and (b) with respect to the 2007 Audited Income Statement under Section 2.4(ii), if the 2007 Net Earnings is no less than US$95,000,000.

(iv) For the avoidance of doubt, the Investors' Final Ownership after any adjustment made under this Section 2.4 shall not be lower than their ownership before such adjustment,

-4-

and no adjustment to the Investors' ownership will be made according to Section 2.4(ii)(b) hereof if a Qualified IPO consummates in 2007.

3.   REPRESENTATIONS AND WARRANTIES OF THE COMPANY, THE PRC SUBSIDIARY AND THE FOUNDER

The Company, the PRC Subsidiary and the Founder jointly and severally represent and warrant to the Investors as of the date of this Agreement and as of the Closing that, other than as set forth in the Disclosure Schedule (the "DISCLOSURE SCHEDULE") with specific reference to the Section to which exception is being taken:

3.1  Organization, Good Standing and Qualification

    (i)   Each member of the Company Group is duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its incorporation. Each member of the Company Group has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted and is duly qualified to transact business and is in good standing in each jurisdiction in which it operates business and the failure to so qualify would have a Material Adverse Effect.

    (ii)  The Company is an exempted company duly organized, validly existing and in good standing under the laws of Cayman Islands, and has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted and is duly qualified to transact business and is in good standing in each jurisdiction in which it operates business and the failure to so qualify would have a Material Adverse Effect. The Company is a holding company and since its formation has not engaged in any business operation, been a party to any agreement, contract or commitment, or incurred any liability or obligation other than in the course of forming and holding its equity interest in the PRC Subsidiary and those relating solely to the transactions contemplated under this Agreement, the Ancillary Agreements and the Exchangeable Notes.

    (iii) The PRC Subsidiary is a wholly foreign-owned enterprise, duly organized and validly existing under the laws of the PRC. The formation of the PRC Subsidiary was duly approved by MOFCOM or its authorized local counterpart. The PRC Subsidiary has the corporate power and authority to own and operate its properties and to carry on its business as specified in the scope of business in the business license issued to the PRC Subsidiary.

3.2  Capitalization and Voting Rights

    (i)   The authorized capital is and as of the Closing will be US$14,000,000. The authorized capital of the Company consists, or will consist immediately prior to the Closing, of:

        (a)  Ordinary Shares. (i) 135,000,000 ordinary shares, par value US$0.10 per share (the "ORDINARY SHARES"), of which 75,000,000 shares are issued and outstanding, and 52,042,000 of which are reserved for issuance upon conversion of the Preferred Shares to be issued pursuant to this Agreement and issuable upon the exercise of the Warrants.

-5-

     (b)   Preferred Shares. 5,000,000 preferred shares, (1) 3,275,109 of which have been designated Series A-1 Preferred Shares, par value US$0.10 per share (the "SERIES A-1 PREFERRED SHARES"), none of which is issued and outstanding; and (2) 1,724,891 of which have been designated Series A-2 Preferred Shares, par value US$0.10 per share (the "SERIES A-2 PREFERRED SHARES" and together with Series A-1 Preferred Shares, the "PREFERRED SHARES"), none of which is issued and outstanding.

(ii)  The registered capital of the PRC Subsidiary is US$29,000,000 as of the Closing, all of which is owned by the Company and has been fully paid for.

(iii) On the date hereof and at the Closing, the issued and outstanding share capital of the Company is and will be as set forth in Section 3.2(iii) of the Disclosure Schedule, which lists all shareholders owning issued and outstanding shares of the Company, together with the number held by each.

(iv) Section 3.2(iv) of the Disclosure Schedule shows an accurate and true list of all outstanding securities of the Company and the PRC Subsidiary and their respective holders to be in effect immediately following the Closing.

(v)  As of the date hereof and the Closing, except as provided in this Agreement, the Ancillary Agreements, the Company Option Plan, the Warrant Purchase Agreement, the Exchangeable Notes, and the rights and privileges of the Preferred Shares under the Memorandum and Articles, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal), proxy or shareholders agreements or agreements of any kind for the purchase or acquisition from the Company or the PRC Subsidiary of any of their securities.

(vi) Except as may be provided by the terms of the Preferred Shares or as otherwise set forth in Section 3.2(vi) of the Disclosure Schedule, neither the Company nor the PRC Subsidiary is subject to any obligation (contingent or otherwise) to purchase or otherwise acquire or retire any equity interest held by its shareholders or to purchase or otherwise acquire or retire any of its other outstanding securities.

3.3  Group Structure

(i)  Section 3.3(i) of the Disclosure Schedule lists each Group Company, and correctly sets forth the capitalization of such Group Company, the Company's ownership interest therein, the interest of any other Person therein, the nature of legal entity which the Group Company constitutes, the jurisdiction in which the Group Company was organized, each jurisdiction in which the Group Company is required to be qualified or licensed to do business as a foreign Person and a brief summary of the Group Company's business.

(ii) Except in respect of any interest held in any Group Company, none of the Company or the Group Companies has any Subsidiaries or owns or controls, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, association or other

-6-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

entity. Except as set forth in Section 3.3(ii) of the Disclosure Schedule, none of the Company or the Group Companies maintains any offices or any branches.

(iii) In respect of any ownership interest held in a Group Company by the Company or another Group Company, as described in Section 3.3(i) of the Disclosure Schedule, (a) the Company or such Group Company holds good and valid title to such ownership interest free and clear of all restrictions on transfer or other encumbrances, other than those restrictions on transfer or other encumbrances created by the Ancillary Agreements or the constitutional documents, (b) such ownership interest was acquired in compliance with all Applicable Laws, including those promulgated by SAFE and those regulating the offer, sale or issuance of securities generally, and (c) there are no outstanding options or rights for the purchase or acquisition from the Company or such Group Company of such ownership interest. There are no outstanding options, warrants, rights (including registration, conversion or preemptive rights and rights of first refusal), proxy or shareholders agreements or agreements of any kind for the purchase or acquisition from any Group Company of any of its equity. None of the Group Companies is subject to any obligation (contingent or otherwise) to purchase or otherwise acquire or retire any interest held by its equity holders or to purchase or otherwise acquire or retire any of its securities.

(iv) In respect of the PRC Subsidiary, as of the Closing, the full amount of the registered capital thereof has been contributed, such contribution has been duly verified by a certified accountant registered in the PRC and the accounting firm employing such accountant, and the report of the certified accountant evidencing such verification has been registered with the SAIC or its authorized local counterpart.

3.4  Authorization

Each of the Company, the PRC Subsidiary and the Founder has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party and to carry out and perform its obligations thereunder. All corporate action on the part of each of the Company, the PRC Subsidiary and their respective officers, directors and shareholders necessary for the authorization, execution and delivery of this Agreement and each of the Ancillary Agreements to which it is a party, the performance of all obligations of each of the Company and the PRC Subsidiary thereunder, and the authorization, issuance (or reservation for issuance), sale and delivery by the Company of the Preferred Shares and the Warrants being sold hereunder and the Ordinary Shares issuable upon conversion of such Preferred Shares, has been taken or will be taken prior to the Closing. This Agreement and each of the Ancillary Agreements to which each of the Company, the PRC Subsidiary or the Founder is a party have been duly executed and delivered by each of the Company, the PRC Subsidiary and the Founder, and constitute valid and legally binding obligations thereof, enforceable thereagainst in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies. Neither the issue of any Preferred Shares or the Warrants, nor the issue of any Conversion Shares is subject to any preemptive rights or rights of first refusal.

-7-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

3.5  Valid Issuance of Preferred Shares and the Warrants

   (i)  The Series A-1 and A-2 Preferred Shares and the Warrants that are
        being purchased by or issued to the Investors hereunder, when issued,
        sold and delivered in accordance with the terms of this Agreement
        against payment of the Subscription Price, including the irrevocable
        mandatory conversion of the Exchangeable Notes, will be duly and
        validly issued, fully paid, and non-assessable, and will be free of
        restrictions on transfer other than such restrictions on transfer as
        may be imposed by this Agreement, the Ancillary Agreements or the
        Memorandum and Articles. The Ordinary Shares issuable upon conversion
        of the Preferred Shares purchased under this Agreement or issuable
        upon the exercise of the Warrants have been duly and validly reserved
        for issuance and, upon issuance in accordance with the terms of the
        Memorandum and Articles, will be duly and validly issued, fully paid,
        and non-assessable and will be free of restrictions on transfer other
        than such restrictions on transfer as may be imposed by this
        Agreement, the Ancillary Agreements or the Memorandum and Articles.

   (ii) All presently outstanding shares of the Company are duly and validly
        issued, fully paid and non-assessable, and in each case such shares
        have been issued in full compliance with the requirements of all
        applicable securities laws and regulations, including to the extent
        applicable, the Securities Act and all other antifraud and other
        provisions of applicable securities laws and regulations.

3.6  Licenses

   (i)  Section 3.6 of the Disclosure Schedule contains a true and complete
        list of all Licenses used in and material to the business or
        operations of the Group Companies, setting forth the owner, the
        function and the expiration and renewal date of each. Prior to the
        execution of this Agreement, the Company has delivered to the
        Investors true and complete copies of all such Licenses.

        (a)  Each Group Company owns or validly holds all Licenses that are
             necessary to conduct its business and own and operate its assets
             and properties as presently conducted and operated, and can
             obtain, without undue burden or expense, all Licenses for the
             conduct of its businesses as currently conducted and as proposed
             to be conducted;

        (b)  Each License listed in Section 3.6 of the Disclosure Schedule is
             valid, binding and in full force and effect; and

        (c)  No Group Company is or has at any time been, or has received any
             notice that it is or has at any time been, in default (or with
             the giving of notice or lapse of time or both, would be in
             default) under any such License.

   (ii) Without limiting the generality of paragraph (i) above, all Licenses
        required under PRC laws for the due and proper establishment and
        operation of the PRC Subsidiary and the consummation of the
        transactions contemplated hereby have been duly obtained from the
        relevant Governmental Authority and are in full force and effect; all
        filings and registrations with the relevant PRC Governmental Authority
        required in respect of the

-8-

PRC Subsidiary and its operations, including but not limited to registration with MOFCOM, SAIC, and SAFE have been duly and timely completed in accordance with the relevant PRC laws; the consummation of the transactions contemplated under this Agreement and each of the Ancillary Agreements will not result in a termination or revocation of any of the Material Licenses; each Group Company is in compliance with applicable requirements of the relevant tax bureau, customs authorities and product registration authorities to which it and its business are subject.

3.7  Consents

No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority or other third party on the part of any of the Company, the PRC Subsidiary or the Founder will be required in connection with the execution, delivery and performance of this Agreement and each of the Ancillary Agreements and the consummation of the transactions contemplated thereby which has not already been secured or effected or will be secured or effected prior to the Closing.

3.8  Offering

The Ordinary Shares, the Preferred Shares, the Warrants and the Conversion Shares have not been, and will not be, registered under the Securities Act and are made subject of sale and purchase under this Agreement, to the extent they are so made herein, pursuant to an exemption from registration requirements of the Securities Act. Subject in part to the truth and accuracy of each Investor's representations set forth in Section 4 of this Agreement, the offer, sale and issuance of the Preferred Shares, the Warrants and the Conversion Shares (when issued), as contemplated by this Agreement, is exempt from the registration and prospectus delivery requirements of the Securities Act and any applicable securities laws, and neither the Company nor any authorized agent acting on its behalf has taken or will take any action that would cause the loss of such exemption.

3.9  Business Plan and Budget

The business plan and budget dated April 2006, as amended (the "2006 BUSINESS PLAN AND BUDGET") was previously delivered to the Investors by the Company and is attached as Exhibit C hereto. The 2006 Business Plan and Budget, including an annual profit and loss projection of the PRC Subsidiary for the fiscal years ending December 31, 2006 and 2007, does not contain any untrue statement of a material fact, nor does it omit to state a material fact necessary to make the statements therein not misleading, except that with respect to assumptions, projections and expressions of opinion or predictions contained in the 2006 Business Plan and Budget, the Company represents only it believes there is a reasonable basis therefor.

3.10 Books and Records; Minutes

All accounts, ledgers, material files, documents, instruments, papers, books and records relating to the business, operations, conditions (financial or other) of each member of the Company Group, results of operations, and assets and properties of each member of the Company Group (collectively, the "BOOKS AND RECORDS"), each as supplied to the Investors, are true, correct, complete and current in all material respects, there are no material inaccuracies or discrepancies of

-9-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

any kind contained or reflected therein, and they have been maintained in accordance with relevant legal requirements and industry standards, as applicable, including the maintenance of an adequate system of internal controls. The minute books of each member of the Company Group, as made available to Investors and their representatives, contain complete and accurate records of all meetings of and corporate actions or written consents by the shareholders and the board of such member of the Company Group and, to the extent that such minute books are deficient, all material information not contained in such minutes has been conveyed to the Investors in other written form.

3.11 Tax Matters

All Tax Returns required to be filed in respect of each member of the Company Group have been duly and timely filed, have been prepared in compliance with Applicable Law, and are true, correct and complete. All Taxes due and payable by each member of the Company Group, whether or not shown as due on such Tax Returns, have been fully paid when due. Each member of the Company Group has established adequate reserves on their respective books of account for all Taxes and for the liability for deferred income Taxes payable in respect of such member of the Company Group. There have been no extraordinary examinations or audits of any tax returns or reports by any applicable governmental agency.

3.12 Review Report

(i)   The Company has delivered to the Investors and attached as Section 3.12(i) of the Disclosure Schedule the review report (the "REVIEW REPORT") for the period from July 5, 2005 to May 31, 2006 (the "REPORT DATE") and the financial forecast for the seven months ending December 31, 2006 of the Company. The Review Report and financial forecast are complete and correct in all material respects and present fairly the financial condition and position of the Company Group as of the Report Date, and are reviewed and signed off by KPMG in accordance with the IFRS.

(ii)  There are no debts, liabilities, or claims owed by or against any member of the Company Group, of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due, other than liabilities set forth in the Review Report or disclosed in Section 3.12(ii) of the Disclosure Schedule. None of the members of the Company Group is a guarantor or indemnitor of, or has provided security for, any indebtedness of any Person.

(iii) Except as otherwise disclosed in Section 3.12(iii) of the Disclosure Schedule, all of the accounts receivable and notes receivable owing to each member of the Company Group, including without limitation all accounts receivable and notes receivable set forth on the Review Report, constitute valid and enforceable claims other than accounts receivable and notes receivable which individually and in the aggregate would not result in a Material Adverse Event if unpaid, and are good and collectible in the ordinary course of business in all material respects, net of any reserves shown on the Review Report (which reserves are adequate and were calculated on a basis consistent with IFRS), and no further goods or services are required to be provided in order to complete the sales and to entitle such Person to collect in full. There are no material contingent or asserted claims,

-10-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

refusals to pay, or other rights of set-off with respect to any member of the Company Group.

3.13 Absence of Changes

Since the Report Date, except as otherwise disclosed in Section 3.13 of the Disclosure Schedule:

(i)    None of the members of the Company Group has entered into any transaction that was not in the ordinary course of business.

(ii)   There has been no Material Adverse Event (individually or when separate events are taken together) with respect to any member of the Company Group or the Company Group taken as a whole.

(iii)  None of the members of the Company Group has incurred any obligation or liability except obligations or liabilities incurred in the ordinary course of business.

(iv)   There has been no resignation or termination of employment of any Senior Manager of any member of the Company Group, and the Company has no Knowledge of any impending resignation or termination of employment of any Senior Manager of any member of the Company Group.

(v)    There has been no labor dispute involving any member of the Company Group or any of its respective employees and none is pending or threatened.

(vi)   There has been no material change in any compensation arrangement or agreement with any employee of any member of the Company Group.

(vii)  There have been no loans or guarantees made by any member of the Company Group to or for the benefit of any Person, other than travel advances and other advances made to employees in the ordinary course of business.

(viii) There has been no waiver by any member of the Company Group of a material right or debt owing to such member.

(ix)   No member of the Company Group has purchased, acquired, sold, leased, granted a security interest in, pledged, mortgaged, created a lien in, or otherwise transferred a material portion of any material asset, whether tangible or intangible, other than the sale of inventory in the ordinary course of business and other than the creation of liens for taxes not yet due or payable.

(x)    There has been no material change to, or termination of, any Material Contracts, no member of the Company Group has entered into any new Material Contracts other than those listed in Section 3.15 of the Disclosure Schedule, and there has been no change to the charter document of any member of the Company Group.

(xi)   There has been no declaration, setting aside or payment or other distribution in respect of any of the share capital of any member of the Company Group, or any direct or indirect redemption, purchase or other acquisition of any such share capital by any member of the Company Group.

-11-

(xii) None of the members of the Company Group has incurred any
indebtedness for money borrowed.

(xiii) There has been no damage to, destruction or loss of physical
property (whether or not covered by insurance) materially affecting
the business or operations of any member of the Company Group.

(xiv) There has been no agreement or commitment by any member of the
Company Group to do any of the things described in this Section 3.13.

3.14 Litigation

Except as set forth in Section 3.14 of the Disclosure Schedule, there are
no legal actions, suits, proceedings or claims pending in any jurisdiction
in which the members of the Company Group operate, are organized or
licensed to do business, or, to the Knowledge of the Company, threatened
(whether or not the defense thereof or liabilities in respect thereof are
covered by insurance), at law, in equity, in arbitration or before any
governmental entity or authority against or affecting the Business or
Condition of the Company Group or the Founder, or any of their respective
assets or properties, nor does the Company have Knowledge of any facts
which are likely to give rise to the same.

No injunction, writ, temporary restraining order, decree or any order of
any nature has been issued by any court or other Governmental Authority
purporting to enjoin or restrain the execution, delivery or performance of
this Agreement or the other Ancillary Documents. No member of the Company
Group has commenced or currently intends to initiate any legal action,
suit, proceeding or claim.

3.15 Material Contracts

Section 3.15 of the Disclosure Schedule lists each outstanding Contract to
which any member of the Company Group is a party or to which any member of
the Company Group or any of their respective properties is subject or by
which any thereof is bound that is deemed a Material Contract under this
Agreement.

(i) True and complete copies of the Material Contracts, including any
amendments and supplements to such Contracts, have been delivered to
the Investors.

(ii) Unless otherwise noted on Section 3.15(ii) of the Disclosure Schedule,
each of the Material Contracts was entered into in the ordinary course
of business.

(iii) Each Material Contract is valid and subsisting, enforceable by the
parties thereto in accordance with its terms, except (a) as limited by
applicable bankruptcy, insolvency, reorganization, moratorium and
other laws of general application affecting enforcement of creditors'
rights generally, and (b) as limited by laws relating to the
availability of specific performance, injunctive relief or other
remedies in the nature of equitable remedies. Each member of the
Company Group has duly performed all its obligations under each
Material Contract to the extent that such obligations to perform have
accrued. No breach or default, alleged breach or default, or event
which would (with the passage of time, notice or both) constitute a
breach or default under any of the Material Contracts

-12-

by any member of the Company Group, as the case may be, or any other party or obligor with respect thereto, has occurred, or as a result of this Agreement or any Ancillary Agreement, or the performance hereof or thereof, will occur.

(iv) Consummation of the transactions contemplated by this Agreement and the Ancillary Agreements will not (and will not give any Person a right to) terminate or modify any rights of, or accelerate or augment any obligation of any member of the Company Group under any Material Contract.

(v) Notwithstanding anything to the contrary provided herein, each of the following Contracts is deemed to be a Material Contract and has been identified in Section 3.15 of the Disclosure Schedule:

   (a) any Contract that, after the Report Date, obligates any member of the Company Group to pay an amount in excess of US$1,000,000;

   (b) any Contract of the Company or any Group Company that has an unexpired term of more than one (1) year valued in excess of US$1,000,000;

   (c) any Contract on which the business of any member of the Company Group is substantially dependent or which is otherwise material to the Business or Conditions of any member of the Company Group;

   (d) any loan agreement, indenture, letter of credit, security agreement, mortgage pledge agreement, deed of trust, bond, note, or other agreement relating to the borrowing of money or to the mortgaging, pledging, transferring of a security interest, or otherwise placing an encumbrance on any material asset or material part of the assets of any member of the Company Group, in an amount in excess of US$1,000,000;

   (e) any Contract involving a guarantee by the Company or any Group Company of performance by any Person or involving any agreement of the Company or any Group Company to indemnify or act as surety for any Person, or any other Contract of the Company or any Group Company to be contingently or secondarily liable for the obligations of any Person;

   (f) any Contract that limits or restricts the ability of any member of the Company Group to compete or otherwise to conduct its business in any manner or place;

   (g) any joint venture, partnership, alliance or similar Contracts of the Company or any Group Company involving a sharing of profits or expenses (including joint development and joint marketing contracts);

   (h) any asset purchase agreement, share purchase agreement or other Contract for acquisition by the Company or any Group Company of assets or shares of another Person;

-13-

(i)   any agreement for the divestiture of (1) any assets by or of any member of the Company Group for consideration in excess of US$1,000,000 or (2) any shares of capital stock of any member of the Company Group;

(j)   any sales agency, marketing or distributorship Contract the termination or non-extension of which would result in a Material Adverse Event;

(k)   any Contract requiring performance on the part of the Company or any Group Company in any country other than the PRC;

(l)   any Contract of the Company or any Group Company that grants a power of attorney, agency or similar authority to another Person or entity, agency or similar authority to another Person or entity;

(m)   any Contract that contains a right of first refusal in respect of the share capital of any member of the Company Group;

(n)   all supply agreements with vendors for materials, parts and other inputs for the Company's products and supply agreements with a value in excess of US$1,000,000;

(o)   all contracts with customers of the Company with a value (or expected value) in excess of US$1,000,000; and

(p)   any other Contract that was not made in the ordinary course of business of the Company or any Group Company.

3.16 Compliance with Laws

(i)   Each member of the Company Group is, and at all times has been, in full compliance with all Applicable Laws in any jurisdiction in which it operates, owns assets or is organized or licensed to do business.

(ii)  No event has occurred and no circumstance exists that (with or without notice or lapse of time) (a) may constitute or result in a violation by any member of the Company Group of, or a failure on the part of any member of the Company Group to comply with, any Applicable Law, or (b) may give rise to any obligation on the part of any member of the Company Group to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

(iii) None of the members of the Company Group has received any notice or other communication (whether oral or written) from any governmental or regulatory body regarding (a) any actual, alleged, possible, or potential violation of, or failure to comply with, any Applicable Law, including without limitation any applicable Environmental Laws and Applicable Law relating to customs, transfer pricing, foreign exchange and related import and export regulations or (b) any actual, alleged, possible, or potential obligation on the part of any member of the Company Group to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

-14-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(iv)  None of the members of the Company Group or the Founder, director, agent, employee or any other person acting for or on behalf of such member of the Company Group, has directly or indirectly (a) made any contribution, gift, bribe, payoff, influence payment, kickback, or any other improper payment in any form, whether in money, property, or services to any person, including but not limited to any officer of any Governmental Authority (w) to obtain favorable treatment in securing business for such member or any other member of the Company Group, (x) to pay for favorable treatment for business secured, (y) to obtain special concessions or for special concessions already obtained, for or in respect of such member or any other member of the Company Group, or (z) in violation of any Applicable Law, or (b) established or maintained any fund or assets in which such member of the Company Group has proprietary rights that have not been recorded in the Books and Records of such member of the Company Group, except, in each case, for such payments which facilitate or expedite the performance of routine government action and which was lawful under the laws of the jurisdiction of such payments.

3.17  Real Property

(i)  None of the members of the Company Group owns or has legal or equitable title or other right or interest in any real property other than the land use rights (the "LAND USE RIGHTS") held by the Company Group as set forth in Section 3.17(i) of the Disclosure Schedule or as held pursuant to Lease (as defined below). True and complete copies of the certificates evidencing the Land Use Rights have been delivered to each of the Investors or their agents or professional advisers. Any land grant premium required under Applicable Law in connection with securing such Land Use Rights has been fully paid. The use of any real property by each of the members of the Company Group has conformed to the intended use of such real property as granted under the applicable Land Use Rights. The particulars of the Land Use Rights as set out in Section 3.17(i) of the Disclosure Schedule are true and complete.

(ii)  Section 3.17(ii) of the Disclosure Schedule sets forth each leasehold interest with the annual lease payment in excess of US$50,000 pursuant to which any member of the Company Group holds any rights, titles or interests of a tenant (each a "LEASE"), indicating the parties to such Lease, the address of the property demised under the Lease, the rent payable under the Lease and the term of the Lease. Each Lease constitutes the entire agreement to which any member of the Company Group is party with respect to the property demised thereunder, and a true and complete copy of each such Lease has been delivered to the Investors, together with all amendments, modifications, alterations and other changes thereto. Each Lease is valid and subsisting, enforceable against the parties thereto in accordance with its terms. As of the date hereof, all conditions precedent to the enforceability of each Lease have been satisfied and there exists no breach or default, nor state of facts which, with the passage of time, notice, or both, would result in a breach or default on the part of any party to the Lease. Each member of the Company Group has accepted possession of the property demised pursuant to each Lease and is in actual possession thereof and has not sublet, assigned or hypothecated its leasehold interest except as set forth on Section 3.17(ii) of the Disclosure Schedule. The

-15-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

particulars of the Leases as set out in Section 3.17(ii) of the Disclosure Schedule are true and complete.

(iii) Except as set forth in Section 3.17(iii) of the Disclosure Schedule, each member of the Company Group has obtained property ownership certification for the plants, buildings and improvements located on land with respect to which it holds Land Use Rights (collectively, the "IMPROVEMENTS"). The Improvements and the operation thereof are part of a construction project plan approved by the applicable construction commission for the jurisdiction where the Improvements are located and do not (A) contravene any Applicable Law relating to zoning or building or (B) violate any restrictive covenant or any provision, in the case of either (i) or (ii), the effect of which could interfere with or prevent the continued use of such Improvements for the purpose for which they are now being used. All of the Improvements are in good operating condition and in a state of reasonable maintenance and repair (except for ordinary wear and tear) and are adequate for the conduct of the business of each member of the Company Group as currently conducted.

(iv) Each of the Land Use Rights and the Improvements is free and clear of any and all encumbrances except for those identified in Section 3.17(iv) of the Disclosure Schedule. A true and complete copy of each of the agreements relating to the encumbrances identified in Section 3.17(iv) of the Disclosure Schedule (the "MORTGAGES") has been delivered to each of the Investors.

(v) Except as set forth in Section 3.17(v) of the Disclosure Schedule, none of the Company Group uses any real property in the conduct of its business except insofar as it holds valid Land Use Rights or has secured a Lease with respect thereto. No default or event of default on the part of any member of the Company Group or event which, with the giving of notice or passage of time or both, would constitute a default or event of default has occurred and is continuing unremedied or unwaived under the terms of any of the Land Use Rights, the Leases or Mortgages. There exists no pending or threatened condemnation, confiscation, dispute, claim, demand or similar proceeding with respect to, or which could materially and adversely affect, the continued use and enjoyment of any Land Use Right, Lease or Improvement. The Land Use Rights, Leases and Mortgages are valid and subsisting and are enforceable in accordance with the terms contained therein in all material respects.

3.18 Personal Property

(i)   The personal property of each member of the Company Group is sufficient for the conduct of its business as currently conducted.

(ii)  All personal property of each member of the Company Group which is reflected in the Review Report therefor delivered to the Investors under Section 3.12(i) or which has been acquired by any member of the Company Group since the Report Date and which has not been disposed of in the ordinary course of its business is owned by such member of the Company Group free and clear of any encumbrances.

-16-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(iii) All machinery, tools and equipment of each member of the Company Group (other than inventories) which are reflected in the Review Report therefor delivered to the Investors under Section 3.12(i) or which have been acquired thereby since the Report Date are in a state of reasonable maintenance and repair (except for ordinary wear and tear) and are adequate for the conduct of the business thereof as currently operated.

(iv) The inventories of each member of the Company Group which are reflected in the Review Report therefor delivered to the Investors under Section 3.12(i) were, on the Report Date, in good condition, and any inventories produced or acquired thereby after such date (to the extent not sold or otherwise disposed of in the ordinary course of business), are in good condition, are useable or useful in the ordinary course of the business thereof and are not in excess of reasonable requirements.

3.19 Entire Business

There are no material facilities, services, assets or properties shared with any other entity, which are used in connection with the business operations of the Company Group, and all of the facilities, services, assets or properties owned by the Group Companies are sufficient to conduct its business as proposed to be conducted.

3.20 Compliance with Other Instruments

None of the members of the Company Group is in, nor will the conduct of business of any of them as proposed to be conducted result in, any violation, breach or default of the Memorandum and Articles or any other constitutional documents (which include, as applicable, any articles of incorporation, by-laws, joint venture contracts and the like), or of any material respect of any term or provision of any mortgage, indenture, contract, agreement or instrument to which any such member of the Company Group is a party or may be bound, or of any provision of any judgment, decree, order, statute, rule or regulation applicable to or binding upon any of them. The execution, delivery and performance of and compliance with each of the Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated thereby, will not result in any such violation, breach or default, or be in conflict with or constitute, with or without the passage of time or the giving of notice or both, either a default under the Memorandum and Articles or any other such constitutional documents, any such contract, agreement or instrument, or a violation of any statutes, laws, regulations or orders, or an event which results in the creation of any lien, charge or encumbrance upon any asset of the Company Group.

3.21 Interested Party Transactions

No officer, director or shareholder, founder of the Company Group or any Affiliate of any of them has had, either directly or indirectly, any interest in (except less than 1% shareholdings for investment purposes in securities of publicly held and traded companies), or is an officer, director, employee or consultant of: (a) any person or entity which purchases, leases or borrows from or sells, licenses, leases, lends or furnishes to any member of the Company Group any goods, property, technology, intellectual or other property rights or services; or (b) any contract or agreement to which any member of the Company Group is a party or by which it may be bound or affected, except as set forth in Section 3.21 of the Disclosure Schedule. All such contracts and agreements were made on terms and conditions as favorable to such member of the Company

-17-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Group as, or more favourable to such member of the Company Group than,
would have been obtainable by it at the time in a comparable arm's-length
transaction with an unrelated party.

3.22 Intellectual Property Rights

    (i)    Each member of the Company Group owns or otherwise has the sufficient
legal right or license to use all Intellectual Property necessary to
permit the members of the Company Group to carry on their businesses
as currently conducted and as proposed to be conducted. No claims are
currently being asserted against any member of the Company Group, nor
is any member of the Company Group aware of any threatened claim or
demand, by any other Person (a) challenging or questioning the Company
Group's validity, enforceability, ownership or use of any of the
Intellectual Property owned or used by the Company Group or the
validity or effectiveness of any license or similar agreement with
respect thereto or (b) alleging any interference, infringement,
misappropriation or unfair competition or trade practices.

    (ii)    Section 3.22(ii) of the Disclosure Schedule sets forth a complete list
of the registered rights to, registration applications of, and
licenses under, any (a) trademarks, service marks and trade names; (b)
patents; (c) copyrights; (d) domain names of each member of the
Company Group.

    (iii)    Each member of the Company Group has taken reasonable steps and
measures to establish and preserve ownership of or right to use all
Intellectual Property material to the operation of its business. Each
member of the Company Group has taken reasonable steps to register,
protect, maintain, and safeguard the Intellectual Property material to
its business, including any Intellectual Property for which improper
or unauthorized disclosure would impair its value or validity, and has
executed appropriate nondisclosure and confidentiality agreements and
made all appropriate filings, registrations and payments of fees in
connection with the foregoing. There is no infringement or
misappropriation by any other Person of any Intellectual Property of
any member of the Company Group. No proceedings or claims in which any
member of the Company Group alleges that any Person is infringing
upon, or otherwise violating, any Intellectual Property of any member
of the Company Group are pending, and none has been served, instituted
or asserted by any member of the Company Group.

    (iv)    Each member of the Company Group owns all rights in and to any and all
Intellectual Property used or planned to be used by such member of the
Company Group, or covering or embodied in any past, current or planned
activity, service or product of such member of the Company Group,
which Intellectual Property was made, developed, conceived, created or
written by any consultant retained, or any employee employed, by such
member of the Company Group. No former or current employee, and no
former or current consultant, of any member of the Company Group has
any rights in any Intellectual Property made, developed, conceived,
created or written by the aforesaid employee or consultant during the
period of his or her retention by such member of the Company Group
which can be asserted against such member of the Company Group, and
such member of the Company Group has no obligation to compensate any
former or current employee for the use of any such Intellectual
Property. Except as set forth on

-18-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Section 3.22(iv) of the Disclosure Schedule, each former and present employee and consultant of each member of the Company Group has executed a Confidentiality, Assignment of Inventions and Non-Competition Agreement in substantially the form attached hereto as Exhibit D. None of the Company, the PRC Subsidiary or the Founder is aware that any of the employees employed, or any of the consultants retained by any member of the Company Group is in violation thereof.

(v) No Intellectual Property owned by any member of the Company Group is the subject of any security interest, lien, license or other Contract granting rights therein to any other Person. The Company Group has not (a) transferred or assigned, (b) granted an exclusive license to or (c) provided or licensed in source code form, any Intellectual Property owned by any member of the Company Group to any Person.

(vi) To the Knowledge of the Company, no patent, invention, device, principle or any statute, law, rule, regulation, standard or code is pending or proposed which would restrict the ability of any member of the Company Group to use any of the Intellectual Property Rights used in the conduct of their business.

3.23 Labor Agreements and Actions; Employee Compensation

(i) Except as disclosed in Section 3.23 of the Disclosure Schedule, none of the members of the Company Group is a party to or is bound by any currently effective employment contract, deferred compensation agreement, bonus plan, incentive plan, profit sharing plan, retirement agreement, vacation, hospitalization, medical or other plan, policy, trust or arrangement or other employee compensation agreement.

(ii) The Company is not aware that any of the Key Persons, senior officer or key employee, or that any group of key employees, intends to terminate their employment with the Company Group, nor does the Company Group have a present intention to terminate the employment of any of the foregoing. The employment of each of the Key Persons, senior officer and key employee of each member of the Company Group is terminable at the will of such member of the Company Group without giving rise to a claim for compensation or damages (other than a statutory severance or redundancy payment or statutory compensation for unfair dismissal). Each members of the Company Group has complied in all material respects with all Applicable Laws related to employment.

(iii) None of the members of the Company Group has any liability (whether legally binding or not) to make any payment to or for the benefit of any employee, officer, consultant, independent contractor or agent in respect of past service, pension or the termination of the employment or engagement of that or any other person (including without limitation, payments for wrongful or unfair dismissal, loss of office or redundancy) that would have a Material Adverse Effect, other than in respect to current month payroll expenses and related deductions in relation to employee and employer contributions.

3.24 Benefit Plans

(i) None of the members of the Company Group has scheduled or agreed upon future increases of benefit levels (or creations of new benefits) with respect to any Benefit Plan,

-19-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

and no such increases or creation of benefits have been proposed or made the subject of representations to employees of the Company Group under circumstances which make such employees reasonably expect that such increases will be granted. No loan is outstanding between any member of the Company Group and any employee.

(ii) Other than statutory social insurance plans operated under the Applicable Laws of the PRC, no member of the Company Group provides or is required to provide any retirement, social insurance, life insurance, medical, dental or other welfare benefits provided on ill-health, injury, death disability or on termination of employment (whether voluntary or involuntary) to any current or former employees, officers, consultants, independent contractors or agents of the Company Group.

(iii) Each member of the Company Group has complied with all Applicable Laws in all material respects relating to any of the Benefit Plans, including by deducting and making all required contributions and payments required to be made by or on behalf of any employees of the Company Group to the relevant Governmental Authority, and no such deductions have been challenged or disallowed by any Governmental Authority or any employee of the Company Group. None of the members of the Company Group has been delinquent in making any payment to or for the benefit of any current or former employee, officer, consultant, independent contractor or agent with respect to statutory social insurance plans operated under the Laws of the PRC.

3.25 No State Assets

Except as set forth in Section 3.25 of the Disclosure Schedule, none of the assets of any member of the Company Group constitute state-owned assets and, inasmuch, are not required to undergo any form of valuation under Applicable Law in the PRC governing the transfer of state-owned assets prior to the consummation of the transactions contemplated herein or in any of the Ancillary Agreements.

3.26 Conflict of Interest

Section 3.26 of the Disclosure Schedule lists all existing or potential conflict of interest any Key Person may have with the members of the Company Group, and all measures that have been taken or are planned to be taken to address such conflicts.

3.27 Insurance

Section 3.27 of the Disclosure Schedule contains copies of all of the insurance policies or programs of each of the members of the Company Group in effect as of the date hereof that have an insured amount of at least US$50,000,000, and indicates the insurer's name, policy number, expiration date, amount of coverage, type of coverage, annual premiums, exclusions and deductibles, that is in effect. All such policies are underwritten by financially sound and reputable insurers, and are sufficient to satisfy all Applicable Laws in all material respects. All such policies will remain in full force and effect and will not in any way be affected by, or terminate or lapse by reason of any of the transactions contemplated hereby.

3.28 Customers

-20-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Section 3.28 of the Disclosure Schedule contains a true, complete and correct list of the ten largest customers of the Company Group taken as a whole in terms of sales during the six-month period from January 1, 2006 to June 30, 2006 and the twelve-month period ended December 31, 2005. There exists no actual or, to the Knowledge of the Company, threatened termination, cancellation or limitation of, or any adverse modification or change in, the business relationship of the members of the Company Group or their business with any customer or any group of customers whose purchases are individually or in the aggregate material to the business of the Company Group, and there exists no present condition or state of facts or circumstances that would cause a Material Adverse Effect or prevent the members of the Company Group from conducting their business after the consummation of the transactions contemplated by this Agreement, in substantially the same manner in which such business has heretofore been conducted.

3.29 Environmental Matters

(i)  The property, assets and operations of the members of the Company Group are and have been in material compliance with all applicable Environmental Laws. No Hazardous Materials have been released, on or into any of the properties or premises of the Company and its Subsidiaries, including without limitation, the ground water, in contravention of Environmental Laws.

(ii) None of the properties, assets or operations of any of the members of the Company Group is the subject of any governmental investigation evaluating whether (i) any remedial action is needed to respond to a release or threatened release of any Hazardous Materials into the environment or (ii) any release or threatened release of any Hazardous Materials into the environment is in contravention of any Environmental Law.

None of the members of the Company Group has received any written notice or claim, nor to the Knowledge of the Company, there are pending or threatened lawsuits or proceedings against any of them with respect to violations of an Environmental Law or any release or threatened release of any Hazardous Materials into the environment.

3.30 Full Disclosure

The Company, the PRC Subsidiary and the Founder have provided each of the Investors with all the information that such Investor has requested for deciding whether to consummate the transactions contemplated under this Agreement. None of this Agreement, any Ancillary Agreements or any other statements or certificates or other materials made or delivered, or to be made or delivered, to such Investor in connection herewith or therewith, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading. No representation or warranty by the Company, the PRC Subsidiary or the Founder in this Agreement and no information or materials provided to such Investor in connection with its due diligence investigation of any member of the Company Group or the negotiation and execution of this Agreement and the Ancillary Agreements contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact required to be stated therein or necessary in order to make the statement therein, in light of the circumstances in which they are made, not misleading.

The Company, the PRC Subsidiary and the Founder acknowledge that each of the Investors is

-21-

entering into this Agreement in reliance on the representations and warranties given herein and that the representations and warranties have been given with the intention of inducing the Investors to enter into this Agreement.

4.    REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

4.1  Representations and Warranties of All Investors

Each of the Investors hereby severally but not jointly represents and warrants to the Company as of the date of this Agreement and as of the Closing that:

(i)   Authorization

Such Investor has full power and authority to enter into this Agreement, and this Agreement, when executed and delivered by such Investor, will constitute its valid and legally binding obligation, enforceable in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(ii)  Purchase for Own Account

This Agreement is made with such Investor in reliance upon such Investor's representation to the Company, which by such Investor's execution of this Agreement such Investor hereby confirms, that the Preferred Shares and the Warrants, as the case may be, to be acquired hereunder and the Conversion Shares (collectively, the "SECURITIES") will be acquired by such Investor for investment for such Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, each of the Investors further represents that it does not have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Securities.

(iii) No Public Market

Such Investor understands that the Securities have not been, and will not be, registered under the Securities Act, that no public market now exists for the Securities, that the Company has made no assurances that a public market will ever exist for the Securities, and that the Securities may not be resold absent a registration under the Securities Act or an available exemption from the registration requirements of the Securities Act.

(iv)  Investment Experience

Such Investor acknowledges that it is able to bear the economic risk of this investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Securities.

(v)   Disclosure of Information

-22-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

The Investors and their advisors have been furnished with all materials relating to the business, finances and operations of any member of the Company Group and materials relating to the securities which have been requested by the Investors or their advisors. The Investors and their advisors have been afforded the opportunity to ask questions of representatives of any member of the Company Group and have received answers to such questions, as the Investors deem necessary in connection with its decision to subscribe for the Preferred Shares. For the avoidance of doubt, nothing in this Section 4.1(v) shall limit in any way the scope of the warranties set forth in Section 3 of this Agreement or the liability of the Company, the PRC Subsidiary or the Founder for breach thereof.

(vi) Legends

Such Investor understands that the certificates evidencing the securities issued pursuant to this Agreement may bear the following legend:

"These securities have not been registered under the Securities Act of 1933, as amended. They may not be sold, offered for sale, pledged or hypothecated in the absence of a registration statement in effect with respect to the securities under such Act or an opinion of counsel satisfactory to the Company that such registration is not required or unless sold pursuant to Rule 144 of such Act."

4.2  Representations and Warranties of Holders of Exchangeable Notes

The holders of the Exchangeable Notes hereby, severally but not jointly, represent, warrant and agree with all the other parties to this Agreement that the definitive documents relating to the Series A-1/A-2 Preferred Shares as contemplated in this Agreement are satisfactory in form and substance and that the holders of the Exchangeable Notes shall exchange their Exchangeable Notes into Series A-1 Preferred Shares at the Closing in accordance with the terms and conditions hereof and thereof.

5.   CONDITIONS OF THE INVESTORS' OBLIGATIONS AT THE CLOSING

The obligations of each Investor under this Agreement at the Closing are subject to the fulfillment on or before the Closing of each of the following conditions unless waived by the Investors; provided, however, that any waiver of a condition shall not be deemed a waiver of any breach of any representation, warranty, agreement, term or covenant or of any misrepresentation by the Company, the PRC Subsidiary or the Founder, except to the extent expressly so waived.

5.1  Representations and Warranties

The representations and warranties of the Company, the PRC Subsidiary and the Founder contained in Section 3 shall be true, correct and complete in all material respects when made, and shall be true, correct and complete on and as of Closing at which the Investors are acquiring Preferred Shares and the Warrants with the same effect as though such representations and warranties had been made on and as of the date of the Closing.

5.2  Performance

Each of the Company, the PRC Subsidiary and the Founder shall have performed and complied

-23-

with all agreements, obligations and conditions contained in this Agreement in all material respects that are required to be performed or complied with by it on or before the Closing.

5.3    Compliance Certificate

The Chief Executive Officer of the Company shall deliver to each Investor at the Closing a certificate stating that the condition specified in Section 5.1, 5.2, 5.5 and 5.20 have been fulfilled in all material respects and stating that there shall have been no Material Adverse Change since the Report Date.

5.4    Secretary's or Director's Certificate

The Investors shall have received a certificate from the Company, dated as of the Closing Date and signed by the Secretary or a director of the Company, certifying (a) that the attached copies of the organizational documents of the Company and each of the members of the Company Group and the resolutions of the Board of Directors and/or shareholders (as appropriate) of the Company and the PRC Subsidiary approving this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby, are all true, complete and correct and remain unamended and in full force and effect, (b) that the incumbency and specimen signature of each officer of the Company and the PRC Subsidiary executing each such document or any other document delivered in connection herewith or therewith on behalf of the Company, (c) that the attached copies of current business licenses of the Company and each of the Group Companies are all true, complete and correct and remain unamended and in full force and effect, and (d) that the attached copy of a good standing certificate for the Company is true, complete and correct.

5.5    Governmental Consents and Approvals

Each of the Company, the PRC Subsidiary and the Founder shall have obtained all authorizations, approvals, waivers or permits of any competent Governmental Authority or regulatory body for the consummation of all of the transactions contemplated by this Agreement that are required in connection with the lawful issuance and sale of the Preferred Shares and the Warrants pursuant to this Agreement, and all such authorizations, approvals, waivers and permits shall be effective as of the Closing.

5.6    Corporate Approval

The Investors shall have received true, complete and correct copies of the resolutions of the Board of Directors and/or shareholders (as appropriate) of the Company and the PRC Subsidiary and such other agreements, schedules, exhibits, certificates, documents, financial information and filings which are reasonably required in connection with or relating to the transactions contemplated hereby, all in form and substance reasonably satisfactory to the Investors.

5.7    Consents From Third Parties

Each of the Company, the PRC Subsidiary and the Founder shall have obtained any necessary third-party consents required in connection with or relating to the transaction contemplated hereby by virtue of Applicable Laws, contractual obligations or otherwise.

5.8    2006 Review Report

-24-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

The Company shall have, at the Company's expense, prepared and submitted to the Investors: (i) the Review Report, all prepared under IFRS and reviewed by the Auditor; and (ii) financial forecast for the seven months ending December 31, 2006, prepared and signed off by KPMG which shall be consistent with the 2006 Business Plan and Budget previously delivered to the Investors.

5.9  Due Diligence

The Investors shall have completed and be satisfied with the results of all business, legal and financial due diligence, and any items requiring correction identified by any Investor shall have been corrected to the Investors' reasonable satisfaction. Without limiting the foregoing, the Investors shall have received from the Company all documents and other materials reasonably requested by the Investors for the purpose of examining and determining the rights of the Company, the PRC Subsidiary or any other members of the Company Group in and to any technology, products and Proprietary Assets now used, proposed to be used in, or necessary to the Company or the PRC Subsidiary's business as now conducted and proposed to be conducted, and the status of its ownership rights in and to all such technology, products and Proprietary Assets shall be reasonably satisfactory to the Investors.

5.10  Approval of the Investment Committee

Each Investor's investment committee shall have approved the terms of the investment, including this Agreement and all ancillary or related agreements.

5.11  "Red Chip" Restructuring

(i)  The "red chip" restructuring (including registration of shares) by the Company shall have been completed with no outstanding issues and the Investors shall have received a legal opinion issued by the Company's PRC counsel confirming the same to the Investors' reasonable satisfaction.

(ii)  The Investors shall also have been provided with documentation in a form reasonably satisfactory to the Investors confirming that (i) the Company has acquired a 100% equity interest in the PRC Subsidiary (as reflected in the articles of incorporation and business license of the PRC Subsidiary, SAIC registration documentation and the Foreign Exchange Certificate in due and proper form), and (ii) the consideration amount of the acquisition has been paid in full in foreign exchange to the former shareholders of the PRC Subsidiary (as reflected in the foreign exchange verification circular issued by SAFE at the provincial level consenting to the settlement of foreign exchange for the transfer to the Company of the 100% equity interest in the PRC Subsidiary).

(iii)  Simultaneously at the Closing, all Exchangeable Notes shall be converted into a total number of 3,000,000 Series A-1 Preferred Shares in accordance with the terms and conditions of such Exchangeable Notes.

5.12  Proceedings and Documents

All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance

-25-

to the Investors, and each Investor shall have received all such counterpart original or other copies of such documents as it may reasonably request.

5.13 Subscription for Preferred Shares Permitted by Applicable Laws

The subscription for the Preferred Shares by the Investors hereunder and the consummation of the transactions contemplated hereby (a) shall not be prohibited by the Memorandum and Articles or any Applicable Laws, (b) shall not subject the Investors to any penalty or other onerous condition under or pursuant to any Applicable Law, and (c) shall be permitted by all Applicable Laws to which the Investors or the transactions contemplated by or referred to herein or in the other documents and agreements contemplated hereby are subject; and the Investors shall have received such certificates or other evidence as they may reasonably request to establish compliance with this condition.

5.14 Memorandum and Articles

The Memorandum and Articles shall have been duly amended by all necessary action of the Company's board of directors and shareholders to read as set forth in the form attached hereto as Exhibit A and such amendment shall be duly filed with and registered by the Registrar of Companies of the Cayman Islands within fifteen (15) days of the adoption of such amendment as required by the applicable Cayman Islands law.

5.15 Right of First Refusal and Co-Sale Agreement

The Founder and the Company shall have entered into a Right of First Refusal and Co-Sale Rights Agreement in substantially the form attached hereto as Exhibit E, and such agreement shall be in full force and effect.

5.16 Opinion of the Company's Cayman Islands Counsel

The Investors shall have received from Conyers Dill & Pearman, Cayman Islands counsel for the Company, an opinion, dated as of the Closing, in the form attached hereto as Exhibit F.

5.17 Opinion of the Company's PRC Counsel

The Investors shall have received from Grandall Legal Group, PRC counsel for the Company, an opinion, dated as of the Closing, substantially in the form and to the effect of Exhibit G, and to such further effect as the Investors may reasonably request.

5.18 Confidentiality, Commitment and Non-Competition Agreement

The Founder and Key Persons of each member of the Company Group with access to confidential information shall have executed a Confidentiality, Assignment of Inventions and Non-Competition Agreement dated on or before the Closing, in the form attached hereto as Exhibit D.

5.19 Registration Rights Agreement

The Company shall have agreed to grant the Investors certain registration rights in accordance with the Registration Rights Agreement in substantially the form attached hereto as Exhibit H.

5.20 No Litigation

-26-

No action, suit, proceeding, claim, arbitration or investigation shall have been threatened or instituted against any of the Founder, the Company, the PRC Subsidiary, any other members of the Company Group or any Investor (a) seeking to restrain, prevent or change the transactions contemplated hereby or questioning the validity or legality of any of such transactions, or (b) which would, if resolved adversely to the Investors or the Company, severally or in the aggregate, cause a Material Adverse Effect.

5.21 Company Option Pool

As of the Closing, the Company shall have authorized a stock option plan, pursuant to which up to 7,958,000 Ordinary Shares, representing up to ten percent (10%) of the aggregate number of the issued and outstanding shares of the Company on an as-converted and fully diluted basis as of the Closing Date, as may be adjusted from time to time, may be issued to the Key Persons, officers, directors, consultants, employees or other service providers of the Company in the form attached hereto as Exhibit I, which shall also include a list of proposed allocation of the options (the "COMPANY OPTION PLAN"). The options granted to the Key Persons, officers, directors and employees of the Company shall provide for a vesting period of no less than three (3) years and no more than one-third (1/3) of the options so granted shall be vested each year, and the exercise price of such options shall be at a fair market value determined by the Board of Directors in good faith at the time of grant, but in no event lower than $4.43 per share; provided however, the options granted to the holders of the Exchangeable Notes under the Company Option Plan shall not be subject to any vesting schedule and shall be immediately exercisable by such holders.

5.22 No Material Adverse Change

There shall not have occurred prior to the Closing any event or transaction reasonably likely to have a Material Adverse Effect (the "MATERIAL ADVERSE CHANGE").

5.23 Directors

The Company shall have duly appointed Kevin Wang (Chinese Characters), as the Investor Director nominated by the Investors, to the Board of Directors of the Company, and shall have procured the PRC Subsidiary to appoint the Investor Director to the Board of Directors of the PRC Subsidiary.

5.24 No Material Judgment or Order

There shall not be on the Closing any judgment or order of a court of competent jurisdiction or any ruling of any governmental entity or authority or any condition imposed under any Applicable Law which, in the reasonable opinion of the Investors, would prohibit the subscription of the Preferred Shares hereunder or subject the Investors to any penalty or other onerous condition under or pursuant to any Applicable Law if the Preferred Shares were to be purchased hereunder or would cause a Material Adverse Effect.

5.25 Closing Condition Fulfilment Notice

Upon fulfilment of all the closing conditions set forth in this Section 5, the Investors, through their legal counsel, shall have issued to the Company a closing condition fulfilment notice acknowledging that all the closing conditions set forth herein have been met.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

6.   CONDITIONS OF THE COMPANY'S, THE PRC SUBSIDIARY'S AND THE FOUNDER'S
     OBLIGATIONS AT THE CLOSING

The obligations of the Company, the PRC Subsidiary and the Founder among
themselves and to the Investors under this Agreement at the Closing are subject
to the fulfillment on or before the Closing of each of the following conditions
by each of the Investors:

6.1   Representations and Warranties

     The representations and warranties of the Investors contained in Section 4
     shall be true, correct and complete when made, and shall be true, correct
     and complete on and as of the Closing with the same effect as though such
     representations and warranties had been made on and as of the Closing.

6.2   Performance

     Each of the Investors shall have performed and complied with all
     agreements, obligations and conditions contained in this Agreement that are
     required to be performed or complied with by it on or before the Closing.

7.   COVENANTS

7.1   Covenants Until Closing

     The Company, the PRC Subsidiary and the Founder covenant and agree with the
     Investors that, at all times from and after the date hereof until the
     Closing, the Company, the PRC Subsidiary and the Founder will comply with
     the following covenants and provisions, except to the extent the Investors
     may otherwise consent in writing.

     (i)   Governmental Authorization; Maintenance of Licenses

          The Company and the PRC Subsidiary will, and the Founder will procure
          the members of the Company Group to (i) proceed diligently and in good
          faith and use all commercially reasonable efforts, as promptly as
          practicable, to obtain all consents, approvals or actions of, to make
          all filings with and to give all notices to Governmental Authorities
          required of the Company or any Subsidiary to consummate the
          transactions contemplated hereby, (ii) provide such other information
          and communications to such Governmental Authorities as the Investors
          or such Governmental Authorities may reasonably request in connection
          with the consummation of the transactions contemplated hereby, (iii)
          cooperate with the Investors in obtaining as promptly as practicable
          all consents, approvals or actions of, making all filings with and
          giving all notices to Governmental Authorities required of the
          Investors to consummate the transactions contemplated hereby, and (iv)
          ensure that all Licenses are, and will remain, in full force and
          effect at all times following the Closing.

     (ii)  Dividends

          The Company and the PRC Subsidiary will not, and the Founder will
          procure the Company and the PRC Subsidiary not to, declare or issue
          any dividends for any class of shares of the Company and the PRC
          Subsidiary.

-28-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(iii) Major Transactions

The members of the Company Group shall not, and the Founder shall
ensure that the members of the Company Group shall not, effect any
merger, consolidation, scheme of arrangement, recapitalization, fund
raising or sale of all or substantially all of the assets of any
member of the Company Group without first discussing the details of
such activities with the Investors prior to actual execution of such
activities.

(iv) Notice and Cure

The members of the Company Group shall conduct their business in a
manner, and shall otherwise use all reasonable efforts, so as to
ensure that the representations and warranties set forth in Section 3
hereof shall continue to be true and correct on and as of the Closing
Date as if made on and as of the Closing. The Company, the PRC
Subsidiary and the Founder will notify the Investors promptly in
writing of, and will as soon as practicable provide the Investors with
true and complete copies of any and all information or documents
relating to, and will use all best efforts to cure before the Closing,
any event, transaction or circumstance occurring after the date of
this Agreement that causes or will cause any covenant or agreement of
any such party under this Agreement to be breached or that renders or
will render untrue any representation or warranty of any such party
contained in this Agreement as if the same were made on or as of the
date of such event, transaction or circumstance. The Company also will
notify the Investors promptly in writing of, and will use all best
efforts to cure, before the Closing, any violation or breach of any
representation, warranty, covenant or agreement made by the Company in
this Agreement, whether occurring or arising before, on or after the
date of this Agreement. No notice given pursuant to this Section
7.1(iv) shall have any effect on the representations, warranties,
covenants or agreements contained in this Agreement for purposes of
determining satisfaction of any condition contained herein or shall in
any way limit the Investors' right to seek any remedy available at law
or in equity.

(v)   Fulfillment of Conditions

The Company, the PRC Subsidiary and the Founder will execute and
deliver at or prior to the Closing this Agreement and each of the
Ancillary Agreements that they are required hereby to execute and
deliver as a condition to the Closing, and will take all commercially
reasonable steps necessary or desirable and proceed diligently and in
good faith to satisfy the other conditions to the obligations of the
Investors contained in this Agreement and will not permit the Company
or any member of the Company Group to take or fail to take any action
that could reasonably be expected to result in the nonfulfillment of
any such condition.

(vi) Memorandum and Articles

The Founder hereby agrees to take, or cause to be taken, all actions
and to do, or cause to be done, all things necessary under the
Applicable Law to abide by the terms of the Memorandum and Articles,
as may be amended from time to time, and to cause each Group Company
to conduct its business as if bound by the Memorandum and

-29-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Articles. The Founder further agrees to execute and deliver, or cause to be executed and delivered, such other documents, certificates, agreements and other writings and to take, or cause to be taken, such other actions as reasonably deemed necessary in order to consummate or implement expeditiously the provisions of the Memorandum and Articles, each as may be amended from time to time.

7.2 Covenants After Closing

The Company, the PRC Subsidiary and the Founder covenant and agree with the Investors that, at all times from and after the date hereof, they will comply with the following covenants.

(i)  Use of Proceeds

Without the Investors' prior written consent, the Subscription Price paid by the Investors to the Company shall be only used by the Company to implement business expansion, make capital expenditures and meet general working capital needs of the PRC Subsidiary within the business scope of solar energy in accordance with the Business Plan of the Company and/or the PRC Subsidiary approved by the Investors.

(ii)  Disclosure of Major Events

The Company covenants to disclose to all of its shareholders all major events that may lead to liabilities of any of the members of the Company Group, including without limitation, legal proceedings threatened or taken against the Company Group.

(iii)  Internal Control and Financial Management

The Company and the PRC Subsidiary shall use their best efforts to adopt an internal control system that ensures the separation of internal audit and financial control of the Company and the PRC Subsidiary, respectively.

(iv)  Regulatory Compliance

The Company, the PRC Subsidiary and the Founder shall cause all shareholders of the Company and the PRC Subsidiary (or any successor entity) to timely complete all required registrations and other procedures with applicable governmental authorities, including without limitation the State Administration of Foreign Exchange, if and when required pursuant to applicable law, and shall ensure that at all times the Company, the PRC Subsidiary and their respective shareholders are in compliance with such requirements and that there is no barrier to repatriation of profits, dividends and other distributions from the PRC Subsidiary (or any successor entity) to the Company.

(v)  Hiring of Chief Financial Officer and Chief Operating Officer

Within six (6) months following the Closing, the Company shall hire, and the Founder shall take, or cause to be taken, all actions and shall do, or cause to be done, all things that are necessary, desirable or appropriate to cause the Company to hire a Chief Financial Officer and Chief Operating Officer in each case of international and professional standard. The Investors agree to assist the Company in such hiring process.

-30-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(vi) Key Man Insurance

    Within ninety (90) days following the Closing, the Company shall obtain key man insurance policy for the Founder, the terms and conditions of which shall be to the reasonable satisfaction of the Investors.

(vii) PRC Matters

    (a)  Within ninety (90) days following the Closing, the Company shall obtain valid titles to all land and buildings located on such land which are used in the conduct of business by the Company Group, and enter into valid and binding land use right transfer agreements to acquire such land if necessary.

    (b)  Within ninety (90) days following the Closing, the Company shall procure the PRC Subsidiary to obtain all permits, certificates, authorizations and approvals required under any PRC environmental laws, regulations, ordinance and orders in connection with the business operations of the PRC Subsidiary.

8.   CONFIDENTIALITY

8.1  Disclosure of Terms

    Each party hereto agrees that it will maintain the confidentiality of the terms and conditions of this Agreement, all exhibits and schedules attached hereto (collectively, the "FINANCING TERMS") and the transactions contemplated hereby of the Company; provided, however, such obligation of confidentiality shall not apply to (i) information which was in the public domain or otherwise known to the relevant party before it was furnished to it by another party hereto or, after it was furnished to that party, entered the public domain otherwise than as a result of (1) a breach by that party of this Section 8.1 or (2) a breach of a confidentiality obligation by the disclosing party, where the breach was known to that party; (ii) information the disclosure of which is necessary in order to comply with applicable law, the order of any court, the requirements of a stock exchange or other governmental or regulatory authority or to obtain tax or other clearances or consents from any relevant authority; (iii) information disclosed by the Investors to a bona fide proposing purchaser of any Preferred Shares, (iv) information disclosed by the Company to holders of the Exchangeable Notes for their consideration of conversion of the Exchangeable Notes into the Series A-1 Preferred Shares, or (v) information disclosed by the parties hereto to their respective directors, managers, officers, employees, partners, accountants and attorneys where such Persons or entities are under appropriate nondisclosure obligation to the relevant party.

8.2  Press Releases

    Notwithstanding any other provision of this Section 8, with respect to the transactions contemplated under this Agreement, within sixty (60) days after the Closing, the Company may issue a press release through any media channels, including industrial conferences, disclosing the existence of this Agreement and the transactions contemplated hereunder, provided that such press release does not disclose the Financing Terms and is in a form approved by the Investors. Any communication with the media or press release (via any medium, including industrial conferences) that uses an Investor's trade name or otherwise refers to an Investor's participation

-31-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

or involvement with the Company Group shall be subject to the prior written approval of the Investors prior to the release or use of such communication or press release.

8.3    OTHER INFORMATION

The provisions of this Section 8 shall survive the termination of this Agreement and shall be in addition to, and not in substitution for, the provisions of any separate nondisclosure agreement executed by any of the parties hereto with respect to the transactions contemplated hereby.

9.    ADDITIONAL AGREEMENTS

9.1    Delivery of Financial Statements

The Company shall deliver to each Investor:

(i)    as soon as practicable, but in any event within one-hundred and twenty (120) days after the end of each fiscal year of the Company, consolidated (with respect to the Company) and unconsolidated (with respect to the PRC Subsidiary) income statements and statements of cash flows for the Company Group for such fiscal year, consolidated balance sheets for the Company and each member of the Company Group as of the end of the fiscal year all prepared in accordance with IFRS and audited and certified by the Auditor;

(ii)    as soon as practicable, but in any event within sixty (60) days after the end of each fiscal quarter, unconsolidated unaudited income statements, statements of cash flows and balance sheets for such fiscal quarter of the PRC Subsidiary, and a management report of the Company;

(iii)    as soon as practicable, but in any event within thirty (30) days of the end of each month, unconsolidated unaudited income statements, statements of cash flows and balance sheets for the PRC Subsidiary as of the end of such month, and a management report of the Company; and

(iv)    as soon as practicable, but in any event prior to the end of each fiscal year, an operating budget, budget of capital expenditures, and strategic plan for the succeeding fiscal year, all as approved by the Board.

-32-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

9.2   Inspection

The Company shall permit each Investor, at such Investor's expense, to visit and inspect any of the properties and examine the books of account and records of the Company Group and discuss the affairs, finances and accounts of the Company Group with the directors, officers, accountants, legal counsel and investment bankers of the Company Group, all at such reasonable times as may be requested in writing by such Investor. Without limiting the foregoing, the Company shall permit each Investor, at such Investor's expense, to inspect all Tax Returns for the Company Group, together with all supporting materials or materials used in the preparation of such Tax Returns, and to discuss the Company's Tax policies with the directors, officers, employees, accountants, legal counsel and investment bankers of the Company and the Group Companies, all at such reasonable times as may be requested by the Investors.

9.3   Termination of Information and Inspection Covenants

The covenants set forth in Sections 9.1 through 9.2 shall terminate as to each holder of the Preferred Shares or Conversion Shares and be of no further force or effect if (i) the Company becomes subject to the filing requirements of the Exchange Act or the rules of any other organized securities exchange, or (ii) such holder of the Preferred Shares shall cease to hold any Preferred Shares or Conversion Shares.

9.4   Assignment

To the extent any holder of the Preferred Shares transfers any such shares to any other Person, such holder may assign its rights under Sections 9.1 and 9.2 to such Person.

9.5   Lock-up of Investors' Preferred Shares

Each of the Investors undertakes not to sell, transfer or otherwise dispose of the legal and beneficial ownership of the Preferred Shares it subscribed for under this Agreement or the Conversion Shares during the six-month period following the Closing. Upon expiration of such six-month period, each of the Investors may, with prior notification in writing to the Company, sell, transfer or otherwise dispose of such ownership, provided that it shall not sell, transfer or otherwise dispose of such ownership to any Competitor of the Company or the PRC Subsidiary.

Each of the Investors also acknowledges that during a Qualified IPO, it will agree to a reasonable lock-up period if so requested by the managing underwriter of such Qualified IPO.

9.6   Board of Directors

(i)   The Board of Directors of the Company shall consist of five (5) directors. The Investors shall have the right to appoint one (1) member of the Board of Directors, currently being Kevin Wang (the "INVESTOR DIRECTOR"). The remaining directors shall be nominated, elected and removed by the holders of Ordinary Shares in accordance with the Memorandum and Articles. The Investor Director designated by the Investors will be entitled to be a member of all board committees, including the Compensation Committee and the Auditing Committee once they are formed by the Board of Directors.

-33-

    (ii)  Meetings of the Board of Directors shall be held at least once per calendar quarter on as regular a basis as possible by giving at least fifteen (15) calendar day's prior notice of such meeting and the agenda of such meeting. The number of directors necessary to constitute a quorum at any regular or special meeting of the Board of Directors of the Company shall be a majority of the total number of directors then in office.

    (iii)  The Company and the PRC Subsidiary shall, and the Founder shall procure the Company and the PRC Subsidiary to, cause the Board of Directors of each member of the Company Group to be composed of the same nominees designated by such Persons pursuant to Section 9.6(i).

    (iv)  The Company shall indemnify and hold harmless each director appointed pursuant to Section 9.6(i) who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that he is or was a director of the Company, or is or was a director of the Company serving at the request of the Company as a director of another company, partnership, joint venture, trust, employee benefit plan or other enterprise, against expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.

    (v)  Each of the parties to this Agreement shall vote any shares of the Company held thereby and if applicable, cause its respective representatives on the Board to, and the Company shall, and the Founder shall cause the Company to, promptly take any and all actions necessary to effect the provisions of this Section 9.6 and Section 9.7 below.

9.7  Major Corporate Transactions

    (i)  Neither the Company nor any other members of the Company Group shall, and the Founder shall cause the Company and such member of the Company Group not to, take any of the following actions subsequent to the Closing without, in addition to any other authorizations or approvals required by Applicable Law and the Memorandum and Articles, the prior written approval of the holders of at least two thirds (2/3) of the total number of issued and outstanding Preferred Shares, voting as a single class.

        (a)  any amendment to the Articles of the Company or the PRC Subsidiary;

        (b)  any merger, acquisition, consolidation, joint venture or like transaction involving any member of the Company Group (whether or not such member of the Company Group is the surviving corporation), or any liquidation, dissolution, winding-up, bankruptcy, revocation of voluntary dissolution (judicial or non-judicial) or similar proceeding filed by or against any of the members of the Company Group;

-34-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(c)    any sale, lease, transfer, exchange or other disposition of all or substantially all of the assets of the Company (including the disposition of operating rights of any member of the Company Group);

(d)    any transfer or exclusive license in any of the Company Group's technology other than licenses of non-exclusive rights in such technology that are required or necessary in the ordinary course of business;

(e)    creation, incurrence, assumption or permission to exist any mortgage, pledge, charge, lien or other encumbrance on all or substantially all of assets of any member of the Company Group, other than those required or necessary in the ordinary course of business which shall not exceed US$5,000,000 in any single transaction;

(f)    issuance or sale by any member of the Company Group of any securities other than (i) any issuance of the Conversion Shares, (ii) any grant of stock options under the Company Option Plan, (iii) any issuance of securities pursuant to the Follow-On Financing, (iv) any issuance of the Series A-1 Preferred Shares upon the conversion of the Exchangeable Notes, and (v) any issuance of the Preferred Shares upon the exercise of the Warrants and the issuance of Conversion Shares thereof;

(g)    any redemption, retirement, purchase or other acquisition, direct or indirect, by any member of the Company Group of any outstanding Ordinary Shares or Securities (or any warrants, rights or options to acquire any such Ordinary Shares or Securities), other than in accordance with the right of redemption of the Investors as provided in the Memorandum and Articles, or any other reduction or similar change of capital structure of any member of the Company Group;

(h)    launch of an initial public offering of the Ordinary Shares at a price lower than the minimum offering price as required for a Qualified IPO (i.e., US$11.00 per Ordinary Share);

(i)    issuance of any securities at the Follow-On Financing at a price per share lower than US$5.00, the maximum number of securities to be issued pursuant to the Follow-On Financing exceeding 20,420,000 shares, or the conversion rate being other than 1:1, with adjustments permitted for recapitalization, share split or combination and share dividends;

(j)    any declaration or payment of any dividend or other distribution, direct or indirect, in cash or in property by any member of the Company Group on account of any class of share capital of such member of the Company Group now or hereafter outstanding;

(k)    any sale, transfer or other disposition of any Ordinary Shares by the Founder prior to a Qualified IPO;

(l)    any sale, transfer or other disposition by any Key Person of any shares acquired through the exercise of stock options received under the Company Option Plan before a Qualified IPO;

-35-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(m)    any sale, transfer or other disposition of any shares by any other holder of equity interest in the Company (other than any of the Investors or their transferees or permitted assigns) representing more than a five percent (5%) equity interest in the Company (on a fully diluted and as converted basis);

(n)    termination of the Company Option Plan or adoption of any other share option or similar incentive plan of any member of the Company Group or any material amendment to the same, including change or determination of the number of options reserved, vesting periods and exercise prices of the stock options thereunder;

(o)    grant of loans to any director, officer or employee of any member of the Company Group;

(p)    engagement in any transactions by any member of the Company Group with (i) its directors, (ii) shareholders, (iii) the Founder, the Key Persons or their respective Affiliates, (iv) close relatives of the Founder or Affiliates of such relatives, (v) close relatives of the Affiliates of the Founder or Affiliates of such relatives, or (vi) any corporation or other entity of which majority equity is held or which is otherwise controlled by any of the Persons listed in (i) through (vi) of this paragraph (p), jointly or respectively;

(q)    creation, incurrence, assumption, guarantee or otherwise becoming liable (directly or indirectly) by any of the member of the Company Group with respect to any indebtedness (including capital leases) which represents an amount in excess of US$8,000,000;

(r)    the purchase or lease by any member of the Company Group of any real estate property valued in excess of US$3,000,000;

(s)    the purchase by any member of the Company Group of listed or unlisted securities;

(t)    any increase or decrease in the total number of directors comprising the board of directors of any member of the Company Group;

(u)    any adoption by the Company Group of a business plan or annual budget or any material amendment to its current business plan or annual budget, or any material alteration or change in the strategic direction or business operations in a manner that is not contemplated in the most recent business plan or annual budget;

(v)    changes of the independent auditors or changes in accounting practices or policies by any member of the Company Group; and

(w)    public offerings and/or registration of securities other than a Qualified IPO of the Company.

(ii)  Notwithstanding anything provided in this Section 9.7 to the contrary, to the extent any of the actions referred to in Section 9.7(i) above will impact the liquidation preference or redemption rights of the holders of the Preferred Shares, the holders of the Series A-1

-36-

Preferred Shares and the Series A-2 Preferred Shares shall vote as separate classes with respect to each of such actions.

9.8   Pre-emptive Right

(i)   General

The Company hereby grants to each Investor a pre-emptive right to purchase up to a pro rata share of any New Securities which the Company may, from time to time, propose to sell and issue. An Investor's "pro rata share", for purposes of this pre-emptive right, shall be determined according to the number of Ordinary Shares owned by such Investor immediately prior to the issuance of the New Securities (assuming the exercise, conversion or exchange of any Ordinary Share Equivalents) in relation to the total number of Ordinary Shares outstanding immediately prior to the issuance of the New Securities (assuming the exercise, conversion or exchange of any Ordinary Share Equivalents). Each Investor shall have a right of over-allotment such that, if any Investor fails to exercise its right hereunder to purchase its pro rata share of New Securities, the other Investors may purchase the non-purchasing Investor's portion on a pro rata basis within ten (10) days from the date such non-purchasing Investor fails to exercise its right hereunder.

(ii)  Issuance Notice

In the event the Company proposes to undertake an issuance of New Securities, it shall give each Investor written notice (an "ISSUANCE NOTICE") of such intention, describing the type of New Securities, and their price and the general terms upon which the Company proposes to issue the same. Each Investor shall have thirty (30) days after any such notice is mailed or delivered to agree to purchase up to such Investor's pro rata share of such New Securities for the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased.

(iii) Sales by the Company

Upon the expiration of forty (40) days from the Company's delivery of the Issuance Notice and for sixty (60) days thereafter, the Company may sell any New Securities with respect to which the Investors' pre-emptive rights under this Section 9.8 was not exercised, at a price and upon terms no more favorable to the purchasers thereof than specified in the Issuance Notice. In the event the Company has not sold such New Securities within such 60-day period, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Investors in the manner provided in Section 9.8(i) above.

(iv)  The pre-emptive right granted under this Agreement shall expire upon, and shall not be applicable to, a Qualified IPO.

(v)   To the extent any holder of Preferred Shares transfers any such shares to any other Person, such holder may assign its rights under this Section 9.8 to such Person.

-37-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

10. MISCELLANEOUS

10.1 Survival

The warranties, representations and covenants of the Company, the PRC Subsidiary, the Founder and each of the Investors contained in or made pursuant to this Agreement and the indemnity given by the Company, the PRC Subsidiary and the Founder pursuant to Section 10.2 shall survive the execution and delivery of this Agreement and the Closing, and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of any of the Investors or the Company.

10.2 Indemnity

(i)   The Company, the PRC Subsidiary and the Founder agree to, jointly and severally, indemnify and hold harmless any Investor and such Investor's directors, officers, employees, Affiliates, agents and permitted assigns (each, an "INDEMNITEE"), against any and all Indemnifiable Losses to such Indemnitee, directly or indirectly, as a result of, or based upon or arising from any inaccuracy in or breach of nonperformance of any of the representations, warranties, covenants or agreements made by the Company, the PRC Subsidiary and the Founder in or pursuant to this Agreement. For purposes of this Section, "INDEMNIFIABLE LOSS" means, with respect to any Indemnitee, any action, cost, damage, disbursement, expense, liability, loss, deficiency, diminution in value, obligation, penalty or settlement of any kind or nature, whether foreseeable or unforeseeable, including, but not limited to, (i) interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses reasonably incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by such Indemnitee and (ii) any taxes that may be payable by such Indemnitee as a result of the indemnification of any Indemnifiable Loss hereunder.

(ii)  The Founder shall indemnify, defend and hold harmless the Company, any Investor and their respective directors, officers, employees, Affiliates, agents and permitted assigns, against any and all Indemnifiable Losses to such Person, directly or indirectly resulting from, arising out of or relating to any tax or other obligations as a result of the Company's purchase of a 72.41% equity interest in the PRC Subsidiary from Liouxin Industrial Limited at US$1.

(iii) The Investors shall indemnify, severally but not jointly, defend and hold harmless the Company, the PRC Subsidiary and the Founder, their respective directors, officers, employees, Affiliates, agents and permitted assigns, against any and all Indemnifiable Losses to such Person, directly or indirectly resulting from, arising out of or relating to any inaccuracy in or breach of nonperformance of any of the representations, warranties, covenants or agreements made by the Investors.

Notwithstanding anything contained herein to the contrary, the indemnification obligations of the Investors pursuant to this Section 10.2(ii) hereof shall expire at Closing.

-38-

10.3  Successors and Permitted Assigns

Except as otherwise provided herein, (i) the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties hereto whose rights or obligations hereunder are affected by such terms and conditions; (ii) except or otherwise provided herein, this Agreement, and the rights and obligations herein may be assigned by any Investor to any Affiliate of such Investor, but not to any other person without the prior written consent of the Company; and (iii) the Founder may not assign any of his rights or delegate any of its obligations under this Agreement without the prior written consent of each Investor. Subject to Section 10.2 above, nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

10.4  Governing Law

This Agreement shall be governed by and construed under the laws of Hong Kong, without regard to principles of conflicts of law thereunder.

10.5  Counterparts

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.6  Titles and Subtitles

The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

10.7  Notices

Any and all notices required or permitted under this Agreement shall be given in writing in English and shall be provided by one or more of the following means and shall be deemed to have been duly given (a) if delivered personally, when received, (b) if transmitted by facsimile, on the date of transmission with receipt of a transmittal confirmation, or (c) if by international courier service, on the fourth (4th) Business Day following the date of deposit with such courier service, or such earlier delivery date as may be confirmed in writing to the sender by such courier service.

10.8  Administrative Fee and Other Expenses

The Company shall bear its own costs in connection with this Agreement. At the Closing, the Company shall also pay all costs and expenses reasonably incurred by the Investors in connection with the negotiation, execution, delivery and performance of this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby through the date of the Closing, including the expenses of counsel and other professional advisors to the Investors, up to a maximum amount of US$50,000 which the Investors are entitled to deduct from payment of the Subscription Price at Closing. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees,

-39-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

costs and necessary disbursements in addition to any other relief to which
such party may be entitled.

10.9 Amendments and Waivers

Any term of this Agreement may be amended and the observance of any term of
this Agreement may be waived (either generally or in a particular instance
and either retroactively or prospectively), only by an instrument signed by
(i) the Company, (ii) the Founder, and (iii) the holders of at least two
thirds (2/3) of the Preferred Shares then outstanding unless otherwise
provided in Section 9.7(ii) hereof. Notwithstanding the foregoing, in the
case of a proposed amendment or waiver of Section 2.1(iii) or Schedule A of
this Agreement, such amendment or waiver shall only be effective if an
instrument is signed by each party to the Agreement.

10.10 Severability

If one or more provisions of this Agreement are held to be unenforceable
under any Applicable Law, such provision shall be excluded from this
Agreement and the balance of the Agreement shall be interpreted as if such
provision were so excluded and shall be enforceable in accordance with its
terms.

10.11 Entire Agreement

This Agreement and the documents referred to herein, together with all
schedules and exhibits hereto and thereto, constitute the entire agreement
among the parties and no party shall be liable or bound to any other party
in any manner by any warranties, representations, or covenants except as
specifically set forth herein or therein; provided, however, that nothing
in this Agreement or any Ancillary Agreement shall be deemed to terminate
or supersede the provisions of any confidentiality and nondisclosure
agreements executed by the parties hereto prior to the date of this
Agreement, all of which agreements shall continue in full force and effect
until terminated in accordance with their respective terms.

10.12 Dispute Resolution

(i)   Any dispute, controversy or claim arising out of or relating to this
      Agreement, or the interpretation, breach, termination or validity
      hereof, shall be resolved through consultation. Such consultation
      shall begin immediately after one party hereto has delivered to the
      other party hereto a written request for such consultation. If within
      thirty (30) days following the date on which such notice is given the
      dispute cannot be resolved, the dispute shall be submitted to
      arbitration upon the request of either party with notice to the other.

(ii)  The arbitration shall be conducted in Hong Kong under the auspices of
      the Hong Kong International Arbitration Centre (the "CENTRE"). There
      shall be three arbitrators. Each party hereto shall each select one
      arbitrator within thirty (30) days after giving or receiving the
      demand for arbitration. Such arbitrators shall be freely selected, and
      the parties shall not be limited in their selection to any prescribed
      list. The Chairman of the Centre shall select the third arbitrator,
      who shall be qualified to practice law in Hong Kong. If either party
      does not appoint an arbitrator who has consented to participate

-40-

within thirty (30) days after selection of the first arbitrator, the relevant appointment shall be made by the Chairman of the Centre.

(iii) The arbitration proceedings shall be conducted in English. The arbitration tribunal shall apply the Arbitration Rules of the Centre in effect at the time of the arbitration. However, if such rules are in conflict with the provisions of this Section 10.12, including the provisions concerning the appointment of arbitrators, the provisions of this Section 10.12 shall prevail.

(iv) The arbitrators shall decide any dispute submitted by the parties to the arbitration strictly in accordance with the substantive law of Hong Kong and shall not apply any other substantive law.

(v) Each party hereto shall cooperate with the other in making full disclosure of and providing complete access to all information and documents requested by the other in connection with such arbitration proceedings, subject only to any confidentiality obligations binding on such party.

(vi) The award of the arbitration tribunal shall be final and binding upon the disputing parties, and either party may apply to a court of competent jurisdiction for enforcement of such award.

(vii) Either party shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the arbitral tribunal.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK]

-41-

        IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of
the date first written above.

                          COMPANY:

                          LDK SOLAR CO., LTD.


                          By: /s/ Peng Xiaofeng
                             ------------------------------------
                          Name: Peng Xiaofeng
                          Capacity: Chief Executive Officer

                          Address:

                          LDK Solar Co., Ltd.
                          Room 2303
                          No. 18 Xizang Mid-Road
                          Harbor Ring Plaza
                          Shanghai 200001

                          Attention: Mr. Peng Xiaofeng &
                                     Mr. Shao Yonggang
                          Facsimile: (86-21) 6350 8707


        -42-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
PRC SUBSIDIARY:

JIANGXI LDK SOLAR HI-TECH CO., LTD.


By: /s/ Peng Xiaofeng
    -------------------------------------
Name: Peng Xiaofeng
Capacity: Chief Executive Officer

Address:

Hi-tech Industrial Park
Xinyu City, Jiangxi Province
People's Republic of China

Attention: Peng Xiaofeng
Fax: 0790-6860085
```

-43-

```
FOUNDER:

PENG XIAOFENG


By: /s/ Peng Xiaofeng
    --------------------------------------
Name: Peng Xiaofeng

Address:

LDK Solar Co., Ltd.
Room 2303
No. 18 Xizang Mid-Road
Harbor Ring Plaza
Shanghai 200001
```

-44-

INVESTOR:

FINANCIERE NATEXIS SINGAPORE 4 PTE, LTD.


By: /s/ Gang Wang
   --------------------------------------
Name: Gang Wang (Kevin)
Capacity: Authorized Officer

Address:

Natexis Private Equity Asia Limited
Suite 1808, 18/F Westgate Mall Plaza
1038 Nanjing West Road
Shanghai, China 200041

Attention: Gang Wang (Kevin)
Fax: (86) 21-6217-3742

INVESTOR:
DECATUR OVERSEAS CORPORATION


By: /s/ Gang Wang
   --------------------------------------
Name: Gang Wang (Kevin)
Capacity: Authorized Officer

Address:

Natexis Private Equity Asia Limited
Suite 1808, 18/F Westgate Mall Plaza
1038 Nanjing West Road
Shanghai, China 200041

Attention: Gang Wang (Kevin) or Nicolazo
           De Barmon, Gael
Fax: (86) 21-6217-3742

-45-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR THROUGH MANDATORY EXCHANGE OF
EXCHANGEABLE NOTE:

BRILLIANT EVER INVESTMENTS LIMITED


By: /s/ Chen Lu
    ------------------------------------
Name: Chen Lu
Capacity: Authorized Signatory

Address:

Suite 2302-3, 23/F Great Eagle Centre
23 Harbour Road
Wanchai
Hong Kong

Attention: Ms Clara Chan
Facsimile: 852-2877-6852

INVESTOR THROUGH MANDATORY EXCHANGE OF
EXCHANGEABLE NOTE:

BOUNDLESS FUTURE INVESTMENT LIMITED


By: /s/ Chen Lu
    ------------------------------------
Name: Chen Lu
Capacity: Authorized Signatory

Address:

Suite 2302-3, 23/F Great Eagle Centre
23 Harbour Road
Wanchai
Hong Kong

Attention: Ms Clara Chan
Facsimile: 852-2877-6852
```

-46-

SCHEDULE OF DEFINITIONS

"2006 BUSINESS PLAN AND BUDGET" has the meaning set forth in Section 3.9.

"2006 AUDITED INCOME STATEMENT" means the consolidated income statement of the Company Group for the financial year ending December 31, 2006 audited and approved by the Auditor in conformity with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"2006 NET EARNINGS" means the US Dollar equivalent (based on the then applicable daily USD/CNY exchange rate set by the People's Bank of China and published by the State Administration of Foreign Exchange at www.safe.gov.cn for the Business Day immediately prior to December 31, 2006, rounded to the nearest ten thousandth USD) of the Net Earnings (as defined below) of the Company Group that is stated in Renminbi as determined from the 2006 Audited Income Statement.

"2007 AUDITED INCOME STATEMENT" means the consolidated income statement of the Company Group for the financial year ending December 31, 2007 audited and approved by the Auditor in conformity with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"2007 NET EARNINGS" means the US Dollar equivalent (based on the then applicable daily USD/CNY exchange rate set by the People's Bank of China and published by the State Administration of Foreign Exchange at www.safe.gov.cn for the Business Day immediately prior to December 31, 2007, rounded to the nearest ten thousandth USD) of the Net Earnings (as defined below) of the Company Group that is stated in Renminbi as determined from the 2007 Audited Income Statement.

"AUDITOR" means an independent accounting firm duly appointed by the Board of Directors to serve as the Company's auditor, being one of the "Big-4" international accounting firms.

"ANCILLARY AGREEMENTS" means, collectively, the Right of First Refusal and Co-Sale Agreement, the Registration Rights Agreement, and any other document or agreement contemplated by this Agreement.

"AFFILIATE" means, with respect to any given Person, a Person that Controls, is Controlled by, or is under common Control with the given Person.

"AGREEMENT" has the meaning ascribed to it in the preamble.

"ANNUAL BUSINESS PLAN AND BUDGET" means the annual business plan and budget of the Company and/or the PRC Subsidiary, as may be amended from time to time.

"APPLICABLE LAW" means, with respect to any Person, all applicable provisions of all (a) constitutions, treaties, statutes, laws (including the common law), codes, rules, regulations, ordinances or orders of any Governmental Authority, (b) Governmental Approvals and (c) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"BOARD INFORMATION" means the meaning set forth in Section 9.6.

"BOOKS AND RECORDS" has the meaning set forth in Section 3.10.

"BUSINESS DAY" means any day other than a Saturday, Sunday or other day on which commercial banks

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

in the PRC, Hong Kong or New York are authorized or required by law or governmental order to close.

"BUSINESS OR CONDITIONS OF THE COMPANY GROUP" means the business, condition (financial or otherwise), results of operation and assets and properties of the Company Group taken as a whole.

"CENTER" means the Hong Kong International Arbitration Centre.

"CLOSING" has the meaning set forth in Section 2.2.

"COMPANY" has the meaning ascribed to it in the preamble.

"COMPANY GROUP" means the Company and all Group Companies, taken together.

"COMPANY OPTION PLAN" means an employee stock option plan to be established by the Company prior to Closing substantially in the form attached hereto as Exhibit I pursuant to which stock options will be granted out of the Company Option Pool.

"COMPANY OPTION POOL" means an aggregate of 7,958,000 Ordinary Shares which shall be reserved prior to the Closing, representing up to ten percent (10%) of the total number of issued and outstanding shares of the Company on an as converted and fully diluted basis immediately after the Closing, as may be adjusted from time to time pursuant to the Company Option Plan, to be issued to the Key Persons, officers, directors, consultants, employees or other service providers of the Company from time to time pursuant to the Company Option Plan.

"COMPETITOR" means any Person that may be reasonably deemed to be engaged in any business that develops, manufactures or produces solar grade silicon ingots and wafers.

"CONTRACT" means any agreement, arrangement, bond, commitment, franchise, indemnity, indenture, instrument, lease, license or binding understanding, whether or not in writing.

"CONTROL" means, when used with respect to any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"CONVERSION RATE" means the effective conversion rate, initially at 1:1 and subject to adjustment as provided in Section 2.4, at which the Preferred Shares are converted into Ordinary Shares in accordance with the Memorandum and Articles.

"CONVERSION SHARES" means shares issuable upon conversion of the Preferred Shares issued under this Agreement or upon exercise of the Warrants.

"DISCLOSURE SCHEDULE" has the meaning set forth in Article 3.

"ENVIRONMENT LAWS" means any applicable present national, territorial, provincial, foreign or local law, common law doctrine, rule, order, decree, judgment, injunction or regulation relating to environmental matters, including those pertaining to land use, air, soil, surface water, ground water (including the protection, cleanup, removal, remediation or damage thereof), public or employee health or safety, together with any other laws (national, territorial, provincial, foreign or local) relating to emissions, discharges, releases or threatened releases of any pollutant or contaminant including without limitation,

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

medical, chemical, biological, biohazardous or radioactive waste and materials, into ambient air, land, surface water, ground water, personal property or structures.

"EQUITY SECURITIES" means any Ordinary Shares or warrants, options and rights exercisable for Ordinary Shares and instruments convertible or exchangeable for Ordinary Shares, including, without limitation, the Preferred Shares.

"EXCHANGEABLE NOTES" means the notes issued by the Company on July 21, 2006 to Brilliant Ever Investments Limited and Boundless Future Investment Limited, each exchangeable into the Series A-1 Preferred Shares upon the Closing.

"FINAL OWNERSHIP" has the meaning ascribed to it in Section 2.4(i) hereof.

"FINANCING TERMS" has the meaning ascribed to it in Section 8.1 hereof.

"FOLLOW-ON FINANCING" means the issuance of shares of the Company's capital stock in a private placement prior to the Qualified IPO of up to 20,420,000 preferred shares with a per share price of no less than US$5.00 and an initial conversion rate of 1:1.

"FOUNDER" has the meaning ascribed to it in the preamble.

"GOVERNMENTAL AUTHORITY" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the PRC, any foreign country or any domestic or foreign state, county, city or other political subdivision including but not limited to MOFCOM and SAIC and their respective local and provincial branches or departments.

"GROUP COMPANY" means a Person (other than a natural person) that is a Subsidiary of the Company.

"GUARANTEED 2006 NET EARNINGS" means the guaranteed Net Earnings of the Company Group for the financial ending December 31, 2006, being an amount that is US$30,000,000.

"GUARANTEED 2007 NET EARNINGS" means the guaranteed Net Earnings of the Company Group for the financial ending December 31, 2007, being an amount that is US$100,000,000.

"HAZARDOUS MATERIALS" means any chemical pollutant, contaminant, pesticide, petroleum or petroleum product or by-product, radioactive substance, solid waste, special, dangerous or toxic waste, hazardous or toxic substance, chemical or material regulated, limited or prohibited under any Environmental Law.

"HONG KONG" means shall mean the Special Administration Region of Hong Kong.

"IFRS" means the International Financial Reporting Standards promulgated by the International Accounting Standards Board (IASB) (which includes standards and interpretations approved by the IASB and International Accounting Principles issued under previous constitutions), together with its pronouncements thereon from time to time, and applied on a consistent basis.

"IMPROVEMENT" has the meaning set forth in Section 3.17.

"INDEMNITEE" has the meaning set forth in Section 10.2.

"INDEMNIFIABLE LOSS" has the meaning set forth in Section 10.2.

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

"INITIAL CONVERSION RATE" means the initial conversion rate at which the Preferred Shares are converted into Ordinary Shares, being a ratio that is 1:1.

"INITIAL OWNERSHIP" has the meaning set forth in Section 2.1(iii).

"INTELLECTUAL PROPERTY" means any and all (i) patents, all patent rights and all applications therefor and all reissues, reexaminations, continuations, continuations-in-part, divisions, and patent term extensions thereof, (ii) inventions (whether patentable or not), discoveries, improvements, concepts, innovations and industrial models, (iii) registered and unregistered copyrights, copyright registrations and applications, author's rights and works of authorship (including artwork of any kind and software of all types in whatever medium, inclusive of computer programs, source code, object code and executable code, and related documentation), (iv) URLs, web sites, web pages and any part thereof, (v) technical information, know-how, trade secrets, drawings, designs, design protocols, specifications for parts and devices, quality assurance and control procedures, design tools, manuals, research data concerning historic and current research and development efforts, including the results of successful and unsuccessful designs, databases and proprietary data, (vi) proprietary processes, technology, engineering, formulae, algorithms and operational procedures, (vii) trade names, trade dress, trademarks, domain names, and service marks, and registrations and applications therefor, and (viii) the goodwill of the business symbolized or represented by the foregoing, customer lists and other proprietary information and common-law rights.

"INVESTOR" or "INVESTORS" has the meaning ascribed to it in the preamble.

"INVESTOR DIRECTOR" has the meaning set forth in Section 9.6(i).

"KEY PERSONS" means Peng Xiaofeng, Shao Yonggan, Zhu Liangbao and all the other Persons listed as Optionees in Exhibit I hereof, other than the holders of the Exchangeable Notes.

"KNOWLEDGE" of a Party means the current actual knowledge of the executive officers of such Party principally responsible for the management of the business (including with respect to Intellectual Property) of such Party and its Subsidiaries.

"LAND USE RIGHTS" has the meaning set forth in Section 3.17.

"LEASE" has the meaning set forth in Section 3.17.

"LICENSES" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental Authority, including but not limited to the Licenses set forth in Section 3.6 of the Disclosure Schedule and the business licenses of the applicable Group Companies.

"MATERIAL ADVERSE CHANGE" has the meaning set forth in Section 5.22.

"MATERIAL ADVERSE EFFECT" means any (a) event, occurrence, fact, condition, change or development that has had a material adverse effect on the Business or Conditions of the Company Group, or (b) material impairment of the ability of any member of the Company Group to perform their respective material obligations hereunder or under each of the Ancillary Agreements, as applicable.

"MATERIAL ADVERSE EVENT" means any change, event or effect that (i) is or would be materially adverse to the Business or Conditions of the Company Group or (ii) is or would materially impair the validity or enforceability of this Agreement against the Company, the PRC Subsidiary or the Founder or (iii) is or

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

would materially and adversely affect the Company, the PRC Subsidiary or the Founder's ability to perform its obligations under this Agreement, any Ancillary Agreements or in connection with the transactions contemplated hereunder or thereunder. "MATERIAL CONTRACT" means, with respect to any Person, any outstanding Contract material to the business of such Person as of or after the date hereof and includes, but is not limited to, those Contracts deemed material by Section 3.15(v).

"MATERIAL LICENSES" means the Licenses set forth in Section 3.6 of the Disclosure Schedule.

"MEMORANDUM AND ARTICLES" means the amended and restated memorandum of association and the articles of association of the Company, as amended from time to time, attached hereto as Exhibit A.

"MOFCOM" means the Ministry of Commerce or, with respect to any matter to be submitted for examination and approval by the Ministry of Commerce, any government entity which is similarly competent to examine and approve such matter under the laws of the PRC.

"MORTGAGE" has the meaning set forth in Section 3.17.

"NET EARNINGS" shall mean the consolidated and normalized positive profit after tax (less one-off, non-recurring and extraordinary items as well as stock compensation charges, if any, but plus any governmental grants and subsidies) attributable to the shareholders of the Company Group as audited by the Auditor in accordance with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"NEW SECURITIES" means any Equity Securities of the Company whether now or hereafter authorized; provided that the term "New Securities" does not include (i) securities issued upon conversion of the Preferred Shares; (ii) the Preferred Shares issuable upon the exercise of the Warrants and securities issued upon conversion of such Preferred Shares; (iii) Ordinary Shares issuable to the Key Persons, officers, directors, consultants, employees or other service providers of the Company pursuant to the Company Option Plan; (iv) securities issued in a Qualified IPO; (v) securities issued in connection with any stock split, stock dividend or re-capitalization of the Company; and (vi) securities issued pursuant to the acquisition of another business entity or business segment of any such entity by the Company by merger, purchase of substantially all the assets or other reorganization whereby the Company will own not less than fifty-one percent (51%) of the voting power of such business entity or business segment of any such entity.

"ORDINARY SHARES" has the meaning ascribed to it in Section 3.2(i).

"ORDINARY SHARE EQUIVALENTS" means warrants, options and rights exercisable for Ordinary Shares and instruments convertible or exchangeable for Ordinary Shares, including, without limitation, the Preferred Shares.

"PERSON" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity.

"PRC" means the People's Republic of China, but solely for the purposes of this Agreement, excluding the Hong Kong Special Administrative Region, Macau Special Administrative Region and Taiwan.

"PRC SUBSIDIARY" has the meaning ascribed to it in the preamble.

-DS 1-

"PREFERRED SHARES" has the meaning set forth in Section 3.2(i).

"PROPRIETARY ASSETS" means all patents, patent applications, trademarks, service marks, trade names, copyrights, moral rights, maskworks, trade secrets, confidential and proprietary information, compositions of matter, formulas, designs, proprietary rights, know-how and processes of a company.

"QUALIFIED EXCHANGE" means (i) the New York Stock Exchange or the Nasdaq Stock Market's National Market System, or (ii) any other exchange of recognized international reputation and standing duly approved by the Company's Board of Directors, including the affirmative vote of the Investor Director.

"QUALIFIED IPO" means an initial public offering on a Qualified Exchange that values the Company at no less than US$1,210,000,000 immediately prior to the initial public offering with a per share offering price of no less than US$11.00 and that results in aggregate net proceeds to the Company of at least US$300,000,000.

"REPORT DATE" has the meaning set forth in Section 3.12.

"REVIEW REPORT" has the meaning set forth in Section 3.12.

"SAFE" means the Sate Administration of Foreign Exchange of the PRC, and any PRC governmental body that is a successor thereto.

"SAIC" means the State Administration of Industry and Commerce or, with respect to the issuance of any business license or filing or registration to be effected with or by the State Administration of Industry and Commerce, any government entity which is similarly competent to issue such business license or accept such filing or registration under the laws of the PRC.

"SECURITIES" has the meaning set forth in Section 4.1(ii).

"SECURITIES ACT" means the U.S. Securities Act of 1933, as amended and interpreted from time to time.

"SENIOR MANAGER" means, with respect to any member of the Company Group, the chief executive officer, the chief financial officer, the chief operating officer, the chief technology officer and the vice presidents of such company.

"SERIES A-1 PREFERRED SHARES" has the meaning set forth in Section 3.2(i).

"SERIES A-2 PREFERRED SHARES" has the meaning set forth in Section 3.2(i).

"SUBSIDIARY" means, with respect to any Person, a corporation or other entity that is, directly or indirectly, controlled by such Person, by the possession of the power to direct or cause the direction of the management and policies of first mentioned Person, whether through the ownership of voting securities or equity interest, by contract or otherwise.

"SUBSCRIPTION PRICE" has the meaning set forth in Section 2.1(iii).

"TAX" and "TAXES" means and includes any and all taxes, including any and all income, gross receipts, franchise, license, severance, stamp, occupation, premium, environmental, customs duties, capital stock, profits, unemployment, disability, real property, personal property, transfer, registration, value added, estimated, sales, use, excise, withholding, employment, payroll, social security taxes, and similar assessments, charges, and fees (including interest, penalties and additions to such taxes, penalties for

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

failure to file or late filing of any return, report or other filing, and any interest in respect of such penalties and additions) imposed or assessed by any federal, state or local taxing authority, including the Cayman Islands, Hong Kong or the PRC (or any political subdivision thereof or therein).

"TAX RETURNS" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"US GAAP" means generally accepted accounting principles in the United States, consistently applied.

"WARRANT" or "WARRANTS" means the Warrant(s) the Company agrees to issue and sell to the Investors at the Closing, the terms and conditions of which are set forth in the Warrant Purchase Agreement substantially in the form attached hereto as Exhibit B.

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

DISCLOSURE SCHEDULE

-DS 1-

SCHEDULE A

INVESTORS AT CLOSING

| NAME | ADDRESS | NUMBER OF PREFERRED SHARES SUBSCRIBED | SUBSCRIPTION PRICE/AMOUNT OF EXCHANGEABLE NOTES CONVERTED |
|------|---------|----------------------------------------|-----------------------------------------------------------|
| Financiere Natexis Singapore 4 Pte Ltd. | Natexis Private Equity Asia Limited Suite 1808, 18/F Westgate Mall Plaza 1038 Nanjing West Road, Shanghai, China 200041<br><br>Attention: Gang Wang (Kevin) | 1,128,571 (Series A-2) | US$5,000,000 |
| Decatur Overseas Corporation | Natexis Private Equity Asia Limited Suite 1808, 18/F Westgate Mall Plaza 1038 Nanjing West Road Shanghai, China 200041<br><br>Attention: Gang Wang (Kevin) or Nicolazo De Barmon, Gael | 451,429 (Series A-2) | US$2,000,000 |
| Brilliant Ever Investments Limited | Suite 2302-3, 23/F Great Eagle Centre 23 Harbour Road Wanchai Hong Kong<br><br>Attention: Ms Clara Chan | 2,000,000 (Series A-1) | US$5,333,333 |
| Boundless Future Investment Limited | Suite 2302-3, 23/F Great Eagle Centre 23 Harbour Road Wanchai Hong Kong<br><br>Attention: Ms Clara Chan | 1,000,000 (Series A-1) | US$2,666,667 |

-SCH A-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT A

AMENDED AND RESTATED MEMORANDUM AND ARTICLES

-EXH A-

EXHIBIT B

WARRANT PURCHASE AGREEMENT

-EXH B-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT C

2006 BUSINESS PLAN AND BUDGET


-EXH C-



EXHIBIT D

CONFIDENTIALITY, ASSIGNMENT OF INVENTIONS AND NON-COMPETITION
AGREEMENT


-EXH D-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT E

RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT


-EXH E-


EXHIBIT F

OPINION OF THE COMPANY'S CAYMAN ISLANDS COUNSEL


-EXH F-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT G

OPINION OF THE COMPANY'S PRC COUNSEL


-EXH G-


EXHIBIT H

REGISTRATION RIGHTS AGREEMENT


-EXH H-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT I

COMPANY OPTION PLAN

-EXH I-

EXECUTION VERSION

AMENDMENT TO

SHARE PURCHASE AGREEMENT

THIS AMENDMENT (the "AMENDMENT"), dated as of September 15, 2006, is made to the SHARE PURCHASE AGREEMENT (the "SERIES A SHARE PURCHASE AGREEMENT") dated as of July 28, 2006 by and among LDK Solar Co., Ltd., a company organized and existing under the laws of the Cayman Islands (the "COMPANY"), Jiangxi LDK Solar Hi-Tech Co., Ltd. (Chinese Characters LDK Chinese Characters), a company organized and existing under the laws of the PRC (the "PRC SUBSIDIARY"), Mr. Peng Xiaofeng (the "FOUNDER") and each of the holders of the Series A-1 Preferred Shares and the Series A-2 Preferred Shares (collectively, the "SERIES A PREFERRED SHARES").

RECITALS

A.   The Company and certain investors are parties to the Series B Preferred Shares Purchase Agreement, dated as of September 15, 2006 (the "SERIES B SHARE PURCHASE AGREEMENT"), pursuant to which such investors (collectively, the "SERIES B PREFERRED SHAREHOLDERS") have agreed to subscribe for a certain number of Series B Preferred Shares of the Company (the "SERIES B PREFERRED SHARES") upon the terms and subject to the conditions contained therein.

B.   The parties intend that the Series A Share Purchase Agreement shall be amended to provide for a concerted ownership adjustment mechanism for both the Series A Preferred Shares and the Series B Preferred Shares.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.   Defined Terms. Unless otherwise defined herein, capitalized terms used herein which are not defined in the Series A Share Purchase Agreement, as amended hereby, are used herein as therein defined.

2.   Amendment to Section 2.1(iii). Section 2.1(iii) of the Series A Share Purchase Agreement is hereby amended by deleting the last two sentences in such section and substituting in lieu thereof the following sentences:

"It is understood that the aggregate number of Series A-1 Preferred Shares and Series A-2 Preferred Shares (collectively, the "SERIES A PREFERRED SHARES") to be issued by the Company at the Closing shall be 4,580,000 shares, representing a 5.230% ownership in the Company (the "INITIAL OWNERSHIP") immediately after the closing of the issuance of the Series B Preferred Shares of the Company (the "SERIES B PREFERRED SHARES") pursuant to the Series B Preferred Shares Purchase Agreement (the "SERIES B SHARE PURCHASE AGREEMENT"), dated as of September 15, 2006, by and among the Company, the PRC Subsidiary, the Founder and certain purchasers of the Series B Preferred Shares (the "SERIES B Financing"). For the avoidance of doubt, the calculation of the Initial Ownership hereunder and any adjustment to such ownership under Section 2.4

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

shall be based on the total issued and outstanding 75,000,000 plus the
total issued and outstanding Series A Preferred Shares and the Series B
Preferred Shares, all on an as-converted basis, as of the date of the
closing of the Series B Financing or the date of adjustment, as the case
may be, and in each case as provided in the Memorandum and Articles,
without consideration of any shares issued pursuant to the Company Option
Plan."

3.  Amendment of Section 2.4. Section 2.4 of the Series A Share Purchase
    Agreement is hereby amended by deleting the whole section in its entirety
    and substituting in lieu thereof the following provisions:

"2.4 Ownership Adjustments

   (ii) Following the issue by the Auditor of the 2006 Audited Income
        Statement:

        (1) if the 2006 Net Earnings are equal to or more than the
            Guaranteed 2006 Net Earnings, the final ownership of the
            Investors in the Company after adjustment (the "FINAL
            OWNERSHIP") shall remain unchanged as the Initial Ownership
            of the Investors in the Company.

        (2) if the 2006 Net Earnings are less than the Guaranteed 2006
            Net Earnings, the Final Ownership of the Investors in the
            Company shall be adjusted in accordance with the following
            formula promptly following the issue of the 2006 Audited
            Income Statement:

$$FO1 = IO \times \frac{GE06}{AE06}$$

            For purposes of the foregoing formula, the following
            definitions shall apply: (1) FO1 shall mean the Final
            Ownership of the Investors after adjustment in accordance
            with this Section 2.4(i)(b); (2) IO shall mean the Initial
            Ownership of the Investors in the Company; (3) GE06 shall
            mean the Guaranteed 2006 Net Earnings of the Company Group,
            being an amount that is US$30,000,000; and (4) AE06 shall
            mean the actual 2006 Net Earnings.

   (iii) Following the issue by the Auditor of the 2007 Audited Income
         Statement:

        (1) If the 2007 Net Earnings are equal to or more than the
            Guaranteed 2007 Net Earnings, the Final Ownership of the
            Investors shall remain unchanged as the ownership adjusted,
            if any, in accordance with 2.4(i)(b) above.

        (2) if the 2007 Net Earnings are less than the Guaranteed 2007
            Net Earnings, the Final Ownership of the Investors in the
            Company shall be adjusted in accordance with the following
            formula promptly following the issue of the 2007 Audited
            Income Statement:

2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

$$FO2 = FO1 \times \frac{GE07}{AE07}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) FO2 shall mean the Final Ownership of the Investors in the Company after adjustment in accordance with this Section 2.4(ii)(b); (2) FO1 shall mean the Final Ownership of the Investors in the Company as adjusted under Section 2.4 (i)(b) above; (3) GE07 shall mean the Guaranteed 2007 Net Earnings of the Company Group, being an amount that is US$100,000,000; and (4) AE07 shall mean the actual 2007 Net Earnings.

(iv)  To effect the ownership adjustment as set forth in Sections 2.4(i) and (ii) above, the effective Conversion Rate of the Series A Preferred Shares shall be adjusted in accordance with the following formula:

$$CR(A) = FO(A) \times \frac{TS}{4,580,000}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) CR(A) shall mean the effective Conversion Rate of the Series A Preferred Shares at which the Series A Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4; (2) FO(A) shall mean the final ownership of the holders of the Series A Preferred Shares in the Company as adjusted according to Section 2.4(i)(b) and Section 2.4(ii)(b) above; and (3) TS shall mean the total number of Ordinary Shares to be issued and outstanding, on an as-converted basis, as of the date of the closing of the Series B Financing or the date of adjustment, as the case may be, which shall be equal to the number derived from the following formula:

$$TS = \frac{75,000,000}{1-FO(A)-FO(B)}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) FO(A) shall mean the Final Ownership of the Investors in the Company as adjusted according to Section 2.4(i)(b) and Section 2.4(ii)(b) above; and (2) FO(B) shall mean the final ownership of the holders of the Series B Preferred Shares as adjusted according to Section 2.4 of the Series B Share Purchase Agreement.

(v)  Notwithstanding the above, the parties hereto may agree from time to time, based on legal advice mutually acceptable to the Company and the Investors, on any other method to effect the adjustment to the Final Ownership of the Investors to be equal to the amounts derived from the formulas set forth in Section 2.4(i)(b) and Section 2.4(ii)(b) above.

3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(vi) Notwithstanding anything to the contrary, the Investors agree not to make any adjustment to the ownership (a) with respect to the 2006 Audited Income Statement under Section 2.4(i), if the 2006 Net Earnings is no less than US$28,500,000; and (b) with respect to the 2007 Audited Income Statement under Section 2.4(ii), if the 2007 Net Earnings is no less than US$95,000,000.

(vii) For the avoidance of doubt, the Investors' Final Ownership after any adjustment made under this Section 2.4 shall not be lower than their ownership before such adjustment, and no adjustment to the Investors' ownership will be made according to Section 2.4(ii)(b) hereof if a Qualified IPO consummates in 2007."

4. Counterparts. This Amendment may be executed by one or more of the parties hereto on any number of separate counterparts and all such counterparts shall be deemed to be one and the same instrument. Each party hereto confirms that any facsimile copy of such party's executed counterpart of this Amendment (or its signature page thereof) shall be deemed to be an executed original thereof.

5. Effectiveness. This Amendment shall become effective as of the date first written above.

6. Continuing Effect. This Amendment is made under Section 10.9 of the Series A Share Purchase Agreement. Except as otherwise described in this Amendment, the terms and conditions of the Series A Share Purchase Agreement shall remain in full force and effect.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK.]

4

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the
date first written above.

COMPANY:

LDK SOLAR CO., LTD.

By: /s/ Peng Xiaofeng
    -------------------------------------
Name: Peng Xiaofeng
Capacity: Chief Executive Officer

Address:

LDK Solar Co., Ltd.
Room 2303
No. 18 Xizang Mid-Road
Harbor Ring Plaza
Shanghai 200001

Attention: Mr. Peng Xiaofeng & Mr. Shao
           Yonggang
Facsimile: (86-21) 6350 8707

PRC SUBSIDIARY:

JIANGXI LDK SOLAR HI-TECH CO., LTD.

By: /s/ Peng Xiaofeng
    -------------------------------------
Name: Peng Xiaofeng
Capacity: Chief Executive Officer

Address:

Hi-tech Industrial Park
Xinyu City, Jiangxi Province
People's Republic of China

Attention: Mr. Peng Xiaofeng
Facsimile: (0790) 6860-085

5

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
FOUNDER:

PENG XIAOFENG


By: /s/ Peng Xiaofeng
    --------------------------------------
Name: Peng Xiaofeng

Address:

LDK Solar Co., Ltd.
Room 2303
Harbor Ring Plaza
No. 18 Xizang Middle Road
Shanghai 200001
```

6

INVESTOR:

FINANCIERE NATEXIS SINGAPORE 4 PTE, LTD.


By: /s/ Gang Wang
    -------------------------------------
Name: Gang Wang (Kevin)
Capacity: Authorized Officer

Address:

Natexis Private Equity Asia Limited
Suite 1808, 18/F Westgate Mall Plaza
1038 Nanjing West Road
Shanghai, China 200041

Attention: Gang Wang (Kevin)
Fax: (86) 21-6217-3742


INVESTOR:

DECATUR OVERSEAS CORPORATION


By: /s/ Gang Wang
    -------------------------------------
Name: Gang Wang (Kevin)
Capacity: Authorized Officer

Address:

Natexis Private Equity Asia Limited
Suite 1808, 18/F Westgate Mall Plaza
1038 Nanjing West Road
Shanghai, China 200041

Attention: Gang Wang (Kevin) or Nicolazo
De Barmon, Gael
Fax: (86) 21-6217-3742

7

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
BRILLIANT EVER INVESTMENTS LIMITED


By: /s/ Chen Lu
    -------------------------------------
Name: Chen Lu
Capacity: Authorized Signatory

Address:

Suite 2302-3, 23/F Great Eagle Centre
23 Harbour Road
Wanchai
Hong Kong

Attention: Ms Clara Chan
Facsimile: 852-2877-6852

BOUNDLESS FUTURE INVESTMENT LIMITED


By: /s/ Chen Lu
    -------------------------------------
Name: Chen Lu
Capacity: Authorized Signatory

Address:

Suite 2302-3, 23/F Great Eagle Centre
23 Harbour Road
Wanchai
Hong Kong

Attention: Ms Clara Chan
Facsimile: 852-2877-6852
```

8

EXECUTION VERSION

SUPPLEMENTAL AGREEMENT

THIS SUPPLEMENTAL AGREEMENT (the "SUPPLEMENTAL AGREEMENT"), dated as of December 15, 2006, is made to: (1) the Share Purchase Agreement, dated as of July 28, 2006, by and among LDK Solar Co., Ltd., a company organized and existing under the laws of the Cayman Islands (the "COMPANY"), Jiangxi LDK Solar Hi-Tech Co., Ltd. (Chinese Characters LDK Chinese Characters), a company organized and existing under the laws of the PRC (the "PRC SUBSIDIARY"), Mr. Peng Xiaofeng (the "FOUNDER") and each of the holders of the Series A-1 Preferred Shares and the Series A-2 Preferred Shares (collectively, the "SERIES A PREFERRED SHARES"), as amended by the Amendment to the Share Purchase Agreement, dated as of September 15, 2006, by and among the Company, the PRC Subsidiary, the Founder and each of the holders of the Series A Preferred Shares (as amended, the "SERIES A SHARE PURCHASE AGREEMENT"); and (2) the Series B Preferred Shares Purchase Agreement, dated as of September 15, 2006, by and among the Company, the PRC Subsidiary, the Founder and each of the holders of the Series B Preferred Shares, as amended by the Amendment to the Series B Preferred Shares Purchase Agreement, dated as of September 26, 2006 (as amended, "SERIES B SHARE PURCHASE AGREEMENT").

RECITALS

A.  The Company and certain investors are parties to the Series C Preferred Shares Purchase Agreement, dated as of December 15, 2006 (the "SERIES C SHARE PURCHASE AGREEMENT"), pursuant to which such investors (collectively, the "SERIES C PREFERRED SHAREHOLDERS") have agreed to subscribe for certain number of Series C Preferred Shares of the Company (the "SERIES C PREFERRED SHARES") upon the terms and subject to the conditions contained therein.

B.  The parties intend that a supplemental agreement be made to the Series A Share Purchase Agreement and the Series B Share Purchase Agreement to provide for a concerted ownership adjustment mechanism for all the Series A Preferred Shares, the Series B Preferred Shares and the Series C Preferred Shares.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.  Defined Terms. Unless otherwise defined herein, capitalized terms used herein which are not defined in the Series A Share Purchase Agreement or the Series B Share Purchase Agreement, each as amended hereby, are used herein as therein defined.

2.  Amendment to Section 2.1(iii) of the Series A Share Purchase Agreement. Section 2.1(iii) of the Series A Share Purchase Agreement is hereby amended by deleting the last two sentences in such section and substituting in lieu thereof the following sentences:

    "It is understood that the aggregate number of Series A-1 Preferred Shares and Series A-2 Preferred Shares (collectively, the "SERIES A PREFERRED SHARES") to be issued by the Company at the Closing shall be 4,580,000 shares, representing a 5.056% ownership

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

in the Company (the "INITIAL OWNERSHIP") immediately after the closing of the issuance of the Series C Preferred Shares of the Company (the "SERIES C PREFERRED SHARES") pursuant to the Series C Preferred Shares Purchase Agreement (the "SERIES C SHARE PURCHASE AGREEMENT"), dated as of December 15, 2006, by and among the Company, the PRC Subsidiary, the Founder and certain purchasers of the Series C Preferred Shares (the "SERIES C FINANCING"). For the avoidance of doubt, the calculation of the Initial Ownership hereunder and any adjustment to such ownership under Section 2.4 shall be based on the sum of the total number of the issued and outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Series A Preferred Shares, Series B Preferred Shares and Series C Preferred Shares, all on an as-converted basis, as of the date of the closing of the Series C Financing or the date of adjustment, as the case may be, and in each case as provided in the Memorandum and Articles, without consideration of any shares issued pursuant to the Company Option Plan."

3.  Amendment to Section 2.4 of the Series A Share Purchase Agreement. Section 2.4 of the Series A Share Purchase Agreement is hereby amended by deleting the section in its entirety and substituting in lieu thereof the following provisions:

"2.4 Ownership Adjustments

    (viii) Following the issue by the Auditor of the 2006 Audited Income Statement:

        (1) if the 2006 Net Earnings are equal to or more than the Guaranteed 2006 Net Earnings, the final ownership of the Investors in the Company after adjustment (the "FINAL OWNERSHIP") shall remain unchanged as the Initial Ownership of the Investors in the Company.

        (2) if the 2006 Net Earnings are less than the Guaranteed 2006 Net Earnings, the Final Ownership of the Investors in the Company shall be adjusted in accordance with the following formula promptly following the issue of the 2006 Audited Income Statement:

$$FO1 = IO \times \frac{GE06}{AE06}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) FO1 shall mean the Final Ownership of the Investors after adjustment in accordance with this Section 2.4(i)(b); (2) IO shall mean the Initial Ownership of the Investors in the Company; (3) GE06 shall mean the Guaranteed 2006 Net Earnings of the Company Group, being an amount that is US$30,000,000; and (4) AE06 shall mean the actual 2006 Net Earnings.

    (ix) Following the issue by the Auditor of the 2007 Audited Income Statement:

2

(1) If the 2007 Net Earnings are equal to or more than the Guaranteed 2007 Net Earnings, the Final Ownership of the Investors shall remain unchanged as the ownership adjusted, if any, in accordance with 2.4(i)(b) above.

(2) if the 2007 Net Earnings are less than the Guaranteed 2007 Net Earnings, the Final Ownership of the Investors in the Company shall be adjusted in accordance with the following formula promptly following the issue of the 2007 Audited Income Statement:

$$FO2 = FO1 \times \frac{GE07}{AE07}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) FO2 shall mean the Final Ownership of the Investors in the Company after adjustment in accordance with this Section 2.4(ii)(b); (2) FO1 shall mean the Final Ownership of the Investors in the Company as adjusted under Section 2.4 (i)(b) above; (3) GE07 shall mean the Guaranteed 2007 Net Earnings of the Company Group, being an amount that is US$100,000,000; and (4) AE07 shall mean the actual 2007 Net Earnings.

(x) To effect the ownership adjustment as set forth in Sections 2.4(i) and (ii) above, the effective Conversion Rate of the Series A Preferred Shares shall be adjusted in accordance with the following formula:

$$CR(A) = FO(A) \times \frac{TS}{4,580,000}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) CR(A) shall mean the effective Conversion Rate of the Series A Preferred Shares at which the Series A Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4; (2) FO(A) shall mean the final ownership of the holders of the Series A Preferred Shares in the Company as adjusted according to Section 2.4 hereof; and (3) TS shall mean the total number of Ordinary Shares to be issued and outstanding, on an as-converted basis, as of the date of the closing of the Series C Financing or the date of adjustment, as the case may be, which shall be equal to the number derived from the following formula:

$$TS = \frac{75,000,000}{1-FO(A)-FO(B)-FO(C)}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) FO(A) shall mean the Final Ownership of the Investors in the Company as adjusted according to Section 2.4 hereof; (2) FO(B) shall mean the final ownership of the holders of the Series B Preferred Shares as adjusted according to Section 2.4 of the Series B Share Purchase Agreement; and (3) FO(C) shall mean the final ownership of the holders

3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

of the Series C Preferred Shares as adjusted according to Section 2.4 of the Series C Share Purchase Agreement.

(xi) Notwithstanding the above, the parties hereto may agree from time to time, based on legal advice mutually acceptable to the Company and the Investors, on any other method to effect the adjustment to the Final Ownership of the Investors to be equal to the amounts derived from the formulas set forth in Section 2.4(i)(b) and Section 2.4(ii)(b) above.

(xii) Notwithstanding anything to the contrary, the Investors agree not to make any adjustment to the ownership (a) with respect to the 2006 Audited Income Statement under Section 2.4(i), if the 2006 Net Earnings is no less than US$28,500,000; and (b) with respect to the 2007 Audited Income Statement under Section 2.4(ii), if the 2007 Net Earnings is no less than US$95,000,000.

(xiii) For the avoidance of doubt, the Investors' Final Ownership after any adjustment made under this Section 2.4 shall not be lower than their ownership before such adjustment, and no adjustment to the Investors' ownership will be made according to Section 2.4(ii)(b) hereof if a Qualified IPO consummates in 2007."

4.   Amendment to Section 2.1(iii) of the Series B Share Purchase Agreement. Section 2.1(iii) of the Series B Share Purchase Agreement is hereby amended by deleting the last two sentences in such section and substituting in lieu thereof the following sentences:

"It is understood that the aggregate number of Series B Preferred Shares (the "SERIES B PREFERRED SHARES") to be issued by the Company at the Closing shall be 8,000,000 shares, representing a 8.832% ownership in the Company (the "INITIAL OWNERSHIP") immediately after the closing of the issuance of the Series C Preferred Shares of the Company (the "SERIES C PREFERRED SHARES") pursuant to the Series C Preferred Shares Purchase Agreement (the "SERIES C SHARE PURCHASE AGREEMENT"), dated as of December 15, 2006, by and among the Company, the PRC Subsidiary, the Founder and certain purchasers of the Series C Preferred Shares (the "SERIES C FINANCING"). For the avoidance of doubt, the calculation of the Initial Ownership hereunder and any adjustment to such ownership under Section 2.4 shall be based on the sum of the total number of issued and outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Series A Preferred Shares, Series B Preferred Shares and Series C Preferred Shares, all on an as-converted basis, as of the date of the closing of the Series C Financing or the date of adjustment, as the case may be, and in each case as provided in the Memorandum and Articles, without consideration of any shares issued pursuant to the Company Option Plan."

5.   Amendment to Section 2.4(iv) of the Series B Share Purchase Agreement. Section 2.4(iv) of the Series B Share Purchase Agreement is hereby amended by deleting the sub-section in its entirety and substituting in lieu thereof the following provisions:

4

"(iv) To effect the ownership adjustment as set forth in Sections 2.4(i), (ii) and (iii) above, the applicable Conversion Rate of the Series A Preferred Shares and the Series B Preferred Shares shall be adjusted in accordance with the following formulas:

$$CR(A) = FO(A) \times \frac{TS}{4,580,000}$$

$$CR(B) = FO(B) \times \frac{TS}{8,000,000}$$

For purposes of the foregoing formulas, the following definitions shall apply: (1) CR(A) shall mean the effective Conversion Rate of the Series A Preferred Shares at which the Series A Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4; (2) CR(B) shall mean the effective Conversion Rate of the Series B Preferred Shares at which the Series B Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4; (3) FO(A) shall mean the final ownership of the holders of the Series A Preferred Shares in the Company as adjusted according to Section 2.4 of the Series A Share Purchase Agreement; (4) FO(B) shall mean the Final Ownership of the Investors in the Company as adjusted according to Section 2.4 hereof; and (5) TS shall mean the total number of Ordinary Shares to be issued and outstanding, on an as-converted basis, as of the date of the closing of the Series C Financing or the date of adjustment, as the case may be, which shall be equal to the number derived from the following formula:

$$TS = \frac{75,000,000}{1-FO(A)-FO(B)-FO(C)}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) FO(A) shall mean the final ownership of the holders of the Series A Preferred Shares in the Company as adjusted according to Section 2.4 of the Series A Share Purchase Agreement; (2) FO(B) shall mean the Final Ownership of the Investors in the Company as adjusted according to Section 2.4 hereof; and (3) FO(C) shall mean the final ownership of the holders of the Series C Preferred Shares in the Company as adjusted according to Section 2.4 of the Series C Share Purchase Agreement."

6.  Counterparts. This Supplemental Agreement may be executed by one or more of the parties hereto on any number of separate counterparts and all such counterparts shall be deemed to be one and the same instrument. Each party hereto confirms that any facsimile copy of such party's executed counterpart of this Supplemental Agreement (or its signature page thereof) shall be deemed to be an executed original thereof.

5

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

7.  Effectiveness. This Supplemental Agreement shall become effective as of the date first written above.

8.  Continuing Effect. This Supplemental Agreement is made under Section 10.9 of the Series A Share Purchase Agreement and Section 9.9 of the Series B Share Purchase Agreement. Except as otherwise described in this Supplemental Agreement, the terms and conditions of the Series A Share Purchase Agreement and the Series B Share Purchase Agreement shall remain in full force and effect.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK.]

6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the
date first written above.

                              COMPANY:

                              LDK SOLAR CO., LTD.


                              By: /s/ Peng Xiaofeng
                                  ------------------------------------
                              Name: Peng Xiaofeng
                              Capacity: Chief Executive Officer

                              Address:

                              LDK Solar Co., Ltd.
                              Room 2303
                              Harbor Ring Plaza
                              No. 18 Xizang Middle Road
                              Shanghai 200001

                              Attention: Mr. Peng Xiaofeng & Mr. Shao
                                         Yonggang
                              Facsimile: (86-21) 6350-8707

                              7

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
PRC SUBSIDIARY:

JIANGXI LDK SOLAR HI-TECH CO., LTD.


By: /s/ Peng Xiaofeng
    -------------------------------------
Name: Peng Xiaofeng
Capacity: Chief Executive Officer

Address:

Hi-tech Industrial Park
Xinyu City, Jiangxi Province
People's Republic of China

Attention: Mr. Peng Xiaofeng
Facsimile: (0790) 6860-085


8
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
FOUNDER:

PENG XIAOFENG


By: /s/ Peng Xiaofeng
    --------------------------------------
Name: Peng Xiaofeng

Address:

LDK Solar Co., Ltd.
Room 2303
Harbor Ring Plaza
No. 18 Xizang Middle Road
Shanghai 200001


9
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INVESTOR:

FINANCIERE NATEXIS SINGAPORE 4 PTE, LTD.

(As a holder of both Series A-2
Preferred Shares and Series B Preferred
Shares)

By: /s/ Gang Wang
   --------------------------------------
Name: Gang Wang (Kevin)
Capacity: Authorized Officer

Address:

Natexis Private Equity Asia Limited
Suite 1808, 18/F Westgate Mall Plaza
1038 Nanjing West Road
Shanghai, China 200041

Attention: Gang Wang (Kevin)
Facsimile: (86-21) 6217-3742

10

```
INVESTOR:

DECATUR OVERSEAS CORPORATION

(As a holder of Series A-2 Preferred
Shares)


By: /s/ Gang Wang
    ------------------------------------
Name: Gang Wang (Kevin)
Capacity: Authorized Officer

Address:

Natexis Private Equity Asia Limited
Suite 1808, 18/F Westgate Mall Plaza
1038 Nanjing West Road
Shanghai, China 200041

Attention: Gang Wang (Kevin) or Nicolazo
           De Barmon, Gael
Facsimile: (86-21) 6217-3742
```

11

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INVESTOR:

BRILLIANT EVER INVESTMENTS LIMITED

(As a holder of Series A-1 Preferred
Shares)


By: /s/ Chen Lu
    -------------------------------------
Name: Chen Lu
Capacity: Authorized Signatory

Address:

Suite 2302-3, 23/F Great Eagle Centre
23 Harbour Road
Wanchai
Hong Kong

Attention: Ms Clara Chan
Facsimile: (852) 2877-6852

12

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:

BOUNDLESS FUTURE INVESTMENT LIMITED

(As a holder of Series A-1 Preferred
Shares)


By: /s/ Chen Lu
    ------------------------------------
Name: Chen Lu
Capacity: Authorized Signatory

Address:

Suite 2302-3, 23/F Great Eagle Centre
23 Harbour Road
Wanchai
Hong Kong

Attention: Ms Clara Chan
Facsimile: (852) 2877-6852
```

13

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:

SHINE FIELD INVESTMENTS LIMITED

(As a holder of Series B Preferred
Shares)


By: /s/ Chen Lu
    ------------------------------------
Name: Chen Lu
Capacity: Authorized Signatory

Address:

P.O. Box 957
Offshore Incorporations Centre
Road Town, Tortola, BVI

c/o Petrius Lui or Ignatius Seu
41st Floor Jardine House
1 Connaught Place
Hong Kong

Attention: Petrius Lui or Ignatius Seu
Facsimile: (852) 2111-3299
```

14

```
INVESTOR:

CDH SOLARFUTURE LIMITED

(As a holder of Series B Preferred
Shares)


By: /s/ Lew Kiang Hua
    ------------------------------------
Name: Lew Kiang Hua
Capacity: Director

Address:

Level 30, Six Battery Road
Singapore 049909

Attention: Mr. Lew Kiang Hua
Facsimile: (65) 6550 9898
```

15

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:

CHF WAFER COMPANY LIMITED

(As a holder of Series B Preferred
Shares)


By: /s/ Andrew Lo
    ------------------------------------
Name: Andrew Lo
Capacity: Authorized Representative

Address:

P.O. Box 173, Kingston Chamber
Road Town, Tortola
British Virgin Islands

c/o China Renaissance Capital Investment
Suites 305-307
St George's Building
2 Ice House Street, Central
Hong Kong

Attention: Hung Shih
Facsimile: (852) 2521-8023
```

16

```
INVESTOR:

CHINA ENVIRONMENT FUND 2004, LP.

(As a holder of Series B Preferred
Shares)


By: /s/ Hua Cao
    ------------------------------------
Name: Hua Cao
Capacity: Authorized Signatory

Address:

P.O. Box 908
George Town, Cayman Islands

c/o Tsinghua Venture Capital Management
A2302, SP Tower, Tsinghua Science Park
Beijing, China 100084

Attention: Dr. Catherine Cao
Facsimile: (86-10) 8215-1150
```

17

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:

JAFCO ASIA TECHNOLOGY FUND III

(As a holder of Series B Preferred
Shares)


By: /s/ Vincent Chan Chun Hung
    -------------------------------------
Name: Vincent Chan Chun Hung
Capacity: Attorney


Address of registered office:

c/o Walkers SPV Limited
P.O. Box 908GT, Mary Street
George Town, Grand Cayman, Cayman
Islands

Notice address:

c/o JAFCO Investment (Asia Pacific) Ltd.
6 Battery Road
#42-01 Singapore 049909

Attention: The President
Facsimile: (65) 6221-3690

With a copy to:

JAFCO Investment (Hong Kong) Ltd.
30/F, Two IFC, 8 Finance Street,
Central, Hong Kong

Attention: General Manager
Facsimile: (852) 2536-1979
```

18

INVESTOR:

MUS ROOSEVELT CHINA PACIFIC FUND L.P.

(As a holder of Series B Preferred
Shares)

By: /s/ Jun Otsuka
    -----------------------------------
Name: Jun Otsuka
Capacity: Managing Direcotr

Address:

c/o MUS Roosevelt Capital Partners, Ltd.
Offshore Incorporations (Cayman) Limited
Scotia Centre 4/F
P.O. Box 2804
George Town, Grand Cayman, Cayman
Islands

With a copy to:

Mitsubishi UFJ Securities (HK) Capital,
Limited
11/F, AIG Tower
One Connaught Road
Central, Hong Kong

Attention: Mr. Jun Otsuka (Managing
           Director)
Facsimile: (852) 2865-6214

19

```
INVESTOR:

TECH TEAM HOLDINGS LIMITED

(As a holder of Series B Preferred
Shares)


By: /s/ Jiyi Weng
    ------------------------------------
Name: Jiyi Weng
Capacity: Director

Address:

2nd Floor, Abbott Building, Road Town,
Tortola, British Virgin Islands

Notice address:

299 Bisheng Road
Suite 13-101
Pudong, Shanghai
China 201204

Attention: Jerry Jiyi WENG
Facsimile: (86-21) 5080-1333
```

20

```
INVESTOR:

GRAND GAINS INTERNATIONAL LIMITED

(As a holder of Series B Preferred
Shares)


By: /s/ Jiyi Weng
    ------------------------------------
Name: Jiyi Weng
Capacity: Director

Registered address:

Palm Grove House, P.O. Box 438, Road
Town, Tortola, British Virgin Islands

Notice address:

32/F, Tower of China Merchants Bank
No. 7088 Shennan Road
Futian, Shenzhen 518040

Attention: Li Hongwei
Facsimile: (86-755) 8319-5157
```

21

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INVESTOR:

BOFA CAPITAL COMPANY LIMITED

(As a holder of Series B Preferred Shares)

By: /s/ Lingyong Peng
    ------------------------------------
Name: Lingyong Peng
Capacity: Authorized Signatory

Registered address:

c/o Maples Finance BVI Limited, P.O. Box 173, Kingston Chambers, Road Town, Tortola, British Virgin Islands

Notice address:

Room 16D
Building 8
Shijicheng 3 Term
Haidian District
Beijing, P.R.China

Attention: Mr. Peng Lingyong
Facsimile: (86-10) 8889 1502

22

</TEXT>
</DOCUMENT>

Exhibit 4.6

LDK SOLAR CO., LTD.

SERIES B PREFERRED SHARES PURCHASE AGREEMENT

THIS SERIES B PREFERRED SHARES PURCHASE AGREEMENT (this "AGREEMENT") is made as of this September 15, 2006, by and among LDK Solar Co., Ltd., a company organized and existing under the laws of the Cayman Islands (the "COMPANY"), Jiangxi LDK Solar Hi-Tech Co., Ltd. (Chinese Characters LDK Chinese Characters), a company organized and existing under the laws of the PRC (the "PRC SUBSIDIARY"), each of the investors set forth in Schedule A attached hereto (each an "INVESTOR" and collectively, the "INVESTORS") and Mr. Peng Xiaofeng (the "FOUNDER").

WITNESSETH

THE PARTIES HEREBY AGREE AS FOLLOWS:

1.    DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings ascribed to them in the Schedule of Definitions.

2.    PURCHASE AND SALE OF SECURITIES

2.1   Sale and Issuance of Series B Preferred Shares

    (i)    The Company shall adopt on or before the Closing (defined below) the Memorandum and Articles in substantially the form attached hereto as Exhibit A and file such Memorandum and Articles with the Registrar of Companies of the Cayman Islands within fifteen (15) days of such adoption.

    (ii)   On or prior to the Closing, the Company shall have authorized (i) the sale and issuance to the Investors of the Series B Preferred Shares (defined below); and (ii) the issuance of the Conversion Shares upon conversion of the Series B Preferred Shares pursuant to the Memorandum and Articles. The Series B Preferred Shares shall have the rights, preferences, privileges and restrictions set forth in the Memorandum and Articles.

    (iii)  Subject to the terms and conditions of this Agreement, each Investor agrees, severally and not jointly, to purchase at the Closing and the Company agrees to sell and issue to each Investor at the Closing that number of the Series B Preferred Shares set forth opposite such Investor's name on Schedule A attached hereto for the purchase price set forth thereon (collectively, the "SUBSCRIPTION PRICE"). It is understood that the aggregate number of Series B Preferred Shares to be issued by the Company at the Closing shall be 8,000,000 shares, representing a 9.135% ownership in the Company immediately after the Closing (the "INITIAL OWNERSHIP"). For the avoidance of doubt, the calculation of the Initial Ownership hereunder and any adjustment to such ownership under Section 2.4 shall be based on the total issued and outstanding 75,000,000 Ordinary Shares plus the total issued and outstanding 12,580,000 Preferred Shares, without consideration of any shares issued pursuant to the Company Option Plan.

1

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

2.2  Closing

Subject to the satisfaction or waiver of the conditions to closing set
forth in Section 5 and Section 6 of this Agreement, the purchase and sale
of the Series B Preferred Shares set forth on Schedule A shall take place
at the offices of Clifford Chance LLP, 40th Floor, the Bund Center, No. 222
Yan An Road East, Shanghai 200002, PRC, at 10:00 a.m., on or prior to
September 28, 2006, or at such other time and place as the Company and the
Investors may mutually agree upon orally or in writing (which time and
place are designated herein as the "CLOSING").

2.3  Closing Delivery

At the Closing, the Company shall deliver to each Investor a certificate or
certificates in form reasonably satisfactory to such Investor evidencing
the Series B Preferred Shares purchased by such Investor, registered in
such Investor's or its nominee's name as evidenced by delivery of a
certified copy of the Company's Register of Members, reflecting such
Investor's ownership of the Series B Preferred Shares purchased hereunder,
against delivery to the Company of the purchase price therefore in the
amount specified in column 4 of Schedule A attached hereto, by a wire
transfer of United States Dollars in immediately available funds or by
other payment methods mutually agreed to by Company and the Investors.

2.4  Ownership Adjustments

(i)  Following the issue by the Auditor of the 2006 Audited Income
Statement:

(a)  if the 2006 Net Earnings are equal to or more than the Guaranteed
2006 Net Earnings and the final ownership of the holders of the
Series A-1 Preferred Shares and the holders of the Series A-2
Preferred Shares (collectively, the "SERIES A SHAREHOLDERS") is
to remain unchanged in accordance with Section 2.4(i) of the
Share Purchase Agreement, dated as of July 28, 2006, by and among
the Company, the Founder and the Series A Shareholders, which is
amended by that certain Amendment to the Share Purchase Agreement
dated as of September 15, 2006 (as amended, the "SERIES A SHARE
PURCHASE AGREEMENT"), then the final ownership of the Investors
in the Company after adjustment (the "FINAL OWNERSHIP") shall
remain unchanged as the Initial Ownership of the Investors in the
Company. For purposes of this Section 2.4, the calculation of the
Final Ownership of the Investors in the Company and any
adjustment to such ownership hereunder shall be effected by
dividing the total number of issued and outstanding Series B
Preferred Shares by the sum of the total issued and --
outstanding Ordinary Shares (being 75,000,000) and the total
number of issued and outstanding Preferred Shares (defined
below), all on an as-converted basis, as of the date of the
Closing or the date of adjustment, as the case may be.

(b)  if the 2006 Net Earnings are less than the Guaranteed 2006 Net
Earnings and the final ownership of the Series A Shareholders is
to be adjusted in accordance with Section 2.4(i)(b) of the Series
A Share Purchase Agreement, in order for the Final Ownership to
remain unchanged as the Initial Ownership of the Investors in the
Company, the respective Conversion Rate at which the Series A-1
Preferred Shares and the Series A-2 Preferred Shares
(collectively, the "SERIES A PREFERRED

2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

SHARES") and the Series B Preferred Shares (together with the Series A Preferred Shares, the "PREFERRED SHARES") are converted into Ordinary Shares shall be appropriately adjusted so that (A) the final ownership of the Series A Shareholders in the Company (calculated by dividing the total number of issued and outstanding Series A Preferred Shares by the sum of the total number of issued and -- outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Preferred Shares, all on an as-if converted basis, as of the date of the adjustment) shall be equal to the number derived from the formula set forth in Section 2.4(i)(b) of the Series A Share Purchase Agreement; and (B) the Final Ownership of the Investors in the Company shall be equal to the Initial Ownership of the Investors in the Company.

(ii) Following the issue by the Auditor of the 2006/2007 Audited Income Statement:

  (a)  If the 2006/2007 Net Earnings are equal to or more than the Guaranteed 2006/2007 Net Earnings, the Final Ownership shall remain unchanged as the Initial Ownership of the Investors in the Company.

  (b)  If the 2006/2007 Net Earnings are less than the Guaranteed 2006/2007 Net Earnings, the Final Ownership of the Investors in the Company shall be adjusted in accordance with the following formula promptly following the issue of the 2006/2007 Audited Income Statement:

$$FO = IO \times \frac{GE06/07}{AE06/07}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) FO shall mean the Final Ownership after adjustment in accordance with this Section 2.4(ii)(b); (2) IO shall mean the Initial Ownership of the Investors in the Company; (3) GE06/07 shall mean the Guaranteed 2006/2007 Net Earnings of the Company Group, being an amount that is US$60,000,000; and (4) AE06/07 shall mean the actual 2006/2007 Net Earnings.

  (c)  The adjustment of the Final Ownership as contemplated in Section 2.4(ii)(b) above shall be effected by adjusting the respective Conversion Rate of the Series A Preferred Shares and the Series B Preferred Shares so that (A) the final ownership of the Series A Shareholders (calculated by dividing the total number of issued and outstanding Series A Preferred Shares by the sum of the total number of issued and outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Preferred Shares, all on an as-converted basis, as of the date of the adjustment) shall remain unchanged as the ownership of the Series A Shareholders adjusted, if any, according to Section 2.4(i)(b) of the Series A Share Purchase Agreement; and (B) the Final Ownership of the Investors in the Company shall be equal to the number derived from the formula set forth in Section 2.4(ii)(b) of this Agreement.

(iii) Following the issue by the Auditor of the 2007 Audited Income Statement:

3

(a)   if the 2007 Net Earnings are equal to or more than the Guaranteed 2007 Net Earnings, then the respective Conversion Rate of the Series A Preferred Shares and the Series B Preferred Shares shall be appropriately adjusted so that (A) the final ownership of the Series A Shareholders in the Company (calculated by dividing the total number of issued and outstanding Series A Preferred Shares by the sum of the total number of issued and -- outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Preferred Shares, all on an as converted basis, as of the date of the adjustment) shall remain unchanged as the ownership of the Series A Shareholders adjusted, if any, according to Section 2.4(i)(b) of the Series A Share Purchase Agreement; and (B) the Final Ownership of the Investors in the Company shall remain unchanged as the ownership of the Investors adjusted, if any, according to Section 2.4(ii)(b) of this Agreement.

(b)   if the 2007 Net Earnings are less than the Guaranteed 2007 Net Earnings and the final ownership of the Series A Shareholders is to be adjusted in accordance with Section 2.4(ii)(b) of the Series A Share Purchase Agreement, in order for the Final Ownership remain unchanged as the ownership of the Investors adjusted, if any, according to Section 2.4(ii)(b) of this Agreement, the respective Conversion Rate of the Series A Shareholders in the Company and the Series B Preferred Shares shall be appropriately adjusted so that (A) the final ownership of the Series A Shareholders (calculated by dividing the total number of issued and outstanding Series A Preferred Shares by the sum of the total number of the -- issued and outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Preferred Shares, all on an as-converted basis, as of the date of the adjustment) shall be equal to the number derived from the formula set forth in Section 2.4(ii)(b) of the Series A Share Purchase Agreement; and (B) the Final Ownership of the Investors in the Company shall remain unchanged as the ownership of the Investors adjusted, if any, according to Section 2.4(ii)(b) of this Agreement.

(iv)  To effect the ownership adjustment as set forth in Sections 2.4(i), (ii) and (iii) above, the applicable Conversion Rate of the Series A Preferred Shares and the Series B Preferred Shares shall be adjusted in accordance with the following formulas:

$$CR(A) = FO(A) \times \frac{TS}{4,580,000}$$

$$CR(B) = FO(B) \times \frac{TS}{8,000,000}$$

For purposes of the foregoing formulas, the following definitions shall apply: (1) CR(A) shall mean the effective Conversion Rate of the Series A Preferred Shares at which the Series A Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4; (2) CR(B) shall mean the effective Conversion Rate of the Series B Preferred Shares at which the Series B Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4; (3) FO(A) shall mean the final ownership of the holders of the Series A Preferred Shares in the Company as adjusted according to Section 2.4 of the Series A Share Purchase Agreement; (4) FO(B) shall mean the Final

4

Ownership of the Investors in the Company as adjusted according to Section 2.4 hereof; and (5) TS shall mean the total number of Ordinary Shares to be issued and outstanding, on an as-converted basis, as of the date of the Closing or the date of adjustment, as the case may be, which shall be equal to the number derived from the following formula:

TS =

(v)   Notwithstanding anything contained herein to the contrary, the Investors agree not to make any adjustment to the ownership with respect to the 2006/2007 Audited Income Statement under Section 2.4(ii) hereof if the 2006/2007 Net Earnings is no less than US$57,000,000.

(vi)  A number of hypothetical examples showing the detailed processes in the adjustment of the respective ownership of the Series A Shareholders and the Investors in accordance with the formulas and principles set forth in this Section 2.4 are attached as Appendix 1 to this Agreement. The parties hereto acknowledge that such examples are for illustration purposes only and shall not be legally binding in any respect.

(vii) Notwithstanding the above, in the event a Qualified IPO consummates or is expected to consummate prior to June 30, 2007, the Company agrees to perform a special audit of the interim period covering the number of complete months prior to such date. If the 2006/2007 Net Earnings is less than the Guaranteed 2006/2007 Net Earnings, each on a pro rata basis, then the Final Ownership of Investors in the Company shall be adjusted, prior to the consummation of the Qualified IPO, in accordance with the formulas and principles set forth in this Section 2.4, except the actual adjustment will be made on a pro rata basis.

(viii) Notwithstanding the above, the parties hereto may agree from time to time, based on legal advice mutually acceptable to the Company and the Investors, on any other method to effect the adjustment to the final ownership of the Series A Shareholders and the Final Ownership of the Investors to be equal to the amounts derived from the formulas and principles set forth in this Section 2.4. For the avoidance of doubt, the Investors' Final Ownership after any adjustment made under this Section 2.4 shall not be lower than their ownership before such adjustment.

(ix)  Notwithstanding anything contained herein to the contrary, in the event there shall be any conflict between the provisions set forth in this Section 2.4 and the provisions contained in the Memorandum and Articles, then the provisions of the Memorandum and Articles shall prevail.

3.   REPRESENTATIONS AND WARRANTIES OF THE COMPANY, THE PRC SUBSIDIARY AND THE FOUNDER

The Company, the PRC Subsidiary and the Founder jointly and severally represent and warrant to the Investors as of the date of this Agreement and as of the Closing that, other than as set forth in the Disclosure Schedule (the "DISCLOSURE SCHEDULE") with specific reference to the Section to which exception is being taken:

3.1  Organization, Good Standing and Qualification

5

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(i)   Each member of the Company Group is duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its incorporation. Each member of the Company Group has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted and is duly qualified to transact business and is in good standing in each jurisdiction in which it operates business and the failure to so qualify would have a Material Adverse Effect.

(ii)  The Company is an exempted company duly organized, validly existing and in good standing under the laws of Cayman Islands, and has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted and is duly qualified to transact business and is in good standing in each jurisdiction in which it operates business and the failure to so qualify would have a Material Adverse Effect. The Company is a holding company and since its formation has not engaged in any business operation, been a party to any agreement, contract or commitment, or incurred any liability or obligation other than in the course of forming and holding its equity interest in the PRC Subsidiary and those relating solely to the transactions contemplated under this Agreement and the Ancillary Agreements.

(iii) The PRC Subsidiary is a wholly foreign-owned enterprise, duly organized and validly existing under the laws of the PRC. The formation of the PRC Subsidiary was duly approved by MOFCOM or its authorized local counterpart. The PRC Subsidiary has the corporate power and authority to own and operate its properties and to carry on its business as specified in the scope of business in the business license issued to the PRC Subsidiary.

3.2  Capitalization and Voting Rights

(i)   The authorized capital is and as of the Closing will be US$14,000,000. The authorized capital of the Company consists, or will consist immediately prior to the Closing, of:

    (a)   Ordinary Shares. 127,000,000 ordinary shares, par value US$0.10 per share (the "ORDINARY SHARES"), of which 75,000,000 shares are issued and outstanding, and 52,000,000 are reserved for issuance upon conversion of the Preferred Shares issued and outstanding as of the Closing Date, upon the exercise of the Warrants as well as upon the exercise of stock options granted under the Company Option Plan.

    (b)   Preferred Shares. 13,000,000 preferred shares, (1) 3,275,109 of which have been designated Series A-1 Preferred Shares, par value US$0.10 per share (the "SERIES A-1 PREFERRED SHARES"), 3,000,000 of which are issued and outstanding; (2) 1,724,891 of which have been designated Series A-2 Preferred Shares, par value US$0.10 per share (the "SERIES A-2 PREFERRED SHARES"), 1,580,000 of which are issued and outstanding; and (3) 8,000,000 of which have been designated Series B Preferred Shares, par value US$0.10 per share (the "SERIES B PREFERRED SHARES", together with the Series A-1 Preferred Shares and the Series A-2 Preferred Shares, the "PREFERRED SHARES"), none of which has been issued and outstanding.

(ii)  The registered capital of the PRC Subsidiary is US$35,900,000 as of the Closing, all of which is owned by the Company and has been fully paid for.

6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(iii) On the date hereof and at the Closing, the issued and outstanding
share capital of the Company is and will be as set forth in Section
3.2(iii) of the Disclosure Schedule, which lists all shareholders
owning issued and outstanding shares of the Company, together with the
number held by each.

(iv) Section 3.2(iv) of the Disclosure Schedule shows an accurate and true
list of all outstanding securities of the Company and the PRC
Subsidiary and their respective holders to be in effect immediately
following the Closing.

(v) As of the date hereof and the Closing, except as provided in this
Agreement, the Ancillary Agreements, the Company Option Plan, the
Warrants and the rights and privileges of the Preferred Shares under
the Memorandum and Articles, there are no outstanding options,
warrants, rights (including conversion or preemptive rights and rights
of first refusal), proxy or shareholders agreements or agreements of
any kind for the purchase or acquisition from the Company or the PRC
Subsidiary of any of their securities.

(vi) Except as may be provided by the terms of the Preferred Shares or as
otherwise set forth in Section 3.2(vi) of the Disclosure Schedule,
neither the Company nor the PRC Subsidiary is subject to any
obligation (contingent or otherwise) to purchase or otherwise acquire
or retire any equity interest held by its shareholders or to purchase
or otherwise acquire or retire any of its other outstanding
securities.

3.3  Group Structure

(i) Section 3.3(i) of the Disclosure Schedule lists each Group Company,
and correctly sets forth the capitalization of such Group Company, the
Company's ownership interest therein, the interest of any other Person
therein, the nature of legal entity which the Group Company
constitutes, the jurisdiction in which the Group Company was
organized, each jurisdiction in which the Group Company is required to
be qualified or licensed to do business as a foreign Person and a
brief summary of the Group Company's business.

(ii) Except in respect of any interest held in any Group Company, none of
the Company or the Group Companies has any Subsidiaries or owns or
controls, directly or indirectly, any interest in any other
corporation, partnership, trust, joint venture, association or other
entity. Except as set forth in Section 3.3(ii) of the Disclosure
Schedule, none of the Company or the Group Companies maintains any
offices or any branches.

(iii) In respect of any ownership interest held in a Group Company by the
Company or another Group Company, as described in Section 3.3(i) of
the Disclosure Schedule, (a) the Company or such Group Company holds
good and valid title to such ownership interest free and clear of all
restrictions on transfer or other encumbrances, other than those
restrictions on transfer or other encumbrances created by the
Ancillary Agreements or the constitutional documents, (b) such
ownership interest was acquired in compliance with all Applicable
Laws, including those promulgated by SAFE and those regulating the
offer, sale or issuance of securities generally, and (c) there are no
outstanding options or rights for the purchase or acquisition from the
Company or such Group Company of such

7

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

ownership interest. There are no outstanding options, warrants, rights (including registration, conversion or preemptive rights and rights of first refusal), proxy or shareholders agreements or agreements of any kind for the purchase or acquisition from any Group Company of any of its equity. None of the Group Companies is subject to any obligation (contingent or otherwise) to purchase or otherwise acquire or retire any interest held by its equity holders or to purchase or otherwise acquire or retire any of its securities.

(iv) In respect of the PRC Subsidiary, as of the Closing, the full amount of the registered capital thereof has been contributed, such contribution has been duly verified by a certified accountant registered in the PRC and the accounting firm employing such accountant, and the report of the certified accountant evidencing such verification has been registered with the SAIC or its authorized local counterpart.

3.4  Authorization

Each of the Company, the PRC Subsidiary and the Founder has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party and to carry out and perform its obligations thereunder. All corporate action on the part of each of the Company, the PRC Subsidiary and their respective officers, directors and shareholders necessary for the authorization, execution and delivery of this Agreement and each of the Ancillary Agreements to which it is a party, the performance of all obligations of each of the Company and the PRC Subsidiary thereunder, and the authorization, issuance (or reservation for issuance), sale and delivery by the Company of the Series B Preferred Shares being sold hereunder and the Ordinary Shares issuable upon conversion of such Series B Preferred Shares, has been taken or will be taken prior to the Closing. This Agreement and each of the Ancillary Agreements to which each of the Company, the PRC Subsidiary or the Founder is a party have been duly executed and delivered by each of the Company, the PRC Subsidiary and the Founder, and constitute valid and legally binding obligations thereof, enforceable thereagainst in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies. Any preemptive rights or rights of first refusal with respect to the issuance of the Series B Preferred Shares or the Ordinary Shares to be issued upon conversion of the Series B Preferred Shares have been duly waived.

3.5  Valid Issuance of the Series B Preferred Shares

(i)  The Series B Preferred Shares that are being purchased by or issued to the Investors hereunder, when issued, sold and delivered in accordance with the terms of this Agreement against payment of the Subscription Price will be duly and validly issued, fully paid, and non-assessable, and will be free of restrictions on transfer other than such restrictions on transfer as may be imposed by this Agreement, the Ancillary Agreements or the Memorandum and Articles. The Ordinary Shares issuable upon conversion of the Series B Preferred Shares purchased under this Agreement have been duly and validly reserved for issuance and, upon issuance in accordance with the terms of the Memorandum and Articles, will be duly and validly issued, fully paid, and non-

8

assessable and will be free of restrictions on transfer other than such restrictions on transfer as may be imposed by this Agreement, the Ancillary Agreements or the Memorandum and Articles.

(ii) All presently outstanding shares of the Company are duly and validly issued, fully paid and non-assessable, and in each case such shares have been issued in full compliance with the requirements of all applicable securities laws and regulations, including to the extent applicable, the Securities Act and all other antifraud and other provisions of applicable securities laws and regulations.

3.6   Licenses

(i) Section 3.6 of the Disclosure Schedule contains a true and complete list of all Licenses used in and material to the business or operations of the Group Companies, setting forth the owner, the function and the expiration and renewal date of each. Prior to the execution of this Agreement, the Company has delivered to the Investors true and complete copies of all such Licenses.

(a) Each Group Company owns or validly holds all Licenses that are necessary to conduct its business and own and operate its assets and properties as presently conducted and operated, and can obtain, without undue burden or expense, all Licenses for the conduct of its businesses as currently conducted and as proposed to be conducted;

(b) Each License listed in Section 3.6 of the Disclosure Schedule is valid, binding and in full force and effect; and

(c) No Group Company is or has at any time been, or has received any notice that it is or has at any time been, in default (or with the giving of notice or lapse of time or both, would be in default) under any such License.

(ii) Without limiting the generality of paragraph (i) above, all Licenses required under PRC laws for the due and proper establishment and operation of the PRC Subsidiary and the consummation of the transactions contemplated hereby have been duly obtained from the relevant Governmental Authority and are in full force and effect; all filings and registrations with the relevant PRC Governmental Authority required in respect of the PRC Subsidiary and its operations, including but not limited to registration with MOFCOM, SAIC, and SAFE have been duly and timely completed in accordance with the relevant PRC laws; the consummation of the transactions contemplated under this Agreement and each of the Ancillary Agreements will not result in a termination or revocation of any of the Material Licenses; each Group Company is in compliance with applicable requirements of the relevant tax bureau, customs authorities and product registration authorities to which it and its business are subject.

3.7   Consents

No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority or other third party on the part of any of the Company, the PRC Subsidiary or the Founder will be required in connection with the

9

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

execution, delivery and performance of this Agreement and each of the Ancillary Agreements and the consummation of the transactions contemplated thereby which has not already been secured or effected or will be secured or effected prior to the Closing.

3.8  Offering

The Series B Preferred Shares and the Ordinary Shares to be issued upon conversion of the Series B Preferred Shares have not been, and will not be, registered under the Securities Act and are made subject of sale and purchase under this Agreement, to the extent they are so made herein, pursuant to an exemption from registration requirements of the Securities Act. Subject in part to the truth and accuracy of each Investor's representations set forth in Section 4 of this Agreement, the offer, sale and issuance of the Series B Preferred Shares and the Ordinary Shares to be issued upon conversion of the Series B Preferred Shares (when issued), as contemplated by this Agreement, is exempt from the registration and prospectus delivery requirements of the Securities Act and any applicable securities laws, and neither the Company nor any authorized agent acting on its behalf has taken or will take any action that would cause the loss of such exemption.

3.9  Business Plan and Budget

The business plan and budget dated August 2, 2006, as amended (the "2006 BUSINESS PLAN AND BUDGET") was previously delivered to the Investors by the Company and is attached as Exhibit C hereto. The 2006 Business Plan and Budget, including an annual profit and loss projection of the PRC Subsidiary for the fiscal years ending December 31, 2006 and 2007 as well as for the fiscal period from July 1, 2006 to June 30, 2007, does not contain any untrue statement of a material fact, nor does it omit to state a material fact necessary to make the statements therein not misleading, except that with respect to assumptions, projections and expressions of opinion or predictions contained in the 2006 Business Plan and Budget, the Company represents only it believes there is a reasonable basis therefor.

3.10  Books and Records; Minutes

All accounts, ledgers, material files, documents, instruments, papers, books and records relating to the business, operations, conditions (financial or other) of each member of the Company Group, results of operations, and assets and properties of each member of the Company Group (collectively, the "BOOKS AND RECORDS"), each as supplied to the Investors, are true, correct, complete and current in all material respects, there are no material inaccuracies or discrepancies of any kind contained or reflected therein, and they have been maintained in accordance with relevant legal requirements and industry standards, as applicable, including the maintenance of an adequate system of internal controls. The minute books of each member of the Company Group, as made available to Investors and their representatives, contain complete and accurate records of all meetings of and corporate actions or written consents by the shareholders and the board of such member of the Company Group and, to the extent that such minute books are deficient, all material information not contained in such minutes has been conveyed to the Investors in other written form.

3.11  Tax Matters

10

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

All Tax Returns required to be filed in respect of each member of the Company Group have been duly and timely filed, have been prepared in compliance with Applicable Law, and are true, correct and complete. All Taxes due and payable by each member of the Company Group, whether or not shown as due on such Tax Returns, have been fully paid when due. Each member of the Company Group has established adequate reserves on their respective books of account for all Taxes and for the liability for deferred income Taxes payable in respect of such member of the Company Group. There have been no extraordinary examinations or audits of any tax returns or reports by any applicable governmental agency.

3.12 Review Reports

(i)  The Company has delivered to the Investors and attached as Section 3.12(i) of the Disclosure Schedule the review reports (the "REVIEW REPORTS") for the period from July 5, 2005 to May 31, 2006 and the period from June 1, 2006 to July 31, 2006 (the last date being the "REPORT DATE") and the financial forecast for the seven months ending December 31, 2006 of the Company. The Review Report and financial forecast are complete and correct in all material respects and present fairly the financial condition and position of the Company Group as of the Report Date, and are reviewed and signed off by KPMG in accordance with the IFRS.

(ii)  There are no debts, liabilities, or claims owed by or against any member of the Company Group, of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due, other than liabilities set forth in the Review Report or disclosed in Section 3.12(ii) of the Disclosure Schedule. None of the members of the Company Group is a guarantor or indemnitor of, or has provided security for, any indebtedness of any Person.

(iii)  Except as otherwise disclosed in Section 3.12(iii) of the Disclosure Schedule, all of the accounts receivable and notes receivable owing to each member of the Company Group, including without limitation all accounts receivable and notes receivable set forth on the Review Report, constitute valid and enforceable claims other than accounts receivable and notes receivable which individually and in the aggregate would not result in a Material Adverse Event if unpaid, and are good and collectible in the ordinary course of business in all material respects, net of any reserves shown on the Review Report (which reserves are adequate and were calculated on a basis consistent with IFRS), and no further goods or services are required to be provided in order to complete the sales and to entitle such Person to collect in full. There are no material contingent or asserted claims, refusals to pay, or other rights of set-off with respect to any member of the Company Group.

3.13 Absence of Changes

Since the Report Date, except as otherwise disclosed in Section 3.13 of the Disclosure Schedule:

(i)  None of the members of the Company Group has entered into any transaction that was not in the ordinary course of business.

11

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(ii) There has been no Material Adverse Event (individually or when separate events are taken together) with respect to any member of the Company Group or the Company Group taken as a whole.

(iii) None of the members of the Company Group has incurred any obligation or liability except obligations or liabilities incurred in the ordinary course of business.

(iv) There has been no resignation or termination of employment of any Senior Manager of any member of the Company Group, and the Company has no Knowledge of any impending resignation or termination of employment of any Senior Manager of any member of the Company Group.

(v) There has been no labor dispute involving any member of the Company Group or any of its respective employees and none is pending or threatened.

(vi) There has been no material change in any compensation arrangement or agreement with any employee of any member of the Company Group.

(vii) There have been no loans or guarantees made by any member of the Company Group to or for the benefit of any Person, other than travel advances and other advances made to employees in the ordinary course of business.

(viii) There has been no waiver by any member of the Company Group of a material right or debt owing to such member.

(ix) No member of the Company Group has purchased, acquired, sold, leased, granted a security interest in, pledged, mortgaged, created a lien in, or otherwise transferred a material portion of any material asset, whether tangible or intangible, other than the sale of inventory in the ordinary course of business and other than the creation of liens for taxes not yet due or payable.

(x) There has been no material change to, or termination of, any Material Contracts, no member of the Company Group has entered into any new Material Contracts other than those listed in Section 3.15 of the Disclosure Schedule, and there has been no change to the charter document of any member of the Company Group.

(xi) There has been no declaration, setting aside or payment or other distribution in respect of any of the share capital of any member of the Company Group, or any direct or indirect redemption, purchase or other acquisition of any such share capital by any member of the Company Group.

(xii) None of the members of the Company Group has incurred any indebtedness for money borrowed.

(xiii) There has been no damage to, destruction or loss of physical property (whether or not covered by insurance) materially affecting the business or operations of any member of the Company Group.

(xiv) There has been no agreement or commitment by any member of the Company Group to do any of the things described in this Section 3.13.

12

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

3.14  Litigation

Except as set forth in Section 3.14 of the Disclosure Schedule, there are no legal actions, suits, proceedings or claims pending in any jurisdiction in which the members of the Company Group operate, are organized or licensed to do business, or, to the Knowledge of the Company, threatened (whether or not the defense thereof or liabilities in respect thereof are covered by insurance), at law, in equity, in arbitration or before any governmental entity or authority against or affecting the Business or Condition of the Company Group or the Founder, or any of their respective assets or properties, nor does the Company have Knowledge of any facts which are likely to give rise to the same.

No injunction, writ, temporary restraining order, decree or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement or the other Ancillary Documents. No member of the Company Group has commenced or currently intends to initiate any legal action, suit, proceeding or claim.

3.15  Material Contracts

Section 3.15 of the Disclosure Schedule lists each outstanding Contract to which any member of the Company Group is a party or to which any member of the Company Group or any of their respective properties is subject or by which any thereof is bound that is deemed a Material Contract under this Agreement.

(i)   True and complete copies of the Material Contracts, including any amendments and supplements to such Contracts, have been delivered to the Investors or will be delivered to the Investors at least three (3) Business Days prior to the Closing; provided the Company may redact certain business sensitive information contained therein.

(ii)  Unless otherwise noted on Section 3.15(ii) of the Disclosure Schedule, each of the Material Contracts was entered into in the ordinary course of business.

(iii) Each Material Contract is valid and subsisting, enforceable by the parties thereto in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief or other remedies in the nature of equitable remedies. Each member of the Company Group has duly performed all its obligations under each Material Contract to the extent that such obligations to perform have accrued. No breach or default, alleged breach or default, or event which would (with the passage of time, notice or both) constitute a breach or default under any of the Material Contracts by any member of the Company Group, as the case may be, or any other party or obligor with respect thereto, has occurred, or as a result of this Agreement or any Ancillary Agreement, or the performance hereof or thereof, will occur.

(iv)  Consummation of the transactions contemplated by this Agreement and the Ancillary Agreements will not (and will not give any Person a right to) terminate or modify any

13

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

rights of, or accelerate or augment any obligation of any member of the Company Group under any Material Contract.

(v) Notwithstanding anything to the contrary provided herein, each of the following Contracts is deemed to be a Material Contract and has been identified in Section 3.15 of the Disclosure Schedule:

(a) any Contract that, after the Report Date, obligates any member of the Company Group to pay an amount in excess of US$1,000,000;

(b) any Contract of the Company or any Group Company that has an unexpired term of more than one (1) year valued in excess of US$1,000,000;

(c) any Contract on which the business of any member of the Company Group is substantially dependent or which is otherwise material to the Business or Conditions of any member of the Company Group;

(d) any loan agreement, indenture, letter of credit, security agreement, mortgage pledge agreement, deed of trust, bond, note, or other agreement relating to the borrowing of money or to the mortgaging, pledging, transferring of a security interest, or otherwise placing an encumbrance on any material asset or material part of the assets of any member of the Company Group, in an amount in excess of US$1,000,000;

(e) any Contract involving a guarantee by the Company or any Group Company of performance by any Person or involving any agreement of the Company or any Group Company to indemnify or act as surety for any Person, or any other Contract of the Company or any Group Company to be contingently or secondarily liable for the obligations of any Person;

(f) any Contract that limits or restricts the ability of any member of the Company Group to compete or otherwise to conduct its business in any manner or place;

(g) any joint venture, partnership, alliance or similar Contracts of the Company or any Group Company involving a sharing of profits or expenses (including joint development and joint marketing contracts);

(h) any asset purchase agreement, share purchase agreement or other Contract for acquisition by the Company or any Group Company of assets or shares of another Person;

(i) any agreement for the divestiture of (1) any assets by or of any member of the Company Group for consideration in excess of US$1,000,000 or (2) any shares of capital stock of any member of the Company Group;

(j) any sales agency, marketing or distributorship Contract the termination or non-extension of which would result in a Material Adverse Event;

(k) any Contract requiring performance on the part of the Company or any Group Company in any country other than the PRC;

14

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(l)   any Contract of the Company or any Group Company that grants a power of attorney, agency or similar authority to another Person or entity, agency or similar authority to another Person or entity;

(m)   any Contract that contains a right of first refusal in respect of the share capital of any member of the Company Group;

(n)   all supply agreements with vendors for materials, parts and other inputs for the Company's products and supply agreements with a value in excess of US$1,000,000;

(o)   all contracts with customers of the Company with a value (or expected value) in excess of US$1,000,000; and

(p)   any other Contract that was not made in the ordinary course of business of the Company or any Group Company or not made at arm's length.

3.16 Compliance with Laws

(i)   Each member of the Company Group is, and at all times has been, in full compliance with all Applicable Laws in any jurisdiction in which it operates, owns assets or is organized or licensed to do business.

(ii)  No event has occurred and no circumstance exists that (with or without notice or lapse of time) (a) may constitute or result in a violation by any member of the Company Group of, or a failure on the part of any member of the Company Group to comply with, any Applicable Law, or (b) may give rise to any obligation on the part of any member of the Company Group to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

(iii) None of the members of the Company Group has received any notice or other communication (whether oral or written) from any governmental or regulatory body regarding (a) any actual, alleged, possible, or potential violation of, or failure to comply with, any Applicable Law, including without limitation any applicable Environmental Laws and Applicable Law relating to customs, transfer pricing, foreign exchange and related import and export regulations or (b) any actual, alleged, possible, or potential obligation on the part of any member of the Company Group to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

(iv)  None of the members of the Company Group or the Founder, director, agent, employee or any other person acting for or on behalf of such member of the Company Group, has directly or indirectly (a) made any contribution, gift, bribe, payoff, influence payment, kickback, or any other improper payment in any form, whether in money, property, or services to any person, including but not limited to any officer of any Governmental Authority (w) to obtain favorable treatment in securing business for such member or any other member of the Company Group, (x) to pay for favorable treatment for business secured, (y) to obtain special concessions or for special concessions already obtained, for or in respect of such member or any other member of the Company Group, or (z) in violation of any Applicable Law, or (b) established or maintained any fund or assets in

15

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

which such member of the Company Group has proprietary rights that
have not been recorded in the Books and Records of such member of the
Company Group, except, in each case, for such payments which
facilitate or expedite the performance of routine government action
and which was lawful under the laws of the jurisdiction of such
payments.

3.17 Real Property

(i)     None of the members of the Company Group owns or has legal or
equitable title or other right or interest in any real property other
than the land use rights (the "LAND USE RIGHTS") held by the Company
Group as set forth in Section 3.17(i) of the Disclosure Schedule or as
held pursuant to Lease (as defined below). True and complete copies of
the certificates evidencing the Land Use Rights have been delivered to
each of the Investors or their agents or professional advisers. Any
land grant premium required under Applicable Law in connection with
securing such Land Use Rights has been fully paid. The use of any real
property by each of the members of the Company Group has conformed to
the intended use of such real property as granted under the applicable
Land Use Rights. The particulars of the Land Use Rights as set out in
Section 3.17(i) of the Disclosure Schedule are true and complete.

(ii)    Section 3.17(ii) of the Disclosure Schedule sets forth each leasehold
interest with the annual lease payment in excess of US$50,000 pursuant
to which any member of the Company Group holds any rights, titles or
interests of a tenant (each a "LEASE"), indicating the parties to such
Lease, the address of the property demised under the Lease, the rent
payable under the Lease and the term of the Lease. Each Lease
constitutes the entire agreement to which any member of the Company
Group is party with respect to the property demised thereunder, and a
true and complete copy of each such Lease has been delivered to the
Investors, together with all amendments, modifications, alterations
and other changes thereto. Each Lease is valid and subsisting,
enforceable against the parties thereto in accordance with its terms.
As of the date hereof, all conditions precedent to the enforceability
of each Lease have been satisfied and there exists no breach or
default, nor state of facts which, with the passage of time, notice,
or both, would result in a breach or default on the part of any party
to the Lease. Each member of the Company Group has accepted possession
of the property demised pursuant to each Lease and is in actual
possession thereof and has not sublet, assigned or hypothecated its
leasehold interest except as set forth on Section 3.17(ii) of the
Disclosure Schedule. The particulars of the Leases as set out in
Section 3.17(ii) of the Disclosure Schedule are true and complete.

(iii)   Except as set forth in Section 3.17(iii) of the Disclosure Schedule,
each member of the Company Group has obtained property ownership
certification for the plants, buildings and improvements located on
land with respect to which it holds Land Use Rights (collectively, the
"IMPROVEMENTS"). The Improvements and the operation thereof are part
of a construction project plan approved by the applicable construction
commission for the jurisdiction where the Improvements are located and
do not (A) contravene any Applicable Law relating to zoning or
building or (B) violate any restrictive covenant or any provision, in
the case of either (i) or (ii), the effect of which could interfere
with or

16

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

prevent the continued use of such Improvements for the purpose for which they are now being used. All of the Improvements are in good operating condition and in a state of reasonable maintenance and repair (except for ordinary wear and tear) and are adequate for the conduct of the business of each member of the Company Group as currently conducted.

(iv) Each of the Land Use Rights and the Improvements is free and clear of any and all encumbrances except for those identified in Section 3.17(iv) of the Disclosure Schedule. A true and complete copy of each of the agreements relating to the encumbrances identified in Section 3.17(iv) of the Disclosure Schedule (the "MORTGAGES") has been delivered to each of the Investors.

(v) Except as set forth in Section 3.17(v) of the Disclosure Schedule, none of the Company Group uses any real property in the conduct of its business except insofar as it holds valid Land Use Rights or has secured a Lease with respect thereto. No default or event of default on the part of any member of the Company Group or event which, with the giving of notice or passage of time or both, would constitute a default or event of default has occurred and is continuing unremedied or unwaived under the terms of any of the Land Use Rights, the Leases or Mortgages. There exists no pending or threatened condemnation, confiscation, dispute, claim, demand or similar proceeding with respect to, or which could materially and adversely affect, the continued use and enjoyment of any Land Use Right, Lease or Improvement. The Land Use Rights, Leases and Mortgages are valid and subsisting and are enforceable in accordance with the terms contained therein in all material respects.

3.18 Personal Property

(i) The personal property of each member of the Company Group is sufficient for the conduct of its business as currently conducted.

(ii) All personal property of each member of the Company Group which is reflected in the Review Report therefor delivered to the Investors under Section 3.12(i) or which has been acquired by any member of the Company Group since the Report Date and which has not been disposed of in the ordinary course of its business is owned by such member of the Company Group free and clear of any encumbrances.

(iii) All machinery, tools and equipment of each member of the Company Group (other than inventories) which are reflected in the Review Report therefor delivered to the Investors under Section 3.12(i) or which have been acquired thereby since the Report Date are in a state of reasonable maintenance and repair (except for ordinary wear and tear) and are adequate for the conduct of the business thereof as currently operated.

(iv) The inventories of each member of the Company Group which are reflected in the Review Report therefor delivered to the Investors under Section 3.12(i) were, on the Report Date, in good condition, and any inventories produced or acquired thereby after such date (to the extent not sold or otherwise disposed of in the ordinary course of business), are in good condition, are useable or useful in the ordinary course of the business thereof and are not in excess of reasonable requirements.

17

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

3.19 Entire Business

    There are no material facilities, services, assets or properties shared with any other entity, which are used in connection with the business operations of the Company Group, and all of the facilities, services, assets or properties owned by the Group Companies are sufficient to conduct its business as proposed to be conducted.

3.20 Compliance with Other Instruments

    None of the members of the Company Group is in, nor will the conduct of business of any of them as proposed to be conducted result in, any violation, breach or default of the Memorandum and Articles or any other constitutional documents (which include, as applicable, any articles of incorporation, by-laws, joint venture contracts and the like), or of any material respect of any term or provision of any mortgage, indenture, contract, agreement or instrument to which any such member of the Company Group is a party or may be bound, or of any provision of any judgment, decree, order, statute, rule or regulation applicable to or binding upon any of them. The execution, delivery and performance of and compliance with each of the Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated thereby, will not result in any such violation, breach or default, or be in conflict with or constitute, with or without the passage of time or the giving of notice or both, either a default under the Memorandum and Articles or any other such constitutional documents, any such contract, agreement or instrument, or a violation of any statutes, laws, regulations or orders, or an event which results in the creation of any lien, charge or encumbrance upon any asset of the Company Group.

3.21 Interested Party Transactions

    No officer, director or shareholder, founder of the Company Group or any Affiliate of any of them has had, either directly or indirectly, any interest in (except less than 1% shareholdings for investment purposes in securities of publicly held and traded companies), or is an officer, director, employee or consultant of: (a) any person or entity which purchases, leases or borrows from or sells, licenses, leases, lends or furnishes to any member of the Company Group any goods, property, technology, intellectual or other property rights or services; or (b) any contract or agreement to which any member of the Company Group is a party or by which it may be bound or affected, except as set forth in Section 3.21 of the Disclosure Schedule. All such contracts and agreements were made on terms and conditions as favorable to such member of the Company Group as, or more favourable to such member of the Company Group than, would have been obtainable by it at the time in a comparable arm's-length transaction with an unrelated party.

3.22 Intellectual Property Rights

    (i)    Each member of the Company Group owns or otherwise has the sufficient legal right or license to use all Intellectual Property necessary to permit the members of the Company Group to carry on their businesses as currently conducted and as proposed to be conducted. No claims are currently being asserted against any member of the Company Group, nor is any member of the Company Group aware of any threatened claim or demand, by any other Person (a) challenging or questioning the Company Group's validity, enforceability, ownership or use of any of the Intellectual Property owned or used by the Company Group or the validity or effectiveness of any license or similar

18

agreement with respect thereto or (b) alleging any interference, infringement, misappropriation or unfair competition or trade practices.

(ii)  Section 3.22(ii) of the Disclosure Schedule sets forth a complete list of the registered rights to, registration applications of, and licenses under, any (a) trademarks, service marks and trade names; (b) patents; (c) copyrights; (d) domain names of each member of the Company Group.

(iii)  Each member of the Company Group has taken reasonable steps and measures to establish and preserve ownership of or right to use all Intellectual Property material to the operation of its business. Each member of the Company Group has taken reasonable steps to register, protect, maintain, and safeguard the Intellectual Property material to its business, including any Intellectual Property for which improper or unauthorized disclosure would impair its value or validity, and has executed appropriate nondisclosure and confidentiality agreements and made all appropriate filings, registrations and payments of fees in connection with the foregoing. There is no infringement or misappropriation by any other Person of any Intellectual Property of any member of the Company Group. No proceedings or claims in which any member of the Company Group alleges that any Person is infringing upon, or otherwise violating, any Intellectual Property of any member of the Company Group are pending, and none has been served, instituted or asserted by any member of the Company Group.

(iv)  Each member of the Company Group owns all rights in and to any and all Intellectual Property used or planned to be used by such member of the Company Group, or covering or embodied in any past, current or planned activity, service or product of such member of the Company Group, which Intellectual Property was made, developed, conceived, created or written by any consultant retained, or any employee employed, by such member of the Company Group. No former or current employee, and no former or current consultant, of any member of the Company Group has any rights in any Intellectual Property made, developed, conceived, created or written by the aforesaid employee or consultant during the period of his or her retention by such member of the Company Group which can be asserted against such member of the Company Group, and such member of the Company Group has no obligation to compensate any former or current employee for the use of any such Intellectual Property. Except as set forth on Section 3.22(iv) of the Disclosure Schedule, each former and present employee and consultant of each of the Company Group has executed a Confidentiality, Assignment of Inventions and Non-Competition Agreement in substantially the form attached hereto as Exhibit D. None of the Company, the PRC Subsidiary or the Founder is aware that any of the employees employed, or any of the consultants retained by any member of the Company Group is in violation thereof.

(v)  No Intellectual Property owned by any member of the Company Group is the subject of any security interest, lien, license or other Contract granting rights therein to any other Person. The Company Group has not (a) transferred or assigned, (b) granted an exclusive license to or (c) provided or licensed in source code form, any Intellectual Property owned by any member of the Company Group to any Person.

19

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(vi)  To the Knowledge of the Company, no patent, invention, device, principle or any statute, law, rule, regulation, standard or code is pending or proposed which would restrict the ability of any member of the Company Group to use any of the Intellectual Property Rights used in the conduct of their business.

3.23  Labor Agreements and Actions; Employee Compensation

(i)   Except as disclosed in Section 3.23 of the Disclosure Schedule, none of the members of the Company Group is a party to or is bound by any currently effective employment contract, deferred compensation agreement, bonus plan, incentive plan, profit sharing plan, retirement agreement, vacation, hospitalization, medical or other plan, policy, trust or arrangement or other employee compensation agreement.

(ii)  The Company is not aware that any of the Key Persons, senior officer or key employee, or that any group of key employees, intends to terminate their employment with the Company Group, nor does the Company Group have a present intention to terminate the employment of any of the foregoing. The employment of each of the Key Persons, senior officer and key employee of each member of the Company Group is terminable at the will of such member of the Company Group without giving rise to a claim for compensation or damages (other than a statutory severance or redundancy payment or statutory compensation for unfair dismissal). Each members of the Company Group has complied in all material respects with all Applicable Laws related to employment.

(iii) None of the members of the Company Group has any liability (whether legally binding or not) to make any payment to or for the benefit of any employee, officer, consultant, independent contractor or agent in respect of past service, pension or the termination of the employment or engagement of that or any other person (including without limitation, payments for wrongful or unfair dismissal, loss of office or redundancy) that would have a Material Adverse Effect, other than in respect to current month payroll expenses and related deductions in relation to employee and employer contributions.

3.24  Benefit Plans

(i)   None of the members of the Company Group has scheduled or agreed upon future increases of benefit levels (or creations of new benefits) with respect to any Benefit Plan, and no such increases or creation of benefits have been proposed or made the subject of representations to employees of the Company Group under circumstances which make such employees reasonably expect that such increases will be granted. No loan is outstanding between any member of the Company Group and any employee.

(ii)  Other than statutory social insurance plans operated under the Applicable Laws of the PRC, no member of the Company Group provides or is required to provide any retirement, social insurance, life insurance, medical, dental or other welfare benefits provided on ill-health, injury, death disability or on termination of employment (whether voluntary or involuntary) to any current or former employees, officers, consultants, independent contractors or agents of the Company Group.

20

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(iii) Each member of the Company Group has complied with all Applicable Laws in all material respects relating to any of the Benefit Plans, including by deducting and making all required contributions and payments required to be made by or on behalf of any employees of the Company Group to the relevant Governmental Authority, and no such deductions have been challenged or disallowed by any Governmental Authority or any employee of the Company Group. None of the members of the Company Group has been delinquent in making any payment to or for the benefit of any current or former employee, officer, consultant, independent contractor or agent with respect to statutory social insurance plans operated under the Laws of the PRC.

3.25 No State Assets

Except as set forth in Section 3.25 of the Disclosure Schedule, none of the assets of any member of the Company Group constitute state-owned assets and, inasmuch, are not required to undergo any form of valuation under Applicable Law in the PRC governing the transfer of state-owned assets prior to the consummation of the transactions contemplated herein or in any of the Ancillary Agreements.

3.26 Conflict of Interest

Section 3.26 of the Disclosure Schedule lists all existing or potential conflict of interest any Key Person may have with the members of the Company Group, and all measures that have been taken or are planned to be taken to address such conflicts.

3.27 Insurance

Section 3.27 of the Disclosure Schedule contains copies of all of the insurance policies or programs of each of the members of the Company Group in effect as of the date hereof that have an insured amount of at least US$50,000,000, and indicates the insurer's name, policy number, expiration date, amount of coverage, type of coverage, annual premiums, exclusions and deductibles, that is in effect. All such policies are underwritten by financially sound and reputable insurers, and are sufficient to satisfy all Applicable Laws in all material respects. All such policies will remain in full force and effect and will not in any way be affected by, or terminate or lapse by reason of any of the transactions contemplated hereby.

3.28 Customers

Section 3.28 of the Disclosure Schedule contains a true, complete and correct list of the ten largest customers of the Company Group taken as a whole in terms of sales during the six-month period from January 1, 2006 to June 30, 2006 and the twelve-month period ended December 31, 2005. There exists no actual or, to the Knowledge of the Company, threatened termination, cancellation or limitation of, or any adverse modification or change in, the business relationship of the members of the Company Group or their business with any customer or any group of customers whose purchases are individually or in the aggregate material to the business of the Company Group, and there exists no present condition or state of facts or circumstances that would cause a Material Adverse Effect or prevent the members of the Company Group from conducting their business after the consummation of the transactions contemplated by this Agreement, in substantially the same manner in which such business has heretofore been conducted.

21

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

3.29 Suppliers

The total amount of silicon feedstock that has been delivered and will be delivered under the currently effective supply contracts during the financial years ending December 31, 2006 and 2007 is no less than 2,000 tons. The weighted average price per kilogram of such silicon feedstock is no more than US$150.

3.30 Environmental Matters

(i)  The property, assets and operations of the members of the Company Group are and have been in material compliance with all applicable Environmental Laws. No Hazardous Materials have been released, on or into any of the properties or premises of the Company and its Subsidiaries, including without limitation, the ground water, in contravention of Environmental Laws.

(ii) None of the properties, assets or operations of any of the members of the Company Group is the subject of any governmental investigation evaluating whether (i) any remedial action is needed to respond to a release or threatened release of any Hazardous Materials into the environment or (ii) any release or threatened release of any Hazardous Materials into the environment is in contravention of any Environmental Law.

None of the members of the Company Group has received any written notice or claim, nor to the Knowledge of the Company, there are pending or threatened lawsuits or proceedings against any of them with respect to violations of an Environmental Law or any release or threatened release of any Hazardous Materials into the environment.

3.31 Full Disclosure

The Company, the PRC Subsidiary and the Founder have provided each of the Investors with all the information that such Investor has requested for deciding whether to consummate the transactions contemplated under this Agreement. None of this Agreement, any Ancillary Agreements or any other statements or certificates or other materials made or delivered, or to be made or delivered, to such Investor in connection herewith or therewith, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading. No representation or warranty by the Company, the PRC Subsidiary or the Founder in this Agreement and no information or materials provided to such Investor in connection with its due diligence investigation of any member of the Company Group or the negotiation and execution of this Agreement and the Ancillary Agreements contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact required to be stated therein or necessary in order to make the statement therein, in light of the circumstances in which they are made, not misleading.

The Company, the PRC Subsidiary and the Founder acknowledge that each of the Investors is entering into this Agreement in reliance on the representations and warranties given herein and that the representations and warranties have been given with the intention of inducing the Investors to enter into this Agreement.

22

4.    REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

Each of the Investors hereby severally but not jointly represents and warrants to the Company as of the date of this Agreement and as of the Closing that:

4.1    Authorization

Such Investor has full power and authority to enter into this Agreement, and this Agreement, when executed and delivered by such Investor, will constitute its valid and legally binding obligation, enforceable in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

4.2    Purchase for Own Account

This Agreement is made with such Investor in reliance upon such Investor's representation to the Company, which by such Investor's execution of this Agreement such Investor hereby confirms, that the Series B Preferred Shares to be acquired hereunder and the Ordinary Shares to be issued upon conversion of the Series B Preferred Shares (collectively, the "SECURITIES") will be acquired by such Investor for investment for such Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, each of the Investors further represents that it does not have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Securities.

4.3    No Public Market

Such Investor understands that the Securities have not been, and will not be, registered under the Securities Act, that no public market now exists for the Securities, that the Company has made no assurances that a public market will ever exist for the Securities, and that the Securities may not be resold absent a registration under the Securities Act or an available exemption from the registration requirements of the Securities Act.

4.4    Investment Experience

Such Investor acknowledges that it is able to bear the economic risk of this investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Securities.

4.5    Disclosure of Information

The Investors and their advisors have been furnished with all materials relating to the business, finances and operations of any member of the Company Group and materials relating to the securities which have been requested by the Investors or their advisors. The Investors and their advisors have been afforded the opportunity to ask questions of representatives of any member of the Company Group and have received answers to such questions, as the Investors deem necessary in connection with its decision to subscribe for the Series B Preferred Shares. For the

23

avoidance of doubt, nothing in this Section 4.5 shall limit in any way the scope of the warranties set forth in Section 3 of this Agreement or the liability of the Company, the PRC Subsidiary or the Founder for breach thereof.

4.6  Legends

Such Investor understands that the certificates evidencing the securities issued pursuant to this Agreement may bear the following legend:

"These securities have not been registered under the Securities Act of 1933, as amended. They may not be sold, offered for sale, pledged or hypothecated in the absence of a registration statement in effect with respect to the securities under such Act or an opinion of counsel satisfactory to the Company that such registration is not required or unless sold pursuant to Rule 144 of such Act."

5.  CONDITIONS OF THE INVESTORS' OBLIGATIONS AT THE CLOSING

The obligations of each Investor under this Agreement at the Closing are subject to the fulfillment on or before the Closing of each of the following conditions unless waived by each Investor with respect to itself; provided, however, that any waiver of a condition shall not be deemed a waiver of any breach of any representation, warranty, agreement, term or covenant or of any misrepresentation by the Company, the PRC Subsidiary or the Founder, except to the extent expressly so waived.

5.1  Representations and Warranties

The representations and warranties of the Company, the PRC Subsidiary and the Founder contained in Section 3 shall be true, correct and complete in all material respects when made, and shall be true, correct and complete on and as of Closing at which the Investors are acquiring the Series B Preferred Shares with the same effect as though such representations and warranties had been made on and as of the date of the Closing.

5.2  Performance

Each of the Company, the PRC Subsidiary and the Founder shall have performed and complied with all agreements, obligations and conditions contained in this Agreement in all material respects that are required to be performed or complied with by it on or before the Closing.

5.3  Compliance Certificate

The Chief Executive Officer of the Company shall deliver to the Investors at the Closing a certificate stating that the condition specified in Section 5.1, 5.2, 5.5 and 5.19 have been fulfilled in all material respects and stating that there shall have been no Material Adverse Change since the Report Date.

5.4  Secretary's or Director's Certificate

The Investors shall have received a certificate from the Company, dated as of the Closing Date and signed by the Secretary or a director of the Company, certifying (a) that the attached copies of the organizational documents of the Company and each of the members of the Company Group and the resolutions of the Board of Directors and/or shareholders (as appropriate) of the Company

24

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

and the PRC Subsidiary approving this Agreement and the Ancillary
Agreements and the transactions contemplated hereby and thereby, are all
true, complete and correct and remain unamended and in full force and
effect, (b) that the incumbency and specimen signature of each officer of
the Company and the PRC Subsidiary executing each such document or any
other document delivered in connection herewith or therewith on behalf of
the Company, (c) that the attached copies of current business licenses of
the Company and each of the Group Companies are all true, complete and
correct and remain unamended and in full force and effect, and (d) that the
attached copy of a good standing certificate for the Company is true,
complete and correct.

5.5    Governmental Consents and Approvals

Each of the Company, the PRC Subsidiary and the Founder shall have obtained
all authorizations, approvals, waivers or permits of any competent
Governmental Authority or regulatory body for the consummation of all of
the transactions contemplated by this Agreement that are required in
connection with the lawful issuance and sale of the Series B Preferred
Shares pursuant to this Agreement, and all such authorizations, approvals,
waivers and permits shall be effective as of the Closing.

5.6    Corporate Approval

The Investors shall have received true, complete and correct copies of the
resolutions of the Board of Directors and/or shareholders (as appropriate)
of the Company and the PRC Subsidiary and such other agreements, schedules,
exhibits, certificates, documents, financial information and filings which
are reasonably required in connection with or relating to the transactions
contemplated hereby, all in form and substance reasonably satisfactory to
the Investors.

5.7    Consents From Third Parties

Each of the Company, the PRC Subsidiary and the Founder shall have obtained
any necessary third-party consents required in connection with or relating
to the transaction contemplated hereby by virtue of Applicable Laws,
contractual obligations or otherwise.

5.8    2006 Review Report

The Company shall have, at the Company's expense, prepared and submitted to
the Investors: (i) the Review Report, all prepared under IFRS and reviewed
by the Auditor; and (ii) financial forecast for the seven months ending
December 31, 2006, prepared and signed off by KPMG which shall be
consistent with the 2006 Business Plan and Budget previously delivered to
the Investors.

5.9    Due Diligence

The Investors shall have completed and be satisfied with the results of all
business, legal and financial due diligence, and any items requiring
correction identified by any Investor shall have been corrected to the
Investors' reasonable satisfaction. Without limiting the foregoing, the
Investors shall have received from the Company all documents and other
materials reasonably requested by the Investors for the purpose of
examining and determining the rights of the Company, the PRC Subsidiary or
any other members of the Company Group in and to any technology, products
and Proprietary Assets now used, proposed to be used in, or necessary to
the

25

Company or the PRC Subsidiary's business as now conducted and proposed to
be conducted, and the status of its ownership rights in and to all such
technology, products and Proprietary Assets shall be reasonably
satisfactory to the Investors.

5.10   Approval of the Investment Committee

Each Investor's investment committee shall have approved the terms of the
investment, including this Agreement and all ancillary or related
agreements.

5.11   Proceedings and Documents

All corporate and other proceedings in connection with the transactions
contemplated at the Closing and all documents incident thereto shall be
reasonably satisfactory in form and substance to the Investors, and each
Investor shall have received all such counterpart original or other copies
of such documents as it may reasonably request.

5.12   Subscription for the Series B Preferred Shares Permitted by Applicable Laws

The subscription for the Series B Preferred Shares by the Investors
hereunder and the consummation of the transactions contemplated hereby (a)
shall not be prohibited by the Memorandum and Articles or any Applicable
Laws, (b) shall not subject the Investors to any penalty or other onerous
condition under or pursuant to any Applicable Law, and (c) shall be
permitted by all Applicable Laws to which the Investors or the transactions
contemplated by or referred to herein or in the other documents and
agreements contemplated hereby are subject; and the Investors shall have
received such certificates or other evidence as they may reasonably request
to establish compliance with this condition.

5.13   Memorandum and Articles

The Memorandum and Articles shall have been duly amended by all necessary
action of the Company's board of directors and shareholders in
substantially the form attached hereto as Exhibit A and such amendment
shall be duly filed with and registered by the Registrar of Companies of
the Cayman Islands within fifteen (15) days of the adoption of such
amendment as required by the applicable Cayman Islands law.

5.14   Shareholders Agreement

The Founder and the Company shall have entered into a Shareholders
Agreement (the "SHAREHOLDERS AGREEMENT") in substantially the form attached
hereto as Exhibit E, and such agreement shall be in full force and effect.

5.15   Opinion of the Company's Cayman Islands Counsel

The Investors shall have received from Conyers Dill & Pearman, Cayman
Islands counsel for the Company, an opinion, dated as of the Closing, in
the form attached hereto as Exhibit F.

5.16   Opinion of the Company's PRC Counsel

The Investors shall have received from Grandall Legal Group, PRC counsel
for the Company, an opinion, dated as of the Closing, substantially in the
form and to the effect of Exhibit G, and to

26

such further effect as the Investors may reasonably request.

5.17 Confidentiality, Commitment and Non-Competition Agreement

The Founder and Key Persons of each member of the Company Group with access to confidential information shall have executed a Confidentiality, Assignment of Inventions and Non-Competition Agreement dated on or before the Closing, in the form attached hereto as Exhibit D.

5.18 Registration Rights Agreement

The Company shall have agreed to grant the Investors certain registration rights in accordance with the Amended and Restated Registration Rights Agreement (the "REGISTRATION RIGHTS AGREEMENT") in substantially the form attached hereto as Exhibit H.

5.19 No Litigation

No action, suit, proceeding, claim, arbitration or investigation shall have been threatened or instituted against any of the Founder, the Company, the PRC Subsidiary, any other members of the Company Group or any Investor (a) seeking to restrain, prevent or change the transactions contemplated hereby or questioning the validity or legality of any of such transactions, or (b) which would, if resolved adversely to the Investors or the Company, severally or in the aggregate, cause a Material Adverse Effect.

5.20 No Material Adverse Change

There shall not have occurred prior to the Closing any event or transaction reasonably likely to have a Material Adverse Effect (the "MATERIAL ADVERSE CHANGE").

5.21 Board Observers

The Company shall have duly appointed each of the persons designated in writing by the Investors (excluding Tech Team Holdings Limited, Grand Gains International Limited and BOFA Capital Company Limited) at the Closing to be observers on the Board of Directors of the Company.

5.22 No Material Judgment or Order

There shall not be on the Closing any judgment or order of a court of competent jurisdiction or any ruling of any governmental entity or authority or any condition imposed under any Applicable Law which, in the reasonable opinion of the Investors, would prohibit the subscription of the Series B Preferred Shares hereunder or subject the Investors to any penalty or other onerous condition under or pursuant to any Applicable Law if the Series B Preferred Shares were to be purchased hereunder or would cause a Material Adverse Effect.

5.23 Closing Condition Fulfilment Notice

Upon fulfilment of all the closing conditions set forth in this Section 5, the Investors, through their legal counsel, shall have issued to the Company a closing condition fulfilment notice acknowledging that all the closing conditions set forth herein have been met.

27

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

6.    CONDITIONS OF THE COMPANY'S, THE PRC SUBSIDIARY'S AND THE FOUNDER'S
      OBLIGATIONS AT THE CLOSING

The obligations of the Company, the PRC Subsidiary and the Founder among
themselves and to the Investors under this Agreement at the Closing are subject
to the fulfillment on or before the Closing of each of the following conditions
by each of the Investors:

6.1    Representations and Warranties

      The representations and warranties of the Investors contained in Section 4
      shall be true, correct and complete when made, and shall be true, correct
      and complete on and as of the Closing with the same effect as though such
      representations and warranties had been made on and as of the Closing.

6.2    Performance

      Each of the Investors shall have performed and complied with all
      agreements, obligations and conditions contained in this Agreement that are
      required to be performed or complied with by it on or before the Closing.

7.    COVENANTS

7.1    Covenants Until Closing

      The Company, the PRC Subsidiary and the Founder covenant and agree with the
      Investors that, at all times from and after the date hereof until the
      Closing, the Company, the PRC Subsidiary and the Founder will comply with
      the following covenants and provisions, except to the extent the Investors
      may otherwise consent in writing.

      (i)    Governmental Authorization; Maintenance of Licenses

            The Company and the PRC Subsidiary will, and the Founder will procure
            the members of the Company Group to (i) proceed diligently and in good
            faith and use all commercially reasonable efforts, as promptly as
            practicable, to obtain all consents, approvals or actions of, to make
            all filings with and to give all notices to Governmental Authorities
            required of the Company or any Subsidiary to consummate the
            transactions contemplated hereby, (ii) provide such other information
            and communications to such Governmental Authorities as the Investors
            or such Governmental Authorities may reasonably request in connection
            with the consummation of the transactions contemplated hereby, (iii)
            cooperate with the Investors in obtaining as promptly as practicable
            all consents, approvals or actions of, making all filings with and
            giving all notices to Governmental Authorities required of the
            Investors to consummate the transactions contemplated hereby, and (iv)
            ensure that all Licenses are, and will remain, in full force and
            effect at all times following the Closing.

      (ii)   Dividends

            The Company and the PRC Subsidiary will not, and the Founder will
            procure the Company and the PRC Subsidiary not to, declare or issue
            any dividends for any class of shares of the Company and the PRC
            Subsidiary.

                                       28

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(iii)  Major Transactions

The members of the Company Group shall not, and the Founder shall ensure that the members of the Company Group shall not, effect any merger, consolidation, scheme of arrangement, recapitalization, fund raising or sale of all or substantially all of the assets of any member of the Company Group without obtaining the consent of the Investors prior to the actual execution of such activities. For the avoidance of doubt, any business transactions that are in the ordinary course of business of the Company and are consistent with the Company's past practice are not subject to the foregoing restriction.

(iv)  Notice and Cure

The members of the Company Group shall conduct their business in a manner, and shall otherwise use all reasonable efforts, so as to ensure that the representations and warranties set forth in Section 3 hereof shall continue to be true and correct on and as of the Closing Date as if made on and as of the Closing. The Company, the PRC Subsidiary and the Founder will notify the Investors promptly in writing of, and will as soon as practicable provide the Investors with true and complete copies of any and all information or documents relating to, and will use all best efforts to cure before the Closing, any event, transaction or circumstance occurring after the date of this Agreement that causes or will cause any covenant or agreement of any such party under this Agreement to be breached or that renders or will render untrue any representation or warranty of any such party contained in this Agreement as if the same were made on or as of the date of such event, transaction or circumstance. The Company also will notify the Investors promptly in writing of, and will use all best efforts to cure, before the Closing, any violation or breach of any representation, warranty, covenant or agreement made by the Company in this Agreement, whether occurring or arising before, on or after the date of this Agreement. No notice given pursuant to this Section 7.1(iv) shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of any condition contained herein or shall in any way limit the Investors' right to seek any remedy available at law or in equity.

(v)  Fulfillment of Conditions

The Company, the PRC Subsidiary and the Founder will execute and deliver at or prior to the Closing this Agreement and each of the Ancillary Agreements that they are required hereby to execute and deliver as a condition to the Closing, and will take all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy the other conditions to the obligations of the Investors contained in this Agreement and will not permit the Company or any member of the Company Group to take or fail to take any action that could reasonably be expected to result in the nonfulfillment of any such condition.

(vi)  Memorandum and Articles

The Founder hereby agrees to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under the Applicable Law to abide by the terms of the

29

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Memorandum and Articles, as may be amended from time to time, and to cause each Group Company to conduct its business as if bound by the Memorandum and Articles. The Founder further agrees to execute and deliver, or cause to be executed and delivered, such other documents, certificates, agreements and other writings and to take, or cause to be taken, such other actions as reasonably deemed necessary in order to consummate or implement expeditiously the provisions of the Memorandum and Articles, each as may be amended from time to time.

7.2  Covenants After Closing

The Company, the PRC Subsidiary and the Founder covenant and agree with the Investors that, at all times from and after the date hereof, they will comply with the following covenants.

(i)  Use of Proceeds

Without the Investors' prior written consent, the Subscription Price paid by the Investors to the Company shall be only used by the Company to implement business expansion, make capital expenditures and meet general working capital needs of the PRC Subsidiary within the business scope of solar energy in accordance with the Business Plan of the Company and/or the PRC Subsidiary approved by the Investors. For the avoidance of doubt, the Company shall not use any of the Subscription Price to make payment for any indebtedness of any Group Company.

(ii)  Disclosure of Major Events

The Company covenants to disclose to all of its shareholders all major events that may lead to liabilities of any of the members of the Company Group, including without limitation, legal proceedings threatened or taken against the Company Group.

(iii)  Internal Control and Financial Management

The Company and the PRC Subsidiary shall use their best efforts to adopt an internal control system that ensures the separation of internal audit and financial control of the Company and the PRC Subsidiary, respectively.

(iv)  Regulatory Compliance

The Company, the PRC Subsidiary and the Founder shall cause all shareholders of the Company and the PRC Subsidiary (or any successor entity) to timely complete all required registrations and other procedures with applicable governmental authorities, including without limitation the State Administration of Foreign Exchange, if and when required pursuant to applicable law, and shall ensure that at all times the Company, the PRC Subsidiary and their respective shareholders are in compliance with such requirements and that there is no barrier to repatriation of profits, dividends and other distributions from the PRC Subsidiary (or any successor entity) to the Company.

(v)  Hiring of Chief Operating Officer

Within six (6) months following the Closing, the Company shall hire, and the Founder shall take, or cause to be taken, all actions and shall do, or cause to be done, all things

30

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

that are necessary, desirable or appropriate to cause the Company to hire a Chief Operating Officer of international and professional standard. The Investors agree to assist the Company in such hiring process.

(vi) Key Man Insurance

Within ninety (90) days following the Closing, the Company shall obtain key man insurance policy for the Founder, the terms and conditions of which shall be to the reasonable satisfaction of the Investors.

(vii) PRC Matters

(a) Within ninety (90) days following the Closing, the Company shall obtain valid titles to all land and buildings located on such land which are used in the conduct of business by the Company Group, and enter into valid and binding land use right transfer agreements to acquire such land if necessary.

(b) Within ninety (90) days following the Closing, the Company shall procure the PRC Subsidiary to obtain all permits, certificates, authorizations and approvals required under any PRC environmental laws, regulations, ordinance and orders in connection with the business operations of the PRC Subsidiary.

(viii) Unless the Board of Directors otherwise approves, including the consent of the Investor Director which shall not be unreasonably withheld, the Company shall commence preparation work for a Qualified IPO in the last quarter of 2006 and procure a formal mandate to be signed with one or more internationally recognized investment banks with respect to a Qualified IPO on the stock exchanges in the US no later than December 31, 2006.

8.   CONFIDENTIALITY

8.1  Disclosure of Terms

Each party hereto agrees that it will maintain the confidentiality of the terms and conditions of this Agreement, all exhibits and schedules attached hereto (collectively, the "FINANCING TERMS") and the transactions contemplated hereby of the Company; provided, however, such obligation of confidentiality shall not apply to (i) information which was in the public domain or otherwise known to the relevant party before it was furnished to it by another party hereto or, after it was furnished to that party, entered the public domain otherwise than as a result of (1) a breach by that party of this Section 8.1 or (2) a breach of a confidentiality obligation by the disclosing party, where the breach was known to that party; (ii) information the disclosure of which is necessary in order to comply with applicable law, the order of any court, the requirements of a stock exchange or other governmental or regulatory authority or to obtain tax or other clearances or consents from any relevant authority; (iii) information disclosed by the Investors to a bona fide proposing purchaser of any Series B Preferred Shares, (iv) information disclosed by the parties hereto to their respective directors, managers, officers, employees, partners, accountants and attorneys where such Persons or entities are under appropriate nondisclosure obligation to the relevant party; or (v) any disclosure by each Investor to such Investor's and/or fund manager's and/or its Affiliate's legal counsel, fund manager, auditor, insurer, accountant, consultant or to any officer,

31

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

director, general manager, limited partner, its fund manager, shareholder, investment counsel or advisor, or employee of such Investor and/or its Affiliates; provided, however, that any counsel, auditor, insurer, accountant, consultant, officer, director, general partner, limited partner, fund manager, shareholder, investment counsel or advisor, or employee shall be advised of the confidential nature of the information or are under appropriate non-disclosure obligation imposed by professional ethics, law or otherwise; and (vi) any disclosure of information by any Investor for fund and inter-fund reporting purposes.

8.2  Press Releases

Notwithstanding any other provision of this Section 8, with respect to the transactions contemplated under this Agreement, within sixty (60) days after the Closing, the Company may issue a press release through any media channels, including industrial conferences, disclosing the existence of this Agreement and the transactions contemplated hereunder, provided that such press release does not disclose the Financing Terms and is in a form approved by the Investors. Any communication with the media or press release (via any medium, including industrial conferences) that uses an Investor's trade name or otherwise refers to an Investor's participation or involvement with the Company Group shall be subject to the prior written approval of the Investors prior to the release or use of such communication or press release.

8.3  OTHER INFORMATION

The provisions of this Section 8 shall survive the termination of this Agreement and shall be in addition to, and not in substitution for, the provisions of any separate nondisclosure agreement executed by any of the parties hereto with respect to the transactions contemplated hereby.

9.  MISCELLANEOUS

9.1  Survival

The warranties, representations and covenants of the Company, the PRC Subsidiary, the Founder and each of the Investors contained in or made pursuant to this Agreement and the indemnity given by the Company, the PRC Subsidiary and the Founder pursuant to Section 9.2 shall survive the execution and delivery of this Agreement and the Closing, and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of any of the Investors or the Company.

9.2  Indemnity

(i)  The Company, the PRC Subsidiary and the Founder agree to, jointly and severally, indemnify and hold harmless any Investor and such Investor's directors, officers, employees, Affiliates, agents and permitted assigns (each, an "INDEMNITEE"), against any and all Indemnifiable Losses to such Indemnitee, directly or indirectly, as a result of, or based upon or arising from any inaccuracy in or breach of nonperformance of any of the representations, warranties, covenants or agreements made by the Company, the PRC Subsidiary and the Founder in or pursuant to this Agreement. For purposes of this Section, "INDEMNIFIABLE LOSS" means, with respect to any Indemnitee, any action, cost, damage, disbursement, expense, liability, loss, deficiency, diminution in value, obligation, penalty or settlement of any kind or nature, whether foreseeable or

32

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

unforeseeable, including, but not limited to, (i) interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses reasonably incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by such Indemnitee and (ii) any taxes that may be payable by such Indemnitee as a result of the indemnification of any Indemnifiable Loss hereunder.

(ii)  The Founder shall indemnify, defend and hold harmless the Company, any Investor and their respective directors, officers, employees, Affiliates, agents and permitted assigns, against any and all Indemnifiable Losses to such Person, directly or indirectly resulting from, arising out of or relating to any tax or other obligations as a result of the Company's purchase of a 72.41% equity interest in the PRC Subsidiary from Liuxin Industrial Limited at US$1.00.

(iii) The Investors shall indemnify, severally but not jointly, defend and hold harmless the Company, the PRC Subsidiary and the Founder, their respective directors, officers, employees, Affiliates, agents and permitted assigns, against any and all Indemnifiable Losses to such Person, directly or indirectly resulting from, arising out of or relating to any inaccuracy in or breach of nonperformance of any of the representations, warranties, covenants or agreements made by such Investor.

Notwithstanding anything contained herein to the contrary, the indemnification obligations of the Investors pursuant to this Section 9.2(iii) hereof shall expire at Closing.

9.3  Successors and Permitted Assigns

Except as otherwise provided herein, (i) the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties hereto whose rights or obligations hereunder are affected by such terms and conditions; (ii) except or otherwise provided herein, this Agreement, and the rights and obligations herein may be assigned by any Investor to any Affiliate of such Investor, but not to any other person without the prior written consent of the Company; and (iii) the Founder may not assign any of his rights or delegate any of its obligations under this Agreement without the prior written consent of each Investor. Subject to Section 9.2 above, nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

9.4  Governing Law

This Agreement shall be governed by and construed under the laws of Hong Kong, without regard to principles of conflicts of law thereunder.

9.5  Counterparts

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.6  Titles and Subtitles

33

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

9.7   Notices

Any and all notices required or permitted under this Agreement shall be given in writing in English and shall be provided by one or more of the following means and shall be deemed to have been duly given (a) if delivered personally, when received, (b) if transmitted by facsimile, on the date of transmission with receipt of a transmittal confirmation, or (c) if by international courier service, on the fourth (4th) Business Day following the date of deposit with such courier service, or such earlier delivery date as may be confirmed in writing to the sender by such courier service.

9.8   Administrative Fee and Other Expenses

The Company shall bear its own costs in connection with this Agreement. At the Closing, the Company shall also pay all costs and expenses reasonably incurred by the Investors in connection with the negotiation, execution, delivery and performance of this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby through the date of the Closing, including the expenses of counsel and other professional advisors to the Investors, up to a maximum amount of US$100,000 which the Investors are entitled to deduct from payment of the Subscription Price at Closing. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

9.9   Amendments and Waivers

Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only by an instrument signed by (i) the Company, (ii) the Founder, and (iii) the holders of at least two thirds (2/3) of the Series B Preferred Shares then outstanding or to be subscribed as set forth in Schedule A of this Agreement. Notwithstanding the foregoing, in the case of a proposed amendment or waiver of Section 2.1(iii) or Schedule A of this Agreement, such amendment or waiver shall only be effective if an instrument is signed by each party to the Agreement.

9.10  Severability

If one or more provisions of this Agreement are held to be unenforceable under any Applicable Law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

9.11  Entire Agreement

This Agreement and the documents referred to herein, together with all schedules and exhibits hereto and thereto, constitute the entire agreement among the parties and no party shall be liable or bound to any other party in any manner by any warranties, representations, or covenants except as

34

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

specifically set forth herein or therein; provided, however, that nothing in this Agreement or any Ancillary Agreement shall be deemed to terminate or supersede the provisions of any confidentiality and nondisclosure agreements executed by the parties hereto prior to the date of this Agreement, all of which agreements shall continue in full force and effect until terminated in accordance with their respective terms.

9.12 Dispute Resolution

(i)  Any dispute, controversy or claim arising out of or relating to this Agreement, or the interpretation, breach, termination or validity hereof, shall be resolved through consultation. Such consultation shall begin immediately after one party hereto has delivered to the other party hereto a written request for such consultation. If within thirty (30) days following the date on which such notice is given the dispute cannot be resolved, the dispute shall be submitted to arbitration upon the request of either party with notice to the other.

(ii)  The arbitration shall be conducted in Hong Kong under the auspices of the Hong Kong International Arbitration Centre (the "CENTRE"). There shall be three arbitrators. Each party hereto shall each select one arbitrator within thirty (30) days after giving or receiving the demand for arbitration. Such arbitrators shall be freely selected, and the parties shall not be limited in their selection to any prescribed list. The Chairman of the Centre shall select the third arbitrator, who shall be qualified to practice law in Hong Kong. If either party does not appoint an arbitrator who has consented to participate within thirty (30) days after selection of the first arbitrator, the relevant appointment shall be made by the Chairman of the Centre.

(iii)  The arbitration proceedings shall be conducted in English. The arbitration tribunal shall apply the Arbitration Rules of the Centre in effect at the time of the arbitration. However, if such rules are in conflict with the provisions of this Section 9.12, including the provisions concerning the appointment of arbitrators, the provisions of this Section 9.12 shall prevail.

(iv)  The arbitrators shall decide any dispute submitted by the parties to the arbitration strictly in accordance with the substantive law of Hong Kong and shall not apply any other substantive law.

(v)  Each party hereto shall cooperate with the other in making full disclosure of and providing complete access to all information and documents requested by the other in connection with such arbitration proceedings, subject only to any confidentiality obligations binding on such party.

(vi)  The award of the arbitration tribunal shall be final and binding upon the disputing parties, and either party may apply to a court of competent jurisdiction for enforcement of such award.

(vii)  Either party shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the arbitral tribunal.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK]

35

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

COMPANY:

LDK SOLAR CO., LTD.


By: /s/ Peng Xiaofeng
    ------------------------------------
Name: Peng Xiaofeng
Capacity: Chief Executive Officer

Address:

LDK Solar Co., Ltd.
Room 2303
Harbor Ring Plaza
No. 18 Xizang Middle Road
Shanghai 200001

Attention: Mr. Peng Xiaofeng & Mr. Shao
           Yonggang
Facsimile: (86-21) 6350-8707

```
PRC SUBSIDIARY:

JIANGXI LDK SOLAR HI-TECH CO., LTD.


By: /s/ Peng Xiaofeng
    --------------------------------------
Name: Peng Xiaofeng
Capacity: Chief Executive Officer

Address:

Hi-tech Industrial Park
Xinyu City, Jiangxi Province
People's Republic of China

Attention: Mr. Peng Xiaofeng
Facsimile: (0790) 6860-085
```

```
FOUNDER:

PENG XIAOFENG


By: /s/ Peng Xiaofeng
    ---------------------------------------
Name: Peng Xiaofeng

Address:

LDK Solar Co., Ltd.
Room 2303
Harbor Ring Plaza
No. 18 Xizang Middle Road
Shanghai 200001
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:

FINANCIERE NATEXIS SINGAPORE 4 PTE, LTD.


By: /s/ Gang Wang
    -------------------------------------
Name: Gang Wang (Kevin)
Capacity: Authorized Officer

Address:

Natexis Private Equity Asia Limited
Suite 1808, 18/F Westgate Mall Plaza
1038 Nanjing West Road
Shanghai, China 200041

Attention: Gang Wang (Kevin)
Facsimile: (86-21) 6217-3742
```

```
INVESTOR:

SHINE FIELD INVESTMENTS LIMITED


By: /s/ Chen Lu
   --------------------------------------
Name: Chen Lu
Capacity: Authorized Signatory

Address:

P.O. Box 957
Offshore Incorporations Centre
Road Town, Tortola, BVI

c/o Petrius Lui or Ignatius Seu
41st Floor Jardine House
1 Connaught Place
Hong Kong

Attention: Petrius Lui or Ignatius Seu
Facsimile: (852) 2111-3299
```

```
INVESTOR:

CDH SOLARFUTURE LIMITED


By: /s/ Yan Huang
   -------------------------------------
Name: Yan Huang
Capacity: Director

Address:

Level 30, Six Battery Road
Singapore 049909

Attention: Mr. Lew Kiang Hua
Facsimile: (65) 6550 9898
```

INVESTOR:

CHF WAFER COMPANY LIMITED


By: /s/ Min Chen
    ------------------------------------
Name: Min Chen
Capacity: Authorized Signatory

Address:

P.O. Box 173, Kingston Chamber
Road Town, Tortola
British Virgin Islands

c/o China Renaissance Capital Investment
Suites 305-307
St George's Building
2 Ice House Street, Central
Hong Kong

Attention: Hung Shih
Facsimile: (852) 2521-8023

```
INVESTOR:

CHINA ENVIRONMENT FUND 2004, LP.


By: /s/ Hua Cao
    --------------------------------------
Name: Hua Cao
Capacity: Authorized Signatory

Address:

P.O. Box 908
George Town, Cayman Islands

c/o Tsinghua Venture Capital Management
A2302, SP Tower, Tsinghua Science Park
Beijing, China 100084

Attention: Dr. Catherine Cao
Facsimile: (86-10) 8215-1150
```

```
INVESTOR:

JAFCO ASIA TECHNOLOGY FUND III


By: /s/ Vincent Chan Chun Hung
    ---------------------------------------
Name: Vincent Chan Chun Hung
Capacity: Attorney

Address of registered office:

c/o Walkers SPV Limited
P.O. Box 908GT, Mary Street
George Town, Grand Cayman, Cayman
Islands

Notice address:

c/o JAFCO Investment (Asia Pacific) Ltd.
6 Battery Road
#42-01 Singapore 049909

Attention: The President
Facsimile: (65) 6221-3690

With a copy to:

JAFCO Investment (Hong Kong) Ltd.
30/F, Two IFC, 8 Finance Street,
Central, Hong Kong

Attention: General Manager
Facsimile: (852) 2536-1979
```

INVESTOR:

MUS ROOSEVELT CHINA PACIFIC FUND L.P.


By: /s/ Jun Otsuka
    -------------------------------------
Name: Jun Otsuka
Capacity: Managing Direcotr

Address of registered office:

c/o MUS Roosevelt Capital Partners, Ltd.
Offshore Incorporations (Cayman) Limited
Scotia Centre 4/F
P.O. Box 2804
George Town, Grand Cayman, Cayman
Islands

With a copy to:

Mitsubishi UFJ Securities (HK) Capital,
Limited
11/F, AIG Tower
One Connaught Road
Central, Hong Kong

Attention: Mr. Jun Otsuka
           (Managing Director)
Facsimile: (852) 2865-6214

```
INVESTOR:

TECH TEAM HOLDINGS LIMITED


By: /s/ Jiyi Weng
    -------------------------------------
Name: Jiyi Weng
Capacity: Director

Address:

2nd Floor, Abbott Building, Road Town,
Tortola, British Virgin Islands

Notice address:

299 Bisheng Road
Suite 13-101
Pudong, Shanghai
China 201204

Attention: Jerry Jiyi WENG
Facsimile: (86-21) 5080-1333
```

```
INVESTOR:

GRAND GAINS INTERNATIONAL LIMITED


By: /s/ Jiyi Weng
    --------------------------------------
Name: Jiyi Weng
Capacity: Director

Registered address:

Palm Grove House, P.O. Box 438, Road
Town, Tortola, British Virgin Islands

Notice address:

32/F, Tower of China Merchants Bank
No. 7088 Shennan Road
Futian, Shenzhen 518040

Attention: Li Hongwei
Facsimile: (86-755) 8319-5157
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INVESTOR:

BOFA CAPITAL COMPANY LIMITED

By: /s/ Lingyong Peng
   --------------------------------------
Name: Lingyong Peng
Capacity: Authorized Signatory

Registered address:

c/o Maples Finance BVI Limited, P.O. Box
173, Kingston Chambers, Road Town,
Tortola, British Virgin Islands

Notice address:

Room 16D
Building 8
Shijicheng 3 Term
Haidian District
Beijing, P.R.China

Attention: Mr. Peng Lingyong
Facsimile: (86-10) 8889 1502

SCHEDULE OF DEFINITIONS

"2006 BUSINESS PLAN AND BUDGET" has the meaning set forth in Section 3.9.

"2006 AUDITED INCOME STATEMENT" means the consolidated income statement of the Company Group for the financial year ending December 31, 2006 audited and approved by the Auditor in conformity with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"2006 NET EARNINGS" means the US Dollar equivalent (based on the then applicable daily USD/CNY exchange rate set by the People's Bank of China and published by the State Administration of Foreign Exchange at www.safe.gov.cn for the Business Day immediately prior to December 31, 2006, rounded to the nearest ten thousandth USD) of the Net Earnings (as defined below) of the Company Group that is stated in Renminbi as determined from the 2006 Audited Income Statement.

"2006/2007 AUDITED INCOME STATEMENT" means the consolidated income statement of the Company Group for the financial period between July 1, 2006 and June 30, 2007 audited and approved by the Auditor in conformity with IFRS and US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"2006/2007 NET EARNINGS" means the US Dollar equivalent (based on the then applicable daily USD/CNY exchange rate set by the People's Bank of China and published by the State Administration of Foreign Exchange at www.safe.gov.cn for the Business Day immediately prior to June 30, 2007, rounded to the nearest ten thousandth USD) of the Net Earnings (as defined below) of the Company Group that is stated in Renminbi as determined from the 2006/2007 Audited Income Statement.

"2007 AUDITED INCOME STATEMENT" means the consolidated income statement of the Company Group for the financial year ending December 31, 2007 audited and approved by the Auditor in conformity with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"2007 NET EARNINGS" means the US Dollar equivalent (based on the then applicable daily USD/CNY exchange rate set by the People's Bank of China and published by the State Administration of Foreign Exchange at www.safe.gov.cn for the Business Day immediately prior to December 31, 2007, rounded to the nearest ten thousandth USD) of the Net Earnings (as defined below) of the Company Group that is stated in Renminbi as determined from the 2007 Audited Income Statement

"AFFILIATE" means, with respect to any given Person, a Person that Controls, is Controlled by, or is under common Control with the given Person.

"AGREEMENT" has the meaning ascribed to it in the preamble.

"ANCILLARY AGREEMENTS" means, collectively, the Shareholders Agreement, the Registration Rights Agreement, the Memorandum and Articles and any other document or agreement contemplated by this Agreement.

"ANNUAL BUSINESS PLAN AND BUDGET" means the annual business plan and budget of the Company and/or

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

the PRC Subsidiary, as may be amended from time to time.

"APPLICABLE LAW" means, with respect to any Person, all applicable provisions of all (a) constitutions, treaties, statutes, laws (including the common law), codes, rules, regulations, ordinances or orders of any Governmental Authority, (b) Governmental Approvals and (c) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"AUDITOR" means an independent accounting firm duly appointed by the Board of Directors to serve as the Company's auditor, being one of the "Big-4" international accounting firms.

"BOOKS AND RECORDS" has the meaning set forth in Section 3.10.

"BUSINESS DAY" means any day other than a Saturday, Sunday or other day on which commercial banks in the PRC, Hong Kong or New York are authorized or required by law or governmental order to close.

"BUSINESS OR CONDITIONS OF THE COMPANY GROUP" means the business, condition (financial or otherwise), results of operation and assets and properties of the Company Group taken as a whole.

"CENTER" means the Hong Kong International Arbitration Centre.

"CLOSING" has the meaning set forth in Section 2.2.

"COMPANY" has the meaning ascribed to it in the preamble.

"COMPANY GROUP" means the Company and all Group Companies, taken together.

"COMPANY OPTION PLAN" means an employee stock option plan adopted by established by the Company on July 28, 2006 pursuant to which stock options may be granted out of the Company Option Pool.

"COMPANY OPTION POOL" means an aggregate of 8,758,000 Ordinary Shares which shall be reserved prior to the Closing, representing up to ten percent (10%) of the total number of issued and outstanding shares of the Company on an as converted and fully diluted basis immediately after the Closing, as may be adjusted from time to time pursuant to the Company Option Plan, to be issued to the Key Persons, officers, directors, consultants, employees or other service providers of the Company from time to time pursuant to the Company Option Plan.

"COMPETITOR" means any Person that may be reasonably deemed to be engaged in any business that develops, manufactures or produces solar grade silicon ingots and wafers.

"CONTRACT" means any agreement, arrangement, bond, commitment, franchise, indemnity, indenture, instrument, lease, license or binding understanding, whether or not in writing.

"CONTROL" means, when used with respect to any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"CONVERSION RATE" means the effective conversion rate, initially at 1:1 and subject to adjustment as provided in this Agreement and the Memorandum and Articles, at which the Series A Preferred Shares and the Series B Preferred Shares, respectively, are converted into Ordinary Shares in accordance with the Memorandum and Articles.

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

"CONVERSION SHARES" means shares issuable upon conversion of the Series B Preferred Shares issued under this Agreement.

"DISCLOSURE SCHEDULE" has the meaning set forth in Section 3.

"ENVIRONMENT LAWS" means any applicable present national, territorial, provincial, foreign or local law, common law doctrine, rule, order, decree, judgment, injunction or regulation relating to environmental matters, including those pertaining to land use, air, soil, surface water, ground water (including the protection, cleanup, removal, remediation or damage thereof), public or employee health or safety, together with any other laws (national, territorial, provincial, foreign or local) relating to emissions, discharges, releases or threatened releases of any pollutant or contaminant including without limitation, medical, chemical, biological, biohazardous or radioactive waste and materials, into ambient air, land, surface water, ground water, personal property or structures.

"FINAL OWNERSHIP" has the meaning ascribed to it in Section 2.4(i)(a) hereof.

"FINANCING TERMS" has the meaning ascribed to it in Section 8.1 hereof.

"FOUNDER" has the meaning ascribed to it in the preamble.

"GOVERNMENTAL AUTHORITY" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the PRC, any foreign country or any domestic or foreign state, county, city or other political subdivision including but not limited to MOFCOM and SAIC and their respective local and provincial branches or departments.

"GROUP COMPANY" means a Person (other than a natural person) that is a Subsidiary of the Company.

"GUARANTEED 2006 NET EARNINGS" means the guaranteed Net Earnings of the Company Group for the financial year ending December 31, 2006, being an amount that is US$30,000,000.

"GUARANTEED 2006/2007 NET EARNINGS" means the guaranteed Net Earnings of the Company Group for the financial period between July 1, 2006 and June 30, 2007, being an amount that is US$60,000,000.

"GUARANTEED 2007 NET EARNINGS" means the guaranteed Net Earnings of the Company Group for the financial year ending December 31, 2007, being an amount that is US$100,000,000.

"HAZARDOUS MATERIALS" means any chemical pollutant, contaminant, pesticide, petroleum or petroleum product or by-product, radioactive substance, solid waste, special, dangerous or toxic waste, hazardous or toxic substance, chemical or material regulated, limited or prohibited under any Environmental Law.

"HONG KONG" means the Special Administrative Region of Hong Kong.

"IFRS" means the International Financial Reporting Standards promulgated by the International Accounting Standards Board (IASB) (which includes standards and interpretations approved by the IASB and International Accounting Principles issued under previous constitutions), together with its pronouncements thereon from time to time, and applied on a consistent basis.

"IMPROVEMENT" has the meaning set forth in Section 3.17(iii).

"INDEMNITEE" has the meaning set forth in Section 9.2(i).

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

"INDEMNIFIABLE LOSS" has the meaning set forth in Section 9.2(i).

"INITIAL OWNERSHIP" has the meaning set forth in Section 2.1(iii).

"INTELLECTUAL PROPERTY" means any and all (i) patents, all patent rights and all applications therefor and all reissues, reexaminations, continuations, continuations-in-part, divisions, and patent term extensions thereof, (ii) inventions (whether patentable or not), discoveries, improvements, concepts, innovations and industrial models, (iii) registered and unregistered copyrights, copyright registrations and applications, author's rights and works of authorship (including artwork of any kind and software of all types in whatever medium, inclusive of computer programs, source code, object code and executable code, and related documentation), (iv) URLs, web sites, web pages and any part thereof, (v) technical information, know-how, trade secrets, drawings, designs, design protocols, specifications for parts and devices, quality assurance and control procedures, design tools, manuals, research data concerning historic and current research and development efforts, including the results of successful and unsuccessful designs, databases and proprietary data, (vi) proprietary processes, technology, engineering, formulae, algorithms and operational procedures, (vii) trade names, trade dress, trademarks, domain names, and service marks, and registrations and applications therefor, and (viii) the goodwill of the business symbolized or represented by the foregoing, customer lists and other proprietary information and common-law rights.

"INVESTOR" or "INVESTORS" has the meaning ascribed to it in the preamble.

"KEY PERSONS" means Peng Xiaofeng, Shao Yonggan, Zhu Liangbao and all the other Persons listed in Exhibit I hereof.

"KNOWLEDGE" of a Party means the current actual knowledge of the executive officers of such Party principally responsible for the management of the business (including with respect to Intellectual Property) of such Party and its Subsidiaries.

"LAND USE RIGHTS" has the meaning set forth in Section 3.17(i).

"LEASE" has the meaning set forth in Section 3.17(ii).

"LICENSES" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental Authority, including but not limited to the Licenses set forth in Section 3.6 of the Disclosure Schedule and the business licenses of the applicable Group Companies.

"MATERIAL ADVERSE CHANGE" has the meaning set forth in Section 5.20.

"MATERIAL ADVERSE EFFECT" means any (a) event, occurrence, fact, condition, change or development that has had a material adverse effect on the Business or Conditions of the Company Group, or (b) material impairment of the ability of any member of the Company Group to perform their respective material obligations hereunder or under each of the Ancillary Agreements, as applicable.

"MATERIAL ADVERSE EVENT" means any change, event or effect that (i) is or would be materially adverse to the Business or Conditions of the Company Group or (ii) is or would materially impair the validity or enforceability of this Agreement against the Company, the PRC Subsidiary or the Founder or (iii) is or would materially and adversely affect the Company, the PRC Subsidiary or the Founder's ability to

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

perform its obligations under this Agreement, any Ancillary Agreements or in connection with the transactions contemplated hereunder or thereunder.

"MATERIAL CONTRACT" means, with respect to any Person, any outstanding Contract material to the business of such Person as of or after the date hereof and includes, but is not limited to, those Contracts deemed material by Section 3.15(v).

"MATERIAL LICENSES" means the Licenses set forth in Section 3.6 of the Disclosure Schedule.

"MEMORANDUM AND ARTICLES" means the second amended and restated memorandum of association and the second amended and restated articles of association of the Company, as amended from time to time, attached hereto as Exhibit A.

"MOFCOM" means the Ministry of Commerce or, with respect to any matter to be submitted for examination and approval by the Ministry of Commerce, any government entity which is similarly competent to examine and approve such matter under the laws of the PRC.

"MORTGAGE" has the meaning set forth in Section 3.17(iv).

"NET EARNINGS" shall mean the consolidated and normalized positive profit after tax (less one-off, non-recurring and extraordinary items as well as stock compensation charges which are required to be deducted from the Company's income under the currently effective US GAAP or IFRS, if any, but plus any governmental grants and subsidies) attributable to the shareholders of the Company Group as audited by the Auditor in accordance with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"ORDINARY SHARES" has the meaning ascribed to it in Section 3.2(i)(a).

"PERSON" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity.

"PRC" means the People's Republic of China, but solely for the purposes of this Agreement, excluding the Hong Kong Special Administrative Region, Macau Special Administrative Region and Taiwan.

"PRC SUBSIDIARY" has the meaning ascribed to it in the preamble.

"PREFERRED SHARES" has the meaning set forth in Section 3.2(i)(b).

"PROPRIETARY ASSETS" means all patents, patent applications, trademarks, service marks, trade names, copyrights, moral rights, maskworks, trade secrets, confidential and proprietary information, compositions of matter, formulas, designs, proprietary rights, know-how and processes of a company.

"QUALIFIED EXCHANGE" means (i) the New York Stock Exchange or the Nasdaq Stock Market's National Market System, or (ii) any other exchange of recognized international reputation and standing duly approved by the Company's Board of Directors, including the affirmative vote of the Investor Director.

"QUALIFIED IPO" means an initial public offering on a Qualified Exchange that values the Company at no less than US$1,210,000,000 immediately prior to the initial public offering with a per share offering price of no less than US$11.00 and that results in aggregate net proceeds to the Company of at least US$300,000,000. The selection of the lead underwriter(s) of the Qualified IPO shall be led by the

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

management of the Company and subject to the consent of the Investor Director, which consent shall not be unreasonably withheld.

"REPORT DATE" has the meaning set forth in Section 3.12(i).

"REVIEW REPORTS" has the meaning set forth in Section 3.12(i).

"SAFE" means the Sate Administration of Foreign Exchange of the PRC, and any PRC governmental body that is a successor thereto.

"SAIC" means the State Administration of Industry and Commerce or, with respect to the issuance of any business license or filing or registration to be effected with or by the State Administration of Industry and Commerce, any government entity which is similarly competent to issue such business license or accept such filing or registration under the laws of the PRC.

"SECURITIES" has the meaning set forth in Section 4.2.

"SECURITIES ACT" means the U.S. Securities Act of 1933, as amended.

"SENIOR MANAGER" means, with respect to any member of the Company Group, the chief executive officer, the chief financial officer, the chief operating officer, the chief technology officer and the vice presidents of such company.

"SERIES A SHAREHOLDERS" has the meaning set forth in Section 2.4(i)(a).

"SERIES A SHARE PURCHASE AGREEMENT" has the meaning set forth in Section 2.4(i)(a).

"SERIES A-1 PREFERRED SHARES" has the meaning set forth in Section 3.2(i)(b).

"SERIES A-2 PREFERRED SHARES" has the meaning set forth in Section 3.2(i)(b).

"SERIES B PREFERRED SHARES" has the meaning set forth in Section 3.2(i)(b).

"SUBSIDIARY" means, with respect to any Person, a corporation or other entity that is, directly or indirectly, controlled by such Person, by the possession of the power to direct or cause the direction of the management and policies of first mentioned Person, whether through the ownership of voting securities or equity interest, by contract or otherwise.

"SUBSCRIPTION PRICE" has the meaning set forth in Section 2.1(iii).

"TAX" and "TAXES" means and includes any and all taxes, including any and all income, gross receipts, franchise, license, severance, stamp, occupation, premium, environmental, customs duties, capital stock, profits, unemployment, disability, real property, personal property, transfer, registration, value added, estimated, sales, use, excise, withholding, employment, payroll, social security taxes, and similar assessments, charges, and fees (including interest, penalties and additions to such taxes, penalties for failure to file or late filing of any return, report or other filing, and any interest in respect of such penalties and additions) imposed or assessed by any federal, state or local taxing authority, including the Cayman Islands, Hong Kong or the PRC (or any political subdivision thereof or therein).

"TAX RETURNS" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

"US GAAP" means generally accepted accounting principles in the United States, consistently applied.

"WARRANT" or "WARRANTS" means the Warrant(s) the Company issued to the holders of the Series A-1 Preferred Shares and the holders of the Series A-2 Preferred Shares pursuant to certain Warrant Purchase Agreement(s), each dated as of July 28, 2006.

-DS 1-


DISCLOSURE SCHEDULE


-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

SCHEDULE A

INVESTORS AT CLOSING

| NAME | ADDRESS | NUMBER OF SERIES B PREFERRED SHARES SUBSCRIBED | SUBSCRIPTION PRICE |
|------|---------|-----------------------------------------------|---------------------|
| Financiere Natexis Singapore 4 Pte Ltd. | Natexis Private Equity Asia Limited Suite 1808, 18/F Westgate Mall Plaza 1038 Nanjing West Road, Shanghai, China 200041 <br><br> Attention: Gang Wang (Kevin) | 1,150,000 | US$ 6,900,000 |
| Shine Field Investments Limited | Registered address: P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, BVI <br><br> Notice address: c/o Petrius Lui or Ignatius Seu 41st Floor Jardine House 1 Connaught Place Hong Kong <br><br> Attention: Petrius Lui or Ignatius Seu | 1,150,000 | US$ 6,900,000 |
| CDH SolarFuture Limited | Level 30, Six Battery Road Singapore 049909 <br><br> Attention: Mr. Lew Kiang Hua | 2,000,000 | US$12,000,000 |
| CHF Wafer Company Limited | Registered address: P.O. Box 173, Kingston Chamber, Road Town, Tortola, British Virgin Islands <br><br> Notice address: c/o China Renaissance Capital Investment Suites 305-307 St George's Building 2 Ice House Street, Central Hong Kong <br><br> Attention: Hung Shih | 1,000,000 | US$ 6,000,000 |

-SCH A-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

| | | | |
|---|---|---|---|
| China Environment Fund 2004, LP. | Registered address: P.O. Box 908, George Town, Cayman Islands<br><br>Notice address: c/o Tsinghua Venture Capital Management A 23-2, SP Tower, Tsinghua Science Park, Beijing, China 100084<br><br>Attention: Dr. Catherine Cao | 833,333 | US$ 4,999,998 |
| JAFCO Asia Technology Fund III | Registered address: c/o Walkers SPV Limited P.O. Box 908GT, Mary Street George Town, Grand Cayman, Cayman Islands<br><br>Notice address: c/o JAFCO Investment (Asia Pacific) Ltd. 6 Battery Road #42-01 Singapore 049909<br><br>Attention: The President | 833,333 | US$ 4,999,998 |
| MUS Roosevelt China Pacific Fund L.P. | c/o MUS Roosevelt Capital Partners, Ltd. Offshore Incorporations (Cayman) Limited Scotia Centre 4/F P.O. Box 2804 George Town, Grand Cayman, Cayman Islands<br><br>With a copy to: Mitsubishi UFJ Securities (HK) Capital, Limited 11/F, AIG Tower One Connaught Road Central, Hong Kong<br><br>Attention: Mr. Jun Otsuka (Managing Director) | 500,000 | US$ 3,000,000 |

-SCH A-

| | | | |
|---|---|---|---|
| Tech Team Holdings Limited | Registered address:<br>2nd Floor, Abbott Building, Road Town, Tortola, British Virgin Islands<br><br>Notice address:<br>299 Bisheng Road<br>Suite 13-101<br>Pudong, Shanghai<br>China 201204<br><br>Attention: Jerry Jiyi WENG | 250,000 | US$ 1,500,000 |
| Grand Gains International Limited | Registered address:<br>Palm Grove House, P.O. Box 438, Road Town, Tortola, British Virgin Islands<br><br>Notice address:<br>32/F, Tower of China Merchants Bank<br>No. 7088 Shennan Road<br>Futian, Shenzhen 518040<br><br>Attention: Li Hongwei | 250,000 | US$ 1,500,000 |
| BOFA Capital Company Limited | Registered address:<br>c/o Maples Finance BVI Limited, P.O. Box 173, Kingston Chambers, Road Town, Tortola, British Virgin Islands<br><br>Notice address:<br>Room 16D<br>Building 8<br>Shijicheng 3 Term<br>Haidian District<br>Beijing, P.R.China<br><br>Attention: Mr. Peng Lingyong | 33,334 | US$   200,004 |
| TOTAL | | 8,000,000 | US$48,000,000 |

-SCH A-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT A

SECOND AMENDED AND RESTATED MEMORANDUM AND ARTICLES

-EXH A-


EXHIBIT B

[RESERVED]

-EXH B-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT C

2006 BUSINESS PLAN AND BUDGET


-EXH C-


EXHIBIT D

CONFIDENTIALITY, ASSIGNMENT OF INVENTIONS AND NON-COMPETITION
AGREEMENT


-EXH D-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
                          EXHIBIT E

                   SHAREHOLDERS AGREEMENT


                         -EXH E-



                          EXHIBIT F

           OPINION OF THE COMPANY'S CAYMAN ISLANDS COUNSEL


                         -EXH F-
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT G

OPINION OF THE COMPANY'S PRC COUNSEL


-EXH G-


EXHIBIT H

AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT


-EXH H-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT I

KEY PERSONS

Peng Xiaofeng
Zhu Liangbao
Shao Yonggang
Jack Lai
Nicola Sarno
Yao Qiqiang
Kuo Lung Lin
Alberto Di Gaetano
Rosseio Pleiro
Cui Rong Qiang
Martin Huang
Fu Xiangqun
Huang Qiumao
Fu Delin
Huang Weixing
Lu Xiaodong
Song Yong
Lin Qinyun
Renato Alberto Cabrini
Xing Guo Ping
Peng Zhijian
Chen Jianwen

EXH-I

APPENDIX 1

OWNERSHIP ADJUSTMENT SCENARIOS

-APPENDIX 1-

EXECUTION VERSION

SUPPLEMENTAL AGREEMENT

THIS SUPPLEMENTAL AGREEMENT (the "SUPPLEMENTAL AGREEMENT"), dated as of December 15, 2006, is made to: (1) the Share Purchase Agreement, dated as of July 28, 2006, by and among LDK Solar Co., Ltd., a company organized and existing under the laws of the Cayman Islands (the "COMPANY"), Jiangxi LDK Solar Hi-Tech Co., Ltd. (Chinese Characters LDK Chinese Characters), a company organized and existing under the laws of the PRC (the "PRC SUBSIDIARY"), Mr. Peng Xiaofeng (the "FOUNDER") and each of the holders of the Series A-1 Preferred Shares and the Series A-2 Preferred Shares (collectively, the "SERIES A PREFERRED SHARES"), as amended by the Amendment to the Share Purchase Agreement, dated as of September 15, 2006, by and among the Company, the PRC Subsidiary, the Founder and each of the holders of the Series A Preferred Shares (as amended, the "SERIES A SHARE PURCHASE AGREEMENT"); and (2) the Series B Preferred Shares Purchase Agreement, dated as of September 15, 2006, by and among the Company, the PRC Subsidiary, the Founder and each of the holders of the Series B Preferred Shares, as amended by the Amendment to the Series B Preferred Shares Purchase Agreement, dated as of September 26, 2006 (as amended, "SERIES B SHARE PURCHASE AGREEMENT").

RECITALS

A.    The Company and certain investors are parties to the Series C Preferred Shares Purchase Agreement, dated as of December 15, 2006 (the "SERIES C SHARE PURCHASE AGREEMENT"), pursuant to which such investors (collectively, the "SERIES C PREFERRED SHAREHOLDERS") have agreed to subscribe for certain number of Series C Preferred Shares of the Company (the "SERIES C PREFERRED SHARES") upon the terms and subject to the conditions contained therein.

B.    The parties intend that a supplemental agreement be made to the Series A Share Purchase Agreement and the Series B Share Purchase Agreement to provide for a concerted ownership adjustment mechanism for all the Series A Preferred Shares, the Series B Preferred Shares and the Series C Preferred Shares.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.    Defined Terms. Unless otherwise defined herein, capitalized terms used herein which are not defined in the Series A Share Purchase Agreement or the Series B Share Purchase Agreement, each as amended hereby, are used herein as therein defined.

2.    Amendment to Section 2.1(iii) of the Series A Share Purchase Agreement. Section 2.1(iii) of the Series A Share Purchase Agreement is hereby amended by deleting the last two sentences in such section and substituting in lieu thereof the following sentences:

"It is understood that the aggregate number of Series A-1 Preferred Shares and Series A-2 Preferred Shares (collectively, the "SERIES A PREFERRED SHARES") to be issued by the Company at the Closing shall be 4,580,000 shares, representing a 5.056% ownership

-1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

in the Company (the "INITIAL OWNERSHIP") immediately after the closing of the issuance of the Series C Preferred Shares of the Company (the "SERIES C PREFERRED SHARES") pursuant to the Series C Preferred Shares Purchase Agreement (the "SERIES C SHARE PURCHASE AGREEMENT"), dated as of December 15, 2006, by and among the Company, the PRC Subsidiary, the Founder and certain purchasers of the Series C Preferred Shares (the "SERIES C FINANCING"). For the avoidance of doubt, the calculation of the Initial Ownership hereunder and any adjustment to such ownership under Section 2.4 shall be based on the sum of the total number of the issued and outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Series A Preferred Shares, Series B Preferred Shares and Series C Preferred Shares, all on an as-converted basis, as of the date of the closing of the Series C Financing or the date of adjustment, as the case may be, and in each case as provided in the Memorandum and Articles, without consideration of any shares issued pursuant to the Company Option Plan."

3.    Amendment to Section 2.4 of the Series A Share Purchase Agreement. Section 2.4 of the Series A Share Purchase Agreement is hereby amended by deleting the section in its entirety and substituting in lieu thereof the following provisions:

"2.4 Ownership Adjustments

    (ii) Following the issue by the Auditor of the 2006 Audited Income Statement:

        (1) if the 2006 Net Earnings are equal to or more than the Guaranteed 2006 Net Earnings, the final ownership of the Investors in the Company after adjustment (the "FINAL OWNERSHIP") shall remain unchanged as the Initial Ownership of the Investors in the Company.

        (2) if the 2006 Net Earnings are less than the Guaranteed 2006 Net Earnings, the Final Ownership of the Investors in the Company shall be adjusted in accordance with the following formula promptly following the issue of the 2006 Audited Income Statement:

$$FO1 = IO \times \frac{GE06}{AE06}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) FO1 shall mean the Final Ownership of the Investors after adjustment in accordance with this Section 2.4(i)(b); (2) IO shall mean the Initial Ownership of the Investors in the Company; (3) GE06 shall mean the Guaranteed 2006 Net Earnings of the Company Group, being an amount that is US$30,000,000; and (4) AE06 shall mean the actual 2006 Net Earnings.

    (iii) Following the issue by the Auditor of the 2007 Audited Income Statement:

-2-

(1) If the 2007 Net Earnings are equal to or more than the Guaranteed 2007 Net Earnings, the Final Ownership of the Investors shall remain unchanged as the ownership adjusted, if any, in accordance with 2.4(i)(b) above.

(2) if the 2007 Net Earnings are less than the Guaranteed 2007 Net Earnings, the Final Ownership of the Investors in the Company shall be adjusted in accordance with the following formula promptly following the issue of the 2007 Audited Income Statement:

$$FO2 = FO1 \times \frac{GE07}{AE07}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) FO2 shall mean the Final Ownership of the Investors in the Company after adjustment in accordance with this Section 2.4(ii)(b); (2) FO1 shall mean the Final Ownership of the Investors in the Company as adjusted under Section 2.4 (i)(b) above; (3) GE07 shall mean the Guaranteed 2007 Net Earnings of the Company Group, being an amount that is US$100,000,000; and (4) AE07 shall mean the actual 2007 Net Earnings.

(iv) To effect the ownership adjustment as set forth in Sections 2.4(i) and (ii) above, the effective Conversion Rate of the Series A Preferred Shares shall be adjusted in accordance with the following formula:

$$CR(A) = FO(A) \times \frac{TS}{4,580,000}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) CR(A) shall mean the effective Conversion Rate of the Series A Preferred Shares at which the Series A Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4; (2) FO(A) shall mean the final ownership of the holders of the Series A Preferred Shares in the Company as adjusted according to Section 2.4 hereof; and (3) TS shall mean the total number of Ordinary Shares to be issued and outstanding, on an as-converted basis, as of the date of the closing of the Series C Financing or the date of adjustment, as the case may be, which shall be equal to the number derived from the following formula:

$$TS = \frac{75,000,000}{1-FO(A)-FO(B)-FO(C)}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) FO(A) shall mean the Final Ownership of the Investors in the Company as adjusted according to Section 2.4 hereof; (2) FO(B) shall mean the final ownership of the holders of the Series B Preferred Shares as adjusted according to Section 2.4 of the Series B Share Purchase Agreement; and (3) FO(C) shall mean the final ownership of the holders

-3-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

of the Series C Preferred Shares as adjusted according to Section 2.4 of the Series C Share Purchase Agreement.

(v)   Notwithstanding the above, the parties hereto may agree from time to time, based on legal advice mutually acceptable to the Company and the Investors, on any other method to effect the adjustment to the Final Ownership of the Investors to be equal to the amounts derived from the formulas set forth in Section 2.4(i)(b) and Section 2.4(ii)(b) above.

(vi)  Notwithstanding anything to the contrary, the Investors agree not to make any adjustment to the ownership (a) with respect to the 2006 Audited Income Statement under Section 2.4(i), if the 2006 Net Earnings is no less than US$28,500,000; and (b) with respect to the 2007 Audited Income Statement under Section 2.4(ii), if the 2007 Net Earnings is no less than US$95,000,000.

(vii) For the avoidance of doubt, the Investors' Final Ownership after any adjustment made under this Section 2.4 shall not be lower than their ownership before such adjustment, and no adjustment to the Investors' ownership will be made according to Section 2.4(ii)(b) hereof if a Qualified IPO consummates in 2007."

4.   Amendment to Section 2.1(iii) of the Series B Share Purchase Agreement. Section 2.1(iii) of the Series B Share Purchase Agreement is hereby amended by deleting the last two sentences in such section and substituting in lieu thereof the following sentences:

"It is understood that the aggregate number of Series B Preferred Shares (the "SERIES B PREFERRED SHARES") to be issued by the Company at the Closing shall be 8,000,000 shares, representing a 8.832% ownership in the Company (the "INITIAL OWNERSHIP") immediately after the closing of the issuance of the Series C Preferred Shares of the Company (the "SERIES C PREFERRED SHARES") pursuant to the Series C Preferred Shares Purchase Agreement (the "SERIES C SHARE PURCHASE AGREEMENT"), dated as of December 15, 2006, by and among the Company, the PRC Subsidiary, the Founder and certain purchasers of the Series C Preferred Shares (the "SERIES C FINANCING"). For the avoidance of doubt, the calculation of the Initial Ownership hereunder and any adjustment to such ownership under Section 2.4 shall be based on the sum of the total number of issued and outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Series A Preferred Shares, Series B Preferred Shares and Series C Preferred Shares, all on an as-converted basis, as of the date of the closing of the Series C Financing or the date of adjustment, as the case may be, and in each case as provided in the Memorandum and Articles, without consideration of any shares issued pursuant to the Company Option Plan."

5.   Amendment to Section 2.4(iv) of the Series B Share Purchase Agreement. Section 2.4(iv) of the Series B Share Purchase Agreement is hereby amended by deleting the sub-section in its entirety and substituting in lieu thereof the following provisions:

-4-

"(iv) To effect the ownership adjustment as set forth in Sections 2.4(i), (ii) and (iii) above, the applicable Conversion Rate of the Series A Preferred Shares and the Series B Preferred Shares shall be adjusted in accordance with the following formulas:

$$CR(A) = FO(A) \times \frac{TS}{4,580,000}$$

$$CR(B) = FO(B) \times \frac{TS}{8,000,000}$$

For purposes of the foregoing formulas, the following definitions shall apply: (1) CR(A) shall mean the effective Conversion Rate of the Series A Preferred Shares at which the Series A Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4; (2) CR(B) shall mean the effective Conversion Rate of the Series B Preferred Shares at which the Series B Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4; (3) FO(A) shall mean the final ownership of the holders of the Series A Preferred Shares in the Company as adjusted according to Section 2.4 of the Series A Share Purchase Agreement; (4) FO(B) shall mean the Final Ownership of the Investors in the Company as adjusted according to Section 2.4 hereof; and (5) TS shall mean the total number of Ordinary Shares to be issued and outstanding, on an as-converted basis, as of the date of the closing of the Series C Financing or the date of adjustment, as the case may be, which shall be equal to the number derived from the following formula:

$$TS = \frac{75,000,000}{1-FO(A)-FO(B)-FO(C)}$$

For purposes of the foregoing formula, the following definitions shall apply: (1) FO(A) shall mean the final ownership of the holders of the Series A Preferred Shares in the Company as adjusted according to Section 2.4 of the Series A Share Purchase Agreement; (2) FO(B) shall mean the Final Ownership of the Investors in the Company as adjusted according to Section 2.4 hereof; and (3) FO(C) shall mean the final ownership of the holders of the Series C Preferred Shares in the Company as adjusted according to Section 2.4 of the Series C Share Purchase Agreement."

6.  Counterparts. This Supplemental Agreement may be executed by one or more of the parties hereto on any number of separate counterparts and all such counterparts shall be deemed to be one and the same instrument. Each party hereto confirms that any facsimile copy of such party's executed counterpart of this Supplemental Agreement (or its signature page thereof) shall be deemed to be an executed original thereof.

-5-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

7.  Effectiveness. This Supplemental Agreement shall become effective as of the date first written above.

8.  Continuing Effect. This Supplemental Agreement is made under Section 10.9 of the Series A Share Purchase Agreement and Section 9.9 of the Series B Share Purchase Agreement. Except as otherwise described in this Supplemental Agreement, the terms and conditions of the Series A Share Purchase Agreement and the Series B Share Purchase Agreement shall remain in full force and effect.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK.]

-6-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the
date first written above.

COMPANY:

LDK SOLAR CO., LTD.


By: /s/ Peng Xiaofeng
    ------------------------------------
Name: Peng Xiaofeng
Capacity: Chief Executive Officer

Address:

LDK Solar Co., Ltd.
Room 2303
Harbor Ring Plaza
No. 18 Xizang Middle Road
Shanghai 200001

Attention: Mr. Peng Xiaofeng & Mr. Shao
           Yonggang
Facsimile: (86-21) 6350-8707

-7-

```
PRC SUBSIDIARY:

JIANGXI LDK SOLAR HI-TECH CO., LTD.


By: /s/ Peng Xiaofeng
    -------------------------------------
Name: Peng Xiaofeng
Capacity: Chief Executive Officer

Address:

Hi-tech Industrial Park
Xinyu City, Jiangxi Province
People's Republic of China

Attention: Mr. Peng Xiaofeng
Facsimile: (0790) 6860-085
```

-8-

```
FOUNDER:

PENG XIAOFENG


By: /s/ Peng Xiaofeng
    -------------------------------------
Name: Peng Xiaofeng

Address:

LDK Solar Co., Ltd.
Room 2303
Harbor Ring Plaza
No. 18 Xizang Middle Road
Shanghai 200001
```

-9-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INVESTOR:

FINANCIERE NATEXIS SINGAPORE 4 PTE, LTD.

(As a holder of both Series A-2
Preferred Shares and Series B Preferred
Shares)

By: /s/ Gang Wang
    ------------------------------------
Name: Gang Wang (Kevin)
Capacity: Authorized Officer

Address:

Natexis Private Equity Asia Limited
Suite 1808, 18/F Westgate Mall Plaza
1038 Nanjing West Road
Shanghai, China 200041

Attention: Gang Wang (Kevin)
Facsimile: (86-21) 6217-3742

-10-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INVESTOR:

DECATUR OVERSEAS CORPORATION

(As a holder of Series A-2 Preferred
Shares)


By: /s/ Gang Wang
    ------------------------------------
Name: Gang Wang (Kevin)
Capacity: Authorized Officer

Address:

Natexis Private Equity Asia Limited
Suite 1808, 18/F Westgate Mall Plaza
1038 Nanjing West Road
Shanghai, China 200041

Attention: Gang Wang (Kevin) or Nicolazo
De Barmon, Gael
Facsimile: (86-21) 6217-3742


-11-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INVESTOR:

BRILLIANT EVER INVESTMENTS LIMITED

(As a holder of Series A-1 Preferred
Shares)

By: /s/ Chen Lu
    -------------------------------------
Name: Chen Lu
Capacity: Authorized Signatory

Address:

Suite 2302-3, 23/F Great Eagle Centre
23 Harbour Road
Wanchai
Hong Kong

Attention: Ms Clara Chan
Facsimile: (852) 2877-6852

-12-

```
INVESTOR:

BOUNDLESS FUTURE INVESTMENT LIMITED

(As a holder of Series A-1 Preferred
Shares)


By: /s/ Chen Lu
    -------------------------------------
Name: Chen Lu
Capacity: Authorized Signatory

Address:

Suite 2302-3, 23/F Great Eagle Centre
23 Harbour Road
Wanchai
Hong Kong

Attention: Ms Clara Chan
Facsimile: (852) 2877-6852
```

-13-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:

SHINE FIELD INVESTMENTS LIMITED

(As a holder of Series B Preferred
Shares)


By: /s/ Chen Lu
    ------------------------------------
Name: Chen Lu
Capacity: Authorized Signatory

Address:

P.O. Box 957
Offshore Incorporations Centre
Road Town, Tortola, BVI

c/o Petrius Lui or Ignatius Seu
41st Floor Jardine House
1 Connaught Place
Hong Kong

Attention: Petrius Lui or Ignatius Seu
Facsimile: (852) 2111-3299
```

-14-

```
INVESTOR:

CDH SOLARFUTURE LIMITED

(As a holder of Series B Preferred
Shares)


By: /s/ Lew Kiang Hua
    -----------------------------------
Name: Lew Kiang Hua
Capacity: Director

Address:

Level 30, Six Battery Road
Singapore 049909

Attention: Mr. Lew Kiang Hua
Facsimile: (65) 6550 9898
```

-15-

```
INVESTOR:

CHF WAFER COMPANY LIMITED

(As a holder of Series B Preferred
Shares)


By: /s/ Andrew Lo
    ------------------------------------
Name: Andrew Lo
Capacity: Authorized Representative

Address:

P.O. Box 173, Kingston Chamber
Road Town, Tortola
British Virgin Islands

c/o China Renaissance Capital Investment
Suites 305-307
St George's Building
2 Ice House Street, Central
Hong Kong

Attention: Hung Shih
Facsimile: (852) 2521-8023
```

-16-

```
INVESTOR:

CHINA ENVIRONMENT FUND 2004, LP.

(As a holder of Series B Preferred
Shares)


By: /s/ Hua Cao
    ------------------------------------
Name: Hua Cao
Capacity: Authorized Signatory

Address:

P.O. Box 908
George Town, Cayman Islands

c/o Tsinghua Venture Capital Management
A2302, SP Tower, Tsinghua Science Park
Beijing, China 100084

Attention: Dr. Catherine Cao
Facsimile: (86-10) 8215-1150
```

-17-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INVESTOR:

JAFCO ASIA TECHNOLOGY FUND III

(As a holder of Series B Preferred Shares)


By: /s/ Vincent Chan Chun Hung
    ------------------------------------
Name: Vincent Chan Chun Hung
Capacity: Attorney

Address of registered office:

c/o Walkers SPV Limited
P.O. Box 908GT, Mary Street
George Town, Grand Cayman, Cayman Islands

Notice address:

c/o JAFCO Investment (Asia Pacific) Ltd.
6 Battery Road
#42-01 Singapore 049909

Attention: The President
Facsimile: (65) 6221-3690

With a copy to:

JAFCO Investment (Hong Kong) Ltd.
30/F, Two IFC, 8 Finance Street,
Central, Hong Kong

Attention: General Manager
Facsimile: (852) 2536-1979

-18-

INVESTOR:

MUS ROOSEVELT CHINA PACIFIC FUND L.P.

(As a holder of Series B Preferred
Shares)


By: /s/ Jun Otsuka
    -------------------------------------
Name: Jun Otsuka
Capacity: Managing Director

Address:

c/o MUS Roosevelt Capital Partners, Ltd.
Offshore Incorporations (Cayman) Limited
Scotia Centre 4/F
P.O. Box 2804
George Town, Grand Cayman, Cayman
Islands

With a copy to:

Mitsubishi UFJ Securities (HK) Capital,
Limited
11/F, AIG Tower
One Connaught Road
Central, Hong Kong

Attention: Mr. Jun Otsuka (Managing
Director)
Facsimile: (852) 2865-6214


-19-

INVESTOR:

TECH TEAM HOLDINGS LIMITED

(As a holder of Series B Preferred
Shares)

By: /s/ Jiyi Weng
    ------------------------------------
Name: Jiyi Weng
Capacity: Director

Address:

2nd Floor, Abbott Building, Road Town,
Tortola, British Virgin Islands

Notice address:

299 Bisheng Road
Suite 13-101
Pudong, Shanghai
China 201204

Attention: Jerry Jiyi WENG
Facsimile: (86-21) 5080-1333

-20-

INVESTOR:

GRAND GAINS INTERNATIONAL LIMITED

(As a holder of Series B Preferred
Shares)


By: /s/ Jiyi Weng
    -------------------------------------
Name: Jiyi Weng
Capacity: Director

Registered address:

Palm Grove House, P.O. Box 438, Road
Town, Tortola, British Virgin Islands

Notice address:

32/F, Tower of China Merchants Bank
No. 7088 Shennan Road
Futian, Shenzhen 518040

Attention: Li Hongwei
Facsimile: (86-755) 8319-5157


-21-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INVESTOR:

BOFA CAPITAL COMPANY LIMITED

(As a holder of Series B Preferred Shares)

By: /s/ Lingyong Peng
    ------------------------------------
Name: Lingyong Peng
Capacity: Authorized Signatory

Registered address:

c/o Maples Finance BVI Limited, P.O. Box 173, Kingston Chambers, Road Town, Tortola, British Virgin Islands

Notice address:

Room 16D
Building 8
Shijicheng 3 Term
Haidian District
Beijing, P.R.China

Attention: Mr. Peng Lingyong
Facsimile: (86-10) 8889 1502

-22-

</TEXT>
</DOCUMENT>

Exhibit 4.7

LDK SOLAR CO., LTD.

SERIES C PREFERRED SHARES PURCHASE AGREEMENT

THIS SERIES C PREFERRED SHARES PURCHASE AGREEMENT (this "AGREEMENT") is made as of this December 15, 2006, by and among LDK Solar Co., Ltd., a company organized and existing under the laws of the Cayman Islands (the "COMPANY"), Jiangxi LDK Solar Hi-Tech Co., Ltd. (Chinese Characters LDK Chinese Characters), a company organized and existing under the laws of the PRC (the "PRC SUBSIDIARY"), each of the investors set forth in Schedule A attached hereto (each an "INVESTOR" and collectively, the "INVESTORS") and Mr. Peng Xiaofeng (the "FOUNDER").

WITNESSETH

THE PARTIES HEREBY AGREE AS FOLLOWS:

1.   DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings ascribed to them in the Schedule of Definitions.

2.   PURCHASE AND SALE OF SECURITIES

2.1  Sale and Issuance of Series C Preferred Shares

    (i)    The Company shall adopt on or before the Closing (defined below) the Memorandum and Articles in substantially the form attached hereto as Exhibit A and file such Memorandum and Articles with the Registrar of Companies of the Cayman Islands within fifteen (15) days of such adoption.

    (ii)   On or prior to the Closing, the Company shall have authorized (i) the sale and issuance to the Investors of the Series C Preferred Shares (defined below); and (ii) the issuance of the Conversion Shares upon conversion of the Series C Preferred Shares pursuant to the Memorandum and Articles. The Series C Preferred Shares shall have the rights, preferences, privileges and restrictions set forth in the Memorandum and Articles.

    (iii)  Subject to the terms and conditions of this Agreement, each Investor agrees, severally and not jointly, to purchase at the Closing and the Company agrees to sell and issue to each Investor at the Closing that number of the Series C Preferred Shares set forth opposite such Investor's name on Schedule A attached hereto for the purchase price set forth thereon (collectively, the "SUBSCRIPTION PRICE"). It is understood that the aggregate number of Series C Preferred Shares to be issued by the Company at the Closing shall be 3,000,000 shares, representing a 3.312% ownership in the Company immediately after the Closing (the "INITIAL OWNERSHIP"). For the avoidance of doubt, the calculation of the Initial Ownership hereunder and any adjustment to such ownership under Section 2.4 shall be based on the total issued and outstanding 75,000,000 Ordinary Shares plus the total issued and outstanding 15,580,000 Preferred Shares, without consideration of any shares issued pursuant to the Company Option Plan.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

2.2  Closing

Subject to the satisfaction or waiver of the conditions to closing set
forth in Section 5 and Section 6 of this Agreement, the purchase and sale
of the Series C Preferred Shares set forth on Schedule A shall take place
at the offices of Clifford Chance LLP, 40th Floor, the Bund Center, No. 222
Yan An Road East, Shanghai 200002, PRC, at 10:00 a.m., on or prior to
December 19, 2006, or at such other time and place as the Company and the
Investors may mutually agree upon orally or in writing (which time and
place are designated herein as the "CLOSING").

2.3  Closing Delivery

At the Closing, the Company shall deliver to each Investor a certificate or
certificates in form reasonably satisfactory to such Investor evidencing
the Series C Preferred Shares purchased by such Investor, registered in
such Investor's or its nominee's name as evidenced by delivery of a
certified copy of the Company's Register of Members, reflecting such
Investor's ownership of the Series C Preferred Shares purchased hereunder,
against delivery to the Company of the purchase price therefore in the
amount specified in column 4 of Schedule A attached hereto, by a wire
transfer of United States Dollars in immediately available funds or by
other payment methods mutually agreed to by Company and the Investors.

2.4  Ownership Adjustments

(i)  Following the issue by the Auditor of the 2006 Audited Income
     Statement:

     (a)  if the 2006 Net Earnings are equal to or more than the Guaranteed
          2006 Net Earnings and the final ownership of the holders of the
          Series A-1 Preferred Shares and the holders of the Series A-2
          Preferred Shares (collectively, the "SERIES A SHAREHOLDERS") is
          to remain unchanged in accordance with Section 2.4(i) of the
          Share Purchase Agreement, dated as of July 28, 2006, by and among
          the Company, the Founder and the Series A Shareholders, which is
          amended by that certain Amendment to the Share Purchase Agreement
          dated as of September 15, 2006 (as amended, the "SERIES A SHARE
          PURCHASE AGREEMENT"), then the final ownership of the Investors
          in the Company after adjustment (the "FINAL OWNERSHIP") shall
          remain unchanged as the Initial Ownership of the Investors in the
          Company. For purposes of this Section 2.4, the calculation of the
          Final Ownership of the Investors in the Company and any
          adjustment to such ownership hereunder shall be effected by
          dividing the total number of issued and outstanding Series C
          Preferred Shares by the sum of the total issued and --
          outstanding Ordinary Shares (being 75,000,000) and the total
          number of issued and outstanding Preferred Shares (defined
          below), all on an as-converted basis, as of the date of the
          Closing or the date of adjustment, as the case may be.

     (b)  if the 2006 Net Earnings are less than the Guaranteed 2006 Net
          Earnings and the final ownership of the Series A Shareholders is
          to be adjusted in accordance with Section 2.4(i)(b) of the Series
          A Share Purchase Agreement, in order for the Final Ownership to
          remain unchanged as the Initial Ownership of the Investors in the
          Company, the respective Conversion Rate at which the Series A-1
          Preferred Shares and the Series A-2 Preferred Shares
          (collectively, the "SERIES A PREFERRED

                                   -2-

SHARES"), the Series B Preferred Shares and the Series C Preferred Shares are converted into Ordinary Shares shall be appropriately adjusted so that (A) the final ownership of the Series A Shareholders in the Company (calculated by dividing the total number of issued and outstanding Series A Preferred Shares by the sum of the total number of issued and outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Preferred Shares, all on an as-if converted basis, as of the date of the adjustment) shall be equal to the number derived from the formula set forth in Section 2.4(i)(b) of the Series A Share Purchase Agreement; (B) the final ownership of the Series B Shareholders in the Company (calculated by dividing the total number of issued and outstanding Series B Preferred Shares by the sum of the total number of issued and outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Preferred Shares, all on an as-if converted basis, as of the date of the adjustment) shall be equal to the initial ownership of the Series B Shareholders as set forth in Section 2.1(iii) of the Series B Preferred Shares Purchase Agreement, dated as of September 15, 2006, by and among the Company, the Founder and the Series B Shareholders, which is amended by that certain Amendment to the Series B Preferred Shares Purchase Agreement, dated September 26, 2006 (as amended, the "SERIES B SHARE PURCHASE AGREEMENT"); and (C) the Final Ownership of the Investors in the Company shall be equal to the Initial Ownership of the Investors in the Company.

(ii) Following the issue by the Auditor of the 2006/2007 Audited Income Statement:

    (a)   If the 2006/2007 Net Earnings are equal to or more than the Guaranteed 2006/2007 Net Earnings and the final ownership of the Series B Shareholders in the Company is to remain unchanged in accordance with Section 2.4(ii)(a) of the Series B Share Purchase Agreement, then the Final Ownership shall remain unchanged as the Initial Ownership of the Investors in the Company.

    (b)   If the 2006/2007 Net Earnings are less than the Guaranteed 2006/2007 Net Earnings and the final ownership of the Series B Shareholders in the Company is to be adjusted in accordance with Section 2.4(ii)(b) of the Series B Purchase Agreement, in order for the Final Ownership to remain unchanged as the Initial Ownership of the Investors in the Company, the respective Conversion Rate at which the Preferred Shares are converted into Ordinary Shares shall be appropriately adjusted so that (A) the final ownership of the Series A Shareholders in the Company (calculated by dividing the total number of issued and outstanding Series A Preferred Shares by the sum of the total number of issued and outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Preferred Shares, all on an as-if converted basis, as of the date of the adjustment) shall remain unchanged as the ownership of the Series A Shareholders adjusted, if any, according to Section 2.4(i)(b) of the Series A Share Purchase Agreement; (B) the final ownership of the Series B Shareholders in the Company (calculated by dividing the total number of issued and outstanding Series B Preferred Shares by the sum of the total number of issued and outstanding Ordinary Shares (being 75,000,000) and the total number of issued and outstanding Preferred Shares, all on

-3-

an as-if converted basis, as of the date of the adjustment) shall
be equal to the number derived from the formula set forth in
Section 2.4(ii)(b) of the Series B Share Purchase Agreement; and
(C) the Final Ownership of the Investors in the Company shall be
equal to the Initial Ownership of the Investors in the Company.

(iii) Following the issue by the Auditor of the 2007 Audited Income
Statement:

(a) if the 2007 Net Earnings are equal to or more than the Guaranteed
2007 Net Earnings, then the respective Conversion Rate of the
Preferred Shares shall be appropriately adjusted so that (A) the
final ownership of the Series A Shareholders in the Company
(calculated by dividing the total number of issued and
outstanding Series A Preferred Shares by the sum -- of the total
number of issued and outstanding Ordinary Shares (being
75,000,000) and the total number of issued and outstanding
Preferred Shares, all on an as converted basis, as of the date of
the adjustment) shall remain unchanged as the ownership of the
Series A Shareholders adjusted, if any, according to Section
2.4(i)(b) of the Series A Share Purchase Agreement; (B) the final
ownership of the Series B Shareholders in the Company (calculated
by dividing the total number of issued and outstanding Series B
Preferred Shares by the sum of the total number of issued and
outstanding Ordinary Shares (being -- 75,000,000) and the total
number of issued and outstanding Preferred Shares, all on an as
converted basis, as of the date of the adjustment) shall remain
unchanged as the ownership of the Series B Shareholders adjusted,
if any, according to Section 2.4(ii)(b) of the Series B Share
Purchase Agreement; and (C) the Final Ownership shall remain
unchanged as the Initial Ownership of the Investors in the
Company.

(b) if the 2007 Net Earnings are less than the Guaranteed 2007 Net
Earnings but are equal to or more than US$100,000,000, the Final
Ownership of the Investors in the Company shall be adjusted in
accordance with the following formula promptly following the
issue of the 2007 Audited Income Statement:

$$FO = IO \times \frac{GE07}{AE07}$$

For purposes of the foregoing formula, the following definitions
shall apply: (1) FO shall mean the Final Ownership after
adjustment in accordance with this Section 2.4(iii)(b); (2) IO
shall mean the Initial Ownership of the Investors in the Company;
(3) AE07 shall mean the actual 2007 Net Earnings; and (4) GE07
shall mean the Guaranteed 2007 Net Earnings.

The adjustment of the Final Ownership as contemplated in Section
2.4(iii)(b) above shall be effected by adjusting the respective
Conversion Rate of the Preferred Shares so that (A) the final
ownership of the Series A Shareholders (calculated by dividing
the total number of issued and outstanding Series A Preferred
Shares by the sum of the total number of issued and outstanding
Ordinary Shares (being 75,000,000) and the total number of issued
and outstanding Preferred Shares, all on an as-converted basis,
as of the date of the adjustment) shall remain unchanged as the
ownership of the Series A Shareholders adjusted, if any,
according to Section

-4-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

2.4(i)(b) of the Series A Share Purchase Agreement; (B) the final
ownership of the Series B Shareholders (calculated by dividing
the total number of issued and outstanding Series B Preferred
Shares by the sum of the total number of issued and outstanding
Ordinary Shares (being 75,000,000) and the total number of issued
and outstanding Preferred Shares, all on an as-converted basis,
as of the date of the adjustment) shall remain unchanged as the
ownership of the Series B Shareholders adjusted, if any,
according to Section 2.4(ii)(b) of the Series B Share Purchase
Agreement; and (C) the Final Ownership of the Investors in the
Company shall be equal to the number derived from the formula set
forth in Section 2.4(iii)(b) of this Agreement.

(c)    if the 2007 Net Earnings are less than US$100,000,000 and the
final ownership of the Series A Shareholders is to be adjusted in
accordance with Section 2.4(ii)(b) of the Series A Share Purchase
Agreement, then the respective Conversion Rate of the Preferred
Shares shall be appropriately adjusted so that (A) the final
ownership of the Series A Shareholders (calculated by dividing
the total number of issued and outstanding Series A Preferred
Shares by the sum of the total number of the issued and
outstanding Ordinary Shares (being 75,000,000) and the total
number of issued and outstanding Preferred Shares, all on an
as-converted basis, as of the date of the adjustment) shall be
equal to the number derived from the formula set forth in Section
2.4(ii)(b) of the Series A Share Purchase Agreement; (B) the
final ownership of the Series B Shareholders (calculated by
dividing the total number of issued and outstanding Series B
Preferred Shares by the sum of the total number of the issued and
outstanding Ordinary Shares (being 75,000,000) and the total
number of issued and outstanding Preferred Shares, all on an
as-converted basis, as of the date of the adjustment) in the
Company shall remain unchanged as the ownership of the Series B
Shareholders adjusted, if any, according to Section 2.4(ii)(b) of
the Series B Share Purchase Agreement; and (C) the Final
Ownership of the Investors in the Company shall remain unchanged
as the ownership of the Investors adjusted according to Section
2.4(iii)(b) of this Agreement.

(iv) To effect the ownership adjustment as set forth in Sections 2.4(i),
(ii) and (iii) above, the applicable Conversion Rate of the Series A
Preferred Shares, the Series B Preferred Shares and the Series C
Preferred Shares shall be adjusted in accordance with the following
formulas:

$$CR(A) = FO(A) \times \frac{TS}{4,580,000}$$

$$CR(B) = FO(B) \times \frac{TS}{8,000,000}$$

$$CR(C) = FO(C) \times \frac{TS}{3,000,000}$$

-5-

For purposes of the foregoing formulas, the following definitions shall apply: (1) CR(A) shall mean the effective Conversion Rate of the Series A Preferred Shares at which the Series A Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4; (2) CR(B) shall mean the effective Conversion Rate of the Series B Preferred Shares at which the Series B Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4; (3) CR(C) shall mean the effective Conversion Rate of the Series C Preferred Shares at which the Series C Preferred Shares are converted into Ordinary Shares in accordance with this Section 2.4; (4) FO(A) shall mean the final ownership of the holders of the Series A Preferred Shares in the Company as adjusted according to Section 2.4 of the Series A Share Purchase Agreement; (5) FO(B) shall mean the final ownership of the holders of the Series B Preferred Shares in the Company as adjusted according to Section 2.4 of the Series B Share Purchase Agreement; (6) FO(C) shall mean the Final Ownership of the Investors in the Company as adjusted according to Section 2.4 hereof; and (7) TS shall mean the total number of Ordinary Shares to be issued and outstanding, on an as-converted basis, as of the date of the Closing or the date of adjustment, as the case may be, which shall be equal to the number derived from the following formula:

$$TS = \frac{75,000,000}{1-FO(A)-FO(B)-FO(C)}$$

(v)  Notwithstanding anything contained herein to the contrary, the Investors agree not to make any adjustment to the ownership with respect to the 2007 Audited Income Statement under Section 2.4(iii) hereof if the 2007 Net Earnings is no less than US$104,500,000.

(vi)  Notwithstanding the above, in the event a Qualified IPO consummates or is expected to consummate prior to December 31, 2007, the Company agrees to perform a special audit of the interim period covering the number of complete months prior to such date. If the actual 2007 Net Earnings is less than the Guaranteed 2007 Net Earnings, each on a pro rata basis, then the Final Ownership of Investors in the Company shall be adjusted, prior to the consummation of the Qualified IPO, in accordance with the formulas and principles set forth in this Section 2.4, except the actual adjustment will be made on a pro rata basis. For purpose of the pro rata adjustment to be made in accordance with this Section 2.4(v), the Guaranteed 2007 Net Earnings allocable to the first six (6) months of 2007 shall be US$50,000,000 and the Guaranteed 2007 Net Earnings allocable to the last six (6) months of 2007 shall be US$60,000,000.

For the avoidance of doubt, both the pro rata Guaranteed 2007 Net Earnings and the pro rata 2007 Net Earnings shall be calculated on a monthly basis, and for purposes of this Section 2.4(vi), the pro rata Guaranteed 2007 Net Earnings shall be derived from the following formulas:

(A)  if the Qualified IPO consummates prior to June 30, 2007,

$$\frac{US\$50,000,000 \times N}{6}$$

-6-

PNE =

(B)  if the Qualified IPO consummates on or after July 1, 2007,

PNE= US$50,000,000 + US$10,000,000 x (N-6)

For purposes of the foregoing formulas, the following definitions shall apply: (1) PNE shall mean the pro rata Guaranteed 2007 Net Earnings and (2) N shall mean the number of complete months that have been audited by the special audit pursuant to this Section 2.4(vi).

(vii) Notwithstanding the above, the parties hereto may agree from time to time, based on legal advice mutually acceptable to the Company and the Investors, on any other method to effect the adjustment to the final ownership of the Series A Shareholders and the Final Ownership of the Investors to be equal to the amounts derived from the formulas and principles set forth in this Section 2.4. For the avoidance of doubt, the Investors' Final Ownership after any adjustment made under this Section 2.4 shall not be lower than their ownership before such adjustment.

(viii) Notwithstanding anything contained herein to the contrary, in the event there shall be any conflict between the provisions set forth in this Section 2.4 and the provisions contained in the Memorandum and Articles, then the provisions of the Memorandum and Articles shall prevail.

3.   REPRESENTATIONS AND WARRANTIES OF THE COMPANY, THE PRC SUBSIDIARY AND THE FOUNDER

The Company, the PRC Subsidiary and the Founder jointly and severally represent and warrant to the Investors as of the date of this Agreement and as of the Closing that, other than as set forth in the Disclosure Schedule (the "DISCLOSURE SCHEDULE") with specific reference to the section to which exception is being taken:

3.1  Organization, Good Standing and Qualification

(i)   Each member of the Company Group is duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its incorporation. Each member of the Company Group has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted and is duly qualified to transact business and is in good standing in each jurisdiction in which it operates business and the failure to so qualify would have a Material Adverse Effect.

(ii)  The Company is an exempted company duly organized, validly existing and in good standing under the laws of Cayman Islands, and has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted and is duly qualified to transact business and is in good standing in each jurisdiction in which it operates business and the failure to so qualify would have a Material Adverse Effect. The Company is a holding company and since its formation has not engaged in any business operation, been a party to any agreement, contract or commitment, or incurred any liability or obligation other than in the course of forming and holding its equity

-7-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

interest in the PRC Subsidiary and those relating solely to the transactions contemplated under this Agreement and the Ancillary Agreements.

(iii) The PRC Subsidiary is a wholly foreign-owned enterprise, duly organized and validly existing under the laws of the PRC. The formation of the PRC Subsidiary was duly approved by MOFCOM or its authorized local counterpart. The PRC Subsidiary has the corporate power and authority to own and operate its properties and to carry on its business as specified in the scope of business in the business license issued to the PRC Subsidiary.

3.2  Capitalization and Voting Rights

(i)  The authorized capital is and as of the Closing will be US$15,000,000. The authorized capital of the Company consists, or will consist immediately prior to the Closing, of:

(a)  Ordinary Shares. 134,000,000 ordinary shares, par value US$0.10 per share (the "ORDINARY SHARES"), of which 75,000,000 shares are issued and outstanding, and 59,000,000 are reserved for issuance upon conversion of the Preferred Shares issued and outstanding as of the Closing Date, upon the exercise of the Warrants as well as upon the exercise of stock options granted under the Company Option Plan.

(b)  Preferred Shares. 16,000,000 preferred shares, (1) 3,275,109 of which have been designated Series A-1 Preferred Shares, par value US$0.10 per share (the "SERIES A-1 PREFERRED SHARES"), 3,000,000 of which are issued and outstanding; (2) 1,724,891 of which have been designated Series A-2 Preferred Shares, par value US$0.10 per share (the "SERIES A-2 PREFERRED SHARES"), 1,580,000 of which are issued and outstanding; (3) 8,000,000 of which have been designated Series B Preferred Shares, par value US$0.10 per share (the "SERIES B PREFERRED SHARES"), all of which are issued and outstanding; and (4) 3,000,000 of which have been designated Series C Preferred Shares, par value US$0.10 per share (the "SERIES C PREFERRED SHARES", together with the Series A-1 Preferred Shares, the Series A-2 Preferred Shares and the Series B Preferred Shares, the "PREFERRED SHARES"), none of which has been issued and outstanding.

(ii)  The registered capital of the PRC Subsidiary is US$83,600,000 as of the Closing, all of which is owned by the Company and has been fully paid for.

(iii)  On the date hereof and at the Closing, the issued and outstanding share capital of the Company is and will be as set forth in Section 3.2(iii) of the Disclosure Schedule, which lists all shareholders owning issued and outstanding shares of the Company, together with the number held by each.

(iv)  Section 3.2(iv) of the Disclosure Schedule shows an accurate and true list of all outstanding securities of the Company and the PRC Subsidiary and their respective holders to be in effect immediately following the Closing.

(v)  As of the date hereof and the Closing, except as provided in this Agreement, the Ancillary Agreements, the Company Option Plan, the Warrants and the rights and privileges of the Preferred Shares under the Memorandum and Articles, there are no

-8-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal), proxy or shareholders agreements or agreements of any kind for the purchase or acquisition from the Company or the PRC Subsidiary of any of their securities.

(vi) Except as may be provided by the terms of the Preferred Shares or as otherwise set forth in Section 3.2(vi) of the Disclosure Schedule, neither the Company nor the PRC Subsidiary is subject to any obligation (contingent or otherwise) to purchase or otherwise acquire or retire any equity interest held by its shareholders or to purchase or otherwise acquire or retire any of its other outstanding securities.

3.3  Group Structure

(i) Section 3.3(i) of the Disclosure Schedule lists each Group Company, and correctly sets forth the capitalization of such Group Company, the Company's ownership interest therein, the interest of any other Person therein, the nature of legal entity which the Group Company constitutes, the jurisdiction in which the Group Company was organized, each jurisdiction in which the Group Company is required to be qualified or licensed to do business as a foreign Person and a brief summary of the Group Company's business.

(ii) Except in respect of any interest held in any Group Company, none of the Company or the Group Companies has any Subsidiaries or owns or controls, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, association or other entity. Except as set forth in Section 3.3(ii) of the Disclosure Schedule, none of the Company or the Group Companies maintains any offices or any branches.

(iii) In respect of any ownership interest held in a Group Company by the Company or another Group Company, as described in Section 3.3(i) of the Disclosure Schedule, (a) the Company or such Group Company holds good and valid title to such ownership interest free and clear of all restrictions on transfer or other encumbrances, other than those restrictions on transfer or other encumbrances created by the Ancillary Agreements or the constitutional documents, (b) such ownership interest was acquired in compliance with all Applicable Laws, including those promulgated by SAFE and those regulating the offer, sale or issuance of securities generally, and (c) there are no outstanding options or rights for the purchase or acquisition from the Company or such Group Company of such ownership interest. There are no outstanding options, warrants, rights (including registration, conversion or preemptive rights and rights of first refusal), proxy or shareholders agreements or agreements of any kind for the purchase or acquisition from any Group Company of any of its equity. None of the Group Companies is subject to any obligation (contingent or otherwise) to purchase or otherwise acquire or retire any interest held by its equity holders or to purchase or otherwise acquire or retire any of its securities.

(iv) In respect of the PRC Subsidiary, as of the Closing, the full amount of the registered capital thereof has been contributed, such contribution has been duly verified by a certified accountant registered in the PRC and the accounting firm employing such

-9-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

accountant, and the report of the certified accountant evidencing such verification has been registered with the SAIC or its authorized local counterpart.

3.4  Authorization

Each of the Company, the PRC Subsidiary and the Founder has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party and to carry out and perform its obligations thereunder. All corporate action on the part of each of the Company, the PRC Subsidiary and their respective officers, directors and shareholders necessary for the authorization, execution and delivery of this Agreement and each of the Ancillary Agreements to which it is a party, the performance of all obligations of each of the Company and the PRC Subsidiary thereunder, and the authorization, issuance (or reservation for issuance), sale and delivery by the Company of the Series C Preferred Shares being sold hereunder and the Ordinary Shares issuable upon conversion of such Series C Preferred Shares, has been taken or will be taken prior to the Closing. This Agreement and each of the Ancillary Agreements to which each of the Company, the PRC Subsidiary or the Founder is a party have been duly executed and delivered by each of the Company, the PRC Subsidiary and the Founder, and constitute valid and legally binding obligations thereof, enforceable thereagainst in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies. Any preemptive rights or rights of first refusal with respect to the issuance of the Series C Preferred Shares or the Ordinary Shares to be issued upon conversion of the Series C Preferred Shares have been duly waived.

3.5  Valid Issuance of the Series C Preferred Shares

(i)  The Series C Preferred Shares that are being purchased by or issued to the Investors hereunder, when issued, sold and delivered in accordance with the terms of this Agreement against payment of the Subscription Price will be duly and validly issued, fully paid, and non-assessable, and will be free of restrictions on transfer other than such restrictions on transfer as may be imposed by this Agreement, the Ancillary Agreements or the Memorandum and Articles. The Ordinary Shares issuable upon conversion of the Series C Preferred Shares purchased under this Agreement have been duly and validly reserved for issuance and, upon issuance in accordance with the terms of the Memorandum and Articles, will be duly and validly issued, fully paid, and non-assessable and will be free of restrictions on transfer other than such restrictions on transfer as may be imposed by this Agreement, the Ancillary Agreements or the Memorandum and Articles.

(ii)  All presently outstanding shares of the Company are duly and validly issued, fully paid and non-assessable, and in each case such shares have been issued in full compliance with the requirements of all applicable securities laws and regulations, including to the extent applicable, the Securities Act and all other antifraud and other provisions of applicable securities laws and regulations.

3.6  Licenses

-10-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(i)   Section 3.6 of the Disclosure Schedule contains a true and complete list of all Licenses used in and material to the business or operations of the Group Companies, setting forth the owner, the function and the expiration and renewal date of each. Prior to the execution of this Agreement, the Company has delivered to the Investors true and complete copies of all such Licenses.

  (a)   Each Group Company owns or validly holds all Licenses that are necessary to conduct its business and own and operate its assets and properties as presently conducted and operated, and can obtain, without undue burden or expense, all Licenses for the conduct of its businesses as currently conducted and as proposed to be conducted;

  (b)   Each License listed in Section 3.6 of the Disclosure Schedule is valid, binding and in full force and effect; and

  (c)   No Group Company is or has at any time been, or has received any notice that it is or has at any time been, in default (or with the giving of notice or lapse of time or both, would be in default) under any such License.

(ii)  Without limiting the generality of paragraph (i) above, all Licenses required under PRC laws for the due and proper establishment and operation of the PRC Subsidiary and the consummation of the transactions contemplated hereby have been duly obtained from the relevant Governmental Authority and are in full force and effect; all filings and registrations with the relevant PRC Governmental Authority required in respect of the PRC Subsidiary and its operations, including but not limited to registration with MOFCOM, SAIC, and SAFE have been duly and timely completed in accordance with the relevant PRC laws; the consummation of the transactions contemplated under this Agreement and each of the Ancillary Agreements will not result in a termination or revocation of any of the Material Licenses; each Group Company is in compliance with applicable requirements of the relevant tax bureau, customs authorities and product registration authorities to which it and its business are subject.

3.7  Consents

No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority or other third party on the part of any of the Company, the PRC Subsidiary or the Founder will be required in connection with the execution, delivery and performance of this Agreement and each of the Ancillary Agreements and the consummation of the transactions contemplated thereby which has not already been secured or effected or will be secured or effected prior to the Closing.

3.8  Offering

The Series C Preferred Shares and the Ordinary Shares to be issued upon conversion of the Series C Preferred Shares have not been, and will not be, registered under the Securities Act and are made subject of sale and purchase under this Agreement, to the extent they are so made herein, pursuant to an exemption from registration requirements of the Securities Act. Subject in part to the truth and accuracy of each Investor's representations set forth in Section 4 of this Agreement,

-11-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

the offer, sale and issuance of the Series C Preferred Shares and the Ordinary Shares to be issued upon conversion of the Series C Preferred Shares (when issued), as contemplated by this Agreement, is exempt from the registration and prospectus delivery requirements of the Securities Act and any applicable securities laws, and neither the Company nor any authorized agent acting on its behalf has taken or will take any action that would cause the loss of such exemption.

3.9   Business Plan and Budget

The business plan and budget dated November 24, 2006, as amended (the "2006 BUSINESS PLAN AND BUDGET") was previously delivered to the Investors by the Company and is attached as Exhibit C hereto. The 2006 Business Plan and Budget, including an annual profit and loss projection of the PRC Subsidiary for the fiscal years ending December 31, 2006 and 2007 as well as for the fiscal period from July 1, 2006 to June 30, 2007, does not contain any untrue statement of a material fact, nor does it omit to state a material fact necessary to make the statements therein not misleading, except that with respect to assumptions, projections and expressions of opinion or predictions contained in the 2006 Business Plan and Budget, the Company represents only it believes there is a reasonable basis therefor.

3.10   Books and Records; Minutes

All accounts, ledgers, material files, documents, instruments, papers, books and records relating to the business, operations, conditions (financial or other) of each member of the Company Group, results of operations, and assets and properties of each member of the Company Group (collectively, the "BOOKS AND RECORDS"), each as supplied to the Investors, are true, correct, complete and current in all material respects, there are no material inaccuracies or discrepancies of any kind contained or reflected therein, and they have been maintained in accordance with relevant legal requirements and industry standards, as applicable, including the maintenance of an adequate system of internal controls. The minute books of each member of the Company Group, as made available to Investors and their representatives, contain complete and accurate records of all meetings of and corporate actions or written consents by the shareholders and the board of such member of the Company Group and, to the extent that such minute books are deficient, all material information not contained in such minutes has been conveyed to the Investors in other written form.

3.11   Tax Matters

All Tax Returns required to be filed in respect of each member of the Company Group have been duly and timely filed, have been prepared in compliance with Applicable Law, and are true, correct and complete. All Taxes due and payable by each member of the Company Group, whether or not shown as due on such Tax Returns, have been fully paid when due. Each member of the Company Group has established adequate reserves on their respective books of account for all Taxes and for the liability for deferred income Taxes payable in respect of such member of the Company Group. There have been no extraordinary examinations or audits of any tax returns or reports by any applicable governmental agency.

3.12   Independent Audit Reports

-12-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(i) The Company has delivered to the Investors and attached as Section 3.12(i) of the Disclosure Schedule the independent audit reports (the "INDEPENDENT AUDIT REPORTS") for the nine month period ended September 30, 2006, which have been prepared under US GAAP and audited by the Auditor (the last date being the "REPORT DATE") and the financial forecast for the twelve months ending December 31, 2007 of the Company. The financial forecast is complete and correct in all material respects and present fairly the financial condition and position of the Company Group as of the Report Date, and is reviewed and signed off by KPMG in accordance with the IFRS.

(ii) There are no debts, liabilities, or claims owed by or against any member of the Company Group, of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due, other than liabilities set forth in the Independent Audit Reportor disclosed in Section 3.12(ii) of the Disclosure Schedule. None of the members of the Company Group is a guarantor or indemnitor of, or has provided security for, any indebtedness of any Person.

(iii) Except as otherwise disclosed in Section 3.12(iii) of the Disclosure Schedule, all of the accounts receivable and notes receivable owing to each member of the Company Group, including without limitation all accounts receivable and notes receivable set forth on the Review Report, constitute valid and enforceable claims other than accounts receivable and notes receivable which individually and in the aggregate would not result in a Material Adverse Event if unpaid, and are good and collectible in the ordinary course of business in all material respects, net of any reserves shown on the Independent Audit Report(which reserves are adequate and were calculated on a basis consistent with IFRS), and no further goods or services are required to be provided in order to complete the sales and to entitle such Person to collect in full. There are no material contingent or asserted claims, refusals to pay, or other rights of set-off with respect to any member of the Company Group.

3.13 Absence of Changes

Since the Report Date, except as otherwise disclosed in Section 3.13 of the Disclosure Schedule:

(i) None of the members of the Company Group has entered into any transaction that was not in the ordinary course of business.

(ii) There has been no Material Adverse Event (individually or when separate events are taken together) with respect to any member of the Company Group or the Company Group taken as a whole.

(iii) None of the members of the Company Group has incurred any obligation or liability except obligations or liabilities incurred in the ordinary course of business.

(iv) There has been no resignation or termination of employment of any Senior Manager of any member of the Company Group, and the Company has no Knowledge of any impending resignation or termination of employment of any Senior Manager of any member of the Company Group.

-13-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(v)   There has been no labor dispute involving any member of the Company Group or any of its respective employees and none is pending or threatened.

(vi)  There has been no material change in any compensation arrangement or agreement with any employee of any member of the Company Group.

(vii) There have been no loans or guarantees made by any member of the Company Group to or for the benefit of any Person, other than travel advances and other advances made to employees in the ordinary course of business.

(viii) There has been no waiver by any member of the Company Group of a material right or debt owing to such member.

(ix)  No member of the Company Group has purchased, acquired, sold, leased, granted a security interest in, pledged, mortgaged, created a lien in, or otherwise transferred a material portion of any material asset, whether tangible or intangible, other than the sale of inventory in the ordinary course of business and other than the creation of liens for taxes not yet due or payable.

(x)   There has been no material change to, or termination of, any Material Contracts, no member of the Company Group has entered into any new Material Contracts other than those listed in Section 3.15 of the Disclosure Schedule, and there has been no change to the charter document of any member of the Company Group.

(xi)  There has been no declaration, setting aside or payment or other distribution in respect of any of the share capital of any member of the Company Group, or any direct or indirect redemption, purchase or other acquisition of any such share capital by any member of the Company Group.

(xii) None of the members of the Company Group has incurred any indebtedness for money borrowed.

(xiii) There has been no damage to, destruction or loss of physical property (whether or not covered by insurance) materially affecting the business or operations of any member of the Company Group.

(xiv) There has been no agreement or commitment by any member of the Company Group to do any of the things described in this Section 3.13.

3.14 Litigation

Except as set forth in Section 3.14 of the Disclosure Schedule, there are no legal actions, suits, proceedings or claims pending in any jurisdiction in which the members of the Company Group operate, are organized or licensed to do business, or, to the Knowledge of the Company, threatened (whether or not the defense thereof or liabilities in respect thereof are covered by insurance), at law, in equity, in arbitration or before any governmental entity or authority against or affecting the Business or Condition of the Company Group or the Founder, or any of their respective assets or properties, nor does the Company have Knowledge of any facts which are likely to give rise to the same.

-14-

No injunction, writ, temporary restraining order, decree or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement or the other Ancillary Documents. No member of the Company Group has commenced or currently intends to initiate any legal action, suit, proceeding or claim.

3.15 Material Contracts

Section 3.15 of the Disclosure Schedule lists each outstanding Contract to which any member of the Company Group is a party or to which any member of the Company Group or any of their respective properties is subject or by which any thereof is bound that is deemed a Material Contract under this Agreement.

(i)   True and complete copies of the Material Contracts, including any amendments and supplements to such Contracts, have been delivered to the Investors or will be delivered to the Investors at least three (3) Business Days prior to the Closing; provided the Company may redact certain business sensitive information contained therein.

(ii)  Unless otherwise noted on Section 3.15(ii) of the Disclosure Schedule, each of the Material Contracts was entered into in the ordinary course of business.

(iii) Each Material Contract is valid and subsisting, enforceable by the parties thereto in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief or other remedies in the nature of equitable remedies. Each member of the Company Group has duly performed all its obligations under each Material Contract to the extent that such obligations to perform have accrued. No breach or default, alleged breach or default, or event which would (with the passage of time, notice or both) constitute a breach or default under any of the Material Contracts by any member of the Company Group, as the case may be, or any other party or obligor with respect thereto, has occurred, or as a result of this Agreement or any Ancillary Agreement, or the performance hereof or thereof, will occur.

(iv)  Consummation of the transactions contemplated by this Agreement and the Ancillary Agreements will not (and will not give any Person a right to) terminate or modify any rights of, or accelerate or augment any obligation of any member of the Company Group under any Material Contract.

(v)   Notwithstanding anything to the contrary provided herein, each of the following Contracts is deemed to be a Material Contract and has been identified in Section 3.15 of the Disclosure Schedule:

(a)   any Contract that, after the Report Date, obligates any member of the Company Group to pay an amount in excess of US$1,000,000;

(b)   any Contract of the Company or any Group Company that has an unexpired term of more than one (1) year valued in excess of US$1,000,000;

-15-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(c) any Contract on which the business of any member of the Company Group is substantially dependent or which is otherwise material to the Business or Conditions of any member of the Company Group;

(d) any loan agreement, indenture, letter of credit, security agreement, mortgage pledge agreement, deed of trust, bond, note, or other agreement relating to the borrowing of money or to the mortgaging, pledging, transferring of a security interest, or otherwise placing an encumbrance on any material asset or material part of the assets of any member of the Company Group, in an amount in excess of US$1,000,000;

(e) any Contract involving a guarantee by the Company or any Group Company of performance by any Person or involving any agreement of the Company or any Group Company to indemnify or act as surety for any Person, or any other Contract of the Company or any Group Company to be contingently or secondarily liable for the obligations of any Person;

(f) any Contract that limits or restricts the ability of any member of the Company Group to compete or otherwise to conduct its business in any manner or place;

(g) any joint venture, partnership, alliance or similar Contracts of the Company or any Group Company involving a sharing of profits or expenses (including joint development and joint marketing contracts);

(h) any asset purchase agreement, share purchase agreement or other Contract for acquisition by the Company or any Group Company of assets or shares of another Person;

(i) any agreement for the divestiture of (1) any assets by or of any member of the Company Group for consideration in excess of US$1,000,000 or (2) any shares of capital stock of any member of the Company Group;

(j) any sales agency, marketing or distributorship Contract the termination or non-extension of which would result in a Material Adverse Event;

(k) any Contract requiring performance on the part of the Company or any Group Company in any country other than the PRC;

(l) any Contract of the Company or any Group Company that grants a power of attorney, agency or similar authority to another Person or entity, agency or similar authority to another Person or entity;

(m) any Contract that contains a right of first refusal in respect of the share capital of any member of the Company Group;

(n) all supply agreements with vendors for materials, parts and other inputs for the Company's products and supply agreements with a value in excess of US$1,000,000;

-16-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

    (o)  all contracts with customers of the Company with a value (or expected value) in excess of US$1,000,000; and

    (p)  any other Contract that was not made in the ordinary course of business of the Company or any Group Company or not made at arm's length.

3.16 Compliance with Laws

    (i)  Each member of the Company Group is, and at all times has been, in full compliance with all Applicable Laws in any jurisdiction in which it operates, owns assets or is organized or licensed to do business.

    (ii)  No event has occurred and no circumstance exists that (with or without notice or lapse of time) (a) may constitute or result in a violation by any member of the Company Group of, or a failure on the part of any member of the Company Group to comply with, any Applicable Law, or (b) may give rise to any obligation on the part of any member of the Company Group to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

    (iii)  None of the members of the Company Group has received any notice or other communication (whether oral or written) from any governmental or regulatory body regarding (a) any actual, alleged, possible, or potential violation of, or failure to comply with, any Applicable Law, including without limitation any applicable Environmental Laws and Applicable Law relating to customs, transfer pricing, foreign exchange and related import and export regulations or (b) any actual, alleged, possible, or potential obligation on the part of any member of the Company Group to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

    (iv)  None of the members of the Company Group or the Founder, director, agent, employee or any other person acting for or on behalf of such member of the Company Group, has directly or indirectly (a) made any contribution, gift, bribe, payoff, influence payment, kickback, or any other improper payment in any form, whether in money, property, or services to any person, including but not limited to any officer of any Governmental Authority (w) to obtain favorable treatment in securing business for such member or any other member of the Company Group, (x) to pay for favorable treatment for business secured, (y) to obtain special concessions or for special concessions already obtained, for or in respect of such member or any other member of the Company Group, or (z) in violation of any Applicable Law, or (b) established or maintained any fund or assets in which such member of the Company Group has proprietary rights that have not been recorded in the Books and Records of such member of the Company Group, except, in each case, for such payments which facilitate or expedite the performance of routine government action and which was lawful under the laws of the jurisdiction of such payments.

3.17 Real Property

    (i)  None of the members of the Company Group owns or has legal or equitable title or other right or interest in any real property other than the land use rights (the "LAND USE

-17-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

RIGHTS") held by the Company Group as set forth in Section 3.17(i) of the Disclosure Schedule or as held pursuant to Lease (as defined below). True and complete copies of the certificates evidencing the Land Use Rights have been delivered to each of the Investors or their agents or professional advisers. Any land grant premium required under Applicable Law in connection with securing such Land Use Rights has been fully paid. The use of any real property by each of the members of the Company Group has conformed to the intended use of such real property as granted under the applicable Land Use Rights. The particulars of the Land Use Rights as set out in Section 3.17(i) of the Disclosure Schedule are true and complete.

(ii) Section 3.17(ii) of the Disclosure Schedule sets forth each leasehold interest with the annual lease payment in excess of US$50,000 pursuant to which any member of the Company Group holds any rights, titles or interests of a tenant (each a "LEASE"), indicating the parties to such Lease, the address of the property demised under the Lease, the rent payable under the Lease and the term of the Lease. Each Lease constitutes the entire agreement to which any member of the Company Group is party with respect to the property demised thereunder, and a true and complete copy of each such Lease has been delivered to the Investors, together with all amendments, modifications, alterations and other changes thereto. Each Lease is valid and subsisting, enforceable against the parties thereto in accordance with its terms. As of the date hereof, all conditions precedent to the enforceability of each Lease have been satisfied and there exists no breach or default, nor state of facts which, with the passage of time, notice, or both, would result in a breach or default on the part of any party to the Lease. Each member of the Company Group has accepted possession of the property demised pursuant to each Lease and is in actual possession thereof and has not sublet, assigned or hypothecated its leasehold interest except as set forth on Section 3.17(ii) of the Disclosure Schedule. The particulars of the Leases as set out in Section 3.17(ii) of the Disclosure Schedule are true and complete.

(iii) Except as set forth in Section 3.17(iii) of the Disclosure Schedule, each member of the Company Group has obtained property ownership certification for the plants, buildings and improvements located on land with respect to which it holds Land Use Rights (collectively, the "IMPROVEMENTS"). The Improvements and the operation thereof are part of a construction project plan approved by the applicable construction commission for the jurisdiction where the Improvements are located and do not (A) contravene any Applicable Law relating to zoning or building or (B) violate any restrictive covenant or any provision, in the case of either (i) or (ii), the effect of which could interfere with or prevent the continued use of such Improvements for the purpose for which they are now being used. All of the Improvements are in good operating condition and in a state of reasonable maintenance and repair (except for ordinary wear and tear) and are adequate for the conduct of the business of each member of the Company Group as currently conducted.

(iv) Each of the Land Use Rights and the Improvements is free and clear of any and all encumbrances except for those identified in Section 3.17(iv) of the Disclosure Schedule. A true and complete copy of each of the agreements relating to the encumbrances

-18-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

identified in Section 3.17(iv) of the Disclosure Schedule (the "MORTGAGES") has been delivered to each of the Investors.

(v) Except as set forth in Section 3.17(v) of the Disclosure Schedule, none of the Company Group uses any real property in the conduct of its business except insofar as it holds valid Land Use Rights or has secured a Lease with respect thereto. No default or event of default on the part of any member of the Company Group or event which, with the giving of notice or passage of time or both, would constitute a default or event of default has occurred and is continuing unremedied or unwaived under the terms of any of the Land Use Rights, the Leases or Mortgages. There exists no pending or threatened condemnation, confiscation, dispute, claim, demand or similar proceeding with respect to, or which could materially and adversely affect, the continued use and enjoyment of any Land Use Right, Lease or Improvement. The Land Use Rights, Leases and Mortgages are valid and subsisting and are enforceable in accordance with the terms contained therein in all material respects.

3.18 Personal Property

(i) The personal property of each member of the Company Group is sufficient for the conduct of its business as currently conducted.

(ii) All personal property of each member of the Company Group which is reflected in the Independent Audit Reporttherefor delivered to the Investors under Section 3.12(i) or which has been acquired by any member of the Company Group since the Report Date and which has not been disposed of in the ordinary course of its business is owned by such member of the Company Group free and clear of any encumbrances.

(iii) All machinery, tools and equipment of each member of the Company Group (other than inventories) which are reflected in the Independent Audit Reportherefor delivered to the Investors under Section 3.12(i) or which have been acquired thereby since the Report Date are in a state of reasonable maintenance and repair (except for ordinary wear and tear) and are adequate for the conduct of the business thereof as currently operated.

(iv) The inventories of each member of the Company Group which are reflected in the Independent Audit Reporttherefor delivered to the Investors under Section 3.12(i) were, on the Report Date, in good condition, and any inventories produced or acquired thereby after such date (to the extent not sold or otherwise disposed of in the ordinary course of business), are in good condition, are useable or useful in the ordinary course of the business thereof and are not in excess of reasonable requirements.

3.19 Entire Business

There are no material facilities, services, assets or properties shared with any other entity, which are used in connection with the business operations of the Company Group, and all of the facilities, services, assets or properties owned by the Group Companies are sufficient to conduct its business as proposed to be conducted.

3.20 Compliance with Other Instruments

-19-

None of the members of the Company Group is in, nor will the conduct of business of any of them as proposed to be conducted result in, any violation, breach or default of the Memorandum and Articles or any other constitutional documents (which include, as applicable, any articles of incorporation, by-laws, joint venture contracts and the like), or of any material respect of any term or provision of any mortgage, indenture, contract, agreement or instrument to which any such member of the Company Group is a party or may be bound, or of any provision of any judgment, decree, order, statute, rule or regulation applicable to or binding upon any of them. The execution, delivery and performance of and compliance with each of the Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated thereby, will not result in any such violation, breach or default, or be in conflict with or constitute, with or without the passage of time or the giving of notice or both, either a default under the Memorandum and Articles or any other such constitutional documents, any such contract, agreement or instrument, or a violation of any statutes, laws, regulations or orders, or an event which results in the creation of any lien, charge or encumbrance upon any asset of the Company Group.

3.21  Interested Party Transactions

No officer, director or shareholder, founder of the Company Group or any Affiliate of any of them has had, either directly or indirectly, any interest in (except less than 1% shareholdings for investment purposes in securities of publicly held and traded companies), or is an officer, director, employee or consultant of: (a) any person or entity which purchases, leases or borrows from or sells, licenses, leases, lends or furnishes to any member of the Company Group any goods, property, technology, intellectual or other property rights or services; or (b) any contract or agreement to which any member of the Company Group is a party or by which it may be bound or affected, except as set forth in Section 3.21 of the Disclosure Schedule. All such contracts and agreements were made on terms and conditions as favorable to such member of the Company Group as, or more favourable to such member of the Company Group than, would have been obtainable by it at the time in a comparable arm's-length transaction with an unrelated party.

3.22 Intellectual Property Rights

(i)  Each member of the Company Group owns or otherwise has the sufficient legal right or license to use all Intellectual Property necessary to permit the members of the Company Group to carry on their businesses as currently conducted and as proposed to be conducted. No claims are currently being asserted against any member of the Company Group, nor is any member of the Company Group aware of any threatened claim or demand, by any other Person (a) challenging or questioning the Company Group's validity, enforceability, ownership or use of any of the Intellectual Property owned or used by the Company Group or the validity or effectiveness of any license or similar agreement with respect thereto or (b) alleging any interference, infringement, misappropriation or unfair competition or trade practices.

(ii) Section 3.22(ii) of the Disclosure Schedule sets forth a complete list of the registered rights to, registration applications of, and licenses under, any (a) trademarks, service marks and trade names; (b) patents; (c) copyrights; (d) domain names of each member of the Company Group.

-20-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(iii) Each member of the Company Group has taken reasonable steps and measures to establish and preserve ownership of or right to use all Intellectual Property material to the operation of its business. Each member of the Company Group has taken reasonable steps to register, protect, maintain, and safeguard the Intellectual Property material to its business, including any Intellectual Property for which improper or unauthorized disclosure would impair its value or validity, and has executed appropriate nondisclosure and confidentiality agreements and made all appropriate filings, registrations and payments of fees in connection with the foregoing. There is no infringement or misappropriation by any other Person of any Intellectual Property of any member of the Company Group. No proceedings or claims in which any member of the Company Group alleges that any Person is infringing upon, or otherwise violating, any Intellectual Property of any member of the Company Group are pending, and none has been served, instituted or asserted by any member of the Company Group.

(iv) Each member of the Company Group owns all rights in and to any and all Intellectual Property used or planned to be used by such member of the Company Group, or covering or embodied in any past, current or planned activity, service or product of such member of the Company Group, which Intellectual Property was made, developed, conceived, created or written by any consultant retained, or any employee employed, by such member of the Company Group. No former or current employee, and no former or current consultant, of any member of the Company Group has any rights in any Intellectual Property made, developed, conceived, created or written by the aforesaid employee or consultant during the period of his or her retention by such member of the Company Group which can be asserted against such member of the Company Group, and such member of the Company Group has no obligation to compensate any former or current employee for the use of any such Intellectual Property. Except as set forth on Section 3.22(iv) of the Disclosure Schedule, each former and present employee and consultant of each member of the Company Group has executed a Confidentiality, Assignment of Inventions and Non-Competition Agreement in substantially the form attached hereto as Exhibit D. None of the Company, the PRC Subsidiary or the Founder is aware that any of the employees employed, or any of the consultants retained by any member of the Company Group is in violation thereof.

(v) No Intellectual Property owned by any member of the Company Group is the subject of any security interest, lien, license or other Contract granting rights therein to any other Person. The Company Group has not (a) transferred or assigned, (b) granted an exclusive license to or (c) provided or licensed in source code form, any Intellectual Property owned by any member of the Company Group to any Person.

(vi) To the Knowledge of the Company, no patent, invention, device, principle or any statute, law, rule, regulation, standard or code is pending or proposed which would restrict the ability of any member of the Company Group to use any of the Intellectual Property Rights used in the conduct of their business.

-21-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

3.23 Labor Agreements and Actions; Employee Compensation

(i)    Except as disclosed in Section 3.23 of the Disclosure Schedule, none of the members of the Company Group is a party to or is bound by any currently effective employment contract, deferred compensation agreement, bonus plan, incentive plan, profit sharing plan, retirement agreement, vacation, hospitalization, medical or other plan, policy, trust or arrangement or other employee compensation agreement.

(ii)   The Company is not aware that any of the Key Persons, senior officer or key employee, or that any group of key employees, intends to terminate their employment with the Company Group, nor does the Company Group have a present intention to terminate the employment of any of the foregoing. The employment of each of the Key Persons, senior officer and key employee of each member of the Company Group is terminable at the will of such member of the Company Group without giving rise to a claim for compensation or damages (other than a statutory severance or redundancy payment or statutory compensation for unfair dismissal). Each members of the Company Group has complied in all material respects with all Applicable Laws related to employment.

(iii)  None of the members of the Company Group has any liability (whether legally binding or not) to make any payment to or for the benefit of any employee, officer, consultant, independent contractor or agent in respect of past service, pension or the termination of the employment or engagement of that or any other person (including without limitation, payments for wrongful or unfair dismissal, loss of office or redundancy) that would have a Material Adverse Effect, other than in respect to current month payroll expenses and related deductions in relation to employee and employer contributions.

3.24 Benefit Plans

(i)    None of the members of the Company Group has scheduled or agreed upon future increases of benefit levels (or creations of new benefits) with respect to any Benefit Plan, and no such increases or creation of benefits have been proposed or made the subject of representations to employees of the Company Group under circumstances which make such employees reasonably expect that such increases will be granted. No loan is outstanding between any member of the Company Group and any employee.

(ii)   Other than statutory social insurance plans operated under the Applicable Laws of the PRC, no member of the Company Group provides or is required to provide any retirement, social insurance, life insurance, medical, dental or other welfare benefits provided on ill-health, injury, death disability or on termination of employment (whether voluntary or involuntary) to any current or former employees, officers, consultants, independent contractors or agents of the Company Group.

(iii)  Each member of the Company Group has complied with all Applicable Laws in all material respects relating to any of the Benefit Plans, including by deducting and making all required contributions and payments required to be made by or on behalf of any employees of the Company Group to the relevant Governmental Authority, and no such deductions have been challenged or disallowed by any Governmental Authority or any employee of the Company Group. None of the members of the Company Group has

-22-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

been delinquent in making any payment to or for the benefit of any current or former employee, officer, consultant, independent contractor or agent with respect to statutory social insurance plans operated under the Laws of the PRC.

3.25 No State Assets

Except as set forth in Section 3.25 of the Disclosure Schedule, none of the assets of any member of the Company Group constitute state-owned assets and, inasmuch, are not required to undergo any form of valuation under Applicable Law in the PRC governing the transfer of state-owned assets prior to the consummation of the transactions contemplated herein or in any of the Ancillary Agreements.

3.26 Conflict of Interest

Section 3.26 of the Disclosure Schedule lists all existing or potential conflict of interest any Key Person may have with the members of the Company Group, and all measures that have been taken or are planned to be taken to address such conflicts.

3.27 Insurance

Section 3.27 of the Disclosure Schedule contains copies of all of the insurance policies or programs of each of the members of the Company Group in effect as of the date hereof that have an insured amount of at least US$50,000,000, and indicates the insurer's name, policy number, expiration date, amount of coverage, type of coverage, annual premiums, exclusions and deductibles, that is in effect. All such policies are underwritten by financially sound and reputable insurers, and are sufficient to satisfy all Applicable Laws in all material respects. All such policies will remain in full force and effect and will not in any way be affected by, or terminate or lapse by reason of any of the transactions contemplated hereby.

3.28 Customers

Section 3.28 of the Disclosure Schedule contains a true, complete and correct list of the ten largest customers of the Company Group taken as a whole in terms of sales during the six-month period from January 1, 2006 to June 30, 2006 and the twelve-month period ended December 31, 2005. There exists no actual or, to the Knowledge of the Company, threatened termination, cancellation or limitation of, or any adverse modification or change in, the business relationship of the members of the Company Group or their business with any customer or any group of customers whose purchases are individually or in the aggregate material to the business of the Company Group, and there exists no present condition or state of facts or circumstances that would cause a Material Adverse Effect or prevent the members of the Company Group from conducting their business after the consummation of the transactions contemplated by this Agreement, in substantially the same manner in which such business has heretofore been conducted.

3.29 Suppliers

The total amount of silicon feedstock that has been delivered and will be delivered under the currently effective supply contracts during the financial years ending December 31, 2006 and 2007 is no less than 2,000 tons. The weighted average price per kilogram of such silicon feedstock is no more than US$150.

-23-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

3.30  Environmental Matters

    (i)  The property, assets and operations of the members of the Company Group are and have been in material compliance with all applicable Environmental Laws. No Hazardous Materials have been released, on or into any of the properties or premises of the Company and its Subsidiaries, including without limitation, the ground water, in contravention of Environmental Laws.

    (ii) None of the properties, assets or operations of any of the members of the Company Group is the subject of any governmental investigation evaluating whether (i) any remedial action is needed to respond to a release or threatened release of any Hazardous Materials into the environment or (ii) any release or threatened release of any Hazardous Materials into the environment is in contravention of any Environmental Law.

None of the members of the Company Group has received any written notice or claim, nor to the Knowledge of the Company, there are pending or threatened lawsuits or proceedings against any of them with respect to violations of an Environmental Law or any release or threatened release of any Hazardous Materials into the environment.

3.31  Full Disclosure

The Company, the PRC Subsidiary and the Founder have provided each of the Investors with all the information that such Investor has requested for deciding whether to consummate the transactions contemplated under this Agreement. None of this Agreement, any Ancillary Agreements or any other statements or certificates or other materials made or delivered, or to be made or delivered, to such Investor in connection herewith or therewith, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading. No representation or warranty by the Company, the PRC Subsidiary or the Founder in this Agreement and no information or materials provided to such Investor in connection with its due diligence investigation of any member of the Company Group or the negotiation and execution of this Agreement and the Ancillary Agreements contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact required to be stated therein or necessary in order to make the statement therein, in light of the circumstances in which they are made, not misleading.

The Company, the PRC Subsidiary and the Founder acknowledge that each of the Investors is entering into this Agreement in reliance on the representations and warranties given herein and that the representations and warranties have been given with the intention of inducing the Investors to enter into this Agreement.

4.    REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

Each of the Investors hereby severally but not jointly represents and warrants to the Company as of the date of this Agreement and as of the Closing that:

4.1  Authorization

Such Investor has full power and authority to enter into this Agreement, and this Agreement, when executed and delivered by such Investor, will constitute its valid and legally binding

-24-

obligation, enforceable in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

4.2    Purchase for Own Account

This Agreement is made with such Investor in reliance upon such Investor's representation to the Company, which by such Investor's execution of this Agreement such Investor hereby confirms, that the Series C Preferred Shares to be acquired hereunder and the Ordinary Shares to be issued upon conversion of the Series C Preferred Shares (collectively, the "SECURITIES") will be acquired by such Investor for investment for such Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, each of the Investors further represents that it does not have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Securities.

4.3    No Public Market

Such Investor understands that the Securities have not been, and will not be, registered under the Securities Act, that no public market now exists for the Securities, that the Company has made no assurances that a public market will ever exist for the Securities, and that the Securities may not be resold absent a registration under the Securities Act or an available exemption from the registration requirements of the Securities Act.

4.4    Investment Experience

Such Investor acknowledges that it is able to bear the economic risk of this investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Securities.

4.5    Disclosure of Information

The Investors and their advisors have been furnished with all materials relating to the business, finances and operations of any member of the Company Group and materials relating to the securities which have been requested by the Investors or their advisors. The Investors and their advisors have been afforded the opportunity to ask questions of representatives of any member of the Company Group and have received answers to such questions, as the Investors deem necessary in connection with its decision to subscribe for the Series C Preferred Shares. For the avoidance of doubt, nothing in this Section 4.5 shall limit in any way the scope of the warranties set forth in Section 3 of this Agreement or the liability of the Company, the PRC Subsidiary or the Founder for breach thereof.

4.6    Legends

Such Investor understands that the certificates evidencing the securities issued pursuant to this Agreement may bear the following legend:

-25-

"These securities have not been registered under the Securities Act of
1933, as amended. They may not be sold, offered for sale, pledged or
hypothecated in the absence of a registration statement in effect with
respect to the securities under such Act or an opinion of counsel
satisfactory to the Company that such registration is not required or
unless sold pursuant to Rule 144 of such Act."

5.    CONDITIONS OF THE INVESTORS' OBLIGATIONS AT THE CLOSING

The obligations of each Investor under this Agreement at the Closing are subject
to the fulfillment on or before the Closing of each of the following conditions
unless waived by each Investor with respect to itself; provided, however, that
any waiver of a condition shall not be deemed a waiver of any breach of any
representation, warranty, agreement, term or covenant or of any
misrepresentation by the Company, the PRC Subsidiary or the Founder, except to
the extent expressly so waived.

5.1    Representations and Warranties

       The representations and warranties of the Company, the PRC Subsidiary and
       the Founder contained in Section 3 shall be true, correct and complete in
       all material respects when made, and shall be true, correct and complete on
       and as of Closing at which the Investors are acquiring the Series C
       Preferred Shares with the same effect as though such representations and
       warranties had been made on and as of the date of the Closing.

5.2    Performance

       Each of the Company, the PRC Subsidiary and the Founder shall have
       performed and complied with all agreements, obligations and conditions
       contained in this Agreement in all material respects that are required to
       be performed or complied with by it on or before the Closing.

5.3    Compliance Certificate

       The Chief Executive Officer of the Company shall deliver to the Investors
       at the Closing a certificate stating that the condition specified in
       Section 5.1, 5.2, 5.5 and 5.19 have been fulfilled in all material respects
       and stating that there shall have been no Material Adverse Change since the
       Report Date.

5.4    Secretary's or Director's Certificate

       The Investors shall have received a certificate from the Company, dated as
       of the Closing Date and signed by the Secretary or a director of the
       Company, certifying (a) that the attached copies of the organizational
       documents of the Company and each of the members of the Company Group and
       the resolutions of the Board of Directors and/or shareholders (as
       appropriate) of the Company and the PRC Subsidiary approving this Agreement
       and the Ancillary Agreements and the transactions contemplated hereby and
       thereby, are all true, complete and correct and remain unamended and in
       full force and effect, (b) that the incumbency and specimen signature of
       each officer of the Company and the PRC Subsidiary executing each such
       document or any other document delivered in connection herewith or
       therewith on behalf of the Company, (c) that the attached copies of current
       business licenses of the Company and each of the Group Companies are all
       true, complete and correct and remain unamended and in full force and
       effect, and (d) that the attached copy of a good standing certificate for
       the Company is true, complete and correct.

-26-

5.5    Governmental Consents and Approvals

Each of the Company, the PRC Subsidiary and the Founder shall have obtained all authorizations, approvals, waivers or permits of any competent Governmental Authority or regulatory body for the consummation of all of the transactions contemplated by this Agreement that are required in connection with the lawful issuance and sale of the Series C Preferred Shares pursuant to this Agreement, and all such authorizations, approvals, waivers and permits shall be effective as of the Closing.

5.6    Corporate Approval

The Investors shall have received true, complete and correct copies of the resolutions of the Board of Directors and/or shareholders (as appropriate) of the Company and the PRC Subsidiary and such other agreements, schedules, exhibits, certificates, documents, financial information and filings which are reasonably required in connection with or relating to the transactions contemplated hereby, all in form and substance reasonably satisfactory to the Investors.

5.7    Consents From Third Parties

Each of the Company, the PRC Subsidiary and the Founder shall have obtained any necessary third-party consents required in connection with or relating to the transaction contemplated hereby by virtue of Applicable Laws, contractual obligations or otherwise.

5.8    Independent Audit Report

The Company shall have, at the Company's expense, prepared and submitted to the Investors: (i) the Independent Audit Report and (ii) financial forecast for the financial year ending December 31, 2007.

5.9    Due Diligence

The Investors shall have completed and be satisfied with the results of all business, legal and financial due diligence, and any items requiring correction identified by any Investor shall have been corrected to the Investors' reasonable satisfaction. Without limiting the foregoing, the Investors shall have received from the Company all documents and other materials reasonably requested by the Investors for the purpose of examining and determining the rights of the Company, the PRC Subsidiary or any other members of the Company Group in and to any technology, products and Proprietary Assets now used, proposed to be used in, or necessary to the Company or the PRC Subsidiary's business as now conducted and proposed to be conducted, and the status of its ownership rights in and to all such technology, products and Proprietary Assets shall be reasonably satisfactory to the Investors.

5.10    Approval of the Investment Committee

Each Investor's investment committee shall have approved the terms of the investment, including this Agreement and all ancillary or related agreements.

5.11    Proceedings and Documents

All corporate and other proceedings in connection with the transactions contemplated at the

-27-

Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Investors, and each Investor shall have received all such counterpart original or other copies of such documents as it may reasonably request.

5.12 Subscription for the Series C Preferred Shares Permitted by Applicable Laws

The subscription for the Series C Preferred Shares by the Investors hereunder and the consummation of the transactions contemplated hereby (a) shall not be prohibited by the Memorandum and Articles or any Applicable Laws, (b) shall not subject the Investors to any penalty or other onerous condition under or pursuant to any Applicable Law, and (c) shall be permitted by all Applicable Laws to which the Investors or the transactions contemplated by or referred to herein or in the other documents and agreements contemplated hereby are subject; and the Investors shall have received such certificates or other evidence as they may reasonably request to establish compliance with this condition.

5.13 Memorandum and Articles

The Second Amended and Restated Memorandum and Articles (the "MEMORANDUM AND ARTICLES") shall have been duly amended by all necessary action of the Company's board of directors and shareholders in substantially the form attached hereto as Exhibit A and such amendment shall be duly filed with and registered by the Registrar of Companies of the Cayman Islands within fifteen (15) days of the adoption of such amendment as required by the applicable Cayman Islands law.

5.14 Shareholders Agreement

The Founder and the Company shall have entered into an Amended and Restated Shareholders Agreement (the "SHAREHOLDERS AGREEMENT") in substantially the form attached hereto as Exhibit E, and such agreement shall be in full force and effect.

5.15 Opinion of the Company's Cayman Islands Counsel

The Investors shall have received from Conyers Dill & Pearman, Cayman Islands counsel for the Company, an opinion, dated as of the Closing, in the form attached hereto as Exhibit F.

5.16 Opinion of the Company's PRC Counsel

The Investors shall have received from Grandall Legal Group, PRC counsel for the Company, an opinion, dated as of the Closing, substantially in the form and to the effect of Exhibit G, and to such further effect as the Investors may reasonably request.

5.17 Confidentiality, Commitment and Non-Competition Agreement

The Founder and Key Persons of each member of the Company Group with access to confidential information shall have executed a Confidentiality, Assignment of Inventions and Non-Competition Agreement dated on or before the Closing, in the form attached hereto as Exhibit D.

5.18 Registration Rights Agreement

-28-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

The Company shall have agreed to grant the Investors certain registration rights in accordance with the Second Amended and Restated Registration Rights Agreement (the "REGISTRATION RIGHTS AGREEMENT") in substantially the form attached hereto as Exhibit H.

5.19 No Litigation

No action, suit, proceeding, claim, arbitration or investigation shall have been threatened or instituted against any of the Founder, the Company, the PRC Subsidiary, any other members of the Company Group or any Investor (a) seeking to restrain, prevent or change the transactions contemplated hereby or questioning the validity or legality of any of such transactions, or (b) which would, if resolved adversely to the Investors or the Company, severally or in the aggregate, cause a Material Adverse Effect.

5.20 No Material Adverse Change

There shall not have occurred prior to the Closing any event or transaction reasonably likely to have a Material Adverse Effect (the "MATERIAL ADVERSE CHANGE").

5.21 Board Observers

The Company shall have duly appointed each of the persons designated in writing by Financiere Natexis Singapore 4 Pte Ltd. and CDH SolarFuture Limited at the Closing to be observers on the Board of Directors of the Company.

5.22 No Material Judgment or Order

There shall not be on the Closing any judgment or order of a court of competent jurisdiction or any ruling of any governmental entity or authority or any condition imposed under any Applicable Law which, in the reasonable opinion of the Investors, would prohibit the subscription of the Series C Preferred Shares hereunder or subject the Investors to any penalty or other onerous condition under or pursuant to any Applicable Law if the Series C Preferred Shares were to be purchased hereunder or would cause a Material Adverse Effect.

5.23 Hiring of Chief Operating Officer

The Company shall have delivered a legally binding offer letter to the candidate who will be hired as the Chief Operating Officer, pursuant to which the Chief Operating Officer will assume his position no later than January 15, 2007.

5.24 Closing Condition Fulfilment Notice

Upon fulfilment of all the closing conditions set forth in this Section 5, the Investors, through their legal counsel, shall have issued to the Company a closing condition fulfilment notice acknowledging that all the closing conditions set forth herein have been met.

6.   CONDITIONS OF THE COMPANY'S, THE PRC SUBSIDIARY'S AND THE FOUNDER'S OBLIGATIONS AT THE CLOSING

The obligations of the Company, the PRC Subsidiary and the Founder among themselves and to the Investors under this Agreement at the Closing are subject to the fulfillment on or before the Closing of each of the following conditions by each of the Investors:

-29-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

6.1  Representations and Warranties

The representations and warranties of the Investors contained in Section 4 shall be true, correct and complete when made, and shall be true, correct and complete on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing.

6.2  Performance

Each of the Investors shall have performed and complied with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing.

7.  COVENANTS

7.1  Covenants Until Closing

The Company, the PRC Subsidiary and the Founder covenant and agree with the Investors that, at all times from and after the date hereof until the Closing, the Company, the PRC Subsidiary and the Founder will comply with the following covenants and provisions, except to the extent the Investors may otherwise consent in writing.

(i)  Governmental Authorization; Maintenance of Licenses

The Company and the PRC Subsidiary will, and the Founder will procure the members of the Company Group to (i) proceed diligently and in good faith and use all commercially reasonable efforts, as promptly as practicable, to obtain all consents, approvals or actions of, to make all filings with and to give all notices to Governmental Authorities required of the Company or any Subsidiary to consummate the transactions contemplated hereby, (ii) provide such other information and communications to such Governmental Authorities as the Investors or such Governmental Authorities may reasonably request in connection with the consummation of the transactions contemplated hereby, (iii) cooperate with the Investors in obtaining as promptly as practicable all consents, approvals or actions of, making all filings with and giving all notices to Governmental Authorities required of the Investors to consummate the transactions contemplated hereby, and (iv) ensure that all Licenses are, and will remain, in full force and effect at all times following the Closing.

(ii)  Dividends

The Company and the PRC Subsidiary will not, and the Founder will procure the Company and the PRC Subsidiary not to, declare or issue any dividends for any class of shares of the Company and the PRC Subsidiary.

(iii)  Major Transactions

The members of the Company Group shall not, and the Founder shall ensure that the members of the Company Group shall not, effect any merger, consolidation, scheme of arrangement, recapitalization, fund raising or sale of all or substantially all of the assets of any member of the Company Group without obtaining the consent of the Investors

-30-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

prior to the actual execution of such activities. For the avoidance of doubt, any business transactions that are in the ordinary course of business of the Company and are consistent with the Company's past practice are not subject to the foregoing restriction.

(iv)  Notice and Cure

The members of the Company Group shall conduct their business in a manner, and shall otherwise use all reasonable efforts, so as to ensure that the representations and warranties set forth in Section 3 hereof shall continue to be true and correct on and as of the Closing Date as if made on and as of the Closing. The Company, the PRC Subsidiary and the Founder will notify the Investors promptly in writing of, and will as soon as practicable provide the Investors with true and complete copies of any and all information or documents relating to, and will use all best efforts to cure before the Closing, any event, transaction or circumstance occurring after the date of this Agreement that causes or will cause any covenant or agreement of any such party under this Agreement to be breached or that renders or will render untrue any representation or warranty of any such party contained in this Agreement as if the same were made on or as of the date of such event, transaction or circumstance. The Company also will notify the Investors promptly in writing of, and will use all best efforts to cure, before the Closing, any violation or breach of any representation, warranty, covenant or agreement made by the Company in this Agreement, whether occurring or arising before, on or after the date of this Agreement. No notice given pursuant to this Section 7.1(iv) shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of any condition contained herein or shall in any way limit the Investors' right to seek any remedy available at law or in equity.

(v)  Fulfillment of Conditions

The Company, the PRC Subsidiary and the Founder will execute and deliver at or prior to the Closing this Agreement and each of the Ancillary Agreements that they are required hereby to execute and deliver as a condition to the Closing, and will take all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy the other conditions to the obligations of the Investors contained in this Agreement and will not permit the Company or any member of the Company Group to take or fail to take any action that could reasonably be expected to result in the nonfulfillment of any such condition.

(vi)  Memorandum and Articles

The Founder hereby agrees to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under the Applicable Law to abide by the terms of the Memorandum and Articles, as may be amended from time to time, and to cause each Group Company to conduct its business as if bound by the Memorandum and Articles. The Founder further agrees to execute and deliver, or cause to be executed and delivered, such other documents, certificates, agreements and other writings and to take, or cause to be taken, such other actions as reasonably deemed necessary in order to

-31-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

consummate or implement expeditiously the provisions of the Memorandum and Articles, each as may be amended from time to time.

7.2    Covenants After Closing

The Company, the PRC Subsidiary and the Founder covenant and agree with the Investors that, at all times from and after the date hereof, they will comply with the following covenants.

(i)    Use of Proceeds

Without the Investors' prior written consent, the Subscription Price paid by the Investors to the Company shall be only used by the Company to implement business expansion, make capital expenditures and meet general working capital needs of the PRC Subsidiary within the business scope of solar energy in accordance with the Business Plan of the Company and/or the PRC Subsidiary approved by the Investors. For the avoidance of doubt, the Company shall not use any of the Subscription Price to make payment for any indebtedness of any Group Company or to settle any related party transactions.

(ii)    Disclosure of Major Events

The Company covenants to disclose to all of its shareholders all major events that may lead to liabilities of any of the members of the Company Group, including without limitation, legal proceedings threatened or taken against the Company Group.

(iii)    Internal Control and Financial Management

The Company and the PRC Subsidiary shall use their best efforts to adopt an internal control system that ensures the separation of internal audit and financial control of the Company and the PRC Subsidiary, respectively.

(iv)    Regulatory Compliance

The Company, the PRC Subsidiary and the Founder shall cause all shareholders of the Company and the PRC Subsidiary (or any successor entity) to timely complete all required registrations and other procedures with applicable governmental authorities, including without limitation the State Administration of Foreign Exchange, if and when required pursuant to applicable law, and shall ensure that at all times the Company, the PRC Subsidiary and their respective shareholders are in compliance with such requirements and that there is no barrier to repatriation of profits, dividends and other distributions from the PRC Subsidiary (or any successor entity) to the Company.

(v)    Key Man Insurance

Within ninety (90) days following the Closing, the Company shall obtain key man insurance policy for the Founder, the terms and conditions of which shall be to the reasonable satisfaction of the Investors.

(vi)    PRC Matters

Within ninety (90) days following the Closing, the Company shall procure the PRC Subsidiary to obtain all permits, certificates, authorizations and approvals required under

-32-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

any PRC environmental laws, regulations, ordinance and orders in connection with the business operations of the PRC Subsidiary.

(vii) Unless the Board of Directors otherwise approves, including the consent of the Investor Director which shall not be unreasonably withheld, the Company shall procure the registration statement on Form F-1 with respect to the registration of the Ordinary Shares in connection with a Qualified IPO to be confidentially submitted to the United States Securities and Exchange Commission no later than January 31, 2007.

8. CONFIDENTIALITY

8.1 Disclosure of Terms

Each party hereto agrees that it will maintain the confidentiality of the terms and conditions of this Agreement, all exhibits and schedules attached hereto (collectively, the "FINANCING TERMS") and the transactions contemplated hereby of the Company; provided, however, such obligation of confidentiality shall not apply to (i) information which was in the public domain or otherwise known to the relevant party before it was furnished to it by another party hereto or, after it was furnished to that party, entered the public domain otherwise than as a result of (1) a breach by that party of this Section 8.1 or (2) a breach of a confidentiality obligation by the disclosing party, where the breach was known to that party; (ii) information the disclosure of which is necessary in order to comply with applicable law, the order of any court, the requirements of a stock exchange or other governmental or regulatory authority or to obtain tax or other clearances or consents from any relevant authority; (iii) information disclosed by the Investors to a bona fide proposing purchaser of any Series C Preferred Shares, (iv) information disclosed by the parties hereto to their respective directors, managers, officers, employees, partners, accountants and attorneys where such Persons or entities are under appropriate nondisclosure obligation to the relevant party; or (v) any disclosure by each Investor to such Investor's and/or fund manager's and/or its Affiliate's legal counsel, fund manager, auditor, insurer, accountant, consultant or to any officer, director, general manager, limited partner, its fund manager, shareholder, investment counsel or advisor, or employee of such Investor and/or its Affiliates; provided, however, that any counsel, auditor, insurer, accountant, consultant, officer, director, general partner, limited partner, fund manager, shareholder, investment counsel or advisor, or employee shall be advised of the confidential nature of the information or are under appropriate non-disclosure obligation imposed by professional ethics, law or otherwise; (vi) any disclosure of information by any Investor for fund and inter-fund reporting purposes; and (vii) any disclosure required or necessary for the parties hereto to comply with their respective obligations under the Series A and Series B financing documents.

8.2 Press Releases

Notwithstanding any other provision of this Section 8, with respect to the transactions contemplated under this Agreement, within sixty (60) days after the Closing, the Company may issue a press release through any media channels, including industrial conferences, disclosing the existence of this Agreement and the transactions contemplated hereunder, provided that such press release does not disclose the Financing Terms and is in a form approved by the Investors. Any communication with the media or press release (via any medium, including industrial conferences) that uses an Investor's trade name or otherwise refers to an Investor's participation

-33-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

or involvement with the Company Group shall be subject to the prior written approval of the Investors prior to the release or use of such communication or press release.

8.3  OTHER INFORMATION

The provisions of this Section 8 shall survive the termination of this Agreement and shall be in addition to, and not in substitution for, the provisions of any separate nondisclosure agreement executed by any of the parties hereto with respect to the transactions contemplated hereby.

9.  MISCELLANEOUS

9.1  Survival

The warranties, representations and covenants of the Company, the PRC Subsidiary, the Founder and each of the Investors contained in or made pursuant to this Agreement and the indemnity given by the Company, the PRC Subsidiary and the Founder pursuant to Section 9.2 shall survive the execution and delivery of this Agreement and the Closing, and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of any of the Investors or the Company.

9.2  Indemnity

(i)  The Company, the PRC Subsidiary and the Founder agree to, jointly and severally, indemnify and hold harmless any Investor and such Investor's directors, officers, employees, Affiliates, agents and permitted assigns (each, an "INDEMNITEE"), against any and all Indemnifiable Losses to such Indemnitee, directly or indirectly, as a result of, or based upon or arising from any inaccuracy in or breach of nonperformance of any of the representations, warranties, covenants or agreements made by the Company, the PRC Subsidiary and the Founder in or pursuant to this Agreement. For purposes of this Section, "INDEMNIFIABLE LOSS" means, with respect to any Indemnitee, any action, cost, damage, disbursement, expense, liability, loss, deficiency, diminution in value, obligation, penalty or settlement of any kind or nature, whether foreseeable or unforeseeable, including, but not limited to, (i) interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses reasonably incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by such Indemnitee and (ii) any taxes that may be payable by such Indemnitee as a result of the indemnification of any Indemnifiable Loss hereunder.

(ii)  The Founder shall indemnify, defend and hold harmless the Company, any Investor and their respective directors, officers, employees, Affiliates, agents and permitted assigns, against any and all Indemnifiable Losses to such Person, directly or indirectly resulting from, arising out of or relating to any tax or other obligations as a result of the Company's purchase of a 72.41% equity interest in the PRC Subsidiary from Liuxin Industrial Limited at US$1.00.

(iii)  The Investors shall indemnify, severally but not jointly, defend and hold harmless the Company, the PRC Subsidiary and the Founder, their respective directors, officers, employees, Affiliates, agents and permitted assigns, against any and all Indemnifiable

-34-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Losses to such Person, directly or indirectly resulting from, arising out of or relating to any inaccuracy in or breach of nonperformance of any of the representations, warranties, covenants or agreements made by such Investor.

Notwithstanding anything contained herein to the contrary, the indemnification obligations of the Investors pursuant to this Section 9.2(iii) hereof shall expire at Closing.

9.3   Successors and Permitted Assigns

Except as otherwise provided herein, (i) the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties hereto whose rights or obligations hereunder are affected by such terms and conditions; (ii) except or otherwise provided herein, this Agreement, and the rights and obligations herein may be assigned by any Investor to any Affiliate of such Investor, but not to any other person without the prior written consent of the Company; and (iii) the Founder may not assign any of his rights or delegate any of its obligations under this Agreement without the prior written consent of each Investor. Subject to Section 9.2 above, nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

9.4   Governing Law

This Agreement shall be governed by and construed under the laws of Hong Kong, without regard to principles of conflicts of law thereunder.

9.5   Counterparts

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.6   Titles and Subtitles

The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

9.7   Notices

Any and all notices required or permitted under this Agreement shall be given in writing in English and shall be provided by one or more of the following means and shall be deemed to have been duly given (a) if delivered personally, when received, (b) if transmitted by facsimile, on the date of transmission with receipt of a transmittal confirmation, or (c) if by international courier service, on the fourth (4th) Business Day following the date of deposit with such courier service, or such earlier delivery date as may be confirmed in writing to the sender by such courier service.

9.8   Administrative Fee and Other Expenses

The Company shall bear its own costs in connection with this Agreement. At the Closing, the Company shall also pay all costs and expenses reasonably incurred by the Investors in connection

-35-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

with the negotiation, execution, delivery and performance of this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby through the date of the Closing, including the fees of counsel and other professional advisors to the Investors, up to a maximum amount of US$50,000, plus reasonable out-of-pocket expenses. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

9.9    Amendments and Waivers

Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only by an instrument signed by (i) the Company, (ii) the Founder, and (iii) the holders of at least two thirds (2/3) of the Series C Preferred Shares then outstanding or to be subscribed as set forth in Schedule A of this Agreement. Notwithstanding the foregoing, in the case of a proposed amendment or waiver of Section 2.1(iii) or Schedule A of this Agreement, such amendment or waiver shall only be effective if an instrument is signed by each party to the Agreement.

9.10   Severability

If one or more provisions of this Agreement are held to be unenforceable under any Applicable Law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

9.11   Entire Agreement

This Agreement and the documents referred to herein, together with all schedules and exhibits hereto and thereto, constitute the entire agreement among the parties and no party shall be liable or bound to any other party in any manner by any warranties, representations, or covenants except as specifically set forth herein or therein; provided, however, that nothing in this Agreement or any Ancillary Agreement shall be deemed to terminate or supersede the provisions of any confidentiality and nondisclosure agreements executed by the parties hereto prior to the date of this Agreement, all of which agreements shall continue in full force and effect until terminated in accordance with their respective terms.

9.12   Dispute Resolution

(i)    Any dispute, controversy or claim arising out of or relating to this Agreement, or the interpretation, breach, termination or validity hereof, shall be resolved through consultation. Such consultation shall begin immediately after one party hereto has delivered to the other party hereto a written request for such consultation. If within thirty (30) days following the date on which such notice is given the dispute cannot be resolved, the dispute shall be submitted to arbitration upon the request of either party with notice to the other.

(ii)   The arbitration shall be conducted in Hong Kong under the auspices of the Hong Kong International Arbitration Centre (the "CENTRE"). There shall be three arbitrators. Each

-36-

party hereto shall each select one arbitrator within thirty (30) days after giving or receiving the demand for arbitration. Such arbitrators shall be freely selected, and the parties shall not be limited in their selection to any prescribed list. The Chairman of the Centre shall select the third arbitrator, who shall be qualified to practice law in Hong Kong. If either party does not appoint an arbitrator who has consented to participate within thirty (30) days after selection of the first arbitrator, the relevant appointment shall be made by the Chairman of the Centre.

(iii) The arbitration proceedings shall be conducted in English. The arbitration tribunal shall apply the Arbitration Rules of the Centre in effect at the time of the arbitration. However, if such rules are in conflict with the provisions of this Section 9.12, including the provisions concerning the appointment of arbitrators, the provisions of this Section 9.12 shall prevail.

(iv) The arbitrators shall decide any dispute submitted by the parties to the arbitration strictly in accordance with the substantive law of Hong Kong and shall not apply any other substantive law.

(v) Each party hereto shall cooperate with the other in making full disclosure of and providing complete access to all information and documents requested by the other in connection with such arbitration proceedings, subject only to any confidentiality obligations binding on such party.

(vi) The award of the arbitration tribunal shall be final and binding upon the disputing parties, and either party may apply to a court of competent jurisdiction for enforcement of such award.

(vii) Either party shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the arbitral tribunal.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK]

-37-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

        IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of
the date first written above.

                    COMPANY:

                    LDK SOLAR CO., LTD.


                    By: /s/ Peng Xiaofeng
                       --------------------------------------------
                    Name: Peng Xiaofeng
                    Capacity: Chief Executive Officer

                    Address:

                    LDK Solar Co., Ltd.
                    Room 2303
                    Harbor Ring Plaza
                    No. 18 Xizang Middle Road
                    Shanghai 200001

                    Attention: Mr. Peng Xiaofeng & Mr. Shao Yonggang
                    Facsimile: (86-21) 6350-8707

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

PRC SUBSIDIARY:

JIANGXI LDK SOLAR HI-TECH CO., LTD.

By: /s/ Peng Xiaofeng
    ----------------------------------------------
Name: Peng Xiaofeng
Capacity: Chief Executive Officer

Address:

Hi-tech Industrial Park
Xinyu City, Jiangxi Province
People's Republic of China

Attention: Mr. Peng Xiaofeng
Facsimile: (0790) 6860-085

```
FOUNDER:

PENG XIAOFENG


By: /s/ Peng Xiaofeng
    -----------------------------------------------
Name: Peng Xiaofeng

Address:

LDK Solar Co., Ltd.
Room 2303
Harbor Ring Plaza
No. 18 Xizang Middle Road
Shanghai 200001
```

```
INVESTOR:

FINANCIERE NATEXIS SINGAPORE 4 PTE, LTD.


By: /s/ Gang Wang
   -----------------------------------------------
Name: Gang Wang (Kevin)
Capacity: Authorized Officer

Registered Address:

Financiere Natexis Singapore 4 Pte, Ltd.
Wong & Leow
27th Floor, Millennia Tower
1 Temasek Avenue
Singapore 03919201

Notice Address:

Natexis Private Equity Asia Limited
Suite 1808, 18/F Westgate Mall Plaza
1038 Nanjing West Road
Shanghai, China 200041

Attention: Gang Wang (Kevin)
Facsimile: (86-21) 6217-3742
```

```
INVESTOR:

CDH SOLARFUTURE LIMITED


By: /s/ Lew Kiang Hua
    ---------------------------------------------
Name: Lew Kiang Hua
Capacity: Director

Address:

Level 30, Six Battery Road
Singapore 049909

Attention: Mr. Lew Kiang Hua
Facsimile: (65) 6550 9898
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:

SHINE FIELD INVESTMENTS LIMITED


By: /s/ Chen Lu
    ---------------------------------------------
Name: Chen Lu
Capacity: Authorized Signatory

Address:

P.O. Box 957
Offshore Incorporations Centre
Road Town, Tortola, BVI
c/o Petrius Lui or Ignatius Seu
41st Floor Jardine House
1 Connaught Place
Hong Kong

Attention: Petrius Lui or Ignatius Seu
Facsimile: (852) 2111-3299
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:

CHINA ENVIRONMENT FUND 2002, LP.


By: /s/ Hua Cao
    ----------------------------------------------
Name: Hua Cao
Capacity: Authorized Signatory

Registered address:

P.O. Box 908
George Town, Cayman Islands

Notice address:

c/o Tsinghua Venture Capital Management
A2302, SP Tower, Tsinghua Science Park
Beijing, China 100084

Attention: Dr. Catherine Cao
Facsimile: (86-10) 8215-1150
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:

SILVERPOINTE INVESTMENTS LTD


By: /s/ Yang Yang
    --------------------------------------------
Name: Yang Yang
Capacity: Director

Registered address:

Portcullis TrustNet (BVI) Limited
Portcullis TrustNet Chambers
P.O. Box 3444, Road Town, Tortola,
British Virgin Islands

Notice address:

8 Cross Street, #28-01 PWC Building,
Singapore 048424

Attention: Chiang Heng Liang
Telephone: (65) 6878-3876
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:

MUS ROOSEVELT CHINA PACIFIC FUND L.P.


By: /s/ Jun Otsuka
    --------------------------------------------
Name: Jun Otsuka
Capacity: Managing Director

Address of registered office:

c/o MUS Roosevelt Capital Partners, Ltd.
Offshore Incorporations (Cayman) Limited
Scotia Centre 4/F
P.O. Box 2804
George Town, Grand Cayman, Cayman Islands

With a copy to:

Mitsubishi UFJ Securities (HK) Capital, Limited
11/F, AIG Tower
One Connaught Road
Central, Hong Kong

Attention: Mr. Jun Otsuka (Managing Director)
Facsimile: (852) 2865-6214
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
INVESTOR:

TECH TEAM HOLDINGS LIMITED


By: /s/ Jiyi Weng
   --------------------------------------------
Name: Jiyi Weng
Capacity: Director

Address:

2nd Floor, Abbott Building, Road Town, Tortola,
British Virgin Islands

Notice address:

299 Bisheng Road
Suite 13-101
Pudong, Shanghai
China 201204

Attention: Jerry Jiyi WENG
Facsimile: (86-21) 5080-1333
```

```
INVESTOR:

BOFA CAPITAL COMPANY LIMITED


By: /s/ Lingyong Peng
    --------------------------------------------
Name: Lingyong Peng
Capacity: Authorized Signatory

Registered address:

c/o Maples Finance BVI Limited, P.O. Box 173,
Kingston Chambers, Road Town, Tortola,
British Virgin Islands

Notice address:

Room 16D
Building 8
Shijicheng 3 Term
Haidian District
Beijing, P.R.China

Attention: Mr. Peng Lingyong
Facsimile: (86-10) 8889 1502
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

SCHEDULE OF DEFINITIONS

"2006 BUSINESS PLAN AND BUDGET" has the meaning set forth in Section 3.9.

"2006 AUDITED INCOME STATEMENT" means the consolidated income statement of the Company Group for the financial year ending December 31, 2006 audited and approved by the Auditor in conformity with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"2006 NET EARNINGS" means the US Dollar equivalent (based on the then applicable daily USD/CNY exchange rate set by the People's Bank of China and published by the State Administration of Foreign Exchange at www.safe.gov.cn for the Business Day immediately prior to December 31, 2006, rounded to the nearest ten thousandth USD) of the Net Earnings (as defined below) of the Company Group that is stated in Renminbi as determined from the 2006 Audited Income Statement.

"2006/2007 AUDITED INCOME STATEMENT" means the consolidated income statement of the Company Group for the financial period between July 1, 2006 and June 30, 2007 audited and approved by the Auditor in conformity with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"2006/2007 NET EARNINGS" means the US Dollar equivalent (based on the then applicable daily USD/CNY exchange rate set by the People's Bank of China and published by the State Administration of Foreign Exchange at www.safe.gov.cn for the Business Day immediately prior to June 30, 2007, rounded to the nearest ten thousandth USD) of the Net Earnings (as defined below) of the Company Group that is stated in Renminbi as determined from the 2006/2007 Audited Income Statement.

"2007 AUDITED INCOME STATEMENT" means the consolidated income statement of the Company Group for the financial year ending December 31, 2007 audited and approved by the Auditor in conformity with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"2007 NET EARNINGS" means the US Dollar equivalent (based on the then applicable daily USD/CNY exchange rate set by the People's Bank of China and published by the State Administration of Foreign Exchange at www.safe.gov.cn for the Business Day immediately prior to December 31, 2007, rounded to the nearest ten thousandth USD) of the Net Earnings (as defined below) of the Company Group that is stated in Renminbi as determined from the 2007 Audited Income Statement

"AFFILIATE" means, with respect to any given Person, a Person that Controls, is Controlled by, or is under common Control with the given Person.

"AGREEMENT" has the meaning ascribed to it in the preamble.

"ANCILLARY AGREEMENTS" means, collectively, the Shareholders Agreement, the Registration Rights Agreement, the Memorandum and Articles and any other document or agreement contemplated by this Agreement.

"ANNUAL BUSINESS PLAN AND BUDGET" means the annual business plan and budget of the Company and/or

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

the PRC Subsidiary, as may be amended from time to time.

"APPLICABLE LAW" means, with respect to any Person, all applicable provisions of all (a) constitutions, treaties, statutes, laws (including the common law), codes, rules, regulations, ordinances or orders of any Governmental Authority, (b) Governmental Approvals and (c) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"AUDITOR" means an independent accounting firm duly appointed by the Board of Directors to serve as the Company's auditor, being one of the "Big-4" international accounting firms.

"BOOKS AND RECORDS" has the meaning set forth in Section 3.10.

"BUSINESS DAY" means any day other than a Saturday, Sunday or other day on which commercial banks in the PRC, Hong Kong or New York are authorized or required by law or governmental order to close.

"BUSINESS OR CONDITIONS OF THE COMPANY GROUP" means the business, condition (financial or otherwise), results of operation and assets and properties of the Company Group taken as a whole.

"CENTER" means the Hong Kong International Arbitration Centre.

"CLOSING" has the meaning set forth in Section 2.2.

"COMPANY" has the meaning ascribed to it in the preamble.

"COMPANY GROUP" means the Company and all Group Companies, taken together.

"COMPANY OPTION PLAN" means an employee stock option plan adopted by established by the Company on July 28, 2006 pursuant to which stock options may be granted out of the Company Option Pool.

"COMPANY OPTION POOL" means an aggregate of 9,058,000 Ordinary Shares which shall be reserved prior to the Closing, representing up to ten percent (10%) of the total number of issued and outstanding shares of the Company on an as converted and fully diluted basis immediately after the Closing, as may be adjusted from time to time pursuant to the Company Option Plan, to be issued to the Key Persons, officers, directors, consultants, employees or other service providers of the Company from time to time pursuant to the Company Option Plan.

"COMPETITOR" means any Person that may be reasonably deemed to be engaged in any business that develops, manufactures or produces solar grade silicon ingots and wafers.

"CONTRACT" means any agreement, arrangement, bond, commitment, franchise, indemnity, indenture, instrument, lease, license or binding understanding, whether or not in writing.

"CONTROL" means, when used with respect to any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"CONVERSION RATE" means the effective conversion rate, initially at 1:1 and subject to adjustment as provided in this Agreement and the Memorandum and Articles, at which the Series A Preferred Shares, the Series B Preferred Shares and the Series C Preferred Shares, respectively, are converted into Ordinary Shares in accordance with the Memorandum and Articles.

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

"CONVERSION SHARES" means shares issuable upon conversion of the Series C Preferred Shares issued under this Agreement.

"DISCLOSURE SCHEDULE" has the meaning set forth in Section 3.

"ENVIRONMENT LAWS" means any applicable present national, territorial, provincial, foreign or local law, common law doctrine, rule, order, decree, judgment, injunction or regulation relating to environmental matters, including those pertaining to land use, air, soil, surface water, ground water (including the protection, cleanup, removal, remediation or damage thereof), public or employee health or safety, together with any other laws (national, territorial, provincial, foreign or local) relating to emissions, discharges, releases or threatened releases of any pollutant or contaminant including without limitation, medical, chemical, biological, biohazardous or radioactive waste and materials, into ambient air, land, surface water, ground water, personal property or structures.

"FINAL OWNERSHIP" has the meaning ascribed to it in Section 2.4(i)(a) hereof.

"FINANCING TERMS" has the meaning ascribed to it in Section 8.1 hereof.

"FOUNDER" has the meaning ascribed to it in the preamble.

"GOVERNMENTAL AUTHORITY" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the PRC, any foreign country or any domestic or foreign state, county, city or other political subdivision including but not limited to MOFCOM and SAIC and their respective local and provincial branches or departments.

"GROUP COMPANY" means a Person (other than a natural person) that is a Subsidiary of the Company.

"GUARANTEED 2006 NET EARNINGS" means the guaranteed Net Earnings of the Company Group for the financial year ending December 31, 2006, being an amount that is US$30,000,000.

"GUARANTEED 2006/2007 NET EARNINGS" means the guaranteed Net Earnings of the Company Group for the financial period between July 1, 2006 and June 30, 2007, being an amount that is US$60,000,000.

"GUARANTEED 2007 NET EARNINGS" means the guaranteed Net Earnings of the Company Group for the financial year ending December 31, 2007, being an aggregate amount of US$110,000,000; it being understood that such guaranteed Net Earnings of the Company Group for the six months ending June 30, 2007 are US$50,000,000 and that for the six months ending December 31, 2007 are US$60,000,000.

"HAZARDOUS MATERIALS" means any chemical pollutant, contaminant, pesticide, petroleum or petroleum product or by-product, radioactive substance, solid waste, special, dangerous or toxic waste, hazardous or toxic substance, chemical or material regulated, limited or prohibited under any Environmental Law.

"HONG KONG" means the Special Administrative Region of Hong Kong.

"IFRS" means the International Financial Reporting Standards promulgated by the International Accounting Standards Board (IASB) (which includes standards and interpretations approved by the IASB and International Accounting Principles issued under previous constitutions), together with its pronouncements thereon from time to time, and applied on a consistent basis.

"IMPROVEMENT" has the meaning set forth in Section 3.17(iii).

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

"INDEMNITEE" has the meaning set forth in Section 9.2(i).

"INDEMNIFIABLE LOSS" has the meaning set forth in Section 9.2(i).

"INITIAL OWNERSHIP" has the meaning set forth in Section 2.1(iii).

"INTELLECTUAL PROPERTY" means any and all (i) patents, all patent rights and all applications therefor and all reissues, reexaminations, continuations, continuations-in-part, divisions, and patent term extensions thereof, (ii) inventions (whether patentable or not), discoveries, improvements, concepts, innovations and industrial models, (iii) registered and unregistered copyrights, copyright registrations and applications, author's rights and works of authorship (including artwork of any kind and software of all types in whatever medium, inclusive of computer programs, source code, object code and executable code, and related documentation), (iv) URLs, web sites, web pages and any part thereof, (v) technical information, know-how, trade secrets, drawings, designs, design protocols, specifications for parts and devices, quality assurance and control procedures, design tools, manuals, research data concerning historic and current research and development efforts, including the results of successful and unsuccessful designs, databases and proprietary data, (vi) proprietary processes, technology, engineering, formulae, algorithms and operational procedures, (vii) trade names, trade dress, trademarks, domain names, and service marks, and registrations and applications therefor, and (viii) the goodwill of the business symbolized or represented by the foregoing, customer lists and other proprietary information and common-law rights.

"INVESTOR" or "INVESTORS" has the meaning ascribed to it in the preamble.

"KEY PERSONS" means Peng Xiaofeng, Shao Yonggan, Zhu Liangbao and all the other Persons listed in Exhibit I hereof.

"KNOWLEDGE" of a Party means the current actual knowledge of the executive officers of such Party principally responsible for the management of the business (including with respect to Intellectual Property) of such Party and its Subsidiaries.

"LAND USE RIGHTS" has the meaning set forth in Section 3.17(i).

"LEASE" has the meaning set forth in Section 3.17(ii).

"LICENSES" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental Authority, including but not limited to the Licenses set forth in Section 3.6 of the Disclosure Schedule and the business licenses of the applicable Group Companies.

"MATERIAL ADVERSE CHANGE" has the meaning set forth in Section 5.20.

"MATERIAL ADVERSE EFFECT" means any (a) event, occurrence, fact, condition, change or development that has had a material adverse effect on the Business or Conditions of the Company Group, or (b) material impairment of the ability of any member of the Company Group to perform their respective material obligations hereunder or under each of the Ancillary Agreements, as applicable.

"MATERIAL ADVERSE EVENT" means any change, event or effect that (i) is or would be materially adverse to the Business or Conditions of the Company Group or (ii) is or would materially impair the validity or enforceability of this Agreement against the Company, the PRC Subsidiary or the Founder or (iii) is or would materially and adversely affect the Company, the PRC Subsidiary or the Founder's ability to

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

perform its obligations under this Agreement, any Ancillary Agreements or in connection with the transactions contemplated hereunder or thereunder.

"MATERIAL CONTRACT" means, with respect to any Person, any outstanding Contract material to the business of such Person as of or after the date hereof and includes, but is not limited to, those Contracts deemed material by Section 3.15(v).

"MATERIAL LICENSES" means the Licenses set forth in Section 3.6 of the Disclosure Schedule.

"MEMORANDUM AND ARTICLES" means the second amended and restated memorandum of association and the second amended and restated articles of association of the Company, as amended from time to time, attached hereto as Exhibit A.

"MOFCOM" means the Ministry of Commerce or, with respect to any matter to be submitted for examination and approval by the Ministry of Commerce, any government entity which is similarly competent to examine and approve such matter under the laws of the PRC.

"MORTGAGE" has the meaning set forth in Section 3.17(iv).

"NET EARNINGS" shall mean the consolidated and normalized positive profit after tax (less one-off, non-recurring and extraordinary items as well as stock compensation charges which are required to be deducted from the Company's income under the currently effective US GAAP or IFRS, if any, but plus any governmental grants and subsidies) attributable to the shareholders of the Company Group as audited by the Auditor in accordance with IFRS or US GAAP (which shall be the same as the relevant accounting standards used in connection with the Company's Qualified IPO).

"ORDINARY SHARES" has the meaning ascribed to it in Section 3.2(i)(a).

"PERSON" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity.

"PRC" means the People's Republic of China, but solely for the purposes of this Agreement, excluding the Hong Kong Special Administrative Region, Macau Special Administrative Region and Taiwan.

"PRC SUBSIDIARY" has the meaning ascribed to it in the preamble.

"PREFERRED SHARES" has the meaning set forth in Section 3.2(i)(b).

"PROPRIETARY ASSETS" means all patents, patent applications, trademarks, service marks, trade names, copyrights, moral rights, maskworks, trade secrets, confidential and proprietary information, compositions of matter, formulas, designs, proprietary rights, know-how and processes of a company.

"QUALIFIED EXCHANGE" means (i) the New York Stock Exchange or the Nasdaq Stock Market's National Market System, or (ii) any other exchange of recognized international reputation and standing duly approved by the Company's Board of Directors, including the affirmative vote of the Investor Director.

"QUALIFIED IPO" means an initial public offering on a Qualified Exchange that values the Company at no less than US$1,210,000,000 immediately prior to the initial public offering with a per share offering price of no less than US$11.00 and that results in aggregate net proceeds to the Company of at least US$300,000,000. The selection of the lead underwriter(s) of the Qualified IPO shall be led by the

-DS 1-

management of the Company and subject to the consent of the Investor Director, which consent shall not be unreasonably withheld.

"REPORT DATE" has the meaning set forth in Section 3.12(i).

"INDEPENDENT AUDIT REPORTS" has the meaning set forth in Section 3.12(i).

"SAFE" means the Sate Administration of Foreign Exchange of the PRC, and any PRC governmental body that is a successor thereto.

"SAIC" means the State Administration of Industry and Commerce or, with respect to the issuance of any business license or filing or registration to be effected with or by the State Administration of Industry and Commerce, any government entity which is similarly competent to issue such business license or accept such filing or registration under the laws of the PRC.

"SECURITIES" has the meaning set forth in Section 4.2.

"SECURITIES ACT" means the U.S. Securities Act of 1933, as amended.

"SENIOR MANAGER" means, with respect to any member of the Company Group, the chief executive officer, the chief financial officer, the chief operating officer, the chief technology officer and the vice presidents of such company.

"SERIES A SHAREHOLDERS" has the meaning set forth in Section 2.4(i)(a).

"SERIES A SHARE PURCHASE AGREEMENT" has the meaning set forth in Section 2.4(i)(a).

"SERIES A-1 PREFERRED SHARES" has the meaning set forth in Section 3.2(i)(b).

"SERIES A-2 PREFERRED SHARES" has the meaning set forth in Section 3.2(i)(b).

"SERIES B PREFERRED SHARES" has the meaning set forth in Section 3.2(i)(b).

"SERIES B SHARE PURCHASE AGREEMENT" has the meaning set forth in Section 2.4(i)(b).

"SERIES C PREFERRED SHARES" has the meaning set forth in Section 3.2(i)(b).

"SUBSIDIARY" means, with respect to any Person, a corporation or other entity that is, directly or indirectly, controlled by such Person, by the possession of the power to direct or cause the direction of the management and policies of first mentioned Person, whether through the ownership of voting securities or equity interest, by contract or otherwise.

"SUBSCRIPTION PRICE" has the meaning set forth in Section 2.1(iii).

"TAX" and "TAXES" means and includes any and all taxes, including any and all income, gross receipts, franchise, license, severance, stamp, occupation, premium, environmental, customs duties, capital stock, profits, unemployment, disability, real property, personal property, transfer, registration, value added, estimated, sales, use, excise, withholding, employment, payroll, social security taxes, and similar assessments, charges, and fees (including interest, penalties and additions to such taxes, penalties for failure to file or late filing of any return, report or other filing, and any interest in respect of such

-DS 1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

penalties and additions) imposed or assessed by any federal, state or local taxing authority, including the Cayman Islands, Hong Kong or the PRC (or any political subdivision thereof or therein).

"TAX RETURNS" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"US GAAP" means generally accepted accounting principles in the United States, consistently applied.

"WARRANT" or "WARRANTS" means the Warrant(s) the Company issued to the holders of the Series A-1 Preferred Shares and the holders of the Series A-2 Preferred Shares pursuant to certain Warrant Purchase Agreement(s), each dated as of July 28, 2006.

                                -DS 1-

DISCLOSURE SCHEDULE

-DS 1-

SCHEDULE A

INVESTORS AT CLOSING

| NAME | ADDRESS | NUMBER OF SERIES C PREFERRED SHARES SUBSCRIBED | SUBSCRIPTION PRICE |
|------|---------|-----------------------------------------------|--------------------|
| Financiere Natexis Singapore 4 Pte Ltd. | Natexis Private Equity Asia Limited Suite 1808, 18/F Westgate Mall Plaza 1038 Nanjing West Road, Shanghai, China 200041<br><br>Attention: Gang Wang (Kevin) | 1,466,666 | US$11,000,000 |
| CDH SolarFuture Limited | Level 30, Six Battery Road Singapore 049909<br><br>Attention: Mr. Lew Kiang Hua | 1,066,667 | US$ 8,000,000 |
| Shine Field Investments Limited | Registered address: P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, BVI<br><br>Notice address: c/o Petrius Lui or Ignatius Seu 41st Floor Jardine House 1 Connaught Place Hong Kong<br><br>Attention: Petrius Lui or Ignatius Seu | 333,333 | US$ 2,500,000 |

-SCH A-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

| | | | | |
|---|---|---|---|---|
| China Environment Fund 2002, LP. | Registered address: P.O. Box 908, George Town, Cayman Islands | 66,667 | US$ | 500,000 |
| | Notice address: c/o Tsinghua Venture Capital Management A 23-2, SP Tower, Tsinghua Science Park, Beijing, China 100084 | | | |
| | Attention: Dr. Catherine Cao | | | |
| Silverpointe Investments Ltd. | Registered address: Portcullis TrustNet (BVI) Limited Portcullis TrustNet Chambers P.O. Box 3444, Road Town, Tortola, British Virgin Islands | 25,233 | US$ | 189,249 |
| | Notice address: 8 Cross Street, #28-01 PWC Building, Singapore 048424 | | | |
| | Attention: Chiang Heng Liang | | | |
| MUS Roosevelt China Pacific Fund L.P. | c/o MUS Roosevelt Capital Partners, Ltd. Offshore Incorporations (Cayman) Limited Scotia Centre 4/F P.O. Box 2804 George Town, Grand Cayman, Cayman Islands | 20,049 | US$ | 150,366 |
| | With a copy to: Mitsubishi UFJ Securities (HK) Capital, Limited 11/F, AIG Tower One Connaught Road Central, Hong Kong | | | |
| | Attention: Mr. Jun Otsuka (Managing Director) | | | |

-SCH A-

| | | | | |
|---|---|---|---|---|
| Tech Team Holdings Limited | Registered address:<br>2nd Floor, Abbott Building, Road Town,<br>Tortola, British Virgin Islands<br><br>Notice address:<br>299 Bisheng Road<br>Suite 13-101<br>Pudong, Shanghai<br>China 201204<br><br>Attention: Jerry Jiyi WENG | 20,048 | US$ | 150,358 |
| BOFA Capital Company Limited | Registered address:<br>c/o Maples Finance BVI Limited, P.O. Box<br>173, Kingston Chambers, Road Town,<br>Tortola, British Virgin Islands<br><br>Notice address:<br>Room 16D<br>Building 8<br>Shijicheng 3 Term<br>Haidian District<br>Beijing, P.R.China<br><br>Attention: Mr. Peng Lingyong | 1,337 | US$ | 10,027 |
| TOTAL | | 3,000,000 | US$ | 22,500,000 |

-SCH A-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT A

THIRD AMENDED AND RESTATED MEMORANDUM AND ARTICLES

-EXH A-


EXHIBIT B

[RESERVED]

-EXH B-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT C

2006 BUSINESS PLAN AND BUDGET


-EXH C-



EXHIBIT D

CONFIDENTIALITY, ASSIGNMENT OF INVENTIONS AND NON-COMPETITION AGREEMENT


-EXH D-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT E

AMENDED AND RESTATED SHAREHOLDERS AGREEMENT


-EXH E-


EXHIBIT F

OPINION OF THE COMPANY'S CAYMAN ISLANDS COUNSEL


-EXH F-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT G

OPINION OF THE COMPANY'S PRC COUNSEL


-EXH G-


EXHIBIT H

SECOND AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT


-EXHIBIT H-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT I

KEY PERSONS

Peng Xiaofeng
Zhu Liangbao
Shao Yonggang
Jack Lai
Nicola Sarno
Yao Qiqiang
Kuo Lung Lin
Alberto Di Gaetano
Rosseio Pleiro
Cui Rong Qiang
Martin Huang
Fu Xiangqun
Huang Qiumao
Fu Delin
Huang Weixing
Lu Xiaodong
Song Yong
Lin Qinyun
Renato Alberto Cabrini
Xing Guo Ping
Peng Zhijian
Chen Jianwen

EXH I

</TEXT>
</DOCUMENT>

Exhibit 4.8

The undersigned holder of the Series B Preferred Shares and/or Series C Preferred Shares of LDK Solar Co., Ltd. (the "Company") has received a copy of the unaudited consolidated income statements of the Company Group (as that term is defined in the Share Purchase Agreement between the Company and the holders of the Series B Preferred Shares, dated September 15, 2006 (the "Series B SPA"), and the Share Purchase Agreement between the Company and the holders of the Series C Preferred Shares, dated December 15, 2006 (the "Series C SPA")) for the three-month period ended March 31, 2007 that has been reviewed by KPMG in accordance with US GAAP (the "Unaudited First Quarter Financial Statements"). According to the Unaudited First Quarter Financial Statements, the Net Income of the Company (as defined in the Unaudited First Quarter Financial Statements) for the three months ended March 31, 2007 are US$24,534,000.

Notwithstanding the provisions in the Series B SPA or the Series C SPA and subject to the provisions set forth in the paragraph immediately below, the undersigned holder of the Series B Preferred Shares and/or Series C Preferred Shares agrees that, if the Company completes its public filing of the F-1 registration statement on or before May 31, 2007, its final ownership in the Company shall remain unchanged as its Initial Ownership in the Company on the basis of the Net Income as stated in the Unaudited First Quarter Financial Statements.

Please note this confirmation is based solely on the Net Income of the Company for the three-month period ended March 31, 2007 that are contained in the Unaudited First Quarter Financial Statements provided by the Company to the undersigned. The undersigned has not conducted any independent verification of such numbers or has not otherwise conducted an independent review or audit of the Company's financial statements for the three months ended March 31, 2007. In the event (i) the financial statements of the three-month period ended March 31, 2007 are revised in any aspect prior to the completion of the Company's Qualified IPO on the NYSE; or (ii) the Company fails to complete its public filing of the F-1 registration statement on or before May 31, 2007; or (iii) the Company fails to complete a Qualified IPO on the NYSE within two months after its public filing of the F-1 registration statement, the confirmation stated above with respect to both the Net Income and the applicable review period shall be null and void, and the rights of the undersigned with respect to the adjustment of its final ownership in the Company as set forth in Section 2.4 of the Series B SPA and/or Section 2.4 of the Series C SPA shall remain in full force and effect.

Dated as of April 30, 2007

HOLDER OF SERIES B PREFERRED SHARES      HOLDER OF SERIES C PREFERRED SHARES

Financiere Natexis Singapore 4 Pte Ltd   Financiere Natexis Singapore 4 Pte Ltd

/s/ Gang Wang                            /s/ Gang Wang
----------------------------------       ----------------------------------
Gang Wang                                Gang Wang
Authorized Signatory                     Authorized Signatory
</TEXT>
</DOCUMENT>

Exhibit 4.9

The undersigned holder of the Series B Preferred Shares and/or Series C
Preferred Shares of LDK Solar Co., Ltd. (the "Company") has received a copy of
the unaudited consolidated income statements of the Company Group (as that term
is defined in the Share Purchase Agreement between the Company and the holders
of the Series B Preferred Shares, dated September 15, 2006 (the "Series B SPA"),
and the Share Purchase Agreement between the Company and the holders of the
Series C Preferred Shares, dated December 15, 2006 (the "Series C SPA")) for the
three-month period ended March 31, 2007 that has been reviewed by KPMG in
accordance with US GAAP (the "Unaudited First Quarter Financial Statements").
According to the Unaudited First Quarter Financial Statements, the Net Income of
the Company (as defined in the Unaudited First Quarter Financial Statements) for
the three months ended March 31, 2007 are US$24,534,000.

Notwithstanding the provisions in the Series B SPA or the Series C SPA and
subject to the provisions set forth in the paragraph immediately below, the
undersigned holder of the Series B Preferred Shares and/or Series C Preferred
Shares agrees that, if the Company completes its public filing of the F-1
registration statement on or before May 31, 2007, its final ownership in the
Company shall remain unchanged as its Initial Ownership in the Company on the
basis of the Net Income as stated in the Unaudited First Quarter Financial
Statements.

Please note this confirmation is based solely on the Net Income of the Company
for the three-month period ended March 31, 2007 that are contained in the
Unaudited First Quarter Financial Statements provided by the Company to the
undersigned. The undersigned has not conducted any independent verification of
such numbers or has not otherwise conducted an independent review or audit of
the Company's financial statements for the three months ended March 31, 2007. In
the event (i) the financial statements of the three-month period ended March 31,
2007 are revised in any aspect prior to the completion of the Company's
Qualified IPO on the NYSE; or (ii) the Company fails to complete its public
filing of the F-1 registration statement on or before May 31, 2007; or (iii) the
Company fails to complete a Qualified IPO on the NYSE within two months after
its public filing of the F-1 registration statement, the confirmation stated
above with respect to both the Net Income and the applicable review period shall
be null and void, and the rights of the undersigned with respect to the
adjustment of its final ownership in the Company as set forth in Section 2.4 of
the Series B SPA and/or Section 2.4 of the Series C SPA shall remain in full
force and effect.

Dated as of April 30, 2007

HOLDER OF SERIES B PREFERRED SHARES        HOLDER OF SERIES C PREFERRED SHARES

/s/ Chen Lu                                /s/ Chen Lu
-------------------------------            -------------------------------
Shine Field Investments Limited            Shine Field Investments Limited

</TEXT>
</DOCUMENT>

Exhibit 4.10

The undersigned holder of the Series B Preferred Shares and/or Series C
Preferred Shares of LDK Solar Co., Ltd. (the "Company") has received a copy of
the unaudited consolidated income statements of the Company Group (as that term
is defined in the Share Purchase Agreement between the Company and the holders
of the Series B Preferred Shares, dated September 15, 2006 (the "Series B SPA"),
and the Share Purchase Agreement between the Company and the holders of the
Series C Preferred Shares, dated December 15, 2006 (the "Series C SPA")) for the
three-month period ended March 31, 2007 that has been reviewed by KPMG in
accordance with US GAAP (the "Unaudited First Quarter Financial Statements").
According to the Unaudited First Quarter Financial Statements, the Net Income of
the Company (as defined in the Unaudited First Quarter Financial Statements) for
the three months ended March 31, 2007 are US$24,534,000.

Notwithstanding the provisions in the Series B SPA or the Series C SPA and
subject to the provisions set forth in the paragraph immediately below, the
undersigned holder of the Series B Preferred Shares and/or Series C Preferred
Shares agrees that, if the Company completes its public filing of the F-1
registration statement on or before May 31, 2007, its final ownership in the
Company shall remain unchanged as its Initial Ownership in the Company on the
basis of the Net Income as stated in the Unaudited First Quarter Financial
Statements.

Please note this confirmation is based solely on the Net Income of the Company
for the three-month period ended March 31, 2007 that are contained in the
Unaudited First Quarter Financial Statements provided by the Company to the
undersigned. The undersigned has not conducted any independent verification of
such numbers or has not otherwise conducted an independent review or audit of
the Company's financial statements for the three months ended March 31, 2007. In
the event (i) the financial statements of the three-month period ended March 31,
2007 are revised in any aspect prior to the completion of the Company's
Qualified IPO on the NYSE; or (ii) the Company fails to complete its public
filing of the F-1 registration statement on or before May 31, 2007; or (iii) the
Company fails to complete a Qualified IPO on the NYSE within two months after
its public filing of the F-1 registration statement, the confirmation stated
above with respect to both the Net Income and the applicable review period shall
be null and void, and the rights of the undersigned with respect to the
adjustment of its final ownership in the Company as set forth in Section 2.4 of
the Series B SPA and/or Section 2.4 of the Series C SPA shall remain in full
force and effect.

Dated as of April 30, 2007

HOLDER OF SERIES B PREFERRED SHARES     HOLDER OF SERIES C PREFERRED SHARES

For and on behalf of                    For and on behalf of
CDH SolarFuture Limited                 CDH SolarFuture Limited

/s/ Huang Yan                           /s/ Huang Yan
-----------------------                 -----------------------
Huang Yan                               Huang Yan
Director                                Director

</TEXT>
</DOCUMENT>

Exhibit 4.11

The undersigned holder of the Series B Preferred Shares and/or Series C
Preferred Shares of LDK Solar Co., Ltd. (the "Company") has received a copy of
the unaudited consolidated income statements of the Company Group (as that term
is defined in the Share Purchase Agreement between the Company and the holders
of the Series B Preferred Shares, dated September 15, 2006 (the "Series B SPA"),
and the Share Purchase Agreement between the Company and the holders of the
Series C Preferred Shares, dated December 15, 2006 (the "Series C SPA")) for the
three-month period ended March 31, 2007 that has been reviewed by KPMG in
accordance with US GAAP (the "Unaudited First Quarter Financial Statements").
According to the Unaudited First Quarter Financial Statements, the Net Income of
the Company (as defined in the Unaudited First Quarter Financial Statements) for
the three months ended March 31, 2007 are US$24,534,000.

Notwithstanding the provisions in the Series B SPA or the Series C SPA and
subject to the provisions set forth in the paragraph immediately below, the
undersigned holder of the Series B Preferred Shares and/or Series C Preferred
Shares agrees that, if the Company completes its public filing of the F-1
registration statement on or before May 31, 2007, its final ownership in the
Company shall remain unchanged as its Initial Ownership in the Company on the
basis of the Net Income as stated in the Unaudited First Quarter Financial
Statements.

Please note this confirmation is based solely on the Net Income of the Company
for the three-month period ended March 31, 2007 that are contained in the
Unaudited First Quarter Financial Statements provided by the Company to the
undersigned. The undersigned has not conducted any independent verification of
such numbers or has not otherwise conducted an independent review or audit of
the Company's financial statements for the three months ended March 31, 2007. In
the event (i) the financial statements of the three-month period ended March 31,
2007 are revised in any aspect prior to the completion of the Company's
Qualified IPO on the NYSE; or (ii) the Company fails to complete its public
filing of the F-1 registration statement on or before May 31, 2007; or (iii) the
Company fails to complete a Qualified IPO on the NYSE within two months after
its public filing of the F-1 registration statement, the confirmation stated
above with respect to both the Net Income and the applicable review period shall
be null and void, and the rights of the undersigned with respect to the
adjustment of its final ownership in the Company as set forth in Section 2.4 of
the Series B SPA and/or Section 2.4 of the Series C SPA shall remain in full
force and effect.

Dated as of April 30, 2007

HOLDER OF SERIES B PREFERRED SHARES      HOLDER OF SERIES C PREFERRED SHARES

CHF Wafer Company Limited
By: /s/ Andrew Lo
    ------------------------
    Andrew Lo
    Authorized Representative
</TEXT>
</DOCUMENT>

Exhibit 4.12

The undersigned holder of the Series B Preferred Shares and/or Series C Preferred Shares of LDK Solar Co., Ltd. (the "Company") has received a copy of the unaudited consolidated income statements of the Company Group (as that term is defined in the Share Purchase Agreement between the Company and the holders of the Series B Preferred Shares, dated September 15, 2006 (the "Series B SPA"), and the Share Purchase Agreement between the Company and the holders of the Series C Preferred Shares, dated December 15, 2006 (the "Series C SPA")) for the three-month period ended March 31, 2007 that has been reviewed by KPMG in accordance with US GAAP (the "Unaudited First Quarter Financial Statements"). According to the Unaudited First Quarter Financial Statements, the Net Income of the Company (as defined in the Unaudited First Quarter Financial Statements) for the three months ended March 31, 2007 are US$24,534,000.

Notwithstanding the provisions in the Series B SPA or the Series C SPA and subject to the provisions set forth in the paragraph immediately below, the undersigned holder of the Series B Preferred Shares and/or Series C Preferred Shares agrees that, if the Company completes its public filing of the F-1 registration statement on or before May 31, 2007, its final ownership in the Company shall remain unchanged as its Initial Ownership in the Company on the basis of the Net Income as stated in the Unaudited First Quarter Financial Statements.

Please note this confirmation is based solely on the Net Income of the Company for the three-month period ended March 31, 2007 that are contained in the Unaudited First Quarter Financial Statements provided by the Company to the undersigned. The undersigned has not conducted any independent verification of such numbers or has not otherwise conducted an independent review or audit of the Company's financial statements for the three months ended March 31, 2007. In the event (i) the financial statements of the three-month period ended March 31, 2007 are revised in any aspect prior to the completion of the Company's Qualified IPO on the NYSE; or (ii) the Company fails to complete its public filing of the F-1 registration statement on or before May 31, 2007; or (iii) the Company fails to complete a Qualified IPO on the NYSE within two months after its public filing of the F-1 registration statement, the confirmation stated above with respect to both the Net Income and the applicable review period shall be null and void, and the rights of the undersigned with respect to the adjustment of its final ownership in the Company as set forth in Section 2.4 of the Series B SPA and/or Section 2.4 of the Series C SPA shall remain in full force and effect.

Dated as of April 30, 2007

HOLDER OF SERIES B PREFERRED SHARES          HOLDER OF SERIES C PREFERRED SHARES

/s/ Catherine Cao                            /s/ Catherine Cao
-------------------                          -------------------
Dr. Catherine Cao                            Dr. Catherine Cao

China Environment Fund 2004                  China Environment Fund 2002
</TEXT>
</DOCUMENT>

Exhibit 4.13

The undersigned holder of the Series B Preferred Shares of LDK Solar Co., Ltd. (the "Company") has received a copy of the unaudited consolidated income statements of the Company Group (as that term is defined in the Share Purchase Agreement between the Company and the holders of the Series B Preferred Shares, dated September 15, 2006 (the "Series B SPA"), for the three-month period ended March 31, 2007 that has been reviewed by KPMG in accordance with US GAAP (the "Unaudited First Quarter Financial Statements"). According to the Unaudited First Quarter Financial Statements, the Net Income of the Company (as defined in the Unaudited First Quarter Financial Statements) for the three months ended March 31, 2007 are US$24,534,000.

Notwithstanding the provisions in the Series B SPA and subject to the provisions set forth in the paragraph immediately below, the undersigned holder of the Series B Preferred Shares agrees that, if the Company completes its public filing of the F-1 registration statement on or before May 31, 2007, its final ownership in the Company shall remain unchanged as its Initial Ownership in the Company on the basis of the Net Income as stated in the Unaudited First Quarter Financial Statements.

Please note this confirmation is based solely on the Net Income of the Company for the three-month period ended March 31, 2007 that are contained in the Unaudited First Quarter Financial Statements provided by the Company to the undersigned. The undersigned has not conducted any independent verification of such numbers or has not otherwise conducted an independent review or audit of the Company's financial statements for the three months ended March 31, 2007. In the event (i) the financial statements of the three-month period ended March 31, 2007 are revised in any aspect prior to the completion of the Company's Qualified IPO on the NYSE; or (ii) the Company fails to complete its public filing of the F-1 registration statement on or before May 31, 2007; or (iii) the Company fails to complete a Qualified IPO on the NYSE within two months after its public filing of the F-1 registration statement, the confirmation stated above with respect to both the Net Income and the applicable review period shall be null and void, and the rights of the undersigned with respect to the adjustment of its final ownership in the Company as set forth in Section 2.4 of the Series B SPA shall remain in full force and effect.

Dated as of April 30, 2007

HOLDER OF SERIES B PREFERRED SHARES

JAFCO ASIA TECHNOLOGY FUND III

/s/ Hiroshi Yamada
-----------------------------------
By: Hiroshi Yamada
Title: Attorney

</TEXT>
</DOCUMENT>

Exhibit 4.14

The undersigned holder of the Series B Preferred Shares and/or Series C Preferred Shares of LDK Solar Co., Ltd. (the "Company") has received a copy of the unaudited consolidated income statements of the Company Group (as that term is defined in the Share Purchase Agreement between the Company and the holders of the Series B Preferred Shares, dated September 15, 2006 (the "Series B SPA"), and the Share Purchase Agreement between the Company and the holders of the Series C Preferred Shares, dated December 15, 2006 (the "Series C SPA")) for the three-month period ended March 31, 2007 that has been reviewed by KPMG in accordance with US GAAP (the "Unaudited First Quarter Financial Statements"). According to the Unaudited First Quarter Financial Statements, the Net Income of the Company (as defined in the Unaudited First Quarter Financial Statements) for the three months ended March 31, 2007 are US$24,534,000.

Notwithstanding the provisions in the Series B SPA or the Series C SPA and subject to the provisions set forth in the paragraph immediately below, the undersigned holder of the Series B Preferred Shares and/or Series C Preferred Shares agrees that, if the Company completes its public filing of the F-1 registration statement on or before May 31, 2007, its final ownership in the Company shall remain unchanged as its Initial Ownership in the Company on the basis of the Net Income as stated in the Unaudited First Quarter Financial Statements.

Please note this confirmation is based solely on the Net Income of the Company for the three-month period ended March 31, 2007 that are contained in the Unaudited First Quarter Financial Statements provided by the Company to the undersigned. The undersigned has not conducted any independent verification of such numbers or has not otherwise conducted an independent review or audit of the Company's financial statements for the three months ended March 31, 2007. In the event (i) the financial statements of the three-month period ended March 31, 2007 are revised in any aspect prior to the completion of the Company's Qualified IPO on the NYSE; or (ii) the Company fails to complete its public filing of the F-1 registration statement on or before May 31, 2007; or (iii) the Company fails to complete a Qualified IPO on the NYSE within two months after its public filing of the F-1 registration statement, the confirmation stated above with respect to both the Net Income and the applicable review period shall be null and void, and the rights of the undersigned with respect to the adjustment of its final ownership in the Company as set forth in Section 2.4 of the Series B SPA and/or Section 2.4 of the Series C SPA shall remain in full force and effect.

Dated as of April 30, 2007

HOLDER OF SERIES B PREFERRED SHARES          HOLDER OF SERIES C PREFERRED SHARES

/s/ Jun Otsuka                               /s/ Jun Otsuka
-----------------------------                -----------------------------
Jun Otsuka                                   Jun Otsuka
Managing Director                            Managing Director
MUS Roosevelt China Pacific Fund L.P.        MUS Roosevelt China Pacific Fund L.P.

</TEXT>
</DOCUMENT>

Exhibit 4.15

The undersigned holder of the Series B Preferred Shares and/or Series C
Preferred Shares of LDK Solar Co., Ltd. (the "Company") has received a copy of
the unaudited consolidated income statements of the Company Group (as that term
is defined in the Share Purchase Agreement between the Company and the holders
of the Series B Preferred Shares, dated September 15, 2006 (the "Series B SPA"),
and the Share Purchase Agreement between the Company and the holders of the
Series C Preferred Shares, dated December 15, 2006 (the "Series C SPA")) for the
three-month period ended March 31, 2007 that has been reviewed by KPMG in
accordance with US GAAP (the "Unaudited First Quarter Financial Statements").
According to the Unaudited First Quarter Financial Statements, the Net Income of
the Company (as defined in the Unaudited First Quarter Financial Statements) for
the three months ended March 31, 2007 are US$24,534,000.

Notwithstanding the provisions in the Series B SPA or the Series C SPA and
subject to the provisions set forth in the paragraph immediately below, the
undersigned holder of the Series B Preferred Shares and/or Series C Preferred
Shares agrees that, if the Company completes its public filing of the F-1
registration statement on or before May 31, 2007, its final ownership in the
Company shall remain unchanged as its Initial Ownership in the Company on the
basis of the Net Income as stated in the Unaudited First Quarter Financial
Statements.

Please note this confirmation is based solely on the Net Income of the Company
for the three-month period ended March 31, 2007 that are contained in the
Unaudited First Quarter Financial Statements provided by the Company to the
undersigned. The undersigned has not conducted any independent verification of
such numbers or has not otherwise conducted an independent review or audit of
the Company's financial statements for the three months ended March 31, 2007. In
the event (i) the financial statements of the three-month period ended March 31,
2007 are revised in any aspect prior to the completion of the Company's
Qualified IPO on the NYSE; or (ii) the Company fails to complete its public
filing of the F-1 registration statement on or before May 31, 2007; or (iii) the
Company fails to complete a Qualified IPO on the NYSE within two months after
its public filing of the F-1 registration statement, the confirmation stated
above with respect to both the Net Income and the applicable review period shall
be null and void, and the rights of the undersigned with respect to the
adjustment of its final ownership in the Company as set forth in Section 2.4 of
the Series B SPA and/or Section 2.4 of the Series C SPA shall remain in full
force and effect.

Dated as of April 30, 2007

HOLDER OF SERIES B PREFERRED SHARES     HOLDER OF SERIES C PREFERRED SHARES

Tech Team Holdings Limited              Tech Team Holdings Limited

/s/ Weng Jiyi                           /s/ Weng Jiyi
</TEXT>
</DOCUMENT>

Exhibit 4.16

The undersigned holder of the Series B Preferred Shares and/or Series C
Preferred Shares of LDK Solar Co., Ltd. (the "Company") has received a copy of
the unaudited consolidated income statements of the Company Group (as that term
is defined in the Share Purchase Agreement between the Company and the holders
of the Series B Preferred Shares, dated September 15, 2006 (the "Series B SPA"),
and the Share Purchase Agreement between the Company and the holders of the
Series C Preferred Shares, dated December 15, 2006 (the "Series C SPA")) for the
three-month period ended March 31, 2007 that has been reviewed by KPMG in
accordance with US GAAP (the "Unaudited First Quarter Financial Statements").
According to the Unaudited First Quarter Financial Statements, the Net Income of
the Company (as defined in the Unaudited First Quarter Financial Statements) for
the three months ended March 31, 2007 are US$24,534,000.

Notwithstanding the provisions in the Series B SPA or the Series C SPA and
subject to the provisions set forth in the paragraph immediately below, the
undersigned holder of the Series B Preferred Shares and/or Series C Preferred
Shares agrees that, if the Company completes its public filing of the F-1
registration statement on or before May 31, 2007, its final ownership in the
Company shall remain unchanged as its Initial Ownership in the Company on the
basis of the Net Income as stated in the Unaudited First Quarter Financial
Statements.

Please note this confirmation is based solely on the Net Income of the Company
for the three-month period ended March 31, 2007 that are contained in the
Unaudited First Quarter Financial Statements provided by the Company to the
undersigned. The undersigned has not conducted any independent verification of
such numbers or has not otherwise conducted an independent review or audit of
the Company's financial statements for the three months ended March 31, 2007. In
the event (i) the financial statements of the three-month period ended March 31,
2007 are revised in any aspect prior to the completion of the Company's
Qualified IPO on the NYSE; or (ii) the Company fails to complete its public
filing of the F-1 registration statement on or before May 31, 2007; or (iii) the
Company fails to complete a Qualified IPO on the NYSE within two months after
its public filing of the F-1 registration statement, the confirmation stated
above with respect to both the Net Income and the applicable review period shall
be null and void, and the rights of the undersigned with respect to the
adjustment of its final ownership in the Company as set forth in Section 2.4 of
the Series B SPA and/or Section 2.4 of the Series C SPA shall remain in full
force and effect.


Dated as of April 30, 2007


HOLDER OF SERIES B PREFERRED SHARES          HOLDER OF SERIES C PREFERRED SHARES

BOFA Capital Company Limited                 BOFA Capital Company Limited

/s/ Peng Lingyong                            /s/ Peng Lingyong
----------------------------                 ----------------------------
Peng Lingyong                                Peng Lingyong
</TEXT>
</DOCUMENT>

Exhibit 4.17

The undersigned holder of the Series B Preferred Shares and/or Series C
Preferred Shares of LDK Solar Co., Ltd. (the "Company") has received a copy of
the unaudited consolidated income statements of the Company Group (as that term
is defined in the Share Purchase Agreement between the Company and the holders
of the Series B Preferred Shares, dated September 15, 2006 (the "Series B SPA"),
and the Share Purchase Agreement between the Company and the holders of the
Series C Preferred Shares, dated December 15, 2006 (the "Series C SPA")) for the
three-month period ended March 31, 2007 that has been reviewed by KPMG in
accordance with US GAAP (the "Unaudited First Quarter Financial Statements").
According to the Unaudited First Quarter Financial Statements, the Net Income of
the Company (as defined in the Unaudited First Quarter Financial Statements) for
the three months ended March 31, 2007 are US$24,534,000.

Notwithstanding the provisions in the Series B SPA or the Series C SPA and
subject to the provisions set forth in the paragraph immediately below, the
undersigned holder of the Series B Preferred Shares and/or Series C Preferred
Shares agrees that, if the Company completes its public filing of the F-1
registration statement on or before May 31, 2007, its final ownership in the
Company shall remain unchanged as its Initial Ownership in the Company on the
basis of the Net Income as stated in the Unaudited First Quarter Financial
Statements.

Please note this confirmation is based solely on the Net Income of the Company
for the three-month period ended March 31, 2007 that are contained in the
Unaudited First Quarter Financial Statements provided by the Company to the
undersigned. The undersigned has not conducted any independent verification of
such numbers or has not otherwise conducted an independent review or audit of
the Company's financial statements for the three months ended March 31, 2007. In
the event (i) the financial statements of the three-month period ended March 31,
2007 are revised in any aspect prior to the completion of the Company's
Qualified IPO on the NYSE; or (ii) the Company fails to complete its public
filing of the F-1 registration statement on or before May 31, 2007; or (iii) the
Company fails to complete a Qualified IPO on the NYSE within two months after
its public filing of the F-1 registration statement, the confirmation stated
above with respect to both the Net Income and the applicable review period shall
be null and void, and the rights of the undersigned with respect to the
adjustment of its final ownership in the Company as set forth in Section 2.4 of
the Series B SPA and/or Section 2.4 of the Series C SPA shall remain in full
force and effect.

Dated as of April 30, 2007

HOLDER OF SERIES B PREFERRED SHARES       HOLDER OF SERIES C PREFERRED SHARES

/s/  Weng Jiyi
----------------------------------
Grand Gains International Limited

</TEXT>
</DOCUMENT>

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 4.18

The undersigned holder of the Series B Preferred Shares and/or Series C Preferred Shares of LDK Solar Co., Ltd. (the "Company") has received a copy of the unaudited consolidated income statements of the Company Group (as that term is defined in the Share Purchase Agreement between the Company and the holders of the Series B Preferred Shares, dated September 15, 2006 (the "Series B SPA"), and the Share Purchase Agreement between the Company and the holders of the Series C Preferred Shares, dated December 15, 2006 (the "Series C SPA")) for the three-month period ended March 31, 2007 that has been reviewed by KPMG in accordance with US GAAP (the "Unaudited First Quarter Financial Statements"). According to the Unaudited First Quarter Financial Statements, the Net Income of the Company (as defined in the Unaudited First Quarter Financial Statements) for the three months ended March 31, 2007 are US$24,534,000.

Notwithstanding the provisions in the Series B SPA or the Series C SPA and subject to the provisions set forth in the paragraph immediately below, the undersigned holder of the Series B Preferred Shares and/or Series C Preferred Shares agrees that, if the Company completes its public filing of the F-1 registration statement on or before May 31, 2007, its final ownership in the Company shall remain unchanged as its Initial Ownership in the Company on the basis of the Net Income as stated in the Unaudited First Quarter Financial Statements.

Please note this confirmation is based solely on the Net Income of the Company for the three-month period ended March 31, 2007 that are contained in the Unaudited First Quarter Financial Statements provided by the Company to the undersigned. The undersigned has not conducted any independent verification of such numbers or has not otherwise conducted an independent review or audit of the Company's financial statements for the three months ended March 31, 2007. In the event (i) the financial statements of the three-month period ended March 31, 2007 are revised in any aspect prior to the completion of the Company's Qualified IPO on the NYSE; or (ii) the Company fails to complete its public filing of the F-1 registration statement on or before May 31, 2007; or (iii) the Company fails to complete a Qualified IPO on the NYSE within two months after its public filing of the F-1 registration statement, the confirmation stated above with respect to both the Net Income and the applicable review period shall be null and void, and the rights of the undersigned with respect to the adjustment of its final ownership in the Company as set forth in Section 2.4 of the Series B SPA and/or Section 2.4 of the Series C SPA shall remain in full force and effect.

Dated as of April 30, 2007

HOLDER OF SERIES B PREFERRED SHARES        HOLDER OF SERIES C PREFERRED SHARES

                                           Silverpointe Investments Ltd.

                                           /s/ Yang Yang
                                           ---------------------------
                                           Yang Yang
                                           Director

</TEXT>
</DOCUMENT>

Exhibit 10.1

LDK SOLAR CO., LTD.

2006 STOCK INCENTIVE PLAN

1. Purposes of the Plan. The purposes of this Stock Incentive Plan are to attract and retain the best available personnel, to provide additional incentive to Employees, Directors and Consultants and to promote the success of the Company's business.

2. Definitions. As used herein, the following definitions shall apply:

(a) "Administrator" means the Board or the Committee.

(b) "Applicable Laws" means the legal requirements relating to the administration of stock incentive plans, if any, under applicable provisions of federal securities laws, state corporate and securities laws, the Code, the rules of any applicable stock exchange or national market system, and the rules of any foreign jurisdiction applicable to Awards granted to residents therein.

(c) "Award" means the grant of an Option or other right or benefit under the Plan.

(d) "Award Agreement" means the written agreement evidencing the grant of an Award executed by the Company and the Grantee, a form of which is attached hereto, including any amendments thereto.

(e) "Board" means the Board of Directors of the Company.

(f) "Cause" has the meaning as defined in the Award Agreement.

(g) "Code" means the United States Internal Revenue Code of 1986, as amended.

(h) "Committee" means any committee appointed by the Board to administer the Plan.

(i) "Company" means LDK Solar Co., Ltd., an exempted company incorporated and existing under the laws of the Cayman Islands.

(j) "Consultant" means any person (other than an Employee or a Director, solely with respect to rendering services in such person's capacity as a Director) who is engaged by the Company or any Related Entity to render consulting or advisory services to the Company or such Related Entity or whom the Board determines has made contributions to the business or other development of the Company.

(k) "Continuous Service" means that the provision of services to the Company or a Related Entity in any capacity of Employee, Director or Consultant is not interrupted or terminated. Continuous Service shall not be considered interrupted in the case of (i) any approved leave of absence, (ii) transfers among the Company, any Related Entity, or any successor, in any capacity of Employee, Director or

1

Consultant, or (iii) any change in status as long as the individual remains in the service of the Company or a Related Entity in any capacity of Employee, Director or Consultant (except as otherwise provided in the Award Agreement). An approved leave of absence shall include sick leave, military leave, or any other authorized personal leave. For purposes of Incentive Stock Options, no such leave may exceed ninety (90) days unless reemployment upon expiration of such leave is guaranteed by statute or contract.

(l) "Corporate Transaction" has the meaning as defined in the Award Agreement.

(m) "Director" means a member of the Board or the board of directors of any Related Entity.

(n) "Disability" has the meaning as defined in the Award Agreement.

(o) "Employee" means any person, including an Officer or Director, who is an employee of the Company or any Related Entity. The payment of an independent director's fee by the Company or a Related Entity shall not be sufficient to constitute "employment" by the Company.

(p) "Exchange Act" means the United States Securities Exchange Act of 1934, as amended.

(q) "Fair Market Value" means, as of any date, the value of Ordinary Shares as follows:

(i) Where there exists a public market for the Ordinary Shares, the Fair Market Value shall be (A) the closing price for a Share for the last market trading day prior to the time of the determination (or, if no closing price was reported on that date, on the last trading date on which a closing price was reported) on the stock exchange determined by the Administrator to be the primary market for the Ordinary Shares or the Nasdaq National Market, whichever is applicable or (B) if the Ordinary Shares are not traded on any such exchange or national market system, the average of the closing bid and asked prices of a Share on the Nasdaq Small Cap Market for the day prior to the time of the determination (or, if no such prices were reported on that date, on the last date on which such prices were reported), in each case, as reported in The Wall Street Journal or such other source as the Administrator deems reliable; or

(ii) In the absence of an established market for the Ordinary Shares of the type described in (i), above, the Fair Market Value thereof shall be determined by the Administrator in good faith by reference to the placing price of the latest private placement of the Shares and the development of the Company's business operations since such latest private placement; provided that, with respect to any Grantee subject to Section 409A of the Code, Fair Market Value shall be determined in a manner consistent with the requirements of such Section;

2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

provided, however, that such value of Ordinary Shares, for purposes of this Plan, shall not be lower than US$4.43 per Share with adjustments permitted for recapitalization, share split or combination and share dividends occurring subsequent to the date of this Plan.

(r) "Grantee" means an Employee, Director or Consultant who receives an Award under the Plan.

(s) "Immediate Family" means any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships, any person sharing the Grantee's household (other than a tenant or employee), a trust in which these persons (or the Grantee) have more than fifty percent (50%) of the beneficial interest, a foundation in which these persons (or the Grantee) control the management of assets, and any other entity in which these persons (or the Grantee) own more than fifty percent (50%) of the voting interests.

(t) "Incentive Stock Option" means an Option intended to qualify as an incentive stock option within the meaning of Section 422 of the Code.

(u) "Non-Qualified Stock Option" means an Option not intended to qualify as an Incentive Stock Option and Other Stock Option.

(v) "Officer" means a person who is an officer of the Company or a Related Entity within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(w) "Option" means an option to purchase Shares pursuant to an Award Agreement granted under the Plan.

(x) "Ordinary Share" means an ordinary share, US$0.10 par value, of the Company, or the number or fraction of American Depositary Shares representing such ordinary share.

(y) "Other Stock Option "means an Option not intended to qualify as either an Incentive Stock Option or a Non-Qualified Option.

(z) "Parent" means a "parent corporation", whether now or hereafter existing, as defined in Section 424(e) of the Code.

(aa) "Plan" means this 2006 Stock Incentive Plan.

(bb) "Registration Date" means the first to occur of (i) the closing of the first sale to the general public of (A) Ordinary Shares or (B) the same class of securities of a successor corporation (or its Parent) issued pursuant to a Corporate Transaction in exchange for or in substitution of the Ordinary Shares, pursuant to a registration statement filed with and declared effective by the SEC under the Securities Act; and (ii) in the event of a Corporate Transaction, the date of the

3

consummation of the Corporate Transaction if the same class of securities of the successor corporation (or its Parent) issuable in such Corporate Transaction shall have been sold to the general public pursuant to a registration statement filed with and declared effective by the SEC under the Securities Act, on or prior to the date of consummation of such Corporate Transaction.

(cc) "Related Entity" means any Parent, Subsidiary and any business, corporation, partnership, limited liability company or other entity in which the Company, a Parent or a Subsidiary holds a substantial ownership interest, directly or indirectly.

(dd) "SEC" means the United States Securities and Exchange Commission.

(ee) "Securities Act" means the United States Securities Act of 1933, as amended.

(ff) "Share" means an Ordinary Share.

(gg) "Subsidiary" means a "subsidiary corporation", whether now or hereafter existing, as defined in Section 424(f) of the Code.

3. Stock Subject to the Plan.

(a) Subject to the provisions of Section 10 below, the maximum aggregate number of Shares which may be issued pursuant to all Awards (including Incentive Stock Options) is up to ten percent (10%) of the aggregate number of Shares issued and outstanding from time to time and Shares issuable upon conversion of any preferred shares of the Company issued and outstanding from time to time.

(b) Any Shares covered by an Award (or portion of an Award) which is forfeited or cancelled, expires or is settled in cash, shall be deemed not to have been issued for purposes of determining the maximum aggregate number of Shares which may be issued under the Plan. If any unissued Shares are retained by the Company upon exercise of an Award in order to satisfy the exercise price for such Award or any withholding taxes due with respect to such Award, such retained Shares subject to such Award shall become available for future issuance under the Plan (unless the Plan has terminated). Shares that actually have been issued under the Plan pursuant to an Award shall not be returned to the Plan and shall not become available for future issuance under the Plan.

4. Administration of the Plan.

(a) Plan Administrator. With respect to grants of Awards to Employees, Directors, or Consultants, the Plan shall be administered by (A) the Board or (B) the Committee (or a subcommittee of the Committee designated by the Board), which Committee shall be constituted in such a manner as to satisfy Applicable Laws. Once appointed, such Committee shall continue to serve in its designated capacity until otherwise directed by the Board.

4

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(b) Powers of the Administrator. Subject to Applicable Laws and the provisions of the Plan (including any other powers given to the Administrator hereunder) and except as otherwise provided by the Board, the Administrator shall have the authority, in its discretion:

(i) to select the Employees, Directors and Consultants to whom Awards may be granted from time to time hereunder;

(ii) to determine whether and to what extent Awards are granted hereunder;

(iii) to determine the number of Shares or the amount of consideration to be covered by each Award granted hereunder;

(iv) to approve forms of Award Agreements for use under the Plan;

(v) to determine the terms and conditions of any Award granted hereunder;

(vi) to establish additional terms, conditions, rules or procedures to accommodate the rules or laws of applicable foreign jurisdictions and to afford Grantees favorable treatment under such rules or laws; provided, however, that no Award shall be granted under any such additional terms, conditions, rules or procedures with terms or conditions which are inconsistent with the provisions of the Plan;

(vii) to construe and interpret the terms of the Plan and Awards, including without limitation, any notice of award or Award Agreement, granted pursuant to the Plan; and

(ix) to take such other action, not inconsistent with the terms of the Plan, as the Administrator deems appropriate.

5. Eligibility. Awards other than Incentive Stock Options may be granted to Employees, Directors and Consultants. Incentive Stock Options may be granted only to Employees of the Company, a Parent or a Subsidiary. An Employee, Director or Consultant who has been granted an Award may, if otherwise eligible, be granted additional Awards. Awards may be granted to such Employees, Directors or Consultants who are residing in foreign jurisdictions as the Administrator may determine from time to time.

6. Terms and Conditions of Awards.

(a) Type of Awards. The Administrator is authorized under the Plan to award any type of arrangement to an Employee, Director or Consultant that is not inconsistent with the provisions of the Plan and that by its terms involves or might involve the issuance of (i) Shares, (ii) an Option, or similar right with a fixed or variable price related to the Fair Market Value of the Shares and with an exercise or conversion privilege related to the passage of time, the occurrence of one or more events, or the satisfaction of performance criteria or other conditions, or (iii) any other

5

security with the value derived from the value of the Shares. Such Awards include, without limitation, Options, and an Award may consist of one such security or benefit or two (2) or more of them in any combination or alternative.

(b) Designation of Award. Each Award shall be designated in the Award Agreement. In the case of an Option, the Option shall be designated as either an Incentive Stock Option or a Non-Qualified Stock Option or an Other Stock Option. However, notwithstanding such designation, to the extent that the aggregate Fair Market Value of Shares subject to Options designated as Incentive Stock Options which become exercisable for the first time by a Grantee during any calendar year (under all plans of the Company or any Parent or Subsidiary) exceeds US$100,000, such excess Options, to the extent of the Shares covered thereby in excess of the foregoing limitation, shall be treated as Non-Qualified Stock Options. For this purpose, Incentive Stock Options shall be taken into account in the order in which they were granted, and the Fair Market Value of the Shares shall be determined as of the grant date of the relevant Option.

(c) Conditions of Award. Subject to the terms of the Plan, the Administrator shall determine the provisions, terms, and conditions of each Award including, but not limited to, the Award vesting schedule, repurchase provisions, rights of first refusal, forfeiture provisions, form of payment (cash, Shares, or other consideration) upon settlement of the Award, payment contingencies, and satisfaction of any performance criteria. The performance criteria established by the Administrator may be based on any one of, or combination of, increase in share price, earnings per share, total shareholder return, return on equity, return on assets, return on investment, net operating income, cash flow, revenue, economic value added, personal management objectives, or other measure of performance selected by the Administrator. Partial achievement of the specified criteria may result in a payment or vesting corresponding to the degree of achievement as specified in the Award Agreement.

(d) Acquisitions and Other Transactions. The Administrator may issue Awards under the Plan in settlement, assumption or substitution for, outstanding Awards or obligations to grant future Awards in connection with the Company or a Related Entity acquiring another entity, an interest in another entity or an additional interest in a Related Entity whether by merger, stock purchase, asset purchase or other form of transaction.

(e) Deferral of Award Payment. The Administrator may establish one or more programs under the Plan to permit selected Grantees the opportunity to elect to defer receipt of consideration upon exercise of an Award, satisfaction of performance criteria, or other event that absent the election would entitle the Grantee to payment or receipt of Shares or other consideration under an Award. The Administrator may establish the election procedures, the timing of such elections, the mechanisms for payments of, and accrual of interest or other earnings, if any, on amounts, Shares or other consideration so deferred, and such other terms, conditions, rules and procedures that the Administrator deems advisable for the administration of any such deferral program.

6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(f) Award Exchange Programs. The Administrator may establish one or more programs under the Plan to permit selected Grantees to exchange an Award under the Plan for one or more other types of Awards under the Plan on such terms and conditions as determined by the Administrator from time to time.

(g) Separate Programs. The Administrator may establish one or more separate programs under the Plan for the purpose of issuing particular forms of Awards to one or more classes of Grantees on such terms and conditions as determined by the Administrator from time to time.

(h) Early Exercise. Any Award granted hereunder shall have a vesting period of no less than three (3) years with one-third of the options under any Award to vest at each anniversary of the date of grant of such Award; provided, however, that any Award granted to a Consultant may vest upon such grant or be subject to a different vesting schedule if so decided by the Board and set forth in the Award Agreement with, and the relevant Award notice to, such Consultant. The Award Agreement may, but need not, include a provision whereby the Grantee may elect, at any time while being an Employee, Director or Consultant, to exercise any part or all of the Award prior to full vesting of the Award. Any unvested Shares received pursuant to such exercise may be subject to a repurchase right in favor of the Company or a Related Entity or to any other restriction the Administrator determines to be appropriate.

(i) Term of Award. The term of each Award shall be the term stated in the Award Agreement. However, in the case of an Incentive Stock Option granted to a Grantee who, at the time the Option is granted, owns stocks representing more than ten percent (10%) of the voting power of all classes of the stocks of the Company or any Parent or Subsidiary, the term of the Incentive Stock Option shall be five (5) years from the date of grant thereof or such shorter term as may be provided in the Award Agreement.

(j) Transferability of Awards. Incentive Stock Options may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the Grantee, only by the Grantee; provided, however, that the Grantee may designate a beneficiary of the Grantee's Incentive Stock Option in the event of the Grantee's death on a beneficiary designation form provided by the Administrator. Other Awards shall be transferred by will and by the laws of descent and distribution, and during the lifetime of the Grantee, by gift and/or pursuant to a domestic relations order to members of the Grantee's Immediate Family to the extent and in the manner determined by the Administrator.

(k) Time of Granting Awards. The date of grant of an Award shall for all purposes be the date on which the Administrator makes the determination to grant such Award, or such other date as is determined by the Administrator. Notice of the grant determination shall be given to each Employee, Director or Consultant to whom an Award is so granted within a reasonable time after the date of such grant.

7. Award Exercise or Purchase Price, Consideration and Taxes.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(a) Exercise or Purchase Price. The exercise or purchase price, if any, for an Award shall be as follows:

(i)  In the case of an Incentive Stock Option:

(A)  granted to an Employee who, at the time of the grant of such Incentive Stock Option owns stocks representing more than ten percent (10%) of the voting power of all classes of stocks of the Company or any Parent or Subsidiary, the per Share exercise price shall be not less than one hundred ten percent (110%) of the Fair Market Value per Share on the date of grant; or

(B)  granted to any Employee other than an Employee described in the preceding paragraph, the per Share exercise price shall be not less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant.

(ii)  In the case of a Non-Qualified Stock Option, the per Share exercise price shall be not less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant unless otherwise determined by the Administrator; provided, however, that such per Share exercise price shall be one hundred percent (100%) with respect to any Grantee subject to Section 409A of the Code.

(iii)  In the case of an Other Stock Option, the per Share exercise price shall be not less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant unless otherwise determined by the Administrator.

(iv)  Notwithstanding the foregoing provisions of this Section 7(a), in the case of an Award issued pursuant to Section 6(d) above, the exercise or purchase price for the Award shall be determined in accordance with the principles of Section 424(a) of the Code or other Applicable Law.

(v)  Notwithstanding the foregoing provisions of this Section 7(a), if the exercise price determined pursuant to the foregoing shall fall below the par value of the Shares, the exercise price shall be the par value of the Shares.

(b) Consideration. Subject to Applicable Laws, the consideration to be paid for the Shares to be issued upon exercise or purchase of an Award, including the method of payment, shall be determined by the Administrator (and, in the case of an Incentive Stock Option, shall be determined at the time of grant). In addition to any other types of consideration the Administrator may determine, the Administrator is authorized to accept as consideration for Shares issued under the Plan the following:

(i) cash or check in U.S. dollars (in connection therewith the Administrator may require the Grantee to provide evidence that the funds were

8

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

taken out of the People's Republic of China in accordance with applicable foreign exchange control laws and regulations);

(ii) cash or check in Hong Kong dollars (in an amount converted from U.S. dollars at the rate announced by banks in Hong Kong on the date the Notice of Exercise is received by the Company);

(iii) cancellation of indebtedness owed by the Company to the Grantee; or

(iv) any combination of the foregoing methods of payment.

(c) Taxes.

(i) As a condition of the exercise of an Award under the Plan, the Grantee (or in the case of the Grantee's death, the person exercising the Award) shall make such arrangements as the Administrator may require or permit for the satisfaction of any applicable federal, state, local or foreign withholding tax obligations that may arise in connection with the exercise of an Award and the issuance of Shares. The Company shall not be required to issue any Shares under the Plan until such obligations are satisfied.

(ii) In the case of an Employee and in the absence of any other arrangement, the Employee shall be deemed to have directed the Company to withhold or collect from his or her compensation an amount sufficient to satisfy such tax obligations from the next payroll payment otherwise payable after the date of an exercise of the Award.

(iii) In the case of a Grantee other than an Employee (or in the case of an Employee where the next payroll payment is not sufficient to satisfy such tax obligations, with respect to any remaining tax obligations), upon and after the Registration Date, in the absence of any other arrangement and to the extent permitted under the Applicable Laws, such Grantee shall be deemed to have elected to have the Company withhold from the issue of the Shares to be issued upon exercise of the Award that number of Shares having a Fair Market Value determined as of the applicable Tax Date (as defined below) equal to the amount required to be withheld. For purposes of this Section 7, the Fair Market Value of the Shares to be withheld shall be determined on the date that the amount of tax to be withheld is to be determined under the Applicable Laws (the "Tax Date").

(iv) At the discretion of the Administrator, a Grantee may satisfy his or her tax withholding obligations arising in connection with an Award by one or some combination of the following methods: (A) by cash payment; (B) by payroll deduction out of Grantee's current compensation; (C) if permitted by the Administrator, in its discretion, a Grantee may satisfy his or her tax withholding obligations upon exercise of an Award by surrendering to the Company Shares that (1) in the case of Shares previously acquired from the Company, have been owned by the Grantee for more than six (6) months on

9

the date of surrender, and (2) have a Fair Market Value determined as of the applicable Tax Date equal to the amount required to be withheld; or (D) if permitted by the Administrator, in its discretion, a Grantee may satisfy his or her tax withholding obligations by electing to have the Company withhold from the issue of Shares to be issued upon exercise of the Award that number of Shares having a Fair Market Value determined as of the applicable Tax Date equal to the mount required to be withheld.

(v) Any election or deemed election by a Grantee to have Shares withheld to satisfy tax withholding obligations under this Section 7(c)(iii) or (iv) above shall be irrevocable as to the particular Shares as to which the election is made or deemed made and shall be subject to the consent or disapproval of the Administrator. Any election by a Grantee under Section 7(c)(iv) above must be made on or prior to the applicable Tax Date.

(vi) In the event that an election to have the issue of Shares withheld is made by a Grantee and the Tax Date is deferred under Section 83 of the Code because no election is filed under Section 83(b) of the Code, the Grantee shall receive the full number of Shares with respect to which the Award or Option is exercised but such Grantee shall be unconditionally obligated to tender back to the Company the proper number of Shares on the Tax Date.

8. Exercise of Award.

(a) Procedure for Exercise; Rights as a Shareholder.

(i) Any Award granted hereunder shall be exercisable at such times and under such conditions as determined by the Administrator under the terms of the Plan and specified in the Award Agreement, but in the case of an Option, in no case at a rate of more than one third (1/3) per year over the vesting period from the date the Option is granted. Notwithstanding the foregoing, in the case of any Award granted to an Officer, Director or Consultant, the Award Agreement may provide that the Award may become exercisable, subject to reasonable conditions such as such Officer's, Director's or Consultant's Continuous Service, at any time or during any period established in the Award Agreement.

(ii) An Award shall be deemed to be exercised when written notice of such exercise has been given to the Company in accordance with the terms of the Award by the person entitled to exercise the Award and full payment for the Shares is made with respect to which the Award is exercised. Until the issuance (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company) of the stock certificate evidencing such Shares, no right to vote or receive dividends or any other rights as a shareholder shall exist with respect to Shares subject to an Award, notwithstanding the exercise of an Option or other Award. The Company shall issue (or cause to be issued) such stock certificate promptly upon exercise of an Award. No adjustment will be made for a dividend or other

10

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

right for which the record date is prior to the date the stock certificate is issued, except as provided in the Award Agreement or Section 10 below.

(b) Exercise of Award Following Termination of Continuous Service.

(i) An Award may not be exercised after the termination date of such Award set forth in the Award Agreement and may be exercised following the termination of a Grantee's Continuous Service only to the extent such Grantee's Continuous Service was terminated without Cause, in which case, the Grantee shall be entitled to exercise any outstanding Awards within three (3) months of the date of such termination or such shorter period as may be designated in the Award Agreement. In the event of termination of the Grantee's Continuous Service for Cause, the Grantee's right to exercise the Option shall, except as otherwise determined by the Administrator, terminate concurrently with the termination of the Grantee's Continuous Service. In no event shall the Option be exercised later than the Expiration Date set forth in the Notice of Stock Option Award.

(ii) Any Award designated as an Incentive Stock Option to the extent not exercised within the time permitted by Applicable Laws for the exercise of Incentive Stock Options following the termination of a Grantee's Continuous Service without cause shall convert automatically to a Non-Qualified Stock Option and thereafter shall be exercisable as such for a period as set forth under Section 8(b)(i) above.

(c) "Easy Sale" Exercise. In lieu of the payment methods set forth herein, when permitted by law and applicable regulations (including Nasdaq and NASD rules), the Grantee may pay the Exercise Price through a "same day sale" commitment from the Grantee (and if applicable a broker-dealer that is a member of the National Association of Securities Dealers Inc. (a "NASD Dealer")), whereby the Grantee irrevocably elects to exercise his/her Options and to sell at least that number of Shares so purchased to pay the Exercise Price (and up to all of the Shares so purchased) and the Grantee (or, if applicable, the NASD Dealer) commits upon sale (or, in the case of the NASD Dealer, upon receipt) of such Shares to forward the Exercise Price directly to the Company, with any sale proceeds in excess of the Exercise Price being for the benefit of the Grantee.

9. Conditions Upon Issuance of Shares.

(a) Shares shall not be issued pursuant to the exercise of an Award unless the exercise of such Award and the issuance and delivery of such Shares pursuant thereto shall comply with all Applicable Laws, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

(b) As a condition to the exercise of an Award, the Company may require the person exercising such Award to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any

11

present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation or warranty is required by any Applicable Laws.

10. Adjustments Upon Changes in Capitalization. Subject to any required action by the shareholders of the Company, the number of Shares covered by each outstanding Award, and the number of Shares which have been authorized for issuance under the Plan but as to which no Awards have yet been granted or which have been returned to the Plan, the exercise or purchase price of each such outstanding Award, as well as any other terms that the Administrator determines require adjustment shall be proportionally adjusted for (i) any increase or decrease in the number of issued Shares resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Shares, or similar transaction affecting the Shares, (ii) any other increase or decrease in the number of issued Shares effected without receipt of consideration by the Company, or (iii) as the Administrator may determine in its discretion, any other transaction with respect to Shares to which Section 424(a) of the Code applies or a similar transaction; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration". Such adjustment shall be made by the Administrator and its determination shall be final, binding and conclusive. Except as the Administrator determines, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason hereof shall be made with respect to, the number or price of Shares subject to an Award.

11. Effective Date and Term of Plan. The Plan shall become effective upon the earlier to occur of its adoption by the Board or its approval by the shareholders of the Company. It shall continue in effect for a term of ten (10) years unless sooner terminated. Subject to Section 16 below and Applicable Laws, Awards may be granted under the Plan upon its becoming effective.

12. Amendment, Suspension or Termination of the Plan.

(a) The Board may at any time amend, suspend or terminate the Plan. To the extent necessary to comply with Applicable Laws, the Company shall obtain shareholder approval of any Plan amendment in such a manner and to such a degree as required.

(b) No Award may be granted during any suspension of the Plan or after termination of the Plan.

(c) Any amendment, suspension or termination of the Plan (including termination of the Plan under Section 12(a) above) shall not affect Awards already granted, and such Awards shall remain in full force and effect as if the Plan had not been amended, suspended or terminated unless mutually agreed otherwise between the Grantee and the Administrator, which agreement must be in writing and signed by the Grantee and the Company.

13. Reservation of Shares.

12

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(a) The Company, during the term of the Plan, will at all times reserve and keep available such number of authorized but unissued Shares as shall be sufficient to satisfy the requirements of the Plan.

(b) The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

14. No Effect on Terms of Employment/Consulting Relationship. The Plan shall not confer upon any Grantee any right with respect to the Grantee's Continuous Service, nor shall it interfere in any way with his or her right or the Company's right to terminate the Grantee's Continuous Service at any time, with or without cause.

15. No Effect on Retirement and Other Benefit Plans. Except as specifically provided in a retirement or other benefit plan of the Company or a Related Entity, Awards shall not be deemed compensation for purposes of computing benefits or contributions under any retirement plan of the Company or a Related Entity, and shall not affect any benefits under any other benefit plan of any kind or any benefit plan subsequently instituted under which the availability or amount of benefits is related to level of compensation. The Plan is not a "Retirement Plan" or "Welfare Plan" under the Employee Retirement Income Security Act of 1974, as amended.

16. Shareholder Approval. The grant of Incentive Stock Options under the Plan shall be subject to approval by the shareholders of the Company within twelve (12) months before or after the date the Plan is adopted excluding Incentive Stock Options issued in substitution for outstanding Incentive Stock Options pursuant to Section 424(a) of the Code. Such shareholder approval shall be obtained in the degree and manner required under Applicable Laws. The Administrator may grant Incentive Stock Options under the Plan prior to approval by the shareholders, but until such approval is obtained, no such Incentive Stock Option shall be exercisable. In the event that shareholder approval is not obtained within the twelve (12) month period provided above, all Incentive Stock Options previously granted under the Plan shall be exercisable as Non-Qualified Stock Options.

13

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

LDK SOLAR CO., LTD.

2006 STOCK INCENTIVE PLAN

NOTICE OF STOCK OPTION AWARD

Grantee's Name and Address:        _____

                                   _____

                                   _____

You have been granted an option to purchase the ordinary shares of LDK Solar Co., Ltd. (the "Company"), subject to the terms and conditions of this Notice of Stock Option Award (the "Notice"), LDK Solar Co., Ltd. 2006 Stock Incentive Plan, as amended from time to time (the "Plan") and the Stock Option Award Agreement (the "Award Agreement") attached hereto, as follows. Unless otherwise defined herein, the terms used in this Notice shall have the same defined meanings in the Plan.

| | |
|---|---|
| Award Number | _____ |
| Date of Award | _____ |
| Date of Employment | _____ |
| Vesting Commencement Date | One year from the Date of Award |
| Exercise Price per Share | US$[_____] |
| Total Number of Shares subject to the Option | [_____] |
| Total Exercise Price | _____ |
| Type of Option: | _____ Incentive Stock Option |
| | _____ Non-Qualified Stock Option |
| | _____ Other Stock Option |
| Expiration Date: | _____ |
| Post-Termination Exercise Period: | _____ |

14

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Vesting Schedule:

     Subject to the Grantee's Continuous Service and other limitations set forth in this Notice, the Plan and the Award Agreement, the Option may be exercised, in whole or in part, in accordance with the following schedule:

       -   One third (1/3) to be vested on the Vesting Commencement Date.

       -   One third (1/3) to be vested on the first anniversary of the Vesting Commencement Date.

       -   One third (1/3) to be vested on the second anniversary of the Vesting Commencement Date.

     During any authorized leave of absence, the vesting of the Option as provided in this schedule shall cease. Vesting of the Option shall resume upon the Grantee's termination of the leave of absence and return to service to the Company or a Related Entity.

     If the Grantee has entered into any stock divesting agreement or arrangement with the Company, the Grantee's right to exercise the Option shall be subject to the terms and conditions of such stock divesting agreement or arrangement to the extent applicable.

     In the event of termination of the Grantee's Continuous Service for Cause, the Grantee's right to exercise the Option shall terminate concurrently with the termination of the Grantee's Continuous Service.

     IN WITNESS WHEREOF, the Company and the Grantee have executed this Notice and agree that the Option is to be governed by the terms and conditions of this Notice, the Plan, and the Award Agreement.

                LDK SOLAR CO., LTD.

                By:
                    ------------------------------------
                Title:
                    ---------------------------------

THE GRANTEE ACKNOWLEDGES AND AGREES THAT THE OPTION SHARES SHALL VEST, IF AT ALL, ONLY DURING THE PERIOD OF THE GRANTEE'S CONTINUOUS SERVICE (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THE OPTION OR ACQUIRING SHARES HEREUNDER). THE GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT NOTHING IN THIS NOTICE, THE AWARD AGREEMENT, OR THE PLAN SHALL CONFER UPON THE GRANTEE ANY RIGHT WITH RESPECT TO FUTURE AWARDS OR CONTINUATION OF GRANTEE'S CONTINUOUS SERVICE, NOR SHALL IT INTERFERE IN ANY WAY WITH THE GRANTEE'S RIGHT OR THE RIGHT OF THE GRANTEE'S EMPLOYER TO TERMINATE GRANTEE'S CONTINUOUS SERVICE, WITH OR WITHOUT CAUSE.

     The Grantee acknowledges receipt of a copy of the Plan and the Award Agreement, and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts the Option subject to all of the terms and provisions hereof and thereof. The Grantee

15

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

has reviewed this Notice, the Plan, and the Award Agreement in their entirety,
has had an opportunity to obtain the advice of counsel prior to executing this
Notice, and fully understands all provisions of this Notice, the Plan and the
Award Agreement. The Grantee hereby agrees that all disputes arising out of or
relating to this Notice, the Plan and the Award Agreement shall be resolved in
accordance with Section 15 of the Award Agreement. The Grantee further agrees to
notify the Company upon any change in the residence address indicated in this
Notice.

Dated:                                    Signed:
    -----------------------------             --------------------------------
                                              Grantee

16

AWARD NUMBER: _____

LDK SOLAR CO., LTD.
2006 STOCK INCENTIVE PLAN

STOCK OPTION AWARD AGREEMENT

1. Grant of Option. LDK Solar Co., Ltd., a Cayman Islands company (the "Company"), hereby grants to the Grantee (the "Grantee") named in the Notice of Stock Option Award (the "Notice"), an option (the "Option") to purchase the Total Number of Ordinary Shares subject to the Option (the "Shares") set forth in the Notice, at the Exercise Price per Share set forth in the Notice (the "Exercise Price") and subject to the terms and provisions of the Notice, this Stock Option Award Agreement (the "Option Agreement") and the Company's 2006 Stock Incentive Plan, as amended from time to time (the "Plan"), which are incorporated herein by reference.

If designated in the Notice as an Incentive Stock Option, the Option is intended to qualify as an Incentive Stock Option as defined in Section 422 of the Code. However, notwithstanding such designation, to the extent that the aggregate Fair Market Value of Shares subject to Options designated as Incentive Stock Options which become exercisable for the first time by the Grantee during any calendar year (under all plans of the Company or any Parent or Subsidiary) exceeds US$100,000, such excess Options, to the extent of the Shares covered thereby in excess of the foregoing limitation, shall be treated as Non-Qualified Stock Options. For this purpose, Incentive Stock Options shall be taken into account in the order in which they were granted, and the Fair Market Value of the Shares shall be determined as of the date the Option with respect to such Shares is awarded.

Unless otherwise defined herein, the terms used in this Option Agreement shall have the same defined meanings in the Plan, but the following terms are used herein as defined below:

(a) "Cause" means, with respect to the termination by the Company or a Related Entity of the Grantee's Continuous Service, that such termination is for "Cause" as such term is expressly defined in a then-effective written agreement between the Grantee and the Company or such Related Entity, or in the absence of such then-effective written agreement and definition, is based on, in the determination of the Administrator, the Grantee's: (i) refusal or failure to act in accordance with any specific, lawful direction or order of the Company or a Related Entity; (ii) unfitness or unavailability for service or unsatisfactory performance (other than as a result of Disability); (iii) performance of any act or failure to perform any act in bad faith to the detriment of the Company or a Related Entity; (iv) gross negligence, dishonesty, intentional misconduct or material breach of any agreement with the Company or a Related Entity; or (v) commission of a crime involving dishonesty, breach of trust, or physical or emotional harm to any person. At least 30 days prior to the termination of the Grantee's Continuous Service pursuant to (i) or (ii) above, the Company shall provide the Grantee with notice of the Company's or such Related Entity's intent to terminate, the reason therefor, and an opportunity for the Grantee to cure such defects in his or her service to the Company's or such Related Entity's satisfaction. During

17

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

this 30 day (or longer) period, no Award issued to the Grantee under the Plan may be exercised or purchased.

    (b) "Corporate Transaction" means any of the following transactions to which the Company is a party:

        (i) a merger or consolidation in which the Company is not the surviving entity except for a transaction the principal purpose of which is to change the jurisdiction in which the Company is incorporated;

        (ii) the sale, transfer or other disposition of all or substantially all of the assets of the Company (including the capital stock of the Company's subsidiary corporations) in connection with the complete liquidation or dissolution of the Company;

        (iii) any reverse merger in which the Company is the surviving entity but in which securities possessing more than fifty percent (50%) of the total combined voting power of the Company's outstanding securities are transferred to a person or persons different from those who held such securities immediately prior to such merger; or

        (iv) acquisition by any person or related group of persons (other than the Company or a Company-sponsored employee benefit plan) of beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act) of securities possessing more than fifty percent (50%) of the total combined voting power of the Company's outstanding securities, but excluding any such transaction that the Administrator determines shall not be a Corporate Transaction.

    (c) "Disability" means that the Grantee is permanently unable to carry out the responsibilities and functions of the position held by the Grantee by reason of any medically determinable physical or mental impairment. A Grantee will not be considered to have incurred a Disability unless he or she furnishes proof of such impairment sufficient to satisfy the Administrator in its discretion.

2. Exercise of Option.

    (a) Right to Exercise. The Option shall be exercisable during its term in accordance with the Vesting Schedule set out in the Notice and with the applicable provisions of the Plan and this Option Agreement. The Option shall be subject to the provisions of Section 10 of the Plan relating to the exercisability or termination of the Option in the event of a change in capitalization. If the Grantee has entered into any stock divesting agreement or arrangement with the Company, the Grantee's right to exercise the Option shall be subject to the terms and conditions of such stock divesting agreement or arrangement to the extent applicable. In no event shall the Company issue fractional Shares.

    (b) Method of Exercise. The Option shall be exercisable only by delivery of an Exercise Notice (attached hereto as Exhibit A) which, subject to the Vesting

18

Schedule in the Notice, shall state the election to exercise the Option, the whole number of Shares in respect of which the Option is being exercised, such other representations and agreements as to the holder's investment intent with respect to such Shares and such other provisions as may be required by the Administrator. The Exercise Notice shall be signed by the Grantee and shall be delivered in person, by certified mail, or by such other method as determined from time to time by the Administrator, to the Company accompanied by payment of the Exercise Price. The Option shall be deemed exercised upon receipt by the Company of such Exercise Notice accompanied by the Exercise Price.

(c) Taxes. No Shares will be delivered to the Grantee or other person pursuant to the exercise of the Option until the Grantee or other person has made arrangements acceptable to the Administrator for the satisfaction of applicable income tax, employment tax, and social security tax withholding obligations, including, without limitation, obligations incident to the receipt of Shares or the disqualifying disposition of Shares received on exercise of an Incentive Stock Option. Upon exercise of the Option, the Company or the Grantee's employer may offset or withhold (from any amount owed by the Company or the Grantee's employer to the Grantee) or collect from the Grantee or other person an amount sufficient to satisfy such tax obligations and/or the employer's withholding obligations.

(d) Pre-Registration Date Exercise. In the event that the Grantee exercises his or her Option prior to the Registration Date, such exercise shall be done in the manner as provided for by the Administrator in accordance with the provisions of the Plan.

3. Method of Payment. In addition to any other types of consideration the Administrator may determine, payment of the Exercise Price shall be by any of the following, or a combination thereof, at the election of the Grantee; provided, however, that such exercise method does not then violate any Applicable Law and, provided, further, that the Exercise Price must be paid in cash or other legal consideration permitted by the Cayman Islands company law:

(a) cash;

(b) check; or

(c) cancellation of indebtedness owed by the Company to the Grantee.

4. Restrictions on Exercise. The Option may not be exercised if the issuance of the Shares subject to the Option upon such exercise would constitute a violation of any Applicable Laws. In addition, the Option, if an Incentive Stock Option, may not be exercised until such time as the Plan has been approved by the shareholders of the Company.

5. Termination or Change of Continuous Service. In the event the Grantee's Continuous Service terminates, other than for Cause, the Grantee may, to the extent otherwise so entitled at the date of such termination (the "Termination Date"), exercise the Option during the Post-Termination Exercise Period as set forth in the Notice. In the event of termination of the Grantee's Continuous Service for Cause, the Grantee's right to exercise the

19

Option shall, except as otherwise determined by the Administrator, terminate concurrently with the termination of the Grantee's Continuous Service. In no event shall the Option be exercised later than the Expiration Date set forth in the Notice. Except as provided in Sections 6 and 7 below, to the extent that the Grantee is not entitled to exercise the Option on the Termination Date, or if the Grantee does not exercise the Option within the Post-Termination Exercise Period, the Option shall terminate.

6. Disability of Grantee. In the event the Grantee's Continuous Service terminates as a result of his or her Disability, the Grantee may, but only within twelve (12) months from the Termination Date (and in no event later than the Expiration Date), exercise the Option to the extent he or she was otherwise entitled to exercise it on or prior to the Termination Date; provided, however, that if such Disability is not a "disability" as such tern is defined in Section 22(e)(3) of the Code and the Option is an Incentive Stock Option, such Incentive Stock Option shall cease to be treated as an Incentive Stock Option and shall be treated as a Non-Qualified Stock Option on the day three (3) months and one (1) day following the Termination Date. To the extent that the Grantee is not entitled to exercise the Option on or prior to the Termination Date, or if the Grantee does not exercise the Option to the extent so entitled within the time specified herein, the Option shall terminate.

7. Death of Grantee. In the event of the termination of the Grantee's Continuous Service as a result of his or her death, or in the event of the Grantee's death during the Post-Termination Exercise Period or during the twelve (12) month period following the Grantee's Termination of Continuous Service as a result of his or her Disability, the Grantee's estate, or a person who acquired the right to exercise the Option by bequest or inheritance, may exercise the Option, but only to the extent the Grantee could exercise the Option at the date of termination, within twelve (12) months from the date of death (but in no event later than the Expiration Date). To the extent that the Grantee is not entitled to exercise the Option on the date of death, or if the Option is not exercised to the extent so entitled within the time specified herein, the Option shall terminate.

8. Transferability of Option. The Option, if an Incentive Stock Option, may not be transferred in any manner other than by will or by the laws of descent and distribution and may be exercised during the lifetime of the Grantee only by the Grantee; provided, however, that the Grantee may designate a beneficiary of the Grantee's Incentive Stock Option in the event of the Grantee's death on a beneficiary designation form provided by the Administrator. The Option, if a Non-Qualified Stock Option or Other Stock Option, may be transferred to any person by will and by the laws of descent and distribution. Non-Qualified Stock Options and Other Stock Options may also be transferred during the lifetime of the Grantee by gift and pursuant to a domestic relations order to members of the Grantee's Immediate Family to the extent and in the manner determined by the Administrator. The terms of the Option shall be binding upon the executors, administrators, heirs, successors and transferees of the Grantee.

9. Term of Option. The Option may be exercised no later than the Expiration Date set forth in the Notice or such earlier date as otherwise provided herein.

10. Tax Consequences. Set forth below is a brief summary as of the date of this Option Agreement of some of the United States federal tax consequences of exercise of the Option and disposition of the Shares. THIS SUMMARY IS NECESSARILY

20

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

INCOMPLETE, AND THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. THE GRANTEE
SHOULD CONSULT A TAX ADVISER BEFORE EXERCISING THE OPTION OR DISPOSING OF THE
SHARES.

(a) Exercise of Incentive Stock Option. If the Option qualifies as an
Incentive Stock Option, there will be no regular United States federal
income tax liability upon the exercise of the Option, although the excess,
if any, of the Fair Market Value of the Shares on the date of exercise over
the Exercise Price will be treated as income for purposes of the
alternative minimum tax for federal tax purposes and may subject the
Grantee to the alternative minimum tax in the year of exercise.

(b) Exercise of Incentive Stock Option Following Disability. If the
Grantee's Continuous Service terminates as a result of Disability that is
not total and permanent disability as defined in Section 22(e)(3) of the
Code, to the extent permitted on the date of termination, the Grantee must
exercise an Incentive Stock Option within three (3) months of such
termination for the Incentive Stock Option to be qualified as an Incentive
Stock Option.

(c) Exercise of Non-Qualified Stock Option. On exercise of a
Non-Qualified Stock Option, the Grantee will be treated as having received
compensation income (taxable at ordinary income tax rates) equal to the
excess, if any, of the Fair Market Value of the Shares on the date of
exercise over the Exercise Price. If the Grantee is an Employee or a former
Employee, the Company will be required to withhold from the Grantee's
compensation or collect from the Grantee and pay to the applicable taxing
authorities an amount in cash equal to a percentage of this compensation
income at the time of exercise, and may refuse to honor the exercise and
refuse to deliver Shares if such withholding amounts are not delivered at
the time of exercise.

(d) Exercise of Other Stock Option. On exercise of an Other Stock
Option, the Grantee will be treated as having received compensation income
(taxable at ordinary income tax rates) equal to the excess, if any, of the
Fair Market Value of the Shares on the date of exercise over the Exercise
Price. If the Grantee is an Employee or a former Employee, the Company will
be required to withhold from the Grantee's compensation or collect from the
Grantee and pay to the applicable taxing authorities an amount in cash
equal to a percentage of this compensation income at the time of exercise,
and may refuse to honor the exercise and refuse to deliver Shares if such
withholding amounts are not delivered at the time of exercise.

(e) Disposition of Shares. In the case of a Non-Qualified Stock
Option, if Shares are held for more than one year, any gain realized on
disposition of the Shares will be treated as long-term capital gain for
United States federal income tax purposes and subject to tax at a maximum
rate of 20%. In the case of an Incentive Stock Option, if Shares
transferred pursuant to the Option are held for more than one year after
receipt of the Shares and are disposed more than two years after the Date
of Award, any gain realized on disposition of the Shares also will be
treated as capital gain for federal income tax purposes and subject to the
same tax rates and holding periods that apply to Shares acquired upon
exercise of a Non-Qualified Stock Option. If Shares purchased under an
Incentive Stock Option are disposed of prior to the

21

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

expiration of such one-year or two-year periods, any gain realized on such disposition will be treated as compensation income (taxable at ordinary income rates) to the extent of the difference between the Exercise Price and the lesser of (i) the Fair Market Value of the Shares on the date of exercise, or (ii) the sale price of the Shares.

    11. Withholding Tax Obligations. The Grantee understands that, upon exercising a Non-Qualified Stock Option, he or she will recognize for income tax purposes an amount equal to the excess of the then Fair Market Value of the Shares over the Exercise Price. However, the timing of this income recognition may be deferred for up to six months if the Grantee is subject to Section 16 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). If the Grantee is an employee, the Company will be required to withhold from the Grantee's compensation, or collect from the Grantee and pay to the applicable taxing authorities an amount equal to a percentage of this compensation income. Additionally, the Grantee may at some point be required to satisfy tax withholding obligations with respect to the disqualifying disposition of an Incentive Stock Option. The Grantee shall satisfy his or her tax withholding obligation arising upon the exercise of this Option by one or some combination of the following methods: (a) by cash payment, (b) out of the Grantee's current compensation, (c) if permitted by the Administrator, in its discretion, by surrendering to the Company Shares which (i) in the case of Shares previously acquired from the Company, have been owned by the Grantee for more than six (6) months on the date of surrender, and (ii) have a Fair Market Value on the date of surrender equal to or greater than the Grantee's marginal tax rate times the ordinary income recognized, or (d) if permitted by the Administrator, in its discretion, by electing to have the Company withhold from the Shares to be issued upon exercise of the Option that number of Shares having a Fair Market Value equal to the amount required to be withheld. For this purpose, the Fair Market Value of the Shares to be withheld shall be determined on the date that the amount of tax to be withheld is to be determined under Applicable Laws (the "Tax Date").

    If the Grantee is subject to Section 16 of the Exchange Act (an "Insider"), any surrender of previously owned Shares to satisfy tax withholding obligations arising upon exercise of this Option must comply with the applicable provisions of Rule 16b-3 promulgated under the Exchange Act ("Rule 16b-3").

    All election by the Grantee to have Shares withheld to satisfy tax withholding obligations shall be made in writing in a form acceptable to the Administrator and shall be subject to the following restrictions:

        (a)   the election must be made on or prior to the applicable Tax Date;

        (b)   once made, the election shall be irrevocable as to the particular Shares of the Option as to which the election is made; and

        (c)   all elections shall be subject to the consent or disapproval of the Administrator.

    12. Market Standoff Agreement. In connection with the initial public offering of the Company's securities and upon request of the Company or the managing underwriters managing any underwritten offering of the Company's securities, the Grantee hereby agrees not to sell, make any short sale of, loan, grant any option for the purchase of, or otherwise

22

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

dispose of any Shares (other than those included in the registration) without the prior written consent of the Company or such managing underwriters, as the case may be, for such period of time (not to exceed 180 days) from the registration date as may be requested by the Company or such managing underwriters and to execute an agreement reflecting the foregoing as may be requested by the managing underwriters at the time of the public offering.

13. Entire Agreement; Governing Law. The Notice, the Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and the Grantee with respect to the subject matter hereof, and may not be modified adversely to the Grantee's interest except by means of a writing signed by the Company and the Grantee. Nothing in the Notice, the Plan and this Option Agreement (except as expressly provided therein) is intended to confer any rights or remedies on any persons other than the parties. The Notice, the Plan and this Option Agreement are to be construed in accordance with and governed by the internal laws of the Cayman Islands. Should any provision of the Notice, the Plan or this Option Agreement be determined by a court of law to be illegal or unenforceable, such provision shall be enforced to the fullest extent allowed by law and the other provisions shall nevertheless remain effective and shall remain enforceable.

14. Headings. The captions used in the Notice, the Plan and this Option Agreement are inserted for convenience and shall not be deemed a part of the Option for construction or interpretation.

15. Dispute Resolution. The provisions of this Section 15 shall be the exclusive means of resolving disputes arising out of or relating to the Notice, the Plan and this Option Agreement. The Company, the Grantee, and the Grantee's transferees pursuant to Section 6(j) of the Plan (the "parties") shall attempt in good faith to resolve any disputes arising out of or relating to the Notice, the Plan and this Option Agreement by negotiation between individuals who have authority to settle the controversy. Negotiations shall be commenced by either party by notice of a written statement of the party's position and the name and title of the individual who will represent the party. Within thirty (30) days of the written notification, the parties shall meet at a mutually acceptable time and place to resolve the dispute. If the dispute has not been resolved by negotiation, the parties agree that any suit, action, or proceeding arising out of or relating to the Notice, the Plan or this Option Agreement shall be within the jurisdiction of the courts of Hong Kong. If any one or more provisions of this Section 15 shall for any reason be held invalid or unenforceable, it is the specific intent of the parties that such provisions shall be modified to the minimum extent necessary to make it or its application valid and enforceable.

16. Notices. Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or upon deposit for delivery by an internationally (for international delivery of notice), or nationally (for national delivery of notice), recognized express mail courier service with postage and fees prepaid, addressed to the other party at its address as shown beneath its signature in the Notice, or to such other address as such party may designate in writing from time to time to the other party.

LDK SOLAR CO., LTD.

23

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
By:
       ---------------------------------
Name:
       ---------------------------------
Date:
       ---------------------------------


Signed:
       ---------------------------------
       Grantee
Date:
       ---------------------------------
```

24

EXHIBIT A

LDK SOLAR CO., LTD.

2006 STOCK INCENTIVE PLAN

EXERCISE NOTICE

LDK Solar Co., Ltd.
Hi-tech Industrial Park
Xinyu City, Jiangxi Province
People's Republic of China

Attention: Secretary of the Board

1. Exercise of Option. Effective as of today, _____, ____ [Date], _____ [Name], the undersigned (the "Grantee") hereby elects to exercise the Grantee's Option, to the extent such Option, in whole or in part, has been vested, to purchase ordinary shares (the "Shares") of LDK Solar Co., Ltd. (the "Company") under and pursuant to the Company's 2006 Stock Incentive Plan, as amended from time to time (the "Plan") and the Stock Option Award Agreement (the "Option Agreement") and Notice of Stock Option Award (the "Notice") dated _____, _____. Unless otherwise defined herein, the terms used in this Exercise Notice shall have the same defined meanings in the Plan and the Option Agreement.

2. Number of Shares to be Exercised. The number of Shares to be exercised under the Option is _____.

3. Representations of the Grantee. The Grantee acknowledges that the Grantee has received, read and understood the Notice, the Plan, and the Award Agreement and agrees to abide by and be bound by their terms and conditions.

4. Rights as Shareholder. Until the stock certificate evidencing such Shares is issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a shareholder shall exist with respect to the Shares, notwithstanding the exercise of the Option. The Company shall issue (or cause to be issued) such stock certificate promptly after the Option is exercised. No adjustment will be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 10 of the Plan.

5. Delivery of Payment. The Grantee herewith delivers to the Company the full Exercise Price in the following manner for the number of Shares as indicated in Section 2 above.

   [ ]  The Grantee tenders herewith payment of the Exercise Price in full in the form of cash or a certified or official bank check in same-day funds in the amount of US$_____ for _____ Shares.

25

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

[ ]  The Grantee elects the Easy Sale Exercise option and accordingly
     requests delivery of a net of _____ of Shares.

     6. Tax Consultation. The Grantee understands that the Grantee may suffer
adverse tax consequences as a result of the Grantee's purchase or disposition of
Shares. The Grantee represents that the Grantee has consulted with tax
consultants the Grantee deems advisable in connection with the purchase or
disposition of the Shares and that the Grantee is not relying on the Company for
any tax advice.

     7. Taxes. The Grantee agrees to satisfy all applicable foreign and U.S.
federal, state and local income and employment tax withholding obligations and
herewith delivers to the Company the full amount of such obligations or has made
arrangements acceptable to the Company to satisfy such obligations. In the case
of an Incentive Stock Option, the Grantee also agrees, as partial consideration
for the designation of the Option as an Incentive Stock Option, to notify the
Company in writing within thirty (30) days of any disposition of any Shares
acquired by exercise of the Option if such disposition occurs within two (2)
years from the Award Date or within one (1) year from the date the Shares were
transferred to the Grantee. If the Company is required to satisfy any foreign or
United States federal, state or local income or employment tax withholding
obligations as a result of such an early disposition, the Grantee agrees to
satisfy the amount of such withholding in a manner that the Administrator
prescribes.

     8. Successors and Assigns. The Company may assign any of its rights under
this Exercise Notice to single or multiple assignees, and this Exercise Notice
shall inure to the benefit of the successors and assigns of the Company. This
Exercise Notice shall be binding upon the Grantee and his or her heirs,
executors, administrators, successors and assigns.

     9. Headings. The captions used in this Exercise Notice are inserted for
convenience and shall not be deemed a part of this Exercise Notice for
construction or interpretation.

     10. Dispute Resolution. The provisions of Section 15 of the Award Agreement
shall be the exclusive means of resolving disputes arising out of or relating to
this Exercise Notice.

     11. Governing Law; Severability. This Exercise Notice is to be construed in
accordance with and governed by the internal laws of the Cayman Islands. Should
any provision of this Exercise Notice be determined by a court of law to be
illegal or unenforceable, such provision shall be enforced to the fullest extent
allowed by law and the other provisions shall nevertheless remain effective and
shall remain enforceable.

     12. Notices. Any notice required or permitted hereunder shall be given in
writing and shall be deemed effectively given upon personal delivery or upon
deposit for delivery by an internationally (for international delivery of
notice), or nationally (for national delivery of notice), recognized express
mail courier service with postage and fees prepaid, addressed to the other party
at its address as shown below beneath its signature, or to such other address as
such party may designate in writing from time to time to the other party.

                                      26

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

13. Further Instruments. The parties agree to execute such further instruments and to take such further action as may be reasonably necessary to carry out the purposes and intent of this Exercise Notice.

14. Entire Agreement. The Notice, the Plan, and the Award Agreement are incorporated herein by reference, and together with this Exercise Notice constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and the Grantee with respect to the subject matter hereof, and may not be modified adversely to the Grantee's interest except by means of a writing signed by the Company and the Grantee. Nothing in the Notice, the Plan, the Award Agreement and this Exercise Notice (except as expressly provided therein) is intended to confer any rights or remedies on any persons other than the parties.

Submitted by:                          Accepted by:

GRANTEE:                               LDK SOLAR CO., LTD.


                                       By:
                                           -----------------------------------
                                       Title:
-------------------------------------      -----------------------------------
(Signature)

                                       Address:
Address:                               Hi-tech Industrial Park
-------------------------------------  Xinyu City, Jiangxi Province
                                       People's Republic of China
-------------------------------------

                          27

</TEXT>
</DOCUMENT>

Exhibit 10.2

THIS AGREEMENT is made the [insert date] day of [insert month and year].

BETWEEN:

(1)     LDK SOLAR CO., LTD, a company incorporated in the Cayman Islands with principal executive offices located at Hi-Tech Industrial Park, Xinyu city, Jiangxi province, the People's Republic of China (the COMPANY); and

(2)     [Name] (the EXECUTIVE).

WHEREAS the Company wishes to employ the Executive and the Executive agrees to be employed by the Company as [management position] in accordance with the terms of this engagement.

WHEREBY IT IS AGREED as follows:-

1.      DEFINITIONS AND INTERPRETATION

1.1 In this Agreement, unless the context otherwise requires, the following words shall have the following meanings:-

EMPLOYMENT means the Employment of the Executive under the terms herein;

ARTICLES means the Articles of Association of the Company as amended from time to time;

BOARD means the board of directors from time to time of the Company or (as the context may require) the majority of directors present and voting at any meeting of the board of directors of the Company duly convened and held or a duly authorized committee thereof;

BUSINESS means all the business and affairs carried out by the Company Group or any company in the Company Group from time to time;

COMMENCEMENT DATE means [insert date], the date of commencement of the Employment;

CONFIDENTIAL INFORMATION means all information, know-how and records (in whatever form held) in any way connected with the Business including (without prejudice to the generality of the foregoing) without limitation all formulae, designs, specifications, drawings, data, operations and testing procedures, manuals and instructions and all customer and supplier lists, sales information, business plans and forecasts and all technical or other expertise and all computer software and all accounting and tax records, correspondence, orders and enquiries that are confidential or not generally known;

COMPANY GROUP means the Company and all of its Subsidiaries;

COMPANY GROUP MEMBER means any company in the Company Group;

HONG KONG means the Hong Kong Special Administrative Region of the People's Republic of China;

INCAPACITY means any illness (whether mental or physical), injury or accident; and

PRC means the People's Republic of China and for geographical purposes of this Agreement, excludes Taiwan, Macau and Hong Kong.

1.2 References herein to CLAUSES are references to the Clauses of this Agreement. The headings in this Agreement are inserted for convenience of reference only and do not affect the interpretation of this Agreement.

1.3 References herein to one gender include references to all other genders. References herein to persons include references to individuals, firms, companies, corporations and unincorporated bodies of persons and vice versa. References herein to the singular number include references to the plural and vice versa.

2.    EMPLOYMENT

2.1 The Company agrees, from the Commencement Date, to employ the Executive and the Executive agrees to be so employed and faithfully serve the Company as [management position] (or such other position as the Company may from time to time designate) subject to and upon the terms hereinafter set out.

2.2 Subject to the provisions for termination set out in Clause 9, the Employment shall continue unless and until terminated by either the Company or the Executive giving to the other not less than [three (3)/six (6)] months' prior notice in writing to terminate the Employment.

2.3 The Executive represents and warrants that s/he is not bound by or subject to any court order, agreement, arrangement or undertaking which in any way restricts or prohibits him from entering into this Agreement or the Employment nor from performing his/her duties hereunder.

3.    EXECUTIVE'S DUTIES AND SERVICES

3.1 The Executive hereby undertakes with the Company that during the term of the Employment s/he shall use his/her best endeavors to carry out his/her duties hereunder and to protect, promote and act in the best interests of the Company Group.

3.2 Without prejudice to the generality of Clause 3.1, the Executive in his/her office as [management position] (or such other position as the Company may from time to time designate) shall:

(a)     devote the whole of his/her attention, skill and time to the interests and affairs to the Company Group in the discharge of his/her duties as [management position] (or such other position as the Company may from time to time designate) in relation to the Company Group, both during his/her hours of work (being the normal business hours of the Company Group together with such additional hours as the Executive may spend on the performance of his/her duties) and at such other times as the Executive may spend for the proper and efficient conduct of the Business (subject to appropriate holidays and vacation time as provided in this Agreement);

(b)     in the discharge of such duties and in the exercise of such powers comply with all and any lawful directions and instructions from time to time made or given to him by the Board according to the best of his/her skills and ability and comply with all resolutions and regulations from time to time passed or made by the Board;

(c)     in pursuance of his/her duties hereunder perform such services for any company in the Company Group and (without further remuneration unless otherwise agreed) accept such offices (including being appointed as director thereof) in any company in the Company Group as the Board may from time to time reasonably require; and

(d)     faithfully and diligently perform such duties and exercise only such powers as are consistent with his/her office in relation to the Company and/or any company in the Company Group and use his/her best endeavors to promote the interests of the Company Group.

3.3 The Executive shall at all times keep the Board promptly and fully informed of the Executive's conduct of the Business or affairs of the Company Group and give promptly to the Board (in writing if so requested) all such information as the Board may reasonably require in relation to his/her conduct of the Business insofar as such information is or ought to be within the knowledge of the Executive and provide such written explanations as the Board may require in connection therewith.

3.4 The Executive shall carry out his/her duties and exercise his/her powers jointly with any director or executive as shall from time to time be appointed by the Board to act jointly with the Executive and the Board may at any time require the Executive to cease performing or exercising any of his/her duties or powers under this Agreement.

3.5 The Executive shall work in any place in the PRC or any part of the world which the Board may from time to time require for the proper performance and exercise of his/her duties and powers under this Agreement.

## 4.     REMUNERATION AND OTHER BENEFITS

4.1 In consideration for the performance of his/her duties hereunder, the Executive shall be entitled to receive with effect from the Commencement Date during the term of the Employment a salary at the rate of [insert] per annum payable by 12 monthly instalments, each such instalment being payable in arrears into an account in the name of the Executive designated by the Executive to the Company on the last business day of each calendar month provided that if the Employment is terminated prior to the end of a calendar month, the Executive shall only be entitled to a proportionate part of such salary in respect of the period of Employment during the relevant month up to the date of termination. For the avoidance of doubt, if the Executive also serves as a director on the Board, the Executive shall not be entitled to any additional compensation for his/her director's position; provided, however, that the Company may reimburse him/her for any reasonable out-of-pocket expenses incurred in connection with discharging his/her director's duties as provided in the relevant service agreement for such directorship.

4.2 Payment of such salary to the Executive referred to in Clause 4.1 shall be made by the Company.

4.3 The Salary referred to in clause 4.1 shall be subject to review by the Board on each anniversary of the Commencement Date.

4.4 The Executive shall continue to receive his/her salary during any period of absence on grounds of medical or physical ill-health up to a maximum of 30 days in any period of twelve (12) months or such number of days not more than that prescribed by law (whichever is longer) provided that the Executive shall, if required by the Company, supply the Company with medical certificates covering the period of absence and/or undergo at the Company's expense a medical examination by a doctor or hospital appointed by the Company.

4.5 The payment of tax, duties, social security and like payments arising out of the Employment shall be dealt with by the parties to this Agreement in accordance with the applicable laws and regulations. The Executive undertakes to the Company promptly to discharge any payments which are payable by him pursuant to the law as they fall due and to

indemnify the Company against any liability in respect thereof which may fall upon the Company as a result of his/her failure to pay.

5.    EXPENSES

The Executive shall be reimbursed all out-of-pocket business expenses (including entertainment, traveling, telephone and hotel expenses) properly and reasonably incurred by him in relation to the Business or in the discharge of his/her duties under this Agreement, providing the Executive complies with directions of the Board as may from time to time be made in relation to such expenses and such expenses shall be evidenced in such manner as the Board may require.

6.    LEAVE AND TRAVEL

The Executive shall be entitled to the public holidays and such other statutory holidays as prescribed by law. The Executive should not be entitled to any other paid holidays under this Agreement.

7.    SHARE OPTIONS AND DEALINGS

The Executive shall comply where relevant with every rule of law and every regulation applicable to the Company and its securities and every regulation contained in the Articles or otherwise applicable to the Company in force in relation to dealings in shares, debentures or other securities of the companies in the Company Group and in relation to unpublished price-sensitive information affecting the shares, debentures or other securities of any company in the Company Group; provided, always, that in relation to overseas dealings the Executive shall also comply with all laws of the state and all regulations of the stock exchange, market or dealing system in which such dealings take place.

8.    INCAPACITY

8.1 If the Executive is absent from work because of Incapacity such fact must be reported by the Executive to the company secretary or an executive director of the Company and, after three continuous days' absence, the Executive must provide, for sickness allowance purposes, a medical practitioners' certificate(s) of his/her Incapacity and its cause covering the whole of the Executive's period of absence.

8.2 If the Executive is absent from work due to Incapacity and has complied with the provisions of Clause 8.1, s/he will continue to be paid sickness allowance in accordance with applicable laws or Clause 4.4 whichever is more favorable. If the Executive's absence exceeds 15 consecutive days, the Company will be entitled to appoint a temporary replacement to cover the Executive's absence.

8.3 The Executive will, whenever requested by the Board (in circumstances where the Board has reasonable grounds to believe that the Executive may be suffering from any Incapacity or that the Executive may not be fit to carry out his/her duties), submit to examination by a medical practitioner selected and paid for by the Company. The Executive hereby authorizes such medical practitioner to disclose to and discuss with the Board any matters which, in the opinion of the medical practitioner, might hinder or prevent the Executive (if during a period of Incapacity) from returning to work for any period or (in other circumstances) from properly performing his/her duties at any time.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

9.    TERMINATION

9.1 Without prejudice to the accrued rights (if any) or remedies of either party under or pursuant to this Agreement, the Company shall be entitled to terminate the Employment without any compensation to the Executive unless otherwise required by the applicable laws and regulations:-

(a)    by not less than three (3) months' notice in writing given at any time while the Executive shall have been suffering from any Incapacity or prevented by reason of ill health (whether physical or mental), injury or accident from performing his/her duties hereunder for a period of or periods aggregating at least ninety (90) days in the preceding twelve (12) months; provided always that such termination shall comply with the applicable laws and regulations; and further provided that if at any time during the currency of a notice given pursuant to this Clause 9.1(a), the Executive shall provide a medical certificate satisfactory to the Board to the effect that s/he has fully recovered his/her physical and/or mental health and that no recurrence of Incapacity can reasonably be anticipated the Company may withdraw such notice; or

(b)    by summary notice in writing with immediate effect if the Executive shall at any time:-

        (i) commit any act of gross or willful misconduct or any serious, willful, grossly negligent or persistent breach of any of the provisions contained in this Agreement;

        (ii) commit any act of dishonesty, whether or not relating to the Employment;

        (iii) engage in any conduct which, in the reasonable opinion of the Board, has caused or is likely to cause the Executive's continued employment to be detrimental to the interests of the Company Group and, where such conduct is capable of remedy, fail to remedy such conduct within thirty (30) days after written notice from the Board requiring him to do so;

        (iv) absent himself/herself from his/her duties and services, including the meetings of the management, during a continuous period of six (6) months, without special leave of absence;

        (v) be otherwise prohibited by law from fulfilling his/her duties (including any circumstances in which it may be unlawful for the Company to employ the Executive) in connection with the Employment or under this Agreement or be removed from office by a special resolution of the shareholders of the Company in general meeting;

        (vi) be convicted of any criminal offence (other than a criminal conviction which in the reasonable opinion of the Board does not affect his/her position in the Company);

        (vii) without prejudice to Clause 9.1(a) above, refuse to carry out any reasonable lawful order given to him by the Board in the course of his/her employment or fail diligently to attend to his/her duties hereunder;

        (viii) without prejudice to Clause 9.1(b)(i) above, improperly divulge to any unauthorized person any Confidential Information or any other business

secret or details of the organization, business or clientele of the Company Group; and

(ix) be convicted of any offence or be identified as an insider dealer under any statutory enactment or regulations relating to insider dealing in force from time to time.

(c)    by giving the Executive a summary notice in writing 30 days prior to the termination if the Executive shall at any time become bankrupt or have a receiving order made against him or suspend payment of his/her debts or make any arrangement or composition with his/her creditors generally; or

(d)    by written notice in accordance with the provisions of Clause 2.2.

9.2 On serving or receiving notice to terminate this Agreement or at any time thereafter during the currency of such notice, the Company is, unless stipulated otherwise in the applicable laws, entitled to pay the Executive his/her salary (at the rate then payable under Clause 4.1 of this Agreement) together with monetary compensation for loss of all other benefits and reimbursement of expenses due to the Executive under this Agreement in lieu of notice.

9.3 At any time after notice (including summary notice) to terminate the Employment has been served or received by the Company, the Executive shall:

(a)    forthwith deliver to the Company all Confidential Information and all other tangible items including, without limitation, computers, computer disks, books, records, documents, papers, materials, credit cards, correspondence, accounts, source code and other intellectual property, and other property of or relating to the Company Group or the Business which may then be in his/her possession or under his/her power or control and all copies thereof or extracts therefrom made by or on behalf of the Executive shall be and remain the property of the Company Group and shall forthwith be delivered to the Company;

(b)    forthwith delete all Confidential Information from any computer disks, tapes or other re-useable material in the Executive's possession or control and destroy all other documents and tangible items in the Executive's possession or under the Executive's control which contain or refer to any Confidential Information; and

(c)    not at any time thereafter represent himself/herself to be an Executive or connected with the Company Group in any way.

9.4 At any time after notice (including summary notice) to terminate or suspend the Employment has been served or received by the Company, the Company may:-

(a)    appoint a replacement to hold the same or similar job title as the Executive and to carry out all or any of the Executive's duties instead of the Executive; and/or

(b)    require the Executive not, without the prior consent of the Board, to engage in any contact (whether or not at the Executive's instigation) with any customer, supplier, employee, Executive, officer or agent of any company in the Company Group which touches and concerns any of the Business; and/or

(c)    require the Executive to remain in the employment of the Company, without any obligation on the Company to provide any work to the Executive, and to continue to

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

be bound by the terms of this Agreement and may restrict the Executive's access to the Company's premises and/or records.

10.    RESTRAINT ON ACTIVITIES OF THE EXECUTIVE

10.1 The Executive undertakes and covenants that during his/her Employment s/he will not directly or indirectly:

    (a)    be employed, engaged, concerned or interested in any other business or undertaking (except as provided in Clause 8.4); or

    (b)    engage in any activity which the Board reasonably considers may be, or become, harmful to the interests of the Company or of any Company Group Member or which might reasonably be considered to interfere with the performance of his/her duties under his/her Employment Agreement with the Company.

10.2    The Executive shall not make any investment in any other company which competes with any Company Group Member in excess of 3% of the total issued share capital of such company.

10.3    The Executive undertakes and covenants that s/he shall not, whether directly or indirectly, on his/her own behalf or on behalf of or in conjunction with any other person, firm, company or other entity:

    (a)    for the period of two years (subject to Clause 8.6) following the Termination Date of his/her Employment Agreement, solicit or entice away or endeavor to solicit or entice away from any Company Group Member any person, firm, company or other entity who is, or was, in the three years immediately prior to the Termination Date, a client of any Company Group Member with whom the Executive had business dealings during the course of his/her employment in that three year period. Nothing in this Clause 8.5(a) shall prohibit the seeking or doing of business not in direct or indirect competition with the business of the Company Group;

    (b)    for the period of two years (subject to Clause 8.6) following the Termination Date, solicit or entice away or endeavor to solicit or entice away from any Company Group Member any person, firm, company or other entity who is, or was, in the three years immediately prior to the Termination Date, a prospective client of such Company Group Member. For the purposes of this Clause 8.5(b) and Clause 8.5(d) the term "prospective client" shall mean any person, firm, company or other entity which was, in the three years immediately prior to the Termination Date, being actively solicited or responded positively to canvassing by any Company Group Member and with which solicitation the Executive was personally involved during the course of his/her employment in that three year period. Nothing in this Clause 8.5(b) shall prohibit the seeking or doing of business not in direct or indirect competition with the business of the Company Group;

    (c)    for the period of two years (subject to Clause 8.6) following the Termination Date, have any business dealings with any person, firm, company or other entity who is, or was, in the three years immediately prior to the Termination Date, a client of any Company Group Member with whom the Executive had business dealings during the course of his/her employment in that three year period. Nothing in this Clause 8.5(c) shall prohibit the seeking or doing of

business not in direct or indirect competition with the business of the Company Group;

(d)    for the period of two years (subject to Clause 8.6) following the Termination Date, have any business dealings with any person, firm, company or other entity who is, or was, in the three years immediately prior to the Termination Date, a prospective client of any Company Group Member with whom the Executive had business dealings during the course of his/her employment in that three year period. Nothing in this Clause 8.5(d) shall prohibit the seeking or doing of business not in direct or indirect competition with the business of the Company Group;

(e)    for the period of two years (subject to Clause 8.6) following the Termination Date, solicit or entice away or endeavor to solicit or entice away any individual who is employed or engaged by any Company Group Member as a director or in a managerial, executive or technical capacity and with whom the Executive had business dealings during the course of his/her employment in the three year period immediately prior to the Termination Date;

(f)    for the period of two years (subject to Clause 8.6) following the Termination Date, employ or engage, whether on an employed or self-employed basis or in any other office or capacity, any individual who is employed or engaged by any Company Group Member as a director or in a managerial, executive or technical capacity and with whom the Executive had business dealings during the course of his/her employment in the three year period immediately prior to the Termination Date; and

(g)    for the period of two years (subject to Clause 8.6) following the Termination Date, carry on, set up, be employed, engaged or interested in a business anywhere in the PRC, including but not limited to Competitors (as defined in the Memorandum and Articles of the Company), which is or is about to be in competition with the business of the Company Group as at the Termination Date. It is agreed that in the event that any such company ceases to be in competition with the Company Group this Clause 8.5(g) shall, with effect from that date, cease to apply in respect of such company. The provisions of this Clause 8.5(g) shall not, at any time following the Termination Date, prevent the Executive from holding shares or other capital not amounting to more than 3% of the total issued share capital of any company whether listed on a regulated market or not and, in addition, shall not prohibit the seeking or doing of business not in direct or indirect competition with the business of the Company Group.

10.4    The period during which the restrictions referred to in Clauses 8.5(a) to (g) inclusive hall apply following the Termination Date shall be reduced by the amount of time during which, if at all, the Company suspends the Executive under the provisions of his/her Employment Agreement.

10.5    The Executive agrees that if, during either the term of his/her employment with the Company or the period of the restrictions set out in Clauses 8.5(a) to (g) inclusive s/he receives an offer of employment or engagement, s/he will provide a copy of this Clause 8 to the offeror as soon as is reasonably practicable after receiving the offer and will inform the Investors of the identity of the offeror as soon as possible after the offer is accepted.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

10.6     The Executive undertakes and covenants that at no time after the termination of his/her employment with the Company shall be directly or indirectly represent himself/herself as being interested in or employed by or in any way connected with any Company Group Member, other than as a former direct or employee of a Company Group Member and (where applicable) as a shareholder or former shareholder of the Company.

10.7     The Executive agrees that the restrictions imposed on him by this Clause 8 extend to any actions by the Executive:

    (a)     on his/her own account;

    (b)     on behalf of any firm, company or other person;

    (c)     whether alone or jointly with any other person; or

    (d)     as a director, manager, partner, shareholder, employee or consultant of any other person.

10.8     The Executive agrees that, having regard to all the circumstances, the restrictions in these Clauses 8 and 9 are reasonable and necessary but no more than sufficient for the protection of each of the Investors and that they do not bear harshly on him. The parties agree that:

    (a)     each restriction shall be read and construed independently of the other restrictions so that if one or more are found to be void or unenforceable as an unreasonable restraint of trade or for any other reason the remaining restrictions shall not be affected; and

    (b)     if any restriction is found to be void but would be valid and enforceable if some part of it were deleted, the restriction shall apply with the deletions that are necessary to make it valid and enforceable.

11.     CONFIDENTIAL INFORMATION

11.1 The Executive shall not at any time during the currency of the Employment or after the termination of the Employment without limit in point of time except authorized or required by his/her duties:

(a)     use, take away, conceal or destroy any Confidential Information for any purpose other than that of the Company Group; or

(b)     divulge or communicate to any person any Confidential Information except to those of the employees or officials of the Company Group whose province is to know the same; or

(c)     through any failure to exercise all due care and diligence cause any unauthorized disclosure of any Confidential Information (including without limitation):-

    (i)     relating to the dealings, organization, business, finance, transactions or any other affairs of the Company Group or its clients or customers; or

    (ii)     in respect of which any such company in the Company Group is bound by an obligation of confidence to any third party; or

(iii)   relating to the working of any process or invention which is
        carried on or used by any company in the Company Group or which
        s/he may discover or make during his/her Employment; including
        anything which by virtue of Clause 12 becomes the absolute
        property of the Company Group,

but so that these restrictions shall cease to apply to any information or
knowledge which may (otherwise than through the default of the Executive)
become available to the public generally or otherwise required by law or
any applicable regulations to be disclosed.

11.2 Since the Executive may obtain in the course of the Employment by reason of
services rendered for or offices held in any other company in the Company Group
knowledge of the trade secrets or other confidential information of such
company, the Executive hereby agrees that s/he will at the request and cost of
the Company or such other company enter into a direct agreement or undertaking
with such company whereby s/he will accept restrictions corresponding to the
restrictions herein contained (or such of them as may be appropriate in the
circumstances) in relation to such products and services and such area and for
such period as such company may reasonably require for the protection of its
legitimate interests.

11.3 All notes, memoranda, records and writings made by the Executive in
relation to the Business or concerning any of its dealings or affairs or the
dealings or affairs of any clients or customers of the Company Group shall be
and remain the property of the Company Group and shall be handed over by him to
the Company (or to such other company in the Company Group as the Company may
direct) from time to time on demand and in any event upon his/her leaving the
service of the Company and the Executive shall not retain any copy thereof.

12.    INTELLECTUAL PROPERTY

12.1 The parties foresee that the Executive has created and may create designs
or other intellectual property in the course of his/her duties hereunder and
agree that in this respect the Executive has a special responsibility to further
the interests of the Company and the Company Group.

12.2 Any invention, production, improvement or design made or process or
information discovered or copyright work or trade mark or trade name or get-up
source code or any other intellectual property created by the Executive during
the continuance of his/her Employment hereunder (whether before or after the
date hereof or whether capable of being patented or registered or not and
whether or not made or discovered in the course of his/her employment hereunder)
in conjunction with or in any way affecting or relating to the business of any
company in the Company Group or capable of being used or adapted for use therein
or in connection therewith shall forthwith be disclosed to the Company and shall
belong to and be the absolute property of such company in the Company Group as
the Company may direct.

12.3 The Executive if and whenever required to do by the Company shall at the
expense of a company in the Company Group apply or join with such company in
applying for letters patent or other protection or registration for any such
invention improvement design process information work trade mark name or get-up
source code or other intellectual property rights as aforesaid which belongs to
such company and shall at the expense of such company execute and do all
instruments and things necessary for vesting the said letters patent or other
protection or registration when obtained and all right title and interest to and
in the same in such company absolutely and as sole beneficial owner or in such
other person as the Company may specify.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

12.4 The Executive hereby irrevocably appoints the Company to be his/her attorney in his/her name and on his/her behalf to execute and do any such instrument or thing and generally to use his/her name for the purpose of giving to the Company the full benefit of this clause and in favor of any third party a certificate in writing signed by any Executive or by the secretary of the Company that any instrument or act falls within the authority hereby conferred shall be conclusive evidence that such is the case.

13.    RESTRICTIONS REASONABLE

While the restrictions contained in Clauses 10 and 11 (on which the Executive has had the opportunity to take independent advice, as the Executive hereby acknowledges) are considered by the parties to be reasonable in all the circumstances, it is recognized that restrictions of the nature in question may fail for technical and/or unforeseen reasons and accordingly it is hereby agreed and declared that if any such restrictions shall be adjudged to be void as going beyond what is reasonable in all the circumstances for the protection of the interest of the Company or any other company in the Company Group but would not be void if part of the wording thereof were deleted or the periods (if any) thereof were reduced the said restriction shall apply with such modifications as may be necessary to make it valid and effective.

14.    WAIVER

14.1 Time is of the essence in relation to this Agreement but no failure or delay on the part of either party to exercise any power, right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by either party of any power, right or remedy preclude any other or further exercise of the remaining part thereof or the exercise of any other available power, right or remedy by that patty.

14.2 The remedies provided herein are cumulative and are not exclusive of any remedies provided by law.

15.    FORMER SERVICE AGREEMENTS

15.1 This Agreement shall be in substitution for and supersedes any previous service agreement, arrangements or undertakings entered into between any company in the Company Group and the Executive and any terns of employment previously in force between any such company and the Executive, whether or not on a legal or formal basis and the Executive now acknowledges that such agreements, arrangement or undertakings are now terminated.

15.2 The Executive hereby acknowledges that s/he has no claim of any kind against any company in the Company Group (other than in respect of accrued but unpaid salary) and without prejudice to the generality of the foregoing s/he further acknowledges that s/he has no claim for damages against any company in the Company Group for the termination of any previous service agreements, arrangements or undertakings for the sole purpose of entering into this Agreement.

15.3 The terms of this Agreement may not be modified, altered, varied or added to except by agreement in writing signed by the parties to this Agreement. None of the rights or duties of the Executive under this Agreement may be assigned, transferred or sub-contracted.

15.4 This Agreement embodies all of the terms and provisions of and relating to the employment of the Executive by the Company.

16.    REPRESENTATIONS AND WARRANTIES

The Executive represents and warrants to the Company, as follows:

16.1 that s/he has no criminal convictions;

16.2 that s/he has not been investigated by any regulatory or government authority;

16.3 that s/he has the necessary work permits (if required) to work for the Company, and

16.4 that s/he had the benefit of independent legal advice before signing this Agreement.

17.    SEVERABILITY

The provisions of this Agreement are severable and if any provision is held to be invalid or unenforceable by any court of competent jurisdiction then such invalidity or unenforceability shall not affect the remaining provisions of this Agreement.

18.    NOTICES

18.1 Any notice to be given hereunder to the Executive may be served by being handed to him personally or by being sent by registered post to him at the address provided at the head of this Agreement (save that where such address is outside the PRC such notice may be sent by airmail) and any notice to be given to the Company may be served by being left at or sent by registered post to its place of business at Hi-Tech Industrial Park, Xinyu city, Jiangxi Province, PRC for the time being.

18.2 Any notice served by registered post in the city to which is addressed shall be deemed to have been served on the second day (excluding Sundays and statutory holidays) following the date of posting and any notice served by airmail shall be deemed to have been served on the seventh day (excluding Sundays and statutory holidays) following the date of posting and in proving such service it shall be sufficient proof that the notice was properly addressed and posted as a prepaid letter by registered post or airmail (as the case may be).

18.3 All notices or communications required to be served or given pursuant to this Agreement shall be in writing.

19.    LAW AND JURISDICTION

19.1 This Agreement is governed by and shall be construed in all respects in accordance with the laws of the Cayman Islands. Any disputes or claims relating to this Contract or the interpretation, breach, termination or validity hereof shall be resolved through friendly consultations between the Company and the Employee, commencing upon written notice given by one party to the other of the existence of such a claim or dispute. If consultation fails to resolve the dispute or claim within 30 days of such notice being given, either party may refer the dispute or claim to the China International Economic and Trade Arbitration Commission for arbitration.

19.2 This Agreement shall be executed in English in one or more counterparts, all of which will together constitute the same Agreement.

IN WITNESS whereof this Agreement has been executed as a deed and delivered by the parties on the day and year first above written.

```
SIGNED by                                      )
for and on behalf of                           )
LDK Solar Co., Ltd                             )
in the presence of:                            )



SIGNED BY                                      )
[Name of the Executive]                        )
in the presence of:                            )
</TEXT>
</DOCUMENT>
```

Exhibit 10.3

LDK SOLAR CO., LTD
(incorporated in the Cayman Islands with limited liability)

[Name of the executive director]
[Address of the executive director]

[Date]

Dear [insert]:

APPOINTMENT AS AN EXECUTIVE DIRECTOR OF
LDK SOLAR CO., LTD
(THE "COMPANY" TOGETHER WITH ITS SUBSIDIARIES, THE "GROUP")

We hereby write to confirm the terms and conditions of your appointment as an executive director of the Company:-

1.  Subject to Clause 6 herein, your appointment as an executive director of the Company will be for an initial term of [three] year and will take effect from the date hereof, and will continue thereafter from year to year until terminated by you or removed by our shareholders with three months' notice in writing served on the other party.

2.  Your role will be that of an executive director, helping the the board of directors of the Company (the "BOARD") to provide the Company with effective leadership and ensuring the continuing effectiveness of the management team and the high standards of probity within the Company.

3.  In addition to your general fiduciary responsibilities, you shall faithfully and diligently perform such functions and exercise such powers as are appropriate to your position as an executive director. The Board may need you to serve on various committees of the Board and/or to accept additional appointments in or on behalf of the Company.

4.  In order to satisfy the requirements of a public company, you are expected to attend general meetings (the "GENERAL MEETINGS") of the Company, each meeting of the Board and of any committees to which you are appointed as a member. If you are unavoidably unable to attend, as much prior notice as possible should be given to the chairman of the Board (the "CHAIRMAN").

5.  You shall not be entitled to any compensation for your appointment hereunder in addition to the compensation for your appointment as the [insert the management position] of the Company; provided, however, that you will be reimbursed for any out-of-pocket expenses you reasonably incur in performing your functions as a director, including attending Board meetings and participating in Board functions.

6.  Your appointment hereunder will, in any event, cease at the Annual General Meeting of the Company immediately following the expiration of your initial term as set forth in Clause 1 and you will be eligible for re-election for consecutive three-year terms at the Annual General Meetings. In addition to these requirements, your appointment will at all times be terminable by [three] months' prior written notice given by either side. Upon the expiry of notice served on you to terminate your appointment, you will resign from your office as a director (and from each and every other office or appointment you then hold in or on behalf of the Company) and, if you have not done so within seven days, you hereby irrevocably appoint any one of your fellow directors for the time being as your attorney to effect such resignation(s) on your behalf by signing any document(s) and doing any other act(s) or thing(s) as may be necessary or requisite.

7.  Your appointment hereunder will terminate automatically without any requirement for notice or

compensation if you:

7.1  vacate your office under the terms of the Company's articles of association;

7.2  are removed from office as a director by any resolution duly proposed and resolved by the members of the Company in General Meeting (provided always that, where a poll is demanded, the result of the poll will count); or

7.3  are not re-elected as a director when you submit yourself to re-election.

8.  Your fiduciary duties as a director to the Company require you at all times:-

8.1  to maintain the confidentiality of all information you acquire by virtue of your appointment hereunder;

8.2  to act in good faith in the Company's interests at all times;

8.3  to act at all times for the proper purposes of the Company;

8.4  to carry out your responsibilities with the care, skill and diligence which the Company is reasonably entitled to expect from someone of your experience and expertise; and

8.5  to act only with the proper authority of the Company.

9.  You must not make any statements on the Company's behalf or concerning the Company to the press, media, venture capitalists, brokers, banks, financial analysts and/or anyone associated with the stock market or investor community without the authorisation of the Board.

10.  You shall disclose to the Board all other directorships and other (direct or indirect) interests, employments, consultancies or associations held by you or members of your family. You must also keep the Board informed on a continuing basis of all changes to such arrangements. During your appointment, you will not be free, unless prior written approval has been given by the Board, to take up new directorships or hold other interests in the same industry as the Group or which could give rise to a conflict of interest in some other way.

11.  You shall not, either during the term of your appointment as an executive director of the Company or thereafter:-

11.1  use to the detriment or prejudice of the Group or divulge or communicate to any person any trade secret or confidential information concerning the business or affairs of the Group (except to employees or directors of the Group whose province is to know the same) which may have come to your knowledge during the term of your appointment hereunder; or

11.2  use for your own purpose or for any purposes other than those of the Group or disclose to any third party (except to regulatory authorities or required by any applicable law) any information or knowledge of a confidential nature which you may from time to time acquire in relation to any member of the Group but so that this restriction shall cease to apply to any information or knowledge which may come into the public domain (otherwise than through your fault).

12.  Save as disclosed or to be disclosed in the prospectus of the Company for the listing of the shares of the Company on any stock exchange as may be approved by the Board, you shall not, during the term of your appointment and for one year thereafter, be a director or employee or

-2-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

agent of, or have any other material financial interest or involvement in, any business or enterprise which competes or is likely to compete (directly or indirectly) or has a significant business relationship with any Group company without the prior written consent of the Board.

13. You shall promptly upon request by the Company or in any event upon your ceasing to be an executive director of the Company deliver up to the Company all lists of clients or customers, correspondence and all other documents, papers and records which may have been prepared by you or have come into your possession as a director of the Company, and you shall not be entitled to and shall not retain any copies thereof. Title and copyright therein shall vest in the Company.

14. This letter shall be governed by and construed in accordance with the laws of the Cayman Islands. Any disputes or claims relating to this letter agreement or the interpretation, breach, termination or validity hereof shall be resolved through friendly consultations between you and the Company, commencing upon written notice given by one party to the other of the existence of such a claim or dispute. If consultation fails to resolve the dispute or claim within 30 days of such notice being given, either party may refer the dispute or claim to the China International Economic and Trade Arbitration Commission for arbitration.

Please sign, date and return the attached copy of this letter to us, confirming your acceptance of the appointment and its terms set out herein. If the terms of this appointment cause you any difficulty, please let us know.


Yours sincerely,


[INSERT]
FOR AND ON BEHALF OF
LDK SOLAR CO., LTD


--------------------------------------------------------------------------------
I agree to the terms and conditions set out above relating to my appointment as an executive director of LDK Solar Co., Ltd.

IN WITNESS WHEREOF I HAVE EXECUTED THIS DOCUMENT AS A DEED ON THE DATE SET OUT BELOW:-


SIGNED, SEALED AND DELIVERED BY      )
[NAME OF executive DIRECTOR]         )
in the presence of:                  )


Witness's name:        _____

Witness's address:     _____

Witness's occupation:  _____

Date:                  _____


                              -3-


</TEXT>
</DOCUMENT>

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 10.4

LDK SOLAR CO., LTD
(incorporated in the Cayman Islands with limited liability)

[Name of independent director]
[Address of independent director]

                                                            [Date]

Dear [insert]

                APPOINTMENT AS AN INDEPENDENT DIRECTOR OF
                            LDK SOLAR CO., LTD
           (THE "COMPANY" TOGETHER WITH ITS SUBSIDIARIES, THE "GROUP")

We hereby write to confirm the terms and conditions of your appointment as an
independent director of the Company:-

1.  Subject to Clause 8 herein, your appointment as an independent director of
    the Company will be for an initial term of [three] years and will take
    effect from the date hereof, and will continue thereafter for successive
    [three]-year terms until terminated by you or removed by our shareholders
    with three months' notice in writing served on the other party.

2.  Your role will be that of an independent director, bringing an objectivity
    and independence of view borne by your outside experience, helping the
    board of directors of the Company (the "BOARD") to provide the Company with
    effective leadership and ensuring the continuing effectiveness of the
    management team and the high standards of probity within the Company. As an
    independent director, the Board may ask you to become a member of the
    various committees of the Board including the audit committee whose
    principal duties include, inter alia, the review and supervision of the
    Company's financial reporting process and internal controls.

3.  In addition to your general fiduciary responsibilities, you shall
    faithfully and diligently perform such functions and exercise such powers
    as are appropriate to your position as an independent director. The Board
    may ask you to accept additional appointments in or on behalf of the
    Company.

4.  In order to satisfy the requirements of a public company, you are expected
    to attend general meetings (the "GENERAL MEETINGS") of the Company, each
    meeting of the Board and of any committees to which you are appointed as a
    member. If you are unavoidably unable to attend, as much prior notice as
    possible should be given to the chairman of the Board (the "CHAIRMAN").

5.  You will be fully reimbursed for all reasonable out-of-pocket expenses you
    incur in discharging your duties on production of appropriate proofs of
    payment. The Company's procedures require you to obtain authorisation in
    advance from the Chairman for any item of expenditure that are to be
    reasonably incurred by you and any expenses to be reasonably incurred
    overseas or for foreign travel.

6.  Because of your independent status, you are not eligible to participate in
    any share option, bonus schemes or other benefits of the kind available to
    executive and other directors of the Company, except as expressly approved
    by the Board at its sole discretion.

7. You shall be entitled to an annual fee of HK$/US$/Rmb [specify] payable in arrears in December each year, which shall accrue on a daily basis.

8. Your appointment will, in any event, cease at the annual General Meeting of the Company immediately before the expiration of your initial term or any subsequent [three]-year term, as the case may be, as set forth in Clause 1 and you will be eligible for re-election for consecutive three-year terms at the annual General Meetings. In addition to these requirements, your appointment will at all times be terminable by three months' prior written notice given by either side.

9. Your appointment will terminate automatically and immediately upon written notice to you without further compensation (for avoidance of doubt, you will be entitled to compensation for your past service as set forth herein) if you:-

   9.1 vacate your office under the terms of the Company's articles of association;

   9.2 are removed for cause from office as a director by any resolution duly proposed and resolved by the members of the Company in General Meeting (provided always that, where a poll is demanded, the result of the poll will count); or

   9.3 are not re-elected as a director when you submit yourself to re-election.

10. Your fiduciary duties to the Company require you at all times:-

    10.1 to maintain the confidentiality of all information you acquire by virtue of your appointment;

    10.2 to act in good faith in the Company's interests at all times;

    10.3 to act at all times for the proper purposes of the Company;

    10.4 to carry out your responsibilities with the care, skill and diligence which the Company is reasonably entitled to expect from someone of your experience and expertise; and

    10.5 to act only with the proper authority of the Company.

11. You must not make any statements on the Company's behalf or concerning the Company to the press, media, venture capitalists, brokers, banks, financial analysts and/or anyone associated with the stock market or investor community without the authorisation of the Board.

12. You shall disclose to the Board all other directorships and other (direct or indirect) interests, employments, consultancies or associations held by you or members of your family. You must also keep the Board informed on a continuing basis of all changes to such arrangements.

13. You have the responsibility to act in the best interests of the Company and the Group and to refrain from any conduct that would be, or may appear to be, adverse or contrary to the interests of the Company or the Group. You shall avoid not only conflicts of interest, but also the appearance of a conflict of interest. You shall disclose to the Board any potential conflicts of interest that you, any member of your family or any persons affiliated with you, may have with respect to any matter under discussion by the Board or proposed to be discussed by the Board and, if appropriate, refrain from voting on a matter in which you, any member of your family or any persons affiliated with you, may have a conflict. A "conflict of interest" exists when the

2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

private interest of yourself, any member of your family or any persons affiliated with you, is inconsistent with or opposed to, or gives the appearance of being inconsistent with or opposed to, the interests of the Company or the Group.

14. You shall not, either during the term of your appointment as an independent director of the Company or thereafter:-

    14.1 use to the detriment or prejudice of the Group or divulge or communicate to any person any trade secret or confidential information concerning the business or affairs of the Group (except to employees or directors of the Group whose province is to know the same) which may have come to your knowledge during the term of your appointment hereunder; or

    14.2 use for your own purpose or for any purposes other than those of the Group or disclose to any third party (except to regulatory authorities or required by any applicable law) any information or knowledge of a confidential nature which you may from time to time acquire in relation to any member of the Group but so that this restriction shall cease to apply to any information or knowledge which may come into the public domain (otherwise than through your fault).

15. You shall not, during the term of your appointment and for one year thereafter, be a director or employee or agent of, or have any other material financial interest or involvement in, any business or enterprise which competes or is likely to compete (directly or indirectly) or has a significant business relationship with any Group company without the prior written consent of the Board.

16. You shall promptly upon request by the Company or in any event upon your ceasing to be an independent director of the Company deliver up to the Company all lists of clients or customers, correspondence and all other documents, papers and records which may have been prepared by you or have come into your possession as a director of the Company, and you shall not be entitled to and shall not retain any copies thereof. Title and copyright therein shall vest in the Company.

17. By accepting this appointment, you will be deemed to have represented to the Company that you have, to the best of your knowledge, satisfied the independence and other requirements of the Securities and Exchange Commission of the United States.

18. This letter shall be governed by and construed in accordance with the laws of the Cayman Islands. Any disputes or claims relating to this letter agreement or the interpretation, breach, termination or validity hereof shall be resolved through friendly consultations between you and the Company, commencing upon written notice given by one party to the other of the existence of such a claim or dispute. If consultation fails to resolve the dispute or claim within 30 days of such notice being given, either party may refer the dispute or claim to the China International Economic and Trade Arbitration Commission for arbitration.

3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Please sign, date and return the attached copy of this letter to us, confirming
your acceptance of the appointment and its terms set out herein. If the terms of
this appointment cause you any difficulty, please let us know.


Yours faithfully,


[SPECIFY]
FOR AND ON BEHALF OF
LDK SOLAR CO., LTD


--------------------------------------------------------------------------------
I agree to the terms and conditions set out above relating to my appointment as
an independent director of LDK Solar Co., Ltd.

IN WITNESS WHEREOF I HAVE EXECUTED THIS DOCUMENT AS A DEED ON THE DATE SET OUT
BELOW:-


SIGNED, SEALED AND DELIVERED BY      )
[NAME OF INDEPENDENT DIRECTOR]       )
in the presence of:                  )


Witness's name:          _____

Witness's address:       _____

Witness's occupation:    _____

Date:                    _____

                              4

</TEXT>
</DOCUMENT>

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 10.5

FORM CONFIDENTIALITY AND NON-COMPETE AGREEMENT

THIS CONFIDENTIALITY AND NON-COMPETE AGREEMENT (the "AGREEMENT") is entered into on [Date] by and between:

JIANGXI LDK SOLAR HI-TECH CO., LTD. (the "COMPANY");

and

[NAME] (the "EMPLOYEE"), a _____ citizen with ID Card No. _____, with the residential address _____ and household registration place_____.

The Company and the Employee are hereinafter referred to collectively as the "PARTIES" and each individually as a "PARTY".

WHEREAS

    (A)   in accordance with PRC laws and, regulations, the Company and the Employee have entered into an Employment Agreement dated [Date] (the "EMPLOYMENT AGREEMENT"); and

    (B)   in accordance with the terms of Article 7 of the Employment Agreement, the Company and the Employee acknowledge that the Employee will from time to time receive Confidential Information (as defined below) during the term of his/her employment with the Company.

    (C)   in order to protect the Company's competitive position and intellectual property rights, the Employee is hereby entering into a binding confidentiality and non-compete agreement with the Company.

Now therefore, in consideration of the Employee's employment by the Company, the Company's agreement to employ the Employee, and the mutual promises contained in this Agreement, the Company and the Employee agree as follows:

ARTICLE 1
CONFIDENTIALITY

1.1  Definition

"CONFIDENTIAL INFORMATION" shall mean information of confidential nature created, discovered, prepared or otherwise developed by the Company or any of its affiliates, which is generally unavailable to the public and has an economic value to the business in which the Company or any of its affiliates is engaged. Such Confidential Information includes but is not limited to, customer and supplier lists, pricing, marketing and sales strategies, employee and consultant rosters and other business or financial information or know-how developed by or disclosed to the Company or any of its subsidiaries or affiliates.

-1-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

1.2   Confidentiality Obligation

(1)   During the term of the Employment Agreement and at any time after the termination of the Employment Agreement, the Employee shall abide by the confidentiality rules formulated by the Company.

(a)   Without the Company's prior written consent, the Employee shall not, directly or indirectly:

    (i)   use any Confidential Information for any purpose other than performance of his/her duties as an Employee;

    (i)   disclose in any form whatsoever any Confidential Information to any third parties;

    (ii)   acquire Confidential Information by any improper methods or allow third parties to do the same;

    (iii)   use or allow third parties to use any Confidential Information so acquired.

(b)   The Employee is obliged to use his/her best efforts to prevent any third party from stealing any Confidential Information.

(2)   For the purpose of this Agreement, "ACQUIRE BY ANY IMPROPER METHODS" includes stealing, fraud, threat, bribery, unauthorized reproduction, breach of confidentiality obligations, persuasion of others to breach any confidentiality obligation or similar methods of the same nature.

(3)   If the Company suffers any loss resulting directly or indirectly from the Employee's breach of Section 1.2(1) hereof, the Company shall have the right to impose a discipline penalty on the Employee, and the Employee shall compensate the Company for the loss according to the relevant provisions of the Employment Agreement and assume any other legal liabilities under PRC laws.

(4)   The obligations under Section 1.2(1) shall not apply to the following information which:

(a)   the Employee can prove has entered into the public domain;

(b)   has been disclosed other than by the Employee's breach of the provisions of this Agreement;

(c)   the Employee can prove was acquired from a third party who was not subject to any confidentiality restrictions; or

(d)   was disclosed by the Employee as required by any applicable law or court order, under which circumstance, the Confidential Information shall be disclosed only to the extent as expressly specified by such applicable law or court order.

(5)   The Employee understands and agrees that as may be required for the Company's business operations and the Employee's performance of his/her duties, the Employee may from time to time have access to Confidential Information owned by the Company's subsidiaries and affiliates. For the purposes of this Article 1, the Company shall be deemed to include any subsidiaries or affiliates of the Company that may, from time to time, become affiliated with the Company.

-2-

(6) The Employee understands and agrees that the Company may from time to time receive confidential information of or relating to third parties which would require the Company to maintain in confidence. The Employee agrees to maintain in confidence for the Company and such third parties and in no event disclose to any party other than the Company and such third parties such confidential information.

(7) Nothing in this Agreement shall be deemed to exclude, weaken or waive any rights related to the protection of trade secrets that the Company may have under PRC laws (including but not limited to the PRC Anti-Unfair Competition Law).

1.3    Obligation to Return

(1) If the Employment Agreement is discharged or terminated for whatsoever reason, the Employee shall forthwith return to the Company, intact and in good condition, any documents (including photocopies) or items, including archives, records, equipment and other property, that the Employee receives from the Company during his/her employment with the Company and that the Employee uses in the course of his/her employment, or that are in his/her possession and relate to the Company's business. Without the Company's written consent, the Employee shall not take the above materials and items out of the Company's office.

(2) If the Company suffers losses from the Employee's failure to return any of the above documents (including copies) or items to the Company, the Employee shall be liable and compensate the Company for the losses. The Company may deduct an amount in respect of such losses from the last salary payment payable to the Employee, and shall have the right to take any other proper measures to protect its own legitimate rights and interests.

ARTICLE 2
INTELLECTUAL PROPERTY

2.1    Definition

"INTELLECTUAL PROPERTY RIGHTS" shall mean all patents, trademarks, service marks, trade names, copyrights, rights in software, domain names, know-how, rights in Creative Works (as defined below), licenses and other intellectual property rights, being used to conduct the business of the Company and its affiliates as now operated.

"CREATIVE WORKS" shall mean, all designs, ideas, discoveries, inventions, products, computer programs, source codes, procedures, improvements, documents, information, materials, drawings, specifications, reports, electronic media or other instruments made, conceived or developed by the Employee alone or with others.

"MORAL RIGHTS" shall mean any right to claim of authorship of a work, any right to object to any distortion or other modification of a work, and any similar right, existing under the law of any country in the world, or under any treaty.

-3-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

2.2  Ownership of Intellectual Property Rights and Transfer of Rights

(1)  During the term of the Employment Agreement and at the termination thereof, the Employee shall promptly disclose to the Company, without additional compensation, the following, to the extent that such disclosure could reasonably be expected to be of interest to the Company:

(a)  any Creative Works related to the Company's business activities or to the Employee's work with the Company;

(b)  any pricing or marketing strategies;

(c)  any products and services;

(d)  any other ideas or information; and

(e)  any Intellectual Property Rights;

which are conceived, adapted, discovered, developed or improved by the Employee while employed by the Company.

(2)  The Employee undertakes and warrants that he/she will not, during the term of the Employment Agreement or at any time after the termination hereof, infringe, misappropriate, acquire or use (unless acquires or uses during the performance of his/her duties as an employee of the Company) any of the Company's Intellectual Property Rights.

(3)  The Employee acknowledges and agrees that any Creative Works created by the Employee for the purpose of the Company's business or primarily using the Company's resources during the term of the Employment Agreement are occupational creations. The right to apply for patents, copyrights trademarks or other protection shall be vested in the Company, and the Company shall be the patentee or holder of the copyright, trademark or other protection after any such protections granted. The Employee agrees to assist the Company in executing and providing any and all documents and rendering any assistance that is reasonably necessary to obtain any patent, copyright, trademark or other protection for the Creative Works in the PRC or any other countries. Subject to applicable laws and treaties, the Employee agrees to irrevocably transfer and assign to the Company any and all Moral Rights that the Employee may have in such Creative Works.

(4)  The Parties agree that during the term of the Employment Agreement, according to the Company's arrangement, the Employee will accept the Company's request to create copyright works. Works which are created under the sponsorship of the Company, and which represent the will of the Company, and for which the responsibility for the work is assumed by the Company, shall be classified as legal person works. The author thereof shall be the Company and the copyright shall vest in the Company. Meanwhile, the Employee agrees that during the term of the Employment Agreement, the copyright of other works completed by the Employee primarily by using the Company's material and technical resources also vest in the Company (if the Employee is entitled to the right of acknowledgement according to PRC laws, the Employee may enjoy the right of acknowledgement, however, other rights of the copyright shall still vest in the Company).

(5)  The Employee agrees that any other Intellectual Property Rights developed by the Employee for the fulfillment of tasks assigned by the Company or primarily by using the Company's material and technical resources during the term of the Employment Agreement shall vest in the Company.

-4-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(6)  In deciding the salary and welfare benefits payable to the Employee, the
     Company has taken into account, and such salary and welfare benefits
     include, rewards for the Employee's contribution to the Intellectual
     Property Rights. The Employee hereby agrees that it shall not be entitled
     to any additional rewards or compensation for the Intellectual Property
     Rights hereunder from the Company.

(7)  The Employee agrees that any Intellectual Property Rights developed by the
     Employee related to his original job at the Company or to the task assigned
     by the Company within one (1) year after the termination of his employment
     with the Company shall vest in the Company.

(8)  The Employee hereby irrevocably assigns, transfers and conveys to the
     Company any Intellectual Property Rights which the Employee creates or is
     involved in creating while employed by the Company (whether or not created
     during the Company's regular working hours or on the Company's premises)
     which do not vest in the Company according to Sections 2.2 (2) to (7)
     above. Further, the Employee agrees that he will use his best efforts to
     protect the benefits the Company may obtain globally as a result of the
     Intellectual Property Rights. During the period of his employment with the
     Company and after he leaves the employment of the Company, the Employee
     shall, at the Company's request in writing from time to time and provided
     that the Company bears all the reasonable expenses, execute all such
     further documents and do all such further acts or things as may be
     necessary inside or outside the PRC to vest all right, title and interest
     in such Intellectual Property Rights referred to in this Section 2.2 (8) in
     the Company (including assisting the Company in handling all related
     applications, registration formalities or other legal formalities
     (including serving as a witness at court)).

(9)  The Employee understands that Intellectual Property Rights developed by the
     Employee prior to the commencement of the term of the Employment Agreement
     shall not be subject to Section 2.2 (7), and at the written request of the
     Company from time to time, the Employee will provide the Company with the
     related information to show that the relevant Intellectual Property Rights
     have been developed prior to the commencement of the term of the Employment
     Agreement.

(10) The Employee agrees that if the Intellectual Property Rights generated
     during the Employee's employment and reduced into written records,
     including words, drafts, blueprints, notes, notebooks, drawings,
     schematics, prototypes, magnetically encoded media, or any related
     materials, such written records, shall be deemed to be the Company's
     property. The Employee undertakes that during the term of the Employment
     Agreement and at any time thereafter, he will not disclose the contents of
     any of such written records to any persons unless authorized by the Company
     in writing.

ARTICLE 3
NON-COMPETITION

3.1  Definition

     "COMPETITIVE POSITION" shall mean serving in a senior management capacity,
     as an employee, consultant, advisor or otherwise, for any person that
     engages in the business that develops, manufactures or produces solar grade
     silicon ingots and wafers.

-5-

3.2  Non-Compete by the Employee

(1)  The Employee hereby irrevocably represents and warrants that during the period of the Employee's employment with the Company and within [24 or 36] months after the Employee leaves his/her post, without regard for the reason, the Employee shall not, directly or indirectly, and whether or not for compensation, either on his or her own behalf or as an employee, officer, agent, consultant, director, owner, partner, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the benefit of the Company):

(a)  serve in a Competitive Position;

(b)  engage in activities contrary or harmful to the interest of the Company or any of its affiliates, including but not limited to:

   (i)   employing or recruiting any present, former or future employee of the Company or any of its affiliates to serve in a Competitive Position;

   (ii)  owning equity (other than as the holder of not more than 1% of total outstanding shares of a publicly-held company) in any other company that is in the business that develops, manufactures or produces solar grade silicon ingots and wafers;

   (iii) disclosing or misusing any Confidential Information; or

   (iv)  participating in a hostile takeover attempt of the Company or any of its affiliates.

(c)  assist in any way any person or entity whose activities are competitive with or otherwise adverse to the Company's own business activities; or

(2)  The Company may, at any time either before or after the expiry or termination of the Employment Agreement, shorten, or waive, the period for its non-compete obligation under Section 3.2 (1) above by giving notice to the Employee thereof. If, at any time either before or after the expiry or termination of the Employment Agreement, the Company does not require the Employee to perform any non-compete obligations hereunder, the period for the non-compete obligation may be shortened to zero, and the Company does not need to pay any economic compensation to the Employee.

(3)  In consideration of the Employee's performance of the provisions under Section 3.2 (1) above, the Company shall, from the day the Employee leaves the employment of the Company, pay to the Employee the economic compensation relating to the non-compete in compliance with applicable laws and regulations, for the enforcement of such restriction of non-competition herein against the Employee, provided that such restriction can be waived in writing by the Company in its sole discretion.

(4)  Upon receipt of each payment from the Company, the Employee shall provide the Company with a receipt recording the payment date signed by the Employee.

(5)  If the Company breaches the provisions of this Agreement by failing to pay to the Employee the economic compensation in a full and timely manner as set out in Section 3.2 (3) above (unless otherwise notified pursuant to Section 3.2 (2)) for a period of 30 days after receipt of the Employee's written notice, the Employee shall be discharged from his/her obligations under Section 3.2 (1) above.

-6-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

3.3  Non-Solicitation

The Employee agrees that, while employed by the Company and for a period of [24 or 36] months after the date of termination of the employment relationship, without regard to the reason, if any, such employment shall terminate, the Employee will not, directly or indirectly, and whether or not for compensation, either on his or her own behalf or as an employee, officer, agent, consultant, director, owner, partner, shareholder, investor, or in any other capacity:

(1)  induce or attempt to induce any employee, consultant, sales agent, supplier, customer or independent contractor of the Company to end his or her relationship with the Company; or

(2)  employ, retain as a consultant or contractor, or cause to be so employed or retained, any employee (or former employee within 12 months after the date such former employee ceases to be employed by the Company), consultant, sales agent, or independent contractor of the Company; or

(3)  accept or solicit investment capital, directly or indirectly, from any individual (other than the general public) or entity, or from an officer, partner, or principal of any entity, from which the Company has accepted investment capital, or with which, prior to the Employee's termination date, the Company has held discussions regarding the possibility of securing investment capital; or

(4)  enter into or attempt to enter into a business relationship with any individual or entity with which, prior to the Employee's termination date, the Company had a business relationship, or with which, prior to the Employee's termination date, the Company had held discussions regarding the possibility of entering into such a relationship, if such relationship would be competitive with or otherwise deleterious to the interests of the Company; or

(5)  do or say anything which is harmful to the reputation of the Company, or which may lead any person to cease to deal with the Company on substantially equivalent terms as before or at all.

ARTICLE 4
MISCELLANEOUS

4.1  Scope of Restrictions

The Employee's covenants and restrictions of confidentiality, intellectual property and non-competition as contained in Articles 1, 2 and 3 hereof shall extend to and for the benefit of the Company and its affiliate companies and to the nature and extent of their respective businesses, throughout the term of Employee's employment with the Company. Where reference is made to the business of the Company, such term shall include any business of the Company and its affiliated companies.

-7-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

4.2    Governing Law

This Agreement, and all matters relating hereto, including any matter or dispute arising out of the Agreement, shall be interpreted, governed, and enforced according to the laws of the People's Republic of China.

4.3    Dispute Resolution

This Agreement in its nature is not a labor contract and is not subject to labor arbitration in any event.

4.4    Liability for Breach

The Employee agrees that breach of any provision of this Agreement will cause the Company irreparable injury and damage. Therefore, the Employee agrees that if the Employee breaches any of his/her obligations under this Agreement, unless otherwise provided herein, the Company shall have the right to terminate the employment with the Employee without paying any compensation to the Employee and the Employee shall pay the Company for an amount of RMB___ as liquidated damages in the event of a breach, in addition to all other compensation available for all losses and damages incurred from such breach, and to injunctive relief to prevent a breach or continuing breach of this Agreement, or any part of it, and to secure its enforcement. In addition, the Employee shall return all of the economic compensation paid by the Company in relation to the non-compete. This Section shall not prevent the Company from seeking any other remedies according to PRC laws.

4.5    Without the prior written consent of the Company, the Employee shall not transfer part or all of his/her rights and obligations hereunder to any third party. The Company shall have the right to assign its rights hereunder to its affiliates or successors.

4.6    Without mutual agreement by the Parties, this Agreement shall not be altered or supplemented. Any alternation of or supplement to this Agreement shall become effective only after signed by the Parties.

4.7    This Agreement shall come into force upon the signature by the Parties.

After this Agreement becomes effective, neither Party may refuse to perform the obligations hereunder for the reasons of changes in the names of respective legal representatives, successors or assignees.

4.8    Any provision of this Agreement which is held by a court or tribunal of competent jurisdiction to be illegal, invalid, or unenforceable shall not affect any other provision of this Agreement, which shall remain in full force and effect.

4.9    The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion or occasions shall not be considered a waiver thereof or deprive that Party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

-8-

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

4.10 Notices

Notices under this Agreement shall be given in writing to the relevant
Party at the address stated herein (or to such other address as it shall
have notified the other Party previously in writing).

If to the Company:

                    Jiangxi LDK Solar Hi-Tech Co., Ltd.
                    [Address]
                    [Fax No.]
                    [Attention:]


If   to the Employee:

                    [Name]
                    [Address]


4.11 Survival of Agreement

This Agreement shall survive the termination of the Employment Agreement
and the Employee shall be liable for any damages suffered by the Company as
a result of a breach of this Agreement.


    IN WITNESS WHEREOF, the undersigned have hereunto caused this Agreement to
be executed as of the day and year first above written.

                    JIANGXI LDK SOLAR HI-TECH CO., LTD.


                    By:
                        ----------------------
                    Name:
                    Title:

                    Date:
                        ---------


                    [NAME]


                    ----------------------

                    Date:
                        ---------

                            -9-


</TEXT>
</DOCUMENT>

Exhibit 10.6

(Summary Translation)

COOPERATION AGREEMENT


Between
Jiangxi LDK Solar Hi-Tech Co., Ltd.
And
Shanghai Jiaotong University


For the Establishment
of
Shanghai Jiaotong University LDK Solar Laboratory


October 10, 2005

This Agreement is made as of October 10, 2005 by and between Jiangxi LDK Solar Hi-Tech Co., Ltd. at High-Tech Industrial Park, Xinyu City, Jiangxi Province, China (herein "Party A") and Shanghai Jiaotong University at 1954 Huashan Road, Shanghai (herein "Party B").

Through friendly negotiations, Party A and Party B have reached the following agreement on the establishment of Shanghai Jiaotong University LDK Solar Laboratory.

ARTICLE 1. COOPERATION CONTENT

Party A and Party B shall jointly establish a solar energy laboratory within the premises of Shanghai Jiaotong University. The name of the laboratory shall be "Shanghai Jiaotong University LDK Solar Laboratory" (herein "LDK Laboratory").

ARTICLE 2. COOPERATION TARGET

Both parties shall endeavor to make the LDK Laboratory a base for implementing their manufacturing, learning and research objectives. Specifically, the LDK Laboratory will support (i) Party B in its application to Shanghai municipal government and the PRC national government for its status as a key solar energy research center and (ii) Party A in the implementation of its commercialization plan to reach 200 MW solargrade multicrystalline wafer production.

Party B will provide technical support to Party A in its implementation of the commercialization plan to reach 200 MW solargrade multicrystalline wafer production. Both parties will jointly adapt and digest advanced equipment and technology imported from overseas and engage in further research and development to achieve the following targets:

(1)  Technology Adaptation

    1)  Cleaning and Etching Technology

        (1)  Master the approaches for analyzing and sorting silicon feedstock of different quality;

        (2)  Master the chemical mixture and etching process for cleaning different silicon feedstock;

        (3)  Master the operating guidelines, procedures and trouble-shooting methodologies for etching equipment; and

        (4)  Master the evaluation and quality control of cleaning and etching results.

    2)  Crystallization Technology

        (1)  Master the operating guidelines, structural designs, functionalities, control systems and trouble-shooting methodologies for the DSS furnaces;

        (2)  Master the feedstock charging procedures and different charging approaches;

        (3)  Master the cleaning, the mould release agents coating and the installation of new crucibles;

        (4)  Master the safety operating procedures and understand the rationale behind each operating procedure to insure safety of operations;

(5) Master the design and control of electricity, air, water and heater systems;

(6) Master the evaluation and quality control of the ingots produced; and

(7) Master the maintenance of the equipment and replacement of spare parts.

3) Wafering Technology

(1) Master the operating guidelines, structural design and functionalities of the multi-wire saws;

(2) Master the loading and unloading of bricks, the installing and changing of the wire web, the slurry mixing and wire sawing technique;

(3) Master the control over wafer thickness, wafer surface quality and wafer yield;

(4) Master the problem detection, trouble shooting and maintenance of the equipment; and

(5) Master the quality measurement, analysis and evaluation of wafers.

(2) Technology Development

1) Cleaning and Etching

(1) Research and develop methodologies for inspecting different types of silicon feedstock;

(2) Optimize etching solution and cleaning process (including ways to improve cleaning and etching quality, to enhance efficiency, to reduce solution consumption, to reduce power consumption in etching process, to increase etching scope and to improve operating capability and safety during the etching process);

(3) Develop and enhance etching equipment (including structural enhancement and process enhancement);

(4) Recycle and safely utilize cleaning/etching acid; and

(5) Localize the manufacturing of consumables for cleaning and etching.

2) Crystallization Technology

(1) Research and develop low-cost crucibles and recyclability of crucibles;

(2) Research and develop ways to increase ingot weight;

(3) Research the relationship between ingot lifetime and crystallization process optimization;

(4) Research silicon feedstock mixing optimization;

(5) Research ways to reduce power consumption for crystallization process;

(6) Research ways to speedily evaluate ingot quality;

(7) Research new DSS furnaces (with larger volume, better quality, less power consumption and higher efficiency); and

(8) Research ways to localize the manufacturing of new mould release agents and crystallization-related consumables.

3)  Wafering Technology

    (1)  Research ways to localize the manufacturing of wafering consumables (including wires, pulleys, glue, SiC and others);

    (2)  Research and develop ways to recycle wafering related raw materials and consumables;

    (3)  Research ways to speedily evaluate wafering quality;

    (4)  Research and develop ways to reduce wafer breakage and kerfing;

    (5)  Research with respect to ultra-thin wafer sawing; and

    (6)  Research with respect to ultra-thin wafer cleaning and packaging.


ARTICLE 3. ADMINISTRATIVE RELATIONSHIP OF THE LDK LABORATORY

The LDK Laboratory is subject to the administrative jurisdiction of Shanghai Jiaotong University.

ARTICLE 4. MANAGEMENT STRUCTURE OF THE LDK LABORATORY

The LDK Laboratory will be managed by its director under the leadership of a managing board. The initial managing board will consist of three members from Party A: Mr. Peng Xiaofeng, Mr. Tong Xingxue and Mr. Shao Yonggang and four members from Party B: Mr. Xie Shenwu, Mr. Peng Yinghong, Mr. Ye Qinghao and Mr. Cui Rongqiang. Each member will serve a term of two years. Professor Xie Shenwu, President of placeCityShanghai Jiaotong University will be the chairman of the initial managing board and Mr. Peng Xiaofeng, chairman of Jiangxi LDK Solar Hi-Tech Co,. Ltd. will be a vice chairman of the initial managing board. Both the chairman and vice chairman will serve a term of two years. The director of the LDK Laboratory will be elected by both parties, subject to nomination by Party B and consent by Party A. The initial director of the LDK Laboratory will be Professor Cui Rongqiang for a term of two years.

ARTICLE 5. WORKING CAPITAL OF THE LDK LABORATORY

Party A will fund Rmb 5,000,000 for the first phase operations of the LDK Laboratory, with the funds to be disbursed in line with the progress and development of the various research and development projects. Funding for the second phase operations of the LDK Laboratory will be determined by the parties on the basis of the results of the first phase. Party A will remit an initial payment of Rmb 1,000,000 (or 20% of its first phase funding commitment) to the account of Party B within one week after this Agreement becomes effective.

ARTICLE 6. FUNDS FOR RESEARCH AND DEVELOPMENT

The LDK Laboratory will report to both parties with respect to the subjects or topics of its research and development in order for Party A to provide funding for such research and development in a timely manner. Party A will have priority in proposing the subjects or topics for research and development by the LDK Laboratory.

ARTICLE 7. FACILITIES OF THE LDK LABORATORY

Party B will provide laboratory facilities (including offices) and research and development equipment and resources (including office equipment and resources) to the LDK Laboratory. Party A will make its existing resources available to the LDK Laboratory for its research and development.

ARTICLE 8. OWNERSHIP OF RESEARCH RESULTS AND COMMERCIALIZATION

The research results of the LDK Laboratory will be jointly owned by Party A and Party B. Party A will have priority in utilizing any research results of the LDK Laboratory. The economic benefits will be shared between Party A (40%) and Party B (30%), with the remaining 30% as re-investment from Party A into the LDK Laboratory. Any transfer of research results of the LDK Laboratory to a third party will require joint approval from Party A and Party B. In addition, Party A agrees that Party B will lead in any joint application for research and development awards and funding.

Party B agrees to make two of its patented technologies available to Party A to use, free of charge. These technologies are (i) impulse lamp-house signal solar cell measurement technology (with patent number: ZL01113030.X) and (ii) transparent conductive thin film and spay deposition antireflection equipment and method (with patent number: ZL99116819.4).

ARTICLE 9. PARTY A'S R&D CENTER

The LDK Laboratory will assist Party A in (i) establishing its solar R&D center in Jiangxi Province, (ii) applying for provincial, ministerial and national research funding allowances and (iii) training research and development personnel. All related expenditures will be funded by funds for research and development under Article 6.

ARTICLE 10. INTERNSHIP AND TRAINING

Party A will provide the LDK Laboratory with internship opportunities and the LDK Laboratory will provide Party A with training facilities.

ARTICLE 11. REPRESENTATIONS AND WARRANTIES

(1) Each party represents, warrants and covenants to the other party as follows (each effective upon the signing of this Agreement):

1)    The obligations undertaken by each party pursuant to this Agreement are legal and will not conflict with its obligations under any other agreement or document and will not contravene any laws, rules and regulations in China; and

2)    Each party shall perform its obligations under this Agreement in compliance with the laws, rules and regulations of China.

(2) Each party shall notify the other party promptly and shall take all reasonable measures to remedy or cure as requested by the other party upon the occurrence of any event or the existence of any circumstance that would result in any of its representations, warranties and covenants becoming untrue or inaccurate.

(3) Neither party may transfer its rights and obligations under this Agreement.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

ARTICLE 12. FORCE MAJEURE

(1) No party shall be liable for non-performance or partial non-performance of its obligations under this Agreement to the extent that such non-performance or partial non-performance is caused by force majeure and not by any fault of such party; provided, however, that such party shall be obligated to take all necessary measures, conditions permitting, to mitigate the losses so caused.

(2) The party that is prevented from performing this Agreement due to force majeure shall notify the other party in writing as soon as practicable upon the occurrence of force majeure and shall submit a report to the other party within 15 days of the occurrence of such force majeure, setting forth therein its reasons for non-performance or partial non-performance and for the need to delay its performance.

ARTICLE 13. DEFAULT

Upon effectiveness of this Agreement, if any party shall default in its performance of its obligations hereunder and causes the performance of this Agreement impossible, unless due to force majeure as described in Article 12, such party shall pay Rmb 100,000 to the other party as liquidated damages.

ARTICLE 14. TERMINATION

(1) Each party shall have the right to terminate this Agreement upon the occurrence of any of the following, after notice in writing to the other party:

1)   The other party has breached or has not performed any of its
     obligations under this Agreement; or

2)   Any representation, warranty or covenant is materially untrue and
     misleading or remains unperformed, regardless of its cause or reason.

(2) When this Agreement is terminated due to causes under Article 14(1), the obligations of the parties shall terminate forthwith; provided, however, that such termination shall not affect any pre-existing rights and claims of the parties or any liabilities for damages as a result of the termination of this Agreement due to causes under Article 14(1).

ARTICLE 15. DISPUTE RESOLUTION

Settlement of any dispute in connection with this Agreement shall first be sought through friendly negotiations, failing which, either party may submit the dispute to a court with jurisdiction for settlement.

ARTICLE 16. AMENDMENT AND SUPPLEMENT

Any amendment and supplement to this Agreement shall be valid only if made out in writing and duly signed by both parties.

ARTICLE 17. VALIDITY

This Agreement shall come into effect upon signing by the respective duly authorized representatives of the parties, with corporate seals attached hereunto. Thereafter, this Agreement shall remain valid for five years.

ARTICLE 18. COUNTERPARTS

This Agreement is made in four original counterparts, with two for Party A and two for Party B. Each original counterpart shall constitute one and the same instrument.

                              Party A: JIANGXI LDK SOLAR HI-TECH CO., LTD.
                              (Seal)

                              By:  /s/ Peng Xiaofeng
                                   ------------------------------------
                              Name:  Peng Xiaofeng
                              Title: Authorized Representative
                              Date:  October 10, 2005


                              Party B: SHANGHAI JIAOTONG UNIVERSITY
                              (Seal)

                              By:  /s/ Zheng Hang
                                   ------------------------------------
                              Name:  Zheng Hang
                              Title: Authorized Representative
                              Date:  October 10, 2005

</TEXT>
</DOCUMENT>

Exhibit 10.7.1

AGREEMENT

This Agreement is made effective as of the 21st day of June, 2005, by and
between GT Solar Technologies, a division of GT Equipment Technologies, Inc. at
243 Daniel Webster Highway, Merrimack, NH 03054 USA ("GT Solar") and Jiangxi LDK
Solar Hi-Tech Co., Ltd. at Xinyu Hi-Tech Development Zone, Xinyu City, Jiangxi,
China ("Customer").

WHEREAS, Customer wishes to buy and GT Solar wishes to sell certain solar wafer,
cell and module fabrication equipment and/or technologies more particularly
defined herein below and in the attached EXHIBITS A and B ("Equipment") and;

WHEREAS, Customer wishes to install the Equipment in Xinyu, Jiangxi, China;

WHEREAS, the parties wish to enter into this Agreement to more particularly
define the terms and conditions of the purchase and sale of such Equipment.

NOW, THEREFORE, for good and valuable considerations the parties agree as
follows:

1. EQUIPMENT. GT Solar shall sell and Customer shall purchase a PV-FAB Water
Fabrication turnkey line, more particularly described in EXHIBITS A and B
attached hereto and incorporated herein by reference. GT Solar warrants and
represents that, upon delivery to Customer pursuant to Article 3, title to the
Equipment will be free and clear and without any liens or encumbrances.

2. PURCHASE PRICE; PAYMENT TERMS. The purchase price for the Equipment and
related services ("Purchase Price") shall be Thirty-three million and one
thousand U.S. Dollars ($33,001,000 USD).

Payment terms:

2.1. Customer shall pay a deposit ("Deposit") equal to twenty percent (20%) of
the total Purchase Price by wire transfer to GT Solar's bank account in such a
way that one-sixth of the deposit amount should be done by the middle of each
month starting from July, 2005 until middle of December, 2005.

2.2. Fourteen (14) days before each payment, GT Solar will open a standby letter
of credit in the amount of the Deposit in favor of Customer against GT Solar's
failure to deliver the Equipment pursuant to the terms of this Agreement.

2.3. At 75 days prior to each shipment, GT Solar will notify the shipment amount
to Customer. No less than sixty (60) days of each shipment, Customer will
establish in favor of GT Solar an irrevocable letter of credit covering seventy
percent (70%) of the said amount of the each shipment, which is payable to GT
Solar upon presentation of shipping documents.

2.4. Ten percent (10%) of the each shipment amount will be paid by Customer to
GT Solar by wire transfer within 90 days from the said shipment here within.

3. SHIPMENT TERMS. The "Commencement Date" will be the date GT Solar receives
the Deposit. All shipments and transfer of title shall be made CIF, Nanchang.

Page 1

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

4. CONTRACT SERVICES. Within sixty (60) days of the Commencement Date, GT Solar shall provide Customer a list of facilities and any other requirements such as power, water and space for operation of the delivered Equipment. GT Solar shall also, as part of the Purchase Price (except for room and board), provide supervision for the unpacking and installation of the Equipment, and shall provide support, training, and assistance to Customer's engineers and operators per EXHIBIT C. Such assistance shall include the supervision of the commissioning and start up of the Equipment. Customer shall provide all local labor and support for commissioning and start up of the Equipment.

Customer shall pay the cost of all the room, board and local transportation of GT Solar's representatives during the period of the performance of such services.

5. CONTRACT TERM. The Term of this Agreement shall commence upon the execution and delivery of this Agreement and shall terminate upon the acceptance of the Equipment by Customer. The warranty and indemnification provisions set forth in sections 9, 10, and 15 shall survive acceptance of the equipment. Projected delivery and performance milestones is attached hereto as EXHIBIT C and incorporated herein by reference.

6. EQUIPMENT INSPECTION AND TRAINING. Customer personnel may be present at GT Solar, or GT's vendors' facilities, for up to eight weeks to train on the installation, operation and maintenance of the Equipment. After training, the Equipment will be containerized for shipment. Customer personnel will assist in the packing of the Equipment as part of their training if present at GT Solar at such time. GT shall be responsible for local cost of Customer's employees for the training in the US.

7. CUSTOMER RESPONSIBILITIES. It will be Customer's responsibility to provide the facilities and prepare the production site for installation of the Equipment one (1) month prior to installation. Facilities preparation shall include, but is not limited to, the provision for appropriate electrical power, compressed air, de-ionized water, cooling water circulation systems, gas circulation systems, exhaust, back-up cooling water systems, back-up power systems, and effluent waste treatment (to the extent required by local laws). Facilities requirements will be defined by GT Solar no later than 60 days after the Commencement Date. Any delays on the part of Customer in preparation of the building, facilities or personnel may result in a delay of the performance by GT Solar of its obligations pursuant to this Agreement and GT Solar reserves the right to extend its performance period and price accordingly. Customer will be solely responsible for all permits required for the installation and operation of the Equipment on Customer site. Customer will also be solely responsible for furnishing the personnel necessary for the proper installation of the Equipment at the Customer site, operational training during start up and other recommended periods, and acceptance of the Equipment. A list of Customer supplied items is attached as EXHIBIT D.

Page 2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

8. SECURITY INTEREST. GT Solar reserves, and Customer hereby grants GT Solar, a continuing security interest in Equipment, together with all additions, improvements and accessories thereto made or supplied by GT Solar at any time, and all proceeds of the foregoing, to secure payment of the Purchase Price to GT Solar. Until receipt of final payment, Customer agrees that GT Solar shall have the right to file or record a financing statement pursuant to applicable law to evidence GT Solar's security interest in the Equipment and Customer will execute such financing statements and other documents as GT Solar shall request to perfect such interest. Customer agrees that, in the event of its failure to make any payment required pursuant to this Agreement, it will make all Equipment available to GT Solar upon demand and will pay all reasonable costs of GT Solar in connection with the collection of any amounts due or other enforcement of GT Solar's rights.

9. WARRANTY. For the earlier of (i) 15 months from the date of shipment to Customer or (ii) one year from acceptance of the Equipment, GT Solar warrants that all electrical and mechanical parts (except normal wear and tear on parts, including bearings and any parts that come in contact with wires or slurry) shall be free from defects in workmanship and materials and shall conform to GT Solar's specifications. If any such parts are defective during the warranty period or, upon delivery, the Equipment fails to meet the specifications set forth in this Agreement, Customer shall inform GT Solar and GT Solar shall either repair or replace any such items determined by GT Solar to be defective. GT Solar's liability shall be limited to the cost of repairing and replacing such defective items when shipped to GT Solar, freight prepaid, by Customer. The repaired or replaced parts shall be shipped to Customer by GT Solar freight prepaid. This warranty specifically excludes Customer's labor, Equipment downtime, punitive, incidental or consequential damages, acts of God, or loss of production. A purchase order from the Customer is required to initiate any warranty action pending approval by GT Solar of the claim.

In the event that Customer has purchased Equipment from GT Solar that has been manufactured by another manufacturer, GT Solar hereby agrees to pass through to Customer any and all warranties without limitation made by such company.

This warranty does not extend to any Equipment that fails to operate by reason of improper installation or operation by Customer or that has been subject to misuse, neglect or accident or that has been repaired or materially altered other than by GT Solar.

> THE WARRANTY SET FORTH HEREIN IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER STATUTORY, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE. THE REMEDIES PROVIDED HEREIN

Page 3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

ARE CUSTOMER'S SOLE AND EXCLUSIVE REMEDIES WHETHER THE CLAIMS BY CUSTOMER
ARE BASED IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE) OR OTHERWISE.

10. INTELLECTUAL PROPERTY INDEMNIFICATION. GT Solar shall indemnify and hold
harmless Customer against any claim by any third party that the Equipment, when
used for the purpose for which it is designed and pursuant to GT Solar's
specifications, violates or infringes the patent, copyright, trademark, trade
secret or other proprietary rights of such third party.

Notwithstanding the foregoing, GT Solar shall have no obligation with respect to
claims of infringement based upon the use of the Equipment, individually or in
combination with other equipment supplied by GT Solar or others, if the
Equipment is used for any process not supplied by GT Solar. Further, GT Solar
shall have no obligation with respect to claims of infringement in the event
that the Equipment is manufactured or designed or operated in accordance with a
design, drawings or process not furnished by GT Solar.

The foregoing states the entire liability of GT Solar for any loss, liability,
or damage whatsoever to or sustained by Customer arising out of the infringement
by the Equipment of the property rights of third parties.

11. CUSTOMER TERMINATION. Customer may terminate this Agreement (other than for
default pursuant to Article 12 below) at any time by providing written notice of
such termination to GT Solar at least thirty (30) days in advance of the
proposed termination date, provided that if Customer terminates this Agreement
or any portion hereof within thirty (30) days following the Commencement Date,
GT Solar shall retain all payments due or received up to the date of the
proposed termination.

In the event that Customer terminates this Agreement between thirty-one (31) and
sixty (60) days after the Commencement Date, Customer shall pay to GT Solar
sixty percent (60%) of the Purchase Price. If the Agreement is terminated by
Customer at any time after sixty-one (61) days following the Commencement Date,
Customer shall pay to GT Solar the entire amount of the Purchase Price.

12. DEFAULT.

A. Either party may terminate this Agreement upon written notice to the other
party upon:

    (1). The failure of the other party to perform any material term, condition
or covenant of this Agreement, which failure has not been corrected within
thirty (30) days of the date of written notice of such failure given by the
other party; or

    (2). The failure of Customer to make a payment when due; or

    (3) The other party becomes insolvent or the subject of any bankruptcy
proceeding that is not dissolved within sixty (60) days.

Page 4

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

B. In the event of termination of this Agreement by GT Solar pursuant to the terms of this Article 12, in addition to any other remedies it may have at law or in equity, GT Solar may recover any and all monies which may be due pursuant to Section 2 or any other provision of this Agreement and repossess any Equipment sold hereunder for which it has not been paid. In the event of termination by Customer pursuant to the terms of this Article 12, Customer shall have the right to terminate the order and recover any monies previously paid by it to GT Solar.

13. FORCE MAJEURE. GT Solar and Customer shall not be held responsible for any delay or failure hereunder caused by fires, strikes, embargoes, government requirements, civil or military authorities, acts of God or of the public enemy or, if not within their reasonable control, by acts or omissions of subcontractors, failure of transport, failure of communications, failure of power supply or any other causes beyond their reasonable control.

14. LIMITATION OF LIABILITY. UNDER NO CIRCUMSTANCES WILL GT SOLAR BE LIABLE TO CUSTOMER, WHETHER IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE), UNDER ANY WARRANTY OR OTHERWISE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE LOSS OR DAMAGE, INCLUDING LOSS OF PROFITS OR REVENUES, RESULTING FROM OR ARISING OUT OF OR IN CONNECTION WITH GT SOLAR'S PERFORMANCE UNDER, OR BREACH OF, THIS AGREEMENT OR THE MANUFACTURE, SALE, DELIVERY, RESALE, REPAIR OR USE OF ANY EQUIPMENT COVERED BY OR FURNISHED PURSUANT TO THIS AGREEMENT.

15. INDEMNIFICATION. Each party agrees to defend, indemnify and hold harmless the other party from and against any third party claims arising out of the acts or omissions of the indemnifying party or its performance pursuant to this Agreement. Each party's duty to defend and indemnify the other is conditional upon timely notice by the other party of any claim for which indemnification is sought and control by the indemnifying party of the litigation or settlement of any indemnified claim.

16. LICENSED PROGRAMS. Computer software or other technology or know-how that, in GT Solar's judgment, are required for the operation of the Equipment shall be provided by GT Solar to Customer subject to such license terms as GT Solar shall reasonably require.

In the event Customer sells, transfers or otherwise assigns its rights or interests in the Equipment to any third party, except a parent or subsidiary company of Customer, it is expressly understood that Customer does not have the right to transfer licensed programs or assign the license or any rights Customer may have regarding the use or possession of such licensed programs to such third party without GT Solar's prior written consent and any attempted transfer or assignment shall be void and of no force and effect.

17. GOVERNING LAW. This Agreement and any related order shall be governed and interpreted, construed, and enforced in accordance with the laws of a neutral country

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

such as Sweden, its choice of laws and the Convention for the International Sale of Goods to the contrary notwithstanding.

18. ASSIGNMENT. Neither party shall delegate any duties or assign any rights or claims under this Agreement, other than to a parent or subsidiary company, without the other party's prior written consent, which consent shall not be unreasonably withheld, and any such attempt at delegation or assignment shall be void.

19. FURTHER ASSURANCES. At any time, and from time to time after the Commencement Date, each party will execute such additional instruments and take such additional actions as may be reasonably requested by the other party to confirm or perfect title to any property transferred hereunder or otherwise to carry out the intent and purposes of this Agreement.

21. WAIVER. Any failure on the part of any party hereto to comply with any of its obligations, agreements or conditions hereunder may only be waived in writing by the party to whom such compliance is owed.

22. ARBITRATION. Any disputes that cannot be amicably resolved by the parties shall be submitted to binding arbitration for resolution. The arbitration shall be conducted before a panel of three (3) arbitrators in New Hampshire under the rules of the American Arbitration Association. Each party shall select one arbitrator and the two so chosen shall select the third, who shall act as chairperson. If a party shall fail to appoint an arbitrator within twenty (20) days after receiving written notice of the arbitration and the name of the arbitrator selected by the party initiating the arbitration, the initiating party may request that the American Arbitration Association appoint the second arbitrator, and if the two arbitrators so selected fail to select a third arbitrator within twenty (20) days after the appointment of the second arbitrator, either arbitrator may request that the American Arbitration Association select the third arbitrator. The decision of the majority of the arbitrators shall be final and binding on the parties with respect to all matters referred to the arbitration panel for decision and may be enforced in an appropriate court in any competent jurisdiction. The arbitrators shall not have the authority to award punitive or special damages. In the absence of a contrary ruling by the arbitrators, each party shall pay its own costs and fees in connection with the arbitration.

23. NOTICES. All notices and other communications hereunder shall be in writing and shall be deemed to have been given if (i) delivered in person, (ii) sent by prepaid first class registered or certified mail, return receipt requested, or (iii) by delivery to the other party by recognized courier to the following addresses:

```
To GT Solar:          GT Solar Technologies
                      243 Daniel Webster Highway
                      Merrimack, NH 03054 USA
                      Attn: President
                      cc: General Counsel
                      Tel: (603) 883-5200
                      Fax: (603) 598-0444
```

Page 6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
To Customer:              Jiangxi LDK Solar Hi-Tech Co., Ltd.
                          Xinyu Hi-Tech Development Zone,
                          Xinyu City, Jiangxi, China
```

24. EXPENSES. Whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated shall be paid by the party incurring such costs and expenses.

25. HEADINGS. The section and subsection headings in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

26. COUNTERPARTS. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

27. BINDING EFFECT. This Agreement shall be binding upon the parties hereto and inure to the benefit of the parties, their successors and permitted assigns.

28. ENTIRE AGREEMENT. This Agreement is the entire agreement of the parties with respect to the subject matter hereof. There are no oral or written promises, conditions, representations, understandings, interpretations or terms of any kind as conditions or inducements to the execution hereof. This Agreement supersedes all prior agreements, written or oral, including any memorandum of understanding between the parties.

29. SEVERABILITY. If any part of this Agreement is deemed to be unenforceable, the balance of this Agreement shall remain in full force and effect.

30. PRE-AGREED ITEM: GT Solar will agree to keep the similar supply schedule as per this contract starting from May of 2006 if another expansion contract will be signed by January of 2006 between the two parties hereby.

THE BALANCE OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

Page 7

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on
their behalf by their duly authorized agents as of the day and year first above
written.

Executed as of the date first written above.


For:  Jiangxi LDK Solar Hi-Tech Co., Ltd.        For:  GT Solar Technologies


/s/ Xiaofeng Peng                                /s/ Kedar P. Gupta, CEO
----------------------------                     --------------------------

Xinyu Hi-Tech Development Zone                    GT Solar Technologies
Xinyu City, Jiangxi, China                        243 Daniel Webster Highway
                                                  Merrimack, NH 03054 USA


                            Page 8

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT A

GTs-WAFFABTM Major Equipment

| PROCESS | EQUIPMENT (sets) | Unit Price |
|---------|------------------|------------|
| Crucible Preparation | GT-Crucible spray system (3), | [*] |
| | Kilns (4) | [*] |
| PolysiliconPreparation | GTs-Etch station, automatic (2) | [*] |
| Ingot Growth | GT-DSS 240 furnace (21) (exclude mezzanines) | [*] |
| | Under/unloader (4) | [*] |
| Ingot Sectioning | Cropping band saw (4) | [*] |
| | GT-Chamfer Grind (4) | [*] |
| | Lifetime Tester (1) | [*] |
| | IR inspection tester (1) | [*] |
| Wafer Cleaning | GTs-Wafer Auto Cleaning station (1) | [*] |
| Wafer inspection | Automation inspection system | [*] |
| Slurry recovering | GT-Slurry recovering system (1) | [*] |
| Misc. | Carts | [*] |
| | Solar grade silicon (30 tons) | [*] |
| Installation | He leak detector (1) | [*] |
| Production | Technology transfer | |
| Spare parts | | |
| Labor/Training/Engineering | | |
| Travel cost | | |
| CIF cost | | |
| Total (USD) | | 33,001,000 |

The line shall be designed to be expandable on a modular basis. Some equipment
provided under this Agreement may be procured from outside the USA. Tooling is
provided for 156 mm x 156 mm wafers.

Manufacturer's recommended spare parts are included with equipment.

* Confidential treatment requested. The redacted material has been separated
Filed with The Securities And Exchange Commission.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT B

SPECIFICATIONS AND ACCEPTANCE TESTING OF WAFERS

| | |
|---|---|
| Conductivity type: | p-type (boron) |
| Crystal Characteristic: | multicrystalline |
| | |
| Resistivity: | 0.5 -- 2.0 ohm-cm |
| | (typical average: 1.5 ohm-cm) |
| | |
| Wafer Size: | 156 mm x 156 mm x (270-325) um thick |
| Wafer Size Variation: | + 0.5 mm |
| Wafer Thickness Variation: | + 40 um |
| | |
| Wafer throughput: | >=65MW |

2

EXHIBIT C

MAJOR TASKS: The Contract major tasks shall be as follows:

| TASK | DESCRIPTION | MONTHS* |
|------|-------------|---------|
| Task 1 | Procurement of equipment | 0 - 2 |
| Task 2 | First Equipment Shipment | 5th |
| Task 3 | Transport & Custom Clearance | 1 |
| Task 4 | Installation | 1 -- 2 |
| Task 5 | Training, Commissioning & Acceptance | 1 |

* Note: DSS will be shipped every month starting from the fifth month of receipt of first Deposit.

A grace period of one (1) month can be added to the above schedule.

3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT D

CUSTOMER SUPPLIED ITEMS

1.  Necessary water chillers with back-up system
2.  Necessary water with back-up systems
3.  Clean, dry compressed air
4.  Deionized water system
5.  All plumbing and wiring to the machines
6.  Necessary power with back-up systems
7.  Effluent treatment equipment
8.  Materials handling equipment
9.  Shelves, storage cabinet, and workbenches
10. Other engineering and facility services needed-to be defined by GT Solar
    within 60 days of the Commencement Date.

4

</TEXT>
</DOCUMENT>

10.7.2

ADDENDUM #2 TO AGREEMENT

This Agreement is made effective as of the 13th day of August, 2005, by and between GT Solar Technologies, a division of GT Equipment Technologies, Inc., located at 243 Danial Webster Highway, Merrimack, NH 03054 USA ("GT Solar") and Jiangxi LDK Solar Hi-tech Co., Ltd at Xinyu Hi-Tech Development Zone, Xinyu City, Jiangxi, China ("Customer").

WHEREAS, The Customer wishes to add an additional twenty six (26) DSS furnaces to the current contract for a 50 MW GTs-WAFFAB turnkey line with the pricing, delivery and payment terms as defined below.

NOW, THEREFORE, for good and valuable considerations the parties agree as follows:

1. EQUIPMENT. Quantity 26 GT-DSS240 furnaces.

2. PURCHASE PRICE; PAYMENT TERMS. The Purchase price for the Equipment is $14,000,000.00 ex-works, crating for ocean shipment is included. Payment terms:

2.1. Customer shall pay a deposit ("Deposit") equal to twenty percent (20%) of the total Purchase Price by wire transfer to GT Solar's bank account in such a way that one-sixth of the deposit amount should be done by the middle of each month starting from January, 2006 until middle of June, 2006.

2.2. Fourteen (14) days before each payment, GT Solar will open a standby letter of credit in the amount of the Deposit in favor of Customer against GT Solar's failure to deliver the Equipment pursuant to the terms of this Agreement.

2.3. At 75 days prior to each shipment, GT will notify the shipment amount to the Customer. No less than sixty (60) days of each shipment, Customer will establish in favor of GT Solar an irrevocable letter of credit covering seventy percent (70%) of the said amount of the each shipment, which is payable to GT upon presentation of shipping documents.

2.4. Ten percent (10%) of each shipment amount will be paid by the Customer to GT Solar by wire transfer within 90 days from the said shipment here within.

3. SHIPMENT TERMS. The "Commencement Date" will be the date GT Solar receives the Deposit. All shipments and transfer of title shall be made EXW. The DSS furnaces will ship at the rate of 4/month (from May through October 2006, and 2 in November) starting the first month after completion of the first order of 24 furnaces.

4. No inspection at GT. The price can increase if the material costs increase, up to a maximum of 5%.

5. All other terms are per the original agreement.

For: Jiangxi LDK Solar Hi-Tech Co., Ltd        For: GT Solar technologies


    /s/ Xiaofeng Peng                         /s/ Kedar P. Gupta
-------------------------------        -------------------------------------
    13/08/05

</TEXT>
</DOCUMENT>

Exhibit 10.7.3

AGREEMENT, Phase 3

This Agreement is a summary of Addendum 6 and 8a of the previous Waffab agreement, by and between GT Solar Technologies, a division of GT Equipment Technologies, Inc. at 243 Daniel Webster Highway, Merrimack, NH 03054 USA ("GT Solar") and Jiangxi LDK Solar Hi-Tech Co., Ltd. at Xinyu Hi-Tech Development Zone, Xinyu City, Jiangxi, China ("Customer").

WHEREAS, Customer wishes to buy and GT Solar wishes to sell certain solar wafer fabrication equipment and/or technologies more particularly defined herein below and in the attached EXHIBITS A and B ("Equipment") and;

WHEREAS, Customer wishes to install the Equipment in Xinyu, Jiangxi, China;

WHEREAS, the parties wish to enter into this Agreement to more particularly define the terms and conditions of the purchase and sale of such Equipment.

NOW, THEREFORE, for good and valuable considerations the parties agree as follows:

1. EQUIPMENT. GT Solar shall sell and Customer shall purchase forty five (45) GT-DSS240 furnaces and other equipment, more particularly described in EXHIBITS A and B attached hereto and incorporated herein by reference. GT Solar warrants and represents that, upon delivery to Customer pursuant to Article 3, title to the Equipment will be free and clear and without any liens or encumbrances.

2. PURCHASE PRICE; PAYMENT TERMS. The purchase price for the Equipment and related services ("Purchase Price") shall be twenty six million three hundred eighty four thousand seven hundred sixty eight U.S. Dollars ($26,384,768.00 USD). The price can increase if the material costs increase, up to a maximum of 5%.

Payment terms:

2.1. Customer shall pay a deposit ("Deposit") equal to twenty percent (20%) of the total Purchase Price by wire transfer to GT Solar's bank account in such a way that one-sixth of the deposit amount should be done by the middle of each month starting from March, 2006 until middle of September, 2006.

2.2. Fourteen (14) days before each payment, GT Solar will open a standby letter of credit in the amount of the Deposit in favor of Customer against GT Solar's failure to deliver the Equipment pursuant to the terms of this Agreement.

2.3. At 75 days prior to each shipment, GT Solar will notify the shipment amount to Customer. No less than sixty (60) days of each shipment, Customer will establish in favor of GT Solar an irrevocable letter of credit covering seventy percent (70%) of the said amount of the each shipment, which is payable to GT Solar upon presentation of shipping documents.

2.4. Ten percent (10%) of the each shipment amount will be paid by Customer to GT Solar by wire transfer within 90 days from the said shipment here within.

3. SHIPMENT TERMS. The "Commencement Date" will be the date GT Solar receives the Deposit. All shipments and transfer of title shall be made EXW.

Page 1

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

4. CONTRACT SERVICES. Within sixty (60) days of the Commencement Date, GT Solar shall provide Customer a list of facilities and any other requirements such as power, water and space for operation of the delivered Equipment. GT Solar shall also, as part of the Purchase Price (except for room and board), provide supervision for the unpacking and installation of the Equipment, and shall provide support, training, and assistance to Customer's engineers and operators per EXHIBIT C. Such assistance shall include the supervision of the commissioning and start up of the Equipment. Customer shall provide all local labor and support for commissioning and start up of the Equipment.

Customer shall pay the cost of all the room, board and local transportation of GT Solar's representatives during the period of the performance of such services.

GT guarantees priority of production capacity to provide LDK with additional DSS furnaces required to support expansion of its factory beyond this order, up to 400MW by 2008.

GT will provide LDK preferential pricing on GT manufactured equipment sold to the Chinese market.

GT will provide LDK first priority on technology upgrades and will work with LDK in its technological development programs.

On a best effort basis GT will assist LDK in the purchase of at least 100MT of feedstock.

In consideration for the purchase of an additional 100 DSS machines and related turnkey equipment by year end 2006. GT will agree to limit DSS sales to its existing China customers, at the time of contract signing, for a period of one year.

5. CONTRACT TERM. The Term of this Agreement shall commence upon the execution and delivery of this Agreement and shall terminate upon the acceptance of the Equipment by Customer. The warranty and indemnification provisions set forth in sections 9, 10, and 15 shall survive acceptance of the equipment. Projected delivery and performance milestones is attached hereto as EXHIBIT C and incorporated herein by reference.

6. EQUIPMENT INSPECTION AND TRAINING. No inspection at GT.

7. CUSTOMER RESPONSIBILITIES. It will be Customer's responsibility to provide the facilities and prepare the production site for installation of the Equipment one (1) month prior to installation. Facilities preparation shall include, but is not limited to, the provision for appropriate electrical power, compressed air, de-ionized water, cooling water circulation systems, gas circulation systems, exhaust, back-up cooling water systems, back-up power systems, and effluent waste treatment (to the extent required by local laws). Facilities requirements will be defined by GT Solar no later than 60 days after the Commencement Date. Any delays on the part of Customer in preparation of the building, facilities or personnel may result in a delay of the performance by GT Solar of its obligations pursuant to this Agreement and GT Solar reserves the right to extend its performance period and price accordingly. Customer will be solely responsible for all permits required for the installation and operation of the Equipment on Customer site.

Page 2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Customer will also be solely responsible for furnishing the personnel necessary for the proper installation of the Equipment at the Customer site, operational training during start up and other recommended periods, and acceptance of the Equipment. A list of Customer supplied items is attached as EXHIBIT D.

8. SECURITY INTEREST. GT Solar reserves, and Customer hereby grants GT Solar, a continuing security interest in Equipment, together with all additions, improvements and accessories thereto made or supplied by GT Solar at any time, and all proceeds of the foregoing, to secure payment of the Purchase Price to GT Solar. Until receipt of final payment, Customer agrees that GT Solar shall have the right to file or record a financing statement pursuant to applicable law to evidence GT Solar's security interest in the Equipment and Customer will execute such financing statements and other documents as GT Solar shall request to perfect such interest. Customer agrees that, in the event of its failure to make any payment required pursuant to this Agreement, it will make all Equipment available to GT Solar upon demand and will pay all reasonable costs of GT Solar in connection with the collection of any amounts due or other enforcement of GT Solar's rights.

9. WARRANTY. For the earlier of (i) 15 months from the date of shipment to Customer or (ii) one year from acceptance of the Equipment, GT Solar warrants that all electrical and mechanical parts (except normal wear and tear on parts, including bearings and any parts that come in contact with wires or slurry) shall be free from defects in workmanship and materials and shall conform to GT Solar's specifications. If any such parts are defective during the warranty period or, upon delivery, the Equipment fails to meet the specifications set forth in this Agreement, Customer shall inform GT Solar and GT Solar shall either repair or replace any such items determined by GT Solar to be defective. GT Solar's liability shall be limited to the cost of repairing and replacing such defective items when shipped to GT Solar, freight prepaid, by Customer. The repaired or replaced parts shall be shipped to Customer by GT Solar freight prepaid. This warranty specifically excludes Customer's labor, Equipment downtime, punitive, incidental or consequential damages, acts of God, or loss of production. A purchase order from the Customer is required to initiate any warranty action pending approval by GT Solar of the claim.

In the event that Customer has purchased Equipment from GT Solar that has been manufactured by another manufacturer, GT Solar hereby agrees to pass through to Customer any and all warranties without limitation made by such company.

This warranty does not extend to any Equipment that fails to operate by reason of improper installation or operation by Customer or that has been subject to misuse, neglect or accident or that has been repaired or materially altered other than by GT Solar.

    THE WARRANTY SET FORTH HEREIN IS EXCLUSIVE AND IN LIEU OF ALL OTHER
    WARRANTIES, WHETHER STATUTORY, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES
    OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND ALL WARRANTIES
    ARISING FROM COURSE OF DEALING OR USAGE. THE REMEDIES PROVIDED HEREIN

Page 3

ARE CUSTOMER'S SOLE AND EXCLUSIVE REMEDIES WHETHER THE CLAIMS BY CUSTOMER
ARE BASED IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE) OR OTHERWISE.

10. INTELLECTUAL PROPERTY INDEMNIFICATION. GT Solar shall indemnify and hold
harmless Customer against any claim by any third party that the Equipment, when
used for the purpose for which it is designed and pursuant to GT Solar's
specifications, violates or infringes the patent, copyright, trademark, trade
secret or other proprietary rights of such third party.

Notwithstanding the foregoing, GT Solar shall have no obligation with respect to
claims of infringement based upon the use of the Equipment, individually or in
combination with other equipment supplied by GT Solar or others, if the
Equipment is used for any process not supplied by GT Solar. Further, GT Solar
shall have no obligation with respect to claims of infringement in the event
that the Equipment is manufactured or designed or operated in accordance with a
design, drawings or process not furnished by GT Solar.

The foregoing states the entire liability of GT Solar for any loss, liability,
or damage whatsoever to or sustained by Customer arising out of the infringement
by the Equipment of the property rights of third parties.

11. CUSTOMER TERMINATION. Customer may terminate this Agreement (other than for
default pursuant to Article 12 below) at any time by providing written notice of
such termination to GT Solar at least thirty (30) days in advance of the
proposed termination date, provided that if Customer terminates this Agreement
or any portion hereof within thirty (30) days following the Commencement Date,
GT Solar shall retain all payments due or received up to the date of the
proposed termination.

In the event that Customer terminates this Agreement between thirty-one (31) and
sixty (60) days after the Commencement Date, Customer shall pay to GT Solar
sixty percent (60%) of the Purchase Price. If the Agreement is terminated by
Customer at any time after sixty-one (61) days following the Commencement Date,
Customer shall pay to GT Solar the entire amount of the Purchase Price.

12. DEFAULT.

A. Either party may terminate this Agreement upon written notice to the other
party upon:

    (1). The failure of the other party to perform any material term, condition
or covenant of this Agreement, which failure has not been corrected within
thirty (30) days of the date of written notice of such failure given by the
other party; or

    (2). The failure of Customer to make a payment when due; or

    (3) The other party becomes insolvent or the subject of any bankruptcy
proceeding that is not dissolved within sixty (60) days.

Page 4

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

B. In the event of termination of this Agreement by GT Solar pursuant to the terms of this Article 12, in addition to any other remedies it may have at law or in equity, GT Solar may recover any and all monies which may be due pursuant to Section 2 or any other provision of this Agreement and repossess any Equipment sold hereunder for which it has not been paid. In the event of termination by Customer pursuant to the terms of this Article 12, Customer shall have the right to terminate the order and recover any monies previously paid by it to GT Solar.

13. FORCE MAJEURE. GT Solar and Customer shall not be held responsible for any delay or failure hereunder caused by fires, strikes, embargoes, government requirements, civil or military authorities, acts of God or of the public enemy or, if not within their reasonable control, by acts or omissions of subcontractors, failure of transport, failure of communications, failure of power supply or any other causes beyond their reasonable control.

14. LIMITATION OF LIABILITY. UNDER NO CIRCUMSTANCES WILL GT SOLAR BE LIABLE TO CUSTOMER, WHETHER IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE), UNDER ANY WARRANTY OR OTHERWISE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE LOSS OR DAMAGE, INCLUDING LOSS OF PROFITS OR REVENUES, RESULTING FROM OR ARISING OUT OF OR IN CONNECTION WITH GT SOLAR'S PERFORMANCE UNDER, OR BREACH OF, THIS AGREEMENT OR THE MANUFACTURE, SALE, DELIVERY, RESALE, REPAIR OR USE OF ANY EQUIPMENT COVERED BY OR FURNISHED PURSUANT TO THIS AGREEMENT.

15. INDEMNIFICATION. Each party agrees to defend, indemnify and hold harmless the other party from and against any third party claims arising out of the acts or omissions of the indemnifying party or its performance pursuant to this Agreement. Each party's duty to defend and indemnify the other is conditional upon timely notice by the other party of any claim for which indemnification is sought and control by the indemnifying party of the litigation or settlement of any indemnified claim.

16. LICENSED PROGRAMS. Computer software or other technology or know-how that, in GT Solar's judgment, are required for the operation of the Equipment shall be provided by GT Solar to Customer subject to such license terms as GT Solar shall reasonably require.

In the event Customer sells, transfers or otherwise assigns its rights or interests in the Equipment to any third party, except a parent or subsidiary company of Customer, it is expressly understood that Customer does not have the right to transfer licensed programs or assign the license or any rights Customer may have regarding the use or possession of such licensed programs to such third party without GT Solar's prior written consent and any attempted transfer or assignment shall be void and of no force and effect.

17. GOVERNING LAW. This Agreement and any related order shall be governed and interpreted, construed, and enforced in accordance with the laws of a neutral country such as Sweden, its choice of laws and the Convention for the International Sale of Goods to the contrary notwithstanding.

Page 5

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

18. ASSIGNMENT. Neither party shall delegate any duties or assign any rights or claims under this Agreement, other than to a parent or subsidiary company, without the other party's prior written consent, which consent shall not be unreasonably withheld, and any such attempt at delegation or assignment shall be void.

19. FURTHER ASSURANCES. At any time, and from time to time after the Commencement Date, each party will execute such additional instruments and take such additional actions as may be reasonably requested by the other party to confirm or perfect title to any property transferred hereunder or otherwise to carry out the intent and purposes of this Agreement.

21. WAIVER. Any failure on the part of any party hereto to comply with any of its obligations, agreements or conditions hereunder may only be waived in writing by the party to whom such compliance is owed.

22. ARBITRATION. Any disputes that cannot be amicably resolved by the parties shall be submitted to binding arbitration for resolution. The arbitration shall be conducted before a panel of three (3) arbitrators in New Hampshire under the rules of the American Arbitration Association. Each party shall select one arbitrator and the two so chosen shall select the third, who shall act as chairperson. If a party shall fail to appoint an arbitrator within twenty (20) days after receiving written notice of the arbitration and the name of the arbitrator selected by the party initiating the arbitration, the initiating party may request that the American Arbitration Association appoint the second arbitrator, and if the two arbitrators so selected fail to select a third arbitrator within twenty (20) days after the appointment of the second arbitrator, either arbitrator may request that the American Arbitration Association select the third arbitrator. The decision of the majority of the arbitrators shall be final and binding on the parties with respect to all matters referred to the arbitration panel for decision and may be enforced in an appropriate court in any competent jurisdiction. The arbitrators shall not have the authority to award punitive or special damages. In the absence of a contrary ruling by the arbitrators, each party shall pay its own costs and fees in connection with the arbitration.

23. NOTICES. All notices and other communications hereunder shall be in writing and shall be deemed to have been given if (i) delivered in person, (ii) sent by prepaid first class registered or certified mail, return receipt requested, or (iii) by delivery to the other party by recognized courier to the following addresses:

```
To GT Solar:         GT Solar Technologies
                     243 Daniel Webster Highway
                     Merrimack, NH 03054 USA
                     Attn: President
                     cc: General Counsel
                     Tel: (603) 883-5200
                     Fax: (603) 598-0444
```

Page 6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

With copies to:

To Customer:              Jiangxi LDK Solar Hi-Tech Co., Ltd.
                          Xinyu Hi-Tech Development Zone,
                          Xinyu City, Jiangxi, China

24. EXPENSES. Whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated shall be paid by the party incurring such costs and expenses.

25. HEADINGS. The section and subsection headings in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

26. COUNTERPARTS. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

27. BINDING EFFECT. This Agreement shall be binding upon the parties hereto and inure to the benefit of the parties, their successors and permitted assigns.

28. ENTIRE AGREEMENT. This Agreement is the entire agreement of the parties with respect to the subject matter hereof. There are no oral or written promises, conditions, representations, understandings, interpretations or terms of any kind as conditions or inducements to the execution hereof. This Agreement supersedes all prior agreements, written or oral, including any memorandum of understanding between the parties.

29. SEVERABILITY. If any part of this Agreement is deemed to be unenforceable, the balance of this Agreement shall remain in full force and effect.

THE BALANCE OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

Page 7

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on
their behalf by their duly authorized agents as of the day and year first above
written.

Executed as of the date first written above.

For:  Jiangxi LDK Solar Hi-Tech Co., Ltd.          For:  GT Solar Technologies

/s/ Xiaofeng Peng                                   /s/ Keith Matthei
------------------------------                      --------------------------

Xinyu Hi-Tech Development Zone                       GT Solar Technologies
Xinyu City, Jiangxi, China                           243 Daniel Webster Highway
                                                     Merrimack, NH 03054 USA

Page 8

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT A

EQUIPMENT (Phase 3)

| EQUIPMENT (sets) | Unit Price | Total |
| --- | --- | --- |
| GT-Crucible spray systems (3) | $[*] | $[*] |
| GTs-Etch station automatic (3) | $[*] | $[*] |
| GT-DSS 240 furnace (45) (exclude mezzamines) | $[*] | $[*] |
| Leader/unloader (5) | $[*] | $[*] |
| GT-Chamfer Grind (1) | $[*] | $[*] |
| GT-Slurry recovering system (1) | TBD | |
| Total (USD) EXW | | $26,384,768.00 |

* Confidential Treatment Requested. The redacted material has been separately
filed with the Securities and Exchange Commission.

Page 9

EXHIBIT B

SPECIFICATIONS AND ACCEPTANCE TESTING

```
Conductivity type:          p-type (boron)
Crystal Characteristic:     multicrystalline

Resistivity:                0.5 - 2.0 ohm-cm
                            (typical average: 1.5 ohm-cm)

Wafer Size:                 156 mm x 156 mm x 240 um thick
Wafer Size Variation:       +/- 0.5 mm
Wafer Thickness Variation:  +/- 40 um

DSS cycle time:             < or = 50 hours
```

Page 10

```
                                EXHIBIT C

SCHEDULE FOR SHIPMENTS, Phase 3:


-------------------------------------------------------------------------------
Date: 1 June 2006  PHASE 3
                                                 No. of
Ship Month        Lot No.  Product               Units    Unit No.   Status

October             1      GT-DSS240 Furnace        3      56-58      Need LC
                    2      GT-DSS240 Furnace        4      59-62      Need LC
                    3      DSS Loader/Unloader      1      7 of 11    Need LC
                    3      Chamfer Grinder          1      5 of 6     Need LC
                    3      Crucible Costing Station 1      6 of 6     Need LC
                           GTS-Feedstock Etch
                    4      Station                  1      4 of 6     Need LC

November            5      GT-DSS240 Furnace        4      63-66      Need LC
                    6      GT-DSS240 Furnace        3      67-69      Need LC
                    7      DSS Loader/Unloader      1      8 of 11    Need LC
                    7      Crucible Costing Station 1      7 of 8     Need LC
                           GTS-Feedstock Etch
                    8      Station                  1      5 of 6     Need LC

December            9      GT-DSS240 Furnace        4      70-73      Need LC
                   10      GT-DSS240 Furnace        3      74-76      Need LC
                           GTS-Feedstock Etch
                   11      Station                  1      5 of 6     Need LC
                   12      DSS Loader/Unloader      1      9 of 11    Need LC

                   12      Crucible Costing Station 1      8 of 8     Need LC

January            13      GT-DSS240 Furnace        3      77-79      Need LC
                   14      GT-DSS240 Furnace        3      80-82      Need LC
                   15      DSS Loader/Unloader      1      10 of 11   Need LC

February           16      GT-DSS240 Furnace        3      83-85      Need LC
                   17      GT-DSS240 Furnace        3      86-88      Need LC
                   18      DSS Loader/Unloader      1      11 of 11   Need LC

March              19      GT-DSS240 Furnace        3      89-91      Need LC
                   20      GT-DSS240 Furnace        3      92-94      Need LC
April              21      GT-DSS240 Furnace        3      95-97      Need LC
                   22      GT-DSS240 Furnace        3      98-100     Need LC
-------------------------------------------------------------------------------


                                Page 11
```

EXHIBIT D

CUSTOMER SUPPLIED ITEMS

1. Necessary water chillers with back-up systems
2. Necessary water with back-up systems
3. Clean, dry compressed air
3. Deionized water system
4. All plumbing and wiring to the machines
6. Necessary power with back-up systems
7. Effluent treatment equipment
8. Materials handling equipment
9. Shelves, storage cabinets, and workbenches
10. Other engineering and facility services needed: to be defined by GT Solar within 60 days of the Commencement Date.

Page 12

</TEXT>
</DOCUMENT>

Exhibit 10.7.4

AGREEMENT, Phase 4

This Agreement is entered into effective as of the 1st day of October, 2006, by
and between GT Solar Incorporated, located at 243 Daniel Webster Highway,
Merrimack, NH 03054 USA ("GT Solar" or "GT") and Jiangxi LDK Solar Hi-Tech Co.,
Ltd. at Xinyu Hi-Tech Development Zone, Xinyu City, Jiangxi, China ("Customer").

WHEREAS, Customer wishes to buy and GT Solar wishes to sell certain solar wafer
fabrication equipment and/or technologies more particularly defined herein below
and in the attached EXHIBITS A and B ("Equipment") and;

WHEREAS, Customer wishes to install the Equipment in Xinyu, Jiangxi, China;

WHEREAS, the parties wish to enter into this Agreement to more particularly
define the terms and conditions of the purchase and sale of such Equipment.

NOW, THEREFORE, for good and valuable considerations the parties agree as
follows:

1. EQUIPMENT. GT Solar shall sell and Customer shall purchase one hundred (100)
GT-DSS450 furnaces, more particularly described in EXHIBITS A and B attached
hereto and incorporated herein by reference. GT Solar warrants and represents
that, upon Shipment to Customer pursuant to Article 4, title to the Equipment
will be free and clear and without any liens or encumbrances except as provided
in Article 9 of this Agreement.

2. PURCHASE PRICE; PAYMENT TERMS. The purchase price for the Equipment and
related services ("Purchase Price") shall be Sixty Four Million Three Hundred
Fifty Thousand U.S. Dollars ($64,350,000 USD).

2.1. Customer shall pay a deposit ("Deposit") equal to twenty percent (20%) of
the total Purchase Price by wire transfer to GT Solar's bank account in six (6)
monthly installments of Two Million One Hundred Forty-five Thousand
(US$2,145,000) US Dollars each beginning November 15, 2006
and ending April 15, 2007 as more fully set forth in Exhibit C.

2.2. Fourteen (14) days before each Deposit installment payment, GT Solar will
open a standby letter of credit in the amount of such Deposit installment in
favor of Customer against GT Solar's failure to deliver the Equipment pursuant
to the terms of this Agreement.

2.3. In accordance with the schedule set forth in Exhibit C, Customer will
establish in favor of GT Solar irrevocable letters of credit equal to seventy
percent (70%) of the Purchase Price allocable to each Shipment, which letters
of credit shall specify that they are payable to GT upon GT's presentation of
shipping documents.

2.4. Ten percent (10%) of the Purchase Price allocable to a given Shipment will
be paid by Customer to GT Solar by wire transfer within 30 days after the date
of Acceptance of the items of Equipment included with such Shipment, but not
later than 90 days after Shipment.

3. COMMENCEMENT DATE. The "Commencement Date" will be the date GT Solar receives
the initial Deposit installment payment.

4. SHIPMENT AND SHIPMENT TERMS. Shipments shall be made pursuant to the schedule
set forth in Exhibit D. Transfer of title and risk of loss for each item of
Equipment shall occur upon each such delivery of such Equipment to Customer ex
works (Incoterms 2000) Woburn, Massachusetts ("Shipment").

Page 1

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

5. CONTRACT SERVICES. Within sixty (60) days of the Commencement Date, GT Solar shall provide Customer a list of facilities and any other requirements such as power, water and space for installation and operation of the Equipment. GT Solar shall also, as part of the Purchase Price, provide supervision for the unpacking, installation, start up and acceptance of the Equipment. Customer shall provide all local labor and support for commissioning and start up of the Equipment.

Customer shall pay the cost of all the room, board and local transportation of GT Solar's representatives during the period of the performance of such services.

6. CONTRACT TERM. The Term of this Agreement shall commence upon the execution and delivery of this Agreement and shall terminate upon the acceptance of the Equipment by Customer as set forth in Exhibit B ("Acceptance"). The warranty, indemnification and non-solicitation provisions set forth in Articles 9, 10, 15 and 30 shall survive acceptance of the equipment.

7. EQUIPMENT INSPECTION. Customer shall not be entitled to inspect Equipment prior to Shipment.

8. CUSTOMER RESPONSIBILITIES. It will be Customer's responsibility to provide the facilities and prepare the production site for installation of the Equipment one (1) month prior to each shipment. Facilities preparation shall include, but is not limited to, the provision for appropriate electrical power, compressed air, cooling water circulation systems, gas circulation systems, exhaust, back-up cooling water systems, back-up power systems, and such other specifications as GT shall provide (including pursuant to Article 5), all subject to compliance with applicable law. Any delays on the part of Customer in preparation of the building, facilities or personnel shall not affect the obligations of Customer to pay for items of Equipment that GT makes available for Shipment as set forth in this Agreement. Additionally, GT may in its sole discretion extend the performance of any of its obligations under this Agreement by an amount of time equal to any such delay by Customer in the scheduled preparation of Customer's building, facilities and/or personnel.

Page 2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Customer will also be solely responsible for furnishing the personnel necessary for the proper installation of the Equipment at the Customer site, operational training during start up and other recommended periods, and acceptance of the Equipment. A list of certain Customer supplied items is attached as EXHIBIT E.

9. SECURITY INTEREST. GT Solar reserves, and Customer hereby grants GT Solar, a continuing security interest in Equipment, together with all additions, improvements and accessories thereto made or supplied by GT Solar at any time, and all proceeds of the foregoing, to secure payment of the Purchase Price to GT Solar. Until receipt of final payment, Customer agrees that GT Solar shall have the right to file or record a financing statement pursuant to applicable law to evidence GT Solar's security interest in the Equipment and Customer will execute such financing statements and other documents as GT Solar shall request to perfect such interest. Customer agrees that, in the event of its failure to make any payment required pursuant to this Agreement, it will make all Equipment available to GT Solar upon demand and will pay all reasonable costs of GT Solar in connection with the collection of any amounts due or other enforcement of GT Solar's rights.

10. WARRANTY. For the earlier of (i) 15 months from the date of shipment to Customer or (ii) one year from Acceptance of each item of Equipment, GT Solar warrants that all electrical and mechanical parts shall be free from defects in workmanship and materials and shall conform to GT Solar's specifications as set forth in Exhibit B. If any such parts are defective during the warranty period or, upon shipment the item of Equipment fails to meet the specifications set forth in this Agreement, Customer shall inform GT Solar and GT Solar shall either repair or replace any such items determined by GT Solar to be defective. GT Solar's liability shall be limited to the cost of repairing and replacing such defective items when shipped to GT Solar, freight prepaid, by Customer. The repaired or replaced parts shall be shipped to Customer by GT Solar freight prepaid.

THE FOREGOING WARRANTY SPECIFICALLY EXCLUDES THE RESULTS OF NORMAL WEAR AND TEAR AND ANY COSTS ASSOCIATED WITH CUSTOMER'S LABOR, EQUIPMENT DOWNTIME, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, ACTS OF GOD, OR LOSS OF PRODUCTION. A PURCHASE ORDER FROM THE CUSTOMER IS REQUIRED TO INITIATE ANY WARRANTY ACTION PENDING APPROVAL BY GT SOLAR OF THE CLAIM.

In the event that Customer has purchased Equipment from GT Solar that has been manufactured by another manufacturer, GT Solar hereby agrees to pass through, to the extent practical to do so, to Customer any and all longer warranties made by such manufacturer.

This warranty does not extend to any items of Equipment that fails to meet the above warranty terms due to any uses other than for the purpose for which it is designed and supplied by GT Solar, or by reason of improper installation or operation by Customer or that has been subject to misuse, neglect or accident or that has been repaired or materially altered other than by GT Solar.

    THE WARRANTY SET FORTH HEREIN IS THE EXCLUSIVE WARRANTY AND IS IN LIEU OF ALL OTHER WARRANTIES, WHETHER STATUTORY, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE. THE REMEDIES PROVIDED HEREIN

Page 3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

ARE CUSTOMER'S SOLE AND EXCLUSIVE REMEDIES WHETHER THE CLAIMS BY CUSTOMER
ARE BASED IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE) OR OTHERWISE.

11. INTELLECTUAL PROPERTY INDEMNIFICATION. GT Solar shall indemnify and hold
harmless Customer against any claim by any third party that the Equipment, when
used for the purpose for which it is designed and pursuant to GT Solar's
specifications, violates or infringes the patent, copyright, trademark, trade
secret or other proprietary rights of such third party. Indemnification
pursuant to this Article 11 shall be subject to the procedures set forth in
Article 16.

Notwithstanding the foregoing, GT Solar shall have no obligation with respect to
claims of infringement based upon the use of the Equipment, individually or in
combination with other equipment supplied by GT Solar or others, if the
Equipment is used for any process other than that for which it was designed and
supplied by GT Solar. Further, GT Solar shall have no obligation with respect to
claims of infringement in the event that the Equipment is manufactured or
designed or operated in accordance with a design, drawings or process not
furnished by GT Solar.

In the event of infringement or suspected infringement of any third party's
proprietary rights based upon the use of the Equipment, GT may, at its cost,
undertake requisite steps to avoid infringement of such third party's
proprietary rights (including, for example, obtaining a license from the
relevant party and/or modifying the Equipment or replacing it with
non-infringing equipment).

The foregoing states the entire liability of GT Solar for any loss, liability,
or damage whatsoever to or sustained by Customer arising out of the infringement
by the Equipment of the proprietary rights of third parties.

12. CUSTOMER TERMINATION. Customer may terminate this Agreement (other than for
default pursuant to Article 13 below) at any time by providing written notice of
such termination to GT Solar at least thirty (30) days in advance of the
proposed termination date. If Customer terminates this Agreement or any portion
hereof within thirty (30) days following the Commencement Date, GT Solar shall
retain all payments due or received up to the date of the proposed termination.
In the event that Customer terminates this Agreement between thirty-one (31) and
sixty (60) days after the Commencement Date, Customer shall pay to GT Solar
sixty percent (60%) of the Purchase Price. If the Agreement is terminated by
Customer at any time after sixty-one (61) days following the Commencement Date,
Customer shall pay to GT Solar the entire amount of the Purchase Price.

13. DEFAULT.

A. Either party may terminate this Agreement upon written notice to the other
party upon the failure of the other party to perform any material term,
condition or covenant of this Agreement, which failure has not been corrected
within thirty (30) days of the date of written notice of such failure given by
the other party. GT may terminate this Agreement upon written notice to Customer
upon the failure of Customer to make a payment when due. In the event that one
of the parties becomes insolvent or the subject of any bankruptcy proceeding
that is not dissolved within sixty (60) days, the other party may terminate this
Agreement upon written notice to the party that is insolvent or subject to the
bankruptcy proceeding.

Page 4

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

B. In the event of termination of this Agreement by GT Solar pursuant to the terms of this Article 13, in addition to any other remedies it may have at law or in equity, GT Solar may recover any and all monies which may be due pursuant to Article 2 or any other provision of this Agreement and repossess any items of Equipment sold hereunder for which it has not been paid in full. In the event of termination by Customer pursuant to the terms of this Article 13, Customer shall have the right to terminate the order and recover any monies previously paid by it to GT Solar for items of Equipment that have not been shipped to Customer.

14. FORCE MAJEURE. GT Solar and Customer shall not be held responsible for any delay or failure hereunder caused by fires, strikes, embargoes, government requirements, civil or military authorities, acts of God or of the public enemy or, if not within their reasonable control, by acts or omissions of subcontractors, failure of transport, failure of communications, failure of power supply or any other causes beyond their reasonable control, provided, however, that this Article 14 shall not relieve a party of its obligation to pay hereunder.

15. LIMITATION OF LIABILITY. UNDER NO CIRCUMSTANCES WILL GT SOLAR BE LIABLE TO CUSTOMER, WHETHER IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE), UNDER ANY WARRANTY OR OTHERWISE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE LOSS OR DAMAGE, OR LOSS OF PROFITS OR REVENUES, RESULTING FROM OR ARISING OUT OF OR IN CONNECTION WITH GT SOLAR'S PERFORMANCE UNDER, OR BREACH OF, THIS AGREEMENT OR THE MANUFACTURE, SALE, DELIVERY, RESALE, REPAIR OR USE OF ANY ITEMS OF EQUIPMENT COVERED BY OR FURNISHED PURSUANT TO THIS AGREEMENT. THE REMEDIES EXPRESSLY PROVIDED HEREIN ARE CUSTOMER'S SOLE AND EXCLUSIVE REMEDIES, WHETHER CLAIMS ARE BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR OTHERWISE. TO THE EXTENT PERMITTED BY LAW, IN NO EVENT SHALL GT'S LIABILITY IN CONNECTION WITH THIS AGREEMENT EXCEED THE PURCHASE PRICE PAID BY CUSTOMER FOR THE EQUIPMENT. NOTHING IN THIS AGREEMENT SHALL LIMIT OR EXCLUDE THE LIABILITY OF EITHER PARTY FOR DEATH OR PERSONAL INJURY RESULTING FROM ITS NEGLIGENCE OR FOR FRAUDULENT MISREPRESENTATION.

16. INDEMNIFICATION. Each party agrees to defend, indemnify and hold harmless the other party from and against any third party claims arising out of the negligence or willful misconduct of the indemnifying party or any material breach by the indemnifying party of any of its obligations under this Agreement. Each party's duty to defend and indemnify the other is conditional upon timely notice by the other party of any claim for which indemnification is sought and control by the indemnifying party of the litigation or settlement of any indemnified claim.

17. LICENSED PROGRAMS. Computer software or other technology or know-how that, in GT Solar's judgment, are required for the operation of the Equipment shall be provided by GT Solar to Customer subject to such license terms as GT Solar shall reasonably require.

In the event Customer sells, transfers or otherwise assigns its rights or interests in the Equipment to any third party, except a parent or subsidiary company of Customer, it is expressly understood that Customer does not have the right to transfer licensed programs or assign the license or any rights Customer may have regarding the use or possession of such licensed programs to such third party without GT Solar's prior written consent and any attempted transfer or assignment shall be void and of no force and effect.

18. GOVERNING LAW. This Agreement and any related order shall be governed and interpreted, construed, and enforced in accordance with the laws of England, notwithstanding the choice of law rules of any jurisdiction, and the Convention for the International Sale of Goods to the contrary notwithstanding, which Convention shall not apply and which is hereby expressly disclaimed.

Page 5

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

19. ASSIGNMENT. Neither party shall delegate any duties or assign any rights or claims under this Agreement, other than to a parent or subsidiary company, and in the case of Customer, to a parent or subsidiary located in the PRC, without the other party's prior written consent, which consent shall not be unreasonably withheld, and any such attempt at delegation or assignment shall be void.

20. FURTHER ASSURANCES. At any time, and from time to time after the Commencement Date, each party will execute such additional instruments and take such additional actions as may be reasonably requested by the other party to confirm or perfect title to any property transferred hereunder or otherwise to carry out the intent and purposes of this Agreement.

21. WAIVER. Any failure on the part of any party hereto to comply with any of its obligations, agreements or conditions hereunder may only be waived in writing by the party to whom such compliance is owed.

22. ARBITRATION. Any disputes that cannot be amicably resolved by the parties shall be submitted to binding arbitration for resolution. The arbitration shall be conducted before a panel of three (3) arbitrators in New Hampshire under the rules of the American Arbitration Association. Each party shall select one arbitrator and the two so chosen shall select the third, who shall act as chairperson. If a party shall fail to appoint an arbitrator within twenty (20) days after receiving written notice of the arbitration and the name of the arbitrator selected by the party initiating the arbitration, the initiating party may request that the American Arbitration Association appoint the second arbitrator, and if the two arbitrators so selected fail to select a third arbitrator within twenty (20) days after the appointment of the second arbitrator, either arbitrator may request that the American Arbitration Association select the third arbitrator. The decision of the majority of the arbitrators shall be final and binding on the parties with respect to all matters referred to the arbitration panel for decision and may be enforced in an appropriate court in any competent jurisdiction. The arbitrators shall not have the authority to award punitive or special damages. In the absence of a contrary ruling by the arbitrators, each party shall pay its own costs and fees in connection with the arbitration.

23. NOTICES. All notices and other communications hereunder shall be in writing and shall be deemed to have been given if (i) delivered in person, (ii) sent by prepaid first class registered or certified mail, return receipt requested, or (iii) by delivery to the other party by recognized courier to the following addresses:

```
To GT Solar:            GT Solar Incorporated
                        243 Daniel Webster Highway
                        Merrimack, NH 03054 USA
                        Attn: President
                        cc: General Counsel
                        Tel: (603) 883-5200
                        Fax: (603) 598-0444
```

Page 6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
To Customer:          Jiangxi LDK Solar Hi-Tech Co., Ltd.
                      Xinyu Hi-Tech Development Zone,
                      Xinyu City, Jiangxi, China
                      Attn: _____
                      Tel : + _____
                      Fax : + _____
```

24. EXPENSES. Whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated shall be paid by the party incurring such costs and expenses.

25. HEADINGS. The section and subsection headings in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

26. COUNTERPARTS. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

27. BINDING EFFECT. This Agreement shall be binding upon the parties hereto and inure to the benefit of the parties, their successors and permitted assigns.

28. ENTIRE AGREEMENT. This Agreement is the entire agreement of the parties with respect to the subject matter hereof. There are no oral or written promises, conditions, representations, understandings, interpretations or terms of any kind as conditions or inducements to the execution hereof. This Agreement supersedes all prior agreements, written or oral, including any memorandum of understanding between the parties.

29. SEVERABILITY. If any part of this Agreement is deemed to be unenforceable, the balance of this Agreement shall remain in full force and effect.

30. CONFIDENTIALITY AND NON-SOLICITATION. Except as expressly authorized herein, neither party will, directly or indirectly, disclose or use for its own purposes any proprietary confidential information of the other party ("Confidential Information"), except that such prohibition shall not apply to information that is or becomes publicly available other than by breach by a party of its obligations hereunder. In no event shall the party receiving Confidential Information reverse engineer, decompile or otherwise attempt to discover or reproduce any technology or other intellectual property or trade secrets included in the Confidential Information supplied by the other party.

During the term of this Agreement and for a period of three (3) years thereafter, neither party will hire, directly or indirectly, any employee, officer, contractor or consultant of the other party.

31. NO THIRD PARTY BENEFICIARIES. Nothing in this Agreement will give rights to any third parties and the provisions of the Contract (Third Party Rights) Act are specifically excluded.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on their behalf by their duly authorized agents as of the day and year first above written.

Executed as of the date first written above.

For:  Jiangxi LDK Solar Hi-Tech Co., Ltd.    For:  GT Solar Incorporated
      Xinyu Hi-Tech Development Zone           243 Daniel Webster Highway
      Xinyu City, Jiangxi, China              Merrimack, NH 03054 USA

/s/ Xiaofeng Peng                         /s/ Thomas M. Zarrella
------------------------------     --------------------------
Light DK Peng                             Thomas M. Zarrella 10/10/06

                                     /s/ Kedar P. Gupta
                                     --------------------------
                                   Kedar P. Gupta 10/10/06

                                     /s/ Howard Smith
                                     --------------------------
                                   Howard Smith 10/10/06

Page 8

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT A

EQUIPMENT

| EQUIPMENT (units) | Unit Price | Total |
|---|---|---|
| GT-DSS 450 furnace (100) (exclude mezzanines) | $[*] | $64,350,000 |

* Confidential Treatment Requested. The redacted material has been separately
  filed with the Securities and Exchange Commission.

Page 9

```
                              EXHIBIT B
                              ---------


                       EQUIPMENT SPECIFICATIONS
                                 AND
                ACCEPTANCE TESTING PROCEDURES AND CRITERIA

                           GT-DSS450 FURNACES



        I.   EQUIPMENT SPECIFICATIONS:
             -------------------------


Ingot Size:          nominal 846 x 846 mm
Ingot Weight:        375 kg to 450 kg
(The ingot weight above requires the feedstock material to have a size
distribution to allow sufficient packing density to fit into the crucible.)


Ingot Conductivity type:        p-type (boron)
Ingot Crystal Characteristic:   multi-crystalline
Ingot Resistivity:              0.5 - 2.0 ohm-cm
                                (Typical average: 1.5 ohm-cm)


DSS Cycle Time:          < or = 60 hours (start to start)

        II.  ACCEPTANCE TESTING PROCEDURES AND CRITERIA
             ------------------------------------------

Within Thirty (30) days following installation of an item of Equipment at the
Customer's facility, but not later than Ninety (90) days following Shipment of
that item of Equipment to Customer, Customer will conduct the testing of such
item of Equipment (which testing will be supervised by GT) to confirm that such
item of Equipment meets the following acceptance criteria. The test shall be
conducted using virgin solar grade silicon as the feedstock material and a
Vesuvius crucible. The Customer will provide the argon gas, silicon feedstock,
crucibles, dopant and crucible coating materials for the tests along with all
other utilites and facilities normally required for operation of the Equipment.


Ingot Size:          nominal 846 x 846 mm
Ingot Weight:        375 kg to 450 kg
(The ingot weight above requires the feedstock material to have a size
distribution to allow sufficient packing density to fit into the crucible.)


Ingot Conductivity type:        p-type (boron)
Ingot Crystal Characteristic:   multi-crystalline
Ingot Resistivity:              0.5 - 2.0 ohm-cm
                                (Typical average: 1.5 ohm-cm)


DSS Cycle Time:      < or = 60 hours (start to start)
DSS Testing:         grow 3 ingots per furnace with no visible cracks
```

Confidential                    Page 11                    Sept. 21, 2006

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Upon confirmation that the acceptance criteria set forth above have been achieved, the Customer will execute and deliver to GT and Equipment Acceptance Certificate in the form attached as Exhibit B, page 2.

The Customer must provide the necessary facilities, materials and utilities for the acceptance testing of each item of Equipment. If, for reasons not wholly attributable to GT, acceptance testing is not completed by the earlier of Thirty (30) days following the installation of an item of Equipment or Ninety 90) days following Shipment of that item of Equipment, then the acceptance criteria will be deemed to have been met and the Customer shall execute and deliver to GT the Equipment Acceptance Certificate in the form attached as Exhibit B, page 2.

Confidential                    Page 12                    Sept. 21, 2006

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT B (PAGE 2)
------------------

Equipment Acceptance Certificate
--------------------------------


Customer:
-------------------------------------------------------------------------------

Contract No.:
-------------------------------------------------------------------------------

Sales Order No.:
-------------------------------------------------------------------------------

Machine Type:
-------------------------------------------------------------------------------

Machine Model:
-------------------------------------------------------------------------------

Serial No.:
-------------------------------------------------------------------------------

Service Engineer/GT Solar Representative:
-------------------------------------------------------------------------------


        This certifies that the item of Equipment referenced above has been
        tested by the Customer and meets all applicable acceptance criteria.

            Print Name:
                        ---------------------------------------------
        Customer Signature:
                        ---------------------------------------------

                DATE:
                        -------------------------

Confidential                    Page 13                    Sept. 21, 2006

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT C

Payment Schedule

Deposit Installment Payment Schedule

| Payment # | Amount (US-$) | Date Due |
| --------- | ------------- | ----------------- |
| 1 | $2,145,000 | November 15, 2006 |
| 2 | $2,145,000 | December 15 2006 |
| 3 | $2,145,000 | January 15, 2007 |
| 4 | $2,145,000 | February 15, 2007 |
| 5 | $2,145,000 | March 15, 2007 |
| 6 | $2,145,000 | April 15, 2007 |

Letter of Credit Schedule

| L/C # | Amount (US-$) | Date Due |
| --------- | ------------- | ----------------- |
| 1 | $4,504,500 | March 15, 2007 |
| 2 | $4,504,500 | April 15, 2007 |
| 3 | $4,504,500 | May 15, 2007 |
| 4 | $4,504,500 | June 15, 2007 |
| 5 | $4,504,500 | July 15, 2007 |
| 6 | $4,504,500 | August 15, 2007 |
| 7 | $4,504,500 | September 15, 2007 |
| 8 | $4,504,500 | October 15, 2007 |
| 9 | $4,504,500 | November 15, 2007 |
| 10 | $4,504,500 | December 15, 2007 |

Page 14

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT D

SHIPMENT SCHEDULE

| UNITS | SHIPMENT DATE |
| ----- | ------------------ |
| 10 | May 31, 2007 |
| 10 | June 30, 2007 |
| 10 | July 31, 2007 |
| 10 | August 31, 2007 |
| 10 | September 30, 2007 |
| 10 | October 31, 2007 |
| 10 | November 30, 2007 |
| 10 | December 31, 2007 |
| 10 | January 31, 2008 |
| 10 | February 28, 2008 |

Page 12

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

EXHIBIT E

CERTAIN CUSTOMER SUPPLIED ITEMS

1.  Necessary water chillers with back-up systems

2.  Necessary water with back-up systems

3.  Clean, dry compressed air

4.  All plumbing and wiring to the machines

5.  Necessary power with back-up systems

6.  Materials handling equipment

7.  Shelves, storage cabinets, and workbenches

8.  Other engineering and facility services needed-to be defined by GT Solar
    within 60 days of the Commencement Date.

</TEXT>
</DOCUMENT>

Exhibit 10.8

PURCHASING AGREEMENT

Date: January 5, 2007

THE BUYERS:     JIANGXI LDK SOLAR HI-TECH CO., LTD.
Address         Xinyu High Tech Development Zone, Xinyu, Jiangxi Province, China
                Tel: 86-512 6562 9698  Fax: 86-512 6562 2785  Post Code: 338032

THE SELLERS:    HCT SHAPING SYSTEMS SA
Address         Route de Geneve 42, CH-1033 Cheseaux, Switzerland
                Tel: +41-21-731 9100  Fax: +41-21-731 9101

This Purchasing Agreement is made by and between the buyers and the Sellers for
the purchase of HCT equipment under following terms and conditions:

1.   The Buyers will place order to the Sellers for a total order of no less
     than 170 units of HCT wire saw model E500SD-B/5 and no less than 65 units
     of HCT wire saw model SQUARER.

2.   The order and delivery shall be completed before December 31, 2008.

3.   The unit price for HCT wire saw model E500SD-B/5 is USD825,000.00. The
     price for HCT wire saw model SQUARER is USD730,000.00. The Sellers agree to
     keep these prices and valid for the delivery until December 31, 2008.
     However, the Sellers has the right to adjust the prices if the USD-CHF
     currency fluctuation is more than 5% of the current prevailing exchange
     rate at 1.31.

4.   Payment terms: 15% advance payment paid by T/T to the Sellers' account in
     Switzerland within 10 days after the aforesaid Contract is signed by both
     parties. 75% of contract value shall be paid by an irrevocable L/C 30 days
     before the shipment, 10% balance payment shall be effected by T/T within 10
     days after the machine is installed and accepted.

5.   A separate contract shall be established for each delivery from the
     Sellers. This contract is used for the executions of payments, customs
     declarations and the machine commissioning. Both parties have discussed and
     mutually agreed to terms and conditions of the contract as appeared in the
     appendix of this Agreement.

The Buyers                           The Sellers
JIANGXI LDK SOLAR HI-TECH CO., LTD.  HCT SHAPING SYSTEMS SA

 /s/ Xiaofeng Peng                    /s/ Stefan Schneeberger
---------------------------------    ------------------------------------

CONTRACT

```
                                          No.
                                              ---------------------------
                                      Date:
                                              ---------------------------
```

THE BUYERS:            JIANGXI LDK SOLAR HI-TECH CO., LTD.
Address:               Xinyu High Tech Development Zone, Xinyu, Jiangxi Province, China
                       Tel: +86-512 6562 9698        Fax: +86-512 65622785      Post Code: 338032

THE SELLERS:           HCT SHAPING SYSTEMS SA
Address:               Route de Geneve 42, CH-1033 Cheseaux, Switzerland
                       Tel: +41-21-731 9100          Fax: +41-21-731 9101

This Contract is made by and between the buyers and the Sellers whereby the Buyers agree to buy and the Sellers agree to sell the goods according to the terms and conditions stipulated hereunder:

1.

| Item | Goods Specifications | Unit | Qty | Unit Price (USD) | Total Amount (USD) |
|------|----------------------|------|-----|------------------|--------------------|
| 1. | HCT Wire Saw Model E500SD-B/S detials as per appendix No. 1, 2 3 & 4 | Sets | | | |
| 2. | HCT Wire Saw Model SQUARER, details as per appendix No. 1, 2 3 & 4 | Sets | | | |
| | | | | Net total | |

Total Contract Value: USD CIP Shanghai, China
U.S.DOLLARS

Remarks: Prices in this contract are valid for the ordered quantities stated above. Any reduction in ordered quantities will be subject to price revision.

2.   COUNTRY OF ORIGIN AND MANUFACTURER: HCT SHAPING SYSTEMS SA, Switzerland
3.   Main machine will be packed in steel frame and plastic cover suitable for air transportation. Goods other than the main machine will be packed in wooden boxes. The wooden packaging materials shall be prepared and stamped in accordance with ISPM #15 (International Standards on Phytosanitary Measures issued by the International Plant Protection Council IPPC), in place of the Certificate of Wood Fumigation issued by the local government authorities.
     During the shipment transit time, the goods must be stored indoors or with proper shelter against rain and humidity.
     The Sellers shall be liable for any damage to the commodity and expenses incurred on account of improper packaging and for any rust attributable to inadequate or improper protective measures taken by the Sellers in regard to the packing.
4.   SHIPPING MARK: The Sellers shall mark on each package with fadeless paint the package number, gross weight, net weight, measurements and the wording:" Keep away from moisture" "Handle with care" "This side up " and the shipping mark:
                        --------------
                        SHANGHAI/CHINA
3.   TIME OF SHIPMENT: Details as per the appendix 3, subject to the advance payment being remitted on time. Any delay in advance payment date may delay shipment date.
5.   PORT OF SHIPMENT: Swiss airport, Switzerland
6.   PORT OF DESTINATION: Shanghai airport, China
7.   INSURANCE: To be covered by the Sellers

8.   PAYMENT:
     a)   15% advance payment shall be effected by T/T directly deposited to the
          Sellers' bank account in Switzerland within 10 days after the contract
          is signed. The Sellers shall furnish the Buyers invoice and bank
          guarantee prior to the advance payment to be made by the Buyers.
          The Seller's bank account:
          UBS SA Lausanne, 243-FS101770.2
          IBAN CH 13 0024 3243 FS10 1770 2
          BIC UBSWCHZH80A
     b)   75% by L/C: The Buyer shall, 30 days prior to the delivery, open an
          irrevocable Letter of Credit with any official bank in P.R. China, in
          favor of the Seller, for 75% of the total value of shipment. The
          credit shall be available against Sellers' draft(s) drawn at sight on
          the opening bank for the invoice value accompanied by the shipping
          documents specified in Clause 10 hereof. Payment shall be effected by
          the opening bank by telegraphic transfer against presentation to them
          of the following draft(s) and documents. The Letter of Credit shall be
          valid for 12 months.
     c)   10% balance payment shall be effected by T/T directly deposited to the
          Sellers' bank account in Switzerland at sight of Machine Acceptance
          Protocol signed by the Buyers.
     d)   The advance payment is due within 10 days after the contract's
          signature. Otherwise, the Seller reserves the right to revise the
          contract value according to the Swiss franc prevailing exchange rate.
     e)   If the final machine acceptance at the Buyers' site does not take
          place within 5 weeks following the arrival of machine at the entry
          port/airport of destination through no fault of Sellers, the final 10%
          of payment shall become payable immediately.
     f)   All the bank charges incurred inside China shall be borne by the
          Buyers and the bank charges incurred outside China shall be borne by
          the Sellers.

9.   DOCUMENTS:
     a)   Full set of Airway bills showing freight prepaid and consigned to the
          party as instructed in the aforesaid L/C
     b)   Manually Signed Commercial invoice in 3 originals indicating the
          Contract number and shipping mark and made out in details as per the
          Contract
     c)   Certificate(s) of origin of the goods issued by the Sellers
     d)   Packing list/Weight Memo in 3 originals issued by the Sellers
     e)   Certificate of Quality and Quantity in one copy issued by the Sellers
     f)   Full set of Insurance Certificate for 110% of the invoice value,
          showing claims payable in People's Republic of China, in currency of
          the draft, blank endorsed, covering All Risks
     g)   Copy of shipping advice to the Buyers
     h)   For final 10% payment, a signed copy of machine test acceptance
          certificate

10.  SHIPMENT: CIP Terms (Airfreight)
     The Sellers shall contract on usual terms at his own expenses for the
     carriage of the goods to the agreed point at the named place of destination
     and bear all risks and expenses until the goods have been delivered to the
     first carrier.

11.  SHIPPING ADVICE:
     The Sellers shall within 2 working days after the shipment of the goods,
     advise the shipping department of the Buyers by fax of Contract No., goods
     name, quantity, value, invoiced value, invoice No., gross weight, air
     waybill No., flight No., etc.

12.  GUARANTEE OF QUALITY:
     The Sellers guarantees that the commodity hereof is made of the best
     materials with first class workmanship brand new and unused, and complies
     in all respects with quality and specifications stipulated in the Contract.
     The guarantee period shall be 15 months counting from the date on which
     the commodity arrives at the port of destination or 12 months after the
     machine acceptance test is passed, whichever comes first.
     In case of defectives judged according to the quality standard agreed by
     both the Buyers and the Sellers, following article 14 shall be observed.

13.  CLAIMS:
     Within 90 days after the arrival of the goods at destination, should the
     quality, specification or quantity be found not in conformity with the
     stipulations of the Contract except those claims for which the insurance
     company or the owners of the airfreight are liable, the Buyers, on the
     strength of the Inspection Certificate issued by the China Entry-Exit
     Inspection and Quarantine Bureau, have the right to claim for replacement
     with new goods, or for compensation, and all the expenses (such as
     inspection charges, freight for returning the goods and sending the
     replacement, insurance premium, storage and loading and unloading charges,
     etc.) shall be borne by the Sellers. As regards to the quality, the Sellers
     guarantee that if, within 12

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

months from the date of arrival of the goods at destination, damages occur in the course of operation by reason of inferior quality, bad workmanship or the use of inferior materials, the Buyers shall immediately notify the Sellers in writing and put forward a claim supported by Inspection Certificate issued by the China Entry-Exit Inspection and Quarantine Bureau. The Certificate so issued shall be accepted as the base of a claim. The Sellers, in accordance with the Buyers' claim shall be responsible for the immediate elimination of the defect(s). Where necessary, the Buyers shall be at liberty to eliminate the defect(s) themselves at the Sellers' expenses. If the Sellers fail to answer the Buyers within one month after receipt of the aforesaid claim, the claim shall be reckoned as having been accepted by the Sellers.

14. FORCE MAJEURE:
The Sellers shall not be held responsible for the delay in shipment or non-delivery of the goods due to Force Majeure, such as war, serious fire, flood, typhoon and earthquake, strike or other events agreed upon between both parties, which might occur during the process of manufacturing or in the course of loading or transit. The Sellers shall advise the Buyers for their acceptance a certificate of the accident mentioned above and within fourteen days thereafter, shall send by airmail to the Buyers for their acceptance a certificate of the accident issued by the Competent Government Authorities, where the accident occurs as evidence thereof. Under such circumstances the Sellers, however, are still under the obligation to take all necessary measures to hasten the delivery of the goods. In case the accident lasts for more than 10 weeks, the Buyers shall have the right to cancel this Contract.

15. LATE DELIVERY AND PENALTY:
Should the Sellers fail to make delivery on time as stipulated in this Contract, with exception of Force Majeure specified in Clause 15 of this Contract, the Buyers shall agree to postpone the delivery on condition that the Sellers agree to pay a penalty, which shall be deducted by the paying bank from the payment. The penalty, however, shall not exceed 5% of the total value of the goods involved in the late delivery. The rate of penalty is charged at 0.5% for every seven days, odd days less than seven days shall be counted as seven days. In case the Sellers fail to make delivery six weeks later than the time of shipment stipulated in this Contract, the Buyers shall have the right to cancel this Contract.

16. ARBITRATION:
All disputes with this Contract or the execution thereof shall be settled friendly through negotiations. In case no settlement can be reached, the case may then be submitted for arbitration to the China International Economics and Trade Arbitration Commission in accordance with the Rules of Arbitration promulgated by the said Arbitration Commission. The Arbitration shall take place in Shanghai and the decision of the Arbitration Commission shall be final and binding upon both parties; neither party shall seek recourse to a law court nor other authorities to appeal for revision of the decision. Arbitration fee shall be borne by the losing party.

17. SPECIAL PROVISIONS:
a)   Upon the Buyers' request, the English version of this Contract is translated into Chinese language for reference only. Shall there be any contradictions found in the Chinese translation versus the English version, the original English version shall prevail.
b)   All appendixes to the Contract shall form an integral part of the Contract and have the same effectiveness as the Contract. IN WITNESS THEREOF, both parties signed this Contract in three original copies, each party holds one copy.


The Buyers:                              The Sellers:

LDK SOLAR HI-TECH CO., LTD.              HCT SHAPING SYSTEMS SA


-------------------------------          -------------------------------
Date:                                    Date:

Appendix No. 1 to Contract No.          dated
------------------------------------------------------------

Bank Guarantee information

The bank guarantee shall be sent directly to the following bank:


Remitter:          JIANGXI LDK SOLAR HI-TECH CO., LTD.
                   ------------------------------------------------------------

Bank Name in full: INDUSTRIAL & COMMERCIAL BANK OF CHINA, JIANGXI PROVINCIAL
                   BRANCH
                   ------------------------------------------------------------

Bank Address:      2 NORTH YANGJIANG ROAD, NANCHANG, JAINGXI, CHINA
                   ------------------------------------------------------------

Swift Code         ICBKCNBJJSI
                   ------------------------------------------------------------

Appendix No. 2 to Contract No.          dated
---------------------------------------------------------------

| Pos | Description | Qty |
| ------- | ------------------------------------------------------ | -------- |
| ------- | ------------------------------------------------------ | -------- |
| 101 | HCT Wire Saw Model E500SD-B/5 | |
| | Basic configuration including: | |
| | One wire saw machine 3x 400V 50 Hz | |
| | Side-by-side double ingots table (replaced standard table) | |
| | One slurry tank with pump(s) and mixer | |
| | Slurry flow and density measurement unit(s) | |
| | One set of wire guides, coated and grooved | |
| | One disposal wire spool shaft adapter | |
| | One take-up spool and its shaft adapter | |
| | One set of ingot holder(s) with gluing plate(s) | |
| | Operating software for Window NT with menu in Chinese NT | |
| | Complete set of machine documentation | |
| | One set of standard metric tools | |
| | One set of special HCT tools | |
| | Modern for connection to remote computer | |
| | | |
| 200 | MACHINE OPTIONS (ADDITIONAL TO POS 101): | |
| 201 | Set of machine consumables for the start up on site | |
| 203 | Power supply failure protection for wire saw | |
| 207 | Quick release hydraulic take up spool | |
| 208 | Side-by-side double ingots table (replaced standard table) | |
| 209 | High load feature (2x 61kw, 140kw cooling, 550L tank, BB | |
| | cooling) | |
| 212 | Metallic filter system | |
| | | |
| 500 | OPTIONS FOR PRODUCTION: | |
| 501 | Set of wire guides standard (DIAMETER)300 | |
| 505 | Ingot holder (per piece) | |
| 506 | Gluing plate (per piece) | |
| | | |
| 600 | ASSISTANT DEVICES: | |
| 603 | Electrical handling unit for spool, wire-guide & | |
| | ingot handling | |
| 604 | Accessory to unload spools | |
| 605 | Accessory to unload wire guides | |
| 606 | Accessory to unload ingots | |
| | | |
| 101 | HCT Wire Saw Model SQUARER | |
| | Basic configuration including: | |
| | One wire saw machine 3x 400V 50Hz | |
| | One slurry tank with pump(s) and mixer | |
| | Slurry flow and density measurement unit(s) | |
| | One set of wire guides, coated and grooved | |
| | One disposal wire spool shaft adapter | |
| | One take-up spool and its shaft adapter | |
| | One set of ingot holder(s) with gluing plate(s) | |
| | Operating software for Window NT with menu in Chinese NT | |
| | Complete set of machine documentation | |
| | One set of standard metric tools | |
| | One set of special HCT tools | |
| | Modern for connection to remote computer | |
| | | |
| 200 | MACHINE OPTIONS (ADDITIONAL TO POS 101): | |
| 201 | Set of machine consumables for the start up on site | |
| 203 | Power supply failure protection for wire saw | |
| | | |
| | OPTIONS FOR SQUARER: | |
| 5004 | Gluing plate for multicrystalline brick for jumbo ingot | |
| | | |
| 500 | OPTIONS FOR PRODUCTION: | |
| 501 | Set of wire guides standard (DIAMETER)300 | |
| 503 | Take up spool type HCT 63 | |

Remarks:
--------

1.  Machine Installation in China
    -----------------------------
    The Sellers shall send their engineer to the Buyers' work site in China for
    machine installation and machine acceptance tests. The duration of stay
    will be seven (7) man-days for each piece of equipment. All costs to be
    borne by the Sellers except the local transportation between hotel and work
    site.

2.  Machine Acceptance Test at the Buyer's Site
    -------------------------------------------
    After the machine is installed and trial runs are made, the Sellers'

machine. Upon fulfillment of one condition or me another after acceding
to one of the following conditions. Both representatives shall sign the
machine acceptance protocol if all conditions have been fulfilled. Details
as per appendix No. 4.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
        Appendix No. 3 to Contract No.          dated
        ----------------------------------------------------------------

Delivery Schedule for Contract No.


        Machine Type      Ex-works date       Shipment within        Routing
                          (On or before)
        ----------------  -----------------   ---------------------  -----------
1.
                                              2 weeks                AIR
        ----------------  -----------------   ---------------------  -----------
2.
                                              2 weeks                AIR
        ----------------  -----------------   ---------------------  -----------
3.                                            2 weeks                AIR
        ----------------  -----------------   ---------------------  -----------
4.
                                              2 weeks                AIR
        ----------------  -----------------   ---------------------  -----------
5.
                                              2 weeks                AIR
        ----------------  -----------------   ---------------------  -----------
6.
                                              2 weeks                AIR
        ----------------  -----------------   ---------------------  -----------
7.
                                              2 weeks                AIR
        ----------------  -----------------   ---------------------  -----------
8.
                                              2 weeks                AIR
        ----------------  -----------------   ---------------------  -----------
9.
                                              2 weeks                AIR
        ----------------  -----------------   ---------------------  -----------
10.
                                              2 weeks                AIR
        ----------------  -----------------   ---------------------  -----------
11.
                                              2 weeks                AIR
        ----------------  -----------------   ---------------------  -----------
12.
                                              2 weeks                AIR
        ----------------  -----------------   ---------------------  -----------


                        * * * * * * *
```

```
      Appendix No. 4 to Contract No.           dated
      ----------------------------------------------------------------

For HCT Wire Saw Model E500SD-B/5


--------------------------------------------------------------------------

GENERAL INFORMATION
                        Wire saw model: Model E500SD-B/5
                              Material: Multi silicon square wafer
      Ingot diameter or section size: 158 x 156mm
                          Ingot length: Total ingot length for each
                                        position should not exceed
                                        500mm, including the space
                                        between ingots (due to ingot
                                        ends sqaureness)
            Wafer thickness (as cut): 200 um

                                        ---------------------------------
                                              Customer acceptance

CUTS REQUIREMENT
      Number of required test cuts for acceptance: 1 x full load (4 assemblies of
                                                   ingot total 500mm long)
              Number of required pre-test cuts: 1 x half load (2 assemblies of
                                                   ingot total 500mm long)
                  Total number of ingots required: 6 assemblies of ingot total
                                                   500mm long
                  Test ingots quality requirement: All prime ingots, without cracks

PROCESS PARAMETERS
                    Cutting table speed: 360um/min
                            Wire speed: According HCT definition
                            Slurry flow: According HCT definition
                      Slurry mixing ratio: According HCT definition

CONSUMABLES DEFINITION
      Wire supplier, spool type and wire diameter: Trefil Arbed, TA100, 140um
                      Abrasive supplier & type: ESK F600
                      Coolant supplier & type: HS20

WAFER SAMPLING METHOD
              Wafers removed from statistics: Three complete sliced wafers
                                             from each ends of each ingots
                                             are discarded from test
                                             sampling. Wafers sampling shall
                                             avoid wafers from area being
                                             affected by closs-interferences
                                             of two parallel ingots due to
                                             difference in lenth.
                  Wafer sampling ratio: 20 wafers from each machine
                                             slicing position
                  Wafer sampling method: Random

WAFER MEASURING METHOD
                      Measuring tool: Mechanical sensor, Heidenhein
                      Measured points: 5 points method
                            Saw marks: Visual check
                  Parameters checked: TV, TTV

PERFORMANCE SPECIFICATION
                                  TV: Thickness +/- 20um
                                 TTV: Max. below 50um
                          Saw marks: None by visual check
                          Wafer step: None by visual check
  Wafer yield (exclusively due to wire sawing): >=95%

OTHERS
                Pre-cleaning of the wafers: (Customer's facilities)
                Return wafers (customer desire): Not applicable
--------------------------------------------------------------------------
```

For HCT Model SQUARER

---------------------------------------------------------------------------

GENERAL INFORMATION
                                        Model: SQUARER
                                     Material: Multi silicon square wafer
                 Ingot diameter or section size: 840 x 840 x 250mm
                                  Bricks size: 156 x 156mm

                                    --------------------------------
                                         CUSTOMER ACCEPTANCE

CUTS REQUIREMENT
    Number of required test cuts for acceptance: 1 x full load (1 ingot 840 x
                                                 840 x 250mm)
                Number of required pre-test cuts: None
                Total number of ingots required: 1 ingot
                Test ingots quality requirement: All prime ingots, without cracks

PROCESS PARAMETERS
                             Cutting table speed: 700um/min structured wire (to be
                                                  confirmed for "jumbo" quality)
                             Back / forth required: Yes

CONSUMABLES DEFINITION
    Wire supplier, spool type and wire diameter: Trefil Arbed, TA 100,
                                                 250um structured
                         Abrasive supplier & type: ESK F360
                         Coolant supplier & type: HS20

BRICKS MEASURING METHOD
                             Parameters checked: Size & angle

PERFORMANCE SPECIFICATION
                             Angle guaranteed: Square angle, 90 degree
                                               +/- 0.2 degree
                                  Bricks size: 156mm +/- 0.25mm
---------------------------------------------------------------------------

</TEXT>
</DOCUMENT>

Exhibit 10.9

CONTRACT

No: MB-SHA2006003A                              DATE: 2006/01/25
                                               At: Xinyu, Jiangxi, China

THE BUYERS:                        THE SELLERS:

Jiangxi LDK Solar Hi-Tech Co., Ltd.    MEYER BURGER AG

Address:                           Address: Alte Bemstrasse 146,
High Technology Industrial                  3613 Steffisburg, Switzerland
Park, Xinyu City 215128,           TEL: 0041-33-4390505
Jiangxi Province, P.R China        FAX: 0041-33-4390510
TEL: 0088-512-65629698
FAX: 0086-512-65622785


This Frame Contract is made by and between the Buyers and the Sellers; whereby
the Buyers agree to buy and the Sellers agree to sell the under-mentioned
commodity according to the terms and conditions stipulated below:

1.



                                         Unit Price
No.    Commodity, Specifications    Quantity    Total Amount(USD)
---    --------------------------   --------    ------------------------------

Model DS264 Wire Saw              40SETS    According to market conditions
(details as per attachment)                 while actual order prices to be
                                            negotiated.

    TOTAL CIF SHANGHAI SEAPORT, SAY US DOLLARS TWENTY-TWO MILLION ONLY.


2.  Country of Origin and Manufacturers: Switzerland, Meyer Burger AG

3.

Packing:  To be packed in strong wooden case(s), or in carton(s), suitable for
          long distance ocean transportation and to change of climate, well
          protected against moisture, shocks and rust. The Sellers shall be
          liable for any damage of the commodity and expenses incurred on
          account of improper packing and for any rust attributable to
          inadequate or improper protective measures taken by the Sellers in
          regard to the packing. One full set of service and operation
          instructions concerned shall be enclosed in the case(s).

4.

Shipping Mark:  The Sellers shall mark on each package with fadeless paint the
                package number, gross weight, net weight, measurement and the
                wordings: "KEEP AWAY FROM MOISTURE", "HANDLE WITH CARE", "THIS
                SIDE UP", etc., and the shipping mark:

                        MB-SHA2006003A
                        -------------------
                        SHANGHAI, CHINA

5.  Time of shipment:              According to attachment 2

6.  Port of Shipment:              European Main Seaport

                                1

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

7.  Port of Destination:           Shanghai Seaport

8.  Insurance:                     TO BE COVERED BY THE SELLER.

9.  Payment:          1) Down Payment: 25% of each shipment value
                         will be paid by the buyer to the seller
                         via T/T 9 months before each shipment
                         and confirmed by the Seller.

                         The rest 65% of each shipment value
                         shall be guaranteed by an irrevocable
                         Letter of Credit issued by a primary
                         Chinese Bank. The Letter of Credit shall
                         be valid until the said total L/C value
                         to be effected in favor of the
                         beneficiary. Within 60 days before
                         shipment, The Buyer will, at buyer's
                         expense, establish in favor of Meyer
                         Burger an irrevocable Letter of Credit
                         in the value equal to 65% of each
                         shipment value.

                      2.1) 65% of each shipment shall be payable
                         within 180 days after each shipment against
                         presentation of shipping documents.

                      3) 10% of each shipment value shall be
                         payable via T/T within 30 days after
                         acceptance certificate issued by the
                         buyer.

10.  Documents:

(1)  Full set of on board ocean bills of lading marked "Freight Prepaid" made
     out to order blank endorsed notifying the Buyer.

(2)  Commercial Invoice in 5 copies indicating contract number, made out in
     details as per relative contract.

(3)  Insurance Policy/Certificate in one original and two copies for 110% of the
     invoice value showing claims payable in China in currency of the draft,
     blank endorsed, covering All Risks.

2

(4)  Packing list in 5 copies issued by the Manufacturers.

(5)  Certificate of Quality and Quantity in 5 copies issued by the
     Manufacturers.

(6)  Copy of fax to the Buyers advising particulars of shipment immediately
     after shipment is made.

(7)  Certificate of Origin issued by the manufacturer.

(8). Fumigation Certificate or certificate of Plant Quarantine issued by
     relative competent authority or Non-wooden packing declaration.

11.  Shipment:

     The Sellers shall ship the goods within the shipment time from factory to
     destination port. Partial shipment is allowed. Transshipment is allowed.

12.  Guarantee of Quality:

     The Sellers guarantee that the commodity hereof is made of the best
     materials with first class workmanship, brand new and unused, and complies
     in all respects with the quality and specification stipulated in this
     Contract. The guarantee period shall be 12 months counting from the date on
     which the acceptance certificate is issued or 15 months after the date of
     shipment, whichever comes first.

13.  Force Majeure:

     The Sellers shall not be held responsible for the delay in shipment or
     non-delivery of the goods due to Force Majeure, which might occur during
     the process of manufacturing or the course of loading or transit. The
     Sellers shall advice Buyers immediately of the occurrence mentioned above
     and within fourteen days thereafter, the Sellers shall send by air mail to
     the Buyers for their acceptance a certificate of the accident issued by the
     Competent Government Authorities where the accident occurs as evidence
     thereof. Seller's inability in obtaining export license shall not be
     considered as Force Majeure.

     Under such circumstances, the Sellers, however, are still under the
     obligation to take all necessary measures to hasten the delivery of the
     goods. In case the accident lasts for more than 10 weeks, the Buyers shall
     have right to cancel the Contract.

14.  Arbitration:

     All disputes arising from the contract or the execution of the contract
     shall be settled first between the buyer and seller in a friendly way. If
     the agreement can not be reached after friendly discussion, the disputes
     will be submitted to the China International Economics and Trade
     Arbitration Commission in Shanghai for arbitration. The arbitration will be
     carried out in accordance with the Commission's arbitration rules in effect
     at the time of arbitration. The arbitral award is final and binding upon
     both parties. The arbitration fees shall be borne by the losing party
     unless otherwise awarded by the Commission.

3

15. This contract is made in Chinese/English, and has the same validity. Two original ones of this contract will be held by the Buyer, the Seller respectively.

Special Provision:

1. In case the buyer cancel the contract after signature of contract due to the buyer's reason, the buyer is liable for compensation to the Seller at the rate of 10% of the contract value. The payment will be made by the buyer within 15 days after cancellation of contract.

2. Unless buyer and seller have not signed official order, Seller will not reserve specific capacity. To reserve capacity and confirm specific capacity and deliveries, Seller shall receive the down payment at least 9 month prior shipment of first machine. The delivery schedule will be agreed separately in the official order.

The Buyers:                              The Sellers:


/s/ Xiaofeng Peng                        /s/ Huiwen Zhou
-------------------------------------    ---------------------------------------
2006.1.25

Attachments 1-4 an integral part of the contract of MB-SHA2006003A.

Attachment 1: Delivery plan
Attachment 2: Facility requirement/unit
Attachment 3: Unpacking, installation and commissioning
Attachment 4: Acceptance criteria

4

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Attachment 1 to contract MB-SHA2006003A

DELIVERY PLAN

Total delivery 40 sets of DS 264:

Shipment

           40 pc. Before end of Dec.    2008

TOTAL DELIVERY    40 PC. DS 264

1

ATTACHMENT 2 TO CONTRACT MB-SHA2006003A

DS264 FACILITY REQUIREMENT/UNIT

MACHINE DIMENSION:
  Length/width/height (approx.):              5180/4250/3467 mm
  Total weight of machine:                    approx. 16'500kg

ELECTRIC ENERGY
  Voltage/Frequency                           400V +/- 10%, 3 phase; 50Hz;
  Maximum power consumption:                  110 kW
  Electric supply must be stable during machine running.

COMPRESSED AIR
  Pressure:                                   6-8 bar
  Quantity:                                   approx 20 Nm(3)/h

AIR EXHAUST
  Quantity:                                   500 m(3)/h

COOLING WATER
  Cooling water quantity:   300l-500l/min (at a temp. of 19 degrees C)
  Temperature min./max.                       < 20 degrees C
  Pressure   min./max.                        2-5 bar
  (Between water supply and water return must be a pressure difference of at
  least 2 bar.)
  Cooling power:                              110 KW

TEMPERATURE

  Environment temperature:                        20-25 degrees C
  Temperature fluctuation during a complete cut:  < 2 degrees C

INTERNET COMMUNICATION INTERFACE HAS TO BE AVAILABLE INSIDE THE WORKSHOP.

VARIES ON ABOVE REQUIREMENTS WILL INFLUENCE THE QUALITY OF THE MACHINE AND
WARRANTY RELIABILITY.

2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

ATTACHMENT 3 TO CONTRACT MB-SHA2006003A

UNPACKING, INSTALLATION AND COMMISSIONING

The installation and commissioning must be ready within 3 weeks after shipment.
Within two weeks after receipt of the buyer's written notice, Meyer Burger shall
send engineer(s) to the buyer's site for installation, commissioning and
acceptance test. The buyer guarantees that the equipment will only be unpacked
with the presence of the seller unless it is required by the relevant Chinese
authority. The buyer will inform the seller of the date of Customs clearance so
that the seller can present in the unpacking if it happens. The buyer shall
provide the local transportation, accommodation, working conditions, ingots and
the consumable commodities for the installation, commissioning and the final
acceptance test.

3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

ATTACHMENT 4 TO CONTRACT MB-SHA2006003A

ACCEPTANCE

WIRE SAW DS264

The Wire Saw will be checked and tested according to the relevant standards.

1.    Material of acceptance test:

     125mmx125mm 156mmx156mm poly silicon

2.    Target wafer thickness: 220 -240 um (Pitch distance will be specified in
      advance by the buyer 2 months before shipment)

3.    Acceptance criteria

      Wire thickness: dia0.14mm
      -95% TTV mean < or = 35 microns
      -Center thickness tolerance +/- 20 microns

6.    Conditions:
            - Room temperature requirements    20 degrees C

      Temperature fluctuations during complete out    < 2 degrees C

      Consumable and wear out items must be according to M+B specification

7.   Sampling and measuring system
              Sampling:
     First wafer measure: No. 20 from each ingot start.

      After this, the each 50th wafer up to the 20th wafer before ingot end
            - TTV Measurement: 5 point test

8.   Once a test fails to meet the acceptance requirement, both parties will
     study together the reason and one or two tests will be carried as soon as
     possible.

9.   After the acceptance test meets above standards, the acceptance certificate
     must be issued at once by the Buyer.

                                        4

</TEXT>
</DOCUMENT>

Exhibit 10.10

(Summary Translation)
COOPERATION AGREEMENT

Under the outstanding leadership of Dr. Shi Zhengrong, chairman and CEO, Suntech
Power Holdings Co., Ltd. ("Suntech") has become the industry's top ten in the
world within a short period of four years (currently, its production capacity
of both solar cells and modules has reached 120MW, accounting for 1/10 of the
world's total production capacity). Suntech is moving forward with a firm and
steady pace.

Under the leadership of Mr. Xiaofeng Peng, Jiangxi LDK Solar Hi-Tech Co., Ltd.
("LDK Solar") entered into the solar energy industry with its outstanding vision
and solid financial strength and will soon stand out on top in multicrystalline
silicon wafer production in the country. It is anticipated that LDK Solar will
become one of the leading manufacturers of multicrystalline silicon wafers in
the world in two years.

It is agreed through friendly consultation between Dr. Shi and Mr. Peng that
Suntech and LDK Solar, as two strong entities, should cooperate with and
supplement each other with each party's own strengths. Such a strategic
partnership will advance the development of the Chinese solar energy electricity
generation industry to a new altitude.

Therefore, based on the principles of equality and good faith, both parties
reached the following agreements to build a strategic partnership and to achieve
a win-win result.

(1) Long term cooperation and supplement each with one's own strengths. In 10
years (subject to adjustments through consultation based on the development of
production techniques, solar cell technologies and market demand), Suntech will
not seek to expand into the area of multicrystalline silicon wafer production
with the existing technologies, and LDK will not expand into solar cell
manufacturing with the current technologies. This is to avoid significant risks
brought to a party by the competition from the other party as a result of its
expansion into such different industry sectors.

(2) Due to the shortage of multicrystalline silicon raw materials, LDK will
supply to Suntech multicrystalline silicon ingots and multicrystalline silicon
wafers as much of its production as it can (40-60% of its production). When the
supply of multicrystalline silicon materials and silicon wafers is relatively
sufficent in the markets, Suntech will purchase multicrystalline silicon ingots
and multicrystalline silicon wafers from LDK Solar as a preferred vendor, at a
price prevailing in the mainstream international market.

(3) Given the recent commencement of production at the beginning of 2006 and the
limited production capacity, LDK Solar plans to supply to Suntech 30 MW of
multicrystalline silicon wafers at the specifications of 156x156x240/280 or
125x125x240/280 in the year of 2006 (specifications to be decided based on
production plans). Silicon raw materials will be provided by LDK Solar and
Suntech at 50% each.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(4)    The prices of silicon wafers supplied in 2006 are calculated as follows:

A)    Based on the average price of silicon raw materials> USD45, <= USD55/kg, silicon wafer prices shall be fixed at: 125=USD3.1/piece, 156=USD4.9/piece;

B)    Based on the average price of silicon raw materials> USD55, <=USD65/kg, silicon wafer prices shall be fixed at: 125=USD3.35/piece, 156=USD5.25/piece;

C)    Based on the average price of silicon raw materials> USD65, <=USD75/kg, silicon wafer prices shall be fixed at: 125=USD3.6/piece, 156=USD5.6/piece;

D)    Based on the average price of silicon raw materials> USD75, <=USD85/kg, silicon wafer prices shall be fixed at: 125=USD3.8/piece, 156=USD6.0/piece;

E)    Based on the average price of silicon raw materials> USD85, <=USD95/kg, silicon wafer prices shall be fixed at: 125=USD4.1/piece, 156=USD6.4/piece;

F)    Based on the average price of silicon raw materials> USD95, <=USD105/kg, silicon wafer prices shall be fixed at: 125=USD4.4/piece, 156=USD6.8/piece;

G)    Based on the average price of silicon raw materials> USD105, <=USD115/kg, silicon wafer prices shall be fixed at: 125=USD4.7/piece, 156=USD7.2/piece;

H)    Based on the average price of silicon raw materials> USD115, <=USD125/kg, silicon wafer prices shall be fixed at: 125=USD5/piece, 156=USD7.6/piece.

All the above prices are bonded price ex-works and require LDK Solar to handle the Processing Carry-Over Bonded Handbook.

If a general trading method is used and account is settled in Renminbi after tax, tariff costs of silicon raw materials shall be taken into consideration. If the price variation of silicon raw materials exceeds the above ranges, both parties will negotiate and fix the prices in a friendly manner based on the above ranges.

(5) When its production capacity reaches 200 MW or above in 2007, LDK Solar will supply 100 MW of silicon wafers to Suntech for the year of 2007. 30% of the silicon raw materials will be supplied by Suntech. After 2007, LDK Solar will supply 50-60% of its silicon wafers annually to Suntech and all the raw materials for the production will be procured by LDK Solar. After 2007, LDK Solar will supply its multicrystalline silicon wafers to Suntech at a 5% discount off the international mainstream market prices. Specific details may be settled by the end of 2006.

(6) Suntech will purchase on a priority basis the maximum amount of silicon wafers produced by LDK Solar. If LDK Solar can satisfy Suntech's rapidly growing requirements for silicon wafers, Suntech will not procure multicrystalline silicon wafers from other manufacturers. In addition, subsequent to an overall evaluation by Suntech on the economics and efficiencies with favourable results, Suntech will try its best to expand its multicrystalline solar cell production and gradually reduce its monocrystalline cell production, in our mutual efforts to contribute to the development of photovoltaic application in China and the world.

(7) Both parties shall negotiate the prices of silicon raw materials supplied by Suntech based on the quality of the materials, which in no event shall be higher than the market price.

(8) The payment terms for silicon wafer purchases: pre-payment of 60% of the purchase price 6 months before shipments of solar wafers. Pre-payments for silicon wafers purchased in 2006 will be based on the pricing under Sub-section F of Section 4 of this agreement. The remaining 40% will be calculated proportionately at the time of delivery based on the actual silicon raw materials procurement contract prices and the corresponding silicon wafer prices.

(9) Support of each other and communication with each other with regard to technological and market information. Suntech will provide LDK Solar with its knowledge of and experiences on the current silicon ingot and wafer production technologies and technical skills. LDK will improve the quality of its products to satisfy the needs of its customers.

(10) With the development of the cooperative relationship, the two parties will further explore their long term in-depth cooperation, such as joint investment in certain projects or holding of each other's shares.

```
Suntech Power Holdings Co., Ltd.       Jiangxi LDK Solar Hi-Tech Co., Ltd.
(Signature and seal)                   (Signature and seal)
/seal/ Company seal                    /seal/ Company seal
Legal representative: /s/ Zhengrong Shi Legal representative: /s/ Xiaofeng Peng
Date: 16 October 2005                  Date: 16 October 2005
</TEXT>
</DOCUMENT>
```

Exhibit 10.11

SALES CONTRACT

No.: 20061029-S1
P.O. # LDK 2006/10/29-5
Date: October 29th 2006

THE SELLER (CO-SELLER 1):

```
Company Name:   TECHNISCHER WARENHANDEL HELLER
Address:        AM LERCHENBERG 16, 97234 REICHENBERG, GERMANY,
Tel.:           +49 9333 1500
Fax:            +49 9333 1011
Represented by: MR. HORST HELLER, PRESIDENT AND CEO
Email:          INFO@HELLER-TECHNIK.DE  Web: WWW.HELLER-TECHNIK.DE
```

AND:

THE SELLER (CO-SELLER 2):

```
Company Name:   NCA FORTIN INC.
Address:        552 GINGRAS, QUEBEC, QC, CANADA, G1X3Y1
Tel:            418-655-7555
Fax:            418-659-5892
Represented by: MR. JEAN-YVES FORTIN, PRESIDENT AND CEO
Email:          NCAF@VIDEOTRON.CA
```

TO:

THE BUYER:

```
Company Name:   JIANGXI LDK SOLAR HIGH-TECH CO., LTD
Address:        HIGH TECHNOLOGY INDUSTRIAL PARK, XINYU CITY,
                JIANGXI PROVINCE, 338032, CHINA
Tel:            +86-512-65629698
Tel/Fax:        +86-512-65622785
Represented by: MR LIGHT DK PENG (CEO AND PRESIDENT)
Email           LDKPENG@LDKSOLAR.COM   ALBERTODIGAETANO@LIOUXINGROUP.COM
Web:            WWW.LDKSOLAR.COM
```

Whereas, the parties mutually accepted to refer to General Terms and
Definitions, as set out by the INCOTERM Edition 2000 with latest amendments,
having the following terminology fully understood and accepted.

DEFINITIONS:

| | |
|---|---|
| METRIC TON | A measure of weight equivalent to one thousand kilograms (1,000 kg) |
| COMMODITY | Is referred to as being MONOCRYSTALLINE SILICON INGOTS-P TYPE - 8N-9N - SOLAR GRADE? elsewhere in this agreement also referred to as ["P]roduct or stock or commodity", which specification are detailed in the APPENDIX 1 which is an integral part of this Agreement. |
| DAYS | Means a calendar day, unless differently specified |
| CALENDAR QUARTER | Period of three (3) consecutive months commencing from January till March |
| NOTARIAL INSPECTION COMPANY | Internationally recognized Inspection company that approved by Buyer on Buyer's choice and cost. |
| DELIVERY DATE | The date mutually accepted by both Seller and Buyer as the date on which the Seller has ascertained the quantity and quality of the product |
| VALIDITY OF CONTRACT | The contract is valid at the time it is signed and sealed by Buyer and Seller. |
| PRICE DEFINITION | The confirmed price of commodity must is fixed for the period of the execution of the contract. |

Page 1 of 7

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

The Contract made out by and between the Seller and the Buyer whereby the Seller agrees to sell and the Buyer agrees to buy the under mentioned goods, subject to terms and conditions set forth hereinafter as follows:

IMPORTANT NOTICE: For this offer and/or contract and/or supplier and/or client regarding this transaction, from now and in the future, including for the renewal and/or modification on it (them), for this product or any other products and services to be sold between and/or coming from the parties and/or from the supplier and/or from the manufacture producing these products and services, and for a period of 3 years following the date of completion of the last part of the last contract and/or payment of each manufacturer and/or supplier and/or client, all parties in this agreement, their affiliate companies, agents and representatives, will have to make all and sole (exclusive) business transactions through Technischer Warenhandel Heller and NCA Fortin Inc.

1. NAME OF COMMODITY AND SPECIFICATION:

Name: MONOCRYSTALLINE SILICON INGOTS - P type - 8N and 9N - SOLAR GRADE.
Quality and Specification of Commodity: See Appendix 1.

2. COUNTRY OF ORIGIN: JAPAN

3. UNIT PRICE AND PRICE TERMS OF COMMODITY:

3.1 Unit Price for 8N - 9N ingots: USD$240.00/KILO - FOB JAPAN NAGOYA SEAPORT.

3.2 Payment schedule: See Appendix 1.

3.3 THE CONTRACT PRICE BY KILO IS RENEGOTIABLE EVERY SIX MONTHS, WITH AGREEMENT TO BE SIGNED 2 MONTHS IN ADVANCE

4. MONTHLY QUANTITY (REGULAR DELIVERY):

4.1 Quantity: As the delivery schedule on APPENDIX 2.

5. OPTION TO BUY MORE IN QUANTITY:

5.1 When it will be available from the Seller and if accepted by the Buyer, and confirmed by a monthly delivery notice, THE BUYER COULD ANYTIME TO BUY UP TO 1,000 METRIC TONS BY MONTH. This new quantity will be of the same specification and same quality than at clauses 1 and on Appendix 1.

6. PERIOD OF CONTRACT: FIVE (5) YEARS CONTRACT, STARTING FROM THE TIME OF THE FIRST DELIVERY.

7. PAYMENT TERMS:

7.1 The Ingots must be prepaid 15 days in advance by TT before each 25th of each month of delivery.

7.2 Payment schedule

| Payment date: | $USD | Amount to pay |
|---|---|---|
| Signature of this contract: | | 3 000 000$ |
| After inspection Nov.15th-20th | | 4 200 000$ |
| Before december 10th 2006: | | 12 000 000$ |
| Before January 10th 2006: | | 12 000 000$ |
| Before February 10th 2007: | | 12 000 000$ |
| Before March 10th 2007: | | 12 000 000$ |
| Before April 10th 2007: | | 12 000 000$ |
| Before May 10th 2007: | | 12 000 000$ |
| Before June 10th 2007: | | 12 000 000$ |
| Before July 10th 2007: | | 12 000 000$ |
| Before August 10th 2007: | | 12 000 000$ |
| Before september 10th 2007: | | 12 000 000$ |
| Before October 10th 2007: | | 12 000 000$ |

7.3 See the delivery schedule with prepayment dates on APPENDIX 2.

Page 2 of 7

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

8. PACKING OF COMMODITY:

The transportation package shall make the cargo capable for long-distance ocean / air transportation, and avoid the damage of the commodity in the process of transportation. The Buyer has to inform Supplier prior to the inspection the expected means of shipment.

9. INSURANCE OF COMMODITY:

The Buyer shall be responsible for the insurance from the delivery point to the client facility.

10. SHIPMENT OF COMMODITY:

10.1 The Seller shall advise the inspection place and time to the Buyer as soon as possible. The Seller must do the initial inspection, packaging of the product, prepare packing list.

10.2 The Buyer shall be responsible for the transportation from the delivery point to the Client facility.

11. COMMODITY INSPECTION:

11.1 The quality Inspection Certificate of commodity shall be made by MANUFACTURER/SELLER. The delivery Inspection Certificate of commodity is Buyer responsibility.

11.2 Quality standard: SEE APPENDIX 1

11.3 The Buyer will be able to visit the commodity at the warehouse manufacture at or around November 15th-20th 2006, and around 5 days before delivery.

12. DOCUMENTS:

For each delivery, the Seller shall provide to the Buyer the following full set of documents:

12.1 Packing List

12.2 Original quality certificates plus two (2) copies as issued at discharging port by MANUFACTURER/SELLER;

12.3 Certificate of Origin.

12.4 Signed commercial invoice, based on the delivered quantity/quality.

12.5 Signed quality certificate from the MANUFACTURER/SELLER, based on the delivered quantity/quality, and for each ingot to be delivered.

13. QUALITY/QUANTITY DISCREPANCY:

13.1 Buyer shall notify the Seller if there is any claimed failure of the goods 30 working days after receiving the goods. Buyer shall return unqualified goods and Seller shall change qualified goods against the order for Buyer within 30 days of failure claiming. All the charges and costs in relating to the replacement of the unqualified goods will be paid by the Seller. If the Seller can not fulfil the replacement of the unqualified goods, the Seller must return the money related to the value of the unqualified goods back to the Buyer within 30 days from the date of the failure claiming.

13.2 In Case of quality discrepancy, claim should be filed by the Buyer within 30 days after the arrival of the goods at the port or place of destination, while for quantity discrepancy; claim should be filed by the Buyer within 30 days after the arrival of the goods at port or place of destination. It is understood that the Seller shall not be liable for any discrepancy of the goods shipped due to causes for which the Insurance Company, Shipping Company, and other Transportation Organization/ or Post Office are liable.

13.3 The Seller is responsible to pay back by TT the payment amount already paid immediately, when and if the monthly quantity and/or quality delivered is not as specification. SEE APPENDIX 1.

14. CONFIDENTIALITY:

Seller and Buyer have duty to keep the Technology and Commercial matters as Confidential.

15. FORCE MAJEURE:

Force majeure means all events that cannot be foreseen at the time of the execution hereof, whose occurrence and consequence cannot be avoided or conquered, and that take place after the Effective Date hereof and affects any party['s] full or partial performance hereof, including earthquake, typhoon, flood, fire, war as well as any other unforeseeable,unavoidable or unconquerable event.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

If due to any force majeure event one party is unable to perform its contractual liabilities, the affected party shall notify the other party within 6 days, and shall present certificate issued by local industrial and commercial authorities, specifying the nature and duration of the force majeure event. If the force majeure event lasts for over 3 months, both parties shall have the right not to continue to perform the liabilities hereunder, in this case, neither party may request the other party to bear the defaulting liabilities.

16. APPLICABLE LAW:

Execution, effect, interpretation, performance hereof and dispute settlement shall be governed by Convention on Contracts for the International Sale of Goods and Incoterms 2000 of the International Chamber of Commerce. If any specific matter is not covered under the laws in the above, the Canadian laws shall apply.

17. ARBITRATION:

17.1 Both parties (Seller and Buyer) shall consult with each other and settle all disputes arising from the performance hereof or relevant hereto in a friendly manner.

17.2 If both parties fail to reach agreement through consultation, then the dispute shall be submitted to SCCCA in Sweden for arbitration in accordance with its arbitration rule. The arbitration award is final and binding on both parties (Seller and Buyer).

18. NOTICES:

All notices shall be written in English.

18.1 Notices or other correspondences hereunder shall be written in English and sent in person, by fax, or by registered mail, postage prepaid, to the receiver.

18.2 All notices and other correspondences shall be deemed to have been formally served the earlier of:

A) If sent in person, the date of receipt;

B) If by fax or Email, the time of receipt;

C) If by express mail, the 7th working day after being posted in express mail;

Both parties confirm: if the address of service needs to be changed, relevant party shall, on the day following such change, notify the other party in writing, otherwise documents sent to the addresses confirmed in the above shall, whether received or not, be deemed to have been served.

19. LANGUAGE:

English is the only language of this contract.

20. BANK INFORMATION FOR PAYMENTS TO THE SELLER:

SELLER['S] BANK ACCOUNT INFORMATION:


Bank Name:          CANADIAN IMPERIAL BANK OF COMMERCE (CIBC)
Bank address:       2880 CHEMIN QUATRE-BOURGEOIS, QUEBEC, QUEBEC, CANADA,
                    G1V 4X7
Bank phone:         001-418-653-8845

Account Name:       NCA FORTIN INC.
Account Number:     0209112
Transit/Routing No: 001000135
SWIFT Number:       CIBCCATT


All funds must be delivered my T/T EXPRESS, for a short delivery time, to be able to receive the funds in the delays for the manufacture payment.

WE MUST RECEIVE BY EMAIL THE SCAN COPY OF THE BANK FUNDS TRANSFER (TT) DOCUMENT AS SOON AS POSSIBLE, OR FAX AT: +418 659 5892

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

21. MISCELLANEOUS:

21.1 Appendixes are an integral part hereof.

21.2 Modification and supplementation hereof shall become effective after being signed between both parties (Seller and Buyer) in writing.

21.3 Neither party may, unless agreed upon in writing between both parties (Seller and Buyer) transfer the liabilities and obligations to the third party.

21.4 This document and any document sign and transmitted by Fax or by Email is considered as an original.

21.5 This Contract is in 2 copies effective since being signed/sealed by two parties and when Seller receives the advance payment.

22. PRIORITY CLAUSE:

22.1 The Seller will make his possible to deliver as much as he can of this product, as described to the clauses 4 and 5.

22.2 As this contract goes on and the monthly products are delivered at the Buyer satisfaction, the Seller will offer to the Buyer, in priority, his new offers of raw material available on the market. But, as this market needs rapid decisions, the Buyer will have to answer without delay to these priority offers. On this matter, the Buyer should stay available to receive these products offers.

22.3 The Seller will offer the priority to renew this contract before the end of the term of this contract.

22.4 The Buyer will resell a large part the wafers coming from these ingots 8N-9N stock at a good and competitive price to the seller.

23. DEFINITIONS:

23.1 The main Seller: This is the company/manufacture/agent/individual that sells the stock/product described in this contract to Technischer Warenhandel Heller (Co-Buyer) and NCA Fortin Inc (Co-Buyer).

23.2 The final Buyer: This is the company/manufacture/agent/individual that buys the stock/product described in this contract from Technischer Warenhandel Heller (Actual Buyer/ReSeller) and NCA Fortin Inc (actual Buyer/ReSeller).

24. VALIDITY OF THE CONTRACT:

24.1 The prepayment of the commodity confirms the validity of this contract. First come, first serve.

Executed by the duly authorized representatives of the parties, and to be effective as the date of signature below:

TECHNISCHER WARENHANDEL HELLER
(CO-SELLER 1)


/s/ Horst Heller                        Germany, this October 29th 2006
------------------------------------    ------------------------------------
MR HORST HELLER, PRESIDENT              Place and Date of signature


NCA FORTIN INC (CO-SELLER 2)


/s/ Jean-Yves Fortin                    Canada, this October 29th 2006
------------------------------------    ------------------------------------
MR. JEAN-YVES FORTIN, PRESIDENT         Place and Date of signature


Page 5 of 7

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

JIANGXI LDK SOLAR HIGH-TECH CO., LTD
(Buyer)


/s/ Xiaofeng Peng
-------------------------------------   ---------------------------------------
Authorised representative               Place and Date of signature

                              Appendix 1

           MONOCRYSTALLINE SILICON INGOTS 8N-9N - SOLAR GRADE

PROPERTIES OF THE SILICON INGOTS 8N - 9N:

Purity:                  8N minimum, solar grade.

Crystallinity:           Mono-crystalline

Donor type / Dopant:     P / Boron

Dislocation density:     < or = 100 cm-2

Orientation:             (100)? ? face and diagonal

Oxygen concentration:    < or = 1 x 10(18) atoms/cm3

Carbon concentration:    < or = 5 x 10(16) atoms/cm3

Resistivity:             0.5 - 3.0 ohm-cm

Lifetime:                > or = 10 [(u)s]

Diameter for 156mm
square wafers:           > or = 205mm (round)

Minimum ingot length:    80mm


                        Page 6 of 7

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

APPENDIX 2
PAYMENT AND DELIVERY SCHEDULE

PAYMENT AND DELIVER SCHEDULE

| Payment Date | Payment (MM USD) | Delivery Date | Delivery (mT) |
|---|---|---|---|
| 30-Oct-06 | 3.0 | | -- |
| 25-Nov-06 | 4.2 | 25-Nov-06 | 30.0 |
| 10-Dec-06 | 7.2 | 25-Dec-06 | 30.0 |
| | | | |
| 10-Jan-07 | 12.0 | 25-Jan-07 | 30.0 |
| 10-Feb-07 | 12.0 | 25-Feb-07 | 50.0 |
| 10-Mar-07 | 12.0 | 25-Mar-07 | 50.0 |
| 10-Apr-07 | 12.0 | 25-Apr-07 | 50.0 |
| 10-May-07 | 12.0 | 25-May-07 | 50.0 |
| 10-Jun-07 | 12.0 | 25-Jun-07 | 50.0 |
| 10-Jul-07 | P2-2007 | 25-Jul-07 | 50.0 |
| 10-Aug-07 | P2-2007 | 25-Aug-07 | 50.0 |
| 10-Sep-07 | P2-2007 | 25-Sep-07 | 50.0 |
| 10-Oct-07 | P2-2007 | 25-Oct-07 | 50.0 |
| 10-Nov-07 | P2-2007 | 25-Nov-07 | 50.0 |
| 10-Dec-07 | P2-2007 | 25-Dec-07 | 50.0 |
| | | | |
| 10-Jan-08 | P1-2008 | 25-Jan-08 | 50.0 |
| 10-Feb-08 | P1-2008 | 25-Feb-08 | 50.0 |
| 10-Mar-08 | P1-2008 | 25-Mar-08 | 50.0 |
| 10-Apr-08 | P1-2008 | 25-Apr-08 | 50.0 |
| 10-May-08 | P1-2008 | 25-May-08 | 50.0 |
| 10-Jun-03 | P1-2008 | 25-Jun-08 | 50.0 |
| 10-Jul-08 | P2-2008 | 25-Jul-08 | 50.0 |
| 10-Aug-08 | P2-2008 | 25-Aug-08 | 50.0 |
| 10-Sep-08 | P2-2008 | 25-Sep-08 | 50.0 |
| 10-Oct-08 | P2-2008 | 25-Oct-08 | 50.0 |
| 10-Nov-08 | P2-2008 | 25-Nov-08 | 50.0 |
| 10-Dec-08 | P2-2008 | 25-Dec-08 | 50.0 |
| | | | |
| 10-Jan-09 | P1-2009 | 25-Jan-09 | 50 0 |
| 10-Feb-09 | P1-2009 | 25-Feb-09 | 50.0 |
| 10-Mar-09 | P1-2009 | 25-Mar-09 | 50.0 |
| 10-Apr-09 | P1-2009 | 25-Apr-09 | 50.0 |
| 10-May-09 | P1-2009 | 25-May-09 | 50.0 |
| 10-Jun-09 | P1-2009 | 25-Jun-09 | 50.0 |
| 10-Jul-09 | P2-2009 | 25-Jul-09 | 50.0 |
| 10-Aug-09 | P2-2009 | 25-Aug-09 | 50.0 |
| 10-Sep-09 | P2-2009 | 25-Sep-09 | 50.0 |
| 10-Oct-09 | P2-2009 | 25-Oct-09 | 50.0 |
| 10-Nov-09 | P2-2009 | 25-Nov-09 | 50.0 |
| 10-Dec-09 | P2-2009 | 25-Dec-09 | 50.0 |

| Payment Date | Payment (MM USD) | Delivery Date | Delivery (mT) |
|---|---|---|---|
| 10-Jan-10 | P1-2010 | 25-Jan-10 | 50.0 |
| 10-Feb-10 | P1-2010 | 25-Feb-10 | 50.0 |
| 10-Mar-10 | P1-2010 | 25-Mar-10 | 50.0 |
| 10-Apr-10 | P1-2010 | 25-Apr-10 | 50.0 |
| 10-May-10 | P1-2010 | 25-May-10 | 50.0 |
| 10-Jun-10 | P1-2010 | 25-Jun-10 | 50.0 |
| 10-Jul-10 | P2-2010 | 25-Jul-10 | 50.0 |
| 10-Aug-10 | P2-2010 | 25-Aug-10 | 50.0 |
| 10-Sep-10 | P2-2010 | 25-Sep-10 | 50.0 |
| 10-Oct-10 | P2-2010 | 25-Oct-10 | 50.0 |
| 10-Nov-10 | P2-2010 | 25-Nov-10 | 50.0 |
| 10-Dec-10 | P2-2010 | 25-Dec-10 | 50.0 |
| | | | |
| 10-Jan-11 | P1-2011 | 25-Jan-10 | 50.0 |
| 10-Feb-11 | P1-2011 | 25-Feb-10 | 50.0 |
| 10-Mar-11 | P1-2011 | 25-Mar-10 | 50.0 |
| 10-Apr-11 | P1-2011 | 25-Apr-10 | 50.0 |
| 10-May-11 | P1-2011 | 25-May-10 | 50.0 |
| 10-Jun-11 | P1-2011 | 25-Jun-10 | 50.0 |
| 10-Jul-11 | P2-2011 | 25-Jul-10 | 50.0 |
| 10-Aug-11 | P2-2011 | 25-Aug-10 | 50.0 |
| 10-Sep-11 | P2-2011 | 25-Sep-10 | 50 0 |
| 10-Oct-11 | P2-2011 | 25-Oct-10 | 50 0 |
| 10-Nov-11 | P2-2011 | 25-Nov-10 | 50.0 |
| 10-Dec-11 | P2-2011 | 25-Dec-10 | 50.0 |

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

from Dec 2006 payment 15 days in advance

Price negotiable every 6months

Page 7 of 7

```
</TEXT>
</DOCUMENT>
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 10.12

5 YEARS SALES CONTRACT

C/NO. PGI-LDK-0611_1111
DATE: 01[st]_NOV_2006

---------------------------
THE SELLER: PRIME GLP INC.
---------------------------

Address: 114-23, Wegacheon-ri, Wongok-Myun, Ansung-City, Kyungki-Do, Korea.
Tel: +82-31-658-5812      Fax: +82-31-658-5813
Link Person : Jeffrey Kim/Marketing VP

----------------------------------------------
THE BUYER: JIANGXI LDK SOLAR HI-TECH CO., LTD.
----------------------------------------------

Address: High Technology Industrial Park, Xinyu City, Jiangxi Province, P.R
         China.
Tel: +86-512-656-29698 Fax : +86-512-656-22785
Link Person : Mr. Light DK Peng/Chair Man.

This contract is made by and between above THE BUYER AND THE SELLER, whereby the
Buyer agree to buy and the Seller agree to sell the under mentioned commodity
according to the terms and conditions stipulated below:

------------------------------------------------------
TERMS OF SALES CONTRACT : 2006.11.1 ~ 2011.11 (5 YEARS)
------------------------------------------------------


-----------------------------------------------------------------------------------------------------
      (1) Commodity and Specifications              (2) Quantity     (3) Unit Price(USD)   (3) Reference
-----------------------------------------------------------------------------------------------------

A. SILICON FEEDSTOCK FOR SOLAR                                                             300~600 MT
   (Almost of originated from Semiconductor company)   5~10MT/MONTH      MARKET PRICE
                                                       (CHANGEABLE)
     a. Silicon Ingot.
     b. Tops/Tails
     c. Pot Scrap
     d. Silicon Wafers
     e. Broken Wafers
     f. Silicon Remelt Scrap
     g. Polysilicon Chunks
     h. Polysilicon Granular
     i. Other silicon materials for solar


B. BASICAL SPECIFICATIONS SAME AS BELOWS.

     a. Single crystalline or Polycrystalline
     b. P-Type or N-type,
     c. Resistivity : > 0.5 ohm.cm(P), > 1ohm.cm(N)
     d. Bare or Coated (for wafers)
     e. Details can be discussible.


-----------------------------------------------------------------------------------------------------
-----------------------------------------------------------------------------------------------------

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

1. Time of Shipment
Shipment : Every month during sales contract term.
The shipment time and date could be discussible and changeable.


2. Terms of Payment:
100% T/T in advance before shipment.


3. Port of Shipment:
By Seller's forwarder.
By Air or By Ocean - FOB Busan or Incheon Korea.


4. Packing:

Put into Carton or styrofoam box and suitable for long distance transportation
and well protected against shock and rough handling. The Seller shall be liable
for any serious damage to the goods on account of improper packing and for any
rust damage attributable to inadequate or improper protective measures taken by
the Seller except in case of transportation compan[y]'s fault. If in case Buyer
claims the case as Seller's fault, Seller reserves the right to choose the
third party such as SGA to determine who is responsible for the claim.


5. Shipping Mark:
On the surface of each package, "HANDLE WITH CARE"

6. Advise of shipment
The Seller shall, immediately upon the completion of the loading of the goods,
advise by fax the Buyer of the Contract number, name of the Goods, number of
packages, quantity, gross/net weight and dimension of each package, invoice
value, name of vessel, port of shipment and port of destination and date of
shipment etc.


7. Guarantee of Quality:
The Seller shall guarantee that the goods are correspond in all respects with
proforma invoice and Sales offer from actual material. If quality of any
shipment from Seller doesn't meet proforma invoice and Sales offer, Buyer can
ask the replacement or pay-back within proper schedule by mutual discussion.


8. Inspection and Claims
Should the quality and/or the specification of goods be found not in conformity
with the contracted stipulations, the Buyer shall arrange for an inspect to be
carried out by incoming test and have the right to claim against the Seller on
the strength of the inspection certificate issued by CIQ. This claim shall be
made and be reported to Seller within 30 days if the material is airflown and 50
days if sea freighted from the date of Bill of Lading.

Any and all claim shall be regarded as accepted if the Seller fail to reply
within 30 days after receipt of the Buyer's claim.


9. Settlement of Claims:
In case the Seller are liable for the discrepancies and a claim is made by the
Buyer, the Seller shall settle the claim upon the agreement of the Buyer in the
following ways.

A. Agree to the rejection of the goods and refund to the Buyer the value of the
goods so rejected in the same currency as contracted herein.

B. Devaluate the goods according to the degree of inferiority or extent of
damage.

10. Force Majeure:
The Seller shall not be held responsible for any delay in delivery or
nondelivery of the goods due to Force Majeure. However, the Seller shall advise
the Buyer immediately of such occurrence and within fourteen days thereafter,
shall send by airmail to the Buyer for their acceptance a certificate issued by
the competent government authorities of the place where the accident occurs as
evidence thereof. Under such circumstances the Seller, however, are still under
the obligation to take all necessary measures to hasten the delivery of the
goods. In case the accident lasts for more than ten weeks, the Buyer shall have
the right to cancel the contract.


11. Late Delivery and Penalty:
In case of delayed delivery, except for force majeure cases, the Seller shall
pay to the Buyer for every week of delay a penalty amounting to 0.3% of the
total value of the goods whose delivery has been delayed. Any fractional part of
a week is to be considered a full week. The total amount of penalty shall not,
however, exceed 3% of the total of the goods involved in late delivery and is to
be deducted from the amount due to the Seller by the paying bank at the time of
negotiation, or by the Buyer direct at the time of payment. In case the period
of delay exceeds 3 weeks after the stipulated delivery date the Buyer have the
right to terminate this contract but the Seller shall not thereby be exempted
from the payment of penalty.


13. Arbitration:
All disputes in connection with this contract or the execution thereof shall be
settled through friendly negotiations.


In case no settlement can be reached through negotiations, the case then will
be submitted for arbitration to the International Chamber of Commerce in Hague.

This Contract is made out in two originals, one original to be held by each
party in witness thereof.


The Buyer:                                         The Seller:
THE BUYER: JIANGXI LDK SOLAR HI-TECH CO., LTD.      PRIME GLP INC.
Address: High Technology Industrial Park, Xinyu City,   Address: 114-23, Wegacheon-ri, Wongok-Myun,
Jiangxi Province, P.R China.                        Ansung-City, Kyungki-Do, Korea.
Tel: +86-512-656-29698 Fax : +86-512-656-22785      Tel: +82-31-658-5812    Fax: +82-31-658-5813
Link Person : Mr. Martin Wiong, Mr. Light DK Peng President.   Link Person : Mr. Jeffrey Kim/Mark[e]ting

JIANGXI LDK SOLAR HI-TECH CO., LTD                  PRIME GLP INC.


/s/ Xiaofeng Peng                                   /s/ Jeffrey Kim


</TEXT>
</DOCUMENT>

Exhibit 10.13

```
(KUNICAL LOGO)        KUNICAL          818 North Lake St.
              INTERNATIONAL GROUP, LTD   Burbank, CA 91502 U.S.A.
                 WWW.KUNICAL.COM         Tel : 818-848-2111
                                         Fax : 818-848-5600
                                         e-mail : kunical@kunical.com
```

--------------------------------------------------------------------------

The Buyer: Jiangxi LDK Solar Co., Ltd.                      December 4, 2006
     No. 58, Suli Road, Suzhou, Jiangsu
        Suzhou, Jiangsu Province, China, 215128
        Tel:+86-512-65629698, Fax:+86-512-65622785
The Seller: Kunical International Group. Ltd.
        818 N. Lake Street, Burbank, CA 91502, USA
        Tel:818-848-0555, Fax:818-848-5600
THE BUYER AND THE SELLER HAVE A BEST EFFORT AGREEMENT AS FOLLOWS:
1. NAME OF PRODUCT, DESCRIPTION, QUANTITY, UNIT PRICE ARE AS BELOWS SHEET:

| ITEM | NAME OF PRODUCTS | QTY (KG) | UNIT PRICE (US$/KG) | TOTAL (US$) |
|------|------------------|----------|---------------------|-------------|
| 1 | SILICON WAFER AND OTHER FEEDSTOCK | 800,000 | $120 | $96,000,000 |

NOTICE
1.This is a cooperation agreement for the period
  of Years 2007-2010 Seller agrees to sell 200MT
  in 2007 to buyer and 200MT per year until 2010.
  Delivery schedule will be fixed in separate PO.
  The Seller will supply the buyer total
  quantity of 800 tons silicon feedstock from
  2007 until 2011
3.Seller will pay Buyer USDollars120 per kilogram
  as an average purchasing price for year 2007-2010        TOTAL        $96,000,000
4.Seller will send PI before each shipment is
  ready and buyer will wire the money within 5
  day after receive the PI.
5.Unit price refer to 100% usable material. Final
  unit price and total volume of each shipment
  will be specified by each PO.
--------------------------------------------------------------------------

2. PACKING: Export standard packing and package guarantee goods integrity during
            transportation, all wooden packing material used have to be treated
            with IPPC stamp.

3. DELIVERY TERM: FOB California, US. Seller shall deliver the goods within 7
business days upon receiving the wire transfer regarding every individual signed
Purchase Order.

4. PAYMENT: 100% T/T in Advance within 5 days after receive PI from the Seller.

5. INSURANCE: To be covered by the Buyer

6. PORT OF DESTINATION: Shanghai, China

7. TRANSPORTATION: To be determined.

8. QUALITY AND QUANTITY INSPECTION:

After receiving the goods, the Buyer should inspect the quality and quantity of
the goods within 30 days, if the shortage of quantity found, and it is the
seller's responsibility, the Seller should complement same quantity of

     Plant : 826 North Lake St. Burbank, CA 91502 Tel : 818-848-4222

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
(KUNICAL LOGO)         KUNICAL            818 North Lake St.
              INTERNATIONAL GROUP, LTD    Burbank, CA 91502 U.S.A.
                   WWW.KUNICAL.COM        Tel : 818-848-2111
                                          Fax : 818-848-5600
                                          e-mail : kunical@kunical.com
```

--------------------------------------------------------------------------------

good quality goods within 30 days from the date of receiving the written notice
of the Buyer; if quality problem, and seller agrees, the Seller should replace
them with same quantity of good quality goods within 30 days from the date of
receiving the written notice of the Buyer.


9. SETTLEMENT OF CLAIMS:
In case the Seller are liable for the discrepancies and a claim is made by the
Buyer within the period of claim as stipulated in this contract, the Seller
shall settle the claim upon the agreement of the Buyer in the following ways.
A. Devaluate the goods according to the degree of inferiority, extent of damage
and amount of losses suffered by the Buyer;
B. Replace the defective goods with new ones which conform to the specification,
quantity as stipulated in this contract, and bear all expenses incurred to and
direct losses sustained by the Buyer.

10. CONFIDENTIAL: Buyer and Seller understand that this transaction is
confidential and is subject to an existing non-disclosure agreement between both
sides. Both sides will keep this contract and deal related issue under strict
confidential. Violating party will pay full responsibility for any consequences.

11. ARBITRATION: All disputes in connection with this contract or the execution
shall be settled through friendly negotiations between two parties. If no
settlement can be reached, the case is dispute shall then be submitted to
Shanghai Branch, China International Economic and Trade Arbitration Commission.


THIS AGREEMENT ISSUED IN TWO ORIGINAL COPIES OF ENGLISH LANGUAGE, WHICH PARTIES
HAVE TAKEN ONE EACH. IN WITNESS WHEREOF, EACH OF THE PARTIES HERETO HAS CAUSED
THIS CONTRACT TO BE EXECUTED BY ITS DULY AUTHORIZED REPRESENTATIVE

PLEASE SIGN AND RETURN ONE COPY.

--------------------------------------------------------------------------
THE SELLER: KUNICAL INTERNATIONAL GROUP. LTD.            DATE
--------------------------------------------------------------------------

/s/ Terry T. Kunimune                             DEC 04, '06


                              TERRY T. KUNIMUNE, CHAIRMAN/CEO
--------------------------------------------------------------------------
                              DECEMBER 4, 2006
--------------------------------------------------------------------------

AUTHORIZED SIGNATORY:
                      --------------------------


--------------------------------------------------------------------------
THE BUYER: JIANGXI LDK SOLAR HI-TECH CO., LTD.          DATE
--------------------------------------------------------------------------


/s/ Xiaofeng Peng

                    LIGHT DK PENG, CHAIRMAN
--------------------------------------------------------------------------
                       DECEMBER 4[TH], 2006
--------------------------------------------------------------------------

AUTHORIZED SIGNATORY:
                      --------------------------

          Plant : 826 North Lake St. Burbank, CA 91502 Tel : 818-848-4222
</TEXT>
</DOCUMENT>

Exhibit 10.14

EIGHT YEARS SILICON SALES CONTRACT

C/NO. KMX-LDK-121406
DATE: 8TH DEC_2006

----------------------
THE SELLER: KOMEX INC.
----------------------

Address:  #1202, VICTORIA B/D, 705-1 YEOKSAM-DONG, KANGANAM-KUSEOUL 135
         -709, KOREA.
Tel: +82- 2 527 3143    Fax: +82-2 506 3173
Link Person: CJ SUK/PRESIDENT

----------------------------------------------
THE BUYER: JIANGXI LDK SOLAR HI-TECH CO., LTD.
----------------------------------------------
Address: High Technology Industrial Park, Xinyu City, Jiangxi Province, P.R
         China.
Tel: +86-512-656-29698 Fax: +86-512-656-22785
Link Person: Mr. Light DK Peng/Chair Man.

This contract is made by and between above the Buyer and the Seller,
whereby the Buyer agree to buy and the Seller agree to sell the under
mentioned commodity according to the terms and conditions stipulated below:

--------------------------------------------------
TERMS OF SALES CONTRACT : 2007.1 - 2015.1(8 YEARS)
--------------------------------------------------

| (1) Commodity and Specifications | (2) Quantity | (3) Unit Price(USD) | (3) Reference |
|---|---|---|---|
| A. SOLAR GRADE SILICON FEEDSTOCK (Almost of originated from Semiconductor company) | AT LEAST 35MT / MONTH FROM JAN 2007 TILL DEC 2015. | MARKET PRICE | AT LEAST 420MT SILICON SUPPLYING TO LDK PER YEAR. |
| 1.Silicon mono ingot & multicrystalline block. 2.Tops/Tails & pots scrap 3.Silicon remelt side block 4.Silicon Wafers & broken wafer 5.Silicon Remelt Scrap 6.Polysilicon Chunks 7.Polysilicon Granular and silicon powder 8.Other silicon materials for solar | | | |

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

1. Time of Shipment
Shipment : Every month during sales contract term.
The shipment time and date could be discussible and changeable.

2. Terms of Payment:
100% T/T in advance before shipment.

3. Port of Shipment:
By Seller's forwarder.
By Air or By Ocean - CIF SHANGHAI


4. Packing:

Put into Carton or styrofoam box and suitable for long distance transportation
and well protected against shock and rough handling. The Seller shall be liable
for any serious damage to the goods on account of improper packing and for any
rust damage attributable to inadequate or improper protective measures taken by
the Seller except in case of transportation compan[y]'s fault. If in case Buyer
claims the case as Seller's fault, Seller reserves the right to choose the third
party such as SGA to determine who is responsible for the claim.

5. Shipping Mark:
On the surface of each package, "HANDLE WITH CARE"

6. Advise of shipment
The Seller shall, immediately upon the completion of the loading of the goods,
advise by fax the Buyer of the Contract number, name of the Goods, number of
packages, quantity, gross/net weight and dimension of each package, invoice
value, name of vessel, port of shipment and port of destination and date of
shipment etc.

7. Guarantee of Quality:
The Seller shall guarantee that the goods are correspond in all respects with
proforma invoice and Sales offer from actual material. If quality of any
shipment from Seller doesn't meet proforma invoice and Sales offer, Buyer can
seek the replacement or pay-back within proper schedule by mutual discussion.

8. Inspection and Claims
Should the quality and/or the specification of goods be found not in
conformity with the contracted stipulations, the Buyer shall arrange for an
inspect to be carried out by incoming test and have the right to claim against
the Seller on the strength of the inspection certificate issued by CIQ. This
claim shall be made and be reported to Seller within 30 days if the material is
airflown and 50 days if sea freighted from the date of Bill of Lading.

Any and all claim shall be regarded as accepted if the Seller fail to reply
within 30 days after receipt of the Buyer's claim.

9. Settlement of Claims:
In case the Seller are liable for the discrepancies and a claim is made by the
Buyer, the Seller shall settle the claim upon the agreement of the Buyer in the
following ways.

A. Agree to the rejection of the goods and refund to the Buyer the value of the
goods so rejected in the same currency as contracted herein.

B. Devaluate the goods according to the degree of inferiority or extent of
damage.

10. Force Majeure:
The Seller shall not be held responsible for any delay in delivery or
nondelivery of the goods due to Force Majeure. However, the Seller shall advise
the Buyer immediately of such occurrence and within fourteen days thereafter,
shall send by airmail to the Buyer for their acceptance a certificate issued by
the competent government authorities of the place where the accident occurs as
evidence thereof. Under such circumstances the Seller, however, are still under
the obligation to take all necessary measures to hasten the delivery of the
goods. In case the accident lasts for more than ten weeks, the Buyer shall have
the right to cancel this contract.

11. Late Delivery and Penalty:
In case of delayed delivery, except for force majeure cases, the Seller shall
pay to the Buyer for every week of delay a penalty amounting to 0.3% of the
total value of the goods whose delivery has been delayed. Any fractional part
of a week is to be considered a full week. The total amount of penalty shall
not, however, exceed 3% of the total of the goods involved in late delivery and
is to be deducted from the amount due to the Seller by the paying bank at the
time of negotiation, or by the Buyer direct at the time of payment, in case the
period of delay exceeds 3 weeks after the stipulated delivery date the Buyer
have the right to terminate this contract but the Seller shall not thereby be
exempted from the payment of penalty.

13. Arbitration:
All disputes in connection with this contract or the execution thereof shall be
settled through friendly negotiations.

In case no settlement can be reached through negotiations, the case then will
be submitted for arbitration to the International Chamber of Commerce in Hague.

This Contract is made out in two originals, one original to be held by each
party in witness thereof.


The Buyer:                                      The Seller:
THE BUYER: JIANGXI LDK SOLAR HI-TECH CO., LTD.  KOMEX INC.
Address:High Technology Industrial Park, Xinyu City,  Address:  #1202, VICTORIA B/D, 705-1 YEOKSAM-DONG,
Jiangxi Province, P.R China.                    KANGANAM-KUSEOUL, 135-709, KOREA.
Tel:+86-512-656-29698 Fax:+86-512-656-22785     Tel:+82-2 527 3143    Fax:+82-2 508 3173
Link Person : Mr. Light DK Peng President.      Link Person : Mr. CJ SUK/PRESIDENT


JIANGXI LDK SOLAR HI-TECH CO., LTD.             KOMEX INC.

Signed by /s/ Xiaofeng Peng      DEC.8.2006     Signed by /s/ C.J. Suk      DEC.21.06
          ------------------------                        --------------------

          Light dk peng / president                       C.J. Suk / president

</TEXT>
</DOCUMENT>

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 10.15

(Summary Translation)

POLYSILICON SUPPLY COOPERATION AGREEMENT

PARTY A: JIANGXI LDK SOLAR HIGH-TECH CO., LTD.

Address: High-Tech Industrial Park, Xinyu City, Jiangxi Province

Legal Representative: Xiaofeng Peng

PARTY B: E'MEI SEMI-CONDUCTOR MATERIALS PLANT

Address: No. 88 Fubei Road, E'meishan City, Sichuan Province

Legal Representative: Wencheng Hu

E'mei Semi-conductor Materials Plant is currently preparing for the construction of a 1500-ton solar grade polysilicon manufacturing project, with its sole investment, which is anticipated to be put into operation at the end of 2008. E'mei Semi-conductor Materials Plant will establish the phase two 1500-ton solar grade polysilicon manufacturing project at an appropriate time.

To take advantage of each other's strengths, jointly prevent market and industry risks and obtain development advantage, Party A and Party B, after friendly negotiations and based on the principle of mutual trust and respect, enter into this long-term strategic cooperation agreement to establish a long-term, friendly and cooperative relationship:

ARTICLE 1    Party A's Obligation

1.  Party A undertakes that it will give priority to using Party B's solar grade polysilicon feedstock under the same condition, and will expand its purchasing quantity each year based on Party B's production capacity expansion.

2.  Party A undertakes that starting from 2008, it will purchase solar grade polysilicon feedstock from Party B with an annual approximate purchasing quantity of 100 tons, provided that the quality of the polysilicon feedstock supplied by Party B shall comply with Party A's manufacturing and technology requirements.

3.  Party A undertakes that it will pay 10% of the total purchasing price in a given year as advance payment for the purchase of solar grade polysilicon feedstock under this agreement. The specific payment schedule is as follows:

    Renminbi ten million to be paid before September 30, 2007; Renminbi forty million to be paid before December 31, 2007; Renminbi eighty million to be paid before June 30, 2008; and Renminbi one hundred and twenty million to be paid before December 31, 2008. The total amount is Renminbi two hundred and fifty million, which shall be deducted from the payment for the products under this agreement.

ARTICLE 2    Party B's Obligation

1.  Party B undertakes that starting from 2008, it will supply Party A with solar grade polysilicon feedstock that is in compliance with the industry standards, and will satisfy Party A's needs to the extent possible based on Party B's output capacity expansion.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

2.   Party B undertakes that starting from 2008, it will supply Party A with solar grade polysilicon feedstock that is in compliance with the industry standard. The specific quantity shall be approximately 100 tons in 2008, 500 tons in 2009, 500 tons in 2010, 500 tons in 2011, 500 tons in 2012 and 400 tons in 2013.

3.   Party B undertakes that based on this long-term, friendly and cooperative relationship, it will give Party A preferential prices and will supply products to Party A at the price it gives to strategic cooperative partners with reference to the market price set by well-known domestic solar grade polysilicon feedstock manufacturers.

4.   Party B undertakes that the quality of the solar grade polysilicon feedstock supplied to Party A shall comply with solar grade solar cells' manufacturing and technology requirements.

5.   Party B undertakes that it will give Party A priority to be involved in Party B's restructuring occurring at the end of 2007 or early 2008. If Party A becomes Party B's investor, the advance payment for the products under this agreement will be turned into Party A's capital contribution in accordance with the relevant state regulations. Specific matters may be further negotiated.

ARTICLE 3 Both parties agree that each party will keep confidential all technologies and business information obtained from the other party. A party shall be entitled to damages for breach against the other party if the violation by the other party causes any losses to the party. Both parties will provide their annual financial statements to each other subject to such confidential undertakings.

ARTICLE 4 The term of both parties' phase one strategic cooperation shall be six years, commencing on June 1, 2008 through December 31, 2013.

ARTICLE 5 Liability for Breach: This agreement has legally binding effect. Both parties shall jointly abide by this agreement in good faith. If a party is in violation of this agreement, the other party is entitled to hold the breaching party legally liable.

ARTICLE 6 Any dispute in connection with this agreement shall be settled through friendly consultation between the two parties. If no settlement can be reached after consultation, such dispute shall be submitted to the court having jurisdiction over the place where the disputing party is located.

ARTICLE 7 This agreement is executed in two originals. Each party holds one original. This agreement shall become effective upon signing by both parties.

Party A:  Jiangxi LDK Solar Hi-Tech Co.,      Party B:  E'mei Semi-conductor
Ltd.                                          Materials Plant


         (Company seal)                           (Company seal)

Legal Representative (signature):        Legal Representative (signature):

       /s/  Xiaofeng Peng                     /s/  Liangping Deng
       -----------------------                ------------------------

Date: March 28, 2007                     Date: March 28, 2007

                                  2

</TEXT>
</DOCUMENT>

Exhibit 10.16

(Summary Translation)

POLYSILICON SUPPLY FRAMEWORK COOPERATION AGREEMENT

PARTY A: JIANGXI LDK SOLAR HIGH-TECH CO., LTD.

Address: High-Tech Industrial Park, Xinyu City, Jiangxi Province

Legal Representative: Xiaofeng Peng

PARTY B: LUOYANG ZHONGGUI HIGH-TECH CO. LTD.

Address: Gaoxin District, Luoyang City

Legal Representative: Wenhai Sun


To take advantage of each other's strengths, jointly prevent market and industry risks and obtain development advantage, Party A and Party B, after friendly negotiations and based on the principle of mutual trust and respect, enter into this long-term strategic cooperation agreement to establish a long-term, friendly and cooperative relationship:

ARTICLE 1  Party A's Obligations

1    Party A undertakes that it will give priority to using Party B's solar grade polysilicon feedstock under the same condition, and will expand its purchasing quantity each year based on Party B's production capacity expansion.

2    Party A undertakes that starting from November 2007, it will purchase solar grade polysilicon feedstock from Party B, provided that the quality of the polysilicon feedstock supplied by Party B shall comply with the industry standards. The specific purchase quantity will be determined based on the production expansion situation of Party B, and the minimum purchasing quantity shall be at least 200 tons per year for each year starting from 2008. The exact supply quantity will be decided by both parties through agreements, and the cooperation period is preliminarily set for 5 years.

3    Party A undertakes to make advance payment for the purchase of solar grade polysilicon feedstock under this agreement. The specific payment schedule is as follows:

Renminbi fifty million to be paid before October 30, 2007; Renminbi one hundred and fifty million to be paid before November 30, 2007; Renminbi one hundred and eighty million to be paid before April 30, 2008; and Renminbi twenty million to be paid before December 31, 2008. The total amount is Renminbi four hundred million,

</TEXT>
</DOCUMENT>

Exhibit 10.17

WAFER SUPPLY AGREEMENT

PARTIES:

1.JIANGXI LDK Solar Hi-Tech Co., Ltd, a company organized and existing under the laws of P.R. China, with its registered office at HIGH TECHNOLOGY INDUSTRIAL PARK, XINYU CITY,JIANGXl PROVINCE, PC 215128, P.R. China, duly represented by Mr. Light DK Peng (hereinafter referred to as "Supplier")

and

2.Solland Solar Energy B.V., a company organized and existing under the laws of The Netherlands, with its registered office at 6422 RL Heerlen, Bohr 10 – Avantis, The Netherlands, duly represented by Dr. G. Boxhoorn and Mr. J-W. Hendriks, hereinafter referred to as "Solland Solar";

hereinafter together referred to as 'Parties' and individually as 'Party'

WHEREAS:

-      Supplier is a manufacturer and seller of multi-crystalline silicon wafers with production facilities in Xinyu City, Jiangxi Province, P.R. China

-      Solland Solar is a manufacturer of multi-crystalline silicon-, mono-crystalline silicon- and special solar cells;

-      Solland Solar is interested in purchasing certain Wafers (as defined hereinafter) from Supplier;

-      Supplier is willing to supply the Wafers to Solland Solar;

-      Parties now wish to lay down the terms and conditions for the supply of Wafers in this Agreement.

THEREFORE IT IS HEREBY AGREED AS FOLLOWS:

1. DEFINITIONS

The following definitions shall be used for the purpose of interpreting the Agreement and all documents relating thereto. Words incorporating the singular will also include the plural and vice versa, where the context so requires.

'Affiliate': mean[s] Parties and any company other than Parties which is for the time being directly or indirectly controlled by a Party;

For the purpose of this definition a particular company is:

(i) directly controlled by another company (or companies) if that other company (or companies) beneficially hold(s) shares carrying fifty percent (50%) or more of the votes at a general meeting (or its equivalent) of the first mentioned company; and

(ii) indirectly controlled by another company (the "Parent Company") if a series of companies can be specified, beginning with the Parent Company and ending with the particular company, so related that each company of the series is directly controlled by one or more of the companies earlier in series.

'Agreement': means this wafer supply agreement, including all appendices and subsequent amendments as agreed in writing by the Parties.

'CONFIDENTIAL INFORMATION': means any information (including formulations, designs and other intellectual property rights) given to Supplier by or on behalf of Solland Solar or given to Solland Solar by or on behalf of Supplier in any form whatsoever and all data derived directly or indirectly from such information received from the respective other Party.

'DELIVERY SCHEDULE': means the schedule specifying the amount of Wafers to be purchased by Solland Solar and delivered by Supplier through the issuance of monthly Purchase Orders based on the agreed Volume, covering a period of at least three months, which shall be basically in the format attached hereto as Appendix D.

'MINIMUM ANNUAL QUANTITIES': means the minimum amount of Wafers as specified in Appendix D that Supplier can be obliged to supply to Solland Solar in any given year.

'PURCHASE ORDER': means Solland Solar's written order or written confirmation, by virtue of which Supplier shall supply the Wafers to Solland Solar, together with any annex, addition or modification thereto, which shall be basically in the format attached hereto as Appendix C, which forms an integral part hereof.

'SHIPMENT': means a delivery of Wafers under this Agreement.

'SPECIFICATIONS': shall mean the technical and functional specification for the Wafer attached hereto as Appendix A, which forms an integral part hereof.

'WAFERS': shall mean multi-crystalline silicon wafers or any other product falling under the scope of this Agreement produced and/or delivered by Supplier in accordance with the Specifications as provided in Appendix A of this Agreement, which forms an integral part hereof.

2. WAFER SUPPLY

2.1 Supplier irrevocably offers to sell and deliver to Solland Solar and Solland Solar shall purchase from Supplier the quantities of Wafers as specified in Appendix D in accordance with the Delivery Schedule.

2.2 It is understood by Parties that any mutually agreed change in the Specifications of the Wafers during a year decreasing the volume of silicon feedstock and/or raw materials incorporated in the Wafers shall result in a proportional increase of the number of Wafers to be supplied in that year.

2.3 Solland Solar shall order the Wafers to be supplied by Supplier by means of separate monthly to be issued Purchase Orders in accordance with the Delivery Schedule and with reference to this Agreement.

2.5 Solland Solar shall order the Wafers at least two (2) months before the stipulated date of delivery.

2.6 The ordered Wafers shall be supplied by Supplier to Solland Solar in accordance with the respective Purchase Order.

2.7 The time stipulated for delivery of the Wafers shall be of the essence. Without prejudice to Supplier's obligation to deliver the Wafers on time, Supplier shall give Solland Solar immediately notice in writing if any delay in the delivery of the Wafers is foreseen. Further, Supplier shall promptly submit its proposal indicating the measures Supplier shall take at its own account to make good the delay in order to maintain the agreed upon delivery date.

3. WAFER PRICING

3.1 For the supply of Wafers under this Agreement Solland Solar shall pay the initial prices in USD as specified in Appendix B. Fob Shanghai, P.R. China as per the Incoterms 2000.

3.2 All taxes, fees and other charges including the cost of any certificate of origin imposed on or required for the Wafers and sale thereof before delivery shall be the responsibility of Supplier and for Supplier's account.

3.3 Supplier is committed to supply cost-effective Wafers (in line with global market prices and conditions for similar Wafers).

4. DELIVERY - AND PAYMENT CONDITIONS

4.1 The Wafers will be delivered in Shipments Fob Shanghai, P.R. China as per the Incoterms 2000, inclusive of adequate packing and labelling as specified in Appendix A.

4.2 Deliveries shall be effected on the date as stipulated in the Purchase Order.

4.3 Following the date of Shipment Supplier will invoice in USD for the value of any Shipment. These invoices shall contain the following information: Wafer code, number of Purchase Order, Solland Solar article number and quantity. A unit price in USD shall be provided and a total invoice value shall be specified.

4.4 Invoices shall be paid as laid down in appendix B.

4.5 Payment does not constitute acceptance of the Wafers as being in compliance with the requirements of this Agreement and the Purchase Order.

5. RISK AND OWNERSHIP

5.1 The risk and ownership of the Wafers shall pass from Supplier to Solland Solar at the time of the delivery of the Wafers according to the stipulations of Fob in Incoterms 2000 and its later amendments.

5.2 The Supplier warrants that Solland Solar will acquire the full and unencumbered ownership of the Wafers.

6. TEST, INSPECTIONS AND QUALITY ASSURANCE

6.1 An inspection of appearance of the package shall be made by Solland Solar within one (1) week after receipt of the Wafers. In case the package has any damage, Solland Solar shall notify Supplier of the result of such an inspection.

6.2 The final inspection of the Wafers will take place by Solland Solar when the Wafer is being used for production of photovoltaic solar cells. The final inspection shall take place ultimately within 60 (sixty) days after the delivery of the Wafer. If the Wafer does not meet the Specifications, Solland Solar shall notify and submit to Supplier documentary evidence of the result of the final inspection whereupon Supplier shall have the right to undertake own inspection.

6.3 Supplier shall provide Solland Solar with a quality certificate for each delivery of Wafers, proving that the Wafer(s) meet the Specifications.

6.4 In case of a defective Wafer, or other complaints (e.g. packaging), Parties have agreed upon to comply with the Rejected Material Administration procedure (RMA) as described in Appendix F, which forms an integral part of this Agreement.

7. WARRANTY

7.1 Supplier warrants that the Wafers meet the Specifications and other requirements of this Agreement and any Purchase Order issued hereunder.

7.2 The expiration of the warranty period shall be twelve (12) months after the actual delivery date of the Wafers to Solland Solar

If the warranty as referred to in Article 7.1 becomes apparent, other than for reasons of normal wear and tear, abnormal operating conditions and/or disregard by Solland Solar of Supplier's operating instructions, Supplier shall forthwith take all necessary action to remedy such defects at Supplier's own expense.

7.3 The warranty period of the Wafers shall be extended by (a) period(s) equal to the period(s) during which;

(i) the Wafers have been out of operation; or

(ii) their putting into operation has been delayed as a result of a defect to which this warranty applies.

7.4 Fresh guarantee periods equal to those specified in Article 7.2 shall apply in respect of the replaced Wafers.

7.5 Solland Solar shall notify Supplier, as soon as practically possible, of any breach of the warranty referred to in Article 7.1 and shall give Supplier the opportunity to inspect and remedy the defect(s)

7.6 In the event of a defect appearing, Solland Solar shall either

(i) return to Supplier at Supplier's expense the Wafers or parts or components thereof for replacement as the case may be; or

(ii) if appropriate, enable Supplier to effect replacement at Solland Solar's worksite(s) in which case Supplier may do so or authorise Solland Solar to do so.

7.7 Replaced Wafers shall be transported by Supplier at Supplier's, expense in a manner acceptable to Solland Solar.

7.8 Upon Solland Solar's requests, Supplier shall provide to Solland Solar reports of the causes, and analysis of the defects and, to the extent required, propose corrective actions to avoid similar defects to the Wafers in future deliveries.

8. LIABILITY

8.1 Supplier shall be liable, without formal notice of non-compliance being required, for any loss or damage reasonably incurred by Solland Solar, such as, but not limited to, the costs of detection of the defect in question, inspection, removal, transport, replacement, retesting and cleaning up of the Wafers, arising from Supplier's non-compliance with the terms and conditions of this Agreement and any Purchase Order issued hereunder.

8.2 Supplier shall at its own expense upon Solland Solar's notification of defect forthwith replace the Wafers so rejected. Any corrective action shall not relieve Supplier of its obligation as to the timely delivery of the Wafers in accordance with this Agreement and any Purchase Order issued hereunder.

8.3 Unless expressly otherwise provided, the Supplier and Solland Solar are not liable towards each other for any consequential loss suffered by them in connection with the performance of the Agreement. For the purpose of this Article consequential loss is understood to mean: loss of profits loss of use, loss of revenue, trading losses and loss as a result of the business being at a standstill.

8.4 The limitations and exclusions of liability set forth in this Agreement shall not apply in the case of damage resulting from wilfulness, gross fault or gross negligence on the part of any party also falling within the scope of such exclusions or limitations.

9. FORCE MAJEURE

9.1 A Force Majeure occurrence shall mean any occurrence which (i) hinders, delays or prevents a Party in performing any of its obligations under the Agreement, and (ii) is beyond the control of, and without the fault or negligence of, such Party, and (iii) by the exercise of reasonable diligence such Party is unable to prevent or provide against.

9.2 In the event of a Force Majeure occurrence, the Party whose performance of any of its obligations under the Agreement is affected shall notify the other Party as soon as is reasonably practicable giving the full relevant particulars and shall use its reasonable efforts to remedy the situation immediately.

9.3 Except for any obligation to make payments, neither Party shall be responsible for any failure to fulfil any term or condition of the Agreement to the extent that fulfilment has been hindered or delayed or prevented by a Force Majeure occurrence which has been notified in accordance with this Article and the time for performance of the obligation(s) affected shall be adjusted by a reasonable amount.

10. INTELLECTUAL PROPERTY RIGHTS

The Supplier warrants that the Wafers, the manner in which the Wafers are realised and the use of the Wafers, in the widest sense, will not infringe any patent rights, trademark rights, copyrights or other intellectual property rights belonging to third parties. The Supplier shall indemnify and hold Solland Solar harmless from any claims from third parties on account of any such infringement and from any costs, including litigation costs, incurred in connection with such claims.

11. LIAISON AND COMMUNICATION

11.1 During the term of this Agreement the Parties shall liaise so as to assure the Specifications of the Wafers and any related technical characteristics. In light thereof the Parties shall convene on a regular basis upon first request of a Party, in a place that is mutual agreed by Parties. The Parties shall specifically address problems of technical nature, including electrical and mechanical properties as well as mutual activities to improve wafer and cell performance.

11.2 All notices or other communications to be sent by either Party to the other Party under this Agreement shall be deemed to have been sufficiently given if in writing and delivered by hand or sent by ordinary mail, e-mail, or telefax, however e-mail and telefax to be confirmed by ordinary mail, to the addresses given in Appendix E, provided that either Party may at any time designate different or further addresses and contact-persons to which communications are thenceforth to be sent.

12. CONFIDENTIAL INFORMATION AND COPYRIGHT

12.1 Solland Solar and Supplier undertake with each other that both during the currency of this Agreement and for a period of three (3) years immediately after its termination or expiration Solland Solar and Supplier will:

(a) not disclose to any third party (other than to an Affiliate or professional advisers and financiers) any Confidential Information received from the other except with the other's prior written consent or as required by applicable law; and

(b) not use any such Confidential Information other than for the purpose for which it has been disclosed by or on behalf of the other.

12.2 The undertaking given in Article 12.1 shall apply and/or continue to apply insofar and for so long as the information in question:

(a) is not or has not become part of the public knowledge or literature without default on the part of the receiving party; or

b) has not been disclosed to the receiving Party by a third party (other than one disclosing on behalf of the other party) whose possession of such information is lawful and who is under no secrecy obligation with respect to the same; or

(c) is not lawfully known by the receiving Party or its Affiliate without binder of secrecy at the time of receipt hereunder.

12.3 Upon termination of this Agreement each Party shall deliver to the other all copies in their respective possession of any Confidential Information supplied by, or on behalf of the other.

12.4 The patent, copyright or other intellectual property rights in any Confidential Information supplied to Supplier by Solland Solar under this Agreement shall, in the absence of any express provision thereof, be vested in Solland Solar, and the patent, copyright or other intellectual property rights in any Confidential Information supplied to Solland Solar by Supplier under this Agreement shall, in the absence of any express provision thereof, be vested in Supplier.

12.5 In the event that either Party during the currency of this Agreement acquires information about the other's or the other's Affiliates' customers and the Wafers made or supplied by or on behalf of such Party or such Party's Affiliates to third party customers in the course of visits or otherwise, such information shall be considered Confidential Information and subject to the terms of this Article:

12.6 Both Parties to this Agreement wish to keep the existence and terms of this Agreement confidential and to this end each Party will, subject to applicable law or stock exchange requirements, use its reasonable endeavours in so far as it does not impede its performance of this Agreement not to disclose the existence of this Agreement to a third party other than its affiliated companies, professional advisors and financiers.

13. ENTIRETY AND MODIFICATIONS

13.1 The provisions stipulated in this Agreement including the Appendices are complete, final and exclusive statements of all the terms of the Agreement between Supplier and Solland Solar for the matters contemplated under the Agreement. There are no understandings, statements, promises or inducements, oral or written, or contrary or supplementary to the terms of this Agreement. The terms of this Agreement are applicable to each individual Purchase Order unless otherwise agreed upon.

13.2 Any modifications relating to the Agreement shall be in the form of a written document signed by duly authorized officers or representatives of the Parties. Any modification or cancellation of any provision shall not constitute a change in the validity of the remaining provisions of the Agreement.

13.3 If any provision of this Agreement were to prove unenforceable by virtue of its being contrary to any mandatory rule of law, the validity of the remaining provisions of this Agreement will in no way be affected. Parties shall, in that case, be bound to perform as intended by the provision(s) thus affected as closely as possible, without infringing any mandatory rules of law effectively applicable.

14. ASSIGNMENT

Neither Party shall transfer or assign any of its rights and/or obligations under this Agreement in whole or in part without prior consent in writing of the other Party, which consent shall not be withhold unreasonably.

15. TERM AND TERMINATION

15.1 This Agreement shall be retroactively effective from 1 January 2006 and shall expire on 31 December 2010. The Agreement shall be automatically extended with consecutive periods of one year. The Parties hereto shall ultimately 90 days before the expiration date of this Agreement convene to discuss any adjustment of the terms and conditions applicable to any such consecutive period. The Agreement may be terminated by either Party by giving a prior 90 days' written notice to this effect.

15.2 Either Party may immediately terminate this Agreement if:

(a) the other Party commits a breach of the provisions of this Agreement and fails to remedy such breach within two (2) weeks after written notice of the existence of such breach, or

(b) the other Party should go into liquidation or public composition or should do or suffer any similar act or thing under any applicable law.

15.3 Furthermore this Agreement is subject to the resolutory condition that the trial relating to the delivery of the testbatch of 10,000 Wafers shall be executed successfully as such that the Specifications of the Wafers to be delivered by Supplier under this Agreement will meet the requirements of Solland Solar (at the sole discretion of Solland Solar).

15.4 Termination or cancellation of this Agreement for any reason shall not affect any obligation arising prior to the effective date of termination or cancellation and any obligation which from the context thereof is intended to survive the termination or cancellation of this Agreement. Termination or cancellation of this Agreement by one Party shall not affect any Purchase Order issued according to this Agreement prior to the termination or cancellation of the Agreement, and Supplier shall continue to supply to Solland Solar the Wafers and Solland Solar shall pay for the Wafers so ordered.

15.5 Any termination under this article shall be without liability for the act of termination but shall be without prejudice to any right of action or claim arising from the period prior to the date of termination.

16. APPLICABLE LAW AND DISPUTES

16.1 This Agreement and any Purchase Order issued there under shall be governed by the laws of The Netherlands.

16.2 Any disputes among Parties, involving any rights or obligations arising out of this Agreement or its interpretations, or to any activities performed pertaining to the Agreement, which cannot be resolved by agreement, shall be submitted and finally settled, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce (ICC). The Arbitration Tribunal shall be composed of three arbitrators appointed in accordance with the Rules. The place of arbitration shall be Brussels, Belgium. The arbitrators shall have power to rule on their own competence and on the validity of the agreement to submit to arbitration. Arbitration proceedings shall be conducted in the English language.

IN WITNESS WHEREOF, Parties have agreed and signed this Agreement in two
originals

For JIANGXI LDK Solar Hi-Tech Co., LTD

Name: LIGHT DK PENG                    Name: LAMBO ZHU
Date:     2006.03.05                   Date:
      -------------------                    -------------------
Function: CEO                          Function: VICE PRESIDENT


Signature: /s/ Xiaofeng Peng           Signature:
           -------------------------              -----------------------------


For Solland Solar Energy B.V.

Name: Gosse Boxhoorn                   Name: Jan-Willem Hendriks
Date: 5th of March, 2006               Date: 5th of March, 2006
Function: CEO                          Function: Director Marketing & Sales


Signature: /s/ Gosse Boxhoorn          Signature: /s/ Jan-Willem Hendriks
           -------------------------              -----------------------------

Appendices:

Appendix A        : Wafers and Specifications (including packaging and labelling)

Appendix B        : Prices

Appendix C        : Standard format Purchase Order

Appendix D        : Minimum Annual Quantities and Delivery Schedule

Appendix E        : Contact details

Appendix F        : Rejected Materials Administration (RMA)-procedure


APPENDIX A

WAFERS AND SPECIFICATIONS (INCLUDING PACKAGING AND LABELLING)

WAFER SPECIFICATION (PRELIMINARY):

For the 10,000 test wafers following wafer specification applies (submitted by LDK):

WAFER FEATURES


| | |
|---|---|
| Conductivity type: | p-type (boron) |
| Crystal Characteristic: | multi-crystalline |
| Crystal defects: | No inclusions visible with naked eyes. |
| Resistivity: | 0.5-2.0 ohm-cm (typical average: 1.5 ohm-cm) |
| Wafer Size Variation: | +/- 0.5mm |
| Wafer Thickness Variation: | +/- 20micro m |
| Bevel Edge Width (chamfer): | 1 - 2 mm |
| Chips: | < or = 3 chips, not deeper than 5 mm (length) x 0.5 mm (d |
| Wafer Surface: | As cut and clean, no stains visible with naked eyes. |
| Life time: | > = 2micro s |
| O content: | < = 8x1017 atoms/cm3 |
| C content: | < = 2x1018 atoms/cm3 |
| TTV: | < = 50 micro m |
| Crack and pinhole: | no cracks and pin holes visible with the naked eyes. |
| Wafer shape: | square |
| Bevel edge angle | 45degrees +/- 10 degrees |
| AQL: | 1.5 |
| WAFER SIZE: | 156 x 156mm x 240/250micro m. |

WAFER SPECIFICATION:

The ultimate wafer specification, yield and efficiency will be further subject of discussion after a first trial of 10,000 PCS has been executed by Solland Solar (see PO. 00000139). The trial is planned for mid May, 2006.

TRACEABILITY/LABELLING:


| | |
|---|---|
| Packaging: | Duly packed in card board box. (alternative to be agreed separately) |
| Labelling: | The label should contain at least the following information: |

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

- Wafer thickness

- Restitivity

- Ingot number

Traceability:                    The ingot number should guarantee information about producer and furnace type.

Packaging on pallet:             The wafer boxes should be duly packed shock proof and protected towards breakage.

Ingot true:                      No split of ingot numbers over several pallets is allowed.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

WAFER BREAKAGE:

If during any trial cell manufacturing a wafer breakage rate of > or = 30% is being monitored, Solland Solar will stop its production and the remaining batch of Wafers will be returned to Supplier (in accordance with the RMA procedure as mentioned in appendix F).

SHIPPING MARK:
LDK SOLAR
SOLAR WAFER
ART.M. 156/240
SIZE: 156x156 MM
THICKNESS: 240 UM
QTY:


APPENDIX B

PRICES

PURCHASE PRICE:

The Purchase Price for the Wafer, according to the Specification given in Appendix A, is as follows:

The Purchase Price for Wafers in size 156 x 156 mm and a wafer thickness of 240 microns is US$[*]/Pc. This price will be valid for the calendar year 2006.

For the calendar year 2007, prices and conditions will be discussed and agreed upon in the month of October 2006. In line with article 3.3 Supplier anticipates that pricing in 2007 and the years thereafter will be lower than the pricing of 2006.

Every reduction of the Wafer thickness with 30 Microns will result in

-    A prices decrease of 3% on the price(s) as mentioned above.

-    A quantity increase of 4,5% on the volumes as mentioned in appendix D.

Payment conditions:

1. Deposit/Advance Payment: an amount equal to 35% (thirty five percent) of the price of the annual quantity to be deposited by T/T (hereinafter referred to as: 'the Advance Payment').

For the year 2006 the annual quantity is 850,000 PCS wafers at US$[*] each.

The Advance Payment is therefore an amount of US$2,290,750.00, to be deposited by T/T within 1 (one) week after the date of signing of this Agreement by both Parties.

2. An amount equal to 65% (sixty five percent) of the price of the wafers to be supplied during each month to be deposited by L/C ultimately 3 (three) months before the agreed delivery date of the wafers each month.

In order to determine the remaining net balance of the Advance Payment as defined in the Agreement, the Parties hereto agree that an amount of US$[*] (*) shall be allocated to each wafer to a maximum of 850,000 PCS.

(*) US$2,290,750.00: 850,000 wafers

3. LDK warrants that at the date of signing of this Agreement by both Parties, LDK shall be in the possession and the sole owner of a quantity poly silicon to be allocated for manufacturing into Wafers that shall be exclusively supplied to Solland Solar, representing a market value equal to the amount of the Advance Payment (hereinafter referred to as: 'the Allocated Poly Silicon Quantity'). Parties agree that as of the moment of receipt of the Advance Payment by LDK, Solland Solar will become the sole owner of the Allocated Poly Silicon Quantity. LDK warrants that Solland Solar will acquire the full and uncumbered ownership of the Allocated Poly Silicon Quantity. However, all risks related to the Allocated Poly Silicon Quantity shall remain at LDK (adequately insured) and shall pass to Solland Solar at the moment of delivery hereof to Solland Solar, or in case this Allocated Poly Silicon Quantity is manufactured into Wafers by LDK, at the time of the delivery of these Wafers to Solland Solar.

4. If Supplier during the calender year 2006 fails to supply the quantities of wafers as mentioned in Appendix D, Solland Solar has the option to either:

-    demand immediate re-payment of the Advance Payment made by Solland Solar either in full or in part;

-    demand the immediate delivery of the (remaining part of the) Allocated Poly Silicon Quantity.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

5. If Parties cannot agree upon the final Specifications of the Wafers after execution of the trial as described in Appendix A, and after having followed the agreed RMA-procedure, and as a consequence the Agreement will be terminated, Supplier will at first request of Solland Solar immediate refund the Advance Payment of US$2,290,750.00 to Solland Solar and in return Solland Solar will retransfer the ownership of the Allocated Poly Silicon Quantity to LDK.

\* Confidential Treatment Requested. The redacted material has been separately filed with the Securities and Exchange Commission.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

APPENDIX C

STANDARD FORMAT PURCHASE ORDER

```
Telephone:                              +31 45 800 600
Fax:                                    +31 45 800 605
Giro
VAT Registration:                       NL8129040059B01
Enterprise number:
Purchase Order Number:                  PO0000000xx-x
(NUMBER TO BE QUOTED ON ALL DOCUMENTS AND PACKAGES
PERTAINING TO THIS ORDER)
Date:                                   xx-xx-2006
Page:                                   1 of 2
```

```
Terms of delivery: DDP          Delivery address   SOLLAND SOLAR ENERGY B.V.
Terms of payment: LC                               BOHR 10, AVANTIS
                                                   6422 RL HEERLEN
                                                   THE NETHERLANDS
```

| Item number | Description | Delivery | Quantity | Price/Unit | Amount |
|---|---|---|---|---|---|

---

```
XXX1030021               Wafer 156x156x240micro
BLANKET ORDER
```

With reference to the Water Supply Agreement dated................, we herewith
order as mentioned above.

Delivery schedule: as agreed in Wafer Supply Agreement appendix D.

Specification as described in Water Supply Agreement dated...............

Quality certificate: each Shipment will contain a certificate which contains the
quality information of the Shipment and does show that the Shipment meets the
agreed Specification.

Shipping document: each Shipment does contain a packing list

Payment term: as agreed in Wafer Supply Agreement appendix B.

Billing address: same as delivery address

Document number:
The number as indicated on this Purchase Order has to be quoted on all documents
and packages pertaining to this Purchase Order.

Purchasing contact person: Mr. Mathieu van den Hof, Tel. +31 (0) 45 8800 627

| Sale balance | Total Discount | Misc. changes. | Sales tax | Round-off | Total |
|---|---|---|---|---|---|
| | | | | | USD |

We request you to confirm this Purchase Order by countersigning this document
and have it returned to the above mentioned address by Fax

Acceptance of our order implies your agreement with the General Purchase Conditions          Solland Solar
of Solland Solar Energy Holding B.V. to the extend we agree otherwise in writing

APPENDIX D

MINIMUM ANNUAL QUANTITIES AND DELIVERY SCHEDULE

Following quantities are part of this agreement:

| WAFER DIMENSION/ THICKNESS | QUANTITIES IN PCS/MWP MINIMUM | MAXIMUM | YEAR | MONTHLY DELIVERY SCHEDULE | |
|---|---|---|---|---|---|
| 156x156 mm 240mu | 850,000 Pcs | 850,000 Pcs | 2006 | July | 50,000 pcs |
| | | | | August | 100,000 pcs |
| | | | | September | 100,000 pcs |
| | | | | October | 200,000 pcs |
| | | | | November | 200,000 pcs |
| | | | | December | 200,000 pcs |
| 156x156 mm 240mu | 2,730,000 Pcs | 2,730,000 Pcs | 2007 | To be agreed upon | |

Note:

Every reduction of the wafer thickness with 30 Microns will result in a quantity
increase of 4.5% on the volumes as mentioned in this appendix.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

APPENDIX E

CONTACT DETAILS

SUPPLIER

COMMERCIAL CONTACT PERSON:            LAMBO ZHU
                                      LDK SOLAR HI-TECH CO., LTD.
                                      E-MAIL: LAMBO@LDKSOLAR.COM

TECHNICAL CONTACT PERSON:             ALBERT FU
                                      LDK SOLAR HI-TECH CO., LTD.
                                      E-MAIL: ALBERT@LDKSOLAR.COM


SOLLAND SOLAR ENERGY B.V.

COMMERCIAL CONTACT PERSONS:

MR. KELVIN KING
SOLLAND SOLAR CELLS BV
REPRESENTATIVE OFFICE SHANGHAI
TEL      021 51506833
CELL     0138 16003170

MR. MATHIEU VAN DEN HOF
SOLLAND SOLAR CELLS B.V.
BOHR 10 -- AVANTIS
6422 RL HEERLEN
THE NETHERLANDS
TEL.     +31 (0)45 880 0627
EMAIL: MVANDENHOF@SOLLANDSOLAR.COM

TECHNICAL CONTACT PERSON:
MR. BERT GEYER
SOLLAND SOLAR CELLS B.V.
BOHR 10 -- AVANTIS
6422 RL HEERLEN
THE NETHERLANDS
TEL.     +31 (0)45 880 0600
EMAIL: BGEYER@SOLLANDSOLAR.COM

APPENDIX F

REJECTED MATERIALS ADMINISTRATION (RMA) PROCEDURE

INTRODUCTION

1.    This procedure outlined the handling of Wafers that the Solland Solar
      regards not being in conformity with the Specifications as given in
      Appendix A. The Procedure is valid for all Wafers produced by Supplier's
      manufacturing or subcontractor facility in Xinyu City, Jiangxi Province,
      P.R. China

2.    Handling of non-conformances

      If the Solland Solar is of the opinion that the whole or part of the
      Shipment contains Wafers or other items which are not in conformity with
      the agreed Specifications (including packing and labeling), following
      steps shall be taken:

      -    The Solland Solar shall notify the Supplier by fax or by e-mail that
           there is an upcoming claim related to a non-conformance.

      -    Supplier shall upon such notification provide a RMA number to be
           used as identification when Wafers are returned from the Solland
           Solar to the Supplier.

      -    As soon as the RMA Wafers and the RMA report (which describes the
           non conformity) are received by Supplier, it will be checked for by
           the Supplier.

The outcome of this inspection may fall into several categories, including but
not limited to:

(a)   The Wafers that meet the agreed Specification will be returned to the
      Solland Solar.

(b)   Wafers that do not meet the Specification shall be replaced by the
      Supplier and the replacement of the Wafers shall be forwarded as part of
      the next shipment.

(c)   Should there after above inspection still be Wafers where the Supplier and
      Solland Solar cannot agree on classification, handling and possible
      compensation, such cases shall be subject of further discussion in
      dedicated meetings.

APPENDICES:
Appendix A    : Wafers and Specifications (including packaging and labeling)
Appendix B    : Prices
Appendix C    : Standard format Purchase Order
Appendix D    : Minimum Annual Quantities and Delivery Schedule
Appendix E    : Contact details
Appendix F    : Rejected Materials Administration (RMA)-procedure

APPENDIX A

WAFERS AND SPECIFICATIONS (INCLUDING PACKAGING AND LABELLING)

WAFER SPECIFICATION:
The following wafer specification applies to the delivery of wafers under this
Agreement (submitted by Solland):

WAFER FEATURES

| | |
|---|---|
| Conductivity type: | p-type (boron) |
| Crystal Characteristic: | multi-crystalline |
| Crystal defects: | No inclusions visible with naked eyes. |
| Resistivity: | 0.5 - 2.0 ohm-cm (typical average: 1.5 ohm-cm) |
| Wafer Size Variation: | plus or minus 0.5 mm |
| Wafer Thickness Variation: | plus or minus 20 mu m |
| Bevel Edge Width (chamfer): | 1 - 2 mm |
| Chips: | less than or equal to 3 chips, not deeper than 5mm (length)x0.5 mm (deep) |
| Wafer Surface: | As cut and clean, no stains visible with naked eyes. |
| Life time: | greater than = 2mu s |
| O content: | less than = 5x10(17)  atoms/cm(3) |
| C content: | less than = 1x10(18)  atoms/cm(3) |
| TTV: | less than = 30 mu m (thickness 200mu m)/50mu m (thickness 240 mu m) |
| Saw marks: | less than or equal to 20mu m |
| Crack and pinhole: | no cracks and pin holes visible with the naked eyes |
| Wafer shape: | square |
| Bevel edge angle: | 45 degrees plus or minus 10 degrees |
| AQL: | 1.5 |
| Wafer size: | 156 x 156mm x 200/240mu m. |

TRACEABILITY/LABELLING:

| | |
|---|---|
| Packaging: | Duly packed in card board box. (alternative to be agreed separately) |
| Labelling: | The Label should contain at lest the following information:<br>- Wafer size<br>- Wafer thickness<br>- Restitivity<br>- Ingot number |
| Traceability: | The ingot number should guarantee information about produce and furnace type. |
| Packaging on pallet: | The wafer boxes should be duly packed shock proof and protected towards breakage. |
| Ingot true: | No split of ingot numbers over several pallets is allowed. |

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

WAFER BREAKAGE:

Breakage in box (+ Unstacker) less than 0.1%
Any percentage higher will be replaced by Supplier.
If during cell manufacturing a wafer breakage rate of greater than or equal to
30% is being monitored, Solland Solar will stop its production and the remaining
batch of Wafers will be returned to Supplier (in accordance with the RMA
procedure as mentioned in appendix F).

SHIPPING MARK:

LDK SOLAR
SOLAR WAFER
ART.M. 156/240
SIZE: 156X156 MM
THICKNESS: 240UM
QTY:

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

APPENDIX B

PRICES

PURCHASE PRICE:

The Purchase Price for the Product, according to the Specification given in
Appendix A, is as follows:

The Purchase Price for wafers in size 156 x 156 mm and a wafer thickness of
240 um is US$[*]/Pc. This price will be valid for the calendar year 2007.

For the subsequent calendar year, prices and conditions will be discussed and
agreed upon in the month of October of the foregoing year with due observance
of the general principle of reasonableness and fairness taken into account the
comparable market prices and the quality of the wafers supplied by LDK to
Solland in the foregoing year. In line with article 3.3 Supplier anticipates
that generally pricing in the subsequent year and the years thereafter will be
lower than the pricing of the foregoing year.

Every reduction of the Wafer thickness with 30 Microns will result in

    - A prices decrease of 3% on the price(s) as mentioned above.
    - A quantity increase of 4,5% on the volumes as mentioned in appendix D.

* Confidential Treatment Requested. The redacted material has been separately
  filed with the Securities and Exchange Commission.

Appendix C

Standard format Purchase Order.

Solland

```
        Telephone:                 +31 45 8800 800
        Fax:                       +31 45 8800 605
        Giro
        VAT Registration:          NL8129040059B01
        Enterprise number.:
        Purchase Order Number:     PO000000xx-x
        (Number to be quoted on ALL documents and packages
        pertaining to this order)
        Date:                      xx-xx-2006
        Page:                      1 of 2
```

```
Terms of delivery:  DDP       Delivery address      Solland Solar Energy B.V.
Terms of payment:   LC                              Bohr 10, Avantis
                                                    6422 RL Heerian
                                                    The Netherlands
```

| Item number | Description | Delivery | Quantity | Price/unit | Amount |
|-------------|-------------|----------|----------|------------|--------|
| XXX1030021  | Wafer 156x156x240u | | | | |
| BLANKET ORDER | | | | | |

With reference to the Wafer Supply Agreement dated................, we herewith order as mentioned above.

Delivery schedule: as agreed in the Wafer Supply Agreement appendix D.

Specification as described in the Wafer Supply Agreement dated.............

Quality certificate: each Shipment will contain a certificate which contains the quality information of the Shipment and does show that the Shipment meets the agreed Specification.

Shipping document: each Shipment does contain a packing list

Payment term: as agreed in the Wafer Supply Agreement appendix B.

Billing address: same as delivery address

Document number:
The number as indicated on this Purchase Order has to be quoted on all documents and packages pertaining to this Purchase Order.

Purchasing contact person: Mr. Mathieu van den Hof, Tel. +31 (0) 45 8800 627

| Sales balance | Total Discount | Misc. charges | Sales tax | Round-off | Total |
|---------------|----------------|---------------|-----------|-----------|-------|
| | | | | | USD |

We request you to confirm this Purchase Order by countersigning this document and have it returned to the above mentioned address by Fax

Acceptance of our order implies your agreement with the General Purchase Conditions of Solland Solar Energy Holding B.V. to the extend we agree otherwise in writing

Solland Solar

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

CONFIDENTIAL                    Page 6 of 10                    26-10-2006

APPENDIX D

QUANTITIES AND DELIVERY SCHEDULE

The following specific terms and conditions apply to the quantities of Wafers
to be supplied to Solland Solar by LDK under this Agreement:

For the purpose of interpreting this Appendix and all documents relating
thereto, the following definitions are used. Words incorporating the singular
will also include the plural and vice versa, where the context so requires.

'MAXIMUM ANNUAL QUANTITY': means the maximum number of Wafers as specified
below that Supplier can be obliged to supply to Solland Solar in any given year.

'MINIMUM ANNUAL QUANTITIES': means the minimum number of Wafers as specified
below to be purchased by Solland Solar in any given year.

'AGREED ANNUAL QUANTITIES': means the agreed number of Wafers to be purchased
by Solland and to be supplied by LDK in a specific calendar year under this
Agreement, being a number of Wafers within the range from the Minimum Annual
Quantities to the Maximum Annual Quantities, which number is determined and
communicated by Solland Solar ultimately before November 1st in the foregoing
year.

1. MAXIMUM ANNUAL QUANTITIES
The Maximum Annual Quantities in a given calendar year starting in 2008 are
calculated as follows:
33 1/3% (thirty three one third per cent) of the actual total solar cells'
production volume of Solland Solar in such given calendar year.

Solland Solar's yearly solar cells' production capacity (end of the year
situation) is currently expected to develop as follows:
2007: 110 MWp *
2008: 210 MWp *
2009: 310 MWp *
2010: 460 MWp *
(* volumes calculated on basis of 20 MWp = 5,460,000 Pcs in 2007)

Solland Solar's yearly solar cells' production volume is currently expected to
develop as follows:
2008: 150 MWp *
2009: 275 MWp *
2010: 400 MWp *
(* volumes calculated on basis of 20 MWp = 5,460,000 Pcs in 2007)

CONFIDENTIAL                 PAGE 7 OF 10                      26-10-2006

2. MINIMUM ANNUAL QUANTITIES

The Minimum Annual Quantities in a given calendar year starting in 2008 are
calculated as follows:
25% (twenty five per cent) of the actual total solar cells' production volume
of Solland Solar in such given calendar year.

For the year 2008 up to 2010 the following Annual quantities apply:

| WAFER DIMENSION/ THICKNESS | QUANTITIES IN PCS/MWP | | YEAR | MONTHLY DELIVERY SCHEDULE |
|---|---|---|---|---|
| | MINIMUM | MAXIMUM | | |
| 156x156 mm 240mu | 5,460,000 Pcs | 5,460,000 Pcs | 2007 | To be agreed upon |
| 156x156 mm 200mu | 10,700,000 Pcs | 14,250,000 Pcs | 2008 | To be agreed |
| 156x156 mm 200mu | 19,600,000 Pcs | 26,125,000 Pcs | 2009 | To be agreed |
| 156x156 mm 170mu | 29,790,000 Pcs | 39,710,000 Pcs | 2010 | To be agreed |

3. AGREED ANNUAL QUANTITIES AND DELIVERY SCHEDULE

For the year 2006 and 2007 the following Agreed Annual Quantities and Delivery
Schedule apply:

| WAFER DIMENSION/ THICKNESS | QUANTITIES IN PCS/MWP | | YEAR | MONTHLY DELIVERY SCHEDULE | |
|---|---|---|---|---|---|
| | MINIMUM | MAXIMUM | | | |
| 156x156 mm 240mu | 850,000 Pcs | 850,000 Pcs | 2006 | July | 50,000 pcs |
| | | | | August | 100,000 pcs |
| | | | | September | 100,000 pcs |
| | | | | October | 200,000 pcs |
| | | | | November | 200,000 pcs |
| | | | | December | 200,000 pcs |

| WAFER DIMENSION/ THICKNESS | QUANTITIES IN PCS/MWP | | YEAR | MONTHLY DELIVERY SCHEDULE | |
|---|---|---|---|---|---|
| | MINIMUM | MAXIMUM | | | |
| 156x158 mm 240mu | 5,460,000 Pcs | 5,460,000 Pcs | 2007 | January | 300,000 pcs |
| | | | | February | 300,000 pcs |
| | | | | March | 350,000 pcs |
| | | | | April | 400,000 pcs |
| | | | | May | 450,000 pcs |
| | | | | June | 500,000 pcs |
| | | | | July | 530,000 pcs |
| | | | | August | 530,000 pcs |
| | | | | September | 530,000 pcs |
| | | | | October | 530,000 pcs |
| | | | | November | 530,000 pcs |
| | | | | December | 510,000 pcs |

Notes:
Every reduction of the wafer thickness with 30 Microns will result in a quantity increase of 4.5% on the volumes as mentioned in this appendix.

APPENDIX E

CONTACT DETAILS

SUPPLIER

Commercial contact person:  LAMBO ZHU
                            LDK SOLAR HI-TECH CO., LTD.
                            E-mail:lambo@idksolar.com

Technical contact person:   ALBERT FU
                            LDK SOLAR HI-TECH CO., LTD.
                            E-mail:albert@idksolar.com

SOLLAND SOLAR ENERGY B.V.

Commercial contact Persons:

Mr. Kelvin King
Solland Solar Cells BV
Representative office Shanghai
Tel   021 51506833
Cell  0138 16003170

Mr. Mathieu van den Hof
Solland Solar Cells B.V.
Bohr 10 -- Avantis
6422 RL Heerlen,
The Netherlands.
Tel. +31 (0)45 880 0627
Email: mvandenhof@sollandsolar.com

Technical contact Person:
Mr. Bert Geyer
Solland Solar Cells B.V.
Bohr 10 -- Avantis
6422 RL Heerlen
The Netherlands.
Tel. +31 (0)45 880 0600
Email: bgeyer@sollandsolar.com

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

APPENDIX F

REJECTED MATERIALS ADMINISTRATION (RMA) PROCEDURE

INTRODUCTION

1. This procedure outlined the handling of Wafers that the Solland Solar regards
   not being in conformity with the Specifications as given in Appendix A. The
   Procedure is valid for all Wafers produced by Supplier's manufacturing or
   subcontractor facility in Xinyu City, Jiangxi Province, P.R. China.

2. Handling of non-conformances

   If the Solland Solar is of the opinion that the whole or part of the Shipment
   contains Wafers or other items which are not in conformity with the agreed
   Specifications (including packing and labeling), following steps shall be
   taken:

   - The Solland Solar shall notify the Supplier by fax or by e-mail that there
     is an upcoming claim related to a non-conformance.
   - Supplier shall upon such notification provide a RMA number to be used as
     identification when Wafers are returned from the Solland Solar to the
     Supplier.
   - As soon as the RMA Wafers and the RMA report (which describes the non
     conformity) are received by Supplier, it will be checked for by the
     Supplier.

The outcome of this inspection may fall into several categories, including but
not limited to:

a) The Wafers that meet the agreed Specification will be returned to the Solland
   Solar.
b) Wafers that do not meet the Specifications shall be replaced by the Supplier
   and the replacement of the Wafers shall be forwarded as part of the next
   shipment.
c) Should there after above inspection still be Wafers where the Supplier and
   Solland Solar cannot agree on classification, handing and possible
   compensation, such cases shall be subject of further discussion in dedicated
   meetings.

APPENDIX D

QUANTITIES AND DELIVERY SCHEDULE

The following specific terms and conditions apply to the quantities of Wafers to be supplied to Solland Solar by LDK under this Agreement:

For the purpose of interpreting this Appendix and all documents relating thereto, the following definitions are used. Words incorporating the singular will also include the plural and vice versa, where the context so requires.

'MAXIMUM ANNUAL QUANTITY': means the maximum number of Wafers as specified below that Supplier can be obliged to supply to Solland Solar in any given year.

'MINIMUM ANNUAL QUANTITIES': means the minimum number of Wafers as specified below to be purchased by Solland Solar in any given year.

'AGREED ANNUAL QUANTITIES': means the agreed number of Wafers to be purchased by Solland and to be supplied by LDK in a specific calendar year under this Agreement, being a number of Wafers within the range from the Minimum Annual Quantities to the Maximum Annual Quantities, which number is determined and communicated by Solland Solar ultimately before November 1st in the foregoing year.


1. MAXIMUM ANNUAL QUANTITIES
The Maximum Annual Quantities in a given calendar year starting in 2008 are calculated as follows:
33 1/3% (thirty three one third per cent) of the actual total solar cells' production volume of Solland Solar in such given calendar year.

Solland Solar's yearly solar cells' production capacity (end of the year situation) is currently expected to develop as follows:
2007: 110 MWp*
2008: 210 MWp*
2009: 310 MWp*
2010: 460 MWp*
(* volumes calculated on basis of 20 MWp = 5,460,000 Pcs in 2007)

Solland Solar's yearly solar cells' production volume is currently expected to develop as follows:
2008: 150 MWp*
2009: 275 MWp*
2010: 400 MWp*
(* volumes calculated on basis of 20 MWp = 5,460,000 Pcs in 2007)

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

2. MINIMUM ANNUAL QUANTITIES

The Minimum Annual Quantities in a given calendar year starting in 2008 are
calculated as follows:
25% (twenty five per cent) of the actual total solar cells' production volume
of Solland Solar in such given calendar year.

For the year 2008 up to 2010 the following Annual Quantities apply:

| WAFER DIMENSION/ THICKNESS | QUANTITIES IN PCA/MWP MINIMUM | MAXIMUM | YEAR | MONTHLY DELIVERY SCHEDULE |
|---|---|---|---|---|
| 156x156 mm 240 mu | 5,460,000 Pcs | 5,460,000 Pcs | 2007 | To be agreed upon |
| 156x156 mm 200mu | 10,700,000 Pcs | 14,250,000 Pcs | 2008 | To be agreed |
| 156x156 mm 200mu | 19,600,000 Pcs | 26,125,000 Pcs | 2009 | To be agreed |
| 156x156 mm 170mu | 29,790,000 Pcs | 39,710,000 Pcs | 2010 | To be agreed |

3. AGREED ANNUAL QUANTITIES AND DELIVERY SCHEDULE

For the year 2007 and 2008 the following Agreed Annual Quantities and Delivery
Schedule apply:

Confidential                    Page 3 of 4                    rev03-04-2007
2007

| WAFER DIMENSION/ THICKNESS | QUANTITIES IN PCS/MWP MINIUM | MAXIMUM | YEAR | MONTHLY DELIVERY SCHEDULE | |
|---|---|---|---|---|---|
| 156x156 mm 240mu | 5,460,000 Pcs | 5,460,000 Pcs | 2007. | January | 200,000 pcs |
| | | | | February | 150,000 pcs |
| | | | | March | 150,000 pcs |
| | | | | April | 150,000 pcs |
| | | | | May | 300,000 pcs |
| | | | | June | 500,000 pcs |
| | | | | July | 660,000 pcs |
| | | | | August | 670,000 pcs |
| | | | | September | 670,000 pcs |
| | | | | October | 670,000 pcs |
| | | | | November | 670,000 pcs |
| | | | | December | 670,000 pcs |

NOTES:
Every reduction of the wafer thickness with 30 Microns will result in a
quantity increase of 4,5% on the volumes as mentioned in this Appendix.

2008

| WAFER DIMENSION/ THICKNESS | QUANTITIES IN PCS/MWP | | YEAR | MONTHLY DELIVERY SCHEDULE (TENTATIVE) | |
|---|---|---|---|---|---|
| | MINIMUM | MAXIMUM | | | |
| 156x156 mm 200mu | 13,650,000 Pcs | 13,650,000 Pcs | 2008. | January | 840,000 pcs |
| | | | | February | 840,000 pcs |
| | | | | March | 840,000 pcs |
| | | | | April | 1,000,000 pcs |
| | | | | May | 1,000,000 pcs |
| | | | | June | 1,000,000 pcs |
| | | | | July | 1,340,000 pcs |
| | | | | August | 1,340,000 pcs |
| | | | | September | 1,340,000 pcs |
| | | | | October | 1,370,000 pcs |
| | | | | November | 1,370,000 pcs |
| | | | | December | 1,370,000 pcs |

Notes:
------
Every reduction of the wafer thickness with 30 Microns will result in a
quantity increase of 4,5% on the volumes as mentioned in this Appendix.

</TEXT>
</DOCUMENT>

Exhibit 10.18

(Summary Translation)

SOLAR CELL SILICON WAFER SUPPLY AGREEMENT

Party A: Canadian Solar Inc.                                CSI-LDK060602W

Address: Mississauga, Ontario, Canada

Party B: Jiangxi LDK Solar High-Tech Co., Ltd.

Address: Xinyu City High Technology Development Zone, Jiangxi Province

Whereas:

1.    Party A and Party B have friendly cooperative relationship;

2.    Party A has decided to invest in and form a solar cell silicon wafer
      production line in China;

After friendly consultation, Party A and Party B hereby reach the following
agreement on Party B's supply of polycrystalline silicon to Party A:

Article 1 Product Supply

Party B agrees to supply polycrystalline silicon wafer products ("Product") to
Party A according to this Agreement in such quantity as determined in accordance
with the relevant provisions of this Agreement.

Party A will carry out the actual procurement through its subsidiary in China
designated by it.

Article 2 Quantity of Supply

|   | Year | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
|---|------|-----------|-----------|-----------|-----------|
| 1 | 2007 | 1 MW | 3 MW | 5 MW | 6 MW |
| 2 | 2008 |      | 50 MW |  |  |
| 3 | 2009 |      | 75 MW |  |  |
| 4 | 2010 |      | 108 MW |  |  |

Article 3 Quality Standard and Specifications

Party B shall make deliveries to Party A according to its publicly announced product quality standard and specifications.

Article 4 Principle for Determination of Supply Price and Payment

1.  The price of the Product to be supplied by Party B to Party A shall be the uniform price at which Party B supplies the Product to all major companies at that time. In principle, the price shall be determined on a monthly basis. Once determined, the price shall remain unchanged for at least one month.

2.  Party A agrees that after this Agreement duly comes into effect it will make an advance payment at 60% of the price to Party B as deposit six months before Party B begins to make deliveries, with the remaining 40% of the price to be paid in full within 30 days before Party B makes deliveries.

Article 5 Procedure of Supply

1.  Party A and Party B shall agree in writing on the material terms of the supply, such as the price of the Product, quantity, quality, specifications, delivery schedule and amount of deposit payment, under separate covers prior to each delivery period.

2.  Party B shall issue a supply order to Party A 45 days prior to a delivery specifying the delivery quantity, quality, specification and delivery schedule.

3.  Upon receipt of Party B's order, Party A shall confirm the supply order in writing within 5 days. A purchase order finally confirmed by both Parties in writing shall be the final basis of the supply of the Product for the delivery period concerned. If any Party proposes to change the delivery quantity or delivery time after such confirmation, that Party shall notify the other Party 10 days in advance and obtain the written consent of the other Party, otherwise it shall be liable for breach of contract accordingly.

4.  Mode of delivery: Delivery shall be taken by Party A itself according to the delivery date and quantity finally confirmed by the Parties and, when Party A takes delivery, the Parties shall confirm the quantity of the Product and complete the delivery formalities in writing onsite.

Article 7 Acceptance and Objection

Party A shall carry out acceptance on the very day of receipt of the Product and shall raise any objection it may have with regard to the quality of the Product within 90 days of receipt of the Product. If it fails to do so within this period, it shall be deemed to have no objection.

-2-

Article 8 Liability for Breach of Contract

If any Party violates any provision of this Agreement, it shall be liable for breach of contract accordingly. If the quality of any Product supplied by Party B does not conform to that agreed by the Parties, Party A has the right to return the Product to Party B within 90 days and Party B shall promptly replace the Product upon receipt of it from Party A.

The Parties agree that in the following circumstances Party A has the right to demand the return of the advance payment:

(1) Party B fails to make deliveries on schedule and according to the quality requirement;

(2) The Parties fail to reach an agreement on the specific price of the goods;

(3) Party B suspends production for a long period (over three months), becomes bankrupt or encounters other material changes;

(4) There is a material change in the equity structure of Party B or Party B's major shareholder;

(5) Party B fails to perform its obligations as required by this Agreement.

Party B shall return the advance payment in full within 30 days after Party A issues a written demand for the return of the advance payment and the obligations under this Agreement will not be deemed terminated until confirmation is given by both Parties.

Article 9 Governing Law and Jurisdiction Over Disputes

1. The conclusion, validity, interpretation and performance of and the resolution of disputes relating to this Agreement shall be governed by the laws of the mainland area of the People's Republic of China.

2. All disputes arising from or in connection with the performance of this Agreement shall be resolved by the Parties through amicable consultation; if such consultation fails to resolve a dispute, either Party may apply to the Suzhou Contract Arbitration Commission for arbitration by an arbitration tribunal formed by the arbitration commission in accordance with the arbitration rules of that arbitration commission in effect at the time of the application. The arbitration award shall be final and binding on both Parties.

Article 10 Effectiveness of Agreement

This Agreement shall come into effect after it is signed by the legal representatives or authorized representatives of the Parties.

-3-

Article 11 Miscellaneous

This Agreement shall be written in quadruplicate with Party A and Party B each
holding two copies (including one original and one duplicate), and all four
copies of the Agreement shall have equal legal effect.

-4-

(No text of the main body hereafter)

Party A: Canadian Solar, Inc.

     Legal representative or authorized representative:

     /s/ Xiaohu Wang
     -------------------------------

     July 6, 2006

Party B: Jiangxi LDK Solar Energy High-Tech Limited Liability Company

     Legal representative or authorized representative:

     /s/ Xiaofeng Peng
     -------------------------------

     July 6, 2006

-5-

(Summary Translation)

SOLAR CELL SILICON WAFER SUPPLY SUPPLEMENTAL AGREEMENT

NO. 60810 CSI/LDK

Party A: Canadian Solar Inc.

Address: 4056 Jefton Crescent, Mississauga, Ontario, L5L 1Z3 Canada

Party B: Jiangxi LDK Solar Energy High-Tech Limited Liability Company

Address: Xinyu City High Technology Development Zone, Jiangxi Province

Based on their respective developmental needs, Party A and Party B hereby supplement the Solar Cell Silicon Wafer Supply Agreement of No. CSI-LDK060602W that they have executed.

Party B agrees to amend the quantity of supply stipulated in the above-said agreement as follows:

|   | Year | Quantity | | | |
|---|------|-----------|-----------|-----------|-----------|
|   |      | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
| 1 | 2007 | 1 MW      | 4 MW      | 8 MW      | 12 MW     |
| 2 | 2008 |           | 50 MW     |           |           |
| 3 | 2009 |           | 75 MW     |           |           |
| 4 | 2010 |           | 108 MW    |           |           |

Other provisions shall remain unchanged.

Party A: /s/ Xiaohua Xu (signature)        Party B: /s/ Xiaofeng Peng (signature)


Representative:                        Representative:
          ---------------------                  ------------------------

Date: August 11, 2006          Date: August 11, 2006
</TEXT>
</DOCUMENT>

Exhibit 10.19

(Summary Translation)

SILICON SUPPLY AGREEMENT

Contract Number: SFBE-061111-LDK
Place of Signing: 666 Linyang Road, Qidong
Date of Signing: November 11, 2006

The Seller: Jiangxi LDK Solar Hi-Tech Co., Ltd.
The Buyer: Jiangsu Linyang Solarfun Co., Ltd.

Based on the status of the performance of Contracts 2005-LY1208, 2006-LY0528 and LDK20060727ZLB, and taking into consideration of the needs of both parties in the course of their development, the Seller and the Buyer hereby enter into this Agreement on Amendments to Product Supply Contracts (this "Agreement") after friendly negotiations.

Article 1.     Contract 2005-LY1208 shall be terminated with respect to the unperformed obligations thereunder. Such unperformed obligations consist of 1.38 million pieces of silicon wafers that shall be but have not been supplied to the Buyer by the Seller under such contract, and RMB37,521,120 that has been prepaid by the Buyer to the Seller under such contract for the purpose of such silicon wafers.

Article 2.     Contract 2006-LY0528 shall be terminated with respect to the unperformed obligations thereunder. Such unperformed obligations consist of 1.98 million pieces of silicon wafers that shall be but have not been supplied to the Buyer by the Seller under such contract, and RMB57,087,744 that has been prepaid by the Buyer to the Seller under such contract for the purpose of such silicon wafers.

Article 3.     Contract LDK20060727ZLB shall be terminated with respect to the unperformed obligations thereunder. Such unperformed obligations consist of 0.25 million pieces of multicrystalline silicon wafers (converted from the quantity of the unsupplied products) that shall be but have not been supplied to the Buyer by the Seller under such contract, and RMB12,648,500 that has been prepaid by the Buyer to the Seller under such contract for the purpose of such silicon wafers.

Article 4.     The Commissioned Processing Contract 2005-LY1209 shall be terminated. Notwithstanding such termination, the Seller shall, prior to November 25, 2006 perform all of its obligations to complete the processing of those products that has actually been commissioned to it by the Buyer.

Article 5.     The Cooperation Agreement dated December 16, 2005 by and between the parties hereto shall be terminated and any obligations thereunder the performance of which has been commenced shall continue to be performed in accordance with the original provisions thereof.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

The above five contracts shall hereinafter be referred to collectively as the "Terminated Contracts."

Article 6.    Any shortfall in the quantity of, and any unqualified or otherwise defective silicon wafers in, any batch of the silicon wafers that has been delivered as a result of the performance of any of the Terminated Contracts, shall be made up or replaced prior to December 25, 2006, as the case may be.

Article 7.    Any and all deposits and advance payments paid for the purpose of those products that are left unsupplied under the Terminated Contracts shall be converted into the advance payments under this Agreement. The amount of such deposits and advance payments shall be determined as RMB98,952,900.80 for the time being. The parties hereto agree that the accurate amount of such advance payments so converted shall be subject to the final amount mutually confirmed by the accounting departments of the parties hereto subsequently. If such final amount is higher than RMB98,952,900.80, then the excess shall be repaid by the Seller to the Buyer or vice versa.

Article 8.    The parties hereto agree that beginning from December 2006 they shall perform this Agreement as follows:

Agreed quantity, name, technical specifications, price and delivery schedule of the subject products;

| NAME OF SUBJECT PRODUCT | TECHNICAL SPECIFICATIONS | QUANTITY | PRETAX UNIT PRICE (RMB YUAN/PIECE) |
|---|---|---|---|
| | 1. DIMENSIONS OF SUBJECT SILICON WAFERS: | | |
| | 1.1 Contour of subject silicon wafers: 125x125+/-0.5mm | | |
| | 1.2 Thickness of subject silicon wafers: 240+/-20(u)m | | |
| | 1.3 Total thickness variation(TTV): 0.03mm | | |
| | 1.4 Vertical angle: diagonal lines in the internal square having equal length, within a tolerance of +/-0.5mm | | |
| Multicrystalline Silicon Wafer | 1.5 Flexibility: < or = 0.035mm | 4 million pieces | 50.00 |
| | 2. TECHNICAL PARAMETERS | | |
| | 2.1 Resistivity: 0.5 ~ 2 (ohm symbol).cm | | |
| | 2.2 Type of electric conduction: Type P | | |
| | 2.3 Minority carrier lifetime: > or = 2(u)s | | |
| | 2.4 Oxygen concentration: <1x10(18)at/cm(3) | | |

2.5 Carbon concentration: <5x10(17)at/cm(3)

3. SURFACIAL QUALITY:

3.1 Notch: notch of crystal orientation on
any subject silicon wafer shall be no bigger
than 1x0.3mm, and there shall be no more than
two notches on any subject

-------------------------------------------------------------------

-------------------------------------------------------------------

| NAME OF SUBJECT PRODUCT | TECHNICAL SPECIFICATIONS | QUANTITY | PRETAX UNIT PRICE (RMB YUAN/PIECE) |
|---|---|---|---|

-------------------------------------------------------------------

silicon wafer.

3.2 Broken edge: any subject silicon wafer
does not allow a broken edge bigger than
1x0.5mm or more than two broken edges.

3.3 Any subject silicon wafer does not
allow any crack or conspicuous mark left
by a knife-cut or pit.

3.4 The surface of any subject silicon
wafer does not allow any stain or abnormal
spot.

-------------------------------------------------------------------

| Total Price | | | RMB200 million |
|---|---|---|---|

-------------------------------------------------------------------

Article 9.    Quality requirements, technical standards and conditions on which
and term during which the Seller shall be responsible for the
quality of the subject silicon wafers: as set forth above in this
Agreement.

Article 10.    Place and manner of delivery: The subject products shall be
delivered to the warehouse of the Buyer.

Article 11.    Manner and cost of transportation: The subject products hereunder
shall be delivered to the Buyer by means of road transportation
at the Seller's expense.

Article 12.    Packaging standards and type of packaging materials: Suitable for
long-distance transportation.

Article 13.    Standards and method of inspection and period for objection:
After each delivery of the silicon wafers to the Buyer, the Buyer
shall before warehousing, conduct full surface inspection of such
silicon wafers pursuant to the specifications set forth herein.
Where it has been discovered in the course of such inspection

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

that there is any shortfall in the quantity of such batch of the silicon wafers so delivered either due to the inconsistency between the delivered quantity and the shipped quantity or the breakage of certain silicon wafers, such shortfall, after being confirmed by the parties hereto, shall be made up within ten days. In addition to that, any serious quality problem that may arise in the production process of the subject products shall be resolved through consultations between the parties hereto.

Article 14.    Terms of and period for payment: Price for the subject products to be supplied hereunder shall be paid as follows:

(1) For each batch of the subject products to be delivered during the period from December 2006 to March 2007, 60% of the price for such batch of the subject products shall be deducted from the advance payments. In other words, RMB10,710,000 shall be deducted each month if the delivery schedule set forth above is followed. The remaining 40% of the price shall be paid within 7 days as of the Buyer's acceptance of such batch of the subject products. In other words, RMB 7,140,000 shall be paid each month if the delivery schedule set forth above is followed.

(2) For each batch of the subject products to be delivered during the period from April to May in 2007, 60% of the price for such batch of the subject products shall be deducted from the advance payments. In other words, RMB16,500,000 shall be deducted each month if the delivery schedule set forth above is followed. The remaining 40% of the price shall be paid within 7 days as of the Buyer's acceptance of such batch of the subject products. In other words, RMB11,000,000 shall be paid each month if the delivery schedule set forth above is followed.

(3) For each batch of the subject products to be delivered during the period from June to July in 2007, 60% of the price for such batch of the subject products shall be deducted from the advance payments and RMB22,500,000 shall be deducted each month if the delivery schedule set forth above is followed. The remaining 40% of the price for each batch of the subject products delivered shall be paid within 7 days as of the Buyer's acceptance of such batch of the subject products and RMB15,000,000 shall be paid each month if the delivery schedule set forth above is followed.

Where the advance payment then left is not enough for any deduction, the Buyer shall make up the shortfall in a timely manner. For the Buyer's payment for each batch of the subject products actually delivered, the Seller shall issue to the Buyer a VAT invoice in a full amount.

Article 15.    Term of this Agreement. This Agreement shall come into effect upon execution and expire upon the full performance hereof.

Article 16.    In the event that either party hereto fails to perform any of its obligations hereunder, the non-breaching party may hold the breaching party liable for damages arising from such failure. Where the quantity of the subject products actually delivered

during any month is less than 90% of the agreed quantity, the Seller shall pay liquidated damages to the Buyer each day which shall be equal to 5% of the total consideration of this Agreement. In such case, the Buyer shall have the right to terminate this Agreement at its sole discretion and request the Seller, within 6 days as of its receipt of the Buyer's notice for termination of this Agreement, to refund any and all the paid advance payments that are left by then and pay the interest accrued thereon at the interest rate of 7 0/00/month for the period when such advance payments have been occupied by the Seller. In addition to that, the Seller shall pay liquidated damages to the Buyer which shall be twice as much as 20% of the payment for the subject products that are left unsupplied in such month.

Article 17.    Any dispute in connection with the performance of this Agreement shall be settled through negotiations between the parties hereto. If no settlement can be reached through such negotiations, the parties hereto agree that the dispute shall be submitted to Shanghai Arbitration Commission for its arbitration.

Article 18.    Miscellaneous. The parties hereto agree that the unit price for the 0.35 million pieces of the 125x125 multicrystalline silicon wafers delivered during November 2006 shall be determined as RMB 45.5/piece. Based on the premise that such agreement is performed, the unit price of the 0.3392 million pieces of the 125x125 multicrystalline silicon wafers delivered during October 2006 shall be determined as RMB 53/piece. The unit price of any silicon wafers delivered during November 2006 other than the above 0.35 million pieces shall be subject to the unit price set forth herein above.

--------------------------------------------------------------------------
        The Seller                          The Buyer
--------------------------------------------------------------------------

Corporate name: Jiangxi LDK Solar Hi-Tech    Corporate name: Jiangsu Linyang
Co., Ltd. (company seal)                     Solarfun Co., Ltd.(company seal)

Address: Xinyu Economic and Technological    Address: 666 Linyang Road,
Development Zone, Jiangxi Province           Qidong, Jiangsu Province

Legal Representative: Zhu Liangbao (signature) Legal Representative: Lu Yonghua
Authorized Agent:                            (signature)
                                             Authorized Agent:
                                                             ----------------

Tel: 0790-6860061
Fax: 0790-6860085                            Tel: 0513-3115763
                                             Fax: 0513-3115763

Bank of Deposit:

                -------------------          Bank of Deposit: Bank of China,
Account No.:                                 Qidong Branch, Business
                -------------------          Department
Tax No.:                                     Account No.: 647032159808091001
                -------------------          Tax No.: 320681765140726

--------------------------------------------------------------------------

</TEXT>
</DOCUMENT>

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 10.20

(Summary Translation)
SILICON SUPPLY COOPERATION AGREEMENT

Whereas, Jiangsu Linyang Solarfun Co., Ltd. (hereinafter referred to as "Solarfun") has been striving to grow into an internationally recognized PV cell manufacturer; and

Whereas, Solarfun and Jiangxi LDK Solar Hi-Tech Co., Ltd. (hereinafter referred to as "LDK") desire to establish a strategic partnership between them to achieve a win-win result and mutual development on the principle of equality and good faith and following the guideline of "Open, Timely and Dynamic Adjustment".

NOW, THEREFORE, after friendly negotiations, Solarfun and LDK hereby reach the following agreement for the purchase and sale of multicrystalline silicon wafers:

1.   In the case of shortage of multicrystalline silicon materials, LDK shall supply multicrystalline silicon wafers it manufactures to Solarfun to the maximum extent possible. While in the case of relative excess of the materials, Solarfun shall, on a priority basis, purchase and consume the multicrystalline silicon wafers manufactured by LDK at the price then prevailing at the international market.

2.   Based on the result of the cooperation between them during 2006 and in view of the development plan of LDK, Solarfun and LDK have agreed that from July 1, 2007 to June 30, 2008 LDK shall supply Solarfun with the multicrystalline silicon wafers necessary for the production of 16,200,000 pieces of multicrystalline silicon PV cells, including 15,000,000 pieces of multicrystalline silicon wafers at the specifications of 156x156, and 1,200,000 pieces of multicrystalline silicon wafers at the specifications of 125x125. Such products shall be delivered to Solarfun by equal installments on a monthly-basis commencing from July 1, 2007.

3.   The actual price and thickness of the silicon wafers to be supplied hereunder shall be determined subject to further negotiations based on the actual market conditions and technology development at the relevant time.

4.   The specific terms for the cooperation contemplated hereunder shall be executed by the parties hereto subsequently as and when appropriate.

5.   This Agreement shall be executed in two (2) originals, with each Solarfun and LDK to hold one (1). This Agreement shall come into effect upon being affixed with the signature of the authorized signatory or the company seal of each Solarfun and LDK hereto.

[signature on the next page]

1

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
LDK:            JIANGXI LDK SOLAR HI-TECH CO., LTD. (affixed with LDK's company
                seal)

Signed by:  /s/ Zhu Liangbao

Dated:  November 14, 2006


SOLARFUN:       JIANGSU LINYANG SOLARFUN CO., LTD. (affixed with Solarfun's
                company seal)

Signed by:  /s/ Lu Yonghua (signature)

Dated:  November 14, 2006
                                    2
</TEXT>
</DOCUMENT>
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 10.21

AGREEMENT

THIS AGREEMENT is made this 28th day of March, 2007 between:

Q-CELLS AG, a company organized and existing under the laws of the Federal
Republic of Germany, with its registered offices in Guardianstrasse 16, D-06766
Thalheim, Germany (hereinafter referred to as "Q-CELLS") legally represented by
Anton Milner, CEO and Hartmut Schuning, CFO- Chief Financial Officer,

AND

LDK SOLAR HI-TECH CO., LTD., a company organized and existing under the
laws of P.R. China, with its registered offices in Hi-Tech Industrial
Park, Xinyu City, Jiangxi Province, P.R. China (hereinafter referred to as
"LDK") legally represented by Light DK Peng, CEO and Nick Sarno, Sr. Vice
President Manufacturing.

Q-CELLS and LDK are also hereinafter identified as "PARTY" or collectively as
"PARTIES".

Preamble

(A)   LDK is the leading solar wafer manufacturer in Asia with its production
      facilities in Xinyhu in P.R. China. To meet the increasing demand for
      solar wafers, LDK is expanding its current installed solar wafer
      production capacities significantly. LDK is utilizing modern production
      technologies and aims at being a cost-effective producer or
      multicrystalline silicon solar wafers serving the global photovoltaic
      market.

(B)   Q-CELLS is the leading manufacturing of crystalline solar cells in Europe
      with its production facilities in Thalheim (Federal Republic of Germany).
      Q-CELLS will expand its production capacity and therefore needs to secure
      a stable, reliable and long lasting supply of multicrystalline silicon
      wafers.

(C)   The Parties enter into this AGREEMENT with the intention of developing a
      long-term partnership encompassing raw materials and wafer deliveries --
      in keeping with the terms of this AGREEMENT -- as well as other joint
      initiatives.

(D)   One objective of the Parties is the establishment of reduced thickness and
      material optimization. The cost and volume effective optimum will be
      evaluated by taking the overall costs and yields of both production
      processes into account.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(E)  An intensive and mutually beneficial co-operation basis is foreseen where, for example, data exchange between both quality management systems will be used to optimize cell efficiency and breakage rate.

Now, therefore, the Parties do hereby agree as follows:

SECTION 1   OBJECT OF THE AGREEMENT

This Agreement ("AGREEMENT") determines the business cooperation between Q-Cells and LDK in the years 2007 -- 2009.

SECTION 2   AGREEMENT VALIDITY

AGREEMENT shall become effective on the date first of signature and remain binding between the Parties until 31st December 2009. It may thereafter be extended and renewed if the Parties mutually decide and agree in writing.

SECTION 3   AGREEMENT FOR SILICON RAW MATERIALS

Q-Cells and LDK enter into an agreement for selling silicon raw materials by Q-Cells to LDK to be further processed into wafers by LDK and for the supply to Q-Cells. The terms of such agreement are as follows:

   Q-Cells shall provide raw materials in the amount of:

   2007: 15 metric tons of broken wafers (Q-Cells spec Poly-Br-NB1/2)

   2008: 200 metric tons solar grade feedstock (polysilicon or mono slabs or equivalent)

   2009: 200 metric tons solar grade feedback (polysilicon or mono slabs or equivalent)

   The volumes delivered in 2008 and 2009 shall be used by LDK for conversion into wafers with the silicon-to-wafer conversion ration of 28,000 wafers (calculation basis: 156x156mm, thickness 220mum) per metric ton. LDK will ship wafers out of feedstock (polysilicon, mono slabs or equivalent) back to Q-Cells within a period of 6 weeks after the arrival of the raw material at LDK, except for wafers out of broken wafers. In

2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

such a case of the wafer delivery time can be 8 weeks after the arrival of the raw material at LDK.

The conversion rate may be increased due to yield improvement and wafer thickness reduction. The application conversion ratios for 2008 and 2009 will be agreed upon by the Parties for a period of six months at a time (January -- June, July -- December), two (2) months in advance each period. In total this Agreement leads to the following annual wafer volumes (based on conversion ratio of 28,000 wafters per metric ton):

5,600,000 Pieces Year 2008 (156mm x 156mm, 220mum and or 200mum)
5,600,000 Pieces in Year 2009 (156mm x 156mm, 220mum and or 200mum)

It is the intention of both Parties to also evaluate the supply of solar grade silicon (mg-SOG) from Q-Cells to LDK and the processing of this material by LDK. For this a mutual project shall be established. Based on the results of this project both Parties may on mutual agreement involved mg-SOG in the raw material supply from Q-Cells to LDK.

SECTION 4   SUPPLY AGREEMENT FOR MULTICRYSTALLINE WAFERS

4.1   In addition to the volumes mentioned in Section 3 Q-CELLS shall order and LDK shall deliver the following annual wafer quantities:

6,000,000 Pieces in Year 2007 (156mm x 156mm, 220mum and or 200mum)
18,400,000 Pieces in Year 2008 (156mm x 156mm, 220mum and or 200mum)
24,400,000 Pieces in Year 2009 (156mm x 156mm, 220mum and or 200mum)

4.2   Q-CELLS has the option to shift to other wafer thickness; provided this wafer size or thickness is in the production program of LDK.

4.3   Any change in annual quantities will be subject to mutual AGREEMENT. However, Q-CELLS is obliged to purchase from LDK and LDK is obliged to sell to Q-Cells the quantity (expressed in numbers of wafers). The delivery schedule is detailed in APPENDIX 2.

4.4   During the entire period of validity of the AGREEMENT a continuous co-ordination on the wafer and raw material specifications and on the corresponding technical

3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

characteristics shall be assured. Therefore the Parties agree to have co-ordinating negotiations every six months. Therefore the Parties agree to have co-ordinating negotiations every six months. The co-ordinating negotiations shall take place alternately in Germany and in P.R. China. By mutual consent, the co-ordinating negotiations can take place at a third place.

4.5    LDK shall at all times ensure that a sufficient quantity of the wafers is manufactured to supply the need of Q-Cells within the annual quantities in accordance with agreed delivery plans as per 4.1

SECTION 5    PRICES

5.1    The prices for the raw materials and for the wafer shall be determined between Q-CELLS and LDK pursuant at this Section 5.

5.2    The agreed prices applicable to the shipments scheduled during the period from April 2007 until December 2007 (specified in APPENDIX 2) shall be as follows: Broken Wafers provided by Q-Cells to LDK pursuant to Section 3: [*] USD / kg Multi Wafer provided by LDK to Q-Cells pursuant to Section 4: [*] Euro / pcs.

5.3    The Prices for deliveries in 2008 and 2009 shall be as follows:

Feedstock (Solar Grade Polysilicon or Mono Slabs or equivalent) provided by Q-Cells to LDK pursuant to Section 3: [*] USD/kg

Multi Wafer provided by LDK to Q-Cells pursuant to Section 3: [*] USD/pcs

For multi Wafers pursuant to Section 4 the agreed price must be within the following ranges:

2008: Maximum Price: [*] Euro, Minimum Price [*] Euro/pc

2009: Maximum Price: [*] Euro, Minimum Price [*] Euro/pcs

The prices for Multi Wafers provided by LDK to Q-Cells pursuant to Section 3 and Section 4 will be agreed upon by the Parties for a period of six months at a time ("PRICING PERIOD"). The prices will be agreed two (2) months in advance of, and be valid for, the following Pricing Period ("PRICE DETERMINATION PERIOD"). Price changes will take into account the changes in market conditions for wafers and for multicrystalline solar cells, cost changes in feedback, cost improvements and effects related to EURO/Dollar exchange rates.

5.4    If the Parties have not been able to agree on new Wafer Prices for the following Pricing Period during the Price Determination Period, the last agreed Prices shall be deemed to be the Prices for the following 3 months. If in this period the Parties once again are not able to agree on the Prices according to paragraph 5.3, the AGREEMENT (Including all obligations as described in Section 3 and Section 4) may be terminated by one of the Parties with effect as of the end of the ongoing Pricing Period.

*    Confidential Treatment Requested. The redacted material has been separately filed with the Securities and Exchange Commission.

4

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

5.5    LDK shall submit an invoice to Q-CELLS for the Multi Wafers delivered to
       Q-CELLS. Q-CELLS shall submit an invoice to LDK for the Feedback
       (Polysilicon or Mono Slabs or equivalent and broken wafers) delivered to
       Q-CELLS.

SECTION 6    PAYMENT TERMS

6.1    For 2007 the payment terms for raw materials deliveries pursuant to
       Section 3 from Q-CELLS to LDK shall be as follows:

       100% has to be paid against shipping documents and packing list
       before shipment.

6.2    For 2007 the payment terms for wafer deliveries pursuant to Section 4 from
       LDK to Q-CELLS shall be as follows:

       Q-CELLS has to provide 40% Down-Payment of the whole supply volume for
       2007 pursuant to Section 4 (Down-payment volume = 15,120,000 - Euro),
       provided that LDK secures this payment with an Advance Payment Guarantee
       for Q3 and Q4, 2007 comparable to the template in APPENDIX 3.

       For each delivery the remaining 60% has to be paid against shipping
       documents and packing list before shipment.

6.3    Payment terms for all shipments in 2008 and 2009 have to be mutually
       agreed latest October of the year before.

SECTION 7    DELIVERY

7.1    The Multi Wafers pursuant to Section 3 and Section 4 shall be delivered
       FOB Shanghai, INCOTERMS 2000, in standard export packaging for wafers. The
       delivery clause present in the AGREEMENT shall be governed by the rules of
       INCOTERMS 2000 and its latest amendments.

7.2    The Raw Materials pursuant to Section 3 shall be delivered FOB Hamburg,
       INCOTERMS 2000, in standard export packaging for raw materials.

7.3    Each shipment must include a detailed packaging list, specifying the
       volume and other specifications according to mutual AGREEMENT.

SECTION 8    DELIVERY DATE

8.1    Delivery Date is specified in APPENDIX 2.

5

8.2   Late deliveries:

> If Q-CELLS is not able to fulfill its commitments to deliver raw materials as described in Section 3 and such delivery is delayed by more than two (2) weeks for reasons attributable to Q-CELLS, and this results in production disruptions and/or additional costs for LDK, LDK shall be entitled to claim a penalty and Q-CELLS shall pay LDK this penalty to be calculated on the delayed quantity of the agreed delivery. The penalty rate is described below.

| Delay | Penalty on delayed quantity in percent of agreed Sales price |
|-------|--------------------------------------------------------------|
| 3rd week | 1.5% |
| 4th week | 2.5% |
| 5th week | 4.0% |

> If LDK is not able to fulfill its commitments to deliver wafers as described in Section 3, Section 4 and APPENDIX 2 and such delivery is delayed by more than two (2) weeks for reasons attributable to LDK, and this results in production disruptions and/or additional costs for Q-CELLS, Q-CELLS shall be entitled to claim a penalty and LDK shall pay Q-CELLS this penalty to be calculated on the delayed quantity of the agreed delivery. The penalty rate is described below.

| Delay | Penalty on delayed quantity in percent of agreed Sales price |
|-------|--------------------------------------------------------------|
| 3rd week | 1.5% |
| 4th week | 2.5% |
| 5th week | 4.0% |

8.3   If one Party wish to raise a claim for penalty in accordance with the above clauses, the claim must be presented in writing to the other Party, no later than six (6) weeks after the penalty situation has occurred. Penalties shall be paid with two (2) months after the penalty claim has been presented.

SECTION 9   WARRANTY

9.1   LDK shall warrant that cell performance being produced out of LDK solar wafer should provide at least an average cell efficiency above 15.3%. The wafer quality

6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

and wafer specification are in conformity with the agreed Specifications attached hereto as APPENDIX 1 and must be fit to be used for the manufacture of solar cells.

9.2    In cases of defective delivery, Q-CELLS is entitled to the statutory claims to warranty and guarantees.

9.3    The expiration of the warranty period shall be 1 month after the arrival of the Wafers at Q-CELLS to the extend that the law does not provide for longer terms.

9.4    In case of defective delivery Q-CELLS shall, in writing, inform LDK of quantity and type of defect, and any other relevant information of the defective Wafer.

9.5    LDK shall be responsible for quality of the Wafers. If there are any problems relating to quality, including non-conformity to the specifications and any defect in the Wafers, LDK will immediately investigate the relevant matters including causes and shall at its responsibility replace defective wafers with good ones free of charge.

9.6    Neither Q-Cells nor LDK shall be liable for any incidental or consequential damages, nor any loss of production time and / or material due to defects of the delivered raw material or Wafers.

9.7    LDK shall replace delivered Multi Wafer within two weeks due to lower wafer volumes based on indication of invoice/ packing list above 0.05%, all breakage in the box above 0.3% of the total delivered wafer quantity and shall also replace wafer breakage rate in the Q-CELLS line exceeding 3.5%. Moreover, the total amount of shunted cell should not exceed the average of Q-CELLS by more than 5%.

SECTION 10    HARDSHIP

If, during the period of the AGREEMENT, performance of the AGREEMENT should lead to unreasonable hardship for one or other Party - taking the interests of all Parties into account - all Parties shall endeavor to agree amicably to amend the AGREEMENT in the light of the change in circumstances.

This shall also apply if the market price for silicon wafers differs by more than 10 % from the price range indicated in Section 5.3.

SECTION 11    FORCE MAJEURE

Q-CELLS and LDK shall not be liable for any failures due to Force Majeure, i.e., any cause beyond reasonable control of the Parties or circumstances of an exceptional and/or unforeseeable nature that may prevent, either in whole or part, the implementation of the AGREEMENT. By way of example, but not by way of limitation, the causes of Force Majeure could be: war, civil disturbance, fire, floods, earthquakes and any other natural event of an exceptional nature, strike, severe delays or disruption in the production process of either Party due to external factors, and hindrances due to administrative or legislative acts. When cases of Force Majeure, as per this present Section 11, arise they must immediately be reported to the other Party and duly documented. In any case, events of Force Majeure must always be reported to the other Party in writing together with appropriate documentary evidence within 15 days of the occurrence of the event. If the Force Majeure event continues beyond 30 days, then the Parties shall meet to agree on how to proceed or on whether to suspend or cancel the AGREEMENT.

7

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

SECTION 12  CONFIDENTIALITY

During the term of the AGREEMENT and at any time thereafter, the Parties agree
to keep secret and not to reveal to third Parties the terms of the AGREEMENT and
any information relating to the feedstock (poly silicon, broken wafer and mono
slabs and equivalent) supply and Multi Wafer deliveries. This shall not apply to
the disclosure of information required by law including stock exchange
regulations or vis-a-vis financial advisors and institutions within the normal
financing activities of the Parties and then only under confidential banking
relationships or with non-disclosure or secrecy AGREEMENT's.

SECTION 13  FISCAL OBLIGATIONS

Each Party is responsible for its own fiscal obligations.

SECTION 14  APPLICABLE LAW

The AGREEMENT shall be governed by the laws of the Federal Republic of Germany,
with jurisdiction in Berlin. This AGREEMENT shall not include, incorporate or be
subject to the provisions of the "United Nations Convention on AGREEMENTs for
the International Sales of Goods of 1980".

SECTION 15  COMMUNICATIONS

All communications relating to the AGREEMENT shall be considered valid when made
in writing and sent via registered mail, telegram, telex or telefax, and
provided that they are addressed as follows:

-       JIANGXI LDK Solar HI-Tech Co., Ltd., Attention Mr. Nick
        Sarno, Hi-Tech Industrial Park, Xinyu, Jiangxi, P.R.C. JIANGI LDK
        SOLAR HI-TECH CO., LTD.; Email: nick@ldksolar.co

8

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
              Telephone: + 86 790-6860095
              Telefax  : + 86 790-6860085

    -     Q-Cells AG, Attention Mr. Dirk Junghans, Guardianstrasse 16,
          D-06766 Thalheim - Germany; Email: d.junghans@q-cells.com

          Telephone: + 49 3494668740
          Telefax  : + 49 3494668764
```

Possible changes of address must be communicated in writing and shall be
effective only after their receipt.

SECTION 16  DISPUTES

16.1  All disputes arising from this AGREEMENT, including those related to its
      validity, interpretation, implementation and cancellation, shall be
      settled by binding arbitration by three arbiters according to the rules
      and regulations of the Sections 1025 to 1066 of the German Code of Civil
      Procedure. The arbitration according to such rules shall be conducted in
      the English language in Berlin.

16.2  If one Party fails to show up at the appointed time and place, without a
      valid excuse previously made, the arbitration will continue as if the
      Party was present, and the arbitration shall be binding upon such Party.

SECTION 17  INVALIDITY

Should any clause of this AGREEMENT be or become invalid in whole or in part,
this shall not affect the validity of the remaining clauses or of the remaining
part of the clause concerned. The Parties shall endeavour to replace any such
invalid arrangement by a valid one which as far as possible, is in line with the
economic purpose of the invalid arrangement. Failure to agree on a replacement
clause shall not make the AGREEMENT invalid as a whole, unless it can reasonably
be assumed that the AGREEMENT would not have been concluded at all without the
invalid clause.

SECTION 18  MODIFICATIONS OF THE AGREEMENT

All modifications relating to the AGREEMENT shall be considered valid only when
made in writing. Every previous AGREEMENT between the Parties shall be
considered invalid and shall be entirely replaced by the AGREEMENT.

9

SECTION 19  STANDARD BUSINESS CONDITIONS

The Parties hereby exclude their standard business conditions.


This AGREEMENT has been prepared in two originals, one for Q-CELLS and one for LDK.

For Q-Cells AG                          For LDK

/s/ Anton Milner                        /s/ Xiaofeng Peng
------------------------------------    ------------------------------------
Name: Anton Milner                      Name: Light DK Peng
Title: CEO                              Title: CEO
Date: 28 March 2007                     Date: 28 March 2007


/s/ Hartmut Schuning                    /s/ Nick Sarno
------------------------------------    ------------------------------------
Name: Hartmut Schuning                  Name: Nick Sarno
Title: CFO (Chief Financial Officer)    Title: Sr. Vice President Manufacturing
Date: 28 March 2007                     Date: 28 March 2007

10

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

ATTACHMENTS:

1)  Appendix 1:  Product Specifications for Multi Wafers

2)  Appendix 2:  Delivery Program

3)  Appendix 3:  Template for Advance Payment Guarantee

11

APPENDIX 1 -- PRODUCT SPECIFICATIONS AND QUALITY CONTROL

| PARAMETER | WAFER |
|---|---|
| GENERAL | |
| Crystal type | Multicrystalline |
| Dopant | Boron |
| ELECTRICAL CHARACTERISTICS | |
| Resistivity | 0.5 -- 3.0 omega.cm |
| Lifetime | > 2 mus |
| CHEMICAL CHARACTERISTICS | |
| Carbon content | < 4 x 10(17) cm(-3) |
| Oxygen content | < 1 x 10(18) cm(-3) |
| DIMENSIONS | |
| Wafer square side | 156 x 156 +/- 0.5 mm |
| Wafer thickness | 220 mum +/- 20 mum or 200 mum +/- 20 mum |
| Square sides angle | 90o +/- 0.3o |
| Bevel edge width | 1.0 -- 2.0 mm |
| Bevel edge angle | 45o +/- 25o |
| TTV | < 50 mum |
| Bow | < 60 mum |
| Saw grooves | < 20 mum |
| Edge defect | not allowed |
| Micro cracks | not allowed |
| MISCELLANEOUS | |
| Wafer surface | as cut and cleaned |
| Contamination | no dirt/oil stains, remain of soap/glue |

12

APPENDIX 2 -- DELIVERY PROGRAM 2007-04-29

WAFER DELIVERIES

| PERIOD OF SHIPMENT | DELIVERY THALHEIM | QUANTITY OF WAFERS |
|---|---|---|
| April 2007 | Last week of April 2007 | 200,000 |
| May 2007 | Last week of May 2007 | 400,000 |
| June 2007 | Last week of June 2007 | 600,000 |
| July 2007 | Last week of July 2007 | 700,000 |
| August 2007 | Last week of August 2007 | 750,000 |
| September 2007 | Last week of September | 800,000 |
| October 2007 | Last week of October 2007 | 800,000 |
| November 2007 | Last week of November | 850,000 |
| December 2007 | Last week of December | 900,000 |

For 2008 and 2009 the delivery schedule has to be mutually agreed latest October of the year before.

RAW MATERIALS DELIVERIES

| PERIOD OF SHIPMENT | DELIVERY XINYU | MATERIAL DESCRIPTION AND AMOUNT IN [METRIC TONS] |
|---|---|---|
| April 2007 | 1st week of April 2007 | 5 mt Broken Wafer |
| June 2007 | 1st week of June 2007 | 5 mt Broken Wafer |
| November 2007 | 1st week of November 2007 | 5 mt Broken Wafer |

For 2008 and 2009 the deliver schedule has to be mutually agreed latest October of the year before.

13

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

APPENDIX 3 -- TEMPLATE FOR ADVANCE PAYMENT GUARANTEE


Order by tested telex/authenticated swift
from: ... (seller's bank)
to:   HYVEDEMM300
      Bayerische Hypo- und Vereinsbank AG, ...

Our counterguarantee no. ... for EUR ... (amount)

Please issue by our order and under our counterindemnity no. ..... an
advance payment guarantee for ... (amount) (in words:...), favour Q-Cells
AG, Guardianstr. 16, D-06766 Thalheim, Germany, for account of .. "Seller
of Wafer" . (mandator's name + address), valid from ... until ...,
concerning tender/off no. ... / contract no. ... / the delivery of ... /
the project ... .

Please issue the guarantee according to the following wording:
Quote
to
Q-Cells AG
Guardianstr. 16
D-06766 Thalheim
Germany

Advance Payment guarantee no. ... for ...

Dear Sir or Madam,

We are informed that on ... you signed the contract no. ... with Messrs.
... (hereinafter "Seller") for the supply of ... with a total contract
value of ...

Under the terms of this contract, the Seller will receive an advance payment in
the amount of ... equal to ... % of the total contract value upon presentation
of a bank guarantee in your favour securing the eventual obligation of the
Seller to refund the advance payment.

At the Seller's request, we, ... Bayerische Hypo- und Vereinsbank AG..., hereby
issue this guarantee and irrevocably undertake to pay to you any amount up to a
maximum of ... (in words: ...)

upon your first written demand by original letter.

14

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

This guarantee expires when this guarantee document has been returned to us. The original of this guarantee document has to be returned to us after expiry or settlement of all claims under this guarantee.

The rights arising from this guarantee may not be assigned without our written consent.

This guarantee is subject to German law. Place of jurisdiction is Munich.

The fees and expenses charged by our bank are for the Seller's account. All other costs are to be borne by you.

Yours sincerely,

Bayerische Hypo-und Vereinbank AG
...
Unquote

We, ... (seller's bank, name + address)....., hereby irrevocably undertake to pay to you on receipt of your first written demand stating that you have been called upon to effect payment under your guarantee issued in conformity with the above-mentioned conditions, the amount claimed by you up to a maximum of

...(amount)
(in words:...).

Our counterindemnity will become effective upon issuance of your guarantee and will cease to be valid upon your releasing us from our liability, at the latest, however, on ..................... Any claim hereunder must have reached us by letter, authenticated SWIFT or tested telex before the closing hours of that day.

We confirm that our counterguarantee is issued in accordance with foreign currency regulations valid in our country and in case of implementation payment will be made in effective USD/EUR without delay and without any deductions or any set-off, counterclaim or any other charges and free of any tax, impost, levy or duty present or future of whatsoever nature.

All commissions and charges arising in connection with the issuance of the above-mentioned guarantee will be borne by us.

Please deliver your letter of guarantee to ... and let us have a copy of it.

This message is the operative instrument, no mail confirmation will follow.

... (seller's bank)

15

</TEXT>
</DOCUMENT>

Exhibit 10.22

(Summary Translation)
LOAN AGREEMENT

This AGREEMENT is made by and between Mr. Xiaofeng Peng (hereinafter referred to as "Party A") and Jiangxi LDK Solar Hi-Tech Co., Ltd. (hereinafter referred to as "Party B").

Whereas, Party B, currently in its early stage of operations, is in need of funds to finance its operations and wishes to borrow loans from Party A.

NOW, THEREFORE, Party A and Party B, subject to the terms and conditions set forth herein, agree as follows:

1.  Currency of the loan: Renminbi (hereinafter referred to as "Rmb").

2.  Loan amount: Party A shall lend to Party B Rmb 200 million (hereinafter referred to as the "Principal" or "Principal Amount").

3.  Interest rate: The loan shall bear interests at the benchmark lending rates published by the People's Bank of China from time to time (hereinafter referred to as the "Interest").

4.  Use of the loan proceeds: The loan proceeds shall be used by Party B to purchase equipment and raw materials necessary for its productions and for other purposes as consented to by Party A.

5.  Source of the loan: Party A undertakes that the source of funds lent to Party B is legal. Except for the obligation to repay the Principal and Interest of the loan to Party A in accordance with this Agreement, Party B shall not be required to pay any financing expenses incurred by Party A to any third party.

6.  Loan advancement: Party A may advance, or designate a third party to fund, the Principal Amount to Party B in installments, and the number and amount of installments shall be determined by Party A. Party A may not demand repayment by Party B of any amount exceeding the sum of the aggregate outstanding Principal Amount plus Interest accrued.

7.  Term of the loan: Both parties agree that the loan shall have no fixed term. Should Party A demand repayment by Party B of any Principal Amount and Interest accrued, Party A shall provide Party B a 15-business day advance notice with respect to the amount of repayment and due date thereof.

8.  Loan repayment: The parties agree that Party B shall repay the loan to Party A or any third party designated by Party A in one lump sum or in installments, and the parties shall separately agree on the particulars of such repayment.

9.  Loan guarantee: The parties agree that Suzhou Liouxin Industry Co., Ltd., Saiweng Technology (Suzhou) Co., Ltd. and Jiangxi Liouxin Industry Co., Ltd. (collectively, the "Guarantors") shall provide guarantees for the loan and be jointly and severally liable for the obligations of Party B under this Agreement and that Party A and the Guarantors shall enter into separate guarantee

agreements to provide particulars of the guarantees.

10. Remedies for breach: (1) Party A has the right to require partial or full
    repayment of the outstanding Principal Amount and accrued but unpaid
    Interest thereof should Party B fail to use the loan in accordance with
    this Agreement; and (2) Party B shall repay the outstanding Principal
    Amount and accrued but unpaid Interest thereof in accordance with this
    Agreement. Should Party B request an extension of the loan, Party B shall
    inform Party A of such intention at least 15 days prior to the due date. If
    Party B fails to repay any loan amount according to this Agreement, Party A
    shall have the right to demand repayment of the outstanding Principal
    Amount and accrued but unpaid Interest thereof and shall also have the
    right to seek damages calculated at 0.01% of the outstanding loan amount
    per day.

11. Dispute resolution: The parties shall resolve all disputes arising from or
    in connection with this Agreement through consultation. If the parities
    cannot reach an agreement through such consultations, both parties agree to
    submit the disputes to the Shanghai Branch of China International Economic
    and Trade Arbitration Commission ("CIETAC") for arbitration. The
    arbitration shall be conducted in accordance with the rules and procedures
    of CIETAC then in effect. The arbitration award by CIETAC shall be final
    and binding upon both parties.

12. Miscellaneous: (1) Except as permitted by laws and administrative
    regulations, neither party may modify or terminate this Agreement without
    the consent of the other party; (2) this Agreement shall become effective
    upon signing by both parties; and (3) this Agreement shall be signed in two
    original copies, and each party shall keep one copy hereof.


PARTY A

/s/ Xiaofeng Peng
-----------------
Xiaofeng Peng


PARTY B

/sealed/ Corporate chop of Jiangxi LDK Solar Hi-Tech Co., Ltd.
--------------------------------------------------------------
Jiangxi LDK Solar Hi-Tech Co., Ltd.


Date: September 22, 2005

</TEXT>
</DOCUMENT>

Exhibit 10.23

(Summary Translation)
GUARANTEE AGREEMENT

This Agreement is made by and among Mr. Xiaofeng Peng (hereinafter referred to as "Party A"), Suzhou Liouxin Industry Co., Ltd. (hereinafter referred to as "Party B"), Saiweng Technology (Suzhou) Co., Ltd. (hereinafter referred to as "Party C") and Jiangxi Liouxin Industry Co., Ltd. (hereinafter referred to as "Party D").

Whereas,

1.   Party A and Jiangxi LDK Solar Hi-Tech Co., Ltd. (hereinafter referred to as "Jiangxi LDK") entered into a loan agreement (hereinafter referred to as the "Loan Agreement"), pursuant to which Party A undertook to lend to Jiangxi LDK loans in the aggregate principal amount of Rmb 200 million (hereinafter referred to as the "Loan"); and

2.   Party B, Party C and Party D (collectively, the "Guarantors") have agreed to guarantee the obligations of Jiangxi LDK to perform the Loan Agreement.

NOW, THEREFORE, Party A, Party B, Party C and Party D, subject to the terms and conditions set forth herein, agree as follows:

1.   The Guarantors agree to provide guarantees for the performance of obligations by Jiangxi LDK under the Loan Agreement and be jointly and severally liable for repayment of the Loan in the event of a default by Jiangxi LDK. Should any default occur, the Guarantors shall fulfill the repayment obligations of Jiangxi LDK in accordance with the Loan Agreement.

2.   The scope of the guarantee hereunder shall include any principal amounts outstanding, interests accrued, damages caused and expenses associated with the realization of Party A's rights under the Loan Agreement.

3.   The term of the guarantee hereunder shall extend for two years beginning on the date of any default by Jiangxi LDK under the Loan Agreement.

4.   The Guarantors undertake to monitor repayment of the Loan by Jiangxi LDK in a timely manner in accordance with the Loan Agreement and to collect, for and at the request of Party A, any default amount under the Loan Agreement from Jiangxi LDK.

5.   In the event any provision of the Loan Agreement is found to be partially or totally invalid or unenforceable for any reason, the guarantee obligations of the Guarantors hereunder shall not be affected, and the Guarantors remain jointly and severally liable for the repayment obligations of Jiangxi LDK in accordance with this Agreement.

6.   If the Guarantors do not fulfill their guarantee obligations hereunder in accordance with this Agreement such that the non-performance by any Guarantor constitutes a default hereunder, Party A shall have the right to demand remedies from any of the Guarantors.

The defaulting Guarantor shall be liable to Party A for any losses and damages incurred, directly or indirectly, as a result of such default.

7.  The parties shall resolve all disputes arising from or in connection with this Agreement through consultation. If the parities cannot reach an agreement through such consultations, both parties agree to submit the disputes to the Shanghai Branch of China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall be conducted in accordance with the rules and procedures of CIETAC then in effect. During the course of arbitration, unless this Agreement expires or is terminated at the request of a party, the parties shall continue to perform their respective obligations under this Agreement except for those relating to the disputed matters.

8.  No party may assign any of its rights and obligations, in whole or in part, under this Agreement to any third parties without the prior written consent of the other parties.

9.  This Agreement shall become effective upon signing by the legal representatives or authorized representatives of the respective parties and fixing hereunto the respective corporate chops. This Agreement is made in four original copies, and each party shall keep one copy hereof.


PARTY A

/s/ Xiaofeng Peng
-----------------
Xiaofeng Peng


PARTY B

/s/ Xiaofeng Peng
-----------------
Suzhou Liouxin Industry Co., Ltd. (sealed)


PARTY C

/s/ Zhengxiang Peng
-------------------
Saiweng Technology (Suzhou) Co., Ltd. (sealed)


PARTY D

Jiangxi Liouxin Industry Co., Ltd. (sealed)


Date: October 21, 2005
</TEXT>
</DOCUMENT>

Exhibit 10.24

(Summary Translation)
LOAN AGREEMENT

This AGREEMENT is made by and between Suzhou Liouxin Industry Co., Ltd.
(hereinafter referred to as "Party A") and Jiangxi LDK Solar Hi-Tech Co., Ltd.
(hereinafter referred to as "Party B").

Whereas, Party B, currently in its early stage of operations, is in need of
funds to finance its operations and wishes to borrow loans from Party A.

NOW, THEREFORE, Party A and Party B, subject to the terms and conditions set
forth herein, agree as follows:

1.  Loan amount: Party A shall lend to Party B US$8 million or its equivalent
    amount in Renminbi (hereinafter referred to as the "Principal" or
    "Principal Amount").

2.  Interest rate: The loan shall be interest free.

3.  Use of the loan proceeds: The loan proceeds shall be used by Party B to
    purchase equipment and raw materials necessary for its productions and for
    other purposes as consented to by Party A.

4.  Source of the loan: Party A undertakes that the source of funds lent to
    Party B is legal. Except for the obligation to repay the Principal and
    Interest of the loan to Party A in accordance with this Agreement, Party B
    shall not be required to pay any financing expenses incurred by Party A to
    any third party.

5.  Loan advancement: Party A shall advance the Principal Amount to Party B in
    one lump sum upon the execution of this Agreement.

6.  Loan term: Party B shall repay the Principal Amount as borrowed under this
    Agreement on December 25, 2006 or within three business days thereafter.

7.  Loan repayment: The parties agree that Party B shall repay the loan to
    Party A or any third party designated by Party A in one lump sum or in
    installments, and the parties shall separately agree on the particulars of
    such repayment.

8.  Remedies for breach: (1) Party A has the right to require partial or full
    repayment of the outstanding Principal Amount and accrued but unpaid
    Interest thereof should Party B fail to use the loan in accordance with
    this Agreement; and (2) Party B shall repay the outstanding Principal
    Amount and accrued but unpaid Interest thereof in accordance with this
    Agreement. Should Party B request an extension of the loan, Party B shall
    inform Party A of such intention at least 15 days prior to the due date. If
    Party B fails to repay any loan amount according to this Agreement, Party A
    shall have the right to demand repayment of the outstanding Principal
    Amount and accrued but unpaid Interest thereof and shall also have the
    right to seek damages calculated at 0.01% of the outstanding loan amount
    per day.

9.  Dispute resolution: The parties shall resolve all disputes arising from or
    in connection with this Agreement through consultation. If the parities
    cannot reach an agreement through such consultations, both parties agree to
    submit the disputes to the Shanghai Branch of China International Economic
    and Trade Arbitration Commission ("CIETAC") for arbitration. The
    arbitration shall be conducted in accordance with the rules and procedures
    of CIETAC then in effect. The arbitration award by CIETAC shall be final
    and binding upon both parties.

10.  Miscellaneous: (1) Except as permitted by laws and administrative
     regulations, neither party may modify or terminate this Agreement without
     the consent of the other party; (2) this Agreement shall become effective
     upon signing by both parties; and (3) this Agreement shall be signed in two
     original copies, and each party shall keep one copy hereof.


PARTY A
Suzhou Liouxin Industry Co., Ltd. (sealed)


PARTY B
Jiangxi LDK Solar Hi-Tech Co., Ltd. (sealed)


Date: July 24, 2006 in Suzhou
</TEXT>
</DOCUMENT>

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 10.25

(Summary Translation)
LOAN REPAYMENT CONFIRMATION AGREEMENT

This Agreement is made by and among Mr. Xiaofeng Peng (hereinafter referred to as "Party A"), Jiangxi LDK Solar Hi-Tech Co., Ltd. (hereinafter referred to as "Party B") and Saiweng Technology (Suzhou) Co., Ltd. (hereinafter referred to as "Party C").

Whereas,

1.  Party A has an outstanding loan in the aggregate principal amount of Rmb 200 million made to Party B (hereinafter referred to as the "Loan") pursuant to a loan agreement with Party B (hereinafter referred to as the "Loan Agreement"); and

2.  Party A has designated Party C as the recipient of the repayment in the aggregate amount of Rmb 73,002,724.26 from Party B under the Loan Agreement.

NOW, THEREFORE, Party A, Party B and Party C, subject to the terms and conditions set forth herein, agree as follows:

1.  Party A has lent a loan in the principal amount of Rmb 200 million to Party B pursuant to the Loan Agreement and is entitled to repayment of its principal amount plus interests calculated at benchmark lending rates published by the People's Bank of China from time to time.

2.  Party A has agreed to assign to Party C its right to the repayment of Rmb 73,002,724.26 (hereinafter referred to as the "Assigned Principal") plus interest accrued with respect to Assigned Principal pursuant to the Loan Agreement (hereinafter referred to as the "Assigned Interest" and, together with the Assigned Principal, the "Assigned Amount") and hereby notifies Party B to repay the Assigned Amount to Party C in accordance with this Agreement.

3.  Party B shall repay the Principal Amount to Party C within ninety days of the execution of this Agreement.

4.  Party B shall pay Party C the Assigned Interest within three years from the execution of this Agreement. The Assigned Interest shall be calculated at the benchmark lending rates published by the PBOC from time to time during the period from the date Party A lent the Assigned Principal to Party B to the date Party B repays the Assigned Principal to Party C.

5.  Party A agrees that Party B shall be deemed to have repaid the principal amount of Rmb 73,002,724.26, plus interest thereon, to Party A when Party B shall have fulfilled its obligations under Articles 3 and 4 of this Agreement.

6.  The parties shall resolve all disputes arising from or in connection with this Agreement through consultation. If the parities cannot reach an

agreement through such consultations, both parties agree to submit the disputes to the Shanghai Branch of China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall be conducted in accordance with the rules and procedures of CIETAC then in effect. The arbitration award by CIETAC shall be final and binding upon both parties.

7.  If Party B shall default in repaying the Assigned Amount to Party C in accordance with this Agreement, Party C shall have the right to demand repayment of the outstanding Assigned Amount upon it becoming due under this Agreement and shall also be entitled damages calculated at 0.01% of the outstanding amount owed per day.

8.  No party may modify this Agreement without the consent of the other parties.

9.  Any supplement to this Agreement to deal with matters not explicitly provided herein shall be subject to the consent of all the parties hereto.

10. This Agreement shall become effective upon signing by the respective authorized representatives and fixing hereunto of corporate chops by the respective parties.

11. This Agreement is made in three original copies, and each party shall keep one copy hereof.

PARTY A
/s/ Xiaofeng Peng
--------------------------
Xiaofeng Peng

PARTY B
Jiangxi LDK Solar Hi-Tech Co., Ltd. (sealed)

PARTY C
/s/ Zhengxiang Peng
--------------------------
Saiweng Technology (Suzhou) Co., Ltd. (sealed)

Date: March 28, 2006


</TEXT>
</DOCUMENT>

Exhibit 10.26

(Summary Translation)
LOAN REPAYMENT CONFIRMATION AGREEMENT

This Agreement is made by and between Jiangxi LDK Solar Hi-Tech Co., Ltd. (hereinafter referred to as "Party A") and Mr. Xiaofeng Peng (hereinafter referred to as "Party B").

WHEREAS,

1.  Party B has an outstanding loan in the aggregate principal amount of Rmb 200 million made to Party A pursuant to a loan agreement with Party A (hereinafter referred to as the "Loan Agreement"); and

2.  Party B designated Xinyu City Cheng Dong Construction Investment Corporation (hereinafter referred to as the "Company") as the recipient of the repayment in the aggregate amount of Rmb 10 million by Party A under the Loan Agreement on March 29, 2006.

NOW, THEREFORE, Party A and Party B, subject to the terms and conditions set forth herein, agree as follows:

1.  Party A and Party B hereby acknowledge the following facts: Party B designated the Company on March 29, 2006 as the recipient of the repayment in the aggregate amount of Rmb 10 million by Party A under the Loan Agreement (hereinafter referred to as the "Assigned Principal"), and the repayment of Rmb 10 million did not include interest accrued with respect to the Assigned Principal pursuant to the Loan Agreement (hereinafter referred to as the "Interest").

2.  Party B hereby confirms that Party A repaid the Assigned Principal to the Company on March 29, 2006 in conformance with Article 1 of this Agreement and that Party A shall be deemed to have fulfilled its obligation under the Loan Agreement to repay the principal amount of Rmb 10 million to Party B.

3.  Party A and Party B hereby confirm that, except for the Interest accrued with respect to the Assigned Principal, the rights and obligations of Party B and Party A associated with the repayment of the aggregate loan amount of Rmb 10 million under the Loan Agreement shall have ceased to exist since March 29, 2006.

4.  Neither party may modify this Agreement without the consent of the other party.

5.  Any supplement to this Agreement to deal with matters not explicitly provided herein shall be subject to the consent of all the parties hereto.

6.  This Agreement shall become effective upon signing by the respective authorized representatives and fixing hereunto of corporate chops by the respective parties.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
7.  This Agreement is made in two original copies, and each party shall keep
    one copy hereof.


PARTY A
Jiangxi LDK Solar Hi-Tech Co., Ltd. (sealed)


PARTY B
/s/ Xiaofeng Peng
-----------------
Xiaofeng Peng


Date: April 8, 2006
</TEXT>
</DOCUMENT>
```

Exhibit 10.27

(Summary Translation)
ENTRUSTMENT AGREEMENT

This AGREEMENT is made by and between Jiangxi LDK Solar Hi-Tech Co., Ltd.
(hereinafter referred to as "Party A") and Jiangxi Liouxin Industry Co., Ltd.
(hereinafter referred to as "Party B").

WHEREAS,

1.  Party A is a Sino-foreign joint venture company established on July 4, 2005
    in Xinyu City, Jiangxi Province;

2.  Party B, as an established local company familiar with the investment
    environment of Xinyu City, is willing to assist Party A in procurement of
    land use rights and equipment and development of infrastructure facilities
    required for Party A's early stage operations; and

3.  Party A agrees to prepay funds to Party B and entrust Party B with the
    development of land and production facilities and procurement of equipment.

NOW, THEREFORE, Party A and Party B, subject to the terms and conditions set
forth herein, agree as follows:

1.  Party A agrees to pay Party B an amount up to Rmb 90 million by May 31,
    2006 and entrust Party B to develop land and infrastructure facilities for
    production uses and to procure equipment required for the operations of
    Party A (hereinafter referred to as the "Entrusted Matters").

2.  Party A shall own the rights to the production use land and infrastructure
    facilities developed and equipment purchased by Party B under this
    Agreement.

3.  Party B shall handle the Entrusted Matters in good faith, based on fair
    market prices and in the interest of Party A.

4.  Party B shall not use the funds from Party A under this Agreement for any
    other purposes.

5.  Party B shall provide Party A with an itemized list of all the expenses
    incurred upon the completion of the Entrustment Matters (hereinafter
    referred to as the "Itemized List"), for confirmation by Party A.

6.  Party B may pay expenses on behalf of Party A to the extent within the
    scope provided in Article 1 of this Agreement. Party A shall reimburse
    Party B with respect to such paid expenses by May 31, 2006 according to the
    Itemized List.

7.  Remedies for breach of contract: (1) If Party B uses the funds that Party A
    prepaid for the Entrusted Matters for purposes other than as permitted by

this Agreement, Party A shall have the right to seek repayment of such funds from Party B and to seek damages calculated at 5% of the misused amount per day, without prejudice to any other right Party A may have to pursue other damages for breach of this Agreement by Party B; (2) if Party A fails to reimburse the expenses incurred by Party B in carrying out the Entrustment Matters in accordance with this Agreement, Party B shall have the right to seek reimbursement from Party A with respect to the outstanding amount and to seek additional damages calculated at 1% of the unpaid amount per day.

8.  Except as permitted by laws and administrative regulations, neither party may modify or terminate this Agreement without the consent of the other party

9.  The parties shall resolve all disputes arising from or in connection with this Agreement through consultation. If the parities cannot reach an agreement through such consultations, both parties agree to submit the disputes to the Shanghai Branch of China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall be conducted in accordance with the rules and procedures of CIETAC then in effect. The arbitration award by CIETAC shall be final and binding upon both parties.

10. This Agreement shall become effective upon signing by both parties.

11. This Agreement is made in two original copies, and each party shall keep one copy hereof.

PARTY A
Jiangxi LDK Solar Hi-Tech Co., Ltd. (sealed)

PARTY B
Jiangxi Liouxin Industry Co., Ltd. (sealed)

Date: August 10, 2005
</TEXT>
</DOCUMENT>

Exhibit 10.28

(Summary Translation)

Renminbi Loan Agreement

China Construction Bank Corporation

Jiangxi Province Branch

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Loan No.: LDKGD-200601

Loan Type: Jiangxi LDK Solar Hi-Tech Co., Ltd  (Loan for infrastructure)


Borrower (Party A):

Domicile: Xinyu, Gaoxin Avenue                              Postcode: 338000

Legal Representative (Official in Charge): PENG Xiaofeng

Fax: 6860030                                               Phone: 6860030


Lender (Party B): China Construction Bank Corporation, Xinyu Branch

Domicile: Xinyu, No. 180 Central Beihu Road                Postcode:

Official in Charge: WU Junmin

Fax:                                                       Phone:

2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

WHA Document 69-2 Filed 04/07/2008 Page 821 of 888

Borrower (hereinafter "Party A"): Jiangxi LDK Solar Hi-Tech Co., Ltd

Lender (hereinafter "Party B"): China Construction Bank Corporation, Xinyu Branch


Based on the loan application by Party A, Party B agrees to make a loan available to Party A. In accordance with the laws and regulations, through friendly consultation, this Loan Agreement is entered into by and between Party A and Party B that both parties shall abide by.

ARTICLE 1   AMOUNT

Party B shall provide Party A a Loan not exceeding RMB 80,000,000.

ARTICLE 2   PURPOSE:

The loan shall only be used by Party A to finance the 75 Mega-Watt Multicrystalline Silicon Wafer Project.

ARTICLE 3   TERM OF THE LOAN

The duration of this Loan shall be three years, from 10 March 2006 to 19 March 2009.

In the event that the starting date is different from the date on the Loan Transfer Document, the date recorded on the Initial Loan Transfer Document shall prevail. The Loan Transfer Document is a component of this Agreement, and it shall has the same legal binding effect with this Agreement.

ARTICLE 4   INTEREST RATE, DEFAULT INTEREST RATE, CALCULATION AND SETTLEMENT

1.   Interest Rate:

The Loan under this Agreement shall bear interest at a rate of 6.336% per annum. The Interest Rate shall be in accordance with (2) of this Article:

    (1) Fixed rate. The Interest Rate remains the same during the Loan Period;

    (2) Floating rate, which floats 10% above the Loan Base Rate. The adjustment are made every twelve months commencing from the starting date of Interest. The Interest Rate Adjustment Day shall be the corresponding day of the Value Date in the adjustment month or, if there is no corresponding day of that month, shall be the last day of the adjustment month.

2.   Default Interest Rate

    (1) The Default Interest Rate shall be 11.520% per annum.

    (2) In the event where Party A fails to use the facility in conformance with the Purpose set forth, the Default Interest Rate shall be in accordance with (b) of this Article:

        (a)   Fixed rate.

3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(b) Floating Rate which floats 100% above the Loan Base Rate. The adjustment are made every twelve months commencing from the starting date of Interest. The Default Interest Rate Adjustment Day shall be the corresponding day of the Value Date in the adjustment month or, if there is no corresponding day of that month, shall be the last day of the adjustment month.

(3) In the event where the Loan is overdue, the Default Interest Rate shall be shall be in accordance with (b) of this Article:

(a) Fixed rate.

(b) Floating Rate which floats 50% above the Loan Base Rate. The adjustment are made every twelve months commencing from the starting date of Interest. The Default Interest Rate Adjustment Day shall be the corresponding day of the Value Date in the adjustment month or, if there is no corresponding day of that month, shall be the last day of the adjustment month.

3. The Value Date in this Article refers to the day on which the initial Loan under this Agreement has been transferred to the account of Party A.

The Base Rate under the initial loan allotment refers to the interest rate for loans of the same grade announced by the People's Bank of China on the Value Date; henceforth, when the Loan Interest or the Default Interest Rate is adjusted in accordance with aforementioned rules, the Base Rate refers to the interest rate for loans of the same grade announced by the People's Bank of China on the Value Date; when the People's Bank of China no longer announce the interest rate for loans of the same grade, the Base Rate refers to the interest rate for loans of the same grade recognized by the Interbank Market, unless otherwise agreed by both Parties.

4. Interest of Loan shall be commenced calculating on the day when the loan has been transferred to the account of Party A. The Loan Interest will be calculated on a daily basis. Daily interest rate = monthly interest rate/30 = annual interest rate/360. If Party A failed to pay interest on time, the Interest will be recalculated on next succeeding day.

5. Settlement

(1) The Interest for Loan with Fixed Rate shall be calculated based on the Interest rate agreed by Parties. The Interest for Loan with Floating Rate shall be calculated based on the Interest rate set by each floating period; if the Interest Rate changes more than one time within an individual settlement period, the Interest shall be calculated first in accordance with each floating period. The Interest in such settlement period is the aggregation of the interest in each floating period on the Interest Settlement Day.

(2) The Loan Interest shall be calculated on a monthly basis. The Interest Settlement Day shall be the 20th day of each month.

ARTICLE 5   LOAN DISBURSEMENT AND USAGE

1.   Conditions Precedent to Disbursement

4

(1) Unless if Party B waive its rights in whole or in part, Party B bears the obligations to launch the Loan only if the following precedent conditions are satisfied:

       (a)   Party A has, in accordance with relevant laws and regulations, completed loan related approval(s), registration, delivery and other statutory procedures;

       (b)   If there is a security attached upon this Agreement, Security Agreement or other security measures meet the requirements by Party B;

       (c)   no Event of Default by Party A have occurred under this Agreement;

       (d)   other precedent conditions agreed by both Parties.

(2) The Loan shall be launched to Party A by Party B within one Business Day upon the satisfaction of aforesaid precedent conditions.

2.    Usage Plan:

March 20, 2006                Amount: RMB 80,000,000

[ date ]                       [ Amount ]

[ date ]                       [ Amount ]

[ date ]                       [ Amount ]

[ date ]                       [ Amount ]

[ date ]                       [ Amount ]

ARTICLE 6   PAYMENT

1.    Payment Principle

Under this Agreement, Party A shall make the Payment according to the following principles:

(1) The Principal shall be paid prior to the Interest in the event if Party A failed to pay the overdue Loan within 90 days upon the maturity of the Principal, or if Party A failed to pay the overdue Loan within 90 days upon the maturity of the Interest, or if Party A suspends its business operations or the Loan related Project is terminated although the Loan is not matured yet or the overdue period not exceeds 90 days, or any other events prescribed by laws, regulations or rules.

(2) The Interest shall be paid prior to the Principal and the Interest shall be paid together with the Principal in the event other than aforementioned situations.

2.    Interest Payment

5

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Due Interest shall be paid by Party A to Party B on the Interest Settlement Day. The initial Payment Day is the initial Interest Settlement Day after the launch of the Loan. The Principal shall be fully paid upon the last Payment Day.

3.    Principal Payment Schedule:

The Principal shall be paid by Party A as following:

March 19, 2008                  Amount: RMB 38,000,000

March 19, 2009                  Amount: RMB 42,000,000

[ date ]                        [ Amount ]

[ date ]                        [ Amount ]

[ date ]                        [ Amount ]


4.    Payment Method

Party A shall deposit enough payables on the account opened by Party B prior to the Payment Day agreed by both Parties and transfer the payment automatically, or transfer fund from other accounts on the Payment Day agreed by both Parties to repay the Loan; in the event where Party A fail to make the payment on time, Party B could transfer fund from accounts opened by Party A within China Construction Bank Corporation.

5.    Pre-payment

      (1) Party A shall notify Party B of its intention to make pre-payment.

      (2) Party A shall give Party B a written notice of its intention to prepay thirty Business Days prior to its Pre-Payment Day. Party A could prepay the whole or any part of the Loan with consent of Party B.

If Party A prepays the Loan, the Interest shall be calculated according to the actual Loan Days and the Interest Rate prescribed in Article 4 of this Agreement.

If Party A prepays the Loan, it agreed to pay Party B a certain amount of compensation. Compensation = Pre-payment Amount x 0.015% x Advance Days.

If Party A repay the principal and interests of the loan by installment, the Pre-payment shall first be used to repay the loan with the latest due date, i.e. the loans shall be repaid in reverse order. The Interest Rate agreed by this Agreement shall apply to the remain Loan balance after the completion of the pre-payment.

ARTICLE 7   SECURITY

The security measure set on the Loan shall in accordance with 1 and 2 of this Article:

1.    Warranty

6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

2.    Mortgage

3.    Pledge

4.    Standby Letter of Credit

5.    Credit Insurance

6.    Other: (intentionally left blank)

ARTICLE 8   PARTY A'S RIGHTS AND OBLIGATIONS

1.    Party A has the following rights:

      (1) Party A is entitle to request Party B launch the Loan in accordance
with this Agreement;

      (2) Party A is entitle to use the Loan in accordance with the purpose set
out in this Agreement;

      (3) Party A is entitle to apply postpone the Loan Period if all
requirements by Party B are satisfied;

      (4) Party A is entitle to request Party B keep the relevant financial
documents and business secrets of production and operations provided by Party A
confidential, unless if otherwise prescribed by the laws and regulations.

2.    Party A assumes the following obligations:

      (1) Party A shall provide relevant financial materials and materials
relating to its production and operation as Party B's request, including but not
limited to, providing to Party B within the first 15 bank business days of
each quarter a balance sheet as of the end of last quarter, and profit and loss
statements (or income and expenditure statements in case of a public
institution) as of the end of last quarter, and at the end of each year,
providing a cash flow report as of the end of the same year; Party A shall be
responsible for the truthfulness, completeness and validity of such materials;

      (2) Party A shall use the loan proceeds for the purposes as provided
herein and shall not use for other purposes;

      (3) Party A shall actively cooperate with Party B and voluntarily accept
Party B's examination and supervision with respect to its production and
operation, financial activities and use of the loan proceeds hereunder;

      (4)   Party A shall repay the principles and interests pursuant to the
terms and provisions herein;

      (5) Party A and its investors shall not withdraw its capital investment or
shift the assets for other purposes therefore to avoid its indebtedness to Party
B;

7

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(6) Party A shall not, without Party B's consent, provide any guarantee to any third party with the assets formed by the loans hereunder before the principals and interests of Party B's loan hereunder are repaid off;

(7) Party A shall give Party B a prior written notice and seek for Party B's consent in case that Party A intents to provide guarantee for other party's indebtedness during the term hereof and such guarantee may impact Party's ability to repay the debt hereunder;

(8) Party A shall provide to Party B other guarantee accepted by Party B in case that the guarantor hereunder is in a situation of production suspension, closing-up, deregistration, being withdrawn of its business license, bankruptcy, cancellation and deficit and therefore has lost part or all of its ability to guarantee the loans hereunder, or in case that the collaterals and pledges hereunder are devaluated, damaged or destroyed by accident;

(9) Party A shall notify Party B in time of any change of its name, legal representative (responsible person), domicile, business scope, registered capital during the term hereof;

(10) Party A shall give Party B a 30-day written notice and seek for Party B's consent in case that, during the term hereof, Party A is involved in contracting, leasing, equity reforming, joint operation, merger, acquisition, splitting, joint venture, application for suspension and streamlining, application for dismissal, application for bankruptcy and other activities that may impact realization of creditor's right of Party B, and shall repay or provide securities to the debts hereunder upon Party B's request;

(11) Party A shall give party B a written notice immediately in case that, during the term hereof, Party A is in a situation of production suspension, closing-up, deregistration, being withdrawn of its business license, illegal activities by its legal representative or major responsible persons, being involved in significant litigation, serious difficulty in production and operation, worsening financial conditions, and shall repay or provide securities to the debts hereunder upon Party B's request;

(12) Party A shall bear the legal fees, insurance, evaluation, registration, deposit, authentication, notarization and other fees relating to this Agreement and the guaranties hereunder.

ARTICLE 9    PARTY B'S RIGHTS AND OBLIGATIONS

1.    Party B has the following rights:-

(1) knowing Party A's production and operation and financial activities and requesting Party A to provide relevant statistics, financial statements and other documents and materials; and

(2) deducting relevant amount in any currency payable by Party A to Party B according to this Agreement from Party A's account opened with the system of China Construction Bank Corporation;

2.    Party B has the following obligations:-

(1) lending loans on time and in full amount according to the provisions hereof, except for the case of any delay caused by Party A; and

8

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(2) keeping the financial materials and the business secrets with respect to production and operation provided by Party A confidential unless otherwise provided by laws, regulations.

ARTICLE 10  DEFAULT LIABILITIES

1.  Default Events

    (1)  It shall be deemed as a default by Party A in the event that: -

        (a)  Party A fails to provide true, complete and effective materials with respect to accounting, production and operation and other materials as requested by Party B;

        (b)  Party A fails to use the loan proceeds for the purpose as agreed by the Parties;

        (c)  Party A fails to repay the principles and interests in due time;

        (d)  Party A refuses or disturbs Party B's examination and supervision to the use of the proceeds;

        (e)  Party A transfers its assets or withdraws its capital contribution to avoid debts;

        (f)  Party A's operational and financial status becomes worse or even insolvent, or Party A is involved or will be involved in significant litigation or arbitrational proceedings or other legal disputes, which Party B deems as may affect or damage or have affected or damaged Party B's rights and interests hereunder;

        (g)  that any other indebtedness of Party A has affected or may affect Party B's performance of the obligations hereunder;

        (h)  Party A fails to repay other due indebtedness to China Construction Bank Corporation;

        (i)  Party A is involved in any contracting, leasing, merger, acquisition, joint venture, splitting, joint operation, joint-stock reform and other activities that may change Party A's operational mode or operational system and may, upon Party B's sole discretion, influence or damage or have influenced or damages Party B's rights and interests hereunder;

        (j)  Party A is involved in other circumstances that, upon Party B's sole discretion, may influence the realization of the creditor's rights;

        (k)  Party A breaches other obligations hereunder.

    (2) Party A will be deemed as default if Party A fails to provide new guarantee that meets Party B's requirement in the event that the guarantor:

9

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

    (a)  is involved in contracting, leasing, merger and acquisition, joint venture, splitting, joint operation, joint-stock reform, bankruptcy, cancellation and other events that will affect the guarantor's performance of its joint and several liabilities;

    (b)  provides guaranties to third party which is beyond its repayment ability;

    (c)  has lost or may loss its guarantee ability; or

    (d)  has other default events as provided in the guarantee agreement.

    (3) Party A will be deemed as default if Party A fails to provide new guarantee that meets Party B's requirement in the event that the mortgagor:

    (a)  fails to purchase property insurance for the collateral, or fails to dispose the insurance compensation pursuant to the mortgage contract after the insured accident occurs;

    (b)  fails to dispose the insurance compensation pursuant to the mortgage contract in case that the collateral is damaged, destroyed or devaluated due to behaviours by a third party;

    (c)  without Party B's written consent, confers, transfers, leases, re-mortgages, relocates or otherwise disposes the collateral,

    (d)  notwithstanding Party B's consent to dispose the collateral, fails to distribute the proceeds of such disposal pursuant to the mortgage contract;

    (e)  fails to recover the collateral's value or fails to provide other guarantee accepted by Party B in case that the collateral is damaged, destroyed or devaluated and the repayment of the indebtedness hereunder therefore may be influenced; or

    (f)  has other default event specified in the mortgage contract.

    (4) Party A will be deemed as default if Party A fails to provide new guarantee that meets Party B's requirement in the event that the pledge:

    (a)  fails to purchase property insurance for the pledge, or fails to dispose the insurance compensation pursuant to the pledge contract after the insured accident occurs;

    (b)  fails to dispose the insurance compensation pursuant to the pledge contract in case that the pledge is damaged, destroyed or devaluated due to behaviours by a third party;

    (c)  notwithstanding Party B's consent to dispose the pledge, fails to distribute the proceeds of such disposal pursuant to the pledge contract;

    (d)  fails to recover the pledge's value or fails to provide other guarantee accepted by Party B in case that the pledge is damaged, destroyed or

10

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

devaluated and the repayment of the principles and interests hereunder therefore may be influenced; or

  (e)  has other default event specified in the pledge contract.

  (5) Party A may be deemed as default if it fails to provide new guarantee upon Party B's request in case that the guarantee contract or other types of guarantee does not become effective, is invalid or is dismissed, or that the guarantor loses part or all of its guarantee ability, or that guarantor refuses to perform its guarantee obligations.

2.  Relief of Default

Party B has the right to take one or several of the following actions in case of any default event specified in the item (1) to (5) above:

  (1) to cease loan distribution, declare the loan becoming due immediately and require Party A to immediately repay the principles, interests and fees of all the debts due or undue hereunder;

  (2) to collect 5/oo of the loan principal from Party A as a default compensation;

  (3) to collect interest and compound interest for such part of loans as is used by Party A for any purpose other than those specified hereunder according to the penalty interest rate and the interest calculation method provided herein for the period from the date of such use for other purpose till the date of repayment of all the principals and interests;

  (4) to collect compound interest for the outstanding interests due from Party A according to the loan interest rate and calculation method as provided in Article 4 hereof before the loan term expires;

  (5) to collect interest and compound interest for the outstanding principals and interests of Party A after the loan term expires (including part or all of the principals and interests declared by Party B as becoming due in advance) for the period from the overdue date till the date of repayment in full of such outstanding principals and interests according to the penalty interest rate and the interest calculation method provided herein. Overdue repayment refers to Party A's failure to make full repayment in time or to repay the instalments according to the repayment schedule as provided herein;

  (6) to deduct relevant amount in any currency from Party A's account opened with the system of China Construction Bank Corporation;

  (7) to request Party A to provide new guarantee that meets Party B's requirement for all the indebtedness hereunder;

  (8) to perform guarantee right;

  (9) to terminate this Agreement.

ARTICLE 11  MISCELLANEOUS

1.  (intentionally left blank) ;
  --------------------------

11

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

```
2.    (blank hereinafter) ;
      -------------------

3.                          ;
      -------------------

4.                        .
      -------------------
```

ARTICLE 12  DISPUTE RESOLUTION

Any dispute raised in the performance hereof may be resolved through negotiation or, if negotiation fails, by means of the following item (1):

(1) submitting to the people's court of the place where Party B resides;

(2) submitting to (intentionally left blank) Arbitration Committee (venue of arbitration) (intentionally left blank) in accordance with the arbitration rules existing when application for arbitration is submitted. The arbitral award is final and binding to both parties.

The non-dispute terms and provisions hereof should be performed during the period of litigation or arbitration.

ARTICLE 13  EFFECTIVENESS OF CONTRACT

This Agreement becomes effective after Party A's legal representative (responsible person) or an authorized representative signs his name and affixes Party A's seal hereon and Party B's responsible person or an authorized representative signs his name and affixes Party B's seal hereon.

ARTICLE 14 This Agreement is executed in four copies.

ARTICLE 15  Representation Clause

1. Party A clearly understands Party B's business scope and power of authorization.

2. Party A has reviewed all the terms and provisions hereof. Party B has explained the terms and provision hereof upon Party A's request. Party A fully understands the meaning of the terms and provisions hereof and is fully aware of relevant legal consequences.

3. Party A is duly authorized to execute this Agreement.

Party A: Jiangxi LDK Solar High-Tech Co., Ltd.  (Company seal)

Legal representative (responsible person) or authorized representative (signature):

```
                                        /s/ Xiangqun Fu
                                   ------------------------

                                         March 20, 2006
```

Party B: China Construction Bank Xinyu City Branch  (Bank seal)

Responsible person or authorized representative (signature):  /s/ Junmin Wu
```
                                                        -------------------

                                                          March 20, 2006
```

                                    12

```
</TEXT>
</DOCUMENT>
```

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 10.29

(Summary Translation)

ENTRUSTED LOAN AGREEMENT

No.: Wei Dai 2006 (001)

Trustor: Jianxi Liouxin Industry Co., Ltd.

Address: Xinyu High-Tech Industrial Park


Trustee Lender (hereinafter, "Lender"): Xinyu Branch of Bank of China Limited.

Address: 2 Xianlaizhong Avenue, Xinyu


Borrower: Jiangxi LDK Solar High-Tech Co., Ltd.

Address: Xinyu High-Tech Industrial Park, Xinyu, Jiangxi


In order to utilize fund more efficiently, the Trustor hereby entrusts the Lender to provide entrusted loan to the Borrower. Therefore, the parties agree as follows:

Article 1    General Provisions

1. The Trustor entrusts the Lender with the Trustor's fund to provide loan to the Borrower and to collect the principal and interests according to the agreed deadlines.

2. The Lender shall assist the Trustor to review the credit of the Borrower, supervise the use of the loan, supervise the timely repayment of principal and interests and deal with the relevant loan formalities.

3. The risks of the loan hereunder shall be assumed by the Trustor rather than the Lender.

4. The entry into this Agreement by the Lender shall not be deemed as repayment guaranty on the part of the Lender for the Borrower.

5. The Lender will charge the Trustor 1/oo of the entrusted amount in one lump-sum as service fees.

Article 2    Currency, Amount and Period of the Entrusted Loan

1. The currency of the loan hereunder shall be Renminbi.

2. The amount of the loan hereunder shall not exceed Renminbi one hundred sixteen million and nine hundred thousand.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

3. The term of the loan hereunder shall be six months as of the date hereof.

Article 3   Purpose of the Loan

1. The loan shall be used for the purpose of production turnover.

2. Unless otherwise consented by the Trustor in writing, the Borrower shall not use the loan in ways other than stated above.

Article 4   Trustor's Account

1. The Trustor shall open an entrusted loan settlement account with the Lender or the entity designated by the Lender within one day as of the date hereof.

2. The Trustor shall deposit the full amount of RMB 116,900 thousand into the entrusted loan settlement account before each drawdown date according to the advance schedule of the Borrower with one day as of the date hereof, and the deposit in this account shall accrue interest as demand deposit.

3. In any event, each drawdown amount by the Borrower shall not exceed the balance of the Trustor account.

4. The Lender shall transfer the full amount of the principal or interest (and penalty interest) received (or deducted) each time less the seasonal service fees to the entrusted loan fund account.

Article 5   Borrower's Account

1. After this Agreement goes into effect and before any advance is made, the Borrower shall open an loan account and RMB and/or foreign currency deposit account with the Lender or any branch of the Lender for making advance and repaying principal, interest and service fees.

2. The Borrower shall open a repayment reserve account with the Lender or its branch and shall deposit full amount into this account at least five days before each principal and interest is due for repayment.

3. The Borrower shall use the Lender to conduct a percentage of its home and foreign currency deposit, domestic and overseas settlement, settlement and sale of foreign currency and other intermediary transactions, which percentage shall not be less than that the loan hereunder accounts for among the total amount of loans borrowed by the Borrower from all the banks.

Article 6   Interest of the Entrusted Loan and Calculation Method

1. The interest rate for the entrusted loan shall be 5.022% per annum. During the term of this Agreement, if there is a change of interest rate or interest calculation method as agreed between the Trustor and Borrower, Trustor shall notify the Lender in writing. Lender shall calculate the interest based on the adjusted interest rate from the second business day after receipt of such notice.

2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

2. Calculation method: Interest shall accrue for the total amount of advances from the first advance date until the corresponding repayment date. The calculation basis is 360 days per year.

3. Interest Payment: Borrower shall pay interest seasonally, respectively on March 20, June 20, September 20 and December 20. If the last repayment date for principal is not an interest payment date, Borrower shall pay all of the due and payable interest on the last repayment date. Borrower shall pay interest on each interest payment date, or Lender may deduct such payment directly from Borrower's deposit account. If Borrower fails to pay the full amount of interest on time and the balance in Borrower's deposit account is not enough to pay the due and payable interest, Lender may charge 2.5/oo0 of the defaulted interest per day as penalty.

Article 7    Overdue Interest and Misappropriation of Interest

1. If Borrower fails to make repayment on schedule and no agreement is entered with respect to repayment deferral, then such unpaid amount shall be overdue amount. Lender may charge interest on the RMB portion of such overdue amount at the rate of 4/oo0 per day (or charge penalty interest on the foreign currency portion of such overdue amount at the original interest rate plus 30%).

2. If Borrower uses the loan in ways other than those provided herein, Lender may charge penalty interest on the RMB portion at the rate of 6/oo0 per day (or charge penalty interest on the foreign currency portion at the original interest rate plus 50%).

Article 8    Drawdown Schedule

1. After this Agreement goes into effect, Borrower shall use the loan hereunder according to the following schedule, provided that Borrower shall obtain prior consent of Trustor and Lender for any drawdown ahead of schedule:

| Drawdown Time | Drawdown Date | Advance Amount | Drawdown Time | Drawdown Date | Advance Amount |
|---|---|---|---|---|---|
| 1st | Dec. 22, 2006 | RMB69,000,000 | 4th | | |
| 2nd | Dec. 22, 2006 | RMB47,900,000 | 5th | | |
| 3rd | | | | | |

2. If Borrower defers the drawdown date for one or more advances, Lender may charge penalty on the deferred amount at the rate of 1/oo0 per day according to the actual number of deferred days and on the basis of 360 days per year.

3. The deadline for Borrower to drawdown is 7 days after the date hereof. Any amount not drawn after the deadline shall be canceled. Drawdown deadline is also the deadline for penalty on deferred advance.

Article 9    Conditions Precedent

3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Borrower may make advance upon satisfaction of all of the following conditions:

1. Borrower has opened a loan account and RMB and foreign currency deposit accounts (loan account, RMB basic deposit account and foreign currency deposit account) with Lender or its branch.

2. This Agreement goes into effect.

3. Borrower provides to Lender resolution and authorization by the board of the Borrower or other competent authority granting approval for the entry and enforcement of this Agreement.

4. Borrower provides to Lender a list of persons authorized to execute this Agreement and documents relating to this Agreement as well as their respective sample signatures.

5. Lender receives the Entrusted Loan Drawdown Application from the Borrower.

6. Other conditions agreed among the parties hereto for drawdown.

Article 10   Repayment Schedule and Conditions for Early Repayment

1. Borrower shall repay the loan hereunder according to the following schedule, provided that Borrower shall make 30 days prior written application for any adjustment to the repayment schedule and obtain Trustor's written consent:

| Repayment Time | Repayment Date | Repayment Amount | Repayment Time | Repayment Date | Repayment Amount |
|---|---|---|---|---|---|
| 1st | June 20, 2007 | RMB60,000,000 | 5th | | |
| 2nd | June 22, 2007 | RMB56,900,000 | 6th | | |
| 3rd | | | | | |
| 4th | | | | | |

2. Without prior written consent of the Trustor, Borrower shall not make early repayment.

3. Borrower shall make written request to the Lender and Trustor for any early repayment plan, and Trustor shall reply in writing. With Trustor's consent, the early repayment shall be used to repay the last due amount in reverse order.

4. For the amount early repaid with Trustor's consent, Borrower shall not request to drawdown for a second time.

5. Any amount paid by the Borrower hereunder and that deducted by the Lender from Borrower's account shall be first used to repay the due and payable interest and penalty and after that, repay due and payable principal.

6. In the event the Borrower fails to repay one or more loans, the Lender may deduct such amount from any Borrower's account opened with the Lender.

4

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

7. Borrower shall apply in writing to the Lender and Trustor for any repayment deferral, and the Trustor shall reply in writing. With Trustor's consent, the Borrower may defer repayment.

Article 11  Certificate of Indebtedness

Lender shall record the principal, interest, fees and any other amount hereunder in the internal book of the Lender. Such records and vouchers occurred and kept by the Lender as a result of drawdown, repayment and payment of interest by the Borrower are effective evidence for the debt relationship between Trustor and Borrower.

Article 12  Guaranty

Credit

Article 13  Borrower's Representations and Warranties

1. Borrower makes the following representations:

(1) Borrower is an enterprise legal person duly registered under PRC laws and regulations, with all necessary rights and authorizations to conduct business activities in its own name or become a party to any legal action, and has lawful right to dispose the assets it manages.

(2) Borrower's execution and performance of this Agreement is made on a voluntary basis with necessary authorization. Such authorization and the execution and performance do not violate the Articles of Association of the Borrower or any other regulations or contracts binding on the Borrower. All the formalities required for the execution and performance of this Agreement by the Borrower have been duly completed.

(3) All the documents, statements and certificates provided by the Borrower to the Trustor and Lender for the loan hereunder are accurate, true, complete and effective.

(4) Borrower has not kept any event from the Trustor and Lender that may cause Trustor to refuse to make the loan hereunder available to the Borrower.

2. The Borrower makes the following warranties:

(1) The Borrower will use the loan strictly according to this Agreement and will not misappropriate the loan.

(2) The Borrower will make payment on principal, interest and fees hereunder according to the schedule agreed herein.

(3) The Borrower will provide the most update financial as requested by the Lender.

(4) Any counter-guarantee or similar agreement that has been or will be signed between the Borrower and the guarantor with respect to the guarantee securing the loans hereunder will not, either from legal aspect or from factual aspect, prejudice any right or benefit of the Trustor hereunder.

(5) The Borrower will accept the Lender's examination and supervision of creditability and provide sufficient assistance and cooperation.

5

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(6) The Borrower will not reduce its registered capital by means whatsoever and will not significantly change its properties right or adjust its operational mode without the Turstor's written consent.

(7) The Borrower will notify the Trustor and the Lender in case that the Borrower provides credit guarantee or provides mortgage or pledge security with its own assets to any third party.

(8) The repayment ranking of the debts hereunder will not be lower than the debts of same type of other creditors.

(9) The Borrower warrants that it will notify the Trustor and the Lender immediately in case of:-

        (i) any breach of this Agreement or of any loan agreement or guarantee agreement signed between the Borrower and any department or branch of the Bank of China, or with other banks or non-bank financial institutions or units;

        (ii)  any change of shareholder, change of senior management, amendment of the articles of association and adjustment of organizational structure of the Borrower;

        (iii) severe difficulties in the Borrower's operation and a worsened financial condition;

        (iv) any litigation, arbitration and other proceedings caused by significant debt dispute of the Borrower.

3. The Borrower's representations and warranties made in this Article 13 is continuous and valid and shall be deemed as being re-made when this Agreement is amended, supplemented or changed.

4. The Borrower acknowledges that the execution hereof by the Trustor and the Lender is relied on the foresaid representations and warranties.

ARTICLE 14  LENDER'S REPRESENTATIONS AND WARRANTIES

1. The Lender makes the following representations:

(1) The Lender is a state-owned commercial bank [or a branch thereof] duly incorporated under PRC laws and, holds License of Financial Institution Legal Person and Financial Business License, has been approved by and registered with the industrial and commercial administration authority and is fully qualified [or duly authorized] to operate financial businesses.

(2) The Lender is duly authorized to execute this Agreement and relevant documents and is entitled to perform the rights and obligations hereunder.

2. The Lender makes the following warranties:

(1) The Lender will distribute loans according to the terms and provisions hereof and will monitor the utilization of the loans and assist the Trustor in collection of the principles and interests.

6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(2) The Lender will not collect additional interests at its will or collect additional interests in disguised form.

ARTICLE 15   TRUSTOR'S REPRESENTATIONS AND WARRANTIES

1. The Trustor makes the following representations:

(1) The loan funds provided by the Trustor is lawful and under the Trustor's ownership and control.

(2) The Trustor has the right to conduct the activities hereunder according to the laws and policies of the People's Republic of China and to its regulations.

(3) The Trustor's execution and performance of this Agreement is made on a voluntary basis with all necessary authorization and is a true indication of its will. The Trustor has finished all the procedures required for execution and performance hereof.

(4) The Trustor decides the lender, purpose of loans, interest rate and loan term hereunder on its own determination.

2. The Trustor makes the following warranties:

(1)   The Trust will deposit self proprietary funds in the account for the funds of entrusted loan in accordance with Article 4 of this Agreement, and undertakes that the amount of the funds in such account will be no less than the amount of the funds to be withdrawn by the Borrower in accordance with this Agreement.

(2)   The Trustor will pay for the handling fee of the entrusted loan to the Lender in accordance with this Agreement.

ARTICLE 16   EVENTS OF DEFAULT AND DEFAULT LIABILITIES

1.    The occurrence of any of the following events will constitute a default by the Borrower under this Agreement:

(1)   The Borrower has not utilized the loan for the purposes as stipulated by this Agreement;

(2)   The Borrower has failed to repay the principle due or pay the interest, the expenses or other payables due in accordance with this Agreement;

(3)   The warranties and representations by the Borrower set forth in Article 13 hereof is untruthful; and

(4)   The Borrower has breached any other provision of this Agreement regarding its obligations.

2.    In case any of the above events of default has occurred, the Borrower shall notify the Lender and the Trustor promptly, and the Lender, with the consent by the Trustor, is entitled to take the following actions separately or concurrently:

(1)   To request the Borrower to rectify the default within a time limit;

7

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(2)  To terminate or cancel the loan facility that has not been withdrawn by the Borrower;

(3)  To announce that all the principle and interest thereof under this Agreement become due immediately, and request the Borrower to repay immediately all the principle and interest of the loan facility and the relevant expenses unconditionally.

3.  Events of Default by Lender and Consequences Thereof

(1)  The Lender unreasonably rejects a withdrawal by the Borrower in accordance  with this Agreement;

(2)  Any provision as stipulated in Article 14 of this Agreement has been breached.

If any of the above default events by the Lender has occurred, the Trustor or the Borrower is entitled to separately or jointly take followings actions:

      (i) To request the Lender to rectify the default within a prescribed time limit;

      (ii) The Borrower is entitled to make repayment ahead of schedule; and

      (iii)The Trustor is entitled to change the Lender.

4.  Occurrence of any of the following events will constitute a default by the Trustor under this Agreement:

(1)  No adequate funds has been deposited in (remitted to) the Trustor's account opened with the Lender in accordance with this Agreement;

(2)  The source of the funds of the entrusted loan is illegal or not compliable with relevant rules; and

(3)  The Turstor has failed to pay the Lender the handing fee for the entrusted loan promptly in accordance with the Contract.

5.  If any of the above defaults has occurred, the Lender or the Borrower is entitled to take one or several of the actions below:

(1)  The Lender or the Borrower is entitled to request the Trustor to rectify the above default within a prescribed time limit;

(2)  The Lender is entitled to refuse to conduct the business of entrusted loan for the Trustor;

(3)  The Borrower is entitled to make repayment ahead of schedule;

(4)  The Lender is entitled to deduct the handling fee owed by the Trustor to the Lender; and

(5)  If the Lender or the Borrower has incurred any loss as a consequence, they are entitled to claim for damages to the Trustor.

ARTICLE 17  EXPENSES

8

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

All expenses (including but not limited to the certification fee) in connection with this Agreement shall be borne by the Borrower unless stipulated by the law otherwise.

Article 18   Deduction

Under this Agreement, the Borrower shall pay in full amount of all the items due, and shall not claim for set-off or counterclaim or attach any condition to the payment.

ARTICLE 19   TRANSFER OF DEBT

1.   In absence of a written consent, the Borrower shall not transfer any right or obligation under this Agreement to a third party.

2.   If the Borrower transfers its rights and obligations under the Contract to a third party with written consent by the Trustor, such third party shall abide by all the provisions of this Agreement unconditionally.

ARTICLE 20   PERFORMANCE OF OBLIGATIONS AND WAIVER OF RIGHTS

1.   The obligations of the Borrower under this Agreement shall stand alone without being affected by the relationship between any Party to this Agreement and the third party, unless it is provided otherwise in this Agreement.

2.   Any tolerance, indulgence, favourite or delayed exercise of any right under this Agreement rendered by the Trustor to the Borrower shall not affect, infringe upon or limit any right or interest of the Trustor under this Agreement and the laws and regulations, and shall not be regarded as a waiver by the Trustor and the Lender of its rights and interests under this Agreement.

ARTICLE 21   SUPPLEMENT, AMENDMENT AND INTERPRETATION OF CONTRACT

1.   This Agreement can be amended, supplemented upon written agreement by three Parties; Any amendment or supplement to this Agreement shall constitute an integrated part of this Agreement.

2.   If any change in the laws, regulations or judicial practices of the state has resulted in the illegality, invalidity or unenforceability of any clause of this Agreement, the legality, validity and enforceability of any other clause of this Agreement shall not be affected. Under such circumstances, the three Parties shall cooperate closely to amend as soon as possible the clause of this Agreement which has become illegal, invalid or unenforceable.

3.   Issue which are not provided in this Agreement shall be interpreted or deal with in accordance with the regulations of the Lender.

ARTICLE 22   DISPUTE, JURISDICTION AND WAIVER OF IMMUNITY

1.   The execution, validity, interpretation, performance and dispute resolution of this Agreement shall all be governed by the law of the P.R.C. During the performance of the Contract, any dispute or controversy arising out of or in respect of this Agreement shall be resolved through friendly consultations by the Parties. In case the

9

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

consultation has failed, any Party is entitled to directly bring a lawsuit before the people's court in the place where the defendant is premised.

2.   All the expenses relevant to litigation shall be borne by the Borrower, unless otherwise provided by an order of the People's court.

3.   During the period of litigation, all the clauses hereunder shall maintain effective, and the Borrower shall not make dispute resolution as the excuse for refusing to implement its obligations hereunder.

4.   The execution and performance of this Agreement as well as any activities carried out by the Borrower are civil acts. The Borrower shall not, at present and in the future, take any economic or administrative actions against the Lender or bring up any objection or argument against any jurisdiction, trial or implementation by reason of the immunity of its corporation, acts or properties.

[If arbitration is adopted to resolve disputes, then the above clauses shall be:]

1.   The execution, effectiveness, construction, performance and dispute resolution shall be governed by Chinese laws. During the performance of this Agreement, any dispute or dissension arising out of or in connection with performance of this Agreement may be resolved though consultation. When the parties fail to resolve such dispute through consultation, any party hereto may refer such dispute to Xinyu Arbitration Committee for arbitration.

2.   The arbitration procedure shall be implemented in accordance with the Arbitration Law of the People's Republic of China and the rules of arbitration procedure of Xinyu Arbitration Committee.

3.   All the expenses relevant to arbitration shall be borne by the Borrower, unless otherwise provided by an award of the Arbitration Committee.

4.   During the arbitration, all the clauses hereunder shall maintain effective, and the Borrower shall not make dispute resolution as the excuse for refusing to implement its obligations hereunder.

5.   The execution and performance of this Agreement as well as any activities carried out by the Borrower are civil acts. The Borrower shall not, at present and in the future, take any economic or administrative actions against the Lender or bring up any objection or argument against any jurisdiction, trial or implementation by reason of the immunity of its corporation, acts or properties.

ARTICLE 23  MISCELLANEOUS

......

ARTICLE 24  APPENDICES

Following appendices are integral parts hereof:

1.   Application for Commission Loan;

10

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

2.    Others

......

ARTICLE 25  NOTICE

1. Any notice, payment requirements and other communication hereunder shall be
   delivered or transmitted to the other party, addressed as follows:


To: Trustor:         Jiangxi Liu Xin Industrial Limited Company
Address:             High-Tech Economic Development Area, Xinyu City
Zip Code:            338000
Telex:
Fax:                 0790-6860022
Attention:           Shan Zhou


To: Lender:          Bank of China Limited, Xinyu Branch
Address:             2 Xian Lai Zhong Road, Xinyu City
Zip Code:            338000
Telex:
Fax:                 0790-6457338
Attention:           Zhigang Zhang


To: Borrower:        Jiangxi Sai Wei LDK Solar Energy High-Tech Limited Co.
Address:             Meiyuan Subdistrict, High-Tec Economic Development
                     Area, Xinyu City
Zip Code:            338000
Telex:
Fax:                 0790-6860028
Attention:           Xiaofeng Peng


11

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Any party hereto shall notify the other two parties in case of any change to the abovementioned addresses:

2.    Any notice given by the Lender or the Borrower shall be deemed to have been received:

    (1)    if by registered mail, on the day of the 5th business day after the mailing of registered mail;

    (2)    if by telex, on the day of receiving the confirmation of receipt from the other parties;

    (3)    if by fax, on the day on which transmitted;

    (4)    if delivered personally, on the day of the receipt.

ARTICLE 26    EFFECTIVENESS OF CONTRACT

This Agreement shall become effective upon satisfaction of the following conditions and until the Borrower hereunder have fully repaid the principle and interest as well as other expenses relevant to the loans:

1.    This Agreement has been duly executed by the legal representatives or authorized person of the parties and affixed with their respective corporate seals.

2.    Other conditions precedent to effectiveness.

This Agreement shall be made in three originals, each party holding one, and all of these three originals shall have the same effect.

Trustor:                          Legal Representative (or Authorized Person):

(Company seal)                    (Shan Zhou's seal)


Lender:                           Legal Representative (or Authorized Person):

(Bank seal)                              /s/ Yongxin Li
                                  ---------------------------------------------


Borrower:                         Legal Representative (or Authorized Person):

 (Company seal)                         /s/ Xiangqun Fu
                                  ---------------------------------------------


Location:             Xinyu City

Date:                 December 22, 2006

12

</TEXT>
</DOCUMENT>

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 10.30

(Summary Translation)

Foreign Currency Loan Contract

Contract No.: 3600231112006510082

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

TABLE OF CONTENTS

Article  1  Definition........................................................  3

Article  2  Facility Commitment..............................................  5

Article  3  Use of Facility..................................................  5

Article  4  Facility Term....................................................  5

Article  5  Rate and Interest................................................  5

Article  6  Overdue Interest.................................................  6

Article  7  Conditions Precedent to Drawdown.................................  6

Article  8  Drawdown.........................................................  7

Article  9  Capital Payment..................................................  8

Article 10  Interest Payment and Principal Reimbursement.................  8

Article 11  Advance Repayment................................................  8

Article 12  Priority of Repayment............................................  9

Article 13  Management of Account............................................  9

Article 14  Settlement and Sale of Foreign Currencies....................  9

Article 15  Settlement Bank.................................................. 10

Article 16  Representation and Warranties of Borrower..................... 10

Article 17  Examination of Use of Proceeds................................. 10

Article 18  Information Disclosure........................................... 11

Article 19  Supervision of Loan Project..................................... 12

Article 20  Rights and Obligations of Borrower............................. 13

Article 21  Security......................................................... 13

Article 22  Default Event and Liability of Borrower....................... 14

Article 23  Amendment and Termination of Loan Agreement................... 14

Article 24  Entire Agreement................................................. 15

Article 25  Confidentiality.................................................. 15

Article 26  Dispute Resolution............................................... 15

Article 27  Miscellaneous.................................................... 15

Article 28  Effectiveness and Termination of Loan Agreement.............. 15

Annex    1  Drawdown Notice.................................................. 17

2

| | |
|---|---|
| Borrower: | Jiangxi LDK Solar High-Tech Co, Ltd. |
| Address: | High-Tech Industrial Park, Xinyu City, Jiangxi |
| Legal Representative: | Xiaofeng Peng |
| Zip Code: | 338000 |
| Handling Person: | Chenshi Fu |
| Tel: | 0790-6860027 |
| Fax: | 0790-6860028 |
| | |
| Lender: | China Development Bank |
| Address: | 29 Fu Chen Men Wai Avenue, Xicheng District, Beijing |
| Legal Representative: | Yuan Chen |
| Zip Code: | 100037 |
| Handling Branch: | Jiangxi Branch |
| Address: | 68 West Zhongshan Rd., Nanchang, Jiangxi |
| Responsible Person: | Huaxiang Cai |
| Zip Code: | 330025 |
| Handling Person: | Zhiping Zhang |
| Tel: | 0791-6592391 |
| Fax: | 0791-6592320 |

To accelerate the industrialization project aimed at an annual output of 200MW solar energy multicrystalline silicon wafers, the Borrower requests to borrow and the Lender agrees to lend foreign-currency loan. In accordance with the relevant state laws and regulations, the Lender and the Borrower enter into the Contract observing an equal, voluntary and fair principle and in good faith.

ARTICLE 1 DEFINITION

Unless otherwise provided herein, the following expressions shall have the following meanings:

(1) BORROWER means China Development Bank.

3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(2)    LENDER means Jiangxi LDK Solar High-Tech Co, Ltd.

(3)    PROJECT means the industrialization project aimed at an annual output of 200MW solar energy multicrystalline silicon wafers.

(4)    FACILITY COMMITMENT means the highest amount the Lenders agrees to lend to the Borrower.

(5)    OUTSTANDING BALANCE means the amount that the Lender has made available to the Borrower but the Borrower has not repaid.

(6)    DRAWDOWN PERIOD shall have the meaning set forth in Article 8.3.

(7)    FACILITY ACCOUNT means the account opened by the Lender for the Borrower to record the lending and repayment under the facility.

(8)    DEPOSIT ACCOUNT means the account opened by the Lender for the Borrower for the purpose of deposit and settlement of loan proceeds.

(9)    LOAN PAYMENT means the payment of loan made by the Lender to the Deposit Account opened with the Handling Branch of the Lender according to the needs of the Borrower or directly to the Borrower based on the Borrower's advance request.

(10)   HANDLING BRANCH means the branch of the Lender as authorized by the Lender to be responsible for the entry of the Contract and the management of the facility.

(11)   SETTLEMENT BANK means the bank providing settlement services to the Borrower and supervising the use of the loan under the Contract according to the relevant agreements.

(12)   INTEREST PERIOD shall have the meaning set forth in Article 5.2.

(13)   INTEREST PAYMENT DATE means the date on which the Borrower shall pay interests to the Lender as set forth in Article 5.2.

(14)   FIRST REPAYMENT DATE means the date on which the Borrower repays the loan principal for the first time as set forth in Article 10.1.

(15)   REPAYMENT DATE means the date on which the Borrower repays the loan principal as set forth in Article 10.1.

(16)   GRACE PERIOD means the period during which the Borrower makes payment on interests only but not on principal.

(17)   BUSINESS DAY means a day other than statutory holidays and general holidays on which the Lender is open.

(18)   GUARANTORS means the warrantors, mortgagors and pledgors providing guaranty for the Borrower hereunder.

4

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(19)  GUARANTY CONTRACTS means the warranty contracts, mortgage contracts and pledge contracts hereunder.

(20)  LIBOR means the London inter-bank offered rate as published by the British Bankers' Association for deposits in Dollars at 11:00 a.m. London time two business days before the beginning of each Interest Period as displayed on page 3750 of the Telerate screen (if no rate is available on said screen, on the corresponding screen of Reuter Terminal).

ARTICLE  2  FACILITY COMMITMENT

The Facility Commitment hereunder shall be USD25,000,000 (twenty-five million US dollars).

ARTICLE  3  USE OF FACILITY

The loan hereunder shall be used for the import of specialized equipment for the industrialization project aimed at an annual output of 200MW solar energy multicrystalline silicon wafers. The Borrower shall not misappropriate the loan hereunder or use it in fields expressly prohibited by the government.

In the event of misappropriation of the loan, the Lender will charge penalty interests on such misappropriated amount based on penalty interest rate until such misappropriation is cured.

Penalty interest rate = loan interest rate provided herein x 200%.

Penalty interest shall be the misappropriated amount x penalty interest rate x number of days of misappropriation divided by 360.

ARTICLE  4  FACILITY TERM

The term of the facility hereunder shall be five years from December 30, 2006 to December 1, 2011, and the Grace Period shall be one year from December 30, 2006 to December 29, 2007.

ARTICLE  5  RATE AND INTEREST

(1)  Interest Rate:

This Loan Agreement shall bear interest at a rate of 6 months USD LIBOR+150BP per annum.

(2)  Interest Period and Interest Payment Date

The duration of each Interest Period shall be six months, the initial Interest Period shall commence from December 2006 to June 21, 2007.

The Interest Payment Date is each June 21 and December 21. Any Interest Period which would otherwise end on a day which is not a Business Day shall end on the next succeeding Business Day or, if that day falls in the following calendar month, on the immediately

5

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

preceding Business Day. The last Interest Payment Day under the Contract shall be the Installment Date for the last Facility. On such day, Principal and Interests shall be fully paid.

(3)    Calculation of Interest:

Interest shall be calculated based on the Loan Balance and on the actual number of days elapsed in a 360-day year.

Formula for Interest Calculation: Loan Balance x Interest Rate x Actual Number of Days of the Loan within the Interest Period divided by 360 days

ARTICLE  6  OVERDUE INTEREST

(1) In the event where the Borrower failed to pay the Principal, Interests and Fees in accordance with the Contract, it shall be charged with the Overdue Interest.

$$\text{Overdue Interest = Interest Rate Agreed x 150\%}$$

(2)    Formula for Overdue Interest calculation: Overdue Amount x Overdue Interest Rate x Overdue Dates divided by 360

(3) In the event where the Borrower failed to pay the overdue Principal, Interests and Fees upon the next Payment Day, the Overdue Interest will be recalculated in accordance with the Interest Period.

(4) If the Interest Rate is a flexible interest rate, all Overdue Interest Rate of the Overdue Amount shall be adjusted according to the Current Interest Rate.

ARTICLE  7  CONDITIONS PRECEDENT TO DRAWDOWN

(1)    The Precedent Conditions to initial Drawdown by the Borrower including the following:

(a)    The Lender has received the following documents provided by the Borrower:

   (i)    approvals from competent authorities on establishment of the Project;

   (ii)    corporate documents of the Borrower, including business license, duplicate of articles of associations, audited financial statements of past 3 years and financial statement of recent quarter;

   (iii)    resolutions by competent authorities of the Borrower to authorize the Borrower enter into and perform the Contract, as well as resolutions of competent authorities of the Warrantor to authorize the Warrantor enter into and perform the Security Agreement;

   (iv)    specimen signature(s) from the legal representative(s) of the Borrower or Power of Attorney for the authorized signatory and specimen signature(s), as well as specimen signature(s) from the legal representative(s) of the Warrantor or Power of Attorney for the authorized signatory and specimen signature(s);

   (v)    duplicate or copy of the approved and valid commercial contract relevant to

6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

the Contract;

(b)    The Borrower has established the Loan Account and Saving Account required by Article 13;

(c)    The Security Agreement required has been executed and validated;

(2) The Precedent Conditions to each Drawdown (including initial Drawdown) by the Borrower including the following:

(i)    statement by the Borrower under Article 16 is true and valid;

(ii)   compliance with the Promises and Warranties made under Article 16;

(iii)  no Event of Default under Article 22 have occurred;

(iv)   the Project Capital and other supportive funds are fully funded follow the proposed project.

ARTICLE  8  DRAWDOWN

(1)    Drawdown Schedule

The following is the Drawdown Schedule of the Facility under the Contract: December 30, 2006: USD 25,000,000 (Twenty-Five Million US dollars)

Where the Borrower wishes to change the Drawdown Schedule, it shall send a Notice shall the Lender 15 Business Days in advance.

(2)    Drawdown Procedure

The Borrower shall give an irrevocable Drawdown Notice to the Lender three Business Days before the Drawdown Date (see Appendix 1). The lender shall, upon the receipt and approval of the Drawdown Notice, transfer the facility from the Loan Account of the Borrower to its Saving Account or to the account designated by the Borrower in the Drawdown Notice on the date of Drawdown.

(3)    Drawdown Period

(a)    The duration of the Drawdown Period shall be 1 month, from December 30, 2007 to January 29, 2007.

(b)    The Facility can only be made to the Borrower within the Drawdown Period. At the close of the Drawdown Period, the undrawn amount of the Facility shall be automatically cancelled.

(c)    Drawdown Period shall not be postponed without consent from the Lender. In the event where the Borrower needs to postpone the Drawdown Period, a written notice

7

shall be submitted to the Lender 3 days prior to the close of the
Drawdown Period. The Drawdown Period can be postponed with the written
approval from the Lender.

ARTICLE  9  CAPITAL PAYMENT

The Borrower shall provide the Lender with Payment Notice and evidence of
payment one day before the proposed payment day. The Lender shall examine the
aforementioned documents in accordance with its internal management process. If
evidence of payment is deemed to be true and completed, the Lender shall perform
the payment upon the day of receiving the payment notice. Where if the evidence
of payment is deemed to be untrue and uncompleted, the Lender could suspend
performance of the payment or refuse to perform.

The Borrower shall provide evidence of payment including : project application,
equipment purchasing contract, list of equipment and so on.

ARTICLE  10 INTEREST PAYMENT AND PRINCIPAL REIMBURSEMENT

(1)    Instalments of Principal Reimbursement

Dec. 1, 2007: USD 5,000,000 (Five million US dollars)

Dec. 1, 2008: USD 5,000,000 (Five million US dollars)

Dec. 1, 2009: USD 5,000,000 (Five million US dollars)

Dec. 1, 2010: USD 5,000,000 (Five million US dollars)

Dec. 1, 2011: USD 5,000,000 (Five million US dollars)

(2) The Lender shall deliver the Notice of Payment for Principal, Interests and
Fees to the Borrower on the day prior to the Payment Day.

(3) The Borrower shall remit the amount payable to the bank account designated
by the Lender within 5 business days before each repayment date.

(4) Whether the Lender has notified the Borrower or not and the contents of the
Payment Notice are accurate or not, the Brower shall not be exempted from its
obligation to repay the principle and interests on time.

(5) On each repayment date, the Lender may credit relevant amounts from the
Deposit Account opened by the Borrower with the Lender.

ARTICLE  11 ADVANCE REPAYMENT

This Article applies in case that the Borrower voluntarily repays the loans
hereunder in advance.

(1) The Borrower is not permitted to make advance repayment without the Lender's
consent.

(2) The Borrower shall apply for an advance repayment by sending to the Lender a
10-day written application.

8

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(3) In case that the Lender permits the Borrower to make an advance repayment, the Borrower shall remit the principles and relevant interests as well as relevant fees to the bank account designated by the Lender within 5 business days before the repayment date of the principles.

(4)   The advance repayment shall first be used to compensate the loan with the latest due date, i.e. the loans shall be repaid in reverse order.

(5) The Borrower's application for advance repayment is irrevocable. The Borrower cannot apply to withdraw the amount that has been repaid in advance.

(6) The Borrower shall not make advance repayment during the Drawdown Period.

ARTICLE  12 PRIORITY OF REPAYMENT

In case that the Borrower makes repayment with an amount less than the amount due on the same day as agreed hereunder, such amount shall be used to repay the following items in sequence:

(1)    compensation and damage,

(2)    penalty interests,

(3)    overdue interests,

(4)    overdue principles,

(5)    fees,

(6)    interests,

(7)    principles.

In case that the repayment made by the Borrower is not sufficient to cover all the amounts in the same sequence, such amounts shall be repaid in the sequence of time when such amounts occur.

ARTICLE  13 MANAGEMENT OF ACCOUNT

The Borrower shall open a loan account and a deposit account with the Lender's Handling Branch no later than December 30, 2006, to be used for lending, settlement and repayment of principles and interests.

ARTICLE  14 SETTLEMENT AND SALE OF FOREIGN CURRENCIES

The Borrower shall handle the settlement of the loan proceeds hereunder and the sale of foreign currencies through the Lender's Handling Branch and shall pay the handling fees pursuant to the Table of Handling Fees of the Lender.

9

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

ARTICLE  15 SETTLEMENT BANK

 The Lender has selected the Bank of Communication Nanchang Branch as the
Settlement Bank, with which the Borrower shall open an account. The payments
made from such bank account shall be supervised by the Lender and the Settlement
Bank.

The foresaid settlement of the loan proceeds refers to the settlement of the
loan proceeds hereunder and the settlement of the account specially opened for
such proceeds.

ARTICLE  16 REPRESENTATION AND WARRANTIES OF BORROWER

(1) The Borrower is a duly incorporated legal entity, holds a currently valid
business license, and owns its assets and operates its business according to
laws;

(2) The Borrower has been duly authorized to execute this Contract and the
undersigned is the Borrower's representative with effective authorization. This
Contract is legally binding to the Borrower upon effectiveness hereof.

(3) The financial reports provided by the Borrower to the Lender is compiled
according to the existing laws, regulations and accounting principles and have
reflected the true and accurate financial status of the Borrower during the
period of such reports.

(4) Other materials provided by the Borrower to the Lender are true and accurate
and the copies thereof are conformed to the originals.

(5) The Borrower confirms that it has obtained the approval from relevant
authority for the loan project and warrants that all the approval documents are
true and lawful.

(6) The technical plan, construction contents and construction scale of the loan
project are reasonable and feasible and there is no reduction, expansion or
surpassing of the construction scale and standards by the Borrower.

(7) The Borrower confirms that the Lender has priority to the loans for the
subsequent project finance plans.

ARTICLE  17 EXAMINATION OF USE OF PROCEEDS

After the loans are distributed, the Lender has the right to inspect the use of
the proceeds hereunder by means of on-site or off-site examination. The Borrower
shall, upon the Lender's request, provide to the handling branch a report on the
use of the proceeds and relevant certification of such uses. The Lender may
examine the use of proceeds on site and the Borrower shall actively cooperate
and provide relevant materials according to the Lender's requests. The Lenders
examination includes:

(1)     whether the capital for the project and other auxiliary capital
have been fully funded as agreed;

(2) whether the purpose of proceeds has been changed and whether the proceeds,
after being received and before becoming materialized work quantity, flows into
equity exchange, option exchange, real estate operation, risk investment and
other area prohibited by the Lender;

10

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(3) whether the project develops smoothly, whether there is any serious accident, whether the large equipments have been properly installed and whether the construction period is extended;

(4) whether the accumulated implementation and progress of the project is consistent with the accumulated expenses for the project and whether such expenses are made according to relevant provisions.

(5) whether the estimated total investment can be limited within the estimation.

In case that the Lender finds, upon examinations, that the completion of the loan project is adversely influenced due to improper use of proceeds by the Borrower, The Lender may request the Borrower to rectify in a specified period of time.

ARTICLE  18 INFORMATION DISCLOSURE

(1) During the period when the Loan Project under this Contract is being constructed, the Borrower shall, by the 5th of each month, submit to the handing branch of the Lender a monthly report on the Loan Project of the previous month in the form as requested by the Lender, and by February 15 of each year, submit to the handling branch of the Lender an annual report on the Loan Project of the previous year in the form as requested by the Lender;

(2) Within the 15 days from the completion and settlement of the Loan Project under this Contract, the Borrower shall submit to the handling branch of the Lender such materials as the financial settlement report on the completion of the Project and the analysis of the investment proceeds post the completion of the Project.

(3) The Borrower shall, by March 31 of each year, submit to the Lender a complete set of financial report (including the asset and liability statement, the profit and loss statement and the cashflow statement) on the previous accounting year audited by an accounting firm authorized by the Lender; and within the first 10 days of each quarter (the specific date is subject to negotiation) submit to the Lender a complete set of financial report on the previous quarter; and by September 10, submit to the Lender a complete set of financial report on the first half of the year (in the event that the Borrower is a publicly listed company, this provision will be changed to "the Borrower shall, within 3 days from its formal disclosure of the interim financial report or the annual financial report, submit to the Lender its interim financial report or annual financial report) ;

(4) In the event that the Borrower makes an amendment as to its name, premise, registered capital, scope of business, type of business, articles of association, or a significant change has occurred in its financial operations, the Borrower shall notify the Lender in writing 10 days in advance, and file the relevant materials with the Lender. In the event that a significant change has occurred as to the legal representative or the chief financial officer of the Borrower, the Borrower shall notify the Lender in writing promptly.

(5) The Lender is entitled to request the Borrower to provide all the material information on the application of the funds from the commencement of the Project to the termination of the Contract, and the Borrower shall provide such information promptly upon request.

11

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

ARTICLE 19 SUPERVISION OF LOAN PROJECT

(1) The Lender may routinely visit the Borrower and the Loan Project, and obtain the information on the Loan Project through the following methods:

(a)   To be briefed by the Borrower on the status of the Loan Project;

(b)   To review accounting documents such as the financial statements, accounting vouchers, accounting books and other relevant materials;

(c)   To examine, investigate and verify the biding process, the quality and the progress of the Loan Project; and

(d)   To verify the financial and cashflow status of the Borrower.

The Borrower shall cooperate with the Lender for the purposes of the above activities.

(2) In the event that the Borrower will invite public bidding for a single project of above US$500,000 under this Contract, the Borrower shall, within 10 business days prior to the formal commencement of the bidding process, notify the Lender. If the Lender is to conduct the supervision on the bidding process, the Borrower shall render cooperation. The supervision and examination can be conducted through the following methods:

(a)   To examine the bidding announcement, bidding invitation letter and bidding documents, and verify the credentials and credit of the tenderers;

(b)   To supervise the opening and evaluation of the bids and attending all the important meetings in connection with the bidding; and

(c)   To obtain information and solicit comments from the tenderee, the tenderer, the bidding agent, the relevant administrative department and the bidding notarization agency;

(d)   To review the reports, contracts and relevant documents in connection with the bidding; and

(e)   To examine, investigate and verify the implementation of the bidding result.

(3) The Borrower shall, in accordance with the relevant regulations of the state and the standard requirements of the industry, engage a qualified supervision agency to supervise the construction and the equipment installation and adjustment of the project. Upon the request by the Lender, the Borrower shall provide a supervision report for the project within the prescribed time limit.

(4) The Borrower shall, in accordance with the relevant regulations of the state and the standard requirements of the industry, purchase insurance for the project being constructed under this Contract. Upon the request by the Lender, the Borrower shall provide the relevant insurance policy or insurance certificate within the prescribed time limit.

12

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

ARTICLE  20 RIGHTS AND OBLIGATIONS OF BORROWER

(1) The Borrower is entitled to request the Lender to provide loans in accordance with this Contract;

(2) The Borrower shall withdraw the loans in accordance with the withdrawal proposal under this Contract;

(3) The Borrower shall repay the principle and interest thereof in accordance with this Contract;

(4) The Borrower shall conduct and complete all the relevant procedures in accordance with the regulations on foreign reserve administration of the state;

(5) In the event that a transfer of operations or assets by the Borrower involves more than 20% of its total assets, a prior written consent by the Lender must be obtained;

(6) In the event that there is a change to the ownership of assets or the structure of the Borrower by way of merger or demerger, the Borrower shall notify the Lender of the relevant change proposal 7 days in advance, and obtain the consent thereof by the Lender. The aforesaid change proposal shall not infringe upon the legitimate rights of the Lender under this Contract;

(7) In the event that the guarantor's ability to provide guarantee under this Contract has been weakened, or the value of the mortgaged (pledged) property has decreased, the Borrower shall make up the security within the time limit as requested by the Lender, and the guarantor and the Lender shall enter into a valid security agreement according to the law;

(8) In the event that the Borrower provides security for a third party, and the accumulative amount subject to such security will exceed 70% of the net assets set forth in the Borrower's most recent financial statements, a prior written consent by the Lender must be obtained.

(9) The Borrower shall be prohibited from applying for loans from the Lender by falsely reporting on a construction project; and

(10) The Borrower shall cooperate with the Lender for the purpose of rating the credit of the Borrower, and provide the relevant materials as requested by the Lender.

ARTICLE  21 SECURITY

The following forms of security have been adopted under this Contract:

(1) Xiaofeng Peng and Shan Zhou, as guarantors, will provide unlimited joint liability guarantee;

(2) Jiangxi LDK Solar High-Tech Co. Ltd, as the mortgagor, will provide security by mortgaging its legally-owned manufacturing equipment, and a land of an area of 278.91 mu for the industrial purposes and a land of an area of 55.34 mu for the business and accommodation purposes located in the Economic Development Zone of Xinyu City as well as the buildings thereon.

13

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

(3) Jiangxi LDK Solar High-Tech Co. Ltd, as the pledger, will provide security by pledging its rights and interests under the long-term sales and purchase agreement, which are allowed to be pledged according to the law.

The guarantor (the mortgagor or the pledger) shall promptly enter into a valid security agreement with the Lender according to the law.

ARTICLE  22 DEFAULT EVENT AND LIABILITY OF BORROWER

(1) Where the Borrower violates the provisions specified in Article 16, 17, 18, 19 or 20, or any representation or warranty made by the Borrower in Article 16 hereunder proves to be incorrect or misleading, the Lender is entitled to request the Borrower to cure such default in due time; Once the Borrower fails to cure such default in due time, the Lender shall have the right to adopt one or more following actions:

(a)   To cease loan distribution;

(b)   To declare such debt due and payable prior to its specified maturity, and require the Borrower to repay in due time the principle and proceeds of the loan already distributed, and to deduct the repayment amount directly from the bank account opened by the Borrower (Upon the execution of this Loan Agreement, the Borrower simultaneously authorized the Lender to excise such aforesaid rights to deduct repayment amount direct from the Borrower's account);

(c)   To terminate the Loan Agreement unilaterally.

(2) Where any default of the Borrower that violates the provision other than those specified in Article 1 hereunder, the Lender shall be entitled to request the Borrower to cure such default in due time; Once the Borrower fails to cure such default in due time, the Lender shall have the right to request a liquidated damage accounting for 50% of the loans distributed at the time of the occurrence of such default, where the liquidated damage is not sufficient to cover the economic loss the Lender has sustained as a consequence of the said default, the Lender shall have the right to claim for compensation against the Borrower.

(3) Where any litigation takes place as a result of the default of the Borrower, the legal service fees paid by the Lender for such litigation shall be borne by the Borrower.

ARTICLE  23 AMENDMENT AND TERMINATION OF LOAN AGREEMENT

(1) Unless otherwise provided herein, after the effectiveness of this Loan Agreement, neither party shall amend or terminate this Loan Agreement unilaterally. This Loan Agreement may be amended or terminated only by mutual consent of both the Lender and the Borrower though consultation and such amendment or termination shall be made in writing.

(2) The Lender may assign its rights hereunder, in whole or in part, to a third party, provided that the Lender shall notify the Borrower of such assignment;

(3) Where all or part of the clauses herein are no longer satisfying the requirements of the Chinese laws, regulations or policies by reason of changes in such Chinese laws, regulations or policies, the Lender and the Borrower shall consult with each other and amend relevant clauses in a timely manner;

14

(4) Where the Borrower or the Lender is unable to perform this Loan Agreement due to any event of force majeure, it shall notify the other party promptly and take efficient actions to prevent further losses. The prevented party shall, within 20 days after the occurrence of the event of force majeure, provide the other party with detailed information about such event of force majeure and documentation issued by relevant government authority evidencing the occurrence of the relevant event of force majeure and its influence associated.

ARTICLE  24 ENTIRE AGREEMENT

Any supplements, amendments or alterations shall constitute integral parts of this Loan Agreement.

ARTICLE  25 CONFIDENTIALITY

Neither party shall disclose to any third party the content hereof and any commercial secrets of the other party without the mutual consent of the Lender and the Borrower.

ARTICLE  26 DISPUTE RESOLUTION

Any disputes arising from the performance of this Loan Agreement shall be resolved though friendly consolation of both parties; In the event that any dispute can not be resolved through consultation, it shall be referred to the People's court of the city which the Lender's domicile is.

ARTICLE  27 MISCELLANEOUS

(1) Any matters not specified herein shall be managed by the Lender and the Borrower through consultation, or implemented in accordance with stipulations under relevant Chinese laws and regulations.

(2) This Loan Agreement is made in two originals and 6 counterparts, each party will hold one original, and the Borrower will hold 2 counterparts while the Lender will hold 4 counterparts.

ARTICLE  28 EFFECTIVENESS AND TERMINATION OF LOAN AGREEMENT

This Loan Agreement shall be effective from the date of the execution of both the Lender and the Borrower till the date of the repayment in full of all the debt hereunder.

15

Borrower: Jiangxi LDK Solar High-Tech Co., Ltd

       (Corporate seal)

Legal Representative (or Authorized Person):     /s/ Xiaofeng Peng
                                             --------------------------

                      Date: December 29, 2006

Bank Name and Account No. of Borrower:


Lender: China Development Bank

       (Bank seal)

Legal Representative (or Authorized Person):   /s/ Lifa Fan
                                     --------------------------

                      Date: December 29, 2006

Signing Location: 68 Zhong Shan Xi Road, Nanchang, Jiangxi Province

16

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

ANNEX 1

DRAWDOWN NOTICE

No.:

TO CHINA DEVELOPMENT BANK:

In accordance with the Loan Agreement entered into by and between our Company
and your Bank (Contract No:        ), we irrevocably apply for a drawdown as
follows:

-        Amount of Drawdown;

-        Drawdown Date;

-        Drawdown Purpose;

-        We authorize your Bank to make the above-mentioned payment to
         _____ directly on the Drawdown Date, whose opening bank and
         account No.  are _____ _____;

-        We authorize your Bank to make the above-mentioned payment to
         _____ directly on the Drawdown Date, whose opening bank and
         account No.  are _____ _____.


 We hereby represent that our Company has met all the conditions precedent to
the drawdown as provided by the Loan Agreement (Contract No: _____) and no
default has occurred under this Loan Agreement. The above drawdown will
constitute the drawdown of our Company from the Bank and any liability incurred
therefrom shall be borne by our Company.


Borrower:_____    (Corporate seal)

Legal representative (authorized person):    /s/  Xiaofeng Peng
                                         _____

Date:

17

</TEXT>
</DOCUMENT>

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 10.31

(Summary Translation)

FOREIGN CURRENCY LOAN CONTRACT

CONTRACT NO.: 2007 YU HUI XIN ZI NO. 001

| | |
|---|---|
| Borrower: | Jiangxi LDK Solar High-tech Co, Ltd. |
| Business License Number: | Qi Du Gan Yu Zong Zi No. 000108 |
| Legal Representative: | Xiaofeng Peng |
| Domicile: | Meiyuan Subdistrict, High-Tech Economic Development Area, Xinyu City |
| Opening Bank and Account Number.: | Bank of China, Xinyu Branch  743045478628091001 |
| Tel: | 0790-6441025 |
| | |
| Lender: | Bank of China, Xinyu Branch |
| Legal Representative or Responsible Person: | Zhigang Zhang |
| Domicile: | 2 Xian Lai Zhong Road, Xinyu City |
| Tel: | 0790-6441025 |

This Contract is made by and between the Borrower and the Lender through equal consultation on the matter of distribution of foreign currency loans from the Lender to the Borrower.

ARTICLE 1   CURRENCY AND AMOUNT

The loan currency shall be US dollar.

The total amount of the loans shall be eight million seven hundred and fifty thousand US dollars (USD 8,750,000.00).

ARTICLE 2   TERM OF LOANS

The duration of the loans hereunder is 24 months, commencing from the agreed drawdown date to the last payment date as agreed by both parties. If the drawdown date as agreed by both parties refers to a specified period, the drawdown date shall refer to the initial date of such drawdown period.

1

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

ARTICLE 3    PURPOSES

The loan hereunder shall be applied towards the following purpose:

The 2nd phase of 100 MW project of the Company and equipment purchase.

The Borrower shall not change the use of such loan without written consent from the Lender.

ARTICLE 4    INTEREST RATE AND CALCULATION METHOD

This facility adopts a interest calculation method as follows: 10% higher than the floating interest rate for 3-month period for foreign currency loan with a maturity of 2 years as published by the Bank of China, and the interest rate for this term is 8.73125% per annum.

Interest shall be calculated from the actual drawdown date based on the drawdown amount and the actual number of days elapsed of a 360-day year.

Where interest calculation method adopts the interest rate for 3 month floating period, then, upon expiry of every three month period starting from the effectiveness hereof, the interest rate for the next floating period shall be determined on the basis of the then floating interest rate for 3-month period for foreign currency loan with a maturity of 2 years as published by the Bank of China.

The Borrower shall adopts the following payment method:

The Borrower shall pay interest on a quarter basis, the days of March 20, June 20, September 20 and December 20 of each year shall be the interest payment dates. If the last payment date for the loan principle does not fall into any abovementioned interest payment date, then the Borrower shall repay all the interest accrued on the principle on the last payment date.

ARTICLE 5    CONDITIONS PRECEDENT TO DRAWDOWN

The Lender shall have the right to refuse the drawdown applied by the Borrower if the Borrower fails to satisfy the conditions as follows:

1.    A written application for drawdown 3 days in advance, together with relevant documentation evidencing the use of such loan;

2.    This Contract and its appendices have become effective;

3.    The Guarantee Contract specified in Article 9 hereunder has become effective;

4.    The Borrower has opened a bank account to be used for drawdown, interest and fee payment, as well as repayment pursuant to request of the Lender;

5.    The Borrower has provide the Lender with following written documents:

2

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

    (1)    Resolution and authorization letter of the Board of Directors or another competent department approving the execution and performance of this Contract;

    (2)    Name list of the persons who have the authorization to sign this Contract and other documents and bills relevant hereto, along with their specimen signatures;

    (3)    Evidence in support of the fulfilment of budget funds for the loan project (including funds raised by the Borrower itself);

    (4)    Certificates approving the construction land use, layout and construction designing plan;

6.    There is no default event as set forth in Article 12 hereunder;

7.    Any other conditions precedent to drawdown as stipulated by laws or agreed by the parties have been satisfied.

ARTICLE 6    DRAWDOWN SCHEDULE

The Borrower shall make a drawdown in accordance with (1) of this Article:

    (1)    The Borrower shall draw the facility in a lump sum on February 5, 2007;

    (2)    The Borrower shall draw all the facility within ____ months from the day of _____ as provided herein. The Lender shall have the right to refuse to distribute any facilities not withdrawn within the said time period. In the event that the Lender assents to distribute the aforesaid facility, it shall be entitled to charge the Borrower a fee at a rate of _/__ per day for those facilities not withdrawn; for those facilities the Lender refuses to distribute, the Lender has the right to charge the Borrower at a rate of __/___ .

ARTICLE 7    DRAWDOWN PROCEDURE

The Borrower shall send a Drawdown application as required by the Lender for every single drawdown, and shall fulfil all the other drawdown formalities.

ARTICLE 8    REPAYMENT

The Borrower shall repay the loans hereunder in strict compliance with the following repayment schedule:

| Repayment Installments | Repayment Date | Repayment Amount | Repayment Installment | Repayment Date | Repayment Amount |
|---|---|---|---|---|---|
| First Installment | February 5, 2008 | USD 4,375,000 | | | |
| Second Installment | February 5, 2009 | USD 4,375,000 | | | |

3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

If the Borrower desires to adjust any part of the above repayment schedule, it shall send a written application 30 days prior to the maturity date of the corresponding facility. Unless otherwise agreed, any adjustment to such repayment schedule shall be confirmed by both parties in writing.

Where between the Borrower and the Lender there exist several loan contracts due, the Lender shall have the right to determine the sequence of performance of these contracts as to each repayment made by the Borrower.

The Borrower may repay loans in advance with a 15 day prior notice to the Lender. The Lender shall be entitled to a compensation amounting for ___/__ of the interest receivable on the advance repayment. The advance repayment shall first be used to compensate the loan with the latest due date, i.e. the loans shall be repaid in reverse order. The Borrower's application for advance repayment is irrevocable. The Borrower cannot apply to withdraw the amount that has been repaid in advance.

ARTICLE 9    SECURITY

The following forms of security have been adopted under this Contract:

1.    Suzhou Liu Xin Industrial Limited Company and Jiangxi Liu Xin Industrial Limited provide unlimited joint liability guarantee and enter into a separate Guarantee Contract, the contract No. of which is 05NR07001 and 05NR07002;

2.    The Borrower, as the pledgor, provides security by pledging its Silicon inventory and enters into a separate Pledge Contract with the Lender, the contract No. of which is 2007 YA ZI No. 001.

3.    Peng Xiaofeng provides individual joint liability guarantee.

4.    The Borrower, as the mortgagor, will provide security by mortgaging its 10,000 sqm factory newly completed and equipment purchased in the 2nd phase of the construction project as well as a land of an area of 300 mu in the 3rd phase after completion of relevant formalities.

In the event of the worsening in guarantor's financial condition or inferior solvency due to any other reasons, or distinct decrease or even elimination of the guarantor's credibility by reason of any depreciation, damage or loss of the mortgaged or pledged properties, the Lender shall have the right to request the Borrower to change its guarantor or provide new assets or properties under mortgage or pledge in order to secure the loan hereunder.

ARTICLE 10    REPRESENTATION AND WARRANTIES

The Borrower represents and warrants as follows:

1.    It is a corporation duly incorporated and validly existing.

2.    It has obtained all the authorization required to execute this Contract.

4

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

3.    All the documents, materials, reports and vouchers provided by it to the Lender are accurate, true, complete and valid.

4.    It has not concealed any of the following events, existed or ongoing, which may have an influence on the judgment of its ability to perform this Contract:

    (1)    Material irregular or illegal events or recourse claims involving the Borrower or its major leadership;

    (2)    Any event of default under other contracts to which the Borrower is a signing party;

    (3)    The debt borne by the Borrower, the contingent debt, or the mortgage or pledge provided to a third party;

    (4)    Pending litigation or arbitration;

    (5)    Other conditions that may affect the financial status and the repayment ability of the Borrower.


THE BORROWER UNDERTAKES THE FOLLOWS:

1. To provide the latest financial statement every month upon the request of the Lender; to provide the audited financial report for the first half year in the first quarter of each year; to provide the documents and materials including, but not limited to, the operational status, financial reports and statements of the Borrower at any time upon the request of the Lender.

2. In the event that the Borrower has entered into or will enter into a counter guarantee agreement or a similar agreement with the guarantor under this Contract with regard to the Guarantor's guarantee liability, such agreement will not infringe upon any right of the Lender under this Contract.

3. To accept the examination and supervision by the Lender on credit, and to render adequate assistance and cooperation for such purpose.

4. In the event that the Borrower will reduce its registered capital or carry out a material change to its asset ownership or a material adjust of its business operations (including but not limited to, foreign investment or cooperation; separation, merger, acquisition or takeover; establishment of a joint stock company through restructuring, sponsoring or reforming; changing the type of business operations concerning leasing, contracting, affiliation or custody), the consent of the Lender must be obtained.

5. The Borrower shall not dispose self proprietary assets by way of reducing its ability to make repayment. In the event that the Borrower will provide guarantee or security by mortgaging or pledging its own assets for a third party, the Borrower will notify the Lender promptly, and undertakes that the total amount of the loan secured by such security will be no more than twice of its net assets.

5

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

6. The repayment of the loan to the lender shall take priority over repayment of loans of shareholders by the Borrower, and shall not be subordinate to that of loans of the same type provided by other creditors.

7. The Borrower undertakes that it will notify the Lender promptly if any of the following events occur:

> (1) A default has occurred under this Contract or any other contract;

> (2) There is a change in the subordination relationship, the senior management, the articles of association of the Borrower, or a substantial adjustment of the internal structure of the Borrower;

> (3) The Borrower has encountered a difficulty in its business operations, or the Borrower's financial conditions have deteriorate;

> (4) The Borrower is involved in material litigation or arbitration;

> (5) The Borrower's ability for repayment has been otherwise affected.

8. The Borrower shall deposit an amount of funds adequate for repayment at least 3 days prior to the expiry of the repayment period for the principle and interest thereof of each instalment of loan.

9. The relevant settlement matters of the Borrower under the present facility shall be dealt with by the Lender or other branches of Bank of China, whose settlement volume should meet the requirement of the Lender.

10. In the event that the net profit after tax of an accounting year is nil or negative, or the profit after tax is inadequate for making up the losses accumulated in the previous accounting years, or the profit before tax has not been used for the repayment of the principle, interest and expenses due in that accounting year, or the profit before the tax is inadequate for the repayment of the principle, interest and expenses of the next instalment of loan, the Borrower shall not distribute dividends or bonus to its shareholders in any form.

11. Registration of loans in foreign currency, approval for repayment of the principle and interest and other procedures shall be conducted with the foreign reserve administrative bureau promptly.

Article 11  Events of Default and Disposal Thereof

In the event that the Borrower fails to repay the interest in full on time, the Lender is entitled to calculate a compound interest with respect to the outstanding interest in line with the interest settlement method for the principle of the loan.

In the event that there is a delay in the repayment of the principle or the interest thereof, the Lender is entitled to collect a punitive interest with respect to the amount overdue by a proportion of 30% based on the original interest rate from the date on which the repayment becomes overdue. In the event that a floating interest rate has been adopted for the loan, the interest rate for the overdue loan shall be calculated based on the new floating interest rate, and

6

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

the original floating period and the method for floating interest calculation shall remain unchanged; in the event that a fixed interest rate has been adopted for the loan, the interest rate for the overdue loan shall be calculated based on the interest under the original loan agreement.

In the event that the Borrower fails to utilize the loan in accordance with this Contract, the Lender is entitled to collect a default fine with respect to the loan being embezzled by a proportion of 50% based on the original interest rate.

If any of the following events occur, the Lender is entitled to stop the Lender from withdrawing the balance amount or cancel the balance amount under the facility, and announce that all the principle and interest thereof under this Contract become due immediately:

1. The Borrower has delayed in repaying the principle and interest thereof for more than 30 days;

2. The amount not repaid or embezzled by the Borrower has reached a total of US$500,000;

3. The statements of the Borrower set forth in Article 11 is inauthentic or contrary to its undertakings;

4. A default by the Borrower has occurred under other contracts;

5. A default by the guarantor, mortgagor or pledger occurred under the security agreement has affected the Borrower's ability to perform its obligations under this Contract;

6. The Borrower has terminated its business operations, or has been dissolved or abolished, or has become bankrupt.

7. The financial conditions of the Borrower or the Guarantor have deteriorated dramatically.

8. The mortgaged or pledged property has depreciated or has been damaged, destroyed, sealed or frozen, and the Borrower has failed to provide new security upon the request by the Lender;

9. There is a significant delay in the project construction, or the construction expenditure of the project has exceeded the budget as permitted by the Lender;

10. The construction quality of the project has failed to meet the standards of the state or the industry.


Article 12   Transfer

The Borrower agrees that any amount to be repaid by the Borrower under this Contract can be transferred directly by the Lender from the bank account opened by the Borrower with any branch of Bank of China.

7

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Article 13  Tax

The tax and expenses in connection with the execution, performance and resolution of disputes of this Contract, including but not limited to, stamp duty, interest withholding tax, litigation costs, enforcement costs, legal service fee and certification fee shall all be paid or repaid by the Borrower.

Article 14  Set-Off, Transfer and Reservation of Rights

The Borrower shall pay in full all the amount due under this Contract and shall not claim for set-off unless it has been consented by the Lender otherwise.

In absence of a written consent by the Lender, the Borrower shall not transfer its obligations under this Contract to a third party.

Any tolerance, indulgence, favourite or delayed exercise of any right under this Contract rendered by the Lender to the Borrower shall not affect, infringe upon or limit any right or interest of the Lender under this Contract and the laws and regulations, and shall not be regarded as a waiver of the Lender to its rights or interests under this Contract, and shall not exempt the Borrower from any of its obligations under this Contract.

Article 15  Amendment and Rescindment

This Contract can be amended, supplemented or rescinded upon mutual agreement by both Parties in writing. Any amendment or supplement to this Contract shall constitute an integrated part of this Contract.

The invalidity of any clause of this Contract shall not affect the validity of any other clause.

Article 16  Applicable Law, Dispute Resolution and Jurisdiction

This Contract shall be governed by the law of the P.R.C.

Any dispute or controversy arising out of or in respect of this Contract shall be resolved through friendly consultations by both Parties. In case of a failure in consultations, both Parties agree to resolve the dispute through method number (1) as set forth below:

    (1).  To bring a lawsuit before the people's court in the place where the Lender is premised.

    (2).  To submit the dispute to the arbitration tribunal of _ /_.

Article 17 Attachment

8

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

The following attachments and any other attachment as mutually confirmed by both Parties shall constitute an integrated part of this Contract, and have the same effect of this Contract.

(1) Loan Receipts; and

(2) Letter of Undertakings.

Article 18 Effectiveness of Contract

This Contract shall become effective upon the execution by the legal representative or the authorized person of each Party and being sealed.

This Contract shall be executed in two counterparts with one copy to be held by each Party, and the two counterparts shall have the same effect.

Article 19 Special Notice

The Borrower has consulted with the Lender sufficiently with respect to all the clauses of this Contract.

The Lender has brought to the Borrower's special attention on all the clauses concerning the rights and obligations of each Party, and requested the Borrower to comprehend such clauses fully and accurately. The Lender has explained the aforesaid clauses upon the request by the Borrower.

Each Party to this Contract has exactly the same understanding of the clauses of this Contract.

Borrower: (Company seal)                    Lender: (Bank seal)

By legal representative (or authorized      By legal representative (or authorized
person) :                                   person) :

(Xiaofeng Peng seal)                         /s/  Yongxin Li
--------------------                        ---------------
February 5, 2007                            February 5, 2007

9

</TEXT>
</DOCUMENT>

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 10.32

(Summary Translation)
PROPERTY SUBLEASE AGREEMENT

AGREEMENT made this 1st day of December 2005 by and between Suzhou Liouxin Industry Co., Ltd. (hereinafter referred to as "Party A") and Jiangxi LDK Solar Hi-Tech Co., Ltd. (hereinafter referred to as "Party B") in connection with the use of certain premises herein specified according to the terms set forth below.

WHEREAS,

1.   Party A and Shanghai Harbor Ring Real Estate Development Co., Ltd. (hereinafter referred to as "Harbor Ring") entered into a real property lease contract on November 7, 2005 (hereinafter referred to as the "Lease Contract"), pursuant to which, Harbor Ring has leased to Party A, and Party A has leased from Harbor Ring, the premises located at Room 2303, Harbor Ring Plaza, No. 18 Xizang Zhong Road, Shanghai (hereinafter referred to as the "Property") in accordance with the terms and conditions therein provided.

2.   Party B wishes to use the Property as its offices for business purposes.

NOW, THEREFORE, Party A and Party B, subject to the terms and conditions set forth herein, agree as follows:

1.   In furtherance of its business goals, Party B subleases the Property from Party A as offices for its Shanghai branch office.

2.   Party A agrees that Party B shall not have any obligation to pay for its use of the Property during the sublease period.

3.   The term of the sublease shall be two years commencing on the effective day of this Agreement. Should Party B desire to continue to use the Property after the expiration of this Agreement, Party B may further negotiate and enter into a new agreement with Party A.

4.   This Agreement shall come into effect upon signing by both parties.

5.   Both parties agree to resolve other related matters not explicitly provided herein through amicable negotiation and consultation.

6.   This Agreement shall be executed in two original copies, and each party shall keep one copy hereof.

PARTY A: Suzhou Liouxin Industry Co., Ltd. (sealed)

PARTY B: Jiangxi LDK Solar Hi-Tech Co., Ltd. (sealed)

</TEXT>
</DOCUMENT>

Exhibit 10.33

(Summary Translation)
LAND USE RIGHT TRANSFER AGREEMENT

This Agreement is made by and between Jiangxi Liouxin Industry Co., Ltd.
(hereinafter referred to as "Party A") and Jiangxi LDK Solar Hi-Tech Co., Ltd.
(hereinafter referred to as "Party B") in accordance with the Interim
Regulations of the People's Republic of China on Grant and Assignment of the Use
Right of State-Owned Urban Land and other relevant State and local rules and
regulations and based on the principles of equality, voluntariness and mutual
consent.

Subject to the terms and conditions set forth herein, the parties agree as
follows:

1.  Party A agrees to transfer to Party B the right to use that certain parcel
    of land herein specified (hereinafter referred to as the "Land") as the
    right to own the Land belongs to the PRC State. The scope of transferred
    land use right does not extend to underground resources, embedded objects
    and public facilities thereon or thereunder, which constitutes an integral
    part of the ownership right of the PRC State.

2.  Party A agrees to transfer to Party B the Land located at west to Zongwu
    Road and north to Hi-tech Road in the Xinyu Hi-Tech Development Zone of
    Jiangxi Province with land registration numbers of GX06-1 and GX06-6 with
    an aggregate site area of 65,491.81 square meters. The attached map
    illustrates the location, land coverage and detailed information of the
    Land as confirmed by both parties. Upon the transfer of the use right to
    the Land from Party A to Party B, the rights and obligations of the
    original assignee, i.e., Party A, under the "Contract for Assignment of the
    Use Right to State-Owned Land" (hereinafter referred to as the "Original
    Assignment Contract") shall be transferred to Party B.

3.  The term of the land use right transferred hereunder shall be from April 1,
    2006 to May 20, 2055. Both parties acknowledge that, except that Party A
    has not transferred the registered name of the land use right holder to
    that of Party B, Party A has fulfilled its obligation to deliver the Land
    to Party B for its uses under this Agreement.

4.  Party A undertakes to Party B that Party A shall provide electricity,
    water, drainage and sewage in conformance with the pre-approved plan as
    marked on the attached map. Party B shall bear the costs and expenses
    incurred in the installation of the electric circuits pursuant to the
    relevant government regulations.

5.  Party B agrees to pay the premium for the transfer of the land use right
    (hereinafter referred to as the "Premium") to Party A in accordance with
    this Agreement. The Premium shall be determined based on the valuation
    price assessed by the land valuation firm selected by both parties, and the
    amount of the Premium shall be fixed in the Land Transfer Premium Payment
    Agreement executed by both parties.

6.  (1) The method of the Premium payment by Party B to Party A for the
    transfer of the land use right shall be in compliance with the Land
    Transfer Premium Payment Agreement

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

executed by both parties. (2) If Party B fails to pay any amount of the
Premium due according to the payment schedule, Party B shall pay damages
calculated at 0.01% of the outstanding amount owed per day from the due
date of such outstanding amount. It shall be deemed a severe breach of
contract if Party B fails to pay the total amount of the Premiums within 30
days after the due date of the Premiums as agreed by the parties, and Party
A shall have the right to terminate the contract and to demand Party B for
payment of damages calculated at 20% of the total amount of the Premiums.

7.  Party B shall pay the Premiums for the transfer of the land use right in
    Renminbi.

8.  Within 20 days after Party B has paid the total amount of the Premium,
    Party A shall assist Party B in applying for the change in the name of land
    use right holder, completing the relevant registration process and
    obtaining a "People's Republic of China Land Use Right Certificate" with
    respect to the Land. Party B shall pay the fees and expenses associated
    with the land use right transfer registration.

9.  If the term of the use rights to the Land transferred hereunder
    (hereinafter referred to as the "Term of Use") is to expire under the
    Original Assignment Contract, should Party B need to continue to use the
    Land, it should file a land use right renewal petition with the government
    within six months prior to the expiration of the Term of Use. If Party B
    fails to file such a petition, upon the expiration of the Term of Use, the
    land use right, together with the rights to the buildings and other
    improvements thereon shall be revert to the PRC State without compensation.
    Party B shall then be required to surrender its land use right certificate
    and complete the registration process for the termination of the land use
    right in accordance with the relevant regulations.

10. During the Term of Use, Party B shall be subject to the monitor and review,
    with respect to the Land, its development, use, transfer, lease, pledge and
    cancellation thereof, by the government land administration department
    according to law.

11. Should Party B fail to obtain the land use right in six months from the
    date of this Agreement as a result of a default of Party A, Party A shall
    pay Party B damages calculated at 20% of the amount of the Premiums paid by
    Party B.

12. This Agreement including its execution, validity, interpretation,
    performance and dispute resolution shall be governed by the laws of the
    People's Republic of China.

13. The parties shall resolve all disputes arising from or in connection with
    this Agreement through negotiation or consultation. In the event that the
    parties cannot reach an agreement to resolve such a dispute or enter into a
    written arbitration agreement, either party may submit the case to the
    people's court having jurisdiction over the matter.

14. This Agreement shall become effective upon signing by the respective
    authorized representatives, fixing hereunto of corporate chops by the
    respective parties and approval by the relevant government authority
    according to law. The parties shall abide by the relevant government
    regulations with respect to the land transfer registration process and the
    payment of handling fees associated with such transfer registration.

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

15.  This Agreement is made in six original copies, and each party shall keep
     two copies hereof, with two copies deposited with the relevant government
     department.

16.  The parties may enter into supplemental agreements to govern other related
     matters not explicitly provided herein. Such supplements shall have the
     same binding effect as this Agreement and constitute an integral part of
     this Agreement.

PARTY A
/s/ Shan Zhou
-------------
Jiangxi Liouxin Industry Co., Ltd. (sealed)

PARTY B
/s/ Xiaofeng Peng
-----------------
Jiangxi LDK Solar Hi-Tech Co., Ltd. (sealed)

Date: May 15, 2006


</TEXT>
</DOCUMENT>

Exhibit 10.34

(Summary Translation)
REAL PROPERTY PURCHASE CONTRACT

This CONTRACT is entered into as of this 15th of May 2006 by and between Jiangxi Liouxin Industry Co., Ltd., as seller (hereinafter referred to as "Party A") and Jiangxi LDK Solar Hi-Tech Co., Ltd., as purchaser (hereinafter referred to as "Party B") in connection with the transfer of land use rights and improvements thereon as specified herein based on the principles of equality, voluntariness and mutual consent and in accordance with the Contract Law of the People's Republic of China, the Law of the People's Republic of China on Administration of Urban Real Estate and other relevant rules and regulations.

Subject to the terms and conditions set forth herein, the parties agree as follows:

1. Party B agrees to purchase from Party A land use rights to certain parcels of land and improvements thereon to be used as manufacturing plants, which are located at Jiangxi Province Xinyu Hi-Tech Industrial Park and have a gross floor area of 19,281.47 square meters with such land area, each as notated on the Land and Building Property Right Certificates No. 50202777, No. 50206141 and No. 5026143 (hereinafter referred to as the "Property").

2. Both parties agree that the purchase price, as determined on the basis of the valuation of the Property at the time of such valuation as agreed by both parties, shall be Rmb 841.0302 per square meter and Rmb 16,216,300.00 in total.

3. As of the date hereof, Party B has fully paid the total purchase price set forth in this Contract.

4. As Party B has been using the Property since April 1, 2006 and Party A has paid certain related water and electricity expenses incurred, both parties acknowledge that, except for Party A to complete title transfer with respect to the Property to Party B, Party A has fulfilled its obligation to deliver its possession of the Property to Party B under this Contract; provided, however, that Party B shall, within seven business days from the date hereof, pay, reimburse or otherwise settle all the relevant water and electricity expenses incurred by Party A on behalf of, or payable by, Party B during its possession of the Property.

5. Both parties shall abide by the relevant PRC property rules and policies and shall pay all the taxes and charges associated with the transfer of title and ownership of the Property. Based on negotiations between the parties, Party B shall be responsible for the payment of any property transfer tax and charges, agent commissions and title transfer handling fees.

6. Should Party A fail to perform this Contract, Party A shall inform Party B in writing. Party A shall refund Party B within seven business days all of the purchase price Party B has paid and pay interest damages to Party B as calculated on the basis of bank saving deposit interest rate then in effect.

7. This Contract is made in five original copies. Each party shall keep two copies hereof and one copy shall be deposited with the Xinyu City Real Property Trading Center.

8. The parties shall resolve all disputes arising from or in connection with this Contract through negotiation or consultation. In the event that the parties cannot reach an agreement to resolve such a dispute or enter into a written arbitration agreement, either party may submit the case to the local people's court having jurisdiction over the matter.

9. The parties may enter into supplemental agreements to deal with matters not explicitly provided herein. Any such supplement shall come into effect upon execution by the parties.

Party A: Jiangxi Liouxin Industry Co., Ltd. (sealed)

Party B: Jiangxi LDK Solar Hi-Tech Co., Ltd. (sealed)
</TEXT>
</DOCUMENT>

Exhibit 10.35

(Summary Translation)
LAND USE RIGHT TRANSFER AGREEMENT

This Agreement is made by and between Jiangxi Liouxin Industry Co., Ltd.
(hereinafter referred to as "Party A") and Jiangxi LDK Solar Hi-Tech Co., Ltd.
(hereinafter referred to as "Party B") in accordance with the Interim
Regulations of the People's Republic of China on Grant and Assignment of the Use
Right of State-Owned Urban Land and other relevant State and local rules and
regulations and based on the principles of equality, voluntariness and mutual
consent.

Subject to the terms and conditions set forth herein, the parties agree as
follows:

1.    Party A agrees to transfer to Party B the right to use that certain parcel
      of land herein specified (hereinafter referred to as the "Land") as the
      right to own the Land belongs to the PRC State. The scope of transferred
      land use right does not extend to underground resources, embedded objects
      and public facilities thereon or thereunder, which constitutes an integral
      part of the ownership right of the PRC State.

2.    Party A agrees to transfer to Party B the Land located at west to Zongwu
      Road and north to New Hi-Tech Road in the Xinyu Hi-Tech Development Zone of
      Jiangxi Province with land registration numbers of GX06-2, GX06-7, GX06-9
      and GX06-10 with site areas of 16,955.36 square meters, 35,427.85 square
      meters, 29,712.25 square meters and 24,279.85 square meters, respectively,
      and the aggregate site area of 106,375.31 square meters. The attached map
      illustrates the location, land coverage and detailed information of the
      Land as confirmed by both parties. Upon the transfer of the use right to
      the Land from Party A to Party B, the rights and obligations of the
      original assignee, i.e., Party A, under the "Contract for Assignment of the
      Use Right to State-Owned Land" (hereinafter referred to as the "Original
      Assignment Contract") shall be transferred to Party B.

3.    The term of the land use right transferred hereunder shall be from the date
      on which Party B obtains the land use right certificate to May 20, 2055.

4.    Party A undertakes to Party B that Party A shall provide electricity,
      water, drainage and sewage in conformance with the pre-approved plan as
      marked on the attached map. Party B shall bear the costs and expenses
      incurred in the installation of the electric circuits pursuant to the
      relevant government regulations.

5.    Party B agrees to pay the premium for the transfer of the land use right
      (hereinafter referred to as the "Premium") to Party A in accordance with
      this Agreement. The Premium shall be determined based on the valuation
      price assessed by the land valuation firm selected by both parties, and the
      amount of the Premium shall be fixed in the Land Transfer Premium Payment
      Agreement executed by both parties.

6.    (1) The method of the Premium payment by Party B to Party A for the
      transfer of the land use right shall be in compliance with the Land
      Transfer Premium Payment Agreement executed by both parties. (2) If Party B
      fails to pay any amount of the Premium due

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

according to the payment schedule, Party B shall pay damages calculated at 0.01% of the outstanding amount owed per day from the due date of such outstanding amount. It shall be deemed a severe breach of contract if Party B fails to pay the total amount of the Premiums within 30 days after the due date of the Premiums as agreed by the parties, and Party A shall have the right to terminate the contract and to demand Party B for payment of damages calculated at 20% of the total amount of the Premiums.

7.  Party B shall pay the Premiums for the transfer of the land use right in Renminbi.

8.  Within 20 days after Party B has paid the total amount of the Premium, Party A shall assist Party B in applying for the change in the name of land use right holder, completing the relevant registration process and obtaining a "People's Republic of China Land Use Right Certificate" with respect to the Land. Party B shall pay the fees and expenses associated with the land use right transfer registration.

9.  If the term of the use rights to the Land transferred hereunder (hereinafter referred to as the "Term of Use") is to expire under the Original Assignment Contract, should Party B need to continue to use the Land, it should file a land use right renewal petition with the government within six months prior to the expiration of the Term of Use. If Party B fails to file such a petition, upon the expiration of the Term of Use, the land use right, together with the rights to the buildings and other improvements thereon shall be revert to the PRC State without compensation. Party B shall then be required to surrender its land use right certificate and complete the registration process for the termination of the land use right in accordance with the relevant regulations.

10. During the Term of Use, Party B shall be subject to the monitor and review, with respect to the Land, its development, use, transfer, lease, pledge and cancellation thereof, by the government land administration department according to law.

11. Should Party B fail to obtain the land use right in six months from the date of this Agreement as a result of a default of Party A, Party A shall pay Party B damages calculated at 20% of the amount of the Premiums paid by Party B.

12. This Agreement including its execution, validity, interpretation, performance and dispute resolution shall be governed by the laws of the People's Republic of China.

13. The parties shall resolve all disputes arising from or in connection with this Agreement through negotiation or consultation. In the event that the parties cannot reach an agreement to resolve such a dispute or enter into a written arbitration agreement, either party may submit the case to the people's court having jurisdiction over the matter.

14. This Agreement shall become effective upon signing by the respective authorized representatives, fixing hereunto of corporate chops by the respective parties and approval by the relevant government authority according to law. The parties shall abide by the relevant government regulations with respect to the land transfer registration process and the payment of handling fees associated with such transfer registration.

15.  This Agreement is made in six original copies, and each party shall keep two copies hereof, with two copies deposited with the relevant government department.

16.  The parties may enter into supplemental agreements to govern other related matters not explicitly provided herein. Such supplements shall have the same binding effect as this Agreement and constitute an integral part of this Agreement.

PARTY A
/s/ Shan Zhou
-------------
Jiangxi Liouxin Industry Co., Ltd. (sealed)

PARTY B
/s/ Xiaofeng Peng
-----------------
Jiangxi LDK Solar Hi-Tech Co., Ltd. (sealed)

Date: September 5, 2006

(Attachment: map of the Land)


</TEXT>
</DOCUMENT>

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

Exhibit 10.36

(Summary Translation)
REAL PROPERTY PURCHASE CONTRACT

This CONTRACT is entered into as of this 5th day of September 2006 by and between Jiangxi Liouxin Industry Co., Ltd., as seller (hereinafter referred to as "Party A") and Jiangxi LDK Solar Hi-Tech Co., Ltd., as purchaser, (hereinafter referred to as "Party B") in connection with the transfer of land use rights and improvements thereon as specified herein based on the principles of equality, voluntariness and mutual consent and in accordance with the Contract Law of the People's Republic of China, the Law of the People's Republic of China on Administration of Urban Real Estate and other relevant rules and regulations.

Subject to the terms and conditions set forth herein, the parties agree as follows:

1. Party B agrees to purchase from Party A land use rights to certain parcels of land and improvements thereon to be used as manufacturing plants, which are located at Jiangxi Province Xinyu Hi-Tech Industrial Park and have a gross floor area of 37,837.12 square meters with such land area, each as notated on the Land and Building Property Right Certificates No. S0202772, No. S0202775, No. S0202779, No. S0202783, No. S0202780, No. S0202784, No. S0208398, No. S0208399, No. S0208400 and No. S0208401 (hereinafter referred to as the "Property"). square meters (hereinafter referred to as the "Property").

2. Both parties agree that the purchase price, as determined on the basis of the valuation of the Property at the time of such valuation as assessed by Jiangxi Ruiyuan Real Estate Valuation & Consulting Co., Ltd. under its Property Valuation Report (2006 Gan Rui Fang Ping Zi No. 09001) and agreed by both parties, shall be Rmb 945.00 per square meter for properties represented by certificates No. S0202772, No. S0202775 and No. S0202779 and Rmb 741.00 per square meter for properties represented by certificates No. S0202783, No. S0202780, No. S0202784, No. S0208398, No. S0208399, No. S0208400 and No. S0208401, respectively. The total purchase price shall be Rmb 33,333,800.00.

3. As of the date hereof, Party B has fully paid the total purchase price set forth in this Contract.

4. As Party B has been using the Property and Party A has paid certain related water and electricity expenses incurred, both parties acknowledge that, except for Party A to complete title transfer with respect to the Property to Party B, Party A has fulfilled its obligation to deliver its possession of the Property to Party B under this Contract; provided, however, that Party B shall, within seven business days from the date hereof, pay, reimburse or otherwise settle all the relevant water and electricity expenses incurred by Party A on behalf of, or payable by, Party B during its possession of the Property.

5. Both parties shall abide by the relevant PRC property rules and policies and shall pay all the taxes and charges associated with the transfer of title and ownership of the Property. Based on negotiations between the parties, Party B

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

shall be responsible for the payment of any property transfer tax and charges, agent commissions and title transfer handling fees.

6. Should Party A fail to perform this Contract, Party A shall inform Party B in writing. Party A shall refund Party B within seven business days all of the purchase price Party B has paid and pay interest damages to Party B as calculated on the basis of bank saving deposit interest rate then in effect.

7. This Contract is made in five original copies. Each party shall keep two copies hereof and one copy shall be deposited with the Xinyu City Real Property Trading Center.

8. The parties shall resolve all disputes arising from or in connection with this Contract through negotiation or consultation. In the event that the parties cannot reach an agreement to resolve such a dispute or enter into a written arbitration agreement, either party may submit the case to the local people's court having jurisdiction over the matter.

9. The parties may enter into supplemental agreements to deal with matters not explicitly provided herein. Any such supplement shall come into effect upon execution by the parties.

Party A: Jiangxi Liouxin Industry Co., Ltd. (sealed)

Party B: Jiangxi LDK Solar Hi-Tech Co., Ltd. (sealed)
</TEXT>
</DOCUMENT>

Exhibit 21.1

LDK SOLAR CO., LTD.

LIST OF SUBSIDIARIES

Wholly-Owned Subsidiaries

1.   Jiangxi LDK Solar Hi-Tech Co., Ltd., a PRC company; and

2.   LDK International Solar Co., Ltd., a Hong Kong Company.
</TEXT>
</DOCUMENT>

Exhibit 23.1

[KPMG LOGO]

| | | |
|---|---|---|
| KPMG | Telephone | +852 2522 6022 |
| 8th Floor | Fax | +852 2845 2588 |
| Prince's Building | Internet | www.kpmg.com.hk |
| 10 Chater Road | | |
| Central, Hong Kong | | |
| P O Box 50 | | |
| General Post Office | | |
| Hong Kong | | |

Consent of Independent Registered Public Accounting Firm

The Board of Directors
LDK Solar Co., Ltd.:

We consent to the use of our report dated February 14, 2007, except as to paragraphs 2 through 6 of note 25 which is as of May 11, 2007, with respect to the consolidated balance sheets of LDK Solar Co., Ltd. and its subsidiaries as of December 31, 2005 and 2006, and the related consolidated statements of operations, shareholders' equity and comprehensive (loss) income, and cash flows for the period from July 5, 2005 to December 31, 2005 and the year ended December 31, 2006, included herein and to the reference to our firm under the heading "Experts" in the registration statement.

/s/ KPMG
KPMG
Hong Kong, China

May 11, 2007

KPMG, a Hong Kong partnership, is the Hong Kong member firm of KPMG International, a Swiss cooperative.
</TEXT>
</DOCUMENT>

Exhibit 23.3

SALLMANNS (FAR EAST) LIMITED

May 11, 2007

LDK Solar Co., Ltd.
Hi-Tech Industrial Park
Xingyu City
Jiangxi Province 215128
People's Republic of China

Ladies and Gentlemen:

    We hereby consent to (i) the use of our name under the caption
"Management's Discussion and Analysis of Financial Condition and Results of
Operations" and the notes to the consolidated financial statements contained in
the registration statement on Form F-1, as may be amended from time to time,
being filed by LDK Solar Co., Ltd. with the United States Securities and
Exchange Commission in connection with the registration of its ordinary shares,
par value $0.10 each, under the United States Securities Act of 1933, as
amended, and (ii) the references to us under the caption "Experts" therein. We
further consent to the filing of this letter as an exhibit to such registration
statement, as may be amended from time to time.

    Our offices are located at 22nd Floor, Siu On Center, 188 Lockhart Road,
Wanchai, Hong Kong.

                              Very truly yours,


                              /s/ SALLMANNS (FAR EAST) LIMITED
</TEXT>
</DOCUMENT>

Exhibit 23.4

SHANGHAI ORIENT REAL ESTATE APPRAISAL CO., LTD.

May 11, 2007

LDK Solar Co., Ltd.
Hi-Tech Industrial Park
Xingyu City
Jiangxi Province 215128
People's Republic of China

Ladies and Gentlemen:

    We hereby consent to (i) the use of our name under the caption "Related
Party Transactions -- Land Use Rights" in the registration statement on
Form F-1, as may be amended from time to time, being filed by LDK Solar Co., Ltd.
with the United States Securities and Exchange Commission in connection with the
registration of its ordinary shares, par value $0.10 each, under the United
States Securities Act of 1933, as amended, and (ii) the references to us under
the caption "Experts" therein. We further consent to the filing of this letter
as an exhibit to such registration statement, as may be amended from time to
time.

    Our offices are located at 2nd Floor, 1279 Dingxi Road, Shanghai 200500,
People's Republic of China.

                    Very truly yours,


                    /seal/ SHANGHAI ORIENT REAL ESTATE APPRAISAL CO., LTD.

</TEXT>
</DOCUMENT>

```
                                                        Exhibit 23.5

                        (CHINESE GRAPHIC COMPANY LOGO)
                        Grandall Legal Group (Shanghai )


        31st Floor, Nanzheng Building, 580 Nanjing XiLu, Shanghai, China, 200041
                     /TEL.: (8621) 5234-1668 /FAX: (8621) 5234-1670
                           /E-mail: grandall@sh163a.sta.net.cn

--------------------------------------------------------------------------------
                                                        May 11, 2007


    LDK Solar Co., Ltd.
    Hi-Tech Industrial Park
    Xingyu City
    Jiangxi Province 215128
    People's Republic of China

    Ladies and Gentlemen:

        We hereby consent to (i) the use of our name under the captions "Prospectus
    Summary -- Our Corporate Structure," "Risk Factors -- Risks Relating to Our
    Company and Our Industry," "Risk Factors -- Risks Relating to Business
    Operations in China," "Management's Discussion and Analysis of Financial
    Condition and Results of Operations," "Business," "PRC Government Regulations"
    and "Enforceability of Civil Liabilities" in the registration statement on Form
    F-1, as may be amended from time to time, being filed by LDK Solar Co., Ltd.
    with the United States Securities and Exchange Commission in connection with the
    registration of its ordinary shares, par value $0.10 each, under the United
    States Securities Act of 1933, as amended, and (ii) the references to us under
    the caption "Experts" therein. We further consent to the filing of this letter
    as an exhibit to such Registration Statement, as may be amended from time to
    time.


        Our offices are located at 31st Floor, Nan Zheng Building, 580 West Nanjing
    Road, Shanghai 200041, People's Republic of China.

                            Very truly yours,


                            /seal/ Grandall Legal Group (Shanghai)

    </TEXT>
    </DOCUMENT>
```

Exhibit 99.1

CODE OF ETHICS OF
LDK SOLAR CO., LTD.

I.   INTRODUCTION

This Code of Ethics summarizes long-standing principles of conduct that our company, LDK Solar Co., Ltd. (the "Company"), follows to ensure our business is conducted with integrity and in compliance with the law. Because our company is incorporated in Cayman Islands with our American depositary shares ("ADSs") listed on the New York Stock Exchange, Inc. ("NYSE"), and because most of our operations are conducted in the People's Republic of China, we are subject to laws and ethical rules of all these jurisdictions. We expect our senior management including our Chief Executive Officer ("CEO"), Chief Financial Officer, President and Vice Presidents (collectively, the "Senior Officers") and all our financial and accounting managers (collectively, "Financial Managers") to know and follow the policies outlined in this Code of Ethics. Any Senior Officer and Financial Manager who violates the letter or spirit of these policies is subject to disciplinary action, up to and including termination.

Every Senior Officer and every Financial Manager has the responsibility to obey the law and act honestly and ethically. To that end, this Code of Ethics is a guide intended to sensitize each Senior Officer and each Financial Manager to significant legal and ethical issues that arise frequently and to the mechanisms available to report illegal or unethical conduct. It is not, however, a comprehensive document that addresses every legal or ethical issue that a Senior Officer or Financial Manager may confront, nor is it a summary of all laws and policies that apply to our business. This Code of Ethics is supplemental to other policies, manuals and internal regulations of our company applicable to all our employees, officers and directors. Ultimately, no code of ethics can replace the thoughtful behavior of an ethical officer.

If any Senior Officer or Financial Manager has any questions about this Code of Ethics or is concerned about conduct s/he believes violates this Code of Ethics, other policies of our company or any applicable law, rule or regulation, the Senior Officer or Financial Manager should consult with our CEO and Chairman of the Board and/or any member of the Audit Committee and the Corporate Governance and Nominating Committee of our Board of Directors. No one at the Company has the authority to make exceptions to these policies, other than our Board of Directors or a committee of our Board of Directors.

II.  COMPLIANCE WITH LAWS, RULES AND REGULATIONS

The Senior Officers and Financial Managers must comply fully with all applicable PRC, Cayman Islands and U.S. laws, rules and regulations that govern our business conduct, including, without limitation, securities laws, NYSE Listed Company Manual, environmental laws, insider trading laws and the U.S. Foreign Corrupt Practices Act.

III. PROHIBITION AGAINST INSIDER TRADING/INSIDER DEALING

Senior Officers or Financial Managers who have access to, or knowledge of, material nonpublic information from or about the Company are prohibited from buying, selling or otherwise trading in our stock or other securities of our company. "Material nonpublic" information includes any information, positive or negative, that has not yet been made available or disclosed to the public and that might be of significance to an investor, as part of the total mix of information, in deciding whether to buy or sell stock or other securities.

Such insiders also are prohibited from giving "tips" on material nonpublic information, that is, directly or indirectly disclosing such information to any other person, including family members, other relatives and friends, so that they may trade in our stock or other securities. Furthermore, if, during the course of service with the Company, any Senior Officer or Financial Manager acquires material nonpublic information about another company, such as one of our customers or suppliers or our affiliates, or you

learn that the Company is planning a major transaction with another company (such as an acquisition), the Senior Officer or Financial Manager is restricted from trading in the securities of the other company.

## IV.   CONFLICTS OF INTEREST

Business decisions must be made in the best interest of our company, not motivated by personal interest or gain. Therefore, as a matter of our company policy, all Senior Officers and Financial Managers must avoid any actual or perceived conflict of interest.

A "conflict of interest" occurs when an individual's personal interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of the Company. A conflict of interest situation can arise when an employee takes actions or has interests (financial or other) that may make it difficult to perform his or her company work objectively and effectively. Conflicts of interest also may arise when an employee or a member of his or her family receives improper personal benefits as a result of his or her position in the Company, regardless of whether such benefits are received from the Company or a third party. Loans to, or guarantees of obligations of, employees and their family members are of special concern. United States federal law currently prohibits the Company from making loans to directors and executive officers.

It is difficult to identify exhaustively what constitutes a conflict of interest. For this reason, the Senior Officers and Financial Managers must avoid any situation in which their independent business judgment might appear to be compromised. Questions about potential conflicts of interest situations, and disclosure of these situations as they arise, should be addressed and reported to our CEO and Chairman of the Board and/or any member of the Audit Committee and the Corporate Governance and Nominating Committee of our Board of Directors.

## V.   CORPORATE OPPORTUNITIES

All Senior Officers and Financial Managers are prohibited from: (a) taking for themselves personally opportunities that properly belong to our company or are discovered through the use of corporate property, information or position; (b) using corporate property, information or position for personal gain; and (c) competing with the Company. All Senior Officers and Financial Managers owe a duty to our company to advance its legitimate interests when the opportunity to do so arises.

## VI.   PROTECTION AND PROPER USE OF COMPANY ASSETS

All Senior Officers and Financial Managers must protect our company's assets and ensure their efficient use. Such assets include, without limitation, intellectual property such as our corporate name, logos, trademarks, patents, copyrights, confidential information, ideas, plans and strategies. Theft, carelessness and waste have a direct impact on our profitability. Any misuse or infringement of our company assets should be reported to our CEO and Chairman of the Board and/or any member of the Audit Committee and the Corporate Governance and Nominating Committee of our Board of Directors.

## VII. PUBLIC COMPANY REPORTING

As a result of our status as a public company in the United States, we are required to file periodic and other reports with the U.S. Securities and Exchange Commission. The Company takes its public disclosure responsibility seriously. To that end in respect of the various disclosure and reporting obligations to which our company is from time to time subject in the United States:

A.   each Senior Officer and each Financial Manager must take all reasonable steps to ensure that these reports and other public communications furnish the marketplace with full, fair, accurate, timely and understandable disclosure regarding the financial and business condition of our company;

B.   each Senior Officer and each Financial Manager must promptly bring to the attention of CEO and Chairman of the Board and/or any member of the Audit Committee of our Board of Directors any

2

material information of which such Senior Officer or Financial Manager may become aware that affects the disclosures made by our company in its public filings or otherwise would assist the Audit Committee of our Board of Directors in fulfilling its responsibilities as specified in applicable securities laws and regulations; and

C.    each Senior Officer and each Financial Manager must promptly bring to the attention of our CEO and Chairman of the Board and/or any member of the Audit Committee and the Corporate Governance and Nominating Committee of our Board of Directors any information he or she may have concerning (i) significant deficiencies in the design or operation of internal controls that could adversely affect our company's ability to record, process, summarize and report financial data or (ii) any fraud, whether or not material, involving management or other employees who have a significant role in our company's financial reporting, disclosures or internal controls.

## VIII. REPORTING ILLEGAL OR UNETHICAL BEHAVIOR

Each Senior Officer and each Financial Manager has a duty to adhere to this Code of Ethics. Each Senior Officer and each Financial Manager must also promptly bring to the attention of our CEO and Chairman of the Board and/or any member of the Audit Committee and the Corporate Governance and Nominating Committee of our Board of Directors any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or of a violation of this Code of Ethics, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in our company's financial reporting, disclosures or internal controls. Confidentiality will be maintained to the fullest extent possible.

A Senior Officer or Financial Manager will not be penalized for making a good-faith report of violations of this Code of Ethics or other illegal or unethical conduct, nor will we tolerate retaliation of any kind against anyone who makes a good-faith report. A Senior Officer or Financial Manager who submits a false report of a violation, however, will be subject to disciplinary action. If you report a violation and in some way also are involved in the violation, the fact that you stepped forward will be considered.

If the result of an investigation indicates that corrective action is required, our Board of Directors will decide, or designate appropriate persons to decide, what actions to take, including, when appropriate, legal proceedings and disciplinary action up to and including termination, to rectify the problem and avoid the likelihood of its recurrence.

## IX.    RELATIONSHIP TO COMPANY MANUAL

This Code of Ethics supplements the existing policies and procedures already in place as stated in other company manuals and communicated to our employees, officers and directors. Certain policies referred to in this Code of Ethics are contained in their entirety in the other company manuals. The company manuals contain information that is proprietary and confidential, and the Company hereby expressly denies waiving any right to assert claims that the contents of such company manuals are proprietary and/or confidential.

This Code of Ethics and other company manuals are statements of goals and expectations for individual and business conduct. They are not intended to, and do not in any way constitute, an employment contract or an assurance of continued employment. The Company does not create any contractual rights by issuing this Code of Ethics or any company manual.

## X.    AMENDMENT, MODIFICATION AND WAIVER

This Code of Ethics may be amended, modified or waived by our Board of Directors. Any change to, or waiver (whether explicit or implicit) of, this Code of Ethics must be disclosed to our stockholders either

3

Source: LDK Solar Co., Ltd., F-1, May 11, 2007

by including a statement in our annual report on Form 20-F filed with the U.S. Securities and Exchange Commission or by publishing a statement on our internet website, www.ldksolar.com.

XI.   ACKNOWLEDGMENT

Each Senior Officer and each Financial Manager is accountable for knowing and abiding by the policies contained in this Code of Ethics. The Company may require that the Senior Officers and Financial Managers sign an acknowledgment confirming that they have received and read this Code of Ethics, understand them and are complying with them.

4

</TEXT>
</DOCUMENT>

_____
Created by 10KWizard    www.10KWizard.com

Source: LDK Solar Co., Ltd., F-1, May 11, 2007