1    Cohen, Milstein, Hausfeld & Toll P.L.L.C.
     Steven J. Toll
2    Mark S. Willis
     Matthew B. Kaplan
3    stoll@cmht.com
     1100 New York Avenue, N.W.
4    Suite 500, West Tower
     Washington, DC 20005
5    Telephone:      (202) 408-4600
     Facsimile:      (202) 408-4699
6
     Cohen, Milstein, Hausfeld & Toll P.L.L.C.
7    Michael Lehmann
     mlehmann@cmht.com
8    One Embarcadero Center
     Suite 526
9    San Francisco, CA 94111
     Telephone:      (415) 623-2048
10   Facsimile:      (415) 433-5994

11   Lead Counsel for the Proposed Class

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14

15   In re LDK Solar Securities Litigation        Master File No. C-07-05182-WHA

16
                                                  OPPOSITION TO DEFENDANTS' MOTION
17   This Document Relates To:                    TO DISMISS PLAINTIFF'S
                                                  CONSOLIDATED CLASS ACTION
18   All Actions                                  COMPLAINT

19                                                Judge:      Hon. William H. Alsup
                                                  Date:       May 15, 2008
20                                                Time:       8:00 a.m.
                                                  Courtroom:  9, 19th Floor
21

22

23

24

25

26

27

28

COHEN, MILSTEIN,
HAUSFELD & TOLL
    P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—
Master File No. C-07-05182-WHA
IMANAGE 368969.1 73920001

1

## TABLE OF CONTENTS

2

I.    STATEMENT OF ISSUES TO BE DECIDED ..................................................................1
II.   PRELIMINARY STATEMENT ......................................................................................1
III.  STATEMENT OF FACTS ...............................................................................................4
      A.   Nature Of This Litigation ........................................................................................4
      B.   LDK And Its Accounting Practices .........................................................................5
      C.   The Market Learns The Truth About LDK ..............................................................8
IV.   ARGUMENT .....................................................................................................................8
      A.   Tellabs Established A Common Sense Standard for Pleading Scienter .....................9
      B.   Defendants Knowingly Made False Statements ......................................................10
            1.   Situ's Statements Are Highly Credible And Provide A Strong Factual Basis For
                 Plaintiff's Allegations Of Falsity ...................................................................11
            2.   Situ's Charges Are Corroborated By Other Sources ........................................14
            3.   The Complaint's Allegations Of Falsity Support The Inference That Defendants
                 Acted With Scienter .......................................................................................16
      C.   Defendants Were Warned That Their Statements Were False And Violated
            GAAP .....................................................................................................................17
      D.   Defendants Had Compelling Motives To Commit Fraud .........................................18
      E.   The Defendants Have Not Been Exonorated By Any Subsequent Findings .............20
            1.   Neither The SEC Nor Analysts Cleared Defendants .......................................20
            2.   No Reliable, Independent Investigation Cleared Defendants ...........................21
      F.   The Safe Harbor Does Not Protect Defendants ......................................................23
      G.   Plaintiffs Have Adequately Pled Loss Causation ....................................................24
      H.   Plaintiffs Have Adequately Pled A Section 20(A) Claim ........................................25
V.    CONCLUSION ...............................................................................................................25

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA          i
IMANAGE 368969.1 73920001

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**CASES**

4

*Aldridge v. A.T. Cross Corp.,*
    284 F.3d 72 (1st Cir. 2002) .......................................................................... 21, 22

5

6

*Atlas v. Accredited Home Lenders Holding Co.,*
    No. 07-CV-488, 2008 WL 80949 (S.D. Cal. Jan. 4, 2008)...................................... 25

7

*Communications Workers of Am. Plan For Employees' Pensions And Death Benefits v.*
    *CSK Auto Corp.,*
    525 F. Supp. 2d 1116 (D. Ariz. 2007)............................................................. 9, 17

8

9

*Eminence Capital, LLC v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003)........................................................................... 25

10

11

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005) ......................................................................................... 24

12

13

*Feiner v. SS & C Tech.,*
    11 F. Supp. 2d 204 (D. Conn. 1998) .................................................................. 22

14

*Howard v. Everex Sys. Inc.,*
    228 F.3d 1057 (9th Cir. 2000)........................................................................... 25

15

16

*In re Daou Systems, Inc. Sec. Litig.,*
    411 F. 3d 1006 (9th Cir. 2005)................................................................... passim

17

18

*In re Elec. Arts Inc. Sec. Litig.,*
    No. C-05-1219, 2006 U.S. Dist. LEXIS 1399 (N.D. Cal. Jan. 5, 2006) ................. 24

19

20

*In re Juniper Networks, Inc. Sec. Litig.,*
    —F. Supp. 2d—, 2008 WL 938445 (N.D. Cal. March 31, 2008).......................... 25

21

22

*In re Levi Strauss & Co. Sec. Litig.,*
    527 F. Supp. 2d 965 (N.D. Cal. 2007) ............................................................... 12

23

*In re Network Associates, Inc., Sec. Litig.,*
    No. C 99-01729, 2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) .......................... 19

24

25

*In re Northpoint Communications Group, Inc., Sec. Litig.,*
    221 F. Supp. 2d 1090 (N.D. Cal. 2002) (Alsup, J.)............................................. 17

26

*In re SeeBeyond Techs. Corp. Secs. Litig.,*
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ............................................................. 18

27

28

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
  No. C-05-0295, 2007 U.S. Dist. LEXIS 21953 (N.D. Cal. Mar. 9, 2007)............... 10, 13, 14

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
  927 F. Supp. 1297 (C.D. Cal. 1996)..................................................................... 22

*Mississippi Public Employees' Retirement Sys. v. Boston Scientific Corp.*,
  No. 07-1794, —F.3d—, 2008 WL 1735390 (1st Cir. Apr. 16, 2008) ........................ 10, 25

*Montoya v. Mamma.Com, Inc.*,
  No. 05 Civ. 2313, 2006 U.S. Dist. LEXIS 13207 (S.D.N.Y. March 28, 2006) ................. 18

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003)............................................................ 10, 19, 23, 24

*Peterson v. Sheran*,
  635 F.2d 1335 (8th Cir. 1980)................................................................................ 5

*Phillips v. Scientific-Atlanta, Inc.*,
  374 F.3d 1015 (11th Cir. 2004)............................................................................... 9

*Rosenbaum Capital, LLC v. McNulty*,
  No. 07-03922008 WL 619001 (N.D. Cal. Mar. 4, 2008)............................................ 9


**STATUTES**

15 U.S.C. § 78u-4.......................................................................................... 1, 9, 10

15 U.S.C. § 78u–5 (e) ........................................................................................ 24

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA          iii
IMANAGE 368969.1 73920001

I.      **STATEMENT OF ISSUES TO BE DECIDED**

Whether, in this securities class action against LDK Solar Co., Ltd. ("LDK" or the "Company"), a Chinese-based manufacturer of solar wafers, and certain of its officers and subsidiaries, the Court should grant Defendants' Motion to Dismiss the Consolidated Class Action Complaint because of the Complaint's supposed failure to meet the heightened pleading standard established by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.

II.     **PRELIMINARY STATEMENT**

The Complaint's allegations are quite straightforward.  As a new Company in a capital-intensive industry, LDK desperately needed to convince investors to provide it with hundreds of millions of dollars if it was to survive and expand.  To attract this capital Defendants materially overstated the quantity and value of their feedstock inventory, falsely making it appear as if LDK was a highly efficient, resource-rich wafer producer.  Investors believed the story and their exuberance helped inflate the price of LDK's securities, vastly increasing the wealth of the Individual Defendants, most substantially Defendant Peng, who became a billionaire several times over with his seventy percent ownership interest.

Defendants attack the Complaint largely on three points.  First, they question the credibility of Charley Situ, LDK's former financial controller.  Their motion paints him as a highly disgruntled employee with an ax to grind and who was not in a position to know what he was talking about.  Because they claim his statements cannot be relied upon, and because they claim he is the sole source for the Complaint's allegations, they conclude that Plaintiff's charges effectively fall apart.  The premise for this conclusion is simply unsupportable.

Situ is a credible source.  He was hired by LDK because of his background in GAAP, including experience at another publicly-traded company.  The Defendants knew and understood his expertise.  The evidence suggests that Situ had no ax to grind, but instead sought to alert the Company to the very real problems he saw with respect to LDK's accounting methodology.  Like any good controller, he wanted to make sure he could substantiate the numbers; when he couldn't, he asked questions to find out why.  When Situ finally resigned (which Defendants characterize

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master File No. C-07-05182-WHA    - 1 -
IMANAGE 368969.1 73920001

1  as termination for cause) he had been raising his concerns about the Company's inventory

2  problems for months.  The chronology of events paints Situ not as an employee with an ax to

3  grind, but as an employee who was the subject of a retaliatory dismissal *because* he felt duty

4  bound to do his job.

5      Defendants repeatedly but wrongly insist that Plaintiff's allegations are derived "solely"

6  from information provided by Situ.  (Mem. at 1, 7, 12, 18.)[1]  There is no question that Situ is the

7  key source for the Complaint's core allegations.  But Situ was not alone.  For example, a

8  knowledgeable source confirmed to <u>Barron's</u> that much of LDK's raw material inventory was of

9  very poor quality. (¶¶ 67, 80.)[2]  And, after Situ's allegations became public, LDK itself

10 acknowledged for the first time that because of quality problems much of its inventory was

11 unusable within the current year. (¶¶ 57-60.)  In addition, securities analysts who followed the

12 Company independently came to the conclusion that there were serious problems with the

13 Company's accounting. (¶ 59.)

14     Defendants also falsely contend that Situ "admits" he is unqualified to evaluate the

15 accuracy of LDK's inventory accounting.  (Mem. at 1.)  For support, they cite to language in the

16 Complaint that describes Situ's extensive qualifications as an accountant and infer that the wafer

17 production process is so complicated no accountant could understand it.  (Mem. at 9.)  In fact, the

18 Complaint explains that far from admitting he was unqualified to determine the amount and the

19 quality of LDK's inventory, Situ worked with warehouse personnel to conduct an accurate

20 inventory, noting that he himself double-checked and reconfirmed some of the critical data.  (¶¶

21 37-40.)  He also attended a July 19, 2007 high level meeting at which LDK's Chief Engineer and

22 its plant manager complained that they could not rely on the Company's inventory numbers

23 because they were "just paper number[s]" and that much of the inventory on LDK's books was

24 unusable or simply did not exist.  (¶ 39.)  Situ says that these two individuals, who were

25 unquestionably in a position to understand LDK's manufacturing operations, noted that despite a

26

27 [1] References to Defendants' Memorandum of Points and Authorities (Apr. 7, 2008) are cited
   herein as "(Mem. at ____.)".

28 [2] References to the Complaint are cited herein as "(¶ __.)".

Cohen, Milstein,
Hausfeld & Toll
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA        - 2 -
IMANAGE 368969.1 73920001

1  supposed abundance of feedstock inventory, they often had to delay production to wait for the

2  purchase of usable feedstock.  (¶ 39.)

3      Similarly inaccurate is Defendants' claim that Situ's charges cannot be relied upon

4  because he also "admits" he only verified part of LDK's inventory.  (Mem. at 1.)  Nothing in the

5  Complaint, or in the documents for which Defendants say the Court should take judicial notice,

6  even remotely suggest such an admission.  The fact that Situ discussed in detail the inventory in

7  the Company's main raw materials warehouse is not an admission that he ignored inventory

8  elsewhere, especially since the Complaint explicitly indicates that Situ **did** take into account

9  inventory in other locations.  (¶ 40.)

10      Defendants' second line of attack is to seek exoneration for engaging in securities fraud

11  by pointing to what they claim are independent investigations that cleared them of any

12  wrongdoing.  This nonsense is best illustrated by Defendants' contention regarding the Securities

13  and Exchange Commission ("SEC") inquiry.[3]  Defendants wrongly claim that a recent letter

14  advising LDK that the SEC's staff would not recommend enforcement action against the

15  Company indicates that the SEC "[d]isagreed [w]ith Situ."  (Mem. at 12.)  What Defendants have

16  conveniently excluded is the accompanying language of Securities Act Release No. 5310, which

17  states that a decision by the SEC not to recommend enforcement "***must in no way be construed***

18  ***as indicating that the party has been exonerated*** or that no action may ultimately result from the

19  staff's investigation.…  ***The attempted use of such a communication as a purported defense in***

20  ***any action … brought against the party … would be clearly inappropriate and improper*** since

21  such a communication, at the most, can mean that, as of its date, the staff … does not regard

22  enforcement action as called for based upon whatever information it then has."

23      None of the other supposed investigations cited by the Defendants exonerate them.  For

24  example, LDK's outside auditors did not express any opinion on the accuracy of ***any*** of the

25  statements the Complaint alleges to be false, including LDK's quarterly results for 2007, despite

26

27  _____
   [3] Defendants' request that the Court consider the supposed findings of these investigations is also
28  an improper effort to put their own version of the facts on the record in a motion to dismiss.  *See*
   Plaintiff's Opposition To Defendants' Request For Judicial Notice, filed with this Opposition.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA        - 3 -
IMANAGE 368969.1 73920001

1  Defendants' unsourced assertions to the contrary. (Mem. at 2.) And LDK's claim that an

2  investigation by the Company's audit committee was "independent" when the committee

3  included not only directors selected by Defendant Peng, but Peng himself (Mem. at 6) is facially

4  preposterous. The Defendants put much weight on the fact that the Simpson Thatcher firm

5  assisted the audit committee in its "independent" investigation. Yet, it appears that the law firm

6  was also LDK's counsel with respect to the SEC investigation. If so, this hardly makes Simpson

7  Thatcher a truly independent voice in the matter.

8      Defendants' final core argument is to repeatedly claim that the failure of key LDK officers

9  to sell "*a single share* of LDK stock" indicates that they lacked scienter (Mem. at 20) (emphasis

10  in original). This is extraordinarily misleading. During the Class Period, *Defendants were barred*

11  *from selling stock* as the result of a temporary "lock up" provision of LDK's June 2007 Initial

12  Public Offering ("IPO"). (¶ 84.) The fact that certain of the defendants lost billions of dollars

13  when investors learned of the allegations of improper inventory accounting doesn't diminish

14  scienter. They may have hoped to cash in on their misconduct once the "lock up" period ended,

15  but Situ's decision to expose the fraud made that impossible.

16      In sum, Defendants have sought to snip away at the edges—attacking character and

17  qualifications—while trying to find exoneration in post-disclosure findings of supposedly

18  "independent" bodies and the SEC. They have not been able to legitimately undermine Mr. Situ's

19  credibility, nor have they explained why the Complaint's detailed allegations fail to satisfy the

20  PSLRA's pleading standard. Consequently, their motion to dismiss should be denied.

21  **III.    STATEMENT OF FACTS**

22      **A.    *Nature Of This Litigation***

23      This consolidated lawsuit, brought on behalf of a proposed Class of persons who

24  purchased LDK securities from June 1, 2007 through October 7, 2007, alleges that Defendants

25  defrauded members of the Class in violation of the federal securities laws. The moving

26  Defendants (generally referred to herein as "Defendants") are LDK, a Chinese company traded on

27  the New York Stock Exchange and incorporated in the Cayman Islands; LDK Solar USA, Inc., a

28  subsidiary of LDK; Xiaofeng Peng, LDK's Chief Executive Officer ("CEO"); and Jack Lai,

Cohen, Milstein,
Hausfeld & Toll
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA          - 4 -
IMANAGE 368969.1 73920001

1    LDK's Chief Financial Officer ("CFO").[4]

2        **B.    *LDK And Its Accounting Practices***

3        At the beginning of the Class Period LDK was less than two years old and had been

4    selling its principal product, multicrystalline solar wafers, a key component in solar cells, for little

5    more than a year. (¶ 22.) Defendant Peng, LDK's CEO and majority owner, had no experience

6    in the business, the Company's financial resources were limited and it was competing against

7    long-established and well-funded competitors. (¶¶ 25-26.) Nevertheless, LDK announced that it

8    intended to become the world's "largest, lowest cost producer" in the multi-billion dollar solar

9    wafer market. (¶ 27.) This ambitious goal reflected the reality that, given the economics of this

10   commodity industry, which put a premium on low production costs and the economies of scale

11   necessary to achieve them, LDK's prospects were dim unless it could quickly become a major

12   wafer producer. (¶ 43.) But to expand in this capital-intensive industry it needed to convince

13   investors and lenders—individuals and entities understandably wary of the viability this new,

14   untested enterprise—to provide it with hundreds of millions of dollars in capital. (¶¶ 27-28.)

15       Polysilicon is the principal input for wafer manufacturing. (¶ 23.) Manufacturers, such as

16   LDK, obtain polysilicon from high quality raw silicon and by extracting, to the extent possible,

17   polysilicon from scrap materials, including scraps left over from the manufacture of

18   semiconductors. (¶ 23.) Although scrap can be purchased at much lower prices than raw

19   polysilicon, recycled materials often have impurities that make them difficult or impossible to

20   use. (¶ 23.) Consequently, LDK had a large team of inspectors who reviewed polysilicon scrap

21

22   ─────────────
     [4] Six other defendants are also named in the Complaint: Jiangxi LDK Solar; Xingxue Tong;
23   Qiqiang Yao; Liangbao Zhu; Yonggang Shao; and Gang Wang. These defendants are senior
     officers of LDK and a subsidiary of LDK. None have joined the motion to dismiss. They have
24   not yet been served because counsel for Defendants has not yet agreed to accept service on their
     behalf (or even clarify which, if any, of the unserved defendants they actually represent) and
25   because of the difficulty of executing service in China. (Plaintiff was able to serve Defendants
     Peng and Lai in California.) Although service should normally occur within 120 days from the
26   filing of a complaint, this time limit "does not apply to service in a foreign country." Fed. R. Civ.
     P. 4(m); s*ee also Peterson v. Sheran*, 635 F.2d 1335, 1337 (8th Cir. 1980). The moving
27   Defendants claim (Mem. at 17) that the Complaint does not allege that all of the unserved
     Individual Defendants made false statements. This is inaccurate. *See, e.g.*, (¶¶ 14, 16-19, 85-95.)
28   In any event, while this Opposition is directed to the moving Defendants, it is equally applicable
     to the defendants who have not yet been served.

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA          - 5 -
IMANAGE 368969.1 73920001

1    as it arrived at LDK's facility, sorting out materials too contaminated to be used.  (¶ 23.)

2         Under Generally Accepted Accounting Principles ("GAAP"), which LDK claimed to

3    adhere to, a company must account for its inventory at the lower of cost or "market" value.  (¶

4    51.)  Initially LDK recorded the raw material inventory in its books at the cost it paid to acquire

5    it.  (¶¶ 51-53.)  However, once LDK employees had sorted through the scrap materials purchased

6    and received by LDK and determined that particular items of scrap were unusable or would be

7    difficult to use, unambiguous GAAP rules required the Company to reduce the book value of its

8    inventory to reflect the "market" value of these items—the net amount, if any, that LDK could

9    receive if it sold these materials, taking into account the costs of selling.  (¶¶ 51-52.)  GAAP also

10   precluded LDK from including in its reported stock of current inventory materials that did not

11   exist and materials that it had determined were unusable or not usable during the current year.  (¶

12   51.)

13        LDK did not comply with these GAAP requirements.  (¶ 52.)  In its public disclosures the

14   Company valued materials it knew to be worthless or nearly so at "cost" rather than "market"

15   value.  (¶¶ 46, 52-53.)  LDK also counted as inventory materials that simply did not exist and

16   materials the Company had determined could not be used during the current year.  (¶ 37.)  For

17   example, in August 2007 CEO Peng publicly claimed that there was "a little bit over 600 tons" of

18   polysilicon feedstock "at the warehouse," but according to a physical inventory the actual amount

19   was 330 tons, only 45 tons of which was usable high-quality polysilicon.  (¶¶ 32, 37.)

20        LDK's improper accounting for its raw material inventory distorted the Company's

21   financial statements in two separate ways.  First, the total value of the inventory that LDK carried

22   on its balance sheet was substantially overstated.  Second, the apparent cost of each ton of

23   polysilicon used to produce wafers was understated, causing LDK's publicly reported cost of

24   production to be dramatically understated.  (¶¶ 5-6.)

25        The overstated value of LDK's inventory was the result of Defendants' failure to write

26   down poor quality scrap materials to its market value and LDK's inclusion on its books as current

27   inventory materials that did not exist as well as materials that could not be used within one year.

28   Consequently, because LDK's inventory was one of the most important assets on the Company's

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA                - 6 -
IMANAGE 368969.1 73920001

1  balance sheet, LDK's assets and the Company's overall apparent value were substantially

2  overstated. (¶ 41.)[5] LDK's supposedly ample inventories—its reported polysilicon inventories

3  were as much as 400% more than actual inventories—reassured investors that, despite a

4  worldwide shortage of polysilicon, LDK would not have to reduce production because of a lack

5  of feedstock.[6] (¶¶ 5, 32-33.)

6  More indirectly, but perhaps even more importantly, LDK's inventory accounting made

7  the Company appear to be far more profitable than was actually the case. LDK used the

8  "weighted average method" of inventory accounting. (¶ 42.) Under this method, LDK

9  effectively divided the total amount it actually paid to acquire its polysilicon inventory by the

10  total number of tons of polysilicon feedstock in that inventory to come up with an average price

11  paid to acquire each ton of feedstock. (¶¶ 43-44, 101-03.) In calculating LDK's cost of

12  production (cost of goods sold) this average price paid per ton was treated as the cost paid to

13  acquire each ton of feedstock used in production, whether a ton of scrap or a ton of raw

14  polysilicon. (¶ 42.)

15  Such weighted average accounting is permissible—provided that the raw material counted

16  as inventory actually exist and are usable within the current period, usually one year. (¶¶ 6, 42).

17  But, during the Class Period, LDK was counting as current inventory materials that did not exist

18  and poor quality scrap that could not be used in a year and likely could not be used ever. (¶¶ 46,

19  50.) This unusable scrap piled up in LDK's warehouse while higher quality and more expensive

20  polysilicon feedstock was used in production. *See* (¶ 46.) But because LDK continued to factor

21  in cheap but unusable or nonexistent polysilicon when calculating the per ton cost of acquiring its

22  feedstock, each ton of polysilicon used in production appeared to have cost LDK much less than

23  was actually the case. (¶ 46.) Because the apparent cost of the primary input for wafer

---

[5] Defendants are wrong when they say the Complaint alleges that LDK's purchases of silicon
scrap were "sham transactions" or that Plaintiff contends that all of LDK's scrap polysilicon
inventory suddenly "becomes worthless merely because LDK possesses it." (Mem. at 14-15 &
n.14.) The Complaint makes no such allegations.

[6] Even if true, LDK's unsupported assertion that scrap prices were rising during the Class Period
is irrelevant. (Mem. at 14.) As LDK itself acknowledged, GAAP requires that inventory be
valued at the *lower* of its cost or its "market" value. (¶¶ 51, 52.) Insiders cannot increase the
book value of inventory to reflect a supposed increase in its market price.

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA         - 7 -
IMANAGE 368969.1 73920001

1  production—polysilicon accounted for roughly 80% of LDK's wafer production costs—had been

2  artificially reduced, LDK's production costs appeared to be much lower than was actually the

3  case and, consequently, its profits were artificially inflated. (¶ 46.)

4        *C.*      ***The Market Learns The Truth About LDK***

5        On October 3, 2007, Piper Jaffray published a research note reporting that "the LDK

6  financial controller recently left the company," and that, although the Company denied the

7  allegations, the controller asserted that LDK had poor internal controls and inaccurate inventory

8  accounting.  (¶ 78.)  On this unexpected disclosure LDK's stock dropped 24.4% in a single day.

9  (¶ 79.)  On October 8, 2007 an article in <u>Barron's</u>, one of the country's most respected business

10  publications, described the irregularities at LDK in much greater detail, noting that the Company

11  might have overstated its inventory by up to $92 million.  (¶ 80.)  Much of the information in the

12  article came from Situ, but <u>Barron's</u> also cited a second source who confirmed that LDK had

13  serious problems with the quality of the polysilicon in its inventory, an allegation consistent with

14  Situ's assertion that much of the Company's feedstock was of very poor quality and effectively

15  unusable.  (¶ 80.)  LDK's stock dropped 26.4% on the day this article was published.  ¶81.  At the

16  close of trading on October 8, 2007 the price of LDK stock had declined more than 45% since the

17  day before the October 3 disclosure.  (¶ 81.)

18  **IV.**    <u>**ARGUMENT**</u>

19        Defendants insist that the Complaint fails to adequately plead their false statements and to

20  demonstrate scienter.  Yet, simply repeating the terms "bald assertions" and "rank speculation" to

21  underscore this contention isn't enough to justify dismissal.  In the Ninth Circuit a defendant acts

22  with scienter when he makes a "false or misleading statements either intentionally or with

23  deliberate recklessness."  *In re Daou Systems, Inc. Sec. Litig.*, 411 F. 3d 1006, 1022 (9th Cir.

24  2005).  The Complaint contains specific detailed facts from multiple sources which indicate that

25  Defendants made false statements, that Defendants were told their statements were false prior to

26  making them and that Defendants stood to gain billions of dollars from their false statements.

27  Taken collectively, the allegations in the Complaint provide overwhelming support for the

28  inference that Defendants acted with scienter.  Moreover, Defendants' half-hearted arguments

COHEN, MILSTEIN, HAUSFELD & TOLL P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master File No. C-07-05182-WHA    - 8 -
IMANAGE 368969.1 73920001

1    that some of their statements are protected by the safe harbor doctrine and that the Complaint fails

2    to plead loss causation are similarly meritless.

3           ***A.       Tellabs Established A Common Sense Standard For Pleading Scienter***

4           The PSLRA provides that in order to survive a motion to dismiss a plaintiff alleging

5    securities fraud must plead facts which create a "strong inference" that the defendants acted with

6    scienter.  15 U.S.C. § 78u–4(b)(2).

7           In *Tellabs* the Supreme Court held that a flexible, common-sense standard applies when

8    determining whether the PSLRA's pleading requirement has been met.  In determining whether a

9    complaint meets this standard, "courts must, as with any motion to dismiss for failure to plead a

10   claim on which relief can be granted, accept all factual allegations in the complaint as true."

11   *Tellabs*, 127 S. Ct. at 2509.  They are then to consider "whether ***all*** of the facts alleged, taken

12   collectively, give rise to a strong inference of scienter, not whether any individual allegation,

13   scrutinized in isolation, meets that standard." *Id.* (emphasis in original).  The "totality" of the

14   allegations in a complaint may adequately establish scienter even where individual allegations

15   "considered separately" do not.  *Daou*, 411 F. 3d at 1024 (quoting *Nursing Home*, 380 F.3d at

16   1234); s*ee also Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004)

17   ("[i]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation

18   prove it.") (quoting *Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987)).

19          In deciding whether scienter has been properly pled, courts are to draw reasonable

20   inferences from the facts alleged, whether they favor the plaintiff or the defendant.  *Tellabs*, 127

21   S. Ct. at 2510.  Ultimately, "[t]he inquiry is inherently comparative: How likely is it that one

22   conclusion, as compared to others, follows from the underlying facts?"  *Id.*  Plaintiffs meet their

23   burden, and the required "strong inference" is established, "if a reasonable person would deem

24   the inference of scienter cogent and at least as compelling as any opposing inference one could

25   draw from the facts alleged."[7]  *Tellabs*, 127 S. Ct. at 2510; *see also Communications Workers of*

26    

---

27   [7] Post-*Tellabs* cases have recognized that plaintiffs meet their burden if they plead any set of facts that create an inference of intentional or extremely reckless conduct that is as least as strong as an

28   inference of non-fraudulent conduct.  For example, in *Rosenbaum Capital, LLC v. McNulty*, No. 07-03922008 WL 619001, at *5, *7 (N.D. Cal. Mar. 4, 2008) a judge of this court found that the

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA    - 9 -
IMANAGE 368969.1 73920001

1     *Am. Plan For Employees' Pensions And Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d

2     1116, 1120 (D. Ariz. 2007) (under *Tellabs* "a tie goes to the Plaintiff").

3        The Ninth Circuit has emphasized that, because "dishonest insiders may be able to cover

4     their tracks fairly well," "the welfare of victimized investors and the integrity of the stock market

5     may be insufficiently protected" "[u]nless reasonable inferences from circumstances suffice to get

6     a case to a jury." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West*

7     *Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003) (quoting *Ranconi v. Larkin*, 253 F.3d 423, 429

8     (9th Cir. 2001). In a recent case applying *Tellabs*, the First Circuit articulated a similar view,

9     explaining that "in determining the adequacy of a complaint" courts "cannot hold plaintiffs to a

10    standard that would effectively require them, pre-discovery, to plead evidence." *Mississippi*

11    *Public Employees' Retirement Sys. v. Boston Scientific Corp.*, No. 07-1794, —F.3d—, 2008 WL

12    1735390, at *12 (1st Cir. Apr. 16, 2008) (quotations omitted).

13        Securities plaintiffs must identify specific false statements and explain why they are false.

14    15 U.S.C. § 78u–4(b)(1). Although Defendants discuss falsity and scienter separately, the Ninth

15    Circuit has explained that, because "falsity and scienter in private securities fraud cases are

16    generally strongly inferred from the same set of facts…the two requirements may be combined

17    into a unitary inquiry under the PSLRA." *Daou*, 411 F.3d at 1015 (internal quotations omitted);

18    *see also In re Silicon Storage Tech., Inc., Sec. Litig.*, No. C-05-0295, 2007 U.S. Dist. LEXIS

19    21953, at *66 (N.D. Cal. Mar. 9, 2007) (often appropriate to treat PSLRA's falsity and scienter

20    pleading requirements as "a single inquiry").

21       **B.**     ***Defendants Knowingly Made False Statements***

22        The Complaint is not complicated. It sets forth a compelling, straightforward set of facts

23    that overwhelmingly support an inference that Defendants' made material false statements about

24

25    allegation "that Defendants knew of the problems" in integrating with another company, "yet still
     stated, in [a] press release, that the integration was going well …. sufficiently pleaded violations
26    of the Securities Exchange Act," rejecting the argument that the plaintiffs needed to plead
     additional "particularized allegations of fact." *See also In re Juniper Networks, Inc. Sec. Litig.*,
27    —F. Supp. 2d—, 2008 WL 938445 (N.D. Cal. Mar. 31, 2008) (although plaintiffs were
     apparently able to plead only limited facts suggestive of scienter, these facts were sufficient to
28    meet the *Tellabs* standard).

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA     - 10 -
IMANAGE 368969.1 73920001

1  LDK's inventory.   The most important of these facts were provided by a well-placed, reliable

2  source:  Charlie Situ, the Company's former financial controller.  Situ had direct, personal

3  knowledge of the Company's inventory accounting and its actual inventory.  But Situ's charges

4  are not the sole source of the Complaint's allegations—his information is corroborated by other

5  sources.  Given the extraordinary degree to which these statements were false and the centrality

6  of inventory issues to LDK's business it is virtually inconceivable that Defendants were ignorant

7  of the falsity of these statements when they made them..

8         1.  <u>Situ's Statements Are Highly Credible And Provide A Strong Factual Basis
         For Plaintiff's Allegations Of Falsity</u>

9

10      Situ charges that LDK's inventory accounting was false and explains how he verified this,

11  including by physically examining LDK's inventory and comparing it to the inventory carried on

12  LDK's accounting records.  Defendants respond by calling Situ's statements speculative.  They

13  wrongly claim he not only lacked the necessary expertise regarding LDK's inventory, but that he

14  supposedly admitted this.  It is not surprising that Defendants go after Situ so aggressively.  If his

15  charge that much of LDK's claimed inventory during the Class Period either did not exist or was

16  unusable, and therefore that LDK's accounting treatment of its inventory was false, Defendants'

17  public statements and LDK's financial statements cannot be squared with reality.

18      Situ is a CPA who had worked at another publicly traded company before coming to

19  LDK.  (¶ 35.)  LDK hired him as a GAAP expert, under pressure from its external auditors who

20  were concerned that existing LDK employees could not effectively apply GAAP accounting

21  rules.  (¶¶ 69-70.)  Situ dealt directly with LDK's top management, including CEO Peng, CFO

22  Lai and Chief Accounting Officer Yao.  (¶ 38.)  He had nothing to gain and much to lose by

23  making his allegations of wrongdoing.  Defendants insist, without explanation or citation, that

24  Situ is a disgruntled employee (Mem. at 1), yet they do not suggest that Situ had any motive to

25  make false charges of wrongdoing.  Situ could have kept quiet and kept his job.  When he chose

26  to speak out, Situ knew he would greatly reduced his prospects for finding employment elsewhere

27  and that he would be subjected (as he was) to repeated public attacks on his character.[8]  (¶ 67.)

28  _____
[8] Defendants say that Situ was fired, but do not say why.  (Mem. at 6.)  Since Situ's departure

COHEN, MILSTEIN, HAUSFELD & TOLL P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master File No. C-07-05182-WHA      - 11 -
IMANAGE 368969.1 73920001

1    Some of Situ's knowledge about wrongdoing at LDK comes from his own physical

2    inspection of LDK's inventory.  He describes how he worked with warehouse personnel to verify

3    LDK's inventory, noting that he himself double-checked and reconfirmed critical data to ensure

4    that his findings were accurate.  (¶ 40.)  As the Company's financial controller it was, after all, his

5    job to understand and verify LDK's financial reporting related to its key operations—and almost

6    nothing was as critical to the Company as its inventory levels.  According to Situ, this inventory

7    verification was documented in a "Silicon Warehouse Stock Ledger" which revealed that, when

8    the Company was telling investors it had over 600 tons of feedstock in its warehouse, LDK

9    actually had only 330 tons, and only about 45 tons of this was high quality polysilicon.  (¶ 37.)

10    Moreover, most of the 285 tons of low quality polysilicon that LDK counted as inventory was

11    unusable.  (¶ 37.)  The detailed information, based on personal knowledge, provided by Situ

12    could not be farther from the "bald assertions" and "difference of opinion" that were found to be

13    insufficient to establish a securities fraud claim in cases highlighted by Defendants.  *See* (Mem. at

14    11) (citing *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 987 (N.D. Cal. 2007));

15    (Mem. at 16) (citing *Elliot Associates, L.P. v. Hayes*, 141 F. Supp. 2d 344, 357 (S.D.N.Y 2000)).

16    Defendants insist that Situ's assertions are unreliable because he supposedly only looked

17    at materials in a single LDK warehouse, even though LDK purportedly had four warehouses.

18    (Mem. at 9.)  But this misses the point.  LDK was making false statements not only about its total

19    feedstock inventory, but also specifically about how much inventory it had in what *it* described as

20    its "warehouse."  Situ used the same terminology as Defendants.  For example, during the Class

21    Period CEO Peng told investors that "raw material [inventory] is at 600, a little bit over 600 tons

22    *at the warehouse*."  (¶ 32) (emphasis added).  Similarly, a trade journal reported that LDK

23    claimed that "614 tons of usable feedstock [were] *in its warehouse*."  (¶ 32) (emphasis added).[9]

24    Moreover, it is reasonable to infer that, if LDK vastly overstated the polysilicon at its warehouse,

25

26    came after he repeatedly and forcefully complained to his superiors that LDK's accounting was
      improper it is reasonable to infer that, if Situ was fired, his dismissal was retaliatory.

27    [9] Defendants' assertion that LDK had four warehouses (Mem. at 10) comes from an unsourced,
      undated aerial photo annotated by an unknown person and included in Defendants' filing in

28    violation of Local Civil Rule 7-5, which requires that "[f]actual contentions made in support of …
      any motion must be supported by an affidavit or declaration."

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

1   its enterprise-wide inventory was also materially inaccurate.  In any event, Situ indicates that he

2   did, in fact, take into account inventory elsewhere.  (¶ 40.)  Defendants' proposed inference—that

3   a qualified CPA with full access to the Company's records simply forgot to take into account

4   feedstock in transit or at other locations is implausible.[10]

5       Defendants also claim that "Situ himself admits that he lacks the expertise to evaluate the

6   usability of polysilicon."  But the only support they provide for this supposed "admission" is

7   Situ's statement that "it is a little more difficult to revaluate the quality . . . ."  (Mem. At 9.)  They

8   also claim that LDK's manufacturing process is so "highly technical and complex" it cannot be

9   understood by a mere CPA.  (Mem. at 9.)  Defendants' apparent view is that LDK's engineers,

10   not its accountants, should determine how to account for the Company's inventory.  But far from

11   admitting a lack of expertise, Situ details the steps he took to understand LDK's production

12   process so he would have the knowledge to evaluate the accuracy of the Company's accounting.

13   *See, e.g.,* (¶ 38) (Situ attended "Green Meetings" between LDK personnel and foreign experts on

14   LDK's production equipment; Situ climbed to the top of LDK's Dimensional Solidification

15   System to better understand this key component in the production process).  Moreover, Situ was

16   responsible for implementing Enterprise Resource Planning (ERP) software meant to coordinate

17   all aspects of LDK's business, including production. (¶ 38.)

18       It is difficult to imagine a source better placed to provide reliable information about

19   accounting improprieties than a company's financial controller.  The Court recognized this in *In*

20   *re Silicon Storage Tech. Inc., Sec. Litig.*, 2007 U.S. Dist. LEXIS 21953, a case relied upon by

21   Defendants.  There, one of the reasons the Court found scienter inadequately pled was that the

22   defendant's controller had provided information to plaintiffs, but had not claimed that any fraud

23

24   [10] Defendants wrongly suggest that an email from Situ which they seek to have the Court consider shows that "Situ did not consider" inventory located outside the Company's warehouse.  (Mem.

25   at 9-10.)  To the contrary, while the email may indicate that Situ could not quantify any overstatement of the Company's offsite feedstock inventory with the same precision as the

26   overstatement of the inventory in the warehouse (which he could physically count), he was clearly aware of the existence of the offsite inventory, noting in the email that LDK's "accounting

27   book inventory of USD206.09M consists of feedstock 176.02M (in warehouse 99.86M, in material dept 36.10M, in transit 40.06M) and all the others 30.07M." Email from Charley Situ to

28   Jack Lai, Louis Hsieh, KPMG Hong Kong, (Sept. 25, 2007) at 1, Defendants' Request for Judicial Notice in Support of Motion to Dismiss ("RJN") Ex. F.

COHEN, MILSTEIN, HAUSFELD & TOLL P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master File No. C-07-05182-WHA      - 13 -
IMANAGE 368969.1 73920001

1   had occurred.  The court reasoned that the controller "would certainly have known about a fraud

2   if there had been one." 2007 U.S. Dist. Lexis 21953 at *78.  To bolster their argument that Situ is

3   unreliable Defendants site cases dealing with the reliability of ***anonymous*** sources.  (Mem. at 8 &

4   n.9, 16) (citing *Nursing Home*, 380 F.3d at 1233 (discussing credibility of confidential

5   informants); *Silicon Storage Tech.*, 2007 U.S. Dist. LEXIS 21953 at *56-57 (same); *In re Tibco*

6   *Software Sec. Litig.*, 2006 U.S. Dist. LEXIS 36666 at *65 (N.D. Cal. 2006) (same); *In re Siebel*

7   *Sec. Litig.*, 2005 WL 3555718 (N.D. Cal. 2005) (same)).  Citation to anonymous sources raises

8   obvious potential credibility concerns, but the Complaint here is not based on such sources.

9        Even if the standards set forth in cases on the credibility of anonymous sources were

10  applied to a named source like Situ, great weight would have to be accorded to the information he

11  provides.  Allegations by anonymous sources can support a strong inference of scienter if the

12  "sources are described with sufficient particularity to support the probability that a person in the

13  position occupied by the source would possess the information alleged and the complaint contains

14  adequate corroborating details." *Daou*, 411 F.3d at 1015 (internal quotations omitted).  The

15  Complaint describes with particularity who Situ is and how he came to know the information

16  attributed to him and also contains abundant "corroborating details."

17            2.  Situ's Charges Are Corroborated By Other Sources

18       Situ is not alone in his charges of impropriety at LDK.  The Complaint cites other sources

19  which bolster Situ's claims and provide further support for an inference that Defendants

20  knowingly made false statements.  For example, Situ confirms that he attended a July 19, 2007

21  high level meeting at which LDK's Chief Engineer and its plant manager complained that they

22  could not rely on the Company's inventory numbers because they were "just paper number[s]"—

23  *i.e.,* much of the inventory on LDK's books was unusable or simply did not exist.  (¶ 39.)  These

24  two individuals—knowledgeable about LDK's manufacturing operations—noted that despite a

25  supposed abundance of feedstock inventory they often had to delay production until the Company

26  was able to obtain usable feedstock.  (¶ 39.)  The fact that multiple people at LDK recognized the

27  Company's improper treatment of inventory makes it harder for Defendants to attack Situ.  If

28  such information was not within the competency of the controller, the Chief Engineer or the plant

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA        - 14 -
IMANAGE 368969.1 73920001

1  manager, who would have it?  Situ's description of this meeting was not invented for this

2  litigation—on September 10, 2007, while still at the Company, Situ described in detail what

3  happened at the July meeting in an email to Defendant Lai, a copy of which has been obtained by

4  Lead Counsel.  (¶ 63.)  One of Situ's key assertions is that even though LDK claimed to have an

5  enormous inventory stockpile, much of these materials could not actually be used.  In its October

6  8, 2007 article, Barron's cited another knowledgeable source who confirmed that LDK had

7  serious problems with the quality of the polysilicon in its inventory.  (¶¶ 67, 80.)  In addition, The

8  Wall Street Journal reported that it had reviewed an audio tape of a conference call between Situ

9  and top LDK managers, including Defendant Lai, that supported Situ's account of events within

10  the Company.  (¶ 64.)

11        Situ's claims are further supported by LDK's own recently filed form 20-F Annual

12  Report, in which LDK disclosed that during 2007, despite its supposedly ample raw material

13  inventory, "[w]e have experienced delays in fulfilling purchase orders from some of our

14  customers due to shortages in supplies of polysilicon feedstock."  LDK Form 20-F Annual Report

15  (Apr. 7, 2007) at 18, RJN Ex. S.

16        As described above, a necessary consequence of LDK's counting unusable feedstock as

17  usable inventory was that it artificially reduced LDK's apparent per-unit cost of acquiring

18  polysilicon.  In October 2007 a securities analyst, who followed LDK, suggested that the

19  Company's claim that it was acquiring polysilicon feedstock for $150 per kilogram was

20  improbable given that competitors reported costs of $230 per kilogram or more.  (¶ 47.)

21        In addition, LDK's own reported fourth quarter 2007 results lend substantial support to

22  Situ's claims.  In its financial statements for the first three quarters of 2007 LDK accounted for its

23  entire inventory as a current asset, meaning that under GAAP rules it could be used in production

24  within a year.  In the fourth quarter, however, LDK suddenly classified a substantial portion of its

25  inventory as "Inventories to be processed beyond one year, net." (¶ 57.)  Accounting for

26  inventory in such a manner is highly unusual.  (¶ 58.)  LDK insists this new accounting line

27  merely reflects the happenstance that during the first three quarters it had no inventory

28  whatsoever that could not be used during the current year, but accumulated a substantial amount

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA        - 15 -
IMANAGE 368969.1 73920001

1   of such inventory during the year's final quarter.[11]  (Mem. at 19.)[12]  But, when considered in the

2   context of Situ's allegation that much of the Company's inventory was unusable and LDK's own

3   acknowledgement of production delays because of inventory shortages, the sudden use of a new

4   inventory classification supports a compelling inference that Situ was correct when he claimed

5   that during the Class Period LDK had a substantial amount of inventory that could not be used—

6   or at least could not be used within a year.  This inference is strengthened by the fact that, unlike

7   the results of the first three quarters, which were not subject to an outside audit, the fourth quarter

8   results were released in conjunction with LDK's financial statements for all of 2007, which were

9   subject to an outside audit.  (¶ 60.)

10          3.   The Complaint's Allegations Of Falsity Support The Inference That
                 Defendants Acted With Scienter

11          The same facts that support falsity also support a strong inference that Defendants acted

12   with scienter.  LDK was in a highly competitive industry and essentially produced a single

13   commodity product.  The Defendants knew that some 80% of the cost of manufacturing that

14   product was attributable to the cost of raw materials and they also knew that, because of a

15   worldwide shortage, investors and lenders were focused intently on the raw material inventories

16   of wafer producers.  Given the massive scale of the irregularities at LDK, these facts undermine

17   any inference that Defendants provided investors with false information because of mistake,

18

19   _____

20   [11] Comparison of two of the documents Defendants seek to be judicially noticed strongly suggests
     that the addition of a line for inventory that cannot be used within a year reflects a change in

21   LDK's accounting, rather than changed circumstances.  Both the Company's IPO prospectus,
     filed at the beginning of the Class Period, and its April 7, 2008 F-20 contain sections entitled

22   "critical accounting based policies."  These sections are nearly identical in both documents.  But
     the April 2008 document includes a new paragraph asserting that LDK conducts regular reviews

23   to determine whether feedstock inventory should be classified as "current" or "non-current."
     "Non-current" inventory is not mentioned in the prospectus.  *Compare* LDK Form F-1 (May 11,

24   2007) at 48-54, RJN Ex. A *with* LDK Form F-20, (Apr. 7, 2008) at 62-68, RJN Ex. S.
     [12] Ostensibly relying on facts asserted in documents they would have the Court judicially notice,

25   Defendants make a convoluted effort to provide an innocent explanation for their suspiciously
     timed decision to create a category of "non-current" inventory. Mem. at 19.  Defendants assert

26   that this accounting change was somehow caused by LDK's receipt of a "new shipment" of "an
     additional 613 MT of polysilicon during the fourth quarter."  But in the conference call cited by

27   Defendants for this supposed increase of over 600 tons between the third and fourth quarters
     Defendant Lai actually told investors that LDK's "silicon inventory increase[d] from 720 tons in

28   the third quarter to 856 tons at end of fourth quarter [of 2007]."  Tr. of Q4 2007 LDK Solar Co.,
     Ltd. Earnings Conference Call at 32 (Feb. 25, 2008), RJN Ex. R.

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

1   negligence or incompetence and provide compelling support for an inference that Defendants

2   knew these statements were false when made or were extremely reckless in not knowing so.  *See,*

3   *e.g., CSK Auto*, 525 F. Supp. 2d at 1124 (scienter established where "the extensive and systematic

4   nature of the accounting irregularities would not likely have escaped the attention of the CEO and

5   CFO."); *In re Northpoint Communications Group, Inc., Sec. Litig.*, 221 F. Supp. 2d 1090, 1104

6   (N.D. Cal. 2002) (Alsup, J.) ("upon the laying of a proper factual foundation that information was

7   known within a corporation, it may be inferred that facts critical to a business's core operations or

8   an important transaction are known to a company's responsible officers."); *see also Nursing*

9   *Home.*, 380 F.3d at 1234 ("It is reasonable to infer that the Oracle executives' detail-oriented

10  management style led them to become aware of the allegedly improper revenue recognition of

11  such significant magnitude.").[13]  Although the falsity of Defendants' statements, standing alone,

12  would likely support a strong inference of scienter, as discussed below the Complaint sets forth

13  numerous additional facts which provide further support for such an inference.

14      **C.    Defendants Were Warned That Their Statements Were False And Violated**
        **GAAP**

15

16          In addition to circumstantial evidence supporting an inference that Defendants knew of

17  inventory shortages and false reporting at LDK, there is direct evidence that Defendants knew of

18  LDK's inventory problems when they made the statements at issue in this case—independent

19  sources confirm that Situ repeatedly told Defendants and other senior mangers about these

20  inventory problems.  (¶¶ 63-64.)

21          For example, The Wall Street Journal reported that Situ had sent emails to defendant Lai

22  on May 29 and June 27, 2007 expressing concern about the Company's compliance with

23  _____

24  [13] As the *CSK Auto* case illustrates, given the facts of this case, including the straightforward
    nature of the accounting rules violated and the scope of the irregularities, the Court can infer that

25  it is unlikely that the Individual Defendants were ignorant of the falsity of their statements
    without necessarily adopting the "group pleading doctrine."  "Under the group pleading doctrine,

26  there is a presumption that allegedly false and misleading group-published information is the
    collective action of [a company's] officers and directors."  *In re BP Prudhoe Bay Royalty Trust*

27  *Sec. Litig.*, No. C06-1505, 2007 WL 3171435, at *7 (W.D. Wash. Oct. 26, 2007).  Despite
    Defendants' insistence that this doctrine did not survive passage of the PSLRA (Mem. at 17-18),

28  "a majority of district courts within the Ninth Circuit which have ruled on the issue have
    concluded that it does."  *Prudhoe Bay*, 2007 WL 3171435, at *7 (citing cases).

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA          - 17 -
IMANAGE 368969.1 73920001

1    GAAP.[14]  (¶ 62.)  The newspaper also reported, based on a tape recording of a conversation it

2    reviewed, that Situ told Defendants Lai and Yao in a September 13, 2007 internal conference call

3    that two-thirds of the Company's feedstock had been sitting for over 180 days and was unusable.

4    (¶ 64.)  According to the recording, Situ argued, unsuccessfully, that the Company was required

5    to reflect this by making a "provision" (taking a write down) to reflect the Company's unusable

6    inventory.  (¶ 64.)  Moreover, according to an online trade publication, during a private

7    conference call with select investors in early October, Defendant Lai admitted that Situ had

8    warned him about inventory problems while Situ was working at the Company.  (¶ 66.)  The trade

9    publication said it had obtained a recording of the conference call.  (¶ 66.)

10        **D.    Defendants Had Compelling Motives To Commit Fraud**

11            Despite Defendants' suggestion to the contrary (Mem. at 20-21), the PSLRA does not

12   require a plaintiff to plead that defendants had a motive to engage in the alleged fraud.  *See, e.g.,*

13   *Tellabs,* 127 S. Ct. at 2511 ("While it is true that motive can be a relevant consideration … the

14   absence of a motive allegation is not fatal."); *Prudhoe Bay,* 2007 WL 3171435 at *3 ("motive is

15   not a required element of scienter").  In this case, however, the Complaint sets forth facts that

16   establish that Defendants had multiple, compelling motives to engage in the alleged fraud.

17   Among these is Defendants' interest in having LDK continue as a viable entity.  Defendants knew

18   that misrepresenting LDK's financial strength was essential to the Company's survival—if the

19   true state of LDK's finances had been known investors and lenders would not have provided

20   LDK with the capital it desperately needed.  *See* (¶¶ 27-28).

21            But the Individual Defendants had a more direct motive—the substantial artificial

22   inflation of LDK's stock price resulting from their false statements increased their net worth by

23   billions of dollars.  (¶ 82.)  When the market learned that LDK's inventory accounting was

24   inaccurate and that, consequently, LDK's manufacturing costs were substantially overstated, the

---

[14] A securities plaintiff may rely on reliable press reports.  *See, e.g., In re SeeBeyond Techs. Corp.*

26   *Secs. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (comments by corporate executive, as
     quoted in The Wall Street Journal, supported "a strong inference that the defendants acted with

27   deliberate or conscious recklessness"); *see also Montoya v. Mamma.Com, Inc.*, No. 05 Civ. 2313,
     2006 U.S. Dist. LEXIS 13207, at *4-*6, *15-*16 (S.D.N.Y. March 28, 2006) (press reports, cited

28   in complaint, supported inference defendants acted with scienter).

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA        - 18 -
IMANAGE 368969.1 73920001

1    Company's stock price collapsed, causing these Defendants to lose billions on the decline in

2    value of their stock and options. (¶ 82); *see also In re Network Associates, Inc., Sec. Litig.*, No. C

3    99-01229, 2000 WL 33376577, at *7 (N.D. Cal. Sept. 5, 2000) ("Because companies are often

4    valued based on the present value of their future net earnings streams, eliminating costs from the

5    equation can inflate the present value of the enterprise and thus the current stock price.").

6    Defendant Peng alone saw approximately $2.31 billion of his personal wealth wiped out when

7    true information about LDK's accounting came into the market.  (¶ 82).

8        Although they acknowledge that the revelations cost them "billions," Defendants assert,

9    without explanation, that "Plaintiff fails to allege that any individual defendant derived a tangible,

10   personal benefit from any alleged fraud or misrepresentation." (Mem. at 21.)  Defendants also

11   argue that "[t]he fact that *none* of the individual defendants sold *a single share* of LDK stock

12   during the Class Period further undercuts any 'strong inference' of scienter." (Mem. at 20)

13   (emphasis in original).  What Defendants do not say is that the Individual Defendants could ***not***

14   sell a single share of LDK stock during the Class Period.  They were ***prohibited*** from doing so by

15   a temporary "lock-up" agreement they entered into in connection with the Company's IPO.  (¶

16   84); *see also* LDK's Form F-1 (May 11, 2007) at 6, RJN Ex. A (discussing "lock-up provision"

17   described in (¶ 84)).  Thus, ***no*** inference can be draw in favor of the Individual Defendants based

18   on their lack of sales.  Conversely, the fact that they would secure a considerable financial benefit

19   if they could prolong the fraud provides strong support for an inference of scienter.

20       The situation of Defendants here is similar to that faced by several of the defendants in

21   *Am. West*, 320 F.3d 920.  In that case temporary restrictions had been placed on the ability of

22   certain defendants to sell shares in a company's stock and "[p]laintiffs allege[d] that [d]efendants

23   schemed to artificially inflate America West's stock price by May 20, 1998, the date on which the

24   major shareholders could freely sell their Class B publicly-traded stock under the Stockholder's

25   Agreement." *Id.* at 932.  Faced with this and other indicia of scienter, the Ninth Circuit reversed

26   the district court's dismissal.  *Id.* at 945.  In this case, as in *America West*, Defendants would have

27   been able to profit enormously if they had been able to keep LDK's stock price artificially

28   inflated until they could sell of some of their shares.  It was their misfortune that Situ revealed the

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA        - 19 -
IMANAGE 368969.1 73920001

fraud before they were able to do so.

### E.    Defendants Have Not Been Exonerated By Any Subsequent Findings

Perhaps recognizing the tenuousness of their position, Defendants urge the Court to consider self-serving "evidence," especially the supposed results of their own inquires into their wrongdoing.  They argue that because they or their agents investigated the allegations in the Complaint and found them wanting, the allegations must be baseless and the action dismissed.

As discussed in Plaintiff's Opposition to Defendants' Request for Judicial Notice, it is unfair and improper for Defendants to introduce such extra-record "facts" without affording Plaintiff an opportunity to use discovery and cross-examination to test the accuracy of Defendants' assertions.  This is especially true in this case where Defendants have a clear motive to misrepresent facts—if their motion to dismiss is denied they will face enormous liability.  If, on a motion to dismiss, a court considers information "outside" the complaint or that is not the proper subject of judicial notice, Rule 12(d) requires that the motion be "treated as one for summary judgment," and that the parties be allowed reasonable discovery so that they can "present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  In this case, however, even if the Court considers them, Defendants' improperly proffered "facts," do not support their arguments.

#### 1.    Neither The SEC Nor Analysts Cleared Defendants

Defendants claim that a recent letter advising LDK that the SEC's staff would not recommend enforcement action against the Company indicates that the SEC "[d]isagreed [w]ith Situ." (Mem. at 12.)  This is a completely baseless assertion and, according to the SEC's own Release No 5310, one that is improperly made.  The letter from the SEC states that its staff was "providing this information under the guidelines in the final paragraph of Securities Act Release No. 5310 (copy attached)."  SEC Letter (Mar. 24, 2008), RJN Ex. G.  The final paragraph of Release No. 5310—which Defendants curiously omitted from the 1234 pages they say should be judicially noticed—explains that such letters:

> must in no way be construed as indicating that the party has been
> exonerated or that no action may ultimately result from the staff's
> investigation.… The attempted use of such a communication as a

Cohen, Milstein, Hausfeld & Toll P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master File No. C-07-05182-WHA        - 20 -
IMANAGE 368969.1 73920001

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*purported defense in any action … brought against the party,
either civilly or criminally, would be clearly inappropriate and
improper* since such a communication, at the most, can mean that,
as of its date, the staff … does not regard enforcement action as
called for based upon whatever information it then has.  Moreover,
this conclusion may be based upon various reasons, some of which,
such as workload considerations, are clearly irrelevant to the merits
of any subsequent action.

Securities Act Release No. 5310, 1972 SEC LEXIS 238, at *6-*7 (Sept. 27, 1972) (emphasis

added); *see also* 17 C.F.R. § 202.5(d) (such letters "must in no way be construed as indicating

that the party has been exonerated.").

Defendants also apparently want the Court to conclude that comments by securities

analysts about LDK negate any inference of scienter.  Even assuming that Defendant-introduced

analyst opinions can be considered by the Court on a motion to dismiss, the analyst comments do

little to help Defendants.  Specifically, Defendants cling to a Piper Jaffray analyst's statement

shortly after LDK's accounting problems surfaced that he had "no reason/proof" to conclude that

Defendant Lai's claims about inventory were lies.  They also point to the recommendation by

another analyst "that investors purchase LDK." (Mem. at 12-13 & n.11).  These statements do not

in any way exonerate Defendants.  Indeed, the Piper Jaffray analyst commented in early 2008 that

LDK's reclassification of some of its inventory as "non-current" "appear[s] to validate some

earlier investor fears that the company holds unusable inventory."  (¶ 59.)

## 2.   No Reliable, Independent Investigation Cleared Defendants

Defendants also insist that they were cleared of misconduct by an "independent"

investigation and by its auditors.  (Mem. at 2.)  But the fact that the Company and its auditors

acquitted themselves of wrongdoing is not surprising and courts have refused to consider such

information on a motion to dismiss.  In *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002),

for example, the court rejected the argument—identical to Defendants' position here—that

because the defendant had been audited by an accounting firm and had not issued a restatement

"no inference of accounting error, and so no inference of scienter, can be drawn." *Id.* at 83.  The

court explained that, if the company's financials had been restated

that might well have been useful to [the plaintiff].  However, the

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA          - 21 -
IMANAGE 368969.1 73920001

> fact that the financial statements … were not restated does not end [the plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA.  To hold otherwise would shift to accountants the responsibility that belongs to the courts.  It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement ….

*Id.*; *see also Feiner v. SS & C Tech.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998) ("the fact that [the corporate defendant] has not elected to restate or reverse its earnings or revenue figures … does not indicate, much less prove, the accuracy of those figures"); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996) ("The fact that [the defendant's] independent auditor may have approved the accounting methods will not shield [the defendant] from liability for deception such methods may have caused.").[15]

Defendants' assertion that KPMG, LDK's auditor, "considered and rejected," Situ's allegations (Mem. at 2), is puzzling.  Nothing in even the expanded record that Defendants would have the Court consider supports this assertion.  Although KPMG issued an unqualified opinion with respect to LDK's full 2007 results, KPMG said nothing about the accuracy of any of the statements the Complaint alleges to be false, including LDK's second and third quarter unaudited financials.  To the contrary, LDK's use of an unusual balance sheet line item for non-current inventory in its fourth quarter 2007 financial statements, (¶ 57)—issued in conjunction with KPMG's audit opinion for the full year—supports an inference that KPMG concluded, in light of Situ's disclosures, that LDK's unaudited inventory accounting for the previous quarters had been improper and insisted that LDK account for some of its inventory as non-current before it would issue its opinion on the full-year financial statements.

Defendants' claim that that KPMG's audit opinion included a "finding" that there were "no material weaknesses in LDK's internal controls (which includes the controls over LDK's inventory calculation)" (Mem. at 7) is also wrong.  As LDK itself explains, with respect to the Company's year 2007 financials, "neither we nor our auditors undertook an assessment of our

---

[15] Defendants assert that *Levi Strauss*, 527 F. Supp. 2d 965, stands for the proposition that a court may consider a favorable audit opinion on a motion to dismiss.  Although language in the case can be read that way, it sites no authority for that proposition and acknowledges that "the lack of restatement or an unqualified independent auditor's opinion does not absolve or shield a defendant from liability."  *Id.* at 987.

Cohen, Milstein, Hausfeld & Toll P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master File No. C-07-05182-WHA        - 22 -
IMANAGE 368969.1 73920001

1    internal control over financial reporting … as we and they will be only required to do as of

2    December 31, 2008."[16] F-20 (Apr. 7, 2008) at 69, RJN Ex. S.

3        Defendants also insist that the Company was cleared by an "independent investigation"

4    supervised by the Company's own audit committee—hardly a persuasive form of exoneration.

5    (Mem. at 11.)  The "independence" of this investigation is, at the least, suspect.  Members of the

6    audit committee in a company with a single majority shareholder such as LDK owe their position

7    on the board to that shareholder.  Moreover, Defendant Peng himself was on the Audit

8    Committee.  (Mem. at 6 n.6.)  Defendants assert, without citation, that Peng did not participate in

9    the investigation "to ensure its independence."  (Mem. at 6 n.6.)  But, although it would

10   presumably have reassured rattled investors, LDK's October 4 press release announcing the

11   investigation said nothing about Peng recusing himself.[17]  LDK's 6-K, (Oct. 4, 2007), RJN Ex. B.

12       **F.    *The Safe Harbor Does Not Protect Defendants***

13       The "safe harbor" provision of the PSLRA precludes liability for certain statements

14   relating to a company's future prospects.  *See Am. West*, 320 F.3d at 936-37.  It does not apply to

15   statements about past or current facts or events.  *See id.*  Defendants' claim that the safe harbor

16   immunizes them from liability for certain of their false statements is unfounded.

17       Defendants claim that a few of the statements Plaintiff challenges are forward looking.[18]

18   (Mem. at 23-24.)  But the safe harbor only applies to forward looking statements accompanied

19   _____

20   [16] In its recent Form 20-F, LDK notes that "[i]n the past, we had certain deficiencies in our
     internal controls" and says that it plans to take "additional steps" to address this issue, suggesting

21   that the internal control problems have yet to be resolved.  LDK's Form 20-F, (Apr. 7, 2008) at
     23, RJN Ex. S.

22   [17] When LDK announced the results of what it described as an "Audit Committee" investigation,
     the Company claimed it had been "over[seen]" by the committee's three independent directors, but

23   did not say that Peng had recused himself.  LDK's Form 6-K, (Dec 17, 2007), RJN ex. C.
     Although elsewhere in their Memorandum Defendants attribute the investigation to the Audit

24   Committee, (Mem. at 6), at one point they assert without citation that the investigation was
     carried out by "a special committee of [LDK's] independent directors."  (Mem. at 2.)  The only

25   reference to special committee in LDK's SEC filings is a reference to an investigative committee
     that apparently included LDK executives.  LDK's Form 6-K, (Oct. 4, 2007), RJN Ex. B. ("LDK's

26   management team and board of directors formed an internal committee to investigate the
     allegations.").

27   [18] Several of these supposed "forward looking" statements are not projections about future events.
     *See, e.g.,* (Mem. at 24) ("We think we **have** many advantages [from] our strategic location")

28   (emphasis added); *id.* ("we **continued to** make progress on our cost reduction efforts through
     further advancements of our production processes.") (emphasis added).

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA        - 23 -
IMANAGE 368969.1 73920001

1    "by meaningful cautionary statements identifying important factors that could cause actual results

2    to differ materially from those in the forward-looking statement." *Am. West* 320 F.3d at 936

3    (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)).  On a motion to dismiss a defendant seeking to invoke

4    the safe harbor is to bring the required "meaningful cautionary statements" to the Court's

5    attention.  *See* 15 U.S.C. § 78u–5 (e) ("On any motion to dismiss based upon [the safe harbor] the

6    court shall consider any statement cited in the complaint and any cautionary statement

7    accompanying the forward-looking statement … cited by the defendant.").  Defendants have not

8    identified any such statements.

9        Even if these supposedly forward looking statements had been accompanied by cautionary

10   language, the safe harbor would nevertheless be inapplicable.  Plaintiff alleges that Defendants

11   knew these statements were false when they made them and, in the Ninth Circuit, the safe harbor

12   does not protect defendants who intentionally make false statements.  *Am. West*, 320 F.3d at 936

13   ("a person may be held liable if the 'forward-looking statement' is made with actual knowledge

14   that the statement was false or misleading.") (quotations and ellipses omitted).  This is because

15   "[w]hether cautionary language is meaningful … can only be understood with reference to the

16   defendant's knowledge."  *See Beyond*, 266 F. Supp. 2d 1150, 1166 (C.D. Cal. 2003).  In other

17   words, "[i]f the forward-looking statement is made with actual knowledge that it is false or

18   misleading, the accompanying cautionary language can only be meaningful if it" reveals that "it is

19   false or misleading."  *Id.* at 1165; *see also In re Elec. Arts Inc. Sec. Litig.*, No. C-05-1219, 2006

20   U.S. Dist. LEXIS 1399, at *2-*3 (N.D. Cal. Jan. 5, 2006) (cautionary statements do not protect

21   knowingly false projections).

22       **G.    *Plaintiff Has Adequately Pled Loss Causation***

23       A securities complaint sufficiently pleads loss causation if it contains a "'short and plain

24   statement'" that provides "a defendant with some indication of the loss and the causal connection

25   that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).  "A

26   plaintiff is not required to show that a misrepresentation was the ***sole*** reason for the investment's

27   decline in value in order to establish loss causation."  *Daou,* 411 F.3d at 1025 (emphasis in

28   original, internal quotations omitted); *see also id.* at 1026 (loss causation adequately pled where

Cohen, Milstein,
Hausfeld & Toll
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA        - 24 -
IMANAGE 368969.1 73920001

1    defendant's stock "fell precipitously" after investors began learning of the "company's true

2    financial condition."); *In re Juniper Networks, Inc. Sec. Litig.*, —F. Supp. 2d—, 2008 WL

3    938445, at *7 (N.D. Cal. March 31, 2008) (rejecting defendants' argument that "general market

4    conditions," not disclosure of wrongdoing caused stock price decline because "Plaintiff's

5    allegations give Defendants fair notice of the grounds upon which their § 10(b) claim rests.");

6    *Atlas v. Accredited Home Lenders Holding Co.*, No. 07-CV-488, 2008 WL 80949, at *11 (S.D.

7    Cal. Jan. 4, 2008) (loss causation adequately pled by allegation that stock price "was artificially

8    inflated during the class period due to accounting improprieties" and "declined significantly when

9    the truth was disclosed").

10    ### H.    *Plaintiff Has Adequately Pled A Section 20(A) Claim*

11    A plaintiff pursuing a Section 20(a) claim must adequately plead "(1) a primary violation

12    of federal securities laws … and (2) that the defendant exercised actual power or control over the

13    primary violator." *Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Defendants

14    here argue that the Section 20(a) claims should be dismissed because a primary violation has not

15    been adequately pled, but they do not dispute that they exercised they required "power or control"

16    over a primary violator. Consequently, Plaintiff's Section 20(a) claim should be sustained unless

17    its 10(b) claim is dismissed in its entirety. *See Boston Scientific*, 2008 WL 1735390, at *15

18    (because "all of the individual defendants held positions of significant responsibility within the

19    company … [they] potentially face … liability under section 20(a)").

20    ## V.    CONCLUSION

21    For the foregoing reasons the Motion to Dismiss should be denied.[19]

22

23

24

25

26    _____

[19] If the Court grants any portion of the Motion, Plaintiff requests that it be granted leave to

27    amend to address any deficiencies the Court identifies. In PSLRA cases "[d]ismissal with
      prejudice and without leave to amend is not appropriate unless it is clear … that the complaint

28    could not be saved by amendment." *Eminence Capital, LLC v. Aspeon Inc.*,, 316 F.3d 1048, 1052
      (9th Cir. 2003). Defendants do not claim they will be prejudiced if amendment is permitted.

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA        - 25 -
IMANAGE 368969.1 73920001

1     Dated: April 24, 2008                                  COHEN, MILSTEIN, HAUSFELD & TOLL
2                                                         P.L.L.C.

3

4                                    By:     /s/ Michael Lehmann
                                             Michael Lehmann

5                                   Cohen, Milstein, Hausfeld & Toll P.L.L.C.
                                  mlehmann@cmht.com
6                                   One Embarcadero Center
                                  Suite 526
7                                   San Francisco, CA 94111
                                  Telephone:     (415) 623-2048
8                                   Facsimile:      (415) 433-5994

9

10                                   Cohen, Milstein, Hausfeld & Toll P.L.L.C.
                                  Steven J. Toll
11                                   Mark S. Willis
                                  Matthew B. Kaplan
12                                   stoll@cmht.com
                                  1100 New York Avenue, N.W.
13                                   Suite 500, West Tower
                                  Washington, DC  20005
14                                   Telephone:     (202) 408-4600
                                  Facsimile:      (202) 408-4699
15

16                                   Lead Counsel for the Proposed Class

17

18

19

20

21

22

23

24

25

26

27

28

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA         - 26 -
IMANAGE 368969.1 73920001

1

## CERTIFICATE OF SERVICE

2

3

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses of the parties of record.

5

6

I further certify that Service Pursuant to Local Rule 23-2 will be made electronically to:

7
        Securities Class Action Clearinghouse
        Att. Juan-Carlos Sanchez/Cara Mia Perlas

8
        Stanford University School of Law
        Crown Quadrangle

9
        Stanford, CA 94305-8612
        scac@law.stanford.edu

10

11

12
           /s/ Michael P. Lehmann
        Michael P. Lehmann

13
        April 24, 2008

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.

Op. To Defendants' Motion To Dismiss Plaintiffs' Consolidated Class Action Compl.—Master
File No. C-07-05182-WHA
IMANAGE 368969.1 73920001