LATHAM & WATKINS LLP
  James J. Farrell (Bar No. 166595)
  james.farrell@lw.com
633 West Fifth Street, Suite 4000
Los Angeles, California 90071-2007
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

LATHAM & WATKINS LLP
  Philip J. Wang (Bar No. 218349)
  philip.wang@lw.com
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600

Attorneys for Defendants LDK Solar Co., Ltd., LDK Solar USA, Inc., Xiaofeng Peng, and Jack Lai

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LDK SOLAR SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | MASTER FILE NO. C-07-05182-WHA<br><br>**DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED CLASS ACTION COMPLAINT PURSUANT TO RULE 12(b)(6)**<br><br>Judge: Hon. William H. Alsup<br>Date: May 15, 2008<br>Time: 8:00 a.m.<br>Courtroom: 9, 19th Floor |

**TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ................................................................................... 1

II.  ARGUMENT ................................................................................................................ 2

     A.   The Complaint Fails to Allege Falsity ............................................................... 2

          1.   Situ's Allegations Lack Foundation......................................................... 2

          2.   The Independent Corroboration of LDK's Inventory
               Weighs Against Any Inference of Falsity................................................ 4

          3.   Plaintiff Concedes the Inadequacy of the Pleadings by
               Changing His Theory of the Case............................................................ 7

          4.   The Sources Allegedly Corroborating Situ Do Not Support
               Any Inference of Falsity .......................................................................... 8

          5.   LDK's "Worthless" Inventory Is Not Pled With
               Particularity.............................................................................................. 9

     B.   The Complaint Fails To Allege Scienter ........................................................... 10

          1.   Plaintiff Fails To Provide Particularized Allegations That
               Any Defendant Made Misstatements With Fraudulent
               Intent. ....................................................................................................... 10

          2.   Plaintiff's Allegations Of Accounting Fraud Do Not
               Establish A Strong Inference Of Scienter................................................ 11

          3.   Defendants' Lack Of Stock Sales Negates Any Inference
               Of Scienter ............................................................................................... 12

III. CONCLUSION............................................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

Aldridge v. A.T. Cross Corp.,
  284 F.3d 72 (1st Cir. 2002) ................................................................................................... 6

Feiner v. SS&C Techs., Inc.,
  11 F. Supp. 2d 204 (D. Conn. 1998) ..................................................................................... 6

Higginbotham v. Baxter International, Inc.,
  495 F.3d 753 (7th Cir. 2007) ................................................................................................. 9

In re 2TheMart.com, Inc. Sec. Litig.,
  114 F. Supp. 2d 955 (C.D. Cal. 2000) ................................................................................. 11

In re CNET Networks, Inc.,
  483 F. Supp. 2d 947 (N.D. Cal. 2007) ................................................................................... 5

In re Daou Systems, Inc. Sec. Litig.,
  411 F.3d 1006 (9th Cir. 2005) ............................................................................................... 3

In re FVC.com Sec. Litig.,
  136 F. Supp. 2d 1031 (N.D. Cal. 2000) ............................................................................... 12

In re Hansen Natural Corp. Sec. Litig.,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) .......................................................................... 2, 12

In re Levi Strauss & Co. Sec. Litig.,
  527 F. Supp. 2d 965 (N.D. Cal. 2007) .............................................................................. 3, 7

In re McKesson HBOC Secs. Litig.,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................................................. 8

In re Pacific Gateway Exch., Inc., Sec. Litig.,
  169 F. Supp. 2d 1160 (N.D. Cal. 2001) ............................................................................... 11

In re Silicon Graphics Inc. Sec. Litig.,
  183 F.3d 970 (9th Cir.1999) ................................................................................................ 12

In re Silicon Storage,
  22007 U.S. Dist. LEXIS 21953 (N.D. Cal. 2007) ................................................................. 3

In re Vantive Corp. Sec. Litig.,
  283 F.3d 1079 (9th Cir. 2002) ............................................................................................. 11

In re VISX Sec. Litig.,
  Nos. C 00-0649 CRB, 2001 WL 210481 (N.D. Cal. Feb. 27, 2001) ..................................... 4

In re Wet Seal Sec. Litig.,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ............................................................................... 12

Marksman Partners, L.P. v. Chantal Pharm. Corp.,
    927 F. Supp. 1297 (C.D. Cal. 1996) ..................................................................................... 6

No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West
    Holding Corp.,
    320 F.3d 920 (9th Cir. 2003) ........................................................................................ 13, 14

Osher v. JNI Corp.,
    308 F. Supp. 2d 1168 (S.D. Cal. 2004), aff'd in part, vacated on other
    grounds, 183 F. App'x 604 (9th Cir. 2006) .................................................................. 10, 13

Osher v. JNI Corporation,
    256 F. Supp. 2d 1144  (S.D. Cal. 2003) ........................................................................ 10, 14

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    127 S. Ct. 2499 (2007) .................................................................................................. 9, 12

**STATUTES**

15 U.S.C. § 78u-4(b)(2) ............................................................................................................... 11

**OTHER AUTHORITIES**

Statement on Auditing Standards 100, *Interim Financial Information* ....................................... 6

Statement on Auditing Standards 109, *Understanding the Entity and Its
    Environment and Assessing the Risks of Material Misstatement*............................................ 6

Statement on Auditing Standards 112, *Communicating Internal Control Related
    Matters Identified in an Audit* ................................................................................................ 6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

REPLY MEMORANDUM ISO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT
MASTER FILE NO. C-07-5182-WHA

# REPLY MEMORANDUM OF POINTS AND AUTHORITIES

## I. PRELIMINARY STATEMENT

As an initial matter, Plaintiff erroneously contends that the Court should ignore judicially noticeable documents and only consider Situ's allegations in isolation. Plaintiff forgets that he bears the burden of alleging specific and particularized facts in context to establish the elements of his claim, and he is only entitled to reasonable inferences. Plaintiff also forgets his own Complaint, which alleges that six months of post class period events are relevant and corroborate Situ's allegations. See Compl. ¶54-60. Given those allegations attacking Defendants' statements and actions over six months after the class period, the Court should consider the full context of what Defendants' complete statements and acts were, as reflected in SEC filings and other judicially noticeable documents. Stated simply, Plaintiff may not pick and choose favorable facts from public documents and have all others ignored.

As to the substance of the allegations, Plaintiff has not established either falsity or scienter. Defendants' moving papers showed that: (1) Situ had no technical expertise to evaluate the quality of LDK's polysilicon inventory and he did not try to test any of it; (2) Situ admittedly did not count all of LDK's inventory; and (3) every person who has examined the facts has corroborated LDK's accounting of its polysilicon inventory, including KPMG, Simpson Thacher, another Big Four accounting firm, the Special Committee, and various technical consultants. In response, Plaintiff does not dispute that Situ does not have a technical background, but rather, makes an absurd argument that Situ somehow gained the necessary technical expertise by attending some "green" meetings in a canteen and climbing on top of a DSS furnace. Desperate to bolster Situ's speculation, Plaintiff alleges that Situ is corroborated by an unidentified source cited in a Barron's article. Even Plaintiff has no idea who the source is, what that person knows or what that person actually said to Barron's.

The Complaint also seeks to corroborate Situ with post class period events, like the SEC's investigation, Lai's statement that Situ was accurate, and LDK's 3Q07 and 4Q07 financial results. But the full and accurate view of those post class events eradicate Plaintiff's claim: the SEC confirmed it would not bring an enforcement action; Lai's full statement was that Situ was

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED AMENED COMPLAINT PURSUANT TO RULE 12(b)(6)
MASTER FILE NO. C-07-5182-WHA

1  accurate as to the one warehouse he considered, but Situ failed to consider all the inventory; and
2  the 3Q07 and 4Q07 financials confirm LDK's inventory was accurate, after careful scrutiny by a
3  litany of outside professionals.  There has been no restatement of LDK's inventory.
4        Plaintiff's Complaint struggles to fabricate even a colorable theory of falsity, and it
5  comes nowhere near establishing a strong inference of scienter.  It alleges that 284 tons of
6  missing and 285 tons of unusable inventory caused three "specific" statements fraudulent by
7  Defendants to be: (1) the June 2007 Prospectus, (2) an August 1, 2007 release, and (3) the
8  October 4, 2007 release.  But the October 4 statement occurred ***after*** the "corrective disclosure"
9  revealing Situ's allegations, so it cannot be actionable,[1] and the first two statements occurred
10 well before Situ first raised his inflated inventory claim in September 2007.[2]  In addition, the
11 Complaint fails to provide any motive or other rationale suggesting that Defendants acted with
12 scienter.  Faced with the devastating fact that none of the Defendants engaged in any suspicious
13 trading, Plaintiff argues that Defendants' lock-up agreement fills the void and creates scienter.
14 The law and logic are to the contrary.  A lock-up agreement further removes any financial
15 motivation to the extent it limits Defendants from trading, and the terms of this lock-up did not
16 preclude Defendants from selling their stock with the underwriters' permission.  So the absence
17 of a suspicious trade by any Defendants here further underscores the complete absence of merit
18 to the Complaint.

## II.    ARGUMENT

###     A.    The Complaint Fails to Allege Falsity

####         1.    Situ's Allegations Lack Foundation

22 Defendants' moving papers established that to plead falsity through employee
23 allegations, Plaintiff must demonstrate that the employee was qualified to state authoritatively
24 that the challenged statement was false, and that this opinion is based on personal knowledge.

---

[1] See In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (finding non-actionable a company press release that disclosed an investigation into allegations, the nature of which had already been disclosed to the market).

[2] Attached as the last page of this Reply is a table lining up Plaintiff's "specific fraudulent statements," allegations and cross references to the Complaint and Situ's email (see RJN, Exh. F), showing that the alleged "specific fraudulent statements" cannot possibly support a Section 10(b) claim.  See Appendix 1 at 15.

1  See Mot. at 7-8. Plaintiff does not dispute these requirements, but instead twists dicta in Silicon

2  Storage to argue that, because Situ is named in the Complaint, his allegations are dispositive.[3]

3  See Opp. at 13-14. Plaintiff's argument is without merit. See also

4      This Court recently rejected a similar argument in In re Levi Strauss & Co. Sec. Litig.,

5  527 F. Supp. 2d 965 (N.D. Cal. 2007). The complaint in Levi also relied heavily on highly

6  publicized employee allegations, made by not one, but two *named* employees. Id. at 971. These

7  employees – former executives in the company's tax department – told reporters that the tax

8  department had engaged in widespread tax fraud. Id. at 968, 971-973. The Court nonetheless

9  dismissed the complaint for failure to plead falsity even though the Complaint repeated these

10  allegations and claimed that these executives were in a position to know about the alleged

11  wrongdoing.[4] Id. at 979-980.

12      Unlike Levi, Plaintiff here has not even established that Situ was in any analogous

13  "position to know." As Plaintiff concedes, a team of testers – over 146 employees at LDK –

14  closely analyzes the incoming inventory. See Opp. at 5-6.; Mot. at 4. The use of the feedstock

15  thus depends on LDK's proprietary process. See Mot. at 4. Plaintiff has pled no facts indicating

---

[3] Plaintiff argues that Defendants' cases are irrelevant because they include anonymous sources. The very reason why courts scrutinize confidential sources is that the credibility and foundation of these sources must be assessed; anonymous sources render this task more difficult. The requirement that sources possess sufficient knowledge and expertise to support a plaintiff's complaint remains the same. See, e.g., In re Daou Systems, Inc. Sec. Litig., 411 F.3d 1006, 1015 (9th Cir. 2005) ("Naming sources is unnecessary so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source, would possess the information alleged and the complaint contains adequate corroborating details.") (citation and internal quotation marks omitted).

Additionally, the inventory at issue in In re Silicon Storage, 2007 U.S. Dist. LEXIS 21953 (N.D. Cal. 2007), was a final product sold every day by the company, not an input to the company's manufacturing process. There, the allegations were also deemed insufficient, but the complaint alleged market prices. The Complaint here alleges no such knowledge or specifics about market price and Situ lacks foundation to provide such market price detail.

[4] Plaintiff attempts to distinguish Levi by merely calling Situ's claims "detailed." Opp. at 12. Plaintiff's distinction is irrelevant. Levi's holding did not turn on the quantity of detail. Rather, the accountants' detailed assertions were truly just a difference of opinion based on different judgments. Although not qualified, Situ's opinion regarding the usability of the polysilicon is similarly not a sufficient basis to infer fraud. Plaintiff also implies that Levi is bad precedent because the Court does not cite sufficient cases in the opinion. See Opp. at. 22, n. 15. As the Court is aware, Levi **is** precedent.

1 that Situ had expertise in LDK's proprietary process or knowledge to support his assertion that
2 the feedstock is unusable.

3     In pointing out the technical nature of this determination, Defendants are not claiming
4 that "the wafer production process is so complicated that no accountant could understand it."
5 Opp. at 2. Rather, the point is that *Situ* must have had sufficient expertise and knowledge to
6 opine on the usability of the feedstock, and he did not. Pleading that Situ was LDK's financial
7 controller does not remedy this deficiency. GAAP has nothing to do with the usability of the
8 feedstock. Situ's former job at a public company (providing wireless service) has nothing to do
9 with the usability of the feedstock. Furthermore, Plaintiff cannot establish that Situ acquired the
10 requisite technical knowledge in his seven-month tenure at LDK by attending some "green
11 meetings" at a canteen or climbing to the top of a LDK furnace.[5] Opp. at 13.

12     Nor can Plaintiff establish that Situ examined all of LDK's inventory, "including items in
13 transit [and] materials on the production line" by including this sentence in the Complaint. Opp.,
14 at 12-13 (referring to Compl. at ¶ 40). The Court need not accept as true conclusory allegations
15 that are contradicted by documents referred to in the complaint, such as Situ's email. See <u>In re</u>
16 <u>VISX Sec. Litig.</u>, Nos. C 00-0649 CRB, 2001 WL 210481, at *3 (N.D. Cal. Feb. 27, 2001). Situ
17 himself directly contradicts this allegation: "[t]he scope of the [review] is the feedstock ***in***
18 ***warehouse***. Feedstock in ***Material Department and in transit not yet verified.***" RJN, Ex. F
19 (Situ September 25, 2007 Email), at ¶ 6. Plaintiff alleges Situ did exactly what he admits he did
20 not do. This fact alone justifies dismissal. See Appendix 1.

    2. <u>The Independent Corroboration of LDK's Inventory Weighs Against Any Inference of Falsity</u>

22     Plaintiff contends that the Court should ignore the special committee's findings, KPMG's
23 audit opinion confirming LDK's inventory valuation, and the termination of the SEC
24 investigation. See Opp. at 22-23. Plaintiff is mistaken. The Complaint alleges that Defendants'

---

[5] Plaintiff seeks to avoid these devastating facts by simply casting LDK's motion as one attacking Situ as disgruntled. While Situ might well be disgruntled (regardless of whether he quit or was fired for absenteeism, as noted in the <u>Barron's</u> article that Plaintiff repeatedly cites in the Opp.), that was not the basis of LDK's motion. Rather, Situ admittedly lacked the foundation to assess the quantity or usability of LDK's feedstock. This lack of foundation is precisely the type of examination of Situ that should be done at this phase, and Plaintiff fails to carry his burden.

statements and conduct over the six months after the class period are relevant and corroborate Situ. Having done so, Plaintiff cannot selectively reveal only part of the story. In evaluating the sufficiency of a complaint, the Court is required to consider all reasonable inferences – not just those advocated by Plaintiff. See In re CNET, 483 F. Supp. 2d 947, 966 (N.D. Cal. 2007) (Alsup, J.) ("Plaintiffs are entitled to inferences in their favor at the pleading stage, however, those inferences must be reasonable. Plaintiffs are not entitled to pick and choose which of defendants' statements in public documents favor them and have all others ignored."). In CNET, for example, the Court took judicial notice of CNET's SEC filings, stating the special committee's investigation found that none of the officers or outside directors engaged in any wrongdoing. Id.

The fact that the Special Committee reviewed Situ's allegations and found them to be without merit weighs strongly against any inference of falsity. The parties advising the Special Committee – Simpson Thacher, a Big Four accounting firm, and the technical consultants – had every incentive to perform a comprehensive investigation and to reveal this "fraud" if it existed. Indeed, Plaintiff's insinuation that these professionals would jeopardize their reputation for a young company – which, according to Plaintiff, is unproven and cash starved – is unfounded. Moreover, the Special Committee was well aware of Situ's allegations and would not have overlooked the alleged discrepancy.[6] See Appendix 1.

Likewise, KPMG completed and signed off on LDK's third quarter financial results after the completion of the Special Committee investigation in December 2007. KPMG was fully aware of Situ's allegations at this time as well, and had professional obligations to investigate, resolve or report its concerns to the SEC if presented with information showing that LDK misstated its financials. See Securities Exchange Act of 1934, Section 10A(b). Nothing in the

---

[6] Nothing in the Complaint or any judicially noticeable documents supports Plaintiff's contention that Peng participated in the Special Committee of the Audit Committee. As the December 17, 2007 Form 6K states, "The Audit Committee's two outside directors, Louis T. Hsieh and Bing Xiang, oversaw the investigation." See RJN, Ex. C (LDK December 17, 2007 Form 6-K), at 2. These two directors were not employed by the Company and were not dependent on the Company for their living; neither Hsieh nor Xiang has been sued or had any connection whatsoever with the transactions under attack in Plaintiff's Complaint. Plaintiff pleads no facts to support his contention that their findings were biased.

pleadings suggests that KPMG found any evidence of fraud or the need to restate the quarterly results. Plaintiff's suggestion that KPMG's 2007 audit is silent as to the 3Q07 financials is also without merit.[7] While the clean audit opinions may have been less determinative in cases cited by Plaintiff, where the companies allegedly concealed a fraudulent scheme from its auditors, here, KPMG knew the details of Situ's allegations before its 3Q07 and 4Q07 review and its full-year 2007 audit.[8] See Appendix 1.

In sum, the fact that KPMG and the Special Committee – as advised by Simpson Thacher, a Big Four accounting firm, and technical experts – found Situ's allegations to be

---

[7] Plaintiff's argues that KPMG did not "audit" the 3Q07 inventory, so KPMG's work would not detect any errors in 3Q07 inventory. But Plaintiff's argument shows a fundamental lack of understanding of auditing of public companies. The interim financials are "reviewed" by the outside auditor, and if an error is identified, the auditor must do more work to satisfy itself that the interim quarterly financials are GAAP compliant. See Statement on Auditing Standards 100, Interim Financial Information ¶¶ 22-32 ("If, in performing a review of interim financial information, the accountant becomes aware of information that leads him or her to believe that the financial information may not be in conformity with generally accepted accounting principles in all material respects, the accountant should make additional inquiries or perform other procedures that the accountant considers appropriate to provide a basis for communicating whether he or she is aware of any material modifications that should be made to the interim financial information . . . ."). If the audit client does not respond appropriately, the auditor may need to consider resignation. Id.

[8] See Aldridge v. A.T. Cross Corp., 284 F.3d 72 (1st Cir. 2002) (outside auditor approved financial statements prior to any allegations of impropriety); Feiner v. SS&C Techs., Inc., 11 F. Supp. 2d 204 (D. Conn. 1998) (auditors were not aware of the alleged misstatements when certifying the prospectus and registration statement at issue); Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297 (C.D. Cal. 1996) (outside auditor approved financial statements prior to any allegations of impropriety).

Plaintiff's reference in Opp. 22-23 to KPMG not testing LDK's internal controls is actually a reference to the separate internal controls opinion required under Sarbanes Oxley, Section 404, which a foreign filer like LDK is not required to comply with until December 2008. However, outside auditors like KPMG nevertheless consider a company's internal controls as part of conducting a normal audit. See, e.g., Statement on Auditing Standards 109, *Understanding the Entity and Its Environment and Assessing the Risks of Material Misstatement* ("The auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures."); Statement on Auditing Standards 112, *Communicating Internal Control Related Matters Identified in an Audit*, ¶ 9 ("The auditor must evaluate identified control deficiencies and determine whether these deficiencies, individually or in combination, are significant deficiencies or material weaknesses."). Moreover, even if LDK's controls are not state of the art, this hardly equates to a strong inference that LDK knowingly misstated its inventory.

without merit rebuts any inference of falsity raised by the Complaint. <u>See, e.g.</u>, <u>In re Levi Strauss & Co. Sec. Litig.</u>, 527 F. Supp. 2d 965, 985-88 (N.D. Cal. 2007) (dismissing § 10(b) claim for failure to plead falsity because (1) "the audit committee's investigation, with the assistance of outside counsel, did not reveal material false or misleading statements based on the improprieties pled by plaintiffs," (2) "audited financial statements and filings with the SEC do not reflect any restatements for these improprieties," and (3) "KPMG issued unqualified audit opinions as to the financial statements.").

        3.     <u>Plaintiff Concedes the Inadequacy of the Pleadings by Changing His Theory of the Case</u>

That Plaintiff continues to change his theory discredits Plaintiff's allegations. First, the Complaint alleged that the SEC investigation corroborated Situ's allegation. <u>See</u> Compl. at ¶ 55. When the SEC terminated its investigation, Plaintiff then contends that it was improper to refer to the SEC. <u>See</u> Opp. at 3, 20-21.

Second, Plaintiff alleged that LDK's CFO Jack Lai confirmed that Situ's allegation was accurate. <u>See</u> Compl. at ¶54. However, after Defendants pointed out that Plaintiff had quoted the newspaper out of context when Lai was really confirming that Situ's allegation was only accurate as a partial picture, Plaintiff argues that all such post-class-period events are irrelevant. <u>See</u> Mot. at 2.

Third, Plaintiff alleges that Defendants' statements and actions through the six months after the class period are relevant and that LDK's financial results for 2Q07, 3Q07 and 4Q07 were all part of LDK's deception whereby it created a "non-current" inventory provision because of the anticipated audit by LDK's outside auditor. <u>See</u> Compl. at ¶¶ 57 – 60. But, in truth, LDK's statements after the class period and the 2007 financials do not corroborate Situ's allegations. And contrary to Plaintiff's misguided accounting argument, the 2007 financial results, including the non-current inventory, do not suggest fraud. Just the opposite. The 3Q07 results were announced and discussed during a conference call on December 19, 2007, and far from corroborating Situ's allegations, it was revealed that the Special Committee had concluded its investigation based on the work of the outside directors, Simpson Thacher, a Big Four accounting firm and polysilicon experts. The investigation confirmed the accuracy of LDK's

inventory and that there was no issue regarding missing or unusable inventory:

> "Mr. Situ's allegations of an inventory discrepancy were incorrect because he had not taken into account all locations in which the Company stored its silicon feedstock. The investigation further concluded that the Company is using each of its various types of silicon feedstock in the production of its multicrystalline solar wafers, and that a provision for obsolete or excess silicon feedstock is not required."

See RJN, Ex. C (LDK December 17, 2007 Form 6-K), at 2.

Similarly, the 4Q07 results and complete statements relating to the 2007 financial results reveal that Plaintiff's "accounting fraud" theory is not corroborated by the post-class events alleged in the Complaint. See Compl. ¶¶ at 57-60. Rather, the 2007 financials show that the classification of 8% of LDK's inventory in 4Q07 as non-current was the result of a substantial increase in LDK's inventory (over 600MT added in 4Q07, a 60% increase). Classifying a small percentage of its inventory as non-current, meaning that it could not be used in 12 months, does not support Situ's assertion that 284MT of inventory did not exist, and another 285MT was unusable. Nonexistent and unusable inventory cannot simply be classified as non-current. Thus, Plaintiff's accounting fraud theory (that this non-current inventory somehow shows that over 50% of LDK's inventory was missing or unusable) is false as a matter of GAAP. And KPMG's review and audit work relating to the 2007 financials did not find such missing or unusable inventory, nor did it lend any support for Plaintiff's demonstrably incorrect accounting fraud theory that 4Q07 "non-current" inventory proves Situ's claim about missing and unusable inventory.[9]

        4.         The Sources Allegedly Corroborating Situ Do Not Support Any Inference of Falsity

Though Plaintiff protests repeatedly that "Situ was not alone," the alternate sources cited by Plaintiff do not corroborate Situ's allegations. To begin with, Plaintiff's reliance on various newspaper articles parroting Situ's allegations cannot corroborate those allegations. See In re McKesson HBOC Secs. Litig., 126 F. Supp. 2d 1248, 1272-1273 (N.D. Cal. 2000) ("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than

---

[9] The 4Q07 clarification of 8% of LDK's inventory as non-current, i.e., not used within 12 months, does not reconcile or support Plaintiff's unfounded allegation that over 50% of LDK's inventory was nonexistent and unusable. Under GAAP, nonexistent or unusable inventory must be written-off completely. Plaintiff's effort to corroborate his speculation with the "non-current" inventory is simply a distortion of the true content of LDK's financials.

1  from plaintiff's counsel . . . .").

2  Plaintiff also contends that an anonymous source corroborated Situ's allegations to
3  Barron's. See Opp. at 2. This confidential source is not even known to Plaintiff and, according
4  to the article, is only "familiar with LDK's manufacturing." There is nothing establishing
5  whether this person truly exists, whether that person had any reason to have personal knowledge
6  of the accuracy of LDK's inventory, or what this source even said to Barron's. Due to this
7  complete lack of information, the Barron's source is the exact type of confidential witness that
8  should be ignored and not merely discounted under Tellabs. Tellabs, Inc. v. Makor Issues &
9  Rights, Ltd., 127 S. Ct. 2499 (2007). Higginbotham v. Baxter International, Inc., 495 F.3d 753,
10 757 (7th Cir. 2007) (explaining that allegations from "confidential witnesses" must be
11 "discounted" rather than ignored. Usually that discount will be steep.).

12 Equally dubious is Plaintiff's claim that Nick Sarno, LDK's Senior Vice President of
13 Manufacturing and Plant Manager, corroborates any inference of falsity. See Opp. at 14. Far
14 from bolstering Situ's claims, Sarno has said that LDK has secured at least 80% of its polysilicon
15 needs for 2008 and that LDK is on track in expanding its wafer production capacity. See RJN, Ex.
16 R, at 4, 5. Those statements are flatly inconsistent with Plaintiff's allegations that LDK had to delay
17 production to meet demand because LDK's feedstock was nonexistent or unusable.[10]

18        5.    LDK's "Worthless" Inventory Is Not Pled With Particularity

19 Defendants' moving papers established that Plaintiff failed to plead falsity with the
20 requisite particularity because he did not plead specific information on both the cost and market
21 price of LDK's inventory. See Mot. at 13-15. Plaintiff concedes that LDK acquired its
22 feedstock in legitimate transactions and does not contest the validity of the cost/book value of
23 LDK's feedstock. See Opp. at 7, n. 5. Rather, Plaintiff contends that LDK paid for 285 tons of

---

[10] Likewise, Plaintiff cannot identify a single securities analyst that has confirmed Situ's allegations – and for good reason. Analysts report on market conditions; they have no direct, personal knowledge of activities at LDK. They cannot add credence to Situ by reporting on the continuing specter created by Situ's earlier speculation. Like the SEC investigation, Defendants did not unilaterally interject analyst reports into this dispute – Plaintiff did. If the reports are relevant, they do not support the Complaint as Plaintiff claims. See Mot. at 12-13 and corresponding footnotes.

feedstock, whose market value has since inexplicably decreased to $0. Other than Situ's baseless speculation, Plaintiff provides no details as to which polysilicon is bogus or why it is useless.[11]

As documents cited in the Complaint or which are otherwise judicially noticeable demonstrate, however, the price of scrap polysilicon <u>rose</u> over the class period (Mot. at 13, nn. 11, 12), which means that LDK complied with GAAP by accounting for its inventory at cost.

### B. **The Complaint Fails To Allege Scienter**

As demonstrated in Defendant's opening brief, Plaintiff's Complaint fails to give rise to any inference, much less the requisite "strong inference," of scienter. <u>See</u> Mot. at 15 – 23. Plaintiff's Opposition is *completely silent* in response to virtually *all* of Defendants' arguments regarding the utter lack of any inference of scienter on the part of any individual defendant.

1) The Complaint does not identify any fraudulent statement from most Defendants, nor does it provide any factual assertions to suggest fraud by the individual defendants.
2) Plaintiff labels the case an "accounting fraud" to create the specter of wrongdoing, but the Complaint fails to identify the specifics of any legitimate accounting error, much less an accounting fraud. There was no restatement and independent parties other than Defendants addressed the accounting issues and confirmed the accuracy of LDK's inventory.
3) Lacking any suspicious sales by Defendants, Plaintiff argues that Defendants' lock-up agreement proves scienter. But the lock-up agreement actually undercuts any inference that the individual defendants had a financial motivation to inflate the stock price where the could not profit from it. And Plaintiff's theory is also contrary to a case directly on point – rejecting a nearly identical argument proffered by Plaintiff. <u>See</u> <u>Osher v. JNI Corporation</u>, 256 F. Supp. 2d 1144 (S.D. Cal. 2003) ("<u>Osher 1</u>"); <u>Osher v. JNI Corp.</u>, 308 F. Supp. 2d 1168 (S.D. Cal. 2004) ("<u>Osher 2</u>"), <u>aff'd in part, vacated on other grounds</u>, 183 Fed.Appx. 604 (9th Cir. 2006) ("<u>Osher 3</u>").

In sum, Plaintiff has not provided any basis for the Court to draw a strong inference of scienter.

### 1. <u>Plaintiff Fails To Provide Particularized Allegations That Any Defendant Made Misstatements With Fraudulent Intent.</u>

Plaintiff's Complaint fails to plead *a single specific fact* regarding any statements, acts or

---

[11] Plaintiff's other core allegation – that 284 MT of inventory simply did not exist – is completely undermined by the contracts to purchase polysilicon attached to the Registration Statement and Plaintiff's concession that there was no conspiracy to fabricate bogus transactions with outside vendors.

the state of mind of five of the seven defendants: Xingxue Tong, Qiqiang Yao, Liangbo Zhu, Yonggang Shao and Gang Wang. Similar to the Complaint, Plaintiff's Opposition relies solely on boilerplate allegations in a misguided attempt to impute liability to these five individuals. Indeed, the only reference in the Opposition to these five individuals is that "Defendants made false statements, that Defendants were told their statements were false prior to making them and that Defendants stood to gain billions of dollars from their false statements." See Opp. at 8. Plaintiff does not cite to any specific allegations as to *who* made misstatements, *what* was said, or what was to be *gained* from making such misstatements. Simply stated, Plaintiff's generic allegations fall far short of meeting the PSLRA's requirement to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" as to "*each* alleged misrepresentation or omission." See In re 2TheMart.com, Inc. Sec. Litig., 114 F. Supp. 2d 955, 960 (C.D. Cal. 2000) (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis added). This fact alone compels dismissal of the Complaint against these five individuals. See Appendix 1.

       In the same vein, while Plaintiff seeks to establish liability against Peng and Lai by referring to alleged misstatements, Plaintiff makes no specific allegations as to their state of mind while such statements were made. Plaintiff's Opposition, much like his Complaint, is completely bereft of any facts that implicate, much less give rise to a strong inference, that Peng or Lai made any misstatements or otherwise acted with the requisite intent. Indeed, Plaintiff's sole allegation regarding Peng's and Lai's state of mind is based on the fact that Situ "dealt directly with LDK's top management," which included Peng and Lai. See Opp. at 11. However, as the Ninth Circuit noted in In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1087-88 (9th Cir. 2002), allegations of "interaction with other corporate officers and employees" is insufficient to establish that Peng and Lai acted with a "strong inference" of scienter. See Appendix 1.

    2.    Plaintiff's Allegations Of Accounting Fraud Do Not Establish A Strong Inference Of Scienter

Defendants established in their opening brief that an unsupported allegation of accounting fraud is insufficient to establish a strong inference of scienter. See In re Pacific Gateway Exch., Inc., Sec. Litig., 169 F. Supp. 2d 1160, 1167 (N.D. Cal. 2001) ("allegations of failure to follow GAAP are not adequate to establish scienter, because scienter requires more

than a misapplication of accounting principles"). Plaintiff does not challenge this point.

To create the illusion of impropriety, Plaintiff uses the buzz-words "accounting fraud" but provides no factual allegations to support that loaded term. There has been no restatement and the accounting issues were addressed by people other than the Defendants. As alleged, Situ raised concerns about LDK's inventory as he left the Company. LDK investigated these allegations internally. See RJN, Ex. B at 4. The Special Committee was formed to investigate these concerns, hiring Simpson Thacher, a Big Four accounting firm, and other outside experts (see RJN, Ex. C at 2); the SEC began an informal inquiry (see Compl. ¶ 55); and KPMG performed its review of 3Q07 and 4Q07 and 2007 audits (see RJN, Ex. S, at 50, F-28).

The fact that several distinct and independent entities determined that there was no accounting errors establishes that Defendants' statements and actions were reasonable, and certainly not unusual or suspicious. See In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (finding that defendant's independent auditors' unqualified opinion that the financial statements presented fairly the financial position of the company was "highly probative" of an absence of scienter); see also In re Wet Seal Sec. Litig., 518 F. Supp. 2d 1148, 1166 (C.D. Cal. 2007) (finding that Deloitte's approval of the defendant's financial statements weighs against scienter as well).

In other words, the outcome of these independent investigations is highly probative of "non-culpable explanations" urged by the Defendants that may be "rationally drawn from the facts alleged." See Tellabs, 127 S. Ct. at 2510. Accordingly, under Tellabs, Plaintiff has not established scienter by merely alleging that disagreements in LDK's polysilicon inventory valuation is equivalent to accounting fraud. See Appendix 1.

    3.     Defendants' Lack Of Stock Sales Negates Any Inference Of Scienter

As demonstrated in Defendants' opening brief, the fact that none of the individual defendants sold a single share of LDK stock during the class period strongly undermines any inference of scienter. See Mot. at 20-21; see also Silicon Graphics, 183 F.3d at 986 (finding no strong inference of fraud where defendants retained over 90% of their stock holdings); In re FVC.com Sec. Litig., 136 F. Supp. 2d 1031, 1038 (N.D. Cal. 2000) (finding no scienter where

1  defendants retained over 86% of stock holdings and all insiders retained over 90%). Plaintiff
2  asks the Court to ignore the complete absence of any suspicious stock sale, arguing that the lock-
3  up agreement prevented Defendants from profiting from the alleged fraud. See Opp. at 19. But
4  logic and the law are to the contrary. Logically, if refraining from suspicious trades counters
5  scienter, then signing a contract committing to refrain from trading does not evidence scienter
6  because Defendants knew that they would not be able to profit from fraudulent stock inflation.

7  Moreover, under the terms of the lock-up agreement, Defendants *had the ability to sell all
8  of their shares* to the underwriters (Morgan Stanley and UBS) or to the public with the
9  permission of the underwriters. See RJN, Ex. A. at 114. Thus, if Defendants went to the trouble
10 of fraudulently inflating LDK's inventory to inflate the stock price, they would have sold it to the
11 underwriters or to the public, as the actual terms of the lock-up authorize. Refraining from doing
12 so here is just as exculpatory and devastating to Plaintiff's speculation on scienter as the absence
13 of other types of suspicious trades. And the Ninth Circuit has endorsed this exact same
14 conclusion. See Osher 2 (holding that defendants' lack of stock sales despite ability to sell
15 shares during a secondary offering pursuant to a lock-up agreement undermines any suggestion
16 of suspicious activity), aff'd in part, vacated on other grounds, Osher 3.

17 Plaintiff cites No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America
18 West Holding Corp., 320 F.3d 920 (9th Cir. 2003) ("America West") for the proposition that the
19 lack of stock sales under the "lock-up" agreement somehow provides "strong support for an
20 inference of scienter." Opp. at 19. Plaintiff's reliance on America West is misplaced.

21 In America West, the Court found a strong inference of scienter against the defendants
22 because the defendants engaged in a large number and percentage of stocks trades, which,
23 coupled with the timing of the sales and the prior trading history of each defendant, showed that
24 the stock sales "were clearly 'calculated to maximize the personal benefit from undisclosed
25 inside information.'" America West, 320 F.3d at 940 (citation omitted). During the class period,
26 most defendants sold 100% of their shares, with the lowest percentage being 88% at premium
27 prices. Id. at 939-40. Under these facts, the Court concluded that "the stock sales by the
28 individual defendants were unusual and suspicious and give rise to a strong inference of

scienter." Id.  The Court's finding of a strong inference of scienter in America West had nothing to do with the lock-up agreement, as Plaintiff now claims.

In stark contrast to America West, none of the individual defendants here engaged in *any trades*, let alone any unusual and suspicious trades that could even suggest an inference of scienter.  Accordingly, Plaintiff's reliance on America West is entirely unavailing.

The present situation is much more akin to the Court's holding in Osher 1, where the Court rejected the argument that a lock-up agreement supports a strong inference of scienter:

> [P]laintiffs have not explained how the lock-up agreements support their allegation that defendants acted with scienter. It is unclear, for instance, how the lock-up agreements furthered defendants' scheme by inflating the stock prices. Equally unclear is why defendants – if they were so eager to rid themselves of JNI stock – would have entered into the lock-up agreements in the first place.

Id. at 1165.  The Court concluded "'even taking into consideration defendants' limitations on trading, plaintiffs have failed to plead facts that establish defendants' stock sales were suspicious in quantity, price or timing." Id.

As in Osher 1, the fact that Defendants voluntarily entered into a lock-up agreement undermines any inference of scienter.  Defendants had no motive to inflate LDK's stock price during the period they knew they would not trade.  In addition, contrary to Plaintiff's assertion that the lock-up is an absolute bar, the individual defendants could have sold all of their shares to the underwriters or to the public with the underwriters' permission.  See RJN, Ex. A, at 114.  The fact that the individual defendants did not engage in any "unusual or suspicious" trading activity weighs against finding a strong inference of scienter.[12]

### III. CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  May 1, 2008

Respectfully submitted,
LATHAM & WATKINS LLP

By _____/s/_____
James J. Farrell

---

[12] Plaintiff retreats to saying Defendants' motive was the viability of LDK, which courts have consistently rejected.  See Mot. at 21.

**APPENDIX 1**

| **Specific Allegation** | **Lack of Falsity and Scienter** |
|---|---|
| **1) June 1, 2007 prospectus:**<br><br>"we believe that our polysilicon feedstock inventory and commitments are sufficient to satisfy over have 90% of our estimated requirements for 2007 and approximately 50% of our estimated requirements for 2008" (¶ 86) and our financials are GAAP. (¶ 88-95) (emphasis added) | • **True Forward Looking Statement:** This forward looking statement anticipates LDK will have sufficient inventory to meet its needs for 2007. Not only a protected statement, even with hindsight, it was true. As the audited financials for 2007 show, as well as the 3Q07 and 4Q07 results discussed in the Complaint, LDK had sufficient feedstock to complete 2007. There is no allegation that a single customer's order was not fulfilled, and since Situ left LDK in September 2007, there no source for an allegation to the contrary.<br>• **Wrong Data:** The GAAP violation is based on Situ's speculation that the inventory was missing or unusable. But even Situ's claim is based on August 31, 2007 data -- <u>two</u> <u>months</u> <u>after</u> the prospectus. (Exh. F, p. 1) There is nothing to suggest that the inventory was wrong in June, even under the most liberal reading of the Complaint. In fact, when Plaintiff attempts to specify how the June prospectus was incorrect regarding the inventory valuation, he cites the August 31 data, which had yet to occur. (Compl ¶ 87, citing ¶ 37).<br>• **Lacks Foundation:** Plaintiff's GAAP allegations are further undermined by the fact that the Prospectus only included audited financials for 2005 and 2006, along with KPMG's audit opinion as to those financials. And it included unaudited financials for 1Q07, ending March 31, 2007. Situ was only hired in March 2007 and has never made any claim that those financials were false. Neither Situ nor plaintiff has any possible foundation to contend what is specifically false about LDK's inventory as of March 2007 and the Complaint is silent on this. (¶ 88-95). |
| **2) August 1, 2007 Release:**<br><br>"Our results demonstrate our success in providing [] high-quality [] wafers at significant cost advantages. . . . we executed our growth strategy . . . [and] continued to make progress on our cost reduction [by] advancements of our production processes." (¶ 97)<br><br>**Aug 1, 2007 Conference:**<br><br>Lai said inventory increased to $174 million.(¶ 112) | • **No Allegation of Falsity:** Other than spin, the Complaint offers nothing to show that Peng's statement – about providing quality wafers, following a growth strategy, and reducing costs through "production processes" improvements – is an actionable statement regarding LDK's <u>inventory</u>.<br>• **Statements Made Before Situ e-mail:** Lai's 8/1 statement pre-dates Situ's claim on 9/25 that the inventory was misstated. Lacking specifics, Plaintiff <u>assumes</u> and applies Situ's Sept. inflation ratio back to 8/1. Situ's email chain includes an email on 9/25, 9/10 and 6/28. (Exh F) Only the 9/25 email is addressed to defendants beyond Lai, and that is the only email that includes the inflated inventory claim, so Situ's claim cannot show intentional deception for any defendant on 8/1. The 6/28 email discusses a range of issues, such as insufficient coordination, LDK's semi-manual system, rapid expansion, untrained workers and a dangerous workplace. But it does not say LDK's inventory is inflated. Similarly, the 9/10 email discusses the difficulty of not being able to use the financial records to plan production needs and the desire for an ERP system that would satisfy both production and finance needs. Such a sophisticated unified inventory management system is laudable and underway, but not a misstatement of inventory. The blending of different types of polysilicon makes the production inventory tracking more demanding than the financial system, which just records quantity at its costs. |
| **3) October 4, 2007 Release:**<br><br>"management team believes that [Situ's] allegations have no merit." (¶ 123). | • **No Specificity:** Simply <u>assumes</u> that every Defendant is a member of management and responsible for this statement, which is conclusory and unfounded.<br>• **No Scienter:** The timing and limited distribution of Situ's emails counter this allegation regarding the "true belief" of Defendants.<br>• **No Falsity:** This statement occurs <u>after</u> the alleged corrective disclosure so it is not actionable. <u>In re Hansen Natural Corp. Sec. Litig.</u>, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007). Plus, Defendants' belief is corroborated by the post Class Period events alleged in the Complaint (¶ 54-60), including the SEC investigation and the 3Q07 and 4Q07 financials, which included the completion of an independent investigation and outside audit. |