1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE LDK SOLAR SECURITIES
LITIGATION.

No. C 07-05182 WHA

————————————————/

This Document Relates to:

    All Actions.

**ORDER DENYING
DEFENDANTS' MOTION TO
DISMISS**

————————————————/

## INTRODUCTION

    In this federal securities action, a consolidated class of securities purchasers is suing

defendant companies LDK Solar Co., Ltd., Jiangxi LDK Solar, and LDK Solar USA, Inc.,

and individual defendants Xiaofeng Peng, Jack Lai, Xingxue Tong, Qiqiang Yao, Liangbao

Zhu, Yonggang Shao, and Gang Wang for materially overstating the quantity and value of their

inventory.  Once the market realized the alleged discrepancies, the value of LDK securities

dropped.  Defendants now move to dismiss this action for failure to state a claim upon which

relief can be granted under the heightened pleading standards of the Private Securities

Litigation Reform Act.  For the reasons stated below, the motion is **DENIED**.

## STATEMENT

    Plaintiffs are a putative class of persons who purchased LDK securities from June 1,

2007, through October 7, 2007.  Investor Shahpour Javidzad was appointed lead plaintiff.

In brief, plaintiffs contend that defendants doctored LDK's financial statements and inventory

and made public statements to make the company appear more profitable than it actually was,

United States District Court

For the Northern District of California

1    thereby inducing more investments. When the market became aware of the accounting

2    irregularities, the value of LDK's stock plummeted.

3       This order must take the well-pled allegations in the complaint as true. Defendant LDK

4    is a manufacturer of multicrystalline solar wafers. It was incorporated in the Cayman Islands,

5    headquartered in China, and traded on the New York Stock Exchange. Defendant Jiangxi LDK

6    Solar is a Chinese entity that is LDK's operating subsidiary. Defendant LDK Solar USA, Inc.,

7    is LDK's United States subsidiary. The individual defendants are as follows.

8       Defendant Xiaofeng Peng was the company's founder, chairman of the board, and chief

9    executive officer. He owned about 70% of LDK's outstanding shares. Defendant Jack Lai was

10    the chief financial officer, executive vice president, and secretary. They were charged with

11    having made, approved, or adopted statements regarding LDK's share price, including

12    statements in LDK's IPO prospectus (which they signed), statements in an August 2007 press

13    release, statements during an August 2007 conference call with analysts, and statements in an

14    October 2007 press release.

15       Defendant Xingxue Tong was the president and chief operating officer. Defendant

16    Qiqiang Yao was the vice president and chief accounting officer. He was a registered

17    accountant in China but was not a CPA in the United States. Defendant Liangbao Zhu was the

18    executive vice president of LDK and a member of the board of directors. Defendant Yonggang

19    Shao was the senior vice president and a member of the board of directors. Like Chairman

20    Peng, they were charged with making, approving, or adopting false statements leading to an

21    artificial inflation of LDK's price, including statements in LDK's IPO prospectus (which they

22    signed), and statements in August and October 2007 press releases. They did not, however,

23    make statements during the August 2007 call with analysts. Finally, defendant Gang Wang was

24    a member of the board of directors. He was alleged to have made, approved, or adopted

25    numerous false statements in LDK's prospectus that caused LDK's share price to be artificially

26    inflated.

27       The only moving defendants in this action are LDK, LDK Solar USA, Inc., Chairman

28    Peng, and CFO Lai. Moving defendants say that they are the only ones who have been served

1   with the complaint and summons.  According to plaintiffs' opposition, the other defendants

2   (Jiangxi LDK Solar, Xingxue Tong, Qiqiang Yao, Liangbao Zhu, Yonggang Shao, and

3   Gang Wang) "have not yet been served because counsel for Defendants has not yet agreed to

4   accept service on their behalf (or even clarify which, if any, of the unserved defendants they

5   actually represent) and because of the difficulty of executing service in China" (Opp. 5 n.4).

6   Accordingly, lead plaintiff Javidzad has moved to serve the remaining unserved defendants

7   through LDK's California office.  The hearing for this motion is set for June 19, 2008.

8   This order does not pertain to the nonmoving, unserved defendants.

9          A "whistleblower" named Charley Situ is central to the revelations in the complaint.

10  In February 2007, LDK's lead auditor, KPMG, "warned the Company's board of directors that

11  LDK's inventory accounting was inadequate.  KPMG also identified a 'significant deficiency'

12  in LDK's internal controls."  In response, LDK specifically hired Situ in mid-March "to deal

13  with the inventory and other accounting issues KPMG had identified" (Compl. ¶¶ 69–70).

14  Prior to joining LDK, Situ was a financial controller at China GrenTech Corporation Limited,

15  a NASDAQ-traded company, where he had been "responsible for [the company's] compliance

16  with U.S. GAAP and other internal control requirements under the U.S. securities laws"

17  (*id.* at ¶ 35).  At LDK, Controller Situ reported directly to Chief Accounting Officer Yao,

18  who in turn reported to CFO Lai.  As part of his financial controller duties, Situ worked with

19  various departments in the company to implement the Enterprise Resource Planning software.

20  This software was used to run every aspect of the company, including managing inventory.

21         LDK went public on June 1, 2007, as a manufacturer of solar wafers, an essential

22  product in solar cells.  Chairman Peng founded and exercised extensive control over the

23  company, even though he had little experience in the industry.  At that point, the solar industry

24  was highly competitive, with many well-established and well-funded global players.

25  Nonetheless, during its August 2007 conference call to investors, LDK announced that its

26  "vision" was to become the world's "largest, lowest cost producer of solar wafers" (*id.* at ¶ 27).

27  Consequently, LDK needed millions of dollars in additional capital.  Without a longer operating

28  history that could inform investors about the competence of management and likelihood of

future profits, LDK needed a strong balance sheet and evidence that the company could produce wafers more cheaply than its competitors.

Plaintiffs allege that LDK failed to abide by the Generally Accepted Accounting Principles — *i.e.*, accounting conventions, rules, and procedures recognized by the accounting profession and the SEC. Investors expect the financial statements of public companies to be prepared in accordance with GAAP and SEC regulations. According to GAAP, inventory may not be accounted for more than its actual worth; it must be valued at the lower of its acquisition cost or the "market" value. LDK's prospectus stated that it adhered to this rule.

LDK regularly purchased scrap materials from which it hoped to extract polysilicon, one of the main materials used in wafer manufacturing. Polysilicon can be obtained in two ways: it can be purchased in its raw form, or it can be extracted from scrap materials. The latter means of purchase is considerably cheaper. Many scrap materials, however, have so many impurities as to render them worthless and unusable. LDK therefore employed a team of inspectors to sort through already-purchased scrap materials and to identify which materials could or could not be used.

After purchasing any scrap materials, LDK accounted them as current inventory and valued them at the acquisition cost. After the LDK employees sorted through the scrap and found worthless pieces, LDK was supposed to reduce the value of the inventory to reflect the "market" value of the scrap materials, in accordance with GAAP. In addition, LDK should not have included in its reported stock of current inventory materials that did not exist or materials deemed unusable. These "unusable" pieces were scrap materials acquired at a low price but were of such poor quality that it could not be used within a year or, in *most* cases, ever. Instead, however, LDK continued to value the worthless scrap materials at cost rather than at "market" value.

LDK's inventory accounting skewed the company's reporting on profitability in the following manner. According to its prospectus, LDK used the "weighted average method" to value its inventory. That meant LDK divided the total amount it paid to purchase its polysilicon inventory by the total number of tons of polysilicon feedstock in inventory to

United States District Court

For the Northern District of California

calculate, for accounting purposes, the average price paid per ton of feedstock. The average price paid per ton was treated as the cost paid to acquire each ton of feedstock used in production — regardless of whether it was a ton of scrap materials or a ton of pure polysilicon. This method of accounting would allegedly have been permissible had the raw material counted as inventory actually existed and was usable within the current period. During the class period, however, LDK counted as current inventory materials that did not even exist or had too many impurities to have any economic value. Low-quality scrap accumulated in LDK's warehouse while the company continued to use the higher-quality and pricier polysilicon feedstock in production. Yet, LDK included the inexpensive low-quality scrap materials when calculating the cost paid to buy a ton of feedstock used in production. This accounting practice made polysilicon costs seem lower and artificially inflated profits.

Specifically, the complaint alleges the following misrepresentations (which will be discussed in greater detail below). *First*, defendants publicly released a prospectus for the company's IPO on June 1, 2007. The prospectus, however, overstated the amount of polysilicon inventory, which was key to the company's overall value, and erroneously stated that LDK's financial statements had been prepared in accordance with GAAP. *Second*, LDK issued a press release on August 1, 2007, that asserted that LDK's cost reductions were due to its growth strategy and "advancements in the production process." The press release also reported a high value on LDK's inventory and reassured investors of GAAP compliance. In reality, plaintiffs say, LDK's vaunted ability to produce at a low cost was based on the fraudulent manipulation of the inventory accounting. *Third*, that same day, Chairman Peng and CFO Lai hosted a conference call for analysts and investors regarding LDK's recently-released financial statements for the first and second quarters. During this call, defendants inflated the amount and value of the inventory. *Fourth*, LDK issued another press release on October 4, 2007, the day after Piper Jaffray published a research note about Controller Situ's resignation and potential accounting irregularities. LDK said that Situ's allegations had no merit.

In late September 2007, Controller Situ resigned. Although defendants imply that Controller Situ was fired, the complaint says otherwise (Compl. ¶ 65): "In late September,

United States District Court

For the Northern District of California

1   with management refusing to heed his advice, and fearing that he would be implicated in

2   securities fraud if he remained at LDK, Situ resigned from the Company."  Furthermore, in a

3   September 2007 email for which defendants requested judicial notice, Controller Situ wrote,

4   "I am sure now [assuring the accuracy of financial data and acting as the interface with KPMG]

5   is an unachievable task for any professional so I hereby reiterate that I have no choice but to

6   quit the job in order to keep away from any potential securities fraud, as well as many other

7   non-compliances or violations" (Req. Jud. Not. Exh. F).[1]

8           On October 3, 2007, Piper Jaffray published a research note that LDK's financial

9   controller had left the company.  The research note stated that "[w]e are also aware of the

10  former controller's allegations of poor financial controls and . . . [an] inventory discrepancy"

11  (Compl. ¶ 78).  The analyst who had written the note added that he had spoke to CFO Lai about

12  the claims, and, because of the conversation, the analyst had no reason to doubt LDK's

13  assertion that Controller Situ's claims were false.  Nevertheless, as a result of the unexpected

14  news, LDK's shares closed at $51.65 on October 3, which represented a 24.4% drop from the

15  previous day's close of $68.31.  Trading volume was extremely high that day.

16          This order takes judicial notice of the following SEC filings and public documents.

17  On October 4, 2007, the Piper Jaffray analyst issued a report for LDK entitled, "Management

18  Defends Financials; Ind Audit Pending; Some Risk 'Priced In.'"  Defendants say that the

19  analyst maintained LDK's rating at "Outperform," the highest designation given by Piper

20  Jaffray.  The analyst, however, also rated LDK's volatility as "high."  The article further stated,

21  "We note that the company had already admitted to 'significant deficiency and other weakness

22  in internal control over financial reporting' in its 3/31/07 SEC filing noting that LDK did not

23  have GAAP experience prior to its CFO hired in August 2006.  Also, the nature of LDK's

24  business makes inventory valuation inherently difficult given that LDK manufactures solar

25  wafers made from scrap silicon that can include powder, broken semi wafers, tiny fragments of

26  impure broken wafers, and wire saw slurry recovery from multiple sources at multiple prices . .

27

28          [1]  Ordinarily evidentiary material, such as the emails between Charley Situ and defendants, are not
    proper subjects of judicial notice.  Nonetheless, the Court has reviewed the emails and finds that they actually
    bolster plaintiffs' case, thereby reinforcing the Court's decision to move forward with this action.

United States District Court

For the Northern District of California

. As a reminder, polysilicon inventory accounting is important because its consumption directly affects cost of goods sold and profitability" (Req. Jud. Not. Exh. I).

LDK announced in its Form 6-K, dated October 4, 2007, that Situ had been "terminated for cause on September 25, 2007." (As stated, this announcement controverts the complaint, which says that Situ resigned.) The Form 6-K further stated, "LDK's management team and board of directors formed an internal committee to investigate the allegations and conduct an immediate physical inventory of LDK's polysilicon materials. The management team found no material discrepancies as compared to LDK's financial statements. The management team believes that these allegations have no merit. Additionally, the Audit Committee has asked an independent auditing firm to conduct a separate, independent engagement on LDK's inventory" (Req. Jud. Not. Exh. B at 2).

On October 8, 2007, *Barron's* published an article describing Controller Situ's allegations in greater detail. Among other things, the article said that the company may have overstated its inventory by up to $92 million. It also cited a second, unidentified source who confirmed that LDK had serious problems with the quality of its polysilicon inventory. That day, LDK's shares closed at $37.50, which was down 26.4% from the previous trading day's close of $50.95. Again, the trading volume was high. The price of LDK stock had declined 45.1% since the day before the October 3 disclosure (Compl. ¶¶ 78–81).

In December 2007, LDK's audit committee announced its conclusions. Another Form 6-K dated December 17, 2007, stated that there were "no material errors in the Company's stated silicon inventory quantities as of August 31st, 2007 . . . and Mr. Situ's allegations of an inventory discrepancy were incorrect because he had not taken into account all locations in which the Company stored its silicon feedstock." The audit committee consisted of two outside directors, and the investigation was conducted by outside independent accountants and the audit committee's independent counsel, Simpson Thacher & Bartlett LLP (Req. Jud. Not. Exh. C at 2).

After the results of the internal investigation had been announced, LDK issued its third-quarter financial statements for 2007 on December 20, 2007. There were no restatements

1   (Req. Jud. Not. Exh. D at 2).  On February 25, 2008, LDK also issued its fourth-quarter

2   financial statements for 2007 without any restatements (Req. Jud. Not. Exh. U at 2).

3   These statements were part of LDK's Form 6-K filings.

4           Plaintiffs filed a consolidated class complaint on March 10, 2008.  They asserted the

5   following allegations: (i) all the defendants violated Section 10(b) of the Securities Exchange

6   Act of 1934 (the "Exchange Act") and Rule 10b-5; and (ii) the individual defendants violated

7   Section 20(a) of the Exchange Act.  Plaintiffs sought compensatory damages and reasonable

8   costs and expenses incurred in the action, including attorney's fees.

9           Defendants attempt to introduce a letter from the SEC to LDK's counsel dated

10  March 24, 2008.  The letter stated, "[W]e do not intend to recommend any enforcement action

11  by the Commission" (Req. Jud. Not. Exh. G).  There is, however, no language in the letter

12  stating that the SEC exonerated LDK or why the SEC decided not to pursue an enforcement

13  action.  Moreover, this letter is not a proper subject of judicial notice.

14          On March 31, 2008, independent registered public accounting firm KPMG issued its

15  audit opinion, which was attached to the Form 20-F filed with the SEC.  Consolidated balance

16  sheets for December 31, 2006, and 2007, were attached.  The opinion concluded, "In our

17  opinion, the consolidated financial statements referred to above present fairly, in all material

18  aspects, the financial position of the Group as of December 31, 2006 and 2007, and the results

19  of its operations and its cash flows for the period from July 5, 2005 (date of inception) to

20  December 31, 2005 and the years ended December 31, 2006 and 2007, in conformity with U.S.

21  generally accepted accounting principles" (Req. Jud. Not. Exh. S at F-2).  In April 2008,

22  defendants filed their motion to dismiss on the ground that the complaint fails to meet the

23  heightened pleading standards under the Private Securities Litigation Reform Act, 15 U.S.C.

24  78u-4.

25                              **ANALYSIS**

26          "[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with

27  any motion to dismiss for failure to plead a claim on which relief can be granted, accept all

28  factual allegations in the complaint as true."  *Telltabs, Inc. v. Makor Issues & Rights, Ltd.*,

United States District Court

For the Northern District of California

8

United States District Court

For the Northern District of California

1    127 S.Ct. 2499, 2509 (2007).  "[C]ourts must consider the complaint in its entirety, as well as

2    other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss,

3    in particular, documents incorporated into the complaint by reference, and matters of which a

4    court may take judicial notice." *Ibid*.  "Under the PSLRA's heightened pleading instructions,

5    any private securities complaint alleging that the defendant made a false or misleading

6    statement must: 'specify each statement alleged to have been misleading [and] the reason or

7    reasons why the statement is misleading,' and 'state with particularity facts giving rise to a

8    strong inference that the defendant acted with the required state of mind.'" *Id.* at 2508.[2]

9         In arguing its motion to dismiss, defendants ask the Court to take judicial notice of SEC

10   filings and public documents.  "Under the incorporation by reference doctrine, we also consider

11   documents submitted by Defendants that were referenced in the complaint and whose

12   authenticity has not been questioned." *No. 84 Employer-Teamster Joint Council Pension Trust*

13   *Fund v. America West Holding Corp.*, 320 F.3d 920, 925 n.2 (9th Cir. 2003).  For other publicly

14   filed documents, "[a] court may take judicial notice of public filings when adjudicating a

15   motion to dismiss a complaint for failure to state a claim upon which relief can be granted." *In*

16   *re Calpine Sec. Litig*., 288 F.Supp.2d 1054, 1076 (N.D. Cal.2003) (Armstrong, J.).  This order

17   therefore finds that the documents referenced in plaintiffs' complaint and the SEC filings are

18   proper subjects of judicial notice.

19        Defendants contend that the consolidated class action complaint should be dismissed

20   under FRCP 12(b)(6) for the failure to meet the heightened pleading standards set forth by the

21   PSLRA, 15 U.S.C. 78u-4.  To state a claim under Section 10(b) of the Exchange Act,

22   the action's basic elements must include the following: (i) a material misrepresentation

23   (or omission); (ii) scienter (a wrongful state of mind); (iii) a connection with the purchase or

24   sale of a security; (iv) reliance (also known as "transaction causation"); (v) economic loss;

25   and (vi) loss causation (a causal connection between the material misrepresentation and the

26   loss). *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).  In the instant

27   action, defendants argue that the complaint fails to allege falsity, fails to establish a strong

28

---

[2]  Internal citations are omitted from all cites unless indicated otherwise.

inference of scienter, attacks forward-looking statements protected by the safe-harbor provision

of the PSLRA, fails to plead loss causation, and fails to state a Section 20(a) claim.

These arguments will be addressed below.

**A.   HAVE PLAINTIFFS ADEQUATELY ALLEGED FALSITY AND SCIENTER?**

Although defendants considered the falsity and scienter requirements separately,

this order will address them at the same time.  According to *In re Daou Systems, Inc.*, 411 F.3d

1006, 1014–15 (9th Cir. 2005), "'falsity and scienter in private securities fraud cases are

generally strongly inferred from the same set of facts,' and the two requirements may be

combined into a unitary inquiry under the PSLRA."

The Supreme Court articulated the following analysis in determining whether pleaded

facts gave rise to a "strong inference" of scienter:

> The strength of an inference cannot be decided in a vacuum.
> The inquiry is inherently comparative: How likely is it that one
> conclusion, as compared to others, follows from the underlying
> facts?  To determine whether the plaintiff has alleged facts that
> give rise to the requisite "strong inference" of scienter, a court must
> consider plausible nonculpable explanations for the defendant's
> conduct, as well as inferences favoring the plaintiff.  The inference
> that the defendant acted with scienter need not be irrefutable, *i.e.*,
> of the "smoking-gun" genre, or even the "most plausible of
> competing inferences."  Recall in this regard that § 21D(b)'s
> pleading requirements are but one constraint among many the
> PSLRA installed to screen out frivolous suits, while allowing
> meritorious actions to move forward.  Yet the inference of scienter
> must be more than merely "reasonable" or "permissible"— it must
> be cogent and compelling, thus strong in light of other explanations.
> *A complaint will survive, we hold, only if a reasonable person
> would deem the inference of scienter cogent and at least as
> compelling as any opposing inference one could draw from the
> facts alleged.*[3]

*Tellabs*, 127 S. Ct. at 2510 (emphasis added).  Furthermore, plaintiffs' allegations must be

considered as a whole.  "The inquiry, as several Courts of Appeals have recognized, is whether

*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether

any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 127 S.Ct.

at 2509.  *See also In re Daou* at 1024; *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,

---

[3]  Section 21D(b)(2) is the same as 15 U.S.C. 78u-4(b)(2), which requires plaintiffs to "state with
particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

10

380 F.3d 1226, 1234 (9th Cir. 2004).  Plaintiffs allege that, given the degree of falsity and how much LDK was notified of the inventory and accounting issues, defendants must have had the requisite scienter.

### 1.     Credibility of Controller Situ.

A main defense theme is that the complaint depends primarily on the allegations of Controller Situ but that he was not qualified to make such statements.  In *In re Silicon Storage Technology, Inc. Securities Litigation*, 2007 WL 760535 (N.D. Cal. 2007) (Hamilton, J.), the investor plaintiffs alleged that defendants made false or misleading statements concerning the company's sales prices and the value of its inventory, which in turn caused the company's statements of gross profit, net income, and total assets to be materially misleading.  The district court granted defendants' motion to dismiss.  One of the reasons was that plaintiffs failed to allege falsity because none of the "informants appear to have occupied positions at [the defendant company] during the relevant period that would have provided them with personal knowledge of the sales prices or market value of [the defendant company's] products." *Id.* at *19.

According to defendants, Controller Situ similarly lacked the expertise and personal knowledge to bolster the falsity claim.  His math and business degrees, CPA license, and job as an accountant did not make him qualified to comment on how much of the polysilicon was usable.  (LDK's quality-control employees, on the other hand, were better placed to determine usability of the feedstock.)  Defendants point to an email dated September 25, 2007, from Controller Situ to defendants and KPMG Hong Kong, where Controller Situ stated, *inter alia*, "it is a little more difficult to revaluate the quality [of the polysilicon feedstock]" (Req. Jud. Not. Exh. F).  This email, defendants say, showed Controller Situ admitting his lack of expertise.  Furthermore, Controller Situ only considered the polysilicon stored in *one* of LDK's several warehouses.[4]

---

[4]  As stated, this email is not a proper subject of judicial notice, nor should it be considered as evidence in support of defendants on a motion to dismiss.  This order nevertheless reviewed the email and notes that it aids plaintiffs' case (discussed *supra*).

United States District Court

For the Northern District of California

This order disagrees.  Unlike the anonymous informants in *In re Silicon Storage Technology*, Controller Situ worked at LDK for most of the class period.  He worked there from mid-March 2007 to late September 2007.  The class period was from June 1, 2007, through October 7, 2007.  He also occupied a position during the relevant period that would have provided him with personal knowledge of the alleged falsity.  The complaint stated that LDK overstated its inventory and understated its cost of production.  An accountant would be aware of such facts.  According to the complaint, KMPG warned the board of directors that the company's inventory accounting was "inadequate" and there was a "significant deficiency" in the internal controls.  Controller Situ was then specifically hired to deal with these matters.

For pleading purposes, it is not necessary that the source have personal firsthand knowledge in a strict evidentiary sense.  Rather, the source must be one whose context and access to critical information makes him or her reasonably reliable, such that his or her conclusions about the inner workings of the company are not speculative but reasonably informed.  *See In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970, 985 (9th Cir. 1999);  *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir. 2000).

Controller Situ satisfies this standard.  According to the complaint, "[i]n his emails Situ describes in detail the steps he took to confirm that the Company's publicly reported numbers were false.  At the end of August, Situ worked with warehouse personnel on a physical inventory which confirmed the inaccuracy of the inventory figures.  He reported that, to be sure that the audit was accurate, 'I myself . . . went to the warehouse physically to double check and reconfirm some critical data.'  Moreover, in reviewing whether LDK's actual inventory was consistent with what the Company was publicly reporting, Situ looked not only at items in the warehouse, but also polysilicon located elsewhere, including items in transit, materials on the production line and the small amount of polysilicon the Company had received on consignment" (Compl. ¶ 40).  Controller Situ made a detailed statement regarding how the LDK told investors that it had over 600 tons of feedstock in its warehouse when it had substantially less.  *He had been specifically hired to be aware of inventory and what was reflected in financial statements.*

United States District Court

For the Northern District of California

This order rejects defendants' claim that, because its other employees were more technically qualified to determine polysilicon usability, Controller Situ was not qualified to speak to the issue. Defendants cannot have it both ways. They cannot first say that only certain LDK employees, who did not have Controller Situ's accounting background, possessed the technical expertise to determine the usability of the feedstock, which affected accounting and inventory. They cannot then say that Controller Situ lacked the expertise to report on accounting and inventory — which was what he was specifically hired to do. If Controller Situ were ill-situated to make such findings, it is unclear who would have had the requisite background to report on the usability of feedstock *and* its effect on accounting and inventory.

Defendants assert that Controller Situ only looked at the materials in a single warehouse while LDK had four such warehouses. This order gives no weight to the defendants' unsourced, undated aerial photo (obtained from Google) pointing to its warehouses. Furthermore, it does not matter whether or not LDK had more than one warehouse. Both parties referred to "the" warehouse rather than "all" warehouses. *See* Compl. ¶ 32; Req. Jud. Not. Exh. F. The complaint also alleged that Controller Situ looked at polysilicon "located elsewhere" (Compl. ¶ 40). This order finds that the complaint sufficiently alleges that Controller Situ examined the different stockpiles of polysilicon feedstock.

This order also does not agree that Controller Situ "admitted" to lacking expertise. A longer excerpt of the email to which defendants cite states: "Many evidence and supporting documents can be found in the warehouse and other operation units, which can not reconcile the accounting books. Most important, the feedstock in the warehouse speaks [for] itself and the physical quantity can not be manipulated, I am sure KPMG (HK) will verify the same thing and find even more if it performs a professional audit, which is subsequently subject to KPMG (US) review and PCAOB inspection. And although it is a little more difficult to revalute the quality, most employees know the fact that there is little good feedstock for production although the 'paper number' is tremendous; most of the feedstock is obsolete stock by any criteria in fact" (Req. Jud. Not. Exh. F). This excerpt does *not* show that Controller Situ admitted an inability to

1    assess the evidence before him.  Accepting all allegations in the complaint as true, this order

2    finds that Controller Situ provided enough evidence to allege falsity.

3               **2.      Accuracy of Situ's Charges Against LDK.**

4               Defendants further argue that, even crediting Controller Situ's allegations, the complaint

5    fails to show Situ's fears ever proved out and that all it shows is that Situ raised issues over

6    which professionals had a good faith difference of opinion.  Plaintiffs failed to plead specific

7    information about the cost and market price of LDK's inventory to establish that it had been

8    overvalued, defendants say.

9               Defendants rely on *In re Levi Strauss & Co. Securities Litigation*, 527 F. Supp. 2d 965,

10   987 (N.D. Cal. 2007) (Whyte, J.).  There, a *San Francisco Chronicle* newspaper article reported

11   that two of Levi's former employees, who used to be managers in the tax department, alleged

12   improper accounting practices.  Levi stated otherwise.  Noteworthy were: Levi's audited

13   financial statements and filings with the SEC did not indicate that the financial information was

14   materially false or misleading; KMPG provided unqualified opinions of the years at issue that

15   required defendants to restate the company financials unrelated to the type of improper

16   accounting alleged by plaintiffs; and the audit committee's investigation, with the assistance of

17   outside counsel, did not reveal materially false or misleading statements.  The district court

18   concluded that "it is more plausible, as defendants suggest, that [the two former employees]

19   merely disagree with the tax positions taken by [defendant]."  *Id.* at 987.  For the district court,

20   this was not enough to allege falsity.

21              Defendants contend that the facts here mirror the circumstances in *Levi Strauss*.

22   Problems at LDK were initially publicized through the Piper Jaffray research note.

23   Defendants say that a two-month independent investigation conducted by people with more

24   expertise in the matter confirmed that LDK properly accounted for its inventory.  After an

25   internal investigation, LDK announced its third and fourth-quarter financial statements for 2007

26   without any restatement.  Finally, KPMG gave its unqualified opinion that LDK complied with

27   GAAP principles.

28

United States District Court
For the Northern District of California

14

In addition, the SEC and research analysts disagreed with Situ, defendants say. The SEC stated that it did "not intend to recommend any enforcement action by the Commission" (Req. Jud. Not. Exh. G). The October 2007 Piper Jaffray analyst stated that, after having spoken to the LDK CFO, he found no reason to dispute the polysilicon inventory. Taken together, this evidence shows a lack of falsity, defendants say.

Again, this order disagrees. Plaintiffs have sufficiently alleged falsity. The complaint does not rely solely on Controller Situ's charges. On July 19, 2007, he attended a meeting with defendants Yao and Lai, the chief engineer, and the plant manager. The chief engineer and plant manager expressed the following concerns (Compl. ¶ 39):

> Although, on paper, LDK's feedstock inventory looked tremendous, they often found themselves without the raw material they needed for production.

> They could not rely on the Company's official inventory numbers to plan production because, in many cases, the official numbers were "just paper number[s] and there are no items physically existing or just some unusable items."

> Despite the supposed abundance of LDK's feedstock inventory the manufacturing department often had to delay production and wait for the purchase of additional feedstock of a usable quality.

LDK's own Form 20-F annual report, dated April 7, 2007, disclosed that LDK "experienced delays in fulfilling purchase orders from some of our customers due to shortages in supplies of polysilicon feedstock" (Req. Jud. Not. Exh. S at 18).

In October 2007, the same Piper Jaffray analyst "noted that LDK management was claiming an average polysilicon feedstock cost of $150/kg, but observed skeptically that 'this amount appears extremely low given the $230/KG + blended cost at [LDK] competitors Yingli and Renesola'" (Compl. ¶ 47). In February 2008, the Piper Jaffray analyst further stated that "the addition of the new balance sheet line [in its inventory] 'would appear to validate some earlier investor fears that the company holds unusable inventory'" (*id*. at ¶ 59). A March 2008 *Barron's* article said that LDK's disclosures showed that "the Company was 'plow[ing] money into a growing scrap pile' and that LDK's accounting disclosure 'seems to validate LDK's former controller, who quit in September complaining that the . . . company refused to write off

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   silicon inventory that was unusable'" (*ibid.*).  In sum, there was other corroboration for

2   Controller Situ's allegations.

3         Moreover, the SEC letter did not "clear" LDK of wrongdoing.  "In instances where the

4   staff has concluded its investigation of a particular matter and has determined that it will not

5   recommend the commencement of an enforcement proceeding against a person, the staff, in its

6   discretion, may advise the party that its formal investigation has been terminated.  Such advice

7   if given *must in no way be construed as indicating that the party has been exonerated or that no*

8   *action may ultimately result from the staff's investigation of the particular matter*."  17 C.F.R.

9   202.5(d) (emphasis added).  Nothing in the letter explained why the SEC did not pursue an

10  enforcement proceeding against LDK.  In addition, the letter is not even properly admitted at

11  the motion-to-dismiss stage of the proceedings.

12        Nor did other investigations absolve LDK of liability.  *First*, the lack of a restatement

13  did not mean that LDK only engaged in legitimate conduct.  In *Aldridge v. A.T. Cross Corp.*,

14  284 F.3d 72, 72 (1st Cir. 2002), the First Circuit stated, "However, the fact that the financial

15  statements for the year in question were not restated does not end [the plaintiff's] case when he

16  has otherwise met the pleading requirements of the PSLRA.  To hold otherwise would shift to

17  accountants the responsibility that belongs to the courts.  It would also allow officers and

18  directors of corporations to exercise an unwarranted degree of control over whether they are

19  sued, because they must agree to a restatement of the financial statements."  *Second*, KPMG's

20  unqualified opinion did not necessarily exonerate LDK.  It did not specifically discuss the time

21  periods at issue; it discussed year-end results.  And with respect to its 2007 financial statements,

22  LDK stated that "neither we nor our auditors undertook an assessment of our internal control

23  over financial reporting Section 404 requirements described above as we and they will be only

24  required to do as of December 31, 2008" (Req. Jud. Not. Exh. S at 69).[5]  *Third*, officers and

25

26        [5]  The Form 20 stated, "Section 404 of the Sarbanes-Oxley Act and the related SEC rules require,
    beginning with our fiscal year ending December 31, 2008, that we evaluate the effectiveness, as of the end of
27  each fiscal year, of our internal control over financial reporting and include in our annual reports on Form 20-F
    for each fiscal year (i) a report of our management on our internal control over financial reporting that contains,
28  among other things, management's assessment of the effectiveness of our internal control over financial
    reporting as of the end of the most recent fiscal year, including a statement whether or not internal control over

United States District Court

For the Northern District of California

1    directors are not exonerated when their own audit committee finds nothing wrong in the

2    company's accounting practices.  To rule otherwise would create a huge fox-guards-the-

3    chicken-house loophole in our private securities law enforcement.  This order finds that

4    plaintiffs adequately alleged falsity.

5                    **3.        Allegations of Scienter.**

6          Defendants argue that the complaint failed to plead particularized facts creating a strong

7    inference of scienter, as required under the Supreme Court's decision in *Tellabs*.  "A complaint

8    will survive, we hold, only if a reasonable person would deem the inference of scienter cogent

9    and at least as compelling as any opposing inference on could draw from the facts alleged."

10   *Tellabs*, 127 S.Ct. at 2510.  A plaintiff may also rely on circumstantial evidence if the evidence

11   creates a "strong inference" of scienter.  *In re Silicon Graphics*, 183 F.3d at 986.

12         Defendants say that plaintiffs have not alleged any facts about the individual defendants'

13   state of mind.  For example, they make no allegations about defendants Peng and Lai's state of

14   mind even though they were the only individual defendants to have actually misspoke.

15   Rather, it is said, plaintiffs improperly rely on the group-pleading doctrine, which contradicts

16   the PSLRA's requirements.  *See Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007);

17   *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004).

18   Even if the group-pleading doctrine were allowed, defendants say that the complaint lacks facts

19   showing that the "non-speaking" defendants (Tong, Yao, Zhu, Shao, and Wang) were involved

20   in preparing the allegedly misleading statements.

21         This order finds that there was sufficient scienter without relying on the group-pleading

22   doctrine.  As stated, "[t]he inquiry, as several Courts of Appeals have recognized, is whether *all*

23   of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether

24   any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 127 S.Ct.

25   at 2509.  In *Communications Workers of America Plan for Employees' Pensions and Death

26   Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1123–24 (D. Ariz. 2007) (Campbell, J.),

27   ───────────────────

28   financial reporting is effective and (ii) the opinion of our registered public accounting firm, either unqualified or
     adverse, as to whether we maintained, in all material respects, effective internal control over financial reporting
     as of the end of such fiscal year" (Req. Jud. Not. Exh. S at 68).

1    the district court concluded that shareholder plaintiff had alleged facts giving rise to an

2    inference of scienter against the CEO and CFO of a company.  The complaint stated that serious

3    accounting errors occurred while the CEO and CFO held their high-level positions, that the

4    officers certified that financial results were compiled in accordance with GAAP and were

5    accurate, and the officers sold a substantial amount of stock.  Most of the witnesses in *CSK* did

6    not allege direct knowledge by the defendants, and "those who [did] provide[d] little or no

7    supporting detail."  *Id.* at 1123.  The district court stated, "[T]he Court must consider the

8    Second Amended Complaint as a whole, and in doing so the Court cannot conclude that the

9    inference of nonculpability is greater than the inference of scienter.  The widespread problems

10   at [the company] may have resulted from poor management, but it appears equally plausible

11   that [defendants] possessed the deliberate recklessness or fraudulent intent necessary for

12   scienter in this circuit."  *Id.* at 1124–25.  Similarly, all of the facts alleged here give rise to a

13   strong inference of scienter in the individual defendants.[6]

14        Plaintiffs have alleged that the solar industry was highly competitive.  As a relative

15   newcomer in need of additional funds, LDK had the motivation to attract investors with strong

16   financial statements.  Moreover, the false statements allowed LDK to inflate its stock price and

17   therefore increase defendants' net worth.

18        Most importantly, assuming that plaintiffs have established falsity, plaintiffs have

19   properly alleged that defendants were notified of the purportedly improper accounting practices

---

21        [6] One main difference between the instant action and the facts in *CSK Auto* is that defendants here did
22   not sell their stock during the class period.  Defendants argue that the lack of stock sales weighs strongly against
     a finding of scienter.  They cite *In re Pixar Securities Litigation*, 450 F. Supp. 2d 1096, 1107 (N.D. Cal. 2006)
23   (White, J.), for the proposition "the absence of insider trading by a defendant is highly relevant and undermines
     any inference of scienter."  Defendants' reliance on *In re Pixar* is misplaced.  Right before the statement cited
24   by defendants, the district court in *In re Pixar* said, "In [two other actions], the plaintiffs did not rely on
     allegations of insider trading to establish scienter.  Therefore, the courts found that the failure to allege selling or
25   trading did not negate the inference of scienter.  In contrast here, Plaintiff relies heavily on allegations of insider
     trading to establish scienter.  Therefore, the absence of insider trading by a defendant is highly relevant and
26   undermines any inference of scienter."  *Ibid.*  According to *In re Pixar*, it is unnecessary for defendants to
     engage in insider trading or to sell LDK stock to establish scienter.  Furthermore, the individual defendants
27   could not have sold stock even if they had wanted to.  They were prohibited from selling shares during the class
     period, according to the "lock-up" provision in LDK's Form F-1 registration statement that was filed with the
28   SEC (Req. Jud. Not. Exh. A at 6).  As stated by plaintiffs, the fact that there was no sale of stock does not cut in
     defendants' favor; rather, "[i]t was [defendants'] misfortune that Situ revealed the fraud before they were able to
     do so" (Opp. 19–20).

United States District Court

For the Northern District of California

during the time of misleading statements.  The following misleading statements were alleged.
*First*, on June 1, 2007, the company publicly released a prospectus in connection with its IPO.
The prospectus asserted that "we believe that our polysilicon feedstock inventory and
commitments from suppliers are sufficient to satisfy over 90% of our estimated requirements
for 2007 and approximately 50% of our estimated requirements for 2008" (Compl. ¶ 86).
The prospectus further stated that the financial statements accompanying the prospectus,
which went up to March 31, 2007, "have been prepared in accordance with U.S. generally
accepted accounting principles" (*id.* at ¶ 88).

Plaintiffs have sufficiently alleged that defendants knew there were inventory and
accounting discrepancies prior to the IPO.  In February 2007, LDK's lead auditor KPMG had
raised concerns about the "inadequate" inventory accounting and "significant deficiency"
in LDK's internal controls.  Shortly thereafter, LDK hired Controller Situ.  A report in *The Wall
Street Journal* stated that Controller Situ first raised his concerns about LDK's accounting in an
email sent to CFO Lai on May 29, 2007, two days before the IPO.  "In his email Situ told Lai
that the Company's financial and operational sides were using different sources and methods to
calculate inventory and output and that it was impossible to verify which figures were accurate.
Subsequently, in a June 27 email to CFO Lai Situ expressed concern that, with respect to
LDK's finances, '[t]he actual story is quite different from what the investors expect or are told'"
(Compl. ¶ 62).  Defendants were on notice, prior to the June 1st IPO, that Controller Situ could
not verify the inventory.

*Second*, on August 1, 2007, LDK issued a press release entitled, "LDK Solar Reports
Financial Results for the Second Quarter 2007."  The press release quoted Chairman Peng as
saying (*id.* at ¶¶ 96–97):

> "Our results demonstrate our success in providing our customers
> . . . with high-quality multicrystalline solar wafers at significant
> cost advantages.  During the quarter, we executed our growth
> strategy on plan . . . In addition to ramping our production lines,
> we continued to make progress on our cost reduction efforts
> through further advancements of our production processes."
>
> "By augmenting our strategy upstream, we believe we will
> enhance our cost efficiencies," concluded Mr. Peng.

19

United States District Court

For the Northern District of California

1   Plaintiffs allege that the press release was false because the cost reductions to which

2   Chairman Peng referred were caused by fraudulent manipulation of the company's inventory

3   accounting, not by the "growth strategy" or "further advancements of [LDK's] production

4   processes." The press release also contained what were purportedly LDK's financial statements

5   for the first and second quarters of 2007 and stated that LDK's financial results complied with

6   GAAP. The value of the inventory, however, was substantially lower than reported.

7       *Third*, that same day, defendants Peng and Lai hosted a conference call for analysts and

8   investors to explain LDK's recently-released financial statements. During the call, CFO Lai

9   stated that "[i]nventories increased from $140 million at the end of first quarter to $174 million

10  at end of second quarter, as we accumulated additional silicon feedstock" (*id.* at ¶¶ 111–12).

11  Chairman Peng further asserted that "the raw material is at 600, a little bit over 600 tons at the

12  warehouse at the end of the second quarter, which is about around 426 tons at the end of the

13  first quarter," and that one of LDK's key "advantages" was its low "operating cost" (*id.* at ¶¶

14  114, 116).

15      In addition to the May 29 email, however, Controller Situ sent another email to CFO Lai

16  on June 27, 2007, at CFO Lai's request. It stated (Req. Jud. Not. Exh. F) (emphasis added):

17          Thank you for asking the accounting, financial, HR, sales,
            manufacturing, capital expenditure or any other business issues
18          after June 1.

19          You may recall that I was reporting to you how the data process
            when you found the critical discrepancy between the 29.2 MW
20          reported in F1 and the 39.2 MW in another report. More in-depth
            knowledge is supplemented so that you will have a true and fair
21          view on the current LDK situation.

22          Some employees and departments are working separately and
            randomly and seldom coordinate each other and reconcile the data.
23          It is common for LDK to make errors at the very beginning of the
            workplace. The many errors proliferate themselves during the
24          filing process, accumulate with other errors generated in the later
            stage. It is just a number-game rather than a professional filing
25          process. "Garbage in, garbage out" is true even for a reliable
            system, for an unreliable system like LDK's manual or
26          semi-manual system, *the financial data is undoubtedly misleading.*
            *The critical discrepancy you found is only one of the many*
27          *examples*.

28          Further, the foreign experts working for LDK at different
            locations and divisions always have a Green Meeting every

20

United States District Court
For the Northern District of California

afternoon at the canteen.  They share the observation and trouble-shooting during the meetings and sometimes I attend and listen to them.  According to their opinion, there are more and more serious outstanding problems.  *The actual story is quite different from what the investors expect or are told.*  The expansion is too fast but lack necessary and fundamental management.  The workers are not only unqualified, but also untrained.  There are dangerous operating in the workplace from time to time and could lead to serious consequences.  *The yield rate is around 78%, far below the industrial average; but some times it appears a ridiculous rate of 140% at some report, etc.*

Contrary to defendants, this order finds that this email was enough to put defendants on notice that the financial statements were misleading.

*Fourth*, on October 4, 2007, LDK issued a press release about Controller Situ's allegations, stating, "The management team believes that these allegations have no merit" (Compl. ¶ 123).  Aside from the previous emails, there was more correspondence from Controller Situ (before his resignation) regarding the LDK inventory.  Controller Situ emailed CFO Lai again on September 10, 2007.  He wrote: "You may recall . . . a meeting with you . . . and me on July 19, 2007 asking for help with the following issues: Although the LDK feedstock inventory looks tremendous, it often lacks of raw material for production.  PMC and plant manager cannot base on the book inventory to plan the production because in many cases data is just paper number and there are no items physically existing or just some unusable items . . . The fact is that among the LDK feedstock only a small percentage is good stock.  According to US GAAP (ARB 43 Ch. 4; APB 28, etc.), the management should make provision in this regard.  In fact, nobody knows if LDK is profitable or not" (*id.* at ¶ 63).

A few days later, Controller Situ told defendants Lai and Yao during an internal conference call that two-thirds of the feedstock had been sitting for over 180 days and was worthless.  Controller Situ resigned shortly thereafter.  According to an online trade publication, *Greentech Media*, in early October, CFO Lai "acknowledged that Situ had raised the inventory issue with him while Situ was still at the Company" during a private conference call with some investors (*id.* at ¶ 66).

There were other alleged facts and circumstances supporting scienter.  "[U]pon the laying of a proper factual foundation that information was known within a corporation, it may

21

be inferred that facts critical to a business's core operations or an important transaction are known to a company's responsible officers." *In re Northpoint Communications Group, Inc., Securities Litigation*, 221 F. Supp. 1090, 1104 (N.D. Cal. 2002) (Alsup, J.). Here, the amount of polysilicon in inventory was critical to LDK's success. It could be reasonably and strongly inferred that LDK's responsible officers were aware of major discrepancies in how much inventory was being reported to the public and how much was actually present. In sum, there was sufficient evidence to generate a "strong inference" of scienter for the moving defendants. This order need not address whether or not plaintiffs have adequately alleged scienter with respect to the other defendants as they have not yet been served.

**B.    DOES THE SAFE-HARBOR PROVISION OF THE PSLRA PROTECT DEFENDANTS?**

Defendants argue that the various alleged misstatements made by LDK are forward-looking statements protected by the PSLRA safe harbor. The PSLRA provides "a safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements." *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004). "A 'forward-looking statement' is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *America West,* 320 F.3d at 936. The safe-harbor provision does not apply to a description of past or present events. *Id.* at 936–37. Defendants say that the complaint is premised on forward-looking statements and should therefore be dismissed.

No safe harbor applies. Here, it does not matter whether or not the statements were forward-looking or were accompanied by meaningful cautionary statements. The Ninth Circuit in *American West* held that "a person may be held liable if the 'forward-looking statement' is made with 'actual knowledge . . . that the statement was false or misleading.'" *Id.* at 936. Because plaintiffs have adequately alleged that defendants actually knew that the statements were false when the statements were made, the safe harbor does not apply.

*United States District Court*
For the Northern District of California

22

C.    HAVE PLAINTIFFS ADEQUATELY ALLEGED LOSS CAUSATION?

Under the PSLRA, another requirement for a Section 10(b) claim is loss causation —
or the causal connection between the material misrepresentation and the loss.  *Dura*, 544 U.S. at
342.  "[T]he logical link between the inflated purchase price and any later economic loss is not
invariably strong, since other factors may affect the price . . . However, to touch upon a loss is
not to *cause* a loss, as 15 U.S.C. § 78u-4(b)(4) requires."  *Id.* at 336–37 (emphasis in original).
Lower stock prices "may reflect not the earlier misrepresentation, but changed economic
circumstances, changed investor expectations, new industry-specific or firm-specific facts,
conditions, or other events, which taken separately or together account for some or all of that
lower price."  *Id.* at 343.  "[T]he 'short and plain statement' must provide the defendant with
'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* at 346.

Defendants claim that plaintiffs failed to allege loss causation.  In *In re Omnicom
Group, Inc. Securities Litigation*, 2008 WL 243788 (S.D.N.Y. 2008) (Pauley, J.), the district
court held on summary judgment that the investor plaintiffs failed to show loss causation.
There, the plaintiffs could not "demonstrate that the market reacted negatively to the
disclosures, rather than to other information simultaneously released to the market.  To prove
loss causation, plaintiffs must distinguish the alleged fraud form the 'tangle of [other] factors'
that affect a stock's price."  *Id.* at *7.  In *In re Omnicom Group*, the disclosures were made in a
newspaper article that included highly negative commentary about facts already known to the
market, and there were contemporaneous reports blaming the stock price decline on the article's
general tone and post-Enron "investor skittishness." *Ibid.*  In the instant action, defendants say
that plaintiffs did not plead any facts "to rule out the possibility of investor skittishness
stemming from China's unproven economy and mercurial political environment" (Br. 25).

This order disagrees.  The Supreme Court stated, "We concede that the Federal Rules of
Civil Procedure require only 'a short and plain statement of the claim showing that the pleader
is entitled to relief.'  And we assume, at least for argument's sake, that neither the Rules nor the
securities statutes impose any special further requirement in respect to the pleading of
proximate causation or economic loss." *Dura*, 544 U.S. at 346.  "A plaintiff is not required to

United States District Court

For the Northern District of California

show 'that a misrepresentation was the *sole* reason for the investment's decline in value' in order to establish loss causation. '[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement' but will play a role 'in determining recoverable damages.'" *In re Daou*, 411 F.3d at 1025.

Plaintiffs have adequately pled loss causation. The Ninth Circuit in *In re Daou* noted that the price of the defendant company's stock "fell precipitously after defendants began to reveal figures showing the company's true financial condition." 411 F.3d at 1026. The plaintiffs there further alleged that the stock price never recovered, nor were they ever able to match the artificially-inflated revenues reported during the class period. The Ninth Circuit therefore concluded that these allegations, if assumed true, were sufficient to put defendants on notice that the drop in stock price was causally related to alleged financial misstatements. *Ibid*. In contrast, the Supreme Court in *Dura* concluded that the complaint contained only one statement describing loss causation — "[t]hat statement says that the plaintiffs 'paid artificially inflated prices for [the defendant's] securities' and suffered 'damage[s].'" This single statement was not enough to allege loss causation. *Dura*, 544 U.S. at 346–48.

In the instant action, however, plaintiffs alleged that LDK artificially inflated its stock price by grossly misrepresenting the company's inventory. When more accurate information about the inventory entered the market on October 3, 2007, LDK's stock price dropped dramatically — 45.1% over five days. When the announcements came out, the trading volume in LDK stock was extremely high. The complaint states, "The decline in LDK's stock price at or near the end of the Class Period was a direct result of the Defendants' fraud being at least partially revealed to investors and the market. The timing and magnitude of LDK's stock price declines negate any inference that the loss suffered by Class Members was caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct. Defendants' misrepresentations during the Class Period

1   were the proximate cause of Plaintiff's losses" (Compl. ¶ 131).  This order finds that the

2   complaint provided fair notice of plaintiffs' claims and the grounds upon which the claims

3   rested.

4        **D.   HAVE PLAINTIFFS STATED A SECTION 20(A) CLAIM?**

5        "[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first

6   allege a violation of § 10(b) or Rule 10b 5."  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035

7   n.15 (9th Cir. 2002).  Defendants contend that, because there was no violation of Section 10(b),

8   they cannot be held liable under Section 20(a).  As this order has already found that plaintiffs

9   have adequately alleged a Section 10(b) violation, the Section 20(a) claim is not dismissed.

10                      **CONCLUSION**

11        For the foregoing reasons, the motion to dismiss is **DENIED**.  Plaintiffs have met the

12   heightened pleading standards of the PSLRA for LDK and LDK Solar USA, Inc., and

13   individual defendants Peng and Lai.  Specifically, plaintiffs have adequately alleged, *inter alia*,

14   falsity, scienter, and loss causation.  Nor are these defendants protected by the safe-harbor

15   provision of the PSLRA.

16        This order does not, however, address the claims against remaining (and unserved)

17   defendants Jiangxi LDK Solar, Xingxue Tong, Qiqiang Yao, Liangbao Zhu, Yonggang Shao,

18   and Gang Wang.  Lead plaintiff Javidzad has recently moved for an order permitting him to

19   serve the as-yet unserved defendants through LDK's California office.  The hearing therein is

20   currently set for June 19, 2008.  Plaintiffs' claims against these remaining defendants will be

21   addressed at a later time.

22

23        **IT IS SO ORDERED.**

24

25   Dated:  May 29, 2008.

                                    _____
26                                    WILLIAM ALSUP
                                    UNITED STATES DISTRICT JUDGE

27

28