PAGES 1 – 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

```
IN RE LDK SOLAR              )
SECURITIES LITIGATION,       )
                             )         NO. C 07-5182 WHA
                             )
                             )
_____)
```

SAN FRANCISCO, CALIFORNIA
THURSDAY, MAY 22, 2008

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

FOR PLAINTIFF:          COHEN MILSTEIN HAUSFELD & TOLL
                        ONE EMBARCADERO CENTER
                        SUITE 2440
                        SAN FRANCISCO, CA  94111
                 BY:    **MICHAEL PAUL LEHMANN**
                        **ATTORNEY AT LAW**


                        COHEN MILSTEIN HAUSFELD & TOLL
                        1100 NEW YORK AVE NW
                        WEST TOWER, SUITE 500
                        WASHINGTON, DC  10005
                 BY:    **HERBERT E. MILSTEIN**
                        **ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:            JAMES YEOMANS, CSR #4039, RPR
                        OFFICIAL REPORTER

            COMPUTERIZED TRANSCRIPTION BY ECLIPSE

1    **APPEARANCES: (CONTINUED)**

2    FOR DEFENDANT:              LATHAM & WATKINS
                                140 SCOTT DR.
3                               MENLO PARK, CA 94025
                          BY:  **PHILIP J. WANG**
4                               **ATTORNEY AT LAW**

5

6                               LATHAM & WATKINS
                                633 WEST 5TH STREET, SUITE 4000
7                               LOS ANGELES, CA 90071
                          BY:  **JAMES JOSEPH FARRELL**
8                               **ATTORNEY AT LAW**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   THURSDAY, MAY 22, 2008                                    1:00 P.M.

2           (THE FOLLOWING PROCEEDINGS WERE HEARD IN OPEN COURT:)

3           **THE CLERK:**  IN RE LDK SOLAR SECURITIES LITIGATION,

4   CASE NUMBER 07-5182.

5           **MR. LEHMANN:**  YOUR HONOR, MICHAEL LEHMANN ON BEHALF OF

6   THE PLAINTIFF CLASS FROM THE FIRM COHEN MILSTEIN HAUSFELD &

7   TOLL.  AND I HAVE WITH ME TODAY HERBERT MILSTEIN WHO WILL BE

8   DOING THE ARGUMENT.

9           **MR. MILSTEIN:**  GOOD AFTERNOON.

10          **THE COURT:**  AND WHO ELSE?

11          **MR. KAPLAN:**  MATTHEW KAPLAN.

12          **THE COURT:**  WHO?

13          **MR. KAPLAN:**  MATT KAPLAN.

14          **THE COURT:**  WHICH ONE IS HE?  WELCOME TO YOU, TOO.

15  WHO IS THAT, OUR LEAD PLAINTIFF?

16          **MR. LEHMANN:**  YES.

17          **THE COURT:**  VERY WELL.  OVER HERE.

18          **MR. FARRELL:**  GOOD AFTERNOON, YOUR HONOR.

19          I'M JIM FARRELL WITH LATHAM & WATKINS, I'LL BE

20  REPRESENTING THE DEFENDANTS.  I HAVE WE ME TODAY PHIL WANG.

21          **THE COURT:**  WELCOME TO BOTH OF YOU.

22          **MR. FARRELL:**  THANK YOU.

23          **THE COURT:**  THIS IS A MOTION TO DISMISS.  IT'S YOUR

24  MOTION, MR. FARRELL, PLEASE GO AHEAD.

25          **MR. FARRELL:**  THANK YOU, YOUR HONOR.

1          I'M CERTAIN YOU'RE FAMILIAR WITH THE PAPERS, SO I'LL

2     BE VERY BRIEF AND TOUCH ON A FEW KEY CONCEPTS THERE.  AND TO

3     THE EXTENT, AGAIN, BEING JUDICIOUS WITH YOUR TIME, QUESTIONS OR

4     RESPONDING TO POINTS RAISED BY THE PLAINTIFFS, THAT'S WHERE I

5     SHOULD RESERVE THE BULK OF MY TIME AND DISCUSSION WITH YOU.

6          **THE COURT:**  THAT'S FINE.

7          **MR. FARRELL:**  QUICKLY, YOUR HONOR, THE COMPLAINT THAT

8     WE HAVE BEFORE US TODAY LACKS BOTH ALLEGATIONS THAT WOULD

9     ESTABLISH WITH THE PARTICULARITY REQUIRED, FALSITY OR SCIENTER.

10         THE SOLE SOURCE FOR THE INFORMATION CONTAINED IN THE

11    COMPLAINT IS A PERSON NAMED CHARLIE SITU AND WE HAVE PUT BEFORE

12    YOU MR. SITU'S VERY E-MAIL THAT IS THE SOURCE FOR THE

13    PLAINTIFFS TO MAKE THESE ALLEGATIONS.  SO THAT YOU DON'T HEAR

14    FILTERED THROUGH THEM BUT FROM CHARLIE SITU DIRECTLY.

15         IN THAT E-MAIL HE ACKNOWLEDGES BOTH THAT HE HAS NOT

16    COUNTED THE INVENTORY THAT'S AT ISSUE AND THAT IT WOULD BE

17    ESSENTIALLY JUST REPEATING A RUMOR AS TO WHETHER OR NOT THAT

18    INVENTORY IS USABLE.

19         THE INVENTORY AS YOU RECALL THAT WE'RE TALKING ABOUT

20    HERE, LDK MANUFACTURES SOLAR WAFERS AND ONE OF THE RAW

21    MATERIALS THAT IT USES IS A PRODUCT THAT'S ESSENTIALLY A METAL

22    CALLED POLYSILICON, SAME MATERIAL IN THE CD'S, SAME MATERIAL

23    SHINY SORT OF ROCK, ESSENTIALLY PRESSED SAND SILICON.

24         AND THAT MATERIAL IS TREATED IN LDK PROCESS.  AND ALL

25    OF THIS IS CONTAINED IN THE REGISTRATION STATEMENT.  THEY HAVE

1   A PROPRIETARY PROCESS WHEREBY THEY USE BOTH VIRGIN POLYSILICON

2   AND RECYCLED MATERIALS.

3           THEY USED POT SCRAP, POWDER, BROKEN DISKS, THINGS OF

4   THAT NATURE, NONE OF THAT IS DISPUTED.  THEY BLEND THOSE THINGS

5   IN DIFFERENT RATIOS TO MAKE AN APPROPRIATE WHAT THEY CALL INK,

6   GET THEY SLICE IT INTO THESE WAFERS USED TO MAKE SOLAR PANELS.

7           AND THE PROPERTY OF THAT RAW MATERIAL, THAT ROCK IS

8   WHAT IS AT ISSUE.  WHAT CHARLIE SITU SAYS, WHAT THE PLAINTIFF

9   SAY HE SAYS, WELL, IT WAS UNUSABLE, WE HAVE ASCERTAINED IT IS

10  UNUSABLE.

11          A PERSON WITHOUT ANY ENGINEERING, NO TECHNICAL

12  BACKGROUND OF ANY KIND, ONLY WITH THE COMPANY FOR SIX MONTHS,

13  LOOKS AT HUNDREDS OF TONS OF DIFFERENT TYPES OF SHINY BROKEN

14  DISKS AND SAYS 285 TONS IS NOT USABLE.

15          THAT'S NOT WHAT HAPPENED AND HIS E-MAIL CLARIFIES

16  THAT'S NOT WHAT HAPPENED.  IN HIS E-MAIL HE STATES THAT HE'S

17  ESSENTIALLY JUST REGURGITATING A RUMOR.  HE SAYS IT WOULD BE

18  MORE DIFFICULT TO ASCERTAIN USE-ABILITY.

19          IN OTHER WORDS, WHAT DO I KNOW CHARLIE SITU ABOUT THE

20  USE-ABILITY OF THIS MATERIAL.  IT'S NOT ALLEGED ANYWHERE IN THE

21  COMPLAINT THAT HE HAS THE BACKGROUND TO MAKE SUCH A

22  DETERMINATION OR THAT HE TESTED IT IN ANY FASHION.

23          HE CAN'T COME IN AND SAY, WELL, 285 METRIC TONS OF

24  THIS MATERIAL IS UNUSABLE, EXCEPT JUST BY REGURGITATING A

25  RUMOR.  HE SAYS IN HIS E-MAIL THAT HE HEARD IT, THAT IS NOT

1    SUFFICIENT UNDER THE REFORM ACT.

2             **THE COURT:**  DO YOU HAVE COPY OF THIS E-MAIL RIGHT

3    THERE?

4             **MR. FARRELL:**  I DO.  IT WAS PART OF THE REQUEST FOR

5    JUDICIAL NOTICE, IT WAS EXHIBIT F.

6             **THE COURT:**  FINE.  HAND UP A FRESH COPY.

7             **MR. FARRELL:**  SURE.

8             **THE COURT:**  ALL RIGHT.  SO CHARLIE SITU WRITES LAST

9    SEPTEMBER?

10            **MR. FARRELL:**  THAT'S RIGHT, SEPTEMBER 25, YOUR HONOR.

11   AND WE'LL GET TO THE TIMING ISSUE AS WELL.  THE TIMING OF THIS

12   IS ALSO CRITICAL HERE.  THE TIMING IS, E-MAIL AS YOU'LL SEE

13   COMES AFTER, THERE'S ONLY THREE STATEMENTS THAT ARE ALLEGED AT

14   ISSUE, THIS COMES AFTER TWO OF THEM.

15            BUT, FIRST OF ALL, YOUR HONOR, LET ME DIRECT YOU IF

16   YOU HAVEN'T ALREADY LOCATED IT, MORE THEN HALFWAY DOWN TO THE

17   FIRST PAGE.  THERE'S A STATEMENT THAT READS "AND ALTHOUGH IT'S

18   A LITTLE MORE DIFFICULT TO RE-EVALUATE THE QUALITY, MOST

19   EMPLOYEES KNOW THE FACT THAT THERE IS LITTLE GOOD FEEDSTOCK

20   FROM PRODUCTION.  ALTHOUGH, THE PAPER NUMBER IS TREMENDOUS MOST

21   FEEDSTOCK IS OBSOLETE.

22            HE'S DONE NOTHING TO DETERMINE THAT.  THERE'S NO TEST,

23   THERE'S NO ALLEGATION IN THE TEST, THERE'S NO ALLEGATION THAT

24   HE'S A CONTROLLER, A FINANCIAL PERSON WHO HAVE ANY ABILITY TO

25   DO THAT.

1       QUITE THE CONTRARY LDK'S REGISTRATION STATEMENT, AND

2    NOT EVEN ATTACKED IS LDK HAS A PROCESS WHEREBY THEY DO TEST THE

3    MATERIAL.  THEY HAVE 146 EMPLOYEES IN THE QUALITY CONTROL

4    GROUP, THEY TEST RAW MATERIALS AS IT'S PURCHASED.

5       THEY ATTACH IN THEIR REGISTRATION STATEMENT THE VERY

6    PURCHASE CONTRACTS TO PURCHASE THE MATERIAL.  NO ALLEGATION OF

7    THE PURCHASES ARE FALSE, THAT THE PURCHASES ARE DECEPTIVE, THAT

8    THE SELLERS POLYSILICON SCRAP MATERIAL, WHICH ALL THE FOLKS IN

9    THIS INDUSTRY USE, IS SOMEHOW A DECEPTIVE CONSPIRACY, WHEREBY

10   THEY WERE PURCHASING SOME DEFECTIVE PRODUCT IN SOME KIND OF

11   COLLUSION WITH THE SELLERS OF THIS PRODUCT.

12      QUITE THE CONTRARY ALLEGATIONS IN THE COMPLAINT SAY,

13   YEAH, THERE'S A MARKET FOR RECYCLED POLYSILICON AND THERE ARE

14   PURCHASES FOR THAT.

15      SO THE E-MAIL ITSELF, YOUR HONOR, YOU WOULD ALSO NOTE

16   ONE OF THE OTHER POINTS ON FOUNDATION, I WOULD LIKE TO MOVE TO

17   SOME OTHER POINTS.

18      **THE COURT:**  JUST REFRESH MY MEMORY.  HE WAS -- HIS JOB

19   WAS WHAT?

20      HOW DID MR. SITU GET INVOLVED IN THIS PROBLEM?

21      SAYS HERE THAT HE WAS A -- HAD SOME ROLE BE INTERFACED

22   WITH KPMG.

23      **MR. FARRELL:**  THAT'S, RIGHT, YOUR HONOR.  HE WAS A

24   FINANCIAL CONTROLLER AT THE COMPANY HIRED IN MARCH OF 2007, SO

25   IT'S SEPTEMBER OF 2007 HE'S BEEN THERE SIX MONTHS.  AND HE IS

```
 1   CERTAINLY --
 2            THE COURT:  HE'S EMPLOYED BY THE COMPANY?
 3            MR. FARRELL:  BY THE COMPANY, YES.
 4            THE COURT:  INTERFACE WITH THE ACCOUNTANTS?
 5            MR. FARRELL:  HE DOES ON OCCASION INTERFACE WITH THE
 6   ACCOUNTANTS, SURE, THAT'S A POSSIBILITY.
 7            THE COURT:  SAYS HERE, YOU AND THE CAO, IS THAT CHIEF
 8   ACCOUNTING OFFICER?
 9            MR. FARRELL:  THAT'S HOW I INTERPRET IT.
10            THE COURT:  EVER ASK ME TO ASSURE THE ACCURACY OF
11   FINANCIAL DATA AND ACT AS THE INTERFACE WITH PEOPLE.
12            SO ONE RESPONSE TO YOUR ARGUMENT IS THAT HE'S BEEN
13   ASKED BY THE COMPANY TO GET INVOLVED WITH THE ACCOUNTING AND BE
14   INTERFACE WITH KPMG AND SO HE'S REPORTING THAT ROLE.
15            MAYBE NOT A TECHNICAL PERSON BUT HE'S REPORTING THAT
16   THE WORD IN THE COMPANY IS THAT THE FEEDSTOCK IS BOGUS.  AND
17   EVEN IF HE'S NOT ABLE TO DO A CHEMICAL TEST HIMSELF.
18            SO WHY WOULDN'T OR, AT LEAST, FOR PLEADING PURPOSE,
19   WHY WOULDN'T THAT BE GOOD ENOUGH?
20            MR. FARRELL:  YOUR HONOR, THERE'S AN IMPORTANT POINT
21   TO RESPOND TO THAT.
22            ONE, KPMG HAS DONE AN AUDIT IN 2006 AND THEN IN 2007,
23   AND IN NONE OF THOSE AUDITS HAS KPMG ASCERTAINED THERE'S ANY
24   MERIT TO THESE ALLEGATIONS.
25            IN FACT, FOLLOWING THIS E-MAIL ON -- IN SEPTEMBER,
```

1   LATE SEPTEMBER 2007, LDK DOES A SPECIAL INVESTIGATION, CREATES

2   A COMMITTEE OF THE -- AUDIT COMMITTEE, A SPECIAL COMMITTEE OF

3   THE AUDIT COMMITTEE THAT ONLY HAS OUTSIDE DIRECTORS, NO

4   OFFICERS DIRECTORS.

5           HIRE SIMPSON THATCHER, HIRES ANOTHER DIFFERENT THEN

6   KPMG BIG FOUR ACCOUNTING FIRM AND SAYS IMMEDIATELY IN OCTOBER

7   INVESTIGATE THIS.

8           TWO MONTHS LATER IN DECEMBER WHEN THE THIRD QUARTER

9   2007 NUMBERS ARE RELEASED TO THE PUBLIC, THE COMPANY, THAT

10  SPECIAL COMMITTEE OF THE AUDIT ANNOUNCES SIMPSON THATCHER THE

11  BIG FORMER ACCOUNTING FIRM AND POLYSILICON EXPERTS ALL HIRED TO

12  DO THE INVESTIGATION, HAVE DONE AN INVESTIGATION AND HAVE

13  CONCLUDED MR. SITU WAS SIMPLY WRONG.

14          HE FAILED TO CONSIDER THAT THERE ARE OTHER PLACES

15  WHERE LDK SIMPLY KEEPS THEIR MATERIALS, DIDN'T LOOK THERE IN

16  TERMS OF USE-ABILITY.

17          THEY TESTED THE MATERIAL AS IT SAYS IN THEIR 6K FILING

18  IN DECEMBER, THEY TESTED THE TERMS AS PART OF THIS

19  INVESTIGATION, NO ABSOLUTE MATERIAL ALLOWANCE REQUIRED, THE

20  TERM FINE.

21          KPMG FOLLOWING THAT DOES A FULL AUDIT, BOTH REVIEWS

22  THE THIRD QUARTER 2007, FOURTH QUARTER 2007 AS IS TYPICAL AND

23  COMPLETES AN AUDIT IN 2007 AND THEY, AGAIN, EXPRESS NO

24  RESERVATION, NO INVENTORY MISCALCULATION, NO RESTATEMENT OF ANY

25  KIND.

1           **THE COURT:**  DID THEIR STOCK GO DOWN?

2           WAS THERE A PLUNGE IN THE STOCK PRICE?

3           **MR. FARRELL:**  CERTAINLY A DECLINE IN THE STOCK PRICE

4   AFTER THIS REVELATION CAME OUT IN OCTOBER 3.  WHEN THIS

5   ALLEGATION BECAME PUBLIC IT IS TRUE THE STOCK DECLINED.

6           NOW, THE STOCK ALSO IN INTERIM PERIOD RESUMED TO ITS

7   ESSENTIAL HEIGHTS SOME PERIOD THEREAFTER, BUT ASIDE FROM THAT

8   CERTAINLY STOCK DOES GO DOWN.

9           WE COULD ADDRESS, AND WE DO BRIEFLY ON A MOTION TO

10  DISMISS, BUT NOT SOMETHING I WAS GOING TO TAKE YOUR TIME WITH

11  NOW, BUT CERTAINLY WE DO ADDRESS LOST CAUSATION.  STOCK DOES

12  DECLINE ON THIS NEWS, THE SPECTER OF THIS NEWS BEING SOUNDS BAD

13  AND THE STOCK DOES RESPOND.

14          BUT IN TERMS OF WHETHER A FALSITY IS ALLEGED, WHETHER

15  SCIENTER IS ALLEGED, YOU GOT TO LOOK BACK TO THE POINTS WE MAKE

16  IN THE BRIEF.

17          ONE, MR. SITU DIDN'T COUNT ALL THE PLACES WHERE

18  INVENTORY WAS.  HE SAYS IN HIS E-MAIL, AGAIN, IN YOUR HANDS, HE

19  SAID DIDN'T LOOK AT THE MATERIALS DEPARTMENT, DIDN'T LOOK AT IN

20  TRANSIT, DIDN'T LOOK AT ALL THE PLACES, ESSENTIALLY CAN'T TELL

21  YOU DEFINITIVELY THERE'S SOMETHING MISSING, WHEN HE DIDN'T

22  LOOK.

23          AND LO AND BEHOLD THE INVESTIGATIONS THAT FOLLOW THEY

24  SIMILARLY CONCLUDED CHARLIE SITU DIDN'T LOOK IN ALL THE

25  LOCATIONS.

1          NOW, IN TERMS OF ADDRESSING THE ACTUAL FALSITY AN

2     SCIENTER POINTS THAT I WANTED TO MAKE WITH YOU, ANOTHER

3     CRITICAL POINT TO CONSIDER IS JUST QUITE SIMPLY THE TIMING.

4          IF YOU RECALL IN OUR REPLY, THE LAST PAGE OF OUR REPLY

5     WE SET OUT A CHART FOR YOU FOR EASE IN TERMS OF LINING UP THE

6     SPECIFIC ALLEGATIONS THAT THE PLAINTIFF HAS MADE AND THERE'S

7     ONLY ESSENTIALLY THREE.

8          THEY SAY IN JUNE OF 2007 THERE WAS AN IPO AND THERE

9     WERE FALSE STATEMENTS ASSOCIATED WITH THAT AND I'LL TELL YOU

10    WHAT THEY WERE.

11         THEY SAY IN AUGUST, AUGUST 1, 2007 THERE WERE FALSE

12    STATEMENTS IN CONJUNCTION WITH THE SECOND QUARTER AND I --

13    WE'LL TALK ABOUT THOSE AND THEN OCTOBER 4, 2007 THE TIMING OF

14    THAT IS CRITICAL.

15         BOTH THE FALSITY AND SCIENTER, AND MOST IMPORTANTLY

16    I'M STRESSING TO YOU NOW FOR SCIENTER, YOU CANNOT ALLEGE, THEY

17    HAVE NOT PROPERLY ALLEGED THE STRONG POWERFUL COGENT STATEMENT

18    OF EVENTS THAT WOULD GIVE RISE TO STRONG INFERENCES OF SCIENTER

19    WHEN THEY RELY ON THE SEPTEMBER 25 E-MAIL THAT CHARLIE SITU

20    SENDS TO JACK LAI ONE OF THE DEFENDANTS, NO OTHER DEFENDANT.

21         AND IN THAT SEPTEMBER 25 E-MAIL THERE'S NOTHING ABOUT

22    AND THERE'S NOTHING IN THE COMPLAINT THAT WOULD LINK IT TO SAY,

23    YOU KNOW, IN JUNE OF 2007 THREE MONTHS EARLIER WHEN YOU HAD AN

24    IPO, THE FINANCE STATEMENT IN THERE WERE FROM MARCH OF 2007

25    BEFORE CHARLIE SITU EVEN GETS TO LDK.  THOSE ARE THE FINANCIAL

1   STATEMENTS AT ISSUE THAT INVENTORY IS SOMEHOW WRONG.

2           THEY SHOULD HAVE KNOWN IN JUNE, THEY SHOULD HAVE KNOWN

3   IN THEIR MARCH 2007 FINANCIAL STATEMENTS BECAUSE OF A

4   SEPTEMBER 25 E-MAIL THAT'S NOT TRUE.  THAT DOESN'T MAKE ANY

5   SENSE AT, ALL.  LET ALONE A POWERFUL COGENT INFERENCE OF

6   SCIENTER.  THAT E-MAIL SENT TO ONLY ONE OF THE DEFENDANTS DOES

7   NOT DO THAT.

8           THEN THE SECOND STATEMENT THAT THEY LOOK AT IS, AS

9   YOU'LL SEE IN THAT TABLE, THE LAST PAGE OF OUR REPLY BRIEF, IS

10  ESSENTIALLY AUGUST 1 THERE ARE PRESS RELEASE AND A CONFERENCE,

11  A CONFERENCE CALL WHERE LDK TALKS ABOUT ITS SECOND QUARTER 2007

12  RESULTS AUGUST 1.

13          SEPTEMBER 25 E-MAIL STILL HAD NOT BEEN PROVIDED, THE

14  INFORMATION IN THE E-MAIL PERTAINS TO AUGUST 31 DATA.  AS OF

15  AUGUST 1 IT'S QUITE SIMPLY THE CASE THAT THE E-MAIL WASN'T

16  SENT, COULD NOT POSSIBLY BE THE BASIS FOR THIS TYPE OF A CLAIM.

17          AND THE FINAL STATEMENT THAT THE PLAINTIFFS RELY ON IS

18  OCTOBER 4, 2001, AFTER SEPTEMBER 25TH STATEMENT IS, WE BELIEVE

19  CHARLIE SITU IS WRONG, WE BELIEVE AND THE WORD BELIEVE IS IN

20  THERE, WE BELIEVE HE IS WRONG.

21          AFTER THE OCTOBER 3 CORRECTED DISCLOSURE, SO ON

22  OCTOBER 3 CHARLIE SITU'S ALLEGATION ARE RELEASED TO THE WORLD,

23  THE STOCK DOES DECLINE.  THAT'S ALLEGED IN THE COMPLAINT.

24          THE NEXT DAY THE COMPANY SAYS WE BELIEVE HE'S WRONG,

25  THAT'S NOT AN ACTUAL STATEMENT, FOLLOWING CORRECTED DISCLOSURE

1    THE TRUTH IS IN THE MARKETPLACE, THEY CANNOT THEN SAY, WELL, WE

2    BELIEVE THAT TYPE OF EXPRESSION OF BELIEF WAS FRAUDULENT, NOT

3    ACTIONABLE.

4        SO WE HAVE TWO STATEMENTS THAT OCCURRED BEFORE THIS

5    AROSE, ONE STATEMENT THAT CAN'T BE ACTIONABLE, ALL OF THE

6    STATEMENTS, THE SPECIFIC STATEMENTS THAT ARE ALLEGED IN THE

7    COMPLAINT, SO IN ADDITION --

8        **THE COURT:**  WHY CAN'T A BELIEF STATEMENT BE

9    ACTIONABLE?

10       **MR. FARRELL:**  WELL, YOUR HONOR, I'M ALLUDING TO, AS WE

11   EXPLAINED IN GREATER DETAIL IN THE BRIEFS, ESSENTIALLY WHAT

12   REALLY FOR THE STATEMENT TO BE WE BELIEVE CHARLIE SITU IS

13   WRONG, THEIR ALLEGING THAT ALL OF THESE DEFENDANTS, NONE OF

14   WHOM ARE IDENTIFIED AS ASSOCIATED WITH THE STATEMENT, THAT ALL

15   OF THEM HAD IN THEIR MINDS AN UNDERSTANDING THAT HE WAS RIGHT,

16   THAT THEY WOULD KNOW, IN FACT, HE WAS RIGHT.

17       ONLY JACK LAI RECEIVED THAT E-MAIL, THERE'S NOTHING

18   AND THEY HAVE ALLEGED NOTHING TO SUGGEST INDIVIDUAL DEFENDANTS

19   HAD THAT E-MAIL.  THAT INDIVIDUAL DEFENDANTS' STATE OF MIND IS

20   SUCH THAT THEY, IN FACT, KNOW CHARLIE SITU WAS RIGHT.

21       **THE COURT:**  WELL, I THOUGHT THE LAW, OKAY, YOU'RE MAY

22   BE WERE NOT FAR DIFFERENT, BUT I BELIEVE THE LAW IS THAT IF

23   SOMEONE MAKES A STATEMENT THAT SAYS I BELIEVE X AND THEY HAVE

24   NO -- AND THEY REALIZE THAT THEY HAVE NO BASIS, REASONABLE

25   BASIS ON WHICH TO MAKE THAT STATEMENT, EVEN THOUGH THEY DON'T

1    KNOW IF IT'S TRUE OR NOT, IN OTHER WORDS, RECKLESS DISREGARD

2    FOR THE TRUTH, THAT'S ACTIONABLE.

3         **MR. FARRELL:**  SO THERE'S, YOUR HONOR, I UNDERSTAND

4    YOUR POINT AND, I GUESS, I HAVE TWO RESPONSES.

5         ONE, A STATEMENT ABOUT BELIEF LIKE THAT WOULD AND

6    COULD, WHEN IT SAYS BELIEF BE CONSIDERED TO BE A TYPE OF

7    PUFFERY FORWARD-LOOKING.

8         THIS IS LITERALLY AFTER HIS ALLEGATIONS HAVE COME OUT

9    AND THE COMPANY HAD MERELY SAID, WELL, WE DON'T BELIEVE THAT

10   HE'S RIGHT.

11        **THE COURT:**  HOW CAN THAT BE FORWARD-LOOKING WHEN HE'S

12   TALKING ABOUT THE INVENTORY AS EXISTS NOW?

13        **MR. FARRELL:**  THE BELIEF IS THAT HE'S WRONG, THEY

14   DON'T SAY HE'S DEFINITIVELY WRONG.

15        **THE COURT:**  I DON'T SEE THAT AS FORWARD-LOOKING.  IT

16   IS A BELIEF AND EVEN IF IT'S INACCURATE, YOU WOULD BE CORRECT

17   IT WOULD HAVE TO BE MORE THAN INACCURATE, IT WOULD HAVE TO BE

18   RECKLESSLY INACCURATE BEFORE IT WOULD BE ACTIONABLE, THAT WOULD

19   BE TRUE.

20        I DON'T SEE HOW A BELIEF STATEMENT LIKE THAT ABOUT

21   PAST INVENTORY OR PRESENT INVENTORY CAN BE DEEMED TO BE

22   FORWARD-LOOKING.

23        **MR. FARRELL:**  I TAKE YOUR POINT.  AS I SAID, I HAVE A

24   COUPLE OF RESPONSES.  THE OTHER IS, E-MAIL NOT SENT TO ANY OF

25   THE INDIVIDUAL DEFENDANTS EXCEPT JACK LAI, HOW THEY EVEN ALLEGE

1    KNOWLEDGE THEY DO NOT.

2          **THE COURT:**  THEY SAID WE BELIEVE, WHAT WERE THEY

3    REFERRING TO?

4          **MR. FARRELL:**  WHICH OF THE DEFENDANTS SAID THAT?

5          LDK ISSUES A STATEMENT, MANAGEMENT BELIEVES THERE'S

6    NOTHING TO LINK ANY OF THE INDIVIDUAL DEFENDANTS TO FIRST AND

7    THEIR OPINION WOULD BE THAT BECAUSE OF THAT E-MAIL THEY SOMEHOW

8    KNOW.

9          **THE COURT:**  BUT HOW COULD WE BLAME THEM IF THE COMPANY

10   CHOOSES TO ISSUE A STATEMENT SAYING MANAGEMENT BELIEVES AND --

11   WHY DOESN'T THAT MEAN ALL THE OFFICERS OF THE COMPANY?

12         **MR. FARRELL:**  CERTAINLY WOULD HAVE TO, UNDER THE LAW,

13   LINK THESE INDIVIDUAL DEFENDANTS SUED PERSONALLY TO ACTUAL

14   STATEMENTS THAT THEY ARE ASSOCIATED WITH IN SOME FASHION IN

15   ORDER TO HOLD THEM ACCOUNTABLE SEPARATE AND PERSONALLY FOR THAT

16   STATEMENT.

17         THE SECOND POINT I WANTED TO MAKE YOUR HONOR --

18         **THE COURT:**  IN THE ENRON CASE ALL THE STATEMENTS HAD

19   BEEN MANAGEMENT BELIEVES THE COMPANY IS DOING WELL, MANAGEMENT

20   BELIEVES, AND SO THE PLAINTIFF COULDN'T FIGURE OUT WHO THE

21   MANAGEMENT WAS, BUT THEY -- SOMEBODY IN MANAGEMENT AND THE 10K

22   TELLS US WHO THE MANAGEMENT IS.

23         SO I WOULD THINK THAT WOULD BE ADEQUATE AND THEN YOU

24   GET IN THERE AND FIND OUT SOMEBODY REALLY IS INNOCENT, BUT YOU

25   DISMISS THEM FROM THE CASE.

```
 1          BUT TO SAY THAT IF THE COMPANY PUTS OUT A STATEMENT

 2    SAYING MANAGEMENT BELIEVES CHARLIE SITU IS WRONG AND MANAGEMENT

 3    DOESN'T HAVE A REASONABLE BASIS FOR THAT STATEMENT, SEEMS TO ME

 4    THAT'S ENOUGH.  THAT'S ENOUGH FOR PLEADING PURPOSE.

 5          MR. FARRELL:  LET ME PROCEED AND ADDRESS, I THINK, THE

 6    ISSUE NOW RAISED, YOUR HONOR, WHICH IS IN THE OCTOBER 4

 7    STATEMENT MANAGEMENT ALSO RELEASES, STATES IN THE PRESS RELEASE

 8    THAT IT HAS DONE AN INTERNAL MANAGEMENT-RUN INVESTIGATION, AND

 9    THEN REMEMBER A SEPARATE INDEPENDENT INVESTIGATION IS DONE,

10    ALSO CONCLUDES CHARLIE SITU IS WRONG.

11          AN AUDIT REVIEW OF THE INTERIM FINANCIALS FOR THE

12    THIRD QUARTER AND THE FOURTH QUARTER AND THE ENTIRE YEAR 2007

13    ALSO CONCLUDE NO PROBLEM.

14          NOW, IN CONTEXT THE IDEA THAT MANAGEMENT MAY BELIEVE

15    THAT HE'S WRONG WHEN CORROBORATED BY EVERY SINGLE PERSON WHO

16    LOOKED AT IT SEEMS REASONABLE.

17          THE COURT:  WERE ALL THOSE THINGS IN THAT MANAGEMENT

18    STATEMENT RELEASED?

19          IN OTHER WORDS, THE ACCOUNTING FIRM LOOKED AT, THE

20    SPECIAL COMMITTEE LOOKED AT, WE ONLY KNOW THAT AFTER THE FACT.

21          MR. FARRELL:  WE KNOW THAT AFTER THE FACT, YOUR HONOR,

22    AND THE CRITICAL THING HERE IN THIS COMPLAINT, AS YOU NO DOUBT

23    RECALL FROM THE PAPERS, IS THAT THIS COMPLAINT ALLEGES FROM

24    PARAGRAPHS 45 TO 60 EVENTS CORROBORATE SITU'S ALLEGATIONS AND

25    THEY ALLUDE TO THESE VERY KINDS OF CONCEPTS.
```

```
1           THEY SAY THINGS IN THOSE AND WE SHOULD GET OUT

2    PARAGRAPHS 54 AND 60 AND READ THEM.  THEY SAY THE SEC IS

3    INVESTIGATING LDK.

4           THE COURT:  IS THIS A CONSOLIDATED CLASS ACTION

5    COMPLAINT?

6           MR. FARRELL:  YES, YOUR HONOR.

7           THE COURT:  LET'S LOOK AT IT.  50 WHAT?

8           MR. FARRELL:  54, YOUR HONOR.

9           THE COURT:  ALRIGHT.  SAYS, WHEN IT WAS PUBLICLY

10   DISCLOSED SITU HAD RESIGNED, COMPANY RUSHED TO BOLSTER ITS

11   STOCK PRICE BY INSISTING HE WAS DISGRUNTLED, I'M PARAPHRASING

12   NOW, CLAIMS UNFOUNDED IMPLICATION WAS THAT SITU WAS A LIAR.

13          BUT IN THE INTERVIEW WITH THE CHINESE THE INTERFAX

14   NEWS AGENCY CFO, IS THAT LAI?

15          MR. FARRELL:  IT IS.

16          THE COURT:  LAI ACKNOWLEDGED THAT THIS WAS NOT THE

17   CASE.  IN THE OCTOBER '07 INTERVIEW QUOTE "LAI STATED THAT THE

18   INFORMATION RELEASED BY SITU IS AUTHENTIC AND ACCURATE."

19          LAI INSISTED, HOWEVER, THAT SITU'S INFORMATION WAS

20   INCOMPLETE, ALTHOUGH HE APPARENTLY DID NOT EXPLAIN WHY THIS WAS

21   THE CASE.

22          MR. FARRELL:  NOW, FIRST, YOUR HONOR, THAT'S AN ITEM,

23   POST-CLASS ITEM IS DISCUSSIONS AFTER THE CLASS, JACK LAI'S THAT

24   WE'LL GET INTO WE -- AND WE CAN TALK MORE ABOUT, BUT THEY IMPLY

25   THAT IT CORROBORATES WHEN, IN FACT, THE FULL AND TOTAL
```

1    STATEMENT ALTHOUGH POST CLASS DOES NOT.

2            JACK LAI SAYING HERE AS THEY SORT OF BACK OF THE HAND

3    ACKNOWLEDGE THAT, IN FACT, HE DID NOT CONSIDER ALL THE OTHER

4    PLACES.  HE CAN BE ACCURATE AS TO ONE OF THE MANY PLACES WHERE

5    THEY STORE MATERIAL, BUT SINCE HE DIDN'T CONSIDER ALL OF THEM

6    HE DOESN'T KNOW HOW MUCH INVENTORY THERE WAS.

7            THE SECOND PARAGRAPH, THE NEXT PARAGRAPH, PARAGRAPH

8    55, THE SEC SEEMS TO BE TAKING SITU SERIOUSLY.  NOW, THE REASON

9    I ALLUDE TO THAT, IS SINCE THEN THE SEC HAS SENT A LETTER TO

10   LDK SAYING WE'RE NO LONGER CONDUCTING AN INFORMAL INQUIRY, WE

11   DO NOT INTEND TO BRING ENFORCEMENT ACTION, AND THEN PLAINTIFFS

12   SAY, WELL, THEN DON'T CONSIDER THAT.

13       **THE COURT:**  I DON'T CONSIDER THAT, I'M NOT GOING TO

14   CONSIDER IT EITHER WAY.

15           MR. LEMA KNOWS FROM ANOTHER CASE WHERE HE ALLEGED

16   ANTITRUST DIVISION WAS INVESTIGATING, THAT DOESN'T PROVE MUCH,

17   SO.

18       **MR. FARRELL:**  AGREE.

19       **THE COURT:**  SO I'M NOT GOING TO HOLD THAT AGAINST YOU,

20   THAT THE SEC INVESTIGATED.

21       **MR. FARRELL:**  RIGHT, THEY CONCLUDED, IN FACT, NOT TO

22   BRING ENFORCEMENT ACTION.

23       **THE COURT:**  EVEN IF HE HADN'T, IT WOULD NOT GET

24   ANYWHERE.  WHAT'S YOUR NEXT?

25       **MR. FARRELL:**  PARAGRAPH 56 YOU'LL SEE THAT THE

1    PLAINTIFF WILL NOW TALK ABOUT FOUR MONTHS AFTER THE END OF THE

2    CLASS PERIOD LDK CONTINUED TO VIGOROUSLY DENY SITU'S

3    ALLEGATIONS.

4         AND AS YOU READ ON YOU'LL SEE IN PARAGRAPH 57 THROUGH

5    60 THEY GET TO THE HUB OF WHAT THEY'RE SAYING.  THEY'RE SAYING

6    THE THIRD QUARTER '07 AND THE FOURTH QUARTER '07 FINANCIALS

7    ACTUALLY CORROBORATE THEIR ASSERTIONS, BUT THEY DO NOT.

8         AND, IN FACT, THE THIRD QUARTER AND FOURTH QUARTER '07

9    AND 2007 NEED TO BE REVIEWED AS INTERIM FINANCIALS BY THE

10   ACCOUNTANT OR AUDITED ULTIMATELY BY THE ACCOUNTANT, AND THEY

11   DID NOT CONCLUDE THAT THERE WAS A RESTATEMENT REQUIRED, THAT

12   THERE WAS NEARLY 600 METRIC TONS OF MISSING OR UNUSABLE

13   INVENTORY.

14        **THE COURT:**  HOW MUCH WAS UNUSABLE?

15        **MR. FARRELL:**  THERE IS NO CONCLUSION AS TO ANY AMOUNT

16   BEING UNUSABLE.

17        **THE COURT:**  WELL, IS THERE AN AFFIRMATIVE CONCLUSION

18   THAT MR. -- THIS IS COMPLETELY BOGUS AND THAT THERE WAS

19   NOTHING, TO SAY THERE WAS NO CONCLUSION VERIFYING DOES NOT MEAN

20   IT WAS UNTRUE?

21        **MR. FARRELL:**  THE AUDIT OPINION IS LDK FINANCIAL'S

22   STATEMENTS INCLUDING ALL OF THIS INVENTORY IS GAP.  AND THE

23   PLAINTIFFS CITE TO THIS IN PARAGRAPHS 57 THROUGH 60 TO TRY TO

24   MAKE THEIR POINT.  THERE'S A NEW LINE OF IT.

25        **THE COURT:**  WHAT?

1          **MR. FARRELL:** LINE ITEM IN THE FINANCIALS WHEREIN $30

2     MILLION IS NOW REGISTERED AS NON-CURRENT ASSETS.  NON-CURRENT

3     ASSETS.

4          THE PLAINTIFF MAKES THE ILLOGICAL AND UNFOUNDED, IN

5     ACCOUNTING, PRINCIPLES CONCLUSION THAT, WELL, IF 8 PERCENT OF

6     YOUR INVENTORY IS NOW NON-CURRENT, WHICH MEANS YOU CAN'T USE IT

7     WITHIN 12 MONTHS, THAT BACK IN AUGUST YOU MUST HAVE HAD MISSING

8     284 METRIC TONS AND USABLE 235 METRIC TONS AND THAT'S JUST

9     PLAIN WRONG ON ITS FACE.

10          AND AS A MATTER OF ACCOUNTING PRINCIPLES AN

11     ACCOUNTANT, AN AUDITOR CANNOT SAY YOUR FINANCIAL STATEMENTS ARE

12     CORRECT, YOUR INVENTORY AS PART OF THAT IS CORRECT, BUT THIS

13     NEW NON-CURRENT LINE ITEM, THAT MEANS WAY BACK IN ANOTHER

14     PERIOD YOU ACTUALLY HAD HUNDREDS AND HUNDREDS ALMOST 600 METRIC

15     TONS OF EITHER MISSING, MISSING OR NON-USABLE INVENTORY.

16          YOU CANNOT SIMPLY SAY, WELL, THE MISSING NON-USABLE

17     INVENTORY NOW GOES FROM 88 PERCENT OF THE INVENTORY DOWN TO

18     8 PERCENT AND SOMEHOW THAT'S WHAT IT IS.  THEY'RE COMPLETELY

19     UNRELATED.

20          THIS IS VERY AKIN TO THE LEVI CASE, YOUR HONOR,

21     WHEREIN SIMILARLY IN THAT CASE TAX ACCOUNTANTS THAT HAD

22     PREVIOUSLY WORKED AT LEVI SAID THAT THERE WAS A PROBLEM WITH

23     THE COMPANY'S TAX ALLOWANCES, IT WAS NOT PROPERLY RECORDED,

24     BOOKING ALLOWANCE ASSOCIATED WITH ITS TAX LIABILITY.

25          AND THE COURT CONCLUDED THAT THE LATER INCREASE IN THE

```
1    TAX ALLOWANCE WAS UNRELATED TO THAT IN PART BECAUSE OF THE

2    OBVIOUS PRINCIPLE UNDER GAP, THAT YOU CAN'T JUST REMEDY AN

3    ERROR IN THE PAST WITHOUT CORRECTING IT FOR THE CORRECT PERIOD.

4    IF THERE WAS AN ERROR IN AUGUST OF 2007 OR SECOND QUARTER OF

5    1007 ONE WOULD NEED TO CORRECT THAT IN THAT PERIOD.

6              AND THIS NON-CURRENT LINE ITEM ISN'T THE RIGHT NUMBER,

7    ISN'T ANYTHING RELATED TO MISSING INVENTORY.  YOU CAN'T JUST

8    SAY, WELL, THERE MUST HAVE BEEN MISSING INVENTORY, IT'S NOT

9    HERE.

10             AN AUDITOR SAYS, WELL, THAT'S FINE, AS LONG AS YOU SAY

11   IT'S NOT GOING TO BE USED WITHIN A YEAR THOSE TWO ARE

12   COMPLETELY INCONSISTENT WITH EACH OTHER, NO RELATIONSHIP TO

13   EACH OTHER AT ALL.

14             AND THESE ALLEGATIONS THE PLAINTIFF MAKES TO TRY AND

15   CORROBORATE ITS THREAD BARE ALLEGATIONS SITU DOESN'T HAVE A

16   BASIS BECAUSE HE DIDN'T COUNT IT, HE DIDN'T TEST IT, HE DOESN'T

17   KNOW IF IT'S MISSING OR USABLE, THEN THESE PEOPLE, THE

18   PLAINTIFFS ALLEGE, WELL, AFTERWARDS YOU DON'T HAVE A

19   RESTATEMENT, YOU NEVER DID ISSUE ANY CORRECTION, BUT WHAT YOU

20   DID WAS YOU HAD THIS NON-CURRENT LINE ITEM.

21             AND THAT WAS DONE AS PART OF AN ELABORATE CONSPIRACY,

22   THAT WAS DONE IN ORDER TO CREATE THIS IMPRESSION THAT THAT

23   NON-CURRENT, THAT FOURTH QUARTER '07 PERIOD WOULD BE REVIEWED

24   BY THE AUDITORS AND, THEREFORE, WE NEED TO DO SOMETHING.

25             QUITE THE CONTRARY, THOUGH, BECAUSE THE AUDIT OPINION
```

1    IS TO THE CONTRARY.

2            **THE COURT:**  I HAVE TO APOLOGIZE, I'M GOING TO GIVE YOU

3    A FEW MINUTES TO RESPOND TO MR. MILSTEIN'S ARGUMENT.

4            **MR. FARRELL:**  THANK YOU, YOUR HONOR.  I APPRECIATE

5    YOUR TIME.

6            **MR. MILSTEIN:**  THANK YOU, YOUR HONOR.

7            **THE COURT:**  IT IS IMPORTANT, MR. MILSTEIN, TO FOCUS ON

8    INDIVIDUAL STATEMENTS AND WHAT IT IS THAT YOU HAVE ALLEGED THAT

9    SHOWS THAT THEY WERE KNOWINGLY FALSE AT THE TIME THEY WERE

10   MADE.

11           COUNSEL MADE A POINT THAT YOU HAVE KIND OF MUSHED IT

12   ALL TOGETHER AND USING POST HAC STATEMENTS AND THE LIKE, SO

13   WHAT CAN WE LOOK TO IN YOUR ACTUAL ALLEGATIONS HERE TO SORT

14   THAT OUT ONE-BY-ONE TO PROVE UP THE SCIENTER FOR EACH?

15           NOT PROVE UP, TO WHETHER OR NOT YOU PLED IT

16   ADEQUATELY?

17           **MR. MILSTEIN:**  YOUR HONOR, LET ME INITIALLY, NOT IN

18   LOGICAL ORDER, BUT IN ORDER TO PRESENT AND, PERHAPS, UNMUSH IT.

19   LET'S LOOK AT THE COMPLAINT, IF WE MAY.

20           **THE COURT:**  I GOT IT RIGHT HERE.

21           **MR. MILSTEIN:**  THANK YOU, YOUR HONOR.  62 TO 66.  AND

22   WE HAVE HERE A SERIES OF STATEMENTS.  PARAGRAPH 62 TALKS ABOUT

23   A WALL STREET JOURNAL ARTICLE THAT THEY HAD ACCESS TO AN E-MAIL

24   PROBABLY ACCESS TO MR. SITU, TOO.

25           ON MAY 29TH TWO DAYS BEFORE THE CLASS PERIOD STARTS,

1    WHICH IS JUNE 1ST, MR. SITU SENT AN E-MAIL AND RESPONDING TO

2    MR. LAI'S REQUEST, DEFENDANT LAI CHIEF FINANCIAL OFFICER TO

3    LOOK IN TWO FIGURES RELATING TO INVENTORY THAT DIDN'T MATCH AN

4    E-MAIL.

5         AND IN RESPONSE MR. SITU IN THIS WRITTEN E-MAIL TELLS

6    MR. LAI THE COMPANY FINANCIAL AND OPERATIONAL SIDES WERE USING

7    DIFFERENT SOURCES AND METHODS TO CALCULATE INVENTORY OUTPUT AND

8    THAT IT WAS IMPOSSIBLE TO VERIFY WHICH FIGURES WERE ACCURATE.

9    ACCURATE, EXCUSE ME.

10        TWO DAYS LATER COMPANY GOES PUBLIC AND SELLS HUNDREDS

11   OF MILLIONS OF DOLLARS WORTH OF SECURITIES LISTED ON THE NEW

12   YORK STOCK EXCHANGE SUBSEQUENTLY.

13        IN A JUNE 27TH E-MAIL DEFENDANT, THAT'S 27 DAYS WITH

14   THE CLASS PERIOD, EXPRESS CONCERNS WITH RESPECT TO LDK'S

15   FINANCES.  THE ACTUAL STORY IS QUITE DIFFERENT FROM WHAT THE

16   INVESTORS EXPECT OR WERE TOLD.

17        HE WRITES AN E-MAIL ON SEPTEMBER 10TH, ALL THESE

18   DOCUMENTS ARE REFERRED TO VERY SPECIFIC DOCUMENT, WHICH WE HAVE

19   AND HE -- AND IN THAT E-MAIL MR. SITU SAYS, YOU MAY RECALL A

20   MEETING WITH YOU AND ME ON JULY 19TH AND HE COMPLAINS ABOUT THE

21   INVENTORY AND THE FEEDSTOCK.

22        AND HE SAYS PMC AND PLANT MANAGEMENT CANNOT BASE ON

23   THE BOOK INVENTORY TO PLAN THE PRODUCTION BECAUSE IN MANY CASES

24   DATA IS JUST PAPER NUMBER AND THERE ARE NO ITEMS PHYSICALLY

25   EXISTING OR JUST SOME USABLE ITEMS.  THE FACT IS AMONG THE LDK

1    FEEDSTOCK ONLY A SMALL PERCENTAGE IS GOOD STOCK.

2          IN SEPTEMBER 11TH IN AN INTERNAL CONFERENCE LOOKING AT

3    PARAGRAPH 64 OF THE COMPLAINT HE SAYS IN A CONFERENCE CALL,

4    SITU TOLD THE DEFENDANTS LAI AND CHIEF FINANCIAL OFFICER, CHIEF

5    OPERATING OFFICER MR. YAO YET TO BE SERVED TWO THIRDS OF THE

6    COMPANY'S FEEDSTOCK HAD BEEN SITTING FOR OVER 180 DAYS WAS

7    UNUSABLE ACCORDING TO THE WALL STREET JOURNAL ARTICLE.

8          SITU ARGUED UNSUCCESSFULLY THE COMPANY WASN'T REQUIRED

9    TO REFLECT THAT.  AND THE JOURNAL HAD A RECORDING OF THAT CALL

10   WHICH HAD REVIEWED.

11          AND THEN IN LATE SEPTEMBER ACCORDING TO THE PARAGRAPH

12   65 SITU WRITES THIS LONG MEMO.  I WANT TO GET INTO THAT IN A

13   SECOND.  IN A VERY REAL WAY THAT'S THE MEMO THAT'S WAS HANDED

14   UP TO THE COURT WHICH IS PROPOSED EXHIBIT F THAT THE DEFENDANTS

15   HAVE PUT IN.

16          AND THAT'S A FAIR AMOUNT OF THINGS, BUT LET ME TAKE A

17   STEP BACKWARDS, THEN I'M GOING TO GET BACK IN ON THIS.  WHO IS

18   CHARLES SITU?

19          THERE ARE TWO THINGS, FIRST OF ALL, LET'S LOOK AT HIM.

20   HE WAS HIRED IN LATE MARCH, BUT HOW DID HE GET HIRED?

21          HE GOT HIRED BECAUSE THE OUTSIDE AUDITOR KPMG WAS

22   UNSATISFIED WITH ACCOUNTING CONTROLS, INTERNAL CONTROLS AND

23   WITH INVENTORY AND THEY ASKED THE COMPANY TO HIRE SOMEONE WHO

24   COULD THEY COULD TALK TO AND WHO COULD LOOK INTO THAT AND THE

25   COMPANY HIRED MR. SITU.

1          MR. SITU THEN BECAME, IN ESSENCE, AN IMPORTANT PART OF

2     THEIR FINANCIAL REPORTING AND THEIR CONTROL SYSTEM AND ALMOST

3     FROM THE BEGINNING, WE SEE AS EARLY AS MAY 29TH HE WAS

4     COMPLAINING ABOUT THE INVENTORY AND IN ESSENCE COMPLAINING

5     ABOUT THE CONTROL.  INVENTORY HERE THAT'S 80 PERCENT OF THE

6     COST OF MAKING THESE SILICON WAFERS, THAT'S NOT A SMALL ITEM.

7          MR. SITU WAS AMERICAN CPA, HE'S WORKED AS AN

8     ACCOUNTING OFFICER, HE'S GOT AN EDUCATION AS ACCOUNTANT,

9     DEFENDANTS HAVE SAID, WELL, HE DOESN'T HAVE THE KNOWLEDGE TO

10    LOOK AT INVENTORY, DOESN'T KNOW WHAT HE'S DOING.

11         BUT IF YOU LOOK CAREFULLY AT WHAT MR. SITU, LET'S LOOK

12    AT WHAT HE SAID.  MY COLLEAGUES HAVE MADE UP A SMALL DOCUMENT

13    WHICH IS TOTALLY BASED, I HOPE ACCURATELY, ON EXHIBIT F AND I'D

14    LIKE TO HAND THAT TO YOU, IF I MAY.

15         **MR. FARRELL:**  THANK YOU.

16         **MR. MILSTEIN:**  YOUR WELCOME.

17         **MR. FARRELL:**  I'D LIKE TO HAND THIS UP TO THE COURT,

18    IF I MAY.

19         OTHER THEN THE COLOR THIS IS TAKING QUOTES SELECTIVELY

20    OUT OF EXHIBIT F.  AND EXHIBIT F IS REFERRED TO IN THE

21    COMPLAINT AND SOMEWHAT QUOTED IN THE COMPLAINT.  LOOK AT SOME

22    OF THESE THINGS.

23         THIS DOESN'T TALK ABOUT THE MAY SITU MEMO, BUT FIRST

24    TALKS ABOUT IS THE JUNE 27TH, 27 DAYS INTO THE CLASS PERIOD.

25    LDK SOLAR ENGAGING IN JUST A NUMBERS GAME, UNRELIABLE SYSTEMS

1    YIELDS FINANCIAL DATA THAT IS UNDOUBTEDLY MISLEADING.  THE

2    ACTUAL STORY IS QUITE DIFFERENT FROM WHAT THE INVESTORS EXPECT

3    OR ARE TOLD.

4          ON JUNE 28TH MR. LAI WRITES BACK AND DOESN'T SAY TO

5    HIM YOUR FULL OF BALONEY, YOUR FIRED, YOU DON'T KNOW WHAT

6    YOU'RE DOING.  HE SAYS THANK YOU FOR YOUR CANDID REPORT,

7    DOESN'T ADMIT TO ANYTHING, BUT SORT OF NICE HE'S GOING TO

8    CONSIDER IT.

9          SEPTEMBER 10TH LAI WRITES PLANT MANAGER, HOW CAN WE

10   KNOW THAT, CAN'T USE BOOK INVENTORY, NOBODY IS SURE IF THERE'S

11   SOME USABLE FEEDSTOCK, HOW MANY.  THEN HE TALKS ABOUT THE ERP

12   TEAM, THIS IS THE TEAM THAT TAKES CARE OF THEIR SOFTWARE AND

13   THE CONTROL MECHANISM FOR CONTROLLING INVENTORY.

14         THE FINANCIAL PERSONNEL FOR WHICH HE'S ONE OF THEM,

15   THE BM CONSULTANTS AND THE WAREHOUSE HAVE DISCUSSED THE PROBLEM

16   SEVERAL TIMES.  THE FACT IS THAT AMONG THE LDK FEEDSTOCK ONLY A

17   SMALL PERCENTAGE IS GOOD STOCK.  AND THEN HE QUOTES GENERALLY

18   ACCEPTED ACCOUNTING PRINCIPLES.

19         AND LAI, THE CHIEF FINANCIAL OFFICER, A DEFENDANT

20   HERE, NOTED LET'S CALL A MEETING TO DISCUSS, AND ON

21   SEPTEMBER 25TH '07 HE WRITES TO LAI AND TO ZHU (PHONETIC) I'M

22   NOT SURE HOW TO PRONOUNCE THAT, THE CHAIRMAN OF THE AUDIT

23   COMMITTEE.

24         HE REFERS TO THE RESULTS OF A AUGUST 31ST '07

25   FINANCIAL ANALYSIS AND HE COMPLAINS WE'RE STILL MISLEADING

1    INVESTORS AND MOST EMPLOYEES KNOW THE FACT THERE IS LITTLE

2    FEEDSTOCK, FEEDSTOCK TO MAKE SILICON WAFERS FOR PRODUCTION.

3         THEY QUOTE "PAPER NUMBER" UNQUOTE IS TREMENDOUS, MOST

4    OF THE FEEDSTOCK IS OBSOLETE STOCK BY ANY CRITERIA AND FACT.

5    AND THEN THIS GENTLEMAN RESIGNS BECAUSE HE SAID I DON'T WANT TO

6    COMMIT SECURITIES FRAUD AND HE LEAVES.

7         SO THIS IS NOT SOME ORDINARY GUY, AT LEAST, HE'S IN A

8    POSITION TO KNOW AND I SUGGEST HIS BACKGROUND IS SUCH THAT HE

9    PERHAPS DOES KNOW.

10        **THE COURT:**  WHAT DO YOU SAY TO WHAT COUNSEL SAID THAT,

11   YEAH, ALL THESE THINGS WERE SAID, BUT KPMG CAME IN AND FOUND IT

12   WAS ALL BALONEY?

13        **MR. FARRELL:**  I THINK, KPMG DID NOTHING OF THE SORT.

14   THE CLASS PERIOD COVERS THE PERIOD OF JUNE 1ST THROUGH

15   OCTOBER 7TH, IT REALLY ATTACKS TWO INTERIM FINANCIAL

16   STATEMENTS, TWO QUARTERS.

17        KPMG DIDN'T ISSUE AN OPINION ON THAT, IT DID ISSUE AN

18   OPINION YEAR-END.  IT DID GIVE THEM A CLEAN OPINION, BUT DIDN'T

19   GIVE A CLEAN OPINION TO THE INTERIM QUARTERS.

20        NOTHING IN THE ACCOUNTING LITERATURE THAT SAYS THAT

21   REQUIRES THEM TO GO BACK AND GIVE AN OPINION AND THEY DIDN'T,

22   THEY DIDN'T GIVE AN OPINION.

23        **THE COURT:**  BUT I UNDERSTAND HOW THAT WORKS, BUT IF

24   THEY BLESSED THE YEAR-END DOESN'T THAT MEAN WERE CORRECT?

25        **MR. FARRELL:**  NO.

1        **THE COURT:** DOESN'T?

2        **MR. FARRELL:** NO.

3        **THE COURT:** WERE DISCREPANCIES BETWEEN THEM?

4        **MR. FARRELL:** I DON'T KNOW.  WE'RE GOING TO HAVE TO

5    ASK SOMEBODY.  I THINK, DISCOVERY WE'LL FIND OUT.  I DON'T KNOW

6    THEY WEREN'T BLESSED.

7        THEY TALK ABOUT INVESTIGATIVE COMMITTEE, I DON'T KNOW

8    WHAT THEY DID.  I DON'T KNOW WHO WAS IT, I DON'T KNOW WHO

9    WASN'T ON IT.  WE DON'T SEE THE COMMITTEE REPORT, IT MAY BE

10    INDEPENDENT, IT MAY NOT, IT LOOKS LIKE IT IS AN INDEPENDENT, I

11    WON'T GET INTO THAT.

12        BUT THESE ARE ARGUMENTS, ARGUMENTS THAT YOU HAVE TO,

13    YOUR HONOR, RESPECTFULLY AS YOUR HONOR KNOWS FAR BETTER THAN I

14    DO, HAVE TO LOOK AT THE FOUR CORNERS OF THE COMPLAINT.  WE HAVE

15    AN ACCOUNTANT LOOKING, HIRED TO LOOK, HE LOOKS AND HE SAYS THE

16    NUMBERS HERE ARE WRONG, THE INVENTORY --

17        **THE COURT:** LET ME REPHRASE WHAT'S YOUR BEST ARGUMENT.

18    YOUR BEST ARGUMENT IS SITU IS NOT JUST AN INTERLOPER, HE WAS

19    SPECIFICALLY HIRED BY THE COMPANY TO BE AN INTERFACE WITH KPMG

20    AND PLACED IN THIS CFO TYPE CONTROLLER POSITION.

21        AND HIS SPECIFIC JOB WAS TO INVESTIGATE MATTERS LIKE

22    THIS.  HE INVESTIGATES, HE FINDS THESE INVENTORY PROBLEMS

23    EXIST, HE REPORTS THEM AS JUST A NUMBERS GAME AND THEN QUITS ON

24    ACCOUNT OF NO ONE IS DOING ANYTHING ABOUT IT.  AND YOU'RE

25    SAYING NOW THE COMPANY WANTS TO SAY HE'S HALF-BAKED CHARACTER

1   WHO DIDN'T KNOW WHAT HE WAS TALKING ABOUT?

2           **MR. FARRELL:**  THAT'S CORRECT, YOUR HONOR.

3           **THE COURT:**  SO THAT'S --

4           **MR. FARRELL:**  IT'S NOT HIM ALONE, YOUR HONOR, IF I

5   CAN, IT'S NOT HIM ALONE.  THERE ARE, YOU KNOW, THE WALL STREET

6   JOURNAL AND BARRON'S WROTE STORIES.

7           **THE COURT:**  IF THE STOCK BOUNCED BACK THEN MAYBE ALL

8   THIS WAS JUST A BAD RUMOR?

9           **MR. FARRELL:**  WELL, THE STOCK DETERIORATED A LOT ON

10  OCTOBER 3RD AND OCTOBER 8TH AND 9TH, IT LOST I DON'T KNOW, 40,

11  50 PERCENT OF ITS VALUE.  SOME OF IT WAS RECAPTURED IN THE 90

12  DAY LOOK BACK PERIOD THE PSR RATE REQUIRES, BUT THERE'S STILL

13  ENORMOUS DAMAGES HERE.

14          THE CLASS PERIOD IS 129 CALENDAR DAYS, I DON'T KNOW

15  HOW MANY TRADING DAYS, AND SOME OF THE TRADING DAYS WE KNOW

16  DAMAGES, AND THE DAMAGES HERE ARE HUGE AND THE LOST CAUSATION

17  IS EVIDENT BECAUSE THE STOCK WENT DOWN ENORMOUSLY ON FAIRLY

18  LARGE VOLUME ON THE NEW YORK STOCK EXCHANGE ON THESE

19  DISCLOSURES, THE DISCLOSURE OF OCTOBER 3RD AND OCTOBER 6TH.

20          AND I DO WANT TO EMPHASIZE, YOUR HONOR, THAT THIS IS

21  NOT A CASE ABOUT WHETHER MR. SITU SIMPLY KNEW WHAT HE WAS

22  TALKING ABOUT OR DIDN'T.  HE'S WRITING MEMOS, HE CLAIMS HE'S

23  TALKING TO PEOPLE, THEY'RE CONTEMPORANEOUS DOCUMENTS.

24          IT'S UNUSUAL WE HAVE HERE, WE HAVE E-MAILS, WE HAVE

25  RECORDINGS, DOCUMENTS WERE SENT, THEY WERE SENT TO THE HIGHEST

1   LEVELS OF THE COMPANY, THEY GOT THE ATTENTION OF THE HIGHEST

2   LEVELS OF THE COMPANY.

3           THE DETAIL IN THIS COMPLAINT IS I THINK VERY UNUSUAL,

4   YOU KNOW SOME THINGS MR. SITU DIDN'T KNOW HOW MANY WAREHOUSES

5   THERE WERE AND THE DEFENDANTS PROFFER PICTURE OF WAREHOUSES,

6   BUT I THINK THEY'RE READING MEMOS IN A SKEWED WAY.

7           **THE COURT:**  GO THROUGH THE PARTICULARIZED STATEMENTS

8   THAT ARE ALLEGED TO BE FALSE AND LET'S CONSIDER THEM ONE AT A

9   TIME.

10           **MR. MILSTEIN:**  ALL RIGHT.

11           **THE COURT:**  AUGUST 1 THE FIRST ONE.

12           **MR. FARRELL:**  WELL, YOU GOT THE IPO PROSPECTUS,

13   SPECIFIC FALSE STATEMENTS ARE SET FORTH BEGINNING ON PARAGRAPH

14   86.  IT'S PAGE 24 OF THE CONSOLIDATED CLASS ACTION COMPLAINT.

15           SO, AND THERE'S THE STATEMENTS ALL REVOLVE AROUND THE

16   TWO THINGS, THEY REVOLVE AROUND THE INVENTORY AND THEY REVOLVE

17   AROUND INTERNAL CONTROLS REGARDING THE INVENTORY.

18           AND THE STATEMENT HERE IS THAT THE CLAIM IS THAT MORE

19   THAN 50 PERCENT OF THE INVENTORY, MORE THEN 50 PERCENT EITHER

20   DOESN'T EXIST OR IS REALLY LARGELY UNUSABLE.  AND, AGAIN,

21   UNUSABLE, THIS IS THE INVENTORY OF POLYSILICON, THE INVENTORY

22   OF POLYSILICON IS 80 PERCENT OF THE COST OF MAKING THE PRODUCT

23   FOR THIS COMPANY.

24           **THE COURT:**  THE IPO IS JUNE 1 AND YOUR EARLIER E-MAIL

25   RIGHT UP HERE IS JUNE 27TH.

1           **MR. FARRELL:** YES. THAT'S ONLY BECAUSE, YOUR HONOR,

2    THAT'S ALL I DID WAS TAKE MATERIAL FROM THE EXHIBIT F.

3           **THE COURT:** WHAT WAS KNOWN TO THE DEFENDANTS AS OF

4    JUNE 1 THAT WOULD HAVE PUT THEM ON NOTICE THAT STATEMENT WAS

5    FALSE?

6           **MR. FARRELL:** ON PARAGRAPH 62 OF THE COMPLAINT THERE'S

7    AN ALLEGATION WHICH DERIVED FROM THE WALL STREET JOURNAL STORY,

8    IN WHICH THE JOURNAL SAID TWO DAYS BEFORE THE COMPANY PRICED

9    ITS INITIAL PUBLIC OFFERING ON JUNE 1ST, SITU WROTE THIS

10   MEMORANDUM WHICH HE SAID THAT IT WAS IMPOSSIBLE TO VERIFY WHICH

11   INVENTORY FIGURES WERE CORRECT AND ACCURATE. THAT'S THE

12   EARLIEST STATEMENT WE KNOW OF AT THIS POINT.

13          NOW, IN ADDITION TO THAT WE HAVE INDICATED THAT EACH

14   PUBLIC STATEMENT THAT WAS PUT UP DURING THIS PROCESS CONTAINED

15   THE SAME OVER VALUATION OF INVENTORY.

16          FOR EXAMPLE, ON PARAGRAPH 96 WE BEGIN TALKING ABOUT AN

17   AUGUST 1ST PRESS RELEASE, AGAIN, ATTACKING THE COST OF THE

18   INVENTORY, WHAT ITS VALUE IS AND AUGUST 1ST IS LITTLE LESS THAN

19   HALFWAY THROUGH THE CLASS PERIOD.

20          THEN THERE'S AN AUGUST 1ST CONFERENCE CALL WHICH IS

21   REFERRED TO BEGINNING PARAGRAPH 111, WHICH IS A CONFERENCE CALL

22   BASED ON THE PRESS RELEASE IN WHICH DEFENDANT LAI AND DEFENDANT

23   PENG, THE CHAIRMAN OF THE BOARD, TALK ABOUT THE VALUE OF THE

24   INVENTORY.

25          AND AGAIN THERE'S A -- AND THOSE -- THE MOST SERIOUS

1    DOCUMENTS THAT ARE ALLEGED TO BE FALSE AND MISLEADING.

2         **THE COURT:**  ALL RIGHT.  BRING IT TO A CLOSE, SO LET ME

3    GIVE YOUR OPPONENT A CHANCE TO RESPOND.

4         **MR. FARRELL:**  THANK YOU, YOUR HONOR.

5         **MR. MILSTEIN:**  THANK YOU, YOUR HONOR.

6         **MR. FARRELL:**  THANK YOU, YOUR HONOR.  I'LL BE VERY

7    BRIEF.  JUST REBUTTING SOME OF THAT.

8         YOU KNOW, YOU ASKED COUNSEL TO TAKE YOU THROUGH THE

9    PARTICULAR STATEMENTS IN HIS COMPLAINT, ESSENTIALLY YOU DIDN'T

10   GET AN ANSWER.

11        YOU LOOK AT THE LAST PAGE OF OUR REPLY BRIEF WE

12   PRESENT A TABLE TO THE COURT THAT DOES EXACTLY WHAT YOU ASKED

13   FOR AND THERE'S NO QUESTION THAT THERE IS NOT AN ACTIONABLE

14   CASE HERE.

15        THERE'S ABSOLUTELY NO SCIENTER ESTABLISHED AND

16   CERTAINLY NOT EVEN REALLY COGNIZABLE FRAUD OR FALSITY.  FIRST

17   LET ME QUICKLY ADDRESS THE POINTS THAT COUNSEL --

18        **THE COURT:**  THIS IS YOUR APPENDIX, IS THAT WHAT YOU

19   KEEP REFERRING TO, THIS APPENDIX TO YOUR COMPLAINT?

20        **MR. FARRELL:**  CORRECT.  PAGE 15 OF THE REPLY BRIEF,

21   BUT REFERRED TO AS APPENDIX.  YOU'LL SEE JUNE 1, 2007 THERE IS

22   THE STATEMENT THAT HE DID NOT DIRECT YOU TO, THAT'S FROM

23   PARAGRAPH 86 OF THEIR COMPLAINT, THE PORTION OF THE COMPLAINT

24   THAT SAYS SPECIFIC ALLEGATIONS, WE BELIEVE THAT OUR POLYSILICON

25   FEEDSTOCK INVENTORY AND COMMITMENTS ARE SUFFICIENT TO SATISFY

1    OVER HALF, TO SATISFY OVER HALF OUR ESTIMATED REQUIREMENTS,

2    SHOULD BE HALF OUR ESTIMATED REQUIREMENTS, I APOLOGIZE FOR

3    THAT.

4         THEY BELIEVE WE HAVE INVENTORY TO SATISFY OVER 90

5    PERCENT, WE BELIEVE THAT OUR POLYSILICON FEEDSTOCK INVENTORY

6    COMMITMENT SUPPLY TO YOU IS SUFFICIENT TO SATISFY OVER 90

7    PERCENT OF OUR ESTIMATED REQUIREMENTS FOR 2007.

8         WELL, THAT TURNED OUT TO BE A TRUTHFUL STATEMENT, THEY

9    DID HAVE AND THERE'S NOTHING IN THE COMPLAINT TO SAY THEY

10   DIDN'T HAVE ENOUGH INVENTORY.

11        SEPARATE AND APART FROM ALL THESE ALLEGATIONS THERE'S

12   NOTHING THERE THAT'S ABSOLUTELY FORWARD-LOOKING WHEN IT'S MADE

13   IN JUNE 2, 2007.  THEY THINK THEY'RE GOING TO HAVE ENOUGH

14   PRODUCT TO MAKE THE ENTIRE YEAR'S WORTH OF MATERIAL.

15        THAT'S RIGHT, THEY DID HAVE ENOUGH PRODUCT, RAW

16   MATERIAL TO MAKE THE ENTIRE YEAR'S WORTH, AND THAT'S ABSOLUTELY

17   FORWARDED LOOKING AND THERE'S WAS NO RESPONSE FROM COUNSEL AS

18   TO THE POINT THAT THIS IS MONTHS BEFORE, MONTHS BEFORE THIS

19   SEPTEMBER 25 E-MAIL.  HE READ TO YOU HIS PARAGRAPH --

20        **THE COURT:**  62.

21        **MR. FARRELL:**  62 EXACTLY, BUT PARAGRAPH 62 WHICH

22   ALLUDED TO TWO FIGURES AND THAT JACK LAI DIRECTED CHARLIE SITU

23   TO THOSE TWO FIGURES.  RATHER THEN ME PARAPHRASING, IF YOU HAVE

24   IT I'LL TURN TO IT.

25        **THE COURT:**  IF YOU HAVE IT, I'M READING 62 NOW, GO

1    AHEAD.

2         MR. FARRELL: HE CONTENDS THERE IN AN E-MAIL, THEY'RE

3    DISCUSSING TWO FIGURES, I'M READING IN PARAGRAPH 62 LINE 15,

4    SITU WAS RESPONDING TO LAI'S REQUEST TO LOOK INTO TWO FIGURES,

5    SO IT'S JACK LAI ASKING SITU TO LOOK INTO TWO FIGURES RELATED

6    TO INVENTORY THAT DIDN'T MATCH.

7         WELL, GUESS WHAT, IT WASN'T INVENTORY. AGAIN, IF YOU

8    LOOK AT THE E-MAIL THEY CITE, THEY HAVEN'T TALKED TO CHARLIE

9    SITU, YOU LOOK AT THE E-MAIL THEY CITE AS THEIR SOURCE HERE

10   THEY'RE ONLY CITING THE WALL STREET JOURNAL, THEY DON'T KNOW.

11        THE E-MAIL THAT THEY HAVE FOR PARAGRAPH 62, THE FIRST

12   E-MAIL IS JUNE 28TH AND IT TALKS ABOUT EXACTLY WHAT THESE TWO

13   FIGURES ARE. THERE'S A 29 FIGURE AND A 39 MEGAWATT FIGURE,

14   NOTHING TO DO WITH INVENTORY.

15        AND THE LOWER, THE 29 MEGAWATT INVENTORY IS ONE THAT

16   WAS REPORTED IN THE F1 AND SITU SAYS, AND WE SAW SOMEWHERE ELSE

17   39 MEGAWATTS, THE MEGAWATT NUMBER, YOUR HONOR, IS HOW MANY

18   OUTPUT THEY PRODUCED, HOW MANY WAFER ELECTRICITY GENERATING

19   WAFER THEY PRODUCED, NOT METRIC TONS OF POLYSILICON.

20        THE TWO FIGURES THAT HE SAYS ARE DISCUSSED HERE, WELL,

21   THEY'RE DISCUSSED IN THAT JUNE 28 E-MAIL THAT YOU HAVE AND THEY

22   HAVEN'T CHALLENGED. THERE'S NO OBJECTION TO THAT E-MAIL

23   INTRODUCTION AND CONSIDERATION HERE, THE STATEMENTS IN THERE

24   TELL YOU THAT HAS NOTHING TO DO WITH INVENTORY, YOUR HONOR.

25        AND BY THE WAY, HE PROVIDED THIS TO YOU WHICH IS JUST

1  HIS OWN SELECTION OF THE PORTIONS OF THE E-MAIL THAT'S

2  SPECIFICS VOLUMES, YOUR HONOR.  LOOK AT THE ACTUAL CONTEXT OF

3  THE ENTIRETY OF THOSE E-MAILS, THERE'S NO OBJECTION AND THEY'RE

4  PROPERLY BEFORE YOU.

5         IN THE JUNE 28TH E-MAIL AFTER THE IPO IT'S TALKING

6  ABOUT WHAT CONTROLLERS AND CFO'S TALK ABOUT, FINANCIAL SYSTEMS,

7  THERE ARE PROCESSES, TRUE, MAKING THEIR SYSTEMS BETTER, BUT

8  THERE'S NO INDICATION OF FRAUD, THERE'S NO INDICATION OF

9  MISSING INVENTORY, THERE'S NO INDICATION OF UNUSABLE INVENTORY.

10  YOU READ THE JUNE 28TH E-MAIL AND COME TO YOUR OWN CONCLUSION

11  THAT WHAT INFERENCE THAT IS.

12         WE'RE NOT ATTACKING MR. SITU'S CHARACTER BY ANY MEANS,

13  BUT IF YOU DON'T COUNT -- AND HIS E-MAIL SAYS HE DIDN'T COUNT

14  ALL THE PLACES WHERE INVENTORY IS, AND IF YOU CAN'T TEST IT

15  BECAUSE YOU'RE NOT QUALIFIED AND HE DIDN'T, HE'S -- YOU DON'T

16  KNOW IF IN TONS OF POWDER AND ROCK IS USABLE OR NOT.

17         IF I BROUGHT IN TODAY TWO BAGS OF POLYSILICON, YOU

18  WOULDN'T BE ABLE TO SAY, AS LEARNED AS YOU ARE, WHETHER ONE BAG

19  IS GOOD AND ONE BAG IS DEFICIENT, NOT USABLE.  YOU HAVE TO TEST

20  IT.

21         AND IN THEIR REGISTRATION STATEMENT YOU WILL SEE LDK

22  HAS THE PROCESS, 146 EMPLOYEES CONDUCT RESISTIVITY LIFE TIME

23  TESTING, THEY TEST THE INVENTORY WHEN IT COMES IN AND THROUGH

24  ITS USE, NO ALLEGATION THAT CREATES IN THE WAKE OF THAT A

25  STRONG INFERENCE OF DECEPTION.

1          IN FACT, AT MOST WHAT COUNSEL PRESENTS TO YOU IS A

2    DISCUSSION BETWEEN THE CFO AND CHARLIE SAYING, WELL, WE SHOULD

3    IMPROVE OUR SYSTEMS, THAT DOESN'T CREATE INTENT, THAT DOESN'T

4    CREATE FRAUD, A STRONG INFERENCE OF POWERFUL COGENT STATEMENT

5    THEY WERE TRYING TO DECEIVE.

6          HERE THE DEFENDANT IS SAYING WE GOT TO GET OUR SYSTEMS

7    BETTER, CHARLIE SITU IS SAYING THERE'S ERRORS, THERE'S

8    MISTAKES, WE'RE A NEW COMPANY, NOT IS WHERE THERE MISSING

9    INVENTORY, NOT THERE'S UNUSABLE INVENTORY, THAT DOESN'T COME

10   UNTIL THE SEPTEMBER 25 E-MAIL AFTER THE ONLY TWO STATEMENTS

11   THAT ARE ACTIONABLE THEY CAN ALLEGED AREN'T ACTUAL.

12         A JUNE PROSPECTUS MONTHS AHEAD OF THIS SEPTEMBER 25

13   E-MAIL, AUGUST 1 CONFERENCE AHEAD OF THIS, THEN OCTOBER 4 AFTER

14   OCTOBER 3 WHEN THEY TELL THE MARKET HERE'S WHAT CHARLIE SITU

15   ALLEGES, ON OCTOBER 4 SAY, WELL, WE DON'T BELIEVE HIM.

16         IN THE WAKE OF ALL THOSE OTHER THINGS THAT

17   CORROBORATED THAT BELIEF CERTAINLY THAT'S NOT ACTIONABLE

18   STATEMENT WHEN THE TRUTH IS IN THE MARKET.  YOU CAN'T FOLLOW A

19   CORRECTED DISCLOSURE AND HAVE AN ACTIONABLE STATEMENT.

20         THE THREE STATEMENTS THAT ARE A BASIS FOR THE

21   COMPLAINT, AND BY THE WAY, ONLY DEFENDANT PENG AND LAI ARE EVEN

22   ASSOCIATED WITH THOSE STATEMENTS, ALL THE OTHER DEFENDANTS NO

23   CONNECTION TO THEM AT ALL.

24         **THE COURT:**  ALL RIGHT.

25         **MR. FARRELL:**  THANK YOU.

1          **THE COURT:**  THIS MATTER WILL BE PUT UNDER SUBMISSION.

2          **MR. MILSTEIN:**  COULD I HAVE THREE QUICK MINUTES?

3          **THE COURT:**  ONE MINUTE.

4          **MR. MILSTEIN:**  TWO THINGS, YOUR HONOR.  I COMMEND TO

5    YOU THEN, IF YOU COULD, LEARNED COUNSEL SUGGESTED YOU READ THE

6    WHOLE EXHIBIT F.  MAY I SUGGEST YOU LOOK CAREFULLY AT SEPTEMBER

7    10TH '07 WHICH INDICATES HOW MANY PEOPLE, HOW MANY EMPLOYEES OF

8    LDK REALLY WERE INVOLVED IN MR. SITU'S OBSERVATIONS AND

9    PRESUMABLY AFFIRM THOSE AND I JUST LIKE TO EMPHASIZE ONE THING.

10          YOU NEED A COGENT IN THE INFERENCE AND IT'S, AT LEAST,

11    HAS TO BE AS COMPELLING AS OPPOSING INFERENCE.  THIS IS A

12    HIGHLY DETAILED COMPLAINT WITH TONS OF NUMBERS, MORE THAN

13    RESPECTFULLY I SAY YOU SEE IN CASES LIKE THIS.

14          BASIS IS MR. SITU, BUT IT'S NOT ALL MR. SITU, IT'S

15    DETAIL, IT'S COMPELLING, IT'S CERTAINLY IS ENOUGH TO WITHSTAND

16    A 12(B)(6) MOTION.

17          THANK YOU.

18          **THE COURT:**  THANK YOU.  UNDER SUBMISSION.

19          WE'RE GOING TO TAKE A SHORT RECESS, THEN WE'LL RESUME

20    WITH THE REST THE CALENDAR IN ABOUT 10 MINUTES.

21

22                    (PROCEEDINGS ADJOURNED.)

23

24

25

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS.

I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

THE FEE CHARGED AND THE PAGE FORMAT FOR THE TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL CONFERENCE.

FURTHERMORE, I CERTIFY THE INVOICE DOES NOT CONTAIN CHARGES FOR THE SALARIED COURT REPORTER'S CERTIFICATION PAGE.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS 5TH DAY OF JUNE, 2008.

_____

JAMES YEOMANS, CSR, RPR