IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE LDK SOLAR SECURITIES LITIGATION.<br><br>_____ /<br><br>This Document Relates to:<br><br>    All Actions.<br><br>_____ / | No. C 07-05182 WHA<br><br>**ORDER DENYING CHINA-BASED DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY DISCOVERY** |

**INTRODUCTION**

In this federal securities action, a putative class of investors filed suit against LDK Solar Co., two of its subsidiaries and several of its officers and directors claiming violations of Sections 10(b) and 20(a) of the Securities Exchange Act. Plaintiffs allege that defendants made material misstatements and omissions relating to LDK's reported inventory of polysilicon, an important raw material for the production of solar wafers. Defendants Jiangxi LDK Solar, Xingxue Tong, Qiqiang Yao, Liangbao Zhu, Yonggang Shao, and Gang Wang move to dismiss the complaint for failure to state a claim upon which relief can be granted and for lack of personal jurisdiction. Defendants also move to stay discovery. For the reasons stated below, defendants' motion to dismiss is **DENIED**. Defendants' motion for a stay is also **DENIED**.

**STATEMENT**

The circumstances of this case have been set forth in a previous order and need not be repeated in detail here (May 29, 2008 Order, Dkt. No. 85). The following paragraphs, which

take the complaint's well-pled allegations as true, summarize the facts pertinent to the pending motions.

Plaintiffs are a putative class of investors who purchased LDK securities between June 1, 2007, and October 7, 2007. Investor Shahpour Javidzad was appointed lead plaintiff. Defendants include LDK Solar Co., a manufacturer of multicrystalline solar wafers (a component of solar cells), LDK Solar USA, Inc., its U.S. subsidiary, Jiangxi LDK Solar, a Chinese subsidiary, and several of LDK's officers and directors. LDK was headquartered in China, was incorporated in the Cayman Islands and, beginning in June 2007, was traded on the New York Stock Exchange.

In a May 2008 order (Dkt. No. 85), the Court denied a previous motion to dismiss filed by defendants LDK, LDK Solar USA, Inc., Xiaofeng Peng, LDK's founder, chairman of the board and chief executive officer, and Jack Lai, the company's chief financial officer, executive vice president and secretary. At that time, plaintiffs had yet to serve the remaining defendants (Jiangxi LDK Solar, Xingxue Tong, Qiqiang Yao, Liangbao Zhu, Yonggang Shao, and Gang Wang) because of the difficulty of executing service in China. Those defendants were subsequently served and now move to dismiss.

Defendant Xingxue Tong was LDK's President and Chief Operating Officer. Defendant Qiqiang Yao was Vice President and Chief Accounting Officer. He was a registered accountant in China but was not a CPA in the United States. Defendant Liangbao Zhu was Executive Vice President of LDK and a member of the board of directors. Defendant Yonggang Shao was the Senior Vice President and a member of the board of directors. Defendant Gang Wang was a member of the board of directors.

Plaintiffs contend that defendants doctored LDK's IPO prospectus and financial statements and made false or misleading public statements regarding the company's financial health. Plaintiffs aver that defendants significantly overstated the value of its inventory of polysilicon, an important material used in wafer manufacturing which constitutes some 80% of LDK's production costs, thus significantly overstating the company's financial performance and

its prospects. When these circumstances came to light in October 2007, LDK's stock fell by nearly 50%.

In February 2007, LDK's lead auditor, KPMG, "warned the Company's board of directors that LDK's inventory accounting was inadequate. KPMG also identified a 'significant deficiency' in LDK's internal controls." In response, LDK hired Charley Situ in mid-March specifically "to deal with the inventory and other accounting issues KPMG had identified" (Compl. ¶¶ 69–70). Controller Situ reported directly to Yao, who in turn reported to CFO Lai.

LDK went public on June 1, 2007, through an initial public offering on the New York Stock Exchange. During its August 2007 conference call to investors, LDK announced that its "vision" was to become the world's "largest, lowest cost producer of solar wafers" (*id.* at ¶ 27). Consequently, LDK needed millions of dollars in additional capital. Without a longer operating history that could inform investors about the competence of management and likelihood of future profits, LDK needed a strong balance sheet and evidence that the company could produce wafers more cheaply than its competitors.

LDK regularly purchased scrap materials from which it hoped to extract its key input, polysilicon. Polysilicon can be obtained in two ways: it can be purchased in its raw form, or it can be extracted from scrap materials. LDK regularly utilized the latter means which is considerably cheaper. Many scrap materials, however, have so many impurities as to render them worthless and unusable. LDK, therefore, employed a team of inspectors to sort through already-purchased scrap materials and to identify which materials could or could not be used. After purchasing any scrap materials, LDK accounted for them as current inventory and valued them at the acquisition cost. After the LDK employees sorted through the scrap and found worthless pieces, however, LDK was supposed to reduce the value of the inventory to reflect the "market" value of the scrap materials in accordance with GAAP. In addition, LDK should not have included in its reported stock of current inventory materials that did not exist or materials deemed unusable. These "unusable" pieces were scrap materials acquired at a low price but were of such poor quality that it could not be used within a year, if ever.

Instead, however, LDK continued to value the worthless scrap materials at cost rather than at "market" value.

Plaintiffs allege that LDK failed to abide by the Generally Accepted Accounting Principles ("GAAP"). LDK's prospectus stated that it adhered to this rule. According to GAAP, inventory may not be accounted for more than its actual worth; it must be valued at the lower of its acquisition cost or the "market" value. According to its prospectus, LDK used the "weighted average method" to value its inventory. That would have meant that LDK divided the total amount it paid to purchase its polysilicon inventory by the total number of tons of polysilicon feedstock in inventory, regardless of whether it was a ton of scrap materials or a ton of pure polysilicon, to calculate the average price paid per ton of feedstock. This method of accounting would allegedly have been permissible had the raw material counted as inventory actually existed and been usable within the current period. During the class period, however, LDK counted as current inventory materials that did not even exist or had too many impurities to have any economic value. This accounting practice made polysilicon costs seem lower and artificially inflated profits.

In late September 2007, Controller Situ resigned due to concerns over LDK's accounting practices (Compl. ¶ 65). In a September 2007 email,[1] Controller Situ wrote, "I am sure now [that assuring the accuracy of financial data and acting as the interface with KPMG] is an unachievable task for any professional so I hereby reiterate that I have no choice but to quit the job in order to keep away from any potential securities fraud, as well as many other non-compliances or violations."

On October 3, 2007, Piper Jaffray published a research note indicating that LDK's financial controller had left the company. The research note stated that "[w]e are also aware of the former controller's allegations of poor financial controls and . . . [an] inventory discrepancy" (Compl. ¶ 78). As a result of these and other developments, LDK's shares closed at $51.65 on October 3, which represented a 24.4% drop from the previous day's close of $68.31.

---

[1] In the May 29 order, the Court took judicial notice of this and other below-described documents.

4

LDK announced in a Form 6-K, dated October 4, 2007, that Situ had been "terminated for cause on September 25, 2007." (As stated, this announcement controverts the complaint, which says that Situ resigned.) The Form 6-K further stated, "LDK's management team and board of directors formed an internal committee to investigate the allegations and conduct an immediate physical inventory of LDK's polysilicon materials. The management team found no material discrepancies as compared to LDK's financial statements. The management team believes that these allegations have no merit. Additionally, the Audit Committee has asked an independent auditing firm to conduct a separate, independent engagement on LDK's inventory."

On October 8, 2007, *Barron's* published an article describing Controller Situ's allegations in greater detail. Among other things, the article said that the company may have overstated its inventory by up to $92 million. It also cited a second, unidentified source who confirmed that LDK had serious problems with the quality of its polysilicon inventory. That day, LDK's shares closed at $37.50, which was down 26.4% from the previous trading day's close of $50.95. The price of LDK stock had declined 45.1% since the day before the October 3 disclosure (Compl. ¶¶ 78–81).

In December 2007, LDK's audit committee announced its conclusions. Another Form 6-K, dated December 17, 2007, stated that there were "no material errors in the Company's stated silicon inventory quantities as of August 31st, 2007 . . . and Mr. Situ's allegations of an inventory discrepancy were incorrect because he had not taken into account all locations in which the Company stored its silicon feedstock." The audit committee consisted of two outside directors, and the investigation was conducted by outside independent accountants and the audit committee's independent counsel, Simpson Thacher & Bartlett LLP.

After the results of the internal investigation had been announced, LDK issued its third-quarter financial statements for 2007 on December 20, 2007. There were no restatements. On February 25, 2008, LDK also issued its fourth-quarter financial statements for 2007 without any restatements. These statements were part of LDK's Form 6-K filings.

5

On March 31, 2008, the accounting firm KPMG issued an audit opinion attached to consolidated financial statements for December 31, 2006, and 2007. The opinion concluded, "In our opinion, the consolidated financial statements referred to above present fairly, in all material aspects, the financial position of the Group as of December 31, 2006 and 2007, and the results of its operations and its cash flows for the period from July 5, 2005 (date of inception) to December 31, 2005 and the years ended December 31, 2006 and 2007, in conformity with U.S. generally accepted accounting principles" (Req. Jud. Not. Exh. S at F-2).

The complaint alleges the following specific misrepresentations. *First*, defendants publicly released a prospectus for the company's IPO on June 1, 2007. The prospectus, however, overstated the amount of polysilicon inventory, which was key to the company's overall value, and erroneously stated that LDK's financial statements had been prepared in accordance with GAAP. *Second*, LDK issued another press release on October 4, 2007, the day after Piper Jaffray published a research note about Controller Situ's resignation and potential accounting irregularities. LDK said that Situ's allegations had no merit.[2]

Plaintiffs filed a consolidated class complaint on March 10, 2008, in which they asserted the following claims: (i) violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against all defendants; and (ii) violations of Section 20(a) of the Exchange Act against the individual defendants.

In an order dated May 29, 2008 (Dkt. No. 85), the Court denied a previous motion to dismiss filed by defendants LDK, LDK Solar USA, Inc., CEO Peng, and CFO Lai. As stated, plaintiffs had at that time been unable to serve the remaining defendants.

After being successfully served, the remaining defendants moved to dismiss. Plaintiffs do not oppose dismissal of their claims against Jiangxi LDK Solar, the Chinese subsidiary, or of their Section 10(b) claims against defendants Shao and Wang. Plaintiffs oppose dismissal of their Section 10(b) claims against defendants Tong, Zhu and Yao, and of their Section 20(a) claims against defendants Tong, Zhu, Yao, Shao and Wang (collectively, "defendants").

---

[2] As explained in the May 29 order, the complaint alleges additional false statements, but the presently moving defendants are only alleged to have made or participated in these two statements.

6

## ANALYSIS

Defendants move to dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted and under 12(b)(2) for lack of personal jurisdiction. Defendants also move to stay discovery pursuant to the Private Securities Litigation Reform Act ("PSLRA").

### 1.   MOTION TO DISMISS.

"[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Telltabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2509 (2007). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Ibid.*[3]

When a defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), plaintiffs bear the burden of establishing the Court's jurisdiction over defendants. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). When, as here, "the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts," *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal quotation omitted), and if "not directly controverted, plaintiff's version of the facts is taken as true." *Unocal Corp.*, 248 F.3d at 922.

#### A.   Personal Jurisdiction.

"For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger*, 374 F.3d at 801 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Congress has provided for nationwide service of process for claims under federal securities laws, 15 U.S.C. 78aa, and therefore "the question becomes whether the party has

---

[3] Internal citations are omitted from all citations in this order, unless otherwise indicated.

7

sufficient contacts with the United States, not any particular state." *Go-Go Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1414 (9th Cir. 1989). *See also MTC Electronic Technologies v. Leung*, 889 F. Supp. 396, 399–400 (C.D. Cal. 1995). "In any personal jurisdiction case [the Court] must evaluate all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et. L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).

Plaintiffs allege that the Court has specific jurisdiction, as opposed to general jurisdiction, over defendants. *See Schwarzenegger*, 374 F.3d at 801–02 (distinguishing the two types of personal jurisdiction). The Court of Appeals for the Ninth Circuit applies a three-prong test for analyzing claims of specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.,* it must be reasonable.

*Id*. at 802. The first element is sometimes referred to as the "purposeful availment" prong, but "[d]espite its label, this prong includes both purposeful availment and purposeful direction. It may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof." *Yahoo! Inc.*, 433 F.3d at 1206.[4]

Plaintiffs base their jurisdictional claim predominantly on defendants' role in their company's 2007 initial public offering. In mid-2007, LDK sold shares on the New York Stock Exchange in order to raise badly needed funding. Defendants signed the prospectus for the offering and caused it to be filed with the SEC. The offering, plaintiffs contend, both raised

---

[4] In purposeful-direction cases, courts normally employ the "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984). This circuit construes *Calder* as imposing three requirements: "the defendant allegedly [must] have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Yahoo! Inc.*, 433 F.3d at 1207.

8

1 financing that LDK required to effectuate its business strategy, and enriched defendants, who
2 owned a considerable number of options in the company.

3 Plaintiffs have satisfied their burden of establishing personal jurisdiction based on these
4 well-pled allegations, subject to proof at trial. The conduct plaintiffs identify contains elements
5 both of purposeful availment and purposeful direction. Defendants purposefully availed
6 themselves of the forum by taking advantage of this nation's laws and its capital markets, and in
7 so doing purposefully directed a fraud at investors on the New York Stock Exchange (and U.S.
8 regulators).[5] Plaintiffs claims arise directly from defendants' forum-related activities — the
9 prospectus, plaintiffs allege, contained material false statements which are integral to plaintiffs'
10 securities claims. Courts regularly assert jurisdiction in such circumstances. *See, e.g.*, *In re*
11 *Royal Ahold N.V. Securities & ERISA Litigation*, 351 F. Supp. 2d 334, 351–52 (D. Md. 2004)
12 ("United States courts frequently have asserted personal jurisdiction over [foreign] individual
13 defendants who sign or, as control persons, approve the filing or dissemination of, particular
14 forms required by the SEC which they knew or should have known would be relied on by U.S.
15 investors").[6]

16 Defendants admit that they signed the prospectus, either personally or through their
17 attorney-in-fact (Ans. ¶ 85). They argue, however, that the act of signing a prospectus is alone
18 insufficient to confer personal jurisdiction over them. They rely on *In re Astrazeneca Sec.*
19 *Litig.*, 2008 WL 2332325 *13 (S.D.N.Y. 2008). This order finds *Astrazeneca* unpersuasive.
20 There, the Court found the plaintiffs' jurisdictional claims — *inter alia*, that a defendant
21 "caused the distribution of false and misleading reports" — insufficient, first, because the
22 allegations were generalized and conclusory and applied to many defendants merely by virtue

---

[5] The parties have presented no allegations regarding how many of LDK's investors are U.S.-based, but the Court has no difficulty concluding that a fraud aimed at New York Stock Exchange investors as well as U.S. regulators is aimed at the United States, and that defendants likely would know that such a fraud would cause harm in the country.

[6] *See also MTC Electronic Technologies v. Leung*, 889 F. Supp. 396, 399-400 (C.D. Cal. 1995); *In re Alstrom SA*, 406 F. Supp.2d 346, 399-400 (S.D.N.Y. 2005); *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 305 (E.D.N.Y. 2002); *Itoba Ltd. v. LEP Group*, 930 F. Supp. 36, 41 (D. Conn. 1996). *Cf. Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 390–91 (D. Del. 2005) (merely signing a registration statement may not alone confer personal jurisdiction if plaintiffs' claims are not predicated on that document).

9

of their positions in the company, *id*. at *13, and second, because "[a] person's status as a board member is not alone sufficient to establish jurisdiction." *Ibid*. In contrast, here defendants actually signed and caused to be filed an allegedly fraudulent IPO prospectus, and the alleged misrepresentations in that document are central to plaintiffs' claims. As explained in greater detail below, those claims are more than conclusory. The *Astrazeneca* court also declined to permit the plaintiffs to amend their compliant in order to allege that the defendants signed certain SEC filings, stating that "signing [of SEC filings], undoubtedly in a foreign country, is insufficient for personal jurisdiction in this case." *Ibid*. That statement may well have been dicta; in the very next sentence the court stated, "[i]n any event, because the Court holds that the case should be dismissed against all defendants on the merits, such amendment would be futile." *Ibid*. The court did not rely on a lack of jurisdiction; it did not discuss why signing SEC statements might be insufficient nor why it deviated from cases, including one in the same District less than three years earlier,[7] which had held otherwise. This order respectfully declines to follow this statement of *Astrazeneca*.

Plaintiffs have satisfied their burden under the first two prongs of the specific jurisdiction test and, therefore, the burden shifts to defendants to "'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)). Defendants identify no compelling reason why the exercise of jurisdiction over them would be unreasonable. Defendants emphasize their lack of geographic connection to the United States: they live and work in China, own no property in the United States, and travel here infrequently. The Court finds these factors to be insufficient to render jurisdiction unreasonable. If the reasonableness inquiry were dictated by the extent of defendants' geographic ties to the forum alone, the purposeful availment and purposeful direction inquiries would be meaningless. Although the burden on defendants is a relevant factor, the other fairness and reasonableness factors — the

---

[7] *In re Alstrom*, 406 F. Supp. 2d at 399 ("[t]he signing of documents filed with the SEC which form the basis for Plaintiffs' claims is sufficient contact with the jurisdiction to justify this Court's exercise of jurisdiction over [the foreign defendant]"). *See also supra* note 5 (collecting additional cases that reached the same conclusion).

10

1  forum state's interest in adjudicating the dispute, plaintiffs' interest in obtaining convenient and
2  effective relief, judicial efficiency, and the shared interest of states "in furthering fundamental
3  substantive social policies," *Burger King Corp.*, 471 U.S. at 476–77 (listing the factors) —
4  weigh in favor of reasonableness. Plaintiffs certainly have a strong interest in obtaining
5  effective and efficient relief, and the integrity of this nation's securities markets would be
6  undermined if foreign corporations and executives could fleece those capital markets while
7  standing just beyond the water's edge. The Court, therefore, finds that plaintiffs have made the
8  requisite prima facie showing that the Court has personal jurisdiction over defendants.

### B.     Rule 10(b) Claims.

10     A plaintiff asserting securities fraud under Section 10(b) of the Exchange Act,
11 15 U.S.C. 78j, and 17 C.F.R. 240.10b-5, must prove (1) a material misrepresentation or
12 omission, (2) scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase
13 or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura*
14 *Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Under the heightened
15 pleading standards of the PSLRA, 15 U.S.C. § 78u-4(b)(2), plaintiffs must "specify each
16 statement alleged to have been misleading [and] the reason or reasons why the statement is
17 misleading, and state with particularity facts giving rise to a strong inference that the defendant
18 acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct.
19 2499, 2508 (2007) (internal quotations omitted).

20     Defendants contend that plaintiffs' Section 10(b) claims against them fail as a matter of
21 law, *first*, because the complaint fails to identify any false or misleading statements made by
22 defendants, and *second*, because the complaint fails to give rise to a strong inference of scienter.
23 As stated, plaintiffs oppose dismissal of the Section 10(b) claims against defendants Tong, Zhu
24 and Yao, but do not oppose dismissal of those claims against defendants Shao and Wang.
25 Defendants' motion to dismiss the Section 10(b) claims against defendants Shao and Wang
26 is therefore granted as unopposed. This order examines the adequacy of the complaint's
27 Section 10(b) allegations against defendants Tong, Zhu and Yao.

28                    *(i)     False statements.*

11

Defendants contend that plaintiffs have failed to identify a single allegedly false statement by any of the moving defendants or that defendants substantially participated in the alleged misrepresentations.  Plaintiffs respond that the complaint adequately pled that defendants Tong, Zhu and Yao made or are responsible for material false statements on the following occasions:  (1) in LDK's 2007 IPO prospectus; and (2) in LDK's October 2007 press release, which stated that Situ's allegations "have no merit."

Plaintiffs allege, and defendants do not dispute, that defendants signed LDK's 2007 IPO prospectus.  The prospectus is integral to plaintiff's claims.  Plaintiffs specifically allege that several statements in the prospectus were false (Compl. ¶¶ 85–95), and the Court's May 29 order found that plaintiffs adequately pled falsity in connection with the IPO prospectus.  The Ninth Circuit has held that "a corporate official . . . who, acting with scienter, signs a SEC filing containing misrepresentations, 'make[s]' a statement so as to be liable as a primary violator under § 10(b)."  *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000).  The complaint therefore adequately pled that defendants made false statements.

Defendants contend (as had their co-defendants) that a different result is warranted because the complaint improperly relies upon the "group pleading doctrine" which, defendants assert, was "flatly rejected" by courts of this circuit.  *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1153 n. 3 (C.D. Cal. 2007).  The Ninth Circuit recognized the group pleading doctrine prior to the passage of the PSLRA but has yet to decide whether the doctrine survives that Act.  Several courts of appeals, however, have held that the "group pleading doctrine" does not survive the PSLRA.  *See, e.g.*, *Winer Family Trust v. Queen*, 503 F.3d 319, 336 and n.5 (3d Cir. 2007) ("The only courts of appeals to have directly addressed the survival of the group-pleading doctrine post-PSLRA have abolished the doctrine;" collecting cases); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2511 n.6 (2007) (recognizing disagreement among the circuits but declining to reach the issue).  District courts in this circuit have also cast doubt on the doctrine.  *See In re Hansen Natural Corp.*, 527 F. Supp. 2d at 1153.  This order need not broach the status of the group pleading doctrine because plaintiffs do not purport to rely on it to establish that defendants made false statements.

As the Court of Appeals for the Fifth Circuit explained the doctrine, "[i]nstead of being required to plead that a defendant actually made, authored or approved an offending statement in a corporate communication, the 'group pleading' doctrine in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles." *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363 (5th Cir. 2004). That is, the doctrine permits attribution of statements "simply by pleading that the defendants were part of the 'group' that likely put the challenged documents together." *Ibid*. Plaintiffs have alleged more than this — plaintiffs alleged that defendants signed the prospectus, thereby actually making the statements therein or "approv[ing]" the document. *Ibid*. The mere signing of a prospectus or other SEC filing does not, of course, alone establish scienter, but it does establish that the individual made or approved the allegedly false statement. Cases such as *Southland Securities* do not necessarily upset the Ninth Circuit's rule that an officer who signs an SEC filing has himself made the statements therein. *Howard*, 228 F.3d at 1061. Although *In re Hansen Natural* arguably suggested that merely signing SEC statements is insufficient,[8] it did not discuss *Howard*, and other courts in this Circuit continue to apply this aspect of *Howard*. *See, e.g.*, *In re Maxim Integrated Products, Inc.*, 2008 WL 4061075 (N.D. Cal. 2008) (Ware, J.); *In re Zoran Corp. Derivative Litigation*, 511 F. Supp. 2d 986, 1011 (N.D. Cal. 2007) (Alsup, J.); *S.E.C. v. Baxter*, 2007 WL 2013958 (N.D. Cal. 2007) (Whyte, J.) (unreported). Insofar as *In re Hansen Natural* suggested that this aspect of *Howard* is no longer good law, this order respectfully disagrees. For these reasons, this order finds that the complaint adequately pled that defendants made false statements.[9]

---

[8] *Id*. at 1153 ("although Plaintiff alleges that Epstein, Taber, and Vidergauz signed Hansen's annual reports as well as a single Form S-8, there are no specific allegations that Hall, Kelly, Schott, Epstein, Taber, or Vidergauz played any role whatsoever in the preparation or dissemination of any allegedly false statements").

[9] Plaintiffs also point to the complaints allegations concerning LDK's October 4 press release, attributed to LDK's "management team," which stated that Mr. Situ's allegations "have no merit" (Compl. ¶ 123), and defendants challenge the adequacy of these allegations. Because this order finds that plaintiffs adequately made false statements irrespective of this press release, it need not determine whether these allegations might state a Section 10(b) claim. Similarly, the Court need not address defendants' contention that defendants have not "substantially participated" in the preparation of the financial statements because under

13

### (ii) *Scienter.*

Defendants next contend that the complaint fails adequately to plead facts "giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2508–09 (2007). "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the standard." *Id*. at 2509. As explained in the Court's May 29 order, Supreme Court articulates the inquiry as follows:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e*., of the "smoking-gun" genre, or even the "most plausible of competing inferences." Recall in this regard that § 21D(b)'s pleading requirements are but one constraint among many the PSLRA installed to screen out frivolous suits, while allowing meritorious actions to move forward. Yet the inference of scienter must be more than merely "reasonable" or "permissible" — it must be cogent and compelling, thus strong in light of other explanations. *A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.*[10]

*Tellabs*, 127 S. Ct. at 2510 (emphasis added). The complaint must therefore contain cogent allegations at least as compelling as any opposing inference that defendants acted with scienter — that is, that defendants knew or were deliberately reckless to the falsity of their statements. *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 977 (9th Cir. 1999).

Plaintiffs contend that defendants Tong, Zhu and Yao made false statements on the following occasions: (1) when they signed LDK's July 2007 IPO prospectus, which contained multiple misrepresentations; and (2) in LDK's October 2007 press release, attributed to the "management team," which stated that Situ's allegations "have no merit." As stated, plaintiffs

---

*Howard*, they are deemed actually to have made those statements.

[10] Section 21D(b)(2), codified at 15 U.S.C. 78u-4(b)(2), requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

14

1  have adequately pled falsity, at a minimum, with respect to the former. Plaintiffs therefore need
2  only establish that defendants knew or were deliberately reckless to the falsity of those
3  statements.

4  Defendants assert that the complaint fails to plead facts giving rise to a strong inference
5  of scienter because (1) the complaint failed to plead that defendants knew of any inventory
6  discrepancies prior to the company's June 2007 IPO, (2) the complaint improperly relied on the
7  "group pleading doctrine," and (3) scienter may not be inferred solely from defendants' position
8  within the company.

9  Defendants' first contention is beside the point because acts or circumstances occurring
10 *after* the statements were made could be relevant — if defendants made false statements
11 unknowingly but learned of the falsity of their statements thereafter, they had a duty to disclose
12 the information necessary to correct the misstatements, and the failure to do so can give rise to
13 Section 10(b) liability. *See, e.g.*, *In re Verity, Inc. Securities Litigation*, 2000 WL 1175580
14 (N.D. Cal. 2000) (Breyer, J.); *Backman v. Polaroid Corp.*, 910 F.2d 10, 16–17 (1st Cir. 1990)
15 (en banc). At no point, the complaint alleges, did defendants come forward to correct their
16 misstatements.

17 This order concludes that defendants' latter two arguments are also unavailing because
18 plaintiffs have adequately pled scienter, not under the group pleading doctrine and not based
19 solely on defendants' positions within the company, but because the complaint avers facts
20 giving rise to a strong inference, at least as compelling as any contrary inference, that *each*
21 *individual defendant* knew, or was deliberately reckless to, the accounting problems at the
22 company and the alleged false statements in the prospectus.[11]

23 Defendants Tong and Zhu were board members. The complaint avers that LDK's
24 outside auditors expressed concern to the board regarding the company's internal controls and

---

[11] Contrary to defense counsel's representation at the hearing, the Court's May 29 order did *not* hold that the "group pleading doctrine" is no longer good law in this circuit. The order simply did not address the issue one way or the other. The order stated, "it is said [*by defendants*], [that] plaintiffs improperly rely on the group-pleading doctrine, which contradicts the PSLRA's requirements . . . . This order finds that there was sufficient scienter without relying on the group-pleading doctrine." *In re LDK Securities Litigation*, 2008 WL 2242185 at *12 (N.D. Cal. 2008) (citing two cases of other circuits which disallowed the doctrine).

15

its inventory accounting prior to the June 2007 IPO. In a February 2007 report entitled "Report to Board of Directors on Internal Control Observations," the complaint avers, LDK's auditor KPMG warned that the company's inventory accounting was inadequate and identified a "significant deficiency" in LDK's internal controls (Compl. ¶ 69). Plaintiffs contend that "as board members Tong and Zhu knew of KPMG's warnings prior to the IPO" (Opp. at 21).

According to the complaint, LDK responded to this KPMG report by hiring Mr. Situ specifically to address the concerns expressed therein (Compl. ¶¶ 68–70). Situ allegedly uncovered substantial problems with the company's financial controls and accounting. Finally, the complaint alleges,

> [i]n late September, with management refusing to heed his advice, and fearing that he would be implicated in securities fraud if he remained at LDK, Situ resigned from the company. On September 25 he outlined his concerns with the inventory in an email he sent to LDK's management, members of its audit committee and employees of LDK's auditor, KPMG. He copied the SEC and the Public Company Accounting Oversight Board

(Compl. ¶ 65).

Although the complaint does not specifically allege that defendants Tong and Zhu received any communications from Situ or any warnings other than the initial KPMG report, considering the totality of the circumstances alleged in the complaint, as this order must do, this order finds at least as compelling as not the inference that defendants Tong and Zhu were at a minimum reckless in failing to know of the alleged accounting problems at LDK. The two directors had been put on notice of the alleged problems with the company's accounting and internal controls relating to its inventory of polysilicon by the February 2007 KPMG report, and the company hired Situ specifically to address those issues. Situ's allegations and the circumstances of his resignation were aired publicly, including in a Piper Jaffray report and in a Barron's article, both published in early-October 2007. The company's supply and inventory of polysilicon were critical to the company's financial health and business prospects. Polysilicon allegedly was the "principal input" for defendants' primary product, solar wafers, and constituted 80% of the cost of producing defendants' wafers (Compl. ¶¶ 23, 44). The company's competitive strategy and its sales pitch to potential investors in the company's

1  IPO centered around the company's supposedly ample stocks of polysilicon and its ability to
2  secure the input cheaply (Compl. ¶¶ 30–33). In these circumstances, having been warned of the
3  problems initially, a director could avoid knowledge of the problems allegedly unearthed by
4  Situ only by deliberately avoiding them. This order finds at least as compelling as not the
5  inference that defendants Tong and Zhu were at a minimum deliberately reckless to the
6  accounting problems at the company and to the (alleged) falsity of the statements in the IPO
7  prospectus identified in the complaint.

Defendants contend that LDK's IPO included only 2006 and first quarter 2007 financial statements, periods which "largely preceded the tenure of Plaintiff's sole source of any claim of wrongdoing (*i.e.*, Situ)" (Reply at 11–12). This order fails to comprehend the import of this argument. The complaint alleges that the prospectus itself contained multiple material false statements and that the company thereafter failed to correct those misstatements. It is irrelevant that those alleged misstatements came to light in part due to events occurring subsequent to the dates of the financial statements in the prospectus or to the filing of the prospectus itself, if defendants made those false statements (or failed to correct them) with scienter. At the hearing, defendants further argued that even if the February 2007 KPMG report warned the board of accounting and control problems, KPMG's March 2008 opinion letter cleared the company of any accounting violations.[12] As the Court explained in its May 29 order, however,

> KPMG's unqualified opinion did not necessarily exonerate LDK.
> It did not specifically discuss the time periods at issue; it discussed
> year-end results. And with respect to its 2007 financial statements,
> LDK stated that "neither we nor our auditors undertook an
> assessment of our internal control over financial reporting
> Section 404 requirements described above as we and they will be
> only required to do as of December 31, 2008."

For these reasons, the Court does not find defendants' arguments persuasive and, instead, concludes that the allegations in the complaint give rise to a strong inference that defendants Tong and Zhu acted with scienter.

---

[12] This KPMG opinion letter, dated March 31, 2008, was included with LDK's 2007 Form 20-F. It stated that the year-end 2006 and 2007 financial statements in that filing fairly presented the company's financial position and complied with GAAP. The Court took judicial notice of and summarized the KPMG letter in its May 29 order.

17

1    Defendant Yao is not alleged to have been a board member. At all relevant times, the
2 complaint avers, Yao was LDK's Chief Accounting Officer, and he was Situ's immediate
3 supervisor. These facts alone lend credence to the inference that Yao was aware of the
4 accounting problems Situ allegedly brought to light. The complaint, however, does not rely
5 solely on Yao's position or his immediate relationship with Situ. The complaint avers that Yao
6 and Situ both attended a meeting on July 19, 2007, at which LDK's Chief Engineer and plant
7 manager expressed concern about the quality of the company's feedstock and expressed the
8 view that the company's official inventory numbers could not be relied upon because those
9 numbers were "just paper numbers and there are no items physically existing or just some
10 unusable items" (Compl. ¶ 39). This meeting occurred less than three weeks after defendants
11 signed the IPO prospectus. Similarly, in a September 2007, conference call in which Yao and
12 others participated, Situ explained that two-thirds of LDK's feedstock inventory was useless
13 and that LDK needed to reflect that reality by recording a charge on its financial statements
14 (Compl. ¶ 64). LDK never did so, the complaint avers. As stated, if defendant learned after he
15 signed the prospectus that his prior statements were false at the time he made them, he had a
16 duty to correct those misstatements. This order finds that defendants made or failed to correct
17 allegedly false statements with scienter.

### C. Section 20(a) Claims.

19    Section 20(a) of the Securities Exchange Act, 15 U.S.C. 78t, provides that "[e]very
20 person who, directly or indirectly, controls any person liable under any provision of this chapter
21 or of any rule or regulation thereunder shall also be liable jointly and severally with and to the
22 same extent as such controlled person . . . unless the controlling person acted in good faith
23 and did not directly or indirectly induce the acts constituting the violation or cause of action."
24 *See also* 17 C.F.R. 230.405 (defining "control"). To state a control-person claim, plaintiff must
25 establish (1) a primary violation of the federal securities laws, and (2) that defendants exercised

18

1  actual power or control over the primary violator. *Howard*, 228 F.3d at 1065.[13] Although the
2  circumstances of the primary violators' fraud must be pled with particularity under Rule 9(b),
3  the control element is not a circumstance that constitutes fraud and therefore need not be pled
4  with particularity. *Siemers v. Wells Fargo & Co.*, 2006 WL 2355411 (N.D. Cal. 2006)
5  (Alsup, J.).

6        Plaintiffs pursue control-person claims against defendants Tong, Zhu, Yao, Shao and
7  Wang. In their motion to dismiss, defendants argued only that the Section 20(a) claims
8  must fail because plaintiffs failed to establish any predicate violations of Section 10(b).
9  That argument is foreclosed by this order's and the May 29 order's conclusions regarding
10 Section 10(b) liability.

11       In their reply, defendants assert for the first time that the control-person claims must fail
12 for additional reasons: because defendant Wang is merely an outside director and Section 20(a)
13 does not extend to outside directors; and because the complaint fails adequately to plead the
14 circumstances of control as to the other defendants. "It is well accepted that raising of new
15 issues and submission of new facts in [a] reply brief is improper." *Schwartz v. Upper Deck Co.*,
16 183 F.R.D. 672, 682 (S.D. Cal. 1999) (quoting *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir.
17 1996)). *See also* Civil Local Rule 7-2. In any event, the complaint avers that each defendant
18 except for Wang is a senior officer or manager of LDK, and that defendants undertook certain
19 activities typical of managers with the ability to control or influence a corporation, including
20 signing the IPO prospectus and financial disclosures (Compl. ¶ 157–58). Defendants' motion to
21 dismiss the Section 20(a) claims is denied.

22     **2.**    **MOTION TO STAY.**

23       The Court filed a case management scheduling order on June 3, 2008, which set forth
24 discovery deadlines (Dkt. No. 88). On July 21, 2008, defendants moved to stay discovery in

---

[13] Plaintiffs need not show that defendants were culpable participants in the violation, but defendants may assert a "good faith" defense. *Ibid*. Thus, "[t]o establish the liability of a controlling person, the plaintiff does not have the burden of establishing that person's scienter distinct from the controlled corporation's scienter . . . . But a defendant who is a controlling person of an issuer with scienter may assert a good faith defense by proving the absence of scienter and a failure to directly or indirectly induce the violations at issue." *Ibid*. (internal quotations omitted).

19

this action. Defendants argued that plaintiffs "launched inappropriate and premature discovery," and that "discovery is premature because it precedes the resolution of the pleadings issues, which will be resolved by the pending motion to dismiss, and which should be resolved before all parties waste resources addressing issues that the Court may conclude are dismissed from the case" (Br. at 4). Defendants rely on the PSLRA, 15 U.S.C. 78u-4(b)(3)(B), which states, "[i]n any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." Plaintiffs have not claimed that discovery is necessary to preserve evidence or to prevent undue prejudice. The issue is moot, however, because this order disposes of defendants' motion to dismiss.[14]

## CONCLUSION

For all of the above-stated reasons, the motion to dismiss all claims against defendant Jiangxi LDK Solar is **GRANTED** as unopposed, and the motion to dismiss the Section 10(b) claims against defendants Shao and Wang is **GRANTED** as unopposed. Defendants' motion to dismiss is otherwise **DENIED**. Additionally, the motion to stay discovery is **DENIED**.

**IT IS SO ORDERED.**

Dated: September 24, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[14] Defendants also cite FRCP 26(d)(1), which states, "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except . . . when authorized by these rules, stipulation, or court order." Defendant emphasizes that the parties have yet to hold a Rule 26(f) conference.

20