**United States District Court**
For the Northern District of California

1
2
3
4
5
6                        IN THE UNITED STATES DISTRICT COURT
7
8                     FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10   IN RE LDK SOLAR SECURITIES                     No. C 07-05182 WHA
11   LITIGATION.
12   ——————————————————————/
                                                    **ORDER RE MOTION FOR**
13   This Document Relates to:                      **CLASS CERTIFICATION**
14        All Actions.
     ——————————————————————/
15
16                                 **INTRODUCTION**
17           Plaintiff filed a putative class action against LDK Solar Company, two of its subsidiaries
18   and several of its officers and directors claiming violations of the Securities Exchange Act.
19   Plaintiff alleges that defendants made material misrepresentations and omissions relating to
20   LDK's reported inventory of polysilicon, an important raw material for the production of solar
21   wafers.  Following the denial of motions to dismiss filed by the domestic and foreign
22   defendants, respectively, plaintiff now moves for class certification.  For the reasons stated
23   below, this order finds class certification appropriate under Rule 23.  The motion for class
24   certification is **GRANTED**.
25                                  **STATEMENT**
26           The circumstances of this case have been set forth in previous orders and need not be
27   repeated in detail (Dkt. Nos. 132, 85).  Plaintiff filed a putative class action on behalf of
28   investors who purchased LDK securities between June 1, 2007, and October 7, 2007.  Investor
     Shahpour Javidzad was appointed lead plaintiff.  Defendants include LDK Solar Co., a

United States District Court

For the Northern District of California

1    manufacturer of multicrystalline solar wafers (a component of solar cells), LDK Solar USA,

2    Inc., its U.S. subsidiary, Jiangxi LDK Solar, a Chinese subsidiary, and several of LDK's

3    officers and directors.

4        Plaintiff contends that defendants doctored LDK's IPO prospectus and financial

5    statements and made other false or misleading public statements regarding the company's

6    financial health.  The allegations center around LDK's internal controls and accounting for its

7    key input, polysilicon.  Plaintiff avers that defendants significantly overstated the value of its

8    inventory of polysilicon, an important material used in wafer manufacturing which constitutes

9    some 80% of LDK's production costs, thus significantly overstating the company's financial

10   performance and prospects.  When these circumstances came to light in October 2007, LDK's

11   stock fell by nearly 50%.

12       The complaint alleges that defendants deceived investors in two general respects.  It first

13   claims that LDK counted as inventory a significant quantity of polysilicon that did not in fact

14   exist.  The second involved the manner in which LDK obtained, and accounted for, its

15   polysilicon.  Polysilicon can be obtained in two ways:  it can be purchased in its raw form, or

16   it can be extracted from scrap materials.  LDK regularly utilized the latter means which is

17   considerably cheaper.  Scrap materials, however, may have impurities that render them of

18   limited usability or worthless.  LDK, therefore, sorted through already-purchased scrap

19   materials to identify which materials could or could not be used.  After purchasing any scrap

20   materials, LDK accounted for them as current inventory and valued them at their acquisition

21   cost.  Once LDK sorted through the scrap and found worthless pieces, however, it was supposed

22   to reduce the value of the inventory to reflect the "market" value of the scrap materials in

23   accordance with Generally Accepted Accounting Principles ("GAAP").  Instead, LDK allegedly

24   continued to value the worthless scrap materials at cost rather than at "market" value.

25       In February 2007, LDK's lead auditor, KPMG, "warned the Company's board of

26   directors that LDK's inventory accounting was inadequate.  KPMG also identified a 'significant

27   deficiency' in LDK's internal controls."  In response, LDK hired Charley Situ in mid-March

28

2

1    specifically "to deal with the inventory and other accounting issues KPMG had identified"

2    (Compl. ¶¶ 69–70).

3    LDK went public on June 1, 2007, via an initial public offering on the New York Stock

4    Exchange.  LDK's offering materials allegedly contained various material misrepresentations or

5    omissions related to the above-described scheme.

6    In late September 2007, Controller Situ resigned due to concerns over LDK's

7    accounting practices.  In a September 2007 email, Controller Situ wrote, "I am sure now [that

8    assuring the accuracy of financial data and acting as the interface with KPMG] is an

9    unachievable task for any professional so I hereby reiterate that I have no choice but to quit the

10    job in order to keep away from any potential securities fraud, as well as many other

11    non-compliances or violations" (Compl. ¶ 65).[1]

12    On October 3, 2007, Piper Jaffray published a research note indicating that LDK's

13    financial controller had left the company.  The research note stated that "[w]e are also aware of

14    the former controller's allegations of poor financial controls and . . . [an] inventory

15    discrepancy."  As a result of these and other developments, LDK's shares closed at $51.65 on

16    October 3, which represented a 24.4% drop from the previous day's close of $68.31 (Compl. ¶

17    78).

18    LDK announced in a Form 6-K, dated October 4, 2007, that Situ had been

19    "terminated for cause on September 25, 2007."  As stated, the complaint avers that Situ actually

20    resigned.  The Form 6-K further stated, "LDK's management team and board of directors

21    formed an internal committee to investigate the allegations and conduct an immediate physical

22    inventory of LDK's polysilicon materials.  The management team found no material

23    discrepancies as compared to LDK's financial statements.  The management team believes that

24    these allegations have no merit.  Additionally, the Audit Committee has asked an independent

25    auditing firm to conduct a separate, independent engagement on LDK's inventory."

26

27

28    _____

[1] In its May 29 order the Court took judicial notice of this and other below-described documents at
defendants' request.

United States District Court

For the Northern District of California

1    On October 8, 2007, *Barron's* published an article describing Controller Situ's

2    allegations in greater detail.  Among other things, the article said that the company may have

3    overstated its inventory by up to $92 million.  It also cited a second, unidentified source who

4    confirmed that LDK had serious problems with the quality of its polysilicon inventory.

5    That day, LDK's shares closed at $37.50, which was down 26.4% from the previous trading

6    day's close of $50.95.  The price of LDK stock had declined 45.1% since the day before the

7    October 3 disclosure (Compl. ¶¶ 78–81).

8    In December 2007, LDK's audit committee announced its conclusions.  Another Form

9    6-K, dated December 17, 2007, stated that there were "no material errors in the Company's

10   stated silicon inventory quantities as of August 31st, 2007 . . . and Mr. Situ's allegations of an

11   inventory discrepancy were incorrect because he had not taken into account all locations in

12   which the Company stored its silicon feedstock."  The audit committee consisted of two outside

13   directors, and the investigation was conducted by outside independent accountants and the audit

14   committee's independent counsel, Simpson Thacher & Bartlett LLP.

15   After the results of the internal investigation had been announced, LDK issued its

16   third-quarter financial statements for 2007 on December 20, 2007.  There were no restatements.

17   On February 25, 2008, LDK issued its fourth-quarter financial statements for 2007 without any

18   restatements.

19   On March 31, 2008, the accounting firm KPMG issued an audit opinion on the

20   consolidated financial statements for December 31, 2006, and 2007.  The opinion concluded,

21   "In our opinion, the consolidated financial statements referred to above present fairly, in all

22   material aspects, the financial position of the Group as of December 31, 2006 and 2007, and the

23   results of its operations and its cash flows for the period from July 5, 2005 (date of inception) to

24   December 31, 2005 and the years ended December 31, 2006 and 2007, in conformity with U.S.

25   generally accepted accounting principles" (Req. Jud. Not. Exh. S at F-2).

26   The complaint alleges the following specific misrepresentations.  *First*, defendants

27   publicly released a prospectus for the company's IPO on June 1, 2007.  The prospectus

28   allegedly misrepresented the quantity and value of LDK's polysilicon inventory by including in

4

1   the reported totals both polysilicon that simply did not exist as well as unusable scrap material.

2   The prospectus also stated, allegedly falsely, that LDK's financial statements had been prepared

3   in accordance with GAAP.  *Second*, LDK issued a press release on August 1, 2007, that

4   asserted that LDK's cost reductions were due to its growth strategy and "advancements in the

5   production process."  This statement was allegedly false because much of the supposed

6   increases in efficiency were instead just a reflection of the fraudulent manipulation of the value

7   of the company's feedstock inventory, which made LDK appear to be a far more efficient

8   producer of solar wafers than it actually was.  The press release also reported the allegedly

9   inflated inventory values and reassured investors of GAAP compliance.  *Third*, that same day,

10  Chairman Peng and CFO Lai hosted a conference call for analysts and investors regarding

11  LDK's recently-released financial statements.  They again made certain allegedly false

12  representations regarding the value, quantity and growth of the company's polysilicon

13  inventories.  *Fourth*, LDK issued a press release on October 4, 2007, the day after Piper Jaffray

14  published a research note about Controller Situ's resignation and potential accounting

15  irregularities.  The release said that Situ's allegations had no merit, a statement the management

16  team allegedly knew to be false.

17      Plaintiff filed a consolidated class complaint on March 10, 2008, asserting claims

18  against all defendants under Sections 10(b) of the Securities Exchange Act of 1934 and Rule

19  10b-5, and claims against the individual defendants under Section 20(a) of the Exchange Act.

20  Motions to dismiss filed by the domestic and foreign-based defendants, respectively, were

21  denied (Dkt. Nos. 85, 132).  Plaintiff now moves for class certification.[2]

22                                          **ANALYSIS**

23      In determining whether class certification is appropriate, "the question is not whether

24  the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather,

25  whether the requirements of Rule 23 are met."  *Eisen v Carlisle & Jacquelin*, 417 U.S. 156,

---

27      [2] Pursuant to Civil Local Rule 79-5(d), defendants have moved to file under seal portions of their
    opposition brief, the Harrison declaration and the Aganin declaration which contain lead plaintiff Javidzad's
28  confidential personal financial information and investment decisions.  The motions are hereby granted.
    Moreover, because plaintiff submitted a rebuttal declaration with his reply brief, defendants' sur-reply brief has
    been accepted and considered.

*United States District Court*
For the Northern District of California

1    177–78 (1974).  Although we may not investigate the likelihood of prevailing on the merits,

2    judges are at liberty to, and indeed must, consider evidence relating to the merits if such

3    evidence also goes to the requirements of Rule 23.  *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168,

4    1177 n.2 (9th Cir. 2007).  The party seeking class certification bears the burden of showing that

5    each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)

6    are met.  *Id.* at 1176; *Hanon v. Data Products Corp.*, 976 F.2d 497, 508-09 (9th Cir. 1992).

7           Pursuant to Rule 23(a), for a named plaintiff to obtain class certification, the court

8    must find:  (1) numerosity of the class; (2) that common questions of law or fact predominate;

9    (3) that the named plaintiff's claims and defenses are typical; and (4) that the named plaintiff

10   can adequately protect the interests of the class.  In addition, in the instant case, plaintiff seeks

11   to certify the class by meeting the requirements of Rule 23(b)(3).  Certification under

12   Rule 23(b)(3) requires that a district court find "that questions of law or fact common to the

13   members of the class predominate over any questions affecting only individual members, and

14   that a class action is superior to other available methods for the fair and efficient adjudication of

15   the controversy."

16          Plaintiff moves for certification of the following class (Br. at 1):

17                 all persons who (a) purchased LDK Solar Co., Ltd. ("LDK" or the
                   "Company") American Depository Shares ("ADSs"); (b)
18                 purchased call options for LDK ADSs; or (c) sold put options for
                   LDK ADSs during the Class Period defined below, and were
19                 damaged thereby.  Excluded from the Class are the Defendants
                   and the other current and former officers and directors of the
20                 Company, their immediate families, their heirs, successors, or
                   assigns and any entity controlled by any such person.  The Class
21                 Period is June 1, 2007 through October 7, 2007.

22          Defendants oppose certification on three grounds:  (1) plaintiff is unable to establish that

23   common questions regarding reliance and the fraud-on-the-market presumption predominate

24   over individual questions; (2) plaintiff must establish loss causation as a prerequisite for

25   certification and is unable to do so; and (3) lead plaintiff is neither typical of the class nor an

26   adequate representative thereof.  Each of the requirements of Rule 23(a) and Rule 23(b)(3) are

27   considered in turn.

28

**United States District Court**
For the Northern District of California

6

United States District Court
For the Northern District of California

1

    **1.    RULE 23(A)(1): NUMEROSITY.**

2      The numerosity requirement of Rule 23(a)(1) is satisfied when joinder of individual

3  plaintiffs would be impracticable.  While plaintiffs need not allege the exact number or identity

4  of class members, mere speculation of the number of class members involved does not satisfy

5  the requirement of Rule 23(a)(1).  *See Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627, 637

6  (N.D. Cal. 2007).  Defendants do not challenge certification based on the numerosity element.

7  This order finds that plaintiff has satisfied the burden required by Rule 23(a)(1).

8

    **2.    RULE 23(A)(2) AND RULE 23(B)(3): COMMONALITY AND PREDOMINANCE.**

9      A class has sufficient commonality under Rule 23(a)(2) if "there are questions of law or

10  fact which are common to the class."  Rule 23(a)(2) does not require each member in a class to

11  have identical factual and legal issues surrounding his or her claim. "The existence of shared

12  legal issues with divergent factual predicates is sufficient" to meet the requirements of Rule

13  23(a)(2).  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

14      The predominance requirement of Rule 23(b)(3) is more stringent than the commonality

15  requirement of Rule 23(a)(2).  The analysis under Rule 23(b)(3) "presumes that the existence of

16  common issues of fact or law have been established pursuant to Rule 23(a)( 2)."  In contrast to

17  Rule 23(a)(2), "Rule 23(b)(3) focuses on the relationship between the common and individual

18  issues."  Class certification under Rule 23(b)(3) is proper when common questions present a

19  significant portion of the case and can be resolved for all members of the class in a single

20  adjudication.  *Hanlon*, 150 F.3d at 1019–22.

21      A plaintiff asserting securities fraud under Section 10(b) must prove (1) a material

22  misrepresentation or omission, (2) scienter, (3) in connection with the purchase or sale of a

23  security, (4) reliance, (5) economic loss, and (6) loss causation.  *Dura Pharmaceuticals, Inc. v.*

24  *Broudo*, 544 U.S. 336, 341–42 (2005).

25      Defendants' opposition to class certification focuses in large part on the commonality

26  and predominance requirements.  *First*, defendants contend that individual questions concerning

27  the element of reliance and the "fraud-on-the-market" presumption predominate over common

28  questions.  *Second*, relying on the Fifth Circuit's decision in *Oscar Private Equity Investments*

7

*v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007), defendants claim that plaintiff must establish loss causation at the class certification stage and has failed to do so.

### A.   Reliance and the Fraud-on-the Market Theory.

Defendants contend that individual issues concerning reliance predominate over common issues, at least for a portion of the proposed class period. As is often the case in securities actions, plaintiff relies on the "fraud-on-the-market" theory to establish reliance. In *Basic, Inc. v. Levinson*, 485 U.S. 224, 242–43 (1988), the Supreme Court ruled that reliance may be presumed in securities cases under the fraud-on-the-market doctrine. *Basic* "created a rebuttable presumption of investor reliance based on the theory that investors presumably rely on the market price, which typically reflects the misrepresentation or omission." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 934 n. 12 (9th Cir.2003). Without the presumption, class certification would be virtually impossible as individual questions regarding reliance would predominate over common questions. *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir.1999); *In re Initial Public Offering Securities Litigation*, 471 F.3d 24, 42–43 (2d Cir.2006).

The fraud-on-the-market theory is based on the efficient market hypothesis (in some form) and therefore is contingent upon the alleged misrepresentation or omission being disseminated into an *efficient* market:

> The fraud-on-the-market presumption is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements" . . . . Thus, the presumption of reliance is available only when a plaintiff alleges that a defendant made material representations or omissions concerning a security that is actively traded in an "efficient market," thereby establishing a "fraud on the market."

*Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) (citations omitted). Specifically, the requirements for the presumption are as follows: (1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; and (4) that the plaintiff traded the shares between the time the

United States District Court

For the Northern District of California

1    misrepresentations were made and the time the truth was revealed. *Basic*, 485 U.S. at 248 n.27

2    (citing the Sixth Circuit's test with approval).

3         Although the Ninth Circuit has not articulated a specific test for market efficiency, it and

4    district courts in this circuit have looked to the factors articulated in *Cammer v. Bloom*, 711 F.

5    Supp. 1264, 1286–87 (D.N.J. 1989), which included both direct and indirect tests for efficiency.

6    *See, e.g.*, *Binder v. Gillespie*, 184 F.3d 1059 (9th Cir. 1999); *In re Surebeam Corp. Securities*

7    *Litigation*, 2005 WL 5036360, *23 (S.D. Cal. 2005); *Levine v. SkyMall, Inc.*, 2002 WL

8    31056919, *3–4 (D. Ariz. 2002).[3]  Plaintiff relies on the report of his expert, Jane Nettesheim.

9    In analyzing market efficiency, the Nettesheim report looked to the *Cammer* factors and others,

10   including those utilized by the Fifth Circuit,[4] and concluded that the market for LDK shares was

11   efficient (Nettesheim Decl. ¶ 2).

12        Defendants raise no direct challenge to the efficiency of the market.  Instead, defendants

13   attack plaintiff's expert report in a motion to exclude the Nettesheim declaration.  The motion,

14   however, primarily concerns the Nettesheim report's analysis regarding loss causation, an issue

15   discussed hereafter, rather than market efficiency.  Even if granted, the motion would leave a

16   significant portion of plaintiff's evidence in support of market efficiency undisturbed.

17   Defendants neither argue that the market is *not* efficient nor offer any evidence of their own on

18   the subject.  Defendants therefore identify no reason to deprive plaintiff the benefit of the fraud-

19   on-the-market presumption.

20        The fraud-on-the-market presumption, however, is a rebuttable presumption, and

21   defendants seek to rebut the presumption for a portion of the class period.  As *Basic* explained,

22            Any showing that severs the link between the alleged
             misrepresentation and either the price received (or paid) by the
23            plaintiff, or his decision to trade at a fair market price, will be
             sufficient to rebut the presumption of reliance . . . . [For example,]
24            if, despite petitioners' allegedly fraudulent attempt to manipulate
             market price, news of the merger discussions credibly entered the
25

26        [3] *Cf. In re Xcelera.com Securities Litigation*, 430 F.3d 503 (1st Cir. 2005) (discussing First Circuit's
     test); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004) (*Cammer* offers relevant, but not
27   exhaustive, list of factors).

28        [4] *See Unger v. Amedisys, Inc.*, 401 F.3d 316, 321 (5th Cir. 2005); *Bell v. Ascendant Solutions, Inc.*, 422
     F.3d 307, 311 (5th Cir. 2005).

                                                    9

1    market and dissipated the effects of the misstatements, those who
     traded Basic shares after the corrective statements would have no
2    direct or indirect connection with the fraud.

3    *Basic*, 485 U.S. at 248–49.

4         The proposed class period is June 1, 2007 through October 7, 2007.  As stated, on

5    October 3, Piper Jaffray published a report disclosing Mr. Situ's departure from LDK and

6    expressing generalized concerns about LDK's inventory accounting.  Defendants assert that, at

7    least as of the release of the October 3 Piper Jaffray report, news of the fraud had credibly

8    entered the market and dissipated the effects of the misstatements.  Defendants contend, in

9    essence, that after October 3, investors could no longer be deemed reasonably to have relied on

10   the alleged misstatements or omissions, and the fraud-on-the-market presumption is therefore

11   rebutted as of that date.  Similarly, defendants contend that various trading and market

12   indicators show that "the investment landscape was altered" on October 3, including an increase

13   in daily trading volume, a rise in daily "short interest," and analyst statements that the stock

14   would "trade with some uncertainty" after the October 3 report (Opp. at 10–12).

15        Defendants raise additional challenges to inclusion of the post-October 3 dates.  On

16   October 4, LDK issued a press release announcing that it had conducted a preliminary inventory

17   count and found no discrepancies.  Defendants argue that the incentives facing those who

18   invested before and after the release of the Piper Jaffray report and LDK press release diverge.

19   Investors who purchased LDK shares after the release of the October 3 Piper Jaffray report,

20   defendants argue, have an incentive to argue that the market did not fully adjust thereafter and

21   that LDK's October 4 press release caused the stock to remain inflated, while investors who

22   purchased prior to the October 3 report and sold in response to it will argue that the October 3

23   report revealed the fraud and will downplay the importance of the October 4 press release.  For

24   all of these reasons, defendants urge that the class period (if a class is certified at all) should

25   therefore end on October 2, 2007 — that is, that purchasers after the release of the Piper Jaffay

26   report should be excluded.

27        These arguments (at least implicitly) challenge the predominance of common questions

28   over individual questions with respect to two distinct aspects of plaintiff's case:  (1) reliance

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    and the fraud-on-the-market presumption, and (2) the calculation of damages.  *First*, if

2    defendants are able to rebut the fraud-on-the-market presumption based on the October 3

3    disclosure, as explained individual issues concerning reliance would predominate for purchasers

4    after that date.  *Second*, defendants argue, in effect, that the proposed class would generate

5    conflicting intra-class incentives regarding the calculation of damages among class members

6    who *purchased* versus those who *sold* after the October 3 disclosure.

7         With respect to the former, defendant relies on *In re Federal National Mortgage*

8    *Association*.  That decision stated, "[i]n determining the duration of a securities fraud class

9    based on a fraud-on-the-market theory, the Court must determine whether 'a curative disclosure

10   had been made so as to render it unreasonable for an investor, or the market, to continue to be

11   mislead by the defendants' alleged misrepresentations.'"  *In re Federal Nat. Mortg. Ass'n*

12   *Securities, Derivative and "ERISA" Litigation*, 247 F.R.D. 32, at *38 (D.D.C. 2008) (Leon, J.)

13   (citation omitted).  Defendants also rely on *Ravens v. Iftikar*, 174 F.R.D. 651 (N.D. Cal. 1997)

14   (Walker, J.).  *Ravens* discussed class-certification problems posed by a situation involving

15   "multiple corrective disclosures" whereby the market, in the middle of the class period,

16             [was] told the truth, figures it out or stumbles across it [and
17             therefore] offer[ed] investors trading opportunities at non-inflated
              (not fraudulent) prices.  The presence in the market of information
18            corrective of the fraud — whatever its source — snap[ed] the
              causal link between misinformation and any injury of plaintiffs.
19            Further, such intervals of truth in the market create[d] gaps or
              phases in the class period and preclude[d] a claim of continuous
20            artificial price inflation.

21   *Id*. at 670.  Therefore, not all class members could claim the benefit of the fraud-on-the-market

22   presumption to establish reliance.

23        Plaintiff, in turn, contends that the issue is governed by *Blackie v. Barrack*, 524 F.2d

24   891 (9th Cir. 1975), and its progeny.  *Blackie* explained that "[c]onfronted with a class of

25   purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have

26   taken the common sense approach that the class is united by a common interest in determining

27   whether a defendant's course of conduct is in its broad outlines actionable, which is not

28   defeated by slight differences in class members' positions, and that the issue may profitably be
     tried in one suit."  *Id*. at 902.

United States District Court

For the Northern District of California

On the one hand, *Federal National Mortgage Association* can be interpreted as a sensible application of *Basic's* above-quoted admonition that "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price," will rebut the presumption of reliance. If the fraud had been fully disclosed to the market, the efficient-market hypothesis instructs that the corrective information would then be incorporated into the stock price, and subsequent purchasers could not claim to have relied upon the fraud when purchasing shares. *Federal National Mortgage Association* cast the inquiry as whether "there [was] 'no substantial doubt as to the curative effect' of the announcement," and on the facts before it, the decision found no substantial doubt. 247 F.R.D. at *39. The decision, however, distinguished situations where only partial or inconclusive corrective statements had been made. Courts have held that where the fraud is only partially revealed (and the stock price only partially adjusted), or where factual uncertainty persists regarding the extent to which a disclosure revealed the fraud, the presumption is not defeated and the class can contain members who purchased both before and after the alleged corrective disclosure. *See, e.g.*, *In re WorldCom, Inc. Securities Litigation*, 219 F.R.D. 267, 307 (S.D.N.Y. 2003); *Freeland v. Iridium World Communications, Ltd.*, 233 F.R.D. 40, 43–44 (D.D.C. 2006); *In re Scientific-Atlanta, Inc. Securities Litigation*, 571 F. Supp. 2d 1315, 1326–28 (N.D. Ga. 2007). That too makes sense. If some tentative or partial disclosure of fraud is published but the truth is not fully revealed, there would be no reason to assume that the market *fully* recovered from the impact of misrepresentation or omission. Investors who purchased after such a disclosure may well have done so at a price still inflated by the same fraud (even if less so) and may suffer losses when the *full* details of the fraud are exposed. Not every rumor or hint or partial disclosure of fraud immediately rebuts the fraud-on-the-market presumption. As the above-cited decisions recognize, whether or not a particular release or disclosure "actually cured a prior misrepresentation" is a sensitive issue to rule on at this early stage of the proceedings because it comes so close to assessing the ultimate merits in the case, and courts therefore decline to find reliance thereafter "unreasonable, as a matter of law," unless there is "no substantial doubt as to the curative effect of the announcement." *In re Federal Nat.*

United States District Court

For the Northern District of California

1    *Mortg. Ass'n*, 247 F.R.D. at *37–39.  *See also In re WorldCom, Inc.*, 219 F.R.D. at 307 ("a

2    class period should not be cut off if questions of fact remain as to whether the disclosures

3    completely cured the market").

4              As stated, plaintiff claims that on October 3, 2007, the Piper Jaffray report partially

5    revealed, or revealed the possibility of, Mr. Situ's allegations regarding LDK's alleged fraud.

6    The stock fell roughly 24%.  The following day, LDK issued a press release stating that Mr.

7    Situ had recently been fired for cause and the company believed that Situ's allegations —

8    alluded to in the Piper Jaffray report — had no merit.  On October 8, 2007, *Barron's* published

9    an article describing Mr. Situ's allegations in greater detail.  The stock plunged (roughly)

10   another 26% from the previous day's close.  The complaint alleges that the fraud was

11   effectively revealed at that point.

12             This order declines to close the class period on October 2, 2007, as defendant urges.

13   The stock-price decline following publication of the October 3 report are suggestive of the

14   materiality of the report.  Nevertheless, the report was, indeed, only a partial disclosure — at

15   least, this order declines to find no factual uncertainty on the issue.  The October 3 report

16   mentioned Mr. Situ's departure but broached few details of his allegations, and it couched the

17   news in a mix of positive and negative statements.  The October 8 Barron's article went into far

18   greater detail regarding Mr. Situ's departure and the specifics of his allegations.  The stock

19   price performance confirms as much — although the stock price suffered a meaningful drop in

20   response to the October 3 report, it fell significantly further in response to the October 8 article,

21   suggesting that the latter introduced significant new information into the market regarding the

22   fraud.  Unlike in *Ravens*, these disclosures were in relatively rapid succession and the latter

23   revealed new details about the same alleged course of fraudulent conduct.  This order is unable

24   to conclude that purchasers after October 2 are necessarily deprived the benefit of the fraud-on-

25   the-market presumption.[5]

26

27             [5] Also unavailing is defendants' argument, raised for the first time in their sur-reply brief, that plaintiff
     is unable to establish materiality (and therefore the fraud-on-the-market presumption) because plaintiff failed to

28   show a statistically significant stock price movement in response to any of the alleged misrepresentations.
     Plaintiff had no opportunity to respond to the argument; the Ninth Circuit does not require a stock-price impact

United States District Court
For the Northern District of California

As stated, defendants' above-described contentions also identify possible conflicts concerning the calculation of damages. Courts have generally declined to reject certification based on potential complications in the calculation of damages where those complications are surmountable. *Blackie* itself stated,

> [t]he amount of damages is invariably an individual question and does not defeat class action treatment. [] Moreover, in this situation we are confident that should the class prevail the amount of price inflation during the period can be charted and the process of computing individual damages will be virtually a mechanical task.

*Blackie*, 524 F.2d at 905. Similarly, *In re Cornerstone Propane Partners* declined to find "inadequate" a named plaintiff who had potentially differing incentives from other class members with respect to damages based on the timing of purchases. *In re Cornerstone Propane Partners, L.P. Securities Litigation*, 2006 WL 1180267 (N.D. Cal. 2006) (Patel, J.) (unreported). Relying on *Blackie*, the decision explained that, where a "common scheme to defraud" is alleged,

> the existence of a later purchaser does not defeat a class certification claim . . . . [I]t is immaterial whether plaintiffs purchased stock at different times and were affected by different statements or omissions in the general scheme of misconduct. Indeed, defendants' argument is untenable because if taken to its logical conclusion it would bar all class actions as "even a class period as short as one day could create [such] . . . conflicts . . . . [To] accept[ ] these intra-class conflicts arguments at face value would prohibit the use of the class action mechanism in the vast majority of securities fraud actions."

*Id.* at * 7 (citations omitted). The decision rejected a claim that the inclusion of both "retention" class members (*i.e.*, those purchased stock during the class period and retained it throughout) and "in/out" members (*i.e.*, those who bought and sold within the class period) — groups that had potentially conflicting incentives regarding damages — defeated certification. *See also Freedman v. Louisiana-Pacific Corp.*, 922 F. Supp. 377 (D. Or. 1996) (Jones, J.)

---

in order to establish materiality, *see No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003), and in any event the pleadings plausibly suggest that the alleged fraud reached the market contemporaneous with or prior to the June 1 IPO, suggesting that the stock price could have been inflated from the time of initial issuance.

United States District Court

For the Northern District of California

1   (similar); *Armour v. Network Associates, Inc.*, 171 F. Supp. 2d 1044, 1053–54 (N.D. Cal. 2001)

2   (Jenkins, J.) (collecting cases).

3          Here, although class members might favor differing interpretations, for example,

4   regarding the extent to which the October 3 report disclosed the fraud or the October 4 press

5   release re-inflated the stock price, all class members are unified by an interest in proving the

6   same common course of conduct regarding LDK's allegedly fraudulent inventory

7   representations.  Common issues concerning that fundamental course of conduct predominate

8   over any individual incentives particular class members may have to maximize their damages.

9   Moreover, the stock price at any given time, and the price at which any particular class

10  members bought or sold, is an objective fact which should be readily discernible.  This order

11  holds that potential complications regarding the computation of damages do not mandate that

12  the class period end October 2 rather than October 7.

13                        **B.       Loss Causation.**

14         Defendants next contend that plaintiff has not met his alleged burden to show that loss

15  causation can be proven on a manageable, class-wide basis.  Defendants rely on the Fifth

16  Circuit's decision in *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d

17  261 (5th Cir. 2007).  Rule 23 motions for *class certification*, the *Oscar* decision held,

18                require more than proof of a material misstatement; [they] require
              proof that the misstatement actually moved the market.  That is,
19            "the plaintiff [may] recover under the fraud on the market theory
              if he [can] prove that the defendant's non-disclosure materially
20            affected the market price of the security."  Essentially, [the
              decision] require[d] plaintiffs to establish loss causation in order
21            to trigger the fraud-on-the-market presumption.

22  *Id*. at 265.  The breadth of the *Oscar* holding is striking.  It essentially injects what is

23  fundamentally a merits inquiry into the class-certification inquiry through the back door:  it

24  requires the *plaintiff* to *prove* loss causation in order to avail itself of the benefit of the fraud-on-

25  the-market presumption (without which certification is virtually impossible).

26         This order declines to adopt *Oscar's* loss-causation requirement for class-certification.

27  *Oscar* placed the Fifth Circuit in a minority — indeed, apparently solitary — stance among the

28  circuits; it is in no small amount of tension with the Supreme Court's decision in *Basic v.*

15

*Levinson*; and although the Ninth Circuit has yet to address the issue specifically in the context of class certification, this circuit's precedent strongly suggests it would reject such a rule.

*First*, as explained, the fraud-on-the-market presumption is triggered when the defendant simply injects material misstatements or omissions into an efficient market, and the plaintiff thereafter trades at a pertinent time.  *See Basic*, 485 U.S. at 248 n.27 (citing the Sixth Circuit's test with approval).  Although a material misstatement might ordinarily be expected to move the market, a price impact is not *required* for a finding of materiality.  The Ninth Circuit specifically rejected any such requirement, explaining that the materiality standard, as set forth by the Supreme Court in *Basic*, is instead simply the "reasonable investor" standard.  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003).

*Second*, *Oscar* not only required a price impact to establish materiality (and therefore the fraud-on-the-market presumption), it went a substantial step further and required the *plaintiff* to *prove*, at the certification stage, that the price impact actually caused a loss in order to attain the benefit of the fraud-on-the-market presumption.  This eviscerated the notion that investors who transact in an efficient market following a material misstatement are presumed to have relied on that statement — a presumption *defendants* must rebut.  As explained, it certainly adds a requirement for the fraud-on-the-market presumption over and above the elements identified by the Supreme Court in *Basic*.  Moreover, it requires the plaintiff to prove a significant portion of the merits of its case in order to achieve class certification.  The rationale for doing so under Rule 23 is far from clear.  In a case like this one, if fraud *did* inflate the market and subsequently cause market losses, some appropriately defined group of investors who traded at pertinent times are likely to share common claims with respect to those losses.  Defining the precise contours of the class is a separate, and potentially challenging, inquiry, as explained above, but that is no reason to eliminate the presumption and deny certification across the board.  If fraud did *not* inflate the market and subsequently cause losses, the plaintiff will simply have failed to prove the merits of the case.  Either way, it is unclear how proof of loss causation becomes a prerequisite to Rule 23 certification.  Not surprisingly, most if not all

16

United States District Court

For the Northern District of California

1   courts outside of the Fifth Circuit that have considered the issue have rejected the requirement.[6]

2   This order does the same.

3          Insofar as defendants further attempt to establish that individual issues concerning loss

4   causation preclude certification in this case, this order finds that effort unpersuasive.  Indeed,

5   defendants' various arguments are contradictory.  Defendants argue that plaintiff failed to

6   establish loss causation because plaintiff identified no "corrective disclosure" concerning the

7   alleged fraud to which the stock's decline can be traced (Opp. at 15–19).  Defendants' argument

8   regarding reliance and the fraud-on-the-market presumption, however, are precisely the

9   opposite; *i.e.*, that "in determining whether . . . the fraud-on-the-market presumption is proper,

10  the Court must determine whether a curative disclosure had been made so as to render it

11  unreasonable for an investor, or the market, to continue to be mislead by the defendants' alleged

12  misrepresentations," and that the October 3 analyst report alone constituted such a curative

13  disclosure (Opp. at 8; internal quotations and citation omitted).  That is, defendants argue that

14  the October 3 report, alone, revealed sufficient details of the alleged fraud to dissipate the

15  fraud's impact on the market.  Yet they go on to say that the October 3 and October 8

16  disclosures *together* did *not* constitute a corrective disclosure of the fraud sufficient to have

17  caused investor losses.  Defendants' claim that "plaintiff cannot identify any corrective

18  disclosure" is not only unsupported by the record but is contradicted by defendants' own

19  arguments.

20         Defendants, moreover, have presented no clear explanation as to why plaintiff would be

21  unable to establish class-wide losses arising from the October 3 and October 8 disclosures.

22  Plaintiff's theory of loss causation is not complicated:  that the class suffered losses when the

23  _____

24         [6] *See, e.g.*, *In re Salomon Analyst Metromedia Litigation*, 544 F.3d 474, 481–84 (2d Cir. 2008) (the
    *Basic* test "is all that is needed to warrant the presumption;" rejecting argument that plaintiff must prove a stock-

25  price impact); *Lapin v. Goldman Sachs & Co.*, 2008 WL 4222850, *14 (S.D.N.Y. 2008) ("The Court agrees
    with the reasoning employed by the majority of courts in this District . . . and finds that *Oscar* should be

26  rejected as a misreading of *Basic*"); *In re Micron Technologies, Inc. Securities Litigation*, 247 F.R.D. 627,
    633–34 (D. Idaho 2007) ("It is unlikely that [*Oscar*] would be adopted in this Circuit because it misreads

27  *Basic*"); *In re Metropolitan Securities Litigation*, 2008 WL 5102303, *2 (E.D. Wash. 2008) (*Oscar* decision is
    "controversial"); *In re Nature's Sunshine Product's Inc. Securities Litigation*, 251 F.R.D. 656 (D. Utah 2008)

28  ("Indeed, [n]o other Court of Appeals, and no other district court outside the Fifth Circuit, appears to have
    followed *Oscar[]* . . . . [T]he Fifth Circuit's decision in *Oscar* appears to be in conflict with Supreme Court and
    Tenth Circuit precedent") (quotation omitted).

United States District Court

For the Northern District of California

1   fraudulent scheme was revealed to the market in disclosures on October 3 and 8, and the stock

2   fell as a result of each.  Defendants arguments — that those reports were uncorroborated or

3   untrue; that the stock's fall could have actually resulted from other "negative and confounding

4   factors;" or that plaintiff's expert fails adequately to tie the stock drop to the two reports — will

5   be relevant to the merits of plaintiff's case, but defendants fail to explain how they are relevant

6   to the present motion, *i.e.*, to commonality and predominance.  This order must consider

7   relevant facts, but *only* insofar as they pertain to the requirements of Rule 23; it would be

8   inappropriate at this stage to further broach the merits of the case.  *Dukes*, 509 F.3d at 1177 n.2.

9   As stated, this order finds no basis under Rule 23 to require *plaintiff* to prove loss causation in

10  order to benefit from the fraud-of-the-market presumption, and defendants raise no argument

11  why loss causation poses an obstacle to class certification under Rule 23.[7]

### 3.  RULE 23(A)(3) AND RULE 23(A)(4): TYPICALITY AND ADEQUACY.

13          The typicality requirement of Rule 23(a)(3) is satisfied when "the claims or defenses of

14  the representative parties are typical of the claims or defenses of the class."  A plaintiff's claims

15  are typical if they "are reasonably co-extensive with those of absent class members; they need

16  not be substantially identical."  *Hanlon*, 150 F.3d at 1020.

17          The final hurdle of Rule 23(a) is that "the representative parties will fairly and

18  adequately protect the interests of the class."  Determining whether the representative parties

19  adequately represent a class involves two inquiries:  (1) does the named plaintiff and their

20  counsel have any conflicts of interest with other class members and (2) will the named plaintiff

21  and her counsel act vigorously on behalf of the class?  *See Lerwill v. Inflight Motion Pictures,*

22  *Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).  The adequacy inquiry under Rule 23(a)(4) serves to

23  uncover conflicts of interest between named parties and the class they seek to represent.  "[A]

24  class representative must be part of the class and possess the same interest and suffer the same

25  injury as the class members."  *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395,

26

27  _____

28          [7] For the reasons stated herein, defendants' motion to exclude the Nettsheim declaration, whether or not meritorious, would not be dispositive as to commonality and predominance.  The motion is therefore denied as moot.

18

403 (1977). The motion analyzed the "typicality" and "adequacy" questions jointly, and this order will therefore do the same.

Defendants contend that the interests of the lead plaintiff, Mr. Javidzad, are adverse to, and atypical of, the class by virtue of the nature of his trading in LDK stock. Defendants assert that his trading activity was speculative and risky and placed him at odds with other members of the class. This contention in large part simply revives defendants' arguments regarding reliance and the fraud-on-the-market theory. Mr. Javidzad, defendants note, purchased shares both before and after the October 3 analyst report; indeed, he purchased the majority of his shares after October 3. He could therefore have incentives concerning the calculation of damages that differ from other members of the class. As explained, however, the potentially conflicting incentives regarding the calculation of damages do not preclude certification of the proposed class. Similarly, the allegation that Mr. Javidzad engaged in allegedly "risky" trading strategies — margin trading and options transactions — adds little to the inquiry. Margin trading tends to magnify the impact on the investor of stock price movements, but the mere fact that plaintiff may have suffered even greater financial losses than other class members in response to a particular change in the stock's price does not render his interests adverse to the remainder of the class. Similarly, there is nothing excessively "risky" or troubling *per se* about the use of options. *See Crossen v. CV Therapeutics*, 2005 WL 1910928 at * 3–5 (N.D. Cal. 2005) (Illston, J.) (discussing the issue and certifying lead plaintiff who had invested in options as well as shares); *In re Priceline.com Inc.*, 236 F.R.D. 89, 98–100 (D. Conn. 2006) (Squatrito, J.) (similar).

Potentially more troubling is the fact that Mr. Javidzad sold call options on 24,500 shares of LDK stock on October 5, 2007, following the alleged partial disclosure of the fraud (Dkt. No. 38-2 at 7). Selling call options is functionally similar to selling a stock short — both involve betting that the stock's price will fall rather than rise. As stated, the proposed class is defined to include investors who would have profited from the rise, rather than the fall, of the stock (Opp. at 22–23). Plaintiff responds that Mr. Javidzad made only a single sale of call options, and that the sale only *partially* hedged the risk of decline in the price of the shares that

he owned (Reply at 12).  That is, at all times, plaintiff had a net "long" position in LDK, meaning that he would have benefitted from a price rise and suffered losses from a price drop. On similar facts, *Crossen* recently certified a class with a lead plaintiff who had sold some call options but whose financial interest, overall, aligned with the class.  *Crossen*, 2005 WL 1910928 at * 3–5.  This order finds no reason to depart from that holding on the current facts.

Finally, defendants claim that lead plaintiff lacks knowledge of the litigation and that he suffers from alleged character defects such as a lack of candor.  Upon review of the cited portions of the record, this order finds no merit to the claim that lead plaintiff lacks adequate knowledge of the issues surrounding this lawsuit.

The challenge to Mr. Javidzad's candor is that he stated at a January 2008 hearing that he had been involved in other litigation but "not a class litigation . . . .  This would be [his] first class action" (Harrison Decl. Exh. A at 115; *Id*. at Exh. V, "Exh. B").  He had, however, recently signed a form indicating a desire to be lead plaintiff in a different class action.  At his deposition, he explained the alleged discrepancy as follows:  "I provided my name to the law firm as one of the potential lead plaintiff's.  That's it" (Harrison Decl. Exh. A at 116).  These statements do not render defendant an inadequate representative nor even, necessarily, evidence a lack of candor.  Mr. Javidzad could well have believed that simply offering a law firm the option to include him as a class representative in a different action did not, without more, constitute involvement in a class action.  Defendants further emphasize that Mr. Javidzad had stated at his deposition that he had not read the complaint in the other matter, while the form he signed offering his name as a class representative in that matter stated that he *had* reviewed the complaint and authorized its filing (Harrison Decl. Exh. A at 116–17; *Id*. at Exh. V, "Exh. B"). That discrepancy may well have simply been the result of a failure to read or recall stock language in the standardized form.  This order is not troubled by these facts.

**CONCLUSION**

For all of the above-stated reasons, plaintiff's motion for class certification is **GRANTED**. The above-quoted class is hereby certified.  Within **TWENTY (20)** days of the date of entry of this order, the parties are requested jointly to submit an agreed-upon form of notice, a joint proposal for dissemination of the notice and the timeline for opting out of the action.  Plaintiff must pay for the cost of notice.


**IT IS SO ORDERED.**


Dated:  January 28, 2009

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE