UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | § | |
|---|---|---|
| | § | |
| In re LDK Securities Litigation | § | Master File No. C-07-05182-WHA (BZ) |
| | § | |
| This Document Relates to: | § | |
| | § | |
| All Actions | § | |
| | § | |
| | § | |

EXPERT REPLY REPORT OF JANE D. NETTESHEIM

November 19, 2009

# Table of Contents

I.      Background and Qualifications ........................................................................... 1

II.     Bases for Opinions ............................................................................................ 2

III.    Summary of Reply Opinions ............................................................................. 3

IV.     Reply Opinions ................................................................................................. 5

    A.   Dr. Lehn Opines that the Allegations in this Matter are False, Which Is the Premise For His Other Opinions Concerning Loss Causation and Damages ........................................ 5

    B.   Dr. Lehn Inappropriately Segregates Plaintiff's Claim Into "Accounting-Related Allegations" Versus Other Allegations ................................................................... 9

    C.   Dr. Lehn Incorrectly Asserts That There Were Non-Allegation Related Factors That May Have Contributed to the Decline in the Price of the LDK ADSs on Dates of Corrective Disclosures .......................................................................................................... 10

        i.    Allegation-Related Information on October 3, 2007 Caused the Company-Specific Decline in the Price of the LDK ADSs ....................................................... 11

        ii.   Allegation-Related Information on October 8, 2007 Caused the Company-Specific Decline in the Price of the LDK ADSs ....................................................... 18

        iii.  Dr. Lehn's Conclusion that Headline Risk "Likely" Contributed to the Price Decline on October 3 and 8, 2007 is Unsupported and Irrelevant ............................ 22

    D.   It is Appropriate to Include October 4 Corrective Disclosures in My Analysis of Loss Causation and Damages .......................................................................................... 22

        i.    My Conclusion that Corrective Disclosures Were Made on October 4, 2007 is Consistent with Plaintiff's Allegations ...................................................... 22

        ii.   The Change in the Price of the LDK ADSs on October 4 Was Statistically Significant and the Disclosures Related to the Allegations Were Material ................................. 23

    E.   Dr. Lehn's Discussion of Post-Class Period Disclosures and His Estimate of Price Inflation That Includes Such Disclosures Is Flawed and Irrelevant ................................ 24

    F.   Dr. Lehn's Criticisms of My Estimates of Price Inflation are Misleading and Flawed .... 26

    G.   The Trading Model Used In the Nettesheim Report Is Reliable and Has Been Accepted By Courts .............................................................................................................. 28

    H.   Dr. Lehn's Characterization of My Calculation of Damages for Options on LDK ADSs Is Incorrect ............................................................................................................. 31

    I.   Contrary To Dr. Lehn's Assertion, Material Information Need Not Be Associated With a Statistically Significant Price Change ...................................................................... 31

    J.   The Control Period Used In the Nettesheim Report Is Appropriate ............................... 32

    K.   Use of Dr. Lehn's Regression Analysis Does Not Change the Measure of Price Inflation or Damages in Any Meaningful Way .................................................................... 33

I, Jane D. Nettesheim, declare:

## I.      Background and Qualifications

1.      Previously in this litigation, I submitted the following:

- Declaration of Jane D. Nettesheim, dated August 25, 2008 (the "Nettesheim Declaration")

- Supplemental Declaration of Jane D. Nettesheim, dated September 10, 2008, which contains revised exhibits 13 and 14 to the Nettesheim Declaration (the "Nettesheim Supplemental Declaration")[1]

- Deposition testimony on September 19, 2008 (the "Nettesheim Deposition")

- Rebuttal Declaration of Jane D. Nettesheim, dated November 3, 2008 (the "Nettesheim Rebuttal Declaration")

- Expert Report of Jane D. Nettesheim, dated October 29, 2009 (the "Nettesheim Report").  A summary of my relevant background and qualifications, including my curriculum vitae and list of testimony, are provided in the Nettesheim Report.

2.      In the Nettesheim Report, I opine that the market for the LDK ADS as well as the market for the call and put options on LDK ADSs, during the Class Period was open, developed, and efficient.[2]  I also provide an analysis of materiality, loss causation, and damages incurred by persons or entities that purchased or otherwise acquired LDK ADSs, and purchased call options and sold put options on the LDK ADSs, during the Class Period, as a result of the alleged misrepresentations and omissions in this matter.  I conclude that the information allegedly misrepresented during the Class Period would have been material to investors.  I also conclude

---

[1] The revised exhibits to the Nettesheim Declaration merely correct indications, noted as "***" in the exhibits, of which days during and immediately following the Class Period have statistically significant company-specific returns.  Exhibit 12 of the Nettesheim Declaration, which provides the supporting data and calculations, and the text of the Nettesheim Declaration are correct.

[2] Although the Class Period as identified in the Complaint ends on October 7, 2007, the last trading day of the Class Period is Friday, October 5, 2007.

that corrective disclosures during and immediately following the Class Period pertaining to the alleged misrepresentations and omissions in this matter regarding LDK's accounting for silicon inventory caused the price of the LDK ADSs to decline significantly.  Had the Company not misrepresented its accounting for inventory, or had it disclosed the alleged misrepresentations and omissions earlier in the Class Period, as Plaintiff alleges the Company could have and should have done, the LDK ADSs and call (put) options on LDK ADSs would have traded at prices materially lower (higher) than the prices at which they did trade during the Class Period.  I provide per-share and aggregate damages for the LDK ADSs and the options on LDK ADSs under a constant-dollar method of measuring price inflation, as well as a constant-percentage method of measuring price inflation.

3.      I have now been asked by Counsel for Lead Plaintiff in this class action to respond to the Expert Report of Kenneth Lehn, PhD, dated November 12, 2009 (the "Lehn Report").

## II.     Bases for Opinions

4.      My opinions expressed in this reply report and its appendices and exhibits are based upon my review and analysis of documents and information relevant to this matter and also my professional knowledge and experience.  The materials I have relied upon in forming my opinions in this report and its appendices and exhibits are identified herein.  Such documents and information are typically relied upon by financial experts in securities class actions or by financial economists in their research.  The opinions offered in this report are subject to refinement or revision based on continuing analysis of related documents and materials, including new or additional information which may be provided to or obtained by me in the course of this matter.  I expect to review additional information and documents, including

information and documents that may become available through discovery and the reports and depositions of other expert witnesses.

**III.     Summary of Reply Opinions**

5.       The opinions and conclusions expressed in the Lehn Report have not caused me to alter or refine the opinions put forth in the Nettesheim Report.  A summary of my responses to the Lehn Report follows:

- Dr. Lehn's opinions on loss causation are based upon his determination that Plaintiff's allegations are false.  Because he opines that the allegations are without merit, he determines that there was never any disclosure of the relevant truth about the alleged misrepresentations.  If the Court decides that Plaintiff has proved that the allegations are true, my analysis is relevant to loss causation and damages.

- By his own admission, Dr. Lehn is weighing the evidence of Plaintiff's claims in this matter, as opposed to conducting a proper loss causation analysis.  It is my understanding that whether the 'relevant truth' has been disclosed is a matter for the judge and/or jury to decide.

- Dr. Lehn inaccurately portrays Plaintiff's case as an assemblage of separate allegations to be analyzed individually, and avoids the fundamental issue of whether Defendants knowingly concealed the Company's true earnings capacity by understating cost of goods sold and thereby overstating gross margins and profitability as Plaintiff alleges.

- I disagree with Dr. Lehn's contention that confounding information was disclosed on dates identified as corrective disclosures in the Nettesheim Report, and that the corrective information on October 8 was not material.  All of the new material

negative company-specific information on these dates is related to the allegations in this matter as described in the Nettesheim Report. That is, they all relate to the revelation of the Company's alleged inappropriate accounting for inventory and cost of goods sold.

- It is appropriate to include October 4, 2007 in my analysis of price inflation and damages. The information revealed on that day was relevant to the allegations and material, and does not contradict Plaintiff's claim.

- Dr. Lehn's discussion of post-Class Period information regarding inventory-related allegations, and his estimate of price inflation that includes this information are flawed and irrelevant. This information is related to the allegations only in that they are statements by the Company that refute the allegations and statements by others that support the allegations. I am assuming that Plaintiff's claims are true, therefore, additional information after the Class Period which serves to re-inflate the price of the LDK ADS is irrelevant to my estimate of price inflation during the Class Period.

- The methodology employed in the Nettesheim Report for calculating per-share damages is appropriate and consistent with the literature on this matter.

- The trading model used in the Nettesheim Report is reliable and has been accepted by courts. A properly-constructed trading model can be informative and useful in securities litigation.

- Dr. Lehn's characterization of my estimate of aggregate damages for put and call options on LDK ADSs is incorrect and his trading model arguments do not apply—I use actual daily trading data for options, not a trading model.

- Dr. Lehn inappropriately equates materiality with a statistically significant company-specific stock price return.  Material information is information that a reasonable investor would want to know in making an investment decision relative to the securities of any particular firm even if it were not a statistically significant return.

- The control period used in the Nettesheim Report is appropriate.  Dr. Lehn's control period incorporates price volatility that was a direct result of the disclosures of the misrepresentations and does not reflect the expected "normalized" relationship between returns on LDK ADSs and the market and its industry during the Class Period.

- Use of Dr. Lehn's company-specific price changes derived from his regression analysis does not change conclusions pertaining to loss causation and damages in the Nettesheim Report in any meaningful way.

- Dr. Lehn does not challenge my conclusion that the market for the LDK ADSs and options on LDK ADSs was efficient during the Class Period.  In fact, Dr. Lehn assumes that the market for the LDK ADSs was efficient during the Class Period for purposes of his analysis.[3]

## IV.   Reply Opinions

## A.   Dr. Lehn Opines that the Allegations in this Matter are False, Which Is the Premise For His Other Opinions Concerning Loss Causation and Damages

6.     Although Dr. Lehn states that he was retained to opine as to whether the declines in the price of the LDK ADSs at the end of the Class Period were caused by a revelation of the relevant

---

[3] Lehn Report, footnote 53 ("Ms. Nettesheim opines that the market for LDK stock was efficient throughout the Class Period.  For purposes of my analysis, I accept this assumption.")

truth about the alleged misrepresentations in this matter,[4] he has instead determined that

Plaintiff's allegations are false, even though it appears that he was not asked to weigh the

evidence in this matter with respect to the merits of Plaintiff's claims and he does not elucidate

how he has determined as a factual matter that the allegations are false.  By his admission, Dr.

Lehn is weighing the evidence of Plaintiff's claims in this matter, rather than conducting a proper

loss causation analysis:

> I have not seen factual evidence that validates Mr. Situ's allegations, the alleged
> accounting improprieties, or the allegations from the unnamed "person familiar
> with LDK's manufacturing."  Thus, there is no factual basis to conclude that the
> relevant truth about the alleged misrepresentations was revealed to the market by
> Piper Jaffray and *Barron's*, on October 3, 2007 and October 8, 2007,
> respectively.[5]

7.      Because he has determined that the allegations are false, he opines that there was never

any disclosure of the relevant truth about the alleged misrepresentations.  His conclusion that the

allegations are untrue is demonstrated by such statements:

> [T]he alleged corrective disclosures were unsubstantiated rumors that have never
> been validated.  To the contrary, information released subsequent to the Class
> Period directly contradicts the allegations.  Hence, there is no objective basis by
> which it can be concluded that the relevant truth about the alleged
> misrepresentations was disclosed in the Piper Jaffray report and the *Barron's*
> article.  Without a disclosure of the relevant truth about the alleged
> misrepresentations, loss causation cannot be established. [6]

8.      I have not offered an opinion as to whether the allegations at issue are factually correct

and I am not qualified to do so.  This is not something that I would normally expect a financial

economist to offer an opinion on, and the types of data normally relied on by a financial

economist would not be data that would allow a financial economist to determine whether

---

[4] Lehn Report, ¶5.

[5] Lehn Report, ¶35.

[6] Lehn Report, ¶9.

accounting rules had been violated.  It is my further understanding that it is Plaintiff's duty to prove the allegations are true; if a judge or jury decides that Plaintiff has done so, my analysis is relevant to loss causation and to damages.

9.      In support of his opinion that the allegations are false and therefore that loss causation cannot be established, Dr. Lehn relies on news events at the end of, and well after the end of, the Class Period.  He asserts that certain news events contradict the allegations.  He points to, for example: the October 4, 2007 statement by the Company denying Mr. Situ's allegations; the October 9, 2007 statement by LDK denying the accusations regarding inventory discrepancies; announcements of contracts during the weeks following the Class Period; the December 17, 2007 release of the results of the independent audit; and the April 7, 2008 Form 20-F filing with the SEC that included KPMG's audit opinion for 2006 and 2007.[7]  However, these post-Class Period events that Dr. Lehn purports "contradict" the allegations do not undermine my loss causation analysis under the assumptions that I have made; it is appropriate for an economist to make certain assumptions in litigation, including that Plaintiff's claims are true.

10.     Dr. Lehn states that I "inexplicably" do not incorporate the effects of [post-class period disclosures] on LDK's stock price in [my] analysis of loss causation and damages."[8]  Indeed, I explain in paragraph 8 of my report, "I have assumed that such [post-Class Period] statements by the Company rebutting Plaintiff's allegations were false, and that the information disclosed on October 3–4 and on October 8, 2007, that Company had poor internal controls and discrepancies in its accounting for silicon inventory, was true."  I did not incorporate the effects of such additional misrepresentations, which would serve to re-inflate the price of the LDK ADSs in my

---

[7] Lehn Report, ¶¶37–40.

[8] Lehn Report, ¶52.

estimate of price inflation and damages.  Furthermore, because that re-inflation of the ADS price occurred after the end of the Class Period, that price inflation was not in the LDK ADSs during the Class Period, and it is therefore correct that I did not incorporate that price inflation in the calculation of the damages during the Class Period.

11.     Dr. Lehn's statement that "even if the alleged corrective disclosures caused some or the entire decline in LDK's stock price at the end of the Class Period, this evidence would not establish that the Plaintiffs suffered an economic loss when the 'relevant truth' about the alleged misrepresentations was disclosed to the market"[9] is illogical.  Assuming as I have that Plaintiff's claims are true, the price declines in the LDK ADSs caused by corrective disclosures related to those claims establishes loss causation.

12.     Dr. Lehn states that "loss causation analysis requires one to show that the Plaintiffs suffered an economic loss when the relevant truth about the alleged misrepresentations was disclosed, not when the allegations were disclosed."[10]  It is my understanding that whether the 'relevant truth' has been disclosed is a matter for the judge and/or jury to decide.  Disclosure of information that at least partially corrects the alleged prior misrepresentations and omissions can constitute a partial corrective disclosure as it changes in the mix of information related to the alleged misrepresentations and omissions available to investors.

13.     In summary, Dr. Lehn disagrees with the allegations and believes that they are false.[11]  It appears that Dr. Lehn believes that the Company must admit to the fraud for it to be true.  Dr. Lehn has accepted Defendants' view of the case and he argues in favor of those views.

---

[9] Lehn Report, ¶24.

[10] Lehn Report, ¶52.

[11] Lehn Report, ¶22.

However, there are several ways for information to arrive in the market, including reports from knowledgeable third parties. Dr. Lehn calls this "unsubstantiated rumors" but it is still public information, nonetheless. There are many instances when corporate wrong-doing is reported by third parties and denied by the company; only later is the wrong-doing verified. I have no opinion as to liability issues. If Plaintiff proves that the allegations are in fact true, my report is relevant to loss causation and damages.

**B.**     **Dr. Lehn Inappropriately Segregates Plaintiff's Claim Into "Accounting-Related Allegations" Versus Other Allegations**

14.     It is my understanding that, in general, Plaintiff's allegations are that, in violation of Generally Accepted Accounting Principles ("GAAP"), LDK improperly accounted for its silicon inventory in a manner that caused its reported cost of goods sold to be materially understated, making LDK appear to investors to be a much more efficient manufacturer of solar wafers than was actually the case. Dr. Lehn argues that the October 3–4 and October 8, 2007 disclosures "did not reveal the relevant truth about any accounting-related allegations that LDK improperly used the weighted average cost method to calculate COGS [cost of goods sold] and that it did not state its inventory at the lower of cost or market."[12]

15.     Dr. Lehn's argument appears to be a misleading attempt to portray Plaintiff's case as an assemblage of accounting practices to be analyzed individually, and it avoids the fundamental issue of whether Defendants concealed the Company's true earnings capacity (by understating cost of goods sold) as Plaintiff alleges. Determination of loss causation in this matter is not dependent on Plaintiff's ability to identify each method that Defendants allegedly used to conceal the Company's true cost of goods sold and earnings capabilities from investors. If the

---

[12] Lehn Report, ¶¶10, 25, 44.

trier of fact determines that LDK's accounting for silicon inventory served to overstate the value of the Company's silicon raw material inventory, understate its cost of goods sold, and overstate its earnings as Plaintiff alleges, my estimates of price inflation and damages remain valid and informative.

16.     Moreover, it is a company's accounting that normally informs the market about the value of its assets, including its inventory, and its income producing capabilities.  There are formal rules as to how this accounting is to be done.  If it is revealed that the internal controls are weak and/or inventories have been overstated for certain reasons, the market may assume that the company does not correctly apply accounting rules and that, as a result, the market cannot trust information relevant to the company's future income producing capabilities.

**C.    Dr. Lehn Incorrectly Asserts That There Were Non-Allegation Related Factors That May Have Contributed to the Decline in the Price of the LDK ADSs on Dates of Corrective Disclosures**

17.     Dr. Lehn argues that I improperly attribute the entire residual declines in the price of the LDK ADS on October 3 and October 8 to the alleged corrective disclosures, because I do not segregate the effects on the price of the LDK ADSs from the effects of confounding information released on these dates.[13]  However, as discussed herein and in the Nettesheim Report, I determined that all of the new material company-specific information on these dates is related to the allegations in this matter.  Also, while Dr. Lehn identifies what other information "could have" caused significant residual changes in price of the LDK ADSs, he does not undertake the necessary analysis, nor does he opine on what information he believes did cause the price changes at issue.

---

[13] Lehn Report, ¶121.

i.   **Allegation-Related Information on October 3, 2007 Caused the Company-Specific Decline in the Price of the LDK ADSs**

18.     Dr. Lehn asserts that confounding information contained in the October 3, 2007 Piper Jaffray report included: (1) a possible delay in internal polysilicon production; and (2) concerns regarding better access to equipment in short supply by competitors.[14]  The bulk of Dr. Lehn's arguments are addressed in the Nettesheim Report.[15]  I address his additional criticisms below.

Possible delay in internal polysilicon production

19.     With respect to statements in the October 3 Piper Jaffray report regarding LDK's ability to ramp polysilicon production in 2009, I address these in the Nettesheim Report and conclude that this was not new news, and that such information was previously well-known and industry-wide.[16]

20.     Dr. Lehn argues that the Piper Jaffray analyst, Mr. Pichel, statements regarding the ramp schedule were based on new information, relying on the fact that Mr. Pichel attended the 2nd Annual Solar Power Field Trip and had "recent" meetings with CEO Peng and CFO Lai.[17] However, the Piper Jaffray annual Solar Power conference was held from September 24 through September 27, 2007—ending a week before the October 4, 2007 Piper Jaffray report.  The conference was marketed as the "largest solar energy event in the United States"[18] and attracted

---

[14] Lehn Report, ¶125.

[15] Nettesheim Report, ¶¶44–45.

[16] Nettesheim Report, ¶44 (For example, Piper Jaffray discussed this topic in an August 1, 2007 conference call with the Company.  A September 23, 2007 CIBC report also discusses this topic.).

[17] Lehn Report, ¶138.

[18] http://www.piperjaffray.com/2col_largeright.aspx?id=531

more than 12,500 people.[19]  Therefore, many market participants would have heard the same

presentation by LDK management as did Mr. Pichel.

21.     On October 1, 2007, Friedman Billings stated that "checks from last week at the Solar

Power Conference revealed that LDK [] has already seen equipment delivery pushouts, thus

bringing into question the co's ability to ramp poly capacity," confirming my conclusion that

possible setbacks in LDK's ramp schedule were already in the market prior to October 3.[20]

22.     Any information disclosed by or about the Company, or by other companies, during that

conference that may have raised concerns over LDK's ability to meet its ramp schedule (or any

other information) entered the market at that time, and was not new news on October 3–4, 2007.

23.     LDK did not provide any change in its ramp schedule on October 3, and in its October 4

conference call, the Company confirmed it was on schedule for its polysilicon plant.  Analysts

did not change their expectations for LDK's ramp schedule in response to the October 3

disclosures.  For example, an October 5, 2007 UBS report states:

> LDK fundamental business unchanged
>
> We believe LDK is on track to expand its wafer capacity to 400MW by end-2007,
> 800MW by end-2008 and 1,600MW by end-2009.  It aims to complete
> construction of a 7kt polysilicon plant by end-2008 and 16kte by end-2009.  We
> expect production of 6kt polysilicon by the company in 2009, which should bring
> down LDK's polysilicon cost to its wafer business substantially.[21]

24.     Dr. Lehn contends that because the potential production delays appear in the first

paragraph of the report, Mr. Pichel must have viewed them as relatively more important for

---

[19] http://www.cleantechblog.com/2007/10/solar-power-2007.html

[20] *Briefing.com*, "LDK: LDK Solar seeing equipment delivery pushouts; considered a positive for WFR," October 1, 2007 13:56 GMT.

[21] UBS Investment Research, "LDK Solar Co Ltd, Short-term volatility remains," October 5, 2007.

investors than the inventory-related allegations.  This is pure speculation on the part of Dr. Lehn.

Indeed, Mr. Pichel states that the news of the inventory-related allegation was expected to

pressure the stock near-term, but made no such statements with respect to the production

concerns.[22]

25.     Dr. Lehn relies on two other analyst reports: the September 23, 2007 CIBC report and a

July 31, 2007 Morgan Stanley report.[23]  The CIBC report was cited in the Nettesheim Report in

support of my conclusion that concerns over LDK's ramp schedule were in the market prior to

October 3, 2007.  Dr. Lehn focuses on the statement in this report "early success from several

polysilicon entrants, providing credibility to LDK's ramp plans" and concludes that "LDK's

aggressive timeframes may not be as farfetched as originally thought."  However, on September

23, CIBC downgraded LDK, stating "the ability of companies to ramp production with minimal

polysilicon experience is concerning.  We believe the mass build of industry poly capacity may

cause greater pricing pressure in 2009 and beyond."[24]

26.     The same CIBC analyst questioned LDK's ramp schedule in a September 17, 2007

article:

> … LDK expects to start production at 6,000 metric tons in the third quarter of
> 2008, rising to 15,000 tons in 2009.  Not all analysts believe this, however.  "It's a
> very aggressive time frame, and it is unrealistic to assume it will hit all those
> targets without any bumps," said analyst Adam Hinckley of CIBC World

---

[22] In the October 4, 2007 Piper Jaffray report, the Company's ramp schedule was the "last" item discussed in the list of "Key Points" (following a three paragraph discussion of the inventory-related allegations and related Company statements) and was limited to one sentence.  If Dr. Lehn's assertions about the importance of the placement of information in analyst reports were applied consistently, this would indicate that the ramp schedule was not an important topic for investors on that day, relative to the inventory-related allegations.

[23] Lehn Report, ¶131.

[24] CIBC World Markets, "LDK Solar Co., Ltd.—Downgrading to SP: Shares Pricing in Early Success from New Poly Comps," September 23, 2007.  Cited in Nettesheim Report, ¶44.

Markets.  As a result, Hinckley's model assumes only 100 tons of silicon production in 2008 and 3,000 tons in 2009, even so, he likes what he sees."[25]

27.    Dr. Lehn relies on the July 31, 2007 Morgan Stanley report for an "empirical basis to understand the potential effects that Piper Jaffray's concerns about LDK's polysilicon ramp schedule might have for LDK's stock price on October 3, 2007."[26]  However, Dr. Lehn ignores a key input into Morgan Stanley's model which is gross margin: Morgan Stanley estimates gross margin of 35% in 2007 and 33% in 2008, while it is Plaintiff's contention that gross margins (and projected gross margins) would have been substantially lower had the Company correctly reported its inventories.  Thus, Morgan Stanley's analysis is invalid for Dr. Lehn's purpose because of the incorrect inputs that were based on the alleged misrepresentations.

28.    Dr. Lehn inexplicably attributes the entire increase in the price of the LDK ADSs during the period July 18, 2007 ($35.55, the day before LDK announced its polysilicon production plans) through September 21, 2007 (when the closing price was $68.71) to "increased confidence and optimism in LDK's ability to produce polysilicon on schedule."[27]  He makes this assertion without any analytical rigor.  He applies no scientific method to reach his conclusions.  For example, he does not provide a comprehensive evaluation of all of the news pertaining to LDK during this period, nor does he discuss market, industry, and/or other company-specific effects that may have contributed to the increase in the price of the LDK ADSs during this period.

---

[25] *Briefing.com*, "LDK Solar Profiled in New America Sections of IBD," September 17, 2007, 11:24 GMT.

[26] Lehn Report, ¶132.

[27] Lehn Report, ¶135.

29.     On October 4, 2007, Morgan Stanley stated that the October 3 decline in the price of the LDK ADSs was caused by the inventory-related allegations.[28]  The entire report is focused on the inventory-related allegations and management's response.  There is no mention of the Company's ramp schedule.

30.     Furthermore, unlike inventory allegations, the ramp schedule mentioned by Piper Jaffray was not discussed elsewhere by news commentators or other analysts on October 3–4, 2007, let alone identified as a cause of the decline in the price of the LDK ADSs that day.[29]

Statements Regarding Better Access to Equipment in Short Supply by Competitors

31.     The second topic Dr. Lehn suggests as confounding news in the October 3 Piper Jaffray report is statements regarding LDK competitors having better access to equipment in short

---

[28] Morgan Stanley, "LDK Solar: Alleged Inventory Discrepancies," October 4, 2007.

[29] *See*, *e.g.*, *Theflyonthewall.com,* "LDK Solar-LDK October implied volatility Spokes to 133 as LDK sells off 24%," October 3, 2007, 4:22:06 p.m.; *Reuters News,* "UPDATE 1- LDK Solar down on report financial controller out," October 3, 2007, 4:57 p.m.; *Briefing.com,* "LDK:  LDK Solar down on report financial controller out – Reuters," October 4, 2007, 12:27:48 a.m.; *Reuters News,* "UPDATE 1-LDK Solar internal probe finds no material issues," October 4, 2007, 4:45 a.m.; *Briefing.com,* "LDK:  LDK Solar:  Credit Suisse discusses yesterday's move; thinks a knee jerk reaction that results in a pull back in China based ADRs may be misplaced," October 4, 2007, 7:27:20 a.m.; *Theflyonthewall.com,* "LDK Solar-LDK volatility Elevated: LDK 'found no material discrepancies,'" October 4, 2007, 7:31:29 a.m.; *Associated Press Newswires,* "LDK investigation finds 'no material discrepancies' in inventory; outside probe planned," October 4, 2007, 7:38 a.m.;  *Theflyonthewall.com,* "LDK Solar-LDK downgraded to Sector Underperformer from Sector Performer@CIBC," October 4, 2007, 8:05:39 a.m.; CIBC World Markets, "LDK Solar Co., Ltd., Downgrading to SU: Unconfirmed Allegations to Create Near-Term Pressure," October 4, 2007; *Associated Press Newswires,* "LDK Solar up on internal probe findings of no wrongdoing, but analyst says questions remain," October 4, 2007, 10:02 a.m.; Needham, "LDK Solar Co. Ltd. (LDK) – Buy, LDK: Allegations of Poor Controls and Inventory Discrepancy by ex Financial Controller Drives Stock Down 24%, Management Reassures there are no Issues; Reiterate BUY," October 4, 2007; Morgan Stanley, "LDK Solar Alleged Inventory Discrepancies," October 4, 2007; Piper Jaffray, "LDK Solar (LDK - $51.65) Management Defends Financials, Ind Audit Pending; Some Risk 'Priced In,'" October 4, 2007; UBS, "LDK Solar Co Ltd, Short-term volatility remains," October 5, 2007.

supply.[30]  This information is not new information, nor is it unique to LDK.[31]  Dr. Lehn states

that the new information is Piper Jaffray's confirmation that LDK competitors would be getting

better access.[32]  However, on September 23, 2007, for example, a CIBC analyst had already

confirmed the "mass build of industry poly capacity."[33]

32.     Furthermore, unlike the inventory-related allegations, statements by Piper Jaffray

regarding increased competition were not discussed elsewhere by news commentators or other

analysts that day, let alone identified as a cause of the decline in the price of the LDK ADSs that

day.[34]

33.     Dr. Lehn argues that cost of goods sold "can be affected by a number of factors"

unrelated to the allegations.[35]  My opinions on loss causation do not contradict the notion that

other factors *could* affect LDK's cost of goods sold and its valuation.  However, on October 3,

2007, the factor that *did* affect the market's perception of LDK's valuation is the inventory-

related allegations.

34.     Contrary to Dr. Lehn's assertions, news commentators and analysts overwhelmingly

attributed the drop in the price of the LDK ADSs on October 3, 2007 to the information

regarding accusations of inventory discrepancies and poor internal controls, as opposed to any

other information, such as the ramp schedule or increased competition for certain production

---

[30] Lehn Report, ¶140.

[31] Nettesheim Report, ¶44.

[32] Lehn Report, ¶140.

[33] CIBC World Markets, "LDK Solar Co., Ltd.—Downgrading to SP: Shares Pricing in Early Success from New Poly Comps," September 23, 2007.

[34] *Supra* footnote 29.

[35] Lehn Report, ¶147.

equipment.[36]  The following are examples of news articles and analyst reports that attributed the

price decline on October 3 to the news about the accusations regarding inventory discrepancies:

- **Analyst reports:** In its October 3 report, Piper Jaffray stated it expected the inventory-

    related allegations to pressure the stock near term.  At least five analyst reports were

    published on October 4 or 5, 2007 for LDK; each was almost entirely focused on the

    October 3 inventory-related allegation and management's response, and each attributed

    the October 3 stock price decline to the disclosure of the allegations.

    - October 4, Morgan Stanley: "What's New: On Sep 25, a financial controller left
        LDK and claimed inconsistencies in its inventory reporting.  These claims were
        then disclosed in a broker report on Oct 3, causing a 24% share price decline."[37]

    - October 4, Needham: "Yesterday LDK fell 24% closing at $51.65 and is driven
        by reports that their financial controller had left the company after making
        allegations of poor controls and an inventory discrepancy of 250 MT
        polysilicon."[38]

    - October 4, Piper Jaffray: "We expect the stock to trade with some uncertainty
        discount until this issue is resolved by an independent auditing firm in the days
        ahead; but having fallen 25%, we believe that at least some of the risk and

---

[36] Nettesheim Report, ¶31, citing *Reuters News*, "UPDATE 1—LDK Solar down on report
financial controller out," October 3, 2007, 4:57 p.m.; *Bloomberg News*, "LDK: LDK Solar drops
$3 over the past 5 minutes; weakness attributed to cautious broker comments," October 3, 2007,
3:43 p.m.; *Bloomberg News*, "LDK Solar: Credit Suisse discusses yesterday's move; thinks a
knee jerk reaction that results in a pull back in China based ADRs may be misplaced," October
4, 2007, 7:27 a.m.; CIBC World Markets, "LDK Solar Co., Ltd., Downgrading to SU:
Unconfirmed Allegations to Create Near-Term Pressure," October 4, 2007; Needham, "LDK
Solar Co. Ltd. (LDK)—Buy LDK: Allegations of Poor Controls and Inventory Discrepancy by
ex Financial Controller Drives Stock Down 24%. Management Reassures there are no Issues;
Reiterate BUY," October 4, 2007; Piper Jaffray, "LDK Solar, Solar & Manufacturing
Technologies Management Defends Financials; Ind Audit Pending; Some Risk 'Priced In,'"
October 4, 2007.

[37] Morgan Stanley, "LDK Solar: Alleged Inventory Discrepancies," October 4, 2007.

[38] Needham, "LDK: Allegations of Poor Controls and Inventory Discrepancy by ex Financial
Controller Drives Stock Down 24%. Management Reassures the are no Issues.  Reiterate BUY,"
October 4, 2007.

uncertainty surrounding its financial controls/inventory is priced into shares at current levels."[39]

&ndash; October 4, CIBC: "We are downgrading shares of LDK to Sector Underperformer from Sector Performer, as we believe the share price will remain pressured in light of the recent allegations of poor financial controls."[40]

&ndash; October 5, UBS: "LDK Solar (LDK) stated in a public announcement on 4 October that an ex-financial controller who had been dismissed by the company on 25 September alleged inconsistencies in LDK's inventory reporting. However, 'the management team believes that these allegations have no merit'. …LDK's share price declined 24% on 3 October."[41]

- **News articles:** News commentators attributed the drop in the price of the LDK ADSs on October 3, 2007 to the information contained in the Piper Jaffray report regarding allegations of poor internal controls and inventory discrepancies. For example:

&ndash; Stock in Chinese-based solar wafer maker LDK Solar Co fell almost 25 percent on Wednesday after a report its financial controller had left the company after making allegations of poor controls and an inventory discrepancy.[42]

### ii. Allegation-Related Information on October 8, 2007 Caused the Company-Specific Decline in the Price of the LDK ADSs

35.     Dr. Lehn argues that the information contained in the October 8 *Barron's* article was either not new news or was unrelated to the allegations, and "amounts to a continuation of the rumors …."[43] Dr. Lehn fails to identify what did cause the LDK ADS price decline on October 8. He argues that there was new negative confounding information that "may have" contributed

---

[39] Piper Jaffray, "Management Defends Financials: Ind Audit Pending; Some Risk 'Priced In'," October 4, 2007.

[40] CIBC, "Downgrading to SU: Unconfirmed Allegations to Create Near-Term Pressure," October 4, 2007.

[41] UBS, "Short-term volatility remains," October 5, 2007.

[42] *Reuters News*, "UPDATE 1—LDK Solar down on report financial controller out," October 3, 2007, 4:57 p.m.

*Supra* footnote 29.

[43] Lehn Report, ¶¶62, 63.

to the stock price decline, however, as I discuss below, this information is either relevant to the allegations or did not contribute to the company-specific decline in the price of the LDK ADSs on October 8, 2007.  Furthermore, as discussed herein, the Company's denial of the allegations on October 8–9 does not undermine my analysis of loss causation; to the extent the Company's denials affected the price of the LDK ADSs, they served to maintain price inflation.

The *Barron's* Article Contained New Material Information Related to the Allegations

36.     Dr. Lehn asserts that information contained in the *Barron's* article regarding the usability of LDK's inventory and the quantification of the amount of overstated inventory was already in the public domain.  He relies on the fact that information contained in emails by Mr. Situ was provided to various market participants prior to the Piper Jaffray October 3 report.[44]  However, the new information in the *Barron's* article is also based on information *Barron's* had learned from "someone with knowledge of LDK's manufacturing," that questioned the Company's inventory, not information from the previously-circulated Situ emails.  *Barron's* indicated that the Company's inventories may be overvalued by as much as $92 million, and that the quality of the Company's silicon ingots "so impure that a recent production run had produced tons of them that were too contaminated for technicians to even analyze with instruments."  The *Barron's* article further corroborated alleged discrepancies in inventory accounting that the Company continued to deny.[45]

Quality of Wafers

37.     Dr. Lehn argues that some of the information contained in the *Barron's* article is unrelated to Plaintiff's allegations because it concerns LDK's ability to produce quality wafers.

---

[44] Lehn Report, ¶¶68, 69.

[45] Nettesheim Report, ¶¶47–49.

It is my understanding that LDK's ability to produce wafers to specifications is directly related to the quality of the Company's silicon inventory, and that much of the Company's feedstock was of poor quality and effectively unusable, which rendered its accounting misleading, and is directly related to the allegations.

"Rumors" from an Unidentified Person Familiar with LDK's Manufacturing

38.   Dr. Lehn argues that the information provided by the unidentified person was denied by the Company, referring to LDK's October 9 press release.[46]   Because Plaintiff alleges that the accusations regarding the impropriety of LDK's inventory made on October 3, 4 and 8 are true, the Company's denial on October 9 would have been a post-Class Period misrepresentation and may have served to reinflate the price of the LDK ADSs.   Because this misrepresentation and its associated price inflation occurred after the end of the Class Period, it has no bearing on the calculation of price inflation during the Class Period.

 "Rumors" Regarding Double and Triple Ordering

39.   Dr. Lehn argues *Barron's* statements regarding the large number of sales agreements announced by LDK as well as other firms in the solar cell industry over the previous few months is confounding negative information.[47]   Because these sales deals were previously publicly released, this is not new information.

"Other Negative Statements"

40.   Dr. Lehn also points to statements in the *Barron's* article that refer to the solar industry as an Internet bubble as confounding information.[48]   I address these statements in the Nettesheim

---

[46] Lehn Report, ¶¶151–155.

[47] Lehn Report, ¶157.

[48] Lehn Report, ¶¶161, 162.

Report and conclude that the notion that the Chinese solar industry was a potential "bubble" was not new to the market.[49]  Dr. Lehn argues that the evidence I rely on does not support my conclusion because the *Barron's* article makes an affirmative statement that LDK was in a bubble, as opposed to a "potential bubble."  This is misleading.  The statements made by *Barron's* comparing the China solar industry to the Internet bubble are analogous to statements made by analysts and news commentators prior to October 8.  Previously, commentators and/or analysts stated the following:

> [Referring to the China market in general] CHINA, one of the most hotly tipped markets of recent times, has been prompting comparisons with the dotcom bubble after soaring 50% this year.[50]

> … [A] bubble may be forming around an industry that has yet to prove it can survive fluctuating energy prices and government-subsidy programs that can come and go with little warning.[51]

> The chairman of the department of economics at Brooklyn College, Robert Bell, said the economy was presently early in a massive bull market for renewable energy.  He believes it will become a bubble much larger than the Internet Dot-com stock bubble of the 1990s.[52]

41.   Furthermore, Dr. Lehn's Exhibit 7 demonstrates that the purported industry bubble did not "pop" in October 2007.  The chart in his Exhibit 7 shows that his industry index continued to increase in value through 2007.

---

[49] Nettesheim Report, ¶53.

[50] *The Sunday Times*, "Profit from China without leaving home," June 3, 2007.

[51] *Dow Jones Commodity Services*, "WSJA(6/7) China Stacks Hopes On New 'Clean Tech' Hub," June 6, 2007, 5:30 p.m.

[52] *The New York Sun*, "Turning Green Into Green," August 14, 2007.

42.     None of the purported confounding pieces of information on October 8 caused the decline in the price of the LDK ADSs, rather, there is overwhelming evidence that the decline in the price of the ADSs was due to the inventory-related allegations.[53]

### iii.   Dr. Lehn's Conclusion that Headline Risk "Likely" Contributed to the Price Decline on October 3 and 8, 2007 is Unsupported and Irrelevant

43.     Dr. Lehn also argues that "it is likely that some of the decline in LDK's stock price was caused by so-called 'headline risk' or 'collateral damage' associated with Piper Jaffray's report and the *Barron's* article."[54]  He does not perform any scientific analysis and he does not conclude how much, or if any, supposed "headline risk" did affect the price of the LDK ADSs. Dr. Lehn's argument regarding headline risk is simply a discussion of uncertainty in the market regarding the truth of the allegations due to the Company's denials.

### D.   It is Appropriate to Include October 4 Corrective Disclosures in My Analysis of Loss Causation and Damages

#### i.   My Conclusion that Corrective Disclosures Were Made on October 4, 2007 is Consistent with Plaintiff's Allegations

44.     Dr. Lehn argues that my conclusion that October 4 constitutes a date with partial corrective disclosures contradicts Plaintiff's allegations.[55]  However, on October 4, there were two sets of information related to the allegations: (1) information that was partially corrective of

---

[53] *Midnight Trader,* "LDK Solar Looks Expensive Amid Questions Over Accounting, Barron's Says," October 8, 2007, 6:33 a.m.; *Reuters News,* "LDK Solar shares extend slide, drop 22 percent," October 8, 2007, 11:11 a.m.; *Associated Press Newswires,* "LDK Solar CFO: Company to report on inventories within days," October 8, 2007, 4:54 p.m.; *Associated Press Newswires,* "Solar shares fall sharply amid allegations that LDK inflated polysilicon inventory figures," October 8, 2007, 5:45 p.m.; *Reuters News,* "UPDATE 2-LDK Solar shares extend slide, down almost 26 pct," October 8, 2007, 3:35 p.m.; CIBC World Markets, "LDK Solar Co., Ltd., Raises 3Q Rev Guidance But Still Leaves Too Many Questions Unanswered," October 9, 2007.

[54] Lehn Report, ¶122.

[55] Lehn Report, ¶55.

the misrepresentations; and (2) information that served to maintain inflation in the ADSs.  On October 4, there were several analyst reports issued in response to the disclosure of the inventory-related allegations.[56]  These analyst reports are discussed extensively in the Nettesheim Report and are relevant to the allegations—therefore, October 4, is correctly included in my estimate of price inflation and damages.

45.     Also on October 4, the Company denied the allegations.  However, assuming such denials were false, as I must for the purpose of a valid analysis, Defendants' statements on October 4 would have re-inflated the stock price to the extent that their statements did affect the stock price.[57]

> ### ii.  The Change in the Price of the LDK ADSs on October 4 Was Statistically Significant and the Disclosures Related to the Allegations Were Material

46.     Dr. Lehn determines that the LDK ADS residual return on October 4, 2007 was -6.01%, but argues that the price decline was not statistically significant using his regression analysis and he opines that price changes that are not statistically significant are not material.[58]  However, material information is information that a reasonable investor would want to know in making an investment decision relative to the securities of any particular firm.  It is likely that an investor would want to know about information that would cause a 6% company-specific return, even if it were not statistically significant.

47.     Dr. Lehn also states that my "first event study" showed that LDK's residual return on October 4, 2007 was not statistically significant.  This is entirely wrong, as Dr. Lehn knows.  The results of the event study I relied on in my initial report (the Nettesheim Declaration) are

---

[56] Nettesheim Report, ¶¶33–37.

[57] Nettesheim Report, ¶40.

[58] Lehn Report, Exhibit 3, ¶199.

contained in the Nettesheim Declaration and demonstrate a statistically significant price change on October 4.[59]  Nevertheless, in the Nettesheim Report I provide an alternative estimate of per-share and aggregate damages for the LDK ADSs that exclude the company-specific return and price change on October 4, 2007.[60]

48.     It is noteworthy that Dr. Lehn uses dates that are <u>not</u> associated with statistically significant price changes in his analysis of price inflation purportedly incorporating the effects of allegation-related disclosures during the period October 9 through December 17, 2007.[61]  His use of non-significant dates contradicts his opinion that the price changes must be statistically significant in order for them to be material and not indistinguishable from "white noise."

**E.      Dr. Lehn's Discussion of Post-Class Period Disclosures and His Estimate of Price Inflation That Includes Such Disclosures Is Flawed and Irrelevant**

49.     In Appendix B to the Nettesheim Report, I provide a summary of post-Class Period information that is related to Company denials of and to commentary on the inventory-related allegations.  Dr. Lehn states that I do not incorporate the effects of such information on LDK's stock price in my analysis of loss causation and damages.

50.     This additional information is related to the allegations in that there are statements by the Company that refute the allegations and statements by others that support the allegations.  I am assuming that Plaintiff's claims are true, therefore, statements which serve to re-inflate the price of the LDK ADS after the Class Period are irrelevant to my estimate of price inflation during the Class Period.

---

[59] Nettesheim Report, ¶37.

[60] Nettesheim Report, Appendix A, ¶17.

[61] Lehn Report, Exhibit 5.

51.     When the price of the LDK ADSs increases upon additional misrepresentations, for example, when the Company denies the allegations, that might be a measure of price inflation that is put into the price on that day, but the new inflation on that day could not have existed on previous days since the effect of that misrepresentation upon the ADS price could not occur prior to the date of the misrepresentation.  Later, if a disclosure corrects that misrepresentation, then the price inflation from the misrepresentation may be removed.  Dr. Lehn is wrong to assert that inflation exists prior to the misrepresentation.

52.     Dr. Lehn claims that his analysis incorporates the dates I considered in the Appendix B to my report.[62]  However, he chooses to stop at December 17, 2007, when the price of the ADSs was $68.18, whereas the dates I considered continue to April 7, 2008, when LDK ADS price was down to $32.50.

53.     Dr. Lehn argues that I identify additional dates between December 17, 2007 and April 7, 2008, with large price declines in the LDK ADSs, but that I fail to recognize substantial negative and confounding information on these days, and fail to establish that the price declines were attributable to allegation-related disclosures.[63]  It is noteworthy that he fails to recognize any confounding information that occurs on the post-Class Period days he chooses to include.  Dr. Lehn uses the entire company-specific price change on certain dates from October 9 through December 17, 2007 and performs no analysis of other confounding information on those dates. For example, while I do not use the October 9 date in my calculation of price inflation during the Class Period, I did note in the Nettesheim Report that on that day LDK announced expected third quarter 2007 revenues higher than previous guidance, which caused some analysts to increase

---

[62] Lehn Report, ¶81, Exhibit 5.

[63] Lehn Report, ¶96.

their earnings projections for third quarter 2007.  The increased revenue guidance was not related

to the allegations, but Dr. Lehn includes any increase in the price of LDK ADSs from this

improved guidance in his calculation of price inflation due to the allegations.

54.      Moreover, his argument is misleading and mischaracterizes my report.  I do not attribute

*any* price changes after October 8, 2007 to any information, nor do I include any such price

changes in my estimate of price inflation.  Appendix B to my report was strictly a recitation of

events that occurred after the Class Period and was included to demonstrate that after the Class

Period there were both denials by the Company and continued concerns by analysts and

commentators regarding the allegations.

**F.      Dr. Lehn's Criticisms of My Estimates of Price Inflation are Misleading and Flawed**

55.      Dr. Lehn suggests that my price inflation estimates should be based on a quantification of

the effects on LDK's stock price directly from the alleged misrepresentations (June 1, August 1,

and October 4, 2007).[64]  These misrepresentations served to maintain inflation that existed at last

as early as the start of the Class Period because the misrepresentations are alleged to have been

in the financial statements available to investors prior to the start of the IPO.[65]  The first date

(June 1) is associated with the financial statements and registration statements available prior to

the IPO, thus that misrepresentation is in effect at the start of the Class Period.  The second date

(August 1) is associated with an allegation that the Company failed to correct and repeated its

earlier misrepresentations originally put forth in its earlier financial statements and registration

statements.  Thus, these statements would maintain the price inflation in effect since the start of

the Class Period.  The third date (October 4) was used in calculating price inflation, therefore to

---

[64] Lehn Report, ¶170.

[65] Nettesheim Report, ¶22.

the extent that the Company's statements on that date inflated the price of the LDK ADSs, that upward effect on the ADS price would reduce the measure of total price inflation during the Class Period.

56.     Dr. Lehn states that I use a mechanistic "back-casting" approach.[66]  He erroneously contends that I use a "non-standard" definition of residual returns.  He states that the standard definition of residual returns is the difference between actual returns and the predicted returns,[67] which is correct when determining statistical significance, but is not correct when measuring price inflation.  The method I use to measure price inflation is consistent with the literature on this matter.[68]

57.     Dr. Lehn argues that the Company could not have disclosed information regarding polysilicon inventory as of August 2007 at the start of the Class Period (June 2007).  This ignores Plaintiff's main contention that, from prior to LDK's IPO through at least the end of the Class Period, the Company had significant quantities of largely unusable raw materials in its inventories, the value of which was substantially overstated, and that cost of goods sold was substantially understated.  At or prior to the start of the Class Period, Plaintiff alleges that the Company could have and should have disclosed the truth about its inventory accounting and its

---

[66] Lehn Report, ¶¶46, 170.

[67] Lehn Report, Exhibit 5, footnote 2.

[68] *See e.g.*, Janet Cooper Alexander, "The Value of Bad News in Securities Class Actions," 41 *UCLA L. Rev.* 1421, August, 1994; Bradford Cornell and Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA L. Rev.* 833, June 1990; Jon Koslow, "Estimating Aggregate Damages in Class-Action Litigation Under Rule 10b-5 for Purposes of Settlement," 59 *Fordham L. Rev*, 811, April, 1991; David Tabak, "Inflation and Damages in a Post-*Dura* World," NERA Working Paper, September 25, 2007; David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases," NERA Working Paper, July 2002.

impact on is reported cost of goods sold.  The corrective disclosures on October 3–4 and October 8 partially disclosed this information.

58.     Dr. Lehn argues that my methodology yields "nonsensical results that estimated inflation exceeds LDK's stock price in the early part of the Class Period."[69]  My daily estimates of price inflation (using both a constant-dollar and a constant-percentage method of measuring price inflation) do not exceed the stock price during the Class Period.  In the Nettesheim Report, I explain at length the difference between and the presumptions underlying the constant-percentage method and constant-dollar method.[70]

**G.     The Trading Model Used In the Nettesheim Report Is Reliable and Has Been Accepted By Courts**

59.     Dr. Lehn claims that it is his "understanding that no trading model has ever been accepted by a court in a securities case."[71]  He appears to be misinformed.  The proportional trading model (as well as the multi-trader model) has been utilized in numerous securities fraud cases and admitted after *Daubert* challenges.  For example, I used a similar trading model in the *Homestore.com Securities Litigation*, where the court denied Defendants' motion *in limine* to exclude my aggregate damages opinion, noting that "disagreements about such testimony goes [*sic*] to the weight, rather than the admissibility."[72]

60.     In the *Oxford Health Plans, Inc. Securities Litigation*  the court denied Defendants' *Daubert* challenge regarding the proportional trading model proffered by my colleague at SCG:

---

[69] Lehn Report, ¶185.

[70] Nettesheim Report, ¶¶65–74.

[71] Lehn Report, ¶192.

[72] *In re Homestore.com, Inc. Securities Litigation*, United States District Court for the Central District of California, Western Division, Master File No. 01-CV-11115 RSWL CWx, transcript of proceedings November 29, 2004, and associated Minutes and Order.

The arguments concerning the aggregate damages estimate and the proportional trading model goes [*sic*] to the weight of the evidence, not its admissibility. …

The proportional trading model issue is resolved since if such studies are probative to the approval of a settlement, they are probative for any other rational use, and "the weight of the evidence is a matter to be argued to the trier of fact."[73]

61.     In the *WorldCom, Inc. Securities Litigation*, a similar trading model was admitted at trial after being subjected to a motion *in limine*.  Judge Cote wrote that Defendant

challenges Nye's uses of a 'proportional trading' model to calculate shareholder damages.  As explained by the Lead Plaintiff, [Defendant's] description of Nye's model fails to capture its complexity.  Moreover, his model has survived repeated *Daubert* challenges in other cases.[74]

62.     Securities trading models have been developed for litigation purposes and have been discussed extensively in the relevant literature.  In securities class action litigation, frequently some sort of trading model is utilized, usually a version of the proportional trading model or a more generalized multi-trader model.  This methodology is a practical application of econometric and statistical techniques which have been accepted, tested and subject to peer review.

63.     The relevant literature supports the use of and reliability of generalized multi-trader models, similar to the one I employed in this action, and the trading data inputs used in my model specific to LDK in the Class Period.[75]  There is literature on trading models in which authors have found certain models to be reasonable approximations of reality.[76]

---

[73] *In re Oxford Health Plans, Inc. Securities Litigation*, United States District Court for the Southern District of New York, MDL 1222 (CLB), Memorandum and Order, March 6, 2003.

[74] *In re WorldCom, Inc. Securities Litigation*, United States District Court, Southern District of New York, Master File no. 02 Civ. 3288 (DLC), Opinion and Order dated February 17, 2005.

[75] Jon Koslow, "Estimating Aggregate Damages in Class-Action Litigation Under Rule 10b-5 for Purposes of Settlement," 59 *Fordham L. Rev*, 811, April, 1991; Dean Furbush and Jeffrey W. Smith, "Estimating the Number of Damaged Shares in Securities Fraud Litigation: An

*Footnote continues on the next page…*

64.     Dr. Lehn is incorrect when he states that my trading model does "not account for characteristics of LDK stock such as high short sale volume, high level of fails to deliver, and day trading."[77]  I used LDK-specific data, including the level of short interest, and a trading volume adjustment to account for day trading.[78]

65.     Dr. Lehn opines that submitted claims would be a more appropriate way to award damages.[79]  However, this is misleading in that recoverable damages represented by claims, and aggregate class damages, are not necessarily equal.  Assuming liability is proven, Class members suffered damages, whether or not everyone who purchased LDK ADSs in the Class Period files a claim.  Even if claims submitted do not equal total damages as estimated by a model, that does not prove or even suggest that the model is wrong.  I was not asked to, and did not, calculate aggregate damages for Class members likely to file claims, or speculate on Class members'

---

Introduction to Stock Trading Models," 49 *Bus. Law*, 527, February, 1994; Marcia Kramer Mayer, "Best-Fit Estimation of Damages Volume in Shareholder Class Actions: the Multi-Sector, Multi-Trader Model of Investor Behavior," NERA working paper, October, 2000; John Finnerty and George Pushner, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," 8 *Stan. J.L. Bus. & Fin.*, 213, Spring, 2003.

[76] William H. Beaver, James K. Malernee and Michael C. Keeley, "Stock Trading Behavior and Damage Estimation in Securities Cases," Cornerstone Research working paper, 1993.  "We found that the 'one-trader' model, which is the type of model implicitly used by plaintiffs in many cases, seriously *exaggerated* the size of the class, while a 'two-trader' model [which I used here] predicted class size much better."  (at 1, emphasis in original.)

Michael Barclay and Frank C. Torchio, "A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation," *Law and Contemporary Problems*, Volume 64, Nos. 2&3, Spring/Summer, 2001, 105–136.  These authors cite to claims data in *In re Health Management, Inc. Securities Litigation* (1999), which indicates that a one-trader model, when properly specified, does not overestimate the number of damaged shares.

[77] Lehn Report, ¶193.

[78] Nettesheim Report, ¶80.

[79] Lehn Report, ¶194.

motivations to do so.  Courts have determined that "aggregate damages awards are a 'standard practice' in securities cases."[80]

66.     Contrary to Dr. Lehn's assertions, a properly-constructed trading model can be informative and useful in securities litigation; the trading model I used is scientific and reliable.

**H.     Dr. Lehn's Characterization of My Calculation of Damages for Options on LDK ADSs Is Incorrect**

67.     Dr. Lehn applies all of his criticisms of trading models to my estimate of aggregate damages for options.  He is wrong in his characterization of how I calculated options damages.  I do not use a trading model for estimating aggregate damages for the options.  Rather, I used daily changes in the number of open contracts (as reported by OptionsMetrics), not approximations or estimates.  My methodology is described in the Nettesheim Report.[81] Therefore, it is wrong for Dr. Lehn to indiscriminately apply his arguments regarding trading models to my calculations of aggregate damages for options.

**I.     Contrary To Dr. Lehn's Assertion, Material Information Need Not Be Associated With a Statistically Significant Price Change**

68.     Dr. Lehn relies on the same Supreme Court decision I rely on for the definition of materiality.[82]  However, Dr. Lehn argues that the "standard method for determining whether new information changed the total mix of information is event study analysis"[83] and that new

---

[80] *In re WorldCom, Inc. Securities Litigation*, United States District Court, Southern District of New York, Master File no. 02 Civ. 3288 (DLC), Opinion and Order dated February 17, 2005. *See* also: *In re Blech Securities Litigation*, No. 94 Civ. 7696(RWS) 2003 WL 1610775 (S.D.N.Y. March 26, 2003), *In re Oxford Health Plans, Inc. Sec. Litig.*, 244 F. Supp. 2d 247, 251 (S.D.N.Y. 2003).

[81] Nettesheim Report, ¶87.

[82] *TSC Indus.*, 426 U.S. 1976 cited in Lehn Report, ¶197, Nettesheim Report, footnote 92.

[83] Lehn Report, ¶197.

information with a small company-specific value impact is not material because it is statistically indistinguishable from noise.[84]   I disagree that small price changes are necessarily not material.[85]

69.     Dr. Lehn "notes" that I do not refer specifically to LDK in my materiality section; in his discussion of materiality, Dr. Lehn does not mention anything specific to the LDK ADSs.[86]   The purpose of the materiality section of my report is to discuss materiality, which is consistent for all securities.

**J.     The Control Period Used In the Nettesheim Report Is Appropriate**

70.     The primary difference between the regression analysis proffered by Dr. Lehn and the regression analysis in the Nettesheim Report is the control period used.   I used a control period from June 11, 2007 through September 28, 2007, beginning shortly after the IPO of the LDK ADSs and ending shortly before the first disclosures regarding the inventory allegations.   In the Nettesheim Report, I discuss extensively why the control period I used is appropriate in this matter.[87]

71.     Dr. Lehn's control period begins on December 24, 2007, after the relatively high level of volatility in the ADSs that occurred during the period following the inventory-related disclosures, and ends on August 31, 2008.   There was additional information about alleged errors in the Company's accounting for its silicon raw materials inventory through the end of 2007 and into 2008; much of this information is summarized in Appendix B to the Nettesheim Report and is discussed by Dr. Lehn.   Thus, this period of time was affected by the revealed alleged fraud

---

[84] Lehn Report, ¶199.

[85] Nettesheim Report, ¶¶89–95.

[86] Lehn Report, ¶¶196–199.

[87] Nettesheim Report, Appendix A, ¶¶3, 4.

and any changes in the statistical relationship between LDK ADS returns and the market and the industry may have been the result of the disclosures of the alleged fraud.

72.     Nevertheless, the measure of price inflation would not change in a meaningful way whether one used my regression or Dr. Lehn's; the only material difference is whether the company-specific return on October 4, 2007 is statistically significant at the 95% level of confidence.

**K.      Use of Dr. Lehn's Regression Analysis Does Not Change the Measure of Price Inflation or Damages in Any Meaningful Way**

73.     Dr. Lehn argues that my event study analysis and regression model have "serious flaws" that lead to artificially low residuals, thereby overstating damages.[88]  However, use of Dr. Lehn's regression analysis does not change conclusions pertaining to price inflation and damages.  If I use Dr. Lehn's regression results for the company-specific returns on October 3, 4 and 8, 2007, there is essentially no difference because the estimate of the total price inflation in the LDK ADS is 44.0%, compared to 44.9% in my report.  If I use Dr. Lehn's regression results for the company-specific returns on October 3 and 8, there is essentially no difference because the total price inflation is 40.4%, compared to 40.4% in my report.

| Date | Residual Change in LDK Price | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Nettesheim Report[89] | | Lehn Report[90] | | Nettesheim Report | | Lehn Report | |
| 10/3/07 | ($14.83) | -21.71% | ($15.51) | -22.71% | ($14.83) | -21.71% | ($15.51) | -22.71% |
| 10/4/07 | ($3.89) | -7.52% | ($3.12) | -6.04% | | | | |
| 10/8/07 | ($12.19) | -23.92% | ($11.69) | -22.95% | ($12.19) | -23.92% | ($11.69) | -22.95% |
| Total | ($30.90) | -44.9% | ($30.32) | -44.0% | ($27.01) | 40.4% | ($27.20) | 40.4% |

---

[88] Lehn Report, ¶92.

[89] Nettesheim Report, ¶62.

[90] Lehn Report, Exhibit 5.

74.     Because the price inflation calculated using Dr. Lehn's company-specific returns is virtually the same as the price inflation in the Nettesheim Report, aggregate damages calculated using the methodology put forth in the Nettesheim Report, but using Dr. Lehn's company-specific returns would yield virtually the same aggregate damages as in the Nettesheim Report.

This report accurately reflects my opinions at this time.  I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 19, 2009, at Redwood City, California.


Jane D. Nettesheim