```
1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4  IN RE:  LDK SOLAR SECURITIES   )
   LITIGATION,                    )
5                                 )   No. C-07-05182-WHA
                                  )
6  THE DOCUMENT RELATES TO        )
   ALL ACTIONS.                   )
7              Defendants.        )
   _____)
8

9

10

11

12

13

14          DEPOSITION OF JANE NETTESHEIM

15            San Francisco, California

16          Friday, September 19, 2008

17

18

19

20

21

22

23  Reported by:
    LAURIE HELD-BIEHL
24  CA CSR No. 6781
    TX CSR No. 8555
25  JOB No. 302184
```

Page 2

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4  IN RE:  LDK SOLAR SECURITIES   )
    LITIGATION,                    )
 5                                 )   No. C-07-05182-WHA
                                   )
 6  THE DOCUMENT RELATES TO        )
    ALL ACTIONS.                   )
 7               Defendants.       )
    _____)

 8

 9

10

11

12

13

14

15         Videotaped Oral Deposition of

16      JANE NETTESHEIM, pages 1 through 224,

17      taken on behalf of Defendants, at

18      505 Montgomery Street, San Francisco,

19      California, beginning at 9:08 a.m.

20      and ending at 3:25 p.m. on Friday,

21      September 19, 2008, before LAURIE

22      HELD-BIEHL, California Certified

23      Shorthand Reporter No. 6781, Texas

24      Certified Shorthand Reporter

25      No. 8555.
```

Page 3

```
 1    APPEARANCES:

 2

 3         For Plaintiffs:

 4              COHEN MILSTEIN HAUSFELD & TOLL
                Attorneys at Law
 5              BY:  JOSEPH S. DEVORE, ESQ.
                1100 New York Avenue, N.W.
 6              Suite 500, West Tower
                Washington, D.C.  20005
 7              (202) 408-4600
                jdevore@cmht.com
 8
           For Defendants:
 9
                LATHAM & WATKINS LLP
10              Attorneys at Law
                BY:  MATTHEW D. HARRISON, ESQ.
11              505 Montgomery Street
                Suite 2000
12              San Francisco, California 94111
                (415) 391-0600
13              matt.harrison@lw.com

14         Also Present:

15              ASHLEY MORROW, Videographer

16              ALEXANDER AGANIN
                (Via Livenote Stream.)
17

18

19

20

21

22

23

24

25
```

Jane Nettesheim                                                    9/19/2008

Page 4

```
 1                          INDEX

 2

 3   WITNESS                              EXAMINATION

 4   JANE NETTESHEIM

 5       BY MR. HARRISON                          7

 6

 7

 8                         EXHIBITS

 9   DEFENDANTS'                              PAGE

10   7    Photocopy of Declaration of Jane D.       9
          Nettesheim, dated 8-25-08, 229 pages
11
     8    Photocopy of Supplemental Declaration     9
12        of Jane D. Nettesheim, dated 9-10-08,
          105 pages
13
     9    Photocopy of Notice of Deposition and    50
14        Subpoena Requesting Production of
          Documents to Jane D. Nettesheim,
15        9 pages

16   10   Photocopy of Objections and Responses    50
          to Defendants' Subpoena Requesting
17        Production of Documents to Jane D.
          Nettesheim, 5 pages
18
     11   Photocopy of Company Note, dated 10-4-08, 78
19        1 page

20   12   Photocopy of Morgan Stanley article      80
          entitled "LDK Solar Alleged Inventory
21        Discrepancies," 7 pages

22   13   Photocopy of UBS Investment Research      82
          article entitled "LDK Solar Co. Ltd.,"
23        11 pages

24   14   Photocopy of Form 6-K, LDK Solar Co.,     87
          LTD, for the month of October 2007,
25        4 pages
```

www.biehletal.com

Jane Nettesheim                                               9/19/2008

Page 5

```
 1    INDEX (Continued):

 2                        EXHIBITS

 3    DEFENDANTS'                                          PAGE

 4    15    Photocopy of CIBC World Markets           93
            article entitled "LDK Solar Co., Ltd.,"
 5          7 pages

 6    16    Photocopy of Reuters Business News        111
            article entitled "UPDATE 1-LDK Solar
 7          down on report financial controller out,"
            2 pages
 8
      17    Photocopy of Bloomberg online article     108
 9          dated 10-3-07, 1 page

10    18    Photocopy of Bloomberg online article     108
            dated 10-4-07, 1 page
11
      19    Photocopy of Consolidated Class Action    138
12          Complaint, 46 pages

13    20    Photocopy of PiperJaffray article         148
            entitled "LDK Solar Market Perform,"
14          6 pages

15    21    Photocopy of Needham article entitled     187
            "LDK Solar Co. Ltd (LDK) - Strong Buy
16          (was Buy)," 9 pages

17

18          PREVIOUSLY MARKED EXHIBITS REFERENCED HEREIN

19                    EXHIBIT        PAGE

20                 Javidzad 4        68
                   Javidzad 5        171
21                 Javidzad 6        75

22

23

24

25
```

Jane Nettesheim 9/19/2008

Page 6

```
1              San Francisco, California

2            Friday, September 19, 2008

3             9:08 a.m.  -  3:25 p.m.

4

5      THE VIDEOGRAPHER:  This begins disk one,

6   Volume 1, in the deposition of Jane Nettesheim, In

7   Re:  LDK Solar Securities litigation in the United

8   States District Court, Northern District of

9   California, the case number of which is

10  C-07-05182-WHA.

11          Today's date is September 19, 2008.  The

12  time is 9:08 a.m.

13          This deposition is being taken at

14  505 Montgomery Street, Suite 2000, San Francisco,

15  California, 94111, and was made at the request of the

16  defendant, represented by the law offices of Latham &

17  Watkins.

18          The court reporter producing the official

19  transcript of today's testimony is Laurie Biehl of

20  Biehl, et al., CSR, Inc.; phone number is

21  (800) 208-6494.

22          The videographer is Ashley Morrow of Legal

23  Data Solutions, also representing Biehl, et al.

24          Would counsel please identify yourselves and

25  state whom you represent.
```

Jane Nettesheim                                          9/19/2008

Page 7

1        MR. HARRISON:   Matthew Harrison of Latham &

2    Watkins for defendants.

3        MR. DEVORE:   Joshua Devore of Cohen Milstein

4    Washington DC representing the proposed class and the

5    witness.

6        THE VIDEOGRAPHER:   And would the court reporter

7    please swear in the witness.

8

9                    JANE NETTESHEIM,

10            having been first duly sworn,

11        was examined and testified as follows:

12

13                    EXAMINATION

14   BY MR. HARRISON:

15        Q    Good morning, Ms. Nettesheim.

16        A    Nettesheim, that's correct.

17        Q    Good morning.

18             Could you please state and spell your full

19   name.

20        A    It's Jane, J-A-N-E, Denese, D-E-N-E-S-E,

21   Nettesheim, N-E-T-T-E-S-H-E-I-M.

22        Q    And you've been deposed before, correct?

23        A    Yes.

24        Q    I'm not going to repeat the whole protocol,

25   then, because I think you're probably familiar with

Page 8

1  the process, but I'll remind you that you are under

2  oath as if you were in court.

3          Do you understand that?

4     A    Yes.

5     Q    Okay.  And I'll remind you to give audible

6  answers so the court reporter can get down your

7  answers.  Does that make sense?

8     A    Yes.

9     Q    And also, let's try not to talk over each

10 other for the same reason; so she can get everything

11 down today.

12    A    Okay.

13    Q    Does that make sense?

14    A    Yes.

15    Q    And finally, if you don't understand a

16 question, just ask me to clarify it and if not, I'll

17 assume you understand it.  Does that make sense?

18    A    Yes.

19    Q    Okay.  So today we're going to be talking

20 about LDK quite a bit and if I refer to "LDK" or "the

21 company" do you know that I'm referring to LDK Solar

22 Company Limited?

23    A    Yes.

24    Q    Okay.  And if I use the phrase "this case,"

25 do you understand that I'll be referring to In Re:

1   LDK Solar Securities litigation in the Northern

2   District of California?

3        A   Yes.

4        Q   Okay.  And by "the defendants," if I use the

5   phrase "defendants" in the case, do you know who I'm

6   referring to?

7        A   I couldn't list the individual defendants as

8   I sit here.  Some of them yes, but --

9        Q   Okay.

10       A   -- generally yes, I know who you're

11  referring to.

12       Q   Okay.  Great.  Thanks.

13           Now, today we're going to be discussing your

14  August 25, 2008 declaration and your September 10,

15  2008 supplemental declaration in this case.  I may

16  refer to them collectively as "your report."  Is that

17  okay?

18       A   Yes.

19       Q   Okay.  Let's mark them.

20           Do you have a copy of your report that you

21  want to use today or should I mark a clean copy?

22       A   I do not have a copy with me.

23           (Defendants' Exhibits 7 and 8

24           were marked for identification and are

25           attached hereto.)

Jane Nettesheim                                                    9/19/2008

Page 10

1        THE REPORTER:  Exhibits 7 and 8 are before the

2    witness.

3    BY MR. HARRISON:

4        Q    And so I've marked as Exhibits 7 and 8 your

5    August 25th declaration and your September 10, 2008

6    supplemental declaration; is that correct?  Do you

7    see that in front of you?

8        A    Yes.

9        Q    Does this appear to be a copy of the

10   declarations that you submitted in this case?  I'll

11   give you a chance to take a look just to --

12       A    Yes.

13       Q    Now, you performed an event study in this

14   case, correct?

15       A    Yes.

16       Q    How did you select the market index for your

17   regression analysis for your event study?

18       A    The -- I used a broad-based market index

19   called -- it's called NAN but it's a -- it's an

20   index, a composite index that incorporates the --

21   it's a market-weighted index, market capitalization

22   weighted index, and it incorporates stocks on the

23   New York Stock Exchange, the American Stock Exchange

24   and NASDAQ.

25       Q    All right.  So NYSE, AMEX and NASDAQ, right?

Page 11

1       A    Yes.

2       Q    Now, LDK ADS is listed on the NYSE, right?

3       A    That's correct.

4       Q    Your supplemental declaration says that you

5  used the NYSE market index for your preliminary

6  regression analysis; is that right?

7       A    Yes.

8       Q    Where did you get the NYSE data?

9       A    Probably off their website or it's just some

10  sort of an NYSE composite index.  We might have -- we

11  could have gotten it off the NYSE Website or perhaps

12  Bloomberg.  There are a number of sources for

13  those -- for those data.

14      Q    You don't recall which source you got the

15  data from?

16      A    No.

17      Q    Did you produce that data in this case?

18      A    I believe we did.

19      Q    Okay.  In your supplemental declaration at

20  paragraph 2 you state that you didn't receive the NAN

21  Data from CRSP until August 14, 2008?

22      A    Yes.

23      Q    Do you see that?

24      A    Yes.

25      Q    And you revised your regression analysis

Jane Nettesheim                                            9/19/2008

Page 12

1    because it changes the effects of your result; is

2    that right?

3        A   No.

4        Q   No.

5            Why did you revise it?

6        A   I originally, and always intended to use the

7    broad-based NAN index; that's the -- the New York

8    Stock Exchange, the AMEX and the NASDAQ index which

9    I'll just refer to as "NAN."  I always intended to

10   use that because it is a broad-based market index, it

11   is more reflective of the US market.  The -- when we

12   contacted CRSP to obtain those data, they told us

13   they had sold that service to Zacks.

14           We contacted Zacks to obtain the data.  They

15   didn't know anything about this particular index.  We

16   went back and forth between CRSP and Zacks for quite

17   awhile.  I was concerned that no one would be able to

18   provide us the index and the data for 2007 because we

19   didn't have them in-house, the data for 2007, but

20   ultimately we did -- we did receive it from CRSP for

21   2007.

22       Q   Okay.  And you received it on August 14th,

23   right?

24       A   Yes.

25       Q   When did you conclude in your report that

Jane Nettesheim                                                9/19/2008

Page 13

1    LDK's return on October 4, 2007 is statistically

2    significant?

3        A    Well, after I -- I ran the analysis.

4        Q    The analysis on the NYSE data?

5        MR. DEVORE:  Object to the form of the question.

6        THE WITNESS:  No.  I believe the final analysis.

7    BY MR. HARRISON:

8        Q    Okay.  So you concluded that sometime after

9    August 14, 2008 is what you're saying?

10       A    Yes.

11       Q    You realize that if you run the analysis on

12   the NYSE data the October 4, 2007 LDK's return is not

13   statistically significant?

14       A    Yes.

15       Q    Now, that result is an important part of

16   your analysis, right?

17       MR. DEVORE:  Object to the form of the question.

18       THE WITNESS:  I -- I'm not sure what you mean by

19   "important."  It's -- it's -- it's one piece of a

20   large analysis.

21   BY MR. HARRISON:

22       Q    You concluded that the October 4, 2007

23   result is statistically significant, right?

24       A    As a result of using the -- the regression

25   analysis that I incorporated into my report it is a

Page 14

1    statistically -- the residual return on that data is

2    statistically significant.

3        Q    Okay.  And that's a part of your conclusion

4    regarding loss causation in this case, right?

5        A    Well, it's a statistical result that it is

6    statistically significant.

7        Q    Based on the NAN Data?

8        A    Based on using a regression that

9    incorporates the broad-based market index, yes.

10       Q    Okay.  Will you turn to Exhibit 12 of your

11   declaration, please.  And for this exhibit you used

12   the data for NAN or for NYSE?

13       A    For -- I used the NAN market index.

14       Q    Okay.  Would you be surprised to know that

15   if you downloaded the NAN Data from CRSP it doesn't

16   mark the market returns on this exhibit?

17       MR. DEVORE:  Object to the form of the question.

18       THE WITNESS:  I believe we provided the CRSP

19   returns.  Well, we provided the CRSP data to you and

20   I know these were calculated from the CRSP data.

21   BY MR. HARRISON:

22       Q    That was downloaded from CRSP?

23       A    It was obtained from CRSP.

24       Q    Okay.  If it's not accurate based on the

25   CRSP data do you plan to update this exhibit?

Jane Nettesheim                                          9/19/2008

Page 15

1       A    I'm not sure that it's not accurate.  I'm
2   not sure what --
3       Q    Okay.  I'm saying if it is would you update
4   it?
5       A    Well, what -- I'm not sure what's inaccurate
6   about it.
7       Q    Okay.  Fair enough.
8            Now, just backing up a little bit, where is
9   the methodology described for your event study in
10  your report?  The methodology that you chose --
11      A    The --
12      Q    -- for the overall event study.
13      A    Well --
14      Q    Is that in your appendix?
15      A    Partly in the appendix and partly page --
16  sort of a general description starting on page 16 and
17  then a more detailed description in the appendix.
18      Q    Okay.  How did you devise the methodology
19  that you used for your event study?
20      A    It's a -- it's a standard methodology that
21  I've used over a number of years.
22      Q    Okay.  That you've used?  I'm sorry.
23      A    Yes.
24      Q    Did you base it on any peer-reviewed
25  authority?

Page 16

1        A    Well, event studies have been described in

2    many academic articles, I mean they've been used for

3    decades.  I identify -- I think three or four

4    articles are footnoted in the appendix to the report

5    that refer to event studies.

6        Q    Did you use a compilation of those to devise

7    the methodology for your event study, or one in

8    particular?

9        A    It's a standard tool or methodology that's

10   used in economics and finance.  They are described in

11   several articles.  I don't -- there isn't one

12   particular article.

13       Q    There's not one particular article that you

14   use to devise the methodology?

15       A    No, not one particular article, no.

16       Q    Is there a typical peer-reviewed publication

17   that sets forth how event studies should be

18   calculated?  Is there one in particular that you rely

19   on?

20       MR. DEVORE:  Object to the form of the question.

21       THE WITNESS:  There isn't one that I rely on --

22   there isn't one in particular that I rely on.  There

23   are many articles that describe event studies.  There

24   are textbooks that describe event studies.

25   BY MR. HARRISON:

Jane Nettesheim                                                      9/19/2008

Page 17

1       Q    Are you familiar with the textbook Campbell,
2   Lo and McKinley?
3       A    Yes.
4       Q    Do you agree that this is an authoritative
5   source for how event studies can be performed?
6       A    I don't know what you mean by
7   "authoritative," it is a source.  I mean they do
8   describe event studies.  It's a -- I think a fairly
9   standard text.
10      Q    Okay.  So in your industry it's known as a
11  standard text for how to perform event studies you'd
12  say?
13      A    It's -- well, it's one of many.  As I said
14  earlier, there are -- there are many.
15      Q    Okay.  Did you rely on that at all to form
16  the parameters of your event study?
17      A    Not specifically, no.
18      Q    Okay.  Now, in performing your event study
19  did you start by considering every day during the
20  class period as a day?  Did you look at the news on
21  every day of the class period?
22      MR. DEVORE:  Object to the form of the question.
23      THE WITNESS:  I have -- I've looked at at least
24  the -- the summary -- the headlines and the first
25  sentences of articles that are reproduced in

Jane Nettesheim                                                    9/19/2008

Page 18

1    Exhibits -- well, 13 and 14 to my declaration and

2    then other -- other articles; so I have seen the

3    headlines and the initial sentences of articles for

4    every day of the class period.

5    BY MR. HARRISON:

6        Q    Okay.  Did you start your analysis by

7    looking at days in which you saw significant movement

8    in LDK's stock and then try and determine what news

9    might have moved that stock, the movement in the

10   stock?

11       A    I wouldn't say that I started there but

12   it -- that's one of many things that I did but it's

13   not necessarily -- it's not the starting point.

14       Q    Okay.  How did you start then?

15       A    Well, I collected all the news, I collected

16   all the headlines and sort of the lead sentence of --

17   of all of the news during the class period, at the

18   same time conducted a regression analysis, looked at

19   stock prices just -- just to see generally how the

20   stock was moving.  It was a combination of steps.

21       Q    Okay.  And in terms of the cause and effect

22   between news and the stock price movement during the

23   class period you looked at the significant movement

24   first, right, and then you tried to determine whether

25   there was any news that caused that movement; is that

Jane Nettesheim                                         9/19/2008

Page 19

1    a correct statement?

2        A    For -- for part of the analysis.  I mean, I

3    looked at news generally just to see what kind of

4    news was coming out, but I also looked at large and

5    significant returns and looked to see what news there

6    was on those particular dates, also.

7        Q    Okay.  And so, for example, on July 19th,

8    and I can show you this in your report, but you say

9    that it's a day for which there was no

10   company-specific news that caused a significant

11   movement, right?  And that's paragraph 39 of your

12   report.

13       A    Right.  I said that on that -- for that

14   particular date I did not find any news or analysts'

15   reports that were published on that specific date.  I

16   do note news that came out early on the 18th and

17   other news that came out on July 20th.  And I also

18   noted in my report that, you know, I don't have --

19   it's not possible to obtain all of the news --

20       Q    Okay.

21       A    -- at this time that may have been in the

22   market at that time or any other time in the past.

23       Q    Okay.  So, for example, on the 19th you saw

24   what you believe was a statistically significant

25   change in the price and you went to see if there was

Jane Nettesheim                                    9/19/2008

Page 20

1    any news around that that caused that, right?

2         A    Yes.

3         Q    In an event study shouldn't it be the other

4    way around; for example, you look at the news first

5    and then you determine if that news causes a

6    statistically significant change in the price?

7         A    Well, as I said, I looked -- I looked at

8    both things.  I mean, I did look at big price changes

9    but as I said, I also looked at all of the news and

10   the headlines on every day of the class period to see

11   what kind of news was coming in.

12        Q    Isn't it true that in an efficient market

13   there should be material news on all statistically

14   significant days?

15        MR. DEVORE:  Object to the form of the question.

16        THE WITNESS:  You would -- you would generally

17   see news on big stock price movement days but as I

18   said, it's impossible to obtain all of the news --

19   BY MR. HARRISON:

20        Q    Okay.

21        A    -- now for -- you know, that occurred in the

22   past.  We don't have oral communications, we don't

23   have first call reports, we don't know about leakage.

24        Q    So if you do what you did, in part, you say,

25   and look at the statistically significant movement

Jane Nettesheim                                          9/19/2008

Page 21

1    first, it's true that you're likely to find some

2    material news about the company that may have caused

3    that movement in the way that you were performing

4    your analysis, right?

5         MR. DEVORE:  Objection.  Misstates testimony.

6         THE WITNESS:  Could you repeat the question?

7         MR. HARRISON:  I can say it again.  I apologize,

8    it wasn't clear.

9         Q   So if you look for statistically significant

10   days first and then look to see what news might have

11   affected that, you're likely to find some material

12   news about the company that had an effect, right?

13        A   If -- if you look at -- yeah.  If you look

14   at statistically significant returns you would

15   generally find material news about the -- something

16   related to the company on those days.  You generally

17   see that.

18        Q   We talked about the textbook earlier

19   Campbell, Lo and McKinley.  Does that book contain a

20   description of your event study methodology?

21        A   Well, as I recall it's a several-hundred

22   page book.  You'd have to show me what part of the

23   book you're referring to.  I don't -- like I said, I

24   didn't use that book or refer to that book for

25   this -- you know, recently or for this case that I

1    recall.

2         Q    Okay.

3         A    Well, you'd have to show me.

4         Q    So you don't know if it does or not?

5         A    I don't recall.

6         Q    Would you be surprised if it didn't have a

7    description of your event study methodology?

8         MR. DEVORE:  Objection.  Calls for speculation.

9         THE WITNESS:  I don't know.

10   BY MR. HARRISON:

11        Q    Is it your opinion that every statistically

12   significant stock price decline reflects that there

13   was previously misstated information impounded in the

14   stock price?

15        A    Could you repeat it just to make sure I have

16   it clear?

17        Q    Yes.

18             Can you read it back, Laurie.  Thanks.

19             (Whereupon the record was read as

20        follows:

21             "QUESTION:  Is it your opinion

22        that every statistically significant

23        stock price decline reflects that

24        there was previously misstated

25        information impounded in the stock

Jane Nettesheim                                              9/19/2008

Page 23

```
 1      price?")

 2      THE WITNESS:  No.

 3  BY MR. HARRISON:

 4      Q    Okay.  So there can be a statistically

 5  significant drop without fraud, right?

 6      A    Yes.

 7      Q    Okay.  I want to talk about the control

 8  period in your model.

 9          Now, the control period over which you

10  estimated your model was June 11, 2007 to

11  September 28, 2007; is that right?

12      A    Let me just check but I believe -- I believe

13  so.

14      Q    And let me refer you to Appendix --

15      A    Yes.

16      Q    And paragraph 3 explains your selection of

17  the start and end date, right?

18      A    Yes.

19      Q    What is your justification for selecting

20  that period?

21      A    Well, as I said in the report, it's -- you

22  try to use a control period that would be impacted as

23  little as possible from alleged misstatements or

24  alleged disclosures.  Frequently you would use a

25  control period that precedes the class period; in
```

Page 24

1   this case that cannot be done because there was --

2   there was an IPO so there is no trading period or

3   price period before the class period.

4           Another option -- possible option is to use

5   a -- a period following the class period if the

6   company is still in a similar type of situation.  In

7   this case the company returns were not correlated

8   with the market returns in a post period; so the

9   control -- so I used a period that started on a

10  Monday approximately a week after the IPO and

11  continued through the end of September, which was

12  prior to the first alleged disclosures.

13      Q   Okay.  So backing up, you define your

14  control period as an in-class regression, right?

15      A   The control period is within the class

16  period, yes.

17      Q   And that means that the period includes

18  alleged false statements and omissions?

19      A   Yes.

20      Q   Now, you cite at footnote 2 Cornell and

21  Morgan, right?

22      A   Yes.

23      Q   And you rely on that as a source for the

24  methodology that you chose with respect to the

25  control period?

Jane Nettesheim                                              9/19/2008

Page 25

1      A   Well, it's -- I mean, they point out, and

2   this is -- it's not just them, they're just an

3   example of, you know, when you're doing an event

4   study you do try to pick, as I said, a control period

5   that does not incorporate the events.

6      Q   Right.

7          And that publication says that it is

8   important to select a sample period during which the

9   fraud does not affect the normal relation between the

10  security, the market and the industry, right?

11     A   Yes.

12     Q   Okay.  In this case that's not something

13  that you performed, right?

14     A   That's incorrect.

15     Q   I'm sorry?

16     A   That's incorrect.

17     Q   My statement was incorrect?

18     A   Yes.

19     Q   Okay.  How is it incorrect?

20     A   As I -- as I said earlier, I couldn't use

21  a -- a pre-class period for the control period

22  because the stock was not trading and the -- using a

23  control period after the end of the class period

24  resulted in no correlation between the market and the

25  index; so there would have been no regression to use

Jane Nettesheim                                                    9/19/2008

Page 26

1    incorporating the market.

2              So the -- in this case the best -- the best

3    option was to use the period that I -- that I

4    selected, the class period prior to the first

5    disclosures.

6         Q    Okay.  So you're basically stuck with what

7    you've got, right, based on the parameters of the

8    class period; is that right?

9         A    In this case, yes.

10        Q    How did you control for the impact of the

11   alleged false statements and omissions on the

12   relationship between LDK's stock price, the market

13   and the industry?

14        A    During the class period I -- I didn't

15   control them -- for them specifically.

16        Q    What happens to the results of your event

17   study if you use an alternative control period?  And

18   knowing that you in footnote 3 said that you tried a

19   post-class period, right?

20        A    Yes.

21        Q    Okay.  Did you try any alternative control

22   periods?

23        A    I tried -- well, I tried post-period

24   class -- control periods, periods after the class

25   period.

Page 27

1       Q    Right.

2            Anything else?

3       A    Well, I think that's it.  There's the class

4    period and there's after the class period.

5       Q    Did you run your analysis including dummy

6    variables on days for which there were alleged false

7    statements?

8       A    No, I did not.

9       Q    How come?

10      A    Well, I already have a fairly short control

11   period and I'm not sure how -- how effective that

12   would be.

13      Q    All right.  Isn't that a way to control the

14   impact of alleged false statements and omissions

15   during a class period?

16      A    Not necessarily because the -- a statement

17   may be made on a particular day that it's an alleged

18   misstatement but its effects may not be limited to

19   that one particular day.

20      Q    Okay.  That's not something you did in

21   connection with your report, right?

22      A    I -- I did not use dummy variables in my

23   regression analysis, if that's your question.

24      Q    That is my question.  Okay.  Thanks.

25           Now, did you attempt to expand the control

Jane Nettesheim                                                    9/19/2008

Page 28

1   period at all to see if your results would vary?

2        A   In -- in terms of did I -- well, I -- I also

3   looked at a post period which was different --

4        Q   Right.

5        A   -- from this but I didn't try -- I didn't

6   use a control period that used dates before June 11th

7   because I wanted to be a -- a few days after the IPO,

8   and I didn't use a control period that included the

9   dates -- the dates in early October, for example.

10       Q   So based on your last answer did you

11  consider starting the control period on the LDK ADS's

12  first full trading day, the first full close-to-close

13  returns?

14       A   Not that I recall, no.

15       Q   Do you know what that date is?

16       A   The -- June 1st.

17       Q   It's not June 4th, the first close-to-close

18  returns?

19       A   Oh, I'm sorry, the first close-to-close

20  return would be on June 4th.  The first day of

21  trading was June 1st.

22       Q   All right.  And you said that you didn't use

23  a date in early October.  Did you consider using or

24  ending the control period at all on, say, October 2,

25  2007, the day before the PiperJaffray report?

Jane Nettesheim                                          9/19/2008

Page 29

1       A   My -- my motive -- I went through just sort
2  of the end of the month just before October.  I don't
3  know that I considered using October 1st or
4  October 2nd.
5       Q   Okay.  So you're aware that if you use
6  June 4th to October 2nd for your control period that
7  LDK's return on October 4, 2007 is not statistically
8  significant?
9       A   No, I was not aware of that.
10      Q   Okay.  Did you in this case produce raw data
11 for the industry index that you use in your analysis?
12      A   I believe we did.
13      Q   I'm not sure if that's the case; so we'll
14 ask I guess counsel if you have that.
15      A   Okay.  I -- it's my understanding we
16 provided a spreadsheet that had the -- for the
17 companies used in the index we provided the
18 spreadsheet that included the prices, shares
19 outstanding and dividends --
20      Q   Okay.
21      A   -- of those companies.
22      Q   We'll take a look and we can talk about it
23 later.  It's not something you need to worry about
24 now.
25      A   Okay.

Jane Nettesheim                                           9/19/2008

Page 30

1        Q    Now, how did you select the components of

2   your industry index?

3        A    I described that in the report but we

4   started with a number of companies that were

5   identified in analysts' reports as competitors or

6   comparable to LDK or if they listed any companies as

7   possible competitors we would have looked at those,

8   too, if they listed those in their SEC filings.

9             And then most of the companies that we

10  looked at were included in a search we did on

11  Bloomberg, it's -- it's a -- it's a function on

12  Bloomberg where you can identify an industry and in

13  this case we -- we selected the energy -- alternate

14  sources, energy alternate sources, companies that

15  trade in the United States and we limited it to

16  100 companies whose market capitalization was closest

17  to LDK.

18       Q    Okay.  And so setting aside competitors for

19  a moment, the last part of your answer would be the

20  comparable part of your selection, right?

21       A    Identified as -- in the same -- or similar

22  industry by Bloomberg.

23       Q    Okay.  Now, your appendix at paragraph 8

24  says that you used a T-statistic of 1.99 as the

25  threshold to select the components of your industry

Page 31

1    index; is that correct?

2        A    Yes.

3        Q    Why did you use a T-statistic of 1.99?

4        A    The control period was -- I believe it was

5    78 days.  Yeah, it was only 78 observations; so

6    it's -- it's a -- when you have 78 observations that

7    1.99 is the threshold for 95 percent confidence --

8    for a 95 percent confidence interval for

9    T-statistics.  So it was based on a limited number of

10   observations.

11       Q    So the T-statistic of 1.99, isn't that

12   inconsistent with the 1.96 that you cite in Appendix

13   Footnote 11?

14       A    No.  That's a different -- that's a

15   different calculation entirely.

16       Q    Okay.  Now what would happen to your

17   analysis if you were to use a T-statistic of 1.96 to

18   select the components, do you know?

19       A    I could look at one -- I could look at

20   Exhibit 16 and see if there would be companies that

21   would have -- would have been included.  I don't --

22            So if I had used a T of 1.96?

23       Q    Right.

24       A    There's potentially -- I -- I list the

25   T-statistics in Exhibit 10A, and I don't know if this

Jane Nettesheim                                          9/19/2008

Page 32

1   is the case or not but perhaps there's a company in

2   that list that had a T-statistic between 1.96 and

3   1.99.

4        Q    Looking at 10A which you just referenced,

5   are you aware that you would have to include

6   Evergreen Solar in your industry index if you were to

7   use a T-statistic of 1.96?

8        A    Yeah.  I see in the exhibit that that

9   T-statistic is 1.971.

10       Q    Now, are you aware that this single change

11  could potentially render LDK's return on October 4,

12  2007 insignificant in your analysis?

13       A    I'm not aware one way or the other.

14       Q    So you --

15       A    I don't know what it would do.

16       Q    Sorry.  Thought you were finished.

17            So you didn't run any analysis using a

18  t-stat of 1.96, right?

19       A    No.

20       Q    Okay.  You said earlier that the components

21  of your industry index are competitors and comparable

22  firms to LDK, right?

23       A    In a similar industry, yes.

24       Q    So you include, if you look at 10B,

25  Exhibit 10B, you include, and I'll just go by the

Jane Nettesheim                                              9/19/2008

Page 33

1   ticker just to be efficient, you include AVR, HEV,

2   FCEL, PLUG and XNL, right?

3        A    Yes.

4        Q    These are not solar companies, right?

5        A    They are alternative energy companies, but I

6   mean it's clear from Exhibit 10B that they're not all

7   solar companies, yeah.

8        Q    Okay.  Did you run any analysis excluding

9   companies that aren't solar companies and including

10  other solar firms such as ESLR?

11       A    What -- what is ESLR?

12       Q    I'm sorry, Evergreen Solar.

13       A    Oh, well, I didn't run an analysis with

14  Evergreen Solar and I didn't run an analysis using a

15  subset of the companies in Exhibit 10B.

16       Q    Why did you use a value-weighted index for

17  your industry index?

18       A    So that it would accurately represent the

19  industry.

20       Q    And a value-weighted index puts a bigger

21  weight on bigger firms, right?

22       A    Because their values are larger.

23       Q    Did you consider whether your industry index

24  includes large differences in the market

25  capitalization of some of the firms?

Page 34

1       A    I'm sure the market capitalizations are

2    different for the firms.

3       Q    Did you consider --

4       A    But I don't know what their capitalizations

5    are.

6       Q    Sorry, I thought you were finished.

7            Did you consider whether such a large

8    disparity or any disparity for that matter might

9    affect your analysis?

10      A    I'm not sure what you mean.

11      Q    So, for example, if you have two really

12   large firms with huge market caps in your index and

13   at the same time you have a lot of tiny firms with

14   small market caps in your analysis, did you consider

15   whether that would affect the outcome of your

16   results, excluding perhaps the larger ones?

17      A    You're asking me if I -- if I were to redo

18   the analysis without the large firms what --

19      Q    I'm asking if you considered that.

20      A    No, I did not run an analysis excluding

21   large firms.

22      Q    Turning to Exhibit 12 of your report you set

23   forth several different variables in that chart,

24   right?

25      A    Yes.

Page 35

1        Q    And you define "residual returns" there

2    above the table as one residual return equals 1 plus

3    actual return over 1 plus predicted return minus 1;

4    is that right?

5        A    Yes.

6        Q    That's not a standard methodology for

7    predicting or calculating predicted returns, right?

8        A    It -- it's not a calculation at all for

9    predicting returns.

10       Q    Is that a standard methodology to determine

11   residual returns?

12       A    There are at least two ways of -- of

13   calculating a residual return.  That's the geometric

14   residual return.  You could also calculate the

15   arithmetic residual return as I describe in the

16   report which is used to calculate the Z-score.

17       Q    The formula, is that a correct way to

18   describe it, "the formula," the formula you used to

19   calculate residual returns?

20       A    On --

21       Q    Is that a formula?

22       A    In Exhibit 12?

23       Q    Yes.

24       A    There is a formula -- there are two formulas

25   at the top and there is one for residual return.

Jane Nettesheim                                          9/19/2008

Page 36

1       Q    Okay.  The formula for residual returns,

2   that's not consistent with the formula that you

3   describe in footnote 9 of your report, right?

4       A    Correct.  As I said earlier in my report the

5   footnote 9 describes the arithmetic residual return,

6   the formula in Exhibit 12 is the geometric residual

7   return.

8       Q    Okay.  So you used the geometric method in

9   your exhibit, right, Exhibit 12?

10      A    I -- again, as I said earlier, I show the

11  geometric residual return on the exhibit but I used

12  the arithmetic residual return to calculate the

13  Z-score.

14      Q    Why did you use the different formula, if

15  you will?

16      A    Well, it depends on what you're trying to

17  calculate.

18      Q    Okay.

19      A    If you were trying to determine if a number

20  is statistically different from its expected number,

21  regardless of what test you're doing, you would use

22  the arithmetic difference.  If you were looking at

23  the company-specific return over a day, the more

24  correct way to look at it, because the base changes

25  from day to day because the price changes from day to

Jane Nettesheim                                    9/19/2008

Page 37

1   day, is to use the geometric residual return.  It

2   incorporates the fact that there's a change in the

3   base as the price changes.

4        Q    In footnote 12 of your appendix you cite

5   Mitchell and Netter, right?

6        A    Yes.

7        Q    And those authors use the standard

8   definition of "residual returns" to calculate --

9             Let me rephrase that.

10            Those authors use the standard method which

11  you described as the arithmetic method to calculate

12  residual returns, right?

13       A    Well, since they're trying to calculate

14  Z-scores I would guess that they did but let me look.

15            I don't see in the -- what -- the piece of

16  the article that I cited I don't see them saying that

17  specifically but since they are -- as I said, they

18  are talking about calculating Z-statistics.  I -- and

19  they're talking about normal returns.  I think that

20  they would have calculated the -- the arithmetic

21  difference.

22       Q    Okay.  As you can probably guess I'm not an

23  economist so I'm going to ask you if you could

24  possibly explain what "Z-score" means.

25       A    It's -- it's -- basically it's -- it's --

Jane Nettesheim                                          9/19/2008

Page 38

1   it's the -- the formula is it's the -- it's the

2   actual return minus the predicted return divided by

3   the standard error.  But it's a measure -- the

4   statistical measure of how far the actual -- or I'm

5   sorry, how far the -- yeah, how far the actual return

6   deviates from its predicted return in the -- in this

7   particular case.  It could be applied to many

8   statistical measures, you know, looking at many

9   things but it's -- but it's a statistical or a

10  standardized measure of how far one number deviates

11  from its expectation.

12       Q    How does that relate to the residual return

13  on a stock?

14       A    The residual return is the difference

15  between -- in this case to calculate the Z-scores the

16  difference between the actual return and the -- and

17  the predicted return.  It's the actual return minus

18  the predicted return.

19       Q    You also describe in appendix footnote 11 a

20  Z-statistic.  What's the difference between a

21  T-statistic and a Z-statistic?

22       A    The T-statistic is -- it's also a measure of

23  whether or not a variable is different from some sort

24  of a -- it's a way to test a hypothesis to see

25  what -- in this case to test whether or not a

Jane Nettesheim                                              9/19/2008

Page 39

1    regression coefficient is statistically significantly

2    different from zero.  The distribution of that

3    coefficient is not normal, it's not a normal

4    distribution, it's a T distribution.

5              In this case when I'm looking at the

6    Z-statistic for the individual predicted returns, the

7    individual returns are normally distributed; so I

8    used a Z-statistic.

9         Q    Okay.  Are there academic peer-reviewed

10   publications that justify using a Z-score in this

11   type of analysis?

12        A    Well, I think, you know, you've -- I've got

13   the -- the Mitchell and Netter article here that does

14   talk about Z-statistics.

15        Q    Is that an authoritative publication?

16        A    Again, I don't know that I would call it

17   authoritative.  It's -- it's -- well, I think a

18   well-known article.  I -- I don't know how others

19   would characterize it, but --

20        Q    Okay.  Now just going back to Exhibit 12,

21   back to the formula described there above the table

22   for residual return --

23        A    Yes.

24        Q    -- you describe that as the geometric

25   formula, right?

Page 40

1    A   Yes.

2    Q   Okay.  Have you used that formula before to

3  calculate predicted returns?  I mean, I'm sorry,

4  residual returns.

5    A   Not for the purpose of -- of calculating a

6  Z-score and I didn't use it for that purpose here

7  either.  It's -- but for the purpose of identifying

8  the company-specific return on a particular day, yes.

9    Q   Okay.  You've used it in prior engagements

10 to offer expert testimony in a securities case,

11 you've used that formula?

12   A   Yes.

13   Q   Do you recall filing a declaration in a case

14 called Isolagen Securities Litigation in

15 Pennsylvania?

16   A   Yes.

17   Q   Did you use that formula to calculate

18 residual returns for that stock, that company stock?

19   A   I -- I don't recall what I did in that

20 report.

21   Q   Okay.  If you didn't use it in that case why

22 would you use it here to calculate residual returns?

23   A   Well, I'm not sure what I -- I don't recall

24 what I did in that report; so I -- I'm not sure

25 whether I did or did not use it in -- or why.

Jane Nettesheim                                                  9/19/2008

Page 41

1      Q    Okay.  Is there a reason why you used this

2   return, this formula instead of the arithmetic

3   formula to calculate residual returns in this case?

4      A    Well, as I've said now several times I used

5   both formulas in this case.  I used the arithmetic

6   difference to calculate -- in the formula to

7   calculate the Z-score.  The formula is in footnote --

8   footnote 11 of the appendix.

9           And then on Exhibit 12 I used the geo- -- I

10  show the geometric return to show the

11  company-specific -- is a better measure of the

12  company-specific return on that day.

13     Q    Okay.  I think I understand that so I'll

14  move off of this exhibit.

15          Let's see, paragraph 17 of your report,

16  let's take a look at that real quick.  That paragraph

17  states, "Call options and put options on a particular

18  stock are considered derivative securities of the

19  stock and their prices depend upon the price of the

20  underlying security"; is that right?

21     A    Yes.

22     Q    Is it true that options traders rely on more

23  than the price of the stock when buying and selling

24  options?

25     A    Yes.

Jane Nettesheim                                    9/19/2008

Page 42

1       Q    What determines the value of call and put

2   options in your opinion?

3       A    The -- their prices?

4       Q    Right.

5       A    Well, a piece of it would be the -- the

6   price of the underlying security.  There's also the

7   time to expiration, the volatility of the returns of

8   the underlying security, the strike price and

9   underlying interest rates, risk-free interest rates.

10      Q    And these factors that you cited, is that

11  commonly known as the Black-Scholes model?

12      A    Those factors are used in the Black-Scholes

13  model.

14      Q    Used?

15      A    Yes.

16      Q    Okay.  And the fifth factor that

17  Black-Scholes discusses is the underlying stock price

18  which we already discussed, right?

19      A    Well, it's one of the factors, yes.

20      Q    Okay.  In addition to the four that you gave

21  me?

22      A    Yes.

23      Q    Okay.  Would you agree with me that an

24  investor who writes calls takes a short position in

25  the stock?

Jane Nettesheim                                      9/19/2008

Page 43

1        A    It would be comparable to taking a short

2    position.

3        Q    Okay.  So it would be comparable to short

4    selling the stock?

5        A    It wouldn't have exactly the same payoff

6    pattern.

7        Q    Short sale also a short position in the

8    stock?

9        A    Correct.  It would be the -- be exactly the

10   same payout pattern.

11       Q    But both short positions in a company stock,

12   right?

13       A    They are positions that are more likely to

14   be more profitable if the stock price goes down.

15       Q    Right.

16       A    But they're not exactly the same payout.

17       Q    Do you know what a margin call is?

18       A    I'm not an expert on that, I just have a

19   basic understanding.

20       Q    Are you aware as part of your basic

21   understanding that margin calls involve more risk

22   than a standard call?

23       A    I'm sorry, are you -- are you talking about

24   calls sold on margin?

25       Q    Yes.

Jane Nettesheim                                                9/19/2008

Page 44

1        A    I'm sorry, I thought you were talking

2    generically about a margin call.

3        Q    Yes, calls sold on margin.

4        A    Okay.  I don't know about that specifically.

5        Q    You don't know whether that involves more

6    risk?

7        A    That wouldn't surprise me but I -- sitting

8    here I'm not an expert on that and so I -- I couldn't

9    say definitively.

10       Q    Okay.  Let's take a look real quickly at

11   Exhibit 18 of your report.  Exhibit 18 shows that

12   this discusses put/call parity during the class

13   period; is that right?

14       A    Yes.

15       Q    And it shows that the put/call parity is

16   violated 6.2 percent of the time when there's a call

17   and put and then it's a -- well, let me back up.

18            This exhibit shows that the put/call parity

19   is violated 6.2 percent of the times when there's a

20   purchase of a call, a sell of a put in a short stock,

21   right, in your table?

22       A    When -- yes, that particular transaction

23   or -- yes.

24       Q    The impact on the market efficiency of call

25   and put options, is the impact of that number

1   discussed anywhere in your report?

2        A    Well, I'm not sure what you mean by "impact

3   of that number."

4        Q    Well, maybe I can phrase it in a different

5   way.

6             That number is supportive of a conclusion

7   that the market for puts and calls in LDK's stock was

8   not efficient, right?

9        MR. DEVORE:  Object to the form of the question.

10       THE WITNESS:  No.  My opinion was that the

11  market for the stock and the puts and the calls was

12  efficient.

13  BY MR. HARRISON:

14       Q    Right.

15            The 6.2 violation that is set forth in your

16  exhibit is supportive, though, of lack of market

17  efficiency for puts and calls in LDK's stock, right?

18       A    No, I -- I don't agree.

19       Q    Is that discussed anywhere in your report?

20       A    It's discussed that there were very few

21  violations.  I would consider that very few.

22       Q    6.2 you'd consider very few?

23       A    Yes.

24       Q    Do you base that on any authoritative

25  literature?

1        A    Well, then I also did the disparity

2   calculation and determined that the dis- -- the

3   disparities are consistent with disparities

4   calculated from a study that looked at thousands and

5   thousands of options.

6        Q    And when you say "disparity," are you

7   talking about the --

8        A    Yes.

9        Q    -- bottom table on your chart?

10       A    Uh-huh, yes.

11       Q    Okay.  Your chart shows that the average

12  size of violations in that column is .564 percent,

13  right?

14       A    That's -- if there is a violation, that's

15  the size of the violation.  I mean, most of the

16  violations are zero.

17       Q    Okay.

18       A    The vast majority are zero.  But if there

19  was a violation, that's the average size of the

20  violations.

21       Q    Isn't that the average size of violations,

22  higher than in the Evans study that you cite at

23  footnote 44 of your report?

24       A    They calculated the disparity measure

25  differently and they included in their measure the

Jane Nettesheim                                          9/19/2008

Page 47

1    average of all the violations.  If I were to

2    include -- in the top table if I were to include the

3    average of all of my pairs, the average would be

4    about zero because 94 percent of them are zero and --

5    of -- 95 out of 1500 are something other than zero or

6    larger than zero.

7          The bottom table is a -- is another way of

8    looking at put/call parity.  It's a slightly

9    different -- it's a different kind of analysis, I

10   don't think you can really compare them, but they

11   look at the average across all of the pairs that

12   they're examining in their -- in their sample.

13       Q   I see.  Okay.  Thanks for the explanation.

14          Did you analyze volume of options during the

15   class period in connection with your report?

16       A   I didn't analyze the volume specifically.  I

17   looked at -- I included in the -- the analysis of

18   put/call parity, I included the pairs on -- I

19   incorporated a pair in the analysis if there was

20   volume in either the put or the call on a particular

21   day.  Or both.

22       Q   Did you analyze volume and bid as spreads

23   for options during the class period in connection

24   with your report?

25       A   I don't understand the question.

Page 48

```
 1       Q   Let me rephrase it.  I'm just going to
 2   strike that one.
 3           Let's just back up a little bit to some of
 4   the general aspects of your report.
 5           Exhibit 1 is your CV, right?
 6       A   Yes.
 7       Q   Is that accurate and up to date?
 8       A   Yes.
 9       Q   Are there any qualifications relevant to
10   your report or your testimony today that aren't
11   listed in the CV, Exhibit 1?
12       A   Not -- no.
13       Q   Exhibit 2 to your report is a list of your
14   testimony, right, prior testimony?
15       A   Yes.
16       Q   Is that list complete and accurate and up to
17   date?
18       A   Yes.
19       Q   In approximately how many cases have you
20   served as an expert witness?  Would I just have to
21   count these to know that?
22       A   Well, this is the number of times where I've
23   been deposed or I've testified.  And then I've been
24   retained in other cases as an expert and may have
25   filed a report or maybe it didn't even get to that
```

Page 49

1    phase; so there are more than the number of cases in

2    this list.

3        Q    Okay.  So if you include that, how many

4    cases involved violations, alleged violations of the

5    federal securities laws?  I think I counted three

6    that you testified in.  Are there more for which you

7    provided a report and didn't testify?

8        A    I think there are five where I testified

9    and -- and then probably another -- my best guess is

10   10 to 20.

11       Q    Okay.  In those 10 to 20 cases did you

12   testify on behalf of a defendant ever?

13       A    In those additional 10 to 20, those are

14   cases where I have not testified.

15       Q    Oh, I'm sorry.  Let me back up, then.

16   Thanks for pointing out the distinction.

17           In all the securities cases for which you've

18   served as an expert, including the ones you didn't

19   testify in, did you testify on behalf of the

20   plaintiff in the case?

21       A    Yes.

22       Q    And why is that?  Is there a reason for

23   that?

24       A    Well, I -- I was retained by plaintiff's

25   counsel in those cases.

Jane Nettesheim                                                    9/19/2008

Page 50

1        Q    And I take it from your discovery responses
2   in this case that you've never testified as an expert
3   on behalf of a defendant in a securities case?
4        A    That's correct.
5        Q    Let me just for the record mark the subpoena
6   and your responses.
7             This will be 9 and 10.
8             (Defendants' Exhibits 9 and 10
9        were marked for identification and are
10       attached hereto.)
11       THE REPORTER:  Exhibit 9 and Exhibit 10.
12  BY MR. HARRISON:
13       Q    Okay.  Have you had a chance to take a look
14  at these?  I'm not going to ask you specific
15  questions here on all of these but --
16       A    Okay.
17       Q    I was just going to ask on Exhibit 9, the
18  subpoena, there's a Section C for requests, and I
19  just wanted to make sure that subject to the
20  objections in your response, you've searched for and
21  produced all the records responsive to the subpoena?
22       A    Yes.  Yes.
23       Q    Now, by agreement between the parties that's
24  set forth at paragraph 10 of your response, I'm not
25  going to ask you about the content of your

Page 51

1   communications with the attorneys in this case, but I

2   am going to ask you about the nature of your

3   retention, sort of the parameters of your work.

4   Okay?

5        A   Yes.

6        Q   When were you first contacted about this

7   case?

8        A   My best estimate is June or possibly early

9   July of this year.

10       Q   Okay.  And who contacted you?

11       A   Well, it was somebody in my office who

12   called me and told me that -- that our office had

13   been contacted asking for me.

14       Q   Who was that person in your office?

15       A   As best that I recall I believe it was Faye

16   Fort.

17           And Faye is spelled F-A-Y-E.

18       THE REPORTER:  And fort is F-O-R-T?

19       THE WITNESS:  Correct.

20       THE REPORTER:  Thank you.

21   BY MR. HARRISON:

22       Q   What did you discuss with --

23           Is it Mr. or Ms. --

24       A   Ms. Fort.

25       Q   Ms. Fort.  You never know.

Jane Nettesheim                                                    9/19/2008

Page 52

1              Okay.  So what did you discuss with Ms. Fort

2    about this case?

3         A    She told me that -- and I believe it was

4    Faye, that she -- that she had received a phone call

5    I believe from Mark Willis, and I believe he

6    described the case to her because she described the

7    parties to me and just sort of generally what the

8    case was about.

9         Q    What were your initial thoughts about the

10   lawsuit when you initially were approached about it?

11        MR. DEVORE:  Objection.  Vague.

12        THE WITNESS:  I'm not sure I had any thoughts

13   about the lawsuit.

14   BY MR. HARRISON:

15        Q    Okay.  How much detail did you get about the

16   case when you first spoke with Ms. Fort?

17        A    I think she just gave me just some general

18   information, where the case was filed, who the law

19   firm was, that it was Cohen Milstein who contacted

20   us, that it was a securities class action.  And then

21   I believe she had received a copy of the complaint.

22   At some point she had E-mailed to me a copy of the

23   complaint.

24        Q    Okay.  Do you remember when you first had a

25   chance to read the complaint?

1      A    Either in June or early July.

2      Q    After reading the complaint what were your

3   initial thoughts about the lawsuit?

4           I'll be more specific.

5           Did you have an initial impression that the

6   market for LDK's stock was sufficient?

7      A    Not one way or the other from reading the

8   complaint, no.

9      Q    Did you have an initial impression that the

10  defendants had made material misrepresentations that

11  inflated LDK's stock price?

12     A    I didn't have any impressions.  I read the

13  information from the complaint that alleges that.

14     Q    Did you have any initial impression that the

15  corrective disclosures alleged in this case revealed

16  the truth of these misrepresentations on October 3rd

17  and 4th?  I mean, excuse me, October 3rd and 8th.

18     A    No impressions.  I read the complaint and

19  saw certain allegations.

20     Q    Now, as you prepared your report did you

21  discuss it with anyone outside of the attorneys at

22  Cohen Milstein?

23     A    The people in my office.

24     Q    What did you discuss?

25     A    I discussed the allegations with them, I

Jane Nettesheim                                          9/19/2008

Page 54

1    discussed the time period, I discussed the tasks that

2    they would do, the tasks that I would do, directed

3    the work product.  Things of that nature.

4        Q    Okay.  Did you communicate with anyone

5    outside of your firm about this case?  And setting

6    aside communications with your attorneys -- or let me

7    strike that.

8             Setting aside communications with Cohen

9    Milstein and the folks in your office, did you

10   communicate with anyone else about this case in

11   preparing your report?

12       A    Not that I recall, no.

13       Q    Besides the materials cited in your report

14   and those that you produced in this case, are there

15   any other materials that you reviewed or used to

16   prepare your report?

17       A    As -- as I sit here, not that I recall.

18       Q    Okay.  Now, the report that you prepared in

19   this case is essentially sort of your standard report

20   on market efficiency, materiality and loss causation,

21   right?

22       A    It's a format that I've used in other cases,

23   yes.

24       Q    So, in other words, you used sort of the

25   same language in other cases and then insert the

Page 55

1   facts and analysis relevant to the specific

2   litigation; is that right?

3       A    Much of the language is -- is the same but

4   not all of it.

5       Q    And much of the factual information that you

6   include in your report is based on the complaint in

7   the case; is that correct?

8       MR. DEVORE:   Object to the form of the question.

9       THE WITNESS:   I'm not sure what you mean by

10  "much of the factual information."

11  BY MR. HARRISON:

12      Q    Okay.  Well, for example, the class period.

13      A    Oh, there -- there is information in the

14  declaration -- in the report that is based on the

15  complaint.

16      Q    Okay.

17      A    I don't know that I would consider that much

18  of the information in the report is based on the

19  complaint, though.  That was my confusion.

20      Q    Oh, I see.  Okay.

21          So some of the information that is included

22  in your report is gleaned from the complaint in this

23  case?

24      A    Yes.

25      Q    Are portions of your report based on

Page 56

1    allegations of the complaint that the plaintiff

2    intends to prove at trial?

3         A    It's -- it's my understanding that, as I

4    describe in the report, that certain -- the plaintiff

5    intends to prove that certain news events were

6    disclosures.

7         Q    Okay.  And when you say "disclosures," do

8    you mean corrected disclosures?

9         A    Yes, related to the fraud.

10        Q    And you based your report on the plaintiffs'

11   allegations about those disclosures, or at least your

12   conclusions regarding loss causation?

13        MR. DEVORE:  Object to the form of the question.

14        THE WITNESS:  Certain of my conclusions

15   regarding loss causation incorporate assumptions, as

16   I describe in the report, and I'm assuming that the

17   allegations in the report are true.

18   BY MR. HARRISON:

19        Q    Now, setting aside the sort of language or

20   analysis that you've used in prior cases that we

21   discussed, how much time did you spend generally

22   preparing the report in this case?

23        A    Ten -- well, tens of hours, probably at

24   least 40 to 60, I don't know, but I -- but I really

25   don't know.

Page 57

```
 1      Q    40 to 60 hours.

 2           Any other folks in your office spend

 3  significant time?

 4      A    Yes.

 5      Q    Do you have a general sense for the time

 6  that they spent working on this report?

 7      A    More -- more hours than I did.

 8      Q    Okay.  40 to 60 hours, is that above or

 9  below the usual time that you spend on expert

10  reports?

11      A    It varies widely.

12      Q    Based on the nature of the case?

13      A    Yes.  And the nature of the -- what I'm

14  asked to do, what kind of report -- report it is,

15  yes.

16      Q    Okay.  How about a report on loss causation,

17  materiality and market efficiency, above or below the

18  same amount of time?

19      A    I don't recall how many hours I've spent on

20  other cases.  I would say this falls -- I would say

21  this falls probably in the middle.

22      Q    Okay.  It may be in here and I apologize if

23  it is, but do you have an hourly billing rate?

24      A    Yes.  4- -- it's in the report but --

25      Q    Sorry.  I just looked at it, the first page
```

Jane Nettesheim                                                      9/19/2008

Page 58

1    and I saw it; so --

2              Okay.   495, right?

3         A    Yes.

4         Q    So if I, you know, take 495 times 40 to

5    60 hours is that generally probably what you've

6    billed for this report?

7         A    For my time?

8         Q    Yes.

9         A    The company would have billed -- I don't do

10   the billing, I'm an employee.   The company, as far as

11   I know, would take the number of hours that I put

12   down in the record and would multiply it by 495.

13        Q    Okay.   Do you know generally how much your

14   firm charged for this report?

15        A    As I recall it was something over $100,000,

16   but I don't recall specifically.

17        Q    I keep interrupting you, I really apologize.

18             What, if anything, did you do to prepare for

19   today's deposition?

20        A    I reviewed both of my declarations.   I

21   reviewed the complaint.   I looked through some of the

22   documents we provided in the document production

23   to -- well, I provided it to Cohen Milstein.

24        Q    Okay.

25        A    I went and met with Mr. Devore.

Jane Nettesheim                                          9/19/2008

Page 59

1      Q    How long was your meeting with Mr. Devore?

2      A    Approximately four to five hours.   About

3   four hours.

4      Q    Did you look at any other documents or data

5   in addition to the documents that you've already

6   described to prepare for this deposition?

7      A    I don't recall looking at other things.

8      Q    Did you speak with anyone else besides

9   Mr. Devore about this deposition?

10      A    Yes.

11      Q    And who is that?

12      A    Faye Fort, Bennett Woo, and I think that's

13   it.

14      Q    What did you discuss in relation to the

15   deposition?

16      A    Well, I gave them the schedule for the

17   deposition.

18      Q    Anything about the substance of this case?

19      A    I asked them some questions about -- I don't

20   recall specifically but I know I went through some of

21   the news articles and some of the data, we talked

22   about things like that, but I don't recall anything

23   specifically but --

24      Q    Okay.   Bennett Woo, another employee in your

25   office?

Jane Nettesheim                                                    9/19/2008

Page 60

1       A    Yes.

2            And his last name is spelled W-O-O.

3       Q    By the way, I didn't mention this in the

4   beginning, but whenever you need to take a break just

5   let me know.  We've been going for about an hour and

6   ten minutes; so I'll just keep talking for another

7   20 minutes unless you want to stop; so just let me

8   know.

9       A    That's fine.

10      Q    Okay.  All right.  Let's just look at your

11  report generally, paragraph 3.  Do you agree that

12  addresses the scope of your opinions in this case?

13      A    Yes.

14      Q    And generally the parameters of your

15  opinions are on three topics, right?  Three general

16  topics?

17      A    Yes.

18      Q    Those are market efficiency of LDK's ADS and

19  options during the class period, right?

20      A    Yes.

21      Q    And materiality pertaining to the alleged

22  representations and omissions during the class

23  period?

24      A    Yes.

25      Q    And loss causation pertaining to the alleged

Page 61

1   representations and omissions during the class

2   period?

3        A    Yes.

4        Q    Would you agree with me that the primary

5   focus of your report is market efficiency?

6        A    It certainly is most of the pages in the

7   report.

8        Q    Okay.  Why is it?  Why does it take up most

9   of the space in your report?

10       MR. DEVORE:  Objection.  Vague.

11       THE WITNESS:  There's no particular reason.  I

12   think to go through the various analyses it took more

13   pages.

14   BY MR. HARRISON:

15       Q    Okay.  Your report doesn't offer any

16   analysis or opinions on potential damages in this

17   case, right?

18       A    That's correct.

19       Q    How come you don't offer an opinion on

20   damages?  Is there a reason for that?

21       A    I wasn't asked to address that issue.

22       Q    Do you have any opinion as to damages at

23   this time?

24       A    No.

25       Q    Do you have any opinion as to whether the

Page 62

1   lead plaintiff in this case suffered losses?

2       A   Other than I believe I read a sentence in

3   the complaint that said he did, I don't know one way

4   or the other.

5       Q   Okay.  Are you aware of the definition of

6   the proposed class in this case, the class members?

7       A   Generally, but just from what I've read in

8   the complaint.

9       Q   Would you agree with me that it includes

10  purchasers of LDK ADS and call options and sellers of

11  put options on LDK ADS; does that sound right?

12      A   During a certain time period, yes.

13      Q   During the parameters of the alleged class

14  period?

15      A   Yes.

16      Q   And that's June 1st through October 7th?

17      A   Yes.

18      Q   Okay.  Does the proposed class include

19  investors -- well, let me back up for a second.

20          The way the class is defined includes

21  investors who took long positions in LDK's stock,

22  right?

23      MR. DEVORE:  Objection.  Calls for a legal

24  conclusion.

25      THE WITNESS:  Well, it includes purchasers.

Jane Nettesheim                                              9/19/2008

Page 63

1    BY MR. HARRISON:

2        Q    That's a long position?

3        A    Generally, yes.

4        Q    Purchase of call options, long position?

5        A    That's my understanding, yes.

6        Q    Sellers of put options, long position?

7        A    I'm not sure what you mean by -- I don't

8    know that that would be a long position in the put

9    options.  It would be they would be selling put

10   options.

11       Q    Seller --

12       A    It includes sellers of put options.

13       Q    That's what I meant, seller of put options,

14   long position, based on an expectation that the stock

15   price would go up?

16       A    It's not a long position in the put option

17   but it's --

18       Q    Yes.

19       A    -- a sale of the put option.

20       Q    Okay.  I understand.

21            Are you aware of whether or not the proposed

22   class excludes investors who took short positions in

23   LDK's stock?

24       MR. DEVORE:  Objection.  Calls for a legal

25   conclusion.

Jane Nettesheim                                          9/19/2008

Page 64

1        THE WITNESS:  I don't recall specifically what

2    the complaint says.

3    BY MR. HARRISON:

4        Q    Do you know if it excludes short sellers?

5        MR. DEVORE:  Same objection.

6        THE WITNESS:  I -- I would look to the complaint

7    to -- to answer that question.

8    BY MR. HARRISON:

9        Q    Okay.  Do you know if it excludes those who

10   took both long and short positions but didn't suffer

11   any net losses?

12       MR. DEVORE:  Same objection.

13       THE WITNESS:  Again, I'd have to look at the

14   language in the complaint.

15   BY MR. HARRISON:

16       Q    That's not something that you've analyzed or

17   thought about in connection with your report?

18       A    That's correct.

19       Q    Okay.  And by the way, I may refer to

20   members of the proposed class as "LDK investors" just

21   to simplify it so I don't have to go through the

22   whole definition.  Does that make sense?  Is that

23   okay?

24       A    Yes.

25       MR. DEVORE:  Well, can you refer to them as

Page 65

1    "class members"?

2          If your theory is that some LDK investors

3    are not class members, which sounds like what your

4    last questions were about, it might be clearer for

5    the record if you call them --

6       MR. HARRISON:  Okay.  I'll do my best.  And if

7    it doesn't make any sense in the context of the

8    question, then I'll restate it.

9          I'm sure you'll point it out if it's vague

10   or unclear.

11      MR. DEVORE:  Maybe I will, if I remember.

12      MR. HARRISON:  Okay.  Fair enough.  And if it's

13   not clear then that's my fault for creating a bad

14   record.

15      Q   Prior to October 3, 2007, did proposed class

16   members rely on LDK's financial statements to make

17   their investment decisions?

18      MR. DEVORE:  Object to the form of the question.

19      THE WITNESS:  I'm not aware of what any

20   particular investor looked at.

21   BY MR. HARRISON:

22      Q   Are you aware generally what the market

23   relied upon before October 3, 2007 with respect to

24   LDK when making investment decisions?

25      A   I'm aware of things that were -- information

Jane Nettesheim                                                    9/19/2008

Page 66

1    that was -- certain information that was available.

2    I'm aware of things that were talked about in some

3    news reports.

4        Q    Are you aware if the market generally relied

5    upon LDK's financial statements in making investment

6    decisions prior to October 3rd?

7        A    I don't know what the market relied upon

8    specifically.

9        Q    You describe in your complaint the fraud of

10   the market presumption, right?

11       A    Generically, yes.  Generally.  Generally,

12   yeah.

13       Q    And that presumes that the market relies on

14   all information in the market at the time, right?

15       A    Yes.

16       Q    Okay.  All information or most information?

17       A    Well, publicly available information.

18       Q    Publicly available.  Okay.

19            So prior to October 3, 2007, that

20   information would include the financial statements

21   issued by the company, right?

22       A    The information in the marketplace would

23   include that, among other -- other very -- a large

24   amount of other information.

25       Q    Okay.  Prior to October 3, 2007, did

Page 67

```
 1   potential class members rely on the alleged false
 2   statements and omissions made by the defendants in
 3   this case?
 4       A    Again, I don't know what any individual
 5   investor specifically relied on.
 6       Q    Okay.
 7       A    I can talk about what was available, what
 8   kind of public information was available.
 9       Q    You opine that LDK's stock price was
10   inflated during the class period, right?
11       A    Yes.
12       Q    Based on alleged misrepresentations and
13   omissions by the defendants in this case?
14       A    I think that opinion was based on the -- the
15   stock price response to the alleged disclosures.
16       Q    So if I understand you correctly, you're
17   saying that the alleged corrective disclosures took
18   out the inflation that was in the stock during the
19   class period, right?
20       A    I haven't done an analysis of inflation.
21       Q    Okay.  Would you agree with me if the stock
22   during the class period, LDK's stock was, as it's
23   alleged in the complaint, inflated during the class
24   period, that investors relied on the alleged false
25   statements made by defendants in this case?
```

Page 68

1       A    Yes.

2       Q    You're aware in connection with your work

3   that on October 3, 2007, PiperJaffray issued a

4   research note regarding LDK, right?

5       A    Did you say on October 3rd?

6       Q    Yes.

7       A    Yes.

8       Q    And you've read that note?

9       A    Yes.

10      Q    Okay.

11           Let's mark it.

12      THE REPORTER:  Exhibit 11.

13      MR. HARRISON:  Thanks.

14      MR. DEVORE:  Actually, before you remark this,

15   this was marked at the last deposition.  It might be

16   easier if we just use the same exhibit number.

17      MR. HARRISON:  Yes.  Let's do that if that's

18   easier.

19           Do you have that?

20      MR. DEVORE:  This document was previously marked

21   as Exhibit 4.

22      MR. HARRISON:  Okay.  Let's go with 4 then.

23      THE REPORTER:  Do you have a copy of the

24   officially marked exhibit?

25      MR. DEVORE:  You know, I don't.

Page 69

1       MR. HARRISON:  Is it this, this one, this

2    version?

3       MR. DEVORE:  Yes, it's the same document.

4    BY MR. HARRISON:

5       Q   I'll give you a second to take a look at

6    this if you need to, but I'll ask you just

7    generally --

8           First let me identify it.

9           This is Exhibit 4, it's a PiperJaffray

10   company note on October 3, 2007.  It says, "LDK Solar

11   Update; Takeaways From Management Meetings."

12          Do you see that?

13      A   Yes.

14      Q   Okay.  And you've read this research note?

15      A   Yes.

16      Q   Okay.  And among other things this note

17   states that "We have confirmed that the LDK financial

18   controller recently left the company.  We are also

19   aware of the former controller's allegations of poor

20   financial controls and a 250MT inventory discrepancy;

21   allegations were made both to the SEC and the

22   external auditor KPMG."

23          Do you see that?

24      A   Yes.

25      Q   And you're aware from your work on this case

Jane Nettesheim                                          9/19/2008

Page 70

1   that the LDK financial controller referenced in this

2   report is a gentleman by the name of Charley Situ?

3        A   Yes.

4        Q   Now, is it your opinion in this case that

5   after the October 3rd PiperJaffray research note was

6   issued, LDK investors relied on the alleged false

7   statements and omissions made by the defendants in

8   this case?

9        A   I'm --

10       MR. DEVORE:  I'm going to object to the extent

11  it calls for a legal conclusion.

12            But you can try to answer it.

13       THE WITNESS:  Well, I think in- -- investors

14  would have been aware of different pieces of

15  information.  I'm not sure what you mean by "relied

16  on" after reading this report.

17  BY MR. HARRISON:

18       Q   Okay.  You said that investors were aware of

19  certain pieces of information.  Is this one of those

20  pieces of information that investors became aware of

21  on October 3, 2007?

22       A   One of several pieces of information, yes.

23       Q   Okay.  Is this the first piece of

24  information that came out discussing Mr. Situ's

25  allegations of inventory discrepancies?

1    A    Well, he isn't -- he is not -- Mr. Situ is

2    not identified, although the controller is.  This is

3    the first analyst report where I've seen -- seen

4    this.

5    Q    Do you know what time of day on October 3rd

6    this company note was issued?

7    A    This particular report I believe was issued

8    late in the afternoon.  I don't know if there were

9    other -- for example, I don't know if they issued a

10   first call report earlier or, you know, what

11   discussions there were in the brokerage firm with

12   clients.  But I believe this particular -- this form

13   of this analyst's report was -- was issued later in

14   the afternoon.

15   Q    And what's a first call report?

16   A    It's an electronic filing of an analyst's

17   report.  And sometimes they will send out a -- sort

18   of an abbreviated report and then produce something

19   that's a little bit more -- this is laid out much

20   more nicely; so they'll produce something like this

21   later.

22   Q    Okay.  Did the October 3rd disclosure, and

23   I'll just refer to this as the PiperJaffray report on

24   October 3rd, did this October 3rd PiperJaffray report

25   about LDK's inventory make the prospects of LDK more

Jane Nettesheim                                          9/19/2008

Page 72

 1   or less certain?

 2        MR. DEVORE:  Objection.  Vague.

 3        THE WITNESS:  I don't know.

 4   BY MR. HARRISON:

 5        Q   Did it increase the certainty surrounding

 6   LDK's stock price in the market?

 7        MR. DEVORE:  Same objection.

 8        THE WITNESS:  I haven't measured -- I haven't

 9   looked at volatility measures specifically before and

10   after this announcement.

11   BY MR. HARRISON:

12        Q   What would they tell you about whether or

13   not there was certainty in the market?

14        A   It would tell me nothing about whether there

15   was certainty in the market.  That wasn't your

16   question, though.

17        Q   Oh, I'm sorry, I thought I asked whether

18   this report increased the certainty surrounding LDK's

19   stock when it was released, and you mentioned that

20   you hadn't looked at volatility.  The reason I asked

21   the question is, you know, what would that tell you

22   about the certainty surrounding LDK's stock?

23        A   I'm sorry, I thought you said "stock

24   price" --

25        Q   Okay.

Jane Nettesheim                                        9/19/2008

Page 73

1        A    -- and I thought you meant changes in the

2   stock price in terms of the question.

3        Q    Okay.

4        A    But -- but I haven't looked at the --

5   whether this changed certainty.  I -- you know, I've

6   look at analysts' comments and news reports about

7   this, and I don't recall whether any of them

8   specifically say that this is -- this increases the

9   uncertainty around the stock price but they may have.

10       Q    Okay.  You'd agree with me that the

11  October 3, 2007 PiperJaffray report informed the

12  market that there were possible material

13  irregularities in the company's polysilicon

14  inventory?  Is that your opinion?

15       A    I don't know that it's opinion.  I observed

16  that information -- that sentence is in this report.

17       Q    Now, you mentioned analysts' reports and

18  their descriptions of LDK and its stock following

19  this disclosure, right?  You took a look at those in

20  connection with your report?

21       A    Yes.

22       Q    Prior to October 3, 2007, did analysts

23  discuss and rely on LDK's representations about

24  polysilicon inventory?

25       MR. DEVORE:  Object to the form of the question.

Page 74

1         THE WITNESS:  You -- you'd have to show me a

2    particular analyst's report.  I don't recall the

3    contents of any particular analyst's report in

4    detail.

5    BY MR. HARRISON:

6         Q   Do you know whether polysilicon inventories

7    at LDK were an important issue to analysts following

8    the company stock?

9         A   I know they were concerned about costs but I

10   don't recall the specifics of that.  I'd have to

11   look -- I'd have to look at a particular analyst's

12   report or all of them.

13        Q   Were you aware that --

14            I'm sorry, were you done?

15        A   Yes.

16        Q   Okay.  Are you aware that the complaint

17   alleges that polysilicon inventory was an issue of

18   fundamental importance to both investors and

19   analysts?

20        A   I don't recall that specific language.

21        Q   Okay.

22        A   You'd have to show me the complaint.

23        Q   Do you agree with that statement?

24        A   Would you repeat the statement again?

25        Q   Yes.  Well, let me see.

Jane Nettesheim                                                    9/19/2008

Page 75

1              The complaint alleges that polysilicon

2     inventories at LDK were an issue of fundamental

3     importance to investors and analysts.

4              Do you agree with that statement?

5       A    I have not looked at the analysts' reports

6     with that particular statement in mind.  I did look

7     at analysts' reports and I -- I see that they're

8     concerned with revenues and expenses.  And then I'm

9     more familiar with the information that came out on

10    October 3rd and 4th that certainly discussed that --

11    discussed the inventories extensively.

12         MR. HARRISON:  Okay.  Was the August 1, 2007

13    earnings call transcript, was that marked at the last

14    deposition?

15         MR. DEVORE:  Let me check.  I think it was.

16         MR. HARRISON:  Okay.

17         MR. DEVORE:  Yes, it was.  It's Exhibit 6.

18         MR. HARRISON:  Okay.  So I'll give you a copy, I

19    think it's the same copy, you can compare with --

20         MR. DEVORE:  Start page 58 at the top?

21         MR. HARRISON:  Yes.

22         MR. DEVORE:  Yes.

23         THE WITNESS:  Yes.

24         MR. DEVORE:  Same document.

25    BY MR. HARRISON:

Page 76

1      Q   And I'm not going to ask you to review the

2  entire transcript, and I think there's actually some

3  other transcripts attached to the back of this, but

4  what I'm concerned about and asking you is the

5  discussion of inventory on pages 65 and 69.  I'm not

6  going to ask you specific questions about numbers or

7  anything.

8          The question I have is taking a look at this

9  transcript is it your view that analysts found it

10 important, found that LDK's inventory was something

11 important that they analyzed in connection with the

12 company's stock?

13     A   And you're asking me --

14     MR. DEVORE:  And if you need to review the

15 entire transcript you can do that to answer the

16 question.

17     MR. HARRISON:  Sure.  Sure.

18     THE WITNESS:  Well, it -- during the

19 question-and-answer session with the analysts they --

20 it seems that there were several questions or

21 comments about the polysilicon inputs to the process.

22 BY MR. HARRISON:

23     Q   So in your view is that something that

24 analysts took into account when they analyzed the

25 stock price of LDK?

Jane Nettesheim                                                    9/19/2008

Page 77

1     A    Well, they certainly asked questions about

2   it --

3     Q    Okay.

4     A    -- and wanted information about it.  I'd

5   have to look at the analysts' reports to see how they

6   characterized it in the analysts' reports following

7   this -- this conference call.

8     Q    Okay.  One thing we discussed prior to

9   looking at this exhibit is whether or not there was

10   uncertainty after the October 3rd PiperJaffray

11   report, right?

12     A    Yes.

13     Q    Okay.  And you had said that you'd have to

14   see some analysts' reports or -- well, I don't want

15   to mischaracterize your testimony but let me ask you:

16   Were you aware that analysts did indicate that there

17   was uncertainty regarding the company's inventory

18   after the PiperJaffray disclosure?

19     A    I'd want to look specifically at an analyst

20   report.

21     Q    Okay.  All right.

22     A    I could also look at my report.  I did

23   include information about that generic generally.

24     Q    That's fine.

25            I'm not sure if this was marked at an

Page 78

1  earlier deposition, October 4th, company note from

2  PiperJaffray.

3        MR. DEVORE:  No, I don't think so.

4        MR. HARRISON:  So the next exhibit we'll mark is

5  11.

6            (Defendants' Exhibit 11 was marked

7        for identification and is attached

8        hereto.)

9        THE REPORTER:  And it's before the witness.

10       THE WITNESS:  I do see in my report on page

11  39 (sic), paragraph 83, that PiperJaffray, in an

12  October 4th report, talks about the ADSs will trade

13  with some uncertainty discount; so they mention the

14  word "uncertainty."

15  BY MR. HARRISON:

16       Q    Okay.

17       A    Other analysts' reports may have mentioned

18  the word "uncertainty."  I don't -- don't recall

19  specifically.

20       Q    Well, the PiperJaffray report that you cited

21  in your report on October 4th, the one you just

22  mentioned, is marked as Exhibit 11.  I think you've

23  cited that at footnote 56 of your report, right?

24       A    Yes.

25       Q    And I'll of course give you time to take a

Jane Nettesheim                                              9/19/2008

Page 79

1   look at this but I wanted to ask you about the first

2   paragraph which mentions that the stock would trade

3   with some uncertainty discount until this issue was

4   resolved by the independent audit in the days ahead.

5            So would you agree with me that after

6   October 3rd the analysts following LDK were

7   discussing the uncertainty surrounding the company

8   based on these allegations; is that fair?

9       A   Well, this -- this analyst uses that --

10  talks about uncertainty.

11      Q   So at least one analyst following the stock

12  was discussing uncertainty surrounding the company's

13  financial future, right?

14      A   Well, I think uncertainty -- I mean, the

15  analyst said specifically uncertainty surrounding its

16  financial controls, yes.

17      Q   Okay.  By the way, you might have mentioned

18  this in your report but how many analysts followed

19  LDK's stock?

20      A   I believe it was nine, let me just check.

21           There were analysts from nine firms who

22  followed or reported on the -- the ADS.

23      Q   Okay.

24           I'm not sure, I'll ask if this was marked at

25  the earlier deposition, the Morgan Stanley report on

Page 80

1    October 4th?

2         MR. DEVORE:  No.

3         MR. HARRISON:  So Exhibit 12.

4              (Defendants' Exhibit 12 was marked

5         for identification and is attached

6         hereto.)

7         THE REPORTER:  And it's before the witness.

8         MR. HARRISON:  Thanks.

9         Q    Okay.  So I've marked as Exhibit 12 the

10   October 4, 2007 Morgan Stanley analyst report titled

11   "LDK Solar Alleged Inventory Discrepancies."

12             Do you see that?

13        A    Yes.  Yes.

14        Q    Have you seen this before?

15        A    I don't believe I have but let me just

16   check.

17        Q    Okay.

18        A    No.  No.  I was aware that Morgan Stanley

19   followed the company but those reports weren't

20   available in the public -- in the public database.

21        Q    Okay.  Well, I'll give you a chance to take

22   a look if you'd like.

23        A    Well, I've flipped through it.

24        Q    Okay.  I was just going to ask you about the

25   first paragraph and in particular the third sentence.

Jane Nettesheim                                        9/19/2008

Page 81

1    It says, "While more information is needed before we

2    can comment further on this matter, the allegation is

3    nevertheless likely to serve as a share price

4    overhang before the auditing report comes out."

5         Do you see that?

6    A    Yes.

7    Q    So Morgan Stanley indicates that more

8    information is needed before it can comment further

9    on this matter.  That indicates further uncertainty,

10   right?

11   A    It indicates to me that they would like more

12   information.

13   Q    Okay.  And that's synonymous with

14   uncertainty about the information available, right?

15   MR. DEVORE:  Object to the form of the question.

16   THE WITNESS:  I don't know that it's synonymous.

17   I think they would like more information.

18   BY MR. HARRISON:

19   Q    Okay.  Are they certain that they have all

20   the information?

21   A    I think --

22   MR. DEVORE:  Object to the form of the question.

23   THE WITNESS:  Well, they say more information is

24   needed; so I take that to mean that they would like

25   more information.

Page 82

1    BY MR. HARRISON:

2        Q    Okay.  Did you read any reports in the days

3    following the PiperJaffray note that investors'

4    confidence in the integrity of the company's

5    financial statements and corporate governance

6    needed -- well, let me strike that.

7             Did you read any reports that discussed

8    investor confidence in the integrity of the company's

9    financial statements and corporate governance?

10       MR. DEVORE:  At what time?

11       MR. HARRISON:  In the days following the

12   PiperJaffray report on October 3rd.

13       THE WITNESS:  I read several things.  I don't

14   recall the specific words.

15       MR. HARRISON:  Was there an October 5, 2007 UBS

16   report marked at the last deposition?

17       MR. DEVORE:  No.

18       MR. HARRISON:  Okay.  Exhibit 13.

19            (Defendants' Exhibit 13 was marked

20            for identification and is attached

21            hereto.)

22       THE REPORTER:  And it's before the witness.

23   BY MR. HARRISON:

24       Q    Have you had a chance to take a look at

25   this?  I'm only going to ask you questions about the

Page 83

1    first page.

2         A    Okay.

3         Q    But for the record it's an October 5, 2007

4    UBS Investment Research Analyst Report on LDK Solar

5    titled "Short-term volatility remains."

6              Do you see the title there, "Short-term

7    volatility remains"?

8         A    Yes.

9         Q    Okay.  Do you see that at least one analyst

10   was reporting on the volatility of LDK's stock at

11   this time?

12        A    Yes.

13        Q    And in the second bullet point under the

14   title it says, "Management has appointed KPMG to

15   review its inventory independently.  We believe the

16   result of this review is important to restore

17   investors' confidence in the integrity of the

18   company's financial statements and corporate

19   governance."

20             Do you see that?

21        A    Yes.

22        Q    Would you agree with me that as of this

23   date or is it your view that as of this date

24   investors' confidence in the integrity of the

25   company's financial statements and corporate

1  governance was impacted by the disclosure on

2  October 3rd?

3      A   Could you repeat the question?

4      Q   Yes.

5          Is it your view that investors' confidence

6  in the integrity of the company's financial

7  statements and corporate governance was impacted by

8  PiperJaffray's disclosure on October 3rd?

9      A   I think -- I think it's clear that, you

10 know, this analyst had a view and this is the

11 information that was available in the market,

12 although this analyst is also re- -- they're not just

13 referring to the PiperJaffray report, there was also

14 other information that came out after that and prior

15 to this report.

16         So my -- my view or my -- my information is

17 based on what I've read that was published

18 contemporaneous with -- you know, at the -- published

19 in early October.

20     Q   Okay.  When during the day was this report

21 issued, do you know?

22     A   The UBS report?

23     Q   Yes.

24     A   I don't think I've seen this report so I'm

25 looking at the news in Exhibit 14 to see if there's

Page 85

1    any information in there about -- about this report.

2         I -- I don't know when the report was

3    published.  There -- you know, if I had the complete

4    news articles around this time there might be a

5    reference to it with a time stamp on the news

6    article.  I note that the -- the price in the upper

7    right-hand corner is the closing price from the 4th,

8    but that doesn't say anything except that it came out

9    after the close on the 4th.

10        Q    Okay.

11        A    There might be -- if I read this report in

12   detail there might be some reference to something

13   that happened on the 5th but -- I could do that if

14   you'd like but I don't have any --

15        Q    Okay.

16        A    -- particular knowledge as I sit here right

17   now as to when this report was published, this -- in

18   this format.

19        Q    The question was prompted by your statement

20   that there was also other information that came out

21   after that and prior to this report, and I was

22   wondering what you were referring to when you said

23   that, what information?

24        A    Oh, was I -- you had asked me something

25   about this analyst's report and referring to the

Jane Nettesheim                                                    9/19/2008

Page 86

1    PiperJaffray report and I believe I was saying that

2    there was the PiperJaffray report and then this

3    report is on the -- purports to have been published

4    on the 5th; so that there was other information

5    between the PiperJaffray report and the 5th of

6    October.  And it -- this report says something about

7    LDK's public statement on the 4th of October; so I

8    was just saying there was other information in

9    addition to the PiperJaffray report.

10        Q    Right.

11             What information specifically are you

12   referring to when you say that?

13        A    Oh, I was just looking, for example, at the

14   first sentence in this analyst's report that says,

15   "LDK Solar stated in a public announcement on

16   4 October that an ex-financial controller who had

17   been dismissed by the company on 25 September alleged

18   inconsistencies in LDK's inventory reporting."

19        MR. HARRISON:  Okay.  We have like three or four

20   minutes left on the tape; so I think we should take a

21   break before we get cut off.  Let's take maybe a

22   10-minute break if that's okay.

23        THE WITNESS:  Okay.  Okay.  Thanks.

24        THE VIDEOGRAPHER:  Going off the record at

25   11:01.  This concludes disk one.

Page 87

1              (Off the record.)

2              (Defendants' Exhibit 14 was marked

3        for identification and is attached

4        hereto.)

5        THE VIDEOGRAPHER:  This begins disk number two.

6   We're now back on the record at 11:14.

7   BY MR. HARRISON:

8        Q    Okay.  Before we took a break we were

9   talking about the UBS October 5, 2007 report and you

10  had pointed out that this report references the

11  announcement by the company on October 4, 2007.  Do

12  you remember that?

13       A    Yes.

14       Q    Okay.  I've marked already Exhibit 14, which

15  I'll let you take a look while I describe it for the

16  record, this is Form 6-K filed with the SEC on

17  October 4, 2007, and it's a press statement by

18  LDK Solar.

19             Have you had a chance to take a look at

20  this?

21       A    Yes.

22       Q    Have you seen it before?

23       A    Yes.

24       Q    Okay.  This was a press release issued by

25  the company on October 4, 2007, right?

Page 88

1        A    Yes.

2        Q    Before the market opened?  I think

3    paragraph 82 of your report mentions the third

4    sentence that "Prior to market open October 4, 2007,

5    the Company issued a press release."

6        A    Yes.  Okay.  Yes.

7        Q    Does that refresh your recollection?

8        A    Yes.  Uh-huh.

9        Q    Okay.  And you reference this or you had

10   noted that the earlier report referenced this -- I'm

11   sorry, let me step back.

12            You had mentioned that the October 5th UBS

13   report mentioned this press release, right --

14       A    Yes.

15       Q    -- as new information that entered the

16   market?  Or at least that's --

17       A    As additional --

18       Q    I'm sorry.

19       A    -- information that came out since the

20   PiperJaffray report, yes.

21       Q    Okay.  Let's take a look at it real quick.

22            This exhibit discloses Mr. Situ's

23   allegations, right?  If you look at the first

24   sentence --

25       MR. DEVORE:  Object to the form of the question.

Jane Nettesheim                                    9/19/2008

Page 89

```
 1   BY MR. HARRISON:

 2        Q    Can you see the first sentence?

 3        A    Yes.  Yes.

 4        Q    Okay.  And that is the company's disclosure

 5   of Mr. Situ's allegations, right?

 6        A    Yes.

 7        Q    Okay.  And this press statement is filed

 8   with the SEC, right?

 9        A    Yes.

10        Q    Okay.  And in disclosing Mr. Situ's

11   allegations would you agree that the company was

12   adhering to its obligations as a public company?

13        A    I --

14        MR. DEVORE:  Object to the form of the question,

15   calls for a legal opinion.

16        THE WITNESS:  I'm not an SEC specialist and I

17   don't know what their requirements are with respect

18   to filing a Form 6-K.

19   BY MR. HARRISON:

20        Q    Okay.  If you look down one more sentence

21   after the description of Mr. Situ, the sentence that

22   starts with, "In response to the allegations."

23             Do you see that?

24        A    Yes.  Uh-huh.

25        Q    Now here the company is disclosing what it
```

Page 90

1    had done in response to Mr. Situ's allegations,

2    right?

3         MR. DEVORE:  Object to the form of the question.

4         THE WITNESS:  Yeah, I see what the company is

5    reporting that it said it did.

6    BY MR. HARRISON:

7         Q    Okay.  And it states that, "The management

8    team believes that these allegations have no merit."

9              Do you see that?

10        A    Yes, it says that.

11        Q    And then finally the report discloses that

12   there would be an independent auditing firm that

13   would be conducting an independent analysis of LDK's

14   inventory, right?

15        A    It essentially says that, yes.

16        Q    Okay.  Now the report notes that the

17   independent investigation would be ongoing, right?

18        A    I don't --

19        MR. DEVORE:  Object to the extent that the

20   document speaks for itself.

21   BY MR. HARRISON:

22        Q    Let me read it.  It says, "These findings

23   are expected to be disclosed after the completion of

24   the review and consideration of the Audit Committee."

25             You'd agree with me that the company is

Page 91

1   saying that the audit, the independent audit, is not

2   complete at that time, right?

3        A   Yes.

4        Q   Okay.  And so basically the company is

5   saying that it would be -- well, the company doesn't

6   indicate that there's any set time for the completion

7   of this independent audit, right?

8        A   I -- I don't see that in this press release,

9   no.

10       Q   And so the amount of time that the audit

11   would take was unknown as of the date of this press

12   release?

13       A   According to this press release.  I mean,

14   you wouldn't know that from this press release.

15       Q   And this is something that the market became

16   aware of on October 4th?

17       A   It was -- yes, it was publicly available

18   early in the morning on October 4th.

19       Q   Are you aware that the complaint identifies

20   this statement as a false or misleading statement by

21   the company?

22       A   I don't recall specifically.

23       Q   You have no opinion on whether or not this

24   statement is false or not?

25       A   I -- I do not.

Page 92

1       Q    Okay.  Are you aware of analysts' reports

2  that came out after this disclosure that discussed

3  that the company's discussion of the allegations was

4  unsatisfactory?

5       A    Well, was it -- we just looked at a report

6  that says -- one of the analysts said they would like

7  more information.  It was the Morgan Stanley report

8  that said specifically they need more information,

9  and that report came out on October 4th.

10      Q    Do you know whether this report came out

11  after the company's press release?

12      A    Well, according to a Bloomberg or a Business

13  Wire article, the press release was available by

14  4:23 a.m.  This Morgan Stanley report -- let's see,

15  they talk about -- they had said they have spoken

16  with the company; I don't know what they mean, if

17  they're referring to the conference call that UBS

18  sponsored with -- with Mr. Lai.

19      Q    Okay.

20      A    So no, I can't tell from the Morgan Stanley

21  report if it came out before or after the company's

22  press release, but the press release was very early

23  in the morning.

24      Q    Let me show you another document.

25           Are we up to 15?

Page 93

1      THE REPORTER:  Yes.

2          (Defendants' Exhibit 15 was marked

3      for identification and is attached

4      hereto.)

5      THE REPORTER:  And it's before the witness.

6      MR. HARRISON:  For the record, this is an

7  October 4, 2007 analyst report by CIBC World Markets

8  entitled "LDK Solar Co, Ltd.  Downgrading to SU:

9  Unconfirmed Allegations to Create Near-Term

10 Pressure."

11     Q    Have you had a chance to take a look at

12 this?

13     A    Yes, and I have seen this before.

14     Q    Okay.  And you cite this in your report,

15 right?

16     A    Yes.

17     Q    Okay.  Now this report says at the third

18 bullet point, it says, "The company has responded to

19 these allegations, but we view the press release as

20 unsatisfactory, as it does not disclose the specifics

21 of the allegations and leaves questions unanswered."

22          Do you see that?

23     A    Yes.

24     Q    So you'd agree with me that at least one

25 analyst was reporting that the company's press

Page 94

1   release left questions unanswered; is that correct?

2        A    It -- at least one, yes.

3        Q    Okay.  And so it's fair to say that CIBC

4   felt that the company's disclosure about the

5   allegations was unsatisfactory?

6        A    That's what their report says.

7        Q    Take a look back at Exhibit 11, which is the

8   PiperJaffray October 4th company note.  Do you see

9   that?

10       A    Yes.

11       Q    We looked at this earlier, but if you look

12  down under "Key Points" there's a paragraph without a

13  bullet and then there's bullet points.  If you look

14  at the second bullet point, the second to last

15  sentence says, "While the company defends its

16  financials and inventory, we believe the investor

17  call may have raised more questions then (sic) it

18  answered."

19            That's referring to an investor call that

20  happened on October 4, 2007.  Are you aware of that

21  call?

22       A    Yes.

23       Q    Is that the call that you discussed earlier

24  that was hosted by UBS?

25       A    I noted in the UBS -- I don't believe I -- I

Jane Nettesheim                                                    9/19/2008

Page 95

1    knew that it had been hosted by UBS until I read

2    the -- I was aware that there was the call.

3        Q    Okay.

4        A    But I read in the UBS report that they said

5    they hosted it.

6        Q    Okay.  Is it fair to say that PiperJaffray

7    is reporting on this date that it believed that the

8    investor call raised more questions than it answered?

9        A    That's what their report says.

10       Q    Okay.  Now, is it fair to say that analysts

11   commented after the PiperJaffray report on

12   October 3rd that the inventory issue would pressure

13   the company stock until it was resolved?  Is that

14   fair to say?

15       A    Well, I think all of the -- the analysts --

16   all of the analysts would like more information

17   and at least a couple of them, and maybe all of them,

18   do say that they expect the lack of information to

19   pressure the stock, yes.

20       Q    So just taking all the reports that we've

21   looked at here, you have what you just said, analysts

22   saying they need information, we have analysts

23   saying --

24            Is that fair?

25            I'll break it up.

Page 96

1          We have analysts saying that they want

2    information, right?

3         A    Yes.

4         Q    And you have analysts discussing the

5    volatility of LDK Solar's stock; is that fair?

6         A    Yes.

7         Q    You have analysts discussing investors'

8    confidence in the integrity of the company's

9    financial statements and corporate governance, right?

10   That's exhibit --

11        A    I think there was one analyst that said

12   that, yes.

13        Q    And you have at least one analyst discussing

14   uncertainty surrounding the company stock; is that

15   fair?

16        A    Yes.

17        Q    And you have analysts, at least one analyst

18   discussing the pressure on the stock until the audit

19   is completed, right?

20        MR. DEVORE:  Objection to the form of the

21   question.

22        THE WITNESS:  Words to that effect, yes.

23   BY MR. HARRISON:

24        Q    Okay.  In your opinion what type of investor

25   would invest in LDK Securities with all this

Page 97

1    information on the market, a risk --

2         MR. DEVORE:  Object to the form of the question.

3              I'm sorry.

4         MR. HARRISON:  No problem.

5         Q    So what kind of investor in your opinion

6    would invest in LDK stock with this information in

7    the market, a risk averse investor?

8         A    I --

9         MR. DEVORE:  Object to the form of the question.

10        THE WITNESS:  I don't know what any

11   particular -- why any particular investor would --

12   would invest or would not invest.

13   BY MR. HARRISON:

14        Q    Do you think that someone who is risk averse

15   would invest in a market following the October 3rd

16   PiperJaffray report?

17        MR. DEVORE:  Object to the form of the question.

18        THE WITNESS:  Well, risk averse is a term of art

19   and it -- that can mean many different things; so I'm

20   not sure what you mean by "risk averse."

21   BY MR. HARRISON:

22        Q    You agree with me that the stock price after

23   October 3rd was volatile, right?

24        A    I --

25        MR. DEVORE:  Object to the form of the question.

Page 98

1        THE WITNESS:  As I said earlier, I haven't

2    measured the -- the volatility standard deviation of

3    the returns prior to and after the -- the

4    announcement.  I do note that the -- at least one

5    analyst said that -- appears to imply that the

6    volatility had increased.

7    BY MR. HARRISON:

8        Q    You agree with me that the investment

9    landscape for LDK securities changed dramatically

10   after the October 3rd PiperJaffray report?

11       MR. DEVORE:  Objection.  Vague.

12       THE WITNESS:  I don't know what you mean by

13   "investment landscape."

14   BY MR. HARRISON:

15       Q    Well, the risk profile.

16       MR. DEVORE:  Same objection.

17       THE WITNESS:  Again, I -- I don't know if it's

18   more or less risky.  There's certainly more

19   information out about the company.  I don't know if

20   that made the stock more or less risky.

21   BY MR. HARRISON:

22       Q    How about investor perceptions about the

23   company, those changed dramatically; is that your

24   opinion?

25       MR. DEVORE:  Object to the form of the question.

Page 99

1        THE WITNESS:  It's not my opinion.  I -- I don't

2   think on October 4, 2007 I had any knowledge of this

3   company at all myself; so I can just read the

4   analysts' reports at that time and I can see what

5   they're saying about the company.

6   BY MR. HARRISON:

7        Q    Okay.  Can you opine that the October 3,

8   2007 PiperJaffray report changed investors'

9   perceptions about the company; is that fair?

10       A    Yes.

11       Q    Okay.  So you'd agree with me, then, that

12  investors' perceptions after that release were

13  dramatically different than investors before that

14  release; is that fair to say?

15       A    I would say that they're changed.  I'm --

16  some might say dramatically different, some would say

17  it's not dramatically different.  I -- but I would

18  definitely say that the information about the company

19  has changed.

20       Q    What's your opinion?  Is it dramatically

21  different?

22       A    I didn't really form an opinion about the

23  dramatics of the information.  I would say that it's

24  important information.  I -- I would say that it was

25  very important but I don't know that I would use the

Jane Nettesheim                                    9/19/2008

Page 100

1   word "dramatic."

2       Q   If an investor purchased LDK stock before

3   October 3, 2007, based on the alleged false

4   statements and omissions by defendants, and then sold

5   after October 3, 2007, did that investor suffer a

6   loss in your opinion?

7       A   I haven't formed any opinions on losses.   I

8   have described loss causation and noted that the

9   stock price dropped.

10      Q   And is it your opinion that the inflation

11  alleged by the plaintiffs in this case dropped out of

12  the stock price after October 3rd?

13      MR. DEVORE:  Objection.  Vague.

14      THE WITNESS:  That -- I didn't measure

15  inflation, per se.  I did report that there was a

16  significant drop in the stock price following these

17  disclosures.

18  BY MR. HARRISON:

19      Q   Okay.  Finished?  Okay.

20          Is it your opinion that investors in LDK

21  stock after October 3, 2007 relied on the alleged

22  false statements made by defendants prior to that

23  date?

24      A   In that it was part of the mix of

25  information but there certainly is more information

Jane Nettesheim                                           9/19/2008

Page 101

1    that comes out on October 3rd and late -- and

2    thereafter; so -- so the mix of information has

3    changed.

4         Q    It is your opinion that to the extent the

5    October 3, 2007 disclosure was part of the mix and

6    information out there, investors were aware of it; is

7    that fair?

8         A    By dis- -- yes, yes, all of the information

9    that came out on October 3rd was publicly available.

10        Q    Is it your opinion that on October 3, 2007,

11   investors in LDK stock were put on notice about

12   uncertainty surrounding LDK's prior polysilicon

13   inventory counts?

14        A    I would say that they were given information

15   that would certainly indicate that there was -- that

16   the past recording of the inventory was -- was --

17   could be incorrect.

18        Q    Is it a fair statement that trading on LDK

19   stock after October 3, 2007, or at least after the

20   October 3, 2007 PiperJaffray report, was based on

21   uncertainty and speculation regarding LDK's financial

22   future?

23        A    I don't know what the trading was based on.

24   There was information and there was a lot of

25   different types of information, we've seen all sorts

Page 102

1    of information in these analysts' reports, but I

2    don't know what any particular trader -- what the

3    basis for any particular trader's transactions were.

4         Q   Is it fair to say in your opinion that

5    investors in LDK stock after October 3, 2007 -- let

6    me back up.

7             Is it fair to say in your opinion that

8    investors in LDK stock after the October 3, 2007

9    PiperJaffray report were differently situated than

10   purchasers before that date because the mix of

11   information available to them was different?

12        A   Well, the information about this company

13   changed constantly throughout the class period.  But

14   yes, I would say the information on October 3rd was

15   different from the information mix on October 2nd

16   which was different from the information mix earlier

17   in the class period.  There was a lot of information

18   coming out about this company throughout the class

19   period.

20        Q   And so is it your opinion that investors in

21   LDK stock after October 3rd, after the October 3,

22   2007 PiperJaffray report, were differently situated

23   than purchasers before that report?

24        A   I don't know if I would describe them

25   differently situated.  I would just say they had a

Page 103

1   different -- different mix of information than people

2   had before the report.

3        Q   Okay.  Did you analyze whether the majority

4   of shares purchased during the days following the

5   October 3, 2007 disclosure were made by new

6   investors?

7        A   No.

8        Q   Would that give you any indication about the

9   investor's risk profile?

10       A   No.

11       Q   Are you aware that the volume of trading on

12  LDK's stock following the October 3rd PiperJaffray

13  report increased significantly?

14       A   Yes.

15           And I have the volume numbers here, I can

16  check that.

17       Q   Yes.  Do you --

18       A   As I recall they were quite high.

19       Q   Can you point that out to me?

20       A   Yes.  Exhibit 4B of the declaration on the

21  second page towards the bottom of the -- second page.

22       Q   Okay.  So the trading volume on LDK

23  securities jumped from approximately 1.5 million on

24  October 2nd to approximately 8.7, 8.8 million on

25  October 3rd; is that a fair statement?

Jane Nettesheim                                        9/19/2008

Page 104

1          A    Yes.   Those were the volumes on the two

2     days, yes.

3          Q    And then the next day on the 4th,

4     October 4th, it jumped up to approximately

5     21 million?

6          A    Yes.

7          Q    Do you agree that because of the uncertainty

8     on October 3rd options players sent implied options

9     volatility through the roof?

10         A    I --

11         MR. DEVORE:  Object to the form of the question.

12         THE WITNESS:  I don't know what the implied

13    volatility was.

14    BY MR. HARRISON:

15         Q    Do you agree that on October 3rd options

16    players sent volatility through the roof on LDK

17    stock?

18         MR. DEVORE:  Same objection.

19         THE WITNESS:  I -- I just don't know.  I know

20    what -- it went up.

21    BY MR. HARRISON:

22         Q    Fair enough.

23         A    But I just don't recall.

24         MR. HARRISON:  Let me mark --

25         THE WITNESS:  I didn't look at that

Jane Nettesheim                                                    9/19/2008

Page 105

1    specifically.

2         MR. HARRISON:  Let me mark 16, Laurie.

3              (Defendants' Exhibit 16 was marked

4         for identification and is attached

5         hereto.)

6         THE REPORTER:  And it's before the witness.

7    BY MR. HARRISON:

8         Q    Have you had a chance to take a look at

9    this?

10        A    Yes.

11        Q    For the record it's a Reuters article on

12   October 3, 2007 with a title "Update 1-LDK Solar down

13   on report financial controller out."

14              Now, if you look down to the bottom of the

15   page it's quoting Andrew Wilkinson of Interactive

16   Brokers Group in Greenwich, Connecticut.  Do you see

17   that?  It continues onto the next page.  Do you see

18   that?

19              I'll read it for the record.  It says,

20   "'Because of the uncertainty following the departure

21   of the financial controller, options players sent

22   implied options volatility through the roof late on

23   Wednesday,' said Andrew Wilkinson" --

24        MR. DEVORE:  I think we've got the wrong

25   document.

Jane Nettesheim                                    9/19/2008

Page 106

1          THE WITNESS:  I don't have that document.

2          MR. HARRISON:  Oh, my gosh.  Let's see.  Wait.

3   Interesting.

4              You know what, it was printed out but not

5   with the next page on it.  Let me see if I have a

6   different copy.

7              It says "continued" at the bottom and what

8   I'm reading from is on the continued part.

9          MR. DEVORE:  You want to take a break and see if

10  you can find it --

11         MR. HARRISON:  Yes.

12         MR. DEVORE:  -- or move on to something else and

13  come back to it later?

14         MR. HARRISON:  Let me just E-mail the paralegal

15  real quick and we won't have to --

16             Or we can take just a two-second break and

17  I'll E-mail someone real quick if that's fine.

18         MR. DEVORE:  No problem.

19         MR. HARRISON:  Okay.  Thanks.

20         THE VIDEOGRAPHER:  Off the record at 11:41.

21             (Off the record.)

22             (Whereupon Exhibit 16 was

23         withdrawn.)

24         THE VIDEOGRAPHER:  And we're back on the record

25  at 11:43.

Jane Nettesheim                                                    9/19/2008

Page 107

1        MR. HARRISON:  Okay.  Sorry about that.  We'll

2    get a revised copy of this exhibit.

3        Q    But let me just ask you generally, are you

4    aware of what option implied volatility is?

5        A    Yes.

6        Q    What is that?

7        A    If you have the price of the option and you

8    know the other three -- three inputs -- four inputs

9    to the -- for example, the Black-Scholes pricing

10   model or some other pricing model, you can back out

11   what the standard deviation of returns is, what the

12   volatility is that's being used to price those

13   options.

14       Q    Okay.  So it's a measure of the volatility

15   of the stock?

16       A    Yes.  It's meant to be the standard

17   deviation of the stock returns.

18       Q    And then that indicates a greater risk in

19   the stock?

20       A    It indicates that -- yes.  Yes.  And it

21   is -- and it's an implied volatility; so it's the

22   volatility that people think may occur in the future.

23   So when I say "standard deviation of the returns,"

24   they're not actually measuring the standard deviation

25   of the returns but it's meant to represent that.

Jane Nettesheim                                                    9/19/2008

Page 108

1      Q    Okay.  We'll come back to this document when

2   I get the full copy but I'll just mark for the record

3   Exhibit 17.

4              (Defendants' Exhibit 17 was marked

5         for identification and is attached

6         hereto.)

7      MR. HARRISON:   And 18.

8              (Defendants' Exhibit 18 was marked

9         for identification and is attached

10        hereto.)

11     THE REPORTER:   And they're both before the

12  witness.

13  BY MR. HARRISON:

14     Q    Have you had a chance to take a look at

15  these?

16     A    Yes.

17     Q    Okay.  This is a strange format, at least to

18  me.  It doesn't really indicate what this document

19  is.

20              Do you have any idea what this is?

21     A    It doesn't say on it directly but it could

22  be something that -- a news item from Bloomberg but

23  it doesn't say where it's from.

24     Q    Okay.  Yes.  I'll represent that it is from

25  Bloomberg and, you know, you don't have to take my

Page 109

1    word for it.  I'll reference you, in case you want to

2    look, because it is in a strange format, that

3    Exhibit 17 is referenced at your revised Exhibit 13,

4    page 16.  And Exhibit 18 is referenced at your

5    revised Exhibit 13, page 19.

6         A    Yes.

7         Q    Do you see that?

8         A    I -- I see 17 and --

9         Q    Okay.  So your report attributes these to

10   Bloomberg, right?

11        A    Pardon?

12        Q    Your report attributes these to Bloomberg,

13   these reports?

14        A    Yes.

15        Q    Okay.  I just wanted to make sure there

16   wasn't any misunderstanding about what these are.

17             Now, Exhibit 17 states that LDK -- it says,

18   "LDK Solar-LDK October, implied volatility spikes to

19   133 as LDK sells off 24 percent."

20             Do you see that?

21        A    Yes.

22        Q    And at the bottom of that paragraph it says,

23   "LDK October option implied volatility of 133 is

24   above its 12-week average of 69 according to Track

25   Data, suggesting larger risk," right?

Page 110

1      A    Yes.  Yes, it says that.

2      Q    So this article is indicating that the

3  implied volatility continued to go up, correct, to

4  133?

5      A    Yes.

6      Q    What is that percent?  That's a percentage,

7  right, 133 percent?

8      A    Yes.

9      Q    What does that percentage mean?

10     A    It's the standard deviation of -- it's meant

11 to represent an estimate of the standard deviation of

12 stock returns of the -- LDK's ADS returns, I should

13 say.

14     Q    Okay.  And the last sentence says it

15 suggests larger risk, and that's what we were

16 discussing earlier, right?

17          So the volatility of 133 suggests a larger

18 risk surrounding LDK stock; is that a fair statement?

19     A    Standard deviation is a measure of risk so

20 it is -- it's a type of risk that that -- that it's

21 measuring.  It's measuring the possible variability

22 in returns.

23     Q    Okay.  And with respect to this article it's

24 discussing that risk with respect to LDK's stock,

25 right?

Jane Nettesheim                                                    9/19/2008

Page 111

1        A    Yes.

2        Q    And just briefly on Exhibit 18 it indicates

3    that on October 4th the volume in volatility spike

4    continues into the second day of LDK sell-off, that's

5    the title, and it says in the last sentence of that

6    paragraph, "LDK October option implied volatility is

7    at 155; November is at 138; above its 12-week average

8    of 69 according to Track Data, suggesting larger

9    risk."

10            Do you see that?

11       A    Yes.

12       Q    So as of October 4th, the risk in LDK's

13   stock, at least according to this article, is

14   increasing; is that correct?

15       A    Yes.  Estimates of standard deviation of

16   returns is higher on -- in this article on the 4th

17   than it was in the article on the 3rd.

18       Q    Okay.  And I have a revised Exhibit 16 that

19   I'd like to remark if that's fair.

20            I don't know if we have a sticker on the

21   other one.

22            (Defendants' Exhibit 16 was marked

23        for identification and is attached

24        hereto.)

25       THE REPORTER:  The new Exhibit 16 is before the

1    witness.

2    BY MR. HARRISON:

3        Q    All right.  If you take a look at this, this

4    is the full article that I previously marked as 16.

5    Do you see that?  At the bottom of the page it says

6    "continued" --

7        A    Yes.

8        Q    -- and then the next page now has the rest

9    of the article?

10        A    Yes.

11        Q    Okay.  And the article as I was trying to

12    read before quotes Andrew Wilkinson of Interactive

13    Brokers Group in Greenwich, Connecticut on the second

14    page.

15        A    Yes.

16        Q    He says, "Because of the uncertainty

17    following the departure of the financial controller,

18    options players sent implied options volatility

19    through the roof late on Wednesday."

20            Now, looking at the option implied

21    volatility in Exhibits 17 and 18, you'd agree that's

22    a fair statement, right?

23        A    Yes, it had -- certainly had increased.

24        Q    Do you agree with Mr. Wilkinson's analysis

25    that it sent volatility through the roof?

Jane Nettesheim                                        9/19/2008

Page 113

1      A    If "by through the roof" he means that the

2   volatility is much, much higher than it was before,

3   yes, it is.

4      Q    Okay.  If you go back up above that

5   paragraph in which he's quoted it says, "Its October

6   option implied volatility stood at 107 percent, way

7   above its 12-week average of 69 percent, according to

8   market research firm Track Data.  That suggests

9   greater risk of price swings, Foster said."

10          Would you agree with that statement, that a

11  high implied volatility suggests greater risk of

12  price swings?

13      MR. DEVORE:  Object to the form of the question.

14      THE WITNESS:  The higher volatility means that

15  the returns are expected to be more variable than

16  they were in the -- with a lower volatility; so I --

17  I would say that generically you'd say it would be

18  increased pricewise, yes.

19  BY MR. HARRISON:

20      Q    Okay.  Earlier I think we discussed short

21  sales and I was wondering if you analyzed the amount

22  of short sales that occurred before October 3, 2007

23  and after the October 3, 2007 PiperJaffray report was

24  issued?

25      A    Well, I have information on my report about

1   the short interest in LDK ADSs at -- it's Exhibit 8.

2        Q    8, okay.

3        A    And that does show the level of short

4   interest prior to and after October 3, 2007.

5        Q    Okay.  This discusses short interest on a

6   monthly basis, right, or at least a bi-monthly basis?

7        A    We -- we obtained these data from Bloomberg.

8   And it's my understanding that if you -- that

9   Bloomberg reports -- after a certain point in time

10  Bloomberg reports it every -- well, twice a month, at

11  the 15th and at the end of the month; so prior to

12  that point it's just the 15th or around the 15th and

13  after that point, which in this case is

14  mid-September.  It's also the end of the month.

15       Q    Okay.  And you're aware that to receive

16  daily short interest data you have to pay for that,

17  right?

18       A    I wasn't aware of that one way or the other.

19       Q    Are you aware that you could obtain daily

20  short interest?

21       A    I don't think so.

22       Q    Would you agree with me that high volume of

23  short selling can have a negative impact on a stock's

24  price?

25       A    Well, when you have in- -- just because you

Jane Nettesheim                                                    9/19/2008

Page 115

1   have high volume doesn't mean that it could have a

2   negative impact on the stock price.  But if you have

3   an increase in short selling that implies that

4   there's more negative -- more -- there's an increase

5   in investors who believe the stock price will go

6   down.

7        Q    And a high volume of such investors can

8   have -- well, let me rephrase that.

9             A high volume of investors who sell the

10  stock short can drive the price down, right?

11       A    I think you need to be a little bit more

12  specific than that.

13       Q    Okay.  Can a high volume of short selling

14  destabilize a stock's price?

15       A    Not necessarily.  It -- it can but it

16  doesn't always happen, and it frequently doesn't

17  destabilize the stock price.

18       Q    Have you ever been an expert witness in a

19  case involving market manipulation?

20       A    Yes.

21       Q    What was the allegation of market

22  manipulation in that case?

23       A    That the -- certain insiders were

24  manipulating the stock price by engaging in a lot of

25  transactions with the stock.

Jane Nettesheim                                    9/19/2008

Page 116

1      Q    What sort of transactions?

2      A    Buying and selling.

3      Q    Options or just the stock?

4      A    Just the stock.

5      Q    Short selling?

6      A    I don't believe there were allegations that

7  they were short selling.

8      Q    What was your opinion in that case with

9  respect to whether the high volume of transactions

10  could manipulate the stock's price?

11      A    In that case it was my opinion that the

12  transaction activity by the insiders was manipulating

13  the stock price.

14      Q    Have you offered an expert opinion in a case

15  in which there were high volumes of short selling?

16      MR. DEVORE:   Object to the form of the question.

17      THE WITNESS:   I know that I have testified in

18  cases where there was high levels of short selling

19  where the -- well, there were -- I should say more

20  accurately there were high levels of short -- short

21  interest.

22  BY MR. HARRISON:

23      Q    To --

24           I'm sorry.

25      A    I don't remember specifically which ones

Jane Nettesheim                                              9/19/2008

Page 117

1   they were but -- but I do recall seeing securities --

2   stocks where there was high levels of short interest.

3        Q   What was your opinion, if you had one, with

4   respect to whether high volumes of short selling

5   affected the stock's price?

6        MR. DEVORE:  In what case?

7        MR. HARRISON:  In the engagement she described

8   in which that involved high volumes of short selling.

9        THE WITNESS:  I -- I don't think I had an

10  opinion about that.

11  BY MR. HARRISON:

12       Q   Okay.  Were you aware that LDK stock was a

13  target for short sellers during the class period?

14       MR. DEVORE:  Object to the form of the question.

15       THE WITNESS:  Not specifically.  I have the

16  information about the level of short interest and --

17  BY MR. HARRISON:

18       Q   Are you aware that LDK stock was on the SEC

19  watch list of potential short selling abuses?

20       A   No.

21       Q   Okay.  Are you aware that short interest

22  spiked considerably on October 3rd through

23  October 5th in LDK stock?

24       A   I'm aware of the level of short interest on

25  September 28th and the level of short interest on

1  October 15th and that it increased over that two-week

2  period substantially, but I just have those two

3  dates.

4      Q   Is a jump in short interest an indication of

5  the stock's volatility?

6      A   I'm not sure why it would be.

7      Q   Did you look at the type of institutional

8  investors that engaged in transactions involving

9  LDK stock between October 3 and October 7, 2007?

10     A   No.  I report quarterly holdings of

11 institutions in -- in Exhibit 17 but that's just --

12 that's quarter-end holdings for the second, third and

13 fourth quarters of 2007.

14     Q   Okay.

15     A   And then the changes in the holdings from

16 the first to the second quarter and -- and from the

17 third quarter to the fourth -- I'm sorry, from the

18 second to the third quarter and from the third

19 quarter to the fourth quarter.

20     Q   What exhibit is that?

21     A   17.

22     Q   And you provided this exhibit in connection

23 with your market efficiency analysis?

24     A   Yes.

25     Q   Do you know whether the composition of large

Page 119

1    institutional investors changed at all after

2    October 3, 2007 in LDK stock?

3         MR. DEVORE:  Object to the form of the question.

4         THE WITNESS:  Well, I -- I have a list of the

5    institutional holders as of September 30, 2007 and as

6    of December 31, 2007.  And I -- you can just look at

7    the list and see that the institutions -- individual

8    institutions changed -- most of them changed their

9    holdings between those two dates.  Almost all of them

10   changed their holdings.

11   BY MR. HARRISON:

12        Q    Did you analyze the investment philosophies

13   of any of these institutional investors?

14        A    No, I did not.

15        Q    That wasn't relevant to your analysis?

16        A    Correct.

17        Q    We've discussed price inflation a couple of

18   times today and I think you indicated -- well, I

19   don't want to put words in your mouth.

20             I'm just asking, and if I've asked this

21   before then just tell me, but is it your opinion that

22   inflation in LDK's stock changed throughout the class

23   period?

24        A    I haven't measured the inflation throughout

25   the class period.

Jane Nettesheim                                    9/19/2008

Page 120

1      Q    Is it your opinion that inflation in LDK

2   stock changed after October 3, 2007?

3      A    If I were to measure inflation, per se, I

4   would say that -- and if that were proven to be a

5   corrective disclosure I would say that it would have

6   changed as of October 3, 2007.

7      Q    And if it is proven that -- well, let me

8   step back.

9           If you assume that it is a corrective

10  disclosure, is it fair to say that calculation of

11  loss in this case would not be a simple matter?

12      MR. DEVORE:   Object to the form of the question.

13      THE WITNESS:   There are many steps in the

14  calculation of loss; so I don't know what -- what you

15  mean by "a simple matter."

16  BY MR. HARRISON:

17      Q    You were asked to analyze loss causation in

18  your report, right?

19      A    Yes.

20      Q    How many times have you served as an expert

21  on the subject of loss causation?

22      A    I -- I don't -- I don't know specifically.

23  Almost as many times as I've been retained as an

24  expert in a securities case, but not every time.

25      Q    Is there a definition of loss causation how

Jane Nettesheim                                    9/19/2008

Page 121

1   you use it in your report?  Can I find one in the

2   report?

3        A    It -- I don't think I have a definition.

4   Paragraph 8 -- paragraphs 7 and 8 sort of discuss

5   that and then paragraph 75 sort of describes the

6   section.  75, 76, 77.

7        Q    Yes.

8        A    But I wouldn't say that there was a

9   definition, per se.

10       Q    Okay.  I didn't want to ask you the

11  question, you know, and have it be in here but, you

12  know, I was just curious if you have a definition of

13  "loss causation" that you use?

14       A    Yeah, I -- as I said, I don't -- I don't --

15  I wouldn't say that there's a definition, per se, in

16  the report, there's more of a description.

17       Q    What is your definition of "loss causation"

18  then?

19       A    It's whether or not the declines -- well,

20  first of all, whether or not there's a decline in the

21  price of -- of a stock and whether or not that

22  decline is related to alleged corrective disclosures.

23       Q    Okay.  Do financial analysts use a different

24  amount of evidence in determining loss causation than

25  those evaluating loss causation from a legal

Page 122

1    perspective?  Is there a difference?

2         A    I don't know.  I'm not sure what you -- are

3    you talking about financial -- are you talking about

4    experts in securities litigation as financial

5    analysts --

6         Q    Yes.

7         A    -- versus how the attorneys perceive it?

8         Q    Yes.

9         A    I don't know what attorneys -- how attorneys

10   perceive loss causation.

11        Q    Okay.  Generally in your report you conclude

12   that the alleged fraud caused a price decline

13   following partially corrective disclosures; is that a

14   fair statement?

15        A    Yes.  I say that the price decline was

16   caused by certain disclosures.

17        Q    Okay.  Your conclusion can be different than

18   a legal conclusion regarding loss causation; is that

19   fair to say?

20        A    I don't know.

21        Q    Are you confident with respect to your

22   opinions on loss causation in this case?  In other

23   words, have you described any sort of level of

24   confidence as to your conclusion on loss causation?

25        A    Well, I think -- I mean, my conclusion is

Jane Nettesheim                                              9/19/2008

Page 123

1   that the decline -- first conclusion related to loss

2   causation is that the declines on October 3rd and 4th

3   were caused by the disclosures that we've talked

4   about, the information that we -- that came out on

5   those days.

6           And with respect to October 8th, again, the

7   decline on that day was -- was caused by information

8   related to the alleged corrective disclosures

9   surrounding October 8th.

10      Q   Do you have a confidence level with respect

11  to your conclusions on those topics?

12      A   Well, I'm very confident that the reason

13  that the ADS price fell on October 3rd and 4th was

14  because of information -- new information coming in

15  related to the correct- -- you know, new information

16  from the corrective disclosures.  And the same with

17  October 8th.

18      Q   How do you determine whether specific

19  negative news is significant to a stock price

20  movement on days when there are multiple negative

21  announcements?

22      A   There could be different -- there -- there

23  are different ways to parse information and sometimes

24  it's difficult to parse information if -- if there

25  are different announcements that aren't related.  But

Jane Nettesheim                                            9/19/2008

Page 124

1    there -- it depends on the information as to how you

2    would approach parsing it.

3        Q    How do you determine whether a specific

4    negative news unrelated to allegations of false

5    statements has an effect on the stock price?

6        A    It would depend on what the information is,

7    how it was being analyzed.  I mean, it could depend

8    on a lot of -- a lot of things.

9        Q    Do you agree with me that the price of

10   stocks can move significantly based on rumors?

11       A    Yes, that's possible.

12       Q    Do you agree that the price of stocks can

13   move significantly based on investor fear, paranoia

14   and speculation?

15       MR. DEVORE:  Object to the form of the question.

16       THE WITNESS:  I think you'd have to be more

17   specific than that.  I'm not sure what "investor

18   fear" -- "investor fear, paranoia and speculation"

19   entail.

20   BY MR. HARRISON:

21       Q    Do you agree that a rumor that later turns

22   out to be incorrect can result in stock prices moving

23   significantly?

24       A    At the time that the rumor occurs?

25       Q    Yes.

Page 125

1      A   Yes, I've already agreed that stock prices

2   can move on --

3          I assume what you mean by "rumors" are, you

4   know, information coming out from somebody other

5   than, say, the company.

6      Q   Going back to my previous question about

7   fear and speculation, by that I mean investors

8   forming a certain opinion about a company that's not

9   based on a corroborated fact, can that cause a stock

10  price to move?

11      MR. DEVORE:  Object to the form of the question.

12      THE WITNESS:  I -- I don't know.  I'd need more

13  information.

14  BY MR. HARRISON:

15      Q   Have you ever offered your opinion in a case

16  where a rumor about the company was disclosed causing

17  a stock price drop and then later that rumor was

18  revealed to be untrue?

19      A   I don't remember specifics but I -- I

20  have -- I have seen cases where stock prices have

21  moved on what was characterized in the popular press

22  as rumors.

23      Q   Do you recall specifically what that company

24  was or its stock?  Ticker or anything?

25      A   As I sit here I don't.

Jane Nettesheim                                              9/19/2008

Page 126

1      Q    And you said you've seen cases where that

2    has been the case.  Do you mean cases that you've

3    been engaged to opine on?

4      A    Yes.  I mean, I've seen instances where

5    there were large stock price movements and it was

6    based on what was characterized as rumors, but I --

7    you know, particular events.  I can't recall anything

8    specific now, but --

9      Q    You don't recall those engagements, the name

10    of the company or the litigation?

11      A    No.

12      Q    Okay.  Let me quickly just turn back to

13    Exhibit 2 which is a description of your prior

14    testimony, right?

15      A    It's a listing.

16      Q    Fair.  Fair enough.  It's a listing of your

17    prior testimony.

18         If you go to the bottom of the first page it

19    describes the In Re:  GenesisIntermedia case.

20      A    Yes.

21      Q    Looking at that does that refresh your

22    recollection that this was one of the cases that you

23    just described about rumors?

24      A    I don't -- I don't recall.  There very well

25    could have been but I don't recall -- I recall

Jane Nettesheim                                          9/19/2008

Page 127

1    generally what the case was about, it was a market

2    manipulation case, but I don't recall the specifics

3    about news and information that was coming out.

4         Q    If you go up three on your list it describes

5    the In Re:  Retek Securities Litigation.  Do you see

6    that?

7         A    Yes.

8         Q    Seeing that name, does that refresh your

9    recollection that that was one of the cases involving

10   rumors that you discussed?

11        A    I don't remember anything about the

12   information in that case.

13        Q    Okay.  How about on the next page, in the

14   middle of the page it describes the In Re:

15   Homestore.com's Securities Litigation?  Do you see

16   that?

17        A    Yes.

18        Q    Seeing the name of that case, does that

19   refresh your recollection that this was one of the

20   cases involving rumors that you discussed earlier?

21        A    No, I don't remember enough detail about the

22   information that came out and what was -- whether

23   anything or -- was described as rumor.  I don't

24   recall.

25        Q    Have you ever offered your opinion in a case

Jane Nettesheim                                          9/19/2008

Page 128

1    where an employee or former employee of a company has

2    made allegations against the company in the

3    securities landscape?

4         MR. DEVORE:  Object to the form of the question.

5         MR. HARRISON:  Securities case.

6         MR. DEVORE:  Are you talking about allegations

7    in a complaint filed against the company or are you

8    talking about like a whistleblower?

9         MR. HARRISON:  That's a fair point.

10          I'm not talking about an employment claim or

11   anything, I'm talking about a securities case in

12   which an employee discloses information about a

13   company or allegations, if you will.

14        Q    Have you ever been involved in a securities

15   case where that was part of the case?

16        A    Yes.  I mean, I know there were other

17   complaints where there were -- former employees of

18   the company were identified as providing information

19   about the allegations.  Is that what you mean?

20        Q    Yes.

21        A    Okay.  Yes, I've seen that in other

22   complaints.

23        Q    The three that we discussed on your

24   Exhibit 2, any three of those involve that situation?

25        A    It's possible in the GenesisIntermedia and

Jane Nettesheim                                              9/19/2008

Page 129

1    the Homestore cases, but I can't be very specific

2    about -- I'm not really sure about that.

3         Q   If you look at your report at paragraph 77

4    you describe various disclosures on October 3 and 4,

5    2007 and October 8 and 9, 2007 as disclosures of

6    information that changed investors' perceptions

7    regarding the true financial condition of LDK; is

8    that right?

9         A   Yes.

10        Q   How are you using the term "corrective

11   disclosure" in your report?

12        A   These are -- well, part of this is an

13   assumption, as I said earlier, that these are alleged

14   disclosures from the complaint and these are

15   disclosures of information that are related to -- the

16   information is related to the type of information

17   that is alleged to have been fraudulently

18   misrepresented or omitted during the class period.

19        Q   What assumption are you referring to?

20        A   That the allegations in the complaint are

21   correct.

22        Q   Okay.  You also describe at paragraph 74 of

23   your report partial corrective disclosures.  Do you

24   see that?

25        A   It's a long paragraph.

Jane Nettesheim                                          9/19/2008

Page 130

1        Q   Go ahead and read it.  I don't want to read
2   the whole thing into the record but starting about
3   halfway down is the discussion of corrective
4   disclosures.
5        A   Okay.
6            Okay.  Yes.
7        Q   So if I were to look for a definition of
8   "partial corrective disclosures" in your report is
9   this the language I should look to?
10       A   Well, this is just a description or an
11  example but it -- it's --
12           Are you referring to the -- basically the
13  word "partial"?  Is that the --
14       Q   Where it says, "that is a partial
15  disclosure" following --
16           Well, I can read it.
17       A   Yes.
18       Q   That sentence starting "Specifically."
19       A   Yes.  Okay.
20       Q   Let me read it.
21           "Specifically, if a company makes an
22  announcement that misrepresents some aspect of its
23  business or omits information that should not have
24  been omitted and later the company 'corrects' the
25  misrepresentation (or omission), even though it did

Page 131

1    not admit its earlier misrepresentation (or

2    omission), that is a partial disclosure."

3            Is that the definition that you're using for

4    "partial disclosure" in your report?

5        A   Yes.  The -- the -- later when it's

6    corrected, yes.  "Partial" just means that it may not

7    be a full -- full disclosure.

8        Q   Okay.  In the next sentence you say, "Thus,

9    a disclosure can be new information regarding the

10   true condition or prospects of a company that has the

11   effect of correcting the prior misrepresentation (or

12   omission) even when the company does not admit to the

13   fraud."

14           So there you're explaining that new

15   information can constitute a disclosure even when the

16   company doesn't admit to the fraud; is that what

17   you're saying there?

18       A   Yes.

19       Q   What's the source of your definition of "a

20   corrective disclosure" and "a partial corrective

21   disclosure"?

22       A   I don't have a particular source in mind.  I

23   have, you know, looked at lots of reports, opinions,

24   articles over many years.  This is sort of a

25   distillation of that, but I -- I don't have anything

Page 132

1   particular in mind right now as I sit here.

2       Q    Would you characterize this as a legal

3   definition?

4       A    No, just as my understanding.

5       Q    Okay.  Are all corrective disclosures,

6   regardless of the source, in your opinion worthy of

7   consideration as a corrective disclosure?

8            Let me restate that.

9            Does the source of a corrective disclosure

10  matter in your opinion in a loss causation analysis?

11      A    Not necessarily.  I -- you know, I -- it may

12  or it may not.  I don't know.  I think it would

13  depend on the circumstances.

14      Q    Is it fair to say that professionals who

15  value a company's stock might choose not to give

16  certain allegations about a company any weight in

17  their analysis, right?  Is that fair?

18      MR. DEVORE:  Object to the form of the question.

19      THE WITNESS:  They may or they may not.

20  BY MR. HARRISON:

21      Q    Do you agree with me that a professional

22  valuing a company stock would consider a source of

23  information that it receives?

24      A    I don't know what particular analysts do but

25  I would think that they would, as you said, consider

Page 133

1    the source.

2        Q    Now, in considering what constitutes a

3    corrective disclosure in your opinion would you give

4    the same weight to an uncorroborated allegation about

5    a company, say, as you would the company's

6    identification and disclosure of such a discrepancy?

7        A    I think it would depend on the

8    circumstances.

9        Q    And what sort of things would it depend on?

10       A    Where the information came from, why it

11   wasn't being corroborated by the company.  I mean, I

12   suppose hypothetically there could be any number of

13   factors that -- that one would look at.

14       Q    What, if anything, did you do in this case

15   as part of your analysis to determine the credibility

16   and accuracy of Mr. Situ's allegations?

17       A    As I said, I've taken the allegations in the

18   complaint as true.  I don't think I've done -- I

19   haven't done anything to -- I haven't done -- I

20   haven't done anything.

21       Q    Okay.  So this is something that is for

22   another part of the process to determine, the legal

23   process?

24       A    Well, it's not -- it's not anything that

25   I've done for this report.

Jane Nettesheim                                    9/19/2008

Page 134

1      Q    Right.

2           So it's not something that you're opining

3    on, is that right --

4      A    That's correct.

5      Q    -- the accuracy of Mr. Situ's statements?

6      A    That's correct.

7      MR. HARRISON:  I'm looking at 12:25 or 26.  Do

8    you guys want to break for lunch?  I don't know how

9    much --

10          I mean, I have stuff to do; so we'll have to

11   break at some point.

12     MR. DEVORE:  I think that makes sense if now is

13   a good time to do it.

14     MR. HARRISON:  If that's fine with you.  Okay.

15     THE VIDEOGRAPHER:  We're going off the record at

16   12:26.  This concludes disk two.

17          (Lunch recess.)

18     THE VIDEOGRAPHER:  This begins disk number

19   three.  We're now back on the record at 1:09.

20   BY MR. HARRISON:

21     Q    Good afternoon, Ms. Nettesheim.

22     A    Good afternoon.

23     Q    So before the lunch break we were talking

24   about corrective disclosures and I think that we had

25   discussed the fact that your report characterizes

Jane Nettesheim                                          9/19/2008

Page 135

1   disclosures on October 3rd and 4th as disclosures of

2   information that partially corrected prior alleged

3   misstatements or omissions during the class period.

4           Is that a fair statement?

5       A   Yes.

6       Q   And that's based on my reading of

7   paragraphs 85 to 86.  Do you see that?

8       A   Yes.

9       Q   In other words, you conclude that

10  disclosures on October 3rd and 4th served as partial

11  corrective disclosures of the alleged fraud in this

12  case?

13      A   Yes.

14      Q   And is that because information on those

15  days at least partially corrected investors'

16  previously erroneous perceptions as to LDK's true

17  financial condition in your opinion?

18      A   Yes.

19      Q   How did you choose which disclosure was

20  corrected, as you claim, by the alleged fraudulent

21  statements and omissions by defendants?

22      A   Well, the -- on October 3rd the PiperJaffray

23  report appeared to address the -- the allegations.  I

24  mean, it -- it was new information in that report.

25  The new information in that report was related to

Jane Nettesheim                                                    9/19/2008

Page 136

1    the -- the allegations in the complaint regarding

2    fraud.

3        Q    That's your conclusion?

4        A    Yes, that -- that was the -- that was the

5    information in that.

6             And then the other -- certain news articles

7    that came out during the day and on the 4th were

8    related to the -- to Mr. Situ's allegations.

9        Q    Okay.  Let's back up to the October 3rd

10   PiperJaffray report.

11            It's your conclusion that that corrected

12   information in prior alleged misstatements; is that

13   right?

14       A    Well, I'm -- I am taking the -- I'm assuming

15   that the allegations in the complaint are -- are

16   true, including that there were corrective

17   disclosures regarding those allegations of

18   misrepresentations and omissions.  And then, you

19   know, I read the PiperJaffray report and the other

20   items on October 3rd and observed that that's the --

21   the new information that's coming out that day has to

22   do with the -- Mr. Situ's allegations.

23       Q    Okay.  So you looked at the content of the

24   PiperJaffray report; is that what you're saying?

25       A    Yes.

Jane Nettesheim                                          9/19/2008

Page 137

1      Q    Did you compare it to the alleged false

2  statements made during the class period?

3      A    No.

4      Q    What did you compare it to?

5      A    The general allegations in the complaint.

6      Q    So you didn't go through the allegations --

7  excuse me, let me back up.

8           You didn't go through the documents that

9  reflected the alleged false statements and figure out

10  whether the PiperJaffray disclosure on October 3,

11  2007 actually addressed the statements made in those

12  disclosures, right?

13     A    Not -- not in the specific disclosures, I

14  did not.

15     Q    So you took the allegations of the complaint

16  as true in your analysis of loss causation; is that

17  fair?

18     A    Yes.

19     Q    And in determining whether the disclosure on

20  October 3, 2007 by PiperJaffray actually addressed

21  the content of the statements, you relied on the

22  allegations in the complaint; is that fair?

23     A    Well, I made myself familiar with the

24  allegations of the complaint and then looked at the

25  PiperJaffray report to -- just as a reality check to

Page 138

1   determine that the PiperJaffray report was in fact

2   reporting on Mr. Situ's allegation.

3       Q   You're aware that the complaint identifies

4   the PiperJaffray report on October 3rd as a

5   corrective disclosure?

6       A   I believe it does.

7       Q   Did that inform your analysis of whether or

8   not it was a corrective disclosure?

9       A   I'd like to look at the specific language in

10  the complaint but that is consistent with my

11  recollection.

12      Q   Okay.  Now, the complaint doesn't allege any

13  other partially corrective disclosures on October 3rd

14  or 4th, does it?

15      A   I'd have to look at the complaint, I don't

16  recall specifically.

17      MR. HARRISON:  Was this marked at the last

18  deposition?

19      MR. DEVORE:  No.

20      MR. HARRISON:  So Exhibit 18?

21      THE REPORTER:  19.

22          (Defendants' Exhibit 19 was marked

23      for identification and is attached

24      hereto.)

25      THE REPORTER:  And it's before the witness.

Jane Nettesheim                                              9/19/2008

Page 139

1    BY MR. HARRISON:

2        Q    I've given you the March 10th Consolidated

3    Class Action Complaint in this case.  Have you seen

4    this document before?

5        A    Yes, I have.

6        Q    If you look at paragraph 78 under Section J

7    it describes the October 3rd PiperJaffray research

8    note as a corrective disclosure, correct?

9        A    Yes.

10       Q    And if you go through that Section J of the

11   complaint, paragraph 78 through 81 doesn't identify

12   any other corrective disclosures on October 3rd or

13   4th, right?

14       A    Right.  From paragraphs 78 to 81 I don't see

15   any other corrective disclosures on that date.

16       Q    You can take a look at October 4th a little

17   bit but I want to just focus on October 3rd for now.

18            Do you have Exhibit 4 in front of you, which

19   is the PiperJaffray research report?

20       A    Yes.

21       Q    This is the document that you opined

22   constituted a corrective disclosure on October 3rd?

23       A    Well, it is a corrective disclosure on that

24   date, yes.

25       Q    And you've read this before?

Jane Nettesheim                                                    9/19/2008

Page 140

1        A    Yes, I have.

2        Q    You're aware that PiperJaffray closely

3   followed the company and its stock, right?

4        MR. DEVORE:  Object to the form of the question.

5        THE WITNESS:  I am aware that they -- yeah, that

6   they reported on the company, the analysts reported

7   on it periodically, yes.

8   BY MR. HARRISON:

9        Q    Would you agree that PiperJaffray was one of

10  the analysts that you identify in your complaint as

11  one that followed the stock during the class period?

12       MR. DEVORE:  Object to the form of the question.

13            It's not her complaint.

14  BY MR. HARRISON:

15       Q    I'm sorry, I meant your report.

16       A    I identify them as one of the -- yes, as one

17  of the analysts that reported on the stock.

18       Q    And would you agree with me it's fair to say

19  that PiperJaffray closely followed the company and

20  its stock?

21       A    I -- I don't know what you mean by "closely

22  followed."  It would seem to me they regularly

23  reported on the company so I would -- if that's what

24  you mean by "closely."

25       Q    Well, take a look at the Exhibit 4, for

Jane Nettesheim                                          9/19/2008

Page 141

1    example.  They analyzed the company's financial

2    statements; fair?

3        A    Yes.

4        Q    Issued recommendations?

5        A    Yes.

6        Q    Gave a price target for the company stock?

7        A    Yes.

8        Q    Discussed inventory counts?

9        A    Yes.

10       Q    Identified key points about the company?

11       A    Yes, they did.

12       Q    Okay.  So you'd agree with me with the

13   characterization that PiperJaffray closely followed

14   the company and its stock?

15       A    Well, on -- I thought you were referring to

16   throughout the class period.  I would say that this

17   is a fairly comprehensive report about the company,

18   if you're referring to this one day.

19       Q    I'm using this as an example.

20       A    Yeah.  And I -- and I said that they

21   reported on them, you know, periodically during the

22   class period with analysts' reports.

23       Q    Okay.  Is it fair to say that PiperJaffray

24   was intimately familiar with LDK Solar and its

25   financial statements?

Page 142

1        MR. DEVORE:  Object to the form of the question.

2        THE WITNESS:  I think it's pretty clear that

3    they reviewed the financial statements.  I don't know

4    what you mean by "intimately familiar with."

5            Financial statements are typically many,

6    many pages long, but it's fair to say that they

7    certainly looked at the financial statements.

8    There's a lot of information in this analyst report

9    that comes from LDK's financial statements.

10   BY MR. HARRISON:

11       Q   Okay.  You're aware that at some point

12   before October 3, 2007, Mr. Situ contacted

13   PiperJaffray with his allegations?

14       MR. DEVORE:  Object to the form of the question.

15       THE WITNESS:  I guess I'm -- I'm not -- I'm not

16   sure that I'm aware that he contacted PiperJaffray

17   directly.  I'm -- I'm -- I don't know that.

18   BY MR. HARRISON:

19       Q   Do you --

20       A   That may be true.  I -- I don't know that

21   either way as I sit here right now.  I don't recall

22   that either way.

23       Q   Are you aware of the source of the

24   information that PiperJaffray disclosed on October 3,

25   2007?

Jane Nettesheim                                          9/19/2008

Page 143

1      A    I am -- it is my understanding they

2    described them as -- as E-mails and -- I believe

3    they'd seen some E-mails.  They may have had

4    conversations with Mr. Situ, I'm just -- I can't be

5    too specific right now.

6      Q    That information came from Mr. Situ; is that

7    your understanding?

8      A    Well, it's my understanding that

9    PiperJaffray had seen E-mails from Mr. Situ.  I guess

10   I'm just not sure if Mr. Situ handed them to him or

11   if there was another party involved, you know, a

12   third party involved, you know, I don't know.

13     Q    Okay.  That's fair.  I'm just trying to find

14   out if you're aware that they received information

15   from Charley Situ about his allegations.  And I

16   think, are you hung up on from him personally?

17     A    Yes, I think --

18     Q    Okay.

19     A    Yes.

20     Q    Okay.  Well, that PiperJaffray received

21   information about his allegations; is that fair?

22     A    Yes.  Yes, that's my understanding.

23     Q    And they had information about an alleged

24   discrepancy in the company's inventory counts, right?

25   And when I say "they," I mean PiperJaffray.

Page 144

1        A    Yes, they did.

2        Q    And they had information that Charley Situ

3    had contacted the SEC and the company's outside

4    auditor; true?

5        A    Yes.   That's what they say in their report,

6    yes.

7        Q    So when PiperJaffray issued its report on

8    October 3rd, it had all this information about the

9    alleged inventory discrepancy?

10       MR. DEVORE:   What do you mean by "all this

11   information"?

12       MR. HARRISON:   The information they disclosed.

13       THE WITNESS:   Well, yeah, they disclosed that

14   they were aware of a number of things, including an

15   inventory discrepancy and that the allegations were

16   made to the SEC and to KPMG.

17   BY MR. HARRISON:

18       Q    Now, looking at the disclosure on October 3,

19   2007, it indicates that PiperJaffray considered

20   Mr. Situ's allegations but indicated that they had no

21   information to substantiate those allegations.   Is

22   that a fair characterization of this disclosure?

23       A    Right.   Right.

24       Q    And that's at the sentence that says, "We

25   have spoken to the LDK CFO about these claims and

Jane Nettesheim                                              9/19/2008

Page 145

1    have found no reason/proof to dispute management's

2    claim of 1000MT of polysilicon in inventory/WIP,"

3    right?

4        A    Correct.

5        Q    So PiperJaffray said that it couldn't find

6    any information to corroborate them, true?

7        A    By "them" you're referring to Mr. Situ's

8    allegations?

9        Q    Yes.

10       A    Yes.

11       Q    And in spite of these uncorroborated

12   allegations PiperJaffray reiterated its outperform

13   rating, right?

14       A    Yes, it did.

15       Q    And that's tantamount or at least comparable

16   to an analyst issuing a buy recommendation, right?

17       A    Yes.  I would say that was comparable, yes.

18       Q    And PiperJaffray noted that the target price

19   for the stock remained unchanged, right?

20       A    Could you point me to the sentence?

21       Q    Yes.  The chart on the left-hand side of the

22   disclosure.  It says "price target."

23       A    Uh-huh.  Yes, it's unchanged, yes.  Uh-huh.

24       Q    Okay.  So considering the allegations made

25   by Charley Situ, is it fair to say that PiperJaffray

Jane Nettesheim                                                      9/19/2008

Page 146

1   didn't think the company stock was worth any less; is

2   that fair?

3        MR. DEVORE:  Object to the form of the question.

4        THE WITNESS:  Well, at this point in time they

5   have a price target of $52.  Apparently that's -- I

6   would -- I'm sure that's based on the analysts'

7   models.

8   BY MR. HARRISON:

9        Q    And that's the same price target that it had

10  previously, right?

11       A    It has no -- it has nothing in "Previous";

12  so we could verify it by looking at an earlier report

13  but I -- unless there's something else in the report

14  that says that they changed it, there's nothing to

15  indicate that they changed it.

16       Q    If they didn't change it would you agree

17  with me that PiperJaffray considered Mr. Situ's

18  allegations and didn't view the stock as worth any

19  less?

20       MR. DEVORE:  Object to the form of the question.

21       THE WITNESS:  Any less than its price target?

22  BY MR. HARRISON:

23       Q    Yes.

24       A    Apparently they saw no reason to change the

25  price target.  Their price target was below the price

Page 147

1   for October 3rd, but apparently they didn't see a

2   reason to change their target.

3       Q   Would you agree with me that PiperJaffray

4   considered this information in connection with the

5   company's financial prospects and assessed the stock

6   as a rational investor would?

7       MR. DEVORE:  Object to the form of the question.

8       THE WITNESS:  I -- there probably are as many

9   different ways to assess the value of an asset as

10  there are people looking at it, but I have no reason

11  to think that PiperJaffray was any more or less

12  competent to do that.

13  BY MR. HARRISON:

14      Q   They didn't approach it irrationally,

15  agreed?

16      MR. DEVORE:  Object to the form of the question.

17      THE WITNESS:  From this report I wouldn't have

18  said they were being irrational, no.

19  BY MR. HARRISON:

20      Q   You're aware that PiperJaffray later

21  downgraded the stock from a market outperform to a

22  market perform?

23      A   I believe -- I believe that they did.  I

24  think that's in my report.

25      Q   Let me show you a document to refresh your

Page 148

1   recollection.

2        A    Yeah.  I -- I don't see it right here but --

3        MR. HARRISON:  This is going to be 20.

4             (Defendants' Exhibit 20 was marked

5        for identification and is attached

6        hereto.)

7        THE REPORTER:  It's before the witness.

8   BY MR. HARRISON:

9        Q    I'll give you a chance to take a look at

10  this --

11       A    Okay.

12       Q    -- but for the record it's a PiperJaffray

13  company note, October 31, 2007 --

14       A    Yes.

15       Q    -- and the title of this says, "Reduce 2008

16  Estimates on Tightening Scrap Supply; Downgrade to

17  MP."

18            Do you see that?

19       A    Yes.

20       Q    Okay.  So does this refresh your

21  recollection that PiperJaffray reduced their

22  recommendation on LDK Solar from outperform market to

23  perform?

24       A    It doesn't refresh my recollection because I

25  was thinking of an analyst downgrade sometime around

Jane Nettesheim                                                9/19/2008

Page 149

1    October 4th or shortly thereafter and this one is

2    October 31st; so I might be thinking of a different

3    analyst but I see that they did downgrade.

4         Q    Okay.  So you see from this document that

5    they downgraded from outperform to perform, right?

6         A    Yes.

7         Q    And that was October 31, 2007?

8         A    The date of this note is October 31st.

9         Q    And if you look at the first bullet point

10   under "Key Points," it says, "We lower estimates for

11   LDK on our belief that scrap polysilicon supplies are

12   tightening and this will result in higher input

13   prices."

14             So it's fair to say that PiperJaffray based

15   its downgrade on an overall shortage of polysilicon

16   supplies and its effect on LDK's profit margins?

17        A    There could be other reasons but I do see

18   that that -- they -- that's the first sentence in

19   that paragraph and that is a reason.  I haven't

20   looked at the whole report so I don't know if that's

21   the only reason, but --

22        Q    Is it fair to say that this was

23   PiperJaffray's logical and objective views as to the

24   performance of the stock based on anticipated reduced

25   margins?

Jane Nettesheim                                                        9/19/2008

Page 150

1        MR. DEVORE:  Object to the form of the question.

2        THE WITNESS:  Could -- could you repeat the

3  question?

4  BY MR. HARRISON:

5        Q   Yes.

6            Is it fair to say that this is

7  PiperJaffray's logical and objective views on the

8  performance of the stock based on anticipated reduced

9  margins?

10       MR. DEVORE:  Same objection.

11       THE WITNESS:  Well, that particular sentence

12  doesn't say anything about margins.  Do you want me

13  to see if they have something to say about margins?

14  BY MR. HARRISON:

15       Q   I'm sorry.  The second bullet halfway down

16  that paragraph says, "We anticipate that LDK margin

17  will fall from about 32 percent in Q307 to about

18  21 percent in Q308 (from our prior estimate of

19  31.9 percent)."

20           Do you see that?

21       A   Yes.

22       Q   So asking the question again:  Is it fair to

23  say that this is PiperJaffray's logical and objective

24  views on the performance of the stock based on

25  anticipated reduced margins?

Jane Nettesheim                                                    9/19/2008

Page 151

1        MR. DEVORE:  Object to the form of the question.

2   Object to the relevance of the document as it's

3   outside of the class period.

4        You can try to answer.

5        THE WITNESS:  Yes.  When you say "performance of

6   the stock," are you -- we've talked about several

7   things in this report.  Are you referring to the fact

8   that they lowered their price target; is that what

9   you mean by "performance of the stock," because I

10  don't know what the stock performance is at this --

11  on this date.

12  BY MR. HARRISON:

13       Q   It's anticipated performance of the stock.

14       A   Okay.  That -- well, the question was pretty

15  long but it looks like based on reading this report

16  one of the inputs into their decision to lower their

17  price target may have been the reduction in the

18  margin -- their reduction in anticipated margins.

19       Q   Okay.  So PiperJaffray considered that

20  information in reducing its recommendation, at least

21  as evidenced by this report?

22       A   Well, the calculations are probably in the

23  spreadsheet they attached to their report.  It's --

24  you know, it appears that this is something that they

25  considered in their modeling.  There may have been

Jane Nettesheim                                           9/19/2008

Page 152

1   other things they considered, but it appears that

2   that was considered in their modeling.

3       Q   Now if you go back to the October 3, 2007

4   report, which is Exhibit 4, and take a look at that,

5   this is a report based on all the information

6   available to PiperJaffray?

7       MR. DEVORE:  Object to the form of the question.

8   BY MR. HARRISON:

9       Q   Do you agree?

10      A   I don't know.  I mean, it's based on the

11  information they have in this report and I suppose

12  other information that they've provided in other

13  reports.  I don't -- I don't know if they're holding

14  back.

15      Q   Okay.

16      A   I would have, I don't think, any way of

17  knowing whether they're holding back.

18      Q   The fraud on the market presumption that you

19  set forth in your report assumes that PiperJaffray

20  and other investors know all of the relevant

21  information that's in the market, right?

22      MR. DEVORE:  Object to the form of the question.

23      THE WITNESS:  No.  It assumes that the prices

24  reflect publicly available information.

25  BY MR. HARRISON:

Jane Nettesheim                                            9/19/2008

Page 153

1        Q    Now, the market you claim became aware of

2   new information relating to alleged fraud on

3   October 3rd when PiperJaffray issued this report,

4   right?

5        A    No, that's not what I said --

6        MR. DEVORE:  This report or the other report?

7        MR. HARRISON:  October 3, 2007.

8        THE WITNESS:  That's not precisely what I said.

9   BY MR. HARRISON:

10       Q    What was wrong with my sentence?  Do you

11  want me to repeat it?

12       A    Sure.

13       Q    Okay.  The question was you claim that the

14  market became aware of new information relating to

15  the alleged fraud on October 3rd when PiperJaffray

16  issued this report.

17       MR. DEVORE:  Same objection.

18            We've been talking about an October 31st

19  report; so --

20       MR. HARRISON:  I asked her to refer back to

21  Exhibit 4, and that's what I'm referring to.

22       MR. DEVORE:  Okay.

23       THE WITNESS:  No, I didn't claim that.

24  BY MR. HARRISON:

25       Q    The market became aware of new information

Page 154

1   on that date?

2        A    I believe the market -- yes, the market

3   became aware of new information on that date.  I

4   didn't specifically say that that -- claim that the

5   market was unaware of any information until the

6   PiperJaffray report.  But I did say that that is a

7   corrected disclosure.

8        Q    Okay.  I just want to make sure we're caught

9   up here because I thought that's what I was saying,

10  that the October 3, 2007 report was a corrected

11  disclosure because it released new information

12  relating to the fraud; is that fair?

13       A    Yes.

14       Q    Okay.

15       A    But it -- but it doesn't mean that some of

16  this or all of this information could not have leaked

17  out to certain investors during the day.  I mean,

18  certainly the analysts knew this during the day

19  before the report was published.

20       Q    Do you agree with me that the market reacted

21  to -- I mean is it your opinion that the market

22  reacted to the PiperJaffray report on October 3,

23  2007?

24       A    Well, I think it reacted to the information

25  that came out on that day.  Certainly the

Page 155

1    PiperJaffray report is -- is an important piece of

2    the information that came out on that day.

3        Q   And the information that was contained in

4    that report was an uncorroborated allegation, right,

5    against the company?

6        MR. DEVORE:  Object to the form of the question.

7        THE WITNESS:  Well, certainly PiperJaffray says

8    that -- the analyst says that he was -- let's see

9    what it says; that he spoke with management and he

10   could not corroborate the allegations.

11   BY MR. HARRISON:

12       Q   Do you agree that it's fair to characterize

13   the information in that report as a rumor about the

14   company?

15       MR. DEVORE:  Object to the form of the question.

16       THE WITNESS:  I don't know that I would

17   characterize it as a rumor since it comes from

18   somebody who was fairly recently with the company --

19   or, you know, the -- the -- the allegations come from

20   a fairly recent former employee.

21   BY MR. HARRISON:

22       Q   Are you aware that the Merriam-Webster

23   Dictionary defines a rumor as a statement or report

24   current without known authority for its truth?

25       A   No.

Page 156

1      Q    Okay.

2      A    I've never memorized the diction- -- I've

3  never memorized the dictionary.

4      Q    Well, that's good.  It might take a while.

5           So you're not aware of that.  Would you

6  agree with that characterization of the term "rumor"?

7      A    Would you repeat the definition?

8      Q    Sure.

9           "A statement or report current without known

10  authority for its truth."

11      A    That sounds like a reasonable possible

12  definition of "rumor," yes.

13      Q    And wasn't the Situ allegations disclosed in

14  the PiperJaffray report on October 3, 2007 a

15  statement or report current without known authority

16  for its truth?

17      A    Well, it's my understanding that the --

18  the -- the -- to use the term "known authority"

19  would -- would be Mr. Situ, who was very recently

20  the -- the controller of the company.

21      Q    But the truth of the allegations were not

22  corroborated; PiperJaffray was unable to corroborate

23  the truth of the allegations, right?

24      MR. DEVORE:  Objection.  Asked and answered.

25      THE WITNESS:  PiperJaffray said they spoke with

Jane Nettesheim                                                          9/19/2008

Page 157

1   the -- with LDK's CFO and that Mr. Lai -- well, they

2   describe the CFO did not necessarily -- PiperJaffray

3   said specifically they found no reason/proof to

4   dispute management's claim of 1 -- 1,000 metric tons

5   of polysilicon.

6   BY MR. HARRISON:

7       Q   But the market reacted to the information,

8   at least in your opinion, contained in the

9   PiperJaffray report on October 3, 2007?

10      MR. DEVORE:  Objection.  Asked and answered.

11      THE WITNESS:  I think the market was reacting to

12  the -- yeah, to the information that came out in this

13  report and some of it might have leaked out earlier

14  but --

15  BY MR. HARRISON:

16      Q   Is it fair to say that the market's reaction

17  was not tied to any objective evidence about LDK's

18  financial performance?

19      A   I'm not sure what you mean by "objective

20  evidence."

21      Q   Evidence that can be corroborated.

22      A   If you're referring to an audited financial

23  statement, there wasn't a new audited financial

24  statement released on that date.  I'm not sure what

25  you mean by "objective evidence" other than that.

Jane Nettesheim                                                9/19/2008

Page 158

1      Q    Factual information about the company and
2   its financials.  Is it --
3      A    Well, apparently there were -- you know,
4   PiperJaffray saw E-mails and Mr. Situ -- that
5   Mr. Situ had written and there were particular facts
6   in those E-mails.  PiperJaffray spoke with the CFO
7   and the CFO apparently disputed those facts.
8      Q    Did you observe that in contrast to
9   PiperJaffray's outperform recommendation a number of
10  investors after the report on October 3rd sold their
11  stock?
12     MR. DEVORE:  Object to the form of that
13  question.
14     THE WITNESS:  Could you repeat the question?
15  BY MR. HARRISON:
16     Q    Yes.
17          Would you agree that in contrast with
18  PiperJaffray's outperform recommendation, which
19  you've agreed is similar to a buy recommendation,
20  many investors sold after the report of Mr. Situ's
21  allegations in the October 3rd PiperJaffray report?
22     MR. DEVORE:  Object to the form of the question.
23     THE WITNESS:  Based on the volume, I -- very
24  high volume on that day I would say that a lot of
25  people sold, a lot of people bought, because you have

Page 159

1   to have two sides to the trade, but volume was

2   certainly higher on that day than on most days.

3   BY MR. HARRISON:

4       Q   It's fair to say that instead of following

5   the recommendation issued by PiperJaffray

6   contemporaneously with this information, the market

7   was acting on speculation based on a rumor that it

8   disclosed?

9       MR. DEVORE:   Object to the form of the question.

10      THE WITNESS:   No, I don't think that's correct.

11  BY MR. HARRISON:

12      Q   What's wrong with that statement?

13      A   I think I've already described why I

14  wouldn't necessarily call the information that

15  PiperJaffray had received somehow, that the -- the

16  E-mails that Mr. Situ had written, I don't know that

17  I would call that a rumor.

18      Q   If I change it to say "uncorroborated

19  allegations against the company," is that a fair

20  sentence?

21      A   Well, apparently they're corroborated by the

22  recently -- former controller but they were not

23  corroborated by at least the CFO.

24      Q   The controller corroborated what

25  information?

Jane Nettesheim                                                    9/19/2008

Page 160

1      A    The discrepancies in the inventory.

2      Q    He made the allegations, right?

3      A    Well, the allegations are that there were

4  discrepancies in the inventory and he brought them to

5  light.

6      Q    Okay.  He didn't corroborate a known fact,

7  though, right?

8      A    What is the known -- I don't know what the

9  known fact is referring to.

10      Q    Well, I thought I heard you to say that he

11  was corroborating information that was already known,

12  i.e., inventory discrepancies when he himself was the

13  one who disclosed them.

14      A    He -- he disclosed the inventory

15  discrepancies.  And as a former controller,

16  et cetera, my understanding is he had -- from the

17  complaint, basically, he had done some analysis and

18  was able to corroborate that there were inventory

19  discrepancies.

20      Q    Okay.  So going back to my earlier question,

21  I know you don't agree with the characterization of

22  this as rumor so let me try it differently.

23          Instead of following the recommendation

24  issued by PiperJaffray, the market instead acted on

25  speculation based on uncorroborated allegations about

Page 161

1   inventory discrepancies; is that a fair statement?

2        MR. DEVORE:  Object to the form of the question.

3        THE WITNESS:  What do you mean by the market

4   reacted?

5   BY MR. HARRISON:

6        Q   Well, the market, the stock price dropped,

7   in that time frame, right?  Is it your opinion that

8   it dropped based on those allegations?

9        A   It dropped based on the information of those

10  allegations.

11       Q   Did you consider whether the market's

12  reaction to those allegations was based in part on

13  the US market's fear or paranoia that Chinese

14  companies are less credible and reliable than

15  US companies?

16       MR. DEVORE:  Object to the form of the question.

17       THE WITNESS:  I don't think I've seen that in

18  this case.  I don't know one way or the other.  I

19  haven't seen that type of information in this case on

20  that day.  I don't recall reading that.

21  BY MR. HARRISON:

22       Q   That's not something you considered in

23  connection with your loss causation analysis?

24       A   No.

25       Q   Now, did investors who transacted in LDK

Page 162

1    stock after the 10/3 disclosure rely on

2    PiperJaffray's recommendation to buy the stock?

3        MR. DEVORE:  Objection.  Misstates the evidence.

4            That's not what the document says.

5        THE WITNESS:  I'm not sure what any

6    particular -- what motivated any particular

7    investors' sales or purchase decision specifically.

8    There was a lot of information out there; so --

9    BY MR. HARRISON:

10       Q    Okay.  A couple times this afternoon you've

11   described, and correct me if I'm wrong, I think

12   you've described that there are other corrected

13   disclosures on October 3, 2007 besides the

14   PiperJaffray report; is that true?

15       A    Well, there's -- there's information that

16   comes out on October 3rd and certainly the

17   PiperJaffray report and the -- the rev- -- basically

18   the -- the revelation of the allegations of Mr. Situ

19   is -- is -- is a corrective disclosure.

20           It was revealed certainly through the

21   PiperJaffray report, I don't know if it was revealed

22   in some other manner through the PiperJaffray firm to

23   certain investors.  And then there were news articles

24   about this issue.  There's a number of them in -- we

25   could count them but there are a number of news

Jane Nettesheim                                          9/19/2008

Page 163

1   articles on that day and the headlines are identified

2   in Exhibit 14 to my report.

3        Q    Okay.  So just to clarify, it's your opinion

4   that on October 3rd and October 4th there were news

5   reports about the allegations that also constituted

6   corrective disclosures?

7        A    Well, to -- to the extent that perhaps some

8   investors didn't see the PiperJaffray report, they

9   could have learned this information through news

10  reports that refer to the PiperJaffray report.

11       Q    Okay.  So the reports that you're referring

12  to as additional corrective disclosures on those days

13  are reports that reference the PiperJaffray

14  disclosure?

15       MR. DEVORE:  Object to the form of the question.

16  Misstates the testimony.

17       THE WITNESS:  Yeah.

18  BY MR. HARRISON:

19       Q    I'm just trying to clarify it.

20       A    It's the -- I mean, the correct- -- the

21  corrective disclosure is the -- the information about

22  Mr. Situ's allegations.  In terms of what we see

23  on -- today in print, the PiperJaffray report is

24  the -- for that day I think is the -- is the clearest

25  and most complete description of those allegations,

Page 164

1    but -- but it's the information, it's not necessarily

2    this report, per se, but the information that came

3    out on that day that's the corrective disclosure.

4         Q    Okay.  So the information generally that was

5    disclosed in all of those reports; is that your

6    opinion?

7         A    Yes.

8         Q    Okay.

9         A    Related to those allegations, yes.

10        Q    Okay.  So you'd include in your analysis of

11   what a corrective disclosure is in this case all news

12   reports about the allegations disclosed on

13   October 3rd and 4th?

14        A    Yes.

15        Q    The reports that referenced the PiperJaffray

16   report on October 3rd that you claim are corrective

17   disclosures, or at least part of the corrective

18   disclosure, what new information did those news

19   reports bring to the market about the alleged fraud?

20        A    I don't know if I could recall anything

21   specifically.

22             I see that there's a report from Dow Jones,

23   capital markets report, that may have come out after

24   the market closed on the 3rd, where Dow Jones says

25   that the chief financial officer, Jack Lai, told Dow

Jane Nettesheim                                    9/19/2008

Page 165

1   Jones on Wednesday that the company's controller was

2   dismissed at the end of September, basically for

3   absenteeism.

4        I don't have the complete articles here, I

5   just have the headlines.  I don't know if there was

6   any -- I don't recall specifically what other

7   information, if any, there was in these -- in the

8   news articles but as I said earlier they were -- they

9   were based on the information in the PiperJaffray

10  report.

11      Q   Okay.  So it's your opinion that to the

12  extent any news reports or analysts' reports on

13  October 3rd and 4th disclosed information that was

14  not already disclosed in the PiperJaffray report,

15  those two were corrective disclosures?

16      A   Well, I think it -- no.  I mean, there

17  was -- I think there was also a report that day about

18  another -- well, let me just check that.

19          There was a report that day about LDK

20  winning a -- there's a headline that says, "LDK Solar

21  wins five-year supply order from Taiwan Solartech."

22  I don't know that -- I don't think that that's -- has

23  anything to do with the corrective disclosure, for

24  example.

25      Q   To the extent news articles related to the

Jane Nettesheim                                                    9/19/2008

Page 166

1    subject that plaintiffs in this case claim was the

2    basis of the fraudulent statements made during the

3    class period, do those constitute additional

4    corrective disclosures on October 3rd and 4th?

5        A   They may have if they provided additional

6    information.

7        Q   Have you identified in your report the new

8    information that any of those news accounts or

9    analysts' reports disclosed relating to the fraud the

10   plaintiffs allege in this case?

11       A   In my report I did not quote the -- all of

12   the news reports on that day in their entirety.

13           I note that the drop in the price that day

14   was attributed to the information that was contained

15   in the PiperJaffray report regarding Mr. Situ's

16   departure or, in other words, the allegations that

17   we're talking about, but I don't -- I don't have the

18   complete -- I didn't quote the complete article; so

19   whether there was something said in the PiperJaffray

20   report and then some additional detail given in

21   another news article, I -- as I sit here right now, I

22   don't -- I don't recall.

23       Q   Now, did you attempt to control and parse

24   out negative and confounding information on October 3

25   and 4, 2007?

Page 167

1      A   The -- well, I did -- I wasn't trying to

2   parse out amounts in particular, but I did -- I did

3   look at all of the information that's available to me

4   that came out on the 3rd and the 4th and didn't see

5   any negative information that wasn't related -- I

6   don't recall seeing any particularly negative

7   information that wasn't related to the allegations in

8   the complaint on those two days.

9      Q   Could you take a look at what's been marked

10  as Exhibit 11, an October 4, 2008 Company Note by

11  PiperJaffray.

12          (Discussion off the record.)

13  BY MR. HARRISON:

14     Q   Okay.  We looked at this earlier --

15     A   Yes.

16     Q   -- but I'm going to direct your attention to

17  a different part of the document.

18          If you look under "Key Points" there's three

19  bullet points.  If you look at the last bullet point

20  towards the end of the paragraph it says, "While

21  these events were a negative catalyst for the stock,

22  we believe the sharp decline in LDK shares was

23  exacerbated by growing investor skepticism over the

24  company's valuation and its overly aggressive

25  polysilicon/TCS ramp schedule."

Jane Nettesheim                                              9/19/2008

Page 168

1          Do you see that?

2     A    Uh-huh.

3     Q    Did you consider in your loss causation

4   analysis growing investor skepticism over the

5   company's valuation in analyzing the reason for the

6   drop in LDK's share price on October 3 and 4, 2007?

7     A    Well, yeah, I think that the stock price

8   reflects the fact that investors think the company's

9   value was lower.

10    Q    Okay.  This valuation that's referenced in

11  the report doesn't say anything about the allegations

12  relating to inventory discrepancies, does it?

13         MR. DEVORE:  Object to the form of the question.

14         THE WITNESS:  It just refers to growing investor

15  skepticism over the company's valuation.  I would say

16  that the -- the allegations -- I would say that

17  investors reassessed their estimates of the company's

18  value and it was a downward assessment.  I don't know

19  where that's -- or how that's inconsistent with the

20  PiperJaffray statement here.

21  BY MR. HARRISON:

22    Q    Did you consider the, what it says here,

23  "its overly aggressive polysilicon/TCS ramp schedule"

24  in your loss causation analysis as a confounding

25  factor in the stock prices drop on October 3 and 4,

Jane Nettesheim                                          9/19/2008

Page 169

1   2007?

2        A   Well, this to me appears to be related.

3        Q   Did you specifically consider that?

4        A   Well, I did -- I did see this report.  And

5   even sitting here reading it again it seems to me to

6   be related.

7        Q   So that's not something that you

8   specifically considered in your analysis?

9        A   Well, I considered all of the information

10  that I saw over the -- that came out over the course

11  of those -- those -- the two days, October 3rd and

12  4th.

13       Q   Did your analysis account for any decline in

14  LDK's share price on October 3, 2007 by the time the

15  PiperJaffray report was issued?

16       A   Well, as I said earlier, I don't -- I don't

17  know to what extent the information in the

18  PiperJaffray report was available to -- to investors

19  or other members of the PiperJaffray firm or how it

20  had been possibly partially published.

21       Q   Did you see any evidence of leakage, any

22  facts indicating to you that there was leakage before

23  the PiperJaffray report?

24       A   No.  I didn't -- I didn't see any news

25  articles that identified the PiperJaffray report

Jane Nettesheim                                                    9/19/2008

Page 170

1   or -- or said anything about a PiperJaffray report

2   that was about to come out.

3        Q   You didn't see any objective facts

4   indicating that there was any leakage before the

5   PiperJaffray report was issued, right?

6        A   Right.  As I said, I hadn't seen any news

7   reports about them until it came out.

8        Q   You identify October 8 and 9, 2007 as

9   additional dates on which corrective disclosures were

10  made; is that right?

11       A   I -- well, October 8th and then October 9th

12  was a -- a -- is an up -- but yes, additional related

13  disclosures, yes.

14       Q   Okay.  I asked you about those two days just

15  because that's how your report characterizes it --

16       A   Yes.

17       Q   -- on page 41.

18           How did you select these dates as days upon

19  which corrective disclosures were made?

20       A   Well, they are identified in the complaint

21  as days when there is a -- alleged corrective

22  disclosure.  Well, I think that October 8th is -- is

23  a date identified in the complaint.  And then I

24  looked at the information around October 8th and

25  observed that information that came out on the 9th

Page 171

1   could be partially related to the allegations.

2        MR. HARRISON:  Now, I think counsel has

3   indicated that the October 8, 2007 Barron's article

4   has already been marked in this case.

5        MR. DEVORE:  That's correct.

6        MR. HARRISON:  I'm not sure what that exhibit

7   number is.

8        MR. DEVORE:  It's Exhibit 5.

9        MR. HARRISON:  Exhibit 5.

10        And it's this article, right?

11        MR. DEVORE:  Yes.

12  BY MR. HARRISON:

13     Q   So I'm handing you a copy of Exhibit 5 in

14  this case, which is an October 8, 2007 article from

15  Barron's entitled "China Solar Boom Loses Its

16  Luster."

17        Do you see that?

18     A   Yes.

19     Q   Have you seen this document before?

20     A   Not in this format but I've seen this

21  article, yes.

22     Q   This is the document that you quote in

23  paragraph 87 of your report, right?

24     A   I believe it is, yeah.  I think so, yes.

25     Q   And this is the document that you identify

Page 172

1    as an additional corrective disclosure on

2    October 8th?

3         A    Yes.

4         Q    Okay.  If you look at the subheading there

5    of the article it says, "China solar-cell stocks are

6    burning too brightly, even if LDK's rumored quality

7    problems prove to be less serious than feared."

8              Now, this disclosure refers to the

9    allegations as rumors, right?

10        MR. DEVORE:  Object to the form of the question.

11   Mischaracterizes the document.

12   BY MR. HARRISON:

13        Q    It says "even if" --

14        A    Well, it just says "LDK's rumored quality

15   problems."

16        Q    Yes.  So it's referring to quality problems.

17             In your opinion are those different than the

18   allegations of inventory discrepancies?

19        A    I'd have to read the article again to see

20   what they say are the quality problems.

21        Q    Go ahead and take a look.

22        A    There's a lot of information in this

23   article.  I didn't see the phrase "quality problems."

24   He's -- maybe I missed it.  There is one reference to

25   quality, the quality of the wafers produced by LDK.

Jane Nettesheim                                    9/19/2008

Page 173

1    I don't know if that's what -- it's a fairly generic

2    subtitle of the article.

3        Q    Is it your opinion that --

4             I'm sorry, are you done?

5        A    So I'm just not sure what the subtitle of

6    the article is referring to, which quality problems,

7    or if it's referring to everything in the article

8    or -- but there's a lot of information in the

9    article.

10       Q    Is it your opinion that the quality problems

11   alleged in this article are related or unrelated to

12   allegations of inventory discrepancies?

13       A    Well, as I said, I'm -- they use the term --

14   Barron's uses the term "quality problems" in its

15   subheadline.  And given the -- there's a lot of

16   information in the article, I'm not sure if the whole

17   art- -- if they mean that the whole article is about

18   quality problems or it's about a lot of different --

19   a lot of different things.  So I'm not sure I can

20   answer that.

21       Q    You don't know what they're referring to

22   when they refer to quality problems?

23       A    Not specifically, but then there's -- below

24   the subheading, which is sort of a generic

25   description, I don't know if they mean it to be a

Page 174

1   generic description of what's in the -- what's in the

2   article or not but there's a lot of specific

3   information in the article.

4        Q    Specific information about quality problems?

5        A    Well, there's this specific information

6   about quality -- the quality -- quality of wafers

7   produced by LDK.

8        Q    I'm sorry, can you tell me what page you're

9   looking at when you say that?

10       A    It's the fourth page of the article in the

11  first full -- at the end of the first full paragraph

12  at the top.  I see the word "quality" there.  But

13  that's -- there's lots of other information in this

14  article.

15       Q    And you're talking about the paragraph that

16  discusses or states that MEMC allegedly stationed a

17  quality control monitor at LDK.  Is that the

18  paragraph you're referring to?

19       A    Well, it doesn't say that they allegedly

20  stationed a quality control monitor there.  It just

21  says that "MEMC was so alarmed at the quality of the

22  wafers produced by LDK, says the source, that it

23  stationed its own quality-control monitor at the LDK

24  factory."

25       Q    And the next paragraph says that the CFO

Jane Nettesheim                                          9/19/2008

Page 175

1    knows nothing about such manufacturing problems,

2    right?

3         A    Right.

4         Q    Okay.  So I guess my question is are the

5    quality problems in this document that are discussed

6    in this article, are those related or unrelated to

7    the alleged inventory discrepancies that were

8    disclosed by Charley Situ?

9         A    Okay.  I -- again, I don't know what quality

10   problems the subheading is referring to.  That was I

11   think the only place in the article where I saw the

12   word "quality."  But the article talks about -- let's

13   see.  It talks about Mr. Situ leaving the firm, it

14   talks about alleged warehouse and financial reports

15   and all this junk.  I mean, it talks about a lot of

16   things.

17             It talk about Mr. Situ's E-mails.

18             Do you want me to go through everything that

19   the article talks about?

20        Q    No.  I just want to focus on the quality

21   thing right now.

22        A    Okay.

23        Q    But, you know, did you consider whether a

24   discussion or an allegation of quality problems at

25   LDK was negative confounding information that

Page 176

1    affected its stock's price on October 8th?

2         MR. DEVORE:  Object to the form of the question.

3         THE WITNESS:  I don't know which -- what quality

4    problem you're referring to.

5    BY MR. HARRISON:

6         Q   I'm referring to the paragraphs that we just

7    discussed --

8         A   The --

9         Q   -- the allegations from this article that

10   are disclosed in those two paragraphs we just

11   discussed on the fourth page.

12        A   That the quality of the wafers --

13        Q   Right.

14        A   Well, I considered everything that I looked

15   at and I certainly looked at this article.

16        Q   Okay.  I'm asking you about this issue

17   specifically.

18            Did you consider whether allegations of

19   quality problems were negative confounding

20   information that affected the stock's price on

21   October 8th?

22        A   Well, I mean it's part of the article that I

23   considered.  I -- I don't know that I would

24   characterize it as confounding, it seems to me to be

25   related to the -- the problems with the inventory.

Page 177

1      Q    Okay.  You're saying that those quality

2   issues are related to the inventory; is that right?

3      MR. DEVORE:  I'm going to object to the extent

4   that it calls for technical expert testimony.

5      THE WITNESS:  I think I said that this doesn't

6   appear to me to be confounding negative information,

7   it seems to be related but --

8   BY MR. HARRISON:

9      Q    And you agree with me that the article is

10  referring to those quality problems as a rumor,

11  right?

12     A    I see that in the subheading it talks about

13  rumored quality problems.  I said that I've looked at

14  the article and this -- it would be more exact to do

15  a word search but this is the only place in the

16  article where I see the word -- the term "quality" or

17  the word "quality."

18          And there is so much information in the

19  article I'm not sure what specifically the quality

20  problems are that the article is referring to.  I

21  think there's information in the article which --

22  some of which it seems that -- that Barron's has

23  corroborated and some of which perhaps they have not

24  corroborated.  And there are --

25          There's a lot of information in this

Jane Nettesheim                                    9/19/2008

Page 178

1   article.  I don't know what that subheading is

2   referring to.

3       Q   Is there anywhere else besides those two

4   paragraphs that quality is discussed?

5       A   Again, I'd have to look at it again.  I

6   don't -- I was looking at it before, that's where I

7   saw the word "quality."

8       MR. DEVORE:  And I'm going to interpose an

9   objection that the document speaks for itself.

10          If you want the witness to read the entire

11  document and pick out every line that mentions some

12  potential quality problem, we could spend a long time

13  on this.

14      MR. HARRISON:  I don't want the witness to do

15  that.

16          I want the witness to tell me if she

17  considered quality issues as part of her loss

18  causation analysis, and as part of that analysis did

19  she consider those issues as confounding factors in

20  the stock price drop.

21      THE WITNESS:  I considered this whole article

22  and there -- I don't recall anything in this article

23  that I -- that appeared to me to be a confounding

24  factor.

25  BY MR. HARRISON:

Jane Nettesheim                                                    9/19/2008

Page 179

1        Q    Okay.  How about the discussion of the

2    alleged -- well, it says in the first paragraph of

3    the article, it describes China solar power stocks as

4    a red hot bubble.

5             Do you see that?

6        A    Yes.

7        Q    And in that paragraph and in the last

8    paragraph of the article it compares solar stocks to

9    dot-com stocks, right?

10       MR. DEVORE:  Again, the document speaks for

11   itself.

12       THE WITNESS:  I don't see that in the first

13   paragraph.  And in the last paragraph they refer to

14   it as Internet -- they refer to the Internet bubble.

15   BY MR. HARRISON:

16       Q    Synonymous to the dot-com bubble in your

17   opinion?

18       A    I -- yeah.

19       Q    That's fine.

20       A    Yeah.

21       Q    Let's refer to the Internet bubble.

22            The statement that solar stocks were

23   overvalued much like Internet stocks at the time had

24   nothing to do with inventory discrepancies, right?

25       MR. DEVORE:  You mean Internet stocks at the

Jane Nettesheim                                              9/19/2008

Page 180

1    time of the Internet bubble; is that what you mean?

2        MR. HARRISON:  Yes, that's what I meant.  At the

3    time.

4        THE WITNESS:  Could you repeat the question?

5    BY MR. HARRISON:

6        Q    Yes.

7            The article's discussion of Internet stocks

8    has nothing to do with the alleged inventory

9    discrepancies that were disclosed by PiperJaffray on

10   October 3, 2007, right?

11       MR. DEVORE:  Object to the form of the question.

12       THE WITNESS:  There's really not much discussion

13   of the Internet -- of Internet stocks.  But yeah, I

14   don't think the discussion has anything to do with

15   the PiperJaffray report on October 3rd.

16   BY MR. HARRISON:

17       Q    And so the article is basically making

18   negative statements about the solar industry as a

19   whole and attributing them to LDK's stock; isn't that

20   right?

21       MR. DEVORE:  Objection.  The document speaks for

22   itself.

23       THE WITNESS:  There are -- there are lots of

24   things in this article that are LDK specific; so let

25   me find something that's not about LDK.

Jane Nettesheim                                              9/19/2008

Page 181

1    BY MR. HARRISON:

2        Q    Well, I mean is it your opinion that solar

3    stocks have an economic correlation with stocks of

4    dot-com companies?

5        A    I've never measured it.  I have no idea.

6        Q    I mean, wouldn't you agree with me that this

7    article is highly negative about the solar industry?

8        A    I -- I would say that it is highly negative

9    about LDK.  It is -- yeah, I would say it was -- it

10   was negative about the solar -- there are some

11   negative statements about the solar wafer industry.

12   Yeah, I mean --

13       Q    Okay.  If you look at paragraph 5 did you --

14   sorry, I have mine numbered, but it's the third full

15   paragraph on the second page of the article.

16       A    Okay.

17       Q    This article, this paragraph, rather,

18   discusses competition, right?  If you take a look at

19   it.

20       A    Uh-huh.

21       Q    Did you take into account the fact that this

22   article cites competition from new producers as a

23   problem for LDK even if financial and manufacturing

24   controls prove not to be?

25       A    Yes.

Jane Nettesheim                                                    9/19/2008

Page 182

1      Q    It has nothing to do with inventory

2  discrepancy, right?

3      A    Well, I think it says that if the -- if

4  there was -- even if there weren't inventory

5  discrepancies competition would be a problem.

6      Q    Right.

7            So unrelated to the inventory discrepancies?

8      A    Well, yeah.   Competition is always a

9  problem.

10     Q    So again this is a negative statement about

11  companies in the solar industry that the author is

12  attributing to LDK, right?

13     A    It's -- well, it's describing -- it's -- you

14  know, it's talking about competition in the industry,

15  yes.

16     Q    Now, if you look at the last page of the

17  article, at least the last -- yes, so the second to

18  the last page of the document, last page of the

19  article, the second to last paragraph discusses the

20  fact that Financial Chief Lai pointed to hundreds of

21  millions in sales agreements.

22           Do you see that?

23     A    Yes.

24     Q    I'm characterizing the document.

25           Do you see what it says in that paragraph

Jane Nettesheim                                              9/19/2008

Page 183

1    about that?

2        A    Yes.

3        Q    Now, the author discounts these sales

4    agreements, right, by claiming that everyone is doing

5    it; is that a fair characterization?

6        MR. DEVORE:    Objection.    The document speaks for

7    itself.

8    BY MR. HARRISON:

9        Q    Well, it says, "That's because companies are

10   doubling- and tripling," excuse me, it says, "That's

11   because companies are double- and triple-ordering, to

12   combat the shortages of good silicon" and explains

13   that that's the reason why there are so many orders,

14   right?

15       A    That -- yes, that's what the document says.

16       Q    So essentially the author has -- well, let

17   me back up.

18           It's a positive thing, right, if you're a

19   company and you have hundreds of millions in sales

20   agreements generally?

21       A    Yes.

22       Q    So the author takes that positive statement

23   and turns it into a negative, right?

24       MR. DEVORE:    Objection.    The document speaks for

25   itself.

Jane Nettesheim                                          9/19/2008

Page 184

1       THE WITNESS:  Well, he -- the -- the author

2   certainly says that it -- it may not -- the sales --

3   there are sales agreements but they may not turn into

4   actual -- not all of them may turn into actual sales.

5   BY MR. HARRISON:

6       Q   Does it cite any objective facts to support

7   that statement?

8       A   I don't know if earlier he has -- he says

9   anything about -- if he has any specifics about the

10  shortage of good silicon.  You know, there could

11  be -- I mean, the article in general talks about

12  trying to -- the company is trying to get silicon.

13      Q   All right.  Now I asked you this question

14  earlier with respect to the PiperJaffray report but I

15  want to ask you again:  Did you do any analysis to

16  determine whether this article further tapped into

17  the anxiety of the US markets relating to

18  Chinese-based companies?

19      MR. DEVORE:  Objection.  Asked and answered.

20      THE WITNESS:  I don't know that it tapped into

21  anything.  I think it -- it -- it talks about some

22  Chinese-based companies but I'm not sure that it

23  tapped into anything.

24  BY MR. HARRISON:

25      Q   Did you do anything to consider, in relation

Jane Nettesheim                                          9/19/2008

Page 185

1   to the October 8th article, whether the market's

2   reaction to this had anything to do with US markets

3   skittishness with regard to Chinese-based companies?

4       MR. DEVORE:  Objection.

5       THE WITNESS:  Well, that's your

6   characterization.  You know, I -- I -- I haven't -- I

7   haven't seen any evidence of that.

8   BY MR. HARRISON:

9       Q   Well, I guess let me ask you just a little

10  more generally.  Did your analysis of the stock drops

11  in relation to the information that you assert are

12  corrective disclosures include any analysis of the

13  fact that LDK is a Chinese company as opposed to a

14  US company?

15      A   Well, my analysis incorporates the industry

16  index; so to the extent -- you know, so it does

17  incorporate that.  But I didn't -- I didn't do a

18  specific analysis of Chinese companies.

19      Q   Are you aware of whether people who sold

20  their LDK stock after the release of the Barron's

21  article relied on analysts' recommendations about the

22  stock?

23      A   I don't -- I don't know what any specific

24  investor -- what caused any specific investor to sell

25  or buy the stock.

Page 186

1       Q    Are you aware of analysts' reports

2   discounting these allegations even after the

3   October 8th disclosure?

4       MR. DEVORE:   Which allegations?

5       MR. HARRISON:   Allegations of inventory

6   discrepancies.

7       THE WITNESS:   Well, I read the analysts'

8   reports.  I don't remember, you know, everything that

9   they said.  I have some information about the CIBC

10  report in -- analyst's report in my declaration.

11  BY MR. HARRISON:

12      Q    What paragraph are you referring to?

13      A    Paragraph 93.  I mean, that -- that's one

14  analyst's report, it's an example.  But I don't have

15  the complete report here.

16          I don't see where that analyst is -- is

17  questioning or not questioning the -- the allegations

18  with respect to -- I don't have the analyst's report

19  sitting here and I don't know whether the analyst

20  said in that report I believe the allegations or I

21  don't believe the allegations.  I don't know if they

22  say anything directly about that.

23      Q    Are you aware that on October 10th -- well,

24  let me back up.

25          Are you aware that Needham & Company was one

Jane Nettesheim                                    9/19/2008

Page 187

1   of the analysts that followed LDK and its stock?

2       A   Yes.

3       Q   Are you aware that on October 10th Needham &

4   Company upgraded its recommendation from buy to

5   strong buy?

6       A   I don't have -- I don't see that report

7   here.  I may have -- I may have seen that report.  I

8   do know that on October 4th they reiterated their

9   buy.

10      MR. HARRISON:  Let me just mark Exhibit 21.  Is

11  that where we're at?

12      THE REPORTER:  Yes.

13          (Defendants' Exhibit 21 was marked

14      for identification and is attached

15      hereto.)

16      THE REPORTER:  It's before the witness.

17  BY MR. HARRISON:

18      Q   I'll let you have a chance to take a look at

19  this.

20          But for the record, it's an October 10, 2007

21  Needham analyst report, the title "LDK Solar Co. Ltd.

22  (LDK) - Strong Buy (was Buy)."

23      A   Yes, I see that.

24      Q   Okay.  So have you seen this analyst's

25  report before?

Jane Nettesheim                                    9/19/2008

Page 188

1        A    I think I have but I'm not -- I'm not sure.

2    I know I've seen Needham reports.

3        Q    Do you see --

4        A    I may have seen this one.

5        Q    Do you see that Needham is upgrading its

6    recommendation from buy to strong buy, right?

7        A    Yes.

8        Q    And the first bullet point under the main

9    paragraph on the first page says, "Based on extensive

10   conversations with management and other industry

11   contacts regarding the intricacies of how incoming

12   polysilicon scrap is allocated we believe there are

13   no accounting issues related to scrap inventories.

14   LDK virtually uses all of the incoming scrap that

15   they buy in the manufacture of their multicrystalline

16   solar wafers."

17            Do you see that?

18       A    Yes.

19       Q    So are you also aware of whether or not

20   PiperJaffray changed its recommendation with regard

21   to the stock after the 10/8 disclosure?  Or I should

22   rephrase that.

23            We've already seen --

24       A    Yes.

25       Q    -- a document in which it changed its

Jane Nettesheim                                                9/19/2008

Page 189

1    recommendation October 31st, right?

2         A    Yes.

3         Q    Do you know whether in the week following

4    the disclosure on October 8th PiperJaffray changed

5    its recommendation?

6         A    No, I don't.

7         Q    So would you agree that certain analysts

8    continued even after the October 8th disclosure to

9    believe that the allegations disclosed on October 3rd

10   and October 8th were uncorroborated, correct?

11        A    Yes.

12        Q    Did you analyze which alleged false

13   statements that the October 8, 2007 Barron's article

14   corrected or do you rely on the complaint for that?

15        A    I relied on the complaint.  I did not go

16   back and match them up.

17        Q    I think earlier you mentioned that

18   October 9th is not a disclosure day; is that correct?

19        A    There's information related -- related to

20   the disclosures; so -- so in that sense I would -- I

21   would consider it a -- a disclosure.  I mean, it

22   would be related to the disclosures.

23            But I also said that it was -- it was an

24   increase on that day.  The stock price went up that

25   day, but there was more information on that day about

Jane Nettesheim                                          9/19/2008

Page 190

1   the allegations.

2        Q    So you're using October 8th as a day in

3   which there were more corrective disclosures?

4        A    You said October 8th.  Did you mean

5   October 9th?

6        Q    I meant October 9th, yes.  Thanks.

7        A    Yeah, I would say that there's more

8   information on October 9th related to the corrective

9   disclosures.

10       Q    What information are you referring to when

11   you say that?

12       A    The -- there was the press release by the

13   company which refuted the inventory manipulation

14   allegations; I would say that's related.  There was

15   other information in the press release but those

16   were -- those were unrelated.

17            There was the CIBC analyst report on that

18   day that talked about the allegations; that is more

19   of a negative type of report, though, they would like

20   more information about the allegations.

21            Those are two things that I cite

22   specifically in the text of my report.  And there may

23   be -- there's other -- you know, there are news

24   articles on the 9th.  News articles are -- appear to

25   be commenting most -- mostly on the company's press

Page 191

1    release.

2           Some other articles, I can't tell just from

3    the headline what -- what was contained in the

4    article.   Some notification of lawsuits.

5         Q    Okay.   So --

6         A    There's actually quite a few articles that

7    day and there's a nightly -- I guess it was discussed

8    in the nightly business report so there might be some

9    other information in that.   But there are -- there

10   are lots of articles on that day.

11        Q    So you identify all of those articles as

12   additional corrective disclosures?

13        A    No.

14           To the extent there was information in there

15   related to the allegations, they're -- they're -- you

16   know, it could be -- it could be informative with

17   respect to the -- to the -- to the allegations.   But

18   there may be other unrelated information in there as

19   well.

20        Q    When you say information in these articles,

21   the press releases, do you mean new information or

22   information that just repeats what's already been

23   disclosed to the market?

24        A    There -- new information, but I -- I don't

25   know if there was new information outside of -- if

Page 192

1   there was any new information related to the

2   allegations in the articles that wasn't just

3   repeating, for example, the company's press release.

4        Q    Okay.  So that wouldn't be a corrective

5   disclosure then, right?

6        A    Correct.

7        Q    So to be a corrective disclosure it would

8   have to have new information that already wasn't

9   disclosed to the market?

10       A    Yes.  But as -- but as I said earlier, there

11   are different ways for different investors to become

12   aware of information.

13       Q    Did you go through all the articles that you

14   described to me from your report and from, I believe

15   it was Exhibit 13, and determine what new information

16   they might have contained that was released to the

17   market?

18       A    I looked at those articles and summarized in

19   my report what I -- what I thought was relevant.  And

20   in my report I included the specific description

21   of -- of what was in the company's press release and

22   what was in the CIBC analyst report.  It -- if there

23   was other new information in the other articles it

24   probably didn't stand out since I didn't include it

25   in the text of the report, but --

Jane Nettesheim                                                    9/19/2008

Page 193

1      Q    All right.  One thing you mentioned was the

2    company's press release on October 9th, right?

3      A    Yes.

4      Q    Is it your opinion that the company's press

5    release is a corrected disclosure?

6      A    Well, I think it -- it -- it added

7    information and that information was related to the

8    allegations and it's -- you know, it's a positive

9    disclosure.

10     Q    But it related to the fraud allegations that

11   plaintiffs advance in this case?

12     A    Yes.

13     Q    So you consider it as a corrective

14   disclosure?

15     A    I -- I would say that the information in

16   that press release would -- is part of the

17   information -- the broad information that would be

18   called a corrective disclosure.

19     Q    When you say "broad information," can you

20   explain what you're referring to?

21     A    The information -- whatever information came

22   out that day related to the allegations.

23     Q    So if the press release contained

24   information relating to the allegations, then that

25   would also be considered part of the corrective

Page 194

1   disclosure?

2        A    Oh, yes.

3        Q    Whether positive or negative?

4        A    Yes.

5        Q    All right.  What if information comes out

6   three days later that relates to the fraud

7   allegations, would you consider that corrective

8   disclosure?

9        MR. DEVORE:  Objection.  Vague.

10       THE WITNESS:  I -- I didn't look out -- I didn't

11  look at information -- I don't recall looking at

12  information past the 9th.

13  BY MR. HARRISON:

14       Q    If it discloses new information about the

15  fraud, isn't that relevant to the analysis of loss

16  causation?

17       A    No.  The analysis of loss causation is

18  not -- I'm not trying to -- to measure anything here,

19  I'm just trying to show that these corrective

20  disclosures had a significant impact on the stock

21  price.

22       Q    All right.  You're identifying the

23  corrective disclosures, though, right?

24       A    With respect to the -- to, you know, what

25  happened at the end of the class period, yes.  But

Jane Nettesheim                                                    9/19/2008

Page 195

1    not beyond that.

2         Q    Why didn't you look beyond that?

3         A    Well, this is -- this -- this demonstrates

4    that there is -- the stock price declines were

5    related to the corrective disclosures, and that was

6    my purpose in -- in -- in analyzing loss causation.

7         Q    And your analysis of loss causation doesn't

8    take into account any other information after that

9    relating to the fraud that plaintiffs allege in this

10   case, right?

11        A    That to me seems to be more of a -- trying

12   to measure inflation or something and I'm not trying

13   to measure inflation, I'm trying it analyze loss

14   causation.

15        Q    Is one aspect of loss causation trying to

16   determine which disclosures had a positive or

17   negative impact on the company's stock that are

18   related to the fraud?

19        A    Yes.  And I demonstrated that, that at the

20   end of the class period the corrective disclosures

21   related to the fraud had a -- had an impact on the

22   company stock price.

23        Q    You're aware that the day after the

24   October 3rd PiperJaffray report the company announced

25   an audit by an independent auditor of the company's

Jane Nettesheim                                    9/19/2008

Page 196

1    inventory, right?

2        A    I -- I believe that's correct.

3        Q    So investors --

4        A    I think that's correct.

5        Q    I'm sorry, I thought you were finished.

6        MR. DEVORE:  Do you want to refer back to the

7    documents?

8        MR. HARRISON:  I think it's Exhibit -- let me

9    see.  Exhibit 14, the SEC document.

10       THE WITNESS:  Are you talking about the

11   company's press release?

12   BY MR. HARRISON:

13       Q    Yes.

14            And I think my question was that the day

15   after the PiperJaffray report on October 3rd the

16   company announced an audit by an independent auditor

17   of the inventory?

18       A    Yes, the company did.

19       Q    And the market was aware of that disclosure,

20   right?

21       A    Yes, that press release would have been

22   available -- broadly available to the public, yes.

23       Q    So the results of such an audit was relevant

24   to the market, correct?

25       A    As I recall, at least one of the analysts

Jane Nettesheim                                          9/19/2008

Page 197

1   said that they were very interested in seeing the

2   results of that audit.

3       Q   But in your loss causation analysis you

4   weren't concerned about the effect of the results of

5   that audit on the company's stock price, right?

6       A   That isn't related to the analysis of loss

7   causation.  It's -- the analysis of loss causation is

8   just did the corrective disclosures affect the stock

9   price, and they did.

10      Q   Okay.  So that's all you're considering,

11  then, right?

12      MR. DEVORE:  Object to the form of the question.

13      MR. HARRISON:  I take your objection.  That

14  question was a little vague.

15      Q   You're not analyzing the truth, then, right,

16  or what the market perceives to be the truth?

17      MR. DEVORE:  Object to the form of the question.

18      THE WITNESS:  I'm just analyzing the -- what was

19  the publicly available information at the time and

20  what was the stock price reaction at the time.

21  BY MR. HARRISON:

22      Q   And your analysis is not interested at all

23  about a disclosure two months later that contradicts

24  what you claim were corrective disclosures right at

25  the end of and after the class period?

Page 198

1        MR. DEVORE:  Objection.  Argumentative,

2   misstates her testimony.

3        THE WITNESS:  I -- well, I didn't claim that

4   they were corrective disclosures.  I -- as I said

5   earlier, I took that -- I take the allegations in the

6   complaint as true.

7             But it's -- you know, it is the case that

8   the stock price went down on October 3rd,

9   October 4th, October 8th and back up on the 9th.  And

10  my analysis I think demonstrates that a large part of

11  those stock price movements were related to

12  disclosures about the allegations.

13  BY MR. HARRISON:

14       Q    Okay.  You considered the October 9th press

15  release by the company as part of your loss causation

16  analysis, right?

17       A    Yes.  I considered that as -- as -- as a

18  piece of information that was relevant, yes.

19       Q    Why, then, is not the company's press

20  release on December 17th about the results of the

21  investigation also relevant?

22       A    Well, it may be relevant on December 17th

23  but it wasn't relevant in terms of explaining the

24  stock price movement at the end and immediately

25  following the class period.

Jane Nettesheim                                    9/19/2008

Page 199

1        Q    So you're cutting it off at a specific

2   period of time, then, right?  Is that what you're

3   saying?  You're only considering the information at

4   the end of and immediately after the class period; is

5   that fair?

6        A    Well, with respect to -- to loss causation,

7   yes.  And why did the stock price drop then.  That

8   was -- I don't think the press release on -- if there

9   was a press release on December 17th, I haven't seen

10  it.  But if there was one, I don't think that was

11  related to the stock price movements in early

12  October.

13       Q    You're not even aware of whether or not the

14  company announced the conclusion of the audit into

15  the very inventory discrepancies that were alleged by

16  Situ and released to the market on October 3rd and

17  October 8th?

18       A    I'm generally aware that there was

19  information about -- about that subject but I --

20  I'm -- I'm not specifically aware of what was said

21  when.

22       Q    Do you know if the December 17, 2007 press

23  release had any effect on the company's stock price?

24       MR. DEVORE:  Objection.

25            The witness has already said she's not aware

Jane Nettesheim                                                    9/19/2008

Page 200

1    of any December 17th press release.

2        THE WITNESS:  I don't -- I don't know.

3    BY MR. HARRISON:

4        Q   I think we discussed this before but are you

5    aware that the plaintiffs allege that the October 4,

6    2007 press release by the company is a false

7    statement in this case?

8        A   It's getting late, I can't remember.  But I

9    think -- I think we established that.  But I could

10   look at the complaint.

11       Q   We've been going for an hour and 45, if you

12   want to take a break, we could.  It might give me a

13   chance to take a look at what else I have.  Do you

14   want to take a break?

15       A   Well, you have a question pending.

16       Q   Okay.

17       A   Do you want me to --

18       Q   Yes.  Answer the question and then we'll

19   take a break.

20       A   Let me just look really quickly and --

21       Q   I'd rather have you, you know, take a break

22   if you need it.

23       A   Yes, the -- yes.

24       Q   Okay.

25           And now that that question is no longer

Jane Nettesheim                                                    9/19/2008

Page 201

1   pending, let's take a quick break.

2        THE VIDEOGRAPHER:  We're going off the record at

3   2:44.  This concludes disk three.

4            (Off the record.)

5        THE VIDEOGRAPHER:  This begins disk number four.

6   We're now back on the record at 2:54.

7        MR. HARRISON:  Okay.

8        Q   Did the company ever disavow its prior

9   statements regarding polysilicon inventory counts

10  during the class period?

11       A   I don't think so, not that I recall.

12       Q   Did the company ever restate its financial

13  statements to reflect inventory discrepancies?

14       A   Ever?  Your last question was during the

15  class period during that time period.  Are you

16  referring to the same time period or --

17       Q   I'll restate it.

18           Has the company ever restated its financial

19  statements to reflect the inventory discrepancies

20  that were alleged by Mr. Situ during the class period

21  or --

22           Sorry.

23       A   Can I just say that --

24       Q   Yes.

25       A   -- with your last question I understood you

Page 202

1    to say -- you were asking me if during the class

2    period, during the period June through October 7,

3    2007 did the company ever change its inventory --

4         Q    I see.

5         A    -- or disavow its inventory during that time

6    period?  Did you ever -- mean ever?

7         Q    I see.  Let me try that again.

8         MR. DEVORE:  Why don't we try it again.

9         MR. HARRISON:  I apologize, I'm just throwing

10   phrases here and there all over the place.

11        Q    All right.  Has the company to your

12   knowledge ever disavowed its statements that it made

13   during the class period about polysilicon inventory

14   accounts?

15        A    I don't know.

16        Q    And did the company ever restate its

17   financials to reflect the inventory discrepancies

18   that were alleged by Mr. Situ?

19        A    I don't think it did but I'm not sure about

20   that.

21        Q    Is any of this information relevant to the

22   analysis that you've done in this case?

23        A    For purposes of this report, no.

24        Q    Is it true that a proposed class member in

25   this case who purchased shares before the October 3,

Jane Nettesheim                                    9/19/2008

Page 203

1    2007 PiperJaffray report and sold before that

2    disclosure did not suffer a loss?

3        MR. DEVORE:  Object to the form of the question.

4        THE WITNESS:  I haven't done an analysis of

5    losses at all.

6    BY MR. HARRISON:

7        Q    You allege that or at least you opine that

8    the October 3, 2007 PiperJaffray report constituted a

9    partial corrective disclosure, right?

10       A    Well, that's based on the -- my -- it's

11   really more of an assumption based on the information

12   in the complaint.  As I already said, I take the

13   allegations about the misrepresentations and

14   omissions in the corrective disclosures from the

15   complaint as -- as true.

16       Q    Okay.  So that corrective disclosure in your

17   opinion reduces the level of inflation that's in the

18   stock based on the false statements that plaintiffs

19   allege, right?

20       A    I haven't done an analysis of inflation, per

21   se, but I would say that on that day there was a

22   large decline in the stock price.

23       Q    Okay.  But you don't have an opinion as to

24   whether someone who sells before that disclosure

25   suffers a loss?

Jane Nettesheim                                        9/19/2008

Page 204

1       A    No, I do not.

2       Q    Okay.  How many times have you served as an

3   expert on the subject of market efficiency?

4       A    Well, I think earlier we counted I believe

5   five times that I've testified in securities cases,

6   and I could look at the list, but I believe in all

7   five of those instances I -- market efficiency was

8   part of my opinion.  And then I've been retained in

9   other cases and as I recall in all of those other

10  cases, market efficiency would have been incorporated

11  or would have been an area I was asked to -- to

12  examine.

13      Q    Do you have an opinion as to how fast prices

14  incorporate all publicly available information

15  relating to the stock of the company?

16      A    I've looked at academic articles and have,

17  you know, seen price reactions in many cases.  And

18  information can be impounded in a stock price very

19  quickly, within -- within minutes.  It depends on the

20  piece of information.  Sometimes it can take hours

21  or -- or days if -- if -- if the value of the

22  information is not clear.

23           So I think it depends on the -- the type of

24  information, but -- but information is incorporated

25  into stock prices quickly.

Jane Nettesheim                                                    9/19/2008

Page 205

1      Q    If certain material news is repeated

2   multiple times on different days is it still material

3   after the first day?

4      MR. DEVORE:   Object to the form of the question.

5      THE WITNESS:   Yes.   If the -- if the news is --

6   is identical I would say that it -- it wouldn't be

7   important or it wouldn't really even be characterized

8   as news after it's first sort of broadly available to

9   the public because it wouldn't be new information;

10  so -- so it wouldn't be news if it were -- if it were

11  identical.

12  BY MR. HARRISON:

13     Q    You wouldn't expect identical news to affect

14  the stock price; is that correct?

15     A    Not after a piece of news is broadly --

16  broadly published or broadly available.

17     Q    Do you agree that there's sometimes a lag

18  between information entering the market and the

19  market assimilating that information?

20     A    I think -- I think it depends on the type of

21  information.   Well, and I suppose, too, where --

22  where that information has been published; if it's a

23  very restrictive -- if it's not widely published, it

24  may take a little while.   Or as I said earlier, if

25  it's information that is difficult to -- to assess

Jane Nettesheim                                                    9/19/2008

Page 206

```
 1   with respect to its value, there -- that could take
 2   some time.
 3        Q    Now, in connection with your opinion on
 4   market efficiency you looked at Cammer factors,
 5   correct?
 6        A    Yes.
 7        Q    Did you find that all five were met with
 8   respect to LDK?
 9        A    Yes.
10        Q    Is it your understanding that all five
11   factors must be met in order for a market to be
12   considered efficient under Cammer?
13        A    I don't recall if all five -- wait, no.  The
14   Cammer factor number 4, whether or not they were
15   eligible to file an S-3, that -- no, that factor was
16   not met because of the -- the -- the timing; they had
17   not -- they had not been filing SEC filings for
18   12 months.  So due to timing issues they could not
19   file an S-3 during that class period; so -- so that
20   Cammer factor they --
21        Q    Okay.  That was in response to my earlier
22   question?
23        A    Yes.  I'm sorry I missed that.
24        Q    No.  That's fine.  That's fine.  Feel free
25   to correct anything if you feel like you've said it
```

Jane Nettesheim                                              9/19/2008

Page 207

1    wrong.

2         My next question was is it your

3    understanding that all five factors have to be

4    satisfied for finding of market efficiency under

5    Cammer?

6         MR. DEVORE:  Object to the extent it calls for a

7    legal conclusion.

8         THE WITNESS:  I don't know.

9    BY MR. HARRISON:

10        Q   Have you ever opined in a case on market

11   efficiency, aside from this one, and not found all

12   five were met?

13        A   There may have been -- I can't recall

14   specifically but there may have been another case

15   where the company did not file an S-3 or was not

16   eligible to file an S-3 because -- again, because of

17   timing, that it hadn't been making SEC files for

18   12 months.

19        Q   Okay.  And so I take it it's your opinion

20   that if only one of the Cammer factors is not met

21   then it still indicates an efficient market?

22        MR. DEVORE:  Object to the form of the question.

23        THE WITNESS:  No, that's not my opinion.

24   BY MR. HARRISON:

25        Q   Okay.  It was sort of a general question,

Page 208

1    right.

2            That's your opinion in this case, right,

3    that four out of the five Cammer factors are met?

4        A   Well, and there's other indicia of market

5    efficiency.

6        Q   Sure.  Sure.  I'm talking about just Cammer

7    right now.

8        A   Yes.

9        Q   Are you aware of whether there's a minimum

10   number that has to be met to find an efficient market

11   under Cammer?

12       MR. DEVORE:  Objection to the extent it calls

13   for a legal conclusion.

14       THE WITNESS:  I don't know.

15   BY MR. HARRISON:

16       Q   Okay.  Now, in your report you conclude at

17   paragraph 19 that "The high level of trading activity

18   associated with trading in the LDK ADSs during the

19   Class Period indicates that LDK ADSs traded in a

20   liquid market."

21            Do you see that?

22       A   Yes.

23       Q   What do you mean by "liquid market"?

24       A   That there was sufficient trading occurring

25   such that if somebody wanted to go to the market and

Page 209

1  trade on a piece of information, they could, they

2  could do so.

3      Q   Is that synonymous with an efficient market,

4  the term "liquid market"?

5      A   Not necessarily.

6      Q   Is volume an important factor in determining

7  whether the market for options on LDK stock is

8  efficient?

9      A   I -- since they're derivative securities,

10 I -- I'm not sure that the volume would be that

11 important.

12     Q   So it's your opinion that volume is not

13 important when determining the efficiency of the

14 market for options on a company stock?

15     A   Well, there has to be some trading,

16 otherwise they wouldn't exist.  But I know -- as I

17 sit here I'm -- I'm not sure what -- how the volume

18 of the put/call options would be relevant.

19     Q   It wasn't relevant to your analysis?

20     A   Only to the extent that in the analysis of

21 put/call parity I used the bid/ask quotes for un- --

22 the closing bid/ask quotes on days when there was

23 volume in either the put option or the call option or

24 both.

25     Q   You studied the put/call parity only when

Page 210

1   puts and calls were traded, right?

2        A    Yes.   One -- if one or the other was traded.

3   The data are -- the data you obtain from

4   OptionMetrics are the closing bid and ask quotes.

5        Q    What if options trade on a day when there's

6   no relevant news or when there is --

7             I'm sorry.

8             What if no options trade on a day when

9   there's no relevant news?

10       MR. DEVORE:   Want to try it one more time?

11       MR. HARRISON:   I hope.   Sorry.   You're right, it

12   is getting late and it's Friday.

13            Let me just strike that for now.

14       Q    I think what I was trying to ask was what if

15   there's no options trading on a day that there's

16   relevant news, what would that tell you about the

17   efficiency of the market for options trading on a

18   company's stock?

19       A    I don't know.   I haven't thought about that.

20   I -- I'm not sure.   Generally there's a lot less

21   trading in options than there is in the stock but --

22   I'm not sure how important -- I don't know that that

23   would be important.

24       Q    Now, with respect to the Cammer factor

25   volume, what sort of a benchmark did you use to

Jane Nettesheim                                                    9/19/2008

Page 211

1    determine whether the trading volume is high?

2         A   Well, the -- based on my experience the

3    trading volume looks high.  But also the -- generally

4    I just refer to the -- the Bromberg -- Cammer court

5    cites Bromberg and that's -- as a benchmark.

6         Q   And what does that tell you, what did

7    Bromberg tell you?

8         A   Well, Bromberg says turnover measured by

9    average weekly trading of 2 percent or more of the

10   outstanding shares, which justifies a strong

11   presumption that the market for the security is an

12   efficient one, 1 percent would justify a substantial

13   presumption.

14        Q   Okay.  What benchmark do you use for

15   annualized turnover ratio?

16        A   I just compared that to the average for NYSE

17   stocks in 2007.

18        Q   Okay.  One of the Cammer factors that you

19   analyzed was whether a significant number of

20   securities analysts followed and reported on the

21   company stock in a class period, right, at

22   paragraph 24?

23        A   Yes; whether securities analysts researched

24   or reported on -- on a company.

25        Q   And you conclude that the number of analysts

Jane Nettesheim                                                        9/19/2008

Page 212

1    and the amount of reporting indicate an efficient

2    market, right?

3        A    Yeah.  Yes, it's consistent with an

4    efficient market.  There were several analysts

5    reporting on the company and several analysts'

6    reports published during the class period.

7        Q    And is there a benchmark that would tell you

8    the number of analysts' reports that would support a

9    finding of an efficient market, or at least that

10   would satisfy this Cammer factor?

11       A    I -- I don't know of a benchmark.

12       Q    Is there a benchmark for the number of

13   analysts that follow a firm that would tell you that

14   this Cammer factor is satisfied?

15       A    I'm not aware of a benchmark.

16       Q    What's the basis for your conclusion, then,

17   that this factor is satisfied based on the number of

18   analysts and the number of analysts' reports?

19       A    Well, that there were -- there were at least

20   nine firms that provided coverage, coverage started

21   immediately after the quiet period, extended through

22   the class period; that the, you know, analysts'

23   reports were published upon, you know, news --

24   important news about the company.  That -- that all

25   seemed to be relevant.

Jane Nettesheim                                           9/19/2008

Page 213

1      Q    Okay.  What did you compare that to to come

2   to your conclusion that this factor was satisfied?

3      A    Well, I've done many cases, many analyses of

4   market efficiency for different companies.  I would

5   say that this company has several analysts.  It

6   certainly isn't as widely followed as other -- as

7   some companies but it's followed as much as most

8   companies that I've seen.

9      Q    In the cases in which you've offered an

10  opinion on analysts' coverage under Cammer, have you

11  ever concluded that this Cammer factor was not

12  satisfied?

13     A    I don't recall if I've published or if I've

14  offered a report -- submitted a report that -- where

15  this Cammer factor was not satisfied.

16     Q    You don't recall?

17     A    I -- I don't recall.  I don't -- I don't

18  recall filing -- you know, having a report filed

19  where I thought this Cammer factor was not satisfied.

20  I don't recall having that opinion.

21     Q    How about for the one we discussed

22  previously, trading volume, did you ever opine in a

23  case that this Cammer factor based on trading volume

24  was not satisfied?

25     A    Where -- I mean, I've seen cases where there

Page 214

1   was very low volume and very low coverage but I

2   wasn't asked to write a report in those cases.  But

3   where I've written a report, I don't think that

4   the -- the first Cammer factor was not satisfied.  I

5   think they've all -- the first Cammer factor was

6   satisfied in all the reports that I've written.

7        Q   Another factor you considered was market

8   makers, right?  Paragraph 28.

9        A   Well, that -- I considered that particular

10  Cammer factor, yes.

11       Q   All right.  You note there in paragraph 28

12  that "this factor applies to stocks traded on the

13  NASDAQ"; is that right?

14       A   Yes.

15       Q   So your analysis of this factor is by

16  analogy because LDK ADS was traded on the New York

17  Stock Exchange, right?

18       A   Yes.

19       Q   Can you identify the number of market makers

20  for LDK's ADS shares?

21       A   Well, there was one specialist assigned by

22  the New York Stock Exchange to -- to this stock.

23       Q   Is that a market maker?

24       A   Well, they -- on the New York Stock Exchange

25  there is -- the New York Stock Exchange assigns just

Jane Nettesheim                                                    9/19/2008

Page 215

1    one specialist to each stock, there's just one, and

2    that specialist -- I mean, I describe in my report

3    what the duties are of a specialist and they -- they

4    function like a market maker, yeah.

5        Q   Are you aware of any decisions finding that

6    the role of a specialist can be a substitute for the

7    number of market makers for this Cammer factor?

8        MR. DEVORE:  Objection to the extent it calls

9    for a legal conclusion.

10       THE WITNESS:  I -- I don't recall.

11   BY MR. HARRISON:

12       Q   Same question with respect to this factor.

13           Have you ever offered an opinion on market

14   efficiency in a case in which you've found that this

15   Cammer factor was not satisfied?

16       A   Well, I've -- there have been other cases

17   where I was analyzing a -- a stock that was listed on

18   the New York Stock Exchange and so therefore instead

19   of having market makers, the Exchange assigns one

20   specialist and I describe that in -- described that

21   circumstance in those reports, also.

22       Q   Are you aware of any authority by which this

23   Cammer factor can be satisfied by analyzing

24   or analogizing to a specialist instead of using

25   market makers?

Page 216

1        MR. DEVORE:  Object to the extent it calls for a

2    legal conclusion.

3        THE WITNESS:  Well, I described in my report

4    what the duties are of a specialist.  They are

5    similar to those of a market maker, although actually

6    I think -- I believe a specialist has -- is required

7    to perform certain -- certain duties as -- in their

8    role as a specialist at the New York Stock Exchange;

9    so I think that's even more stringent.  But that's

10   the way the Exchange is organized.

11   BY MR. HARRISON:

12       Q    Cammer factor 5 concerns a cause-and-effect

13   relationship, right?

14       A    Yes.

15       Q    I mean, in shorthand it does?

16       A    Yes.

17       Q    And that looks to your event study that you

18   performed in this case, right?

19       A    Yes.

20       Q    We've talked about that at length here today

21   but I was wondering if you've ever offered your

22   opinion in a securities case for market efficiency in

23   which you've concluded that Cammer factor number 5

24   was not satisfied?

25       A    No.

Jane Nettesheim                                          9/19/2008

Page 217

1       Q    How about what you refer to as Unger/Bell

2   factor 6, market capitalization; have you ever

3   offered an opinion in a securities case in which you

4   have found that this factor is not satisfied?

5       A    In older reports I didn't even consider this

6   factor.  I just don't remember if I had a report with

7   a particularly small company or not.

8       Q    Have you ever offered your opinion on market

9   efficiency on a case that involves ADS shares traded

10  on NYSE?

11      A    Yes.

12      Q    Do you remember the name of that case?

13      A    Yes.

14      Q    Is it something you can disclose?

15      A    I think so.

16      Q    I asked because you seemed a little

17  hesitant.

18      A    I think so.  I think so.

19      Q    Okay.

20      A    Did you ask me if I filed a -- if there was

21  a report?

22      Q    Yes.

23      A    Okay.  Yes, I believe I can disclose it.

24           It was Vivendi Securities litigation.

25      Q    How long ago was that?

1       A    Maybe four years ago.

2       Q    Do you recall where that was filed, where

3   the case was?

4       A    New York.

5       Q    Federal court obviously?

6       A    Yeah.  Is that the Southern District,

7   Manhattan?  I think it's the Southern District of

8   New York, I think, but it's the Manhattan --

9       Q    East Coast guys probably know more than me.

10          So turning back to some of these Unger/Bell

11  factors, you said in older reports you haven't

12  applied the Unger/Bell factors.

13      A    In some older reports.

14      Q    Oh, I'm sorry.

15      A    There are reports where I've applied

16  Unger/Bell factors more recently, but in some older

17  reports I did not.

18      Q    Why did you use the Unger/Bell factor here,

19  or the factors that you analyzed?

20      A    It -- it seems more recently that the courts

21  are interested in -- may be interested in more and

22  more information; so -- so I've incorporated them.

23      Q    We talked about market factor real quick.

24  How about for bid/ask spreads, Unger/Bell factor 7,

25  have you ever opined in a securities case in which

Page 219

1   you've found that this factor was not satisfied?

2        A    I don't think so.  And again, this is a

3   factor that I've looked at more recently but I

4   don't -- I think this factor was satisfied.

5        Q    How about factor number 8 on page 23, same

6   question?  I can repeat it if you want.

7        A    Well, in this case I said that the -- the

8   public float is only about -- approximately

9   17 percent of the combined ordinary -- well, of the

10  ordinary shares outstanding and the ADSs are a subset

11  of that; so I would say that the public float here

12  is -- is small.

13       Q    Okay.  So this factor is not satisfied?

14       A    I'd say it's inconclusive.  I'm not sure --

15  especially market capitalization and public float,

16  I'm not sure what that tells you about market

17  efficiency, but it seems to be something that the

18  courts are interested in.

19       Q    Skip to factor 10, "Institutional

20  Ownership."  Any case in which you've found that this

21  factor wasn't satisfied?

22       A    You know, I've seen cases where there was

23  limited institutional ownership of stock.  I'm not

24  sure if I filed a report in those cases -- couple of

25  cases or not.  Probably didn't.  I don't recall.

Jane Nettesheim                                              9/19/2008

Page 220

1        Q    And then the 11th factor you cite here, same

2   question?

3        A    As I recall, the reports that I've filed

4   there's been wide dissemination of news about

5   companies.  I think this factor has been satisfied.

6        Q    Do you anticipate filing any further reports

7   in this case?

8        A    I -- I don't know.

9        Q    That option is open to you, right?

10       A    Well --

11       MR. DEVORE:  Object to the form of the question.

12       MR. HARRISON:  That was a very awkward question

13   and I'm almost done; so --

14       Q    You don't at this time anticipate filing

15   another report in this case; is that right?

16       A    I -- I don't know where it -- whether there

17   will be a rebuttal report or not.

18       Q    Okay.  Possibility?

19       A    Not -- I -- I -- well, I think you know the

20   schedule better than I do.  I just assumed that that

21   was a possibility but frankly, I don't know.

22       MR. HARRISON:  Okay.  Earlier today we discussed

23   certain documents that --

24            Well, we can discuss off the record.

25            -- that might not have been produced, or at

Jane Nettesheim                                          9/19/2008

Page 221

1   least that we can talk about.

2       MR. DEVORE:  Yes, we can discuss it.  I'm not

3   sure that anything wasn't produced, but we can talk

4   about it.

5       MR. HARRISON:  Okay.

6           And if those documents have any relevance to

7   your analysis or we need to question you about those

8   documents, then I'd like to leave the deposition open

9   for now.  And also if you file a rebuttal report in

10  this case, but I'm finished answering questions as of

11  today.

12      MR. DEVORE:  I mean, I don't consent to you

13  leaving the deposition open.  I think she -- you

14  know, I do believe that you've received all the

15  relevant information.

16      MR. HARRISON:  Okay.

17      MR. DEVORE:  But we can talk about it off the

18  record.

19      MR. HARRISON:  Okay.

20      MR. DEVORE:  And I think under the terms of our

21  stipulation and protective order, we're required to

22  request 20 days to review the transcript for any

23  confidential information.

24      MR. HARRISON:  Right.

25      MR. DEVORE:  I doubt that there was anything in

Page 222

1  this deposition since everything involved public

2  information but, you know, we'll exercise that right

3  and if there is anything confidential, we'll

4  designate it.

5      MR. HARRISON:  Okay.  We'll have to discuss how

6  that impacts the filing of our opposition to the

7  class cert motion in case we want to use testimony;

8  so perhaps we can discuss that in the next couple

9  weeks.

10     MR. DEVORE:  Yes.  Or we can talk about it off

11  the record right now.  That's fine.

12     MR. HARRISON:  Okay.

13         I think that's it.  All right.

14     MR. DEVORE:  You have nothing further?

15     MR. HARRISON:  All right.  Thanks.

16     THE VIDEOGRAPHER:  This concludes today's

17  proceeding in the deposition of Jane Nettesheim.  The

18  number of disks used is four.  We're going off the

19  record at 3:25.

20  /

21  /

22

23

24

25

Jane Nettesheim                                          9/19/2008

Page 223

```
 1   STATE OF _____)
                                     )  ss.
 2   COUNTY OF _____)

 3

 4

 5

 6

 7

 8          I, the undersigned, say that I have read the

 9   foregoing deposition, and I declare, under penalty of

10   perjury under the laws of the State of California,

11   that the foregoing is a true and correct transcript

12   of my testimony contained therein, incorporating any

13   and all changes and/or corrections as noted by me.

14          EXECUTED this _____ day of _____,

15   2008, at _____.

16

17

18          _____
                      JANE NETTESHEIM
19

20

21

22

23

24

25
```

1

2

3

4          I, the undersigned, a Certified Shorthand

5     Reporter of the State of California and the State of

6     Texas, do hereby certify:

7          That the foregoing proceedings were taken

8     before me at the time and place herein set forth;

9     that any witnesses in the foregoing proceedings,

10    prior to testifying, were placed under oath; that a

11    verbatim record of the proceedings was made by me

12    using machine shorthand which was thereafter

13    transcribed under my direction; further, that the

14    foregoing is an accurate transcription thereof.

15          I further certify that I am neither

16    financially interested in the action nor a relative

17    or employee of any attorney of any of the parties.

18          IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20

21    Dated: _____

22

23

          _____
24          LAURIE HELD-BIEHL, CSR, RPR, CRR, CLR
          CSR No. 6781
25