UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:                          )
                                )
LDK SOLAR SECURITIES            )
LITIGATION                      )
                                )   Master File No.
This Document Relates to:       )   C-07-05182-WHA
                                )
All Actions                     )
_____ )

DEPOSITION OF KENNETH LEHN, Ph.D.

San Francisco, California

Tuesday, December 15, 2009

Reported by:  Cynthia Manning
              CSR No. 7645

HUDSON REPORTING & VIDEO                    1-800-310-1769

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   In re:                    )
                               )
 6   LDK SOLAR SECURITIES      )
     LITIGATION                )
 7                             )   Master File No.
     This Document Relates to: )   C-07-05182-WHA
 8                             )
     All Actions               )
 9   _____)

10

11

12

13

14

15           DEPOSITION OF KENNETH LEHN, Ph.D., taken

16      on behalf of Plaintiffs, at 425 California Street,

17      San Francisco, California, beginning at 9:00 a.m.

18      and ending at 5:05 p.m., Tuesday, December 15, 2009,

19      before Cynthia Manning, Certified Shorthand Reporter

20      Number 7645.

21

22

23

24

25
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1   APPEARANCES:

 2

 3   For Plaintiffs:

 4        COHEN, MILSTEIN, SELLERS & TOLL, PLLC
          BY:  JOSHUA S. DEVORE, ESQ.
 5             HERBERT E. MILSTEIN, ESQ.
          1100 New York Avenue
 6        Suite 500 West
          Washington, DC 20005
 7        (202) 408-4600
          jdevore@cohenmilstein.com
 8        hmilstein@cohenmilstein.com

 9

10   For Defendant:

11        LATHAM & WATKINS, LLP
          BY:  MATTHEW D. HARRISON, ESQ.
12        505 Montgomery Street
          Suite 2000
13        San Francisco, California  94111
          (415) 391-0600
14        matt.harrison@lw.com

15

16   Also present:

17        FAYE FORT, Stanford Consulting Group

18

19

20

21

22

23

24

25
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 4

```
 1                        INDEX

 2

 3    WITNESS

 4    KENNETH LEHN, Ph.D.

 5    EXAMINATION                              PAGE

 6       (By Mr. Devore)                         5

 7

 8

 9                       EXHIBITS

10    NUMBER              DESCRIPTION       IDENTIFIED

11

12    Exhibit 2019    Expert Report of            5

13                    Kenneth Lehn, Ph.D.

14

15    Exhibit 2020    USA Today article; Bates   164

16                    Nos. LEHN-0000363 -

17                    LEHN-0000364

18

19    Exhibit 2021    Barron's article, 10/8/07  167

20

21    Exhibit 2022    Morgan Stanley on report on 173

22                    LDK Solar; Bates Nos.

23                    LDK-NDCA-01859437 -

24                    LDK-NDCA-01859465

25
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

1            KENNETH LEHN, Ph.D.

2          SAN FRANCISCO, CALIFORNIA;

3        TUESDAY, DECEMBER 15, 2009; 9:00 A.M.

4

5            KENNETH LEHN, Ph.D.,

6        having first been duly sworn, testified as

7        follows:

8

9        (Deposition Exhibit No. 2019 was marked for

10        identification)

11

12                    EXAMINATION

13    BY MR. DEVORE:

14        Q.  Good morning.  Is it "Lehn" or "Lehn"?

15        A.  It's pronounced "Lehn."

16        Q.  Dr. Lehn.

17        Marked as Exhibit 2019 is a copy of your

18    report and exhibits; is that right?

19        A.  Right, without vouching for every page,

20    this does appear to be my report.

21        Q.  Okay.  You have been deposed plenty of

22    times, so you know how this works; right?  I don't

23    have to go over the ground rules?

24        A.  I generally do, but I'm happy to go over

25    the ground rules, if you wish.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1               KENNETH LEHN, Ph.D.

2        Q.  Just let me finish my questions and wait

3    and see if your counsel has any objections before

4    you answer the question, unless he tells you not to.

5    We don't have to deal with video or anything like

6    that.

7            Unless you have any questions on how it

8    works, we can go ahead.

9        A.  Okay.

10       Q.  Let me ask you to turn to Exhibit 1 of your

11   report.

12           And is this a current copy of your CV?

13       A.  Yes, it is.

14       Q.  As far as you're aware, there are no

15   omissions from any of the items on here?

16       A.  None that I'm aware of, as I sit here.

17       Q.  Okay.  You have three degrees all in

18   economics?

19       A.  That's correct.

20       Q.  Have you ever taken any accounting courses?

21       A.  I did at the undergraduate level, and,

22   frankly, I don't recall whether I did at the

23   graduate level.

24       Q.  Okay.  What about any engineering classes,

25   take any chemical engineering, anything like that?

1                    KENNETH LEHN, Ph.D.

2        A.  Not that I recall, no.

3        Q.  And you're not an expert in accounting, I

4    take it?

5        A.  No.  I use accounting data.  I do a fair

6    amount of valuation work, including teaching a

7    valuation course that requires analysis of financial

8    statements for the purpose of valuation.  So whereas

9    I do use accounting information a great deal, I am

10   not an accounting expert.

11       Q.  Okay.  And the same question with regard to

12   some of the technical issues in this case, you're

13   not an expert on silicon manufacturing technologies;

14   is that fair?

15       A.  That's correct.

16       Q.  Let me ask you to turn to page 7 of your

17   CV.  There is a heading "Expert Witness Testimony

18   During Last Four Years."

19            Do you see that?

20       A.  I do.

21       Q.  In any of these actions, were you retained

22   by the plaintiff?

23       A.  I don't believe so, no.

24       Q.  Have you ever done any work for LDK Solar

25   before this engagement?

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2        A.   Not that I can recall, no.

3        Q.   What about Latham & Watkins, have you done

4   any work for Latham & Watkins prior to this

5   engagement?

6        A.   I'm not sure what you mean by "work for

7   Latham & Watkins."  I have been retained by Latham &

8   Watkins before.

9        Q.   Okay.  That was what I was getting at.

10            How many times, if you recall?

11       A.   I can recall two other times, as I sit

12   here.  There may be more, but I can only think of

13   two as I sit here.

14       Q.   What type of cases were those two?

15       A.   They both were/are securities cases.

16       Q.   Securities class actions?

17       A.   They are, yes.

18       Q.   Do you know who the defendants are in this

19   case?

20       A.   I know that there is LDK and I believe a

21   subsidiary of LDK, and then a group of individual

22   officers and/or board members of LDK.

23       Q.   Have you ever met any of the individual

24   defendants?

25       A.   No, I have not.

1                    KENNETH LEHN, Ph.D.

2      Q.  Never spoken with any of them?

3      A.  Not that I recall, no.

4      Q.  Have you met any of the members of LDK's

5  board that aren't defendants?

6      A.  No.

7      Q.  Do you know who LDK's auditors were during

8  the class period?

9      A.  My recollection is it was KPMG.

10     Q.  Do you know which KPMG entity that was?

11     A.  No.

12     Q.  And you don't know any individual auditors

13  other than KPMG that worked for LDK?

14          MR. HARRISON:  Objection; vague and

15  ambiguous.

16          THE WITNESS:  I'm not aware of who they

17  are.  My only hesitancy is I have taught thousands

18  of students over the years, many of which have gone

19  into accounting, so there is some possibility that

20  one of them might be an auditor for KPMG and maybe

21  audited LDK, but I'm not aware of that.

22  BY MR. DEVORE:

23     Q.  Do you know who any of the individuals are

24  who did audit work for KPMG at LDK?

25     A.  No.

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 10

1              KENNETH LEHN, Ph.D.

2        Q.  Have you ever done any work on behalf of

3   KPMG?

4        A.  I believe I have been retained by counsel

5   for KPMG, you know, one or two or three matters over

6   the years.  I don't recall specifically which

7   matters, as I sit here.

8        Q.  Okay.  Have you ever done any work against

9   KPMG, where KPMG was on the other side in

10  litigation?

11       A.  It is possible, but I don't recall any

12  specific instances, as I sit here.

13       Q.  You're aware that at some point there was

14  an external investigation of LDK?

15       A.  I am, if you're referring to the internal

16  investigation following the Piper Jaffray report of

17  October 3rd.

18       Q.  No, not internal.  There was -- are you

19  aware that there was an independent investigation

20  conducted by LDK's Audit Committee?

21       A.  Yes, I am.

22       Q.  And you're aware that they retained Simpson

23  Thacher to do that investigation?

24       A.  I am, yes.

25       Q.  Have you ever done any work for Simpson

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1                 KENNETH LEHN, Ph.D.

 2  Thacher?

 3           MR. HARRISON:  Objection; vague.

 4           THE WITNESS:  Well, again, I have been

 5  retained by Simpson Thacher on a few matters over

 6  the years.

 7  BY MR. DEVORE:

 8      Q.  Any in particular that you can recall?

 9      A.  One is a matter that is on my CV, the

10  Dollar General litigation.  And then I can think of

11  one other matter, and I'm not sure whether or not

12  this is in the public domain.  It was a matter about

13  five or six years ago, and it involved a client of

14  Simpson Thacher who was under investigation by the

15  SEC, and I'm not sure the SEC ever took any action

16  in that matter.

17      Q.  Okay.  And if at any time you think

18  something might call for some information covered by

19  a confidentiality order, just let me know that.  We

20  don't want to pry into anything that's confidential

21  under a court order.

22      A.  Okay.

23      Q.  What was your engagement in the Dollar

24  General case?

25      A.  Well, it's been over a year, but my

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    recollection is that I was retained by counsel for

3    KKR, a private equity firm, that had acquired Dollar

4    General Corporation in a going-private transaction,

5    and there was a dispute as to whether or not KKR

6    paid a, quote/unquote, fair price in the

7    acquisition.  And I was retained by counsel for KKR

8    in that matter.

9         Q.  And do you recall what your opinion was in

10   that matter?

11        A.  Not with any specificity, other than in my

12   opinion, there was no evidence that they didn't pay

13   a fair price.  And a large part of my report and

14   deposition testimony was critiquing a valuation

15   report that the plaintiffs in that matter had

16   submitted.

17        Q.  In any of the matters where you have

18   offered expert testimony, are you aware of the court

19   rejecting your opinions?

20        A.  I'm not aware of any.

21        Q.  Go ahead and turn back to the first page of

22   your report, if you would.

23             Paragraph 2, you indicate that you were the

24   Chief Economist at the SEC; is that right?

25        A.  That's right.

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 13

1                    KENNETH LEHN, Ph.D.

2        Q.  And you indicate that you were asked to

3    offer opinions as to whether release of particular

4    information had a statistically significant effect

5    on a company's securities prices.

6            Do you see that?

7        A.  I do.

8        Q.  Why were you asked to do that?

9        A.  Well, that was usually done in the context

10   of enforcement actions that the commission staff was

11   either considering or the actions which they had

12   brought, and they typically asked either me or

13   people in the office that I directed to form an

14   opinion as to whether a given piece of information

15   was material.  And the standard test that we, the

16   economists, as well as the Division of Enforcement

17   used during my tenure there to determine whether

18   information was material, was to conduct an event

19   study when the information was released and to

20   determine whether or not the release of that

21   information was associated with a statistically

22   significant change in the value of the underlying

23   security.

24       Q.  You indicate that you're being compensated

25   at a rate of $700 per hour in this matter; is that

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    right?

3         A.   That's right.

4         Q.   Is that your standard rate?

5         A.   It was as of the time of the engagement

6    here.

7         Q.   Has it gone up since then?

8         A.   It has, yes.

9         Q.   You're charging Latham & Watkins more now?

10        A.   No.

11        Q.   Good deal for them.

12             Do you know approximately how many hours

13   you worked in this case?

14        A.   I don't have an exact count, but I would

15   think through today it would be approximately 150

16   hours.

17        Q.   Have you had help on this case?

18        A.   Yes, I have.

19        Q.   And who was helping you perform your task

20   in this case?

21        A.   Cornerstone Research.

22        Q.   And do you know how much Cornerstone has

23   worked on this case, many hours or total billing?

24        A.   No, I don't.

25        Q.   Have you seen any invoices or anything

1                    KENNETH LEHN, Ph.D.

2     before?

3          A.  No.

4          Q.  Are you getting compensated by Cornerstone

5     for referring work to them in this matter?

6          A.  No.

7          Q.  And you're not receiving any percentage of

8     payments that go to Cornerstone in this case?

9          A.  No.

10         Q.  Have you received a referral fee from

11    Cornerstone?

12         A.  No.  You're referring to this matter?

13         Q.  In this matter.

14         A.  Yeah.  No.

15         Q.  Do you know what tasks Cornerstone has

16    performed in this case?

17              MR. HARRISON:  Objection; vague.

18              THE WITNESS:  I know --

19              MR. HARRISON:  Let me just clarify.

20              MR. DEVORE:  Go ahead.

21              MR. HARRISON:  Do you mean in connection

22    with his report or in general?

23              MR. DEVORE:  In general.

24              MR. HARRISON:  Same objection.

25              THE WITNESS:  I know the tasks -- sorry.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2           MR. HARRISON:  Go ahead.

3           THE WITNESS:  I know the tasks that I have

4    asked them to perform, but beyond that, I don't

5    know.

6    BY MR. DEVORE:

7        Q.  What tasks have you asked them to perform;

8    do you recall?

9        A.  Well, there are several categories.  After

10   I was engaged in this matter, you know, there were

11   basic documents that I asked Cornerstone to gather,

12   and then after thinking about the assignment and

13   learning more about the facts, there were different

14   types of analyses that I asked Cornerstone to

15   conduct.  And as part of that analysis there was

16   data that needed to be gathered, and I asked them to

17   gather that data and information for me to organize

18   it, to examine it empirically, in accordance with

19   the way that I wanted the data analyzed.

20           They also provided some drafting of

21   sections at my request.  These were drafts at the

22   early stage of the report and they also provided

23   some physical production of exhibits under my

24   direction and, you know, I would provide them with

25   comments and ultimately they would physically

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 17

```
 1                    KENNETH LEHN, Ph.D.
 2   produce the final set of exhibits.
 3            There may be other tasks, but that's a, you
 4   know, pretty comprehensive description of what
 5   they've done.
 6            MR. DEVORE:  Okay.  Matt, at some point
 7   we'd like to get Cornerstone's invoice as well.  We
 8   can talk about that later.
 9            MR. HARRISON:  I don't think -- I mean, we
10   can talk about it off the record, but I'm not sure
11   we're going to be willing to produce those as agents
12   of the firm, but we can talk about that off the
13   record.
14   BY MR. DEVORE:
15       Q.  Let me ask you to turn back to Exhibit 2 of
16   your report.
17            Did you review each of the documents listed
18   in Exhibit 2?
19       A.  In varying degrees I did, yes.
20       Q.  The last entry on Exhibit 2 is a little
21   bit -- well, it says, "Other documents specifically
22   cited in the report, appendix, and exhibits but not
23   listed in this exhibit."
24            If a document is not specifically cited in
25   the report, appendix and exhibit, does that mean
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                     KENNETH LEHN, Ph.D.

2     that you have not considered that document in

3     connection with this engagement?

4          MR. HARRISON:  Objection; vague.

5     BY MR. DEVORE:

6          Q.  Is that a clear question?

7          A.  I'm not sure I understand.

8          Q.  I appreciate that.

9              If you didn't list a document specifically

10    in Exhibit 2, that doesn't mean that you haven't

11    looked at that document; is that right?

12         MR. HARRISON:  Objection; vague.

13         THE WITNESS:  I attempted to list all of

14    the documents that I did review and considered as of

15    the date of my report.  It's conceivable that there

16    was something that I did review that inadvertently

17    was not listed in Exhibit 2.  And there have been

18    some documents that I've reviewed subsequent to

19    filing the report.

20             So I believe that Exhibit 2 does list the

21    documents that I considered as of the date of my

22    report, but there may be some unintentional

23    omissions there.

24    BY MR. DEVORE:

25         Q.  Okay.  You indicated you looked at some

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    more documents since you submitted this report.  Can

3    you recall what those documents were?

4         A.  I can recall a few.  One would be Ms.

5    Nettesheim's reply report.  One would be her

6    deposition transcript from a couple of weeks ago.

7    In addition, I have reviewed Mr. Harmon's report, I

8    believe.

9    BY MR. DEVORE:

10        Q.  Harden?

11        A.  Harden, rather.

12            And also reviewed his deposition testimony.

13   There may be others.  Those are the ones that I can

14   think of as I sit here.

15        Q.  And I take it the documents listed on

16   Exhibit 2 are those that you relied upon in forming

17   your opinions in this matter?

18        A.  Well, technically, those are the documents

19   that I considered.  And I don't mean to parse words,

20   but I don't know if there are legal connotations for

21   "relied upon" versus "considered."  It may well be

22   that some of the opinions I've formed could have

23   been formed without some of the information listed

24   on Exhibit 2, but it's certainly information that I

25   considered.

Page 20

1                    KENNETH LEHN, Ph.D.

2        Q.  Fair enough.

3             You haven't specifically relied upon any

4    document to form any of your opinions that isn't

5    listed on Exhibit 2, as far as you can recall; is

6    that right?

7             MR. HARRISON:  Objection; vague.

8             THE WITNESS:  I can't think of any as of

9    the time that I filed the report.

10   BY MR. DEVORE:

11       Q.  Did you rely on any work by Cornerstone?

12            MR. HARRISON:  Objection; vague.

13            THE WITNESS:  I didn't rely on any work by

14   Cornerstone, I did ask Cornerstone to perform

15   analyses under my direction and they provided me

16   with that, but the information I received from

17   Cornerstone would have been responsive to requests

18   that I made.  So in that sense, I didn't rely on

19   documents from Cornerstone.

20   BY MR. DEVORE:

21       Q.  Did you perform independent tests on the

22   information that you received from Cornerstone to

23   validate their work?

24            MR. HARRISON:  Objection; vague.

25            THE WITNESS:  I didn't run any separate

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 21

1              KENNETH LEHN, Ph.D.

2    regressions or event studies, if that's who you're

3    asking, no.

4    BY MR. DEVORE:

5        Q.  And Cornerstone's work is incorporated into

6    your report; is that fair?

7              MR. HARRISON:  Objection; vague.

8              THE WITNESS:  Well, the work that I asked

9    Cornerstone to conduct is reflected obviously in my

10   report, yes.

11   BY MR. DEVORE:

12       Q.  How did you determine -- how did you

13   determine which documents to look at in this case?

14       A.  Well, there is some that I specifically

15   requested, given the nature of the assignment and

16   the approach that I wished to take to analyze the

17   issues that I examined in this case; for example,

18   the complaint is a pretty basic document and one

19   that I requested.  Analysts reports, stock price

20   data for LDK, news stories about LDK.  So

21   information of that sort were specific requests that

22   I made.

23            In addition, counsel provided me with

24   access to all of the documents that had been

25   produced in this litigation, and there are quite a

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 22

1                     KENNETH LEHN, Ph.D.

2      lot of documents.  So I didn't review every document

3      that's been produced in litigation, but there would

4      be times when I would ask whether or not there may

5      be deposition testimony on a particular topic that

6      may be relevant, and without knowing what particular

7      document it might be, counsel and/or Cornerstone

8      would provide me with the document that would be

9      responsive to that request.

10          Q.  And when you received documents in response

11     to those requests, did you consider those in

12     connection with forming your opinions?

13              MR. HARRISON:  Objection; vague.

14              THE WITNESS:  I did, yes.

15     BY MR. DEVORE:

16          Q.  But you didn't list any of those documents

17     on Exhibit 2; is that right?

18              MR. HARRISON:  Same objection; misstates

19     testimony.

20              THE WITNESS:  I believe I did.  I mean, for

21     example, the deposition testimony of several

22     individuals here were in response to requests for a

23     particular type of information.  So, in that sense,

24     I believe the documents that I requested are listed

25     on Exhibit 2.

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 23

1              KENNETH LEHN, Ph.D.

2    BY MR. DEVORE:

3        Q.  Okay.  From my reading of Exhibit 2, and

4    correct me if I am wrong, you haven't seen a single

5    internal LDK document in connection with this

6    engagement?

7              MR. HARRISON:  Objection; misstates

8    testimony, vague.

9              THE WITNESS:  Well, I've seen Charlie

10   Situ's e-mails and I can't recall whether they are

11   listed here in Exhibit 2.  As I sit here, I can't

12   recall seeing other internal documents.

13   BY MR. DEVORE:

14       Q.  Let me ask you to turn back to page 2 of

15   your report.  And I think you indicated previously

16   the substance of Footnote 2, which is that you had

17   access to all of the discovery in this case?

18       A.  That is correct.

19       Q.  But as far as you can recall, you haven't

20   actually looked at any internal LDK documents in

21   forming your opinions?

22       A.  Other than Mr. Situ's e-mails, I can't

23   recall as I sit here.

24       Q.  While you're on that page, or turn back to

25   the previous page, paragraph 5, this accurately sets

1                          KENNETH LEHN, Ph.D.

2    forth your assignment in this matter?

3         A.  Yes, it does.

4         Q.  You indicate that one of your assignments

5    was to form an opinion as to whether the declines in

6    LDK's ADS price at the end of the class period as

7    defined in the complaint were caused by a revelation

8    of the relevant truth, is that right, leaving out

9    some of the parentheticals?

10        A.  That's correct, the relevant truth about

11   the alleged misrepresentations in this matter.

12        Q.  Can you tell me what part of that sentence

13   the phrase "as define in the complaint" refers to?

14   Does that refer to the declines or class period?

15             MR. HARRISON:  Objection; vague.

16   BY MR. DEVORE:

17        Q.  Or both?

18        A.  It does refer to both the declines, as well

19   as the end of the class period.

20        Q.  So is that referring to declines in LDK's

21   stock price October 3rd and October 8th or is it

22   something more than that?

23        A.  It is October 3rd and October 8th.  And in

24   my review in response to the expert report of Ms.

25   Nettesheim, I also discuss October 4th, since she

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1                    KENNETH LEHN, Ph.D.

 2    examines that and classifies that as an alleged

 3    corrective disclosure.

 4        Q.   Broadly speaking, what analysis did you do

 5    to form an opinion on whether the declines in LDK's

 6    ADSs were caused revelation of the relevant truth?

 7        A.   Well, the first step is to determine what

 8    information was released on October 3rd and October

 9    8th, and then to determine whether or not there was

10    additional information that clarified those

11    information releases subsequent to the class period.

12    And by clarifying, I mean either validating,

13    contradicting, or simply providing more information

14    about the allegations.

15            And I determined that the information that

16    was released on October 3rd and October 8th was

17    speculative information, i.e., rumors, that were

18    never subsequently validated, and no subsequent

19    validation was communicated to the marketplace.

20            And, as I indicate in my report, in my

21    opinion, a rumor or an allegation, speculation does

22    not constitute the relevant truth, and, therefore,

23    in my opinion, the relevant truth about the alleged

24    misrepresentations has not been communicated to the

25    marketplace and was not communicated to the

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 26

1                    KENNETH LEHN, Ph.D.

2    marketplace on October 3rd and October 8th and that

3    formed the basis of my opinion.

4         Q.  Are all of your opinions set out in your

5    report?  I don't mean -- let me strike that.

6             Are all of your opinions in this case set

7    out in your report?

8         A.  All of my opinions as of the time of the

9    report are set out in the report.

10        Q.  Have you formed any new opinions since you

11   have submitted your report in this case?

12        A.  I have formed a few additional opinions

13   based on Ms. Nettesheim's reply report.

14        Q.  What are those?

15        A.  Well, I have a couple that I can speak to,

16   and then, in addition, if you wish, I would be happy

17   to go through her report and provide you with

18   additional thoughts.

19             But one comment I have is that upon

20   receiving her expert report and the backup data, it

21   appears that Ms. Nettesheim in estimating the

22   damages for option holders used the FIFO approach,

23   F-I-F-O, and only the FIFO approach in estimating

24   damages.  And, in my opinion, LIFO is a preferred

25   approach to estimate damages in securities

1                    KENNETH LEHN, Ph.D.

2    litigation.

3            Second, it appears that in estimating

4    damages for option holders, Ms. Nettesheim has not

5    used actual option prices but rather estimated

6    option prices using the Black Scholes model, and I

7    don't see any basis for using the Black Scholes

8    model, as opposed to actual option prices.

9            So those are two additional reasons of why

10   I feel her damages for option holders is flawed and

11   unreliable.

12       Q.  You indicated that you prefer LIFO to FIFO

13   in estimating damages in securities cases; is that

14   right?

15       A.  As a general matter, that's correct.

16       Q.  Does that matter in a case that the class

17   period starts at an IPO?

18       A.  It may or may not.  The point is that one

19   should do the analysis using both approaches in

20   order to determine whether it matters.

21       Q.  Did you redo Ms. Nettesheim's analysis

22   using LIFO?

23       A.  I have not, no.

24       Q.  Since you reviewed Ms. Nettesheim's

25   rebuttal, have you changed any of your other

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    opinions?

3         A.  No, I have not.

4         Q.  Have you done any additional analysis on

5    the options damage estimates using actual prices

6    instead of Ms. Nettesheim's, what you referred to

7    as, estimates?

8         A.  No, I have not.

9         Q.  Let's talk about a couple of terms that you

10   used in your report.  You used the word "scientific"

11   in your report.  What does that word mean to you?

12        A.  Well, as a general matter, it means in

13   accordance with the peer-review literature.

14        Q.  Is that a standard definition of the word

15   "scientific"?

16             MR. HARRISON:  Objection; vague, calls for

17   speculation.

18             THE WITNESS:  Yeah, I can't speak to that,

19   but it's the sense in which I use it in this matter.

20   It's that the method used would be consistent with

21   what is expected in the peer-review literature.

22   BY MR. DEVORE:

23        Q.  So you're not using "scientific" in the

24   ordinary sense that it's a method that's subject to

25   replication?

Page 29

1               KENNETH LEHN, Ph.D.

2            MR. HARRISON:  Objection.  Same objection.

3            THE WITNESS:  Well, I think that's part of

4    what constitutes a scientific analysis and -- but

5    it's not the only part.  It may be that it's

6    replicable but it's simply faulty.  And even though

7    you can replicate it, it's just flat-out wrong.  So

8    that would be part of what would be considered to be

9    scientific, but certainly not the entirety of what

10   is scientific.

11   BY MR. DEVORE:

12       Q.  So your opinion relies on the definition of

13   "scientific" in that only peer-reviewed analysis is

14   scientific in the context that you're using the

15   word?

16       A.  The way in which I use it is that the

17   approach uses principles that would be accepted

18   practice in the peer-reviewed literature, and in

19   that sense it's scientific.  So there may not be a

20   study that deals directly with that particular

21   topic, but the approach that is taken is one that

22   conforms with accepted practice in the peer-review

23   literature and the basic principles of finance and

24   economics.

25       //

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    BY MR. DEVORE:

3         Q.  So if I understand you right, it does not

4    have to have actually been published in peer review

5    to be scientific?

6              MR. HARRISON:  Objection; vague.

7              THE WITNESS:  It's fact-specific in the

8    sense that, you know, one may use principles that

9    are accepted practice in the literature to do a

10   calculation, and then the question is, was the

11   calculation scientific.

12             And, you know, if one is calculating the

13   present value of a stream of cash flows in a

14   particular setting, there may not be an article in

15   the academic literature that addresses the use of

16   present value analysis in that setting.  But if one

17   uses the proper measure of present value, then I

18   would view that to be scientific, even though it may

19   be a setting that hasn't attracted academic

20   interest.

21             If one, on the other hand, is talking about

22   a model that has been developed to estimate some

23   phenomenon and that model has never been subjected

24   to empirical testing and empirical validation in the

25   peer-review literature, then I would say that that

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1                  KENNETH LEHN, Ph.D.
 2   model is unscientific or lacks scientific support.
 3   BY MR. DEVORE:
 4        Q.  Okay.  I understand.
 5             You also use the phrase "factual basis" in
 6   your report; is that right?
 7        A.  That's correct.
 8        Q.  What does that phrase mean in the context
 9   of your report?
10             MR. HARRISON:  Objection; vague.
11             THE WITNESS:  Well, "factual basis" would
12   refer to information that -- information that --
13   it's using basically a Webster-Dictionary-type
14   definition of factual, but information that is
15   concrete, not speculative, not rumor.  Information
16   that is validated.
17   BY MR. DEVORE:
18        Q.  And do you use "objective basis" in the
19   same way or does that mean something different?
20             MR. HARRISON:  Objection; vague, overbroad.
21             MR. DEVORE:  That's fair.
22        Q.  You used the phrase "objective basis" in
23   your report as well; is that right?
24        A.  I do, yes.
25        Q.  What does the phrase "objective basis" mean
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    in your report?

3         A.  "Objective" again would refer to a basis

4    that can be validated and is validated.  So it's

5    something that can be verified by an individual, and

6    the two individuals looking at the same news release

7    would come to the same conclusion that this

8    represents a release of factual information.

9         Q.  One of the tasks you undertook in this

10   matter was to determine whether there was a factual

11   basis for any of the information disclosed on

12   October 3rd; is that right?

13              MR. HARRISON:  Objection; misstates the

14   report, vague.

15              THE WITNESS:  That wasn't what I did or

16   intended to do.  What I was concerned with is

17   whether or not there were releases of information to

18   the market that conveyed factual information that

19   validated the rumors that were disseminated on

20   October 3rd and October 8th, and that is logically

21   different than setting out to determine whether or

22   not there was a factual basis for the information

23   released on October 3rd and October 8th.

24              And I think Ms. Nettesheim either

25   misunderstands or mischaracterizes my report when

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                   KENNETH LEHN, Ph.D.

2     she alleges that I set out to be a fact-finder.

3               What matters in loss causation is the

4     information that was released to the market, and I

5     in no way set out to be a fact-finder in order to

6     fulfill my assignment.

7     BY MR. DEVORE:

8          Q.   You write in paragraph 8 of your report:

9               "There is no factual basis to conclude that

10              the alleged corrective disclosures in the

11              October 3, 2007 Piper Jaffray report and

12              the October 8, 2007 Barron's article

13              revealed the relevant truth about the

14              alleged misrepresentations."

15              Is that right?

16         A.   That is correct.

17         Q.   And does that accurately set out what your

18    opinion is in this matter?

19         A.   It does.  One of the opinions.

20         Q.   And in paragraph 9 you write:

21              "Instead, the alleged corrective

22              disclosures were unsubstantiated rumors

23              that have never been validated."

24              Is that right?

25         A.   That is correct.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2       Q.   And that is also your opinion in this

3   matter?

4       A.   It is part of my opinion.

5       Q.   (Reading):

6            "To the contrary, information released

7            subsequent to the class period directly

8            contradicts the allegations, hence there is

9            no objective basis by which it can be

10           concluded that the relevant truth about the

11           alleged misrepresentations was disclosed in

12           the Piper Jaffray report and the Barron's

13           article."

14           Is that right?

15      A.   That is correct.

16      Q.   And that's also your opinion in this

17   matter?

18      A.   That is part of my opinion, that's correct.

19      Q.   Without a disclosure of the relevant truth

20   about the alleged misrepresentations, loss causation

21   cannot be established; is that your opinion?

22      A.   That is part of my opinion, correct.

23      Q.   What does the phrase "relevant truth" mean

24   to you?

25      A.   Truth -- it refers, in my opinion, to truth

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                 KENNETH LEHN, Ph.D.

2    that ties back to the alleged misrepresentations and

3    information release that is corrective of the

4    alleged misrepresentations in a matter.

5         Q.  What do you mean by "ties back" to the

6    earlier information?

7         A.  Well, it means that there is a connection

8    between the alleged corrective disclosure and the

9    specific alleged misrepresentations as contained in

10   the complaint.

11        Q.  Is "corrective disclosure" synonymous with

12   "disclosure of the relevant truth" or do you use

13   those two phrases differently?

14        A.  In my opinion, and I'm not an attorney, so

15   I don't know -- I'm not making a legal judgment

16   here, but --

17        Q.  Well, in the way that you use the two

18   phrases.

19        A.  As to me, as an economist, a corrective

20   disclosure is an information release that reveals

21   the truth about the alleged misrepresentations.  So

22   in that sense, you know, I generally view them as

23   being interchangeable.

24        Q.  Okay.  Your understanding is that without

25   disclosure of the relevant truth, loss causation

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    cannot be established; is that right?

3         A.   That is correct.

4         Q.   And if "corrective disclosure" is

5    interchangeable with "relevant truth," is it your

6    opinion without a corrective disclosure loss

7    causation cannot be established?

8         A.   As a general matter, I believe that to be

9    true.  There may be specific facts in a case where

10   perhaps that may not be true; but, as a general

11   matter, I would say that's true.

12        Q.   What is your basis for your opinion that in

13   order for there to be a loss causation, relevant

14   truth has to be revealed?

15        A.   Well, from an economic perspective, and

16   again, I'm not a lawyer, but from an economic

17   perspective, if one is attempting to show they

18   suffered a loss because of some alleged

19   misrepresentation, then, as a general matter, it

20   would be necessary to show that when the truth about

21   that alleged misrepresentation was revealed to the

22   public, that one suffered an economic loss,

23   typically, because the value of some security

24   declined when the information was revealed.

25        Q.   And under your opinion, the information

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page  37

1              KENNETH LEHN, Ph.D.

2    that is disclosed must be objectively true in order

3    for there to be loss causation?

4          MR. HARRISON:  Objection; misstates

5    testimony, vague.

6          THE WITNESS:  I don't think I said that.

7    BY MR. DEVORE:

8        Q.  It was a question.

9        A.  One -- there are conditions under which a

10   speculative announcement might constitute a partial

11   corrective disclosure, but that, again, would be

12   fact- and case-specific.  So I'm not categorically

13   ruling that out, but in order for a speculative

14   announcement to serve as a partial corrective

15   disclosure, there would have to be some subsequent

16   disclosure to the market that validated that initial

17   speculation.

18          So, for example, if on day one it is

19   rumored that a company had committed accounting

20   fraud, and on day two there is a disclosure that

21   validates that rumor and sets forth factual

22   information that says the company indeed did commit

23   accounting fraud, in a case such as that, it might

24   be appropriate to view the two announcements in

25   tandem as a corrective disclosure.  And the idea

1          KENNETH LEHN, Ph.D.

2    being that some of the price reaction may have

3    occurred at the rumor date and then maybe some

4    additional price movement occurred when the

5    validation of the rumor was disseminated to the

6    market on the following day.

7          So that would be an example where

8    potentially a speculative announcement or the

9    disclosure of speculative information could serve as

10   a partial corrective disclosure.  But the key would

11   be that shortly thereafter there was some validation

12   of that speculation which was communicated to the

13   market.

14   Q.  How shortly thereafter?

15   A.  I'm not sure that I can give you a bright

16   line.  And there would inevitably be some judgment

17   involved into how close in proximity the validation

18   must occur, but if validation occurs years after the

19   rumor appeared, in my opinion there would be no

20   substantive basis to view the rumor date as a

21   partial corrective disclosure.

22          An analog would be that in the academic

23   literature that uses event-study analysis to measure

24   the valuation impact of takeovers, it is often the

25   case that authors will use a date in which there is

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 39

```
 1                    KENNETH LEHN, Ph.D.
 2    a rumor of a takeover as an event date and then look
 3    at the subsequent announcement of the merger as a
 4    subsequent event date.  But as a general practice in
 5    the academic literature, the rumors are in pretty
 6    close proximity to the actual announcement of the
 7    merger.  And one, again, would need to use some
 8    judgment, but you're generally not going to find
 9    authors using rumor dates that occur years before an
10    announcement of a merger, for example.
11         Q.  Let's stick with your hypothetical day one
12    and day two.
13              On day one analysts report that the
14    company's CFO was quitting and he is alleging
15    accounting errors.  Stock drops 50 percent.  By day
16    90, no further information has come out.  Is it a
17    loss causation?
18              MR. HARRISON:  Objection; incomplete
19    hypothetical, vague.
20              THE WITNESS:  I don't believe there is
21    based on the cryptic facts that you've provided,
22    because there would have been speculation on day one
23    and no subsequent validation, meaning that one would
24    have no objective basis to believe that the relevant
25    truth was disclosed to market on day one.  All one
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 40

1                 KENNETH LEHN, Ph.D.

2    could say is that the market learned of a rumor on

3    day one.

4            And, again, what is relevant for loss

5    causation is the information disclosed to the

6    market, and all the market would know on day 90 is

7    that a rumor had been disclosed on day one.

8    BY MR. DEVORE:

9        Q.  What if -- same hypothetical -- analysts

10   report CFO is out, says there is accounting

11   problems, day one, stock drops 50 percent.  Day 90,

12   company denies the report, stock goes back up to

13   where it was.

14           In your opinion, there is no loss

15   causation; is that right?

16           MR. HARRISON:  Same objections.

17   BY MR. DEVORE:

18       Q.  And assume no other intervening facts.

19       A.  Right, assuming no other facts, again,

20   there would be no loss causation because there was

21   never validation of the rumor communicated to the

22   market.

23       Q.  What if the CFO was right and the company

24   was lying, would that change your analysis?

25           MR. HARRISON:  Same objections.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2            THE WITNESS:  Well, unless there was some

3    subsequent communication to the market that revealed

4    that the CFO was right and the company was lying,

5    there would be no basis to conclude that there was

6    loss causation because, again, what matters is not

7    factually whether or not the CFO was true, but,

8    rather, what was communicated to the market.  And in

9    your example, even if factually the CFO was correct,

10   if that was not communicated to the market, in my

11   opinion one could not establish loss causation.

12   BY MR. DEVORE:

13       Q.  So if I'm the CEO of this company we're

14   talking about and on day one --

15            MR. MILSTEIN:  Hypothetical company?

16            MR. DEVORE:  Yeah, hypothetical.

17       Q.  And day one my CFO quits and announces that

18   I have accounting problems, my stock drops 50

19   percent.  And the CFO is right, but I, the CEO, go

20   out and tell the world there is nothing wrong and

21   the stock goes back up.

22            I'm off the hook?  I can't be held liable

23   for accounting fraud?

24            MR. HARRISON:  Objection; vague, ambiguous,

25   calls for a legal conclusion.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1          KENNETH LEHN, Ph.D.

2          THE WITNESS:  I'm not a lawyer, so all I

3     can speak to is whether or not plaintiff had

4     suffered a loss because of a correction of an

5     alleged misrepresentation.  And given your facts, if

6     there was never any subsequent revelation that the

7     CFO was right and the CEO was wrong in committing

8     fraud, then, by definition, the market never would

9     have learned of that and, therefore, by definition,

10    stockholders never would have suffered a loss when

11    the relevant truth about the alleged

12    misrepresentation occurred.

13    BY MR. DEVORE:

14         Q.  So under this hypothetical, the fact that

15    the CFO's information was correct, it was

16    objectively true, when it was released to the

17    market, nonetheless there would be no loss causation

18    because the company never confirmed that

19    information?

20         A.  It need not be confirmation by the firm,

21    although that would be one way in which one could

22    correct an alleged misrepresentation.  The general

23    point is that unless there was some release of

24    information that validated that initial speculation,

25    in my opinion, by definition, one could not conclude

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                KENNETH LEHN, Ph.D.

2    that security holders suffered a loss when the

3    relevant truth about the alleged misrepresentation

4    was disclosed.

5             And, again, however, right or wrong the CFO

6    was in your example, the only thing the market would

7    have known on that day and subsequent to that date

8    was that there was a rumor, and any loss caused by

9    the rumor would be a loss caused by a rumor, not a

10   loss caused by a revelation of the relevant truth.

11        Q.  You were the chief economist of the

12   Securities and Exchange Commission; is that right?

13        A.  I was, yes.

14        Q.  Do you think your opinion is favorable in

15   protecting investors against securities fraud?

16             MR. HARRISON:  Objection; vague, calls for

17   speculation, outside the scope.

18             THE WITNESS:  You know, I haven't set out

19   to examine the policy implications of different

20   theories of loss causation.  I'm simply giving you

21   an economic analysis of loss causation.  It's a

22   complicated issue as to whether investors are helped

23   or hurt by different theories of loss causation, and

24   I can imagine that there would certainly be benefits

25   as well as costs to different theories of loss

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                  KENNETH LEHN, Ph.D.

2   causation as there are with most things.  So one

3   would have to do an analysis and study of that in

4   order to form an opinion as to that.

5       Q.  Do you think a theory of loss causation

6   that encourages companies to conceal fraud and lie

7   to investors to prevent calculations of damages in

8   security fraud cases is in good public policy?

9             MR. HARRISON:  Same objections.

10            THE WITNESS:  I don't think policies that

11  encourage that are desirable policies, but I don't

12  think that that is a natural implication that flows

13  from my economic understanding of loss causation.

14            I can imagine that collectively investors

15  might be a lot worse off if the rules of the game

16  were such that class action lawsuits could be filed

17  against companies any time a rumor is disseminated

18  in the marketplace, a rumor that could be beyond the

19  control of a particular company.  Because if a

20  journalist decides to write an article or an analyst

21  decides to write a report and there is no factual

22  basis for a rumor, and yet one can recover damages

23  when a rumor is disseminated and companies then have

24  to write big checks, I can imagine collectively

25  investors would be worse off in that world.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                KENNETH LEHN, Ph.D.

2       Q.  Even if those rumors are true?

3       A.  But, again, what matters is whether or not

4    a validation of the rumor is communicated to the

5    market.  And if the filter is simply a rumor is

6    sufficient to establish loss causation, then my

7    guess is you would see a lot more rumors out there

8    that are never validated.

9            So at the end of the day, the key is

10   whether or not a rumor is validated and that

11   validation is communicated to the market.  And as an

12   economist, that appears to me to be a very sensible

13   approach to take in loss causation.

14      Q.  And it's your conclusion that none of the

15   allegations in the October 3rd Piper Jaffray report

16   or October 4th analysts reports or October 8th

17   Barron's article were ever validated to the market?

18           MR. HARRISON:  Hold on.

19           Okay.  Sorry.

20           THE WITNESS:  Sorry, can you repeat the

21   question?

22   BY MR. DEVORE:

23      Q.  Sure.

24           MR. HARRISON:  You trailed -- to me, at

25   least, you trailed off.

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 46

1                    KENNETH LEHN, Ph.D.

2            MR. DEVORE:  Yeah, I know.  Sorry.  We'll

3    read this again.

4        Q.  And it's your conclusion that none of the

5    allegations in the October 3rd Piper Jaffray report

6    or October 4th analyst reports or October 8 Barron's

7    article were ever validated to the market?

8        A.  And just so I understand, by "allegations"

9    you're referring to the allegations in Piper Jaffray

10   and Barron's that pertained to the alleged

11   misrepresentations in this matter?

12       Q.  Yes.

13       A.  Yes, in my opinion, none of those

14   allegations have ever been validated in a way that

15   the market learned that those allegations were true.

16       Q.  You've read the March 3rd, 2008 Barron's

17   article; right?

18       A.  I have.

19       Q.  You quoted that in your report; right?

20       A.  I did.

21       Q.  That article specifically uses the word

22   "validate" doesn't it?

23       A.  I don't recall the specific use, but it

24   doesn't matter to me whether it did or didn't use a

25   certain word.  The question is:  Did it actually

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2   communicate to the market information that confirmed

3   the information that was communicated to the market

4   on October 3rd and October 8th.  And in my opinion,

5   it did not.

6         Q.  It's your opinion that the Barron's March

7   3rd report that says this information appears to

8   validate the previous allegations did not in fact

9   validate anything to the market?

10        A.  Again, I'd have to look at the specific

11   passage that you're referring to.

12        Q.  It's in your report.  Let's see.  Where it

13   is -- let's turn to the article itself, which is

14   easier.  Turn -- let's go straight to the source, to

15   Exhibit 8, page 485.

16            You see the article there March 3, 2008?

17        A.  I do.

18        Q.  "Review and Preview Follow-up - A Return

19   Visit to Earlier Stories --

20        A.  I do.

21        Q.  -- at LDK, Sunlight Would Disinfect."

22            And the article says:

23            "Silicon-wafer maker LDK Solar's

24            December-quarter balance sheet sold $30

25            million of 'inventories to be processed

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                   KENNETH LEHN, Ph.D.

2            beyond one year' -- a strange long-term

3            asset that seems to validate LDK's former

4            controller, who quit in September

5            complaining that the Xinyu City, China,

6            company refused to write-off silicon

7            inventory that was unusable."

8            Do you see that?

9       A.   I do.

10      Q.   And despite that, it's your opinion that no

11   information was ever released to the market to

12   validate any of the previous allegations about

13   unusable inventory?

14      A.   That is correct.  And I know a couple

15   things.  One is that Barron's is offering an opinion

16   where it says it seems to validate LDK's former

17   controller.  So it's offering its opinion on that

18   particular issue.

19      Q.   You disagree with Barron's?

20      A.   Well --

21           MR. HARRISON:  I don't think he was done.

22   BY MR. DEVORE:

23      Q.   Yeah, I apologize.

24      A.   It's not a matter of whether I agree or

25   disagree with Barron's.  It's what is communicated

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    to the market on that date and they are simply

3    opining that in their opinion this seems to validate

4    the former controller.

5              I might add that this announcement was

6    followed about a month later by the filing of LDK's

7    20-F, in which KPMG indicated that the company's

8    2006 and 2007 financials were in conformity with

9    U.S. GAAP.  And the SEC staff had looked into this

10   issue and chosen to recommend no enforcement action

11   against LDK.

12             So, again, this is an opinion by Barron's

13   and there is no subsequent validation of this

14   speculation by Barron's.

15        Q.  Are you aware whether it was KPMG that

16   required LDK to change its accounting and move

17   materials into noncurrent assets?

18        A.  I don't know that.

19        Q.  You haven't done any investigation to

20   determine whether KPMG actually audited LDK at all;

21   is that right?

22             MR. HARRISON:  Objection; vague.

23             THE WITNESS:  Again, what my focus is on in

24   analysis of loss causation is information that is

25   communicated to the market, and for that purpose, it

Page 50

1                    KENNETH LEHN, Ph.D.

2    was not necessary for me to determine whether or not

3    that's the case.

4    BY MR. DEVORE:

5        Q.   And in your analysis, you're assuming that

6    every statement made by LDK is true; is that right?

7             MR. HARRISON:   Objection; vague.

8             THE WITNESS:   No, I'm not saying that at

9    all.  Again, to me, what was disclosed on October

10   3rd and October 8th was speculative information,

11   allegations, rumors, and without weighing the merits

12   of whether they were true or false or whether

13   subsequent statements by LDK or anyone else was true

14   or false, what I have concluded is that there was

15   never any validation of those rumors that was

16   communicated to the market.

17   BY MR. DEVORE:

18       Q.   And if the rumor at the time it was

19   released to the market was true, nonetheless, the

20   revelation of that rumor, in your opinion, does not

21   reveal the relevant truth because it's never been

22   confirmed independently?

23       A.   Again, if it's never been validated in such

24   a way that the market learned that the rumor was

25   true, then all the market knows, as we sit here

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 51

1                    KENNETH LEHN, Ph.D.

2   today, is that there were rumors disseminated on

3   October 3rd and October 8th, and any price declines

4   associated with those rumors would not be price

5   declines caused by the disclosure of the relevant

6   truth but, rather, price declines caused by rumors,

7   which, by definition, means no loss causation.

8        Q.   Is it your -- well, strike that.

9             You cite Dura versus Broudo in your report.

10       A.   I do.

11       Q.   Is that the basis for your opinion that the

12   relevant truth needs to be disclosed in the market

13   in order for there to be loss causation?

14       A.   It's not the basis for my opinion.  My

15   opinion is based on my analysis as an economist

16   and -- but I note that the approach that I take to

17   this is also an approach that I believe has been

18   endorsed by the Supreme Court in the Dura case.

19       Q.   Do you know what the phrase "proximate

20   cause" means?

21            MR. HARRISON:   Objection; calls for a legal

22   conclusion.

23   BY MR. DEVORE:

24       Q.   Well, that's -- all right.  Strike that.

25            What is your understanding of the phrase

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1                  KENNETH LEHN, Ph.D.

 2    "proximate cause" as a layperson?

 3            Maybe that's not fair that you're a

 4    layperson.  You're a Ph.D. economist.  You're not a

 5    lawyer.

 6        A.   Right.

 7        Q.  What is your understanding of the term

 8    "proximate cause"?

 9            MR. HARRISON:  Same objection for the

10    record.

11            THE WITNESS:  Yeah, I am a lay person when

12    it comes to law.  So I'm not a lawyer and I'm not

13    offering a legal opinion.  And the phrase "proximate

14    cause" is not one that is used frequently in the

15    economics literature.

16            So my very vague understanding of the

17    phrase would be sort of a principal and primary

18    cause, but I don't know whether that's the legal

19    definition.

20    BY MR. DEVORE:

21        Q.  Okay.  Do you have an opinion as to whether

22    your definition of loss causation is consistent with

23    the Supreme Court's requirements for proving loss

24    causation in Dura?

25        A.  No, I --

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2          MR. DEVORE:  Objection; asked and answered.

3          THE WITNESS:  No, I do not.

4    BY MR. DEVORE:

5     Q.   And if your definition of loss causation

6    was inconsistent with the Supreme Court's opinion,

7    would that change the analysis that you would do in

8    any way?

9          MR. HARRISON:  Objection; vague, calls for

10   speculation and a legal conclusion.

11         THE WITNESS:  It depends on the nature of

12   the assignment.  So if I was retained on a matter

13   and asked to assume that in order to show loss

14   causation one had to show the following, then I

15   would take those assumptions and do my analysis.

16         But if the assignment was to simply

17   determine whether price declines at the end of the

18   class period were caused by a disclosure of the

19   relevant truth about the alleged misrepresentations,

20   then, at least from an economist perspective, I

21   would go about that, you know, frankly, without

22   regard to what the view of the Supreme Court was.

23    Q.   And in this matter, you were not asked to

24   opine as to whether the October 3rd Piper Jaffray

25   report proximately caused the decline in LDK's

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 54

1                    KENNETH LEHN, Ph.D.

2    stock; is that right?

3         A.  Certainly those words were never used,

4    that's correct.

5         Q.  And that's not in your report in any place,

6    as far as I can tell; is that right?

7         A.  That's correct.

8         Q.  And you were not asked to opine as to

9    whether any information released on October 4th

10   proximately caused any decline in LDK's stock price;

11   is that right?

12             MR. HARRISON:  Objection.

13             THE WITNESS:  Again, those words were never

14   used in the assignment, that's correct.

15   BY MR. DEVORE:

16        Q.  And you were not asked to opine as to

17   whether any information disclosed in Barron's

18   October 8th report approximately caused any decline

19   in LDK's solar stock price; is that right?

20             MR. HARRISON:  Objection; vague, calls for

21   a legal conclusion.

22             THE WITNESS:  Again, those words were never

23   used in describing it.

24   BY MR. DEVORE:

25        Q.  In your understanding what is the relevant

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1                    KENNETH LEHN, Ph.D.

 2   truth in this matter?

 3          MR. HARRISON:  Objection; vague.

 4          MR. DEVORE:  Let's back up.

 5      Q.  What is your understanding of what the

 6   allegations are in this matter?

 7      A.  Well, my reading of the complaint indicates

 8   that the allegations were that LDK had

 9   inappropriately reported inventory in its IPO

10   prospectus of June 1, 2007 and in its release of

11   quarterly data in August of 2007 in a corresponding

12   conference call and then on October 4th, 2007 when

13   it denied the allegations in the Piper Jaffray

14   report.

15          And the allegations appear to be twofold

16   from the complaint.  One is that based on Mr. Situ's

17   allegations, the company had overstated its

18   inventory by a rather sizable amount.  And then,

19   secondarily, that the company had committed some

20   violations of U.S. GAAP in the way that it accounted

21   for its costs; namely, it inappropriately used the

22   weighted average cost method and then it also

23   inappropriately reported its inventory by not using

24   the lower of cost or market.

25          Ms. Nettesheim's depiction of the

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1                    KENNETH LEHN, Ph.D.
 2   allegations is a bit different.  I don't think she
 3   refers to Mr. Situ's allegations at all.  And I
 4   believe it's paragraph 22 of her report, and her
 5   understanding of the allegations is a bit broader
 6   than what my understanding would be based on the
 7   complaint.  And, you know, I describe her
 8   understanding in my report as well.
 9        Q.  So with that understanding of the
10   allegations, what in your opinion is the, quote,
11   relevant truth, closed quote?
12             MR. HARRISON:  Objection vague, overbroad.
13             Go ahead.
14             THE WITNESS:  Again, at a general level the
15   relevant truth would be the release of information
16   that corrects those alleged misrepresentations.  So
17   after reading the complaint, I would look for
18   information releases that revealed information that,
19   effectively, Mr. Situ's allegations were correct.
20             I would also look for information releases
21   that indicated that LDK had improperly used the
22   weighted average cost method in calculating its cost
23   of goods sold.  And then I would also look for
24   information releases that disclose that LDK had not
25   used lower of cost or market in valuing its
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 57

1              KENNETH LEHN, Ph.D.

2    inventory.

3         Q.  And you have looked for that information?

4         A.  I have, yes.

5         Q.  Where did you look?

6         A.  Well, I conducted a search of news stories

7    on the Factiva database and on the Bloomberg news

8    database, and Exhibit 8 contains the results of my

9    news search for stories about LDK.

10        Q.  And in your search, you didn't find any

11   articles indicating that LDK improperly used the

12   weighted average cost method?

13        A.  I certainly didn't see any articles that

14   stated to the market that LDK had misused the

15   weighted average cost method in calculating its cost

16   of goods sold.

17             Again, there were rumors and speculation,

18   but never any validation of those rumors and

19   speculation that would constitute, in my opinion,

20   the relevant truth about the alleged

21   misrepresentations.

22        Q.  In your opinion, where would that

23   validation need to come from in order for it to be

24   sufficient to reveal the relevant truth?

25             MR. HARRISON:  Objection; vague, overbroad.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                  KENNETH LEHN, Ph.D.

2          THE WITNESS:  It could come from a number

3    of sources.  I mean, it could come from the company

4    itself and with a corresponding restatement.

5    Potentially could come from some sort of legal

6    action by the Securities and Exchange Commission,

7    not only an allegation but some validation that the

8    SEC was correct, which could include a judgment,

9    could include potentially a settlement with certain

10   acknowledgments by a company.

11         There may be other ways that the

12   information could come out as well.  So I don't mean

13   that to be an exhaustive list, but there could be a

14   number of ways in which the relevant truth might

15   emerge.

16   BY MR. DEVORE:

17      Q.  Well, so far you've told me that the only

18   way that you can validate information is the company

19   admits it or the SEC gets a judgment against them or

20   settles with them.

21         Any other ways that would validate the

22   relevant truth?

23      A.  Again, as I sit here, I'm not in a position

24   to provide an exhaustive list, but I've given you

25   two ways.  Undoubtedly, there are other ways, but I

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    would need to think more about that.

3         Q.  And additional research by securities

4    analysts, would that be one way that would validate

5    the relevant truth?

6              MR. HARRISON:  Objection; vague, calls for

7    speculation.

8              THE WITNESS:  You know, potentially, but it

9    would depend upon the nature of the research by the

10   analyst.  It would have to be more than a commentary

11   or speculation or rumor.  If it contained, you know,

12   hard factual information based on some new

13   information that the market heretofore did not have,

14   then theoretically that might constitute a

15   revelation of the truth.

16   BY MR. DEVORE:

17        Q.  Where would the analysts have to get that

18   hard factual information from in your opinion?

19             MR. HARRISON:  Same objection.

20             THE WITNESS:  Well, in the hypothetical

21   where an analyst report might constitute a

22   corrective disclosure, again, it has to be more than

23   just a rumor or speculation or an allegation.  It

24   would have to be rooted in something that is factual

25   and validated.  It potentially could come from the

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 60

1                    KENNETH LEHN, Ph.D.
2    company itself.
3    BY MR. DEVORE:
4        Q.  Would something like an accounting change
5    validate an allegation?
6              MR. HARRISON:  Same objection.
7              MR. DEVORE:  Strike that.  Let me be a
8    little more specific.
9        Q.  Would something like the fact that a
10   company changes the way it accounts for certain
11   items be the type of factual information that would
12   validate information in your opinion?
13             MR. HARRISON:  Same objection.
14             THE WITNESS:  Again, you know, we're
15   talking in a hypothetical.  Potentially, but it
16   would take more than an accounting change because
17   companies change accounting policies quite
18   frequently.
19             I teach a valuation class at the University
20   of Pittsburg and, you know, we value companies and
21   the students value companies and some companies got
22   valued over time and they change their accounting
23   policies, and it doesn't mean that their prior
24   accounting policies were incorrect at the time.
25   Companies switch from LIFO to FIFO for accounting

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 61

1                    KENNETH LEHN, Ph.D.

2    inventory.  It doesn't mean that their previous

3    accounting was wrong.

4           So an accounting change by itself would not

5    be sufficient, but an accounting change with some

6    additional factual information that the previous

7    accounting had been wrong at the time that it was

8    used, at least theoretically, might constitute

9    disclosure.

10   BY MR. DEVORE:

11      Q.  The company would have to admit that the

12   prior accounting was wrong?

13           MR. HARRISON:  Objection; misstates

14   testimony.

15           THE WITNESS:  I don't think it would

16   necessarily require an admission by the company.

17   That certainly might do it, but there may be other

18   ways as well.  And, as I said, SEC actions, you

19   know, potentially, you know, a resignation of an

20   auditor with factual information that is somehow

21   ultimately validated could potentially do it.  But

22   it would be very case- and fact-specific.

23           MR. HARRISON:  Josh, when you have a

24   chance, we've been going over an hour.

25           MR. DEVORE:  Yeah, you want to take a

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 62

1                    KENNETH LEHN, Ph.D.

2    break?

3           MR. HARRISON:  If this is a transition,

4    then that's fine.

5           MR. DEVORE:  Let's take a break.

6           MR. HARRISON:  Okay.

7           (Recess taken)

8    BY MR. DEVORE:

9        Q.  Before we broke, we were talking about what

10   information might validate, and you indicated that

11   an SEC judgment or settlement with admission might

12   constitute such a validation; is that right?

13       A.  Again, it would be case-specific,

14   fact-specific.  It would depend upon a lot more

15   information; but, at least theoretically, I could

16   see where that might constitute a corrective

17   disclosure.

18       Q.  In your experience at the SEC, how common

19   was it for a company to actually admit to wrongdoing

20   and settle with the SEC?

21          MR. HARRISON:  Objection; vague, overbroad.

22          THE WITNESS:  It's been 20 years since I

23   worked at the SEC, so I, frankly, don't recall.

24   BY MR. DEVORE:

25       Q.  Have you done any analysis, tests, searches

Page 63

1                    KENNETH LEHN, Ph.D.

2      to analyze the frequency with which companies admit

3      to wrongdoing in SEC?

4           A.  No, I haven't.

5           Q.  And you also indicated that an auditor

6      might make a noisy withdraw, so to speak.  You know

7      what that refers to?

8           A.  Right.

9           Q.  In your opinion, if an auditor make a

10     non-noisy withdraw, they withdraw their prior

11     opinion and quit, but don't reveal anything

12     additional, would that validate a prior allegation?

13               MR. HARRISON:  Same objections.

14               THE WITNESS:  Well, again, it would be

15     specific to the facts of a particular case.  On the

16     surface, it would appear that neither a noisy

17     withdrawal or a withdrawal by themselves would

18     constitute a corrective disclosure.  There would

19     have to be, again, some validation, and I'm just

20     suggesting that that may be part of a corrective

21     disclosure.

22     BY MR. DEVORE:

23          Q.  But a noisy withdrawal by an auditor itself

24     wouldn't validate the relevant truth?

25               MR. HARRISON:  Same objections.

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1                    KENNETH LEHN, Ph.D.

 2           THE WITNESS:  Again, in my opinion it would

 3    depend on the facts of a case.  Theoretically, I

 4    would think it would be rare that an allegation by

 5    an auditor who was resigning in and of itself would

 6    be sufficient to constitute validation.

 7    BY MR. DEVORE:

 8        Q.  What additional information would need to

 9    be disclosed?

10           MR. HARRISON:  Same objections.

11           THE WITNESS:  Well, it might be -- again,

12    this is just purely theoretical and hypothetical,

13    but it may be a prelude to something else that might

14    happen, such as the management of the company, then

15    acknowledging there had some been fraud or some

16    misrepresentation.  So it could be the catalyst for

17    some admission by the company.

18    BY MR. DEVORE:

19        Q.  But if there is no admission by the

20    company, a noisy withdrawal by an auditor wouldn't

21    reveal the relevant truth?

22           MR. HARRISON:  Same objections.

23           THE WITNESS:  Well, again, it would depend

24    on the facts of a case and what exactly the auditor

25    disclosed.  And whether what they disclosed was
```

1              KENNETH LEHN, Ph.D.

2    factual or simply a difference in opinion about

3    accounting policy.

4         And I could imagine there may be some

5    situations where what an auditor discusses is hard

6    facts, not simply a disagreement over accounting

7    policy.  So at least theoretically, depending upon

8    the facts of the case, that might constitute a

9    corrective disclosure.

10   BY MR. DEVORE:

11     Q.  You used the phrase "hard facts" in your

12   previous answer.  What do you mean by "hard facts"?

13     A.  Well, again, to me it would be information

14   that can be validated and is not speculative, it's

15   not opinion.

16     Q.  Information that could be validated but

17   hasn't necessarily been validated?

18         MR. HARRISON:  Objection; vague, same

19   objections.

20         THE WITNESS:  Well, again, a hard fact to

21   me would be information that is undeniable, that is

22   validated, verifiable and not simply speculation or

23   opinion.

24   BY MR. DEVORE:

25     Q.  But hasn't necessarily been confirmed by

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 66

1                    KENNETH LEHN, Ph.D.

2    the company?

3              MR. HARRISON:  Same objection.

4              THE WITNESS:  That's what I was saying

5    before.  Depending upon the nature of the

6    disclosure, there may be -- it may be a prelude to

7    some subsequent validation.  But in response to your

8    question, I also suggested the theoretical

9    possibility that, you know, there may be

10   circumstances where an auditor resignation would

11   reveal factual information that at least

12   theoretically might constitute a corrective

13   disclosure in itself.

14   BY MR. DEVORE:

15        Q.  By revealing factual information that's

16   undeniably true, which I think is the phrase that

17   you used?

18        A.  That would be one definition.

19        Q.  Okay.

20        A.  I'm not a linguist, but that would be a --

21        Q.  I'm just using your phrase.

22             A hard fact would be a information that is

23   undeniable, is the phrase that you used; is that

24   right?  I'll represent to you that that's what you

25   said.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2        A.  That would be one definition.  I may be

3    able to able to think of a better definition.

4        Q.  What happens if the company denies it

5    anyway, does that no longer reveal the relevant

6    truth?

7             MR. HARRISON:  Same objection; calls for

8    speculation, hypothetical.

9             THE WITNESS:  It would depend on the facts

10   of the case, and if a company denied it anyway, then

11   most likely what was disclosed initially was not

12   something that could be easily verified or

13   validated.  So it would probably then fall into the

14   category of speculation that has not yet been

15   validated.

16             Now, again, it could be validated by

17   someone else.

18   BY MR. DEVORE:

19       Q.  So as long as no one from the outside has

20   access to the truth, the company is free to deny any

21   rumors, facts, allegations to prevent the disclosure

22   of relevant truth?

23             MR. HARRISON:  Same objection;

24   argumentative.

25             THE WITNESS:  I don't think that's what I'm

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1                    KENNETH LEHN, Ph.D.

 2   saying.  What I'm saying is that there needs to be

 3   validation by someone, and it's natural to think

 4   about the company as being a likely source of the

 5   validation.  And I'm simply suggesting that at least

 6   at a theoretical level, it need not be simply a

 7   company that validates.  You could have others that

 8   might, depending on the facts of the case, be able

 9   to validate that there had been a misrepresentation,

10   and it could be the SEC, could be an auditor, could

11   be an analyst, could even be a journalist perhaps if

12   they had factual information that validated a rumor

13   or speculation.

14   BY MR. DEVORE:

15       Q.  So an analyst with factual information

16   could disclose the relevant truth; is that right?

17            MR. HARRISON:  Same objections.

18            THE WITNESS:  Again, at a theoretical

19   level, it's certainly possible.

20   BY MR. DEVORE:

21       Q.  And if an analyst's information was

22   accurate in disclosing that information, would that

23   disclose the relevant truth?

24            MR. HARRISON:  Same objections.

25            THE WITNESS:  It again would -- what

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    matters is what was released to the market and

3    whether what the market received was validation of

4    either some allegation or some rumor, some

5    speculation.  An analyst who simply adds to the

6    speculation and the rumor and so forth by expressing

7    an opinion, in my opinion, would not be validating.

8         So what matters is not what the ultimate

9    truth is, but rather what was communicated to the

10   marketplace.

11   BY MR. DEVORE:

12   Q.  Well, let's say hypothetically an analyst

13   gets an e-mail from a whistleblower, factual

14   information from inside the company.

15   Hypothetically, let's assume the information is

16   accurate.  The analyst releases that information.

17   Does that disclose the relevant truth even though

18   the company hasn't admitted that the information is

19   accurate?

20        MR. HARRISON:  Objection; incomplete

21   hypothetical, calls for speculation.

22        THE WITNESS:  Again, as an economist, I

23   never want to say never, but -- so it's possible,

24   but it would depend on the facts of the case.  And I

25   think, as a general matter, when I hear a

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    whistleblower provided information, one doesn't know

3    whether the whistleblower is a disgruntled employee

4    or a jilted lover, any number of motivations they

5    may have.  And then the question is, what is the

6    nature of the information that's been passed on.

7    And so I don't think it's sufficient to say if a

8    whistleblower provided some facts to an analyst that

9    that would constitute a corrective disclosure.

10   BY MR. DEVORE:

11        Q.  Unless the information is admitted by the

12   company, it's not a disclosure of the relevant

13   truth?

14        A.  I disagree with that.  Again, unless the

15   information is validated in some way and, again, a

16   likely source of the validation would be the

17   company, but there are other potential sources of

18   validation as well.

19        Q.  A judgment by the SEC or admission with an

20   SEC settlement?

21        A.  Those might be two examples, correct.

22        Q.  Anything else?

23             MR. HARRISON:  Same objections.

24             THE WITNESS:  Well, again, I think I've

25   indicated that it would depend on the facts of a

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 71

1                    KENNETH LEHN, Ph.D.

2     particular matter.  I don't think there are general

3     rules that would say anytime an auditor resigns and

4     discloses information to the public, that that would

5     constitute a corrective disclosure, but there may be

6     cases where it would.

7             It may be that, you know, a journalist is

8     able to provide validation that a rumor is true,

9     maybe a company was alleged to be defrauding the

10    public by claiming to have a facility they didn't

11    have, and a crackerjack investigative journalist

12    went there, took pictures, somehow had the pictures

13    validated, released the pictures and said there is

14    nothing here, and if the market interpreted that as

15    factual information that validated the allegation,

16    then something like that, theoretically, might

17    constitute a corrective disclosure.

18            So I'm not, as I sit here, going to limit

19    the sources of the validation; but at the end of the

20    day there has to be, in my opinion, validation in

21    order for prior rumor or speculation to be a partial

22    corrective disclosure.

23    BY MR. DEVORE:

24        Q.  And so long as a company keeps the truth

25    concealed, there can never be a revelation of the

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1                    KENNETH LEHN, Ph.D.

 2     relevant truth; is that right?

 3              MR. HARRISON:  Vague, ambiguous, calls for

 4     speculation, asked and answered.

 5              THE WITNESS:  I'm not sure what you mean by

 6     a company keeps it concealed.  The company might

 7     attempt to keep it concealed, but an investigative

 8     journalist or someone is able to reveal factual

 9     information that indicates a misrepresentation had

10     occurred.

11     BY MR. DEVORE:

12        Q.  Well, hypothetically, let's assume that

13     there is an allegation that a company's accounting

14     is wrong by a former employee.  And the company

15     manages to conceal the truth about the accounting

16     indefinitely.  In your opinion, there is no

17     revelation of the relevant truth; is that right?

18        A.  Well, I think, by definition, that's

19     correct.  If the only thing the market had learned

20     was that there had been an allegation, and for

21     better or worse there was never any subsequent

22     validation of that rumor, the only thing one can say

23     analytically is there was a rumor that might have

24     caused an economic loss, but there would be no

25     objective basis for concluding that the disclosure

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 73

1                    KENNETH LEHN, Ph.D.

2   of the relevant truth had caused an economic loss.

3        Q.  Let's assume hypothetically that something

4   like this happens.  A former employee makes vague

5   allegations of accounting irregularities and the

6   stock drops 50 percent and the company never admits

7   it; no further public information is released.  I

8   think under your opinion there is no disclosure of

9   the relevant truth in that instance; is that right?

10          MR. HARRISON:  Objection; incomplete

11   hypothetical.

12          THE WITNESS:  Based on the limited

13   information that you described, if there was simply

14   an allegation not followed by validation, then, in

15   my opinion, that's correct.

16   BY MR. DEVORE:

17        Q.  Let's continue the hypothetical to say that

18   in reaction to the stock drop, shockingly enough,

19   the company gets sued by its investors, and the

20   investors in the course of litigation undertake

21   discovery of internal company documents, and those

22   internal company documents show that the allegations

23   are true.  But because there is a confidentiality in

24   play, none of that information is actually revealed

25   to the market.  In your opinion, has the relevant

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1                    KENNETH LEHN, Ph.D.

 2    truth ever been disclosed?

 3              MR. HARRISON:  Same objections.

 4              THE WITNESS:  And assuming none of the

 5    lawyers or anyone leaks it to the market?

 6    BY MR. DEVORE:

 7         Q.  Everybody does what they are supposed to

 8    under the confidentiality order.

 9         A.  Right.  Then I think, by definition, then

10    the truth about the allegation would have never been

11    disclosed, that's correct.

12         Q.  And because of that, there cannot be any

13    loss causation; is that right?

14         A.  Well, again, if there has not been a

15    disclosure of the relevant truth, then as a general

16    matter, one would not be able to establish loss

17    causation in a matter such as that.

18         Q.  In your opinion does the information that

19    must be disclosed to the market to reveal the

20    relevant truth have to match fact for fact what is

21    alleged to have been concealed?

22              MR. HARRISON:  Objection; vague.

23              THE WITNESS:  I'm not sure I understand

24    exactly what you mean by "match fact for fact."

25    //

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1                  KENNETH LEHN, Ph.D.

 2    BY MR. DEVORE:

 3        Q.  Let's say a company is alleged to have

 4    misstated its inventory balance by 300 tons, and it

 5    is subsequently revealed to the market that the

 6    company's inventory balance was wrong but only by

 7    150 tons.  Does that reveal the relevant truth?

 8              MR. HARRISON:  Objection; vague and

 9    ambiguous, incomplete hypothetical.

10              THE WITNESS:  It, again, would be

11    fact-specific and it would depend upon perhaps the

12    reason for the overstatement; was the inventory

13    overstated by 150 million dollars for the reasons

14    that were given in the complaint.  And with the

15    caveat, again, that it would depend upon the facts

16    of the case.

17              If the allegations were validated by a

18    subsequent disclosure but the numbers didn't exactly

19    match what was contained in the complaint dollar for

20    dollar, depending upon the facts of the case, that

21    might constitute, in my opinion, a corrective

22    disclosure.

23    BY MR. DEVORE:

24        Q.  It might?

25        A.  It might.  It would depend upon the facts.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2        Q.  So in order to constitute a corrective

3   disclosure, the information revealed doesn't

4   necessarily have to be a hundred percent accurate as

5   long as a portion of it is subsequently validated?

6             MR. HARRISON:  Same objections.

7             THE WITNESS:  My opinion -- "a portion" is

8   sort of vague.

9   BY MR. DEVORE:

10       Q.  I agree.

11       A.  But that's why I say it really would be, in

12  my opinion, dependent upon the facts in a particular

13  matter.

14            You know, if the allegations were that a

15  company had overstated its inventory because some

16  inventory was missing and it turned out there was a

17  subsequent announcement by the company that restated

18  its inventory but the allegation of missing

19  inventory was untrue, then even if the restatement

20  of the inventory was of the same magnitude of what

21  had been alleged in the complaint, again, depending

22  on the facts of the case, my initial inclination is

23  that would not be a corrective disclosure.

24            By the same token, if in a complaint it's

25  alleged that 100 million dollars of inventory was

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 77

1                    KENNETH LEHN, Ph.D.

2    missing and there was a subsequent corrective

3    disclosure indicating that 90 million dollars of

4    inventory was missing, I would say that that would

5    constitute a corrective disclosure even though the

6    numbers didn't match exactly.

7        Q.  So let me make sure I understand.

8            If it's alleged that a company has a

9    shortage of raw materials because the materials

10   don't exist, and it subsequently is revealed that

11   the company does have a shortage of raw materials

12   but only because what it does have it can't actually

13   use to make anything out of, does that reveal the

14   relevant truth?

15           MR. HARRISON:  Objection; vague and

16   ambiguous, incomplete hypothetical.

17           THE WITNESS:  Well, I think one would need

18   more information because there may be disputes among

19   engineers and accountants as to what is from an

20   engineering perspective usable and from an

21   accounting sense what is usable.  So I would be

22   reluctant to provide a categoric answer on that

23   either way.

24   BY MR. DEVORE:

25       Q.  Well, let's assume hypothetically that all

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2     the technical people agree that you can't really use

3     very much of this stuff.  So under the hypothetical

4     that it's alleged that a company is short on raw

5     materials because they don't exist, and subsequently

6     it's revealed that the company has a large volume of

7     materials but it can't use it and the company

8     reclassifies it as a noncurrent asset, does that

9     reveal the relevant truth?

10            MR. HARRISON:  Same objections.

11            THE WITNESS:  Again, I don't think I can

12    provide you with a categorical yes or no.  There are

13    not only engineering issues, but then there are

14    accounting issues.  And reasonable accountants may

15    disagree about how to classify different types of

16    inventory and whether to classify inventory as a

17    current asset or a longer-term asset.  So I just

18    don't think there would be a uniform yes or no to

19    that question.

20    BY MR. DEVORE:

21        Q.  That certainly wouldn't be a fact-for-fact

22    revelation; is that right?

23            MR. HARRISON:  Objection; vague and

24    ambiguous.

25            THE WITNESS:  When you say that wouldn't be

5df1c887-47f5-4222-bb18-9551ffd7ea90

1               KENNETH LEHN, Ph.D.

2    a fact for fact, what's the "that?"  I'm sorry.

3    BY MR. DEVORE:

4        Q.  That's fair.

5               Relevant revelation that a company has a

6    large volume of inventory that it can't process

7    immediately would not be a fact-for-fact revelation

8    of the fact that the company had allegedly missing

9    inventory?

10              MR. HARRISON:  Objection; vague, ambiguous.

11   To the extent it's a hypothetical, it's incomplete.

12              THE WITNESS:  If I can just describe my

13   understanding of your hypothetical.

14              If the hypothetical was that it was alleged

15   that a company at a given point in time was

16   reporting inventory as being usable when it was

17   allegedly not usable, and then subsequent to that

18   the company changes its accounting policy and

19   reclassifies inventory, or some inventory, from

20   being a current asset to an asset expected to be

21   used beyond one year, that, to me, would not qualify

22   as a corrective disclosure because there would be a

23   distinction between inventory that's usable as

24   opposed to inventory that's usable beyond one year.

25              If the allegation had been that there had

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    been a misclassification of inventory between a

3    currents asset and long-term assets, it still

4    wouldn't, in my opinion, in the hypothetical that

5    you have given be sufficient if the company

6    subsequently changed the accounting policy, whereby

7    it reclassified some assets from a current asset to

8    a long-term asset.  If it went back and restated

9    prior financials to do that, claiming that we should

10   have done this two years earlier or three years

11   earlier, then, again with the same caveat, depending

12   on the facts of the case, that would get you closer

13   to being a corrective disclosure.

14          But I think a change in accounting policy

15   subsequent to an allegation in and of itself

16   wouldn't mean that what was initially reported was

17   incorrect.

18   BY MR. DEVORE:

19      Q.  Picking up on something that you just said,

20   would the corrective disclosure in that case be the

21   announcement that the information was allegedly

22   mischaracterized or the two-years-later restatement?

23          MR. HARRISON:  Objection; vague.

24          THE WITNESS:  I'm sorry, I'm not sure I

25   understand.

Page 81

1                    KENNETH LEHN, Ph.D.

2    BY MR. DEVORE:

3        Q.   Maybe I missed your answer.

4             But you said the company restated two years

5    later to recategorize that material.  At what point

6    in time does the corrective disclosure occur, at the

7    time that it is alleged that the information is

8    unusable or two years later at the time of the

9    restatement?

10       A.   Well, I think in the hypothetical we're

11   discussing, if a company restated its financials in

12   such a way that it constituted a corrective

13   disclosure, then to establish loss causation, the

14   appropriate analysis should be to examine how the

15   security prices changed on the announcement of the

16   restatement, and that would be necessary in order to

17   establish whether or not stockholders had suffered a

18   loss because of a revelation of the relevant truth.

19   Again, assuming that that disclosure qualified as a

20   corrective disclosure.

21       Q.   But assuming that in your world a

22   disclosure is a corrective disclosure and it is done

23   two years after the fact at the time of the

24   restatement, under your methodology would you

25   consider the decline at the time of the initial

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    allegation of the discrepancy or only a stock

3    decline at the time of the restatement in order to

4    calculate damages?

5          MR. HARRISON:  Objection; incomplete

6    hypothetical.

7          THE WITNESS:  And you're saying the

8    allegation was made two years prior to the actual

9    restatement?

10   BY MR. DEVORE:

11       Q.  Sure.

12       A.  With all the same caveats, about it being

13   case- and fact-specific, it would be hard for me to

14   imagine that it would be appropriate to use the

15   allegation date to establish loss causation if it is

16   that far away from the ultimate validation.

17          And the reason is, is that when there is a

18   rumor or an allegation, and this pertains to rumors

19   of not only alleged fraud but rumors of a takeover,

20   for example, if that rumor occurs two years prior to

21   the validation, it would be inappropriate, in my

22   opinion, as a general matter, to look at the two

23   dates in tandem.  And the reason goes back I think

24   to an example that I discussed earlier, that if you

25   have a rumor of a takeover on day one and then an

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 83

1                KENNETH LEHN, Ph.D.

2    announcement of a takeover on day two, it's highly

3    appropriate to look at the two dates together to

4    establish the valuation impact of that merger.

5            If you have a rumor of a takeover on day

6    one and then an announcement of a takeover two years

7    later, it's not appropriate to look at the two dates

8    in tandem to establish the valuation impact of the

9    merger.  And the reason, in my opinion, is that when

10   there is a rumor, there is a lot of uncertainty.

11   The market doesn't know whether the rumor is true,

12   and, if so, what is the valuation impact going to be

13   if the rumor is true.

14           So there is a lot of uncertainty.  That

15   uncertainty can either dissipate over time, if the

16   rumored event doesn't occur, in which case the

17   uncertainty discount, if you will, will contract and

18   the valuation of the security would go back up, or

19   it could, under some circumstances, expand.  There

20   could be more speculation that causes the

21   uncertainty discount to get bigger and bigger.

22           And so by the time that I get to the

23   ultimate validation, you don't know the total mix of

24   information in the market about the rumor and

25   whether or not there is more or less uncertainty.

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 84

1              KENNETH LEHN, Ph.D.

2   And so the farther away in time you get from the

3   rumor, the less appropriate it is to look at the

4   rumor date and the validation date together.  And,

5   in my opinion, two years, again, as a general matter

6   would be too long to consider using both together.

7              With the continuous caveat that it may

8   depend upon the facts of the case.

9        Q.  So under your opinion, the longer a company

10  manages to conceal the alleged fraud, the better off

11  it is because an investor won't be able to prove

12  loss causation if it doesn't come out until two

13  years later that an alleged fraud happened?

14             MR. HARRISON:  Objection; misstates

15  testimony, incomplete hypothetical.

16             THE WITNESS:  That's not obvious at all.

17  It depends on what was the valuation impact of the

18  rumor and what is the valuation impact of the

19  validation.

20             And all I'm saying is, analytically, it is

21  less defensible to look at the two dates together

22  the farther in time they are from each other.  But

23  it could be you get a larger valuation impact on

24  validation date, depending on what's been happening

25  with the stock and other information in the market

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                   KENNETH LEHN, Ph.D.

2    about the stock, or it could be less.  So I just

3    don't know a priori whether it, you know, would have

4    the effect that you're suggesting.

5    BY MR. DEVORE:

6         Q.  Well, let's assume hypothetically that a

7    company's chief accounting officer quits, walks out

8    and says:  Their internal controls are a mess, I'm

9    out of here.  Company's stock drops 50 percent.  Two

10   years later the company is bankrupt.  Nothing else

11   has ever come out about the allegations, whether

12   they were true or not.

13            In that case, is there a loss causation?

14            MR. HARRISON:  Same objections.

15   BY MR. DEVORE:

16        Q.  Assume that the chief accounting officer

17   was right.

18            MR. HARRISON:  Same objections.

19            THE WITNESS:  Well, again, if the company

20   is bankrupt and there has not been a public

21   disclosure to that effect, then depending on the

22   facts of the particular case, without subsequent

23   validation, there would not be loss causation.

24   BY MR. DEVORE:

25        Q.  When you say "to that effect," you're

Page 86

1                    KENNETH LEHN, Ph.D.

2    referring to the CFO's allegations?

3         A.  Correct.

4         Q.  And what if once the company is bankrupt,

5    someone new comes in, buys up the assets, goes in

6    there, realizes, well, these internal controls are a

7    mess, and they announce that to the public.  In that

8    situation, is there now a disclosure of the relevant

9    truth?

10            MR. HARRISON:  Same objections.

11            THE WITNESS:  If, again, it validates that

12   rumor that had been disseminated two years earlier,

13   then that would, by definition, reveal the relevant

14   truth about the alleged misrepresentation.

15   BY MR. DEVORE:

16        Q.  And in analyzing loss causation, the fact

17   that the company is already bankrupt, shares aren't

18   trading anymore, so obviously there is not going to

19   be any share reaction to the disclosure by the

20   liquidator or the new owner, do you measure the loss

21   causation impact at the time that the rumor was

22   announced or at the time that the new owners came in

23   and made the revelation?

24            MR. HARRISON:  Same objections.

25            THE WITNESS:  Again, I think it would

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    depend upon the facts of a particular matter and

3    what was happening to the stock price and

4    information releases following the initial rumor of

5    two years earlier, and somehow taking all of that

6    into account in determining whether or not that

7    could constitute a corrective disclosure.

8           So, theoretically, it might be possible in

9    that case to do what you're suggesting, but I think

10   it would be difficult.  But I wouldn't again ever

11   want to say never.

12   BY MR. DEVORE:

13        Q.  Do you have any outside bounds as to how

14   far out in time it just becomes impossible for the

15   disclosure of the relevant truth about a prior

16   allegation to be a corrective disclosure?

17        A.  Again, I don't have a bright line and it

18   would depend on an individual case.  But as a

19   general matter, the further out in time one goes,

20   the less compelling it becomes to use the rumor date

21   as a corrective disclosure date.

22        Q.  Do you know what the word "leakage" refers

23   to in the context of analyzing securities damages,

24   loss causation?

25        A.  I know what it means to me and I think

Page 88

1               KENNETH LEHN, Ph.D.

2    sometimes people have different definitions of the

3    same word, but I think I know what it generally

4    means.

5         Q.  What does "leakage" mean to you in this

6    context?

7         A.  Generally, what it means is that

8    information is gradually disseminated to the market.

9         Q.  In your opinion, can leakage constitute

10   disclosure of the relevant truth?

11        A.  If there can be documentation that there

12   was a dissemination of information and that it was

13   gradually disclosed to the market, then I think

14   leakage in that sense, theoretically, could

15   constitute a corrective disclosure.

16             Sometimes -- this is why the definition is

17   important.  Sometimes what people are referring to

18   when they refer to "leakage" is just a gradual

19   change in a company's securities price.  And it is

20   inferred that the reason for that gradual decline

21   was that there must have been some information in

22   the market, even though one can't point to specific

23   information releases.  I don't think that definition

24   of leakage is sufficient to qualify as a corrective

25   disclosure.  I think that it has to be tied to a

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 89

1                    KENNETH LEHN, Ph.D.

2    dissemination of information.

3         Q.  And, in your opinion, the source of that

4    information has to have some proof to validate the

5    information that's leaking out?

6              MR. HARRISON:  Objection; vague.

7              THE WITNESS:  Well, again, if there is a

8    gradual dissemination of information, with all the

9    caveats that we've talked about to this point, and

10   at a theoretical level, you can have information

11   that initially starts as speculation and then

12   ultimately ends with some type of validation.  And

13   collectively, that leakage of information, depending

14   on the facts of the case, might qualify as a

15   corrective disclosure.

16   BY MR. DEVORE:

17        Q.  As a general matter, in your opinion, is

18   information from company insiders speculation when

19   it is information about that company?

20             MR. HARRISON:  Objection; vague, calls for

21   speculation.

22             THE WITNESS:  It's hard to give a flat yes

23   or no.  I mean, on the one hand, companies do, as a

24   general matter, have access to more information than

25   the public market does about their operations and

5df1c887-47f5-4222-bb18-9551ffd7ea90

1               KENNETH LEHN, Ph.D.

2    their technology and their products and so on and so

3    forth.

4            But, on the other hand, companies also

5    often will release information that has a certain

6    spin element to it.  So if they are making an

7    acquisition, they'll praise, you know, how this

8    acquisition is going to create so much value for

9    shareholders.  And then, as frequently as not, the

10   stock price of the company will go down, so that the

11   market sort of discounts a lot of that information

12   and makes its own judgment, and it certainly would

13   consider what management is saying, but it doesn't

14   blindly follow what the company is saying.

15           So, as a general matter, I mean, the market

16   forms its own judgment.  Part of that judgment is

17   based on what management is saying, but, you know,

18   the market is not like sheep that just follow

19   blindly what the management of companies say.

20       Q.  Is it your opinion that nothing in the

21   October 3rd Piper Jaffray report about LDK caused

22   LDK's stock price to go down on that day?

23       A.  Sorry, can you repeat that?

24       Q.  Yeah.  Is it your opinion that nothing in

25   the October 3rd Piper Jaffray report about LDK

1                    KENNETH LEHN, Ph.D.

2    caused LDK's stock price to go down on that day?

3         A.  No, I don't, that's not my opinion.

4         Q.  Is it your opinion that no statements by

5    analysts on October 4th about LDK caused LDK's stock

6    price to go down?

7         A.  What I would say there is that, in my

8    opinion, there is not a scientifically valid basis

9    to conclude that statements made by analysts on that

10   day caused LDK's stock price to decline.

11             MR. DEVORE:  Move to strike as

12   nonresponsive.

13        Q.  Is it your opinion that no statements by

14   analysts on October 4th about LDK caused LDK's stock

15   price to go down?

16        A.  Well, again, as an expert witness, there

17   should be a scientific basis for my opinion, and my

18   analysis of LDK's stock price on October 4th leads

19   me to conclude that there is no scientific basis to

20   conclude that information released on that day

21   caused a decline in LDK's stock price, and that

22   would include information by analysts.

23        Q.  It's your opinion that the change in

24   closing price from October 3rd to 4th was not

25   statistically significant?

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 92

1                    KENNETH LEHN, Ph.D.

2         A.   That's correct.

3         Q.   Did you analyze the intraday movement of

4    LDK's shares on October 4th in any way?

5         A.   I did not, no.

6         Q.   Did you consider the fact that LDK's shares

7    opened higher on October 4th than it closed on

8    October 3rd?

9         A.   No, I did not.

10        Q.   Did you analyze whether the timing of LDK's

11   press release on October 4th might have cased its

12   stock to open higher on October 4th?

13        A.   I did not examine the intraday data for

14   October 4th.

15        Q.   Did you consider the timing of the October

16   4th conference call that Mr. Lai participated in on

17   October 4th?

18        A.   No, did not.

19        Q.   Did you analyze the stock reaction to the

20   conference call on October 4th?

21        A.   No, I did not.

22        Q.   And did you analyze the stock reaction to

23   any of the analysts reports released during the day

24   on October 4th?

25        A.   You mean by looking at the timestamp of

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 93

1                    KENNETH LEHN, Ph.D.

2    their release?

3         Q.  Yes.

4         A.  No, I did not.

5         Q.  And you haven't considered whether the high

6    to low on October 4th might be a statistically

7    significant movement in LDK's share price even if

8    the day-to-day close in your analysis was not a

9    statistically significant movement?

10        A.  Sorry, can you repeat that?

11        Q.  I can try.  I can read it back.

12             And you haven't considered whether the high

13   to low movement of LDK's ADSs on October 4th might

14   be a statistically significant movement in LDK's

15   share price even if under your analysis the

16   day-to-day close was not statistically significant?

17        A.  I haven't, but that would be an

18   unconventional way of measuring whether there was a

19   statistically significant price change.  So I'm not

20   sure why one would look at that particular variable.

21        Q.  Well, as the chief economist at the SEC you

22   were asked to measure statistically significant

23   movements of stock prices in reactions to particular

24   announce; is that right?

25        A.  That is correct.

1                    KENNETH LEHN, Ph.D.

2        Q.  And while you were at the SEC, did you ever

3   analyze intraday movements of shares?

4        A.  Yes, and I'm not discounting looking at

5   intraday data, but I'm saying these specific tests

6   of looking at the high to low difference is not a

7   measure that is conventionally used to determine

8   whether there is a statistically significant change

9   in the company's stock price.

10       Q.  Fair enough.

11            Did you at the SEC undertake any intraday

12   statistically significant movement analysis at any

13   time?

14       A.  Again, you know, it's been 20-some-odd

15   years, but if the facts in the particular matter

16   warrant that, then we would have done that.

17       Q.  Is it your opinion that nothing in the

18   Barron's October 8th article caused LDK's stock

19   price to decline?

20       A.  No.

21            MR. DEVORE:  Why don't we take a break.

22            (Recess taken)

23   BY MR. DEVORE:

24       Q.  Earlier we were talking about what your

25   understandings of the allegations were, and my

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 95

1              KENNETH LEHN, Ph.D.

2    question to you is:  In your analysis, do you assume

3    any of the allegations to be true?

4        A.  Well, it was unnecessary to form an opinion

5    either way for the affirmative opinion that I was

6    asked to form, which was simply whether the decline

7    in LDK's stock price -- and I'll refer to it as

8    stock price, even though it was the ADS price --

9        Q.  Yeah, sure, that's fine.

10       A.  -- at the end of the class period was

11   caused by a revelation of the relevant truth about

12   the alleged misrepresentations.  So for that opinion

13   it was unnecessary to form an opinion either way.

14           The second part of my assignment was to

15   review and respond to Ms. Nettesheim's report, and

16   in addition to opining on loss causation, she

17   obviously also offers an opinion as to damages.  And

18   in estimating damages, it is certainly my practice,

19   and I think it's her practice, to assume liability.

20   So even though I didn't formally have to assume

21   liability for the affirmative opinion, as I reviewed

22   and responded to her analysis of damages, certainly

23   the presumption is that for damages one assumes

24   liability.

25       Q.  Let me ask you to turn to paragraph 11 of

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1                    KENNETH LEHN, Ph.D.

 2   your report.

 3         A.   Paragraph 11.

 4         Q.   Paragraph 11.

 5              You write:

 6              "In my opinion, Ms. Nettesheim's analysis

 7              of loss causation and damages is flawed,

 8              unscientific, and unreliable.  She fails to

 9              establish loss causation and commits

10              numerous errors that result in an

11              unscientific unreliable, and meaningless

12              estimate of damages."

13              You write:

14              "A:  First, she assumes that

15              unsubstantiated rumors that have never been

16              validated revealed the relevant truth about

17              the alleged misrepresentations to the

18              market.  There is no objective basis for

19              this assumption."

20              It's your opinion that Ms. Nettesheim was

21   incorrect in assuming that the allegations were

22   true --

23         A.   No.

24         Q.   -- or are you saying something different?

25   What are you saying in 11A?
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

                           KENNETH LEHN, Ph.D.

1

2       A.   What I'm saying, again, is that what

3   matters is the information that was revealed to the

4   market when one is analyzing loss causation.  And

5   one doesn't, for purposes of loss causation, have to

6   make any judgment as to whether the allegations are

7   true or false.  One simply has to determine whether

8   or not the relevant truth about the alleged

9   misrepresentations was disclosed to the market and,

10  if so, did the stockholders suffer an economic loss

11  when that disclosure was made.

12          Again, for purposes --

13      Q.   Sorry.

14      A.   -- for purposes of damages, one does assume

15  the allegations are true, but for loss causation,

16  what matters, again, is what is disclosed to the

17  market.

18      Q.   How does one -- get your answer right -- go

19  about determining whether or not the relevant truth

20  about the alleged misrepresentations was disclosed

21  to the market?

22      A.   Well, again, by examining the information

23  that's disclosed and determining whether or not it

24  is corrective of some prior alleged

25  misrepresentation.

1                    KENNETH LEHN, Ph.D.

2        Q.   What econometric analysis did you perform

3   to determine whether the information that was

4   disclosed was corrective of some prior or alleged

5   misrepresentation?

6        A.   I'm not sure I understand what you mean by

7   "econometric analysis."

8        Q.   You're an economist; right?

9        A.   Correct.

10       Q.   What calculations did you perform to

11  determine whether the information that was disclosed

12  was corrective of some prior alleged

13  misrepresentation in this case?

14       A.   Well, to reach that judgment one would not

15  do calculations.  What one would do is examine

16  information releases and determine whether there was

17  a release of information that was corrective of the

18  alleged misrepresentations.  It's the first step in

19  doing event-study analysis, is identifying the

20  event.  And for purposes of identifying relevant

21  events, one doesn't do calculations, one simply

22  looks at the information that is released.

23       Q.   What is it about your particular expertise

24  that let's you look at a particular piece of

25  information and determine whether that piece of

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 99

1                KENNETH LEHN, Ph.D.

2    information related to another piece of information

3    any better than any other layperson?

4        A.  Well, again, I think it's an endemic part

5    of conducting an event-study analysis and oftentimes

6    people portray event-study analysis as running

7    regressions and crunching numbers, but the very

8    first step in an event study is identifying the

9    event.

10              I have published many papers that use

11   event-study analysis, and one is meticulous about

12   reviewing information releases and making sure that

13   you identify a date on which the relevant

14   information, given the research question at issue,

15   the date at which information was released.

16              As I said, when I was at the SEC, a big

17   part of our work with the Division of Enforcement

18   was conducting event-study analysis and making sure

19   we poured over information releases such that we

20   identified appropriate event dates.

21              I also was editor of a journal for ten

22   years, the Journal of Corporate Finance, and we

23   published many, many papers that did event-study

24   analysis, and we had to make decisions about the

25   quality of those papers.  And as part of that, we

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 100

1                    KENNETH LEHN, Ph.D.

2    would focus on, you know, the extent to which the

3    authors properly identified the events.

4            So I think as one who works in the field

5    and who exams how information releases are

6    associated with changes in securities prices, that I

7    have the expertise to judge whether a particular

8    piece of information released corresponds to the

9    real event, given the nature of the assignment.

10       Q.  And once you've identified the events

11   located in all of the articles, what is it about

12   your experience that allows you personally to have

13   better judgment about whether one piece of news

14   relates to another piece of news than anyone else?

15       A.  And I'm not sure I understand the question.

16   If the issue is --

17       Q.  I'll rephrase it.

18       A.  Okay.

19       Q.  Let's assume that you've done your Factiva,

20   Bloomberg searches and you produced Exhibit 8, which

21   has a collection of all of the relevant events.

22           Is that fair?

23       A.  Okay.

24       Q.  What is it about your experience that

25   enables you to better analyze whether one piece of

Page 101

1                    KENNETH LEHN, Ph.D.

2      news that you found relates to another piece of news

3      that you found than anyone else?

4           A.  Well, I'm not sure it's a matter of

5      "better," but it's a matter of whether or not the

6      information that was released constituted a

7      revelation of the truth about an alleged

8      misrepresentation.  And that task is no different in

9      principle than the task of saying I want to do an

10     event study on mergers and I have to identify what

11     the appropriate data is to determine when the market

12     learned about a merger.  And similar issues arise in

13     that exercise in the academic literature as arise

14     here.  If you see a rumor about a merger on day one

15     and then the merger is announced on day two, what's

16     the event date?

17               So it's an inherent part of doing an

18     event-study analysis.  And that certainly gives

19     rise, I think, to expertise and understanding

20     information releases.

21          Q.  I guess what I'm trying to understand is

22     how is it that you can read two different news

23     articles better than I can read two different news

24     articles and see if they relate to each other or

25     not?

5df1c887-47f5-4222-bb18-9551ffd7ea90

1            KENNETH LEHN, Ph.D.

2            MR. HARRISON:  Objection; vague.

3    BY MR. DEVORE:

4        Q.  And for the record, I'm not an economist.

5        A.  I'm not offering the opinion that I can

6    read them better than you can read them.

7        Q.  Okay.  So why is it that you can read two

8    different news articles and determine whether the

9    two different articles reveal the relevant truth

10   better than a juror can in this case?

11       A.  Sorry, better than a?

12       Q.  Juror.

13       A.  A juror.  I'm not even saying I can read

14   the articles better than jurors.  What I am saying

15   is that if one is attempting to estimate whether

16   stockholders suffered a loss when the truth about an

17   allegation was revealed to the market, then one has

18   to identify dates on which that truth was revealed.

19       Q.  And once -- sorry.

20       A.  And a rumor is not truth by definition.

21   Speculation is not truth by definition.  Excerpts

22   from analyst reports in October of 2007 saying that

23   they can neither confirm nor deny the allegations

24   is, by definition, indicating that the truth was not

25   revealed to the market on that date.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2          MR. DEVORE:  Move to strike as

3   nonresponsive.

4          THE WITNESS:  They were rumors and

5   allegation, and whether or not that requires special

6   expertise is up for others to determine.  But I'm

7   simply saying that by no objective means can one

8   argue that the truth was revealed on October 3rd and

9   October 8th.

10  BY MR. DEVORE:

11      Q.  It's your opinion that no reasonable person

12  could disagree that the information disclosed on

13  October 3rd corrected some misimpression of LDK --

14          MR. HARRISON:  Objection.

15  BY MR. DEVORE:

16      Q.  -- in the marketplace?

17          MR. HARRISON:  Objection; vague and

18  ambiguous --

19          THE WITNESS:  Again --

20          MR. HARRISON:  -- calls for a legal

21  conclusion.

22          THE WITNESS:  -- my assignment was to

23  determine whether the decline in the LDK stock price

24  at the end of the class period was caused by a

25  revelation of the relevant truth.  And, as I have

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1                   KENNETH LEHN, Ph.D.

 2    indicated several times, and I indicated in my

 3    report, all one can say is that rumors and

 4    allegations were disclosed at the end of the class

 5    period, but there is no basis to conclude that the

 6    relevant truth was disclosed at the end of the class

 7    period.

 8    BY MR. DEVORE:

 9         Q.  My question is a simple one:  Is it your

10    neighbor no reasonable person could disagree with

11    that conclusion?

12              MR. HARRISON:  Same objections.

13              THE WITNESS:  I haven't been asked to form

14    that opinion.  Obviously it's my opinion that the

15    relevant truth was not disclosed on October 3rd and

16    October 8th, nor was it disclosed on October 4th;

17    that what was disclosed was speculation and rumors.

18    BY MR. DEVORE:

19         Q.  And if a jury in this matter was to

20    disagree with you, would that change your analysis?

21              MR. HARRISON:  Objection; vague, calls for

22    a legal conclusion.

23              THE WITNESS:  My analysis is my analysis,

24    so it would not change if others reached a different

25    judgment on that.

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1                KENNETH LEHN, Ph.D.
 2   BY MR. DEVORE:
 3        Q.  Have you ever been on a jury?
 4            MR. HARRISON:  Objection.
 5            THE WITNESS:  Don't think so.  I was called
 6   for jury duty once, but I don't think I served on
 7   the jury.
 8   BY MR. DEVORE:
 9        Q.  Got out of it somehow.  Strike that.
10            MR. HARRISON:  Well --
11   BY MR. DEVORE:
12        Q.  Do you understand the role of a jury?
13            MR. HARRISON:  Objection; vague, calls for
14   speculation and a legal conclusion.
15            THE WITNESS:  Yeah, I'm not a lawyer, but I
16   have a general layman's understanding of what juries
17   do.
18   BY MR. DEVORE:
19        Q.  Juries are the finders of fact?
20        A.  Correct.
21        Q.  Do you know whether or not the information
22   revealed on October 3rd was a corrective disclosure
23   or not is a fact question?
24            MR. HARRISON:  Same objections.
25            THE WITNESS:  Again, this goes back to an
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 106

1                    KENNETH LEHN, Ph.D.

2    earlier discussion we had when I indicated that to

3    determine loss causation one does not have to be a

4    finder of the facts.  And contrary to Ms.

5    Nettesheim's mischaracterization of my opinion in

6    her reply report, I am not a finder of facts, nor

7    have I set out to do that.

8            What matters for purposes of establishing

9    loss causation is understanding whether the

10   information released to the market was a revelation

11   of truth or, as in this case, was it an allegation

12   and rumor.  And if at some point in the future a

13   finder of fact finds that the allegations contained

14   in the complaint were true, at that point there

15   would be an information release that potentially

16   would reveal the truth about the allegations, but as

17   we sit here today, no such disclosure has been made.

18   BY MR. DEVORE:

19       Q.  And in your hypothetical future jury

20   verdict situation, if a jury in this matter were to

21   find in fact that the allegations were true and that

22   information was released to the market, would that

23   jury finding constitute disclosure of the relevant

24   truth?

25       A.  It, depending on the facts, may -- may

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    indeed.

3             MR. HARRISON:  I was just going to object

4    that it's an incomplete hypothetical.

5             Go ahead.

6    BY MR. DEVORE:

7        Q.  Do you have an opinion one way or another

8    whether there were any misrepresentations during the

9    class period, putting aside the question as to

10   whether or not they were corrected by the truth?

11            MR. HARRISON:  Objection; vague, calls for

12   a legal conclusion.

13            THE WITNESS:  You're referring to

14   misrepresentations by?

15            MR. DEVORE:  Let me do it again.

16       Q.  Do you have an opinion one way or the other

17   as to whether the defendants in this case made any

18   misrepresentations during the class period

19   irrespective of whether the relevant truth about

20   those misrepresentations was revealed to the market?

21            MR. HARRISON:  Same objections.

22            THE WITNESS:  I do not.

23   BY MR. DEVORE:

24       Q.  Have you assumed that there were or were

25   not misrepresentations in your analysis?

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2              MR. HARRISON:  Objection; asked and

3     answered.

4              THE WITNESS:  Well, again for purposes of

5     the affirmative opinion that I've reached, it was

6     unnecessary to make an assumption either way.  For

7     purposes of reviewing and responding to Ms.

8     Nettesheim's report, especially as it pertained to

9     damages, as I indicated before, when one is

10    examining damages one assumes that the allegations

11    are true.  And in my response and review of her

12    analysis of damages, that was an implicit assumption

13    that I made.

14    BY MR. DEVORE:

15         Q.  In your affirmative opinion, we'll call it,

16    that the relevant truth was not revealed, is that a

17    fair summary of your affirmative opinion?

18         A.  That there is no basis to believe that the

19    relevant truth was disclosed on those dates, that's

20    correct.

21         Q.  In your affirmative opinion, is it an

22    assumption that there was no fraud?

23         A.  No.

24         Q.  In your affirmative opinion, did you assume

25    that there was fraud?

Page 109

1                    KENNETH LEHN, Ph.D.

2      A.  No.  As I say, unless one is forming an

3  opinion as to damages, it's not necessary to make an

4  assumption either way on that.  Insofar that there

5  is no loss causation, if one was asked to offer an

6  affirmative opinion on damages, one would assume

7  that the allegations were true but still reach the

8  opinion that there are no damages because, as we sit

9  here today, there is no loss causation.

10     Q.  So to be clear, your affirmative opinion is

11 that there is no loss causation, and, therefore,

12 there are no damages; is that right?

13     A.  Well, again, technically, I have not, as we

14 sit here today been asked to offer an affirmative

15 opinion on damages, but a logical consequence of

16 assuming that there is no loss causation is that

17 there are no damages.

18     Q.  And it's your opinion that there were no

19 corrective disclosures in October of 2007 related to

20 LDK; is that right?

21     A.  That is correct.

22     Q.  You indicated that in order to calculate

23 damages you have to assume liability; right?

24     A.  That is the general assumption, correct.

25     Q.  And you don't disagree with Ms. Nettesheim

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    making that assumption in calculating damages; is

3    that right?

4         A.  That is correct.

5         Q.  You do disagree with Ms. Nettesheim in

6    assuming liability in determining loss causation; is

7    that right?

8         A.  I am not sure she explicitly assumes

9    liability when she examines loss causation.  And, as

10   I indicated before, technically, I don't think

11   that's necessary because what one looks for is

12   whether plaintiff suffered an economic loss when the

13   relevant truth was disclosed, and what matters again

14   is what was disclosed to the market, not whether or

15   not the allegations are true.

16            So I'm not sure she necessarily made that

17   explicit assumption when she did her loss causation

18   analysis.

19        Q.  In performing your loss causation analysis,

20   did you make any assumptions as to whether any

21   statements by LDK were true?

22            MR. HARRISON:  Asked and answered and

23   vague.

24            THE WITNESS:  No, I did not.

25   //

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1                    KENNETH LEHN, Ph.D.
 2   BY MR. DEVORE:
 3        Q.  Did you consider in your loss causation
 4   analysis whether any of LDK's statements might have
 5   been false?
 6             MR. HARRISON:  Same objections.
 7             THE WITNESS:  No, that was not necessary
 8   either.
 9   BY MR. DEVORE:
10        Q.  In performing your damage analysis, did you
11   consider whether any of LDK's statements might have
12   been false?
13             MR. HARRISON:  Objection; vague.
14             MR. DEVORE:  Yeah, that's fair.  Let's try
15   that differently.
16        Q.  In performing your damage analysis, did you
17   consider whether any of LDK's statements on October
18   4th might have been false?  And by "LDK," I'm
19   referring to LDK or Mr. Lai.
20        A.  Well, again, I didn't technically do an
21   affirmative damages analysis.  If asked to opine as
22   to the implications of my opinion with respect to
23   loss causation, it would be that there are no
24   damages, but technically I haven't been asked to
25   date to do that.  So when you refer to my damage
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 112

1                    KENNETH LEHN, Ph.D.

2    analysis --

3         Q.  Okay.  Let's call it something else.  Let's

4    called it your criticism of Ms. Nettesheim's damages

5    analysis; is that fair?

6              MR. HARRISON:  And what's the question?

7    BY MR. DEVORE:

8         Q.  Is that fair as to -- what you're telling

9    me is you didn't do a damage analysis; you just

10   analyzed Ms. Nettesheim's damage analysis?

11        A.  I haven't offered an affirmative damages

12   analysis, but I have reviewed and responded to Ms.

13   Nettesheim's damage analysis.

14        Q.  So in reviewing and responding to Ms.

15   Nettesheim's damages analysis, did you take into

16   account or consider in any way whether any statement

17   by LDK or Mr. Lai on October 4th might have been

18   false?

19        A.  Well, again, in conducting a damages

20   analysis, one would assume that the allegations are

21   true; but, again, without loss causation there are

22   no damages.  So that's where Ms. Nettesheim and I

23   disagree as to whether or not loss causation of this

24   matter can be established.

25        Q.  Let's put aside your affirmative opinion

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                  KENNETH LEHN, Ph.D.

2    that there is no loss causation and focus on your

3    response to Ms. Nettesheim's opinion.

4           In analyzing Ms. Nettesheim's opinion, did

5    you consider whether or not any statements by LDK or

6    Mr. Lai on October 4th might have been false?

7         A.  No, I did not reach a judgment --

8    independent judgment as to that.

9         Q.  Did you assume the statements on October

10   4th were true?

11        A.  I didn't make an assumption either way as

12   to that.

13        Q.  Same question with respect to October 9th.

14   In analyzing Ms. Nettesheim's damage analysis, did

15   you assume that statements by LDK or Mr. Lai on

16   October 9th were true?

17        A.  I made no assumption either way as to that.

18        Q.  Did you consider whether or not the

19   statements by LDK on October 9 denying the

20   allegations in Barron's may have been false in your

21   analysis?

22           MR. HARRISON:  Objection; vague.

23           THE WITNESS:  That was not necessary for

24   the analysis that I conducted.

25   //

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    BY MR. DEVORE:

3         Q.  The analysis that you conducted -- which

4    analysis that you conducted?

5         A.  The review and response to Ms. Nettesheim's

6    damages analysis.

7         Q.  In reviewing and responding to Ms.

8    Nettesheim's damages analysis, you seek to subtract

9    from her inflation the increase in LDK's stock price

10   on October 9th; isn't that right?

11        A.  Well, one has to look at the totality of my

12   review and response, and the first point is the one

13   that you've already highlighted, which is 11A, which

14   is that she is assuming unsubstantiated rumors

15   constitute relevant truth, and I disagree with that.

16        Q.  Let's move past your affirmative opinion.

17        A.  Mm-hmm.

18        Q.  And focus on your response to Ms.

19   Nettesheim's analysis.

20             You do seek to recalculate what the

21   inflation would have been, isn't that right,

22   applying some additional post-class-period

23   disclosures?

24        A.  I don't offer that affirmatively.  What I'm

25   pointing out is that Ms. Nettesheim failed to

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2     consider confounded information, and insofar that

3     one assumes that there were corrective disclosures

4     on October 3rd and October 8th, she failed to

5     consider the effects of confounding information on

6     LDK's stock price, and it's in that spirit that I

7     offered some empirical evidence indicating that the

8     effects of this confounding information potentially

9     could be substantial.

10         Q.  And one of those confounding pieces of

11    information was LDK's press release on October 9; is

12    that right?

13         A.  That was one piece of information, that's

14    correct.

15         Q.  And in your analysis, you believe that the

16    October 9th press release by LDK caused an increase

17    in LDK's stock price; is that right?

18         A.  I do.  And there were several pieces to

19    that press release.

20         Q.  Sure.

21             In doing that analysis, did you consider

22    whether or not that statement may have been false?

23         A.  Well, one has to look at that statement

24    and, again, the Barron's article made reference to a

25    person, quote/unquote, with knowledge of LDK's

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2   manufacturing, or words to that effect, who raised

3   allegations about the quality of LDK's wafers.  I

4   characterized that as confounding negative

5   information because there is nothing in the

6   complaint, as I recall, that indicated that LDK was

7   misrepresenting the quality of its wafers.

8          So for purposes of damages analysis, it is

9   unnecessary to determine whether LDK's statement on

10  October 9th denying the allegations of manufacturing

11  problems was true or false.  That is an issue that

12  is separate from the allegations as laid out in the

13  complaint.

14         And, in addition, LDK increased its revenue

15  guidance, and I believe it was UBS that subsequently

16  indicated that the information released by UBS on

17  October 9th made it highly unlikely that Mr. Situ's

18  allegations were true.  And I'm simply pointing out

19  in my analysis that Ms. Nettesheim ignored the

20  effects of this confounding information on October

21  8th when she estimated her share inflation.

22     Q.  And you assume that the October 9th

23  rebuttals of Barron's allegation were true; isn't

24  that right?

25     A.  Again, I don't make a judgment either way.

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 117

1                KENNETH LEHN, Ph.D.

2   What I am looking at is the information that was

3   released to the market and how the market reacted to

4   that information.

5        Q.  And the market reacted positively to LDK's

6   statements on October 9th; right?

7        A.  It did.

8        Q.  But you didn't take into account the fact

9   that LDK may have been lying on October 9th; is that

10  right?

11       A.  That was unnecessary for the point I was

12  making in my report.

13       Q.  And you didn't take into account whether or

14  not LDK's shares might have fallen even further on

15  October 9th had LDK not made additional false

16  statements on October 9th; isn't that right?

17            MR. HARRISON:  Objection; vague, calls for

18  a hypothetical, incomplete hypothetical.

19            THE WITNESS:  And I'm not sure what you're

20  referring to when you say additional statements.

21  BY MR. DEVORE:

22       Q.  The October 9th statement.  The October 9th

23  press release by LDK.

24       A.  I'm not sure I understand the question.

25  I'm sorry.

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 118

1                    KENNETH LEHN, Ph.D.

2        Q.   You're aware that LDK put out a press

3    release on October 9th denying Barron's allegations,

4    among other things?

5        A.   Correct.

6        Q.   You didn't take into account whether or not

7    that denial may have been false; is that right?

8        A.   That is correct.  And, as I indicated, that

9    was unnecessary for the purpose of my analysis.

10       Q.   And you didn't do any analysis to determine

11   whether the inflation in LDK's shares might have

12   actually been greater due to the reinflation of

13   LDK's share price by a false statement on October

14   9th; is that right?

15            MR. HARRISON:  Objection; assumes facts not

16   in evidence, calls for speculation.

17            THE WITNESS:  Again, I'm sorry.  I'm not

18   sure I understand the question.

19   BY MR. DEVORE:

20       Q.   You didn't do any analysis to determine one

21   way or the other whether the October 9th statement

22   by LDK fraudulently reinflated the stock after

23   disclosure by Barron's on October 8th?

24            MR. HARRISON:  Same objections.

25            THE WITNESS:  And by "reinflate," you're

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    referring to inflation associated with a reiteration

3    of the initial alleged misrepresentation as

4    described in the complaint?

5    BY MR. DEVORE:

6         Q.   That's a fair way to put it.

7              MR. HARRISON:   Same objections and vague.

8              THE WITNESS:   Well, again, the point that I

9    make in my report is that there was no new

10   information in the Barron's article pertaining to

11   Mr. Situ's allegations; that the reference to a

12   person familiar with LDK's manufacturing in the

13   Barron's article represents a different allegation,

14   namely, one that makes reference to the quality of

15   LDK's wafers and its saw yields and so on and so

16   forth.

17             I saw nothing in the complaint that alleges

18   that the quality of the solar wafers and the saw

19   yield data reported by LDK had been misrepresented.

20             I point out that that is a piece of

21   confounding information that Ms. Nettesheim ignores

22   when examining LDK's stock price reaction to the

23   Barron's article.  I further point out that this

24   information released in the Barron's article is

25   addressed by loss causation in a press release on

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 120

1                    KENNETH LEHN, Ph.D.

2    the next day.  And the market reacted positively to

3    that, not only in terms of stock price but in terms

4    of analysts' reaction to the LDK information release

5    which denied they had manufacturing problems and

6    raised revenue guidance for 4th quarter.

7    BY MR. DEVORE:

8         Q.  And you use that October 9th stock reaction

9    to offset the damages that Ms. Nettesheim

10   calculates; is that right?

11            MR. HARRISON:  Objection; misstates

12   testimony.

13            THE WITNESS:  Well, again, I'm simply

14   pointing out that Ms. Nettesheim in her affirmative

15   damages analysis did not adequately consider the

16   effects of confounding information on LDK's stock

17   price, and in conducting this analysis, I'm simply

18   showing that potentially the confounding information

19   could have a substantial effect.

20            I'm not affirmatively saying that this is

21   the appropriate damages number, because for reasons

22   that I have already indicated, if one assumes the

23   allegations are true based on my affirmative opinion

24   that there is no loss causation, there are no

25   damages.  So this is purely to respond to what Ms.

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 121

1                    KENNETH LEHN, Ph.D.

2    Nettesheim did.

3    BY MR. DEVORE:

4         Q.  And to respond to Ms. Nettesheim's

5    analysis, you use the October 9th stock price

6    reaction as a metric to determine what the

7    confounding information's impact may have been; is

8    that fair?

9         A.  That is a fair depiction.

10        Q.  And in doing that, you don't take into

11   account whether or not the October 9th statement

12   that caused that movement may have been false?

13        A.  Well, but, again, I -- this is why I asked

14   about your reference to alleged reinflation, that if

15   that statement was false, that there are no

16   manufacturing problems, that is an issue that is

17   separate than the alleged misrepresentation in the

18   complaint, which made no reference to the quality of

19   the solar wafers and the saw yield data and so

20   forth.

21             So I don't view that as reinflation given

22   the allegations that have been made in this

23   particular matter --

24        Q.  It's your --

25        A.  -- even if one assumes that the statement

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                     KENNETH LEHN, Ph.D.

2    was false.

3         Q.  It's your understanding that the complaint

4    doesn't incorporate all of the allegations that

5    Barron's disclosed?

6         A.  Sorry, can you repeat the question?

7         Q.  It's your understanding that the complaint

8    doesn't allege everything that Barron's alleged was

9    wrong at LDK?

10             MR. HARRISON:  Objection; vague.

11             THE WITNESS:  Again, what I'm saying is

12   that Barron's makes reference to quality problems at

13   LDK with respect to its wafers and it makes

14   reference to saw yield data possibly being

15   misreported.

16             I do not see in the complaint references to

17   alleged misrepresentations about the quality of the

18   wafers and the saw yield data.

19             Insofar that on October 9th LDK falsely

20   represented the quality of its wafers and the saw

21   yield data, and that caused the stock price to rise,

22   analytically it is inappropriate to refer to that as

23   reinflation given the allegations in the complaint.

24        Q.  What did you do to analyze which pieces of

25   the October 9th statement caused LDK's stock price

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 123

1                    KENNETH LEHN, Ph.D.

2     to rise?

3          A.  Well, again, sir, this is responding to

4     what Ms. Nettesheim did.  It is Ms. Nettesheim's

5     burden if she is proffering a damages estimate to

6     account for confounding information.

7               What I did was to show that as much as

8     $5.82 of the price decline on October 8th could be

9     attributed to the confounding information that I

10    just described.

11              I'm not affirmatively saying that $5.82 is

12    the right number, I'm just saying it could have been

13    as much, and she didn't even consider that.

14         Q.  What did you do to analyze whether

15    confounding information on October 9th that was

16    directly related to the allegations by Mr. Situ is

17    what caused the stock price to rise, as opposed to

18    the information about saw yield data?

19         A.  Again, I'm not offering an affirmative

20    opinion as to damages.  I'm responding to what Ms.

21    Nettesheim did.

22         Q.  And Ms. Nettesheim was wrong to ignore

23    compounding information?

24         A.  Correct.

25         Q.  But it's okay for you to ignore confounding

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 124

1                    KENNETH LEHN, Ph.D.

2    information?

3            MR. HARRISON:  Objection; argumentative.

4            THE WITNESS:  Again, this is her analysis,

5    and if she is proffering an estimate of damages, I'm

6    simply pointing out that she has ignored confounding

7    information and the impact of that could be as large

8    as $5.82 on October 9th.

9        Q.  But you performed no analysis to determine

10   whether it's actually as large as $5.82 by trying to

11   eliminate the confounding information on October

12   9th; isn't that right?

13       A.  I didn't view that as being necessary to

14   establish the point that I was attempting to

15   establish.  So I did not do that.

16       Q.  So if I understand the point that you were

17   trying to establish, is that Ms. Nettesheim might be

18   off by as much as $5.82 on October 9th; is that

19   right?

20       A.  When you say on October 9th --

21       Q.  Yeah.

22       A.  -- meaning --

23       Q.  Based on the October 9th movement.

24       A.  Based on the October 9th movement, that's

25   correct.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2      Q.  But you haven't done any analysis to

3  determine whether she is actually off by $5.82 based

4  on the October 9th movement; isn't that right?

5          MR. HARRISON:  Objection; asked and

6  answered.

7          THE WITNESS:  Again, what I have done is

8  showed that the confounding information on October

9  8th could be worth as much as $5.82, but I don't

10  view it as my burden to establish what the precise

11  number is.

12  BY MR. DEVORE:

13      Q.  What scientific analysis did you do to

14  determine whether the $5.82 movement on October 9th

15  was related to the allegations or some other

16  confounding information?

17      A.  Well, I conducted an event-study analysis

18  on October 9th and estimated that the residual

19  dollar decline in LDK's stock price was $5.82.  And

20  my conclusion is that the confounding information

21  could have had an impact on LDK's stock price as

22  high as $5.82, and that's the extent of what I have

23  did.

24      Q.  You said "decline," I think you meant

25  increase.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2       A.  Decline.  Well, I'm remember referring to

3    the decline on October 8th, though.

4       Q.  Okay.  I think it's clear.

5            You also allege that Ms. Nettesheim ignored

6    several other dates in the post-class period, the

7    period immediately following the class period, where

8    LDK's share price went up; is that right?

9            Let me try it again.  That's a mess.

10           You also identify several other dates where

11   positive statements were made that would have offset

12   Ms. Nettesheim's inflation analysis had she

13   considered those dates; is that right?

14      A.  Positive and negative.

15      Q.  How far after the end of the class period

16   does one need to go in conducting a post-class

17   period analysis on the impact of post-class-period

18   news and adjusting for whatever class-period

19   inflation there may have been?

20           MR. HARRISON:  Objection; incomplete

21   hypothetical.

22           THE WITNESS:  Well, again, my analysis of

23   this is in response to Ms. Nettesheim's estimate of

24   damages, and my substantive point is that she

25   ignores post-class-period disclosures that relate to

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    what she characterizes as the corrective disclosure.

3            And, I might add, she actually herself in I

4    believe a prior deposition in this matter and then

5    in her deposition of a couple weeks ago, which I

6    attended, I think she defined "corrective

7    disclosures" as disclosures of information that

8    relate to the allegations.

9            Well, there are many post-class period

10   disclosures of information that relate to the

11   allegations, which, by her own definition, would

12   qualify as corrective disclosures.  And if she

13   assumes that the Piper Jaffray report and the

14   Barron's report are corrective disclosures, which I

15   don't, but she does, and if she does, there is no

16   principle basis for then ignoring the effects of the

17   post-class-period, quote/unquote, corrective

18   disclosures on LDK's stock price.

19        Q.  You -- sorry.  Go ahead.

20        A.  In my report, I simply illustrate how

21   fragile her estimate of damages are to whether or

22   not one considers those post-class-period

23   disclosures.  And under one reasonable scenario

24   where one looks at post-class-period disclosures

25   through December 17th, 2007, when LDK released the

5df1c887-47f5-4222-bb18-9551ffd7ea90

1            KENNETH LEHN, Ph.D.

2     results of the independent department investigation

3     into its accounting for inventory and the merits of

4     the allegations made by Mr. Situ, I find that there

5     are no damages even under her flawed approach.

6            Now, whether or not one can extend it to a

7     different date is an open question.  My only point

8     is that she didn't consider any of those

9     post-class-period disclosures.

10         Q.  It's your understanding that Ms. Nettesheim

11    didn't consider any post-class-period disclosures in

12    her analysis?

13         A.  Well, she lists them in Appendix B, but she

14    doesn't use the effects of those disclosures on

15    LDK's stock price in her estimate of damages.

16         Q.  You're aware that Ms. Nettesheim assumes

17    that any positive statements by LDK after the class

18    period were false; is that right?

19         A.  I heard her say that and I heard her make

20    reference to the so-called reinflation.

21            If she believes it was reinflation on dates

22    such as December 17th, then her damages analysis is

23    flawed.  For example, damages in securities cases

24    are typically measured as the difference between

25    inflation at purchase and inflation at sale.  If

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2   there was an investor who bought LDK shares on,

3   let's say, October 1st before any of the alleged

4   corrective disclosures, which under her calculations

5   means they would have been buying at an inflated

6   price of $30.90, and that person then sold on

7   December 18th, the day after the alleged

8   reinflation, according to Ms. Nettesheim, that

9   person would be entitled to a full $30.90 of damages

10   even though they sold after a substantial

11   reinflation of the stock price under Ms.

12   Nettesheim's logic on December 17th.

13           So if those post-class-period disclosures

14   constituted reinflation, then her entire analysis of

15   damages makes no sense.  She is not setting damages

16   equal to the difference between purchase at --

17   inflation at purchase and inflation at sale.

18       Q.   You've read the PSLRA, I assume; right?

19       A.   I have.

20       Q.   PSLRA has a formula for how damages are

21   calculated?

22       A.   It does.

23       Q.   And you know what that formula is?

24       A.   I do.

25       Q.   And you're aware that Ms. Nettesheim

1                    KENNETH LEHN, Ph.D.

2    applied the 90-day look-back limitation in her

3    damages analysis; right?

4         A.  I am aware of that.

5             MR. DEVORE:  Want to take a break and get

6    lunch?

7             THE WITNESS:  Sure.

8             MR. HARRISON:  Sounds good.  Thanks.

9             (Lunch recess taken)

10   //

11   //

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 131

1                     KENNETH LEHN, Ph.D.

2

3                     AFTERNOON SESSION

4    BY MR. DEVORE:

5         Q.   Before lunch we were talking about how far

6    out past the end of the class period you had to look

7    to consider whether information was relevant to a

8    disclosure; is that right?  Is that fair?

9         A.   I think we were discussing it not in the

10   abstract but specifics of this case.

11        Q.   And -- okay.  Talk about the specifics of

12   this case.

13             In your opinion, the relevant truth has

14   never been disclosed; is that right?

15        A.   That is correct.

16        Q.   How do I know when the class period ends if

17   the relevant truth has never been disclosed?

18             MR. HARRISON:  Objection; vague, calls for

19   speculation.

20             THE WITNESS:  When you ask "how do you

21   know," meaning you personally or how does --

22   BY MR. DEVORE:

23        Q.   How would anyone.

24        A.   Well, certainly an economist would look at

25   the end of the class period as defined in the

Page 132

1                    KENNETH LEHN, Ph.D.

2    complaint.

3         Q.  And your understanding as an economist is

4    that until the relevant truth is revealed, there is

5    no loss causation; is that right?

6         A.  I would put it a little differently and say

7    that in order to establish loss causation there must

8    be a disclosure of the relevant truth.

9         Q.  And from my view point, as a lawyer, how do

10   I know when to end the alleged class period if in

11   fact the relevant truth still has not been

12   disclosed?

13            MR. HARRISON:  Objection; calls for a legal

14   conclusion, vague.

15            THE WITNESS:  Yeah, again, I'm an

16   economist.  I'm not an attorney.  So I don't believe

17   I'm in a position to give advice as to how one

18   determines the class period.

19   BY MR. DEVORE:

20        Q.  Earlier we had talked about a hypothetical

21   situation in which ultimately a jury in this case

22   were to reveal the relevant truth in the form of a

23   verdict; right?

24        A.  Correct.

25        Q.  Is it your opinion that the class period

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                     KENNETH LEHN, Ph.D.

2    would continue until the relevant truth is revealed?

3                MR. HARRISON:  Same objections.

4                THE WITNESS:  Again, I'm not an attorney

5    and I don't have particular expertise on the legal

6    issues that arise in defining the class period.

7    BY MR. DEVORE:

8        Q.  It's your opinion, though, that revelation

9    of the relevant truth at the end of a jury trial, if

10   it caused a decline in LDK's share price, could

11   amount to loss causation; is that right?

12       A.  Theoretically, a legal judgment might be a

13   disclosure that would reveal the relevant truth,

14   yes.

15       Q.  And if that disclosure caused a decline in

16   LDK's share price, there might be loss causation;

17   right?

18       A.  Theoretically there could be, yes.

19       Q.  And under your analysis, anyone that bought

20   LDK's shares from the time of the IPO until -- when

21   the alleged misrepresentations were made until the

22   time of the jury verdict disclosing the relevant

23   truth, bought shares at an inflated price; is that

24   right?

25                MR. HARRISON:  Objection; incomplete

1                    KENNETH LEHN, Ph.D.

2    hypothetical, calls for speculation.

3             THE WITNESS:  Well, by definition, if upon

4    the release of a corrective disclosure there was a

5    statistically significant decline in a company's

6    stock price, say LDK, that would -- that would

7    establish loss causation and then that would require

8    one to estimate the per share inflation during some

9    class period.

10   BY MR. DEVORE:

11        Q.  And investors that are purchasing LDK

12   shares today, assuming a future verdict revealing a

13   relevant truth causing a decline, are purchasing

14   LDK's shares at an inflated price; is that correct?

15            MR. HARRISON:  Same objections.

16            THE WITNESS:  One would have to do a

17   separate estimate of the per share inflation, but

18   under your hypothetical, if there was some

19   subsequent corrective disclosure associated with a

20   statistically significant decline in LDK's stock

21   price, then my presumption is that would be true.

22   BY MR. DEVORE:

23        Q.  And were this matter to go before a jury,

24   would you inform the jury that they should award

25   damages to anyone that's purchased LDK's shares at

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    any time from June 1, 2007 until the time of the

3    jury verdict because the shares were inflated

4    throughout that time?

5              MR. HARRISON:  Same objections.

6              THE WITNESS:  Well, two things.  One is

7    that, as an economist, you don't have to do a lot of

8    work on estimating per share inflation.  Two is, as

9    an economist, I'd be reluctant to provide a jury

10   with advice as to whom they should award damages,

11   and rather would probably just take assumption by

12   counsel as to who would be eligible to receive

13   damages.

14   BY MR. DEVORE:

15       Q.  But you're telling the jury in this case

16   that they shouldn't award damages because the

17   relevant truth hasn't been revealed; right?  That's

18   your plan?

19       A.  What I would testify to, if asked, is

20   whether or not the decline in LDK's stock price at

21   the end of the class period was caused by a

22   revelation of the relevant truth, and my testimony

23   would be that it was not, that it was caused by the

24   revelation of a rumor, which to the date of my

25   testimony, assuming that was true, would not yet

1                    KENNETH LEHN, Ph.D.

2    have been validated in a way that was communicated

3    to the market.

4        Q.  And would you then subsequently tell the

5    jury that they could validate the information by

6    finding for the plaintiffs?

7               MR. HARRISON:  Same objections.

8               THE WITNESS:  I don't think that would be

9    part of my affirmative testimony; but, rather, the

10   affirmative testimony would be related to the

11   affirmative opinion in my report.

12   BY MR. DEVORE:

13       Q.  And -- all right.  I understand.

14              Let's go back to something else we were

15   talking about before lunch, this question of how far

16   out in time you have to look to consider relevant

17   information.

18              One of the post-class period disclosures

19   that you refer to in your criticism of Ms.

20   Nettesheim's damage analysis is a December 10th

21   announcement of a contract with a company called

22   Q-Cells; is that right?

23       A.  That's correct.

24       Q.  Do you recall, including in your report, an

25   observation that when Q-Cells' contract was

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                KENNETH LEHN, Ph.D.

2    announced, LDK's stock rose in a statistically

3    significant way; is that right?

4        A.  On December 10th, correct.

5        Q.  How far out in time do you have to consider

6    other information relevant to the Q-Cells' deal to

7    determine inflation properly?

8        A.  Well, again, let's start from the premise

9    that Ms. Nettesheim and I disagree fundamentally

10   about whether the Piper Jaffray report and the

11   Barron's news article and also October 4th

12   constituted corrective disclosures.

13       Q.  Putting that aside and just focusing on

14   your criticism of Ms. Nettesheim, using the

15   assumption that there was a correct disclosure.

16       A.  That's what I was going to say, putting

17   that fundamental disagreement aside, she assumes

18   that those disclosures were partial corrected

19   disclosures.  She defines corrective disclosures in

20   her deposition testimony, testimonies, plural, as

21   disclosure that relate to the allegations.

22            In her report she acknowledges there are

23   many announcements beyond the end of the class

24   period that relate to the allegations, which by

25   definition, under her definition, they would

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1              KENNETH LEHN, Ph.D.
 2   constitute corrective disclosures.  Analytically, if
 3   one is presuming that the speculation disclosed to
 4   the market on October 3rd and October 8th revealed
 5   some relevant truth, then in my opinion there is no
 6   principal basis for then ignoring subsequent
 7   announcements that revealed additional information
 8   about those allegations and that's what she has
 9   done.
10              Now, what I did in my report was simply
11   illustrate that if one looked at post-class-period
12   announcements through December 17th, 2007, which is
13   when LDK announced the results of the independent
14   investigation, and a number of analysts made
15   reference to a clean bill of health, we can now
16   focus on fundamentals, this removes the overhang, so
17   on and so forth, which indicates to me that that
18   would be a reasonable stopping point.  I'm not
19   saying that's the only stopping point, but it's a
20   reasonable stopping point.  And if one were to do
21   that, one finds that her estimate of per share
22   inflation drops precipitously.
23       Q.  That's assuming --
24       A.  Given her analysis, in my opinion, it's her
25   burden to determine what additional disclosures were
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

1           KENNETH LEHN, Ph.D.

2   made beyond the end of the class period that would

3   constitute corrective disclosures, given her

4   definition.

5           I was simply illustrating one stopping

6   point.  I'm not prepared, as I sit here today, to

7   tell you what exactly the stopping point should be,

8   but there is no basis to ignore the

9   post-class-period disclosures that relate to the

10  corrective disclosures that she identifies.

11      Q.  So if I understand you right, Ms.

12  Nettesheim's obligation is to perform a rigorous

13  scientific analysis, but your obligation is not to

14  perform a rigorous scientific analysis and criticize

15  her?

16      A.  That's not what I said at all.  What I said

17  is that in my opinion, there is no loss causation.

18  That's my affirmative opinion.  She is the one who

19  is proffering an estimate of damages, and I'm simply

20  pointing out that once she accepts the premise that

21  the disclosures in October of '07 were partial

22  corrective disclosures, within her framework there

23  is no basis to ignore the post-class-period

24  announcements that provide additional information.

25  It's her model.  It's her burden.  It's not my

5df1c887-47f5-4222-bb18-9551ffd7ea90

1               KENNETH LEHN, Ph.D.

2    model.

3         Q.  What date range did you do your event study

4    to cover?

5         A.  I'm not sure.  What do you mean?  I

6    estimate a regression from December 24th, '07

7    through August 28th of '08.

8         Q.  Did you consider all of the news during

9    that time period as to whether it related to any of

10   the allegations?

11        A.  I'm not -- I'm not sure what you mean by

12   the question.  That was the period over which I

13   estimated the regression model, you know, the

14   parameters from which I used in my event-study

15   analysis; but I didn't do an analysis of all the

16   events that occurred during that period.

17        Q.  Are you aware that last month there was

18   some press regarding Q-Cells' contract between

19   Q-Cells and LDK?

20        A.  No, I don't have any recollection of that.

21        Q.  You didn't consider that in your analysis?

22        A.  The announcement of last month?

23        Q.  Right.

24        A.  No.

25        Q.  So the fact Q-Cells announced that it was

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2     canceling the contract that was announced in

3     December of 2007 is unrelated to the disclosures?

4              MR. HARRISON:  Objection; vague, calls for

5     speculation.

6              THE WITNESS:  Well, I haven't examined that

7     announcement, but, you know, what is relevant is the

8     fact that by her own acknowledgment Ms. Nettesheim

9     stated that announcements of contracts during the

10    period after the Piper Jaffray and the Barron's

11    article would be related to the allegations because

12    they provided the market with information about

13    LDK's ability to sell product, which would in turn

14    provide information about their production capacity

15    and so forth.

16             So what I examined was information on the

17    market during that period.  Insofar as Q-Cells

18    canceled the contract, one would have to examine the

19    reasons for the cancellation and did it tie back in

20    any way to the alleged misrepresentations.  Again, I

21    haven't investigated that.

22    BY MR. DEVORE:

23        Q.  How far after the end of the class period

24    should Ms. Nettesheim have gone in considering

25    whether each successive piece of information was

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 142

1                    KENNETH LEHN, Ph.D.

2    relevant to the prior allegations?

3         A.  Well, because she states that the Piper

4    Jaffray and Barron's article and news releases on

5    October 4th constituted corrective disclosures, and

6    because she said information that relates to the

7    allegations are corrective disclosures, and because

8    she acknowledges in her Appendix B that there were a

9    series of announcements after the end of the class

10   period that relate to the allegations, it is

11   incumbent upon her, since it's her model, to make

12   that determination.

13        Q.  So you don't have an opinion one way or the

14   other as to how far past the end of the class period

15   Ms. Nettesheim should have gone?

16        A.  Well, as a guiding principle, it would be

17   until full and accurate information pertaining to

18   the information releases on October 3rd and October

19   8th were made, and that would be a determination

20   that she or one who is doing her type of analysis

21   should conduct.  But, again, it's not my model and

22   I'm simply pointing out that her result is highly

23   sensitive to whether or not she does that.

24        Q.  As a guiding principle, it would be until

25   full and accurate information pertaining to the

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 143

1                KENNETH LEHN, Ph.D.

2    information releases on October 3rd and October 8th?

3         A.  Correct.

4         Q.  That hasn't happened yet; right?

5         A.  What hasn't happened?

6         Q.  Under your analysis, there has been no full

7    and accurate disclosure of information pertaining to

8    the October 3rd and October 8th allegations; is that

9    right?

10         A.  I'm referring to the information pertaining

11    to the rumors and the allegations and the

12    speculation in October of '07, and there has been

13    other information that has been disclosed pertaining

14    to those allegations.  So in terms of the fullness,

15    that information is out there.

16             With respect to the accuracy, you know,

17    information that has been disclosed since then has

18    been contradictory of those allegations, and that is

19    not speaking as to whether the allegations are true

20    or false, but it is speaking to the fact that the

21    market has received additional information that Ms.

22    Nettesheim has not considered.

23         Q.  And you're equating that additional

24    information with full and accurate information; is

25    that right?

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 144

1                    KENNETH LEHN, Ph.D.

2               MR. HARRISON:  Objection; vague.

3               THE WITNESS:  As it -- again, not making

4    judgment as to the merits of the information, but

5    rather as it relates to the alleged corrective

6    disclosures on October 3rd and October 8th.

7    BY MR. DEVORE:

8          Q.  I'm not sure I understand that answer.

9    You're saying that LDK's self-clearing announcement

10   on December 17th and the SEC's subsequent

11   determination not to pursue claims against LDK

12   revealed full and accurate information or didn't

13   reveal full and accurate information?

14         A.  I'm not talking about full and accurate in

15   terms of the merits of the claims.  What I'm saying

16   is that one cannot cherrypick some information that

17   is associated with stock price declines, which is

18   information that is rumor and speculative, and then

19   ignore subsequent information that provides

20   additional information about those alleged

21   corrective disclosures, some of which may cause the

22   company's stock price to go down, some of which may

23   cause it to go up.

24               And what I'm saying is that if you accept

25   Ms. Nettesheim's initial premise that there were

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 145

1                     KENNETH LEHN, Ph.D.

2    corrective disclosures which were partial corrective

3    disclosures, which is what she says, then there is

4    no principal basis for ignoring the subsequent

5    information that adds to the total mix of

6    information concerning those alleged corrective

7    disclosures.

8         Q.  And what is the principal basis for

9    ignoring all of the discovery in this case

10   considering whether the relevant truth was revealed?

11            MR. HARRISON:  Objection; vague, calls for

12   a legal conclusion.

13            THE WITNESS:  I'm not sure I understand

14   your question.

15   BY MR. DEVORE:

16        Q.  I think we established earlier that you

17   hadn't seen a single internal LDK document in this

18   case other than Mr. Situ's e-mails; right?

19        A.  That's my recollection, correct.

20        Q.  And you're offering the opinion that the

21   relevant truth hasn't been revealed to the market;

22   correct?

23        A.  That's exactly right.  And that's, again,

24   based on a review of the information releases that

25   have been made to the market.

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 146

1                   KENNETH LEHN, Ph.D.

2          Q.   And you haven't --

3          A.   As we sit here today, the market has never

4     received information that validates the rumors and

5     speculation that Ms. Nettesheim uses as partial

6     corrective disclosures.

7          Q.   You've done absolutely nothing to determine

8     whether in fact the rumors at the time were true

9     based on the discovery in this case; isn't that

10    right?

11         A.   That is correct; but, again, for two

12    reasons.  One is I'm not a finder-of-fact.  What

13    matters to me in terms of establishing loss

14    causation is information that was revealed to the

15    market.  And if there are internal documents that

16    were not revealed to the market, no matter what

17    those internal documents say, they're irrelevant for

18    purposes of establishing loss causation.

19         Q.   Let's turn to another subject.

20    Materiality.  What is materiality?  Can you define

21    materiality as the way you use it?

22         A.   Material information.

23         Q.   I think I used the word "materiality" in

24    your report; right?

25         A.   Right.  Material information generally is

Page 147

1                    KENNETH LEHN, Ph.D.

2    information that is -- and under Supreme Court

3    decisions, I believe information that is likely to

4    significantly alter the total mix of information

5    about a company's securities and/or information that

6    a reasonable investor would want to know in making

7    an investment decision regarding those securities.

8         Q.  And you rely on the Supreme Court's opinion

9    in TSC for that; is that right?

10        A.  It's the TSC Northway case.

11        Q.  Yes.

12        A.  And I believe also basically Levinson.

13        Q.  Is it your reading of those cases that the

14   Supreme Court requires a statistically significant

15   price change in order for a certain bit of

16   information to be material?

17        A.  I don't have --

18            MR. HARRISON:  Objection.  Sorry.

19   Objection; legal -- calls for a legal conclusion.

20            MR. DEVORE:  I agree.

21        Q.  But go ahead.

22        A.  I don't have an opinion as to what the

23   Supreme Court requires.

24        Q.  Do you personally have the opinion that in

25   order for a piece of information to be material, it

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                KENNETH LEHN, Ph.D.

2    has to cause a statistically significant change in

3    price of the security that that news relates to?

4         A.  I think, as a general matter, the most

5    appropriate test for determining whether information

6    is material is to conduct an event study when the

7    information is released and then to test whether or

8    not the change in the security price is

9    statistically significant.  So in my opinion that is

10   the -- as a general principle, the most appropriate

11   way to test for materiality.

12        Q.  Is that the only way?

13        A.  There, again, may be facts in a particular

14   case that allow one alternative ways of testing

15   whether information is material; but, as a general

16   matter, I think that is the most appropriate way.  I

17   wouldn't want to say necessarily the only way.

18        Q.  So hypothetically, if there were two pieces

19   of information on the same day, one that was

20   positive and one that was negative, so the resulting

21   share-price movement is nil, does that mean that

22   both of those pieces of information are immaterial?

23             MR. HARRISON:  Objection; calls for

24   speculation, hypothetical.

25             THE WITNESS:  Depending on, again, the

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 149

1                    KENNETH LEHN, Ph.D.

2    facts of the case.  It may be that the threshold for

3    determining statistical significance for a company

4    is a 5 percent movement, and in your hypothetical,

5    if in fact you had good news that would have caused

6    a 10 percent increase and bad news causing a 10

7    percent decrease, both of which on their own would

8    have been statistically significant, but they cancel

9    each other out, that would be a classic case of

10   confounding information.  And I would argue that in

11   that case, an event study would not be an

12   appropriate way to inform an opinion as to

13   materiality, and that one would then seek

14   alternative ways to test whether information is

15   material.

16   BY MR. DEVORE:

17        Q.  So to be clear, the fact that there was no

18   statistically significant movement on the day of two

19   pieces of confounding information, doesn't mandate

20   that both pieces are immaterial?

21        A.  Correct.

22        Q.  You did a regression analysis in this case;

23   is that right?

24        A.  That's correct.

25        Q.  Or asked someone to do one for you.

1                    KENNETH LEHN, Ph.D.

2          A.  Well, I did it, but I received assistance

3     from Cornerstone, correct.

4          Q.  What threshold for statistical significance

5     did you use?

6          A.  Well, the root mean square from the

7     regression equation was 4.2 percent.  So in order to

8     get a t-statistic of 1.96, you would need a residual

9     return that would be roughly twice that, about 8.4

10    percent, in a given day.

11         Q.  You used the 1.96?

12         A.  Right.

13         Q.  95 percent confidence level?

14         A.  Correct.

15         Q.  Did you do any analysis of a 90 percent

16    confidence level?

17         A.  No.  I mean, I did the analysis that

18    provides the t-statistic, so one can easily infer

19    whether or not something is significant at the 90

20    percent level.  But, in my opinion, the appropriate

21    threshold is 95 percent, and that's a two-tailed

22    test.

23         Q.  And is it your opinion that information

24    that meets the 95 percent confidence test is

25    presumptively material?

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2         A.   I'm not -- when you say information that

3    meets the threshold, do you mean if that information

4    is released on a day and there is a statistically

5    significant price movement, is that information

6    presumptively material?

7              That, again, would depend upon other facts,

8    such as, was there other information released on

9    that day.  If it's a clean announcement and the only

10   information released on that day was the information

11   at issue, and there was a statistically significant

12   change in the security price, then I would conclude

13   that that information was material.

14        Q.   I'm going to ask you another inappropriate

15   legal question.

16             Do you know what the standard of proof is

17   in a civil case?

18             MR. HARRISON:  Do I need to object?

19             MR. DEVORE:  Go ahead.  Yeah, I suppose you

20   probably should.

21             MR. HARRISON:  Objection to the extent he

22   is asking for a legal conclusion.

23             THE WITNESS:  Yeah, I'm not an attorney.

24   BY MR. DEVORE:

25        Q.   So assume hypothetically that the standard

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 152

1              KENNETH LEHN, Ph.D.

2    of proof is more likely than not fifty-fifty.  In

3    that rubric, does information have to be 95 percent

4    sure, statistically speaking, to be material?

5              MR. HARRISON:  Same objection and

6    incomplete hypothetical.

7              THE WITNESS:  The appropriate standard in

8    the academic arena is that the threshold be 95

9    percent.  There are papers and -- and papers

10   reported 90 percent, as well as 95, as well as 1.

11   And so it's a convention in the literature to report

12   all three levels: 1 percent, 5 percent, 10 percent.

13             However, the threshold for acceptance in

14   the literature is generally 95 percent.  So people

15   will report 90 percent, but it's rare that a paper

16   would be accepted if the key result was significant

17   only at the 90 percent level.

18             So with that as a guiding principle, I

19   think to conform with accepted practice in the

20   peer-review literature to be confident that you have

21   something other than, you know, white noise or

22   random movement in a company's stock price, one

23   should stick to that 95 percent threshold.

24             So I think there may be a disconnect

25   between the more likely than not standard versus

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2   what someone would feel comfortable from a

3   scientific perspective.

4   BY MR. DEVORE:

5       Q.  Let me ask you to turn to paragraph 196 of

6   your report.  You write that Ms. Nettesheim's

7   definition of materiality does not allow for

8   scientific method for testing materiality.

9           Do you see that?

10      A.  Yes.

11      Q.  What do you mean by that?

12      A.  Well, again, her definition is one that

13  simply says if the information is expected by a

14  reasonable investor to cause a share-price reaction

15  greater than the cost to transact in that share,

16  then that information is material; meaning that it,

17  effectively, is value-relevant to investors.

18          What I mean by that is that you can have

19  stock-price movements for a company that are in

20  excess of the cost of transacting that simply

21  represent white noise, if you will, random noise,

22  random price movements.  And when you estimate the

23  market model, which is used as part of the

24  event-study methodology, what you find is that on a

25  daily basis the residual from that equation, which

5df1c887-47f5-4222-bb18-9551ffd7ea90

1          KENNETH LEHN, Ph.D.

2     is the difference between the company's actual

3     return and that predicted by the regression model,

4     oscillates, it varies.

5          So there is an unexplained component,

6     unrelated to market and industry movements, and

7     usually unrelated to information releases.  We see

8     that happen when there is no information being

9     released.  So even when no information is released,

10    you see share-price reactions that are greater than

11    the cost to transact.

12          So when she says that if you see a price

13    movement in excess of the cost to transact, that

14    means it's material, that's highly unscientific.

15    You have no confidence at all that what you're

16    observing is nothing more than just a random price

17    movement.

18    Q.  Is it your opinion that there is some sort

19    of scientific method to determine whether a piece of

20    information is material or not?

21    A.  Well, I already did indicate that one such

22    way would be event-study methodology.

23    Q.  Okay.  Do you have an opinion as to whether

24    material information -- or strike that.

25          Do you have an opinion as to whether a

```
 1                    KENNETH LEHN, Ph.D.

 2    piece of information is material is a subjective

 3    inquiry?

 4            MR. HARRISON:  Objection; vague.

 5            THE WITNESS:  Well, I think if it becomes

 6    subjective in the sense that it's in the eye of the

 7    beholder, then it is likely to be unscientific

 8    because there would not be any objective criterion

 9    or replicable way of establishing whether that

10    information is material.

11            So, again, it would depend upon precisely

12    what you mean by "subjective," but in my opinion

13    there should be objective criterion for establishing

14    whether information is material.

15        Q.  Do you have an opinion as to whether it's

16    appropriate for an economist to opine on whether or

17    not a piece of information is material?

18        A.  And I don't know whether you mean

19    appropriate in a legal setting or in some other

20    setting.

21        Q.  In any setting.

22        A.  Again, I'm not a lawyer; so I don't want to

23    say that I'm making a legal determination and it's

24    appropriate for an economist to make these

25    judgments.
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                KENNETH LEHN, Ph.D.

2            What I am saying is that --

3       Q.  Well, let me ask it another way.

4            Is it your opinion that it is inappropriate

5    for an economist to opine on whether a piece of

6    information is material in this context?

7            MR. HARRISON:  Objection; vague, calls for

8    speculation.

9            THE WITNESS:  Well, again, I'm not sure

10   whether I understand whether you mean appropriate or

11   inappropriate from a legal perspective.  And if you

12   do, then I'm not prepared --

13   BY MR. DEVORE:

14      Q.  From a scientific perspective.

15      A.  From a scientific perspective, I certainly

16   believe it's appropriate for an economist to test

17   whether information is material, and I think there

18   are tools in the peer-review literature that allow

19   us to do so.

20      Q.  You don't offer any opinions as to whether

21   the market securities case is sufficient; is that

22   right?

23      A.  I haven't performed any analysis of that,

24   no.

25      Q.  And you have no current plans to do so?

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2        A.   As I sit here today, I do not.

3        Q.   Let's talk about confounding information.

4   What do you mean by the phrase "confounding

5   information"?

6        A.   Well, in the context of a matter such as

7   this, confounding information would be information

8   that is distinct from the alleged corrective

9   disclosures.

10       Q.   Does it have to be contemporaneous with the

11  alleged corrective disclosure?

12            MR. HARRISON:   Objection; vague, incomplete

13  hypothetical.

14            THE WITNESS:   Well, as a general matter,

15  the presumption is that information would be fully

16  reflected in a company's securities price within one

17  trading day, assuming that the market for the

18  security is efficient.   And if by "contemporaneous"

19  you mean the same trading day, then, yes, that is

20  what I am referring to.

21  BY MR. DEVORE:

22       Q.   Okay.   Is a piece of confounding

23  information still confounding information in your

24  view if it's not new news to the market?

25       A.   Well, if the information is simply

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                   KENNETH LEHN, Ph.D.

2    reiterating information that had been previously

3    disclosed, then in my opinion it's confounding only

4    in the sense that it is released concurrent or

5    contemporaneously with the relevant information.

6    But there, again, would be no reason to presume that

7    it would affect a company's stock price if the

8    market for the company's stock is efficient.

9         Q.  So in order to properly analyze the effects

10   of a particular piece of information, you have to

11   eliminate all of the confounding information; is

12   that right?

13        A.  Sorry, could you restate?

14        Q.  In order to properly analyze the effect of

15   a particular piece of information, one would have to

16   control for any other confounding information on

17   that day; is that your opinion?

18            MR. HARRISON:  Objection; vague.

19            THE WITNESS:  Right, one would have to

20   parse the contribution of the confounding

21   information on a company's stock price from the

22   effect of the information that was allegedly

23   corrective.

24   BY MR. DEVORE:

25        Q.  Obviously you're familiar with the October

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2   3rd Piper Jaffray report?

3        A.  I am, yes.

4        Q.  What information in that report do you

5   believe was confounding information vis-a-vie the

6   allegations at issue in this case?

7        A.  Well, the two pieces are, number one,

8   concerns that Piper Jaffray expressed about the

9   ramping of LDK's internal polysilicon production

10  plant, and, in particular, its concerns based on

11  discussion with the CEO and CFO, and concerns that

12  it expressed regarding the ramping of the TCS plant.

13          The second piece of potentially confounding

14  information is information that some of LDK's

15  competitors had gained access to equipment that had

16  supposedly been in short supply, and, in particular,

17  this is equipment related to the building of

18  furnaces in which the ingots are produced.

19       Q.  And it's your opinion that concerns

20  regarding LDK's ability to ramp its internal

21  polysilicon production were new to the market on

22  October 3rd?

23       A.  This particular concern was new to the

24  market on October 3rd, correct.

25       Q.  Which particular concern?

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2       A.   The concern expressed in the Piper Jaffray

3   report.

4       Q.   And it's your opinion that Piper Jaffray's

5   concern was new on October 3rd?

6       A.   The concern and the basis for the concern,

7   the reason for the concern was new, correct.

8       Q.   And it's your opinion that Piper Jaffray's

9   concern about increased competition was new to the

10  market on October 3rd; is that right?

11      A.   I do; but, to clarify, it's not only the

12  concern but the reason for the concern.

13      Q.   And what analysis did you do to determine

14  whether either of those pieces of information was

15  already in the market by October 3rd?

16      A.   Well, certainly by looking at prior

17  information releases pertaining to LDK and

18  determining whether or not there was prior

19  information released that was identical to the

20  information released in the Piper Jaffray report.

21      Q.   And in order for it to be new information,

22  it simply had to be not identical to prior concerns

23  on any of those topics?

24           MR. HARRISON:  Objection; vague.

25           THE WITNESS:  Well, by "not identical," I'm

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 161

1                    KENNETH LEHN, Ph.D.

2    not only saying that it had to be -- if it was -- if

3    the wording was different but the substance was the

4    same, I wouldn't consider that to be new

5    information.  But if the basis for an opinion about

6    the ramping of a new polysilicon plant and concerns

7    about that ramping, if the bases for that concern

8    were new, then that would be new information, which

9    it was.

10   BY MR. DEVORE:

11       Q.  Let's do the same thing for the Barron's

12   article.  What information did you believe was

13   confounding information in the October 8th Barron's

14   article?

15       A.  Well, there was several.  One is one that

16   we talked about earlier today that Barron's, in

17   addition to repeating information about Mr. Situ's

18   allegations, which were already in the market,

19   Barron's quoted through a translator a so-called,

20   quote/unquote, person with knowledge of LDK's

21   manufacturing, unquote, who indicated concerns about

22   quality issues at LDK and saw yield data that was

23   purportedly not credible.

24             In addition, the Barron's article made

25   reference to the fact that there was double and

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 162

1                KENNETH LEHN, Ph.D.

2    triple ordering by customers of the manufacturers of

3    solar wafers.  So even though there had been many

4    sales agreements announced, according to Barron's

5    this represented double and triple ordering, which

6    had not previously been disclosed in the market.

7            And, in addition, the overall tone of the

8    Barron's article was highly negative, criticizing

9    the analysts that covered solar-wafer manufacturers,

10   comparing them to Henry Blodgett, implying that the

11   solar sector was analogous to an internet bubble.

12   And often when business publications publish stories

13   that have a highly negative tone about a company,

14   they're associated with statistically significant

15   price declines for the company.

16       Q.  Let's break that down a little bit.

17           You indicate that Situ's allegations were

18   already in the market by the time Barron's published

19   this article; correct?

20       A.  Correct.

21       Q.  When you say "Situ's allegations," are you

22   referring to the one-line description in the Piper

23   Jaffray report or all of Mr. Situ's e-mail?

24       A.  Well, I was certainly referring to the

25   Piper Jaffray report.  In addition, referring to Mr.

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 163

1                   KENNETH LEHN, Ph.D.

2    Situ's e-mail and reference to as much as a

3    92-million-dollar overstatement of inventory.

4         Q.  Is it your opinion that the first time

5    anyone ever mentioned the fact that the Chinese

6    solar industry might be a bubble was Barron's on

7    October 8th, 2007?

8         A.  No.

9         Q.  So that wasn't new news?

10        A.  Well, I think the only one that I'm aware

11   of that made such a reference was a publication that

12   basically disputed the fact that it was an internet

13   bubble, said this is not an internet bubble.  So the

14   tone was very different.  It raised the issue but

15   then came to a different conclusion than that which

16   Barron's came to.

17        Q.  What publication are you thinking of?

18        A.  I forget offhand.  It was, I believe, in

19   June of '07, but I forget the specific reference.  I

20   could -- I mentioned it in my report.

21        Q.  Other than that, you haven't seen any

22   articles concerning the fact that there might be a

23   bubble in the Chinese solar stocks?

24        A.  I don't -- I don't recall seeing any that

25   had the tone of the Barron's article, the highly

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 164

1                    KENNETH LEHN, Ph.D.

2   negative tone that the Barron's article had.

3        Q.  So in order for it to be new news in the

4   Barron's article, it simply had to have a more

5   negative tone?

6              MR. HARRISON:  Objection; vague, misstates

7   testimony.

8              THE WITNESS:  Well, again, as I indicate,

9   the entire tone of the Barron's article was highly

10  negative towards the solar-wafer industry and LDK in

11  particular.  And I don't recall having seen a

12  similar article prior to the Barron's article.

13             MR. DEVORE:  Can you mark this as the next

14  number?

15             (Deposition Exhibit No. 2020 was marked for

16             identification)

17             MR. MILSTEIN:  What's the number?

18             THE REPORTER:  2020.

19  BY MR. DEVORE:

20       Q.  Marked as Exhibit 2020, a document with

21  Bates Lehn 363 to 364.

22             Have you seen this before?

23       A.  I may have.  I don't recall seeing this.

24       Q.  Can I just ask you to turn to the last

25  page.  You see the discussion there is a bubble in

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                     KENNETH LEHN, Ph.D.

2    Chinese stocks?

3         A.   I'm sorry, which particular reference?

4         Q.   Well, there is more than one, actually.

5              MR. HARRISON:  Do you want him to read the

6    whole thing or is there a specific passage?

7    BY MR. DEVORE:

8         Q.   Take as much time as you want to review the

9    document, but let me know if you've reviewed or

10   considered this article?

11        A.   (Witness reviewing document.)

12             Okay.  I've finished.

13        Q.   Is this article something you considered in

14   forming your opinions?

15        A.   I don't recall having seen it.  It's

16   possible I would have, but it's clearly distinct

17   from the information in the Barron's article.  So it

18   wouldn't affect my opinion.

19        Q.   In what way is it "clearly distinct"?

20        A.   Well, this article, based on my quick

21   reading, is making reference to a possible bubble in

22   Chinese stocks that are traded in the United States

23   without specific reference to the specific

24   solar-wafer industry; whereas, the Barron's article

25   of course is dealing very much not only with Chinese

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 166

1                KENNETH LEHN, Ph.D.

2    companies but it's talking about industry-specific

3    information.

4           So the analog would be that a month ago a

5    newspaper publishes an article about there being a

6    bubble in the U.S. Stock Market and then a month

7    later there is an article that talks about a

8    particular bubble in a certain industry.  Those

9    would be two different pieces of news releases.

10       Q.  Let's turn to paragraph 129 in your report.

11          And while you're looking at that, let me

12   ask you one other question, which might be kind of

13   obvious, but in your opinion, was Barron's analysis

14   of Mr. Situ's allegations in the market prior to

15   Barron's publishing its report on October 8th?

16          MR. HARRISON:  Objection; vague, calls for

17   speculation.

18          THE WITNESS:  I'm not sure I understand

19   what you mean when you refer to "Barron's analysis."

20   BY MR. DEVORE:

21       Q.  Okay.  The October 8th Barron's article,

22   Barron's analyzed the allegations by Mr. Situ; is

23   that fair?

24       A.  Maybe we're splitting hairs over words.

25   I'm not sure how much of it was analysis and how

1                    KENNETH LEHN, Ph.D.

2    much of it was descriptive.  So I'm not exactly sure

3    what you're referring to as "analysis" there.

4         Q.  Well, let me -- let's take a look at that.

5              (Deposition Exhibit No. 2021 was marked for

6              identification)

7    BY MR. DEVORE:

8         Q.  So we've marked as Exhibit 2021 a copy of

9    the October 2007 Barron's article again.

10             And you've seen this before obviously?

11        A.  I have.

12        Q.  Let me ask you to turn to -- it's numbered

13   at page 7 of 9 on the docket page number.

14             Are you with me?

15        A.  I am.

16        Q.  And you've seen this before; right?

17        A.  I have.

18        Q.  And you see on this chart Barron's

19   questions the valuations of a number of solar

20   participants, and it questions whether their

21   valuation is based on sloppy accounting and junky

22   inventories; is that right?

23        A.  Yes.

24        Q.  Is it your opinion that Barron's analysis

25   of the valuations of solar companies was already in

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 168

1              KENNETH LEHN, Ph.D.

2    the market prior to October 8th?

3         A.  Well, again, I'm not sure what you mean by

4    "analysis."  You know, they're raising questions

5    here, but I don't see, for example, on this

6    particular page analysis per se.

7         Q.  Are Barron's questions in the market prior

8    to October 8th?

9              MR. HARRISON:  Objection; vague.

10             THE WITNESS:  Well, I mean, I think clearly

11   when one looks at the October 3rd Piper Jaffray

12   report and looks at the stock-price reaction on

13   October 3rd, there was a statistically significant

14   decline in LDK's stock price and Ms. Nettesheim and

15   I are in agreement about that.

16             I also point out there was confounding

17   information and she did not take it into

18   consideration, which we've talked about.

19             But having said all that, it also is

20   reasonable that some decline on October 3rd may have

21   been caused by the rumors concerning Mr. Situ's

22   allegations.

23             Barron's seems to be reiterating a question

24   as to whether or not their valuation and valuation

25   of others in the industry were based on sloppy

5df1c887-47f5-4222-bb18-9551ffd7ea90

1               KENNETH LEHN, Ph.D.

2    accounting and so-called junky inventories.  I don't

3    see any new information in that question.  The only

4    thing that is new is that they're raising the

5    question about the entire specter -- sector, rather.

6    So it's not uniquely targeted towards LDK.  But in

7    my opinion, those questions were raised in the Piper

8    Jaffray report.

9    BY MR. DEVORE:

10        Q.  It's your opinion that the Piper Jaffray

11    report questions the quality of LDK's inventory?

12        A.  The Piper Jaffray report made reference to

13    Mr. Situ's allegations of -- I believe they reported

14    it as a 250-metric-ton inventory discrepancy.  So in

15    that sense, they were raising questions, at least

16    reporting on Mr. Situ's allegations regarding the

17    inventory.

18        Q.  Are those, in your opinion, identical

19    disclosures?

20        A.  "Those" being?

21        Q.  Being what Piper Jaffray mentioned, an

22    inventory discrepancy on October 3rd and Barron's

23    description of junky inventories on October 8th.

24        A.  The words are different, but I don't really

25    see any new information in Barron's pertaining to

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 170

1                    KENNETH LEHN, Ph.D.

2    that particular point.

3         Q.  You're aware that in this article Mr. Lai

4    claimed to have not seen Mr. Situ's e-mail; right?

5         A.  I don't -- if you can refer me to the

6    specific quote, I would appreciate that.

7         Q.  It's on page 5 of 9, third paragraph,

8    fourth line.

9              "Lai says he never saw September 25

10   resignation e-mail that Situ addressed to him and

11   copied to the SEC."

12             Do you see that?

13        A.  I do.

14        Q.  You read Mr. Lai's deposition transcript;

15   right?

16        A.  I reviewed it, but I didn't read it word

17   for word.

18        Q.  You're aware that Mr. Lai's statement to

19   Barron's that he hadn't seen Mr. Situ's e-mail was

20   false; right?

21             MR. HARRISON:  Objection; vague, calls for

22   speculation.

23             THE WITNESS:  I'm not aware of that.

24   BY MR. DEVORE:

25        Q.  If you were aware of that, would that

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1                   KENNETH LEHN, Ph.D.

 2   change your opinions in any way?

 3            MR. HARRISON:  Same objection.

 4            THE WITNESS:  You know, it certainly

 5   wouldn't change my affirmative opinion as to whether

 6   the decline in LDK's stock price at the end of the

 7   class period was caused by the revelation of the

 8   relevant truth, nor would it change my comments

 9   regarding Ms. Nettesheim's analysis.  So it wouldn't

10   change my opinions.

11   BY MR. DEVORE:

12        Q.  Let's go back to paragraph 129 of your

13   report, discussing Piper Jaffray's concerns on

14   October 3rd of scheduled polysilicon production.

15            You wrote:

16            "Concerns about a potential delay in the

17            schedule of polysilicon production, which

18            Piper Jaffray expressed on October 3, 2007,

19            could have substantially affected LDK's

20            stock price on that day."

21            Do you see that?

22        A.  I do.

23        Q.  What did you do to analyze whether or not

24   it actually did affect LDK's stock price on that

25   day?
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 172

1          KENNETH LEHN, Ph.D.

2     A.  Well, again, this is similar to some

3  previous comments I've made that I am reviewing what

4  Ms. Nettesheim did and this is her model; it's her

5  estimate of, ultimately, per share inflation.  It's

6  not mine.

7          And I'm indicating that before she can

8  reach the conclusion she should reach, she needs to

9  account for this potentially confounding

10  information.  And what I'm pointing out is that she

11  has ignored some new information released on October

12  3rd that could potentially have substantially

13  affected LDK's stock price on that day.

14          And then I precede to show that in fact the

15  market viewed the ramping of LDK's polysilicon plant

16  to be important for its valuation, and based on the

17  Morgan Stanley analysis, there is reason to believe

18  that potentially new concerns about the ramping of

19  the polysilicon plant could have had a large impact

20  on LDK's stock price.  But I don't view it, since

21  it's not my model and not my estimate of per share

22  inflation, to actually go out there and

23  affirmatively estimate the impact of that.

24     Q.  And you're aware that Ms. Nettesheim has

25  considered whether confounding information on

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    October 3rd did negatively impact LDK's share price

3    and concluded that it did not; right?

4         A.  I'm aware that she states that she

5    dismissed the fact that there may have been

6    confounding information on October 3rd.

7              MR. DEVORE:  You mentioned a Morgan Stanley

8    analysis.

9              (Deposition Exhibit No. 2022 was marked for

10             identification)

11   BY MR. DEVORE:

12        Q.  We've marked as Exhibit 2022 a document

13   that begins with LDK-NDCA-01859437 and goes through

14   '465.  This is the Morgan Stanley analysis you're

15   referring to; is that right?

16        A.  Yeah.  I can't be sure every page is here,

17   but it certainly appears to be the Morgan Stanley

18   report.

19        Q.  It's your conclusion that the statements in

20   the October 3rd Piper Jaffray report lowered LDK

21   from the bull case to the base case in Morgan

22   Stanley's analysis?

23        A.  No.  What I'm saying is that the concerns

24   that Piper Jaffray expressed in its October 3rd

25   report and the basis for those concerns potentially

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                  KENNETH LEHN, Ph.D.

2    could have had a large impact on LDK's stock price

3    on October 3rd.

4         Q.  Potentially?

5         A.  Potentially.

6         Q.  But you haven't actually done any analysis

7    to determine whether it did?

8         A.  And, again, for reasons that I have already

9    stated, that this is Ms. Nettesheim's analysis and

10   it's not my analysis, I'm pointing out that before

11   she can reach the conclusions that she reached, she

12   needs to account for that possibility.

13        Q.  And you've seen Ms. Nettesheim's rebuttal

14   report?

15        A.  I have.

16        Q.  And she accounts for that possibility; is

17   that right?

18        A.  Inadequately, in my opinion.

19        Q.  She considers your criticism that she

20   should have analyzed Morgan Stanley's bull versus

21   base case; right?

22        A.  She states that she considered that, yes.

23        Q.  And she concluded that it doesn't change

24   anything in her opinion; right?

25        A.  I believe that's what she concluded,

5df1c887-47f5-4222-bb18-9551ffd7ea90

1          KENNETH LEHN, Ph.D.

2    correct.

3        Q.  Did you consider whether Morgan Stanley's

4    price targets would have been different had Morgan

5    Stanley adjusted LDK's gross margins as it is

6    alleged that they were overstated?

7        A.  I'm not sure I understand the question.

8        Q.  You understand that Morgan Stanley did some

9    calculations to determine a target price; right?

10       A.  For LDK, correct.

11       Q.  And one of the inputs into Morgan Stanley's

12   analysis is LDK's gross margin; correct?

13       A.  Right.

14       Q.  Did you consider whether had Morgan Stanley

15   lowered the gross-margin assumptions, whether Morgan

16   Stanley's price targets would have changed?

17       A.  And I'm not sure what -- are you referring

18   to the gross margin of LDK or the gross margin of

19   the polysilicon?

20       Q.  Either.

21       A.  Well, first, two things.  One is, Morgan

22   Stanley's price target, it's actual target, is not

23   particularly relevant to what I'm illustrating.

24   What I'm illustrating is that we had a reputable

25   banking firm with presumably a reputable analyst

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1                 KENNETH LEHN, Ph.D.

 2    covering the sector who proffered a valuation of LDK

 3    that included a valuation of its polysilicon plant.

 4    And one of the themes in this report is the

 5    importance of the polysilicon plant for the

 6    valuation of LDK.

 7              And, as I indicate in my report, a frequent

 8    comment that was made in the summer of 2007 leading

 9    up to the October 3rd Piper Jaffray report was the

10    importance of an internal polysilicon plant for LDK.

11    Morgan Stanley provides a valuation analysis.  I'm

12    not offering an opinion as to the scientific

13    validity of that analysis.  I'm simply saying that

14    they thought this was important enough to do a

15    valuation analysis of the polysilicon plant, and

16    they provided a valuation of the polysilicon plant

17    based on three scenarios: the bear case, the base

18    case and the bull case.

19              What's relevant for valuing the polysilicon

20    plant is the gross margin not of LDK but of the

21    polysilicon operation, and that's what they do.  So

22    as to the implications of a different assumption

23    about gross margin for polysilicon on its target

24    price, I didn't consider that, but that would have

25    no relevance for the point that I was attempting to

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    make.

3         Q.  Did you consider what the impact of

4    lowering LDK's overall gross margins would have been

5    on Morgan Stanley's target price?

6         A.  No, but, again, I don't see the relevance

7    of that for the point that I was making in my report

8    with regard to the Morgan Stanley analysis.  It

9    wouldn't have mattered.

10        Q.  And it's your opinion that the first time

11   LDK's bull versus base case scenario for its

12   polysilicon plant ramp-up was questioned was with

13   the outcome of the Piper Jaffray report?

14        A.  No, that's not.

15        Q.  That's not true; right?

16        A.  That's not true and it's not my opinion.

17             MR. HARRISON:  If you are transitioning, it

18   might be a good time for a break.

19             MR. DEVORE:  Yeah, sure.

20             (Recess taken)

21   BY MR. DEVORE:

22        Q.  Let's move on to another fun topic.  Price

23   inflation.

24             Do you have an opinion as to whether one

25   should measure inflation in a stock based on its

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    reaction to a disclosure or at the time the

3    misrepresentation was made?

4        A.  Well, I think a starting point is to

5    examine how a company's stock price reacts when

6    there is an alleged corrective disclosure.  But it's

7    not, in my opinion, as a general rule, sufficient to

8    then assume that the residual price decline on the

9    alleged corrective disclosure dates is equivalent to

10   per share inflation throughout the class period.

11            And I think there are three considerations

12   that must be given to the use of the residual price

13   declines on the corrective disclosure dates to

14   measure per share inflation.

15       Q.  We'll get to those.

16       A.  Okay.

17       Q.  So if I understand you, you start at the

18   end and work backwards --

19            MR. HARRISON:  Objection; vague.

20   BY MR. DEVORE:

21       Q.  -- as a general matter?

22       A.  I wouldn't put it that way.  I think you

23   start and you do the loss-causation-type analysis,

24   which requires one to do an events study upon the

25   corrective disclosures, the release of the

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    corrective disclosures, and then to establish per

3    share inflation, other considerations must be taken

4    into account.

5         Q.   Okay.  Have you ever measured price

6    inflation in a security?

7         A.   I believe so, yes.

8         Q.   Can you tell me when?

9         A.   No specific case comes to mind, but I'm

10   confident that I have.

11        Q.   When?

12        A.   I just don't recall which particular case.

13        Q.   Do you remember what the circumstances

14   were?

15        A.   Again, I don't recall a specific case; so I

16   don't obviously recall the circumstances.

17        Q.   Was it in a litigation context?

18        A.   I believe so, yes.

19        Q.   What methodology did you use in that

20   circumstance, if you can recall, to measure the

21   price inflation?

22        A.   I don't recall.

23        Q.   How would you go about -- well, strike

24   that.

25             Have you sought to measure price inflation

```
 1                    KENNETH LEHN, Ph.D.
 2    in this case affirmatively?
 3        A.  I have not, no.
 4        Q.  If you were to do that, how would you go
 5    about doing that analysis?
 6        A.  Well, it's a big task, so at most I can
 7    give you a general framework.  But what one would
 8    want to do is to quantify the valuation impact of
 9    the alleged misrepresentations at various points in
10    time during the class period in which alleged
11    misstatements were made.  And to do that one has to
12    identify what the so-called but-for disclosures
13    should have been on the dates of which the alleged
14    misrepresentations had occurred, and then estimate
15    the impact that the alleged misrepresentations had
16    on the price of the relevant security.
17        Q.  And is that the same in a case alleging
18    affirmative misrepresentation, as in a case where
19    there is an omission of a piece of information
20    alleged?
21            MR. HARRISON:  Objection; incomplete
22    hypothetical, calls for speculation.
23            THE WITNESS:  Well, with an affirmative
24    misrepresentation there is some prospect of
25    conducting an event study on the days of the alleged
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                   KENNETH LEHN, Ph.D.

2    misrepresentation, in which case one potentially

3    could use event study analysis to estimate inflation

4    on those various dates.

5           In the case of an alleged omission, one

6    really can't do an event study on the day of alleged

7    omission for reasons that are probably pretty

8    obvious.

9    BY MR. DEVORE:

10      Q.  Okay.  Nonetheless, what would those

11   obvious reasons be?

12      A.  Well, if the allegation is that there was

13   an alleged omission on a given day, then there is no

14   reason to believe that if one conducted an event

15   study there would be any positive price impact due

16   to the alleged omission, and that would not mean

17   that the alleged omission hadn't inflated the price.

18   You can inflate a price by keeping it from falling.

19   So an event study for an alleged omission on those

20   dates would not be practical.

21      Q.  But you could inflate a stock by keeping it

22   from falling with an affirmative misrepresentation

23   as well; right?

24      A.  That is correct.

25      Q.  So in this case, would it be appropriate to

1                    KENNETH LEHN, Ph.D.

2     measure the price inflation based on the change in

3     stock price on the alleged dates of the

4     misrepresentations?

5          A.   Again, I haven't done an affirmative

6     analysis of percent inflation, nor have I been asked

7     to do that.

8          Q.   Okay.

9          A.   So I haven't investigated that, but that

10    would be a reasonable part of the inquiry, and it

11    oftentimes is difficult, if not impractical, to do

12    such an event study on those days, in which case one

13    would have to consider other ways of estimating per

14    share inflation.

15         Q.   Such as analyzing the decline in response

16    to a disclosure of corrective information?

17         A.   Well, that may do it, but there have to be

18    very peculiar circumstances in which that would be

19    an appropriate way to measure per share inflation.

20              There are other ways that one could

21    estimate per share inflation depending on the facts

22    of the case, but to look simply at the price drop on

23    the corrective disclosure and assume that that would

24    be the per share inflation throughout the class

25    period, as a general rule, is likely to be

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    inappropriate.

3         Q.  Why is that?

4         A.  Well, there are at least three reasons.

5    One is that the information that is disclosed in the

6    corrective disclosure is rarely going to be the same

7    type of information that should have been disclosed

8    as of the beginning of the class period.  And in

9    this case, for example, the -- some of the

10   information in the corrective disclosures pertain to

11   Mr. Situ's analysis of the extent to which LDK's

12   inventory was misstated as of, I believe, August 31

13   of '07.  And, therefore, any price drop associated

14   with that allegation, assuming that it was a

15   corrective disclosure, which I don't, would on the

16   surface be irrelevant to measuring price inflation

17   as of the beginning of the class period, which would

18   have been two months prior to August 31st.

19             So one reason why it's difficult is that it

20   usually is the case that the information released on

21   the corrective disclosure date is not the same

22   information that could have been disclosed

23   earlier -- at all points earlier during the class

24   period.

25             Second is the issue of confounding

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    information, which we have already discussed, and

3    insofar that the alleged corrective disclosure is

4    packaged with confounding information, one needs to

5    parse the effect of the confounding information from

6    the effect of the corrective disclosure.

7             And then third is that insofar that the

8    market and industry and firm conditions have changed

9    from the beginning of the class period to the end of

10   the class period, the valuation impact of a

11   corrective disclosure could be different at the end

12   of a class period than the same disclosure might

13   have -- the same effect that that disclosure might

14   have had at earlier points in the class period.

15            And one obvious way to show that is

16   assuming everything else in her analysis was

17   correct, Ms. Nettesheim estimates the residual price

18   drop on the three October dates to be $30.90, and

19   that estimate of a residual price drop follows

20   substantial price appreciation in LDK's stock price

21   during the summer of 2007.  And that $30.90 price

22   drop actually exceeds LDK's stock price during the

23   early part of the class period, which means setting

24   aside all the other problems, it's just obviously

25   inappropriate to roll that residual price drop back

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    to the beginning of the class period.

3        Q.  So if I am following you, you're describing

4    what's in paragraphs 172 through 175 of your report;

5    correct?  170.

6        A.  That is correct, yes.

7        Q.  You're aware that Ms. Nettesheim offers two

8    analyses of damages, right -- or inflation, one

9    constant dollar and one constant percentage;

10   correct?

11       A.  Right.

12       Q.  Do you have the same criticisms of her

13   constant percentage analysis, her constant dollar

14   analysis?

15       A.  Well, they do hold.  I mean, they hold for

16   both the residual price design, the constant dollar,

17   as well as the constant percentage.

18            I also, as a general matter, disagree with

19   her when she says that she prefers the constant

20   percentage method.  And her explanation somehow

21   relates to the fact that the alleged

22   misrepresentations pertain to the operations of the

23   firm, and I, frankly, don't understand the logic as

24   to why that would give one a preference with for the

25   constant percentage method.

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1                 KENNETH LEHN, Ph.D.

 2           The general problem with the constant

 3    percentage method is that -- and it's especially

 4    true in a case like this, where there was a

 5    substantial price rise in LDK's stock price.  It

 6    rose from about less than $30 during the early part

 7    of the class period to as high as about $68 a share

 8    in September.  And if one uses the constant

 9    percentage method, then, effectively, damages will

10    vary as the stock price of the company varies.

11           And, whereas, I will acknowledge that there

12    may be some facts in cases where the constant

13    percentage method may be appropriate, depending on

14    the allegations, in a matter such as this, assuming

15    Ms. Nettesheim is right about the corrective

16    disclosures, I see no basis for allowing your

17    measure of inflation to vary with the stock price of

18    LDK.

19           As information comes out, the market

20    reacts.  Assuming it's a corrective disclosure, the

21    market would have caused the price of LDK's stock

22    price to decline by a certain amount.  Assuming that

23    one could use the dollar decline as a measure of

24    price inflation, there is at least some possibility

25    that that would be defensible.  But to use the
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    constant percentage and allow inflation to vary

3    widely with LDK's stock price, in my opinion, is

4    inappropriate and not defensible.

5        Q.  It's your opinion that stocks trade in

6    multiples of their earnings?

7        A.  By definition, stocks have values and you

8    can express that value as a multiple of earnings,

9    but I teach a valuation course at the university

10   and, you know, I tell the students that the multiple

11   in some sense is a byproduct of the valuation.  It's

12   not as if the market determines the value based on

13   multiples, but, rather, the market estimates a value

14   of a company, and that value in turn can be

15   expressed as a multiple of the earnings or sales or

16   assets or whatever.

17            So I almost view the multiple as a

18   byproduct of the market's valuation of the company,

19   not something that drives the valuation.

20       Q.  And it's your opinion that stocks move in

21   hard dollars and not in percentages?

22            MR. HARRISON:  Objection; vague.

23            THE WITNESS:  I'm not sure what you mean by

24   moves in hard dollars, not percentages.

25   //

1              KENNETH LEHN, Ph.D.

2    BY MR. DEVORE:

3         Q.  Is it your opinion that when analyzing the

4    movement of a stock, the appropriate analysis is the

5    absolute dollar amount that a stock moves, not the

6    percent of that movement?

7         A.  Well, it depends on the research question,

8    and I don't think there is a general answer.  It

9    depends on the question one is attempting to

10   address.

11        Q.  Stocks are analyzed in terms of their

12   absolute dollar movement and also in terms of their

13   percentage movement, depending on what the analysis

14   is for?

15        A.  Well, it depends on, again, the question

16   that one is attempting to address, and there may be

17   circumstances where looking at percentages are

18   appropriate and circumstances where looking at

19   dollars is appropriate.

20        Q.  And it's your opinion that in analyzing the

21   effects of securities fraud, absolute dollar

22   movement is the appropriate analysis and not

23   percentage movement?

24        A.  Well, what I'm saying is that there may be

25   cases where the nature of an allegation is such that

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 189

1              KENNETH LEHN, Ph.D.

2   percentage movements, constant percentage may be

3   appropriate.  I'm not saying it would never be

4   appropriate.  But in most matters in which I've been

5   involved, I find it's inappropriate.  Because under

6   the constant percentage method, the value of the

7   fraud, if you will, is moving with the company's

8   stock price, and the company's stock price is

9   presumably driven during much of that period by

10  factors unrelated to the fraud.

11             So if you measure the market reaction to

12  the revelation of the truth about the fraud, you can

13  come up with a dollar value, which may or may not be

14  appropriate to roll back the way Ms. Nettesheim

15  does.  But with respect to the percentage, it's

16  almost always the case, in my opinion, that that's

17  wrong.  Because once you calculate that percentage,

18  you're now letting your inflation estimate vary with

19  the stock price of the company throughout the class

20  period, and, in my opinion, most of the time there

21  is just no defense for doing that.

22      Q.  So it's your understanding that it would be

23  wrong to consider a stock to be overvalued by 50

24  percent as opposed to considering a stock to be

25  overvalued by 30 dollars?

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2              MR. HARRISON:  Objection; vague, incomplete

3    hypothetical.

4              THE WITNESS:  Well, you know, it depends

5    again on the nature of the allegation.  But in a

6    typical -- if there is such a thing -- case

7    involving, say, alleged accounting fraud, and in a

8    hypothetical suppose that a company was alleged to

9    have misrepresented the value of an asset.  And the

10   allegation is you should have taken a write-down and

11   then at the end of some of class period the company

12   takes a write-down and its stock price drops from 10

13   to 8, hypothetically, and it's statistically

14   significant and everyone agrees that that represents

15   a 20 percent decline, or, alternatively, a $2

16   decline per share, the market then would,

17   effectively, be saying we think that this fraud

18   caused a $2 loss.  And insofar that all these other

19   conditions are met, that you can then take that and

20   roll it back and use that as a measure of inflation,

21   the market would have said this inflated the price

22   by $2 a share or 20 percent as of the day of the

23   corrective disclosure.

24              Well, suppose that this company at some

25   point during the class period had a stock price that

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    traded at 100.  Under the constant dollar rule you'd

3    say, well, it's still worth $2.  That's what the

4    market thought it was worth at the end of the class

5    period.

6              Under the constant percentage, 20 percent

7    of 100 means it's a price inflation of $20.  And

8    there generally is no economically defensible reason

9    to believe that this fraud that might have been

10   valued at $2 a share at the end of the class period

11   would suddenly be worth $20 simply because the stock

12   price had been $100 at some point.  It just -- so as

13   a general matter, in my opinion, it does not make

14   sense to use the constant percentage method.

15   BY MR. DEVORE:

16        Q.  And in a case where what's alleged to have

17   been wrong is the company's margins, which are a

18   percentage expression of its profits, and those

19   percentage expressions of its profits would have

20   been constantly wrong in the same percentage

21   throughout the class period, it's still your opinion

22   that the constant percentage analysis is

23   inappropriate?

24              MR. HARRISON:  Objection; incomplete

25   hypothetical.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                 KENNETH LEHN, Ph.D.

2         THE WITNESS:  It depends on the specific

3    allegations.  And, you know, again, insofar that the

4    reason that the COGS were allegedly understated was

5    related to the fact that the inventory had been

6    overstated, and then once you recognize that the

7    inventory was allegedly overstated, then that has

8    implications just naturally for other financials of

9    the firm.

10          And the impact on perhaps COGS and other

11   factors would have been a byproduct of the fact that

12   you overstated your inventory, but at the end of the

13   day the price impact would still be a constant

14   dollar impact, and there is no reason to believe

15   that that alleged overvaluation of the inventory

16   would somehow have a more prominent effect on the

17   stock price at an earlier point in the class period

18   when the stock price was higher.

19          So I think one has to again look at the

20   facts of the particular case before reaching that

21   judgment.

22       Q.  So in this case, it's your opinion that

23   constant percentage method is inappropriate; right?

24       A.  In my opinion, Ms. Nettesheim has not

25   provided a defense as to why she believes the

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2     constant percent method is the preferred method.

3              MR. DEVORE:  Move to strike as

4     nonresponsive.

5         Q.   In this case, it's your opinion that the

6     constant percentage method is inappropriate or is

7     that wrong?

8         A.   Well, again, I am responding to Ms.

9     Nettesheim's damages analysis, and I'm pointing out

10    that she has proffered a reason for why she prefers

11    the constant percentage method, and I find her

12    explanation to be unpersuasive.  But this is her

13    model and I haven't set out to perform an

14    affirmative damages analysis other than, again, by

15    implication, the absence of loss causation implies

16    zero damage.

17             But I haven't set out to affirmatively

18    estimate damages in any way.  So my opinion, as I

19    sit here now, is that Ms. Nettesheim has not

20    provided a sound economic reason for why she prefers

21    the constant percentage method.

22        Q.   So you don't like the reason that she gave

23    for using the constant percentage, but you have no

24    opinion as to whether or not constant percentage is

25    the appropriate analysis?

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2        A.  Again, other than my general view that in

3   matters such as this, there is no sound basis for

4   using the constant percentage method.  But, again, I

5   haven't set out to do a damage analysis, so I

6   haven't reached the point of making that decision

7   affirmatively.  I'm just saying that she has not

8   provided a sound defense for why she prefers the

9   constant percentage method.

10       Q.  But you have no opinion in this case

11  whether the constant percentage method is the

12  appropriate measure of inflation?

13       A.  Again, other than my general presumption

14  that it is inappropriate unless there is some

15  extenuating fact in the case that theoretically

16  could make it appropriate, I haven't formed an

17  affirmative opinion about that.

18       Q.  And you do have an opinion that the

19  constant dollar method is inappropriate in this

20  case; is that right?

21       A.  That is correct.

22       Q.  So do you have an opinion that there is no

23  means of calculating inflation in this case?

24       A.  No.

25       Q.  So there could be some means of calculating

1                    KENNETH LEHN, Ph.D.

2    inflation in case?

3         A.   Sure.

4         Q.   But it's not constant dollar?

5         A.   That is correct.

6         Q.   And it's probably not constant percentage?

7         A.   That is correct.

8         Q.   What other ways are there?

9         A.   Well, again, if one was attempting to

10   estimate per share inflation associated with the

11   specific alleged misrepresentations that occurred at

12   different points in time, then one would first have

13   to specify what the but-for disclosures were on

14   those particular points in time, compare it to the

15   actual disclosures, and then attempt to estimate the

16   value of the alleged misrepresentations at those

17   different points in time.

18            And we've talked earlier about one

19   possibility is doing an event study on those dates.

20   If the conditions don't allow for that, there are

21   other ways to approximate that, depending on the

22   facts of the case.  One might be a discounted cash

23   flow valuation, where you substitute the but-for

24   numbers for the actual numbers and take the delta or

25   the difference in the discounted cash flow valuation

5df1c887-47f5-4222-bb18-9551ffd7ea90

1            KENNETH LEHN, Ph.D.

2   with the implied impact on stock price, and

3   depending upon the facts and the data that's

4   available and the soundness of the valuation, that

5   may well be a defensible way to estimate that.

6            Another possible way that would be

7   consistent with accepted practice in the literature

8   is to do something along the lines of what I call

9   the BBHL model.  It's the acronym for Beaver, Barth

10  Hand, Landsman, who are four accounting professors

11  who I think were all at Stanford at one point.  Two

12  are still at Stanford.  And they have developed

13  empirical models that allow you to estimate the

14  relation between the market capitalization of

15  companies and their underlying accounting data.

16           So you can look at market value of equity

17  for perhaps solar-wafer companies as a function of

18  their book equity, their net income, their inventory

19  perhaps, and if the conditions allow, you would have

20  an empirical basis for estimating how the market

21  values companies as a function of the underlying

22  accounting metrics.

23           And, again, potentially you could

24  substitute the but-for numbers for the actual

25  numbers and come up with an empirical estimate of

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 197

1                    KENNETH LEHN, Ph.D.

2    the impact that the alleged misrepresentation at

3    different points in time would have on a company's

4    stock price.

5             Another way -- I don't know if you want me

6    to keep --

7         Q.  Well, let's stop with those two.

8             Have you ever used a discounted cash flow

9    analysis to determine damages in a securities fraud

10   case?

11        A.  I have used a discounted cash flow model

12   when an event study was not practical in a

13   materiality case.  I may well have done it in a

14   damages case, but I don't recall.

15        Q.  You don't recall any specific instances of

16   having done it?

17        A.  I do not, that's correct, in a damages

18   case.  I have in a materiality matter.

19        Q.  And what about the BBHL, have you ever used

20   that to determine damages in a securities fraud

21   case?

22        A.  I actually have.  And it was an acquisition

23   that settled prior to any deposition or trial

24   testimony, but I have.

25        Q.  And so that's confidential; you can't tell

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    me which case it is?

3         A.  I believe so.  I could check with counsel,

4    but I think it's probably confidential.

5         Q.  Fair enough.

6              Do you have an opinion as to whether one

7    must apportion various fragments of a corrective

8    disclosure across separate alleged individual

9    misrepresentations --

10             MR. HARRISON:  Objection; vague and

11   ambiguous.

12   BY MR. DEVORE:

13        Q.  -- in this case?

14        A.  Yeah, when you say "one must," I don't know

15   again whether you're referring to whether one must

16   as a matter of --

17        Q.  In your opinion.

18        A.  -- law.

19        Q.  In your opinion.

20        A.  I think a sound analysis of damages should

21   tether the damages analysis to individual alleged

22   misrepresentations; otherwise, the estimate of

23   damages is independent of whether the defendants are

24   found liable for some or all of the allegations.

25   And it seems to me to be an unsound approach to

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1                 KENNETH LEHN, Ph.D.

 2      damages to say that I have a damages number and it

 3      just doesn't depend upon how many of the allegations

 4      are found to be true.

 5              So it seems to me that it should be a

 6      bottoms-up approach, where one tethers the estimate

 7      of damages to the individual alleged

 8      misrepresentations, and then the sum across all the

 9      alleged misrepresentations would represent an upper

10      bound on per share damages.

11         Q.  And it's your opinion that for the jury to

12      conclude that the defendants committed fraud in this

13      case, the measure of damages would depend on the

14      number of alleged misrepresentations that were false

15      out of the whole of the misrepresentations?

16         A.  Well, it presumably would.  For example,

17      you know, one of the allegations in the complaint is

18      that there was I think 284 metric tons of

19      polysilicon that was missing out of 614 metric tons

20      that had been reported.  If it turns out that a

21      finder of fact says that none was missing, and

22      it's -- from my review of Mr. Harden's deposition

23      transcript, it's my understanding that that is a

24      conclusion that he has reached; that Mr. Situ was

25      wrong about the missing polysilicon.  And it seems
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    to me that if one's damages estimate doesn't change

3    in light of that fact, that there is something

4    fundamentally wrong with the damages estimate.

5            And I think Ms. Nettesheim in her

6    deposition two weeks ago made a rather astonishing

7    statement, that the amount of damages that she

8    estimates doesn't depend upon the magnitude of the

9    alleged overstatement of inventory, which I find

10   astonishing, and it has relevance to the question

11   that you raised.

12       Q.  Okay.  And it's your opinion that the

13   measure of damages is dependent on the reasons why

14   the alleged misrepresentations were false, as

15   opposed to the fact that the alleged

16   misrepresentations were false?

17           MR. HARRISON:  Objection; vague, calls for

18   a legal conclusion.

19           THE WITNESS:  I'm not sure I understand,

20   sir.

21   BY MR. DEVORE:

22       Q.  Okay.  In this case it's been alleged that

23   LDK misstated its financial results in a broad

24   sense.

25           Is it your opinion that the reason why a

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 201

1                  KENNETH LEHN, Ph.D.

2   particular statement was false will affect the

3   measure of damages based on the falsity of that

4   statement?

5              MR. HARRISON:  Same objections.

6              THE WITNESS:  Sorry, I'm not understanding.

7   BY MR. DEVORE:

8       Q.  All right.  Let's try a little more

9   specifically.

10             Let's assume hypothetically that LDK's

11  inventory was overvalued, not for the reasons Mr.

12  Situ alleged, but for other reasons.  And assuming

13  that the jury finds that, yes, the inventory was

14  overvalued, but not because it was missing, just

15  because it wasn't any good, is it your opinion that

16  there is a different measure of damages in that

17  situation because the reasons the statement was

18  false are different from the original reasons

19  alleged?

20             MR. HARRISON:  Same objection.

21             THE WITNESS:  Well, again, I'm not in a

22  position obviously to render a legal judgment and,

23  you know, that could well be a legal issue as to

24  whether or not plaintiffs must be right about the

25  reason, and so I have no opinion obviously from a

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    legal perspective.

3           From an economic perspective, I would think

4    that the reason could have implications for the

5    extent to which a company's securities price might

6    have been allegedly inflated because of an

7    overstatement of inventory.  So if the inventory is

8    missing, that might have a different valuation

9    impact than if the inventory is difficult to use.

10   So a priori, on economic grounds, it would seem that

11   the reason can be quite significant from a valuation

12   point of view.

13   BY MR. DEVORE:

14        Q.  What analysis have you undertaken to

15   determine the impact of the difference between what

16   Mr. Situ alleged as far as missing quantities versus

17   what Ms. Nettesheim assumes, which is that there was

18   a large quantity of barely usable materials in

19   inventory?

20        A.  I haven't done any analysis to address

21   that, nor do I think it's relevant for the questions

22   on which I've been asked to form an opinion.

23        Q.  So you haven't undertaken any analysis to

24   determine what damages might be in the event that

25   the jury concludes that in fact LDK had a large

1                    KENNETH LEHN, Ph.D.

2    quantity of barely usable materials in its

3    inventory?

4              MR. HARRISON:  Sorry, just trailing off a

5    little bit.  I got it.

6              THE WITNESS:  Again, I haven't been asked

7    to form an affirmative opinion as to damages.  My

8    opinion with respect to, effectively, loss causation

9    would be unaffected.  And without loss causation,

10   there are no damages.  So in that sense, the logical

11   implication of no damages would remain intact.

12             With respect to my review of Ms.

13   Nettesheim's analysis, I haven't undertaken that

14   analysis.

15   BY MR. DEVORE:

16        Q.  In connection with your analysis of loss

17   causation -- total change of subject.  I'm back to

18   this morning.  So I apologize.

19             In connection with your analysis of loss

20   causation, did you review the court's previous

21   opinions in this case?

22        A.  I don't believe so, no.

23        Q.  You need a break or you want to keep going?

24        A.  Your call.

25        Q.  Let's keep going.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2          Let's talk about trading laws a little bit.

3    Turn to paragraph 192 of your report.

4          You write in paragraph 192:

5          "It is my understanding that no trading

6          model has ever been accepted by a court in

7          a securities case and that two have been

8          rejected under Daubert standards."

9          Is that right?

10    A.   That's correct.

11    Q.   What did you do to investigate whether your

12    understanding was correct --

13          MR. HARRISON:  Objection.

14    BY MR. DEVORE:

15    Q.   -- as set forth in paragraph 192?

16          MR. HARRISON:  Objection; vague.

17          THE WITNESS:  I haven't done any

18    independent legal research.  I'm not a legal

19    scholar.

20          And, you know, my main criticism of Ms.

21    Nettesheim's use of a trading model is based on the

22    fact that there is no support in the peer-reviewed

23    literature for the use of such models and there is

24    no scientific basis to believe that they provide a

25    reliable estimate of the number of damaged shares.

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1              KENNETH LEHN, Ph.D.

 2          In paragraph 192, I'm adding

 3   parenthetically that it's my understanding from

 4   having worked in this area professionally for some

 5   time, and from my understanding from discussions

 6   with counsel, not only in this case but in other

 7   cases, that this has been the case.  And I have been

 8   aware that two have been rejected under Daubert

 9   standards.  So it's not based on any independent

10   research, it's based on my understanding.

11   BY MR. DEVORE:

12       Q.  You have seen Ms. Nettesheim's rebuttal

13   report, I take it?

14       A.  I have, yes.

15       Q.  Does that change your understanding?

16       A.  No, not especially.  I don't know that she

17   is a legal scholar and has the skills to determine

18   that either.

19       Q.  Did you look at the cases that she

20   referenced?

21       A.  I frankly did not, no.

22       Q.  You're not offering a legal opinion that

23   trading models are inadmissible, though; right?

24       A.  I am not.

25       Q.  Have you ever used a trading model for

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    anything?

3         A.   I never have.  There have been one or two

4    cases over the years where I believe the consulting

5    firm that I work with used a trading model for the

6    law firm that had retained me purely for purposes of

7    settlement discussions, but I was never, as far as I

8    recall, a part of that exercise, and I have

9    consistently criticized the use of trading models in

10   matters such as this.

11        Q.   You didn't do that in this case, undertake

12   a trading model analysis?

13        A.   That's correct.

14        Q.   Or have your assistants at Cornerstone do

15   that?

16        A.   That's correct.

17        Q.   In your experience, in what context has

18   trading models been used?

19        A.   Can I just clarify my answer to the

20   question?

21        Q.   Sure.

22        A.   I can't rule out the fact that in some

23   case -- I don't recall any, but just to clarify my

24   answer, there may be one or two cases where after I

25   offered my criticism of trading models, and

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    indicated that I thought it was unscientific to use

3    them to estimate the number of damaged shares and

4    aggregate damages, that with the caveat that I don't

5    believe there is scientific validity of the models,

6    in order to show other problems in an opposing

7    expert's analysis, I might have replicated their

8    analysis with all those caveats and then changed

9    some other variables just to show the independent

10   effect of other variables.

11          So I don't view that as having used the

12   trading model, but I did want to clarify that.

13          Q.  Fair enough.

14          And, again, you're using the definition of

15   "scientific" that we talked about this morning;

16   right?

17          A.  Correct.

18          Q.  Because obviously you were able in those

19   cases to replicate the trading models and then

20   adjust them?

21          A.  Well, I think, frankly, in most of the

22   cases it is was hard to replicate the trading models

23   that others have used.

24          Q.  Have you tried to replicate Ms.

25   Nettesheim's trading model?

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2        A.   I have not.

3        Q.   In your experience, are trading models ever

4   used outside of the litigation context?

5        A.   There is, you know, frankly no academic

6   literature in the peer-review journals that embraces

7   trading models or even tests trading models or,

8   frankly, even uses trading models in the way that

9   it's used in litigation.  I'm not aware of any such

10  literature.

11       Q.   So I think the answer is no, you're not

12  aware of any use of trading models outside the

13  litigation context?

14       A.   Well, there are a few articles that have

15  been published in journals like Business Lawyer and

16  I think there may be a Stanford Journal of Business

17  and Law, something like that.

18       Q.   Something like that.

19       A.   But these are not mainstream economics and

20  finance journals, and I'm not aware of, you know,

21  the mainstream finance and economics journals, and

22  especially the leading finance and economics

23  journals, that have published papers that use

24  trading models of this sort.

25       Q.   So in order to be scientific in your view,

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    it would have -- a trading model would have to be

3    published in a leading journal of econometrics?

4         A.  No, I wouldn't say that.  But I think it

5    should be subject to the peer-review process.  And I

6    think it's not only being subject to the peer-review

7    process, but in order to have scientific validity,

8    it is a model that has been tested and is widely

9    used among practitioners.  And trading models fail

10   miserably in that regard when it comes to the

11   peer-review literature.

12        Q.  Do you think trading models are not widely

13   used amongst professionals who seek to estimate

14   damages in securities fraud cases?

15        A.  No.  What I said is, with respect to the

16   scientific validity, as I've described it, there is

17   no scientific validity in these trading models, and

18   there is no scientific basis to believe that they

19   provide a credible estimate of the number of damaged

20   shares.  So they may be used, but they lack

21   scientific validity.

22        Q.  Because they have never been published in

23   peer-reviewed journals?

24        A.  Well, the publication in peer-reviewed

25   journals is an indication that they have been

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2    subject to the type of empirical testing that would

3    qualify it as being scientific.  So it's not just a

4    matter of not being published in peer-reviewed

5    journals.  The bottom line is there is not a body of

6    evidence that indicates that it's scientifically

7    valid to use these models.

8         Q.  What analysis have you done in your efforts

9    to determine whether trading models produce accurate

10   results?

11        A.  Other than point out that these models have

12   not been validated with scientific evidence in the

13   peer-reviewed journals, I haven't independently

14   assessed whether they do or do not provide reliable

15   estimates.

16             And the reason is that -- and the reason

17   perhaps why there is no systematic body of evidence

18   that validates the use of these models is that these

19   models attempt to estimate the number of damaged

20   shares, and one would need a large body of evidence

21   that compares the predictability of these models

22   with actual numbers of damaged shares, and, as a

23   practical matter, that body of evidence does not

24   exist.

25        Q.  Other than claims data from a securities

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    fraud proof-of-claim process, is there any possible

3    way to estimate the aggregate damages in a

4    securities fraud case, class action?

5         A.  When you say "other than" --

6         Q.  Other than actually analyzing each and

7    every proof of claim that's received after a claims

8    process.

9         A.  Well, there may be other ways, but the

10   question is whether the other ways are scientific,

11   whether they are scientifically valid, and I'm not

12   aware of a scientifically valid way to estimate the

13   number of damaged shares.

14        Q.  And it's your opinion that the only way to

15   calculate the number of damaged shares is to wait

16   until the proof of claims come back in a claims

17   process in a securities fraud case?

18        A.  And, again, I'm not making a legal judgment

19   as to whether that should be done.  I'm simply

20   saying that there would be no basis to believe that

21   models that attempt to estimate the number of

22   damaged shares are scientifically valid, in which

23   case, in my opinion, my advice to the courts is to

24   rely on proofs of claim.

25                    MR. DEVORE:  How about we take a break?

1                    KENNETH LEHN, Ph.D.

2           (Recess taken)

3    BY MR. DEVORE:

4        Q.  Let's take a look at Appendix A of your

5    report.  And Appendix A describes your event study

6    methodology; is that right?

7        A.  That's correct.

8        Q.  How did you choose the market index that

9    you used in your event study?

10       A.  It was the one that provided the highest

11   adjusted R squared of others that I considered.

12       Q.  Is that the industry index or market index?

13       A.  Market index.

14       Q.  And how many alternative indexes did you

15   test to determine which market index to use?

16       A.  I don't recall the exact number, as I sit

17   here.

18       Q.  More than one?

19       A.  Yeah, my recollection is that it was more

20   than one.

21       Q.  You ultimately chose the NAN index?

22       A.  Correct.

23       Q.  Do you recall what other indexes you looked

24   at?

25       A.  I don't as I sit here.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2          Q.   Did you look at the NYSE index?

3          A.   I believe so, right.

4          Q.   And you chose the NAN index as the better

5     fit?

6          A.   Correct.

7          Q.   Take a look at paragraph 5 of your Appendix

8     A, describing how you formed your industry index.

9     You chose companies for your industry index that

10    were mentioned by at least seven unique analysts; is

11    that right?

12         A.   That's correct.

13         Q.   How did you choose -- well, first, let me

14    just get the whole thing in there.

15              You chose companies for your industry index

16    that were mentioned by at least seven unique

17    analysts that followed LDK from July 11, 2007 to

18    April 7, 2008; is that right?

19         A.   That is correct.

20         Q.   Okay.  First, how did you choose that date

21    range?

22         A.   Well, the date range was a period that

23    obviously began after the beginning of the class

24    period.  And I believe July 11th was among the

25    earliest dates for which I had analysts reports.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2  And then April 7, 2008 was the date on which LDK

3  filed the 20-F that revealed that KPMG had basically

4  signed off on the 2006 and 2007 financials and that

5  the SEC staff would not recommend an enforcement

6  action.  So seemed like a reasonable cutoff date.

7       Q.  That's -- that date is -- well, put this a

8  different way.  That date is not the same as your

9  control period, that date range -- strike that.  Let

10 me get it right.

11           The date range over which you analyzed the

12 analysts reports to determine which companies to

13 include in your industry index is a different date

14 range than you use for your control period; is that

15 right?

16      A.  That is right.

17      Q.  How did you choose the

18 seven-unique-mentions number?

19      A.  Well, I started with the following type of

20 analysis, which I typically use in trying to

21 identify peer index.

22           After gathering analysts reports on LDK

23 from Investext, principally through Investext, I

24 asked Cornerstone to do a count of the frequency

25 with which analysts mentioned other companies in

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2    their analysts reports on LDK, and then to create a

3    matrix literally where you have the companies that

4    are mentioned in rows and then the columns are the

5    analysts and then you do a frequency count and --

6         Q.  And that's one of the exhibits to your

7    report?

8         A.  Correct.  That's right.  If you turn,

9    actually to Exhibit 6, you see that there are five

10   companies that were mentioned by eight unique

11   analysts during this period: Canadian solar, JA

12   Solar, Solarfun, Suntech and Trina Solar.

13   T-R-I-N-A.

14           And I then estimated a regression where I

15   used an equal-weighted index and an evaluated index

16   of those five companies, recorded the adjusted R

17   squared, which measures the goodness of fit, and

18   then I worked down.  I then added to that index

19   companies that were mentioned seven times, and the

20   only publicly traded companies of the group

21   mentioned seven times, publicly traded in the United

22   States, were China Sunergy, MEMC and Yingli Green

23   Energy.  The others were either private companies or

24   foreign companies that don't trade in the U.S.

25           And I did the same thing.  I added those

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2    companies to the peer index and then estimated the

3    adjusted R squared and found that it was actually

4    higher when you added those additional companies.

5              I then went down to those that were

6    mentioned six times, and as far down as those that

7    were mentioned five times, and I found that once you

8    got below seven unique mentions the R squared

9    started to drop again.

10             And the intuition is that the less

11   frequently -- the less frequent the mention of a

12   given company, the less likely it is that it would

13   be an appropriate peer company.  So based on the

14   adjusted R squared analysis, I thought the index

15   that I chose, which was an equal-weighted index of

16   those companies, was the most appropriate peer

17   index.

18        Q.  Did you produce the data that you used to

19   calculate the R squares?

20        A.  Produce it to the plaintiff's counsel?

21        Q.  Yeah.

22        A.  I frankly don't know what was turned over

23   to plaintiff's counsel, but I certainly instructed,

24   you know, Cornerstone to provide counsel with

25   whatever needed to be turned over.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2         Q.  Okay.  Turning back to Appendix A, you used

3    a control period of December 24, 2007 through August

4    31, 2008; is that right?

5         A.  That is correct.

6         Q.  How did you choose that period?

7         A.  Well, I initially considered using the

8    class period as a control period, as Ms. Nettesheim

9    did, but there were a couple of reasons why I didn't

10   think that was appropriate.  One is that it's well

11   known in the finance literature that returns can act

12   rather funny following initial public offerings, and

13   that makes one a bit skeptical about using returns

14   to estimate a market model immediately after an IPO.

15   It's not a dealer killer in and of itself, but it

16   raises one's skepticism.  But, more importantly, as

17   I point out in my report, that Ms. Nettesheim

18   reports a very, very high alpha which is what one

19   estimates when you use the class period as the

20   control period.  And the high alpha is an artifact

21   of the fact that the stock price rose a great deal

22   from mid-July through mid-to-late September for

23   reasons, in part, large part, perhaps, related to

24   the issues we talked about concerning the

25   polysilicon plant.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2          And the increase in LDK's stock price was

3    aberrationally high given the movements of the

4    market and the peer index during this period.  So it

5    creates a very, very high alpha.  And when one is

6    conducting an event study, if you have a high alpha,

7    which -- her alpha basically implies an annualized

8    return well in excess of a thousand percent.  What

9    that means, then, is when you're predicting returns,

10   you're artificially inflating the predicted return

11   because you have an aberrationally high alpha.  And

12   if you have an artificially high predicted return,

13   you're going to have an artificially low residual

14   return.  And, in my opinion, that's inappropriate.

15          So choosing a period that went outside the

16   class period seemed to me to be a more appropriate

17   route to go, because what you're really trying to do

18   when you do an event study is measure the normal

19   relationship between the returns on a company's

20   stock and the returns on the market and peer index,

21   absent any new information.  And there is no sound

22   reason to believe that the normal relationship would

23   be to have this high aberration all alpha baked into

24   the returns.

25          So I chose a period that went beyond the

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                KENNETH LEHN, Ph.D.

2    class period, and because December 17th, 2007 was a

3    date on which the company reported the results of

4    the internal investigation, I made the decision that

5    it would be appropriate to go, you know, essentially

6    one week beyond that announcement as the start date.

7          My normal inclination would be to use one

8    full year of data, which would take you from

9    December of '07 to December of '08.  The problem is

10   that is that in September of '08 Lehman Brothers

11   filed for bankruptcy and the credit crunch kicked in

12   big time and the market was extraordinary volatile

13   during that period.  So I decided to truncate the

14   analysis in late August, prior to that turbulence in

15   the market.

16        Q.  Are you done?

17        A.  I am.

18        Q.  You excluded certain dates during your

19   control period; right?

20        A.  And which dates in particular are you

21   referring to?

22        Q.  The end of paragraph 4 of Appendix A.  You

23   indicate, "I exclude from my analysis event days

24   identified by Nettesheim as 'post-class period --

25        A.  Correct.

1                    KENNETH LEHN, Ph.D.

2          Q.  -- disclosures related to the alleged

3     misrepresentations'"; right?

4          A.  That's right.

5          Q.  Did you exclude any dates other than those

6     that Nettesheim specifically identified in Appendix

7     B?

8          A.  Not that I recall, no.

9          Q.  Did you do any analysis to investigate

10    whether you should exclude other event days during

11    your control period beyond those identified by Ms.

12    Nettesheim?

13         A.  Not that I recall, no.

14         Q.  The reason why you take out those event

15    days is to adjust for what?

16         A.  Well, it's being conservative.  I'm not

17    sure from an econometric perspective it is

18    necessary, but given that Ms. Nettesheim has

19    identified some days as being post class period

20    disclosures related to the alleged

21    misrepresentations, I didn't want the regression

22    results -- I didn't want there to be a concern that

23    the regression results were contaminated by

24    including days that might be construed as corrective

25    disclosures.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1          KENNETH LEHN, Ph.D.

2     Q.  Does taking out those individual event days

3  adjust for any change in volatility that might be

4  baked into the stock subsequent to the earlier fraud

5  allegations?

6          MR. HARRISON:  Objection; vague.

7          THE WITNESS:  I'm not sure I understand.

8  BY MR. DEVORE:

9     Q.  Did you do any analysis to determine

10  whether the volatility during your control period

11  was higher or lower than the volatility during the

12  class period?

13     A.  I believe my root, the root main square

14  that I estimated, was higher than that which Ms.

15  Nettesheim estimated.

16     Q.  Volatility was higher?

17     A.  Technically, the volatility sometimes is

18  viewed as a standard deviation of returns, which is

19  something a little different, but one interpretation

20  of the root mean square is volatility.  So in that

21  sense, mine is a bit higher, I believe.

22     Q.  And that didn't impact or concern you in

23  any way that your control period had a higher

24  implied volatility than the one that Ms. Nettesheim

25  chose?

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 222

1                    KENNETH LEHN, Ph.D.

2         A.   Not especially, no.

3         Q.   In fact, choosing a control period with a

4    higher volatility will result in fewer statistically

5    significant event days; isn't that right?

6         A.   Everything else equal, choosing a period --

7    in this case, choosing the period that had a lower

8    root mean square was a period that had an enormously

9    high alpha.  So, again, there is that to consider as

10   well.

11        Q.   And it's not your opinion that Ms.

12   Nettesheim's alpha calculation was wrong; it's just

13   what she calculated happened to be high, right?

14        A.   When you say it's not my opinion that her

15   estimate of alpha was wrong, I mean, econometrically

16   she estimated alpha properly, given the

17   specification of her model, meaning given her market

18   index and industry index.  The computation was

19   correct.  It's just that I disagree with her that

20   it's appropriate to use such a high alpha in doing

21   this type of event-study analysis.

22        Q.   But during the period from the IPO until

23   the end of September 2007, LDK's annualized return

24   would be something on the order of a thousand

25   percent; is that right?

1              KENNETH LEHN, Ph.D.

2       A.   That is correct.  But, again, the reason

3   that that raises red flags is when you are doing an

4   event study, you're using your regression model to

5   allow you to predict what the return would be absent

6   the release of information.

7              And during this period shortly after an

8   IPO -- I mean, it is related to the IPO in some

9   sense, because when a company, like LDK, does an

10  IPO, and -- on June 1 of '07 the market, if you

11  will, it's sort of groping for a way to value this

12  new entity.  And it's normal that there is going to

13  be a lot of volatility and there can be very unusual

14  returns, high or local, following an IPO, as the

15  market is sort of seeking a valuation for this new

16  public company.

17             And during the summer of 2007, as I've

18  indicated, there was a lot of information,

19  especially about the polysilicon plant and the

20  importance of that plant and so on and so forth,

21  analysts reports, news stories.  So the high alpha

22  is an artifact of both, in my opinion, the fact that

23  this was a new public company about which there was

24  a fair amount of information, and insofar as the

25  alpha is related to those information releases, and

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 224

1                    KENNETH LEHN, Ph.D.

2    that the substantial increase in stock price.  In my

3    opinion, it's inappropriate to then use that very

4    high alpha to try to predict what the returns of a

5    company might be if there was no information

6    released and that's the concern I have.

7         Q.  Okay.  You cited Dr. Aganin's declaration

8    in one point in your report; is that right?

9         A.  That's right.

10        Q.  Do you know what control period Dr. Aganin

11   used when he did his regression analysis?

12        A.  I don't recall as I sit here.

13        Q.  Do you know if it was the same as yours?

14        A.  I don't.

15        Q.  You didn't consider that when did you your

16   regression analysis?

17        A.  I did not.

18        Q.  You agree that there is more than one

19   correct control period or, put another way -- strike

20   that.

21             Is it right that there is no, quote,

22   correct, closed quote, control period?

23             MR. HARRISON:  Objection; vague, calls for

24   speculation.

25             THE WITNESS:  I think there is certain

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1                    KENNETH LEHN, Ph.D.

 2    diagnostics that one can look at to determine

 3    whether one control period is more appropriate than

 4    another.  But having said that, there can be

 5    disagreement among reasonable people as to exactly

 6    how to define the control group.

 7    BY MR. DEVORE:

 8         Q.  Go ahead and turn to the back of that page

 9    you're on there.  Page 2.

10         A.  Back of?

11         Q.  Of Appendix A.

12         A.  Okay.

13         Q.  Footnote 1 you write:  "Appropriate tests

14    indicated no structural change in the model between

15    control and class period."

16         A.  Correct.

17         Q.  What does that mean?

18         A.  What I did was, to determine whether there

19    was a structural change, especially in the relation

20    between LDK's returns and both the market and

21    industry returns, I pooled the data, meaning that I

22    combined the data during the class period with the

23    data during the control period that I used.

24              So you now have a pooled time series

25    database and you can test whether or not there is a

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    shift in the relevant parameters by putting a

3    so-called dummy variable in for the control period

4    versus the class period and determine whether the

5    key parameters, the betas, for example, change

6    significantly during the two periods.  And I

7    conducted a test and found that there was no

8    significant structural change in the relation.

9         Q.  Do you know if you produced those tests?

10        A.  Again, I asked Cornerstone obviously to be

11   responsive to whatever requests were made and

12   provide that to counsel.  So I don't know, as I sit

13   here.

14        Q.  I think I asked you earlier if you had any

15   opinion on whether the market for LDK's ADSs were

16   efficient.  I don't know if I asked you whether you

17   had any opinion on whether the market for LDK's

18   options was efficient.

19            Do you have any opinion as to whether the

20   market for LDK's options was efficient during the

21   class period?

22        A.  I haven't independently assessed that.

23        Q.  Do you have any plans to do so?

24        A.  Not as I sit here today, no.

25        Q.  Turn to paragraph 201, if you would.

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 227

1              KENNETH LEHN, Ph.D.

2    Paragraphs 201 and 202.

3              Is this the extent of your opinion as it

4    relates to LDK's put and call options in this case?

5        A.  Well, as I indicated I think earlier today,

6    subsequent to receiving -- subsequent to my filing

7    of this report, and subsequent to the filing of Ms.

8    Nettesheim's reply report, we have received the data

9    that underlies Ms. Nettesheim's analysis, and it's

10   become a bit clearer beyond what she described in

11   her report as to how she estimated damages for the

12   option holders, and there are two comments.

13             One, and I think I made both of them this

14   morning, is it appears that she only estimated

15   damages using the FIFO approach, not the LIFO

16   approach.  And second is that it appears that she is

17   using the Black Scholes model to estimate the value

18   of the options that reflect the alleged fraud, as

19   well as what the value of the options would be with

20   the but-for stock prices that she estimates.

21             And, in my opinion, it's not clear why one

22   would use a Black Scholes model to value the options

23   when you've got actual option prices to use, but

24   those are the only two additional opinions I have as

25   I sit here.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2         Q.  In analyzing the Black Scholes calculations

3    that Ms. Netesheim did, did you consider the fact

4    that the inputs in her Black Scholes analysis

5    yielded the midpoint between the bid and ask for the

6    options on those particular days?

7         A.  I know she made reference to that in her

8    report, and I'm aware of that, but at the end of the

9    day my understanding is that she substituted the

10   but-for stock price for the actual stock price in

11   order to estimate what the value of the options

12   would be in her but-for world, and, in my opinion,

13   it's not clear why she would do that.

14        Q.  You're familiar with the Black Scholes

15   method obviously; right?

16        A.  I am.

17        Q.  You think that's a reliable way to value an

18   options contract?

19        A.  It is.  I mean, it especially is for

20   so-called European options that can be exercised at

21   the expiration date.  It's less clear that it's

22   appropriate for valuing American options that can be

23   exercised prior to the expiration date.

24        Q.  Why is that?

25        A.  Well, there is some additional value if you

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                        KENNETH LEHN, Ph.D.

2      can exercise prior to the expiration date, and the

3      Black Scholes model is designed to value the

4      European options.  So there is that.

5              An additional complication is that if one

6      is going to use an estimate of an option price using

7      Black Scholes, as opposed to actual transaction

8      prices, as one would do in the stock market, what

9      Ms. Nettesheim did was she, at least as best I

10     understand what she did, is she substituted the

11     but-for stock price for the actual stock price, but

12     she left the implied volatility, which is a key

13     parameter in the valuation, unchanged and it

14     doesn't -- I don't understand why the implied

15     volatility would remain unchanged if you're

16     dramatically changing the actual estimated stock

17     price.

18             So, again, I mean, it's curious to me that

19     she would use these estimated Black Scholes prices

20     rather than actual option prices.

21         Q.  And if she increased the implied

22     volatility, she would have resulted in a higher

23     damages value; is that right?

24         A.  But it's not clear to me whether it would

25     increase or decrease.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2         For example, if the argument is that a

3    company's stock price was vastly overstated, then

4    what that would indicate is that the company's

5    growth options are less than had been initially

6    presented to the marketplace.  And by "growth

7    options," I'm referring to the proportion of the

8    firm's value that is coming from its future expected

9    growth.  And, as a general proposition, companies

10   that have higher growth opportunities generally have

11   higher risk, higher variance, higher betas, higher

12   implied volatilities.

13        So if the argument is that somehow this

14   stock price which at one point was trading at $23 a

15   share should have been zero, then what she is saying

16   is that the market would have inferred that the

17   growth opportunities of LDK were a lot less than

18   they thought they were, and it's not clear that

19   implied volatility would go up.  One can make an

20   argument it should go down.

21        My whole point is, once one opens the door

22   to using Black Scholes, as opposed to actual

23   transaction prices in a matter such as this, there

24   becomes a question about how reliable those but-for

25   estimates are.

1                 KENNETH LEHN, Ph.D.

2       Q.  Is it your understanding that actual option

3   price data is available for LDK during the class

4   period?

5       A.  My understanding is that there are data

6   available for LDK.

7       Q.  What kind of data is available?

8           Well, move to strike as nonresponsive.

9           Is it your understanding that actual option

10  price data was available for LDK during the class

11  period?

12      A.  I don't know about for the entire class

13  period, but it is my understanding that there is

14  some options price data available for LDK.

15      Q.  But you don't know how much?

16      A.  I don't.

17      Q.  Or what date range it covers?

18      A.  Correct.

19      Q.  Do you have an understanding as to whether

20  Ms. Nettesheim uses a trading model in calculating

21  her options?

22      A.  She very clearly does.

23      Q.  And in what way is what she does a trading

24  model?

25      A.  Well, a model is an attempt to estimate

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    actual behavior.  So if the exercise is to try to

3    estimate the actual trading behavior in a security,

4    whether it be stocks or options or bonds or

5    anything, if you don't have the actual trading

6    behavior and you're trying to estimate it, by

7    definition, you're using a model.

8            Now, I think she in her reply report claims

9    she didn't use a trading model.  Well, she did.  She

10   didn't have the actual data.  She doesn't know how

11   individuals actually traded the options.  She is

12   trying to estimate it.  She is using a model.

13           And she is using a very simplified model.

14   It's not a two-trader model in the sense that she

15   used for the equity market, but it's a model.  She

16   is trying to estimate actual behavior, and for her

17   to claim she is not using a model is just wrong.

18       Q.  So when you use the phrase "trading model"

19   in your report, you're not referring to a classic

20   two-trader model of the type Ms. Nettesheim used in

21   her equity analysis; right?

22       A.  No, but a trading model is a model that

23   attempts to estimate trading behavior.  It doesn't

24   have to be confined to a two-trader model that's

25   used to estimate the number of damaged shares.  And

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2    she is using a model.  It's -- as I mentioned in my

3    report, it's a very simplified model, and one could

4    even argue a simplistic model, but it's a model.

5              And I should add, it's a model that is,

6    again, similar to the two-trader model that she uses

7    to estimate the number of damaged shares.  It's a

8    model that has not been validated in the peer-review

9    academic literature.

10        Q.  And just so I'm clear that there is not a

11   terrible disagreement between you and Ms.

12   Nettesheim, in your opinion, any analysis that uses

13   some estimates of trading behavior, as opposed to

14   each and every actual trading -- each and every

15   actual trade, would be a trading model; is that

16   right?

17        A.  I think any attempt to estimate trading

18   behavior in the absence of having actual trading

19   data means that you are using a model.

20        Q.  Okay.  Let's turn back to paragraph 122 of

21   your report, if you would.  And in this paragraph

22   you discuss what you refer to as "headline risk or

23   collateral damage"; is that right?

24        A.  That's correct.

25        Q.  And you say, "Headline risk and collateral

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    damage refer to consequences that might result from

3    the allegations," emphasis on "might."

4         A.  That's correct.

5         Q.  And you go on to say:

6              "However, the effects of headline risk on a

7              company's stock price, which reflects

8              uncertainty that is ultimately resolved, is

9              logically distinct from the effects of the

10             alleged corrective disclosures."

11             Right?

12        A.  That's correct.

13        Q.  It's your opinion that the risk of a

14   company being sued for securities fraud is logically

15   distinct from the fact that someone disclosed that

16   it was committing securities fraud?

17        A.  That's correct.

18        Q.  You indicate -- or you emphasized the word

19   "might" in this paragraph.

20        A.  Right.

21        Q.  Headline risk and collateral damages might

22   have some effect on LDK's shares; right?

23        A.  Well, that is a separate issue.  The

24   sentence there is referring to headline risk and

25   collateral damage refer to consequences that might

5df1c887-47f5-4222-bb18-9551ffd7ea90

1              KENNETH LEHN, Ph.D.

2    result from the allegations, which is separate from

3    whether it might have an impact on the stock price.

4         Q.  Fair enough.

5              Did you do any calculations to determine

6    the impact of headline risk on LDK's shares in this

7    case?

8         A.  No.  And, again, this was reviewing and

9    responding to Ms. Nettesheim, and my point is that

10   she did not.

11        Q.  And same question with respect to

12   collateral damage, you didn't do any analysis to

13   calculate what the effect of any collateral damage

14   was on LDK's share price; is that right?

15        A.  Correct.  And, again, I'm reviewing and

16   responding to Ms. Nettesheim, and I'm arguing that

17   she reached a conclusion without doing this type of

18   analysis.

19        Q.  What type of analysis would Ms. Nettesheim

20   have to do to account for headline risk?

21        A.  Well, there are -- it depends on the facts

22   of a particular case and, you know, one is to look

23   to subsequent events that resolve uncertainty about

24   the allegations and as done -- you know, for

25   example, on December 17, 2007 when the results of

1                    KENNETH LEHN, Ph.D.

2    the internal investigation were communicated to the

3    market, analysts reports basically said this

4    resolves uncertainty about the allegations in

5    October.

6              So, you know, one potentially can look at

7    discrete events subsequent to the allegations and

8    estimate the price impact associated with those

9    events.  And, you know, frankly, in some cases it

10   may be that there is no scientifically valid way of

11   separating the headline risk -- the effect of the

12   headline risk on a company's security price from the

13   effect of the alleged corrective disclosure.

14        Q.  Have you ever performed any analysis in any

15   case to scientifically measure the impact of

16   headline risk?

17        A.  I don't recall.  It's come up in some cases

18   I've been involved in, but I don't recall whether I

19   actually attempted to estimate the impact of that

20   headline risk.

21        Q.  Do you recall seeing anyone try to do a

22   scientific analysis to try to determine the impact

23   of headline risk on a company?

24        A.  I did see someone in a matter I have fairly

25   recently been involved in who attempted to do that.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2         Q.   And what mechanism did that person use?

3         A.   That person also said I'm going to look at

4    subsequent events to the alleged corrective

5    disclosure and do an event study on those subsequent

6    events that in the eyes of this person resolved the

7    uncertainty associated with the headline risk.

8         Q.   And in this particular case, it's your

9    opinion that the December 17th announcement that the

10   independent investigation cleared LDK was such a

11   disclosure?

12        A.   It may or may not.  Again, I'm just

13   responding to your question as to hypothetically how

14   might Ms. Nettesheim have done it, given that,

15   again, I'm not offering an affirmative analysis of

16   damages but she is, and this is her model, and so

17   I'm simply pointing out that she didn't do it and

18   potentially looking at that date might be one way to

19   resolve it.  But, again, I haven't affirmatively

20   done that.

21        Q.   And you haven't done any analysis to

22   determine the magnitude of the impact of Ms.

23   Nettesheim's failure to consider the December 17th

24   disclosure is a correction of headline risk; is that

25   right?

5df1c887-47f5-4222-bb18-9551ffd7ea90

```
 1                    KENNETH LEHN, Ph.D.
 2        A.   That's correct.
 3        Q.   I assume the same would go for collateral
 4   damage?  Do you use those terms interchangeably?
 5        A.   I do.
 6        Q.   Is it your opinion that there is no
 7   scientific basis to ever award aggregate damages in
 8   a securities class action?
 9             MR. HARRISON:  Objection; vague, incomplete
10   hypothetical.
11             THE WITNESS:  I've never been asked to
12   offer an opinion as to a general question.  So as I
13   sit here, I don't have an opinion as to that.
14   BY MR. DEVORE:
15        Q.   Do you have an opinion as to whether there
16   is ever a scientific basis to award damages at all
17   in a securities class action?
18             MR. HARRISON:  Same objection.
19             THE WITNESS:  Can you repeat the question?
20   BY MR. DEVORE:
21        Q.   Do you have an opinion as to whether there
22   is ever a scientific basis to award damages at all
23   in a securities class action?
24        A.   Conceptually, sure.
25        Q.   Just not in this case?
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

 1                   KENNETH LEHN, Ph.D.

 2        A.  Well, again, I haven't been asked to form

 3   an affirmative opinion as to damages.  A logical

 4   implication of my opinion with respect to loss

 5   causation is that there are no damages.

 6        Q.  Let me ask you to turn to paragraph 94 of

 7   your report.  In paragraph 94, without reading the

 8   whole thing, essentially summarizes some of the

 9   events that you conclude were corrective of the

10   false rumors; is that fair?

11        A.  I wouldn't put it that way.  I'm not

12   opining as to whether the rumors were false or not.

13        Q.  Okay.  How would you put it then?

14        A.   Well, I'm simply pointing out that there

15   were, as Ms. Nettesheim points out, disclosures

16   after the class period that related to the alleged

17   misrepresentations and the alleged corrective

18   disclosures that she identifies on October 3rd,

19   October 4th and October 8th, without rendering a

20   judgment as to whether those rumors and allegations

21   were true or false.

22        Q.  At the end of paragraph 94, which is on the

23   top of page 32, you write:

24                "The SEC and LDK's independent auditor

25                implicitly endorsed the findings of the

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                   KENNETH LEHN, Ph.D.

2            independent investigation announced on

3            December 17, 2007."

4            Do you see that?

5      A.   Yes.

6      Q.   Did you mean to say that?

7      A.   I did.

8      Q.   It's your opinion that the fact that the

9  SEC chooses not to investigate or take further legal

10 action against a company endorses what that company

11 did?

12           MR. HARRISON:  Objection; vague, overbroad.

13           THE WITNESS:  Well, what I'm referring to

14 there, and perhaps I could have worded it a bit more

15 carefully, but the independent investigation found

16 that there were no material errors in LDK's

17 accounting for inventory as it pertained to Mr.

18 Situ's allegations.

19 BY MR. DEVORE:

20     Q.   Are you sure about that?

21     A.   That's my recollection.

22     Q.   Okay.  Have you seen the Simpson Thacher

23 presentation?

24     A.   I don't believe so.

25     Q.   So you don't know what it is that Simpson

1                KENNETH LEHN, Ph.D.

2   Thacher actually cleared LDK of?

3       A.  Well, what I'm referring to is the

4   information that was released to the market.

5       Q.  And the information released to the market,

6   you're aware, was that there were no issues with the

7   quantity of LDK's inventory; is that right?

8       A.  I'd have to refresh my recollection and

9   look at the news release on that day.

10       Q.  Okay.  You don't know one way or the other,

11   sitting here?

12       A.  I don't recall that specifically, as I sit

13   here, but --

14       Q.  But you haven't considered the fact that

15   the December 17th announcement might have been

16   misleading?

17       A.  Well, again, from a loss causation point of

18   view, what matters is what was released to the

19   market.  And for purposes of that analysis, it's

20   unnecessary to address the merits of the news

21   release.  I'm simply reporting on what the market

22   learned at various points in time.

23       Q.  That's for your affirmative opinion?

24       A.  Correct.

25       Q.  Doesn't that impact your analysis of Ms.

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 242

1              KENNETH LEHN, Ph.D.

2    Nettesheim's opinion, though?

3            MR. HARRISON:  Objection; vague.

4            THE WITNESS:  Not with respect to this

5    point, which is looking at the post-class-period

6    disclosures and their effect on LDK's stock price

7    and how that would factor into an analysis of both

8    loss causation and damages as Ms. Nettesheim

9    conducts.

10   BY MR. DEVORE:

11       Q.  So are you withdrawing your opinion that

12   the SEC endorsed the findings of LDK's independent

13   investigation?

14           MR. HARRISON:  Objection; vague.

15           THE WITNESS:  I wouldn't say I'm

16   withdrawing it.  I may be clarifying it in the sense

17   that what I mean to say, and perhaps could have said

18   more artfully, is that the independent investigation

19   indicated that there were -- I think the phrase "no

20   material errors" appeared in the press release, as I

21   recall, in the accounting for inventory in relation

22   to the allegations that were made in the -- in

23   October of '07.

24           And the fact that the SEC staff chose not

25   to recommend enforcement action is consistent with

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2    the view that the SEC staff did not believe that

3    there was a material misstatement in LDK's

4    financials, especially in regard to the allegations

5    that Mr. Situ made.

6    BY MR. DEVORE:

7         Q.  But you haven't done any analysis to

8    determine whether the results of the independent

9    investigation were misleading?

10        A.  I have done no such analysis, that's

11   correct.

12        Q.  And you haven't done any analysis to

13   determine whether the SEC was misled by the results

14   of the independent investigation?

15        A.  That is correct.

16        Q.  Let me ask you to turn to paragraph 193,

17   and I apologize if I asked you this before, because

18   I know I mentioned Dr. Aganin's report at some

19   point.

20             Are you relying on work that Dr. Aganin did

21   previously in this litigation to form any of your

22   opinions?

23        A.  I wouldn't say I'm relying on it.  I

24   certainly considered Dr. Aganin's report and

25   obviously footnote it here.

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                 KENNETH LEHN, Ph.D.

2          The statement in paragraph 193 that Ms.

3    Nettesheim's trading model does not account for

4    characteristics of LDK stock, such as the high

5    short-sale volume, high levels it fails to deliver,

6    and day trading, are factual statements that she

7    does not account for those characteristics.  And

8    those are facts that are validated independent of

9    what Mr. Aganin has identified.  But I am

10   referencing him because that information is also

11   contained in his declaration.

12       Q.  You performed an independent analysis to

13   confirm what Dr. Aganin wrote in his declaration

14   regarding those topics?

15       A.  I have examined the data independently, but

16   it's descriptive information, as opposed to

17   analysis.

18       Q.  Footnote 151 on the same page you write, "I

19   reserve the right to address other errors in her

20   aggregate damages calculations"; right?

21       A.  That's right.

22       Q.  Have you addressed any other errors in Ms.

23   Nettesheim's damages calculations to date?

24       A.  Not as of this date, no.

25       Q.  Do you have any current plans to do so?

5df1c887-47f5-4222-bb18-9551ffd7ea90

1                    KENNETH LEHN, Ph.D.

2       A.  No.

3       Q.  Have you seen any of Dr. Aganin's

4  supporting documentation that he used to form his

5  opinions that were set forth in his declaration?

6       A.  No.

7       Q.  Do you have access to that information, if

8  you asked for it?

9            MR. HARRISON:  Objection; vague.

10           THE WITNESS:  Not that I'm aware of, no.

11           MR. HARRISON:  Calls for speculation.

12  BY MR. DEVORE:

13      Q.  Do you know if Cornerstone performed the

14  work for Dr. Aganin in this case?

15      A.  I do not.

16           MR. DEVORE:  Why don't we take a short

17  break.

18           (Recess taken)

19           MR. DEVORE:  Subject to the previous

20  request to get Cornerstone's invoice, which we'd

21  like to get, no further questions right now.

22           MR. HARRISON:  Okay.  I don't have any

23  follow-up.

24           I am not sure if we used any confidential

25  documents, but we'll have to take a look afterwards

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 246

1                    KENNETH LEHN, Ph.D.

2      to see if there is anything we want to mark

3      confidential.

4              MR. DEVORE:  Thank you.

5              (Time noted:  5:05 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 247

1            PENALTY OF PERJURY CERTIFICATE

2

3        I hereby declare I am the witness in the within

4     matter, that I have read the foregoing transcript and

5     know the contents thereof; that I declare that the same

6     is true to my knowledge, except as to the matters which

7     are therein stated upon my information or belief, and as

8     to those matters, I believe them to be true.

9        I declare being aware of the penalties of perjury,

10     that the foregoing answers are true and correct.

11

12

13

14

15        Executed on the _____ day of _____, _____,

16     at _____, _____.

17                (CITY)                        (STATE)

18

19

20

21        _____

22                KENNETH LEHN, Ph.D.

23

24

25

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 248

```
 1   STATE OF CALIFORNIA          )
                                  )  ss.
 2   COUNTY OF SAN MATEO          )

 3

 4            I, CYNTHIA MANNING, do hereby certify:

 5            That I am a duly qualified Certified Shorthand

 6   Reporter, in and for the State of California, holder of

 7   certificate number 7645, which is in full force and

 8   effect and that I am authorized to administer oaths and

 9   affirmations;

10            That the foregoing deposition testimony of the

11   herein named witness was taken before me at the time and

12   place herein set forth;

13            That prior to being examined, the witness named

14   in the foregoing deposition, was duly sworn or affirmed

15   by me, to testify the truth, the whole truth, and

16   nothing but the truth;

17            That the testimony of the witness and all

18   objections made at the time of the examination were

19   recorded stenographically by me, and were thereafter

20   transcribed under my direction and supervision;

21            That the foregoing pages contain a full, true

22   and accurate record of the proceedings and testimony to

23   the best of my skill and ability;

24            That prior to the completion of the foregoing

25   deposition, review of the transcript was not requested.
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

1          I further certify that I am not a relative or

2    employee or attorney or counsel of any of the parties,

3    nor am I a relative or employee of such attorney or

4    counsel, nor am I financially interested in the outcome

5    of this action.

6

7          IN WITNESS WHEREOF, I have subscribed my name

8    this 17th day of Decwmber, 2009.

9

10

11    _____

12          CYNTHIA MANNING, CSR No. 7645

13

14

15

16

17

18

19

20

21

22

23

24

25

5df1c887-47f5-4222-bb18-9551ffd7ea90

Page 250

```
1                        ERRATA SHEET

2

3    If any corrections to your deposition are necessary,
     indicate them on this sheet, giving the change, page
4    number, line number and reason for change.

5    PAGE  LINE  FROM                    TO

6    ____  ____  _____      _____

7    Reason  _____

8    ____  ____  _____      _____

9    Reason  _____

10   ____  ____  _____      _____

11   Reason  _____

12   ____  ____  _____      _____

13   Reason  _____

14   ____  ____  _____      _____

15   Reason  _____

16   ____  ____  _____      _____

17   Reason  _____

18   ____  ____  _____      _____

19   Reason  _____

20   ____  ____  _____      _____

21   Reason  _____

22   ____  ____  _____      _____

23   Reason  _____

24   _____    _____

25   Signature of Deponent               Date
```

5df1c887-47f5-4222-bb18-9551ffd7ea90

Case:      In re LDK Solar Securities Litigation

Case No.:  United States District Court, Northern District of California,
           Case No. C-07-05182-WHA

Witness:   Kenneth Lehn

Date:      December 15, 2009

Reporter:  Cynthia Manning

I submit the following changes to the transcript of my deposition taken on December 15, 2009.

Dated this 7th day of January, 2010, at Pittsburgh, Pennsylvania.

Kenneth Lehn

| PAGE | LINE | CHANGE (Changes are to correct transcription and/or for clarification.) |
|------|------|---------------------------------------------------------------------|
| 21   | 2    | "that's who" to "that's what"                                        |
| 21   | 14   | "there is some" to "there are some"                                  |
| 23   | 9    | "Charlie" to "Charley"                                               |
| 50   | 13   | "else was true" to "else were true"                                  |
| 53   | 2    | "MR. DEVORE" to "MR. HARRISON"                                        |
| 58   | 5    | "Potentially could" to "Potentially it could"                        |
| 63   | 17   | "or a withdrawal" to "nor a withdrawal"                              |
| 64   | 15   | "had some been" to "had been some"                                   |
| 80   | 3    | "currents asset" to "current asset"                                  |
| 92   | 18   | "No, did not." to "No, I did not."                                   |
| 101  | 11   | "appropriate data" to "appropriate date"                            |

| PAGE | LINE | CHANGE (Changes are to correct transcription and/or for clarification.) |
|------|------|------|
| 101 | 19 | "expertise and" to "expertise in" |
| 115 | 2 | "confounded information" to "confounding information" |
| 116 | 16 | "by UBS on" to "by LDK on" |
| 116 | 21 | "her share inflation" to "per share inflation" |
| 119 | 25 | "by loss causation" to "by LDK" |
| 121 | 17 | "alleged misrepresentation" to "alleged misrepresentations" |
| 127 | 16 | "principle basis" to "principled basis" |
| 128 | 2 | "independent department investigation" to "independent investigation" |
| 135 | 7 | "you don't have to" to "you have to" |
| 137 | 18 | "partial corrected" to "partial corrective" |
| 137 | 21 | "disclosure that" to "disclosures that" |
| 138 | 6 | "principal basis" to "principled basis" |
| 140 | 5 | "I'm not sure. What do you mean?" to "I'm not sure what you mean." |
| 140 | 7 | "August 28th" to "August 31st" |
| 141 | 16 | "information on the" to "information in the" |
| 145 | 4 | "principal basis" to "principled basis" |
| 147 | 12 | "basically Levinson" to "Basic v. Levinson" |
| 152 | 10 | "as well as 1" to "as well as 99" |
| 159 | 11 | "discussion with" to "discussions with" |
| 172 | 8 | "she should" to "she could" |
| 172 | 14 | "I precede to" to "I proceed to" |
| 178 | 24 | "events study" to "event study" |
| 180 | 13 | "dates of which" to "dates on which" |
| 185 | 16 | "price design" to "price decline" |
| 190 | 11 | "some of class" to "some class" |

| PAGE | LINE | CHANGE (Changes are to correct transcription and/or for clarification.) |
|------|------|------------------------------------------------------------------------|
| 195  | 14   | "compare it" to "compare those" |
| 197  | 22   | "was an acquisition" to "was a litigation" |
| 215  | 11   | "Canadian solar" to "Canadian Solar" |
| 215  | 15   | "an evaluated index" to "a value-weighted index" |
| 217  | 15   | "a dealer killer" to "a deal killer" |
| 218  | 23   | "high aberration all" to "high aberrational" |
| 219  | 4    | "internal investigation" to "independent investigation" |
| 221  | 13   | "root main square" to "root mean square" |
| 223  | 14   | "high or local" to "high or low" |
| 236  | 2    | "internal investigation" to "independent investigation" |
| 244  | 5    | "levels it fails" to "levels of fails" |