1   Joseph J. Tabacco, Jr. (SBN 75484)
    jtabacco@bermandevalerio.com
2   Christopher T. Heffelfinger (SBN 118058)
    cheffelfinger@bermandevalerio.com
3   Anthony D. Phillips (SBN 259688)
    aphillips@bermandevalerio.com
4   **BERMAN DeVALERIO**
    One California Street, Suite 900
5   San Francisco, CA  94111
    Telephone: (415) 433-3200
6   Facsimile:  (415) 433-6382

7   *Liaison Counsel for the Class*

8   Herbert E. Milstein
    hmilstein@cohenmilstein.com
9   Joshua S. Devore
    jdevore@cohenmilstein.com
10  Mathew B. Kaplan
    mkaplan@cohenmilstein.com
11  **COHEN MILSTEIN SELLERS**
      **& TOLL PLLC**
12  1100 New York Avenue, N.W.
    West Tower, Suite 500
13  Washington, DC  20005-3964
    Telephone: (202) 408-4600
14  Facsimile:  (202) 408-4699

15  *Lead Counsel for the Proposed Class*

16              **UNITED STATES DISTRICT COURT**

17           **NORTHERN DISTRICT OF CALIFORNIA**

18

19  In re LDK SOLAR SECURITIES          Master File No. C-07-05182-WHA (BZ)
    LITIGATION
20                                      CLASS ACTION

21  _____    **LEAD PLAINTIFF'S MEMORANDUM
                                        IN OPPOSITION TO DEFENDANTS'**
22  This Document Relates To:           **MOTION TO EXCLUDE EVIDENCE
                                        AND ARGUMENT REGARDING JANE**
23       ALL ACTIONS.                   **D. NETTESHEIM'S OPINIONS ON
                                        LOSS CAUSATION AND DAMAGES**
24
                                        Judge:  Hon. William H. Alsup
25                                      Date:   February 11, 2010
                                        Time:  8:00 a.m.
26                                      Ctrm:  9, 19th Floor

27

28

    [C-07-5182-WHA(BZ)] LP MEM IN OPP TO DEFS' MTN TO EXCLUDE EVIDENCE

# TABLE OF CONTENTS

I. STATEMENT OF ISSUE TO BE DECIDED ................................................................... 1

II. INTRODUCTION ....................................................................................................... 1

III. FACTS PERTINENT TO MOTION .............................................................................. 4

IV. ARGUMENT .............................................................................................................. 5

    A. Nettesheim Is Fully Qualified To Provide Expert Testimony On Loss Causation And Damages, Which Defendants Do Not Dispute ....................................................... 5

        1. Applicable Standards ....................................................................................... 5

        2. Defendants Do Not Challenge Nettesheim's Qualifications To Render Her Opinions ................................................................................................... 6

    B. Nettesheim's Opinions Regarding Loss Causation Are Reliable .............................. 7

        1. Nettesheim's Conclusions Concerning The Fact Of Loss Causation Are Well-Founded ................................................................................................... 7

        2. Nettesheim's Analysis Properly Accounts For Negative Confounding Information ..................................................................................................... 13

            a. October 3 – Nettesheim Fully Considered The Information In The Piper Jaffray Report ................................................................................. 14

            b. October 8 – Nettesheim Fully Considered The Information In The *Barron's* Article ................................................................................ 14

            c. Nettesheim Fully Considered "Headline Risk" ..................................... 17

    C. Nettesheim's Damage Estimates Are Reliable ....................................................... 18

        1. Nettesheim's Inflation Per Share Damage Calculations Are Based on Well-Accepted Methodologies ....................................................................... 18

            a. The Constant-Percentage Method Is Appropriate ................................ 19

            b. The Constant-Dollar Method Is Appropriate ...................................... 20

            c. The Inflation Methodologies Go To Weight Not Admissibility ............. 21

        2. Nettesheim Uses A Conservative Trader Model To Estimate The Number of Damaged Shares ....................................................................................... 21

        3. Nettesheim's Regression Analysis Is Reliable and Accepted ........................... 22

V. CONCLUSION ......................................................................................................... 25

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009)........................ 10, 12

4

*Bazemore v. Friday*, 478 U.S. 385 (1986) .................................................................................... 22

5

*Blakely v. Anesthetix of Iowa*, P.C., No. 04-3031, 2006 US Dist. Lexis 97179

6

    (N.D. Iowa, Feb. 27, 2006) .................................................................................................. 6

7

*Breidor v. Sears Roebuck & Co.*, 722 F.2d 1134 (3d Cir. 1983) .................................................. 21

8

*Campbell v. Metropolitan Prop. and Cas. Ins. Co.*, 239 F.3d 179 (2d Cir. 2001).................... 7, 22

9

*Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993) ............................................. 6, 21

10

*Dorn v. Burlington N. Santa Fe R.R. Co.,* 397 F.3d 1183 (9th Cir. 2005) ............................... 6, 20

11

*Dura Pharms., Inc. v. Bruodo*, 544 U.S. 336 (2005) ................................................................... 12

12

*Humetrix, Inc. v. Gemplus, S.C.A.*, 268 F.3d 910 (9th Cir. 2001) ............................................... 21

13

*In re Cendant Corp.*, 109 F. Supp. 2d 235 (D.N.J. 2000)............................................................ 22

14

*In re Daou Sys., Inc.,* 411 F.3d 1006 (9th Cir. 2005)................................................................... 12

15

*In re Homestore.com, Inc. Sec. Litig.*, Master File No. 01-CV-11115 RSWL CWx

16

    (Docket Number 715; Decl. 17, 2004)............................................................................... 21

*In re LDK Solar Sec. Litig.*, 255 F.R.D. 519 (N.D. Cal. 2009)...................................................... 8

17

*In re LDK Solar Sec. Litig.,* No. C 07-05182 WHA, 2008 WL 4369987

18

    (N.D. Cal. Sept. 24, 2008)................................................................................................. 12

19

*In re Motorola Securities Litig.*, 505 F.Supp.2d 501 (N.D. Ill. 2007) ......................................... 10

20

*In re Oxford Health Plans, Inc. Sec. Litig.*, MDL 1222 (CLB), 244 F. Supp. 2d 247

    (S.D.N.Y. March 6, 2003)................................................................................................. 21

21

*In re Vivendi Universal, S.A. Sec. Litig.*, 634 F.Supp.2d 352 (S.D.N.Y. 2009)........................... 10

22

*In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 U.S. Dist. LEXIS 2215

23

    (S.D.N.Y. Feb. 17, 2005) .................................................................................................. 22

24

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) ............................................... 12

25

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................................... 6

26

*Lentell v. Merrill Lynch*, 363 F.3d 161 (2d Cir. 2005) ................................................................ 10

27

*RMED Int'l Inc. v. Sloan's Supermarkets, Inc.*, No. 94 - 5587, 2000 U.S. Dist. LEXIS 3742

    (S.D.N.Y. Mar. 24, 2000) ................................................................................................. 21

28

*Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) .................................................. 12

*Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408 (3d Cir. 2002).............................................. 21

*Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162 (4th Cir. 2007).......................................................... 17

*Wortley v. Camplin*, 333 F.3d 284 (1st Cir. 2003)............................................................................ 8

**Statutes**

Federal Rule of Evidence 702 ................................................................................ 5, 6, 21

**Other Authorities**

"Estimating Aggregate Damages in Class-Action Litigation under Rule 10b-5 for Purposes of Settlement," 59 Fordham L. Rev. 811, April 1991 ..................................... 18

Bradford Cornell and Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases, 37 UCLA L. Rev. 883, 899, June 1990.......................................... 18

Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA Working Paper, 6 July 2002............................................................ 18

Janet Cooper Alexander, "The Value of Bad News in Securities Class Actions," 41 UCLA L. Rev. 1421, August 1994.......................................................................... 18

Lead Plaintiff Shahpour Javidzad ("Plaintiff") respectfully submits this Memorandum In Opposition to Defendants' Motion to Exclude Evidence and Argument Regarding Jane D. Nettesheim's Opinions on Loss Causation and Damages.

## I.    STATEMENT OF ISSUE TO BE DECIDED

Whether the expert opinion testimony of Jane D. Nettesheim ("Nettesheim") on loss causation and damages, including that expressed in her Expert Report dated October 29, 2009 and her Expert Reply Report dated November 19, 2009, is admissible pursuant to Federal Rule of Evidence 702.

## II.    INTRODUCTION

Defendants seek to exclude Nettesheim's expert opinions on loss causation and damages even though they are based on reasonable assumptions supported by the evidence and her proper application of well-established methodologies.  Defendants do not (and could not) challenge Nettesheim's qualifications, knowledge and experience to render her opinions.  While they contend that her reports and testimony are inadmissible because they are "unreliable," Defendants simply disagree with Nettesheim's expert judgments.  But this affords no ground to exclude her opinions.  Instead, Defendants' proper avenues for challenging Nettesheim's conclusions are to cross examine her and offer contrary expert opinions, as they have already done.  By this means, the jury at trial may then determine the weight to accord Nettesheim's testimony.

Defendants first argue that Nettesheim cannot reliably opine that loss causation occurred in this case because she assumed the truth of Plaintiff's allegations.  This is so, according to Defendants, because the fraud that Nettesheim assumed occurred at LDK for purposes of her analysis is based exclusively on specific claims by LDK's former controller, Charlie Situ ("Situ"), which Defendants insist have not been substantiated to the market.  Thus, Defendants contend – based largely on the subjective opinions of their own expert that are contrary to law and in ignorance of the facts – that there has never been a disclosure of a "relevant truth" exposing Defendants' misrepresentations and therefore these misrepresentations could not have caused any of the investors' losses.

1    As discussed below, and in Plaintiff's accompanying Opposition to Defendants' Motion

2    for Summary Judgment, Defendants' argument is premised on the suggestion that there can be no

3    "corrective disclosure" giving rise to loss causation unless such disclosure "mirrors" or

4    corresponds "fact-for-fact" with the alleged misrepresentation and that the disclosure is

5    "validated" by the very persons accused of the fraud.  This is erroneous; it is sufficient that the

6    disclosure is relevant or related to, or "within the zone" of, the misrepresentation.    And no law

7    or policy does or could countenance Defendants' expert's theory that Defendants cannot be held

8    liable for securities fraud damages unless they admit their own fraud.

9    The fraud claim asserted here is that Defendants misstated or concealed improper

10   inventory and accounting practices.  The early October 2007 disclosures which Plaintiff alleges

11   revealed the truth about the fraud to the market were disclosures about improper inventory and

12   accounting practices.  Even if, as Defendants insist, the October disclosures did not get all of the

13   *details* about LDK's fraud right because Situ got some of his facts wrong, these disclosures were

14   clearly within the zone of, and relate to, Defendants' alleged misrepresentations.  As such,

15   Nettesheim's opinion that the early October 2007 disclosures were corrective disclosures

16   regarding LDK's accounting for silicon inventory that caused the price of LDK's securities to

17   decline significantly is a reliable expert judgment.  As Nettesheim explains, Defendants' tack is

18   "a misleading attempt to portray Plaintiff's case as an assemblage of accounting practices to be

19   analyzed individually, and it avoids the fundamental issue of whether Defendants concealed the

20   Company's true earnings capacity."[1]

21   Perhaps most tellingly, Defendants' latest attack on Nettesheim -- that there is no loss

22   causation for lack of a corrective disclosure -- contradicts the losing arguments that Defendants

23   previously made in connection with the Court's certification of the class, when Defendants

24   argued unsuccessfully that the entire fraud had been revealed by October 3.    And while

---

[1]  Declaration of Jane D. Nettesheim in Support of Lead Plaintiff's Opposition to Motion to Exclude Testimony and Reports of Jane D. Nettesheim ("Nettesheim Decl."), filed herewith, Ex. 2 ¶ 15.  (For the Court's convenience, given the volume of her Reports in this matter, Nettesheim has offered an abbreviated version of her opinions in the Nettesheim Decl. specifically related to Defendants' attacks.  It does not set out any new opinions.)

1   Defendants did half-heartedly advance their "no-disclosure" theory at that time as well, the Court

2   explicitly rejected it as contrary to their other arguments.

3          Defendants' other challenge to Nettesheim's analysis of loss causation, *i.e.*, that she

4   purportedly failed to consider negative confounding information in conducting her loss causation

5   analysis and "simply assumed that 100 percent of the residual price drops . . . were related to the

6   alleged fraud," also fails.  Through her work on this matter, Nettesheim reached the opinion that

7   the price drops were fully related to the fraud.  She did *not*, however, "simply assum[e]" this, as

8   Defendants falsely claim.  Rather, Nettesheim came to her conclusion only after performing a

9   thorough review of *all* information extant in the market during the relevant period.  In other

10  words, Nettesheim *did* consider whether the price drops could be attributed to negative,

11  confounding information and determined that they were not.  The fact that Defendants disagree

12  with this conclusion is not a basis to seek, let alone grant, exclusion of Nettesheim's opinions.

13         Defendants also attack Nettesheim's use of the constant-percentage and the constant-

14  dollar methodologies of estimating per-share inflation in LDK's ADSs as being unscientific and

15  unreliable.  This attack must be rejected as the courts commonly use these methodologies and

16  Defendants have not proffered any alternative methodology.  Nettesheim discusses at length both

17  the presumptions underlying both methodologies and the economic implications of using both

18  methods; in addition, Nettesheim observes that both of these methods have been used at trial.  It is

19  the province of a jury to determine in relation to the trading days at issue the overall

20  reasonableness of one or both of these accepted methodologies.

21         Defendants' attacks on Nettesheim's multi-trader model and regression analysis are

22  similarly without merit.  Nettesheim's multi-trader model is generally accepted in the field of

23  estimating damages in securities class actions.  Each of the specific challenges to Nettesheim's

24  regression analysis is addressed below, but, in the final analysis, there is no material difference in

25  the regression equation she uses and the one offered by Defendants' expert, Kenneth Lehn

26  ("Lehn").

27

28

1    In short, Nettesheim's opinions and reports are certainly reliable. Defendants' challenges

2    to Nettesheim at best go to the weight of her testimony, not its admissibility. Defendants'

3    *Daubert* challenge should therefore be denied in its entirety.

4    **III.    FACTS PERTINENT TO MOTION**

5    Plaintiff engaged Nettesheim to render expert opinions on (a) whether Defendants' alleged

6    misrepresentations caused Plaintiff and the certified class he represents to sustain economic

7    losses, and (b) the amount of damages suffered from any such loss. Nettesheim Decl., Ex. 1, ¶5.[2]

8    Nettesheim is well-qualified to provide expert testimony regarding these matters, and her

9    background and experience provide a sound and dependable basis for the application of well-

10   accepted methodologies she performed in this case. Since 1990, Nettesheim has served as a

11   consultant and expert in numerous securities class actions in the areas of market efficiency,

12   materiality, causation and damages. *Id.*, Ex. 1, ¶¶1-2 and exhibits 1-2. In connection with such

13   cases, and for a number of stocks in a variety of industries, Nettesheim has examined the

14   relationship between stock price movements and changes in market and industry indices,

15   examined the relationship between information releases and changes in stock prices, and analyzed

16   various data sources for information about shareholdings and trading activity for different types

17   of market participants. *Id.* With respect to these matters, she has prepared numerous event

18   studies and regression analyses, and testified frequently. *Id.*[3]

19   In this case, Nettesheim has concluded with respect to the matter of loss causation that

20   disclosures during and immediately following the Class Period were corrective disclosures

21   pertaining to misrepresentations and omissions regarding LDK's accounting for silicon inventory

22   that caused the price of LDK's securities to decline significantly (and prices for put options to go

23   up). *Id.*, ¶¶9-10 and Ex. 1, ¶¶ 9, 18-54. Nettesheim reached this conclusion only after reviewing

---

24   [2] Nettesheim was also engaged to formulate an opinion as to the efficiency of the market for the
25   securities of LDK, i.e., American depository shares of LDK ("ADSs") and put and call options of
     the ADSs. Nettesheim Decl., Ex. 1, ¶¶4, 5, 15. Defendants do not challenge Nettesheim's
26   conclusion in this respect, which is that there was an efficient market for such securities. *See id.*

27   [3] Nettesheim is a Vice President at Stanford Consulting Group, Inc. ("SCG"), which was
     established in 1981. Nettesheim Decl., Ex. 1, ¶1. Using the same or similar methodologies to
28   those used here, SCG's consultants have offered expert opinions and/or testimony in numerous
     securities cases, including in this District.

1  and analyzing a host of documents and information typically relied upon by financial economists

2  in rendering the opinions at issue here, including LDK's ADS prices, market and industry indices,

3  all available news articles, analysts' reports and press releases, and conducting an event study to

4  determine whether news affecting LDK promptly caused a measurable price reaction for LDK

5  ADSs after accounting for general market and industry effects.  Nettesheim Decl., ¶4, Ex. 1,

6  ¶¶123-129 (and the appendices and exhibits thereto).[4]

7       Nettesheim has also opined that aggregate damages incurred by acquirers of LDK ADSs

8  during the Class Period are approximately $259.3 million under the constant-dollar method of

9  measuring price inflation, and approximately $265.6 million under the constant-percentage

10  method of measuring price inflation.  *Id.*, Ex. 1, ¶¶10-11 and exhibits 6, 8.  As to aggregate

11  damages incurred by purchasers of call options and sellers of put options on the LDK ADSs

12  during the Class Period, Nettesheim has determined these to be approximately $33.6 million

13  under the constant-dollar method of measuring price inflation, and approximately $33.7 million

14  under the constant-percentage method of measuring price inflation.  *Id.*, ¶¶12-13 and exhibits 10,

15  12.  A description of the methodologies Nettesheim used to reach these conclusions is set forth in

16  abundant detail in her Expert Report dated October 29, 2009.  *See id.*, ¶¶ 60-88.

17  **IV.  ARGUMENT**

18       **A.  Nettesheim Is Fully Qualified To Provide Expert Testimony On Loss
            Causation And Damages, Which Defendants Do Not Dispute**

19

20            **1.  Applicable Standards**

21       Federal Rule of Evidence 702 provides:

22       If scientific, technical, or other specialized knowledge will assist the trier of fact to
         understand the evidence or to determine a fact in issue, a witness qualified as an

23       expert by knowledge, skill, experience, training, or education, may testify thereto
         in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient

24       facts or data, (2) the testimony is the product of reliable principles and methods,
         and (3) the witness has applied the principles and methods reliably to the facts of

25

26  [4] Nettesheim's analysis included a review of all available news and analyst reports surrounding
    the early October 2007 partially corrective disclosures. *See* Nettesheim Decl., Ex. 1, ¶¶25-53. A

27  detailed description of the event study and regression analysis Nettesheim performed, technical
    information thereto, and the chronology of news and events during and immediately following the

28  Class Period she considered is set forth in her October 29, 2009 Expert Report. *See id.*, Ex. 1,
    App. A and exhibits 13-16.

1    the case.

2    The Rule, as amended in 2000, codifies the Supreme Court's decisions in *Daubert v. Merrell*

3    *Dow Pharmaceuticals,* 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137

4    (1999). *See* Fed. R. Evid. 702, Advisory Committee Notes to 2000 amendments.

5        In *Daubert,* the Supreme Court held that the district court has a "gatekeeping" function

6    "of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the

7    task at hand." 509 U.S. 579, 597 (1993). There is no dispute that Nettesheim's opinions are

8    relevant.

9        As to the reliability prong of the *Daubert* test, *Kumho* later clarified that "the test of

10   reliability is 'flexible.'" 526 U.S. 137, 141 (1999). "The objective of [the gatekeeping]

11   requirement … is to make certain that an expert, whether basing testimony upon professional

12   studies or personal experience, employs in the courtroom the same level of intellectual rigor that

13   characterizes the practice of an expert in the relevant field." *Id.,* at 152.

14       As a general rule, however, questions relating to the bases and sources of an expert's

15   opinion affect only the *weight* to be given an expert's opinion rather than its admissibility, and

16   such consideration should be left to the jury. *See Dorn v. Burlington N. Santa Fe R.R. Co.,* 397

17   F.3d 1183, 1196 (9th Cir. 2005) (finding district court erred in excluding expert witness

18   testimony). Indeed, it is axiomatic that "[t]he rejection of expert testimony is the exception rather

19   than the rule." Fed. R. Evid. 702, Advisory Committee Notes. Ultimately, while there should be

20   no doubt that Nettesheim's opinions are admissible, any "[d]oubts regarding the admissibility of

21   expert testimony should be resolved in favor of its admission." *Blakely v. Anesthetix of Iowa*,

22   P.C., No. 04-3031, 2006 US Dist. Lexis 97179, at *8 (N.D. Iowa, Feb. 27, 2006).

23           **2.      Defendants Do Not Challenge Nettesheim's Qualifications To Render
                       Her Opinions**
24

25       Nettesheim's testimony and opinions are reliable because they are grounded in her

26   substantial knowledge, experience, and training, which Defendants do ***not*** challenge (nor could

27   they challenge given her background summarized above).

28

1    Instead, as shown below, Defendants focus their attacks on Nettesheim's conclusions. But

2  Defendants' disagreements with Nettesheim's judgments do not afford a basis for a *Daubert*

3  challenge or excluding evidence regarding her opinions. Instead, Defendants' challenges

4  properly go to the weight of the evidence, not its admissibility. *Campbell v. Metropolitan Prop.*

5  *and Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (citing *Daubert*, 509 U.S. at 595) ("The focus

6  [of the admissibility inquiry], of course, must be solely on principles and methodology, not on the

7  conclusions that they generate."). As such, Nettesheim's opinions are entitled to consideration.

8        **B.    Nettesheim's Opinions Regarding Loss Causation Are Reliable**

9    Defendants devote a substantial portion of their brief to leveling two challenges to

10  Nettesheim's opinions on loss causation. In particular, they argue that (1) Nettesheim could not

11  reliably opine that loss causation occurred in this case because she assumed the truth of Plaintiff's

12  allegations, that his allegations are based purely on certain of Situ's specific claims concerning

13  missing and unusable inventory, and that those claims have not been substantiated; and (2) she

14  fails to account for negative, confounding information that may have caused the residual price

15  drops of the ADSs. Neither challenge has merit.

16        **1.    Nettesheim's Conclusions Concerning The Fact Of Loss Causation Are**

17               **Well-Founded**

18    In their lead argument Defendants protest that Nettesheim's opinion on the fact of loss

19  causation must be excluded because she purportedly "merely accepts Plaintiff's allegations of

20  loss causation as true." Defs.' Br. at 4:18-19. Defendants thus contend "Nettesheim's opinion

21  provides no support" for the proposition that Plaintiff "suffered an economic loss when the

22  'relevant truth' about alleged misrepresentations was disclosed." *Id.* at 4:21-23. Defendants

23  further argue that Nettesheim could not have found a causal connection between the decline in the

24  prices of LDK's securities on October 3-4, and 8, 2007 and the disclosure of a "relevant truth"

25  because the only thing newly disclosed on those days were charges leveled by former LDK

26  controller Situ concerning discrepancies in the amount and quality of inventory reported by the

27  Company that have not been substantiated. Finally, Defendants dismiss as "euphemistic"

28  Plaintiff's broader claims and Nettesheim's opinion that the matters disclosed in early October

1   were partial corrective disclosures revealing that LDK was engaged in the accounting

2   improprieties alleged in the Complaint.

3       As a preliminary matter, Defendants' arguments are flatly inconsistent with their prior

4   arguments in this matter, and directly contrary to the law of the case.  They are in every sense

5   frivolous, as they have been specifically rejected by the Court on numerous occasions and are

6   directly contrary to controlling law.  *See In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 532 (N.D.

7   Cal. 2009) (Order Re Motion For Class Certification, filed on January 28th, 2009, at p. 17

8   (Docket Number 177)) ("Defendants' claim that 'plaintiff cannot identify any corrective

9   disclosure' is not only unsupported by the record but is contradicted by defendants' own

10  arguments."); *see also* Order Denying Defendants' Motion to Dismiss, filed on May 29th, 2008,

11  at pp. 23-24 (Docket Number 85) (finding the complaint adequately alleged loss causation based

12  on declines in LDK's stock price after October 3, 2007 disclosure).   Nevertheless, Plaintiff

13  addresses the merits of these rejected arguments yet again.

14      Defendants' arguments are predicated on a mischaracterization of Nettesheim's analysis

15  as well as a distortion of Plaintiff's allegations and complete ignorance of the matters actually

16  disclosed on the pertinent October 2007 dates.   They are also premised on the incorrect

17  proposition that a disclosure must "mirror" the misrepresented or concealed matter in order to be

18  deemed a corrective one as to which a stock price decline may be attributed (even though, to a

19  large extent, such  "fact-for-fact" disclosure did actually occur here, which Defendants simply

20  ignore).  Accordingly, Defendants' argument provides no basis for the Court to find fault with

21  Nettesheim's expert judgment that requisite loss causation is present in this case.   This is

22  especially true given that disputes about loss causation turn primarily on questions of fact.  *See*

23  *Wortley v. Camplin*, 333 F.3d 284, 295 (1st Cir. 2003).

24      First, Defendants' assertion that Nettesheim "merely accepts Plaintiff's allegations of loss

25  causation as true" is flat wrong, and deliberately obscures the distinction between her

26  assumptions and conclusions.  Nettesheim did *not* assume the fact of loss causation, but rather

27  concluded that it occurred in this case only after she conducted a comprehensive, independent

28  analysis to determine the same.  *See* Nettesheim Decl., ¶¶9-11, Ex. 1, ¶¶18-54, 123-129 (and

appendices and exhibits) and Ex. 2, ¶¶6-13. Nettesheim did assume the truth of Plaintiff's allegations that LDK made misrepresentations and omissions concerning its inventory, and accounting practices and reporting with respect thereto. *Id.*, Ex. 1, ¶1. This, however, is hardly remarkable, as these matters (essentially making legal judgments as to liability) were not within the scope of her engagement and are outside the purview of the opinions that financial economists render. *See id.*, Ex.2, ¶8.[5] Indeed, experts routinely make such assumptions.

Second, Defendants' argument that the October 3 and 8, 2007 disclosures did not and could not reveal a "relevant truth" about a matter previously alleged to have been misrepresented is predicated on two interdependent fallacies, and a blatant misreading of controlling law. The first one is Defendants' erroneous suggestion that Plaintiff's fraud allegations are confined to the specific matters charged by Situ who, according to Defendants, was wrong when he said that LDK was missing tons of silicon raw material from its inventory. *See* Defs. Br. at 4:24-5:2. But Plaintiff's fraud claim is far more expansive than what Defendants depict in their motion. It is not limited to allegations that LDK's inventory was missing; Plaintiff alleges in his complaint, *inter alia*, that LDK had engaged in improper inventory accounting practices that artificially decreased LDK's reported cost of goods sold, making the Company appear more profitable than it actually was (*see* Consol. Complaint, ¶¶41-47); represented that its financial statements had been prepared in accordance with GAAP principles, when they had not been, as LDK had failed to account for its inventory at the lower of cost or market (*id.*, ¶¶48-47, 88-95); and asserted that its favorable results were achieved through effecting cost reductions and advancements in its production process when, in fact, such cost savings were based on its misstatement of the costs of good sold (*id.*, ¶¶98-103).[6]

---

[5] Of course, Plaintiff's claims are supported by substantial evidence, including other expert testimony, as shown in Plaintiff's parallel brief and the related papers opposing Defendants' summary judgment motion filed herewith. Thus, among many other things, the testimony of Plaintiff's accounting expert, Stuart Harden, provides more than an adequate foundation for Nettesheim's assumptions about Defendants' GAAP violations and other improper accounting practices.

[6] Given the broad scope of the fraud Plaintiff actually alleged in his complaint, there is no merit to Defendants' repeated pejorative statements in their motion to the effect that Plaintiff and his expert have "abandoned" or "shifted away" from Plaintiff's allegations, or engaged in "demonstration of loss causation by euphemisim."

Having mischaracterized Plaintiff's allegations, Defendants proceed to argue (largely based on their own expert's subjective judgment[7]) that the information disclosed on October 3 and 8, 2007, could not be deemed to constitute "corrective disclosures" as they "revealed nothing more than Situ's unsubstantiated claims" and therefore cannot provide the causal connection necessary to establish loss causation. *See* Defs.' Br. at 5:4-10. But this construct is similarly fallacious. In effect, defendants are contending that there must be a "one-to-one" correlation between the corrective disclosure and the alleged misrepresentation, or that the disclosure and the misrepresentation must 'mirror' each other. To establish loss causation, however, a plaintiff need only show a causal connection "between a decline in the price of a security, and the revelation of the truth that the defendant's misrepresentation or omission concealed."[8] *See*, *e.g.*, *In re Motorola Securities Litig.*, 505 F.Supp.2d 501, 535-36 (N.D. Ill. 2007). In order for a disclosure to give rise to loss causation it need *not* "mirror" or correspond "fact-for-fact" with the misrepresentation. *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F.Supp.2d 352, 363 (S.D.N.Y. 2009); *accord, Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229 (5th Cir. 2009). It is sufficient that that "risk of the [loss-inducing] event occurring 'was within the zone of risk *concealed* by the misrepresentations and omissions.'" *Vivendi*, 634 F.Supp.2d at 363 (quoting *Lentell v. Merrill Lynch*, 363 F.3d 161, 173 (2d Cir. 2005)).

As *Vivendi* explains, it is important to distinguish carefully between the misrepresentation/omission, the risk of loss created by the misrepresentation/omission, and the event that materializes the concealed risk and triggers the loss. So long as the event triggering the loss is within the zone of risk created by the misrepresentation/omission, loss causation is satisfied. *Id.* Here, LDK's misrepresentations and omissions regarding its inventory accounting methods and regarding its improper calculation of costs of goods sold created a foreseeable risk

---

[7] As discussed *infra*, Defendants' expert Lehn has staked out the extreme (and legally unsupportable) position that essentially the only thing that constitutes a corrective disclosure is an admission by a company that it committed fraud. *See* Declaration of Christopher T. Heffelfinger in Support of Lead Plaintiff's Opposition to Motion to Exclude Testimony and Reports of Jane D. Nettesheim ("Heffelfinger Decl."), filed herewith, Ex. C at pp. 40:23-43:10, 57:22-59:2, 61:11-22.

[8] Plaintiff also refers the Court to the authority on loss causation cited in Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

1   that the stock price would decline in response to reports questioning the accuracy of LDK's

2   inventory, and thus the accuracy of LDK's costs.  The October events questioned the accuracy of

3   LDK's inventory and inventory accounting and thus fall within the zone of risk created by the

4   earlier misrepresentations and omissions, even if more information about the true state of LDK's

5   inventory and accounting methods emerged later.  Thus, Nettesheim concluded following an

6   extensive analysis set forth in her reports that the October disclosures were revelatory as to

7   Plaintiff's allegations that LDK had been engaged in accounting improprieties relative to

8   inventory.  *See* Nettesheim Decl., Ex. 1, ¶¶9, 18-54.[9]

9        Moreover, the October disclosures *did* substantially correspond to Situ's allegations on a

10   "fact-for-fact" basis.  The sequence of disclosures unfolded as follows.  First, Situ stated, *inter*

11   *alia*, in his September 25, 2007 email to LDK's board, the SEC and the NYSE the "fact that there

12   is little good feedstock for the production although the paper number is tremendous[.]"  *See*

13   Exhibit H to the Declaration of Jack Lai (filed on January 8, 2010 as Docket Number 344).  Next,

14   the Piper Jaffray report of October 4 acknowledged Situ's departure from LDK and allegations

15   and noted that "polysilicon accounting is important because its consumption directly affects cost

16   of goods sold and profitability."  Heffelfinger Decl., Ex. J.  Then, the Barron's article of October

17   8 confirmed and expanded on the serious problems with LDK's inventory.  For example,

18   Barron's reported that LDK's inventory may have been over-valued because it included high

19   quantities of unusable scrap.  Heffelfinger Decl. Ex. K ("There may be good stuff in that pile of

20   silicon, but that doesn't mean it's worth what LDK's balance sheet says.").

21        In short, in view of Plaintiff's *actual* allegations, Nettesheim's conclusion that there was a

22   causal connection between the massive declines in the price of LDK's securities and the October

23   disclosures remains a reliable expert judgment.  "For an event to qualify as a materialization of

24

25   _____
[9] As Nettesheim explains in her Reply Report, Defendants misleadingly "attempt to portray

26   Plaintiff's case as an assemblage of accounting practices to be analyzed individually, and . . .
avoid[] the fundamental issue of whether Defendants concealed the Company's true earnings

27   capacity." Nettesheim Decl., Ex. 2, ¶15.  Thus, Defendants obfuscate the fundamental issue,
which is "whether Defendants concealed the Company's true earnings capacity." *Id.* Moreover,

28   "[s]ophisticated market participants understand the relationship between reported inventories and
costs of goods sold and operating profits." *See* Nettesheim Decl., ¶13.

1   the risk, it need only disclose part of the truth that was previously concealed by the fraud."

2   *Vivendi*, 634 F.Supp.2d at 364.

3       Indeed, Defendants' entire argument that *all* of the "relevant truth" must be disclosed is

4   based on a misreading of *Dura* by their purported expert.  *Dura* contains no such requirement,

5   and merely held that a Plaintiff must prove that the fraud proximately caused his loss.  *Dura*

6   *Pharms., Inc. v. Bruodo*, 544 U.S. 336, 342 (2005).  More strikingly, Defendants' purported

7   expert, Lehn, has advocated a completely unsupportable and anti-investor rule that would require

8   any disclosure not only to be objectively true, but that it must be "validated" by an admission by

9   the company that the disclosure is in fact correct.[10]  Lehn's position, boiled down to its essence, is

10  that so long as a company continues to deny it committed fraud, loss causation can never be

11  established.[11]    *See* Heffelfinger Decl., Ex. C at pp. 40:23-43:10, 57:22-59:2, 61:11-22.

12  Fortunately for investors everywhere this pro-fraud postulate is not, and has never been, the law.

13      The Court must therefore reject Defendants' first challenge to Nettesheim's loss causation

14  analysis, namely, their contention that Plaintiff's expert has not and cannot come to a reliable

15  judgment regarding the fact of loss causation.[12]  Defendants may disagree with Nettesheim's

16  opinion that there was loss causation on October 3-4 and 8, 2007.  They cannot, however, contend

17

18

19  [10] Lehn also suggested that a conviction by the SEC could also validate a disclosure, but was not
    able to conceive of any other "validation" other than a direct admission.  *See* Heffelfinger Decl.,
20  Ex. C at p. 58:2-25.

21  [11] This is *precisely* why this position has been condemned and explicitly rejected by controlling
    authority that Defendants fail to cite.  *See, e.g., In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407,
    1422 (9th Cir. 1994); *Alaska Elec. Pension Fund*, 572 F.3d at 230.
22
    [12] In this respect, it bears mention that, as this Court has already recognized during the class
23  certification phase, in order to establish loss causation, Plaintiff need only establish that at least a
    portion of the loss was caused by Defendants' fraud.  *See* Order Denying Defendants' Motion to
24  Dismiss, Dkt. No. 85 (May 29, 2008), at 24; *see also In re LDK Solar Sec. Litig.*, No. C 07-05182
    WHA, 2008 WL 4369987, *3 (N.D. Cal. Sept. 24, 2008). "A plaintiff is not required to show
25  'that a misrepresentation was the *sole* reason for the investment's decline in value' in order to
    establish loss causation."  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (quoting
26  *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n. 5 (11th Cir. 1997) (emphasis added by
    *Daou*)).  "[A]s long as the misrepresentation is one substantial cause of the investment's decline
27  in value, other contributing forces will not bar recovery under the loss causation requirement" but
    will play a role "in determining recoverable damages."  *Id.* Here, after taking into account
28  confounding factors, Nettesheim has concluded that 100% of the residual decline is related to the
    fraud.

1   that Nettesheim's methodology or approach was unreliable so as to warrant the exclusion of her

2   testimony on this matter.

3           **2.      Nettesheim's Analysis Properly Accounts For Negative Confounding
                       Information**
4

5           Defendants' assertions that Nettesheim failed to parse out the effects that negative

6   confounding information may have had on LDK's stock price on October 3 and 8, 2007 and

7   instead "simply assumed that 100 percent of the residual price drops . . . were related to the

8   alleged fraud" (*see* Defs. Br. at 8:4-9) are pure fiction.  Nettesheim's reports and testimony

9   demonstrate that, as part of her event study, she underwent an incredibly detailed day-by-day

10  review of all public information and releases disclosed or available to the market precisely to

11  determine not just that the releases on the above dates constituted partial corrective disclosures,

12  but also to assess the existence and effects, if any, of negative, confounding information.  *See*

13  Nettesheim Decl., ¶¶10, 14, Ex. 1, ¶¶23-54 and Ex. 2, ¶¶17-43.  In other words, Nettesheim did

14  precisely what Defendants claim she was required to do – she analyzed all of the available

15  information on each of the relevant days to determine whether that news explained the movement

16  of LDK's securities' prices.

17          As part of this process, Nettesheim considered the *very* information Defendants variously

18  but falsely argue she failed to "parse out," "ignored" or "overlooked."  *See id.*; *see also*

19  Nettesheim Decl., ¶14 ("I examined and responded to each of the pieces of information purported

20  by Defendants to be negative and confounding (including, among other items, information related

21  to LDK's polysilicon ramp schedule, increased furnace availability, manufacturing quality

22  problems, double and triple orders of polysilicon, the solar stock "bubble," and "headline risk"

23  [and] concluded that the information proffered by Defendants is not new, not material or is, in

24  fact relevant to the allegations in this matter and therefore not confounding.").

25          It is therefore not surprising that, when examined closely, Defendants' real gripe, once

26  again, is with Nettesheim's conclusions, not her process.  But this is not a basis to disqualify

27  Nettesheim.

28

### a.  October 3 – Nettesheim Fully Considered The Information In The Piper Jaffray Report

Defendants unabashedly argue that "Nettesheim improperly ascribes the entire residual decline in LDK's stock price on October 3 to the revelation of Situ's allegations by Piper Jaffray . . . and ignores the impact of other negative information disclosed in the Piper Jaffray report."  Defs.' Br. at 8:17-20.  Defendants expand on this by describing two matters that Nettesheim purportedly "did not consider" or "overlooked," *i.e.*, decreased confidence in LDK's polysilicon ramp schedule and increased competition due to better access of its new competitors to DSS furnaces."  *Id.* at 8:21-10:6.  Defendants' argument is simply wrong.

Nettesheim *did* specifically consider the ramp schedule, as shown by *both* of her reports.  *See* Nettesheim Decl., Ex. 1, ¶¶44-45 and Ex. 2, ¶¶18-30.  As described therein, she concluded that the "statements in the October 3 Piper Jaffray report regarding LDK's ability to ramp polysilicon production in 2009 . . . was not new news, and that such information was previously well-known and industry wide."  *See*, *e.g.*, *id.*, Ex. 2, ¶19.  Moreover, this conclusion was reached only after Nettesheim considered a host of materials, which are described in abundant detail in her reports.  *Id.*, Ex. 1, ¶¶29-31, 41-46 and Ex. 2, ¶¶19-30.

Defendants' claim that Nettesheim "ignored" the impact of information concerning LDK's competitors' access to furnaces is likewise bogus.  Once again, it is indisputable that Nettesheim *did* consider this very information, which Defendants necessarily concede in their argument.  *Id.*, Ex. 1, ¶44 and Ex. 2, ¶31.  It was only after she considered other information which had been disseminated to the market that she concluded that the information on this subject in the Piper Jaffray Report was neither new nor unique to LDK.  *Id.*  That Defendants disagree with Nettesheim's conclusion is no reason to exclude Plaintiff's expert's opinion.

### b.  October 8 – Nettesheim Fully Considered The Information In The *Barron's* Article

Defendants also fault Nettesheim for "attribut[ing] the entire residual decline on October 8, following the publication of an article in *Barron's*, to allegation-related information."  Defs.' Br. at 10:17-18.  Their spin here is that Nettesheim supposedly "merely assumes, based on

1   information from counsel, that the [information contained in] *Barron's* article . . . was new."

2   *See* Defs.' Br. at 10:17-20.  In fact, Nettesheim did not make the referenced assumption; the

3   deposition testimony Defendants cite for this proposition demonstrates no such thing.[13]  What

4   Nettesheim's reports and deposition testimony actually show is that she reviewed the whole

5   article and concluded it contained either new related corrective information or no negative,

6   confounding information.  Heffelfinger Decl., Ex.A at p. 176:14-25; *see also* Nettesheim Decl.,

7   Ex. 1,  ¶¶47-54 and Ex. 2, ¶¶35-42.

8        Moreover, the record amply demonstrates that Nettesheim considered each *specific* item

9   in the article that Defendants discuss in their brief.  *See* Nettesheim Decl., ¶14.  Once again,

10  Defendants' real problem is with Nettesheim's conclusions.  They essentially arrogate that simply

11  because her judgments came out differently than Defendants' expert, there must be something

12  wrong with her analysis.  But again, this disagreement between the parties provides no grounds

13  for Defendants to invoke *Daubert*.

14       As to the information Defendants falsely claim Nettesheim merely "assumed" was newly

15  revealed in the *Barron's* article, they first argue that the article merely restated information that

16  had already been disclosed to the market by former controller Situ, and therefore was not new and

17  did not account for the drop in the price of LDK's securities on that date.  Defs. Br. at 11:2-13.  In

18  fact, while the article made mention of Situ's disclosures, it was far more expansive.  *See*

19  Nettesheim Decl., Ex. 1, ¶¶47-53 and Ex. 2, ¶36.  Thus, as Nettesheim concluded, it provided,

20  *inter alia*, new information that further corroborated allegations that LDK was engaged in

21  improper inventory accounting.  *Id*., Ex. 1, ¶52 and Ex. 2, ¶36.  Moreover, such information was

22  based explicitly on information *Barron's* had learned from someone other than Situ -- "someone

23  with knowledge of LDK's manufacturing" who questioned the Company's inventory -- and there

24  was no indication that the statements in the article by the person "with knowledge of LDK's

25  manufacturing" or the details quantifying the amount of inventory alleged to be overstated were

26  ---

[13]  The Nettesheim testimony Defendants cite as support for the assertion that Nettesheim
27  "assumed" the information in the *Barron's* article was new *actually* concerned Nettesheim's
    "understanding" about the relationship the quality of wafers has to the allegations in the complaint.
28  *See* Declaration of Meghna Subramanian, filed on January 8, 2010 as Docket Number 376,
    ("Subramanian Decl."), Ex. 1 at 176:22-179:5.

known to the market prior to the release of the *Barron's* article on October 8.  *Id.*[14]  And, in any event, the simple fact that new analysis was done by *Barron's* is sufficient to show loss causation.

The Court must also reject Defendants' claim that Nettesheim "ignores negative, confounding information in the *Barron's* article about manufacturing problems," and simply assumed this "new information is related to Plaintiff's allegations."  *See*  Defs. Br. at 11:14-12:4.  Again, Nettesheim neither ignored this information nor simply assumed it was new.  *See* Heffelfinger Decl., Ex. A at p. 176:14-25; Nettesheim Decl., ¶14, Ex. 1, ¶52 and Ex.2, ¶37.  Also, Nettesheim understood that LDK's ability to produce wafers to specifications related to the quality of the silicon inventory, but she did *not* "assume" the relationship of these "quality problems" to Plaintiff's allegations.  Rather it was her judgment that they were related because such problems bore on the Company's misleading accounting practices, and (as reflected by the very deposition Defendants cite) it was her *opinion* that the information regarding quality was new.  *See id.*, Ex. 2, ¶37; *see also* Subramanian Decl., Ex. at 179:8-15.

Conversely, Defendants argue, based on their expert's subjective judgment and false description, that information in the *Barron's* article regarding double and triple ordering was new.  Defs. Br. at12:5-14.  Because the sales deals had previously been publicly released Nettesheim disagrees.  *See* Nettesheim Decl., ¶14 and Ex. 2, ¶39.  Defendants' position is not advanced by their claim that Nettesheim misses the point because supposedly the article "characterized [the previously announced sales contracts] as nefarious" and suggested the contracts "were a sham."  In fact, it did not.  *See* Heffelfinger Decl., Ex. K.

Defendants' final assault regarding Nettesheim's evaluation of the items in the *Barron's* article, concerns its mention of the China solar industry as a potential "bubble."   They contend information concerning this matter also constituted new, confounding information.  Defs.' Br. at 12:15-27.   Once again, as set forth in her reports, Nettesheim considered this very information, and based on her review of numerous articles that had been published prior to the *Barron's* article, and from at least June 2007, concluded that the notion that the Chinese solar industry was

---

[14] Upon reviewing the testimony Defendants proffer, the Court will also see that Defendants have fabricated their assertion that Nettesheim admitted the impact of the information in the article had already been reflected in LDK's stock price.

a potential "bubble" was not new to the market.  *See* Nettesheim Decl., ¶14, Ex. 1, ¶53, and Ex. 2, ¶40.

In sum, Nettesheim's judgments with respect to the *Barron's* article are both reliable and based on her proper application of event study methodology.

### c.   Nettesheim Fully Considered "Headline Risk"

Defendants argue that Nettesheim's analysis was also defective because she supposedly did "not consider the impact of headline risk" (as they define that term by referring to an internet site) even though -- they claim -- she "admitted that great uncertainty and market paranoia about LDK existed" after Situ's revelations.  Defs. Br. at 13:2-10.   Defendants' contentions are flat wrong.  In fact, Nettesheim *did* consider the possibility of such risk (*see* Nettesheim Decl., ¶14 and Ex. 2, ¶43), and she did *not* make the admission Defendants falsely attribute to her.  In fact, nowhere in the deposition testimony they cite is there an admission of any kind by Nettesheim, let alone a reference to either "great uncertainty" or "paranoia."   Rather, Nettesheim simply acknowledged that in single analyst report out of many she *did* consider, there was mention of "*some* uncertainty" in the market.

Defendants' own expert, Lehn, reveals that their argument is a straw man.  He opines in his report that "it is likely that some of the decline in LDK's stock price was caused by so-called "headline risk" or "collateral damage," and, of course, he faults Nettesheim for failing to attempt to quantify such items.  *See* Declaration of Kenneth Lehn (filed on January 8, 2010 as Docket Number 354), Ex. A, ¶¶122-123.  But when pressed at *his* deposition, he admitted that he hadn't done any calculations or analysis himself to determine whether the price of LDK's securities was impacted by such risk or damage.  *See* Heffelfinger Decl., Ex. C at 235:5-18. More significantly, he could not recall ever having undertaken such an analysis himself in *any* case, and at best could only say he knew "someone" who purportedly had "attempted to" perform a scientific analysis to determine the impact of headline risk in some unspecified matter.  *See id.* at 236:14-25.

In these circumstances, Nettesheim's ultimate judgment that "headline risk" was not relevant to her analysis is hardly remarkable, especially because, as she testified, LDK had immediately come out and denied Situ's allegations.  *See* Subramanian Decl., Ex. 1 at pp. 201:20-

202:3.[15]   In sum, Nettesheim's loss causation analysis and conclusions are fully reliable and admissible.  She properly conducted an event study that allowed her to determine the impact of news related specifically to LDK on LDK's share price by adjusting the share price movements to remove the impact of price changes caused by developments affecting the market as a whole, or LDK's industry generally.  The event study confirmed what common sense suggests:  that the October 2007 disclosures "caused the price of the LDK [shares] to decline significantly."  *See* Nettesheim Decl., ¶9 and Ex. 1, ¶9.[16]

### C.   Nettesheim's Damage Estimates Are Reliable

#### 1.   Nettesheim's Inflation Per Share Damage Calculations Are Based on Well-Accepted Methodologies

Defendants take Nettesheim to task that her estimates of per-share inflation in LDK's stock price are unscientific and unreliable.  Defs' Br. at 14.  This is incorrect.  Nettesheim employs, alternatively, a constant-dollar and a constant-percentage method of estimating inflation in securities class actions, both of which are consistent with the literature on this matter.[17]  Not

---

[15] The single case Defendants cite on this subject, *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162 (4th Cir. 2007), which does not even mention "headline risk," is patently distinguishable. There, the court affirmed a dismissal of an investor's complaint for numerous reasons, including based on its finding that loss causation could not be alleged because the earlier lawsuit filed by the company's former founder and CEO to which the investor attributed the stock price decline did not contain any allegations "relating to" the "round-trip" transactions at the heart of the investor's complaint or any new facts. *Id.* at 187-88.  Thus, the court concluded that the decline could only be attributable to discord and a disruption of operations that a lawsuit by a company's former founder and CEO would create.  Here, in contrast, the October disclosures clearly related to the accounting fraud alleged by Plaintiff and constituted new information, as Nettesheim has opined and as discussed above.

[16] Plaintiff's brief filed contemporaneously herewith in opposition to Defendants' parallel summary judgment motion sets forth additional reasons why the Court should reject Defendants' position on loss causation (and provides further explanation why, given the facts of this case, Defendants' position on this subject is not advanced by the authorities on which they rely).

[17] *See e.g.*, Janet Cooper Alexander, "The Value of Bad News in Securities Class Actions," 41 UCLA L. Rev. 1421, August 1994 (discussing both constant-dollar and constant-percentage methods), Heffelfinger Decl. Ex. D; Bradford Cornell and Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases, 37 UCLA L. Rev. 883, 899, June 1990 (using constant percentage approach), Heffelfinger Decl. Ex. E; Jon Koslow, "Estimating Aggregate Damages in Class-Action Litigation under Rule 10b-5 for Purposes of Settlement," 59 Fordham L. Rev. 811, April 1991 (discussing constant-percentage method), Heffelfinger Decl. Ex. F; David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA Working Paper, 6 July 2002 (discussing both constant-dollar and constant-percentage methods, and stating: "…it is not always clear whether a certain disclosure is better modeled as constant percentage or constant dollar inflation."), Heffelfinger Decl. Ex. G;

1   surprisingly, Defendants proffer no alternative methodologies to calculate per-share inflation in

2   their motion to exclude Nettesheim's reports and testimony, and their purported expert on

3   damages issues has offered no alternatives either.

4          In her report, Nettesheim discusses at length the difference between the presumptions

5   underlying the constant-percentage method and constant-dollar method and economic

6   implications of using these methods. *See* Nettesheim Decl., ¶16 and Ex. 1, ¶¶65-74. Nettesheim

7   also explains at length in her report how, historically, the constant-percentage method has been

8   widely used as the most appropriate method of estimating damages in situations where the fraud

9   concerns the operations of the firm, as is the case with respect to the allegations regarding LDK,

10  in that damages are the amount caused by the fraud. Nettesheim Decl., ¶16. Nettesheim states

11  that "[i]in the few securities cases that have gone to trial, I understand that both of these methods

12  have been used." *Id.*, ¶16, fn. 32.

13              **a.      The Constant-Percentage Method Is Appropriate**

14         In challenging Nettesheim's inflation estimates under the constant-percentage method as

15  unreliable, Defendants argue that the 44.9% inflation in LDK's stock price estimated by

16  Nettesheim results in an increase in inflation of LDK's stock price on any day in which the stock

17  price was higher than before for reasons unrelated to the fraud. Defs.' Br. at 15. This is simply

18  misleading. Defendants attempt to illustrate their challenge by comparing LDK ADS purchases

19  on August 30, 2007 (when the stock price was $48.16, and Nettesheim's estimate of price

20  inflation is $21.63, or 44.9%) to purchases on September 26, 2007 (when the stock price was

21  $73.95, and Nettesheim's estimate of price inflation is $33.21, or 44.9%), where the stock is sold

22  on October 8, 2007. *Id.*; *see also* Nettesheim Decl., ¶20 and Ex. 1, ¶¶65-79 and exhibit 7B.

23         As explained in the Nettesheim Report, the share price is made up of the real share price

24  absent the fraud (the "true value" of the share), plus an additional dollar value created by the

25  fraud (the "inflation"). Nettesheim Decl., ¶20 and Ex. 1, ¶66. Here, according to Nettesheim,

26  because operating costs of the company are alleged to have been understated by the

27  misrepresentations, it is economically reasonable to conclude that both parts of LDK's share

28  ──────────────────────────────────────────────

Nettesheim Decl., ¶16, fn. 31, Ex. 1, ¶66-67, and Ex. 2, ¶56, fn. 68.

[C-07-5182-WHA(BZ)] LP MEM IN OPP TO DEFS' MTN TO EXCLUDE EVIDENCE

price, the true value and the inflation, are similarly influenced by market, industry and company-specific events.  Nettesheim Decl., ¶20.  As is the case here, when misrepresentations are related to understating the costs of the business (and thereby misrepresenting the true operating profits of the business) then market and industry conditions and changes in investor sentiment about LDK will change the amount of the price inflation caused by the alleged fraud.  *Id.*, Ex. 1, ¶¶65-79; Heffelfinger Decl., Ex. B at pp. 62:16-68:24.  In this case, on September 26, while the price of LDK stock was higher than it was on August 30, the inflation was also higher.  *See* Nettesheim Decl., ¶20 and Ex. 1, exhibit 7B.  Accordingly, and contrary to Defendants' contentions, the reason why an investor on September 26 would recover more damages than the investor on August 30 under the constant-percentage method is because the inflation in the price of LDK stock was higher on the later date.  *Id.*

Defendants also challenge the constant-percentage methodology on the grounds that the price inflation on some dates during the Class Period exceeds the total dollar drop on dates of corrective disclosures ($30.90). Defs' Br. at 16.  This only occurs on four days (September 25-28, 2007), Nettesheim Decl., ¶21, which days are, perhaps not coincidentally, the four on which LDK's shares reached their all-time highs while Defendants did not disclose Situ's September 25 email.  Here, Defendants do not complain when the price inflation from the constant-percentage methodology is substantially less than the total dollar drop, as it is on most days in the Class Period. *Id*. Again, according to Nettesheim, it is economically reasonable to conclude that the price inflation during the Class Period would be affected by market, industry and company-specific events, such that the dollar amount of price inflation during the Class Period could be more or less than the dollar amount of the price inflation on dates of corrective disclosures, due to changes in the market, industry and company-specific events that will affect the value of the fraud portion of the LDK stock.  *See id*., ¶20.

### b.   The Constant-Dollar Method Is Appropriate

Regarding the constant-dollar method, Defendants contend that this method produces nonsensical results, as the total dollar drop in the price of LDK's stock price on dates of the corrective disclosures ($30.90) may exceed the stock price on a given day earlier in the Class

1    Period.  *See* Defs' Br. at 14.  Nettesheim did recognize and account for this fact in her analysis by

2    limiting the inflation per share to the share price. Nettesheim Decl., Ex. 1, ¶77. That adjustments

3    might have to be made to the constant-dollar methodology in certain circumstances does not

4    invalidate the methodology.   The specific example cited by Defendants illustrates only that

5    certain issues may arise from using the constant-dollar method of estimating price inflation when

6    the alleged fraud is related to the purported operations of the firm and that therefore the amount of

7    price inflation would be expected to vary with changes in the security price due to market,

8    industry and company-specific events.  Nettesheim Decl., ¶19 and Ex. 1, ¶¶ 65-74, 77.

9                           **c.**      **The Inflation Methodologies Go To Weight Not Admissibility**

10                Regardless of which methodology is used, provided an expert's opinion is relevant and

11   reliable, it should not be excluded.  *Dorn,* 397 F.3d at 1196 ("[T]he authority to determine the

12   victor in . . . a battle of the expert witnesses is properly reposed in the jury.") (quoting *Humetrix,*

13   *Inc. v. Gemplus, S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001)); *RMED Int'l Inc. v. Sloan's*

14   *Supermarkets, Inc.*, No. 94 - 5587, 2000 U.S. Dist. LEXIS 3742, at *7, *35-36 (S.D.N.Y. Mar.

15   24, 2000); *Breidor v. Sears Roebuck & Co.*, 722 F.2d 1134, 1138-39 (3d Cir. 1983) ("Where there

16   is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is

17   to be determined by the jury, not the trial judge").   Thus, the appropriate means of attacking

18   Nettesheim's judgments and applications is through "[v]igorous cross-examination [or]

19   presentation of contrary evidence" by their own expert, not exclusion.  *See Daubert*, 509 U.S. at

20   596; *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (stating that "[A]

21   party confronted with an adverse expert witness who has sufficient . . . facts and assumptions as

22   the basis for his opinion can highlight those weaknesses through effective cross-examination").

23                **2.**      **Nettesheim Uses A Conservative Trader Model To Estimate The**
                             **Number of Damaged Shares**
24

25                Nettesheim's multi-trader model is generally accepted in the field of estimating damages

26   in securities class actions. Nettesheim Decl., ¶¶24-28 and Ex. 2, ¶¶59-63.  The multi-trader model

27   employed by Nettesheim is consistent with the available empirical evidence and trading behavior,

28   the error rate can be quantified, and the underlying theory is more widely accepted than

1    alternative models.  Nettesheim Decl., ¶28 and Ex. 2, ¶63.  For example, Nettesheim's multi-

2    trader model is generally considered more conservative than a single trading model.  Nettesheim

3    Decl., ¶24.  Also, other courts have accepted this model.  *See e.g.,* Nettesheim Decl., ¶¶26-27 and

4    Ex. 2, ¶¶59-66; *In re Homestore.com, Inc. Sec. Litig.*, Master File No. 01-CV-11115 RSWL CWx

5    (Docket Number 715; Decl. 17, 2004) (Heffelfinger Decl., Ex. H) (Denying defendants' motion

6    *in limine* to exclude Nettesheim's aggregate damages opinion and holding: "The testimony of

7    Plaintiffs' Damages Expert Jane Nettesheim is admissible under Federal Rule of Evidence 702.

8    [Defendant's] motion raises issues of the weight of the evidence**"**); *In re Oxford Health Plans,*

9    *Inc. Sec. Litig.*, MDL 1222 (CLB), 244 F. Supp. 2d 247, slip op. at 4 (S.D.N.Y. March 6, 2003)

10   (Heffelfinger Decl., Ex. I)  ("[t]he arguments concerning aggregate damages estimate and

11   proportional trading model go to the weight of the evidence, not its admissibility") (citing

12   *Campbell*, 239 F.3d at 184); *see also In re Cendant Corp.*, 109 F. Supp. 2d 235, 266-267 (D.N.J.

13   2000); *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 U.S. Dist. LEXIS 2215, at

14   *14  (S.D.N.Y. Feb. 17, 2005) (admitting a proportional trading model and noting that such a

15   model has survived repeated *Daubert* challenges in other cases).

16            **3.       Nettesheim's Regression Analysis Is Reliable and Accepted**

17            Defendants also challenge Nettesheim's regression analysis on the basis that she

18   purportedly changed data sets in a manner that supported her theory, data-mined the control

19   period, and cherry-picked companies for her industry index.  Here again, the appropriateness of

20   the variables Nettesheim used go to weight, not admissibility.  *See Bazemore v. Friday*, 478 U.S.

21   385, 400 (1986) ("failure to include variables will affect the analysis' probativeness, not its

22   admissibility").  In any case, none of these challenges has any merit.[18]  Moreover, at its core, this

23   attack on Nettesheim's regression analysis is much ado about nothing since if Nettesheim were to

24   use Defendants' regression results for company-specific returns on October 3, 4 and 8, 2007, *i.e.*,

25   those generated by Dr. Lehn, there would essentially be no difference. Nettesheim Decl., ¶8 and

26

27   ───────────────────

28   [18] In her Reports, Nettesheim addresses each of these contentions.  Nettesheim Decl., Ex. 1, App.
     A, ¶¶3, 4, 15-40 and Ex. 2, ¶¶70-72.

     [C-07-5182-WHA(BZ)] LP MEM IN OPP TO DEFS' MTN TO EXCLUDE EVIDENCE          - 22 -

Ex. 2, ¶¶73-74. This is so, according to Nettesheim, because the estimate of the total price inflation in the LDK ADS using Dr. Lehn's results is 44%, compared to 44.9% in her report. *Id.*

As a preliminary matter, Nettesheim uses regression analysis to determine the dates on which the daily return on the price of LDK ADSs is significantly different from the return which would have been expected based on the returns on a market index and on an industry index of comparable companies to or competitors of LDK, and on the correlation of LDK ADS returns with market and industry returns. Nettesheim Decl., Ex. 1, App. A, ¶1. Put another way, regression analysis is simply a statistical tool used by economists to estimate the relationship between two or more variables. *Id.*, Ex.1, App. A, ¶2. Here, the regression is used to measure the relationship between the daily LDK ADS returns (the dependent variable) and (1) daily changes in market-wide factors (independent variable) that would be expected to impact all stocks in a particular industry, and (2) daily changes in industry-wide factors (independent variable) that would be expected to impact all stocks in a particular industry. *Id.*

A period of time over which to estimate the regression equation, a control period, must be selected. *Id.*, Ex.1, App. A, ¶3. *See id.*[19] As Nettesheim explains, she used a four-month control period (from June 11, 2007 through September 28, 2007) overlapping with the Class Period instead of a control period preceding the Class Period because there was no trading in LDK ADSs prior to the start of the Class Period. *Id.* Further, as Nettesheim explains, "[b]ecause the alleged corrective statements occur in early October 2007, it is appropriate to use a control period that ends prior to October 2007. *Id.*, Ex.1, App. A, ¶3. Nettesheim further explains in her Report why she cannot use a control period after the Class Period. *Id.*, Ex.1, App. A, ¶4 ("it is incorrect to use the statistical relationship measured during the period affected by the revealed alleged fraud because changes in the statistical relationship may be the result of the disclosures of the alleged fraud"). *Id.* Nettesheim further explains that the control period she used appropriately models the normal relationship between LDK ADS returns and the returns on a market index and an industry index, and appropriately estimates the normal volatility in LDK ADS residual returns. *Id.*

---

[19] A more detailed description of this calculation is provided in Appendix A to the Nettesheim Report (*i.e.*, Nettesheim Decl., Ex. 1).

1    Defendants' suggestion that Nettesheim manipulated data sets by using a data set different

2    from the NYSE in order to support her theory that news on October 4, 2007 caused a statistically

3    significant stock price movement is frivolous. Defs.' Br. at 18.  As Nettesheim explains, the

4    market index she used is a market capitalization weighted composite of all stocks traded on the

5    NYSE, American Stock Exchange ("Amex"), and NASDAQ (the NYSE/Amex/NASDAQ

6    composite index, or "NAN"), and that the NAN is a broad-based market index commonly used by

7    economists as a representation of the market and the data are provided by the Center for Research

8    in Securities Prices at the Graduate School of Business, University of Chicago ("CRSP").

9    Defendants' expert used the same market index in his analysis.  Lehn Decl., Ex. A, App. A, ¶5;

10   Nettesheim Decl., ¶4.

11   Defendants' challenge as to the selectivity of companies Nettesheim included in her

12   industry index is also without merit.  Nettesheim explains her selection of the companies she used

13   in the industry index: "Companies considered for the industry index include those that are

14   referred to in analysts' reports as competitors or comparables to LDK, companies listed as

15   competitors in LDK's SEC filings, and constituents in certain industry peer groups." Nettesheim

16   Decl., Ex. 1, App. A, ¶6.  Again, as stated above, the choices Nettesheim made for her use in the

17   industry index go to weight, not admissibility.

18   Here, Defendants' criticisms are largely aimed at one date, October 4, 2007, and whether

19   or not this date is statistically significant. Defs.' Br. at 18-19.  However, as Nettesheim states,

20   "the large price movement of the LDK ADSs on October 3, 2007 alone demonstrates loss

21   causation with respect to the disclosures regarding the alleged discrepancies in the Company's

22   accounting for polysilicon inventory."  Nettesheim Decl., ¶7.  This, notwithstanding the decline in

23   the price of ADSs on October 4, 2007, was relatively large and relevant to loss causation.  As

24   Nettesheim describes in her report, stock prices move in response to information.  *Id.*, Ex. 1, ¶95.

25

26

27

28

1    **V.    CONCLUSION**

2           For all of the foregoing reasons, the Court should deny in its entirety Defendants' motion

3    to exclude evidence and arguments relating to Nettesheim's opinions on loss causation and

4    damages.

5    Dated: January 21, 2010                         **BERMAN DeVALERIO**

6

7                                                    By:   /s/ Christopher T. Heffelfinger
                                                          Christopher T. Heffelfinger

8                                                    Joseph J. Tabacco, Jr.
                                                     Christopher T. Heffelfinger
9                                                    Anthony D. Phillips
                                                     **BERMAN DEVALERIO**
10                                                   One California Street, Suite 900
                                                     San Francisco, CA  94111
11                                                   Telephone: (415) 433-3200
                                                     Facsimile:  (415) 433-6382
12
                                                     *Liaison Counsel for the Class*
13
                                                     **COHEN MILSTEIN SELLERS**
14                                                   **& TOLL PLLC**
                                                     Herbert S. Milstein
15                                                   Joshua S. Devore
                                                     Matthew B. Kaplan
16                                                   1100 New York Avenue, N.W.
                                                     West Tower, Suite 500
17                                                   Washington, DC 20005-3964
                                                     Telephone: (202) 408-4600
18                                                   Facsimile:  (202) 408-4699

19                                                   *Lead Counsel for the Class*

20

21

22

23

24

25

26

27

28