Joseph J. Tabacco, Jr. (SBN 75484)
jtabacco@bermandevalerio.com
Christopher T. Heffelfinger (SBN 118058)
cheffelfinger@bermandevalerio.com
Anthony D. Phillips (SBN 259688)
aphillips@bermandevalerio.com
**BERMAN DeVALERIO**
One California Street, Suite 900
San Francisco, CA  94111
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382

*Liaison Counsel for the Class*

Herbert E. Milstein
hmilstein@cohenmilstein.com
Joshua S. Devore
jdevore@cohenmilstein.com
Mathew B. Kaplan
mkaplan@cohenmilstein.com
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC  20005-3964
Telephone: (202) 408-4600
Facsimile:  (202) 408-4699

*Lead Counsel for the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LDK SOLAR SECURITIES LITIGATION | Master File No. C-07-05182-WHA |
| | **DECLARATION OF JANE D. NETTESHEIM IN SUPPORT OF LEAD PLAINTIFF'S OPPOSITION TO MOTION TO EXCLUDE TESTIMONY AND REPORTS OF JANE D. NETTESHEIM** |
| This Document Relates To: | |
| ALL ACTIONS. | Date: February 11, 2010 |
| | Time: 8:00 a.m. |
| | Judge: Hon. William H. Alsup |

1

**Table of Contents**

2

3    I.      Background ................................................................................................. 1

4    II.     Summary Of Methodologies Used For Loss Causation And Damages Analyses And
5           Responses to Defendants' Motion .............................................................. 1

6                  A.      Defendants' Criticisms Of My Event Study And Regression Analysis Are
                           Unfounded; Use Of Dr. Lehn's Regression Analysis Does Not Change The
7                          Measure Of Price Inflation Or Damages In Any Meaningful Way ...................... 2

8                  B.      Defendants Mischaracterize My Analysis Of Loss Causation And Distort
                           Plaintiff's Allegations ............................................................................. 5
9

                   C.      Extensive And Comprehensive Analyses Demonstrate That Defendants
10                         Incorrectly Assert That There Were Non-Allegation Related Factors That May
                           Have Contributed To The Decline In The Price Of The LDK ADSs On Dates Of
11                         Corrective Disclosures .......................................................................... 7

12
                   D.      The Measures Of Price Inflation In The Nettesheim Report Are Reasonable And
13                         Well-Established ................................................................................. 8

14                 E.      The Trading Model Used In The Nettesheim Report Is Reliable And Has Been
                           Accepted By Courts ............................................................................ 12
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  JANE D. NETTESHEIM declares:

2  **I.      Background**

3        1.      This declaration is submitted in support of Lead Plaintiff's Opposition To Motion

4  To Exclude Testimony And Reports Of Jane D. Nettesheim.[1]   In response to Defendants'

5  Motion, in this declaration I summarize the methodologies used in formulating my opinions on

6  loss causation and damages contained in my previous reports and testimony in this matter.[2,3]   I

7  also provide the bases for those opinions.  I am not offering any new opinions at this time.

8  Because Defendants challenge the reliability of my methodologies, I have provided some

9  additional legal and academic references to further illustrate that my opinions are widely-

10  recognized in the academic literature and in securities litigation, and are based on sound

11  economic theory.

12  **II.     Summary Of Methodologies Used For Loss Causation And Damages Analyses And
          Responses to Defendants' Motion**

13

14        2.      Defendants seek to exclude my opinions on loss causation and damages, claiming

15  they are unreliable.[4]   However, Defendants have selectively quoted from the Nettesheim Report,

16  from the Nettesheim Reply Report and the Nettesheim December 2009 Deposition, which has

17  distorted my analysis and ignored much of my analysis.  I have responded to virtually all of

18  Defendants' criticisms of my opinions in my reports and testimony in this matter.

19

20  [1]  Herein, Defendants' Notice of Motion and Motion to Exclude Evidence and Argument
    Regarding Jane D. Nettesheim's Opinions on Loss Causation and Damages, dated January 7,
21  2010, is referred to as "Defendants' Motion."  The Expert Report of Jane D. Nettesheim, dated
    October 29, 2009 is referred to as the "Nettesheim Report."  The Expert Reply Report of Jane D.
22  Nettesheim, dated November 19, 2009 is referred to as the "Nettesheim Reply Report."  My
    deposition testimony on December 2, 2009 is referred to as the "Nettesheim December 2009
23  Deposition."

24  [2]  This declaration does not summarize my qualifications or my analysis of market efficiency and
25  materiality, as it is my understanding that Defendants do challenge these matters in their motion.

26  [3]  A summary of my relevant background and qualifications, including my curriculum vitae and
    list of testimony, are provided in the Nettesheim Report, ¶¶1, 2, Exhibits 1, 2.

27  [4]  Defendants' Motion, p. 1.

28

3.      It is important to note that judgment plays an important role in applying statistical methods, decision making, developing models and performing analyses.  There may be different models with different attributes, that are based on sound economic theory, and that serve equally well in solving an economic problem.  This notion is widely acknowledged in the academic literature.[5]

A.      **Defendants' Criticisms Of My Event Study And Regression Analysis Are Unfounded; Use Of Dr. Lehn's Regression Analysis Does Not Change The Measure Of Price Inflation Or Damages In Any Meaningful Way**

4.      I conducted an event study analysis to determine whether material news concerning LDK promptly caused a measurable price reaction in the LDK ADSs after accounting for general market and industry effects.[6]  As discussed below, the event study also was used to identify corrective disclosures and to isolate the effect of that information on the price of the ADSs.[7]  In the event study process, I conducted a regression analysis (a statistical tool commonly used by economists) to disentangle the effects of company-specific information from the effects of market and industry information on the price of the LDK ADSs.  The market index I used is a broad-based market index commonly used by economists as a representation of

---

[5] *See*, *e.g.*, Chow, Gregory C., Econometrics, 1983, McGraw-Hill, Inc., p. 1:

> Econometrics is the art and science of using statistical methods for the measurement of economic relations.  In the practice of econometrics, economic theory, institutional information, and other assumptions are relied upon to formulate a statistical model, or a set of statistical hypotheses, to explain the phenomena in question.  ….  A good econometrician uses sound judgment to bring the relevant knowledge in economics to bear in formulating a useful model. …

> Given a set of requirements in the construction of a building, two good architects will come up with two different designs.  Both may serve the purposes well.  Similarly, given the same objectives, two econometricians are not likely to come up with two identical models, but both may capture the essential elements of the problem sufficiently to be useful.

[6] Nettesheim Report, ¶¶123–129, Appendix A, Exhibits 13–16.

[7] Nettesheim Report, ¶¶18–54.

1  the market, and is the same market index used by Defendants' expert in this matter.[8] I evaluated

2  many companies (more than 100) for use in an industry index, including those that are referred to

3  in analysts' reports as competitors or comparables to LDK, companies listed as competitors in

4  LDK's SEC filings, and constituents in certain industry peer groups.[9] I chose a control period

5  for my regression analysis that appropriately models the normal relationship between the LDK

6  ADS returns and the returns on the market index and the industry index, and appropriately

7  estimates the normal volatility in the LDK ADS residual returns.[10]

8         5.      As discussed in the Nettesheim Report, the event study methodology I used is the

9  same methodology I and others have used in other securities litigation,[11] and is the same

10  methodology that was used in two cases that went to trial.[12] This methodology is described in

11  the relevant literature.[13]

12

13  [8] The market index used in the Nettesheim Report and in the report of Dr. Kenneth Lehn is the
    Nasdaq/Amex/NYSE ("NAN") market capitalization weighted index. (Nettesheim Report,

14  Appendix A, ¶5; Expert Report of Kenneth Lehn, PhD, dated November 12, 2009, Appendix A,
    ¶5)

15  [9] Nettesheim Report, Appendix A, ¶¶6–8.

16  [10] Nettesheim Report, Appendix A, ¶¶3–4. A description of the regression analysis used for this
    event study is provided in Appendix A to the Nettesheim Report. The analysis and results of the

17  event study are included in Exhibits 13, 14, 15 and 16 to the Nettesheim Report.

18  [11] For example, I used the same event study methodology where the class was certified: *In Re
    Homestore, Inc. Securities Litigation*, United States District Court for the Central District of

19  California, Western Division, Master File No. 01-CV-11115 RSWL CWx; *In Re Vivendi
    Universal, S.A. Securities Litigation*, United States District Court, Southern District of New

20  York, 02 Civ. 5571 (RJH) (HBP).

21  A colleague of mine at SCG used the same methodology: *In Re Enron Corporation Securities
    Litigation*, United States District Court, Southern District of Texas, Houston Division, Civil

22  Action No. H-0103624 (Consolidated). [The class was certified by the district court but later

23  reversed on appeal because in that particular case, "secondary actors (such as the investment
    banks involved in this case [which were the remaining defendants]) who act in concert with

24  issuers of publicly-traded securities in schemes to defraud the investing public cannot be held
    liable as primary violators of Section 10(b) or Rule 10b-5."]

25
    [12] For example, the same event study methodology was used by another SCG expert in the *In Re
26  WorldCom, Inc. Securities Litigation*, United States District Court, Southern District of New
    York, 02 Civ. 3288 (DLC). (The class was certified and the case proceeded to trial; a settlement
27  was reached during trial and therefore there was no verdict.)

28  *Footnote continues on next page...*

6.      Defendants challenge certain aspects of my regression analysis and event study.[14] In the Nettesheim Report and Nettesheim Reply Report, I extensively discuss my basis for selecting the market index and companies included in the industry index and why the control period I used is appropriate in this matter.  I have addressed each of Defendants' criticisms.[15]

7.      Defendants' criticisms are largely aimed at one date, October 4, 2007, and whether or not this date is statistically significant.  However, the large price movement of the LDK ADSs on October 3, 2007 alone demonstrates loss causation with respect to the disclosures regarding the alleged discrepancies in the Company's accounting for its silicon inventory.  This notwithstanding, the decline in the price of the ADSs on October 4, 2007 was relatively large and relevant to loss causation.[16]

8.      Nevertheless, as also discussed in the Nettesheim Reply Report, use of Defendants' expert Dr. Lehn's regression analysis does not change conclusions pertaining to price inflation and damages.  If I use Dr. Lehn's regression results for the company-specific returns on October 3, 4 and 8, 2007, there is essentially no difference because the estimate of the

---

This same SCG expert who testified at trial in 2009 used the same event study methodology *In Re Vivendi Universal, S.A. Securities Litigation*, United States District Court, Southern District of New York, 02 Civ. 5571 (RJH) (HBP).

[13] *See* Nettesheim Report, Appendix A, ¶¶11, 14, citing: Mitchell, Mark L. and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *Business Lawyer*, 49, 545; Eisenhofer, Jay W., Geoffrey C. Jarvis and James R. Banko, "Securities Fraud, Stock Price Valuation, and Loss Causation: Toward A Corporate Finance-Based Theory of Loss Causation," 59, *Business Lawyer*, August 2004, pp. 1425–1426, 1445; and Marais, M. Laurentius and Katherine Schipper, "Event Study Methods: Detecting and Measuring the Security Price Effects of Disclosures and Interventions," in *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2004 Cumulative Supplement, edited by Roman L. Weil, Michael J. Wagner and Peter B. Frank, pp. 17A-2, 17A-18–19.

[14] Defendants' Motion, pp. 17–18.

[15] Nettesheim Report, Appendix A, ¶¶3, 4, 15–40; Nettesheim Reply Report, ¶¶70–72.

[16] The z-score for October 4, 2007 is -2.08, which is very close to -1.96, the critical value for statistical significance at the 95% confidence level.  (Nettesheim Declaration, Exhibit 12.)  Thus, small changes to the regression analysis could result in small changes to this z-score such that it would not reach the critical value.

- 4 -

total price inflation in the LDK ADS using Dr. Lehn's results is 44.0%, compared to 44.9% in my report.  If I use Dr. Lehn's regression results for the company-specific returns on October 3 and 8, there is no difference because the total price inflation using Dr. Lehn's results is 40.4%, compared to 40.4% in my report.  Because the price inflation calculated using Dr. Lehn's company-specific returns is essentially the same as the price inflation in the Nettesheim Report, aggregate damages calculated using the methodology put forth in the Nettesheim Report, but using Dr. Lehn's company-specific returns would yield virtually the same aggregate damages as in the Nettesheim Report.[17]

> **B.     Defendants Mischaracterize My Analysis Of Loss Causation And Distort Plaintiff's Allegations**

9.     My analysis of loss causation includes an extensive analysis of the false and misleading statements regarding LDK's financial condition, specifically its raw material inventories and cost of goods sold, and I identify corrective disclosures during and immediately following the Class Period pertaining to LDK's true cost of goods sold that caused the price of the LDK ADSs to decline significantly.  The scope of that review is detailed in my report.[18] These disclosures corrected alleged false or misleading information, or revealed information that was allegedly wrongly omitted, during the Class Period, regarding the Company's accounting for its silicon raw material inventories.  I reviewed extensively all of the available news and analyst reports surrounding each of these disclosures.  I explained analysts' concerns regarding LDK's cost of goods sold (which directly impacted operating costs and thereby operating profits).  I describe how the LDK ADS price reacted to those disclosures and the analysis and commentary that followed certain disclosures.  I determined that such corrective disclosures explain the company-specific stock price declines on certain dates, specifically, October 3, 4 and 8, 2007.

10.     I specifically considered that there could have been other negative or confounding news on these dates; however, after an extensive and comprehensive examination of all of the

---

[17] Nettesheim Reply Report, ¶¶73–74.

[18] Nettesheim Report, ¶¶18–54, 123–129.

1  information available to me, I did not identify any other new, negative, company-specific news

2  that would have materially contributed to the company-specific stock price declines on these

3  dates.  Thus, the company-specific decline in the price of LDK ADSs on each of these dates was

4  caused by information that partially corrected prior alleged misstatements and omissions,

5  specifically related to the Company's accounting for silicon inventory.

6      11.    Misleadingly, Defendants state that I assume that the information disclosed on

7  October 3–4 and October 8 was corrective of the alleged misrepresentations.[19]    However,

8  Defendants neglect to differentiate between my assumptions and my conclusions.  As I state in

9  the Nettesheim Reply Report, while I have assumed Plaintiff's allegations are true,[20] I have

10  conducted an independent analysis of loss causation in this matter.[21]  My damages estimates are

11  not based on my own assessment of the alleged fraud or the underlying truth.  I have not offered

12  an opinion as to whether the allegations at issue are factually correct and I am not qualified to do

13  so.

14      12.    Defendants argue that the October 3–4, and 8 disclosures did not reveal the

15  relevant truth about any accounting-related allegations that LDK improperly used the weighted

16  average cost method to calculate cost of goods sold and that it did not state its inventory at the

17  lower of cost or market.  They argue that such disclosures were rumors that revealed only the

18  "risk" for fraud.[22]  As I describe, Defendants' argument avoids the fundamental issue of whether

19  Defendants concealed the Company's true earnings capacity (by understating cost of goods sold)

20  as Plaintiff alleges.[23]  If the jury determines that LDK's accounting for silicon inventory served

[19] Defendants' Motion, pp. 4–5.

[20] I provide my understanding of the allegations in ¶8 to the Nettesheim Report.

[21] Nettesheim Reply Report, ¶¶6–13; *See also*, Nettesheim Report, ¶8 "… I have **concluded** that the information disclosed on October 3–4 and October 8, 2007 regarding poor internal controls at the Company and alleged errors in its accounting for silicon inventory, was corrective of the alleged misrepresentations and omissions in this matter." [Emphasis added.]; and ¶¶18–54 (section entitled "Loss Causation").

[22] Defendants' Motion, pp. 5, 6.

[23] Nettesheim Reply Report, ¶¶14–16.

- 6 -

1   to overstate the value of the Company's silicon raw material inventory, understate its cost of

2   goods sold, and thereby overstate its operating earnings as Plaintiff alleges, my estimates of price

3   inflation and damages remain valid and informative.

4          13.    Defendants appear to ascribe to market participants no financial or accounting

5   knowledge or wherewithal when they assert that I "cannot provide any evidence that the market

6   recognized a relationship between the event disclosed and these hindsight applications of

7   GAAP."[24]   Sophisticated market participants understand the relationships between reported

8   inventories and cost of goods sold and operating profits.  In fact, during the Class Period, almost

9   all of the LDK analyst reports emphasized the importance of the Company's raw material costs,

10  production costs, and cost of goods sold.[25]

11  **C.    Extensive And Comprehensive Analyses Demonstrate That Defendants**
        **Incorrectly Assert That There Were Non-Allegation Related Factors That**
12      **May Have Contributed To The Decline In The Price Of The LDK ADSs On**
        **Dates Of Corrective Disclosures**
13

14         14.    Defendants' claim that I "failed to consider the impact of negative confounding

15  information" on dates of corrective disclosures, and that I "assumed that 100% of the residual

16  share price drops [] were related to the alleged fraud."[26]  This is false.  I conducted an extensive

17  and comprehensive analysis of the information disclosed on dates of corrective disclosures, and I

18  determined that all of the new material company-specific information on these dates is related to

19  the allegations in this matter.[27]  I examined and responded to each of the pieces of information

20  purported by Defendants to be negative and confounding (including, among other items,

21  information related to LDK's polysilicon ramp schedule, increased furnace availability,

22  manufacturing quality problems, double and triple orders of polysilicon, the solar stock

23

24  [24] Defendants' Motion, p. 7.

25  [25] *See, e.g.*, Piper Jaffray, "Management Defends Financials; Ind Audit Pending; Some Risk
    'Priced In'," October 4, 2007.
26
    [26] Defendants' Motion, p. 8.
27
    [27] Nettesheim Report, ¶¶29–54.
28

1    "bubble," and "headline risk").  I concluded that the information proffered by Defendants is not

2    new, not material or is, in fact, relevant to the allegations in this matter and therefore not

3    confounding.[28]   While Defendants may disagree with my conclusions, they are wrong in their

4    assertion that I did not consider such effects.

5        D.    **The Measures Of Price Inflation In The Nettesheim Report Are Reasonable
              And Well-Established**

6

7    15.    I determined the amount of price inflation in LDK's ADS by examining the ADS

8    price reaction to the corrective disclosures related to information about LDK's true cost of goods

9    sold that occurred near the end of and immediately following the Class Period.  I used those price

10   reactions to estimate the price inflation in the ADSs on all days during the Class Period.[29]

11   16.    In securities litigation, a variety of methodologies are available for measuring

12   stock price inflation due to fraud.  In this matter, I have calculated price inflation using both a

13   "constant-percentage method" and a "constant-dollar method."  I have discussed at length the

14   difference between and the presumptions underlying the constant-percentage method and

15   constant-dollar method and the economic implications and appropriateness of using these

16   methods.[30]  I have also explained how historically, the constant-percentage method has been

17   widely used as the most appropriate method of estimating damages in situations where the fraud

18   concerns the operations of the firm, as is the case with respect to the allegations regarding LDK,

19   in that damages are the amount misappropriated by the fraud and only by the fraud, *i.e.*, damages

20   cannot include losses due to non-fraud-related effects on the securities' prices.  However, the

21   courts must define recoverable damages under securities law, and, as a result, I have been asked

22   by Counsel to calculate per-share inflation using both the constant-dollar measure of inflation

23   and the constant-percentage measure of inflation.  The methods I use to measure price inflation

24

25   ───────────────

26   [28] Nettesheim Report, ¶¶44, 45, 53; Nettesheim Reply Report, ¶¶17–43.

     [29] Nettesheim Report ¶61.

27   [30] Nettesheim Report, ¶¶65–74.

28

are consistent with the literature on this matter.[31]  In the few securities litigation cases that have gone to trial, I understand that both of these methods have been used.[32]

17.    The inflation in the various series of LDK call and put options were calculated based on the estimated true value of the underlying ADSs absent the fraud, for both the constant-dollar and the constant-percentage method, using the Black-Scholes option pricing model, a widely-used and well-accepted financial model for valuing options.[33]

---

[31] *See e.g.*, Janet Cooper Alexander, "The Value of Bad News in Securities Class Actions," 41 *UCLA L. Rev.* 1421, August, 1994 (discussing both constant-dollar and constant-percentage methods); Bradford Cornell and Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA L. Rev.* 833, June 1990 (discussing constant-percentage method); Jon Koslow, "Estimating Aggregate Damages in Class-Action Litigation Under Rule 10b-5 for Purposes of Settlement," 59 *Fordham L. Rev*, 811, April, 1991 (discussing constant-percentage method); David Tabak, "Inflation and Damages in a Post-*Dura* World," NERA Working Paper, September 25, 2007 (discussing both constant-dollar and constant-percentage methods);  David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases," NERA Working Paper, July 2002 (discussing both constant-dollar and constant-percentage methods); John Finnerty and George Pushner, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," 8 *Stan. J.L. Bus. & Fin.*, 213, Spring, 2003 (discussing constant-percentage method).

[32] In the *JDS Uniphase* trial, Plaintiff's expert was permitted to testify as to both percentage and constant dollar methodologies.  *In re JDS Uniphase Corp. Sec. Litig.*, No. C 02-1486 CW, U.S. District Court for the Northern District of California; *see* Document 1861-3, completed Verdict Questions Form, November 27, 2007, p. 3.

In the *Household International* trial, Plaintiff's expert testified as to both a constant-dollar method and an index method with a cap ("leakage model"); the jury chose the leakage method. *Lawrence E. Jaffe Pension Plan v. Household International, Inc.*, no. 02-cv-08893 U.S. District Court for the Northern District of Illinois; *see* Document 1611, completed Verdict Form, dated May 7, 2009, pp. 41, 89–95 and trial transcript, pp. 2666, 2854–5.

In the *Vivendi* matter currently in trial in New York, the court found that the constant-percentage method could be sensibly used, and was not necessarily contrary to *Dura*—but that it was precluded by Second Circuit precedent.  (*In Re Vivendi Universal, S.A. Securities Litigation*, United States District Court, Southern District of New York, 02 Civ. 5571 (RJH) (HBP), Order dated August 12, 2009, pp. 7-9.)  No challenge was made to the constant-dollar methodology, and figures based on it were used at trial.

[33] Nettesheim Report, ¶¶83–88.  *See*, *e.g.*, "Option Valuation," in Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments*, 8th ed., McGraw-Hill/Irwin, 2009, ch. 21,  pp. 715–748.

18.     Defendants argue that both of the methods I use to estimate per-share price inflation for the LDK ADSs (the constant-dollar and the constant-percentage method) are not reliable.[34]  However, they proffer no alternative.

19.     Regarding the constant-dollar method, Defendants claim that the constant-dollar method produces nonsensical results because the total dollar drop in the price of the ADSs on dates of corrective disclosures may exceed the stock price on a given day earlier in the Class Period.  I explain at length the difference between and the presumptions underlying the constant-percentage method and constant-dollar method.  I also explain how this case illustrates certain issues that arise from using the constant-dollar method of estimating price inflation when the alleged fraud is related to the reported operations of the firm and therefore the amount of price inflation would be expected to vary with changes in the security price due to market, industry and company events.[35]

20.     Regarding the constant-percentage method, Defendants misleadingly attempt to argue that Class members would recover damages for reasons unrelated to the fraud.[36]  As explained in the Nettesheim Report, the share price is made up of the real share price absent the fraud (the "true value" of the share), plus an additional dollar value created by the fraud (the "inflation").  In this case, because operating costs of the company are alleged to have been understated by the misrepresentations, it is economically reasonable to conclude that both parts of the firm's share price—the true value and the inflation—are similarly influenced by market, industry and company-specific events.[37]  Contrary to statements by Defendants, the reason why an investor on a particular date would recover more (or less) damages than an investor on

---

[34] Defendants' Motion, p. 14.

[35] Nettesheim Report, ¶¶65–74, 77.

[36] Defendants' Motion, ¶¶14–15.

[37] Nettesheim Report, ¶¶65–79; Nettesheim December 2009 Deposition, pp. 62–68.

1    another date under the constant-percentage method, is because the inflation in the price of the

2    LDK ADSs was higher (or lower) on that particular date.[38]

3        21.    Defendants complain that under the constant-percentage methodology the price

4    inflation on some dates during the Class Period exceeds the total dollar drop on dates of

5    corrective disclosures ($30.90).[39]    This occurs on only 4 days (September 25–28, 2007).

6    Defendants do not complain when the price inflation from the constant-percentage methodology

7    is substantially less than the total dollar drop, as it is on most days in the Class Period.

8        22.    The price inflation measures the difference between the actual price of the ADSs

9    and the estimated value of the ADSs absent the misrepresentations during the Class Period.  I

10   have calculated damages only if the inflation in the share price had been dissipated as a result of

11   a corrective disclosure.    Damages incurred on shares acquired during the Class Period and

12   retained through the end of the Class Period are equal to the amount of inflation at purchase.  For

13   shares acquired during the Class Period and sold during the Class Period, damages are the price

14   inflation at purchase minus the price inflation at sale.    There are no damages for shares

15   purchased and sold between dates of corrective disclosures.  For shares sold during the Class

16   Period, per-share damages also are limited to actual transaction loss, *i.e.*, per-share damages

17   cannot exceed the difference between the purchase price and the sale price.  The 90-day look-

18   back provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") also was

19   incorporated in the damages calculations.[40, 41]

20       23.    The relevant literature concludes that the method I employed for estimating per-

21   share damages is consistent with generally accepted methods used by experts in securities

22
23   [38] Calculated damages also appropriately incorporate the actual transaction loss and the impact of the PSLRA.

24   [39] Defendants' Motion, p. 16.

25   [40] Nettesheim Report, ¶81.  During the time period when Defendants complain that the price
     inflation from the constant-dollar method exceeds the ADS price, the constraints of the PSLRA
26   limit damages to zero.

27   [41] Nettesheim Report, ¶¶83–88, describing the calculation of damages on the call and put options
     on LDK ADSs.
28

litigation.[42]   Thus, the economic logic and support for my analysis is widely accepted and consistent with sound economic theory.

       **E.**    **The Trading Model Used In The Nettesheim Report Is Reliable And Has Been Accepted By Courts**

      24.    Defendants argue that the trading model I use for estimating aggregate damages is unreliable and not based on peer-reviewed or generally accepted methodologies.[43]   I employed a "multi-trader model" to estimate the number of ADSs damaged and to calculate the aggregate damages to the Class in this action.   The multi-trader model is a version of the "proportional trading model" previously used by damages experts in securities fraud cases which has been enhanced to respond to various criticisms of the proportional trading model.   For example, in the multi-trader model, the daily inflation rate is now applied to the volume of shares traded proportionately by institutional and non-institutional traders and allows for the proportionate holdings of both institutional and non-institutional traders.   Consideration of multi-trader profiles generally provides a more accurate and conservative calculation of the aggregate damages than a single-trader model that is not appropriately specified.[44]

      25.    To calculate aggregate damages, I considered the daily price inflation data along with the reduced reported trading volume, the calculated shares available to trade, an allocation of shares available to trade between institutions and non-institutions according to average holdings during the Class Period, and an allocation of reduced reported trading volume between

---

[42] John Finnerty and George Pushner, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," 8 *Stan. J.L. Bus. & Fin.*, 213, Spring, 2003; Marcia Kramer Mayer, "Best-Fit Estimation of Damages Volume in Shareholder Class Actions: the Multi-Sector, Multi-Trader Model of Investor Behavior," NERA working paper, October, 2000; Bradford Cornell and Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA L. Rev.* 833, June 1990, pp. 885–886; Barclay, Michael and Frank C. Torchio, "A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation," *Law and Contemporary Problems*, Volume 64, Nos. 2&3, Spring/Summer, 2001, p. 106.

[43] Defendants' Motion, pp. 17, 18.

[44] Nettesheim Report, ¶80; Nettesheim Reply Report, ¶¶59, 62, 63.

institutions and non-institutions according to average block versus non-block trading during the Class Period.  All of these inputs to the multi-trader model use data specific to LDK.[45]

26.     The proportional trading model (as well as the multi-trader model) has been utilized in numerous securities fraud cases and admitted after *Daubert* challenges.  For example, I used a similar multi-trader model in the *Homestore.com Securities Litigation*, where the court denied Defendants' motion *in limine* to exclude my aggregate damages opinion, noting that "disagreements about such testimony goes [*sic*] to the weight, rather than the admissibility."[46]

27.     I am informed and believe that in the *Oxford Health Plans, Inc. Securities Litigation* the court denied Defendants' *Daubert* challenge regarding the similar multi-trader model proffered by my colleague at SCG.[47]  I also am informed and believe that in the *WorldCom, Inc. Securities Litigation* a similar multi-trader model was admitted at trial after being subjected to a motion *in limine*.[48]

28.     Additionally, the primary application for aggregate trading models is in securities litigation.  This methodology is not used in finance or economic research or academic study and thus not subject to review or testing in those venues.  However, there is discussion about the application and testing of aggregate trading models in the relevant literature concerning securities litigation.  It is a practical application of statistical techniques which have been generally accepted, tested and subject to peer review.  The relevant literature supports the use of and reliability of generalized multi-trader models, similar to the one I employed in this action,

---

[45] Nettesheim Report, ¶80 and Exhibits 4 and 19.

[46] *In re Homestore.com, Inc. Securities Litigation*, United States District Court for the Central District of California, Western Division, Master File No. 01-CV-11115 RSWL CWx, Order filed December 17, 2004.  (Nettesheim Reply Report, ¶59.)

[47] *In re Oxford Health Plans, Inc. Securities Litigation*, United States District Court for the Southern District of New York, MDL 1222 (CLB), Memorandum and Order, March 6, 2003. (Nettesheim Reply Report, ¶60.)

[48] *In re WorldCom, Inc. Securities Litigation*, United States District Court, Southern District of New York, Master File no. 02 Civ. 3288 (DLC), Opinion and Order dated February 17, 2005. (Nettesheim Reply Report, ¶61.)

1    and the trading data inputs used in my model specific to LDK in the Class Period.[49]  There is

2    literature on trading models in which authors have found certain models to be reasonable

3    approximations of reality.[50]

4          29.    On October 29, 2009, I caused to be submitted my expert report, a true and

5    correct copy of which is attached as Exhibit 1 to this declaration.  On November 19, 2009, I

6    caused to be submitted my expert reply report, a true and correct copy of which is attached as

7    Exhibit 2 to this declaration.  I adopt and incorporate the statements and opinions in those reports

8    as fully set forth in this declaration.

9

10

11

12

13

14

---

15   [49] Jon Koslow, "Estimating Aggregate Damages in Class-Action Litigation Under Rule 10b-5 for
16   Purposes of Settlement," 59 *Fordham L. Rev*, 811, April, 1991; Dean Furbush and Jeffrey W.
     Smith, "Estimating the Number of Damaged Shares in Securities Fraud Litigation: An
17   Introduction to Stock Trading Models," 49 *Bus. Law*, 527, February, 1994; Marcia Kramer
     Mayer, "Best-Fit Estimation of Damages Volume in Shareholder Class Actions: the Multi-
18   Sector, Multi-Trader Model of Investor Behavior," NERA working paper, October, 2000; John
     Finnerty and George Pushner, "An Improved Two-Trader Model for Measuring Damages in
19   Securities Fraud Class Actions," 8 *Stan. J.L. Bus. & Fin.*, 213, Spring, 2003.  (Nettesheim Reply
20   Report, fn. 75.)  *See also*, Janet Cooper Alexander, "The Value of Bad News in Securities Class
     Actions," 41 *UCLA L. Rev.* 1421, August, 1994, pp. 1431–4.

21   [50] William H. Beaver, James K. Malernee and Michael C. Keeley, "Stock Trading Behavior and
22   Damage Estimation in Securities Cases," Cornerstone Research working paper, 1993.  "We
     found that the 'one-trader' model, which is the type of model implicitly used by plaintiffs in
23   many cases, seriously *exaggerated* the size of the class, while a 'two-trader' model [which I used
     here] predicted class size much better."  (at 1, emphasis in original.)

24   Michael Barclay and Frank C. Torchio, "A Comparison of Trading Models Used for Calculating
25   Aggregate Damages in Securities Litigation," *Law and Contemporary Problems*, Volume 64,
     Nos. 2&3, Spring/Summer, 2001, 105–36.  These authors cite to claims data in *In re Health
26   Management, Inc. Securities Litigation* (1999), which indicates that a one-trader model, when
     properly specified, does not overestimate the number of damaged shares.  (Nettesheim Reply
27   Report, fn. 76.)

28

1

2      I declare under penalty of perjury under the laws of the United States of America that

3  the foregoing is true and correct and that this declaration was executed on January 21, 2010 at

4  Redwood City, California.

5

6

7

8  _____

9  JANE D. NETTESHEIM

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28