**BERMAN DEVALERIO**
Joseph J. Tabacco, Jr. (SBN 75484)
Christopher T. Heffelfinger (SBN 118058)
Anthony D. Phillips (SBN 259688)
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: jtabacco@bermandevalerio.com
        cheffelfinger@bermandevalerio.com
        aphillips@bermandevalerio.com

Liaison Counsel for the Class

**COHEN MILSTEIN SELLERS
  & TOLL PLLC**
Herbert E. Milstein
Joshua S. Devore
Matthew B. Kaplan
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005-3964
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: hmilstein@cohenmilstein.com
        jdevore@cohenmilstein.com
        mkaplan@cohenmilstein.com

Lead Counsel for the Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LDK SOLAR SECURITIES LITIGATION | MASTER FILE NO.  C-07-05182-WHA (BZ) |
| | CLASS ACTION |
| This Document Relates To: | **LEAD PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR AN AWARD OF FEES AND EXPENSES AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| ALL ACTIONS. | |
| | Judge:        Hon. William Alsup |
| | Date:         June 17, 2010 |
| | Time:         8:00 a.m. |
| | Courtroom:  9, 19th Floor |

1

2

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED ..................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

I.      INTRODUCTION ........................................................................................ 1

II.     BACKGROUND .......................................................................................... 3

        A.      Lead Counsel and Lead Plaintiff.................................................... 3

        B.      Factual Basis For This Litigation.................................................... 4

        C.      Motion Practice, Discovery And Mediation .................................. 6

III.    ARGUMENT ................................................................................................ 8

        A.      Plaintiff's Counsel Are Entitled to a Fee From the Common Fund
                They Created .................................................................................... 8

        B.      Plaintiff's Counsel Should Be Awarded 13.75% Of The Common
                Fund .................................................................................................. 9

                1.      The Result Achieved Support's The Fee Request ................. 11

                2.      The Difficulty Of This Case And The Contingent Nature
                        Of The Fee Supports The Fee Request .................................. 12

                3.      The Quality Of Representation Supports The Fee Request .... 16

        C.      Plaintiff's Counsel Has Proposed A Reasonable Division Of Fees.... 18

        D.      Plaintiff's Counsel's Expenses Are Reasonable And Were
                Necessary To Achieve the Benefit Obtained For The Class.............. 19

        E.      Lead Plaintiff Should Be Reimbursed For His Time And Expenses ... 22

IV.     CONCLUSION ........................................................................................... 25

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

CASES

5

*Abrams v. Lightolier Inc.*,
   50 F.3d 1204 (3d Cir. 1995)........................................................................................19

6

7
*Adderley v. National Football League Players Ass'n*,
   No. C 07-00943 WHA, 2009 WL 4250792 (N.D. Cal. Nov. 23, 2009) ...............................24

8

*Anixter v. Home-Stake Prod. Co.*,
9   77 F.3d 1215 (10th Cir. 1996) .....................................................................................13

10
*Backman v. Polaroid Corp.*,
   910 F.2d 10 (1st Cir. 1990).........................................................................................13

11

12
*Bateman Eichler, Hill Richards, Inc. v. Berner*,
   472 U.S. 299 (1985)...................................................................................................9

13

14
*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979)........................................................................................13

15

*Boeing Co. v. Van Gemert*,
16   444 U.S. 472 (1980)...................................................................................................8

17
*Cunha v. Hansen Natural Corp.*,
   2009 WL 2029797 (C.D. Cal. July 13, 2009)................................................................23

18

19
*Harris v. Marhoefer*,
   24 F.3d 16 (9th Cir. 1994) .........................................................................................19

20

*Headlands Reserve, LLC v. Center For Natural Lands Mgmt*,
21   523 F. Supp. 2d 1113 (C.D. Cal. 2007) .......................................................................17

22
*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)..................................................................................................11

23

24
*In re Apollo Group, Inc. Sec. Litig.*,
   No. CV 04-2147, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) ...........................13

25
*In re Apple Computer Sec. Litig.*,
   No. C-84-20148, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) ........................14

26

27
*In re Cont'l Ill. Sec. Litig.*,
   962 F.2d 566 (7th Cir. 1992) ......................................................................................10

28

*In re Critical Path, Inc., Sec. Litig.*,
   No. C 01-00551, 2002 WL 32627559 (N.D. Cal. June 18, 2002) (Alsup, J.) ..................10, 18

*In re Heritage Bond Litig.*,
   No. 02-ML-1475, 2005 U.S. Dist. LEXIS 13627 (C.D. Cal. June 10, 2005)........................16

*In re JDS Uniphase Corp. Sec. Litig.*,
   No. C 02-148................................................................................................................13

*In re King Res. Co. Sec. Litig.*,
   420 F. Supp. 610 (D. Colo. 1976) ................................................................................11, 13

*In re MetLife Demutualization Litig.*,
   No. 00 CV 2258, 2010 WL 517389 (E.D.N.Y. Feb. 12, 2010) ............................................24

*In re MicroStrategy Inc. Sec. Litig.*,
   110 F. Supp. 2d 427 (E.D. Va. 2000) .................................................................................24

*In re The Mills Corp. Sec. Litig.*,
   No. 06-cv-0007, 2009 WL 5091931 (E.D. Va. Dec. 23, 2009)............................................17

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2007) ....................................................................10, 11, 12

*In re Prudential-Bache Energy Income P'ships Sec. Litig.*,
   No. 888, 1994 WL 202394 (E.D. La. May 18, 1994)...........................................................13

*In re Quintus Sec. Litig.*,
   No. C-00-4263, 2006 WL 3507936 (N.D. Cal. Dec. 5, 2006)..............................................24

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994) .....................................................................................9, 10, 12

*J. N. Futia Co. v. Phelps Dodge Indus., Inc.*,
   No. 78 Civ. 4547, 1982 U.S. Dist. LEXIS 15261 (S.D.N.Y. Sept. 17, 1982) ........................16

*Kakani v. Oracle Corp.*,
   No. C 06-06493, 2007 WL 4570190 (N.D. Cal. Dec. 21, 2007) (Alsup, J.) ..........................12

*Mashburn v. Nat'l Healthcare, Inc.*,
   684 F. Supp. 679 (M.D. Ala. 1988) ...................................................................................9

*Miltland Raleigh-Durham v. Myers*,
   840 F. Supp. 235 (S.D.N.Y. 1993).....................................................................................19

*Paul, Johnson, Alston & Hunt v. Graulty*,
   886 F.2d 268 (9th Cir. 1989) ..........................................................................................10

*Ressler v. Jacobson*,
   149 F.R.D. 651 (M.D. Fla. 1992).......................................................................................9

*Robbins v. Koger Props. Inc.*,
116 F.3d 1441 (11th Cir. 1997) ...........................................................14

*Sutton v. Bernard*,
504 F.3d 688 (7th Cir. 2007) ...............................................................13

*TBK Partners, Ltd. v. Warshow*,
No. 77 Civ. 972, 1977 U.S. Dist. LEXIS 13597 (S.D.N.Y. Oct. 6, 1977) .............................19

*Trustees v. Greenough*,
105 U.S. 527 (1882)...............................................................................8

*Ward v. Succession of Freeman*,
854 F.2d 780 (5th Cir. 1988) ...............................................................14


**STATUTES**

15 U.S.C. § 78u-4 ....................................................................................23


**OTHER AUTHORITIES**

Arthur Anyuan Yuan, *Enforcing and Collecting Money Judgments in China from a U.S. Judgment Creditor's Perspective*, 36 Geo. Wash. Int'l L. Rev. 757, 758 (2004) ...................15

Donald C. Clarke, *The Enforcement of United States Court Judgments in China: A Research Note* (May 27, 2004) .......................................................................14

Federal Travel Regulations §301-10.125....................................................22

H.R. Conf. Rep. No. 104-369, 1995 U.S.C.C.A.N. ...................................25

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on June 17, 2010 at 8:00 a.m., in Courtroom No. 9, 19th Floor, the Honorable William H. Alsup, United States District Judge presiding, located at 450 Golden Gate Avenue, San Francisco, California, Lead Plaintiff Shahpour Javidzad will move this Court for an order awarding Lead Plaintiff and Plaintiff's Counsel fees and expenses arising from this litigation.  Defendants take no position on this motion.

**STATEMENT OF ISSUES TO BE DECIDED**

1.   Whether Plaintiff's Counsel's request for an award of attorneys' fees should be approved.

2.   Whether Plaintiff's Counsel's request for reimbursement of litigation expenses should be approved.

3.   Whether the proposed allocation of fees between Lead and Li$2,699,725.56ison Counsel should be approved.

4.   Whether Lead Plaintiff's request for reimbursement for his time and out-of-pocket expenses should be approved.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Lead and Liaison Counsel (collectively "Plaintiff's Counsel") respectfully submit this memorandum of points and authorities in support of their request for an award of attorneys' fees of 13.75% of the settlement fund plus their litigation expenses of $2,699,725.56 plus interest at the same rate and for the same period of time as that earned by the settlement fund until paid.[1] The substantial and certain recovery obtained for the Class after some two and a half years of intense litigation—an all cash recovery of $16,000,000.00 plus accruing interest—was achieved through the skill, effort, tenacity, and effective advocacy of Plaintiff's Counsel.

---

[1] Submitted simultaneously with this brief is Lead Plaintiffs' Notice of Motion and Motion in Support of Final Approval of Proposed Settlement and Memorandum of Points and Authorities in Support Thereof (the "Settlement Brief").

Plaintiff's Counsel's efforts to date have been without compensation of any kind and their fee has been wholly contingent upon the result achieved. Plaintiff's Counsel devoted an enormous amount of time and money to this case, which settled less than two months before trial. At the time the parties agreed to the Settlement, discovery—during which Plaintiff's Counsel reviewed millions of pages of documents and took 25 lengthy depositions, most of them in a foreign language and outside the continental United States—had been completed and multiple motions for summary judgment and to strike expert testimony by had been fully briefed.

The requested fee—$2.2 million plus accruing interests—is consistent with the agreement entered into between Lead Plaintiff and Lead Counsel at the beginning of this litigation and is substantially less than both the Ninth Circuit's 25% "benchmark" fee in similar actions and the fee that Plaintiff's Counsel would be entitled to if they charged for their time at their reasonable and customary rates. The amount requested is supported by the extensive efforts of Plaintiff's Counsel in prosecuting this litigation for more than two years in the face of substantial obstacles, the contingent nature of counsel's representation, the substantial risk that counsel would receive little or no fee or reimbursement of its expenses and the favorable result obtained for the Class. In total, Plaintiff's Counsel spent 17,952.5 hours in the prosecution of this litigation, time which, if this were not a contingent fee case, they would have billed for in the total amount of $7,598,381 at their reasonable and customary rates (an amount generally referred to as counsel's "lodestar"). The requested fee, therefore, represents a substantial discount to counsel's lodestar. In order that Lead Counsel and Liaison Counsel are appropriately compensated for their work, Lead Counsel, with the agreement of Liaison Counsel, proposes to allocate 88% of any fees awarded to Lead Counsel and 12% to Liaison Counsel, reflecting counsel's joint assessment of their contributions to this case and their relative risk of loss in the event that this case ended without any recovery for the class.

The $2,699,725.56 in litigation expenses incurred by Plaintiff's Counsel are also reasonable and Plaintiff's Counsel should be reimbursed for them. While substantial, these expenses were necessary to successfully prosecute this case. Similarly, Lead Plaintiff, whose

substantial work on behalf of the Class materially enhanced the recovery of each Class member, should be reimbursed for his expenses and for at least some of the time he spent on this case.

Lead Plaintiff supports Plaintiff's Counsel's fee and expense requests.

## II.   Background

### A.   Lead Counsel and Lead Plaintiff

The Court appointed Shahpour ("Shawn") Javidzad as lead Plaintiff in this case on January 4, 2008.  (Dkt. No. 57.)  In its January 4 Order, and at the January 3, 2008 hearing on the pending lead plaintiff motions, the Court emphasized that it expected Mr. Javidzad to play an active role in this litigation.  Among other things, it instructed Mr. Javidzad to conduct a competition between law firms to determine who should be appointed lead counsel.  (*See* Order at 5 (Mr. Javidzad "should immediately proceed to … to interview appropriate candidates" to serve as lead counsel); Hr'g Tr. 70:11-14, Jan. 3, 2008 ("I want the lead plaintiff to go through the proper drill of analyzing and do this sincerely.  I'd say [he should consider] some three or four candidate law firms").)  In accordance with the Court's instructions Mr. Javidzad sent a request for proposal to four prominent class action securities law firms.  All four firms initially expressed interest in serving as Lead Counsel, but only two responded with formal proposals. (Javidzad Decl. at 1-2, Dkt. No. 62-3 ("Javidzad Decl. I"), Feb. 4, 2008).   Mr. Javidzad recommended that one of those firms, Cohen Milstein Sellers & Toll LLP, serve as lead counsel because of its proposed fee agreement and the qualifications of the firm's attorneys.  (*Id.* at 2.)

Cohen Milstein agreed to take the case in return for Mr. Javidzad's agreement to recommend to the Court that, upon its successful conclusion, Cohen Milstein should be reimbursed for its reasonable expenses and receive, as a fee, "a fixed rate of 12.5% of the recovery no matter how long the case would take, regardless of settling the case or going to trial."  (*Id.*)  Mr. Javidzad also advised the Court that "in order to convince [Cohen Milstein] to agree on this rate" he agreed to ask the Court to award Cohen Milstein up to an additional 2.5% of any total recovery, for a total of 15%, if he believed that Cohen Milstein's performance made such a higher percentage appropriate.  (*Id.*)  Mr. Javidzad now recommends that counsel receive

a fee of 13.75% of the $16 million settlement, $2.2 million.[2]  (*See* accompanying Decl. of Shahpour Javidzad In Supp. Of Proposed Settlement and Proposed Award of Fees and Expenses ("Javidzad Decl. II "), ¶ 16.)  Mr. Javidzad explains that "although I believe that the Plaintiff's Counsel deserves to be awarded the additional 2.5%," the maximum additional amount authorized by the fee agreement, he is recommending only an additional 1.75% because he believes that such a recommendation is in the best interests of the class, which will receive the remainder of the fund after allocation of all fees and expenses.  *(Id.)*

The Court approved the choice of Cohen Milstein on February 8, 2008 (Dkt. No. 64.)  It noted that Cohen Milstein's fee proposal would be given "due weight in the process of approving any fee request later in the case," but that, in making any fee award, the Court would also consider other factors, "including the risk [associated with the litigation]" and other fee proposals that had been "submitted by other counsel" to Lead Plaintiff.  (*Order* at 1-2, Dkt. No. 64, Feb. 8, 2008.)

## B.     Factual Basis For This Litigation

Defendants in this securities class action are LDK Solar Co. Ltd. ("LDK") and several of its officers, directors and subsidiaries.  The allegations which formed the basis of the initial complaints filed in this consolidated matter were largely based on statements sent to the SEC and others by Mr. Charley Situ, LDK's former financial controller.  Mr. Situ alleged a number of inventory accounting irregularities, including, most notably, that 284 metric tons of raw material inventory on LDK's books was missing.  (Consolidated Compl. ¶ 37, Dkt. No. 65, Mar. 10, 2008.)  Mr. Situ, however, refused to cooperate with Plaintiff's Counsel and Plaintiff's Counsel

---

[2] The only other firm to fully respond to Mr. Javidzad's request for proposal proposed the following fee structure:

    25% of any recovery up to $10,000,000.
    20% of any additional recovery from $10,000,000 to $20,000,000.
    15% of any additional recovery from $20,000,000 to $40,000,000.
    10% of any additional recovery from $40,000,000 to $60,000,000.
    6% of any additional recovery over $60,000,000.

Under that fee schedule the amount that Mr. Javidzad might have recommended to the Court would have totaled $3.7 million, over 50% more than the $2.2 million now sought by Plaintiff's Counsel.

1    did not have sufficient evidence to prove that the materials that Situ said were missing were

2    actually missing.  (*See* accompanying Decl. of Herbert E. Milstein ("Milstein Decl.") ¶ 10.)

3            Nevertheless, Plaintiff's Counsel developed a theory of the case based not on missing

4    inventory, but on what Plaintiff's Counsel argued was Defendants improper conduct in

5    intentionally or recklessly understating the value of the raw material that LDK used in

6    production, artificially and substantially decreasing LDK's reported cost of goods sold and

7    increasing its reported profits.  (Milstein Decl. ¶ 12.)  Plaintiff's Counsel advanced this theory

8    during mediation sessions with Defendants, in response to Defendants' summary judgment

9    motions and expected to rely on this theory at trial.  (*Id.*)  As a result of careful review of the

10   millions of pages of mostly Chinese language documents Defendants produced in discovery and

11   by using the information in these documents to painstakingly reconstruct LDK's true accounting

12   and inventory records, Plaintiff's Counsel developed substantial evidence to support this theory.

13   (*Id.*)  Lead Plaintiff's case was, however, almost entirely based on documents and was dependant

14   on being able to convince a jury of abstract accounting concepts.  (*Id.*)  Moreover, Defendants

15   would likely have testified at trial that any accounting errors were not the result of reckless or

16   intentional conduct.

17           Defendants deny that LDK made any accounting errors and assert that an investigation by

18   an independent law firm found that they did nothing wrong.  (*See, e.g.,* Defs.' Summ. J. Mot. at

19   7, Dkt. No. 338, Jan. 7, 2010.)  LDK has never restated any of its financial statements and the

20   SEC closed a preliminary inquiry into the company's accounting after SEC staff received a

21   briefing from the independent law firm that conducted the investigation at LDK.  (Milstein Decl.

22   ¶ 7; Defs.' Summ. J. Mot. at 3.)  Moreover, LDK has substantially all of its assets in China,

23   beyond the jurisdiction of U.S. courts.  LDK, Prospectus (Form F-1) ("LDK Propsectus") at 29,

24   (May 11, 2007.)

25

26

27

28

C.      **Motion Practice, Discovery And Mediation**

There has been extensive motion practice in this vigorously contested case.[3]   For example, on March 10, 2008, after considerable investigation, Lead Plaintiff filed a 46 page Complaint setting out in detail the basis for his case.  (Dkt. No. 65.)  On April 4, 2008 four of the Defendants moved to dismiss the Complaint.  (Dkt. No. 68.)  On May 29, 2008, after briefing and a hearing, the Court denied this motion in its entirety.  (Dkt. No. 85.)  On June 13, 2008 Defendants filed a motion asking the Court to reconsider this decision or to certify it for appeal.  (Dkt. No. 93.)  On July 14, 2008, after briefing, the Court denied that motion in its entirety.  (Dkt. No. 107.)  On May 6, 2008 Lead Plaintiff moved the Court for permission to serve through LDK's California office certain Defendants who were officers or directors of LDK, but who Defendants' counsel asserted were beyond the Court's reach because they resided in China.  (Dkt. No. 76.)  After briefing the Court granted this motion on June 12, 2008.  (Dkt. No. 92.)  On July 21, 2008, after these additional China-based Defendants were served, Defense counsel moved to dismiss the Complaint on behalf of these newly served Defendants.  (Dkt. No. 108.)  After briefing and oral argument the Court denied this motion in its entirety on September 24, 2008.  (Dkt. No. 132.)  On July 21, 2008 Defendants moved to stay discovery.  (Dkt. No. 109.)  The motion was fully briefed but the Court dismissed it as moot when it dismissed Defendants' final motion to dismiss.  (Dkt. No. 132.)  On August 21, 2008 Defendants filed a motion for a protective order which sought a determination that certain documents were privileged and not discoverable.  (Dkt. No. 113.)  In his opposition to this motion Lead Plaintiff argued that the record actually established that the documents were discoverable and urged the Court to affirmatively rule that they were not privileged.  (Dkt. No. 124, Sept. 4, 2008.)  Defendants responded by withdrawing their motion.  (Dkt. No. 127, Sept. 9, 2008.)

Lead Plaintiff moved to certify a class on August 28, 2008.  (Dkt. No. 119.)   On September 30, 2008 Defendants moved *in limine* to exclude evidence given by Lead Plaintiff's expert in support of class certification.  (Dkt. No. 143.) On January 28, 2009, after expert

---

[3] A chart listing the hearings and the principal substantive motions filed during the course of this litigation is at Milstein Decl. Ex. E.

discovery by Plaintiff and Defendants, the deposition of Lead Plaintiff, full briefing of both motions and a hearing, the Court granted Lead Plaintiff's motion and certified a class and denied Defendants motion *in limine*.[4]  (Dkt. No. 177.)

On February 12, 2009 Defendants filed a petition with the Ninth Circuit seeking permission to file an interlocutory appeal of the Court's decision to certify a class.  (Petition for Permission to Appeal, Dkt. No. 1, 09-80039 (9th Cir. Feb. 12, 2009).)  After briefing by both parties the Ninth Circuit denied permission in May.  (Order, Dkt. No. 14, No. 09-80039 (9th Cir. May 1, 2009).  Shortly after the Ninth Circuit's ruling a Court-approved notice was sent to class members advising them of the class certification decision.  (Decl. of Eric Schachter ("Schachter Decl.") ¶¶ 6,9.)

During 2009 the parties engaged in extensive discovery.  Defendants produced over 2 million pages of documents and additional documents were produced by non-parties in response to Plaintiff's subpoenas.  (Milstein Decl. ¶ 3.)  The parties took a total of 31 depositions, 25 of them by Plaintiff's Counsel.[5]  (*Id.* ¶ 3 & Ex. B.)  Fourteen of these twenty-five depositions took place in Hong Kong during a three week period and five were taken in Hawaii (chosen because it is roughly halfway between China and the continental United States).  (*Id.*)  Seventeen of these depositions took place in Chinese (with translation into English) and one was in Italian.  (*Id.* Ex. A.)  Largely because of the need for translation and the technical issues involved most depositions took nearly a full seven hours and several took more time to complete.  (*Id.*)  Lead Plaintiff also hired four experts—each of whom was deposed by Defendants—to assist in discovery, to calculate damages and to testify at trial.  Discovery concluded in late December 2009.  (*Id.* ¶ 3.)  Lead Plaintiff also took the deposition of four experts Defendants had hired to provide trial Testimony.  (*Id.*)  There was further time consuming motion practice during discovery—Defendants' aggressive stance on discovery issues required Plaintiff to repeatedly

---

[4] The Court had delayed issuing its class certification ruling at the request of the parties to facilitate an ultimately unsuccessful attempt to negotiate a settlement in late 2008.  (*See* Notice Re Motion For Class Certification, Dkt. No. 201 (Mar. 10, 2009).)

[5] A chart listing all depositions taken in this matter and indicating the place and language of each deposition can be found at Milstein Decl. Ex. B.

1    seek the Court's intervention.  (*Id.* ¶ 6; *see also* Dkt. Nos. 184, 193, 203, 205, 211, 226, 228,

2    235, 276, 278, 288, 289, 321.)

3           On January 7, 2010 Defendants filed a motion for summary judgment and three motions

4    to exclude expert testimony from Lead Plaintiff's technical, damages, and accounting experts.

5    (Dkt. Nos. 338, 341, 375, 382.)  Lead Plaintiff also filed his own motion for partial summary

6    judgment. (Dkt. No. 335.)  Briefing of these motions was completed on January 28, 2010 (Dkt.

7    Nos. 469, 471, 475, 477, 479), but because of the proposed Settlement no ruling has been issued

8    in connection with these motions.

9           During the course of the litigation, the parties participated in extensive mediation efforts.

10   (Milstein Decl. ¶ 9.)  On December 22, 2008, the parties attended a formal mediation conducted

11   by the Hon. Daniel Weinstein (Ret.).  (*Id.*)  The parties participated in subsequent mediations

12   conducted by Judge Weinstein on August 18, 2009, and on February 1, 2010.  (*Id.*)  Lead

13   Plaintiff, on behalf of the Class, and Defendant Jack Lai, on behalf of all Defendants, personally

14   attended each of these sessions.  (*Id.*)  At various times throughout the period from December

15   2008 through January 2010 the parties discussed a possible resolution of this case with Judge

16   Weinstein. (*Id.*)  At the conclusion of the February 1, 2010 mediation, and with the participation

17   of Judge Weinstein, the parties agreed that this case should be settled for a payment of $16

18   million for the benefit of the class by Defendants and their insurer.  (*Id.*)

19   **III.    ARGUMENT**

20

21          **A.    Plaintiff's Counsel Are Entitled to a Fee From the Common Fund They
                    Created**

22

23          For over a century, the Supreme Court has accepted the "common fund" exception to the

24   general rule that litigants bear their own attorneys' fees.  *Trustees v. Greenough*, 105 U.S. 527

     (1882).  As *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), explains, the Court "has recognized

25   consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons

26   other than himself or his client is entitled to a reasonable attorney's fee from the fund as a

27   whole." *Id.* at 478 (citations omitted).  In other words, one purpose of the common fund doctrine

28

1   is to avoid unjust enrichment so that "those who benefit from the creation of the fund should

2   share the wealth with the lawyers whose skill and effort helped create it."  *In re Wash. Pub.*

3   *Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) ("*WPPSS*").

4          The doctrine also encourages counsel to protect the rights of those with small claims.

5   Private actions provide "'a most effective weapon in the enforcement' of the securities laws and

6   are 'a necessary supplement to [Securities and Exchange] Commission action.'"  *Bateman*

7   *Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (quoting *J. I. Case Co. v. Borak*,

8   377 U.S. 426, 432 (1964)).  Fee awards in successful cases, such as the instant one, encourage

9   the prosecution of other actions on behalf of individuals with small but valid claims, thereby

10  promoting private enforcement of, and compliance with the federal securities laws.  *See, e.g.,*

11  *Mashburn v. Nat'1 Healthcare, Inc.*, 684 F. Supp. 679, 687 (M.D. Ala. 1988) ("[C]ourts also

12  have acknowledged the economic reality that in order to encourage … class actions brought to

13  enforce the securities laws on behalf of persons with small individual losses, a financial incentive

14  is necessary to entice capable attorneys, who otherwise could be paid regularly by hourly-rate

15  clients, to devote their time to complex, time-consuming cases for which they may never be

16  paid.").[6]  As a practical matter, a large segment of the public would be denied a remedy for

17  violations of the securities laws if fees awarded by the courts did not fairly and adequately

18  compensate counsel for the services provided, the serious risks undertaken, and the delay before

19  any compensation is received.

20      **B.    Plaintiff's Counsel Should Be Awarded 13.75% Of The Common Fund**

21         Plaintiff's Counsel, with the support of Lead Plaintiff, request an award of attorneys' fees

22  of 13.75% of the settlement fund that was created by counsel's work—$2.2 million plus accruing

23  interest.  The Court should award the requested fee.

24

25

26  _____

27  [6] *See also Ressler v. Jacobson*, 149 F.R.D. 651, 657 (M.D. Fla. 1992) (citing *In re Warner Comm'ns Sec. Litig.*, 618 F. Supp. 735, 750-51 (S.D.N.Y. 1985)) ("Attorneys who bring class

28  actions are acting as 'private attorneys general' and are vital to the enforcement of the securities laws.  Accordingly, public policy favors the granting of counsel fees sufficient to reward counsel for bringing these actions and to encourage them to bring additional such actions.").

1    In awarding attorneys fees in a securities class action a court "may use either the lodestar
2    or the percentage approach to derive a reasonable fee." *In re Critical Path, Inc., Sec. Litig.*, No.
3    C 01-00551, 2002 WL 32627559, at *8 (N.D. Cal. June 18, 2002) (Alsup, J.) (citing *Powers v.*
4    *Eichen,* 229 F.3d 1249, 1256 (9th Cir. 2000) and *Serrano v. Priest,* 569 P.2d 1303 (1977)).
5    While the percentage approach awards a portion of the total recovery as a fee, the lodestar
6    method "calculates the fee award by multiplying the number of hours reasonably spent by a
7    reasonable hourly rate and then enhancing that figure, if necessary, to account for the risks
8    associated with the representation." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272
9    (9th Cir. 1989). Whatever method is used, the purpose of any fee award is "to reasonably
10   compensate counsel for their efforts in creating the common fund."[7] *In re Omnivision Techs.,*
11   *Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2007); *see also WPPSS*, 19 F.3d at 1296 ("the
12   fundamental principle [is] that fee awards out of common funds be '*reasonable under the*
13   *circumstances*'" (emphasis in original) (citation omitted)).

14       In this case the percentage of the fund method is most appropriate, in part because such
15   an award would be consistent with the agreement between Lead Plaintiff and Lead Counsel,
16   which provides that Plaintiff's Counsel will receive a fee up to 15% of any recovery. The Court
17   is not, of course, bound by this agreement, but there is no good reason for the Court to deviate
18   from the percentage of the fund method contemplated in the agreement, especially since, in this
19   case, the lodestar method would not be in the interest of the Class—Plaintiff's Counsel's lodestar
20   is some $7.6 million even without any enhancement, far more than the $2.2 million award (plus
21   accruing interest) Plaintiff's Counsel is seeking. In this case numerous factors, including the

---

24   [7] Courts are encouraged to look to the private marketplace in setting a percentage fee:
         The judicial task might be simplified if the judge and the lawyers
         bent their efforts on finding out what the market in fact pays not
         for the individual hours but for the ensemble of services rendered
25       in a case of this character. This was a contingent fee suit that
         yielded a recovery for the "clients" (the class members). . . . The
26       class counsel are entitled to the fee they would have received had
         they handled a similar suit on a contingent fee basis, with a similar
27       outcome, for a paying client.
28   *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992).

1    results achieved, the contingent nature of the fee, the risks of the litigation and the quality of

2    representation weigh in favor of awarding the 13.75% requested.

3                    **1.       The Result Achieved Support's The Fee Request**

4         Courts have consistently recognized that the result achieved is a major factor to be

5    considered in making a fee award.  *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *In*

6    *re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 630 (D. Colo. 1976).   Here, a certain and

7    substantial recovery of $16,000,000.00 in cash plus accruing interest has been obtained through

8    the efforts of Plaintiff's Counsel.   The settlement is a very good result, particularly when

9    considered in view of the substantial risks and obstacles to recovery presented in this case if

10   litigation were to continue.[8]  As a result of the settlement, class member will be compensated for

11   a meaningful part of their losses and will avoid the substantial expense and uncertainty of

12   continued litigation.

13        Although the recovery is only approximately 5.3% of what Lead Plaintiff would have

14   argued were total damages, the settlement is nevertheless a good one for the Class—there is

15   substantial uncertainty about Lead Plaintiff's ability to prove his case and, even if Lead Plaintiff

16   proves his case, there is substantial uncertainty about his ability to prove damages anywhere near

17   the $300 million he claims.  Moreover, given Defendants' limited remaining insurance coverage

18   and LDK's precarious financial condition, there is substantial uncertainty as to whether there

19   would be funds available to pay significantly more than the $16 million agreed to as the

20   settlement amount.  And perhaps most importantly, regardless of Plaintiff's success before the

21   U.S. courts it would be impossible to enforce a judgment in China, where virtually all

22   Defendants' assets are located.

23        In *Omnivision*, the court described a recovery of 9% of possible damages as "a

24   substantial achievement on behalf of the class," noting that the average recovery in securities

25

26

27   _____

28   [8] These risks and difficulties are discussed more fully below and in the accompanying Settlement
     Brief.

class actions was less than 3% of possible damages.[9]  559 F. Supp. 2d at 1046.  In substantial part because of the size of the recovery in that case, the court approved a fee of 28% of the settlement fund.  *Id.* at 1046-49.  In contrast to the situation in this case, there is no indication in the *Omnivision* decision that the plaintiffs in that case faced any uncertainty about the collectability of any judgment.

### 2.    The Difficulty Of This Case And The Contingent Nature Of The Fee Supports The Fee Request

Lead Counsel voluntarily undertook this litigation on a contingent fee basis, knowing from the beginning that there was a substantial possibility that the case might yield no recovery, leaving it not only uncompensated for substantial work by its attorneys, but also potentially out-of-pocket for millions of dollars in litigation expenses.  Unlike counsel for defendants, who are normally paid an hourly rate and reimbursed for their expenses, Plaintiff's Counsel have not been compensated for their time or expenses since this case began in late 2007.

Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees.  For example, the Ninth Circuit has explained that

> [i]t is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases.  Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose. . . .  [I]f this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

*WPPSS*, 19 F.3d at 1299 -1300 (citations and internal quotations omitted); *see also Kakani v. Oracle Corp.*, No. C 06-06493, 2007 WL 4570190, at *4 (N.D. Cal. Dec. 21, 2007) (Alsup, J.)

---

[9] According to the *Omnivision* court, in shareholder class actions the "median amount [of maximum potential damages] recovered in settlement was 2.7% in 2002, 2.8% in 2003, 2.3% in 2004, 3% in 2005, and 2.2% in 2006."  559 F. Supp. 2d at 1042 (citing *In re Heritage Bond Litig.*, No. 02-ML-1475, 2005 U.S. Dist. LEXIS 13627, at *27-28 (C.D. Cal. June 10, 2005)).

1   ("Attorneys should be properly incentivized to take on worthwhile cases where the probability of

2   payment is low or uncertain.").[10]

3        Class action securities litigation is inherently uncertain.  There are numerous cases where

4   plaintiffs' counsel in contingent cases such as this, after the expenditure of thousands of hours

5   and substantial amounts in litigation costs, have received no compensation.  Plaintiff's Counsel

6   are aware of many hard-fought lawsuits where, because of the discovery of facts unknown when

7   the case was commenced, or changes in the law during the pendency of the case, or a decision of

8   a judge or jury following a trial on the merits, excellent professional efforts of members of the

9   plaintiffs' bar produced no fee for counsel.   (Milstein Decl. ¶ 28.)   Two recent examples

10  highlight this point.  In a case against JDS Uniphase Corporation, after a lengthy trial involving

11  securities claims, the jury reached a verdict in defendants' favor.  *See In re JDS Uniphase Corp.*

12  *Sec. Litig.*, No. C 02-148, Verdict Questions Form (N.D. Cal. Nov. 27, 2007).  Similarly, in *In re*

13  *Apollo Group, Inc. Sec. Litig.*, No. CV 04-2147, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4,

14  2008), the court overturned a jury verdict of $277 million on a motion for judgment as a matter

15  of law because insufficient evidence had been presented at trial to establish loss causation.  There

16  are many other appellate decisions affirming summary judgment and directed verdicts for

17  defendants or overturning jury verdicts in securities class actions.[11]

18  _____

19  [10] Courts around the country have expressed similar views.  In *In re Prudential-Bache Energy*
    *Income P'ships Sec. Litig.*, No. 888, 1994 WL 202394 (E.D. La. May 18, 1994), the court

20  explained that

21         [c]ounsel's contingent fee risk is an important factor in
           determining the fee award.  Success is never guaranteed and
           counsel faced serious risks since both trial and judicial review are

22         unpredictable.  Counsel advanced all of the costs of litigation, a not
           insubstantial amount, and bore the additional risk of unsuccessful

23         prosecution.

    *Id.* at *6; *see also Sutton v. Bernard*, 504 F.3d 688, 694 (7th Cir. 2007) ("[b]ecause the district

24  court failed to provide for the risk of loss, the possibility exists that Counsel, whose only source
    of a fee was a contingent one, was undercompensated," reversing fee award); *King Res.*, 420 F.

25  Supp. at 632, 636-37 ("appropriate consideration must be given to the risks assumed by
    plaintiffs' counsel in undertaking the litigation.").

26

27  [11] *See, e.g., Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning
    securities fraud class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988 on

28  the basis of 1994 Supreme Court opinion); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir.
    1990) (reversing substantial jury verdict and dismissing case—after 11 years of litigation);
    *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing multimillion

1    In this case, however, it was obvious from the outset that this would be an especially

2    difficult and costly matter to litigate.  The substantial risk of no recovery, and the likely costs

3    involved, may be one reason why only two individuals appeared at the January 3, 2008 hearing

4    seeking to be appointed lead plaintiff and why only two of the four firms that Lead Plaintiff

5    Javidzad contacted made a formal proposal to represent the proposed class.  (*See* Javidzad Decl.

6    I at 1-2.)

7    Unlike corporate defendants in many securities cases, LDK never restated the financial

8    statements that Plaintiff alleges were false and misleading.  Defendants denied (and continue to

9    deny) that they did anything wrong, insisting that an investigation by an independent law firm

10   working for LDK's audit committee determined that the allegations against LDK were false.

11   Moreover, Defendants have consistently argued that the accounting practices that Plaintiff

12   alleges were improper were approved by KPMG's Chinese affiliate, LDK's outside auditor.

13   It has also always been clear that the fact that LDK was a Cayman Islands corporation,

14   with substantially all of its assets and personnel in China, would make obtaining a verdict against

15   Defendants more complicated and would create substantial difficulties in collecting on any

16   judgment.  LDK itself disclosed in its May 2007 prospectus that it was unlikely that Cayman

17   Island courts would "recognize or enforce judgments of courts of the United States obtained

18   against us or our directors or officers predicated upon the civil liability provisions of securities

19   laws of the United States."  LDK Prospectus at 29.  The company further warned that "the laws

20   of the Cayman Islands and of China may render you unable to enforce a judgment against our

21   assets or the assets of our directors and officers."  *Id.*  Plaintiff's research has confirmed that it

22   would, in fact, be virtually impossible to enforce any judgment in China.  *See, e.g.,* Donald C.

23   Clarke, *The Enforcement of United States Court Judgments in China: A Research Note* (May 27,

24   2004)  (unpublished  research  paper,  George  Washington  Univ.  Law  Sch.,  available  at

25

26   dollar judgment after lengthy trial); *In re Apple Computer Sec. Litig.*, No. C-84-20148, 1991
     U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) (verdict against two individual defendants, but
27   vacating judgment on motion for judgment notwithstanding the verdict); *Robbins v. Koger
     Props. Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing jury verdict of $81 million on loss
28   causation grounds after 19-day trial); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir.
     1988) (reversing plaintiffs' jury verdict for securities fraud).

1   http://ssrn.com/abstract=943922) (the question of whether a U.S. judgment can be enforced in

2   China "can be answered with a fair degree of confidence both as to formal law and as to actual

3   practice: almost certainly no, at least where a defendant is present and objecting"); Arthur

4   Anyuan Yuan, *Enforcing and Collecting Money Judgments in China from a U.S. Judgment*

5   *Creditor's Perspective*, 36 Geo. Wash. Int'l L. Rev. 757, 758 (2004) ("The enforcement of

6   foreign judgments in China has been notoriously difficult in recent years.").

7       Moreover, because of LDK's location in China it was apparent from the beginning of this

8   case that it might be impossible for Plaintiff to compel production of documents and testimony

9   from nonparties which might be of critical importance.   In fact, even though one of the

10  Defendants' defenses is that they relied on advice from KPMG's Chinese affiliate, Plaintiff has

11  been unable to compel production of audit work papers and similar materials from that affiliate,

12  which insists that producing these documents would violate Chinese criminal law.   (Milstein

13  Decl. ¶ 4.)   Moreover, because most LDK employees are effectively beyond the reach of the

14  criminal jurisdiction of the United States, they faced little prospect of any sanction for untruthful

15  testimony during depositions, most of which were conducted in Hong Kong.

16      It was also evident from the beginning of this case that most documents and testimony

17  produced in discovery would be in Chinese.   As Lead Counsel was well aware from its role as

18  lead counsel in the *Parmalat* case (involving European Defendants), translation of documents

19  and interpretation of testimony is difficult and extremely expensive.[12]   (Milstein Decl. ¶ 23.)

20  Moreover, the ambiguities and difficulties inherent in the interpretation and translation processes

21  greatly complicate presenting a case to a jury.

22      This case did, in fact, turn out to be expensive to litigate.   At the time the settlement was

23  reached Plaintiff's Counsel had incurred some $2.7 million in out-of-pocket expenses.   Plaintiff's

24  Counsel's out-of-pocket costs (and the financial risk to Plaintiff's Counsel) would have been far

25  lower if this case, like many securities cases, was settled before substantial discovery was

26

27  _____

28  [12] Costs incurred by Plaintiff's Counsel directly attributable to interpretation of depositions and
    translation of documents total approximately $490,100.  (Milstein Decl. ¶ 23.)

1    completed, but Lead Plaintiff did not agree to such a settlement because that would not have

2    been in the best interests of the class.  (Milstein Decl. ¶ 22.)

3        Even though a successful result was far from certain, Plaintiff's Counsel expended

4    enormous effort and millions of dollars of their own money to vigorously litigate this case for

5    more than two years.  Few law firms could have devoted this kind of time and financial resources

6    to such a case without any certainty of recovery or reimbursement.  In determining whether

7    Plaintiff's Counsel's fee request is reasonable the Court should consider the substantial risk that

8    Lead Counsel took in taking this case and vigorously litigating it.

9            **3.      The Quality Of Representation Supports The Fee Request**

10       The "'prosecution and management of a complex national class action requires unique

11   legal skills and abilities.'"  *In re Heritage Bond Litig. v. U.S. Trust Co. of Tex., N.A.*, No. 02-ML-

12   1475, 2005 U.S. Dist. LEXIS 13627, at *39 (C.D. Cal. June 10, 2005) (citation omitted).  Lead

13   and Liaison Counsel are nationally known leaders in securities class action litigation.  (*See*

14   Resume of Cohen Milstein, Milstein Decl. Ex. A; Resume of Berman DeValerio, Heffelfinger

15   Decl. Ex. C.)  From the outset of this case Plaintiff's Counsel engaged in a concerted effort to

16   obtain the maximum recovery for the class.  Plaintiff's Counsel devoted a substantial amount of

17   its own money and marshaled considerable resources to the prosecution of this matter.  Because

18   of Plaintiff's Counsel's diligent efforts on behalf of the class and their skill and reputations, Lead

19   Counsel was able to negotiate a favorable settlement under difficult and challenging

20   circumstances.  Such quality, efficiency, and dedication should be rewarded.  *See, e.g., J. N.*

21   *Futia Co. v. Phelps Dodge Indus., Inc.*, No. 78 Civ. 4547, 1982 U.S. Dist. LEXIS 15261

22   (S.D.N.Y. Sept. 17, 1982).

23       The quality of the representation provided by Plaintiff's Counsel is reflected in their

24   success in arguing key motions before the Court.  For example, after briefing and oral argument,

25   the Court roundly rejected all aspects of both of Defendants' motions to dismiss, despite the high

26   pleading standard established by the Private Securities Litigation Reform Act (PSLRA) in

27   securities cases.  And in a June 12, 2008 Order (Dkt. No. 92) the Court adopted Lead Plaintiff's

28   innovative argument that he could properly serve certain individual Defendants, who claimed

1   that they were beyond the Court's reach because they lived in China, through LDK's California

2   office.

3          In evaluating the quality of Plaintiff's Counsel's work it is also appropriate to consider

4   the quality of opposing counsel and the resources opposing counsel devoted to this case.  *See In*

5   *re The Mills Corp. Sec. Litig.*, No. 06-cv-0007, 2009 WL 5091931, at*17 (E.D. Va. Dec. 23,

6   2009) (citing *In Re Warner Commc'ns Sec. Litig.,* 618 F. Supp. 735, 749 (S.D.N.Y.1985)

7   ("quality of opposing counsel is a factor to be considered in evaluating Lead Counsel's

8   performance").  Defendants in this case were represented by a large team of attorneys from

9   Latham & Watkins, one of the country's most respected law firms.  *See Headlands Reserve, LLC*

10  *v. Center For Natural Lands Mgmt*, 523 F. Supp. 2d 1113, 1130 (C.D. Cal. 2007) ("Latham &

11  Watkins [is] a prestigious law firm with offices all over the world.").

12         Defendants' counsel zealously litigated all aspects of this case.  For example, as noted

13  above, in addition to their initial motion to dismiss, which the Court rejected on May 2008 (Dkt.

14  No. 85, May 29, 2008), Defendants filed a motion to reconsider that decision in June 2008 (Dkt.

15  No. 93, June 13, 2008), which was also rejected by the court, after briefing by the parties (Dkt.

16  No. 107, July 14, 2008), and a second motion to dismiss (for certain Defendants resident in

17  China) in July 2008 (Dkt. No. 108, July 21, 2008) (which was denied in September 2008 (Dkt.

18  No. 132, Sept. 24, 2008)).   And Defendants' aggressive stance on discovery issues created

19  considerable difficulties for Plaintiff's Counsel.  (Milstein Decl. ¶ 6.)  Moreover, in addition to

20  litigating against Latham & Watkins, Plaintiff's Counsel had to negotiate and litigate with

21  another respected law firm, Simpson Thacher & Bartlett LLP, which represented LDK's audit

22  committee, to obtain access to important documents purportedly protected by privileges asserted

23  by the audit committee.  (Milstein Decl. ¶ 5.)

24         Although the fees and expenses incurred by Defendants are not public, Plaintiff

25  understands that approximately fourteen million dollars in insurance coverage was utilized prior

26  to the settlement, presumably in funding Defendants' litigation costs.  (Milstein Decl. ¶ 20.)  The

27  quality, vigorousness and cost of opposing counsel's defense of their clients supports the

28

1    reasonableness of Plaintiffs' Counsel's request for $2.2 million in fees and approximately $2.7

2    million in expenses (plus accruing interest).

3          **C.**    **Plaintiff's Counsel Has Proposed A Reasonable Division Of Fees**

4          Lead Counsel, proposes to award 12% of any fee to Liaison Counsel, a percentage that

5    both Lead and Liaison Counsel believe will appropriately compensate Liaison Counsel for its

6    role as Liaison Counsel and the risks it assumed and for its overall substantial assistance in the

7    litigation of this matter.[13]  (Milstein Decl. ¶ 19; Heffelfinger Decl. ¶ 12.)  Acting at the direction

8    of Lead Counsel—which needed the help, especially given the tight deadlines imposed by the

9    Court—Liaison Counsel did significant substantive work on this case, including by taking

10   several depositions in Hong Kong and Hawaii.  One of Liaison Counsel's attorneys was a native

11   Chinese speaker, a fact that considerably facilitated Plaintiff's Counsel's efforts.  (Milstein Decl.

12   ¶ 17.)  Liaison Counsel's work did not duplicate Lead Counsel's work.  (Milstein Decl. ¶ 16.)

13   Lead and Liaison Counsel did not have any agreement between them on allocation of fees in this

14   case prior to the settlement.  (Milstein Decl. ¶ 18.)

15         Lead Counsel also proposes to pay, from its share of any fee award $5,000 to Danesh &

16   Dadmehr, LLP, a Los Angeles law firm, which Lead Plaintiff Javidzad contracted for on a fixed

17   fee basis prior to the appointment of Lead Counsel to provide him with independent legal advice

18   on his responsibilities at lead plaintiff.[14]  (*See* accompanying Decl. of Nazila Danesh ("Danesh

19   Decl.") ¶ 3.)  Lead and Liaison counsel had no role in Mr. Javidzad's selection of the Danesh &

20   Dadmehr firm and have no connection to or fee agreement with that firm.  (Milstein Decl. ¶ 15;

21   Danesh Decl. ¶ 5.)

---

23   [13] Lead Counsel's total lodestar is $6,544,450.75 and Liaison Counsel's total lodestar is $1,053,930.25, for a total lodestar of $7,598,381.00.  (Milstein Decl. Ex. F; Heffelfinger Decl.

24   ¶ 7.)  In *In re Critical Path, Inc., Sec. Litig.*, No. C 01-00551, 2002 WL 32627559 (N.D. Cal. 2002) (Alsup, J.), the Court criticized the proposal by a lead counsel in securities case that it be

25   given discretion to allocate a fee award among firms that had assisted in the case, explaining that "the better practice, for future cases, is to disclose the exact allocation proposed between the

26   firms" in lead counsel's fee request.  *Id.* at 8.  Consequently, Plaintiff seeks the Court's approval for this proposed allocation of any fees awarded.

27
28   [14] The work performed by Danesh & Dadmehr for the benefit of the Class is described in the accompanying declaration of Nazila Danesh.  *See also* Javidzad Decl. II ¶ 18 (explaining Danesh & Dadmehr's role).

1

**D.    Plaintiff's Counsel's Expenses Are Reasonable And Were Necessary To Achieve the Benefit Obtained For The Class**

2

3    Plaintiff's Counsel also request reimbursement of expenses incurred by Counsel in

4    connection with the prosecution of this litigation.  They have submitted detailed declarations

5    with supporting attachments attesting to the accuracy of their expenses.  (Milstein Decl. ¶ 26 &

6    Ex. H; Heffelfinger Decl. ¶ 8 & Ex. B.)   Lead Counsel have incurred expenses totaling

7    $2,699,725.56 in prosecuting this lawsuit.  (*Id.*)  This was an unusually costly case to litigate, in

8    part because of the quantity of documents and other data produced during discovery, the fact that

9    most documents and depositions were in Chinese, the necessity of taking almost all fact

10   depositions outside the continental United States, the need make extensive use of experts and the

11   advanced stage that the litigation had reached at the time of the settlement.

12       The standard for determining whether expenses are compensable in a common fund case

13   of this type is whether the expenses are of the type typically billed by attorneys to paying clients

14   in the marketplace. *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) ("Harris may recover as

15   part of the award of attorney's fees those out-of-pocket expenses that 'would normally be

16   charged to a fee paying client.'") (citation omitted); *see also Abrams v. Lightolier Inc.*, 50 F.3d

17   1204, 1225 (3d Cir. 1995) (expenses recoverable if customary to bill clients for them); *Miltland*

18   *Raleigh-Durham v. Myers*, 840 F. Supp. 235, 239 (S.D.N.Y. 1993) ("Attorneys may be

19   compensated for reasonable out-of-pocket expenses incurred and customarily charged to their

20   clients, as long as they 'were incidental and necessary to the representation' of those clients.")

21   (citation omitted); *TBK Partners, Ltd. v. Warshow*, No. 77 Civ. 972, 1977 U.S. Dist. LEXIS

22   13597, at *8 (S.D.N.Y. Oct. 6, 1977) (noting in securities case that "of course, [plaintiffs'

23   counsel] are also entitled to reimbursement for their expenses").  The expenses for which

24   Plaintiff's Counsel seeks payment for are the type of expenses routinely charged to hourly clients

25   and, therefore, should be paid out of the common fund.  These expenses incurred were

26   necessary—without these expenditures Lead Plaintiff's case would have been substantially

27   weaker and any settlement reached would have almost certainly been less favorable to the class.

28   (Milstein Decl. ¶ 26.)

The quantity of documents produced by Defendants was enormous—over two million pages—and additional documents were produced by non-parties and dealing with these documents was very costly.  (Accompanying Decl. of Matthew B. Kaplan In Support of Proposed Award of Fees and Expenses ("Kaplan Decl.") ¶ 2.)  Each of these documents needed to be reviewed for relevant information.  (*Id.*)  Many of the most important documents were large data compilations, sometimes numbering thousands of pages, which, despite Lead Plaintiff's requests, were not produced in easy to use formats.  (*Id.* ¶ 3.)  Review and manipulation of these data compilations was especially difficult and time consuming.  (*Id.*)  In some cases spreadsheets produced in printed form had to be typed into a database so that this data could be made usable.  (*Id.*)

The majority of the documents produced by Defendants were in Chinese and almost all of the witnesses (other than experts) testified in a language other than English, considerably increasing Lead Plaintiff's expenses.  (*Id.* ¶ 4.)  Important foreign language documents identified by the document reviewers needed to be translated into English so that they could be analyzed by Plaintiff's Counsel and Lead Plaintiff's experts.  (*Id.*)  Given the volume of documents involved and the time pressure—translations of key documents were needed prior to the depositions of relevant witnesses—Lead Plaintiff often had to pay a premium to translators to have documents quickly translated.  (*Id.*)  Moreover, Lead Plaintiff had considerable difficulty in obtaining qualified interpreters to interpret during the deposition.  (*Id.* ¶ 5.)  For example, in Hawaii Lead Plaintiff sought to save money by using purportedly qualified interpreters resident in that state.  (*Id.*)  But the work of these interpreters was inadequate and Lead Plaintiff had to fly in a more qualified interpreter from New York.  (*Id.*)  And because Lead Plaintiff was unable to locate an English to Italian interpreter in Hong Kong or in any nearby country it was necessary to fly such an interpreter in from Los Angeles.  (*Id.*)

Fourteen of the twenty fact depositions in this case took place in Hong Kong, and five of the fact depositions took place in Hawaii, further increasing Lead Plaintiff's costs.  (*Id.* ¶ 6.)  Defendants would not agree to permit many LDK employees to travel to the U.S. for depositions, even though Plaintiff offered to pay part of the costs of such travel to reduce deposition costs.

1    (*Id.*)  Consequently, pursuant to Court order, fourteen fact depositions took place in Hong Kong,

2    five in Hawaii and one in New York.  (*Id.*)  The accompanying Declaration of Laura Armstrong

3    In Support of Proposed Award of Fees and Expenses describes Lead Counsel's efforts to

4    minimize costs incurred in Hong Kong and Hawaii.

5          When the final stipulation was signed by the parties discovery was complete and this case

6    was less then two months from the scheduled start of trial.   Consequently, the expenses

7    reasonably incurred by Lead Plaintiff were higher than the norm in many class actions, which

8    often settle at an earlier stage in the proceedings.  Indeed, many class actions are settled before

9    any substantial discovery has occurred.  (Milstein Decl. ¶27.)

10         Roughly one half of Lead Plaintiffs' total expenses were for fees incurred by experts.

11   (Milstein Decl. Ex. I.)   Lead Plaintiff's principal experts were in the areas of damages,

12   accounting, silicon wafer manufacturing and the silicon wafer industry.  Without highly qualified

13   experts who a jury would find credible Lead Plaintiff would not have had a case.  (*Id.* ¶ 24.)  A

14   declaration by each expert who did substantial work on this matter outlining the scope of his or

15   her work and discussing the reasonableness of the fees and expenses that they billed

16   accompanies this brief.  *See* accompanying Declarations in Support of Proposed Settlement and

17   Proposed Award of Fees and Expenses of Jane D. Nettesheim, Robert E. Lorenzini, Stuart

18   Harden, Harris. L Devor, and Thomas J. Todaro.   To the extent practicable, Plaintiff's Counsel

19   took steps to minimize or eliminate any duplication of work by Lead Plaintiff's experts.  (Kaplan

20   Decl. ¶ 7.)

21         Other expenses that were necessarily incurred in the prosecution of this litigation include

22   expenses for private investigators, fees for a document hosting system (provided by LLM, Inc.)

23   which allowed Plaintiff's Counsel and Lead Plaintiff's experts to access and review documents

24   produced in discovery, legal research services (such as LEXIS and Westlaw), photocopying,

25   mediator fees, travel, filing fees, postage and overnight delivery, and telephone expenses.

26   (Milstein Decl. Ex. H & I.)  Throughout this case Plaintiff's Counsel has taken particular care to

27   minimize travel expenses and is requesting reimbursement only for counsel's use of coach class

28

1    air travel within the United States, for lodging at available reasonably priced hotels and for

2    reimbursement of reasonable meal expenses.[15]   (Milstein Decl. ¶ 24.)

3              **E.       Lead Plaintiff Should Be Reimbursed For His Time And Expenses**

4              As more fully detailed in the accompanying Javidzad Declaration, Lead Plaintiff Shawn

5    Javidzad has devoted substantial time and money to furthering the interests of the Class.  He

6    does not seek a per-share recovery that is greater than what other class members are entitled to or

7    an "incentive" payment to reward him for volunteering to act as lead plaintiff and a fiduciary for

8    the class.  But he does ask the Court to approve reasonable compensation for his time and out-of-

9    pocket expenses.  To date Mr. Javidzad has received no reimbursement or compensation for his

10   participation in this case.  (Javidzad Decl. II ¶ 14.)

11             Mr. Javidzad has been personally involved in this case to a far greater extent than is

12   normally the case by a representative plaintiff in a class action—and indeed, far beyond what a

13   typical plaintiff in an individual action would be required to undertake.  (Milstein Decl. ¶ 14 ("In

14   my 40 years of involvement in securities class action litigation I have never encountered an

15   individual class representative who has been as actively involved in a case as Mr. Javidzad has

16   been in this case.")  In addition to selecting proposed Lead Counsel after negotiating with several

17   law firms, and closely monitoring the case, Mr. Javidzad, who lives in Los Angeles, travelled

18   seven times to San Francisco and twice to New York at his own expense to consult with counsel

19   and to attend mediation sessions and court hearings.[16]   (Javidzad Decl. II ¶ 7.)  The Class has

20   benefited from his involvement.  Among other things, Mr. Javidzad negotiated a fee agreement

21   with Lead Counsel that caps counsel's fee at 15% of the total recovery, a lower percentage than

22

23

24

[15] Plaintiff's Counsel does seek reimbursement for business class travel to and from Hong Kong,
25   which they believe was reasonable given the distance and time involved.  *See* Federal Travel
     Regulations  §301-10.125  (available  at  http://www.gsa.gov/Portal/gsa/ep/channelView.do?pf=
26   y&specialContentType=FTR&channelId=-24568&pageTypeId=17113&file=FTR/
     Chapter301p010.html (authorizing business class travel for federal government employees when
27   scheduled flight time is more than 14 hours).

28   [16] This includes Mr. Javidzad's planned travel to the June 17, 2009 hearing on final approval of
     the Settlement.

1   the norm in securities fraud class actions, an he has recommended to the Court that Plaintiff's

2   Counsel only actually receive 13.75% of the total recovery..

3       In addition to actual out-of-pocket expenses of $6,000.68,[17] Mr. Javidzad seeks

4   compensation for 230 hours of work on behalf of the class in this case at $100 per hour, a rate

5   substantially less than the average amount of income he believes each hour of the time he spent

6   on this case would otherwise have generated.[18]   (Javidzad Decl. II ¶¶ 9, 11.)  Consequently, Mr.

7   Javidzad's total request for compensation for time devoted to this case will be $23,000, for a

8   total requested reimbursement of $29,003.68.  The notice to the class advised class members that

9   Mr. Javidzad would request reimbursement of "no more than $8,250 for his out-of-pocket

10  expenses and no more than $23,000 for his time."  (Notice at 10, Schachter Decl. Ex. D.)

11      Concerned about "professional" plaintiffs, in enacting the PSLRA Congress indicated

12  that persons who suffered a loss on a security should not receive any special incentive for

13  agreeing to act as class representative.  *See Cunha v. Hansen Natural Corp.*, 2009 WL 2029797,

14  *4 (C.D. Cal. July 13, 2009) ("The PSLRA seeks to restrict the use of 'professional plaintiffs'

15  who have only a nominal interest in the litigation and who act as lead plaintiff primarily to

16  accommodate counsel.").  Congress mandated that any recovery by a lead plaintiff "shall be

17  equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other

18  members of the class."  15 U.S.C. § 78u-4.  But it also seems clear that Congress did not mean to

19  create burdensome disincentives for class members to serve as a lead plaintiff.  The PSLRA also

20  provides that a lead plaintiff may receive an "award" for reasonable "costs and expenses

21  (***including lost wages***)."  *Id.* (emphasis added).

22

23

---

24  [17] In its February 17, 2010 letter to the Court discussing Mr. Javidzad's expenses (Dkt. No. 504)

25  counsel made a mistake in calculating Mr. Javidzad's expenses.  Mr. Javidzad's total claimed out-of-pocket expenses have been reduced by $1,383.94 from what was set forth in that letter to

26  compensate for that error.  In addition, $500 has been added to Mr. Javidzad's expenses to cover his anticipated travel to the final fairness hearing.

27  [18] Mr. Javidzad has actually devoted more than 230 hours to this case, but, cognizant of his

28  duties as a fiduciary, he has limited both the number of hours for which he seeks compensation and his hourly rate.  (Javidzad Decl. ¶ 11.)

1    While the PSLRA does not explicitly discuss whether self employed individuals, such as

2    Mr. Javidzad, may recover income lost as a result of their work on behalf of the class, given the

3    statute's objective of encouraging sophisticated investors to serve as lead plaintiffs, it seems

4    unlikely that Congress intended to allow those paid on an hourly basis to be compensated for

5    their time, while simultaneously prohibiting such compensation for self employed individuals

6    who lose business opportunities and, consequently, income because of their work on behalf of a

7    class.  *See In re MicroStrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 434 (E.D. Va. 2000)

8    (Congress intended lead plaintiffs to be "reasonably sophisticated" investors).  Recognizing this

9    logic, numerous courts have found that lead plaintiffs who cannot document the loss of a specific

10   amount in hourly wages may nevertheless receive a payment for the time they spend working on

11   behalf of a class.  For example, in *In re MetLife Demutualization Litig.*, No. 00 CV 2258, 2010

12   WL 517389 (E.D.N.Y. Feb. 12, 2010), a securities class action, the court approved an award to

13   lead plaintiffs for their services "rendered on behalf of the class" beyond actual out-of-pocket

14   expenses.  *Id.* at 65-67; *see also In re Quintus Sec. Litig.*, No. C-00-4263, 2006 WL 3507936,

15   *4-*5 (N.D. Cal. Dec. 5, 2006) (approving award to lead plaintiff of $12,000 as "reimbursement

16   for 80 hours of his time at a rate of $150/hour").

17   In *Adderley v. National Football League Players Ass'n*, No. C 07-00943 WHA, 2009 WL

18   4250792 (N.D. Cal. Nov. 23, 2009), a non-securities class action, this Court noted that

19   "incentive" awards to named plaintiffs are generally inappropriate, but agreed to a payment of

20   $10,000 to the class representative in that case, explaining that "[t]his is not an 'incentive' fee.

21   Rather, it is compensation for the many hours Mr. Adderley spent representing the class."  *Id.* at

22   *8.  Mr. Javidzad should also be fairly compensated for his time.  In enacting the PSLRA

23   Congress sought to have lead plaintiffs play a leading role in securities class actions, a sharp

24   break with the traditional practice, in which a class representatives' involvement in a case was

25   often only nominal.  *MicroStrategy*, 110 F. Supp. 2d at 434.  And in appointing Mr. Javidzad as

26   Lead Plaintiff the Court emphasized his extensive fiduciary responsibilities to the class.  (*See,

27   e.g.,* Order at 5, Dkt. No. 57, Jan. 4, 2008; Hr'g Tr. 70:11-14, Jan. 3, 2008.)

28

1    Consequently, it is entirely reasonable that the request for compensation that Mr.

2    Javidzad is now submitting is greater than what would be expected in a more typical class action.

3    Mr. Javidzad understands that he cannot receive proportionally more for reimbursement of his

4    losses than other class members, but failure to award conscientious lead plaintiffs reasonable

5    compensation would create a strong disincentive for lead plaintiffs to do what Congress intended

6    them to do—carefully monitor securities class actions and ensure that class counsel is, in fact,

7    acting in the best interests of the class.[19]

8    While travelling on behalf of the class Mr. Javidzad purchased economy class tickets and

9    stayed at reasonably priced business class hotels.  (Javidzad Decl. II ¶ 10.)  A summary of Mr.

10   Javidzad's out-of-pocket expenses is attached to his declaration (Javidzad Decl. II Ex. A) and

11   and receipts for these expenses are available should the Court wish to review them.

12   Mr. Javidzad's support for the settlement and for Plaintiff's Counsel's request for an

13   award of fees and for reimbursement of expenses are not contingent on the Court's approval of

14   any reimbursement to him for his time and expenses.  (Javidzad Decl. II ¶¶ 15, 18.)

15   **IV.    CONCLUSION**

16

17   For all of the foregoing reasons, Plaintiff's Counsel respectfully submit that the requested

18   attorneys' fees and expenses (with interest) are fair and reasonable and, accordingly, should be

19   awarded by the Court, that the proposed allocation of fees between Lead and Liaison Counsel

20   should be approved and that Mr. Javidzad's request that he be reimbursed for his time and

21   expenses should also be approved..

22

23

24

---

25   [19] Congress' intent in passing the PSLRA was that "[i]ndividuals who are motivated by the

26   payment of a bounty or bonus should not be permitted to serve as lead plaintiffs.  These
     individuals do not adequately represent other shareholders—in many cases the 'lead plaintiff'

27   has not even read the complaint."  H.R. Conf. Rep. No. 104-369, 1995 U.S.C.C.A.N. at 731-32.
     Mr. Javidzad was not motivated by the prospect of receiving a "bounty" or "bonus" and is not

28   now seeking a bounty or bonus.  He is the polar opposite of the disengaged, lawyer controlled
     plaintiff that Congress sought to avoid.

1

2     April 16, 2010                              By:  ____/s/ Herbert E. Milstein_____

3                                                **COHEN MILSTEIN SELLERS & TOLL
                                                 PLLC**
4                                                Herbert E. Milstein
                                                 Joshua S. Devore
5                                                Matthew B. Kaplan
                                                 1100 New York Avenue, N.W.
6                                                West Tower, Suite 500
                                                 Washington, D.C. 20005
7                                                Telephone:  (202) 408-4600
                                                 Facsimile:  (202) 408-4699
8                                                Email: hmilstein@cohenmilstein.com
                                                 jdevore@cohenmilstein.com
9                                                mkaplan@cohenmilstein.com

10                                               *Lead Counsel for the Class*

11

12                                               By:  ____/s/ Christopher T. Heffelfinger_____

13                                               **BERMAN DEVALERIO**
                                                 Joseph J. Tabacco, Jr. (SBN 75484)
14                                               Christopher T. Heffelfinger (SBN 118058)
                                                 Anthony D. Phillips (SBN 259688)
15                                               One California Street, Suite 900
                                                 San Francisco, CA 94111
16                                               Telephone: (415) 433-3200
                                                 Facsimile: (415) 433-6382
17                                               Email: jtabacco@bermandevalerio.com
                                                 cheffelfinger@bermandevalerio.com
18                                               aphillips@bermandevalerio.com

19                                               *Liaison Counsel for the Class*

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2

3          I hereby certify that on this date, I caused to be electronically filed the foregoing with the

4   Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-

5   mail addresses of the parties of record.

6

7                                          ____/s/ Matthew B. Kaplan_____
                                           Matthew B. Kaplan

8                                          April 16, 2010

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28